ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>  Plaintiff,<br>v.<br><br>1. Michael Lacey, and<br><br>2. James Larkin,<br><br>  Defendants. | CR-18-00422-PHX-SPL (BSB)<br><br>**UNITED STATES' MOTION TO DISQUALIFY COUNSEL** |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Carl Ferrer, Michael Lacey, and James Larkin are the co-founders of the website Backpage.com. Over the last decade, the law firm of Davis Wright Tremaine ("DWT") has represented Ferrer in an array of civil and criminal matters related to Ferrer's work at

Backpage. In addition, the law firm of Henze Cook Murphy ("HCM") has represented Ferrer in certain criminal proceedings related to Ferrer's work at Backpage.

Recently, Ferrer severed his relationship with the DWT and HCM firms and entered a plea of guilty to federal criminal charges arising from his work at Backpage. *See* Case No. CR 18-464-PHX-DJH. Additionally, the grand jury recently returned a 93-count indictment charging seven other individuals, including Lacey and Larkin, with various crimes arising from their work at Backpage. It is expected that Ferrer will be a prosecution witness in any trial against Lacey and Larkin.

Notwithstanding all of this, lawyers from the DWT and HCM firms have now entered notices of appearance on behalf of Lacey (and, in the DWT firm's case, also on behalf of Larkin). In the United States' view, such representation is improper—a long line of cases (not to mention the applicable ethical rules) prohibit an attorney from representing a client in a criminal trial if a former client will be called as a cooperating prosecution witness and the former client does not consent to the representation. Here, Ferrer has specifically advised the DWT and HCM firms that he does *not* consent to their representation of Lacey and Larkin. *See* Exhibits A, B (Ferrer letters to DWT and HCM). Furthermore, DWT's engagement letter with Ferrer, Lacey, and Larkin expressly provided that DWT would "withdraw from representing each and all of you individually" if the parties' interests ever became adverse. *See* Exhibit A at 1 n.1. Accordingly, the United States moves to disqualify the DWT and HCM firms from further participation in this case.

Finally, the Court should be aware that, before filing this motion, the United States met and conferred with attorneys from DWT and HCM (and certain other defense attorneys). As part of this process, the United States provided the citations discussed in this motion and participated in a conference call with defense counsel. Unfortunately, the parties were not able to reach a resolution. Defense counsel also requested that the United States postpone filing this motion until they had an opportunity to conduct further research and consultation. Although this was not an unreasonable request, the United States felt it appropriate (and required by the relevant case law) to file the motion as soon as possible,

particularly because some of the arguably-conflicted defense attorneys will be appearing at the April 30 status conference at which important trial deadlines may be established.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  DWT's and HCM's Long Track Record Of Representing Ferrer

Since 2010, Ferrer has been named a defendant, in his personal capacity, in an array of Backpage-related lawsuits in state and federal courts across the country.  The law firms of DWT and HCM have repeatedly represented Ferrer in those lawsuits.  For example:

- In October 2015, the Senate Permanent Subcommittee on Investigations ("PSI") issued a subpoena to Ferrer for certain Backpage-related documents.  Later, the PSI filed a motion to compel in federal court in the District of Columbia.  *See* Exhibit C.  In response, the DWT firm filed a notice of appearance on Ferrer's behalf (*see* Exhibit D) and proceeded to litigate the matter on Ferrer's behalf.  The district court ultimately ruled against Ferrer and ordered him to comply.  *Senate Perm. Subcomm. v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016).  Afterward, the DWT firm filed a notice of appeal on Ferrer's behalf and sought a stay pending appeal.   This request was denied by the district court, the D.C. Circuit, and the Supreme Court.  *Ferrer v. Senate Perm. Subcomm.*, 137 S. Ct. 28 (2016).

