# Exhibit E

James C. Grant (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA  98101
Telephone:     (206) 622-3150
Facsimile:     (206) 757-7700
Email:         jamesgrant@dwt.com
*Counsel for Defendants Carl Ferrer, Michael Lacey and James Larkin*

Cristina C. Arguedas (SBN 87787)
Ted W. Cassman (SBN 98932)
ARGUEDAS CASSMAN & HEADLEY LLP
803 Hearst Ave
Berkeley, CA 94710
Telephone:     (510) 845-3000
Facsimile:     (510) 845-3003
Email:         arguedas@achlaw.com
               cassman@achlaw.com
*Counsel for Defendants Michael Lacey and James Larkin*

Tom Henze (admitted *pro hac vice*)
Janey Henze Cook (SBN 244088)
HENZE COOK MURPHY PLLC
4645 N. 32nd St., Suite 150
Phoenix, AZ  85018
Telephone:     (602) 956-1730
Facsimile:     (602) 956-1220
Email:         tom@henzecookmurphy.com
               janey@henzecookmurphy.com
*Counsel for Defendant Carl Ferrer*

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>                    Plaintiff,<br><br>          v.<br><br>CARL FERRER, MICHAEL LACEY, and JAMES LARKIN,<br><br>                    Defendants. | Case No. 16FE019224, Dept. No. 61<br><br>**NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**<br>[California Penal Code § 1004]<br><br>Opposition Due:  November 4, 2016<br>Reply Due:       November 10, 2016<br>Hearing Date:    November 16, 2016<br>Time:            1:30 p.m.<br><br>Complaint Filed: September 26, 2016<br>Trial Date:      N/A |

DAVIS WRIGHT TREMAINE LLP

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

*Additional Counsel*:

Don Bennett Moon (*pro hac vice* application to be filed)
500 Downer Trail
Prescott, AZ  86305
Telephone:     (928) 778-7934
Email:         don.moon@azbar.org

*Counsel for Defendants Michael Lacey and James Larkin*

Robert Corn-Revere (*pro hac vice* application to be filed)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C.  20006
Telephone:     (202) 973-4200
Facsimile:     (202) 973-4499
Email:         bobcornrevere@dwt.com

Rochelle L. Wilcox (SBN 197790)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111
Telephone:     (415) 276-6500
Facsimile:     (415) 276-6599
Email:         rochellewilcox@dwt.com

*Counsel for Defendants Carl Ferrer, Michael Lacey and James Larkin*

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that, on November 16, 2016, at 1:30 p.m. or as soon thereafter

3  as the matter may be heard in Department 61 of the Sacramento County Superior Court, 651

4  I Street, Sacramento, California 95814, defendants Carl Ferrer, Michael Lacey and James Larkin,

5  respectively the CEO and former owners of an online publisher, Backpage.com, LLC, pursuant to

6  California Penal Code §§ 1002-1005, will and hereby do demur to the criminal Complaint filed by

7  California Attorney General Kamala D. Harris and all charges asserted on the following grounds:

8      1.     The Demurrer should be sustained under Penal Code §§ 1004(4) and (5) because

9  the Complaint and the prosecution are legally barred under the First Amendment to the United

10  States Constitution, as the Attorney General seeks to hold an online publisher of third-party speech

11  criminally liable, with no allegation of scienter that Backpage.com knew the specific speech upon

12  which the charges are based was unlawful, much less that the named Defendants had *any*

13  knowledge of or participated in any way in the creation or posting of the speech.  The First

14  Amendment bars the prosecution because imposing an obligation on publishers to review all

15  speech to ensure that none is unlawful would severely chill free expression.

16      2.     The Demurrer should be sustained under Penal Code §§ 1004(4) and (5) because

17  the Complaint and prosecution are legally barred by Section 230 of the Communications Decency

18  Act, 47 U.S.C. § 230, which grants immunity to interactive computer services such as

19  Backpage.com for any liability based on publishing third-party content or for failing to remove

20  any such content, regardless of any allegations that the website knew or should have known of

21  illegal content.  Section 230 expressly preempts *all* state criminal laws and absolutely precludes

22  the prosecution in this case.  Indeed, the Attorney General has admitted she has no authority to

23  bring state criminal charges against Backpage.com for publishing third-party content.

24      3.     The Demurrer should be sustained under Penal Code §§ 1004(2) and (4) because

25  the Complaint does not state facts that constitute public offenses under the criminal statutes

26  charged.  Contrary to Penal Code § 950, the Complaint (and the supporting declaration it

27  incorporates) fails to allege facts supporting each element of the charged offenses.

28

1

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

a.      With regard to the charges of pimping under Cal. Penal Code § 266h, the Complaint alleges no facts that Mr. Ferrer knew anything about the nine individuals who posted ads that are the premise for the charges, much less that they were prostitutes, as required by section 266h. *See Wooten v. Superior Court*, 93 Cal. App. 4th 422, 437-38 (2001) (directing dismissal of claims based on failure to show defendants had any knowledge of alleged prostitution, and holding that allegations of generalized knowledge are insufficient under Section 266h). Moreover, the First Amendment requires that, as essential elements of the charges against Mr. Ferrer, the State must allege facts (and ultimately prove) that he knew of the unlawful nature and content of the specific ads that are the subject of the charges, and, for Counts Two-Six, knew that the individuals involved were minors. Yet, the Complaint and declaration allege no such facts, and do not even allege that Mr. Ferrer ever saw the subject ads or knew *anything* about them or the individuals who posted the ads.

b.      With regard to the charges of conspiracy under Penal Code § 182, the Complaint fails to allege any facts to establish the elements of the crime charged. The Complaint and supporting declaration do not anywhere allege that Messrs. Lacey, Larkin and Ferrer entered into any agreement with anyone, or that they had any specific intent to commit a public offense of pimping as to any individual or engaged in any overt acts even remotely showing a purpose of accomplishing the illegal objective of any such (nonexistent) agreement.

The demurrer should be sustained without leave to amend, because the charges contained in the Complaint and the Attorney General's prosecution are absolutely barred by the First Amendment and Section 230 of the CDA and cannot be cured by amendment, and the Complaint does not and cannot state facts that constitute public offenses under the criminal statutes charged.

This Demurrer is supported by the concurrently filed Memorandum of Points and Authorities, Request for Judicial Notice (with accompanying Declaration of James C. Grant), and the papers and pleadings on file in this matter.

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

DATED:  October 19, 2016.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:

James C. Grant

Attorneys for Defendants
Carl Ferrer, Michael Lacey and James Larkin

DAVIS WRIGHT TREMAINE LLP

3

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

1

**TABLE OF CONTENTS**

2

Page

3   MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

4   I.      INTRODUCTION.................................................................................................................1

5   II.     BACKGROUND....................................................................................................................2

6           A.      Backpage.com. ...........................................................................................................3

7           B.      Unsuccessful Efforts of AG Harris and Other AGs to Shut Down Adult Online
8                   Advertising and Admissions that CDA Section 230 Bars State Prosecutions. .........4

9           C.      The Criminal Complaint and Arrest Warrant Declaration. ........................................6

10          D.      The AG's Arrests and Incarceration of Defendants, Searches and Seizures, and
                    Opposition to Defendants' Efforts to Post Bail.........................................................7

11  III.    ARGUMENT .........................................................................................................................8

12          A.      Standards for a Demurrer Under Penal Code § 1004..................................................8

13          B.      The Complaint and Prosecution Are Legally Barred By the First Amendment. .......9

14          C.      The Complaint and Prosecution Are Legally Deficient Under Section 230 of
15                  the CDA, as the Attorney General Has Admitted. ...................................................14

16          D.      The Complaint Does Not State Facts that Constitute Public Offenses under the
                    Criminal Statutes Charged. .....................................................................................21

17                  1.      The "Pimping" Allegations Against Mr. Ferrer Are Wholly Deficient. .....23

18                  2.      The Conspiracy Charges Against Defendants Are Likewise Deficient. .....25

19  IV.     CONCLUSION ....................................................................................................................27

20

21

22

23

24

25

26

27

28

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almeida v. Amazon.com, Inc.*,
   456 F.3d 1316 (11th Cir. 2006) ..............................................................16

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004) ..............................................................................10

*Ashcroft v. Free Speech Coalition*,
   535 U.S. 234 (2002) ..............................................................................12

*Backpage.com, LLC v. Cooper*,
   939 F. Supp. 2d 805 (M.D. Tenn. 2013) ................................... *passim*

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ................................................11, 12, 22

*Backpage.com, LLC v. Hoffman*,
   2013 WL 4502097 (D.N.J. Aug. 20, 2013) ...................5, 11, 18, 19

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012) ................................ *passim*

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ................................................................................11

*Barrett v. Rosenthal*,
   40 Cal. 4th 33 (2006) ....................................................14, 15, 16, 17

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ........................................................15, 16

*Ben Ezra, Weinstein & Co. v. America Online, Inc.*,
   206 F.3d 980, 985 n.3 (10th Cir. 2000) ..........................................17

*Berry v. City of Santa Barbara*,
   40 Cal. App. 4th 1075 (1995) ............................................................13

