PICCARRETA DAVIS KEENAN FIDEL PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701
(520) 622-6900
Michael L. Piccarreta
State Bar No. 003962
Email: mlp@pd-law.com
Attorney for Defendant Andrew Padilla

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-06-PHX-SPL (BSB) |
| Plaintiff, | |
| vs. | DEFENDANT PADILLA'S OPPOSITION TO GOVERNMENT'S MOTION TO DISQUALIFY COUNSEL (Doc. 118) |
| 6. Andrew Padilla, (Counts 1-51) | |
| Defendants. | (Oral Argument Requested) |

Defendant Andrew Padilla, by and through his undersigned attorney, hereby responds in opposition to the government's motion to disqualify counsel. (Doc. 118).

**BACKGROUND**

Defendant Andrew Padilla worked at the website Backpage.com ("Backpage") until the government shut it down. One of Mr. Padilla's primary responsibilities was ensuring that third-party ads posted on Backpage conformed to the website's terms of use. Mr. Padilla is aware that Backpage, its owner Carl Ferrer, its prior owners Michael Lacey and Jim Larkin, and, in some cases, other employees of Backpage, have been involved in litigation across the country concerning Backpage. Mr. Padilla is also aware that Backpage and some of these individuals have been represented by the law firm Davis Wright Tremaine LLP ("DWT"). Specifically, DWT attorneys James C. Grant and Robert Corn-

Revere have been very successful in litigating issues related to the First Amendment, Title 47 U.S.C. § 230 (the Communications Decency Act), and other relevant and related legal and constitutional issues as they relate to challenges by government authorities and others concerning Backpage.[1]

Mr. Padilla retained undersigned counsel in 2017 in connection with a federal grand jury investigation of Backpage in the District of Arizona. At that time, Mr. Padilla entered into a joint defense agreement with Mr. Ferrer, Mr. Lacey, Mr. Larkin, and others employed by or associated with Backpage.[2] While the contents of that agreement are and remain confidential (and without waiving any claims of confidentiality or privilege), it was the intent of the agreement that Mr. Padilla, and other signatories to the agreement, would continue to receive the benefit of the excellent representation DWT's lawyers had been providing in all of these matters.[3] Quite simply, DWT is Mr. Padilla's counsel of choice for these issues. As a signatory to the agreement (and under the Fifth and Sixth Amendments

---

[1] Robert Corn-Revere has extensive experience in First Amendment law and communications, media, and information technology law. He formerly served as Chief Counsel to the Chairman of the Federal Communications Commission and is a past national chairman of the First Amendment Lawyers Association. His numerous honors include being selected by Best Lawyers in America as Washington D.C.'s "Lawyer of the Year" in both First Amendment litigation and First Amendment law for 2017. He has long been recognized as one of the leading attorneys in the country on First Amendment issues. James C. Grant has over 30 years of experience and his practice focuses on internet businesses and websites in cases across the country, including numerous high-profile actions concerning free speech, state regulatory efforts, privacy, and consumer, marketing, and business practices. He was formerly vice president and chief litigation counsel for AT&T Wireless. He has also been recognized by Best Lawyers in America and is considered a preeminent attorney in 47 U.S.C. § 230 litigation.

[2] Mr. Padilla has joined in Mr. Lacey and Mr. Larkin's opposition to the government's motion to disqualify counsel.

[3] The joint defense agreement will be provided to the Court for *In Camera* review.

to the United States Constitution), Mr. Padilla has the right to the continued service of the DWT lawyers.

It must be noted that Mr. Grant and Mr. Corn-Revere do *not* devote their practices to defending the criminally accused. Mr. Ferrer, Mr. Lacey, Mr. Larkin, Mr. Padilla, and the others listed in the indictment, have all retained separate experienced criminal defense counsel to represent them individually in these criminal proceedings. It is the intent of the joint defense agreement that the DWT lawyers would continue their role in addressing issues concerning the First Amendment, internet free speech and privacy, and other related and relevant legal and constitutional issues for all signatories to the agreement. These issues apply equally to all defendants in the case and it was the purpose of the agreement that the DWT lawyers would continue to address these issues for all defendants (even if members of the joint defense agreement withdrew and cooperated), including filing legal motions to dismiss, other motions, and related appeals.

