# **Exhibit D**

1

2

3

4

5

6          IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
7                 IN AND FOR THE COUNTY OF PIERCE
   _____

8    R.O., by and through her mother,    )
     S.H., and K.M., by and through      )
9    her mother, L.M.,                    )
                                          )
10                   Plaintiffs,          ) No. 17-2-04897-1
                                          )
11        vs.                             )
                                          )
12   MEDALIST HOLDINGS, INC., et al.      )
                                          )
13                   Defendants.          )
14   _____

15           VERBATIM TRANSCRIPT OF PROCEEDINGS

16   _____

17

18                  **Wednesday, May 23, 2018**
           Before The Honorable G. Helen Whitener
19               Pierce County Courthouse
                    Tacoma, Washington
20

                     <<<<<<  >>>>>>
21

22

23

             Kimberly A. O'Neill, CCR #1954
24                Official Court Reporter
              Department 11, Room 202-A
25                  (253) 798-7281

```
 1                    A P P E A R A N C E S

 2

 3        For the Plaintiffs:    MICHAEL T. PFAU
                                 JASON P. AMALA
                                 Attorneys at Law
 4                               PFAU COCHRAN VERTETIS AMALA PLLC
                                 403 Columbia Street, Suite 500
 5                               Seattle, Washington 98104
                                 (206) 462-4334
 6

 7        For the Plaintiffs:    ERIK L. BAUER
                                 Attorney at Law
 8                               THE LAW OFFICE OF ERIK L. BAUER
                                 215 Tacoma Avenue South
 9                               Tacoma, WA 98402

10

          For the Defendant:    ERIC M. STAHL
11                               JAMES GRANT
                                 Attorneys at Law
12                               Davis Wright Tremaine LLP
                                 1201 Third Avenue, Suite 2200
13                               Seattle, WA 98101-3045
                                 (206) 622-3150
14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

R.O. vs. MEDALIST HOLDINGS, LLC

No. 17-2-04897-1

Proceedings of May 23, 2018

                                                    Page:

Plaintiffs' Motion to Compel Compliance with
     Court's Order...................................6

Plaintiffs' Motion for Sanctions.................45

Defendant's Motion to Withdraw...................45

1                    BE IT REMEMBERED that on Wednesday, the

2       23rd day of May, 2018, the above-captioned cause came on

3       duly for hearing before THE HONORABLE G. HELEN WHITENER,

4       Judge of the Superior Court in and for the county of Pierce,

5       state of Washington; the following proceedings were had, to

6       wit:

7

8                         <<<<<<  >>>>>>

9

10                   THE COURT:  All right.  Good morning,

11      everyone.

12                   MR. AMALA:  Good morning, Your Honor.

13                   MR. PFAU:  Good morning, Your Honor.

14                   MR. BAUER:  Good morning, Your Honor.

15                   MR. STAHL:  Good morning, Your Honor.

16                   MR. GRANT:  Good morning, Your Honor.

17                   THE COURT:  Go ahead and be seated.  All

18      right.  We're on the record on R.O. vs. Medalist Holdings,

19      LLC, Cause No. 17-2-04897-1.  Go ahead and introduce

20      yourselves for the record.

21                   MR. PFAU:  Michael Pfau on behalf of the

22      Plaintiffs, Your Honor.

23                   THE COURT:  Good morning.

24                   MR. AMALA:  And good morning, Your Honor.

25      Jason Amala on behalf of Plaintiffs.

```
 1                         THE COURT:  Good morning.

 2                         MR. BAUER:  Good morning, Your Honor.

 3       Erik Bauer for the Plaintiffs.

 4                         THE COURT:  Good morning.

 5                         MR. STAHL:  Good morning, Your Honor.

 6       Eric Stahl, Davis Wright Tremaine, here for the Medalist

 7       defendants.

 8                         THE COURT:  All right.  Good morning.

 9                         MR. GRANT:  And good morning, Your Honor.

10       Jim Grant on behalf of the Medalist defendants as well.

11                         THE COURT:  All right.  Counsels, we have

12       the motions that were brought previously set over to be

13       resolved today.  We have the motion to withdraw.  We also

14       have the objection to the withdrawal, and we have motions

15       for sanctions and attorney fees against Backpage pursuant to

16       CR 11.  And, of course, we still have the issue regarding

17       the motion to compel; would that be accurate?

18                         MR. PFAU:  That's accurate, Your Honor.

19                         MR. STAHL:  Yes, Your Honor.

20                         THE COURT:  Okay.  Any particular order?

21                         MR. PFAU:  Your Honor, we would like to

22       start with the motion to compel and then take the sanctions

23       motion separately.  Mr. Amala is going to argue the motion

24       to compel, and I'm going to argue the motion for sanctions.

