# **<u>Exhibit A</u>**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

)
**In Re Grand Jury 16-4,**           ) Phoenix, Arizona
                                     )
_____)  ) **February 22, 2017**

**BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**Motion to Compel and Cross-Motion to Quash Grand Jury Subpoena**

<u>**SEALED**</u>

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3     For the Government:

4              US Attorney's Office
                By: **DOMINIC LANZA,** ESQ.
5              40 N. Central Ave., Ste. 1200
                Phoenix, AZ  85004

6
                Department of Justice
7              By: **REGINALD JONES,** ESQ.
                Washington DC
8

9

10    For Backpage.com and Mr. Ferrer:

11             Henze Cook Murphy
                By: **TOM HENZE,** ESQ.
12             By: **JANEY HENZE COOK,** ESQ.
                4645 N. 32nd St., Ste. 150
13             Phoenix, AZ  85018

14
                Davis Wright Tremaine
15             By: **JAMES C. GRANT,** ESQ.
                1201 Third Ave., Ste. 2200
16             Seattle, WA  98101

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

14:09:11  1

        2

        3        THE COURTROOM DEPUTY:  Grand Jury Number 16-4, on

        4   motion for hearing, motion to compel.  Will the parties please

14:09:20  5   announce.

        6        MR. LANZA:  Afternoon, Your Honor.  Dominic Lanza and

        7   Reggie Jones on behalf of the United States.

        8        MR. HENZE:  Good afternoon, Judge Campbell.  Tom

        9   Henze and Janey Henze Cook from Henze Cook Murphy appearing.

14:09:31 10        Let me introduce Your Honor, the Court, to Jim Grant

       11   from Davis Wright Tremaine.  He is appearing pro hoc vice and

       12   he will be addressing the Court today.

       13        I also have one housekeeping matter.  I think I

       14   covered it.  Also present in the courtroom --

14:09:51 15        THE COURT:  Mr. Henze, could you pull the mic over

       16   just so we can hear you a little more clearly.

       17        MR. HENZE:  Excuse me.  Also present in the courtroom

       18   is Backpage LLC's general counsel, Liz McDougall.  She's not

       19   appearing, but we would like the Court's permission for her to

14:10:07 20   remain.

       21        THE COURT:  Any objection?

       22        MR. LANZA:  No objection.

       23        THE COURT:  All right.  Good afternoon everybody.

       24        Counsel, we're here on the government's motion to

14:10:21 25   compel.  We've sealed the courtroom since this proceeding is a

14:10:24    1   grand jury proceeding and the materials have been filed under

2   seal.

3           This was originally in front of Judge Rayes but was

4   reassigned to me a couple of weeks ago.  I have read the

14:10:35    5   briefs.  I have read many of the cases that you all have

6   cited.  So I think I understand the arguments being made on

7   both sides, but I want to give you an opportunity to address

8   anything that you think is important so that I'm fully

9   informed when I make the decision.

14:10:50   10           And since this is the government's motion, let's have

11   government counsel go first.

12           MR. LANZA:  Thank you, Your Honor.  May I approach

13   the podium?

14           THE COURT:  Yes.

14:11:13   15           MR. LANZA:  Thank you.  I'd like to focus -- the

16   Court said it's read the pleadings.  I know they're

17   voluminous.  We thank the Court for getting to this on an

18   expedited basis.

19           I want to focus on five topics this afternoon.  First

14:11:25   20   is the interplay between the First Amendment and what the

21   standard of review is here.

22           The second is Backpage's argument that this

23   investigation isn't being conducted in bad faith and that's a

24   ground for quashing the subpoena.

14:11:37   25           The third is Backpage's argument that there's no

14:11:41    1    connection between the materials being sought and the

2    underlying scope of the investigation.

3    Fourth is whether the subpoena is unreasonable or

4    oppressive under Rule 17(c).

14:11:50    5    And the fifth is the extent to which this Court

6    permissibly can consider the contents of a PSI report when

7    addressing the issues that are before it.

8    So, first, the interplay between the First Amendment

9    and the standard of review.

14:12:05   10    The pleadings contain a great deal of discussion

11    concerning a very interesting and complicated issue, which is

12    whether a grand jury subpoena is subject to heightened level

13    of review when the recipient claims complying with it would

14    chill or implicate its First Amendment rights in the future.

14:12:23   15    I think ultimately the Court doesn't need to address

16    that issue with certainty because we should prevail even under

17    Backpage's expansive view of what *Bursey* means.  It's in our

18    briefs, but I want to talk briefly why we think we have the

19    better side of this argument, that in fact the standard the

14:12:39   20    Court should apply is very similar to the traditional standard

21    under Rule 17(c), which is that the subpoena is presumptively

22    enforceable unless there's a showing that the investigation is

23    being conducted in bad faith or there's no connection between

24    the requested materials and the investigation.

14:12:56   25    In my view, the four key cases here are *Bursey*,

14:13:00   1    *Branzburg*, the 1993 *In Re Grand Jury Subpoena* case, which is

2    referred to as *Scarce* sometimes, and the 1971 Ninth Circuit

3    decision in *Weinberg*.

4         Our position, it is true that at first blush this

14:13:14   5    *Bursey* decision from 1972 seems to articulate the test that

6    Backpage claims it articulates, which is the burden's on the

7    government, when the First Amendment is implicated there's

8    these three factors, et cetera.  But I find it significant

9    that *Bursey* was decided almost simultaneously with *Branzburg*,

14:13:30  10    which had a very different approach that was more favorable to

11    the enforcement of subpoenas in the First Amendment context.

12         And *Bursey* itself doesn't even mention *Branzburg*, and

13    the only mention of *Branzburg* came when government then filed

14    a petition for rehearing, and that's addressed on the very

14:13:49  15    last page or two of the *Bursey* decision.  They say on the one

16    hand, the Ninth Circuit, that *Branzburg* doesn't overrule the

17    result they reached here, but the way I read it and the way I

18    think this 1993 *Scarce* opinion construes it is it says that

19    the *Bursey* approach is consistent with *Branzburg* so long as

14:14:07  20    the focus is simply on whether the materials being sought by

21    the grand jury are actually relevant to the underlying

22    investigation.  Which really isn't any different from a

23    traditional Rule 17(c) standard that the Court would apply

24    irrespective of whether the First Amendment was implicated.

14:14:25  25         So we've shown in our brief several decades afterward

14:14:29  1    the Ninth Circuit has considered First Amendment challenges to

2    subpoenas.  It's never struck one down under *Bursey*, It's

3    never interpreted or applied *Bursey* the way Backpage argues.

4         Now, in their surreply Backpage argues all these

14:14:44  5    cases we've cited, the *Lewis cases, Scarce*, 2006 case, they're

6    distinguishable because they dealt with reporter's privilege

7    claims, not the same sort of full-throated First Amendment

8    claim that was present at *Bursey*.  I don't think that's the

9    right way to interpret those cases.  The reason for that is in

14:15:01 10    that 1993 decision in *Scarce*, the researcher in that case also

11    claimed that *Bursey* supported his position that he shouldn't

12    have to comply with the subpoena.

13         If it were true, as Backpage asserts, that the reason

14    his reliance on *Bursey* was misplaced is because he had a much

14:15:20 15    lesser First Amendment basis than was present in *Bursey*, they

16    would have dismissed it on that ground.  But they didn't do

17    that.

18         Instead, in 1993 the Ninth Circuit said this

19    researcher didn't prevail under *Bursey* because it sort of

14:15:33 20    dismissed and narrowly construed *Bursey* as a pre-*Lewis* case

21    that in any event simply dealt with no connection between the

22    materials sought and the scope of the investigation.

23         So all of that, I think, is then punctuated by this

24    1971 case that we cited in our reply, *Weinberg*, which says in

14:15:51 25    the Ninth Circuit the chilling effect of grand jury

14:15:53  1   questions -- any chilling effect grand jury questions may have

2   on the future exercise of First Amendment rights isn't

3   generally a recognized ground for refusing to comply with a

4   subpoena.

14:16:03  5        So for all those reasons, we're not denying that

6   Backpage, their conduct, might implicate the First Amendment.

7   It's difficult to articulate precisely how the First Amendment

8   applies here.  But the test nevertheless, we believe the

9   burden should be on Backpage to show that subpoena is not

14:16:22 10  enforceable either by showing a lack of good faith or no

11  connection.  And as I'll address in a second, they haven't

12  made that showing either way.

13       As on the bad faith issue, they've primarily cited

14  two grounds for saying this isn't a good faith investigation,

14:16:39 15  we're just trying to harass them.  The first is this order

16  from the Western District of Washington and the other is the

17  Communications Decency Act.

18       With respect to the Washington order, I can't

19  emphasize strongly enough how different this investigation is

14:16:55 20  and the facts and circumstances are here than they were in

21  Washington.

22       In brief, in Washington there was litigation over a

23  subpoena and the U.S. Attorneys Office up there, for whatever

24  reason, refused to explain to the court in the course of those

14:17:10 25  proceedings why it thought the materials it was seeking were

14:17:13  1    relevant to its investigation.  During the first round, the

2    court ordered them to narrow the scope of their subpoenas.

3    They didn't do that; they reissued in the same scope.  They

4    then added categories seeking information that had no

14:17:26  5    relevance to their investigation.  It was simply meant to

6    embarrass Backpage's employees by seeing if they had used some

7    of the prostitution and escort services.

8         And, finally, there was investigation in that case

9    that the U.S. Attorneys Office knew, because they were the

14:17:41 10    first party who had ever subpoenaed this stuff from Backpage,

11    they were causing Backpage to incur tens of thousands of

12    dollars of costs to comply.

13         Given that set of facts, it's perhaps not surprising

14    the judge in Washington found it just didn't seem right, it

14:17:55 15    had a bad smell about what the office was doing there.

16    Without reaching the First Amendment -- without endorsing the

17    First Amendment arguments that Backpage is making there, or

18    here, he said I'm not going to enforce it because it just

19    looks like U.S. Attorneys Office is trying to harass Backpage.

14:18:12 20         Here, on every one of those key grounds, the exact

21    opposite is true.  We've gone out of our way in our pleadings,

22    at length, to try to explain why we have a good faith basis

23    for believing that the evidence, if it turns out the way we

24    think it might, could support criminal liability against

14:18:30 25    Backpage.

14:18:30  1        We have identified other cases where website

       2  operators have been recently criminally prosecuted

       3  successfully.  I acknowledge the cases aren't on all fours,

       4  but the broader point is that the First Amendment doesn't give

14:18:43  5  a blanket shield to website operators that they can never be

       6  held liable.

       7        I can also represent to this Court that my office has

       8  four AUSA's assigned to this matter.  Mr. Jones is here from a

       9  DOJ component working on this matter.  We have three different

14:19:00 10  federal agencies with agents working very hard on this

      11  investigation.  This is not some sham investigation simply

      12  meant to harass Backpage.

      13        Second, our subpoenas here don't seek any

      14  embarrassing information simply meant to harass.  In fact, the

14:19:15 15  third one, we put in italics we specifically don't want any

      16  personally identifying information because we don't even want

      17  to go down that road of having that be an issue.

      18        And, finally, the cost issue.  I think it's

      19  tremendously relevant and helpful for our position that our

14:19:33 20  subpoena's mirrored on the PSI subpoena.  And the reason for

      21  that, we chose to do it that way in large part so that

      22  Backpage couldn't raise any complaints about the costs of

      23  compliance or need to start from scratch and get attorneys and

      24  private firms to start billing and reviewing documents and all

14:19:51 25  those things, because the work has already been done.

