ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>James Larkin,<br><br>　　　　　Defendant. | No. CR-18-0422-02-PHX-SPL (BSB)<br><br>**UNITED STATES' RESPONSE TO MOTION TO AMEND THE RELEASE CONDITIONS OF DEFENDANT LARKIN'S PRETRIAL RELEASE**<br>**(Docs. 171 and 183)** |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The United States of America, by and through undersigned counsel, submits this memorandum in response to defendant James Larkin's ("Larkin") motion to amend his

conditions of release (Doc. 171). The United States argued at the early stage of these proceedings that Larkin constitutes a risk of flight in light of the serious charges against him, the weight of the evidence, and his financial status and ties abroad, and that he should be released only on conditions or a combination of conditions sufficient to reasonably assure his appearances as required by law. For a variety of reasons, Larkin's recent request to remove electronic monitoring is unavailing and the government is not prepared to consent to, and indeed, opposes a change in the current conditions of release.

*First,* Larkin's release conditions resulted from a stipulated agreement between him and the government. He has not articulated any change in circumstances to warrant amending his release conditions, other than that he now has new counsel (located in southern California, as opposed to northern California). His other reasons in support of his motion were previously known at the time of his arrest.

*Second*, Larkin misled the court at his arraignment about his involvement with Backpage. In addition, he was recently sanctioned by another court for misconduct in Backpage-related litigation. As discussed below, this raises concerns about whether he would be candid with the Court (including Pretrial Services) when responding to questions about travel, finances, etc.

*Third*, since his arrest, the weight of the evidence against him has increased – and he faces a significant amount of time in prison if convicted. As explained below, Larkin, in his capacity as a Backpage owner, employed several business strategies to increase revenue by expanding the volume of prostitution-related ads. These acts (and other factors) rebut his claims of First Amendment immunity. His motion to amend his conditions should be denied.

**RELEVANT FACTS**

On April 5, 2018, Larkin was arrested at Phoenix Sky Harbor Airport while returning from a trip to Europe. On April 9, 2018, the United States filed a Motion seeking Larkin's detention pending the imposition of release conditions. *See* CR 22. From April 6, 2018, until Larkin's release on April 16, 2018, the parties negotiated a package of release

conditions in lieu of proceeding with a detention hearing.  One of the important terms of his release included electronic monitoring. The United States would not have agreed to his release without this term.  On April 16, 2018, Larkin was released on numerous stipulated conditions, including electronic monitoring.  *See* CR 93.  Another condition was that Larkin not assert control over Backpage. Without any prompting, Larkin advised the Court that he hadn't "been in control [of Backpage] for [the previous] three years."  (Exhibit A; RT 4/16/18, lns. 3-11.)  On June 1, 2018, Larkin filed a motion requesting that electronic monitoring be removed as a release condition.  (Doc. 171.)

**ARGUMENT**

**A.  <u>Larkin Fails to Articulate Changed Circumstances</u>**

Larkin's motion to modify his release conditions should be denied because he has failed to demonstrate changed circumstances.  Larkin is incorrect that a "plain reading" of § 3142(c) (3) does not require changed circumstances.  Motion at 3 n.1.

Under the Bail Reform Act of 1984, the "judicial officer may at any time amend the [release] order to impose additional or different conditions of release."  18 U.S.C. § 3142(c)(3). The legislative history of this provision is clear that Congress intended to require a showing of changed circumstances to justify a modification of conditions: "[t]his authorization is based on the possibility that a changed situation or new information may warrant altered release conditions."  S. Rep. 98-225, *available at* 1983 WL 25404, at *16 (Aug. 3, 1983); *see also United States v. Lafrance*, No. 16-10090, 2016 WL 3882845, at *1 (D. Mass. July 13, 2016) ("Defendant has failed to show a substantial change in circumstances that warrants such a significant change in the conditions of his release, and the developments in this case, as described in the summary of the docket (set out above) similarly shows no qualifying change in circumstances for the modification sought.  To the contrary, Defendant's case has progressed closer to trial: he has been indicted, discovery has been provided, and a superseding indictment broadens the scope of potential liability and increases the potential penalties.").