- In September 2016, Ferrer, Lacey, and Larkin were charged with pimping-related offenses in a 10-count criminal complaint filed in California state court.  *People v. Ferrer et al.,* 2016 WL 6091120 (Sac. Cty. Sup. Ct. 2016).  Afterward, the DWT firm made an appearance on behalf of all three defendants and the HCM firm made an appearance solely on behalf of Ferrer.  The DWT firm and the HCM firm then filed a joint motion to dismiss on Ferrer's behalf.  *See* Exhibit E (demurrer, identifying DWT firm as "Counsel for Defendants Carl Ferrer, Michael Lacey and James Larkin" and the HCM firm as "Counsel for Defendant Carl Ferrer").  In December 2016, the trial court granted the demurrer (based on state-law defenses not applicable in this case).  *People v. Ferrer,* 2016 WL 7237305 (Sac. Cty. Sup. Ct. 2016).

- Since October 2016, certain sealed proceedings have occurred in the District of Arizona in which the DWT firm and the HCM firm have acted as Ferrer's attorneys.  *See,*

*e.g.,* Sealed Exhibit F (February 2017 minute entry from sealed hearing: "Attorneys for Backpage.com and Carl Ferrer, Tom Henze, James Grant, Janey Henze Cook . . . ."); Sealed Exhibit G (April 2017 minute entry from sealed hearing: "Attorneys for Backpage.com and Carl Ferrer, Tom Henze, James Grant, Janey Henze Cook, client Carl Ferrer . . . .").

- In January 2017, Ferrer was one of the named defendants in a civil lawsuit in California state court filed by a victim who had been trafficked via Backpage. Afterward, the DWT firm filed a notice of appearance on behalf of Ferrer and certain other defendants (*see* Exhibit H) and litigated on his behalf, including by removing the case to federal court (*see* Exhibit I). *See Jane Doe v. Medalist Holdings LLC et al.*, CV 17-1264 (C.D. Cal.).

- In January 2017, Ferrer was one of the named defendants in a civil lawsuit in Alabama state court filed by a victim who had been trafficked via Backpage. Afterward, the DWT firm filed a notice of appearance on behalf of Ferrer and certain other defendants (*see* Exhibit J) and litigated on his behalf, including by removing the case to federal court (*see* Exhibit K). *See K.R. v. Backpage.com, LLC et al.*, CV 17-299 (M.D. Ala.).

- In February 2017, Ferrer was one of the named defendants in a civil lawsuit in the Middle District of Florida filed by an advocacy group and by a victim who had been trafficked via Backpage. *See Florida Abolitionist et al. v. Backpage.com LLC et al.*, CV 17-218 (M.D. Fla.). Afterward, members of the DWT firm filed a representation certificate stating they represented all of the defendants, including Ferrer (*see* Exhibit L), and filed a motion to dismiss on Ferrer's behalf (*see* Exhibit M).

- In February 2017, Ferrer was one of the named defendants in a civil lawsuit in the District of Arizona filed by domestic violence shelter. *See Soujourner Center et al. v. Backpage.com LLC et al.*, CV 17-399-PHX-GMS (D. Ariz.). Afterward, members of the DWT firm filed a motion to dismiss on Ferrer's behalf (*see* Exhibit N).

- In May 2017, the Missouri Attorney General's office served a civil investigative demand notice on Ferrer seeking certain Backpage-related records. *See* Exhibit O. Afterward, the DWT firm contacted the Attorney General's office, sought an extension of the compliance deadline, and made clear that the DWT firm was representing Ferrer in his

personal capacity. *See* Exhibit P (email from DWT firm dated June 19, 2017: "My firm is counsel for Mr. Ferrer <u>and</u> Backpage, and I made that clear in my call.") (emphasis in original). The DWT firm then sought a permanent injunction to prevent Missouri "from enforcing the Civil Investigative Demand served on Backpage and its CEO Carl Ferrer." *See* Exhibit Q. In November 2017, a federal district court denied this motion. *See Backpage.com LLC v. Hawley*, 2017 WL 5726868 (E.D. Mo. 2017).