*Bursey v. United States*,
   466 F.2d 1059 (9th Cir. 1972) ..........................................................23

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ....................................................16, 17

*Dart v. Craigslist, Inc.*,
   665 F. Supp. 2d 961 (N.D. Ill. 2009) ..............................................22

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

*Delfino v. Agilent Techs., Inc.*,
   145 Cal. App. 4th 790 (2006).................................................................15, 16, 20

*Doe ex rel. Roe v. Backpage.com, LLC*,
   104 F. Supp. 3d 149, 156 (D. Mass. 2015) ..................................................5, 22

*Doe II v. MySpace Inc.*,
   175 Cal. App. 4th 561 (2009).......................................................... *passim*

*Doe v. GTE Corp.*,
   347 F.3d 655 (7th Cir. 2003)...............................................................22, 26

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008)........................................................................16

*Doe v. MySpace, Inc.*,
   629 F. Supp. 2d 663 (E.D. Tex. 2009) ......................................................20

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965) ....................................................................................14

*Dulaney v. Municipal Court*,
   11 Cal. 3d 77 (1974)......................................................................................9

*Elrod v. Burns*,
   427 U.S. 347 (1976) ....................................................................................14

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008)...............................................17, 18, 19, 20

*Gentry v. eBay, Inc.*,
   99 Cal. App. 4th 816 (2002)................................................................15, 19, 20

*Goddard v. Google, Inc.*,
   640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...............................................20

*Green v. Am. Online*,
   318 F.3d 465 (3d Cir. 2003)........................................................................16

*Hupp v. Freedom Commc'ns, Inc.*,
   221 Cal. App. 4th 398 (2013)......................................................................14

*Johnson v. Arden*,
   614 F.3d 785 (8th Cir. 2010)........................................................................16

*Jones v. Dirty World Entertainment Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014)................................................................16, 18

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ............................................................16, 19

iii

*Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666, 671 (7th Cir. 2008) ......................................................................16

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,
   809 F. Supp. 2d 1041 (E.D. Mo. 2011) ..........................................................21, 22

*Mandel v. Municipal Court*,
   276 Cal. App. 2d 649 (1969) ................................................................................9

*Mishkin v. New York*,
   383 U.S. 502 (1966) ...........................................................................................12

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) .........................................................................16, 18

*Osman v. Appellate Div. of Superior Court*,
   134 Cal. App. 4th 32 (2005) ................................................................................9

*People v. Bollaert*,
   248 Cal. App. 699 (2016) ...................................................................................20

*People v. Gourlay*,
   2009 WL 529216 (Mich. Ct. App. Mar. 3, 2009) ................................................18

*People v. Morante*,
   20 Cal. 4th 403 (1999) ..................................................................................25, 26

*People v. Osorio*,
   235 Cal. App. 4th 1408 (2015) .............................................................................8

*People v. Superior Court*,
   49 Cal. 3d 14 (1989) ...........................................................................................9

*People v. Tolbert*,
   176 Cal. App. 3d 685 (1986) ................................................................................8

*People v. Toledo*,
   26 Cal. 4th 221 (2001) .......................................................................................25

*Reno v. American Civil Liberties Union*,
   521 U.S. 844, 872 (1997) .......................................................................10, 13, 17

*Ricci v. Teamsters Union Local 456*,
   781 F.3d 25 (2d Cir. 2015) .................................................................................17

*Sea Horse Ranch, Inc. v. Superior Court*,
   24 Cal. App. 4th 446 (1994) ..............................................................................26

*Smith v. California*,
   361 U.S. 147 (1959) ........................................................................................1, 12

DAVIS WRIGHT TREMAINE LLP

iv

DAVIS WRIGHT TREMAINE LLP

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
  1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........................................................15

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) ........................................................12

*United States v. United States District Court*,
  858 F.2d 534 (9th Cir. 1988) ........................................................13

*United States v. X-Citement Video, Inc.*,
  513 U.S. 64 (1994) ........................................................13

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007) ........................................................15, 17

*Video Software Dealers Ass'n v. Webster*,
  968 F.2d 684 (8th Cir. 1992) ........................................................13

*Voicenet Commn'cns, Inc. v. Corbett*,
  2006 WL 2506318 (E.D. Pa. Aug. 30, 2006) ........................................................18

*Whitney v. Municipal Court*,
  58 Cal. 2d 907 (1962) ........................................................9

*Williams v. Superior Court*,
  111 Cal. App. 4th Supp. 1 (Cal. App. Dep't Super. Ct. 2003) ........................................................8

*Wooten v. Superior Court*,
  93 Cal. App. 4th 422 (2001) ........................................................25

*Zeran v. Am. Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ........................................................16, 17

**Statutes**

18 U.S.C. § 2 ........................................................21

18 U.S.C. § 2255 ........................................................21

47 U.S.C. § 230(a) ........................................................ *passim*

47 U.S.C. § 230(b) ........................................................ *passim*

47 U.S.C. § 230(c) ........................................................ *passim*

47 U.S.C. § 230(e) ........................................................14, 17

47 U.S.C. § 230(f) ........................................................14

v

California Penal Code § 182 ........................................................................................1, 2

California Penal Code § 266h ................................................................................. *passim*

California Penal Code § 664 .................................................................................... 2, 25

California Penal Code § 1004 ................................................................................. *passim*

California Penal Code § 1275.1 .................................................................................7, 8

Los Angeles County Code Chapter 7.38 ......................................................................10

Orange County Code, Title 5, Article 22 .....................................................................10

Sacramento City Code Chapter 5.04 ............................................................................10

San Francisco Police Code, art. 15.6............................................................................10

**Other Authorities**

California Criminal Jury Instructions for Judges and Attorneys (CALCRIM) 1150.....................24

Fed. R. Crim. P. 17...................................................................................................23

DAVIS WRIGHT TREMAINE LLP

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The Attorney General arrested and incarcerated the CEO of Backpage.com, LLC ("Backpage.com"), charging him with "pimping" under Penal Code § 266h, as well as two former owners of the company (Michael Lacey and James Larkin) on charges of conspiring to commit pimping, Penal Code § 182.  The basis for the AG's charges is that third-party users posted ads on Backpage.com, and the AG's office determined by responding to the ads that the users were offering prostitution.  With no allegations that Backpage.com had any knowledge of this—much less that any of the individual Defendants had knowledge or participated in any way in the ads that were created and posted by users—the Complaint alleges that Defendants are guilty of pimping and conspiracy because the users paid to post their ads.

The AG's Complaint and theory of prosecution are frankly outrageous.  The AG seeks to impose criminal liability on a website simply because it published and received fees for third-party ads.  The AG's chrages directly contravene the First Amendment and the immunity afforded to websites under Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230.  Escort ads on Backpage.com are protected speech under the First Amendment, as several courts have held.  The AG cannot arrest, imprison and refuse to release individuals associated with the website simply based on an investigator's opinions about what he believes is "obvious" about escort ads.  Courts upholding the First Amendment rights of Backpage.com and its users have rejected the same tack time and again.  The First Amendment also expressly precludes state authorities from imposing criminal liability on parties that publish or distribute speech absent proof of scienter, *i.e.*, that the publisher knew the specific information published was unlawful.  The Supreme Court so held over fifty years ago, *Smith v. California*, 361 U.S. 147 (1959), recognizing the First Amendment prohibits states from imposing criminal liability that would require publishers to review all materials they distribute, because such a requirement would severely chill speech.

More specifically, the AG's theory expressly violates Section 230, which Congress enacted twenty years ago to preserve and promote free speech on the Internet by immunizing website

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

operators from liability for publishing content provided by third-party users.  Section 230 preempts all contrary state laws—including state criminal laws.  Indeed, Attorney General Harris has acknowledged that Section 230 precludes her from prosecuting Backpage.com, but she has now commenced a prosecution to do precisely what she admits Section 230 prohibits.

The AG's Complaint should be dismissed immediately.  The charges the state asserts amount to a brazen effort to intimidate or shut down an online publisher by using all the criminal sanctions at the AG's disposal, despite that she has no authority whatsoever to do so.

## II.    BACKGROUND

On September 26, 2016, the Attorney General's office filed the Complaint, charging Mr. Ferrer with nine counts of pimping and attempted pimping under Cal. Penal Code § 266h, and charging him and Messrs. Lacey and Larkin with one count of conspiracy based on the same alleged pimping charges.[1]  In support of arrest warrants, the AG submitted a declaration of Special Agent Brian Fichtner of the California Department of Justice ("Fitchner Decl.").[2]  The Complaint also expressly incorporates the supporting declaration.  Complaint at 9.

The AG coordinated with Texas authorities to arrest Mr. Ferrer at the Houston airport on October 6, 2016, transferring him to California and holding him in custody.  Messrs. Lacey and Larkin voluntarily traveled to and appeared in Sacramento, California on October 10, and were arrested and incarcerated that day.  In the meantime, on October 6-7, Texas authorities executed search warrants for Backpage.com's offices in Dallas and Mr. Ferrer's home.