The government is well aware of the successful results the DWT lawyers have

obtained in proceedings involving Backpage across the country.[4] These cases include attempts to hold Backpage, and others associated with the website, vicariously liable for the acts of third persons predicated on the same underlying theories of criminal liability that are at issue in the present case. The DWT lawyers were successful in obtaining dismissal of criminal charges in California premised on the theory that Backpage was criminally liable for receiving payments for ads posted on the website and that doing so allegedly constituted pimping or promotion of prostitution.[5] More recently, the DWT lawyers filed a motion in the California case to dismiss the remaining charges or suppress evidence for prosecutorial misconduct and violations of constitutional rights and statutory protection proscribing government access to electronic communications, proceedings which very well may affect these current proceedings.[6] In short, the DWT lawyers have been very effective in combatting efforts such as the present criminal prosecution in which the First

---

[4] A partial list includes successfully enjoining state criminal laws directed at Backpage's operations on the grounds that these activities are protected by the First Amendment. *See Backpage.com LLC v. Cooper*, 939 F.Supp.2d 805 (M. D. Tenn. 2013); *Backpage.com LLC v. Hoffman*, 2013 WL 4502097 (D. N. J. 2013); *Backpage.com LLC v. McKenna*, 881 F.Supp.2d 1262 (W. D. Wash. 2012). Other successes include *Jane Doe No. 1 v. Backpage.com LLC*, 817 F.3d 12, 21 (1st Cir. 2016) ("Features such as [Backpage's decisions about how to treat postings], which reflect choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions"); and *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (recognizing First Amendment protections for Backpage's activities and finding that county sheriff's demand that credit card companies prohibit use of their cards to purchase any ads on Backpage violated the First Amendment).

[5] *People v. Ferrer*, No. 16FE019224 (Cal. Super. Ct. Dec. 16, 2016, *10) and No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017, p. 13).

[6] *See* Notice of Motion and Motion to Dismiss for Government Misconduct and to Void Warrants and Subpoenas and Suppress Evidence for Violations of the California Electronic Communications Privacy Act and the U.S. and California Constitutions, *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. March 5, 2018), attached hereto as Exhibit A.

Amendment rights of websites that publish ads are the core protection against the government's novel attempt to vicariously impose criminal liability on the publishers for the acts of others. Although the government professes concern for the integrity of the trial process, the stark reality is that the government will gain *huge* tactical advantages if DWT is removed from their role in these matters, whereas the defendants will be tactically disadvantaged in ways that simply cannot be remedied.

The basis for the government's motion to disqualify counsel is the government's erroneous claim that the fact that Mr. Ferrer is now a cooperating witness for the government creates a conflict with DWT continuing their representation of the seven non-cooperating defendants listed in the indictment. The purported basis for the conflict is the claim that the DWT attorneys will not be able to effectively cross-examine Mr. Ferrer while also respecting their duty to Mr. Ferrer as a former client to preserve confidential and privileged information that may provide fodder for effective cross-examination. These purported concerns are baseless.

First, as part and parcel of his agreement to cooperate with the government, Mr. Ferrer waived, in writing, any claims of attorney-client privilege, whether in his personal or official capacity, as to communications with any attorney or law firm that represented Backpage, or any related entities, except as to his current criminal defense counsel Nanci Clarence and Jonathan Baum. (Correspondence from AUSA Kevin Rapp to Mike Piccarreta, May 14, 2018, attached hereto as Exhibit B). Second, it is Mr. Padilla's understanding that Mr. Ferrer, Mr. Lacey, and Mr. Larkin entered into agreements for DWT's joint representation in which Mr. Ferrer also agreed to share confidential

information and waive potential conflicts of interest as to any pending or potential civil or criminal proceedings and these agreements specifically anticipated that the parties' interests could diverge in the future, and therefore allowed that a party could withdraw from the joint representation arrangement but could not move to disqualify counsel from continuing to represent the remaining parties. Third, Mr. Ferrer and his criminal counsel, Nanci Clarence, as signatories to the joint defense agreement, specifically waived any claims of conflict, specifically agreed that any confidential information acquired by any of the other signatories or their attorneys could be used in cross-examination of Mr. Ferrer if he became a cooperating government witness, and further specifically agreed not to assert any future claim that any attorneys would be disqualified from continued representation due to the receipt of any such information.