25                         THE COURT:  And, Counsel, what is your
```

1    preference?

2                        MR. STAHL:  I think it makes sense to

3    start with the motion to withdraw first to make clear who we

4    are representing.

5                        THE COURT:  Well, I'd like to start with

6    the motion to compel as you were -- "you" being the

7    attorneys for the Defense -- representing the Defendants as

8    a whole at the time my order went into effect.  The

9    withdrawal does not affect the decision in regards to

10   compliance on my motion -- or, actually, my order and the

11   motion to compel; so let's hear that one first.

12                        MR. AMALA:  Your Honor, may we approach?

13                        THE COURT:  Of course.

14                        MR. AMALA:  Good morning, Your Honor.

15   Jason Amala on behalf of the Plaintiffs, R.O. and K.M.  And

16   I'll keep this somewhat succinct, Your Honor, because there

17   really wasn't much of an opposition to the motion, at least

18   substantively.  In January, you entered a very clear order

19   that compelled these defendants to search for responsive

20   documents to our discovery requests and those discovery

21   requests had been issued months earlier.  We finally came to

22   you for relief to get them to answer discovery or at least

23   to get the ball rolling.  Those search terms and what they

24   were ordered to produce was very similar to what these

25   defendants -- or, actually, was identical to the search that

1      these defendants had done in the *J.S.* litigation which was

2      litigated for five-plus years.

3         The Court's order was entered in January and over the

4      next five months until we filed this motion, we met and

5      conferred with the Defendants multiple times, trying to get

6      them to comply with the Court's order.  It got to the point

7      where we asked them to at least start producing responsive

8      information on a rolling basis and what we were told was:

9      "We're still looking, and we don't know what records we

10     have; We're trying to identify what sources there are; We

11     haven't started our review yet."  And we filed this motion

12     because the Defendants -- at least two of them pleaded

13     guilty.  Their assets are being seized, and we still don't

14     have any documents in response to your order.

15        And I'll say what's most troubling is that we filed this

16     motion and in response, the representation to the Court was

17     the same representation that we had been hearing for five

18     months.  And I think it's highlighted on Page 3 of their

19     opposition where they say, quote -- at Line 3, quote, "nor

20     have these documents been reviewed for privilege, privacy

21     concerns, or confidentiality," end quote.  So in our reply,

22     we focused on this argument about reviewing for privilege

23     because that, really cutting to the chase, seemed like that

24     would be the one argument the Court might find somewhat

25     compelling, saying that these folks should have an

1      opportunity to review for privilege; and it occurred to us

2      that the U.S. Senate had had a subpoena to which these folks

3      were ordered to comply.  They were held in contempt of

4      Congress, and they litigated some of these issues before a

5      federal judge in D.C., and so we thought "let's go look at

6      the docket to see if there had been any court orders on this

7      privilege issue because if they have litigated the issue

8      somewhere else, they shouldn't get to relitigate it here."

9          And that's where we found -- what we provided in the

10     supplemental declaration of Mr. Pfau are the declarations by

11     counsel for these defendants, representing to the Court in

12     D.C. the exact opposite of what they're telling this Court,

13     and that is, that they spent 30,000 attorney hours reviewing

14     these same documents for these same issues and produced them

15     to the U.S. Senate.  I believe the cost was around three

16     million dollars that they paid to their lawyers.  What was

17     even more troubling is that Davis Wright Tremaine, the same

18     law firm who is here today -- and I'm going to give them the

19     benefit of the doubt to the extent we can.  Ms. Roos'

20     declarations indicate that Davis Wright Tremaine was counsel

21     of record and oversaw that entire review and production; so

22     at some point, there had been this -- I think an argument

23     that, well, gosh, we've got to pretend like we don't know

24     what Perkins Coie did and now their own declarations from

25     Perkins Coie indicate that Davis Wright Tremaine oversaw

1   that entire review for these same issues.  They've already

2   done the review for privilege.  They've already done the

3   review for responsiveness, and so that's why we'd ask that

4   the motion to compel be granted.  The order that we've

5   provided to the Court allows them to withhold documents that

6   they have flagged for privilege as long as they haven't

7   litigated the issue and lost elsewhere and that seems

8   entirely appropriate.

9       And I will flag for the Court, because I understand at

10   the last hearing there was some arguments about, well, now

11   they want this stuff from the Senate, and we're going to

12   have to cross that bridge a different day because I'm very

13   concerned that we issued these discovery requests at the end

14   of last year.  We have an order from you and now it appears

15   that they have reviewed all of these and cataloged them for

16   responsiveness, and yet we didn't get any of those in

17   response to our discovery requests, yet have we received any

18   documents in response to your order.  So, we will cross that

19   bridge a different day; but for today, we ask the documents

20   that they have identified as being responsive to your order

21   be produced within a week.  They know what documents are

22   privileged.  They've flagged those in a prior case.  My

23   understanding is they provided the U.S. Senate with a

24   privilege log, so that work has been done and there's no

25   reason that they can't comply with your order and produce to

1      us what they flagged, withholding what they claim is

2      privileged as long as they haven't litigated that issue

3      somewhere else and lost.  Thank you, Your Honor.

4                     MR. STAHL:  Your Honor --

5                     THE COURT:  Counsel?

6                     MR. STAHL:  Thank you, Your Honor.  The

7      issue before the Court is whether there's any basis for the

8      overreaching remedy they're asking for in this case, for us

9      to turn over 1.1 million documents that we had identified as

10     having certain search terms in responding to this Court's

11     order, not in *J.S.*, not in the Senate hearing.  It's an

12     overreaching remedy, and they're conflating two different --

13     three different things.

14        The documents we reviewed for this --

15                     THE COURT:  Let me stop you there.  It's

16     an "overreaching remedy" to comply with my order?

17                     MR. STAHL:  No, they're not asking -- it's

18     an overreaching remedy for them to ask for us to turn over

19     these 1.1 million documents, which, contrary to what

20     Mr. Amala just said, have not been flagged as responsive.

21     They have been flagged as having certain search terms.  This

22     is not work that was done for the Senate cases.  This is the

23     period of time after *J.S.*, so it's not work that was done

24     for the *J.S.* case.

25        Let me just take a step back and --

1        THE COURT:  Well, before you get there --

2   because you tend to talk pretty fast so that's why I tried

3   to slow you down, not because I'm not hearing you.  It's

4   because I'd like to hear and understand what you're saying.

5   What I'm asking is based on your review of all of the

6   documents you have and the order that I entered, you were

7   not able to find any documents, whatsoever, that needed to

8   be turned over to be complied with my order?

9        MR. STAHL:  No.

10        THE COURT:  Because what I heard Counsel

11   state is as of today's date, they have not received any

12   documents in response to my order; so just answer that.

13        MR. STAHL:  That's not true.  First of

14   all, they received 95,000 pages that we have previously

15   produced in *J.S.*, number one.  Number two, they received

16   some number of documents specific to this case -- to the

17   case -- specific terms -- search terms that they asked us to

18   run which we did and which we have produced.

19        THE COURT:  And these were produced after

20   my order?

21        MR. STAHL:  Correct.

22        THE COURT:  Okay.

23        MR. STAHL:  The part of your order that we

24   are here discussing is the part that said go around these

25   500-plus search terms on data not from *J.S.* but from the

1    period after *J.S.*, from 2012 to the present.  We worked

2    diligently to comply with that.  Let me tell you what we

3    did.  When we ran those 500-plus search terms against two

4    terabytes of data that had been gathered in the Spring of

5    2016 -- and just for some perspective, I looked this up.

6    Two terabytes of data is something like 150 million pages of

7    data; it's a vast amount of material.  If printed out, it

8    would be more than anyone in this room could read in a

9    lifetime.

10       We ran those search terms.  The results that came back

11   from just the search terms was 1.1 million documents.  We

12   acted diligently and transparently going to the Plaintiffs

13   and saying "here's what we've got; it is going to take eight

14   to twelve months to search this material."  And their own --

15   their own declaration, what Mr. Amala just said, kind of

16   makes the point.  For a similar volume of documents, it took

17   a year to produce in the Senate case.  I was not involved in

18   *J.S.*, but the discovery there took thousands of hours and

19   several years and cost millions of dollars.

20       We went to the Plaintiffs and we said, "Can we discuss

21   how you want us to search these documents; Can we be more

22   precise?  Can we narrow the search terms, or can we make

23   them, you know, more tailored to a way that actually

24   generates responsive material?"  So, the 1.1 million

25   documents are documents that just have words like

1    "requirement" or "terms of use" in them.  They're not

2    necessarily responsive to any discovery request.

3        My May 20th letter, which is in the record and which I

4    believe the Court has read, sets out what we did and what

5    we're asking the Plaintiffs to discuss.  It was a diligent

6    attempt to cooperate with them to get the discovery done in

7    the time that we had under the case schedule.  We sent that

8    letter on May 20th, and we asked to confer with them.  It

9    took us, I'll tell you, ten days to even get them to agree

10   to speak to us.  They put all kinds of conditions on wanting

11   to speak to us in terms of additional information we wanted.

12   We conferred on -- Friday, I believe, was the -- March 30th.

13   They asked for some additional information which we provided

14   in e-mails on May 3rd -- and I'm sorry, April 3rd and April

15   6th which are in the record, also, in Mr. Pfau's

16   declaration.  They never responded to that, and literally

17   until the day that we got Mr. Ferrer's communication that

18   caused us to -- the need to withdraw from representing the

19   Backpage defendants, we were communicating with them; and we

20   were trying to figure out a way to make this workable.  The

21   last communication and last attempt to confer among the

22   parties was that April 6th e-mail until we got the motion to

23   compel.

24       So, this notion that we were not trying to comply or

25   ignoring the motion is just not true.  It's not born out by

1    the record.  It's false, and we were diligently trying to

2    figure out a way to get this job done in the time that we

3    provided.  So when I say there's no basis for the remedy

4    they're proposing, we've got 1.1 million documents that have

5    a search term that have not been determined to be either

6    responsive or privileged or not.  They have not been

7    reviewed.  We currently don't have a client we can

8    represent.  These are Backpage.com documents gathered by

9    Backpage for the *J.S.* case.  We no longer are able to

10   represent or to produce documents on their behalf or to

11   review them.

12       In terms of where we are now, they're asking for an order

13   that would compel our firm to turn over a million documents,

14   to turn over the larger database in which they are situated

15   in and which the motion documents are located.  We can't

16   turn over documents on behalf of a client we don't represent

17   without knowing what's in them, whether they have

18   confidential or privileged material.  The Court can

19   certainly order us to preserve those records, order us to

20   cooperate with Backpage or with Counsel, which we're going

21   to do, anyway.  And we are officers of the court, and we're

22   not going anywhere; but in terms of an order for us to start

23   reviewing and producing materials, much less to produce it

24   in a week, is not -- it's not realistic.

25       I'll also say that we have not met or conferred over the

1    remedy they sought in this motion.  The last communication,

2    again, was April 6th when we were trying to figure out how

3    to comply with the order generally.  There was no meet and

4    confer over this idea that they can seize the 2-terabyte

5    database.  There was no meet and confer over the idea that

6    we should turn over 1.1 million records in a week.  The

7    request raises all kinds of practical problems and just

8    physically how those records would be copied, who would pay

9    for it, who would do the review, this sort of stuff the

10   parties are supposed to meet and confer over before

11   burdening the Court with a motion like this.

12       And, you know, I'll just add that the meet and confer

13   requirement is mandatory in Division II.  *Clarke vs. State*