14:19:53  1          That is very different from Washington where there

2     was evidence that the U.S. Attorneys Office was trying to run

3     up costs.

4          If we're trying to harass Backpage here, we're doing

14:20:02  5     a really poor job of it.  We picked the quickest and easiest

6     way possible for them to comply by defining what we're

7     seeking.

8          Other argument about good faith or bad faith is the

9     CDA.  I think Backpage's reliance on the CDA here is the

14:20:18 10     weakest part of their argument.  They asked this Court to

11     conjure up, based on its views of the spirit and purpose of

12     the statute, that it should apply in the federal criminal

13     context, too.  And with all respect, statutes don't have

14     spirits and don't have purposes, they have text.

14:20:35 15          The analysis of the statute should start and end with

16     the plain language of the statute, and here the plain language

17     of the CDA could not be clearer:  Nothing in this section

18     shall be construed to impair the enforcement of any criminal

19     statute.  No effect on criminal law.  It would turn the rules

14:20:53 20     of statutory construction on their head to conclude that

21     notwithstanding that language Congress secretly wanted the

22     courts to not enforce grand jury subpoenas in the criminal

23     context.

24          If Congress had wanted the CDA to provide protection

14:21:05 25     from federal criminal investigations, they could have said so.

14:21:09   1    They pointedly didn't.

           2           Finally, we also cited the *roommates.com* case in our

           3    reply.  Again, even putting aside federal criminal context

           4    where we feel like we're on very good footing on the CDA, even

14:21:20   5    in civil damages lawsuit in state and criminal prosecutions,

           6    the rule in the Ninth Circuit, which a lot of website

           7    operators don't like, is that if an operator edits its users

           8    content in a way that contributes to the illegality of the

           9    content, the CDA no longer provides a defense.  That is --

14:21:38  10    again, that's the exact thing we want to investigate here.

          11    I'll talk about it in a moment.  We have good faith reasons

          12    for believing that Backpage has engaged in moderation

          13    practices to scrub out illegal -- scrub out terms from illegal

          14    prostitution ads in a way to make them less obvious to law

14:21:57  15    enforcement.  That's right what *roommates.com* gets at and says

          16    CDA doesn't apply.

          17           Third issue, connection.  Their position is that we

          18    can't show a connection between what we're seeking and any

          19    legitimate chance of ever having a criminal prosecution

14:22:13  20    because under the First Amendment they could never be liable

          21    for just running -- being a conduit for other people's

          22    content.

          23           As an initial matter, I think it is important to note

          24    there's a tension between the positions Backpage is taking.

14:22:28  25    On the one hand they say we're just a conduit for other

14:22:32  1    people's content, we don't have anything to do with their

2    content.  On the other hand, they're saying that the First

3    Amendment gives us this broad protection because we're making

4    active editorial decisions about what not to print and what to

14:22:42  5    print.  And I think that that smacks of having it both ways,

6    to say I'm both a mere conduit and a First Amendment actor who

7    is making editorial decisions.

8         But putting that aside, these arguments about them

9    being liable criminally for merely re-posting others' ads are

14:23:00  10   a straw man.  We tried to be as clear about this as we could

11   in our briefs.  Our theory here is not that Backpage could be

12   held liable for merely re-posting other people's ads or being

13   negligent, or strict liability negligence type of theory.

14        The theories here are, one, Backpage acquired actual

14:23:16  15   knowledge of the illegality of ads and continued to post them

16   despite that knowledge, or, second, and even worse, they

17   affirmatively edited and wordsmithed their clients' ads in an

18   effort to, as one of the Backpage moderators told the PSI,

19   sanitize them.  That is not merely acting as a conduit.

14:23:37  20        And it's telling that just a few months ago the

21   district court for the District of Columbia, Backpage had

22   brought a constitutional challenge to a newly amended statute

23   that makes knowingly running advertising involving child sex

24   trafficking victims a crime.  The court there rejected

14:23:54  25   Backpage's arguments and endorsed the very theory we're

14:23:58   1    propounding here, which is if a website operator knowingly

2    runs ads that are soliciting illegal services, the First

3    Amendment doesn't apply in that context.

4         So all that gets to the connection here.  Because

14:24:12   5    we're trying to investigate what Backpage knew about the

6    legality of its users' ads and whether it was editing them, it

7    follows that the three categories of things we're trying to

8    get are subpoenaed.  There couldn't be a tighter fit.  They go

9    to the heart of what we're trying to investigate, the

14:24:27  10    knowledge and editing practices.

11         The fourth issue I wanted to address is, putting

12    aside the First Amendment issues under Rule 17(c), should the

13    subpoena be deemed oppressive or unreasonable?  Backpage has

14    used colorful language in its briefs.  It likens this

14:24:50  15    investigation to the Star Chamber and talks about it being a

16    dragnet search, makes an analogy to law enforcement doing a

17    search of an entire bookstore in hope of finding maybe one

18    illegal book.

19         Those analogies don't work because the facts matter.

14:25:05  20         There's ample evidence here that virtually all of

21    Backpage's ads are illegal prostitution ads and not lawful

22    escort ads.  We cited in our briefs law enforcement officers

23    in Chicago and Seattle have both put in evidence in other

24    lawsuits that they've done hundreds of investigations arising

14:25:22  25    from ads on Backpage and 100 percent of the time, hundreds and

14:25:27   1    hundreds of times, it's always a prostitution ad, not on

       2    escort ad.

       3            Backpage received a letter from the National

       4    Association of Attorneys General in 2011 making the common

14:25:38   5    sense point that of course these are prostitution ads.  We

       6    don't check our common sense at the door.

       7            The PSI report contains an e-mail from Backpage's

       8    CEO, Mr. Ferrer, in 2011 where he acknowledges they were

       9    stripping out banned terms from quote, unquote, almost every

14:25:55  10    adult ad on the website.  Which, again, gives the lie to the

      11    notion that nearly all of these are lawful escort ads.

      12            And, finally, the moderators who testified in the PSI

      13    proceeding also talked about everybody knew these were all

      14    prostitution ads.  It was no secret.

14:26:14  15            One other consideration under Rule 17(c) is cost.  We

      16    acknowledge that in some circumstances if a federal grand jury

      17    subpoena were issued to a company and it would cost millions

      18    of dollars and a ton of attorney time to compile the

      19    materials, there might be an argument about oppressiveness or

14:26:32  20    unreasonableness.  But here, those costs were already incurred

      21    before we got involved.  The test under Rule 17(c) is whether

      22    complying with this subpoena would be unreasonable or

      23    oppressive, and it wouldn't.  It would cost virtually nothing

      24    and take virtually no time.

14:26:49  25            Final issue I wanted to address is the consideration

14:26:51  1    of the PSI report.  They've asked this Court to essentially

2    blind itself to the report and not consider it when evaluating

3    this motion, and we would submit there are four reasons why

4    that's not an approach the court should take.

14:27:07  5        First, tellingly, they have cited zero cases to

6    support their position.  And that's telling because, of

7    course, the Court should consider all of the relevant evidence

8    before it.  Courts should always try to make the best

9    decisions they can based on all the available evidence.  And

14:27:23  10   the available evidence here includes the PSI report and its

11   appendix.

12        The Court can see from the appendix exactly what's in

13   some of these e-mails and how they fit into our theory of

14   investigation and it would be anomalous for the Court to not

14:27:38  15   look at evidence when deciding whether to evaluate a motion.

16        A related point is that I was trying to search for

17   the right analogy to think about this.  Sometimes in criminal

18   cases the government ultimately comes into possession of

19   evidence that was ultimately obtained by some third party

14:27:55  20   through some improper means.  The government didn't have

21   anything to do with how it was improperly obtained, but it

22   later comes into the government's hands.  In that

23   circumstance, a defendant can't suppress that evidence by

24   pointing to how the evidence was initially obtained because

14:28:08  25   the person prosecuting them didn't have anything to do with

14:28:10  1    that process.  It's not a perfect analogy, but I think it's a

2    rough analogy for what happened here.

3             The Department of Justice has nothing to do with

4    these PSI proceedings.  The e-mails, for better or worse, are

14:28:22  5    out there and they powerfully show why things we're seeking

6    have a tight connection with the grand jury's investigation.

7    And, again, it would be anomalous for the Court to ignore this

8    evidence when deciding this motion.

9             A third point is that although it's true that the PSI

14:28:39 10    report was based in part on the e-mails that the senate

11    obtained through the subpoena, which are the same thing we're

12    trying to obtain here, it wasn't only based on the e-mails and

13    the documents, it was also based on testimony.  Testimony both

14    from former employees of Backpage and from victims of

14:28:55 15    Backpage.  And that also formed part of the report.

16             So even if Backpage later somehow prevailed in the DC

17    circuit, I'm not sure exactly what remedy they're trying to

18    get there, but if the court rules that the district court in

19    that matter shouldn't have enforced the subpoena in the first

14:29:11 20    place, nevertheless the PSI report is out there with all this

21    moderator testimony talking about how widespread the knowledge

22    was within Backpage that virtually all these ads are illegal,

23    how moderators viewed the marching orders from management as

24    trying to sanitize prostitution ads, the victims testifying

14:29:29 25    that they located their underage daughters on Backpage would

14:29:33  1    call the company begging to get the ads taken down and

       2    Backpage would refuse to do it, which, again, is knowingly

       3    running ads once they've subjectively acquired knowledge of

       4    its illegality.

14:29:46  5         Finally, separate from everything that's in the PSI

       6    report, there's loads of predication here showing this isn't

       7    some fishing expedition.  We've got these investigations from

       8    local law enforcement agencies, we've got the NAAG letter,

       9    we've got the First Circuit's finding last year in the civil

14:30:03 10    case that even though it found the CDA barred the victims in

      11    that case from seeking civil damages, there was compelling

      12    evidence that Backpage had created its moderation practices so

      13    as to enhance the ability of sex traffickers to ply their

      14    trade.

14:30:22 15         The bottom line is that grand jury subpoenas carry

      16    with them a heavy presumption of validity.  Now we're not

      17    coming before the Court disputing that subpoenas are subject

      18    to judicial review.  There are circumstances where the

      19    government overreaches, and courts have the ability to strike

14:30:35 20    down subpoenas when they overreach.  But this one doesn't.

      21    This subpoena, which would cost Backpage virtually nothing to

      22    comply with, goes to the heart of legitimate criminal

      23    theories.

      24         Backpage at times seems like they're arguing a

14:30:52 25    summary judgment or Rule 29 motion about whether the evidence

14:30:56  1   is ultimately going to be sufficient to sustain a criminal

        2   conviction.  That's the wrong way to look at this.  We're at

        3   the grand jury stage.  The grand jury is simply trying to get

        4   information so it can make an informed choice about how to

14:31:07  5   proceed.  So we ask the Court to enforce the subpoena.

        6            THE COURT:  All right.  Thank you, Mr. Lanza.

        7            Counsel, I wasn't paying close enough attention when

        8   Mr. Henze introduced you.  Are you Mr. Grant?

        9            MR. GRANT:  Mr. Grant.

14:31:30 10            THE COURT:  Okay.  Go ahead, Mr. Grant.

       11            MR. GRANT:  Thank you, Your Honor.

       12            I'd like to focus on three points and respond to any

       13   questions the Court has, and also respond to the government's

       14   position.

14:31:41 15            THE COURT REPORTER:  Excuse me, Counsel, could you

       16   pull the mic over.