Courts reviewing requests to amend bond conditions under Section 3142(c)(3) read the provision "in conjunction with §3142(f)." *United States v. Merola*, No. CRIM 08-327, 2008 WL 4449624, at *2 (D.N.J. Sept. 30, 2008) ("'Under § 3142(f) of the Bail Reform Act of 1984, the Court is expressly authorized to reopen the detention hearing of a defendant when material information "that was not known to the movant at the time of the hearing" comes to light. Courts have interpreted this provision strictly, holding that hearings should not be reopened if the evidence was available at the time of the hearing. Thus, the definition of 'changed circumstances.'"); *see also United States v. Wei Seng Phua*, No. 2:14-CR-00249, 2015 WL 127715, at *1--2 (D. Nev. Jan. 8, 2015) ("Contrary to defendants' assertions, the government's factual support and reliance on 18 U.S.C. § 3142(f) are justified because this Court must consider whether new information exists that was not previously known or presented at the detention hearing to determine whether to modify the pretrial release condition at issue.")

A defendant awaiting trial may reopen a detention hearing "if the judicial officer finds that information exists *that was not known* to the movant at the time of the hearing and that has a material bearing on the issue" of whether he will flee or is a danger. (emphasis added) 18 U.S.C. § 3142(f)(2). "This provision is strictly interpreted and the hearing should not be reopened if the evidence was available at the time of the initial hearing." *United States v. Santos*, No. 2:17-CR-00001 JAD, 2017 U.S. Dist. LEXIS 68335,4-5 (D. Nev. 3, 2017). For example, the testimony of defendant's friends or relatives does not qualify to reopen a detention hearing. *United States v. Hare*, 873 F.2d 796 (5th Cir 1989).

Here, there was no detention hearing. Instead, the parties negotiated over ten days and settled on mutually-acceptable terms for release. One important term insisted upon by the United States was active Global Positioning System (GPS) electronic monitoring. Defendant agreed to this term. Less than two months later, Larkin seeks relief on the ground that electronic monitoring is an inconvenience because his family and attorneys are located in California. These facts were known to him at the time of his conditional release.

They are not materially changed circumstances justifying modification under the Bail Reform Act. For this reason alone, the motion should be denied.

### B. Misrepresentations to the Court

As noted above, the Court reviewed release conditions with Larkin that included an absolute prohibition against any control of Backpage. Larkin responded to the Court's inquiry about whether he understood the prohibition by stating: "Yes, I do. I haven't been in control for three years." (*See* Exhibit A.) At trial, however, the United States will show that Larkin's 2015 sale of his interest (he owned 43%) in Backpage was nothing more than a sham where he and co-defendant Michael Lacey retained management involvement in the website and disguised substantial annual revenue as debt.

Indeed, the evidence will show that Larkin retained considerable operational control over Backpage *after* the "sale" to Backpage CEO Carl Ferrer ("Ferrer") in 2015. For example, after the sale of Backpage, Ferrer had numerous discussions with Larkin about efforts to circumvent conventional banking (after Visa and Mastercard refused to allow sex traffickers to use their card services) in order for Backpage to continue to receive revenue. Ferrer continued to meet with Larkin in various locations (Phoenix, San Francisco and Tucson, among others) to discuss the management of Backpage. Despite having sold the website, Larkin was not only very much engaged but insisted that he retain management of the legal strategy in an attempt to fend off civil and criminal cases faced by Backpage so that the revenue stream could continue unabated.

Moreover, as recently as May 23, 2018, in the Superior Court of the State of Washington, a judge imposed two $100,000 sanction awards against Larkin, co-defendant Michael Lacey and other defendants for, among other things, making claims [to the court] that were untruthful:

> "Another one that the Court can consider in regards to bad faith is procedural bad faith and that is vexatious conduct during the course of litigation, wasting private and judicial resources, making claims that, months later, were found to be untruthful." (*See* Exhibit B, p. 64-65.)

Given this recent history, Larkin does not inspire confidence that he would be candid with this Court (and his assigned Pretrial Services Officer). For this additional reason, the precaution of electronic monitoring is warranted. *See United States v. Hir*, 517 F.3d 1081,1092 (9th Cir. 2008) (for release orders to be effective, "they depend on [the defendant's] good faith compliance") (quoting *United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (concluding that a similarly extensive set of release conditions contained "an Achilles' heel. . . virtually all of them hinge on the defendant's good faith compliance" and "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated.").