- In June 2017, Ferrer was one of the named defendants in a civil lawsuit in Oregon state court filed by a victim who had been trafficked via Backpage. Afterward, the DWT firm filed a notice of appearance on behalf of Ferrer and certain other defendants (*see* Exhibit R) and litigated on his behalf, including by removing the case to federal court (*see* Exhibit S). *See Kocher v. Hilton Worldwide Holdings, Inc. et al.*, CV 18-449 (D. Or.).

- In June 2017, Ferrer was one of the named defendants in a civil lawsuit in the District of Massachusetts filed by several victims who had been trafficked via Backpage. *See Jane Doe No. 1 et al. v. Backpage.com LLC et al.*, CV 17-11069 (D. Mass.). Afterward, members of the DWT firm filed a notice of appearance on behalf of Ferrer and the other defendants, in which they claimed to "have particularized knowledge of the facts and legal issues in this case" (*see* Exhibit T), and later filed a motion to dismiss on the defendants' behalf. Just recently, the district court denied that motion in part, holding that one of the plaintiffs had made a plausible allegation that Backpage "redrafted [her] advertisement . . . to suggest she was an adult." *See Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056, * 1 (D. Mass. 2018).

B.  <u>Mr. Ferrer's Guilty Plea</u>

On April 5, 2018, Mr. Ferrer pleaded guilty to the crime of conspiracy to facilitate prostitution and to engage in money laundering. *See* CR 18-464-PHX-DJH, Dkt. No. 7. In the factual basis of his plea agreement, Mr. Ferrer specifically identified M.L. (*i.e.,* Michael Lacey) and J.L. (*i.e.,* James Larkin) as two of the individuals with whom he conspired. The factual basis, in its entirety, provides as follows:

> *In 2004, I co-founded the website www.Backpage.com ("Backpage"), along with M.L. and J.L.*  Backpage eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.
>
> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). *Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers*.  For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad.  Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage.  These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.
>
> *In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, I also conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., J.B., and D.H.) to engage in various money laundering offenses*.  Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads.  Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business.  In response, I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies . . . for similar purposes.

*Id.* at 12-14 (emphases added).

After entering his guilty plea, Ferrer wrote letters to the DWT and HCM firms requesting that they comply with the ethical duties they owed to him, as a former client, and withdraw from representing Lacey and Larkin.  *See* Exhibits A, B.

C. <u>The Proceedings In This Case</u>

On April 6, 2018, Lacey and Larkin were arrested based on the charges contained in a 93-count federal indictment. *See* CR 4. The charges include conspiracy to facilitate prostitution (Count 1) and conspiracy to engage in money laundering (Count 52)—the same crimes to which Mr. Ferrer pleaded guilty—and are based on the same conduct addressed in the factual basis of Mr. Ferrer's plea agreement.

On April 9, 2018, the Court granted the *pro hac vice* applications of two attorneys from the DWT law firm (Robert Corn-Revere and Ronald London) to appear on behalf of Lacey. The following day, the Court granted the *pro hac vice* application of a third attorney from the DWT law firm (James Grant). This application was to appear on behalf of Lacey and Larkin.

On April 9, 2018, Lacey filed an opposition to the government's detention motion. *See* CR 23. The top of the first page identifies two DWT attorneys (James Grant and Robert Corn-Revere) as "Attorneys for Defendant MICHAEL LACEY." *Id.*

On April 11, 2018, Judge Bade presided over a detention hearing for Lacey. One of the attorneys who represented Lacey at this hearing was from the HCM firm. *See* CR 62 (minute entry: "Appearances: AUSA Kevin Rapp and AUSA Dominic Lanza for the Government, retained attorney Paul Cambria and Janey Cook for the defendant.").