[1] More specifically, the Complaint alleges against Mr. Ferrer four counts of pimping under Penal Code § 266h(b)(2) (Counts Two-Four and Six), one count of attempting pimping under Sections 266h(b)(2) and 664 (Count Five), and four counts of pimping under Section 266h(a) (Counts Seven-Ten).  The Complaint also charges Mr. Ferrer in the single conspiracy count under Penal Code § 182 (Count One), along with Messrs. Lacey and Larkin.

[2] Materials supporting this motion are provided with the accompanying Motion for Judicial Notice with Declaration of James C. Grant ("MJN").  For the Court's convenience, the Complaint, the Fitchner Declaration and the Texas search warrant for Backpage.com offices are attached to this Demurrer as Exhibits A, B and C, respectively.

DAVIS WRIGHT TREMAINE LLP

**A.    Backpage.com.**

Backpage.com operates an online classified advertising service through which users can post ads in a variety of categories, including local places, buy/sell/trade, automotive, rentals, real estate, jobs, dating, adult, and services.  *See* Fitchner Decl. at 2-3; *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 813 (M.D. Tenn. 2013).  The site is organized geographically, by state and municipality.  *Id*.  Users post millions of ads every month, making Backpage.com the second-largest online classified ad service in the country, after Craigslist.  *See* Fitchner Decl. at 2 ("BACKPAGE is similar to Craigslist.org"); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1266 (W.D. Wash. 2012).

Users provide all the content for ads they post on the website, using an automated interface; Backpage.com does not dictate or require any content.  Until July 2015, the website charged for ads in the adult and dating categories, while users could post ads for free in other categories.  *See* Fitchner Decl. at 12; *Cooper*, 939 F. Supp. 2d at 813, 815 (noting the charges helped to discourage improper posting and state AGs originally encouraged Craigslist to impose charges to aid law enforcement).

Backpage.com imposes rules for ads posted on the site, and all users must affirmatively accept the posting rules.  *Cooper*, 939 F. Supp. 2d at 813-14.  The rules are designed to prevent improper ads or misuse of the website.  The site's Terms of Use also prohibit illegal acts and warn that improper posts will be reported to law enforcement and subject to criminal prosecution.  *See McKenna*, 881 F. Supp. 2d at 1266.  The site contains numerous hyperlinks to a "User Safety" page, which includes phone numbers and links for the National Center for Missing and Exploited Children ("NCMEC") and similar resources.  *Id.*  Every ad contains a "Report Ad" button, and Backpage.com has an email address (abuse@backpage.com) for users to identify ads they believe improper or suspect.  *See Cooper*, 939 F. Supp. 2d at 814.

"In addition to user reports, Backpage.com monitors potentially inappropriate ads through automated and manual reviews."  *Id.*  Through this screening, Backpage.com blocks and removes posts and refers any that may indicate child exploitation to NCMEC.  *See McKenna*, 881 F. Supp. 2d at 1266-67.  In his declaration, Agent Fichtner confirms that Backpage.com's practices are

DAVIS WRIGHT TREMAINE LLP

3

effective.  When he sought to post an escort ad "containing sexual verbiage indicative of a prostitution ad," Backpage.com blocked the ad.  Fitchner Decl. at 6-7.  On another occasion, Agent Fichtner attempted to repost an ad that had been removed, "but Backpage.com did not allow it to go through."  *Id.* at 6.

"Backpage.com also regularly works with local, state and federal law enforcement officials by responding to subpoena requests, providing officials with Internet search tools, and removing posts and blocking users at the request of officials."  *Cooper*, 939 F. Supp. 2d at 814.  Here again, Agent Fichtner attests to Backpage.com's cooperation with law enforcement.  After he posted "undercover ads" on the website, he contacted Mr. Ferrer, identified himself as law enforcement, said that he "had identified a prostitution ad," and asked that it be removed.  Backpage.com removed the ad that day (as well as another ad Agent Fichtner had posted), and would not allow it to be re-posted.  Fichtner Decl. at 6.

**B.     Unsuccessful Efforts of AG Harris and Other AGs to Shut Down Adult Online Advertising and Admissions that CDA Section 230 Bars State Prosecutions.**

In 2010, Craigslist shut down its adult services category in response to pressure from a group of state attorneys general.[3]  Less than a week later, the AGs targeted Backpage.com, demanding it shut down its adult category.[4]  Attorney General Harris joined and signed an August 31, 2011 letter from the National Association of Attorneys General ("NAAG") to Backpage.com (which was publicly released and promoted by NAAG) demanding that it remove its adult category as Craigslist had done.[5]  Yet, NAAG's president at the time admitted the state AGs "have little legal standing to forcibly shut down" Backpage.com, because Section 230

---

[3] *See* M. Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever*, TIME, Sept. 16, 2010, http://content.time.com/time/nation/article/0,8599,2019499,00.html.

[4] *See* State Attorney General Letter, http://www.illinoisattorneygeneral.gov/ pressroom/2010_09/Backpage_com9-20-2010.pdf).

[5] *See* MJN Ex. D (NAAG August 31, 2011 letter to Backpage.com counsel, http://www.ct.gov/ag/ lib/ag/press_releases/2011/083111backpageletter.pdf).

4

1   provides "broad immunity" to websites for third-party content, presenting a "high barrier"

2   precluding any action by the state AGs.[6]

3         In July 2013, AG Harris signed on to another NAAG letter addressed to various members

4   of Congress, urging that Section 230 be amended to exempt state criminal laws from immunity so

5   that state authorities could pursue Backpage.com.  The letter acknowledged that "[f]ederal courts

6   have broadly interpreted the immunity provided by the CDA," to "prevent[] State and local law

7   enforcement agencies from prosecuting" Backpage.com and insisted that "[t]his must change."[7]

8         The efforts of NAAG and Attorney General Harris to amend Section 230 to allow state

9   prosecutions of websites have been unsuccessful, as have their other efforts to censor

10  Backpage.com.  As discussed below, *see* Section III.B, three states (Washington, Tennessee and

11  New Jersey) passed criminal laws aimed at Backpage.com, but courts promptly enjoined and

12  struck down all three laws as unconstitutional and preempted by Section 230.  *See McKenna*, 881

13  F. Supp. 2d 1262; *Cooper*, 939 F. Supp. 2d 805; *Backpage.com, LLC v. Hoffman*, 2013 WL

14  4502097 (D.N.J. Aug. 20, 2013).  And, rather than lessen the CDA's strong immunity to websites,

15  Congress has "ratcheted it up … by expanding the scope of Section 230 immunity to preempt the

16  enforcement of inconsistent foreign judgments."  *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F.

17  Supp. 3d 149, 156 (D. Mass. 2015) (dismissing under Section 230 private claims alleging

18  Backpage.com violated federal sex trafficking laws), *aff'd sub nom. Jane Doe No. 1 v.

19  Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. petition filed*, No. 16-276 (U.S. Aug. 31,

20  2016).

21

22

---

23  [6] *See* MJN Ex. E (Washington AG gubernatorial campaign website quoting press statements about
24  AG's efforts against Backpage.com and the bar presented by Section 230).

25  [7] *See* MJN Ex. F (NAAG July 23, 2013 letter to members of Congress, https://www.eff.org/files/
    cda-ag-letter.pdf).  This letter was promoted by a group within NAAG called the "Backpage
26  Executive Committee," which explained that the purpose of the proposed Section 230 amendment
    was to "extend[] criminal jurisdiction … to state and local governments," because under the law
27  only the federal government has authority to prosecute websites.  *See id.* Ex. G (June 14, 2013
    letter from the Backpage Executive Committee to all Attorneys General, Chief Deputies, and
28  Executive Assistants, https://www.cdt.org/files/file/AG-Letter-Section-230.pdf).

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

### C.     The Criminal Complaint and Arrest Warrant Declaration.

The AG asserts eight charges of pimping and one charge of attempted pimping against Mr. Ferrer based on allegations that nine individuals posted and paid for ads on Backpage.com. Complaint at 4-9 (Counts Two-Ten).[8]  The Complaint and declaration provide no basis for these charges except that Mr. Ferrer is the CEO of Backpage.com and the named partner of the corporate parent of Backpage.com, LLC.  Fichtner Decl. at 3.  Agent Fichtner's declaration explains that all of the ads about these individuals were written and posted by the individuals themselves.  *Id.* at 7-11.  The AG does not allege that Mr.Ferrer had any role in or any knowledge of the ads or that he ever even saw them.  Indeed, Agent Fichtner alleges the individuals who posted ads evaded the website's rules and restrictions, so that Backpage.com could not have known the ads were improper or concerned prostitution.  *Id.* at 8, 10 (including statement by one individual:  "how are they supposed to know I'm underage?").  The only specific allegations Agent Fitchner offers concerning Mr. Ferrer relating to ads on the website are that he promptly removed ads when requested and he was copied on Backpage.com's responses to "numerous law enforcement subpoenas and search warrants."  Fitchner Decl. at 4, 6.

Instead, the Complaint charges that Mr. Ferrer is guilty of pimping because the individuals paid for their ads (in amounts totaling $79.60, *see* Complaint at 3-4), Backpage.com received these payments, and therefore Mr. Ferrer "did live and derive support and maintenance" from persons engaged in prostitution or "solicit[ed] and receive[d] compensation for soliciting for said prostitute[s]."  Complaint at 5 (*see* Penal Code § 266h).