Mr. Padilla now objects to the government's improper attempt to deprive him of his Fifth and Sixth Amendment rights to counsel of choice on these matters.

## ARGUMENT

The Sixth Amendment guarantees the right of non-indigent defendants to choose who will represent them. Erroneous denial of the right to counsel of choice is structural error and requires automatic reversal even in the absence of any showing of prejudice. The "Sixth Amendment right to counsel of choice…commands, not that a trial be fair, but that a particular guarantee of fairness be provided -- to wit, that the accused be defended by the counsel he believes to be best." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006). "The right to select counsel of one's choice…has been regarded as the root meaning of the constitutional guarantee." *Id.* at 147-48. "Where the right to be assisted by

counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *Id.* at 148. "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id.*[7]

Because erroneous denial of the right to counsel of choice requires automatic reversal courts have repeatedly "warned that disqualification of defense counsel should be a measure of last resort." *United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986). "In moving to disqualify appellants' chosen counsel, the government bears a heavy burden of establishing that disqualification is justified. *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986)." *Id.*

Moreover, because of the clear potential for abuse when the government attempts to separate a defendant from his counsel of choice:

> the court should be extremely careful not to let the government's attempted disqualification of defense counsel "transform the sixth amendment right to conflict-free counsel into a two-edge sword with which the government would be able to sever defendants from those most able to protect their legitimate legal interests." *In re Paradyne Corp.*, 803 F.2d 604, 611 (11th Cir. 1986). In an extremely complicated case it may cause a fundamental injustice to remove the *one* attorney whose intimate knowledge of the defense and whose close relationship with the defendants make him practically the only available attorney capable of presenting effective

---

[7] The Supreme Court recently reaffirmed the "nature and importance of the constitutional right" to counsel of choice under the Sixth Amendment. *Luis v. United States*, 578 U.S. __, __, 136 S.Ct. 1083, 1088 (2016). It has also long been settled that, under the Fifth Amendment's guarantee of due process of law, "a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932).

assistance of counsel.

*United States v. Renda*, 669 F.Supp. 1544, 1549 (D. Kan. 1987) (emphasis in original).

The Arizona Supreme Court "also view[s] with suspicion motions by opposing counsel to disqualify a party's attorney based upon conflict of interest" and places particular emphasis on the "public suspicion regarding an attempt by the state to disqualify a defendant's attorney." *Gomez v. Superior Court*, 149 Ariz. 223, 226 (1986).[8] In addition, the Arizona Supreme Court has made it clear that the prosecution "has no standing to object as to who will or will not represent the defendant or be associated as counsel." *Knapp v. Hardy*, 111 Ariz. 107, 112 (1974). "Not only does this strike at the very heart of the adversary system, but as we have previously stated:…'for the prosecution to participate in the selection or rejection of its opposing counsel is unseemly if for no other reason than the distasteful impression which could be conveyed.' *State v. Madrid*, 105 Ariz. 534, 535 [] (1970)." *Id. See also Rodriguez v. State*, 129 Ariz. 67, 70 (1981) (prosecution lacked standing to seek to disqualify defense counsel).

Having brought the matter to this Court's attention, the government should not be permitted to participate any further in any proceedings relating to the disqualification issue, especially because the government has indicated that Mr. Ferrer does not wish to be a party to the government's motion. (Ex. B, p. 4). As noted above, resolution of these matters will require the *In Camera* submission of privileged and confidential materials that opposing

---

[8] "Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue." *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000).

counsel has no right to see.

The Arizona Supreme Court has also emphasized that "[o]nly in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent." *Alexander v. Superior Court*, 141 Ariz. 157, 161 (1984) (citations omitted).[9] "The burden should be upon the moving party to show sufficient reason why an attorney should be disqualified from representing his client. Whenever possible the courts should endeavor to reach a solution that is least burdensome upon the client or clients." *Id*.