14   says you have to confer before you bring this to the Court.

15   They cite a Division I case, *Amy vs. Kmart*, that says, well,

16   in some circumstances, you don't need to confer.  That's not

17   the rule in this division.

18       The documents -- the motion is not properly directed to

19   the clients that I'm standing here for today, the Medalist

20   parties.  Again, these were collected by Backpage in the

21   course of the *J.S.* case.  The Medalist parties were not

22   defendants, and so we would ask that the Court either deny

23   the motion or direct the parties to preserve the records and

24   to confer further.

25                    THE COURT:  So your remedy that you're

requesting the Court to do today, Counsel, if I heard you
correctly, is to deny the motion and direct you to preserve
the records, which I believe I've already done, and direct
you to confer further for a client that you're indicating
you no longer represent.

MR. STAHL:  My request is that you deny
the motion.  I'm suggesting, if the Court is inclined to do
so, that it could extend the existing preservation order;
and beyond that, again, we will cooperate with Backpage.com
or its new counsel, but what I think is improper is to
conflate the obligations of the clients with their attorneys
or former attorneys which is what they're asking the Court
to do.

THE COURT:  Okay.

MR. GRANT:  Your Honor --

THE COURT:  One second, Counsel.

MR. GRANT:  Sure.

THE COURT:  Counsel, I'd like to hear from
you in regards to the response given that they have not
fully complied but substantially complied within their
capabilities.

MR. AMALA:  And I appreciate you asking
that, Your Honor, because that's where I wanted to start.
That is not accurate and even remotely close to accurate.
What has been produced to us -- and let me back up.  If the

1    Court may recall, when we came on the motion to compel

2    before you entered your order, the issue is that in the *J.S.*

3    case, those documents ended in January of 2012.  The

4    Plaintiffs in this case -- and that's because the girls in

5    that case had been sold on the website in 2010, so the

6    Court, in *J.S.*, had limited the discovery, the scope of

7    discovery until -- I think it was January 1, 2012.

8        When we -- the girls in this case were sold in late 2014

9    and early 2015, so when we came to you on the motion to

10   compel, it was because the discovery we had received in *J.S.*

11   ended in 2012; and so we essentially asked you to require

12   them to do the same search and production that had been

13   ordered in *J.S.*

14       The 95,000 documents we've received are the documents

15   from *J.S.*, not the documents we came asking you to compel.

16   They're basically asking for credit for the documents that

17   took us a half a dozen or more motions to compel in the *J.S.*

18   case and that was plainly not the focus of why we came to

19   you in this case.  They basically just gave us what they

20   gave us in *J.S.* and now they want credit for it, but

21   obviously, the focus of your order was -- I mean, does it

22   include those?  Yes.  But the focus is making sure we got

23   the documents for the time period that's at issue in this

24   case.  So have they given us the *J.S.* documents or regiven

25   them to us?  Yes.  But that was plainly not the primary

1    focus of the motion or the focus of your order.

2        The only other documents we have received are a relative

3    handful and those are about the advertisements for our own

4    clients, and we're talking -- I mean, I don't know the total

5    off the top of my head, Your Honor, but it is a very, very

6    small amount, and we had to kick and scream to get them to

7    give them to us by literally telling them you've already --

8    you've got this because in the criminal cases for these

9    girls, those documents had been produced, so we essentially

10   said, "Well, we know you gave them to law enforcement; Can

11   you at least give us what you gave to law enforcement?"

12   That is the extent to what we've received and that's why

13   I've made the statement your search, which you ordered, they

14   have not complied with.  They've essentially given us

15   documents on our own clients that they gave to law

16   enforcement and then the documents from *J.S.*  The purpose of

17   your order has not been complied with nor have we received

18   anything in response to your order we will get in that

19   context.  To put it simply, we've received nothing from them

20   from after January 2012 other than the documents about our

21   own clients.

22       And I'll just -- unless the Court has any pointed

23   questions for me, I do want to address just a couple of

24   issues.  We met and conferred --

25                   THE COURT:  One second.

1              MR. AMALA:  Yes, Your Honor.

2                        (Pause.)

3              THE COURT:  I'm looking at the -- and both

4     counsels were referring to the January 12th court order I

5     signed; correct?

6              MR. AMALA:  Yes, Your Honor.  And, Your

7     Honor, if I -- I know you asked me to pause.  Mr. Pfau

8     pointed out something I should have probably made clear.

9     They actually didn't give us any new documents.  The *J.S.*

10    documents, they basically said you can keep what you already

11    have.  I guess I should make that clear.  There was no new

12    search.  They just said you can keep what you've already

13    got.

14             THE COURT:  All right.  Counsel?

15             MR. AMALA:  And, Your Honor, may I --

16    two --

17             THE COURT:  Are you finished?

18             MR. AMALA:  Just the last two points, Your

19    Honor.  We're here on a motion to compel compliance with

20    your order.  The parties have met and conferred in good

21    faith multiple times, and I will add -- I want to make

22    something very -- I think there's a point at issue here, and

23    I'm a little concerned about some semantics, that the

24    language that is being used appears to be very careful which

25    is saying the documents haven't been reviewed in this case,

1    and that is --

2                    THE COURT:  Well, you heard that too?

3                    MR. AMALA:  Yeah.

4                    THE COURT:  Okay.  Go ahead.

5                    MR. AMALA:  And that is obviously not the

6    issue because they -- we know they have reviewed these to

7    the tune of 30,000 hours and multi-million dollars and that

8    this law firm is the one that oversaw that review.  I don't

9    think there's case law that says you can review all of your

10   documents in one case and in the next case pretend like you

11   don't know what's in your documents.

12       Regarding the withdrawal, as the Court pointed out, this

13   is the firm that has overseen the entire process, and we

14   have grave concerns that they have tried to -- I want to be

15   careful with my words.  They have tried to not -- they've

16   distanced themselves, pretending like they don't know what

17   Perkins Coie did.  We know now -- we now know that's not

18   true and now this firm is saying we want to withdraw and

19   punt to the next law firm, and this is the firm that has

20   overseen the entire process and that's why I think the Court

21   started with this motion correctly, which is they're the

22   firm that should be ordered to compel or to comply with the

23   order.  Thank you.

24                    THE COURT:  All right.

25                    MR. STAHL:  Mr. Grant was involved in the

1    earlier --

2                    MR. GRANT:  Well, I wanted to point out

3    and respond to some of Mr. Amala's comments which are not

4    accurate, Your Honor, and let me just put it this way.  The

5    requests in the PSI production are different than the

6    requests here.  As is true in any document production, you

7    deal with the collection requests that you get in that -- in

8    that context, so -- that we reviewed documents -- I should

9    step back; I'll correct that.  Actually, the other parties

10   reviewed documents.  In the context of the PSI production

11   does not mean that that's the same exercise that will be

12   done here.  It's a very different exercise now that has to

13   be based on the search terms and --

14                    THE COURT:  But you represent all of them?

15                    MR. GRANT:  We actually did not handle

16   the -- this is the other point I have to correct.  We did

17   not handle the review and production of documents of the

18   PSI.  That was done by the Perkins Coie firm and by other

19   contractors with Perkins Coie.  We represented one of my

20   partners who is a First Amendment expert.  We represented

21   parties in that context having to do with the First

22   Amendment issues of the PSI subpoena; it's overbroad in its

23   violation.

24                    THE COURT:  And when you took over from

25   Perkins Coie, you were aware of what was already completed

1   and how it was completed?

2              MR. GRANT:  Your Honor, we did not take

3   over from Perkins Coie in the PSI list.

4              THE COURT:  All right.

5              MR. GRANT:  Perkins Coie had --

6              THE COURT:  Just this --

7              MR. GRANT:  Perkins Coie had the document

8   responsibilities in the PSI case; that was not ours.  We

9   certainly coordinated with cocounsel, including Akin Gump --

10             THE COURT:  Well, that's what I was

11  asking.

12             MR. GRANT:  -- including Paul Hastings and

13  including Perkins Coie, so there was coordination but that

14  was not our role; and we were not the ones responsible for

15  the document collection there.

16             THE COURT:  Right, but you were privy to

17  what was covered by Perkins Coie in that representation --

18             MR. GRANT:  I'll be honest.  I don't want

19  to overstate because I'm not sure we were privy as to what

20  Perkins Coie was producing in that context.  We relied on

21  our cocounsel for that work; so as I'm saying, that's not

22  our work.  It's not -- it's not what we were doing, and it's

23  really -- you know, it's sort of reflective of -- the

24  responsibilities for document productions fall to the

25  client, as was true in that matter and as is true here, so

1    the client here or the party here that has the obligations

2    to produce documents is Backpage.com.  We did previously

3    represent them.  Now, this is where the two motions sort of

4    become intertwined.  Now, we have the difficulty that we

5    don't represent them.  We don't have authority to represent

6    them.  We don't even have communications with them, so the

7    problem is the next stage in the -- in the compliance would

8    be virtually impossible given the lack of relationship, but

9    I wanted to make sure it was clear that the involvement in

10   the PSI has a completely different set of requests, a

11   completely different review that was done.  You can't say

12   that because, you know, we or our cocounsel fulfilled our

13   obligations in another case, that means, de facto, we did

14   not fulfill our obligations in this case.

15                    MR. AMALA:  Your Honor, I'm going to --

16                    MR. GRANT:  That's an unfair

17   characterization.

18                    MR. AMALA:  I'm going to -- I want to --

19   and I'm sorry to interrupt.  I'm going to object and move to

20   strike Mr. Grant's -- he's essentially conceded he has no

21   foundation or personal knowledge for the statements he just

22   made regarding his firm's involvement, and I'm very

23   concerned because the representations he just made, to which

24   he says he doesn't have personal knowledge because he wasn't

25   involved, directly conflict with the evidence that's before

1      the Court in Ms. Roos' declaration; and I can read the Court

2      the excerpts, but it's in the record.

3                     THE COURT:  Will you read it into the

4      record.

5                     MR. AMALA:  I will.  This is Ms. Roos'

6      declaration from November 8, 2016.

7                     THE COURT:  And just read the portions

8      that are applicable.

9                     MR. AMALA:  Thank you, Your Honor.  And

10     this was Exhibit 3 to Mr. Pfau's supplemental declaration

11     that was filed for this motion.  Ms. Roos begins in her

12     declaration and says that, quote, "On" -- this is paragraph

13     (2), quote, "On August 10, 2016, Perkins Coie was engaged to

14     conduct a document review and production in connection with

15     Request Nos. 1, 2, and 3 of the October 1, 2015, subpoena

16     duces tecum (the 'Subpoena') issued to Carl Ferrer (CEO of

17     Backpage) by the Senate Permanent Subcommittee on

18     Investigations," and parentheses, "('PSI')," end

19     parentheses.  "With regard to the PSI proceeding, Backpage

20     and Mr. Ferrer have been represented at all times by the

21     firms of Akin Gump and Davis Wright Tremaine," end quote;

22     and she then refers to those firms as "Counsel of Record."

23         Then in paragraph (4), Ms. Roos states, quote, "Perkins

24     Coie's work on this matter, including the identification of

25     particular custodians and other sources of records

1    potentially responsive to the Subpoena, as well as the

2    selection of particular search terms utilized in the review,

3    was performed at the direction of Backpage, in consultation

4    with Counsel of Record," end quote, which she identified as

5    including Davis Wright Tremaine.  She then goes on in her

6    declaration, in both this declaration and the other

7    declaration as Exhibit 1 to Mr. Pfau's supplemental

8    declaration, to state how Davis Wright Tremaine helped to

9    collect data sources that were, then, given to Perkins Coie

10   and was actively involved in the search and the review that

11   Perkins Coie did at the behest of Davis Wright Tremaine

12   acting as counsel.

13      Thank you, Your Honor, and I apologize for the

14   interruption.

15               MR. GRANT:  And I apologize, Your Honor,

16   but that is not what I just said.  The quotes are accurate

17   and it is true, as I've just explained to the Court, that

18   Davis Wright was one of the counsel of record along with

19   Akin Gump and along with Paul Hastings and along with