       17            THE COURT:  Actually, you can kind of pull them both

       18   in and everybody will be able to hear you.

       19            MR. GRANT:  I have a low voice.  Can you hear me

14:31:53 20   okay?

       21            I think there are three central issues here and at

       22   least three central problems with the government subpoena.

       23   The first is that this unquestionably challenges and

       24   implicates First Amendment rights.  When the government sets

14:32:10 25   out to investigate a publisher for publishing and making

14:32:13  1   editorial decisions and what those decisions are, that's the

       2   heart of the First Amendment.  That's why the law *Bursey* in

       3   this circuit applies.

       4          Second, there's a very real concern here, Your Honor,

14:32:27  5   about the process how we got here.  Listening to the

       6   government's argument that this is merely copying the PSI

       7   subpoena, that makes it all more permissible, they think.  I

       8   think it raises a serious constitutional question about

       9   investigating under PSI initially and then using that as the

14:32:47 10   hook for a grand jury subpoena.  That's the second point.

      11          And the third is that the subpoena here, I think it's

      12   unreasonable, overbroad, and burdensome under any standard.

      13   There I'd like to talk again about the Western District of

      14   Washington's ruling, but also in connection with the

14:33:05 15   constitutional standards which should be applicable here.

      16          Let me start with the First Amendment issues.

      17          The argument that we hear from the government today

      18   is the same argument that Backpage has heard and courts have

      19   heard in countless cases now dating back over eight years.

14:33:30 20   It's an argument that's been rejected over and over again.

      21   This notion that all the ads on Backpage are for illegal

      22   conduct and they're all just prostitution ads.  Your Honor,

      23   nine different courts have now held that the content of escort

      24   ads on Backpage are, in fact, protected speech.

14:33:50 25          And there's a very real difference between -- an

14:33:53  1    escort ad, it is permissible and has been permissible, whether

2    in the yellow pages or in newspapers, for scores of years.

3    Escort services are regulated within the state of Arizona and

4    many, many other states and cities.  So escort ads are

14:34:11  5    permissible.

6         The courts have held, as I say, that that's also

7    protected speech.  The Seventh Circuit in the *Dart* case, the

8    district courts of Washington, Tennessee, and New Jersey, each

9    in instances where states tried to pass laws to target

14:34:30  10   Backpage.  So it's established now that not only is there a

11   presumption in favor of speech being protected, but in this

12   case there's actually established law that the speech on

13   Backpage is protected.  And that's the premise for the

14   applicable standard to determine the appropriateness of the

14:34:50  15   grand jury subpoenas here.

16        The government criticizes the *Bursey* case, suggests

17   it's no longer good law.  I submit, Your Honor, it is in fact

18   very much good law, and there are several cases.  We didn't

19   have an opportunity in our surreply to cite the balance of

14:35:11  20   other cases that have upheld *Bursey* and have applied *Bursey*

21   within the Ninth Circuit, and outside the Ninth Circuit, since

22   it's been decided, but the government's position is all based

23   on a series of cases that arose from *Branzburg* that have held

24   there is no constitutional reporter's privilege.

14:35:31  25        When the government suggests that the Ninth Circuit

14:35:33  1    in *Bursey* did not take into account the analysis of *Branzburg*,

2    they really overlooked the rehearing statement from the Ninth

3    Circuit saying they expressly considered *Branzburg* and they

4    expressly say this does not change our analysis.

14:35:51  5         And there's a very real difference between the

6    reporter's privilege cases and the circumstances of *Bursey*

7    itself.

8         Reporter's privilege cases had to do with the

9    question of whether or not there's an absolute constitutional

14:36:04 10   privilege not to reveal confidential sources which have to do

11   with witnessing or evidence of a crime.  Directly going to a

12   criminal investigation and evidence of that crime.

13        The situation in *Bursey* is very different, and the

14   cases that have applied the *Bursey* standard are different.

14:36:21 15   They're situations where the government is going after an

16   organization, the press, or a publisher, and they're going

17   after them for those kinds of activities.  That directly

18   implicates the First Amendment and it does so in such a way

19   that the *Bursey* test applies.  Substantial relationship,

14:36:39 20   compelling interest to the government, substantial connection

21   in order to show that the information the government seeks is

22   directly relevant to its investigation.  And that this is the

23   least intrusive means the government can pursue for its

24   investigation.

14:36:56 25        So I respectfully disagree with the government that

14:36:58  1    *Bursey* is not the governing standard here.  I believe it is.

       2            And in this circumstance, what we're talking about

       3    really is very plainly an investigation of the public.

       4            If you look at the three requests that the government

14:37:10  5    has made, and the breadth of those requests, they cover

       6    effectively all editorial decisions throughout the country for

       7    any ads on Backpage over the course of the last seven years,

       8    plus any determinations about rules, about monitoring content,

       9    about barring users, about screening content, about words that

14:37:33 10    are to be permitted or not permitted on the website.  All of

      11    those things are exactly what websites do and exactly what

      12    publishers do.  So it's the heart of what the First Amendment

      13    should protect and *Bursey* should protect.

      14            THE COURT:  Let me ask you a question because I know

14:37:53 15    I'll forget it if I wait until the end of your comments.

      16            You distinguished *Bursey* a moment ago from *Lewis* and

      17    other Ninth Circuit cases by saying -- I think you said that

      18    *Bursey* was an instance of the government going after an

      19    organization.  *Bursey* specifically was the government trying

14:38:17 20    to compel two women to testify about what they knew regarding

      21    the publishing activities of the Black Panther newspaper.

      22    Now, there's no doubt the ultimate target was the Black

      23    Panther party and their activities, but the subpoenas were to

      24    individuals about what they knew or observed in their role in

14:38:44 25    the Black Panther publication.

14:38:48  1    *Branzburg* was quite similar in that it was the

2    government going after individuals to find out what they knew

3    about various criminal activities that were ultimately the

4    target of the government there.  And *Lewis and Scarce* and *Wolf*

14:39:07  5    were all sort of the same.  So I'm not understanding,

6    Mr. Grant, the distinction you're drawing between *Bursey* and

7    those other cases.  Could you explain that?

8         MR. GRANT:  Glad to, Your Honor.  The difference

9    between the two being -- and there is a piece of *Bursey*, in

14:39:23  10   fact, remember, where the Ninth Circuit did permit

11   questioning.  There were four different categories of

12   questions.  It wasn't solely, though, that the two individuals

13   who were testifying were reporters and they weren't solely

14   being asked about information they had witnesses or obtained

14:39:39  15   from confidential sources.

16        So remember that the one thing that the government

17   said was permissible to ask, and they allowed the questions,

18   had to do with -- I think the statement was "We are going to

19   kill the president."  It was a statement within an editorial.

14:39:54  20   And they asked questions about who the "we" were that was

21   referred to in that editorial.  As I recall, the government

22   said -- the Ninth Circuit has said those kinds of questions

23   are permissible.

24        But what the government did in *Bursey* went well

14:40:08  25   beyond that because the rest of the questions had to do with

14:40:11  1    who makes the editorial decisions within the Black Panther

2    newspaper, what kind of decisions are there, who are these

3    people who are involved with the newspaper, and, much broader,

4    having to do with all of the publication of the newspaper and

14:40:23  5    the association of people within the Black Panther party as

6    well.  That's what the Ninth Circuit said could not be the

7    subject of investigation.  That was going too far.  That's the

8    component of *Bursey* that's all about the publishing conduct.

9           So, yes, there is an element of if the reporter has

14:40:42 10    witnessed a crime and a grand jury asks the reporter about

11    that, the reporter is not privileged to not disclose the

12    information.  Likewise, if the reporter's gotten the

13    information from a confidential source, there is no absolute

14    constitutional privilege.  There are various other privileges

14:40:58 15    as well.

16           Does that answer the Court's question?

17           THE COURT:  I think I understand.

18           MR. GRANT:  It really is a publishing function that

19    happened in *Bursey*.

14:41:06 20           THE COURT:  I understand the point you've made, I

21    think.

22           MR. GRANT:  If I may, let me turn to the second very

23    real concern here.

24           As I say, the government's view is that the grand

14:41:18 25    jury subpoena here is more permissible, more acceptable,

14:41:22  1    because it's patterned on -- it's actually verbatim duplicate

2    of the PSI subpoena.  And that raises the very serious

3    concern.

4          Remember that the PSI subpoena was issued by the

14:41:38  5    senate from its subcommittee on investigations subject to its

6    investigative powers.  Now, while I can't necessarily -- I

7    won't necessarily concede the government's position in that

8    case because that's pending appeal before the DC circuit, the

9    government's position is that the breadth of its subpoena

14:41:55 10    powers for legislative purposes is as broad as the United

11    States Code.  It's any subject that Congress could legislate

12    on.  The DC district court accepted that argument.  And based

13    on that threat, enforced the subpoena against Backpage and the

14    respondents there.

14:42:11 15          The government's purpose here is anything but

16    legislation.  The government's purpose here is punitive.  It's

17    to investigate targeting backpage.com.  They've said that.

18          So the requirements that the government has to

19    satisfy here are those that are applicable to a grand jury.

14:42:30 20    Here's the problem though.  If the PSI gets all of its

21    information under this ostensibly broader purpose and merely

22    says -- and the government merely comes in and says we want

23    the exact same information because they got it, that

24    completely messes the purpose -- the differences of the

14:42:49 25    purposes of the two different entities and completely can

14:42:51   1   override the constitutional protections that should be

2   applicable in the grand jury context.

3           In fact, really works out to be a recipe for how the

4   government can evade the constitutional protections that

14:43:05   5   should apply in the context of grand jury.  Congressional

6   committee goes out, does its broad investigation, then the

7   government turns around and says, the DOJ, we want the same

8   information because it's already been disclosed.

9           This is actually a very real concern in connection

14:43:20  10   with the investigation that the PSI did.  And I note it's one

11   of the issues that's pending before the DC circuit, is whether

12   in fact the purpose of that was legislative at all or,

13   instead, was a purpose of gathering information for possible

14   prosecutions.

14:43:41  15           And in that regard, just recently, this is from

16   February 14, the minority chairperson, Senator McCaskill,

17   issued a statement that after the PSI had finished their final

18   report, which said nothing about legislation, said nothing

19   about any sort of possible remedies or proposals about sex

14:44:07  20   traffic but merely focused on attacks on Backpage, then most

21   recently Senator McCaskill said "I'm hopeful the results of

22   our investigation will give future cases against Backpage the

23   legal ammunition to more effectively pursue justice against

24   the company and we didn't need to pass a new law to achieve

14:44:28  25   it."

14:44:29  1        The concern is this mechanism can be used, if you use

        2    the broader powers, or arguably broader powers, of a PSI and

        3    then use that for punitive purposes.  That's the concern in

        4    connection with the PSI subpoena.

14:44:43  5        The government also argues it should be fair game for

        6    the Court to consider all of that information.  I suggest,

        7    Your Honor, it should not.  In part because the decision by

        8    the DC district court is currently pending before the DC

        9    circuit court of appeals.  There are very significant problems

14:45:00 10    in that case about First Amendment, about the DC district

       11    courts shifting the burden backwards.  Remember, under the

       12    First Amendment it should be that the government has the

       13    burden to show the compelling interest for its investigations.

       14    That's true for the legislative context as it is in the grand

14:45:16 15    jury context.  The DC district court flipped it and put the

       16    burdens on the respondents instead.  And, as I say, there are

       17    serious questions that are still pending.