### C. **Nature of the Offense and Strength of the Evidence**

Larkin's rehash of the nature of the offense and the strength of the evidence is inaccurate and should be rejected. The United States argued in its original detention motion that the strength-of-the-evidence factor supports a flight-risk determination because the grand jury has already returned a 93-count indictment, the indictment contains a detailed summary of some of the incriminating evidence against Larkin, and the United States Senate separately issued a 50-page report recognizing that Backpage and its founders, including Larkin, facilitated criminal activity. Larkin's motion is conspicuously silent regarding these points. It also fails to address that Backpage CEO Carl Ferrer and Backpage (and four other Backpage-related corporate entities) have pleaded guilty to conspiring to promote prostitution in violation of 18 U.S.C. § 1952 (Travel Act).

Rather, in his response to the United States' detention motion, and again in his motion to amend conditions, Larkin argues that the strength-of-the-evidence factor favors him because the theory underlying the indictment in this case has "been repeatedly litigated, and in each case, rejected on First Amendment grounds." *See* Motion at 8. Although Larkin recognizes that this is not the time to address the ultimate merits of his First Amendment argument (Motion n.4), he bases his motion to modify release conditions primarily on First Amendment grounds.

The United States cannot help but point out that Larkin's claims are incorrect and have in recent years been consistently rejected. *First*, the evidence of Larkin's involvement in the operation and management of Backpage is considerable such that he cannot plausibly claim he had no knowledge of the true purpose of Backpage's business model: to derive revenue from prostitution. He certainly cannot claim he was unaware of Backpage's facilitation of prostitution especially in light of Ferrer's and Backpage's recent guilty pleas.

*Second*, Larkin is simply wrong in his claim that "no court" has ever accepted the theory that a website or website operator may be criminally prosecuted under federal law for knowingly facilitating prostitution. *Id.* In *United States v. Omuro*, N.D. Cal. No. CR 14-CR-336, the founder of the website www.myRedBook.com was convicted of violating 18 U.S.C. § 1952—the very crime charged in this case. In the factual basis of his plea agreement, Omuro (like Ferrer) admitted that "[t]he website hosted advertisements, the vast majority of which were posted by prostitutes containing their picture[s], and in most instances, the sexual services they offered, and their rates. . . . The website also allowed site users to submit, search, and read reviews of the services offered by particular prostitutes. . . . As such, the website promoted and facilitated the carrying on of prostitution throughout California, elsewhere in the United States, and Canada." Similarly, in *United States v. Hurant*, E.D.N.Y No. CR 16-45, the founder of the website www.Rentboy.com was convicted of violating 18 U.S.C. § 1952. In his sentencing memo, Hurant admitted he "was well aware . . . that the escort ads he posted . . . were thinly-veiled proposals of sexual services in exchange for money."[1]  And again, in 2012, the Department of Justice obtained the forfeiture of the website www.escorts.com based on similar conduct. *See*

---

[1] *Hurant* has other parallels to this case. In its *Hurant* sentencing memo, the government stated that although the Rentboy.com website "had disclaimers that claimed that the advertisements on the site were for companionship only and not for prostitution," the company's employees would often reject ads containing explicit offers of sex for money "but allow the ad to be resubmitted with different language. In many cases, Rentboy.com employees would just edit the advertisement's language and approve it."

https://archives.fbi.gov/archives/philadelphia/press-releases/2012/internet-escort-services-firms-charged-with-money-laundering-sentenced-in-federal-court.

The results in these cases are hardly surprising and easy to harmonize with the First Amendment. Long ago, the Supreme Court recognized that "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad . . . soliciting prostitutes." *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973). Put simply, the First Amendment does not protect speech promoting criminal conduct. *See, e.g., United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present, . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never include[d] a freedom to disregard these traditional limitations. These historic and traditional categories long familiar to the bar—including obscenity, defamation, fraud, incitement, and *speech integral to criminal conduct*—are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.") (citations omitted); *United States v. Meredith*, 685 F.3d 814, 819-20 (9th Cir. 2012) (applying "the First Amendment exception that allows the government to regulate speech that is integral to criminal conduct"); *United States v. Rahman*, 189 F.3d 88, 116-17 (2d Cir. 1999) ("[F]reedom of speech . . . do[es] not extend so far as to bar prosecution of one who uses a public speech . . . to commit crimes."). *See also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980) ("[T]here can be no constitutional objection [under the First Amendment] to the suppression of . . . commercial speech related to illegal activity.").