On April 13, 2018, Judge Bade presided over a continuation of Lacey's detention hearing. This time, both of Lacey's attorneys were from the HCM firm. *See* CR 65 (minute entry: "Appearances: AUSA Kevin Rapp and Dominic Lanza for the Government, retained attorney Tom Henze and Janey Cook for defendant.").

D. <u>DWT's Withdrawal From Other Ferrer Representations</u>

On April 20, 2018, DWT submitted a letter to Ferrer explaining that, in light of recent developments, it would be withdrawing from all pending matters in which the firm had previously represented him in his personal capacity and/or any of the Backpage corporate entities. *See* Exhibit U. Included with the letter was a table identifying 17 such cases. *Id.*

- 7 -

**ARGUMENT**

For years, the DWT and HCM firms represented Ferrer in civil and criminal litigation arising from Ferrer's work at Backpage. Recently, Ferrer chose to terminate his relationship with those firms and to plead guilty to Backpage-related criminal charges. In the factual basis of his plea agreement, Ferrer expressly implicated Lacey and Larkin as his co-conspirators, and it is expected that Ferrer will be a key prosecution witness against Lacey and Larkin at trial. Notwithstanding all of this, the DWT and HCM firms are attempting to represent Lacey and Larkin in this matter. As explained below, such representation is improper. The DWT and HCM firms have an obvious and incurable conflict of interest and should be precluded from further participation in this case.

A.  <u>Arizona's Ethical Rules Mandate Disqualification</u>

The Arizona Rules of Professional Conduct provide the starting point for any disqualification analysis. *Roosevelt Irr. Dist. v. Salt River Project Agr. Imr. & Power Dist.*, 810 F. Supp. 2d 929, 944 (D. Ariz. 2010) ("The United States District Court for the District of Arizona has adopted the Arizona Rules of Professional Conduct as its ethical standards. Accordingly, this Court applies the Arizona ethical rules when evaluating motions to disqualify counsel.").

Here, the Arizona rules are directly on point and compel disqualification. Rule 1.9(a) of the Arizona Rules of Professional Conduct provides that "[a] lawyer who has formerly represented a client in a matter ***shall not*** thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Comment 1 to Rule 1.9 elaborates: "Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients, unless all affected clients give informed consent."

Similarly, Rule 1.7(a)(2) of the Arizona Rules of Professional Conduct provides that, absent written consent from the prior client, an attorney may not represent a current

client if "there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to . . . a former client." Comment 28 to Rule 1.7 further explains that, "[i]n considering whether to represent multiple clients in the same matter, a lawyer should be mindful that . . . [o]rdinarily, the lawyer will be forced to withdraw from representing all of the clients if the common representation fails."

The Arizona rules, in short, provide that the representation arrangement being pursued by the DWT and HCM firms is improper. Furthermore, one of the potential solutions that defense counsel proposed during the parties' meet-and-confer process (*i.e.*, setting up an internal screen within the defense team that would preclude the DWT and HCM firms from cross-examining Ferrer or otherwise sharing any privileged information they learned through their prior representation of Ferrer) is not an appropriate one. Indeed, in an ethics opinion issued more than 20 years ago, the Arizona State Bar's Ethics Committee rejected this exact suggestion. *See* Az. Ethics Op. 91-05. There, a lawyer sought to represent the defendant in a federal criminal trial even though his firm had previously represented a key prosecution witness. In an effort to "cure" the conflict posed by this arrangement, the lawyer proposed hiring auxiliary counsel to conduct the cross-examination of the former client at trial. The ethics opinion rejected this proposal, explaining:

> Does the involvement of [auxiliary counsel] eliminate the conflict of interest for [the attorney] and his law firm? If [auxiliary counsel] is not part of [the attorney's] firm, and will conduct an independent investigation and cross examination of [the former client], may [the attorney] ethically continue the representation? ***We think not. One must remember that ER 1.9(a) is designed to protect [the former client].*** It is intended to give [the former client] the assurance that her lawyer-client confidences will not be used against her. ***No matter how carefully [auxiliary counsel] and [the attorney] avoid discussing [the former client] or her prior representation by [the attorney's] firm, they necessarily will engage in many communications about the criminal defense of [the defendant]. They will have to coordinate their facts, coordinate their theories, coordinate their arguments. [The former client] will thus be confronted with the uncomfortable fact that her former lawyers are cooperating closely with the lawyer who will cross examine her at trial. ER 1.9(a) is designed to prevent precisely such***

>***discomfort from arising***.   [The former client] is "'entitled to freedom from apprehension' that confidences will be revealed in a succeeding representation."