The one-count conspiracy charge alleged against Messrs. Ferrer, Lacey and Larkin is even more attenuated.  These gentlemen were, respectively, the chief editor and publisher of Village Voice Media Holdings, the company that formerly owned Backpage.com as well as fourteen weekly newspapers across the country.  As Agent Fichtner asserts, they no longer own interests in Backpage.com and haven't for almost two years.  Fichtner Decl. at 3.  Nonetheless, the AG charges them with conspiracy to commit pimping as to the nine individuals who advertised on the

---

[8] The nine individuals are identified as:  A.C., E.V., L.F., E.S., Z.G., A.H, S.C., L.B., and K.A.

6

DAVIS WRIGHT TREMAINE LLP

website (the ads that are the predicate for the claims against Mr. Ferrer) based solely on their former ownership interests in Backpage.com and that the website charged for escort ads, employed a process to screen ads, arranged for a processor to handle credit card transactions; and the nine individuals paid for the ads.  Complaint at 2-4.  As with Mr. Ferrer, the Complaint and declaration offer no allegations that Messrs. Lacey and Larkin ever had anything to do with or knew anything about these ads.

> **D.    The AG's Arrests and Incarceration of Defendants, Searches and Seizures, and Opposition to Defendants' Efforts to Post Bail.**

The Attorney General's office did not contact Backpage.com, its counsel, or the Defendants before moving forward with arrests and searches based on the Complaint (notwithstanding that Backpage.com has cooperated with the AG's office many times before).  Rather, the AG enlisted Texas law enforcement authorities to arrest Mr. Ferrer on October 6, 2016, as he deplaned in Houston from a flight from Amsterdam, based on the California AG's Complaint and arrest warrant.  The Texas authorities jailed Mr. Ferrer, while the California AG's office sought to extradite him.  Through counsel, Mr. Ferrer agreed to be transferred to California, and he was flown to Sacramento and incarcerated there on October 7.

On October 6 and 7, 2016, Texas authorities executed search warrants based on the declaration supplied by the California AG.  In a two-day search of Backpage.com's offices in Dallas, authorities seized computers, servers, passwords, and scores of boxes of documents, effectively anything relating to Backpage.com's operation of its business and the website.[9]  Texas law enforcement also searched Mr. Ferrer's home.

In the meantime, the AG obtained an order requiring bail of $500,000 to secure Mr. Ferrer's release.  Counsel for Mr. Ferrer sought to make arrangements to post bail, but the AG's office insisted it would object to any payment of the bail or posting of a bond under Cal. Penal Code § 1275.1, and would demand proof that funds were not "tainted" as being connected in some way to revenues from Backpage.com (notwithstanding that AG lacked authority to prosecute and the Complaint did not and could not allege that all funds associated with Backpage.com were

---

[9] *See* Texas search warrant for Backpage.com offices, attached as Exhibit C.

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

unlawful).  Mr. Ferrer's counsel communicated to the AG's office that bond could be posted based on funds unrelated to Backpage.com (and offered to provide proof), but the AG still insisted that Mr. Ferrer remain incarcerated until a hearing could be held on its demands under Penal Code § 1275.1.

Messrs. Lacey and Larkin agreed to voluntarily travel to and appear to state authorities in Sacramento on October 10, 2016.  They expected and were prepared to post bail (set at $250,000 for each) but, again, the AG insisted that it would contest any bond or bail under Section 1275.1. As a consequence, these gentlemen were also taken into custody.

While defendants' counsel sought to resolve the bail issues as soon as possible, the AG asked for a delay until after the defendants appeared for a public arraignment, which they did on October 12, 2016.  The next day, the Court held the 1275.1 hearing and promptly ordered that the defendants be released on bail.  Mr. Ferrer was finally released in the early hours of October 14, after he had been held in custody for a week, and Messrs. Lacey and Larkin were released after being incarcerated for four days.

## III.    ARGUMENT

### A.    Standards for a Demurrer Under Penal Code § 1004.

Penal Code § 1004 authorizes a defendant to demur to an accusatory pleading that (1) fails to "substantially conform" to the provisions of Sections 950 and 952, which govern the form and content of accusatory pleadings, (2) alleges facts that "do not constitute a public offense," or (3) "contains matter which, if true, would constitute a legal justification or excuse of the offense charged, or other legal bar to the prosecution."  *Id.* §§ 1004(2), (4), (5).  A demurrer "tests only those defects appearing on the face of [the accusatory] pleading," and is appropriate when it "raises an issue of law as to the sufficiency of the … pleading."  *People v. Osorio*, 235 Cal. App. 4th 1408, 1412 (2015) (quoting *People v. Manfredi*, 169 Cal. App. 4th 622, 626 (2008)).  "[F]or purposes of demurrer … matters which may be judicially noticed may be said to appear constructively on the face of the pleading."  *People v. Tolbert*, 176 Cal. App. 3d 685, 689 (1986).

A demurrer is appropriate to dismiss charges that are unconstitutional or preempted.  *See Williams v. Superior Court*, 111 Cal. App. 4th Supp. 1, 6 (Cal. App. Dep't Super. Ct. 2003) ("A

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

demurrer's purpose under section 1004 is dismissal of a pleading which lacks adequate notice of the public offense charged or charges one that is unconstitutional so as to generate a legally sufficient accusation."), *disagreed with on other grounds*, *Osman v. Appellate Div. of Superior Court*, 134 Cal. App. 4th 32 (2005).  Indeed, the California Supreme Court has often sustained demurrers dismissing criminal charges that violate the First Amendment.  *See, e.g.*, *People v. Superior Court*, 49 Cal. 3d 14, 27 (1989) (sustaining superior court demurrer to charges against theatre for unlawfully displaying adult films based on standard that violated the First Amendment); *Dulaney v. Municipal Court*, 11 Cal. 3d 77, 89 (1974) (sustaining demurrer and entering writ of prohibition prohibiting prosecution under municipal ordinance precluding posting of signs on utility poles as violating the First Amendment); *Whitney v. Municipal Court*, 58 Cal. 2d 907, 910-11 (1962) (sustaining demurrer to prosecution under municipal obscenity ordinance preempted by state law); *see also Mandel v. Municipal Court*, 276 Cal. App. 2d 649, 673-74 (1969) (reversing trial court decision refusing to grant demurrer and holding that prosecution of defendant under vagrancy ordinance for distributing anti-draft leaflets on high school campuses violated First Amendment).  As the case law demonstrates, when the State seeks to prosecute criminal charges that violate the Constitution or as to which the State has no authority, a Section 1004 demurrer is the proper remedy to dismiss the charges and stop the prosecution at the outset.

**B.      The Complaint and Prosecution Are Legally Barred By the First Amendment.**

The Attorney General's theory of prosecution violates basic principles of First Amendment law.  The AG's theory, reflected in the Complaint and supporting declaration, is that the State may prosecute individuals associated with an online publisher simply for publishing third-party speech if it turns out that some content implicates unlawful conduct, *i.e.* prostitution.  Ample Supreme Court precedent expressly rejects such a theory of unknowing criminal liability, given the chilling effect it would have on free speech.

The AG initiated this prosecution in the face of an unbroken line of cases holding that online forums for classified ads—and specifically Backpage.com—are protected by the First Amendment.  Government officials at various levels have attempted to censor such advertising forums in many ways, and each has been held to violate the Constitution.  Speech through the

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

Internet is subject to the same First Amendment protections and judicial scrutiny as applied to other media. *Reno v. ACLU*, 521 U.S. 844, 870 (1997). And, the First Amendment concerns in this case are particularly acute, where the state has commenced a criminal prosecution. *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004) (speech restrictions "enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people").

In a series of cases, federal courts enjoined state criminal laws that targeted Backpage.com, holding that escort ads on the website are protected speech and states' efforts to criminalize publication violated the First Amendment. First, in *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, the court enjoined enforcement of a Washington state statute that made it a felony to publish, disseminate or display content that contained a "depiction of a minor" and any "explicit or implicit offer" of sex for "something of value." 881 F. Supp. 2d at 1268. The court rejected the state's argument that the law affected only speech proposing illegal transactions, noting that escort ads have long been permitted and escort services are licensed and regulated in many states. *Id.* at 1282;[10] *see also id.* at 1280 ("The statue criminalizes more than offers to engage in illegal transactions because the statute encompasses transactions that are not illegal."). The court went on to note that the Washington law was problematic not only because of "the protected speech that it regulates by its terms," but also because it would "chill a substantial amount of protected speech," by creating a Hobson's choice for websites of either shutting down escort advertising or requiring age verification and risking prosecution. *Id.* at 1282.

The court in *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, struck down a similar Tennessee statute, likewise holding that third-party ads on Backpage.com are protected speech under the First Amendment.[11] Here again, the court rejected the state's argument that the statute "[did] not implicate First Amendment scrutiny because it criminalize[d] only offers to engage in

---

[10] The same is true in California, as many cities and counties in the state license and regulate escort services. *See, e.g.*, Sacramento City Code ch. 5.04; San Francisco Police Code, art. 15.6; Los Angeles County Code ch. 7.38; Orange County Code, tit. 5, art. 22

[11] The Tennessee law made it a felony to sell or offer to sell "an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act." *Cooper*, 939 F.3d at 816.