In the present case, this Court must consider the burdens placed upon the seven non-cooperating signatories to the joint defense agreement who are entitled to the continued representation of DWT on these vital First Amendment, internet, and privacy issues. As signatories to the joint defense agreement, Mr. Padilla and the remaining non-cooperating defendants have standing to oppose the government's motion to disqualify counsel. *See United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995) ("Mr. Scott also contends that his *personal* Sixth Amendment rights were implicated because the disqualification denied him the ability to plan and pursue a joint defense….Mr. Scott has standing to bring this claim….") (emphasis in original).

> If a co-defendant's attorney is threatened with disqualification or is actually disqualified -- whether on the government's motion or on the court's own initiative -- then a defendant may have standing to complain of the

---

[9] *Alexander* is discussed in the Arizona State Bar Ethics Opinion (91-05) the government cited to this Court. (Doc. 118, pp. 9-10).

disqualification if he planned to pursue a joint defense. In this situation, the defendant's personal Sixth Amendment rights are implicated, and he has standing to join the dispute as a result.

D. Richmond, The Rude Question of Standing in Attorney Disqualification Disputes, 25 Am. J. Trial Advoc. 17, 65 (Summer 2001) (citing *Jones*).

Under the law governing joint defense agreements, one signatory cannot blow up the entire agreement for the rest of the signatories through his unilateral decision to cooperate with the government, and thereby deprive all the remaining signatories of their constitutional right to counsel of choice and the continued benefits of representation under the agreement. It is highly foreseeable that a defendant may choose to cooperate with the government and the joint defense agreement specifically provides for this contingency. As signatories to the agreement, Mr. Ferrer and his criminal counsel, Ms. Clarence, specifically waived any claims of conflict, specifically agreed that confidential information acquired by any of the other signatories or their attorneys could be used in cross-examination of Mr. Ferrer if he became a cooperating government witness, and further specifically agreed not to assert any future claim that any attorneys would be disqualified from continued representation due to the receipt of any such representation.[10]

The case law governing joint defense agreements also makes it clear that a defendant's decision to cooperate with the government does not create any conflict of

_____

[10] Such conflict waivers in joint defense agreements are valid and enforceable. In fact, the American Law Institute and American Bar Association jointly drafted a form waiver in their model joint defense agreement. Joint Defense Agreement, Am. Law Institute - Am. Bar Ass'n, Trial Evidence in the Federal Courts, Problems and Solutions, at 35 (1999); *see also* 5B West's Federal Forms, District Courts -- Criminal § 94.42, Joint Defense Agreement, sec. VIII, Conflict of Interest and Disqualification (5th ed. June 2017 Update).

interest requiring disqualification of remaining counsel. In *United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003), the court held "that [cooperating defendant] waived his attorney-client privilege when he turned state's evidence, thereby entirely removing the possibility of a conflict of interest from the case." *Id*. at 1324.

> We hold that when each party to a joint defense agreement is represented by his own attorney, and when communications by one co-defendant are made to the attorneys of other co-defendants, such communications do not get the benefit of the attorney-client privilege in the event that the co-defendant decides to testify on behalf of the government in exchange for a reduced sentence.

*Id*. at 1326.[11] In the present case, Mr. Ferrer, Mr. Lacey, Mr. Larkin, Mr. Padilla, and all of the other signatories to the joint defense agreement were separately represented by their own criminal counsel. Mr. Ferrer is therefore barred from claiming that his decision to cooperate with the government now creates a conflict of interest requiring disqualification.

This is especially true in light of the fact that, in his cooperation agreement with the government, Mr. Ferrer and his criminal counsel, Ms. Clarence, also waived, in writing, any claims of attorney-client privilege, whether in his personal or official capacity, as to communications with any attorney or law firm that represented Backpage, or any related entities, except as to his current criminal defense counsel. (Exhibit B hereto). Accordingly, there is no legally cognizable prejudice to either Mr. Ferrer or the government if the government's motion to disqualify is denied.