20   Perkins Coie, but Davis Wright -- and Ms. Roos says it in

21   her declaration that Perkins Coie did a review.  Perkins

22   Coie collected the documents to the extent that they were

23   collections that others had, including what we had from the

24   *J.S.* case, but it is absolutely not true that Davis Wright

25   was responsible for that review and collection.  Davis

1    Wright was counsel of record in the PSI case on First

2    Amendment issues, not in regard to the document production;

3    and I take offense to that because there's a suggestion that

4    I misrepresented that to the Court.

5                    THE COURT:  Well, I read it so I'm

6    familiar with what's in it; but what I'm trying to figure

7    out, Counsel from Davis Wright Tremaine, is that even though

8    your firm, you're stating, did not necessarily review the

9    documents, since you were counsel of record, part of the

10   threesome, for lack of a better word, are you saying that

11   you were not aware of what documents had been reviewed in

12   this case or in that case?

13                   MR. GRANT:  In the PSI case?

14                   THE COURT:  In the PSI case.

15                   MR. GRANT:  I would say in a general

16   sense, Your Honor, we were aware of what kinds of documents

17   were being reviewed.  We certainly knew the three requests

18   that the Permanent Subcommittee on Investigations had posed,

19   the requests that they had made.  We knew that the review

20   was taking place.  We were not involved in doing a review,

21   but we did know generally what the kinds of documents were

22   and what the collections were.

23                   THE COURT:  And given that knowledge base,

24   when you were compelled to produce documents in this case,

25   having that information, are you saying you were not aware

1    of the likelihood that many of those documents would be

2    relevant to this case?

3                    MR. GRANT:  I would say we were aware of

4    the likelihood that that collection of documents would be

5    part of the big pot that would have to be reviewed for

6    purposes of this case.

7                    THE COURT:  Okay.

8                    MR. GRANT:  And one set of document

9    requests there in the PSI, the Perkins firm did the review

10   and collected and produced the documents that were relevant,

11   another set of requests here that are a different set of

12   requests; so the process that has to happen is you go find

13   the full collection of materials you have to work with,

14   which, I suspect, subsumed the PSI materials and more, then

15   you run the search terms against that collection because now

16   you have to focus on the specific requests in this case, not

17   some request from some other case, and determine from that

18   what kinds of hits you get.

19                   THE COURT:  But here's where I'm having a

20   little problem following your reasoning.  You have the PSI

21   case --

22                   MR. GRANT:  Mm-hmm.

23                   THE COURT:  -- and you have certain

24   documents that you are aware were reviewed, and you just

25   indicated from that subset you were aware that some of them

1  may be relevant in this case, so you don't have to go review

2  the whole amount to come up with the PSI amount.  You're now

3  reviewing a small subset to see whether or not it's relevant

4  to this case; and afterwards, as you're doing your

5  compliance with the Court's order, you can, then, go beyond

6  it.  But what I'm hearing is nothing was turned over;

7  whereas, what I'm saying is couldn't you have looked at the

8  subset that was already reviewed in the PSI case and see if

9  you can comply with this Court's order, see what's relevant

10  in that subset -- it's not the big picture here; we're just

11  dealing with the subset -- and, after complying with this

12  Court's order, indicate to Counsel, hey, there might be some

13  more in the bigger scheme of documents.  And, of course, my

14  terminology isn't as great as all of you because you've been

15  dealing with it, but I'm trying to make it as reasonable as

16  possible.  You didn't have to go, so we're looking at the

17  small subset, just the PSI stuff that very likely, based on

18  what you said, would have documents relevant to this case

19  and would be relevant to complying with my court order; but

20  that wasn't even done.

21              MR. GRANT:  Your Honor, those materials

22  may or may not be relevant to the request here.

23              THE COURT:  But you never checked.

24              MR. GRANT:  Because the process is that

25  you need to have the collective whole in order to work from

1    it, and here's why.

2                    THE COURT:  Why?

3                    MR. GRANT:  If we had gone off with

4    just -- I can see the motion coming from the Plaintiffs now.

5    If we had gone off just to re-review the collection of

6    materials that had been produced with the PSI and nothing

7    else, I can guarantee you we would have had a motion to

8    compel by the Plaintiffs against us saying that's not the

9    request we made and that's not the Court's order.  What you

10   have to do is go back to your old collection of documents

11   and make sure you encompass all those materials for all the

12   search terms that were subject to the Court's order, so

13   that's why -- and this is just the logical progression that

14   you always do in a process like this.

15                   THE COURT:  So what I'm hearing is you're

16   saying you could not comply with the Court's order on a

17   rolling basis --

18                   MR. GRANT:  No.

19                   THE COURT:  -- that you had to comply with

20   the Court's order by reviewing all of the documents again.

21   So every time -- what I'm hearing and correct me if I'm

22   wrong -- so every time you get a Court, whether it's this

23   Court or another Court in regards to these issues, you would

24   have to go back from scratch to look at the whole; whereas,

25   you reference the PSI case and that case had documents

1       relevant to this one and a letter indicating this is just

2       the first of many on a rolling basis; we're going to give

3       you this amount so that we can, at least, start complying

4       with the Court's order.  You're saying that couldn't be done

5       is what I'm hearing.

6                       MR. GRANT:  No, I'm not saying that, Your

7       Honor.  What I'm saying is that, first of all, that's not --

8       that's not a rolling basis review.  That would be taking a

9       subset of materials, re-reviewing it, having to run these

10      search terms against that subset of materials; but it's a

11      process, then, we would have to duplicate for the source

12      materials from which that came.  This is what I mean; you've

13      got the small pot which is the -- which is the production

14      that came out of the PSI.  You've got the bigger pot which

15      is the production -- or which is the collection of materials

16      from the PSI.  Then you've got a bigger pot, still, which is

17      the collection of all the documents from Backpage that is

18      potentially responsive, the 2 terabytes.  So what you're

19      suggesting is you have to search all that once through a

20      PSI.  Then you have to search the same materials all over

21      again because I can't segregate them back out just for the

22      PSI pot.  Then you've got to search them all over again for

23      the -- for the entire collective pot.

24          What I'm saying, Your Honor -- I've been doing this 35

25      years and some pretty big document productions back in my

1        earlier days, I can attest, but I don't do much of it now,

2        but that is not --

3                    THE COURT:  Back then you didn't have the

4        ability to do quick search terms on databases.

5                    MR. GRANT:  I can tell you a story about

6        20 million pages of documents in the *Exxon Valdez* case; but

7        in any event, that is not how you undertake a process like

8        this.  I believe what I wanted to say, too, that had that

9        been the issue in the -- in the communications with

10       Mr. Amala and Mr. Pfau about how to go about doing this, had

11       there been a suggestion that that's how you should have

12       proceeded, we could have addressed that suggestion.  That's

13       not what happened in the course of this meet and confer.

14       What happened was, as is typical in a process like this, we

15       had gotten to the stage where we knew there was a huge

16       collection of documents and that the search term hits were

17       vastly overbroad.  They were going to get lots and lots of

18       junk information.  That's the way this process works.  We

19       were trying to work out that issue with them.  That comes to

20       the point when Mr. Ferrer indicates to us -- gives us an

21       indication that we can no longer represent him as counsel.

22       That's where we stand.

23                    THE COURT:  So the Court's order was

24       January 12, 2018, and what I'm hearing you say is at that

25       point in time, you knew it was not going to be realistic to

1    comply for many months with the Court's order.

2                    MR. GRANT:  I'm not saying that, Your

3    Honor, and Mr. Stahl has been more directly involved in

4    this, certainly, than I have, but my understanding is that

5    in that process, we went out to collect the materials to

6    find out exactly what we had.  This is not easy stuff; it

7    takes some time.

8                    THE COURT:  Well, okay.  For

9    clarification --

10                    MR. GRANT:  Sorry.

11                    THE COURT:  -- when I say "comply,"

12   meaning, produce the documents to the other side within a

13   relatively short period of time is what I'm hearing.  It

14   would have taken many, many, many, many months.

15                    MR. GRANT:  Given the volume of materials

16   we were talking about, given the problem of too many hits

17   with the search hits, it would have taken many months and a

18   vast amount of work, and Mr. Amala's example of the PSI

19   matter is exact proof of that --

20                    THE COURT:  And that --

21                    MR. GRANT:  -- and in order to do it

22   there, it took -- I'm sorry, Your Honor.

23                    THE COURT:  And that the more efficient

24   way of approaching this by utilizing search terms that were

25   previously done that produced documents of similar discovery

1          requests, or if not similar, the same in different cases,

2          you're saying you could not do that on a rolling basis; you

3          had to, then, review the whole.

4                    MR. GRANT:  Again, Your Honor, I don't

5          want to misstate.  I'm not saying we couldn't do things on a

6          rolling basis in one fashion or another.  I'm saying the way

7          we were approaching this is the way that is traditionally

8          done in a document production like this.  We were trying to

9          determine how many hits there were going to be against those

10         search terms.  When we did and we found out that it was a

11         problem, Mr. Stahl conferred with him about that.

12                   THE COURT:  And you're saying

13         traditionally done by way of Davis Wright Tremaine or in the

14         industry?

15                   MR. GRANT:  In the industry.

16                   THE COURT:  Okay.

17                   MR. GRANT:  I'm saying -- and I've worked

18         for other law firms as well, and I've dealt with a lot of

19         document productions in my day; that's how you do it.

20                   THE COURT:  Okay.

21                   MR. AMALA:  Your Honor, if I --

22                   THE COURT:  I'm sure Counsel --

23                   MR. AMALA:  Yeah, briefly.

24                   THE COURT:  -- probably would not agree.

25                   MR. AMALA:  You know, and I appreciate

1    Mr. Grant may have a few years on me, but I appreciate the

2    reference to the traditional litigation and paper copy,

3    using the *Exxon Valdez*.  I don't imagine a Court ever in the

4    country endorsed the idea that Exxon reviews those 20

5    million pages of documents, catalogs them, does a privilege

6    log in one case and then when the next case is filed

7    involving the same oil spill, they get to say, we need to

8    re-review those 20 million documents and pretend like we

9    don't know what of those 20 million are responsive; and that

10   is the issue here.  These documents are not a mystery;

11   they're just not.  And Ms. Roos' declaration makes that

12   clear.  The PSI Subcommittee was focused on these same

13   issues that we are in this case, and that is the fundamental

14   problem.

15     We also repeatedly asked them to produce documents on a

16   rolling basis and at no point did Mr. Stahl or Davis Wright

17   Tremaine tell us that these documents had already been

18   reviewed for confidentiality and for privilege.  And

19   confidentiality, Ms. Roos talks about the 40,000 documents

20   that they had redacted for confidentiality.  At no point

21   during our meet and confers did they tell us, oh, by the

22   way, we've already overseen the review of all these

23   documents.  That would have been a very different

24   discussion, and that's why we're asking the Court to order

25   them to produce the documents that were responsive to the

1      search terms.  They can withhold documents that they have

2      already flagged for privilege because they've already done

3      that.  That is a fair way to proceed and balance the

4      interests of the parties and especially since they've

5      already reviewed these, there's no risk.  I guess if there's

6      a little risk of overbreadth, the Court is well within its

7      discretion to allow that to happen so long as its privilege

8      is protected which it can do by allowing them to withhold

9      documents that they already flagged as privilege, after

10     that, is completely fair.  To the extent it's over --

11     slightly overbroad somehow, we'll have to review those

12     documents, but we'll take that burden at this point because