       18        THE COURT:  Before you leave that point, let me make

       19    sure I understand it.

14:45:34 20        It seems to me what you're saying, Mr. Grant, is that

       21    if a legislative committee is permitted to obtain information

       22    under its very broad subpoena powers, that fact should never

       23    be used to justify a grand jury subpoena that simply tracks

       24    the legislative subpoena because they have very different

14:45:59 25    purposes and powers.  Is that your argument?

14:46:04   1          MR. GRANT:  It's my argument that that should not per

       2      se justify the grand jury subpoena.

       3          THE COURT:  Right.

       4          MR. GRANT:  I don't believe you can do that.  What

14:46:11   5      I'm suggesting is this court has an independent obligation to

       6      look at the grand jury subpoena anew.  You can't take the PSI

       7      subpoena as justification whether this is proper or improper.

       8          THE COURT:  Well, that gets to my next question,

       9      which I think you just answered, but I assume it's also your

14:46:27  10      position that if a legislative body undertakes a broad

      11      subpoena and obtains information, that fact does not preclude

      12      a grand jury from obtaining the same information if the grand

      13      jury meets the appropriate test for grand jury subpoenas.

      14          MR. GRANT:  I think I was answering that question as

14:46:48  15      well, Your Honor.  What I was suggesting was the grand jury

      16      needs to satisfy the grand jury standards, can't bootstrap in

      17      from the governmental standards.

      18          But the other thing to keep in mind here is it's also

      19      inappropriate, though, to say because the government obtained

14:47:04  20      that information -- and it's still subject to question whether

      21      the government obtained it properly in the PSI context, that

      22      is not a final decision, that's currently pending appeal -- to

      23      use that information and to use the PSI's report in particular

      24      here as justification for why this grand jury subpoena should

14:47:19  25      be permitted, I think it's entirely backwards and a serious

14:47:25  1    challenge to due process.  Because that's sort of taking if

       2    you got the information improperly in the first instance and

       3    then you choose to use it for some other purpose, then that's

       4    permissible.

14:47:37  5           I listened to the government's suggestion that that's

       6    like some third party has inappropriately obtained evidence

       7    and the government could still use that.  Well, this is not a

       8    third party.  This is one government body and another

       9    government body which, at least from Senator McCaskill, was

14:47:58 10    one that was intending to help prosecutions by the other.  So

      11    this is not a situation where it was inadvertently disclosed

      12    information.

      13           And the difficulty with the PSI report itself, I

      14    don't have a fraction of the time I would need to go through

14:48:12 15    all of the inaccuracies and how much of a, really, just an

      16    argumentative document that is.  But let me just sort of

      17    summarize, because effectively what it's talking about --

      18           THE COURT:  Let me interrupt you for a minute and

      19    tell you this -- I don't know if this will help your

14:48:26 20    argument -- I have not read it.  I have deliberately chosen

      21    not to read it because what I did before I decided whether or

      22    not to read it is I read your surreply where you suggested I

      23    shouldn't be looking at it.  And I thought until I'd heard the

      24    argument here, I ought not read it.

14:48:43 25           So you can talk about what's wrong with it if you

14:48:46   1   want, but you don't need to do that to persuade me to

2   disregard what's in it because I haven't read it yet.  I'll

3   obviously decide after the hearing whether I should.  But I

4   just wanted you to be aware of that fact as you proceed.

14:48:58   5          MR. GRANT:  I appreciate that.  And there is still

6   pieces of the report and statements from the report that are

7   included within the government's briefs, and I just listened

8   to the government's arguments again focusing on pieces of

9   that.  So let me respond very briefly about that.

14:49:13  10          THE COURT:  That's fine.

11          MR. GRANT:  The real concern is this is all an attack

12   on Backpage's efforts to moderate, to review, to screen ads,

13   to block ads, make sure the content that's going on the

14   website is not offensive, not unlawful, and going through lots

14:49:36  15   of different mechanisms to do that.  It's an enormous job.

16   They use automated filters, they use multiple levels of manual

17   review.

18          But the gist of what the government is arguing about

19   this is, well, let's talk about this term that they banned or

14:49:54  20   that term they banned, and that must mean the underlying ads

21   are illegal and they must have been trying to intentionally

22   scrub illegality.

23          Your Honor, I can get into the particulars why that

24   makes no sense at all, that in fact what they were trying to

14:50:08  25   do is to make sure the ads that were submitted were not

14:50:11   1   offensive, not improper, and going through means to do that.

2   That's -- this is where my point about the CDA comes in.  That

3   is exactly what Congress intended.

4           Congress set out to say to websites, knowing that

14:50:23   5   there's such an enormous volume of information that comes

6   through them, they wanted to encourage websites to come up

7   with means to screen content, to do so voluntarily, and

8   whether that is automated or whether it's by manual review,

9   that is what Congress set out to do.

14:50:42  10           They also said -- and admittedly this is in the civil

11  context.  I'll take the government's point that there is an

12  exemption for federal criminal charges within the CDA.  I

13  accept that.  But the idea was that if we were to impose

14  liability on websites if they were imperfect in their

14:51:03  15  screening practices or if someone thought the screening

16  practices were inadequate, that would be exactly backwards

17  from what we intend to do to encourage websites to police

18  their content.  That's the problem.

19           What the government really is attacking is coming up

14:51:20  20  with characterizations and castigations of ways that were

21  being used to screen to try to suggest that those things were

22  nefarious when, in fact, they were intended for every good

23  purpose to try to make sure the content on the website was not

24  offensive and not improper.

14:51:37  25           Your Honor, if I may, let me turn to my last point.

14:51:43  1          The subpoena, I suggest, here is unreasonable and

       2  burdensome under any standard, whether we're talking about a

       3  First Amendment standard or Rule 17 standard.

       4          If you look at the three categories of information --

14:51:56  5  the government seems to think because we only have three

       6  requests, that's not very extensive.  In fact, that's -- if

       7  you look at the breadth of those three requests, they're

       8  enormously extensive, and if you look at all eight requests of

       9  the subpoena, they effectively ask for everything about

14:52:13 10  editorial practices, ads, whatever's been posted nationwide

      11  for seven years and all the decisions of the website about how

      12  to do that, how to edit, how to publish, as well as revenue

      13  information and a variety of other things in the other five

      14  requests.

14:52:33 15          If you were to draw a comparison of those requests to

      16  ones that the Western District of Washington considered, in

      17  fact Western District of Washington requests were narrower.

      18  There, the request had to do with specific ads for the most

      19  part, although one piece was broader.  But they were ads

14:52:48 20  within specific markets:  State of Washington, Western

      21  Washington, and later the government expanded it to say 16

      22  other cities in the country.  Here, the request is for the

      23  entire nation.  So all communications about editorial

      24  decisions, monitoring and screening across the country.  So

14:53:10 25  the requests in Western District of Washington were actually

14:53:12  1    narrower rather than broader here.

2              The Court's decision in that case was that whether

3         you applied a First Amendment standard or not, the requests

4         that the government made were oppressive and burdensome, and I

14:53:32  5    suggest, Your Honor, the Western District of Washington, in

6         all fairness, did not find the government in bad faith.  The

7         issue that the Court raised was a real concern about whether

8         the government had shown any basis to prosecute, whether there

9         was any theory here to prosecute.

14:53:48 10         And what the court said was if the government's

11        theory is that all ads on Backpage are unlawful, they don't

12        need to undertake this investigation to pursue that theory.

13        They already know that argument, they already know the ads on

14        Backpage, they could already pursue that theory if they

14:54:03 15   thought they had a basis to do it.

16             But the problem is, this is a fundamental problem

17        under the First Amendment.  This notion is that you can argue

18        that simply because an improper ad appears that that somehow

19        infers knowledge.  And the Western District recognized that

14:54:26 20   the idea was sort of backwards.  What the government was

21        trying to do was investigate every ad posted on the website to

22        try to find something that was illegal about those ads.

23             That's the same problems we have here.  In effect

24        what the government is doing is boil the ocean approach.  We

14:54:44 25   want to know about every editorial decision that's ever been

14:54:48  1   made concerning ads over the last about seven years, and from

2   that we'd like to find something to infer there was something

3   improper or some knowledge of illegality.

4          That's backwards.

14:54:58  5          And that's the case law we've suggested that dates

6   back to *Smith versus California*.  It is the same case law that

7   the government can't go seize all the books of a bookstore and

8   try to find something that's obscene or unlawful in it.

9          But the problem here is even greater than that.  If

14:55:15  10  the government could adopt this kind of theory, then virtually

11  any website, any website, that screens content would be

12  vulnerable.  Google screens content.  They block web pages all

13  the time.  Hundreds of millions of them.  And, in fact,

14  they've been investigated by government authorities

14:55:34  15  challenging whether their blocking techniques and screening

16  techniques are good enough or not.

17         Amazon does the same.

18         EBay has all sorts of rules about what can and cannot

19  be posted on their website.

14:55:48  20         So this theory that the government pursues here, we

21  can go investigate about anyone's rule if there's something on

22  the website that we don't like, it's a dangerous theory, a

23  chilling theory for free speech interest.  That's the

24  fundamental problem.

14:56:09  25         Your Honor, I would suggest the approach taken by the

14:56:11   1     Western District of Washington is instructive and I recommend;
           2     the Court's attention to that --
           3               THE COURT:  I've read both of Judge Jones' orders.
           4               MR. GRANT:  Thank you.
14:56:21   5               But -- and I say that because what he did was he
           6     looked very closely at the actual request the government was
           7     making.  He said I'm not going to redraft your subpoenas for
           8     you, but you can't do this; this is too broad.  There may be
           9     some permissible request, there may not be, but come back to
14:56:43  10     me with something else.  That was the first of the subpoenas
          11     he eliminated.
          12               Then afterward, when the government did come back
          13     with further subpoenas and had no better connection for their
          14     cause of their investigation, he said, in effect, enough's
14:57:00  15     enough.
          16               So I think his sort of measured approach as to how to
          17     address the subpoenas and to recognize the real flaw was this
          18     vast overbreadth of the subpoena in the first place, that it
          19     recommends itself and Rule 17 suggests that is exactly the way
14:57:19  20     the analysis should go.
          21               Are there other questions?
          22               THE COURT:  Yeah.  Hold on just a minute.
          23               MR. GRANT:  Sure.
          24               THE COURT:  If a website operator republishes an
14:58:05  25     advertisement knowing, completely knowing and understanding

14:58:09  1    that the advertisement is for underage prostitution, meeting

2    the scienter requirement that was addressed in the briefing,

3    is it Backpage's position that that -- either that that is not

4    a crime or, if it could be characterized as a crime, it can't

14:58:34  5    be prosecuted because it's committed in a First Amendment

6    context?

7              MR. GRANT:  To take the Court's question, I'm

8    assuming they have knowledge not simply because somebody

9    submitted an ad, but they know something?

14:58:47 10              THE COURT:  Yeah, they know something more --

11              MR. GRANT:  Actual mens rea, actual knowledge?

12              THE COURT:  Right.  That's my hypothetical.

13              MR. GRANT:  So the situation of the hypothetical is

14    if there is actual knowledge, say through participation in a

14:58:58 15    venture, you're conspiring with somebody, you know they posted

16    an ad, you know the person involved is underaged, that's a

17    prosecutable crime, Your Honor.