*Third*, Larkin is also wrong in his claim that "the problem is that the government's theory is based on the false premise that Backpage.com engaged in prostitution and sex trafficking." (Motion at 7.) Recent cases against Backpage and Larkin belie this claim. In 2015, for example, the Washington Supreme Court denied Backpage's and Larkin's motion to dismiss a civil lawsuit brought by three minor girls who had been "bought and sold for sexual services online on Backpage.com." *See J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015). The Court held that, because the plaintiffs had

plausibly alleged that Backpage does "more than just provide a forum for illegal content" and affirmatively shapes the content of users' ads through "posting rules [that are] 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message,'" the plaintiffs should be permitted to conduct discovery "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking." *Id.* at 718. Tellingly, in 2017, following extensive discovery, the trial judge in the *J.S.* case denied Backpage's motion for summary judgment. *See* Exhibit C. Afterward, Backpage agreed to enter into a confidential settlement with the plaintiffs.[2] In light of these various courts denying Backpage's First Amendment arguments, it is difficult to understand how Larkin can argue that the government's case is weak and "faces unusual and strong head winds generated by the First Amendment." *See* Motion at 9.

Moreover, less than three months ago—on March 29, 2018—the Hon. Leo Sorokin in the District of Massachusetts issued a five-page order denying in part a motion to dismiss that Larkin had filed in a civil case brought by a different underage victim who had been trafficked via Backpage. *See Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056 (D. Mass. 2018). The ruling explained that, because the plaintiff had made a plausible allegation that Backpage had "redrafted [her] advertisement . . . to suggest she was an adult," the alleged conduct was not covered by the CDA's grant of immunity. *Id.* at *1. Here, similarly, the indictment and further investigation *after* indictment demonstrate that Backpage helped edit and redraft prostitution advertisements. (Additional related arguments are set forth in the Reply in Support of Motion to Disqualify Counsel recently

---

[2] The October 2017 settlement in *J.S. v. Village Voice Media Holdings et. al* was sealed. Travelers Property Casualty Co. is seeking to deny an indemnification claim concerning the settlement, arguing that it has no duty to indemnify and citing exclusions that bar coverage for *intentional acts*, among other things. (*See Traveler Property Casualty Company of America v. Village Voice Media Holdings LLC, et al*, 2:2017cv03994)

filed by the United States at Doc. 194, pages 5-9.  The United States incorporates these arguments by this cross-reference.)

Larkin also relies upon the ruling in *Backpage.com LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015), that found Backpage's adult section protected by the First Amendment. Yet Larkin fails to acknowledge that, at the time of the ruling, Ferrer and Backpage had not pleaded guilty.  In the pleas of Ferrer and Backpage (and related corporate entities), Ferrer and Backpage acknowledged that Backpage was, in fact, facilitating prostitution. Larkin fails to discuss these pleas – and he conspicuously avoids noting that the *Dart* case was *dismissed* on May 18, 2018 in light of the recent plea agreements.  (*See* Exhibit D). The court in that case is now considering sanctions regarding the fact that the litigation was even instituted in the first place.  (*See* Exhibit F; Sheriff's Motion for Sanctions Against Backpage and its Attorneys.)

*Fourth*, although it is true that Larkin and Backpage have prevailed in a number of prior cases that sought civil remedies or that turned on whether Backpage could be prosecuted under state criminal law, those cases are easily distinguishable.  First, those cases are distinguishable for the obvious reason that the CDA provides a broad grant of immunity in such contexts.  This, however, is a case brought under federal criminal law— a context in which the CDA has no application.  *See* 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of . . . [any] Federal criminal statute.").  Indeed, the successful prosecutions in the myRedBook.com, Rentboy.com, and escorts.com cases demonstrate that federal criminal liability may be imposed under these circumstances.  Second, those cases are also distinguishable because, with one exception (*People v. Ferrer*), they were decided prior to the release of the Senate Report in 2017.  That report addressed documents and other evidence that were not available when the cited cases were decided.  (So, too, did the grand jury investigation in this case.)

Finally, in the District Court of Arizona, during the grand jury litigation that preceded the indictment in this case, Judge David C. Campbell and a unanimous three-

judge panel of the Ninth Circuit rejected Backpage's First Amendment-based challenges to the government's investigation and theory of the case.[3]

If convicted of all (or even a portion of) these charges, Larkin—who is nearly 70 years old—faces the very real possibility of spending the rest of his life in federal prison. Such exposure creates a powerful incentive to flee. *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005) (ordering pretrial detention in white collar case, even though the defendant had no prior felony convictions and "no history of violent criminal activity," in part because "[t]he combined statutory maximum penalties for the federal crimes with which Mr. Anderson is charged is 23 years. . . . At 51 years old, Mr. Anderson potentially could spend most of the remainder of his life in prison if convicted.").