*Id.* (emphases added).

Finally, it is notable that Ethics Opinion 91-05 also cited, with approval, the opinion in *United States v. Cheshire*, 707 F. Supp. 235 (M.D. La. 1989)—a case with obvious parallels to this case.  In *Cheshire*, a defendant (Dyer) was charged with conspiring to bribe a public official (Jones).  *Id.* at 237.  During the early stages of the case, the official was represented by attorney Marabella, but the official subsequently hired new counsel, pleaded guilty, and agreed to serve as a prosecution witness at trial.  *Id.*  Afterward, Marabella sought to represent Dyer and argued he could "cure" any conflict of interest by "independently [hiring] co-counsel for the specific and limited purpose of cross examination of Jones and that Mr. Marabella will participate in neither the preparation for nor the cross examination."  *Id.* at 238.  The district court rejected this suggestion and disqualified Marabella from further participation in the case, holding that the positions of Dyer and Jones were "materially adverse," that the Dyer and Jones representations arose from a "substantially related matter," and Marabella's proposed solution would "not eliminate the conflict. . . . [T]his judge views it as an almost impossible task for a lawyer to participate throughout the course of a trial but not suggest a single question or style for cross examination of the most important witness against his present client."  *Id.* at 240.  The court concluded by emphasizing that, although Dyer might have a Sixth Amendment-protected interest in being represented by his counsel of choice at trial, that interest was not absolute and could be overridden by the federal judiciary's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *Id.* (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)).

B.     The Case Law Supports Disqualification

The relevant case law further supports the conclusion that the DWT and HCM firms should be disqualified from representing Lacey and Larkin in this matter. The *Cheshire* case, discussed above, is simply one of a long line of decisions disqualifying criminal defense attorneys from participating in cases due to the expected participation of former clients as cooperators. For example:

• <u>*United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994)</u>.  In *Ross*, the defendant retained a particular law firm to represent him in a drug trafficking case. *Id.* at 1522. One of the key prosecution witnesses was Aspuru, who had previously been represented by the same firm in a different drug-trafficking case. *Id.* As a result, the prosecution moved to disqualify the firm from representing Ross. *Id.* The district court granted the motion and the Eleventh Circuit affirmed, holding that "***[t]he need for fair, efficient, and orderly administration of justice overcomes the [Sixth Amendment] right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial***." *Id.* at 1523 (emphasis added). In reaching this conclusion, the court emphasized that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. . . . Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation." *Id.* at 1524 (citation omitted).

• <u>*United States v. Moscony*, 927 F.2d 742 (3d Cir. 1991)</u>. In *Moscony*, several employees of a real estate business were represented by the same law firm ("the Sprague firm") during a grand jury investigation. *Id.* at 747. The grand jury then returned an indictment charging two of the individuals (Moscony and Cullen) with various crimes, and the government determined that the remaining individuals (including Thiel and Napolitano) were potential prosecution witnesses at trial. *Id.* When Moscony sought to retain the Sprague firm to represent him at trial, the government moved to disqualify. *Id.*

1  The district court granted the motion, holding that "Thiel's trial testimony, which was to
2  be corroborated by Napolitano, would be central to the government's case," that "vigorous
3  cross-examination of these witnesses would be necessary," and that "such cross-
4  examination . . . if pursued would have violated ethical standards regarding privileged
5  communications." *Id.* at 747-48.  The Third Circuit affirmed, emphasizing that "an actual
6  conflict of interest obviously existed.  ***Conflicts of interest arise whenever an attorney's***
7  ***loyalties are divided, and an attorney who cross-examines former clients inherently***
8  ***encounters divided loyalties***." *Id.* at 750 (emphasis added).