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

illegal transactions," noting that the "statute's potential reach extend[ed] to notices related to legal, consensual activity by adults." *Id.* at 833-34.  As the court aptly said in that case:

> The Constitution tells us that—when freedom of speech hangs in the balance—the state may not use a butcher knife on a problem that requires a scalpel to fix.  Nor may a state enforce a law that flatly conflicts with federal law.

*Id.* at 813.

In the third case of the trilogy concerning state criminal laws aimed at Backpage.com, *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, the court struck down a New Jersey statute almost identical to the Washington law that had been invalidated, again rejecting arguments of the state that escort ads on the website are unprotected speech.  *Id.* at *9-11 (accepting argument that the law would impermissibly burden any Internet "forum for communication … if it does not police or eliminate user postings").

In each of these cases, state authorities falsely sought to cast all escort ads as ads for prostitution, and each time courts rejected the arguments because the states' theories and laws would have burdened broad swaths of constitutionally protected speech.  *See McKenna*, 881 F. Supp. 2d at 1280, 1282; *Cooper*, 939 F. Supp. 2d at 831; *Hoffman*, 2013 WL 4502097, at *9-11.[12] More recently, the Seventh Circuit underscored this point when it enjoined efforts by the Sheriff of Cook County to bully credit card companies into terminating services to Backpage.com based on the same false premise.  In *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235-36 (7th Cir. 2015), *cert. denied*, 2016 WL 1723950 (U.S. Oct. 3, 2016), the Seventh Circuit held that Sheriff Dart's threatening letters and other actions toward Visa and MasterCard constituted an unconstitutional prior restraint under *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).  Here too, the Sheriff argued that all ads in the adult section of Backpage.com were unlawful, but the Seventh Circuit rejected the argument and held that First Amendment protections applied.  807 F.3d at 234 ("Nor

---

[12] The courts in the three cases discussed above barred enforcement of the respective state laws because they forced Backpage.com to choose between "foregoing the right to publish third-party content and risking felony charges." *Cooper*, 939 F. Supp. 2d at 845.  Here, there is not just a risk but the reality of criminal charges, coupled with incarceration of the individual defendants and dragnet searches and seizures of the publisher's home and business offices.  The constitutional stakes here exceed the possible chilling effect that persuaded courts to invalidate state laws in *McKenna*, *Cooper*, and *Hoffman*.

11

is Sheriff Dart on solid ground in suggesting that *everything* in the adult section of Backpage's website is criminal, violent, or exploitive.... [N]ot all advertisements for sex are advertisements for illegal sex.").  As Judge Posner wrote, "a public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment."  *Id.* at 230 (internal quotation marks omitted).

The Attorney General's Complaint and theory of prosecution is likewise based on the flawed (and oft-rejected) premise that the State can assert criminal charges based merely on allegations that escort ads are illegal or may concern unlawful conduct.  The First Amendment does not permit such a blunderbuss approach.  Under the First Amendment, in all contexts, it is the *government's burden* to establish and justify actions that burden speech rights.  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, [it] bears the burden of proving the constitutionality of its actions.").  In short, the state may not merely presume that speech is unlawful.

> The Government may not suppress lawful speech as the means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse.  "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others will be muted …."

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

Thus, it is a basic proposition of First Amendment law that states cannot criminally punish publishers or distributors of speech without proof of scienter, *i.e.*, sufficient proof that a defendant knew that the specific speech that is the basis for criminal charges was unlawful.  In *Smith v. California*, 361 U.S. 147, the Supreme Court struck down a Los Angeles ordinance imposing criminal sanctions on the sale of obscene books which required no scienter, because absent proof that a seller had knowledge, "he will tend to restrict the books he sells" and the law would "impose a severe limitation on the public's access to constitutionally protected matter" because the threat of unknowing criminal liability would cause self-censorship, and "the bookseller's burden would become the public's burden."  *Id.* at 153-54.  *See also Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("[t]he Constitution requires proof of scienter to avoid the hazard of self-censorship of

12

constitutionally protected material and to compensate for the ambiguities inherent in the definition

of obscenity").  Similarly, in *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), the

Court interpreted a federal statute prohibiting interstate transfer of child pornography to require

that the government prove a defendant had knowledge of "both … the sexually explicit nature of

the material and … the age of the performers," because a lack of such scienter requirements

"would raise serious constitutional doubts." *Id.* at 78.[13]  California cases recognize and follow

these constitutional principles, holding that statutes criminalizing the distribution of obscene or

unlawful materials must contain scienter requirements (or be fairly interpreted as doing so)

because otherwise such laws "would have an unacceptable chilling effect on the public's access to

constitutionally protected materials."  *Berry v. City of Santa Barbara*, 40 Cal. App. 4th 1075, 1087

(1995).

      The AG's Complaint in this case ignores and is irreparably deficient under these First

Amendment principles.  Nothing in the Complaint or Agent Ficthner's declaration alleges that the

advertisements posted by the nine individuals upon which the charges are based were unlawful on

their face.  The declaration states that all of the ads were written and posted by the individuals

themselves.  There is no allegation that the defendants or anyone from Backpage.com had any role

in creating or posting the ads.  The AG does not even allege that Mr. Ferrer ever saw or had any

knowledge of the ads.  The Complaint is still more deficient as to Messrs. Lacey and Larkin, as it

alleges that their only connection is that they formerly owned interests in Backpage.com and so

should be criminally liable because the website received payments of $79.60 for ads from the nine

individuals.  The allegations set forth in Agent Fitchner's declaration do not even attempt to

establish scienter as to any of the defendants for any of the ads that are the basis for the state's

prosecution.  The First Amendment expressly forbids criminal charges on this premise.

      Criminal sanctions inhibiting free speech rights are among the most pernicious forms of

government violations of the First Amendment.  *See Reno*, 521 U.S. at 872 ("The severity of

DAVIS WRIGHT TREMAINE LLP

---

[13] *See also United States v. United States District Court*, 858 F.2d 534, 540 (9th Cir. 1988) ("the first amendment does not permit the imposition of criminal sanctions on the basis of strict liability where doing so would seriously chill protected speech"); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("Statutes that impose criminal responsibility for dissemination of unprotected speech must contain a knowledge requirement.").

13

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."); *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965) (even as to criminal charges that are groundless, the threat of prosecution "is a real and substantial one" that can have a "chilling effect on protected expression").  Here, the severity of the charges leveled, and the aggressiveness with which the AG has sought to demonize and punish the defendants on baseless charges illustrates why this Court should promptly dismiss this prosecution.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

### C.    The Complaint and Prosecution Are Legally Deficient Under Section 230 of the CDA, as the Attorney General Has Admitted.

Free speech on the Internet is protected not only by the First Amendment, but also by Section 230 of the CDA.  "[T]he plain language of section 230 'creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user.'"  *Barrett v. Rosenthal*, 40 Cal. 4th 33, 43 (2006) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).  In simple terms, Section 230 bars any state-law claims—civil or criminal—against an online publisher such as Backpage.com (and the defendants) based on third-party content it publishes.  Attorney General Harris knows and has admitted she has no authority to prosecute Backpage.com for ads it publishes, yet the Complaint and the prosecution here seek to do exactly that.

Section 230 states:  "No provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[14]  The statute expressly preempts state laws:  "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* § 230(e)(3).[15]

---

[14] An "information content provider" is one "responsible, in whole or in part, for the creation or development of information," 47 U.S.C. § 230(f)(3), such as users who post on Backpage.com.

[15] California courts routinely reject claims based on Section 230 on preliminary motions.  *E.g.*, *Barrett*, 40 Cal. 4th 33 (2006) (affirming trial court order granting special motion to strike claims based on Section 230); *Hupp v. Freedom Commc'ns, Inc.*, 221 Cal. App. 4th 398 (2013) (same); *Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 563, 566 (2009) (affirming trial court orders

14

DAVIS WRIGHT TREMAINE LLP

Congress enacted Section 230 to achieve two goals.  First, the statute is meant "to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *accord Barrett*, 40 Cal. 4th at 56 (Section 230 reflects "legislative commitment to the value of maintaining a free market for online expression"); *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 802-03 (2006) (CDA was intended to "avoid the chilling effect upon Internet free speech" that would arise from imposing liability on "companies that do not create potentially harmful messages but are simply intermediaries for their delivery").  Congress recognized the Internet would be crippled if online providers could be held liable for third-party content, "given the volume of material communicated …, the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech."  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007); *see Batzel*, 333 F.3d at 1034 (absent Section 230, "speech over the Internet will be chilled rather than encouraged"); *see* 47 U.S.C. § 230(a)(4) and (b)(2) (finding the Internet has "flourished, to the benefit of all Americans, with a minimum of government regulation," and Section 230 is intended to "preserve the vibrant and competitive free market that presently exists for the Internet").