Even if there were some technical violation of some ethical rule, which there is not,

---

[11] This passage was cited with approval by the Ninth Circuit Court of Appeals in *Murdoch v. Castro*, 365 F.3d 699, 703 n. 2 (9th Cir. 2004).

"the rules of professional responsibility are for ethical enforcement and are not designed to be used as a means to disqualify counsel." *Amparano v. ASARCO, Inc.*, 208 Ariz. 370, 376 ¶ 22 (App. 2004). Again, this Court is required to consider the personal Sixth Amendment right to counsel of choice of Mr. Padilla and the other six non-cooperating signatories to the joint defense agreement. *See Alexander*, 141 Ariz. at 161 ("[w]henever possible the court should endeavor to reach a solution that is least burdensome upon the client or clients").

In light of the significance and magnitude of the Sixth Amendment right to counsel of choice, the balance is heavily weighted against depriving Mr. Padilla and the remaining non-cooperating defendants of their counsel of choice on these issues and requiring them to find and fund new counsel to be brought up to speed. The government clearly has not met its "heavy burden" of showing the "extreme circumstances" justifying the "measure of last resort" that would permit the government "to sever defendants from those most able to protect their legitimate legal interests." *Washington*, 797 F.2d at 1465; *Alexander*, 141 Ariz. at 161; *Diozzi*, 807 F.2d at 12; *In re Paradyne Corp.*, 803 F.2d at 611. While there is no damage to Mr. Ferrer or the government if the government's motion to disqualify is not granted, the damage to Mr. Padilla and the other defendants if the motion is granted is immeasurable.

While the government professes concern for the integrity of the trial process, the inescapable reality is that the government's motion to disqualify gains them huge tactical advantages in many ways. First, the government will be removing the most knowledgeable and experienced attorneys in the country on these First Amendment, internet, and privacy issues. Second, the government will be removing attorneys with over six years of

institutional knowledge about the issues surrounding Backpage that are involved in the present litigation. Third, the government will be removing the very lawyers that, after exhaustive research and analysis, uncovered misconduct in gathering evidence by the California Attorney General's Office that may significantly impact the present proceedings. In contrast, the defendants will be irreparably disadvantaged because no amount of time and effort on the part of new counsel (even if defendants can find and fund them) could come anywhere near to replicating DWT's efforts thus far.

Specifically, the DWT lawyers are absolutely critical to Mr. Padilla's defense. The First Amendment and § 230 issues are pivotal to his role at Backpage in ensuring the ads posted by third parties conformed with Backpage's terms of use. As courts have consistently found, in cases litigated by DWT and others, Mr. Padilla's acts, and those of others at Backpage, are prototypical editorial functions that are clearly protected by the First Amendment.[12] Moreover, the government is sadly mistaken that § 230 provides only "state law defenses not applicable in this case." (Doc. 118, p. 3). The Travel Act (18 U.S.C. § 1952) counts in the indictment allege facilitation of prostitution offenses in violation of state law.[13] However, if the State of Arizona attempted to prosecute state law offenses relating to prosecution based on the government's theory of third-party liability for the

---

[12] *See, e.g., Jane Doe*, 817 F.3d at 21 ("Features such as [Backpage's decisions about how to treat postings], which reflect choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions").

[13] It should be noted that facilitation of prostitution under Arizona law is a class 3 misdemeanor, the lowest level of criminal offense, with a maximum penalty of 30 days in jail and a $500 fine. Arizona Revised Statutes § 13-3214; § 13-1004(C); § 13-707(A)(3); § 13-802(C).

conduct of others, § 230 would provide a complete defense.[14] The government cannot premise a Travel Act prosecution on violations of state laws that the states, themselves, cannot prosecute. Moreover, § 230, and the cases interpreting it including those successfully litigated by DWT, shows that Mr. Padilla and the other defendants lack the specific intent required to commit the offenses in the indictment. The point is: the First Amendment and § 230 issues are critical to Mr. Padilla's defense and he cannot be deprived of the assistance of the most able attorneys to represent him. In addition, there are other relevant legal and constitutional matters that will need to be litigated with the assistance and institutional knowledge of DWT.