13     we are very afraid that we're, essentially, asking to

14     re-review the 20 million "Exxon" documents that have already

15     been reviewed.

16                    MR. GRANT:  Your Honor --

17                    THE COURT:  Counsel, what I'd like to know

18     is, just for the record, in regards to Defendants Ferrer,

19     Larkin, and Lacey from Backpage.com and Medalist Holdings,

20     how many of these cases, nationwide, does Davis Wright

21     Tremaine participate in as counsel?

22                    MR. GRANT:  For which parties, those four

23     that you mentioned or five?

24                    THE COURT:  Correct.

25                    MR. AMALA:  And, Your Honor, may I -- just

1    so you get a -- I think the question you're asking, to make

2    sure we're clear here, this -- and I think they've referred

3    to this.  The Court may want to ask as of the date of the

4    Court's order in January, how many cases throughout the

5    country did Davis Wright represent these defendants because

6    we have this issue about them trying to withdraw in

7    different cases; so if the Court is trying to get a sense

8    for how involved has this law firm been involved in

9    representing these defendants across the country, the

10   answer, I think, will be -- if you're asking the time when

11   you entered your order, you'll probably get a different

12   answer than if Counsel tries to answer based on today.

13            MR. GRANT:  I was going to give the Court

14   a complete answer and --

15            THE COURT:  My question went to overall

16   and that includes cases you may have recently been allowed

17   to withdraw from so that we're clear.

18            MR. GRANT:  Right, so I was going to

19   answer by saying as things stand right now, maybe six or

20   eight because of the withdrawals.  Virtually, every court

21   has signed off on withdrawal notices or orders of

22   withdrawal.

23       In terms of going back in time, there were as many as 17

24   cases total, this one being one of the 17.  There are

25   different varieties, Your Honor.  So, for example, there are

1        instances where the firm represented Backpage.com against

2        the Sheriff of Cook County, obtained an order there

3        declaring that his action of cutting off credit card

4        services was an unlawful, unconstitutional prior restraint;

5        and we have some other cases that also involve actions

6        against governmental parties and then some cases, as are

7        civil matters, most of which, apparently, have been brought

8        by Mr. Pfau's firm.

9                    THE COURT:  So overall from the first

10       time, I guess, Davis Wright Tremaine started representing

11       one or more parties that are connected somehow to

12       Backpage.com and Medalist Holdings, the largest amount of

13       cases would have been 17.

14                   MR. GRANT:  We've represented the parties

15       in other prior cases as well, some of which have terminated.

16                   THE COURT:  Okay.  So I want to know

17       overall to include terminated cases.

18                   MR. GRANT:  Yeah, it would go back to the

19       proceedings against the State of Washington where we

20       invalidated the laws.  I'm sorry.  I'm scratching my memory.

21       I would say 25, Your Honor, is my estimate.

22                   THE COURT:  And, of course,

23       representations were for different types of things, but

24       overall from day one when someone walked in that's connected

25       to these parties to Davis Wright Tremaine for

1    representation, about 25.

2                    MR. GRANT:  Approximately.

3                    THE COURT:  Approximately.

4                    MR. GRANT:  And, Your Honor, because there

5    are differences of organizations in time here, you have to

6    bear in mind that up through April of 2015 --

7                    THE COURT:  '15.

8                    MR. GRANT:  -- that was all one company;

9    they were all collectively owned.  Well, that's not accurate

10   to say one company --

11                   THE COURT:  Well --

12                   MR. GRANT:  -- but then ownership changes

13   April of 2015.

14                   THE COURT:  Correct, and I'll deal with

15   that when I get to the withdrawal.  Now, presently after

16   various withdrawals over time, Davis Wright Tremaine has

17   about six or eight of these cases approximately.

18                   MR. GRANT:  It's a rough number, Your

19   Honor.

20                   THE COURT:  Okay.  All right.  At the end

21   of the day, I entered an order on January 12, 2018, and the

22   order was specific in regards to the motion brought to

23   compel full and complete responses from Backpage corporate

24   defendants with regards to discovery requests outlined in

25   what was deemed Appendix A; the pleadings were 72 pages.

1       The order was relatively straightforward, requiring full and

2       complete responses from the Backpage corporate defendants

3       regarding the discovery requests outlined, full and complete

4       responses regarding discovery requests outlined, including

5       declarations and evidence submitted in support thereof; and

6       then production of all records in the *J.S.* matter required

7       that the same search methodology employed in the *J.S.* case

8       be utilized which is why my questioning in regards to PSI

9       was along those lines, that you could do a search to, at

10      least, start complying with the Court's order and not wait

11      to get everything when you have been representing the

12      parties before this Court over a number of years in

13      different phases but most specifically in regards to this

14      case and the *J.S.* case and cases throughout the U.S.,

15      addressing very similar issues.

16         To require the Plaintiff to wait for a review of

17      discovery that the Defense is privy to, has been analyzing,

18      has been reviewing throughout the states, not just even

19      Washington State but throughout the states in response to

20      very similar requests, I don't find that to be efficient.  I

21      don't find that to be comporting with the technology we can

22      use today.

23         The *Exxon* case, kind of dated, Counsel, there.

24                   MR. GRANT:  Agreed, Your Honor.

25                   THE COURT:  But we have many ways of

1        responding more timely to discovery involving a vast amount

2        of documents, and it's time to change the responses to these

3        requests so that they're more timely by utilizing those

4        search engines a little more efficiently; and I'm finding

5        that wasn't done in this case.

6            January 12th -- we're now at May 23rd, five months later,

7        and documents that were turned over in response to my order

8        with documents that were, previously, available and could

9        have been turned over before that hearing; so to say that

10       you were complying with my order by turning over something

11       that was already available, packaged and ready to be shipped

12       out, so to speak, is not complying with this Court's order.

13       That is not in response to the arguments I heard, the

14       pleadings I reviewed, and the request that was made which

15       resulted in my order, so I'm finding there was not

16       compliance.

17           In regards to a remedy, it's a little difficult, so

18       before I give a decision in regards to remedy, I'm going to

19       hear the motion to withdraw.

20                        MR. AMALA:  Thank you, Your Honor.

21                        MR. GRANT:  May I add one comment, Your

22       Honor?

23                        THE COURT:  Sure.

24                        MR. GRANT:  The first we have heard of

25       this idea of producing the PSI documents as though they're

*R.O. vs. Medalist Holdings, LLC*

1      supposed to be the same thing, without further review, is in

2      this motion.

3                          MR. STAHL:  The reply.

4                          MR. GRANT:  The reply.  It is tantamount

5      to a complete, new, and different discovery request to us;

6      and Monday morning quarterbacking, you should have done it

7      this way, though we never asked for it this way, Your Honor,

8      I submit that's entirely unfair to us to say that looking at

9      this backwards, we should have done the production that way

10     when the way we were going about doing the production was

11     entirely reasonable and was an effort to work in good faith

12     with Plaintiffs' Counsel, so doing it this way effectively

13     lets the Plaintiffs bring in brand-new discovery requests,

14     brand-new approaches about how these things should be

15     reviewed and produced.  And then, because it's never been

16     asked for before, convince a Court to, in some fashion,

17     impose a remedy against the law firm rather than against the

18     party on whose behalf the law firm was acting, I suggest

19     it's unfair, Your Honor.

20                          THE COURT:  Thank you, Counsel.

21                          MR. AMALA:  And, Your Honor --

22                          THE COURT:  I will note -- I don't need a

23     response.

24                          MR. AMALA:  Thank you, Your Honor.

25                          THE COURT:  I will note, Counsel, that

1      your terminology that the way you went about producing the

2      documents was "entirely reasonable" does not comport with my

3      decision here today, and I'm finding that it was not

4      reasonable given the technology that was available to Davis

5      Wright Tremaine, given the history Davis Wright Tremaine had

6      with these defendants, not just in this case, not just

7      locally in Washington State but nationally, and it was

8      foreseeable to Davis Wright Tremaine to, basically, respond

9      to this Court's order of January 12, 2018, in a more

10     expeditious manner than the manner in which it was done to

11     the point where, as we sit here today, May 23rd, there has

12     been no response comporting with my order of January 12,

13     2016; so, therefore, this Court cannot find that it was

14     reasonable.

15        All right.  Counsels, let's get to the next motion

16     because we have three which would be --

17                      (Interruption.)

18            THE COURT:  All right.  The motion to

19     withdraw, Counsel, I'll hear that motion at this time.  I

20     will note for the record, and I'm not going to hear any new

21     arguments other than -- well, I'm going to allow you to

22     supplement the record, if needed, briefly.  However, I have

23     received the pleadings filed by Davis Wright Tremaine in

24     regards to their motion to withdraw.  I've reviewed those in

25     camera, and I'll allow both sides to make a brief record,

1    and then I will give my ruling in regards to my in-camera

2    review on the case.

3                    MR. GRANT:  Your Honor, I will, briefly.

4    I think we covered the background, the relationship, the

5    nature of the agreements that's between Davis Wright and the

6    respective clients, the distinction between the Medalist

7    parties and the Backpage.com parties; and Mr. Ferrer pointed

8    out the issues under the Rules of Professional

9    Responsibility and, in particular, the inability for us to

10   continue to represent Mr. Ferrer and the Backpage.com

11   parties for lack of authority, lack of communication, and

12   other problems that we've identified.

13                   THE COURT:  All right.

14                   MR. GRANT:  I'll answer other questions if

15   the Court has any, but I'll just leave it at that for now.

16                   THE COURT:  Thank you.  Counsel?

17                   MR. PFAU:  I'll address this, Your Honor,

18   and if there are any issues specifically in the motion to

19   compel, I'll let Mr. Amala -- or I'll ask the Judge to let

20   Mr. Amala comment.

21     We object to their withdrawing at this point in the

22   litigation.  Your Honor has the discretion to allow them to

23   withdraw or not.  I want to point out that this is a very

24   unusual situation in that we have their corporate counsel

25   for over a decade that has been intimately involved in the

1    issues pertaining both to the motion to compel and the

2    motion for sanctions and also to point out that we're

3    shooting in the dark a little bit because we weren't privy

4    to what they filed; although, we have a long history with

5    this firm and this defendant.

6        Your Honor, I think eventually, if they're allowed to

7    withdraw or if they are forced to be disqualified from

8    representing the remaining defendants, those may be issues

9    down the road; but you'll recall, Your Honor, I said Carl

10   Ferrer is not showing up.  There won't be an attorney here.

11   I speculated about that.  Carl Ferrer is not here.  There's

12   no attorney here, and it puts the Plaintiffs in a highly

13   prejudicial position if they're allowed to withdraw before

14   the issues on the documents and the sanctions are sorted

15   out, and that's all I can say without having been privy to

16   why they claim they feel the need to withdraw.

17               THE COURT:  All right.  So given that and

18   your request, it appears, Counsel, you'd like to have the

19   motion regarding sanctions addressed first before I do the

20   motion for withdrawal.

21               MR. PFAU:  I would, Your Honor, and

22   also -- yes, Your Honor, I would.

23               THE COURT:  Okay.

24               MR. PFAU:  And one more point with regard

25   to the motion to withdraw, we would ask that any portion of

1    what they filed that is not clearly privileged, if need be,

2    Plaintiffs be allowed to receive some information about

3    that.  Joint Defense agreements, for example, are not

4    generally privileged.

5         On the motion for sanctions, Your Honor, and I'm going to

6    argue this but there may be different ways that we can

7    divide this, so to speak, based on what you ultimately do on

8    the motion to withdraw; but for the record, and I know

9    you've read our pleadings, and I appreciate that, but again,