18              THE COURT:  Let's assume, then, hypothetically, that

19    the government has reason to believe that a website operator

14:59:16 20    is doing that.  Is knowingly engaging in illegal activity by

21    publishing these advertisements, and let's say that the

22    government serves a grand jury subpoena on the website

23    operator to obtain information from the operator as to how the

24    ads are received and processed and revised and what

14:59:45 25    communications occur with the advertisers to try to figure out

14:59:49    1    whether or not the website operator does in fact know this is

        2    illegal conduct.  Is it Backpage's position that that subpoena

        3    is improper?

        4         MR. GRANT:  The subpoena that the government issued

15:00:08    5    had to do with an incident of sex trafficking and they had a

        6    basis -- I'm not sure --

        7         THE COURT:  Let's say not even an incident.  Let's

        8    say they have reason to believe, from various sources of

        9    information, that this particular operator is knowingly

15:00:21   10    publishing advertisements for underaged prostitution.  So they

       11    serve a subpoena saying we want documents showing how these

       12    things get on your website, what editing you do, what

       13    communications you have with the advertisers, because we want

       14    to find out if you know, as we think you do, that this is

15:00:42   15    prostitution.

       16         Is that subpoena an improper subpoena in some way?

       17         MR. GRANT:  That's --

       18         THE COURT:  I know it's a general question, but I'm

       19    trying to get at the heart of what your argument is.

15:00:53   20         MR. GRANT:  I understand, but I think that's where

       21    there's the distinction between what I was suggesting.  If

       22    it's a specific incident and the government has information

       23    that there was conspiracy, somebody was participating with the

       24    website to traffic somebody underaged, that's an investigation

15:01:08   25    I think they can pursue.

15:01:10    1          The hypothetical Your Honor just gave me, though,

            2    suggests this more -- this broader sense of the government

            3    thinks that there's some basis to think that the website has

            4    knowledge that underaged people might be trafficked through

15:01:26    5    ads.  And that's where the problem comes in, because given

            6    that Backpage, for example, cooperates routinely with law

            7    enforcement about investigations, and, in fact, Backpage

            8    itself reports suspect ads, if the inference of knowledge is

            9    because something has happened that there have been incidents

15:01:49   10    and that Backpage knows of those incidents despite its best

           11    efforts to prevent them, then that becomes an improper basis,

           12    I think, to issue a subpoena to investigate a website.

           13          THE COURT:  Why?

           14          MR. GRANT:  Because the same theory would apply to

15:02:06   15    every website and every publisher.  Because improper content

           16    does go out over the web and it goes out over almost every

           17    website.  And the fact that you would be taking the

           18    cooperation, the efforts by a website publisher to prevent

           19    that from happening and turning that around to say that's the

15:02:27   20    basis for an inference of knowledge would be completely

           21    backwards.

           22          And, this is where I think the First Amendment

           23    concern comes into play, that's a very, very dangerous

           24    precedent for the First Amendment.  That's why what I'm

15:02:42   25    suggesting is under all the case law that has to do with

15:02:46  1   scienter and mens rea, the way that First Amendment

2   investigations have been done, the way that First Amendment

3   laws, regulations, prosecutions have been done, needs to be

4   done on the basis of a specific incident. It needs to be done

15:03:01  5   on something that's a much more significant and better

6   connection or basis for the government to pursue it.

7        The idea that if you set out to try to prevent it,

8   that shows your knowledge -- and by the "it" I mean some form

9   of sex trafficking -- that shows your knowledge that sex

15:03:22 10   trafficking can occur and therefore I can investigate you?

11   Every website's at risk now.  And that, I suggest, is exactly

12   the First Amendment backwards.

13        THE COURT:  How would you articulate what the

14   government needs to know before it can launch that kind of

15:03:42 15   investigation of a website operator?

16        MR. GRANT:  I've thought about that question and it's

17   a little difficult for me to articulate because I'm not the

18   one to suggest to the government how it should pursue its

19   investigations --

15:03:56 20        THE COURT:  Maybe I can ask it differently.  I don't

21   want to have you create the government standard.

22        *Branzburg*, which I do think is a relevant case, has a

23   fairly relevant discussion, in my view, on page 701 of 408

24   U.S. where it talks about what kinds of thing a grand jury may

15:04:33 25   investigate.  And Justice White in this decision says that,

15:04:42  1    I'm now reading from page 701:  "The role of the grand jury as

2    an important instrument of effective law enforcement

3    necessarily includes an investigatory function with respect to

4    determining whether a crime has been committed and who

15:05:01  5    committed it.  To this end, it must call witnesses in the

6    manner best suited to perform its task.

7            "When the grand jury is performing its investigatory

8    function into a general problem area, society's interest is

9    best served by a thorough and extensive investigation.  A

15:05:21 10    grand jury investigation is not fully carried out until every

11    available clue has been run down, et cetera."

12            But then he says, "Such an investigation may be

13    triggered by tips, rumors, evidence proffered by the

14    prosecutor, or the personal knowledge of the grand jurors."

15:05:42 15            He seems to be saying you don't have some sort of

16    probable cause threshold that the jury has to conclude before

17    it launches an investigation.  And this is in the context of

18    talking about when the grand jury function collides with the

19    First Amendment.

15:06:00 20            So what I'm wrestling with is the argument I think

21    you're making, that there is some threshold that has to be

22    cleared before a grand jury can investigate a website

23    operator's posting of information.  If you could address that.

24            MR. GRANT:  So let me address it in two respects.

15:06:17 25    First of all as to *Branzburg* itself.  As you'll recall,

15:06:17  1    *Branzburg* said in the decision, this is not -- we're not

2    deciding a First Amendment issue here.  They're deciding a

3    separate issue having to do with the reporter's privilege.

4    And, secondly, concurrence --

15:06:32  5         THE COURT:  Well, what they're deciding is whether

6    the First Amendment creates a reporter's privilege.

7         MR. GRANT:  And the decision is that it does not.

8         THE COURT:  Right.

9         MR. GRANT:  So there is not a First Amendment issue

15:06:42 10    for the privilege, claim privilege that they're addressing

11    there.

12         And recall that the occurrences say, and *Branzburg*

13    itself says, we have no doubt that grand juries are

14    constrained by the First Amendment and by the Fourth

15:06:56 15    Amendment, and Fifth, and that if there are circumstances

16    where the government goes beyond this kind of situation, that

17    courts are not without power to step in and monitor their

18    activities.

19         And that's where I think we come back to *Bursey*.  I

15:07:15 20    appreciate the Court's point *Branzburg* is at least on the

21    periphery of the First Amendment, it does relate to reporters,

22    that is true.  But it is a different circumstance.  When we

23    come back to *Bursey*, which still controls in this circuit,

24    your question about is there a need for a threshold of some

15:07:34 25    kind now comes into play.  So the quote, for example, the

15:07:37  1    Court was just reading, that's very certainly a good and

2    accurate description of the broad powers of the grand jury.

3         I suspect I could find you 20 or 30 more because,

4    obviously, grand juries do have broad powers and do have a

15:07:53  5    right to investigate for the sake of investigating to

6    determine whether a crime -- sorry.  That's a misstatement.

7    They have a right to investigate for purposes of determining

8    whether or not a crime was committed.

9         But, but, when they intrude on areas of First

15:08:10 10    Amendment speech, publisher's association rights, and the

11    press, then they have to show an immediate, substantial,

12    subordinating need, they have to show substantial relationship

13    of that information, and they have to show there isn't another

14    means to obtain the information.  And I suggest on the third

15:08:29 15    category in particular, Your Honor, this is where the

16    government can investigate in many, many other ways.  But

17    issuing a subpoena says give me -- in effect.  I realize this

18    isn't exactly what the subpoena says, but in effect, give me

19    everybody you've ever published and everything you've ever

15:08:49 20    decided about your publication and let me go through that.

21    I'll rummage through all that information and I'll see if I

22    can find something to suggest that you actually knowingly are

23    promoting some sort of illegality.

24         That's backwards.  That's the problem.

15:09:03 25         And I'm back to the Court's question about how would

15:09:05  1   I structure what the government should do. I don't know the

2   answer to that, but I do know it's considerably narrower than

3   the tact we've taken here.

4        THE COURT:  Let me ask you another question about

15:09:16  5   *Bursey*.

6        As you know, Judge Hufstedler and her panel issued

7   the *Bursey* decision, I think it was the day after *Branzburg*

8   came down.  No Westlaw to post it that day for them, so they

9   didn't know about it for a week.

15:09:38  10       MR. GRANT:  In fact, Shepardized it.

11       THE COURT:  Right.  *Branzburg* comes down, there's a

12   petition for rehearing, and she says in her opinion

13   accompanying the denial of the petition for hearing *Branzburg*

14   doesn't change the result.

15:09:58  15       Two years later we get the *Lewis* decision, *Lewis I*.

16   A member of the panel in the *Lewis* case is Judge Koelsch,

17   K-O-E-L-S-C-H, who was also on the panel in the *Bursey* case.

18   So he's well aware of *Bursey*.

19       MR. GRANT:  He's from my neck of the woods, Seattle.

15:10:19  20       THE COURT:  And he -- it's a procuring opinion so we

21   don't know if he wrote it, but *Lewis* addresses the clash

22   between the grand jury subpoena and First Amendment rights.

23   This was, as you well know, a radio station manager who

24   wouldn't turn over certain information it had obtained.

15:10:35  25   Doesn't even mention *Bursey*.  Cites *Branzburg* for the

15:10:40   1   controlling test.

2          Next year *Lewis II* comes down with three other

3   judges, including one from your neck of the woods, Judge

4   O'Scannlain, which doesn't even mention *Bursey*; relies

15:10:53   5   entirely on *Branzburg*.

6          We then get to 1993, the opinion that's sometimes

7   called the *Scarce* decision where yet another panel addresses

8   the colliding of grand jury powers and First Amendment, and

9   doesn't rely on *Bursey*.  It relies upon *Branzburg*.  And, in

15:11:17  10   fact, it says *Bursey* can be explained as falling within the

11   narrow exception that Justice Powell described in his

12   concurrence in *Branzburg*.

13          And then there's a 2006 decision, which I don't know

14   that we can even cite because it's unpublished and it's before

15:11:34  15   2007, which is sort of the trigger date for citing, but it is

16   a case that relies on *Branzburg* again.

17          Given that history, why isn't it a fair reading of

18   Ninth Circuit law to conclude that *Branzburg* is an example of

19   Justice Powell's, and also Justice White's, sort of exception

15:12:00  20   to the general rule that people can't refuse to turn over

21   information to a grand jury on the basis of the First

22   Amendment?

23          MR. GRANT:  That *Bursey* is an exception to --

24          THE COURT:  No, that *Bursey* falls within Powell's

15:12:13  25   exception.  That's what *Scarce* said.

15:12:15   1        MR. GRANT:  I think there's a concern about reading

          2   too much into the series of cases, reporter's privilege cases

          3   from *Lewis* all the way through *Scarce* and the 2006 decision.

          4   They all fall squarely within *Branzburg*.  As a matter of fact,

15:12:28   5   I think it was *Scarce* itself that says that.  This is

          6   controlled by that.

          7        So the fact that they don't address the *Bursey*

          8   circumstance is pretty obvious.  Because there's no need to.

          9   There's no absolute reporter's privilege.  *Scarce* extends it

15:12:46  10   to the scholar's privilege.  It's effectively the same thing.

         11   Radio station, largely the same thing.

         12        So you've got very clearcut law, *Branzburg* is the

         13   law.  There isn't a need to consider the *Bursey* analysis

         14   because we're not outside the realm of someone simply claiming

15:13:04  15   the reporter's privilege.