In addition to the instant federal prosecution, Larkin is facing charges in the State of California and is under investigation by the Attorney General in the State of Texas. In the final analysis, the prosecution is not facing the "headwinds" of a First Amendment defense. Rather, Larkin faces a tidal wave of civil and criminal litigation that provides ample motive to flee.

### D. Creating Prostitution Based Content

Again, Larkin argues that he does not intend to litigate First Amendment issues at this time but then premises his motion to amend release conditions by litigating First Amendment issues. Motion at 7, fn. 4. Larkin's specific argument that he enjoys First Amendment protection because Backpage was merely a conduit for content and that

---

[3] On May 17, 2018, Judge Campbell issued an order authorizing the United States to disclose the Grand Jury proceedings in this case. *See* CR 198 at 7-8 and attached exhibits.

- 11 -

he was not involved in creating content on behalf of pimps and sex traffickers should be rejected.

The strength of the evidence lends greater support for a flight-risk finding. As an initial matter, the fact the grand jury has returned an indictment is enough to meet the government's initial burden as to the strength-of-the-evidence factor. *See, e.g., United States v. Hamlin*, 2007 WL 2225868, *1 (E.D. Mich. 2007) ("Under subsection (g)(2), from the a grand jury having passed an Indictment, there is a definite weight of evidence against the Defendant."); *United States v. Bradshaw*, 2000 WL 1371517, *4 (D. Kan. 2000) ("[T]he grand jury's indictment, standing alone, establishes probable cause for purposes of the Bail Reform Act."). The considerable evidence currently set forth in the indictment weighs in favor of imposing electronic monitoring as a condition of release.

Larkin is aware that the United States (and the States of California and Texas) continue to investigate the criminal activity of Backpage. This is evidenced by the fact that the United States intends to seek a superseding indictment (*see* Doc 131; Scheduling Order.) and Larkin is well aware that Ferrer's cooperation included both Attorney Generals Offices' for California and Texas. To that end, the United States continues to investigate Larkin's knowledge and involvement regarding content creation for sex traffickers and his receipt of revenues from prostitution-related advertising. At trial, the United States will demonstrate (primarily through Larkin's own emails, testimony from Ferrer and public acknowledgments by Larkin and others working at his direction) that Larkin was involved in content creation to increase prostitution revenue.

1) Strip Filter and Moderation

While Larkin owned and operated Backpage, the company took an array of affirmative steps to help its customers (*i.e.,* pimps and sex traffickers, including child sex traffickers) "sanitize" ads and conceal their illegality:

> The internal company documents obtained by the Subcommittee conclusively show that Backpage's public defense is a fiction. Backpage has maintained a practice of altering ads before publication by deleting words,

> phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created.

*See* January 9, 2017, the Senate Subcommittee on Permanent Investigations "Backpage.com's Knowing Facilitation of Online Sex Trafficking." Report at 2. *See also id.* at 3 ("Backpage knows that it facilitates prostitution and child sex trafficking. . . . Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for prostitution and that their job was to 'put[] lipstick on a pig' by sanitizing them.")

Further supporting evidence has emerged. One such example is an email sent to Larkin in 2011 (also co-defendant Scott Spear) wherein it is explained that the term "new in town" refers to an underage prostitute because "a pimp will have to drive them to the location of the customer."[4] This email is significant because three of the victims detailed in the indictment were posted in ads that included the language "new in town" three years *after* the subject email. (*See* indictment, Counts 12-15, 39,41; ¶s 132,133.) As the United States has noted, the seriousness of charged offenses and the potential of adding additional charges contribute significantly to the risk-of-flight analysis.

### 2) Aggregation: Soliciting Posters (i.e. Pimps and Sex Traffickers) From Competing Websites

Evidence has come to light that Larkin was aware of and encouraged a business plan to solicit users of competing websites to post their prostitution-related ads on Backpage. This was informally known as the "The Dallas Plan."[5] In 2007 a marketing plan was developed at the Dallas Observer to develop more ad content. The basic theory was that if

---

[4] (*See* Exhibit E; p. 2 #12, "Finding Illegal Adds, Key Words: "New in Town" terminology often used by pimps who shuttle children to locations where they do not know anyone and cannot get help. When this phrase is used, moderators should be told to be on heightened alert that the image may belong to [sic] an under 18.)