9  • <u>*United States v. Williams*, 81 F.3d 1321 (4th Cir. 1996)</u>.  In *Williams*, an engaged
10 couple (Williams and Martin) were the subjects of an FBI investigation into bank fraud.
11 *Id.* at 1322-23.  During the investigation, Martin retained an attorney, Crawley, to represent
12 her.  *Id.*  The government eventually indicted Williams, declined to charge Martin because
13 she did not engage in any wrongdoing, and voiced its intention to call Martin as a
14 prosecution witness against Williams at trial.  *Id.*  Accordingly, when Williams sought to
15 retain Crawley (Martin's former attorney) to represent him at trial, the prosecution moved
16 to disqualify.  *Id.*  The district court granted the motion and the Fourth Circuit affirmed,
17 holding that "disqualification of Williams's counsel was well within the district court's
18 discretion here. . . .  ***Williams desired representation by the same lawyer who had***
19 ***represented a significant potential witness for the government with respect to the same***
20 ***crime.  That lawyer would have faced [a] potential conflict*** . . . .  Nor could that conflict
21 so surely have been avoided by the device of retaining auxiliary counsel for the special
22 purpose of cross-examining Ms. Williams that abuse occurred by not employing it rather
23 than disqualifying counsel.  Significant, unavoidable risks would have remained.  After all,
24 Crawley would remain at counsel table and likely be the auxiliary lawyer's chief source of
25 information about the case." *Id.* at 1325 (emphasis added).

26 • <u>*United States v. Alfonzo-Reyes*, 592 F.3d 280 (1st Cir. 2010)</u>: Defendant Morales
27 attempted to retain a particular attorney, Sandoval, to represent her at trial, but the trial
28 court determined that Sandoval was disqualified because Sandoval had previously

represented a potential prosecution witness (who had entered into a cooperation-based plea agreement) in a related matter. *Id.* at 293-94. Ultimately, the prosecution declined to call this witness at trial, and Morales was convicted. *Id.* On appeal, Morales argued the trial court's disqualification decision violated her Sixth Amendment rights, but the First Circuit affirmed, explaining that "Attorney Sandoval's representation may have placed her in the position of having to cross-examine her former client, a witness with whom she shared confidences protected by attorney-client privilege. The district court could conclude the matters were sufficiently related given some evidence linking the government's potential witness . . . to co-defendant Morales. . . . Under these circumstances, the district court did not abuse its broad discretion in disqualifying Attorney Sandoval." *Id.* at 294-95.

Notably, some of the defense attorneys in this case have been involved in decisions applying these principles. In *United States v. Falzone*, 766 F. Supp. 1265 (W.D.N.Y. 1991), a defendant in a RICO case (Spano) retained "Mr. Paul J. Cambria, Jr., Esq., of the law firm of Lipsitz, Green, Fahringer, Roll, Salisbury and Cambria" to represent him at trial. *Id.* at 1266. Because one of the key prosecution witnesses (Fino) had been previously represented by Mr. Cambria, the prosecution moved for disqualification. *Id.* The district court granted the motion, holding that Fino hadn't waived his right to confidentiality by cooperating with the government (*id.* at 1272-73) and that "it would be unfair to the government and Fino to allow Mr. Cambria to remain in the case. Mr. Cambria may have received confidential information from Fino during the course of their attorney-client relationship, and it would be unfair to allow him to use that information, either purposely or inadvertently, during a cross-examination of Fino at trial. . . . In addition, if it were to become known to the jury that Mr. Cambria was formerly Fino's attorney, the jury might give undue weight to Mr. Cambria's attack on Fino's credibility during his opening statement, his cross-examination of Fino, and his summation." *Id.* at 1275-76.