Second, Congress sought to encourage online providers to self-police for potentially harmful or offensive material by providing immunity for such efforts.  *See Doe II*, 175 Cal. App. 4th at 570 (emphasizing "Congress' intent 'to remove disincentives for the development and utilization of blocking and filtering technologies'" (quoting 47 U.S.C. § 230(b)(4)); *Batzel*, 333 F.3d at 1028.  Congress recognized that if websites undertook to screen or block improper content but could be held liable for doing so imperfectly, they likely would do no screening at all.  *See Barrett*, 40 Cal. 4th at 44 (noting that, in passing Section 230, Congress expressly rejected *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which applied common law principles to hold Prodigy liable as a publisher because it screened and edited some bulletin board messages to prevent offensive content but failed to delete the posts

sustaining demurrers based on Section 230); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 819 (2002) (same).

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

1   about which the plaintiff claimed); *see also Batzel*, 333 F.3d at 1029 ("If efforts to review and

2   omit third-party defamatory, obscene or inappropriate material make a computer service provider

3   or user liable for posted speech, then website operators and Internet service providers are likely to

4   abandon efforts to eliminate such material from their site[s].").

5          The purposes and scope of Section 230 immunity were summarized by the Fourth Circuit

6   in *Zeran*, which California courts have followed as "[t]he leading case on immunity protection

7   under Section 230," *Doe II*, 175 Cal. App. 4th at 569; *see Barrett*, 40 Cal. 4th at 42-46; *Delfino*,

8   145 Cal. App. 4th at 802-803:

> Congress' purpose in providing the § 230 immunity was thus evident.  Interactive
> computer services have millions of users.  The amount of information
> communicated via interactive computer services is therefore staggering.  The
> specter of tort liability in an area of such prolific speech would have an obvious
> chilling effect.  It would be impossible for service providers to screen each of
> their millions of postings for possible problems.  Faced with potential liability for
> each message republished by their services, interactive computer service
> providers might choose to severely restrict the number and type of messages
> posted.  Congress considered the weight of the speech interests implicated and
> chose to immunize service providers to avoid any such restrictive effect.

15  *Zeran*, 129 F.3d at 331 (citations omitted), *quoted in Doe II*, 175 Cal. App. 4th at 569.[16]

16         Courts have interpreted Section 230 in accordance with its purposes.  Thus, California

17  courts have followed the uniform interpretation of the federal circuit courts in holding that Section

18  230 establishes broad immunity for online providers.  *Barrett*, 40 Cal. 4th at 53 (Section 230

19  "broadly shield[s] all providers from liability for 'publishing' information received from third

20  parties"); *Doe II*, 175 Cal. App. 4th at 572 (noting "consensus to interpret Section 230 broadly").[17]

21

22  [16] Congress recognized that some material on the Internet could be harmful, but made a policy
    choice that liability could be imposed on "the person who creates or develops unlawful content,
23  but not the interactive computer service provider who merely enables that content to be posted
    online."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 254 (4th Cir. 2009).

24  [17] *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("circuits have
25  interpreted [Section 230] to establish broad federal immunity"); *Carafano v. Metrosplash.com,
    Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003) (noting "consensus" that "§ 230(c) provides broad
26  immunity for publishing content provided primarily by third parties"); *Green v. Am. Online*, 318
    F.3d 465, 471 (3d Cir. 2003); *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010); *Doe v.
27  MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Chi. Lawyers' Comm. for Civil Rights Under
    Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008); *Jones v. Dirty World Entm't
28  Recordings LLC*, 755 F.3d 398, 406-07 (6th Cir. 2014); *Klayman v. Zuckerberg*, 753 F.3d 1354,

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

Likewise, the case law uniformly holds that Section 230 forbids claims against a website "for the exercise of its editorial and self-regulatory functions" about whether to block or allow content. *Zeran*, 129 F.3d at 331. "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is *perforce* immune under section 230." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc); *accord Doe II*, 175 Cal. App. 4th at 572 (Section 230 protects "exercise of a publisher's traditional editorial functions, such as editing, altering, or deciding whether or not to publish certain material"); *Carafano*, 339 F.3d at 1124 ("[u]nder section 230(c), … so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process").

Section 230 immunity applies and protects a website notwithstanding allegations that it knew or should have known of unlawful content or conduct, as "[s]ubjecting service providers to notice liability would defeat 'the dual purposes' of section 230, by encouraging providers to restrict speech and abstain from self-regulation." *Barrett*, 40 Cal. 4th at 45 (quoting *Zeran*, 129 F.3d at 333). "It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420 (citing *Barrett*, 40 Cal. 4th at 51).

By its terms, Section 230 preempts and precludes not only state *civil* claims but also charges under state *criminal* laws. Section 230(c)(1) states, without qualification, that "[n]o cause of action may be brought and *no liability may be imposed* under *any State or local law* that is inconsistent with this section." 47 U.S.C. § 230(e)(3) (emphasis added). While immunity does not extend to prosecutions under a "*Federal* criminal statute," *id*. § 230(e)(1) (emphasis added), *state* criminal statutes are not exempt from its reach. "If Congress had wanted all criminal statutes to trump the CDA, it could have written subsection [230(e)](1) to cover 'any criminal statute' or 'any similar State criminal statute.' Instead, sub-subsection (1) is limited to *federal* criminal

_____

1359 (D.C. Cir. 2014); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015); *Ben Ezra, Weinstein & Co. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000); *Zeran*, 129 F.3d at 330-31.

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

1   statutes." *Voicenet Commn'cns, Inc. v. Corbett*, 2006 WL 2506318, at *4 (E.D. Pa. Aug. 30,

2   2006) (emphasis added).  Every court to consider this issue has reached the same conclusion,

3   holding that Section 230 preempts state criminal laws.  *See McKenna*, 881 F. Supp. 2d at 1275 ("If

4   Congress did not want the CDA to apply in state criminal actions, it would have said so.");

5   *Cooper*, 939 F. Supp. 2d at 821-26; *Hoffman*, 2013 WL 4502097, at *6; *People v. Gourlay*, 2009

6   WL 529216, at *3 (Mich. Ct. App. Mar. 3, 2009) ("the phrase 'any State or local law' includes

7   civil and criminal laws").[18]

8        Section 230 provides "an *immunity from suit* rather than a mere defense to liability." *Nemet*

9   *Chevrolet*, 591 F.3d at 254, and, as a result, courts uniformly hold that claims against online

10  providers based on third-party content should be dismissed at the earliest possible opportunity, to

11  avoid "costly and protracted legal battles," *Roommates.com, LLC*, 521 F.3d at 1175.  Congress's

12  intent to protect Internet free speech and the purpose of the immunity are "effectively lost if a case

13  is erroneously permitted to go to trial" rather than being dismissed at the outset.  *Nemet Chevrolet*,

14  591 F.3d at 254; *accord Jones*, 755 F.3d at 417 ("[g]iven the role that the CDA plays in an open

15  and robust internet by preventing the speech-chilling threat of the heckler's veto, we point out that

16  determinations of immunity under the CDA should be resolved at an earlier stage of litigation").

17       In the trilogy of cases striking down state laws aimed at Backpage.com, all three federal

18  courts held that the laws were invalid and Backpage.com was entitled to immunity under Section

19  230.  In *McKenna*, the court held the Washington law "impos[ed] liability on Backpage.com …

20  for information created by third parties—namely ads for commercial sex acts depicting minors—

21  so long as it 'knows' that it is publishing, disseminating, displaying, or causing to be published,

22  disseminated, or displayed such information."  881 F. Supp. 2d at 1273.  In doing so, the law

23  "create[d] an incentive for online service providers *not* to monitor content … precisely the

24  situation that the CDA was enacted to remedy."  *Id.*; *see also Cooper*, 939 F. Supp. 2d at 823

25  ─────────────────

26  [18] The legislative history of Section 230 reinforces this conclusion.  As originally written, Section
    230(b)(5) stated "[i]t is the policy of the United States to… ensure vigorous enforcement of
27  criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of
    computer."  H.R. 1978 (June 30, 1995).  But it was later changed to say "[i]t is the policy of the
28  United States … to ensure vigorous enforcement of *Federal* criminal laws …."  47 U.S.C.
    § 230(b)(5) (emphasis added).

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

(enjoining Tennessee statute because it "impose[d] liability on websites such as Backpage.com for selling or offering to sell advertisements, activity inherent in their role as publishers"); *Hoffman*, 2013 WL 4502097, at \*6 (similar law "r[a]n[] afoul of Section 230 by imposing liability … for information created by third parties—namely ads for commercial sex acts depicting minors").

The AG's tack to impose criminal liability on the Defendants for Backpage.com's publication of third-party content is likewise expressly barred and preempted under Section 230. Section 230 immunity applies when:  "(1) the defendant [is] a provider or user of an interactive computer service; (2) the cause of action treat[s] the defendant as a publisher or speaker of information; and (3) the information at issue [is] provided by another information content provider."  *Gentry*, 99 Cal. App. 4th at 830 (citing 47 U.S.C. § 230(c)(1)).  All of the elements of the three-part test for Section 230 immunity are established here.