Finally, the government's motion to disqualify counsel must not be viewed in a vacuum and must be considered in light of the government's simultaneous efforts in this matter to seize legitimate assets necessary to retain counsel of choice.[15] In the present case, the government's improper attempt to gain a tactical advantage by seeking to disqualify learned, highly qualified, and highly knowledgeable counsel who have had six years' experience dealing with the legal issues in the case, is coupled with an improper attempt at "drying up" funds needed to pay those attorneys or the even greater sums needed to retain

---

[14] *See, e.g., Gourlay v. Barrett*, 2017 WL 1329434, *4 (E. D. Mich. 2017) ("Congress intended that no liability may be imposed under a state criminal law that is inconsistent with § 230").

[15] *See Luis*, 578 U.S. at __, 136 S.Ct. at 1089 ("the Government would undermine the value of that right by taking from Luis the ability to use the funds she needs to pay for her chosen attorney").

and bring new attorneys up to speed. *Alexander*, 141 Ariz. at 165.[16] Courts have dismissed indictments outright for such government interference into defendants' Sixth Amendment rights to counsel of choice.

For example, in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), the Second Circuit Court of Appeals upheld the district court's dismissal of the indictment due to the government's interference with corporate employees' right to counsel of choice. The government influenced the corporation to adopt a policy under which it conditioned, capped, and ultimately ceased advancing legal fees to defendant employees. *Id*. at 135. The court recognized the Sixth Amendment right to counsel of choice for "an employee who reasonably expects to receive attorneys' fees as a benefit or perquisite of employment, whether or not the expectation arises from a legal entitlement." *Id*. at 155. "In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *Id*. at 156. Accordingly, the court accepted the defendants' claim "that the government unjustifiably interfered with their relationship with counsel and their ability to mount the best defense they could muster." *Id*. at 155.

Indeed, the court found that the defendant employees "easily demonstrate[d] interference in their relationships with counsel and impairment of their ability to mount a

---

[16] Whether this is a pattern of government overreaching to deny these defendants their Sixth Amendment right to counsel and Fifth Amendment right to due process of law, or simply random isolated occurrences may have to be decided by this Court at a later date. *See, e.g., United States v. Stein*, 435 F.Supp.2d 330 (S.D.N.Y. 2006), *aff'd* 541 F.3d 130 (2d Cir. 2008).

defense" based on factors that are *very* similar to the circumstances of the present case: "Defendants were indicted based on a fairly novel theory of criminal liability; they face substantial penalties; [and] the relevant facts are scattered throughout over [several] million documents." *Id*. at 157. Under these circumstances, dismissal of the indictment was the only remedy for the Sixth Amendment violation. *Id*.; *see also United States v. Leung*, 351 F.Supp.2d 992 (C. D. Cal. 2005) (dismissing indictment due to government's interference with defendant's Sixth Amendment rights).

The government's similar efforts to deny Mr. Padilla and the other defendants their right to counsel of choice cannot be condoned.

## CONCLUSION

Because the highly valued right to counsel of one's choosing is regarded as the root meaning of the Sixth Amendment's guarantee of assistance of counsel and the Fifth Amendment right to due process of law, the erroneous denial of counsel of choice constitutes fundamental structural error and mandates reversal. "Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *Gonzalez-Lopez*, 548 U.S. at 148. The government has not shouldered its heavy burden of showing that this drastic measure of last resort is necessary or justified. This Court should not deny these defendants their Sixth Amendment right to counsel of choice with the attendant risk that any error cannot be deemed harmless. *Id*. The government's motion to disqualify counsel must be denied.

RESPECTFULLY SUBMITTED this 6th day of June, 2018.

PICCARRETA DAVIS KEENAN FIDEL PC

By:    /s/      Michael L. Piccarreta
                Michael L. Piccarreta
                Attorney for Andrew Padilla

On June 6, 2018, a PDF version
of this document was filed with the
Clerk of Court using the CM/ECF
System for filing and for Transmittal
of a Notice of Electronic Filing to the
following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, Peter.Kozinets@usdoj.Gov
Andrew Stone, Andrew.Stone@usdoj.Gov