10   because these situations are so extraordinary, I want to

11   read a small portion of the plea agreement into the record

12   because I think it's very relevant; and this is cited on

13   our -- in our brief on Page 3 of 16.  It's a direct quote

14   from Mr. Ferrer's plea agreement:  "In 2004, I co-founded

15   the website www.Backpage.com," open quote -- or open

16   paren/open quote, "('Backpage')," closed quote/closed paren,

17   "along with M.L.," Michael Lacey, "and J.L.," James Larkin,

18   who, I will point out, are the principals behind the

19   Medalist defendants.  "Backpage eventually became the

20   second-largest classified advertising website in the world

21   and, during its 14 years of existence, has derived the great

22   majority of its revenue from fees charged in return for

23   publishing advertisements for," quote, "'adult'," unquote,

24   "and," quote, "'escort'," closed quote, "services."

25        Importantly, next paragraph:  "I have long been aware

1    that the great majority of these advertisements are, in

2    fact, advertisements for prostitution services (which are

3    not protected by the First Amendment)."  Skipping ahead a

4    little here, and may I also point out that that has always

5    been Plaintiffs' position in our allegations, "Acting with

6    this knowledge, I conspired with other Backpage principals,"

7    open paren, "(including but not limited to M.L. and J.L.),"

8    Larkin and Lacey, the Medalist principals, and he names

9    others, "to find ways to knowingly facilitate the state-law

10   prostitution crimes being committed by Backpage customers."

11       That is Plaintiffs' theory of the case.  It's what we

12   have alleged and in various ways, it's what they've denied.

13   For example, specifically, he says, "I worked with my

14   co-conspirators," which include Larkin and Lacey, the

15   principals for the Medalist defendants, "to create," open

16   quote, "'moderation' process -- or processes through which

17   Backpage would remove terms and pictures that were

18   particularly indicative of prostitution and then publish a

19   revised version of the ad.  Such editing did not, of course,

20   change the essential nature of the illegal service being

21   offered in the ad -- it was merely intended to create a

22   veneer of deniability for Backpage.  These editing practices

23   were only one component of an overall, company-wide culture

24   and policy of concealing and refusing to officially

25   acknowledge the true nature of the services being offered in

1    Backpage's 'escort' and 'adult' ads."

2        I read that into the record, Your Honor, to emphasize not

3    only how sanctionable the actions have been but also how

4    extraordinary it is vis-a-vis this law firm and their

5    defendant.  And I want to make very clear, because I

6    understand these things, I am not suggesting that Davis

7    Wright Tremaine conspired and -- but corporate defendants

8    through -- it starts up here, corporate owners; corporate

9    CEO; corporate counsel, Liz McDougall; corporate lawyers,

10   Davis Wright; litigation lawyers, Perkins Coie.  Clients

11   don't always tell lawyers what's going on.  I'm talking

12   here, we're not moving for sanctions against Davis Wright

13   Tremaine.  We're set at moving for sanctions against all the

14   Backpage defendants.

15       And in my motion, Your Honor, and I'm happy to talk more

16   about any specific issue, a global picture is we have fought

17   in the seven or eight lawsuits we have across the country,

18   and others have fought, arguing these very points that this

19   is just -- there is a co-conspiracy basically to whitewash

20   prostitution ads; and as a result of that, whether escort is

21   legal or not, children were trafficked.  That's the heart of

22   our case, and we're -- let's not forget this, you know -- we

23   get involved in all these lawyer arguments -- children were

24   gravely, gravely, gravely hurt while men who started out in

25   the journalist field made hundreds of millions of dollars

1      and paid lawyers millions of dollars across this country to

2      basically deny what we are alleging.

3          I used four examples in our brief.  One was their

4      corporate counsel in, I think, March of 2017, importantly --

5      while in the *J.S.* case -- importantly, while our case was

6      pending, filed a motion to dismiss essentially denying all

7      we've alleged and creating a fiction about how Backpage was

8      actually trying to protect children.  Then in a hard-fought

9      battle to actually get a corporate representative to

10     testify -- because all of the principals pled the Fifth,

11     refused to testify.  As we prepared the *J.S.* case for trial,

12     their corporate lawyer, Liz McDougall, basically, and we've

13     set out segments of her deposition, again reinforced the

14     same fiction.

15         Now, in this case as litigation goes on, we filed

16     requests for admissions asking them to admit basically the

17     facts that we now see in Ferrer's plea agreement; and on

18     behalf of all corporate defendants, they deny that the

19     banned terms were used for the purposes we allege.

20         And again, Your Honor, if you can bear with me, Request

21     for Admission No. 11, part of our materials, "Admit that by

22     January 1, 2014, you knew that the majority of the escort

23     advertisements in the --", quote, "in the -- in the Seattle

24     escort section of Backpage.com were advertisements for

25     prostitution."  Subject to their objection, corporate

1   defendants deny request for -- Request No. 11.

2      We go on to ask them of the banned terms, really

3   masking -- I'll read it -- Request for Admission 58:  "Admit

4   that you removed 'banned terms' from advertisements posted

5   in the 'Seattle escorts' and 'Tacoma escorts' sections of

6   Backpage.com in 2015," the relevant time period, "to mask

7   illegal activity on the website, such as prostitution."

8      "On behalf of the corporate defendants, we deny this."

9      I submit to you, Your Honor, I, in my career, have not

10  seen a case where sanctions are more appropriate, where a

11  corporate defendant misrepresented to opposing party,

12  misrepresented to the courts here and around the country

13  what was really a criminal activity; and I have said in the

14  past in oral argument, this is akin to a criminal activity.

15  We now know, based on Ferrer's plea agreement, that it was

16  criminal activity.

17     I am sure what you're going to hear from the Davis Wright

18  attorneys is we crafted a long objection that said not all

19  defendants know all the information involved, and I want to

20  address that specifically, perhaps in rebuttal; but what's

21  really, really important, and I know we mentioned this when

22  we were here on Friday, there is nothing in their response

23  brief that amounts to critical evidence.  All you have is

24  lawyers' discussions about what this particular defendant

25  may or may not have known.  There is not one signed

declaration from a representative of Backpage or of the
Defendants that they -- well, Backpage -- any Backpage
defendants; and if we're going to split them in two, the
Backpage.com defendants or the Medalist defendants, there's
nothing in their statements that says what -- from a
witness -- what Carl Ferrer is saying is not true, nothing,
not a shred of evidence.

Also, Your Honor, while they make a distinction that
maybe some of the corporate defendants didn't know what the
Backpage defendants were doing, there's really no evidence
that says I, CEO of Medalist defendants, or I, owner,
Michael Lacey, had no idea that there was prostitution
occurring.  We have a declaration that has gone unchallenged
that says these were all criminal activities.

Your Honor, I ask that all the Backpage defendants be
sanctioned, and we're asking for a sanction of $300,000, a
hundred thousand to each of these girls, a hundred thousand
to the court, and reasonable attorney's fees; and I would
submit that that is a tiny sanction when you consider the
grave harm that occurred to these girls and the hundreds of
millions of dollars that these corporate owners made.

Your Honor, if your intent is to let them withdraw before
they're sanctioned, I think there are avenues we can look
at, for example, to sanction the Backpage.com -- the
Backpage.com defendants now as opposed to the Medalist

1    defendants, but if that -- I think, when you answer a

2    discovery response, you need to do it truthfully; and the

3    Medalist defendants did not do that.  I ask that all the

4    defendants be sanctioned.  But in rebuttal, I'm happy to

5    address your thoughts if the motion to withdraw becomes

6    relevant.

7                    THE COURT:  All right.  Counsel, I'm aware

8    of the conflict you've raised in regards to Backpage.com;

9    so, I believe, in responding, and you let me know if I'm

10   right, you'll probably be responding for Medalist at this

11   juncture.

12                    MR. STAHL:  That's correct, Your Honor,

13   and let me start there.  First of all, the motion for

14   sanctions, here, is really premised on an entirely post-hoc

15   view that everything Mr. Ferrer said in his negotiated plea

16   agreement is true and all the prior representations are,

17   necessarily, false; and by the way, there is evidence in the

18   record contradicting Mr. Ferrer's plea agreement.  We

19   submitted, I think, four of the several additional

20   declarations that Mr. Ferrer submitted in prior proceedings.

21      But more to the point for the Medalist parties, they are,

22   essentially, asking for a finding of liability without

23   coming forward with any admissible evidence.  Mr. Ferrer's

24   plea agreement, as to the Medalist parties, is classic

25   hearsay.  It's an out-of-court statement offered for the

*R.O. vs. Medalist Holdings, LLC*

1    truth of what's in that statement against a different party.

2    A representation by Mr. Ferrer is not a representation by

3    the Medalist parties.  They try to conflate them.  Mr. Pfau

4    made a vertical chart with his hands as if to indicate the

5    Medalist parties are somehow responsible for Backpage.com.

6    I think we've explained in our papers and in our

7    declaration, and it's also in the record that the Medalist

8    parties don't own Backpage.  They haven't had operating --

9    they haven't had operating control of it since 2015, so as

10   to the Medalist parties, you can't hold Mr. Ferrer's latest

11   statement as a basis to hold them liable.

12       The three representations that they rely on as the basis

13   for finding sanctionable conduct here, it's really three

14   things.  Two of them were in the *J.S.* case.  They point to a

15   Backpage.com corporate deposition given in the *J.S.* case in

16   2016 and also a Backpage declaration that was submitted in

17   *J.S.* in 2016 or 2017.  The Medalist parties were not

18   defendants in that case.  The Medalist parties did not make

19   those representations.  There's no basis for tabbing or

20   sanctioning the Medalist parties for what happened in the

21   *J.S.* case.

22       I'll also add, and this is relevant to, I think, all the

23   defendants, there's no basis under the Court's inherent

24   authority, or Rule 11, to sanction a party in the proceeding

25   before the Court for something that happened in a different

*R.O. vs. Medalist Holdings, LLC*

1    case which resolved, was dismissed by agreement and settled,

2    so we don't think the *J.S.* representations have anything to

3    do with -- or can provide any support for sanctions in this

4    case but certainly not as to the Medalist defense.

5    Mr. Lacey and Mr. Martin [sic] were not in that case nor

6    were the parties.

7        As for the requests for admission, there was no

8    misrepresentation by the Medalist parties.  We were very

9    upfront in those discovery responses where we said in a

10   portion of the responses that they neglected to cite or to

11   mention in their motion that the discovery responses were

12   based on knowledge and information available to Backpage.com

13   because the other parties did not have the knowledge to

14   answer the discovery generally.  They are requests for

15   admission that were denied that the Medalist parties

16   continued to deny.  And, frankly, if that's the basis for

17   the sanctions motion, then this is really just another

18   discovery motion that we -- that also fails because there

19   was no meet and confer basis; but the Medalist parties

20   expressly disclaimed knowledge and did not make those

21   responses in the request for admission.

22       There's no basis to hold that a civil -- that a party in

23   a civil action can be sanctioned because a codefendant pled

24   guilty in a criminal case.  Mr. Ferrer may be subject to

25   cross-examination or discovery about his prior inconsistent

1    statements, but that's not a basis for essentially trying to

2    bring a backdoor finding of liability against all the

3    defendants based on the recent developments.  We would ask

4    that the sanction motion be denied.

5                    THE COURT:  As to Medalist Holdings.

6                    MR. STAHL:  As to the Medalist parties,

7    but I think that there's -- it would be grounds for the

8    Court to deny it on behalf of all the parties that are --

9                    THE COURT:  So who are you representing?

10                   MR. STAHL:  I'm representing the Medalist

11   parties, Your Honor, and I want to be clear about that; but

12   I do think some of the grounds apply generally as well.

13                   THE COURT:  Now, in regards to the

14   Backpage defendants, what notice was given to them in

15   regards to -- given the information you received that made

16   you want to file your notice of intent to withdraw, what

17   information was given to the Backpage defendants in regards

18   to the motion?

19                   MR. STAHL:  I can represent to the

20   Court --

21                   MR. GRANT:  You mean the motion for

22   sanctions, Your Honor?

23                   THE COURT:  Say that again?

24                   MR. GRANT:  You mean the motion for

25   sanctions?

*R.O. vs. Medalist Holdings, LLC*