         16        So I don't think it's appropriate, given the holdings

         17   of this cases don't affect a situation where there is

         18   investigation of a publisher for publishing.  They don't

         19   affect the kind of associational rights issues that were

15:13:20  20   involved in *Bursey*.  Given their holdings have nothing to do

         21   with that, it's not surprising that they don't mention *Bursey*.

         22        And saying *Bursey* is sort of a unique carve-out,

         23   whether you do it in terms of Justice Powell's concurrence or

         24   you say simply *Bursey* stands and it stands and as Judge

15:13:40  25   Hufstedler decided it, I agree it is a unique circumstance.

15:13:45  1    And it doesn't arise very often.  But it does arise here, and

2    it would arise in every situation where the government decides

3    it's going to investigate editorial practices of a website

4    because it doesn't like the content on the website.

15:14:04  5         THE COURT:  Are you aware of any Ninth Circuit case

6    or district court case within the Ninth Circuit that has

7    recognized what you just said, namely that *Bursey* is not a

8    reporter's privilege case, it's really a different kind of

9    case and it has continuing vitality in that area?

15:14:23 10         MR. GRANT:  Trying to recall whether it's Ninth

11   Circuit or not.  I know cases that have followed *Bursey* and

12   its analysis since *Bursey* was decided.  I don't recall, Your

13   Honor, whether they're in the Ninth Circuit or not.  I can

14   tell you they're in, for instance, circumstances of

15:14:36 15   investigating information about what books someone read, going

16   to a book seller and asking for that information, *Bursey*

17   applies and the analysis applies there.  So, yes.  And there

18   have been other circumstances as well.

19         So there's situations where we're not talking about

15:14:53 20   the straight reporter's privilege, but we're talking about

21   press, speech, book sellers, rights to decide what to read.

22   I'd be happy to give you a list of those cases.  I have it

23   from prior briefing I don't have it in front of me now.

24         THE COURT:  That's okay.  They're easy to find if

15:15:12 25   they've cited *Bursey*.

15:15:15  1        Last question for you when I looked over the eight or

2    nine cases you cited, the Seventh Circuit and all of the

3    district court cases, it appeared to me that the only one of

4    them that's a grand jury case is Judge Jones from the Western

15:15:28  5    District of Washington.  Am I right about that?

6        MR. GRANT:  That is correct, Your Honor.  The others

7    arise in different contexts.  I think the point we were trying

8    to make from all the cases is they're all consistent for the

9    notion that the government can't presume the speech is

15:15:44 10    illegal, that in fact escort ads are protected speech and that

11    efforts by the government to try to establish otherwise, the

12    burden always falls to the government in order to establish

13    its subordinating need and the connection for that, and that

14    there's no less-intrusive means to get the information.

15:16:03 15        That's -- let me just say this sort of in closing.

16    *Bursey* is entirely consistent with all First Amendment law.

17    It is the notion that it is always the government's burden in

18    a circumstance that directly infringes speech or implicates

19    speech rights.  The government has the burden to establish

15:16:24 20    something along the lines of what the *Bursey* test proposes.

21        THE COURT:  Okay.  Thanks, Mr. Grant.

22        MR. GRANT:  Thank you.

23        THE COURT:  Mr. Lanza.

24        MR. LANZA:  Couple points in responding to

15:16:42 25    Mr. Grant's arguments.  Talked about the state lawsuits that

15:16:46   1    they'd previously won where they challenged states that were

         2    trying to bring criminal actions, and articulated that as a

         3    broad judicial recognition that the First Amendment shields

         4    what they do here.  I disagree.  Those were CDA cases not

15:17:00   5    First Amendment cases, and they beg the question what happens

         6    here when the CDA doesn't apply.

         7            There's discussion on how the fact that the senate

         8    had a different legislative purpose in using its subpoena

         9    power to get the documents than we have.  That may be true,

15:17:16  10    but our position here is not that because the senate got these

        11    documents, we get them automatically without making any

        12    showing whatsoever.  That's not our position.

        13            Our position is we also have a compelling reason for

        14    getting these.  We're conducting a federal criminal

15:17:33  15    investigation, which the Ninth Circuit has found time again is

        16    a compelling interest of the government, and these documents

        17    are relevant to what we're investigating.

        18            We're not just trying to coast on the fact that the

        19    PSI obtained them to show they're fair game for anybody.  But

15:17:47  20    here, they meet even the heightened *Bursey* test you just

        21    talked to.  We do have a compelling need and they do go to the

        22    heart and have substantial fit in connection with what we're

        23    investigating.

        24            I think that the most salient points I want to

15:18:05  25    address, even though Mr. Grant had some others, were right at

15:18:08  1    the end when the Court asked the two hypotheticals.  I think

2    those hypotheticals get exactly to the heart of the issues

3    here.

4          One, can a website operator be held criminally liable

15:18:18  5    for knowingly publishing advertisements with the knowledge

6    that they're for criminal activities?  Yes.  He admitted that.

7    That's what the *Lynch* case from DC came out with last year,

8    and that's exactly what we're trying to investigate here.

9    We're trying to figure out what they knew.

15:18:35  10         Then the Court's question was if the government

11   reasonably believes this is happening, can they subpoena it?

12   I think it was telling his answer was no, but I didn't really

13   see much of a principled reason for that other than "it would

14   be bad for my client here."

15:18:51  15         Of course.

16         Under *Branzburg* the court hit the nail on the head.

17   Grand juries have wide latitude when they think something is

18   afoot to investigate.  There is no requirement of a

19   preliminary showing of probable cause or anything like that.

15:19:03  20         But I'd further note that even though *Branzburg* sets

21   the bar very low, we would meet even a higher bar here.

22   There's all sorts of predication and evidence here on the

23   record justifying why the grand jury is conducting this

24   investigation.  There's statements from Backpage moderators

15:19:22  25   that everybody knows this is prostitution.  There's these

15:19:23  1    findings from law enforcement folks back in 2011 and 2012.

2    There's the First Circuit's findings.  So this isn't some

3    blind fishing expedition.

4         *Branzburg* sets a very low bar.  Wherever the bar is,

15:19:34  5    even if it's true -- I don't agree, but even if it's true that

6    somehow different sort of First Amendment claims raise the bar

7    a little bit in the First Amendment context, we've still

8    greatly exceeded wherever that bar is.

9         Unless the Court has any questions --

15:19:48  10    THE COURT:  I do have a couple of questions.

11    What statute, in your view, is violated if a website

12    operator knowingly publishes an advisement that is for illegal

13    activity?

14    MR. LANZA:  There's at least two of them that we're

15:20:04  15    focusing on here.  First is 1952 the Travel Act, which makes

16    it a crime to use interstate --

17    THE COURT:  Is that 18 USC?

18    MR. LANZA:  18 USC 1952.

19    THE COURT:  I thought that was part of racketeering.

15:20:18  20    MR. LANZA:  The Travel Act -- I'll give the Court a

21    chance to look it up.  I don't have the statute book in front

22    of me, but I'm pretty sure that's it.

23    THE COURT:  Well, 18 USC 1951 is in chapter 95 on

24    racketeering.  And 1952, maybe that's what you're focusing on

15:20:39  25    as part of the racketeering statute, is interstate and foreign

15:20:42  1    travel or transportation in aid of racketeering?

2    MR. LANZA:  And then I think subdivision -- I'm

3    going -- I don't have it in front of me.  There's a

4    subdivision that says it's a crime to knowingly facilitate

15:20:52  5    prostitution committed in violation of state law.

6    THE COURT:  Unfortunately, like all other

7    racketeering sections, this has got about a thousand words in

8    it.

9    Mr. Lanza -- Traci, would you hand this to him --

15:21:35 10    point out to me, if you would, what you're talking about, but

11    do it in the mic so the other counsel can hear you.

12    MR. LANZA:  So 1952(a)(3) makes it a crime whoever

13    uses any facility in interstate commerce, which would be the

14    internet, to otherwise promote, manage, establish, carry on,

15:22:17 15    or facilitate the promotion, management, establishment, or

16    carrying on of any specif- -- excuse me, of any unlawful

17    activity.  And the term "unlawful activity" is defined further

18    on in the statute.

19    So in our view we'd be focusing on using a facility

15:22:33 20    in interstate commerce to facilitate the promotion,

21    management, establishment, or carrying on of an unlawful

22    activity.

23    Then in 1952 subdivision (b)(1), "As used in this

24    section, 'unlawful activity' means," and then it goes on to

15:22:54 25    say "prostitution offenses in violation of the laws of the

15:22:57  1    state in which they're committed or of the United States."

2    THE COURT:  And what was the second statute that you

3    mentioned?

4    MR. LANZA:  Then 15 -- 18 USC 1591, which I believe

15:23:11  5    formed the basis for the hypothetical that the Court asked

6    earlier.  That's --

7    THE COURT:  I wish I had a statute in mind when I

8    asked it, but I didn't.

9    MR. LANZA:  That is the statute -- one of the cases

15:23:23  10   we cited in our brief is the District Court for the District

11   of Columbia *Backpage v Lynch*, which was decided last year.

12   Backpage brought a constitutional challenge to this statute

13   and the statute makes it a crime whoever knowingly in or

14   affecting interstate or foreign commerce recruits, entices

15:23:41  15   harbors, transports, provides, obtains, advertises, or

16   maintains by any means a person that the person has not

17   obtained the age of 18 be caused to engage in a commercial sex

18   act.  So that statute expressly makes it a crime for a person

19   to knowingly advertise an underaged sex trafficking victim.

15:24:12  20   THE COURT:  Okay.  Would you comment on the

21   distinction that Mr. Grant drew between *Bursey* and the

22   reporter privilege cases.

23   MR. LANZA:  Yeah.  I think the key case here is that

24   1993 case *In Re Grand Jury*, or *Scarce*, where the court

15:24:32  25   directly addressed the reporter's claim in that case -- or,

15:24:35   1   excuse me, the researcher's claim in that case that *Bursey*

2   supported his position.  And if the distinction they're

3   drawing were the correct distinction, the Ninth Circuit would

4   have said, you know, Mr. Researcher, you're out of luck here

15:24:49   5   because *Bursey* was a full-blooded First Amendment claim,

6   you're a researcher trying to rely on the reporter's privilege

7   and that is some lesser species of First Amendment claim, so

8   that's why you don't win under *Bursey*.  And that's not what

9   they said.

15:25:02  10       Instead they distinguish *Bursey* along the grounds

11  that we've laid out in our brief and that the court was

12  discussing.  They dismissed it as that was a case that was

13  decided before *Lewis*, and in any event it's consistent with

14  Justice Powell's concurrence in *Branzburg*.

15:26:20  15       THE COURT:  What is your response to Backpage's

16  argument that the three categories in the subpoena that you

17  want me to enforce are broader than the categories that Judge

18  Jones found overly broad in the Washington case because these

19  are nationwide, they go back four years, they uncover all

15:26:43  20  documents within these three categories during that entire

21  period?

22       MR. LANZA:  I disagree.  I think in part I disagree

23  because in Backpage they weren't simply -- excuse me, in

24  Washington they weren't simply seeking information about the

15:26:55  25  moderation practices, they were also seeking about information

15:26:58  1    about a host of other issues, including information about

2    whether Backpage employees had personally used the services,

3    which really seemed to be one of the things that caught the

4    judge's attention up there as improper and isn't present here.