[5] Exhibit G is an agenda from one of the many Backpage management meetings attended by Larkin. Item III is entitled Dallas update. This is example of efforts to aggregate information from the adult sections of other (competing) prostitution websites.

- 13 -

Backpage marketed to the users and gave them free ads, they could become paying users at some point.  The Dallas Plan, as it came to be known, was distributed by management, including Larkin, and involved the following method for promoting Backpage to sex traffickers on other adult websites:

> a. Go to Google and type in erotic services and the area code.  The search would bring up all of the Craigslist ads of sex traffickers in that area.
>
> b. Call the numbers of sex traffickers on the ads and offer them ads.  The phone calls were being made by the classified ad sales reps who were having a hard time selling other ads.
>
> c. A large percentage of ads sold this way would end up becoming paid ads.  This laid the groundwork for users to migrate to Backpage when Craigslist shut down its adult section.

In 2012, after Craigslist discontinued an adult section in response to public pressure, the volume of adds to Backpage increased exponentially. As a result, Larkin no longer had to solicit adds domestically.  Backpage, however, expanded the Dallas Plan overseas to the Philippines and Australia by having marketing staff work on stealing content from the other (competing) adult websites.  In sum, at trial, the United States will demonstrate that Larkin and others were involved in content creation for sex traffickers and others using Backpage to facilitate prostitution.  Again, this activity undermines his First Amendment defense and provides an incentive to flee.

### 3)  The Erotic Review

There's more.  A third way that Larkin was involved in content creation included his business arrangement with a website known as The Erotic Review (TER).  Larkin was involved in efforts to increase Backpage's revenue.  At annual meetings, Backpage management (Larkin, Lacey, Ferrer, Spear and Brunst) discussed strategy, which included where both revenue and referrals were coming from.  One commonly discussed source of referrals was TER, a site with profiles and provides contact information for individual prostitutes (including underage sex trafficking victims). With a premium membership, one

could also read reviews written by prostitutes' customers describing the sexual activity provided or the lack thereof. [6]

Larkin, as founder and manager of Backpage, was familiar with TER. Larkin knew the referrals were coming from a prostitute review site and he approved a referral arrangement with TER. Backpage had a reciprocal link agreement where Backpage would allow links to TER in its ads, but not for competitors and TER would have links on its profiles to Backpage ads. At trial, it is expected that Ferrer will testify that he made a deal, with the knowledge and approval of Larkin, with the owner of TER to pay $10,000 per month to have more referrals to Backpage. The business relationship with TER was disguised by intentionally receiving an invoice from TER but with a name like Web Services, LLC so that the checks would not have to be written to TER. As a result of this agreement, TER increased the number of profile pages that linked to Backpage versus other sites. Revenue from TER referrals went up after this deal was made. The government will argue at trial that Larkin was aware that the increase in revenue resulted from the increase in prostitution-related ads.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[6] See exhibit G (agenda of meeting where Larkin was present). Item II(c) references "Trade with TER." This an agenda item that involves an arrangement with TER to trade links. Again, TER is a site that allows individuals to read reviews on prostitutes.

**CONCLUSION**

For the foregoing reasons, Larkin's motion to revisit his release conditions should be denied.

Respectfully submitted this <u>15th</u> day of June 2018.

                              ELIZABETH A. STRANGE
                              First Assistant United States Attorney
                              District of Arizona

                              <u>*s/Kevin M. Rapp*</u>
                              KEVIN M. RAPP
                              MARGARET PERLMETER
                              PETER S. KOZINETS
                              ANDREW C. STONE
                              Assistant U.S. Attorneys

                              JOHN P. CRONAN
                              Acting Assistant Attorney General
                              Criminal Division, U.S. Department of Justice

                              REGINALD E. JONES
                              Senior Trial Attorney
                              U.S. Department of Justice, Criminal Division
                              Child Exploitation and Obscenity Section

**Certificate of Service**

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Anne Chapman, Erin McCampbell, Gregory Zamora, James Grant, Larry Debus, Lawrence Kazan, Lee Stein, Paul Cambria, Robert Corn-Revere, Ronald London, Janey Henze Cook, John Littrell, Kenneth Miller, Thomas Bienart, Jr., Bruce Feder, Michael Kimerer, Rhonda Neff, KC Maxwell, David Wakukawa, Michael Piccarreta, Stephen Weiss.


<u>*s/Erica Lane*</u>
U.S. Attorney's Office