Finally, the Court should also be aware that the failure to order disqualification could result in future appellate issues. In *United States v. Iorizzo*, 786 F.2d 52 (2d Cir. 1986), the defendant was the owner of a petroleum company who was charged with certain

financial crimes. *Id.* at 53. The government's key witness was Tietz, a supervisor in the company's accounting department, and Iorizzo's trial counsel had previously represented Tietz in a state investigation into the same conduct. *Id.* at 54. Before trial, the prosecutor brought this conflict of interest to the trial court's attention but did not expressly move for disqualification. *Id.* at 54-55. As a result, Iorizzo's counsel was allowed to remain on the case. *Id.* However, when it came time to cross-examine Tietz, Iorizzo's counsel refrained from asking certain questions due to concerns about the ethical propriety of doing so. *Id.* at 57-58. As a result, the Second Circuit reversed Iorizzo's conviction, holding that "Iorizzo . . . was entitled to a counsel unburdened by the ethical constraints resulting from prior representation of the government's key witness." *Id.* at 58. The Second Circuit concluded its opinion by encouraging prosecutors in future cases to file pretrial disqualification motions should similar concerns arise: "The prosecutors here were aware of defense counsel's conflict of interest at an early stage and were invited by the district judge to make a disqualification motion in writing. We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future." *Id.* at 59.

Similarly, in *United States v. Henke*, 222 F.3d 633 (9th Cir. 2000), three co-workers (Henke, Desaigoudar, and Gupta) were indicted on securities fraud charges. *Id.* at 636. They initially entered into a joint defense agreement ("JDA"), but Gupta later withdrew from the JDA, entered into a cooperation-based plea agreement, and promised to testify against the remaining defendants at trial. *Id.* at 637. In response, the attorneys for Henke and Desaigoudar moved to withdraw on the ground that their "duty of confidentiality to Gupta under the joint defense agreement prevented [them] from cross-examining Gupta on matters involving information [they] learned as a result of the privileged pre-trial meetings," but the district court denied the motion. *Id.* As a result, during trial, "Defense counsel conducted no cross-examination [of Gupta] for fear that the examination would lead to inquiries into material covered by the joint defense privilege." *Id.* The jury voted to convict but the Ninth Circuit reversed, holding that the defense "lawyers' ability to conduct their defense was impaired by a conflict of interest." *Id.* at 635. Although the

Court stopped short of holding that disqualification is automatically required in such circumstances, the Court observed that an attorney ordinarily should "not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client." *Id.* at 637-38 (citation omitted).

## CONCLUSION

For the reasons discuss above, the Court should disqualify the DWT and HCM firms from further participation in this case. The Court also may wish to inquire whether the DWT and HCM firms have shared any privileged information, gleaned from their prior representation of Ferrer, with the other defense attorneys in this case.

Respectfully submitted this 25th day of April 2018.

>
> ELIZABETH A. STRANGE
> First Assistant United States Attorney
> District of Arizona
>
> JOHN P. CRONAN
> Acting Assistant Attorney General
> Criminal Division, U.S. Department of Justice
>
> */s Kevin Rapp*
> KEVIN M. RAPP
> DOMINIC LANZA
> MARGARET PERLMETER
> Assistant U.S. Attorneys
>
> JOHN J. KUCERA
> Special Assistant U.S. Attorney
>
> REGINALD E. JONES
> Senior Trial Attorney
> U.S. Department of Justice, Criminal Division
> Child Exploitation and Obscenity Section

**Certificate of Service:**

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Paul Cambria, James Grant, Robert Corn-Revere, Ronald London, Janey Henze Cook. Exhibits Under Seal have been emailed to Paul Cambria, James Grant, Robert Corn-Revere, and Janey Henze Cook.

s/Zachry Stoebe
U.S. Attorney's Office