First, Backpage.com indisputably is a "provider … of an interactive computer service."  47 U.S.C. § 230(c)(1).  *See Roommates.com*, 521 F.3d at 1162 n.6 (the "most common interactive computer services are websites"); *Hoffman*, 2013 WL 4502097, at \*6 (Backpage is a "provider[] of an interactive computer service within the meaning of CDA Section 230.").  The defendants are also entitled to immunity, as Section 230 extends to individuals who operate websites, as well as to the websites themselves.  *See, e.g.*, *Klayman*, 753 F.3d at 1357-58 ("Mark Zuckerberg, too, qualifies for protection [under § 230] because he is a 'provider' of Facebook's interactive computer service and Klayman's complaint seeks to hold him accountable for his role in making that service available.").

Second, the AG's charges against Defendants are based on third-party ads on the website, *i.e.*, content provided by other information content providers.  The AG nowhere alleges that Defendants authored, created, or participated in posting the ads of the nine individuals.  To the contrary, the Complaint and declaration admit the opposite.  *See, e.g.*, Complaint at 2 (alleging that "users of Backpage.com … post[ed] escort advertisements"); Fitchner Decl. at 2-3 ("BACKPAGE is similar to Craigslist.org in that it is an on-line general classified advertising site" allowing "user[s] to post advertisements for 'escorts'" for certain fees); *id.* at 7-10 (noting that users identified as A.H. , E.S., A.C. S.C. L.B. E.V. K.A. and L.F. stated that they posted ads on

19

1   Backpage.com).  *See Delfino*, 145 Cal. App. 4th at 807-08 (Section 230 provided immunity to

2   defendant where "the complaint consistently and repeatedly attributes authorship of the offensive

3   messages to [a third party]").[19]

4         Finally, the charges target Backpage.com for publishing information online and alleged

5   harms "caused by content provided by … third part[ies]."  *Gentry*, 99 Cal. App. 4th at 830; *see*

6   *also id.* at 832 (Section 230 forbids putting a website "in the shoes" of individuals who misused

7   the site for unlawful purposes).  Indeed, the AG *admits* Backpage.com takes measures to screen

8   and block inappropriate ads, *see* Complaint at 2 (alleging Mr. Ferrer "developed and oversaw a

9   process to screen escort ads"); Fitchner Decl. at 4 (acknowledging screening process), and the only

10  *facts* alleged concerning the website's screening and removal of ads are that they were effective,

11  *see* Fitchner Decl. at 6-7 (stating that he was unable to post ads with inappropriate terms,

12  Mr. Ferrer removed ads as requested, and the website thereafter blocked reposting of the same

13  ads).  These are precisely the efforts the CDA was designed to protect, and the AG's charges

14  based on Agent Fitchner's opinions about the "obvious nature" of escort ads or the efficacy of

15  Backpage.com's screening processes are precisely what the CDA prohibits.  As *Cooper* held,

16  "Backpage.com is the quintessential publisher contemplated by the CDA: it hosts and maintains

17  an ongoing forum for user-generated postings—some paid, others free—that it shares with the

18  public at large."  939 F. Supp. 2d at 823.  *See also Doe II v. Myspace Inc.*, 175 Cal. App. at 573

19

20  [19] Because there is no dispute here that third-party users created and posted the ads that are the
    premise of the AG's charges, *People v. Bollaert*, 248 Cal. App. 699 (2016), is inapplicable.

21  There, the Court of Appeal held that a website was not immune under Section 230 because it

22  forced users to provide information that was itself unlawful and violated privacy rights of
    individuals whose compromising photos were posted by other users (*i.e.*, the website required

23  users to provide names, locations and Facebook addresses of the persons photographed).  *Id.* at
    833-34.  In so doing, the court followed the narrow exception to Section 230 immunity discussed

24  in *Roommates.com*, 521 F.3d 1157.  *See Goddard v. Google, Inc*., 640 F. Supp. 2d 1193, 1198

25  (N.D. Cal. 2009) (*Roommates.com* "carved out only a narrow exception" that "turned entirely on
    the website's decision to force subscribers to divulge the protected characteristics and

26  discriminatory preferences as a condition of using its services." (internal quotation marks
    omitted)); *see also Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009)

27  (distinguishing *Roommates.com* because "[t]he Ninth Circuit repeatedly stated … that the
    Roommates.com website *required* its users to provide certain information as a condition of its use

28  …." (emphasis in original)).

DAVIS WRIGHT TREMAINE LLP

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

(barring claims by four minors against social networking site where they met men who sexually assaulted them; plaintiffs wanted website "to ensure that sexual predators do not gain access to (i.e., communicate with) minors" and "[t]hat type of activity—to restrict or make available certain material—is expressly covered by section 230").

This case does not present a close question.  The AG's abuse of prosecutorial powers is obvious because she has *admitted* Section 230 preempts state laws and precludes a state criminal prosecution of Backpage.com.  With other state attorneys general, in 2013 she urged Congress to amend Section 230 because the law "prevents State and local law enforcement agencies from prosecuting" Backpage.com, noting the *McKenna* decision, which "held that the CDA preempts state criminal law."  MJN Ex. F.  The AG knows full well that Section 230 precludes the charges alleged in the Complaint.  Yet, she has brought them anyway, in a blatant misuse of prosecutorial authority.  This is particularly egregious in the context of threatening a publisher with criminal penalties—coupled with arrest and incarceration to enforce the threats.

### D. The Complaint Does Not State Facts that Constitute Public Offenses under the Criminal Statutes Charged.

Even setting aside that the AG's prosecution is legally barred under the First Amendment and Section 230 of the CDA, the Court should grant the demurrer because the Complaint fails to allege any public offense.  Indeed, the AG has failed to allege essentially all of the elements of the charges or any facts to support any claim.

As noted, the AG's theory is that the state can prosecute a website (and individuals associated with the website in some way, no matter how attenuated) based on allegations that users posted content allegedly relating to unlawful conduct, regardless of whether the defendants knew of or participated in the unlawful activity.  Every court that has considered this theory has rejected it.

For example, the court in *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011), rejected arguments that Backpage.com could be held liable "as an aider and abettor of minor sex trafficking."  *Id.* at 1053-54 (under 18 U.S.C. §§ 2, 2255).  Noting that such a charge requires the government to prove that a defendant participated in a specific

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

unlawful venture and acted to make the venture succeed, the court held that accusations attacking the website fell well short of "the specific intent required for aiding and abetting." *Id.* at 1054.

Sheriff Dart raised and lost a similar claim in *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009). The court rejected his argument that Craigslist violated criminal prostitution laws because it had an "adult services" category, holding this does not "cause" postings except "'in the sense of providing a place where people can post," and websites "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts." *Id.* at 967, 969 ("having an adult services category is not unlawful in itself nor does it necessarily call for unlawful content").

More recently, the court in *Doe v. Backpage.com*, 104 F. Supp. 3d 149, held that accusations attacking the Backpage.com website could not establish "affirmative participation in an illegal venture" because having "an escorts section in a classified ad service, whatever its social merits, is not illegal" and other features of the website or allegations about its efforts to screen improper content could not be the basis for criminal liability. 104 F. Supp. 3d at 157. *See also Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (noting that "[e]ven entities that know the information's content do not become liable for the sponsor's deeds," and asking rhetorically: "Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity?"). "A web host cannot be classified as an aider and abettor of criminal activities conducted through access to the Internet" any more so than a telephone company aids or abets the sale of tapes or narcotics sold by phone or the Postal Service aids and abets such sales delivered by mail. *Id.* Backpage.com simply cannot be subject to criminal liability as "an intermediary between the advertisers of adult services and visitors to [the] website." *Backpage.com, LLC v. Dart*, 807 F.3d at 234.

Similarly, the U.S. Department of Justice has expressly acknowledged that federal sex trafficking laws do not impose criminal liability on websites for publishing third-party content that may concern illegal acts. The DOJ's National Coordinator for Child Exploitation Prevention and

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

Interdiction was asked in Congressional hearings:  "[W]hat laws apply to Internet providers like craigslist that would make them criminally liable for the postings?"  She responded:

> I am not aware of any laws that would make them liable [for third-party postings], unless there was evidence that craigslist was a participant ... conspiring with those who were misusing their site, that is, knowingly conspiring to violate the laws. . .. [T]he standard for prosecution would be knowing or willful. ... I am not aware of anything that shows us that craigslist might be criminally liable.  [A]t this point we have the proper tools.  We have what we need to prosecute the guilty, that is, the people who are using the Internet....  And I don't think anyone ... here would propose closing the Internet.

*Domestic Minor Sex Trafficking: Hearing Before Subcomm. on Crime, Terrorism, & Homeland Security of the H Comm. on the Judiciary,* 11th Cong. 215-16 (2010).

In fact, when the U.S. Attorney for the Western District of Washington later launched a criminal investigation of Backpage.com, the federal court in that district quashed the grand jury subpoenas issued at the government's behest.  Backpage.com argued that the subpoenas and investigation violated the First Amendment, *see, e.g.*, *Bursey v. United States*, 466 F.2d 1059, 1087-88 (9th Cir. 1972) ("Were we to hold that the exercise of editorial judgments ... raised an inference that the persons involved in the judgments had or may have had criminal intent, we would destroy effective First Amendment protection ...."), were unreasonable and oppressive under Fed. R. Crim. P. 17, and reflected an improper motive rather than a legitimate investigation. The court's orders remain sealed, but, as noted, the court quashed the government's subpoenas, and the U.S. Attorney's Office then terminated its investigation.