```
1                      THE COURT:  Correct.  All the motions that
2          we had --
3                      MR. GRANT:  Right.
4                      MR. STAHL:  They were forwarded to
5          Mr. Ferrer's criminal counsel as well as to the addresses we
6          had for Backpage.com and Mr. Ferrer.
7                      THE COURT:  And that was done when?
8                      MR. STAHL:  More or less contemporaneous
9          with -- our papers, I know, were served on Ms. Clarence when
10         we -- when we served them on the court.  The responses may
11         have trailed by a day or so.
12                     THE COURT:  And the Backpage defendants
13         were notified in regards to the proceeding and the various
14         motions that are before the Court?
15                     MR. STAHL:  I can represent that I
16         forwarded the papers to Mr. Ferrer's criminal lawyer and
17         mailed them to the address we had for Mr. Ferrer and
18         Backpage.com.
19                     MR. GRANT:  And, Your Honor, we've done
20         that consistently throughout even as to the hearing last
21         Friday.  We sent notice of this hearing today, so we've
22         tried to continue to make sure that they know what's going
23         on in this and other matters.
24                     THE COURT:  All right.  Thank you.
25         Counsel, the last word, it's your motion.
```

1          MR. PFAU:  The last word is this:  The

2     Medalist defendants, in a sense, did not exist until the

3     motion to withdraw.

4        And as to the now new Backpage defendants --

5          THE COURT:  Counsel, what do you mean they

6     did not exist?

7          MR. PFAU:  Well, in this sense, Your

8     Honor, when they answered the discovery and Counsel made the

9     distinction of what's in *J.S.* and what's not.  I won't

10    reargue that other than to say I don't need to because there

11    are answers to interrogatories that are misrepresentations,

12    and there are requests for admissions that are

13    misrepresentations and those misrepresentations are answered

14    on behalf of the corporate defendants.  This law firm has

15    represented all the defendants in this litigation until the

16    plea deal.

17         THE COURT:  So let me ask you this:  In

18    regards to the interrogatories, did you receive separate

19    responses, one from Backpage.com, the Backpage defendants,

20    and one from Medalist Holdings?

21         MR. PFAU:  No, we did not, Your Honor.

22         THE COURT:  So throughout this proceeding,

23    responses and representations have been made to -- from the

24    defendants, which were Backpage.com and Medalist Holdings,

25    represented by Davis Wright Tremaine as a whole.

1           MR. PFAU:  That's right, Your Honor, with

2      the caveat, as Counsel pointed out, that in an objection,

3      they said not all defendants have the knowledge but what --

4      that's not an appropriate response because, as Counsel

5      knows, counsel and client have a duty of reasonable inquiry;

6      so, Larkin and Lacey and the Medalist defendants have been

7      defendants in this case.  They've been defendants in other

8      cases, and they have watched as the United States Senate

9      voted, you know, 96-0 to hold them in contempt.  It has

10     always been the Backpage defendants.  That's why there's

11     grounds to sanction both.

12         If you're inclined to separate them, Your Honor, I would

13     point out that with the -- what I'll call -- now, we're

14     calling the Backpage defendants, we have filed a motion for

15     sanctions.  No lawyer has showed up.  No response has been

16     filed because there won't be one.  It's essentially

17     unopposed.  The motion, if we're going to now at least

18     conceive of them as different defendants, I think there is

19     grounds on this record to sanction the Medalist defendants

20     for their -- for the false discovery responses; and if Your

21     Honor, for some reason, is not willing to sanction them, we

22     need discovery responses from them telling them what of the

23     various Medalist Holdings or Medalist defendants knew about

24     this, didn't know about this, not giving us evidence that's,

25     basically, Ferrer's contradictory statements.  We know he

1       lied previously, and that's why we're here before you but

2       declarations from the Medalist principals denying what

3       Ferrer said is true and perhaps depositions for the

4       limited -- and I mean limited because we're not talking

5       about liability here; that comes later -- limited purpose of

6       proving what I believe is true; which is, the coconspirators

7       knew what was going on, were part of the whole process and

8       should be sanctioned, too, and made hundreds of millions of

9       dollars with that knowledge.

10                      THE COURT:  Counsel, briefly.

11                      MR. STAHL:  The discovery responses were

12      responded to on behalf of all the corporate defendants

13      because that's how they were drafted and directed.  They

14      were directed to all corporate defendants.  We responded on

15      behalf of --

16                      THE COURT:  Whoa, whoa, whoa, Counsel, one

17      second.

18                      MR. STAHL:  When --

19                      THE COURT:  They were drafted --

20                      MR. STAHL:  No, when we received --

21                      THE COURT:  Well, one second.  You're

22      saying you were drafting a response because it came to you

23      as one but wouldn't it have been the onus placed on you, if

24      you thought there was a distinction between the two, to

25      identify it as such and respond separately?

*R.O. vs. Medalist Holdings, LLC*

1                    MR. STAHL:  And we did that, and we said

2        these responses are on behalf of Backpage.com which is the

3        operating entity that has the knowledge, so -- and I think I

4        heard Mr. Pfau just say --

5                    THE COURT:  So -- slow down -- so if

6        that's the case, are you saying, then, that Medalist

7        Holdings has not responded to anything in this case if it

8        was only just Backpage.com because in one instance, I'm

9        hearing you represented both.  You were responding as one or

10       separately, but then I also just heard you say, when I asked

11       that question, that your responses were on behalf of

12       Backpage.  So where were your responses on behalf of

13       Medalist Holdings?

14                   MR. STAHL:  The actual -- the actual

15       discovery requests that we received were directed to all the

16       corporate defendants with no distinction, so we responded in

17       turn by saying these objections and responses are submitted

18       by all the defendants; however, the answers and the parties

19       will be operating with the ownership of the website.  The

20       operating entity of the business is Backpage.com, so to the

21       extent we are giving substantive responses, that's the

22       entity that has the knowledge, that's --

23                   THE COURT:  In regards to the website.

24                   MR. STAHL:  Correct.

25                   THE COURT:  Okay.  I'm following.

*R.O. vs. Medalist Holdings, LLC*

1          MR. STAHL:  The request for admission, had

2     we received separate requests, and I think I heard Mr. Pfau

3     say they need additional discovery to determine exactly what

4     Medalist did and did not know.

5          MR. PFAU:  That's not what I said, but --

6          MR. STAHL:  Well, you said there may be --

7     there may be the need for additional discovery about their

8     knowledge.  That's not in the record and certainly not the

9     basis for sanctions.

10      The sanctions motion also did not identify any false

11     representation in any interrogatories.  They're talking

12     about the denial of the request for admission.

13          MR. GRANT:  May I just pick up one point

14     on your question, Your Honor?  So the answer is that, yes,

15     we responded on behalf of all the corporate defendants

16     making the distinction, as Mr. Stahl has pointed out, about

17     the information obtained from Backpage, and that's also true

18     in the individual responses to the request for admission

19     where there is information that we provided -- it said

20     Backpage.com, LLC, provides the information; but as is true

21     in lots of corporate parent settings, the corporate parent

22     is not the one who has that information and, therefore,

23     denies the request on the subject of the objections.

24          THE COURT:  All right.  I'm going to give

25     a ruling that combines the motion to withdraw with the

1    sanctions against Backpage and the Backpage defendants and

2    the Medalist Holdings defendants, and the reason I'm doing

3    that is Counsels for the Defendants pretty much have

4    provided the Court with pleadings that the Court has

5    reviewed in camera to support their motion to withdraw, and

6    they have made a record today and at the last hearing to

7    support their motion to withdraw; and after reviewing the

8    pleadings filed in camera, I am going to grant the motion to

9    withdraw as to the Backpage defendants.

10       In regards to the pleadings I've reviewed and the

11   arguments I've heard at the last hearing, as well as this

12   hearing, I am also going to disqualify Davis Wright Tremaine

13   from representing Medalist Holdings in this matter.  The two

14   entities are intertwined in such a manner that to allow

15   Davis Wright Tremaine to continue to represent Medalist

16   Holdings will create an injustice on the administration of

17   justice but will also, more probable than not, create

18   conflicts of interest that this Court will have to address

19   moving forward.

20       My review has indicated that the request by Mr. Ferrer to

21   terminate the attorney-client relationship created a -- I

22   guess the word is "revoked," the consent given to Davis

23   Wright Tremaine to allow them to represent these multiple

24   parties.  There's a nature of the conflict that I saw that

25   continued representation would be prohibited even if the

1    other clients were to give consent.  Mr. Ferrer revoked his

2    consent because of his -- I think the term used in the case

3    law is "material changed circumstances," the federal

4    conviction being a major one; that and the facts pertaining

5    to that are related to the facts intertwined in this case

6    significantly or similar to the facts in this case.

7        This Court finds that there would be material detriment

8    to the other clients and a high possibility that the lawyers

9    would encounter conflicts proceeding forward.

10       Pursuant to GR 15, I am going to seal the pleadings to

11   include the declaration provided; and I'm talking about the

12   pleadings that were filed for my in-camera review.

13       I am finding that this case, up to this point, started

14   with an 83-page Complaint for Damages.  Answers were filed

15   by the Defendants as a whole, no material distinction was

16   made between Davis Wright Tremaine and -- sorry -- between

17   the Backpage defendants and Medalist Holdings in regards to

18   the responses to pleadings and the motions brought before

19   the Court and the arguments that were made up until the

20   request for the motion to terminate.

21       We have a scheduling order that was in place with a trial

22   date, I believe, in October.  Discovery was delayed due to

23   the lack of compliance or substantial or significant

24   compliance with my court order in January, and now we're

25   five months away from an October 16, 2018, confirmed trial

1    date.  Prejudice can flow both ways in litigation.  It can

2    flow to the Defense or from the Defense to the Plaintiff,

3    and I'm finding that there's grave prejudice flowing to the

4    Plaintiffs in this case due to no actions of their own but

5    due to multiple issues, which, some of which we have

6    addressed here today.  The administration of justice,

7    because of my ruling to allow Davis Wright Tremaine to be

8    allowed to withdraw from representing the Backpage

9    defendants and my disqualification of them proceeding

10   forward, representing the Medalist Holdings company, has

11   placed the Court in operating and moving forward this case

12   less efficiently at this late stage in the game.