15:27:09  5         But separately the question of whether or not it's

6    okay to seek nationwide evidence, of course it is.  Backpage

7    is a nationwide company.  A charge here would presumably

8    involve an allegation of a conspiracy between two or more

9    people to commit these statutes that I've mentioned earlier,

15:27:26 10    and perhaps some money laundering statutes that the violations

11    of 1591 and 1952 could be underlying SUA for.

12         A criminal prosecution in that case would include

13    everything Backpage did across the country.  Although the

14    conspiracy would have to take place, in part, in Arizona for

15:27:51 15    venue to be here, the crimes have nationwide applicability.

16         So we're -- it would be improper, and we're certainly

17    aren't limited in only investigating acts of advertising or

18    sex crimes that happened to occur within Arizona when the

19    grand jury has a legitimate basis under *Branzburg* and for

15:28:07 20    other reasons to think this was a conspiracy that stretched

21    outside of Arizona's borders.

22         THE COURT:  Okay.

23         Counsel, what I want to do is take a 15-minute break

24    to go back and review my thoughts and my notes and see if I

15:28:24 25    can give you a ruling today.  Or, if not, then I'll just come

15:28:29  1    in and tell you that, but I want to think through that before

2    I just dismiss you.  So we'll break until 3:45.

3         (Recess taken from 3:28 to 3:52.)

4              THE COURT:  Thank you.  Please be seated.

15:52:30  5              Thank you for your patience, everybody.

6              I am going to give you my decision now.  In an ideal

7    world, I would write a more thorough written basis for the

8    decision, but, frankly, the press of business right now in my

9    other cases just doesn't afford me the time to do it, and I

15:52:48 10    don't want to wait a month or two to get you a decision.  So

11    I'm going to give you the most complete description I can now

12    on the record so that there's at least, hopefully, a

13    reasonably clear basis for my decision.

14              And to avoid undue suspense, I'm going to rule in

15:53:06 15    favor of the government and grant the motion to compel.  And I

16    will try to explain my reasons as carefully as I can.

17              The key issue, in my judgment, is what test applies,

18    whether it is the test under the *Bursey* case from the Ninth

19    Circuit that the respondent has argued or it is the test under

15:53:31 20    the *Branzburg*, B-R-A-N-Z-B-U-R-G, case and subsequent Ninth

21    Circuit cases that the government has discussed.

22              The *Branzburg* case, which is a 1972 decision from the

23    Supreme Court, as we all know, held that the First Amendment

24    does not create a privilege for news gatherers, newspaper

15:53:57 25    reporters, to refuse to turn over information subpoenaed by a

15:54:01  1   grand jury.  And the Supreme Court specifically declined to

2   recognize a First Amendment right to refuse to turn over

3   information.

4         Near the end of the decision, Justice White put a

15:54:17  5   caveat into the majority opinion where he said that if a grand

6   jury proceeding is being instituted or conducted other than in

7   good faith, or if it constitutes official harassment of the

8   press, undertaken not for purposes of law enforcement but to

9   disrupt a reporter's relationship, then the First Amendment

15:54:43 10   would prevail.  At least that is what he implied.  He said it

11   would be a different outcome.  And that's at pages 707 and 708

12   of the *Branzburg* decision, which is at 408 U.S.

13         Justice Powell, who concurred and who was the fifth

14   vote in the majority, and therefore arguably his concurrence

15:55:05 15   would have some influence on the scope of the ruling, was a

16   bit more specific on this caveat.

17         Justice Powell said that if a grand jury proceeding

18   is not be being conducted in good faith, or if it seeks

19   information bearing only remotely and tenuously on the subject

15:55:24 20   of the investigation, or if it implicates confidential source

21   relationships without a legitimate need of law enforcement,

22   then a court could step in with a motion to quash.

23         The *Bursey* case, decided by the Ninth Circuit the day

24   after *Branzburg*, adopted quite a different test, which has

15:55:49 25   been outlined by the parties in this case.  And as you well

15:55:53  1   know, and I won't take time to repeat it, it requires a

2   showing of a compelling government interest, and there's other

3   adjectives used to describe the strength of that interest that

4   has to be established.  In addition, the government showed --

15:56:25  5   the government must show that there is a substantial

6   connection between the information it seeks and the overriding

7   government interest.  And, third, the government must use a

8   means that is not more drastic than necessary to achieve the

9   government's purposes.

15:56:43 10       *Bursey* didn't mention *Branzburg* for obvious reasons,

11   but did say, as we've already indicated in this discussion, in

12   a petition or in denying a petition for re-hearing that the

13   different analysis in *Branzburg* would not have changed the

14   outcome in *Bursey*.

15:57:01 15       *Bursey* was decided in 1972.  It's at 466 F.2d 1059.

16   Two years later, the Ninth Circuit decided *Lewis versus United*

17   *States*, 501 F.2d 418.  As I've already mentioned, Judge

18   Koelsch was on the panel in the *Lewis* case.  He had also been

19   on the panel in the *Bursey* case.  The question was whether a

15:57:26 20   radio manager could refuse to turn over an audiotape and

21   document he had received for inspection by a grand jury, or

22   whether the First Amendment protected him from having to do

23   so.

24       The Ninth Circuit ruled that he could not assert the

15:57:45 25   First Amendment to oppose the grand jury subpoena, affirmed

15:57:49  1   his contempt citation for failing to do so.  Significantly,

2   the panel in *Lewis* did not cite *Bursey*.  They relied instead

3   on the good faith test that's set forth in *Branzburg*.  And at

4   501 F.2d, page 423, the Ninth Circuit said, "There was no

15:58:14  5   evidence that the request of the grand jury -- that the

6   requests of the grand jury were in the course of official

7   harassment of the press and not for legitimate purposes of law

8   enforcement."  And therefore ruled against the First Amendment

9   argument made by Mr. *Lewis*.

15:58:33  10   The next year Mr. *Lewis* was back in front of the

11   Ninth Circuit again in another contempt citation for having

12   failed to turn over another document that he obtained from a

13   confidential source.  A different panel of the Ninth Circuit

14   reviewed his contempt citation and affirmed it, and looked to

15:58:52  15   *Branzburg* as the controlling test.

16   It noted, and I'm now reading from page 238 at 517

17   F.2d, "The opinion of the court in *Branzburg* stated that a

18   reporter will be protected where a grand jury investigation is

19   instituted or conducted other than in good faith.  The court

15:59:21  20   continued, official harassment of the press undertaken not for

21   purposes of law enforcement but to disrupt a reporter's

22   relationship with his news sources would have no

23   justification.  A similar area of protection was suggested in

24   Justice Powell's concurring opinion."

15:59:42  25   So the Ninth Circuit was recognizing the caveat that

15:59:46  1    Justice White had recognized in *Branzburg* in saying it did not

       2    compel protection of the First Amendment interests of

       3    Mr. Lewis in this case, which was a 1975 decision.

       4            After writing what I just read, the Ninth Circuit

16:00:04  5    said, "Appellate has shown no basis for relief under these

       6    standards."  So that was clearly the standard it was looking

       7    to.

       8            In 1993 the Ninth Circuit decided In Re Grand Jury

       9    Proceedings, 5 F.3d 397, also sometimes cited as *Scarce*,

16:00:23 10    S-C-A-R-C-E, versus United States.  We've talked about this

      11    case today.  It was a Ph.D student who asserted a scholar's

      12    privilege against turning over -- against describing

      13    information he had learned from individuals who may have

      14    conducted vandalism at the University of Washington.  He was

16:00:42 15    held in contempt for refusing to do so.  He made a First

      16    Amendment argument that he was collecting information for his

      17    Ph.D work and his studies that was protected by the First

      18    Amendment.  And the Ninth Circuit rejected that argument and

      19    affirmed the contempt citation.

16:01:00 20            Again, the Ninth Circuit looked to *Branzburg* to

      21    decide whether or not the First Amendment could be asserted as

      22    a defense against the grand jury subpoena and held that it

      23    could not.  The Ninth Circuit again looked to the caveat that

      24    Justice White had identified in the majority opinion.  And

16:01:18 25    then the Ninth Circuit said, on page 401, "Justice Powell

16:01:25  1    underscored this point in a separate concurrence in which he

2    noted that news gatherers may be entitled to First Amendment

3    protection where the information sought bears only a remote

4    and tenuous relationship to the subject of the investigation,

16:01:42  5    or where there is some other reason to believe that the

6    testimony implicates confidential source relationships without

7    a legitimate need of law enforcement."

8         The Ninth Circuit said that was the controlling test.

9    It wasn't satisfied by Mr. Scarce.  The Ninth Circuit then

16:02:04  10   said this test is consistent with *Lewis I* and *Lewis* II, that

11   I've already discussed.  And the individual in the *Scarce* case

12   who had been held in contempt argued that *Bursey* controlled

13   with its higher standard.  The Ninth Circuit disagreed and

14   said *Bursey*, "Is consistent with the limited area for

16:02:30  15   balancing of interests described by Justice Powell and

16   consistent with our discussion thereafter in the *Lewis* cases."

17   That's page 402 at 5 F.3d.

18        The Ninth Circuit in that decision seemed clearly to

19   me to say that *Bursey* is limited to the caveat that Justice

16:02:55  20   White identified in *Branzburg* and that Justice Powell

21   articulated more fully in his concurrence in *Branzburg*.  The

22   Ninth Circuit did not say in the *Scarce* case that *Bursey* was

23   inapplicable because it applies to a different kind of First

24   Amendment right.  Namely, publisher's rights or associational

16:03:20  25   rights.  It seemed clearly to put *Bursey* into the category of

16:03:24   1    the *Branzburg* caveat.

2        Finally, as already mentioned in *In Re Grand Jury*

3    *Subpoena*, sometimes referred as the *Wolf* case, at 201 Fed

4    Appendix 430, the Ninth Circuit 2006 memorandum decision, the

16:03:45   5    Ninth Circuit followed *Scarce*.  It didn't mention *Bursey*.

6    That's not a precedential decision so I can't rely on it, but

7    to me it at least shows the Ninth Circuit was consistent with

8    what apparently had been established in *Scarce* and in the two

9    *Lewis* cases.

16:04:03  10        So my conclusion is -- and, incidentally, I did,

11   while I was out, look at cases that have cited the *Bursey*

12   test, the compelling standards test.  There were six of them

13   cited.  None of them entered a holding consistent with *Bursey*.

14   Most were not even quite on point, they were citing it for

16:04:21  15   other First Amendment purposes.

16        So my conclusion is that the test that applies in

17   this case is the *Branzburg* test, and that Backpage's First

18   Amendment refusal to comply with the subpoena is valid only

19   if, as described by Justice Powell, I can conclude that the

16:04:44  20   grand jury investigation is not being conducted in good faith,

21   or that the information sought from Backpage bears only a

22   remote and tenuous relationship to the subject of the

23   investigation, or if I conclude that the grand jury is looking

24   into sensitive First Amendment information without a

16:05:06  25   legitimate need of law enforcement.

16:05:10   1          When I apply that test, I conclude that the subpoena

           2   is appropriate.  My conclusion is that this grand jury

           3   investigation, on the basis of the information that I have in

           4   front of me, is a good faith investigation and not being

16:05:28   5   undertaken for bad faith purposes.

           6          I still have not read what's been referred to as the

           7   PSI report that was attached to the government's reply in this

           8   case, so I'm not relying upon that.