### 1.    The "Pimping" Allegations Against Mr. Ferrer Are Wholly Deficient.

The allegations of the Complaint and incorporated declaration regarding all defendants are wholly deficient in that they allege nothing more than that they were associated with Backpage.com, which published and received $79.60 in payment for ads from nine individuals who allegedly were involved in prostitution.  The Complaint and declaration provide no allegations of any knowledge, involvement or participation by any of the defendants in any illegal conduct of any of the nine individuals.

First, with regard to the charges against Mr. Ferrer for pimping, the Complaint and declaration allege only that he is the CEO of Backpage.com, Fitchner Decl. at 2; has been the sole

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

named partner of Backpage.com's parent company since late 2014, *id.* at 3; "runs the day-to-day operations" of Backpage.com, *id.* at 4; was "copied on" Backpage.com's responses to law enforcement subpoenas, *id.*; had been the recipient of communications from the National Center for Missing and Exploited Children (without mentioning whether this relates to Backpage.com's regular reporting to NCMEC of suspect ads), *id.* at 3-4; has "publicly acknowledged" that "prostitution occurs on BACKPAGE" while acting to "mitigate[ ] criminal activity through a screening process," *id.*; cooperated and promptly acted to remove an ad that Agent Fitchner had posted when he told Mr. Ferrer that he was "law enforcement" and had "identified a prostitution ad," *id.* at 6; and emailed a payment processor about whether banks might be concerned about "sexy email address names" of customers, *id.* at 12.

Otherwise, Agent Fitchner describes information he and other DOJ personnel learned in interviews of the nine individuals about *their* activities, *id.* at 7-11; *see also* Complaint at 4-9; mentions unrelated "undercover operations" conducted by DOJ (*i.e.*, posting sting ads on the website), *id.* at 4, and offers his opinion that "it [is] plain to any individual … that BACKPAGE's 'Escort' ads are for prostitution," *id.*

None of this shows or even alleges that Mr. Ferrer (or anyone at Backpage.com, for that matter) had any connection to any ads of the nine individuals that are the premise for the criminal charges. The AG alleges no facts that Mr. Ferrer ever saw any advertisements of these individuals, much less that he knew any of them were acting as prostitutes, which is the central element of Penal Code § 266h (liability applicable only to "any person who, knowing another person is a prostitute …."); *see also* CALCRIM 1150. Similarly, there is no allegation whatsoever that Mr. Ferrer "derive[d] support or maintenance … from the earnings or proceeds of [these] persons' prostitution," or that he knowingly "solicit[ed] or receiv[ed] compensation for soliciting [prostitution services] for [these] person[s]." Penal Code § 266h.[20] Nor does the AG assert any

---

[20] Penal Codes § 266h(a) provides:

> [A]ny person who, knowing another person is a prostitute, lives or derives support
> or maintenance in whole or in part from the earnings or proceeds of the person's
> prostitution, or from money loaned or advanced to or charged against that person
> by any keeper or manager or inmate of a house or other place where prostitution
> is practiced or allowed, or who solicits or receives compensation for soliciting for

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

DAVIS WRIGHT TREMAINE LLP

1  allegations that Mr. Ferrer had any knowledge that the ads posted by the nine individuals were for

2  unlawful conduct or knew that the individuals who are the subject of Counts Two-Six were

3  minors, as is constitutionally required.

4      California law does not allow a charge or conviction under Penal Code § 266h without

5  proof that the defendant had knowledge that another person (from whom he obtained support) was

6  acting as a prostitute.  *See Wooten v. Superior Court*, 93 Cal. App. 4th 422, 437 (2001) (reversing

7  trial court's denial of motion to set aside information alleging pimping charges against strip club

8  owners where there was no showing they had knowledge that a dancer had offered to perform a

9  sex act; "pimping requires that a defendant know that another person is a prostitute").  So too, the

10 government's obligation is to allege and prove the defendant's knowledge of specific acts of

11 prostitution; allegations of "general knowledge" are not enough.  *Id.* at 438 (rejecting argument

12 that strip club owners could be convicted of pimping or pandering based on "general awareness of

13 sex acts occurring at the club"). [21]

14          **2.      The Conspiracy Charges Against Defendants Are Likewise Deficient.**

15     The Complaint's charge of conspiracy to commit pimping against all three defendants,

16 Complaint at 1-4 (Count One), is also completely deficient under California law.

17     To convict on a charge of conspiracy, the government must prove that the defendant and

18 another person entered into an agreement with the specific intent to commit an offense, as well as

19 the specific intent to commit the elements of that offense, together with proof of the commission

20 of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.

21 *People v. Morante*, 20 Cal. 4th 403, 416 (1999) (quoting Penal Code § 184).  The Complaint

22 alleges none of these elements, and the declaration offers no facts to support any conspiracy

23 charge.

24

25          the person, is guilty of pimping, a felony, and shall be punishable by

26          imprisonment in the state prison for three, four, or six years.

27 [21] Count Five alleges attempted pimping in violation of Penal Code §§ 266h and 664.  Complaint
   at 6.  This charge would require proof that the defendant had the specific intent to engage in

28 pimping.  *People v. Toledo*, 26 Cal. 4th 221, 229-30 (2001).

DAVIS WRIGHT TREMAINE LLP

25

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

1    Again, the Complaint and declaration do not purport to allege that the defendants knew

2    about any of the supposedly improper advertisements before they appeared on Backpage.com, or

3    that the ads concerned any illegal activity, or that defendants knew of and agreed to commit any

4    crime.  The allegations concerning Mr. Ferrer (discussed above) do not assert or suggest he

5    entered into any agreement with anyone with the intent to commit a crime.

6    The allegations concerning Messrs. Lacey and Larkin are no better.  The Complaint and

7    declaration assert that these gentlemen founded Backpage.com in 2004 and remained controlling

8    shareholders until 2012, when Backpage.com separated from its former parent company, Fitchner

9    Decl. at 2; owned and participated in operating Backpage.com until late 2014, Complaint at 2,

10   Fitchner Decl. at 3;[22] received communications from NCMEC, as did Mr. Ferrer, Fitchner Decl. at

11   3-4; received "regular updates, correspondence, and meeting notices" from Mr. Ferrer, *id.* at 4;

12   received "bonuses" in September 2014 (before they sold their interests in Backpage.com), *id.* at 4;

13   and revenues from Backpage.com were once used to pay them salaries and bonuses, *id.* at 6.

14   Nothing in these meager alleged facts suggests participation in a criminal conspiracy.

15   There is no alleged agreement to commit a crime, no suggestion that Mr. Lacey, Mr. Larkin or Mr.

16   Ferrer intended to commit the crime of pimping, no contention that any man knew that any of the

17   subject ads concerned prostitution or any illegal activity, and not even a hint that they knew

18   anything about or had anything to do with the ads.  Instead, the AG charges Messrs. Lacey and

19   Larkin with a criminal conspiracy on the sole basis that they once owned Backpage.com.  Such

20   allegations are a far cry from meeting the statutory definition of conspiracy.  *See Morante*, 20 Cal.

21   4th at 416; *cf. Doe v. GTE Corp.*, 347 F.3d at 659 ("[Under] the ordinary understanding of

22   culpable assistance to a wrongdoer," the defendant must have "a desire to promote the wrongful

23   venture's success . ... That web hosting services … may be used to carry out illegal activities does

24   not justify condemning their provision whenever a given customer turns out to be crooked.").

25   _____

26   [22] The status of the defendants as corporate officers and shareholders is irrelevant.  "It is well
settled that '[a]n officer of a corporation is not criminally answerable for any act of a corporation

27   in which he [or she] is not personally a participant.'"  *Sea Horse Ranch, Inc. v. Superior Court*, 24
Cal. App. 4th 446, 457 (1994) (alterations by *Sea Horse Ranch* court) (quoting *Otis v. Superior*

28   *Court*, 148 Cal. 129, 131 (1905).

*DAVIS WRIGHT TREMAINE LLP*

26

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224

1

## IV.   CONCLUSION

2        This prosecution is patently improper, given the obvious disconnect between the charges in

3    the Complaint and the factual allegations asserted by the AG.  The state cannot marshal any facts

4    even suggesting that the defendants committed any crime.  The AG's prosecution tramples First

5    Amendment rights and is flatly barred by Section 230, as she has admitted.  Defendants' demurrer

6    should be granted without leave to amend, and this proceeding should be swiftly terminated.

7    DATED:  October 19, 2016                                  Respectfully submitted,

8                                                              DAVIS WRIGHT TREMAINE LLP

9

10   By: _____

11                                                              James C. Grant

12                                                              Attorneys for Defendants
                                                              Carl Ferrer, Michael Lacey and James Larkin

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

DEMURRER TO CRIMINAL COMPLAINT, Case No. 16FE019224