13        I am going to require, however, that my protective order

14   regarding the documents in this case continue for 60 days.

15   Within that time frame, the documents need to be placed in

16   trust.  Davis Wright Tremaine will be required to comply

17   with my previous order, will be required to secure all

18   documents pursuant to that order or a new order and to work

19   with the Plaintiffs to secure those documents for future

20   litigation in this matter.

21        Davis Wright Tremaine will remain counsel to secure the

22   interests of their clients and that being Medalist Holdings

23   as the Backpage defendants previously, because of

24   Mr. Ferrer's request, are no longer their client which

25   brings me to the motion for sanctions.

1    I am going to grant the motion for sanctions.  I believe

2    an adequate record has been made supporting sanctions in

3    this case for a number of reasons, all listed by Plaintiffs,

4    but also the Court looks at what constitutes a bad faith,

5    and there are three ways the Court can look at it.

6    Pre-litigation misconduct:  I'm finding that given the

7    history of the defendants in this case in the multiple cases

8    they've had, not just before this Court -- I have two -- not

9    just in this state but nationally, it is clear to this Court

10   that their conduct was to necessitate delay where there were

11   what appears to be clearly valid claims or rights being

12   asserted by the Plaintiff which, months and years later, is

13   now being disclosed by Mr. Ferrer as seen by his plea and

14   the statements made in those pleadings in the Arizona case

15   which I reviewed.

16   Another one that the Court can consider in regards to bad

17   faith is procedural bad faith and that is vexatious conduct

18   during the course of litigation, wasting private and

19   judicial resources, making claims that, months later, were

20   found to be untruthful.  Many of the statements that I'm not

21   placing into the record can be seen in the pleadings the

22   Court reviewed in camera provided by the Defense which will

23   be placed under seal if there is further review of this

24   matter.

25   And a third factor that can constitute bad faith is

1    substantive bad faith, and I'm not finding that in this

2    case.

3        I will say, also, supporting my position regarding the

4    pre-litigation misconduct and procedural bad faith were the

5    Court's review of the Interrogatory No. 2 and the Request

6    for Production No. 1.  The various requests for admission

7    were taken into consideration and Exhibit 3, the declaration

8    of Attorney Elizabeth McDougall.

9        I will note that Mr. Ferrer's condition of his plea in

10   March 2018 in Arizona were for overriding conspiracy with a

11   start date of 2004 through March of 2018 during the time

12   period not only when this case was filed but the *J.S.* case,

13   that this Court also had, was filed.

14       Sanctions in the amount of $100,000 for each plaintiff is

15   being ordered.  That needs to be paid within 30 days of

16   today's date.  Failure to comply, the Court will issue

17   sanctions in the amount of one dollar for every page of the

18   1.2 million documents -- and, actually, not page, for the

19   documents.  So, there were 1.2 million documents, one dollar

20   for every document, so that will be $1.2 million for every

21   14 days of noncompliance.

22       Reasonable attorney fees will be allowed and granted,

23   subject, of course, to any objections to the amount.  If not

24   objected to, that needs to be paid within 30 days, as well,

25   of production of the billings.

1    The question, then, becomes what happens to the R.O. vs.

2    Medalist Holdings case as we have a trial date of October

3    2018?  And I'll hear from Counsel.

4                MR. PFAU:  Your Honor, Plaintiffs, at this

5    juncture, would like to hold the trial date until we can --

6    obviously, there has been a sea shift in terms of lawyers

7    involved and our ability to get discovery.  If Your Honor

8    would indulge us and let us hold the trial date until we can

9    determine who's going to appear on behalf of the Medalist

10   Holdings.  I'm confident no one will appear on behalf of the

11   Backpage defendants, and we can address that later; but I

12   would like to hold the trial date, Your Honor.

13               THE COURT:  And what I'd like, Counsels,

14   is because my ruling came on a special-set, I am going to

15   ask that we set a hearing for presentation of an order for

16   me to review so that my findings are entered into the

17   record, so I will be on recess next week, so I would ask

18   that it be set upon my return.

19               MR. PFAU:  And, Your Honor, just so I'm

20   clear, sanctions were applied against all defendants;

21   correct?

22               THE COURT:  Correct.

23               MR. PFAU:  Okay.  Thank you, Your Honor.

24               THE COURT:  I did not separate; it's one

25   as far as my order goes.

1              MR. PFAU:  I understand.  I just wanted to

2      clarify.

3              MR. AMALA:  Your Honor, so that we make

4      sure we note the presentation properly, may I ask when the

5      court reporter believes a transcript would be available so

6      that we can present an order properly?

7              THE COURT:  Okay.  That will be up to Miss

8      Kim.

9                  (Discussion off the record.)

10             MR. AMALA:  Your Honor, the court reporter

11     has indicated two weeks from today as the Court is on recess

12     next week.

13             THE COURT:  Okay.

14             MR. AMALA:  So if it's acceptable to the

15     Court, we'll get the transcript and put it into the proposed

16     order and try to work it out with Counsel and then go to

17     presentation.

18             THE COURT:  So I'd like to schedule the

19     presentation; I don't want to lose parties.

20             MR. AMALA:  Sure.

21                 (Discussion off the record.)

22             MR. AMALA:  So, Your Honor, two weeks from

23     today would be June 6th, and I think, just to make sure we

24     proceed, we have no issues with the procedure.  I think if

25     we gave everyone -- I would suggest that a week to,

1    basically, absorb the transcript in an order and that way,

2    we could note it -- if we -- if we filed it and noted it for

3    presentation -- filed it on the 12th and -- or, I guess, it

4    would be the 13th and note it for presentation, whatever the

5    Court would have available that would fit within the five

6    days for a presentation which, I think, would either be

7    the --

8                    MR. GRANT:  One suggestion, Your Honor,

9    will you allow a little bit more time there for getting the

10   transcript -- I'm sure it's two weeks but to be sure -- and

11   to give us an opportunity to deal with this.  Honestly,

12   we've got a lot of things to digest and chew on.

13                   THE COURT:  Exactly, before that order is

14   entered, in addition to which the 30- and 60-day time frame

15   that I've given Davis Wright Tremaine does not start until

16   that order is entered, so it doesn't start today.  It starts

17   when that order is entered --

18                   MR. GRANT:  I appreciate that.

19                   THE COURT:  -- so the sooner we can get

20   that order done.

21                   MR. GRANT:  I was just trying to allow

22   enough of a window of time, once we get the transcript, to

23   deal with the draft of the order and the presentation; and,

24   obviously, we're going to have -- I think we're going to

25   have further issues still but -- so I would suggest sometime

1          the week of the 18th, perhaps, for a return hearing.

2                          MR. PFAU:  The 18th of June?

3                          MR. GRANT:  Yeah, exactly.

4                          MR. PFAU:  Okay.

5                          THE COURT:  That's fine.

6                          MR. GRANT:  All right.

7                              (Discussion off the record.)

8                          THE COURT:  So let's special-set it for

9          9:00.

10                         MR. PFAU:  On the 21st.

11                         MR. STAHL:  9:00 a.m. on the 21st?

12                         THE COURT:  Yes.  Now, Counsels, we need

13         to fashion an order which I will do regarding sealing the

14         documents for -- that I reviewed in camera.  I don't think I

15         need your signatures for that.  However, I believe your

16         objections, if any, need to be noted.

17                         MR. AMALA:  Your Honor, the only, I guess,

18         objection we would file, just to reiterate Mr. Pfau's

19         request, that to the extent there's any information that's

20         not -- that should not be sealed or redacted that that be

21         accounted for.  Obviously, we haven't seen it so we don't

22         know, so we'll probably file something very short, unless

23         the Court can -- is there anything in there that may not be

24         sealed, if that makes sense?  I don't want to file an

25         objection to the file, but if you need that to be able to

1    say I'm not redacting X, Y, and Z.

2                   MR. PFAU:  Let me -- let me just step in.

3    I think it would be helpful if we filed a one-page, no more,

4    objection so Your Honor understands our objection.  If for

5    some reason this is appealed, then the appellate court would

6    understand our objection.

7                   THE COURT:  Yes.

8                   MR. PFAU:  Okay.

9                   THE COURT:  So I think that would be the

10   best way to proceed; however, we're in open court at this

11   time.  I've indicated that I will be ordering the document

12   sealed subject to reconsideration, of course, Counsel, from

13   your motion.

14      My question is:  Is there anyone in the courtroom that is

15   objecting to the sealing of the pleadings filed and the

16   motion to withdraw as well as the declaration other than the

17   litigants involved in this case?  I will note that there are

18   individuals in the courtroom.  No one has indicated that

19   there is any objections, and I will be sealing it subject to

20   a Bone-Club analysis.  All right?

21                  MR. AMALA:  Okay.

22                  MR. PFAU:  Thank you.

23                  THE COURT:  Anything else, Counsel?

24                  MR. PFAU:  No, Your Honor.

25                  MR. AMALA:  No, Your Honor.  Thank you.

*R.O. vs. Medalist Holdings, LLC*

1                      MR. STAHL:  No, Your Honor.

2                      THE COURT:  I'll see everyone on the --

3                      MR. PFAU:  21st.

4                      THE COURT:  The 21st at 9:00.  Court will

5       be in recess.

6                           (Proceedings concluded.)

7       / / /

8       / / /

9       / / /

10      / / /

11      / / /

12      / / /

13      / / /

14      / / /

15      / / /

16      / / /

17      / / /

18      / / /

19      / / /

20      / / /

21      / / /

22      / / /

23      / / /

24      / / /

25      / / /

```
 1

 2

 3

 4              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                   IN AND FOR THE COUNTY OF PIERCE
 5      _____

 6      R.O., by and through her mother,     )
        S.H., and K.M., by and through       )
 7      her mother, L.M.,                     )
                                              )
 8                        Plaintiffs,         ) No. 17-2-04897-1
                                              )
 9           vs.                              )
                                              )
10      MEDALIST HOLDINGS, INC., et al.       )
                                              )
11                        Defendants.         )
        _____
12
                         REPORTER'S CERTIFICATE
13      _____

14
        STATE OF WASHINGTON    )
15                             )  ss.
        COUNTY OF PIERCE       )
16
             I, Kimberly A. O'Neill, Court Reporter in the state
17      of Washington, county of Pierce, do hereby certify that
        the foregoing transcript is a full, true, and accurate
18      transcript of the proceedings and testimony taken in the
        matter of the above-entitled cause.
19
             DATED this 5th day of June, 2018.
20

21                           Kimberly A. O'Neill
                             _____
22                           KIMBERLY A. O'NEILL, CCR
                             License No. 1954
23

24

25
```

*R.O. vs. Medalist Holdings, LLC*