           9          Rather, I'm relying upon the fact that the government

16:05:58  10   has cited other sources of information to suggest that there

          11   is reason to believe that Backpage has been knowingly involved

          12   with the posting of illegal advertisements.  I say "reason to

          13   believe."  I should -- that's probably too strong.  There's

          14   reason to at least have a suspicion about that.  I don't want

16:06:24  15   to characterize this as somehow being substantial proof, but

          16   it is certainly enough, in my view, to warrant a grand jury

          17   investigation.

          18          The examples are the statement in *Backpage.com versus

          19   Dart,* 127 F.Supp. 3rd 919, and specifically page 922.  This is

16:06:44  20   a 2015 decision from the Northern District of Illinois noting

          21   that in over 800 sting operations responding to Backpage ads

          22   since 2009, law enforcement officers have made arrests for

          23   prostitution, child trafficking, or related crimes 100 percent

          24   of the time.

16:07:08  25          Similarly, in the *McKenna* case that's discussed by

16:07:10   1   both parties, 881 F.Supp. 2d, pages 1267 and '68, that

2   decision notes that many child prostitutes are advertised

3   through online escort advertisements displayed on Backpage.com

4   and that a Seattle vice detective has never contacted any

16:07:31   5   person, juvenile or otherwise, posting advertisements on the

6   escorts section of backpage.com who was advertising for

7   legitimate escort services.

8         Third, there is the letter from the National

9   Association of Attorneys General to Backpage in August of 2011

16:07:52  10   noting that "Nearly naked persons in provocative positions are

11   pictured in nearly every adult services advertisement on

12   backpage.com, and the site requires advertisement for escorts

13   and other similar services to include hourly rates.  It does

14   not require forensic training to understand that these

16:08:12  15   advertisements are for prostitution."

16         Again, I'm not reaching any conclusions as to whether

17   or not these suggestions of improper conduct by Backpage are

18   valid or warranted, but my judgment is, given that

19   information, the grand jury or a grand jury clearly has the

16:08:35  20   power to conduct an investigation.

21         I won't take time to read it again, but I read

22   earlier in the discussion the quotation from *Branzburg*.  I

23   will read one sentence.  This, again, is at 408 U.S., page

24   701.  "Such an investigation may be triggered by tips, rumors,

16:09:01  25   evidence proffered by the prosecutor, or the personal

16:09:04  1    knowledge of grand jurors."  And that is citing another

2    Supreme Court case of *Costello versus United States.*

3         My conclusion based on this information is that

4    there's a good faith basis for the government to conduct an

16:09:20  5    investigation and I cannot conclude the investigation is being

6    conducted in bad faith, which would bring it within the first

7    criteria of Justice Powell's concurrence in *Branzburg.*

8         The second circumstance identified by Justice

9    Powell -- actually it's the third, but I'm going to take them

16:09:42  10   out of order.  The third circumstance is the First Amendment

11   prevents grand jury activity if the information sought is not

12   legitimately linked to a legitimate government purpose.

13        I cannot conclude that that circumstance exists in

14   this case.  It does appear to me that if an online website

16:10:10  15   operator knows that information that it is posting as

16   advertisements is for illegal activity, then a crime is being

17   committed.  And I don't think Backpage contests that based on

18   the exchange I had with Mr. Grant.  But specifically, it does

19   appear to me that 18 USC Section 1952(a)(3) and (b)(1), and

16:10:34  20   Section 1591, would criminalize the knowing publication of an

21   advertisement for illegal prostitution or other illegal

22   activity.

23        So it does appear to me that there is a legitimate

24   basis for the investigation into criminal activity.

16:10:53  25        The government has been clear, and I think they've

16:10:57  1    substantiated it, they're not doing this investigation on some

       2    theory of strict liability, that a website operator can be

       3    held criminally liable merely because somebody else gives it

       4    an ad that's promoting criminal activity.  The government

16:11:12  5    seems clearly to agree there has to be a scienter requirement,

       6    knowledge on the part of the website operator.  If there is,

       7    it appears to me there is the possibility of criminal conduct,

       8    and, therefore, that the objective for which the investigation

       9    is being undertaken is a legitimate objective and does not

16:11:36 10    fall within the caveat Justice Powell identified where

      11    information intrudes in the First Amendment without a

      12    legitimate need for law enforcement.

      13         The final category that Justice Powell identified is

      14    when a grand jury seeks information that bears only a remote

16:11:57 15    and tenuous relationship to the subject of the investigation.

      16    I've read the three subpoena categories the government seeks

      17    to enforce several times.  It does appear to me that this

      18    information is designed to determine whether or not Backpage

      19    and its personnel knew that advertisements posted on the

16:12:28 20    website were for illegal activity.  It appears to me each

      21    category is designed to get at information that will go to

      22    that specific question, which is a key question in whether or

      23    not crimes have been committed.

      24         I cannot conclude that this information bears only a

16:12:47 25    remote and tenuous connection to that inquiry, which I think

16:12:53   1   is a legitimate inquiry.  And, therefore, I don't find that

2   the scope of the three categories of information the

3   government seeks fall within one of Justice Powell's

4   exceptions to the general rule that the First Amendment is not

16:13:13   5   a bar to grand jury information.

6         I do want to add that I did read carefully the

7   decisions by Judge Jones from the Western District of

8   Washington, which are attached as Exhibits A and B to

9   Backpage's opposition to the government's motion to compel.

16:13:40  10         Judge Jones quashed the subpoenas in that case, not

11   on First Amendment grounds, as was pointed out, but because

12   they were unduly burdensome and overly broad.  And in fact, in

13   his first decision, which is Exhibit A, he specifically said

14   "In this case, however," I'm reading now at the bottom of page

16:14:10  15   22 of his opinion at Exhibit A.  "In this case, however,

16   Backpage would succeed in quashing the subpoenas regardless of

17   the Court's approach to the First Amendment issues.  For that

18   reason, the Court will not answer unsettled First Amendment

19   questions today."

16:14:27  20         And Judge Jones found the subpoenas overly broad in

21   part, I think, out of his exasperation with the fact that the

22   government wouldn't tailor them as he had instructed them to

23   do and came back with broader subpoenas than he had found

24   appropriate.

16:14:44  25         But it was also clear that Judge Jones didn't find

16:14:47  1    the First Amendment a bar to appropriately tailored inquiries

        2    because he enforced the second subpoena and Backpage produced

        3    7,000 pages of documents in response to it.

        4         So I view the situation in front of Judge Jones as

16:15:02  5    different from the situation here, and his decision is not

        6    directly relevant to what I'm having to decide.

        7         A final couple of points.

        8         The authorities relied upon by Backpage, the nine or

        9    so cases that are cited, as mentioned during our exchange, are

16:15:33 10    not grand jury cases with the exception of Judge Jones'

       11    decision.  I think that's a significant consideration.

       12         I agree with Backpage's point that they do recognize

       13    there are First Amendment rights implicated by the things

       14    Backpage does.  I think that's clearly correct.  But there

16:15:50 15    were First Amendment rights implicated by all of the people

       16    who were before the courts in *Branzburg*, in *Lewis*, in *Scarce*,

       17    in *Wolf*, and the question was what happens when First

       18    Amendment rights and grand jury investigative powers collide?

       19    And none of those cases address that issue, with the exception

16:16:12 20    of Judge Jones, and I've already explained why I think that is

       21    distinguishable.

       22         So although I agree those cases stand for the

       23    proposition that Backpage has First Amendment rights with

       24    respect to what it does, they don't control, in my judgment,

16:16:27 25    what happens when those rights collide with a grand jury

16:16:30   1   subpoena.  That is decided, in my judgment, under the

       2   *Branzburg* test, and, for the reasons I've described, I don't

       3   believe that test calls for the subpoenas to be quashed here.

       4          I've said it a couple of times but I'll say it again,

16:16:46   5   I have not read the PSI report.  I haven't relied on anything

       6   in it.  I don't know whether it would be appropriate for me to

       7   do so or not, but it's not necessary for me to do so, so I've

       8   set that aside and I have not considered it.

       9          The last point -- I keep saying that.  I think this

16:17:02  10   is the last point.  I am not concluding that the subpoena in

      11   this case is appropriate because the legislative subpoena was

      12   appropriate.  That, to me, is an apples and oranges issue.  It

      13   would be inappropriate for me to say the subpoena from the

      14   grand jury in this case is proper because another judge found

16:17:25  15   the legislative subpoena proper.  I agree with what Mr. Grant

      16   said, they're different inquiries, they're different tests,

      17   and I've tried to apply what I believe to be the grand jury

      18   test under *Branzburg*.

      19          The legislative subpoena is factually relevant in the

16:17:48  20   sense that Backpage has already gone through the process of

      21   finding and collecting these documents and so there hasn't

      22   been an argument made in this case that it would be unduly

      23   burdensome in the sense of time and expense to respond.  But

      24   that is merely a fact.  That's not in any way a controlling

16:18:08  25   factor in the analysis applied to the First Amendment.

16:18:12  1          So that's my best description of the reasons for the

       2   decision.  Obviously you can get a copy of the transcript if

       3   you decide to appeal this, and hopefully the Court of Appeals

       4   will be able to tell how I got to the conclusion that I did.

16:18:25  5          Are there any questions?

       6          MR. LANZA:  Could I have just a moment?

       7          THE COURT:  Yeah.

       8          MR. LANZA:  Your Honor, only thing we'd ask is now

       9   that the order's been entered, technically they need to comply

16:18:56 10   because the compliance date has already past.  We don't expect

      11   them to comply right now, they need to evaluate it and figure

      12   out what their next step is going to be, but it might make

      13   sense for the Court to set a reasonable date, I don't know,

      14   maybe a week or two out where compliance would be expected --

16:19:12 15          THE COURT:  That's a fair point.  I was thinking we

      16   should say in the minute entry that comes out that compliance

      17   is required within X period of time to give some limit to my

      18   order.  But I'm interested in your thoughts about what that

      19   ought to be.

16:19:26 20          MR. GRANT:  Yes, Your Honor.  To give us reasonable

      21   period of time to determine how we want to respond to the

      22   Court's ruling.  I'm sort of shooting blind.  I would say I

      23   would ask for a month if that's possible.

      24          THE COURT:  Well, today is the 22nd.  I'm going to

16:19:52 25   say I'm going to require compliance by Friday, March 17th.

16:20:09 1    That's a little over three weeks.  Seems to me that's enough

2    time to sort through the legal issue and decide what strategy

3    you want to follow.  And if production is required, it seems

4    to me it could happen within that amount of time as well.

16:20:21 5    Unless, Mr. Grant, you see any particular problem with three

6    and a half weeks.

7              MR. GRANT:  No.  The only thing that comes to mind,

8    Your Honor, is if we do pursue appellate rights, we may be

9    back to suggest compliance be stayed.

16:20:35 10             THE COURT:  Sure.  I recognize if you decide you're

11   going to appeal my decision that we'll need to address stay

12   issues, and you would certainly have the right to do it.

13             I'll tell you what I would suggest if we get there,

14   though, is if you decide you're going to appeal and you want a

16:20:50 15   stay, confer with the government.  If you can't reach

16   agreement, call me and let's talk about how best to tee up

17   that issue, rather than just have everybody launch into

18   briefing.  If I need briefing on it, then we can do some

19   focused briefing.  But that would be more efficient, to me,

16:21:07 20   than just having a motion to stay filed.

21             MR. GRANT:  Thank you, Your Honor.

22             THE COURT:  Okay.  Thank you all for your patience.

23             MR. LANZA:  Thank you, Your Honor.

24        (End of transcript.)

16:21:27 25                         *  *  *  *  *

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 27th day of February,

15   2017.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25