# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-06340 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| THOMAS J. DART, Sheriff of Cook | ) | Magistrate Judge Young B. Kim |
| County, Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

**SHERIFF'S MOTION FOR SANCTIONS
AGAINST BACKPAGE AND ITS ATTORNEYS**

Thomas J. Dart, Sheriff of Cook County, Illinois, by his undersigned Special

Assistant State's Attorneys, requests that this Court enter an order based on its inherent authority

and pursuant to Federal Rule of Civil Procedure 26(g)(3) and 28 U.S.C. § 1927 requiring

Backpage and its attorneys, jointly and severally, to pay Cook County, Illinois all of its

attorneys' fees and costs incurred in this litigation, including on appeal and in petitioning for

*certiorari*, on the grounds that Backpage admitted on April 5, 2018 that its entire first

amendment civil rights case was based on untrue facts from the beginning, and thus a hoax, a

fraud on this Court, a fraud on the Seventh Circuit Court of Appeals and a fraud on the United

States Supreme Court. Backpage and its attorneys also have squandered resources of the Cook

County State's Attorney Office, the Office of the Sheriff of Cook County and the taxpayers of

Cook County under the guise of a civil rights plaintiff in its phony lawsuit, simultaneously

fighting off the advances of law enforcement so that it could continue to make hundreds of

millions of dollars from its enterprise that admittedly facilitated and promoted prostitution and

child trafficking. In support of his motion, the Sheriff states:

I.    **THE SIGNED PLEA AGREEMENT OF CARL FERRER,**
      **CEO AND OWNER OF BACKPAGE, PROVES FALSITY**

On April 5, 2018 Carl Ferrer, CEO and owner of Backpage, entered into a plea

agreement with the United States on behalf of himself and Backpage. *See* Exhibits A and B. In

those plea agreements, Ferrer attested to facts demonstrating that the entirety of Backpage's

complaint against the Sheriff was a fraud from the beginning—something the Sheriff has been

arguing since the inception of this case.

In the signed plea agreements, Ferrer admits the following facts regarding

Backpage being a content provider for illegal prostitution advertisements on its website:

> I have long been aware that the great majority of these advertisements [on
> Backpage] are, in fact, advertisements for prostitution services (which are
> not protected by the First Amendment and which are illegal in 49 states
> and much of Nevada).  (Ex. B, ¶ 10(a).)
>
> Acting with this knowledge, I conspired with other Backpage principals
> (including but not limited to M.L., J.L., S.S., D.H., A.P., and J.V.) to find
> ways to knowingly facilitate the state-law prostitution crimes being
> committed by Backpage's customers.  *Id.*
>
> For example, I worked with my co-conspirators to create "moderation"
> processes through which Backpage would remove terms and pictures that
> were particularly indicative of prostitution and publish a revised version
> of the ad.  *Id.*
>
> These editing practices were only one component of an overall,
> company-wide culture and policy of concealing and refusing to officially
> acknowledge the true nature of the services being offered in Backpage's
> "escort" and "adult" ads."  *Id.*

In addition to acknowledging that Backpage was a content provider for illegal advertisements for

prostitution, Ferrer admitted that the reason credit cards companies stopped doing business with

Backpage was due to the illegal nature of Backpage's business, and not the Sheriff's letters to the

credit card companies:

2

> Since 2004, Backpage has earned hundreds of millions of dollars
> in revenue from publishing "escort" and "adult" ads. Over time,
> many banks, credit card companies, and other financial institutions
> refused to do business with Backpage due to the illegal nature of
> its business. *Id.*

And on top of Backpage wrongfully accusing the Sheriff of first amendment violations,

Backpage and its attorneys lied to this Court when stating that due to the Sheriff's actions,

Backpage had not been able to accept credit card payments for advertisements and was being

crippled by the loss of income. (ECF No. 5 at p. 17.)   On the contrary, Ferrer now admits:

> In response [to the credit card companies refusing to do business with
> Backpage], I worked with my co-conspirators to find ways to fool credit
> card companies into believing that Backpage-associated charges were
> being incurred on different websites, to route Backpage-related payments
> and proceeds through bank accounts held in the name of seemingly
> unconnected entities (including, but not limited to Posting Solutions,
> Website Technologies, Website Technologies, and Cereus Properties) . . .
> (Ex. B, ¶ 10(a).)

## II.   THE ENDLESS LIES OF BACKPAGE AND ITS ATTORNEYS ARE WIDESPREAD, BEGINNING WITH THE COMPLAINT AND TAINTING THE ENTIRETY OF ITS CONDUCT THROUGHOUT THIS LITIGATION

### A.   Backpage's complaint was a fraud when filed

On August 21, 2015, two weeks after the United States Senate Permanent

Subcommittee on Investigations had issued a subpoena to Backpage requesting information

regarding its business practices, Backpage filed suit against the Sheriff.  From day one,

Backpage's complaint against the Sheriff was a fraud, neither grounded in fact nor law.  From

the opening salvo through the prayer for relief, Backpage painted a false picture of a first

amendment-crusading Backpage versus a Sheriff that was trying take away the constitutional

rights of an information platform and its posters:

> Sheriff Dart's actions to cripple Backpage.com and all speech through the
> site are an especially pernicious form of prior restraint.  He has achieved
> his purpose through false accusations, innuendo, and coercion . . .

3

> Moreover, Sheriff Dart's actions have not only infringed Backpage.com's
> right to publish and distribute speech, but the rights of millions of the
> website's users to post and receive protected speech.  (ECF No. 1, ¶ 6.)

As shown in the Ferrer and Backpage plea agreements, the above factual

assertions have always been lies; the speech at issue was never protected by the first amendment,

and Backpage was a content provider and distributor of illegal, non-protected speech.

The lies in **Backpage's complaint** range from Backpage stating it prohibited and

prevented illegal content on its platform:

> Backpage.com prohibits illegal content and activity on its website and
> takes extensive steps to prevent such misuse, especially to guard against
> any form of human trafficking or child exploitation (ECF No. 1, ¶ 23)

to Backpage stating it was only a third-party content provider, not an author of the illegal

advertisements for prostitution:

> Sheriff Dart's actions also violate Section 230 of the CDA, 47 U.S.C. §
> 230, as he has no right or authority to preclude or seek to prosecute
> Backpage.com under state law for publishing third-party content (ECF No.
> 1, ¶ 56)

to Backpage stating that it was the Sheriff's actions that caused the credit card companies to stop

doing business with Backpage:

> Thus, because of Sheriff Dart's actions, Backpage.com is barred from
> credit card services of any of the three largest card companies [American
> Express, Visa, Master Card] or any acquiring banks or credit processing
> companies. (ECF No. 1, ¶ 43.)

**B.**     **Backpage follows up its fraudulent complaint with**
          **a request for a TRO and a Preliminary Injunction**

Not satisfied with its fraudulent request for money damages and declaratory relief

in its Complaint, Backpage also filed an Emergency Motion for Temporary Restraining Order

and Preliminary Injunction.   (ECF No. 5.)  In support of the same, Backpage attached the sworn

declaration of Carl Ferrer (ECF No. 6), which was replete with lies:

4

- Backpage.com does not dictate or require users to post any content. Instead, users provide all the content for ads they post using an automated interface. Ferrer Declaration, ¶ 4.

- Backpage.com also employs extensive, voluntary monitoring measures to prevent and remove improper user postings. Ferrer Declaration, ¶ 14.

- The practical effect of Sheriff Dart's and the credit card companies' actions has been to cut off nearly all revenue to Backpage.com. This affects not only adult ads but also other ads for dating, housing, services, trades, and sales of goods, among others. Although Backpage.com allows payment by bitcoin, this has accounted for a very small percentage of purchase on Backpage.com. Ferrer Declaration, ¶ 27.

- Sheriff Dart's actions and the termination of credit card services have also harmed Backpage.com's efforts to police and preclude improper ads. Ferrer Declaration, ¶ 29.

And those lies created the basis for this Court to enter a Temporary Restraining Order against the Sheriff on July 24, 2015. (ECF No. 29.)

    After the TRO was entered by this Court, based on the misrepresentations of Backpage, the parties began to engage in limited discovery to determine whether a preliminary injunction was appropriate. In this limited discovery period, during which Backpage was withholding valuable information from the Sheriff, Backpage was completely stonewalling the United States Senate. On August 6, 2015 Backpage informed the Senate that it was refusing to provide any information regarding its business practices. *See Backpage Answer to Subpoena,* August 6, 2015; ECF No. 197-1 at 14. And Backpage's attorneys in this case were aware of Backpage's obstructionist conduct before the Senate as they served as Backpage's attorneys in the Senate proceedings. U.S. District Court for the District of Colombia, Case No. 16-mc-00621 at ECF No. 6 (Appearance of Robert Corn-Revere).

    During this limited discovery period, Backpage's lies continued. In answers to interrogatories, Backpage referenced the above-cited affidavit from Carl Ferrer, thereby perpetuating those falsehoods. Additionally, in its written response to the Sheriff's interrogatory

number four, Backpage stated that after July 6, 2015 Backpage.com could no longer charge for

ads because of the Sheriff's actions to pressure Visa and MasterCard. We now know for certain

that this is false as Backpage and Ferrer have admitted to setting up straw companies to

circumvent the credit card companies' ban. (Ex. A, ⁋ 10(a) and Ex. B, ⁋ 10(a).)

      In preparation for the subsequent preliminary injunction hearing, Backpage's lies

continued. In the deposition of Carl Ferrer, he perpetuated the lie that Backpage did not know

that many ads on its site were for child prostitution, for example:

> Q.    You are aware that each month hundreds of postings in Backpage's adult
>       services site likely involve minors?
>
> A.    No.

August 18, 2015 deposition of Carl Ferrer. But despite the lies and deceit of Backpage, this

Court correctly denied its request for a preliminary injunction. Backpage moved to stay the case

pending an appeal of the denial of its request for a preliminary injunction, and therein lied again.

Backpage told the Court that VISA and Mastercard had "cut off nearly all revenue to

Backpage.com." As set forth above, we now know this to not be true, and to this day, neither

Backpage nor its attorneys have corrected the record.

### C.    Backpage continued its lies on appeal

      In its opening and reply briefs on appeal, the parade of lies continued. Here are

two of the most egregious:

- Backpage.com had a multi-tiered system to screen, block and remove
  posts that may be improper. (October 2, 2015 Opening Brief at 5, n.1.)

- [Sheriff] Dart cannot pursue legal claims against Backpage.com under
  state criminal or nuisance laws for allegedly aiding and abetting
  individuals who misuse the site, because the website does not cause this in
  any sense. (November 5, 2015 Reply Brief at 5.)

The assertion Backpage made to the Seventh Circuit that it was doing everything it could to

block prostitution ads when in fact it was helping to write them is as material of a lie as

Backpage could have made. And that its lawyers then used this lie to make an argument that

Backpage could never be liable under state criminal laws for aiding and abetting prostitution—an

argument that was clearly wrong—is exactly the type of argument that Backpage's lawyers

should have refused to make. Their participation makes them complicit in their client's lies.

    **D.**    **Backpage's lies continued throughout the litigation**

        At points that Backpage and its attorneys could and should have come clean about

Backpage's lies to this Court, they instead prolonged them. In its Motion for Partial Summary

Judgment, Backpage made the following false statements:

- Backpage.com also employs extensive voluntary monitoring measures to prevent and remove improper user postings. (ECF No. 124-1, ¶ 14.)

- Through its review process, Backpage.com . . . immediately reports any that may concern child exploitation to NCMEC (approximately 300 per month.) (ECF No. 124-1, ¶ 15.)

Backpage went to great lengths to fight the Sheriff's Motion for Leave to Amend Affirmative

Defenses and spent a great deal of effort trying to undercut the importance of the Red Beauty ad

placed by a member of Sheriff's Office. As this Court recalls, the Sheriff sought to plead the

affirmative defense of illegality, and in support provided evidence regarding Backpage sanitizing

the Red Beauty ad of references indicating the subject was a child. Backpage filed briefs and

affidavits trying to show that the Sheriff's claims about the Red Beauty ad were false. *See, e.g.,*

Backpage's May 17, 2016 Opposition to Dart's Motion for Leave to Amend Affirmative

Defenses. (ECF No. 160.) In fact, the "evidence" provided by Backpage in support of that

argument was false, but focusing on that misrepresentation misses the larger point. The larger

point is that Backpage knew that it routinely did exactly what the Red Beauty evidence showed:

sanitize ads of references to the subject of the ads being children, and its tremendous efforts to attack the Red Beauty evidence was designed to divert the Court's attention. What Backpage and its lawyers should have done, in fact were required to do, was come clean to the Court and admit that it engaged in sanitization of ads, for example, by amending their false complaint.

## III.    SANCTIONS AGAINST BACKPAGE AND ITS COUNSEL SHOULD BE AWARDED PURSUANT TO THIS COURT'S INHERENT AUTHORITY

As this Court is aware, it has power to sanction parties and their attorneys under several rules and statutes. *See, e.g.,* Federal Rule of Civil Procedure 11, 26, 37 & 56 and 28 U.S.C. § 1927. In addition to these specific rule and statutory bases, the Court has inherent authority to enter sanctions. "[I]f a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). "A court has inherent power, which is to say a common law power, to punish by an award of reasonable attorneys' fees or other monetary sanction . . . misconduct by lawyers appearing before it." *Carr v. Tillery,* 591 F.3d 909, 919 (7th Cir. 2010) (*citing Chambers,* 501 U.S. at 43-46). The Supreme Court has made clear that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers,* 501 U.S. at 49. This Court should use its inherent power to sanction both Backpage and its counsel for the lies which Backpage told and which its counsel must have known were lies when stated.

In *Chambers,* the Court explained that "the District Court could have employed Rule 11 to sanction [the plaintiff] for filing 'false and frivolous pleadings,' and that some of the other conduct might have been reached through other Rules. Much of the bad-faith conduct by [plaintiff], however, was beyond the reach of the Rules; his entire course of conduct throughout

the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address. In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id.* at 50–51 (citations omitted).

In *Reichmann v. Neumann*, 553 F. Supp. 2d 307, 327–28 (S.D.N.Y. 2008), the court entered a sanction pursuant to the court's inherent authority requiring plaintiff and his attorneys to pay the defendant's costs and attorneys' fees where plaintiff's attorneys "did not reasonably question [plaintiff] or investigate the support for his claims, even as the facts he alleged grew more and more implausible."

In *In re Narragansett Clothing Co.*, 143 B.R. 582 (Bankr. D.R.I. 1992), the court granted a motion for sanctions against the bankruptcy trustee and his attorney. The court reasoned that "at no time during the pleading and pre-trial stage, nor at the hearing on the merits, has there been any discernable or justifiable reason for the Trustee to litigate this matter. While [the court did] not, with the benefit of hindsight, like to second guess the litigants in such matters, here, with or without hindsight, there was never any reasonable basis upon which the Trustee should have incurred legal expense to the estate in litigating this matter. Because of the total absence of any merit in the Trustee's position, [the] motion for sanctions is granted, and the full amount of its necessary and reasonable attorneys' fees herein are awarded against the Trustee and his attorneys, and **payment of said sanctions, of course, should not come from estate funds**." *Id.* at 583–84.

In *In re Evergreen Sec., Ltd*., 384 B.R. 882, 937 (Bankr. M.D. Fla.), *aff'd,* 391

B.R. 184 (M.D. Fla. 2008), *aff'd*, 570 F.3d 1257 (11th Cir. 2009), the court awarded as sanctions

"the amount of $371,517.69, representing approximately fifty-five percent of Evergreen's fees

and costs incurred in the recusal litigation" to be paid by the party who filed the motion to recuse

and his law firm, jointly and severally.   The court explained that in filing motion for recusal of

judge, disqualification of Chapter 11 debtor's counsel and his law firm, and revocation of all

orders entered in main case and proceedings involving their clients, attorneys and law firms

engaged in "bad faith," as warranted imposition of sanctions pursuant to court's inherent powers,

section of Bankruptcy Code authorizing court to issue any order necessary or appropriate to carry

out provisions of title 11, and Bankruptcy Rule 9011.  *Id.*  Attorneys and firm "conducted no

reasonably thorough and objective investigation of the actual facts" instead constructing their

motion from "gossip, hearsay, untruths, and assumptions," so that every allegation in the motion

was objectively frivolous, they relied on inapposite and inflammatory case law to support the

motion, namely, case law involving criminal investigations of judges, and they filed the motion

for improper purposes of delaying matters in debtor's case, harassing the court, debtor and

debtor's attorneys and punishing the court for unfavorable rulings. *Id.* at 932.

As seen in the above-cited cases, when a party and its counsel perpetuate a

meritless case based upon bald-faced lies, the Court should impose sanctions against the party

and its lawyers for engaging in such egregious conduct.  As seen in the fact section above and in

the sections immediately below, Backpage lied to this Court and its attorneys perpetuated those

lies when they should have instead brought those lies to the Court's attention so that it could

properly and timely address them.

10

**A.**     **The Court should use its inherent authority to sanction Backpage**

Here, Backpage repeatedly lied to this Court about numerous issues, the most mendacious of which are Backpage's statements that:  (1) it did not "sanitize" or "moderate" the ads on its website that were, prior to sanitization or moderation, clearly for adult prostitution or child prostitution; (2) that VISA and Mastercard ceased doing business with it because of the letters sent by the Sheriff; and (3) that it was unable to process credit card transaction or otherwise be paid for ads placed on its website.  These lies caused the Seventh Circuit to order that this Court enter a preliminary injunction, the Supreme Court to deny a *certiorari* petition, and caused this Court to rule against the Sheriff on several motions and allow this case to go on for more than another year.  This Court should find that Backpage perpetrated a fraud on the Court, and that under its inherent authority, sanctions should be awarded to the Sheriff in the amount of the reasonable attorneys' fees for his entire representation in this matter.  *See Reichman*, 553 F. Supp. 2d at 319 (plaintiff in breach of contract case sanctioned where he brought claim knowing that the dispute had been settled and only dismissed case when documents showed up that completely foreclosed his claim).

**B.**     **The Court should sanction Backpage's counsel**

Backpage's counsel may well have known all along about their client's lies, but even if not, they were presented with an abundance of opportunities from very early on in this case to know that their client was lying to the Court about the critical issues.  They then either learned of these lies but did nothing or stuck their heads in the sand.  "Sticking one's head in the sand is more than undignified.  It is sanctionable.  In this case appellees' attorneys' fees are an appropriate sanction; these are costs that would not have been incurred but for a doomed appeal, and the expense should be borne by the side that created them." *Khalil v.*

11

*Town of Cicero*, 916 F.2d 715 (7th Cir. 1990) (imposing sanctions under Rule 37). *See also City of Livonia Employees' Retirement System v. Boeing Co.*, 306 F.R.D. 175, 181 (N.D. Ill. 2014) (Rule 11); *Paniagua v. Max 18, Inc.*, No. 11 C 03320, 2013 WL 5907893, *8 (N.D. Ill. Nov. 4, 2013) (Rule 11). The following chronology paints the picture of why and when Backpage's counsel knew or should have known that their client was lying to the Court:

In April 2015, the United States Senate, through the Permanent Subcommittee on Investigations (the "Subcommittee"), requested an interview to discuss Backpage's business practices. ECF No. 197-1 at 14. On June 19, 2015, after two months of negotiations with Backpage's counsel over specific topics the Subcommittee wished to discuss, the Subcommittee interviewed Elizabeth McDougall, Backpage's general counsel. *Id.* During that interview, McDougall would not answer critical questions regarding Backpage's procedures for screening for illegal content. *Id.* This was the first red flag that gave an indication that Backpage's procedures may be less than legal.

On July 7, 2015, two weeks before Backpage filed its complaint against the Sheriff, the Subcommittee issued a subpoena to Backpage, seeking, among other things, documentation regarding its screening process and data retention policies. *Id.* On August 6, 2015, a few weeks prior to the preliminary injunction hearing in this case, Backpage sent the Subcommittee a letter stating it was refusing to answer its subpoena. *Id.* Red Flag Number Two.

On August 13, 2015 the Subcommittee subpoenaed two Backpage employees, Andrew Padilla—the head of Backpage's moderation department—and Joye Vaught—the supervisor in charge of training Backpage's moderators (not coincidentally, on information and belief, two of the people that Carl Ferrer alleges he conspired with, *see* Plea Agreement at Ex. B at ¶ 10(a))—to discuss their job duties. ECF No. 192-1 at 14—15. Instead of answering the

Subcommittee's questions, both individuals hired an attorney and refused to answer, invoking their fifth amendment privilege, stating their answers might tend to incriminate them. *Id.* at 15. Red Flag Number Three.

On October 1, 2015 the Subcommittee issued a new, more targeted subpoena, focusing on Backpage's moderation efforts, including information related to editing or modifying of ads prior to publication—the very information that would have destroyed Backpage's argument of immunity under the Communications Decency Act. *Id.* Backpage answered by providing twenty-one pages of publicly available documents and writing a letter stating it refused to provide any relevant documents, citing first amendment objections. *Id.* Red Flag Number Four.

The Subcommittee informed Backpage that its objection was without merit and ordered Backpage to comply by November 12, 2015. *Id.* at 16. Additionally, the Subcommittee subpoenaed Carl Ferrer to testify before the Subcommittee on November 19, 2015. *Id.* Not surprisingly, Backpage refused to answer the subpoena and Carl Ferrer did not show up at the Subcommittee's hearing as he had fled the country. *Id.*; ECF No. 126. Red Flag Number Five.

On November 30, 2015 the Seventh Circuit reversed this Court's decision regarding the preliminary injunction, finding that "it is *unclear* that Backpage is engaged in illegal activity." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (emphasis added). Given that Backpage was refusing to answer subpoenas regarding its moderation processes, and its employees were invoking their fifth amendment privileges against self-incrimination with regard to those processes, it was becoming clear that "illegal activity" may be at the heart of Backpage's functions.

13

On March 11, 2016 Backpage filed a Motion for Partial Summary Judgment, stating that there was no need for the parties to engage in further discovery. ECF No. 124. Again, Backpage was pushing to cover up its "illegal activity," as it did not want the Court to allow the Sheriff to see discovery which would demonstrate that the entire case against the Sheriff was a farce.

On March 29, 2016 the Subcommittee filed its Application to Enforce Subpoena Duces Tecum with the U.S. District Court for the District of Columbia, and Backpage through its counsel (*the same counsel that is representing Backpage in this case*) filed its opposition to the same. ECF No. 197-1 at 16—17; U.S. District Court for the District of Colombia, Case No. 16-mc-00621 at ECF No. 6 (Appearance of Robert Corn-Revere). Red Flag Number Six.

On March 30, 2016, the Court denied Backpage's Motion for Summary Judgment without prejudice and ordered the parties to brief any disputed discovery issues. ECF No. 137. On April 6, 2016 the Sheriff filed a Bench Memorandum, arguing he was entitled to discovery on, among other things: (1) Backpage's purported damages, specifically requesting information on lost profits and any illegal contracts for prostitution, as Backpage should not be compensated for the same; and (2) Backpage's moderation practices to show the illegality of Backpage's business. ECF No. 143.

On April 20, 2016 Backpage filed a response to the Sheriff's Bench Memorandum, arguing Backpage should not have to turn over moderation discovery as the Communication Decency Act provides immunity for Backpage as a platform provider. ECF No. 153. This argument by Backpage's attorneys was disingenuous at best, as by now they had to know that Backpage was a part author in a great majority of the prostitution ads on the website, thereby losing any possible immunity under the CDA. As of this date, at the very latest,

14

Backpage's attorneys were at best practicing willful indifference to Backpage's actions, because

if its attorneys did not know that Backpage was authoring ads for prostitution, that is due to their

intentionally turning a blind eye to all of the evidence in front of them.

On April 21, 2016, as part of the Sheriff's Motion for Leave to Amend

Affirmative Defenses, the Sheriff informed the Court about the Red Beauty Investigation, during

which the Sheriff gained first-hand knowledge of Backpage's sanitization process, proving that

Backpage was not just an information platform provider but an author of ads purporting to

prostitute children. ECF No. 155. Rather than acknowledging Backpage's conduct, Backpage's

attorneys accused the Sheriff of creating fake ads that failed to demonstrate any sanitization.

ECF No. 160. This was obviously false and provides further evidence that Backpage's attorneys

were either covering up their clients' illegal actions or purposefully sticking their heads in the

sand.

On May 17, 2016 Backpage's attorneys filed an opposition brief with the Court,

arguing that the Sheriff should not be allowed to amend his affirmative defenses as the Sherriff's

defense on illegality was "futile" because the Sheriff's "proposed illegal conduct defense directly

violates [the CDA]." *Id.* Again, by now, Backpage's attorneys should have known that this was

untrue.

On August 2, 2016 Backpage sought leave to file a first amended complaint,

abandoning its request for monetary damages. ECF No. 167. Backpage and its attorneys knew

that it needed to drop the claim for money damages, otherwise the Court would allow discovery

into Backpage's purported lost profits, and its moderation practices for purposes of determining

which "contracts" were illegal (*i.e.*, payments for ads for prostitution). ECF No. 141 (Transcript

from March 30, 2016). Backpage knew that if it allowed the Sheriff to dig into its lost profits

claim, the Sheriff would learn (1) that Backpage never stopped making money through Visa and

MasterCard, and therefore the entire basis for its requested injunctive relief—that Backpage was

stopped from doing business with Visa and Master Card—was a sham; (2) that Backpage was a

content provider and could never have any protections under the CDA; and (3) that Backpage

was laundering money through straw entities.

On August 5, 2016 the district court in the Senate Action granted enforcement of

the Subcommittee's subpoena, rejecting Backpage's first amendment argument. *Senate*

*Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016*), vacated as moot sub nom.*

*Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017). Over

the course of the next three months, Backpage engaged in legal theatrics, requesting appeals and

stays from the district court's enforcement order. ECF No. 197-1 at 17—18. Finally, after all

appeals and stays were exhausted, Backpage started turning over documents. *Id.* at 18. By the

end of 2016, Backpage had turned over more than five hundred thousand pages of documents in

response to the Subcommittee's subpoena. *Id.* at 20.

On August 9, 2016 Backpage again requested that this Court proceed with

summary judgment proceedings, stating the "Court should reject the Sheriff's arguments

[regarding needing additional discovery] again and move this case forward to consideration and

briefing of summary judgment on liability and declaratory relief."

On September 26, 2016 and December 23, 2016, Carl Ferrer was indicted in the

State of California for taking part in a pimping conspiracy and money-laundering conspiracy.

Ex. C. The December indictment detailed efforts that Backpage had undertaken to set up sham

companies to bypass detection by American Express. *Id.* According to the indictment, in May

of 2015, in only the State of California, Backpage was able to conduct $48,288.25 worth of

16

transactions, even though American Express had ceased processing Backpage transactions on

May 1, 2015. *Id.* Attorneys for Backpage in this case also represented Carl Ferrer in the

indictment proceedings. Ex. D.

        At this point there is direct evidence, known to Backpage's attorneys, that

Backpage and its CEO, Carl Ferrer, had lied to this Court. Specifically, in paragraph 4 of both

the complaint and the amended complaint, which was filed just prior to the indictments,

Backpage stated that due to the Sheriff's letters, American Express, Visa and Master Card all

blocked use of their cards for any and all purchases on the website. ECF No. 1; ECF No. 173. If

Backpage was circumventing the blocks being administered by the credit card companies, and

still using American Express, Visa and Master Card to accept payment, this directly affects

Backpage's theory of causation and its requests for relief. Specifically, if Backpage was still

running transactions through the credit card companies, albeit illegally, Backpage was never

suffering the harm it alleged in its complaint.

        Instead of bringing the above to this Court's attention, as they were obligated to

do, Backpage's attorneys chose to do nothing, except press forward with Backpage's request for

summary judgment. In fact, since learning that Backpage had lied in the amended complaint

pending before this Court, Backpage sought summary judgment or a summary judgment hearing

on four separate occasions. *See* Opposition to Defendant's Motion for Leave to File Sur-

Response Opposing Backpage's Motion to Renew Summary Judgment Proceedings (November

23, 2016) (ECF No. 191) (stating "the Court should set a hearing on the Plaintiff's motion for

summary judgment at the earliest possible date"); Opposition to Suggestion of Mootness

(February 21, 2017) (ECF No. 196) (stating the Court should "hold this case is moot and

expeditiously proceed to Plaintiff's motion for summary judgment"); Plaintiff's Motion for

Sanctions Based on Sheriff Dart's Fraud on the Court (December 15, 2017) (ECF No. 205)
(stating that Backpage seeks an order requiring that "[a] schedule be set for briefing and
argument on Plaintiff's motion for summary judgment," even though it was completely unrelated
to the motion it filed); Plaintiff's Reply to Sheriff Dart's Opposition to Motion for Sanctions
Based on Sheriff Dart's Fraud on the Court (February 2, 2018) (ECF No. 214) ("Backpage filed
its Motion for Sanctions and asked this Court to order … a briefing schedule for resolution of the
case on summary judgment"). Once Backpage's attorneys learned that the factual basis for the
entire amended complaint was false, namely that Backpage was still actively using credit cards
to pay for services on its website, they had a duty and an obligation to inform the Court and the
Sheriff's attorneys of the same, at a minimum, by amending their errant pleading. Instead, they
ran from that obligation, and pushed this Court for an entry of summary judgment in their
client's favor, even though such a judgment would have been based on a fraud.

On January 19, 2017 after reviewing documentation provided and testimony
regarding Backpage's business practices, the Subcommittee issued a report from its investigation
titled Backpage.com's Knowing Facilitation of Online Sex Trafficking. ECF No. 197-1. In the
report the Subcommittee found that Backpage had knowingly concealed evidence of criminality
by systematically editing its adult ads, and that it knowingly facilitated prostitution and child
trafficking. *Id.*

On September 15, 2017, the Sheriff sought leave to issue subpoenas to discover
evidence proving that Backpage has been and is engaged in criminal activities, including the
solicitation of prostitutes and creation of advertisements for prostitution. ECF No. 201. The
evidence was discovered in the Philippines in a non-related case. *Id.* The Sheriff explained in
his motion that based on the date range of a few of the incriminating documents that were

18

available from the docket in Backpage's case against Missouri Attorney General Hawley, it

appeared that Backpage was sanitizing ads of their criminal content in 2015 and 2016, the same

time it was telling this Court that it was not. *Id.*

   In response to the Sheriff's request, Backpage's attorneys did not tell this Court

about any of the evidence that they had discovered over the course of the last eighteen months,

but rather, pushed forward and continued to argue that the Court should reject the issue raised in

the Sheriff's motion as those issues already had been considered by the Court. ECF No. 204.

   Counsel for Backpage, throughout the course of this litigation, their representation

of Backpage in the Subcommittee proceedings, and their representation of Carl Ferrer in his

California criminal proceedings, learned of information disproving the facts alleged by Backpage

in its amended complaint. At the very least, counsel for Backpage, in this case, learned that (1)

Backpage, even after the attempted ban by the credit card companies, was still able to use credit

cards to process payments for services provided through Backpage.com; and (2) Backpage was

sanitizing its ads such that it was an information content provider, and not afforded protections

by the Communications Decency Act.   Even with such knowledge, they performed no

investigation into the same, and failed to inform the Court of evidence discovered.   Such

"ostrichism" is shocking and sanctionable.

## IV. BACKPAGE'S COUNSEL SHOULD BE SANCTIONED UNDER 28 U.S.C. § 1927

   Sanctions under § 1927 should be awarded when counsel acts in an objectively

unreasonable and vexatious manner. *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 452 B.R.

676, 685 (N.D. Ill. 2011), *aff'd*, 719 F.3d 785 (7th Cir. 2013). "Objective bad faith does not

require a finding of malice or ill will; reckless indifference to the law will qualify. If a lawyer

pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to

be unsound, the conduct is objectively unreasonable and vexatious." *Id.* When determining whether an attorney's actions were objectively reasonable, the court "may infer intent from a total lack of factual or legal basis for a suit." *Id. See also Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184–85 (7th Cir.1992) (counsel sanctioned under § 1927 when "counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders").

Now that the criminal indictment and guilty pleas from Backpage and Carl Ferrer have come to light, it is clear that almost every paper filed and proceeding conducted was tainted by false representations, omissions and outright lies. It is obvious that counsel knew or should have known that Backpage was engaged in a criminal conspiracy, and yet its attorneys continued to make false assertions and fight all attempts by the Sheriff to uncover the truth. By repeatedly filing false declarations and motions intended to thwart attempts to reveal the illegitimacy of their client's business, Backpage's counsel have shown utter disrespect for the judicial process and the rule of law. Similar actions have resulted in the imposition of harsh sanctions against the attorneys. *See Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.*, 886 F.2d 1485, 1490 (7th Cir. 1989) (imposing sanctions against attorney for the cost incurred by the defendants in defending the litigation where the actions of the plaintiff's attorney "evidenced a disregard for an orderly and truthful resolution of the dispute"). Here, the Court needs to simply look at the indictment and plea filed in the criminal case and the misrepresentations and deceit on the Court that Backpage's attorneys have engaged in throughout the proceedings becomes clear.

Considering Backpage's admission in the plea agreement that it fraudulently implemented methods of continuing to receive payment after credit card companies ceased doing business with them, it appears the damages initially claimed in this case were non-existent. "An

20

award of sanctions is proper if the attorney 'has acted in an objectively unreasonable manner by

engaging in a serious and studied disregard for the orderly process of justice or where a claim is

without a plausible legal or factual basis and lacking in justification." *Lightspeed Media Corp. v.*

*Smith*, 761 F.3d 699, 708 (7th Cir.2014) (*quoting Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir.

1988)).  Similarly, Backpage's claim that it did not sanitize or moderate ads to remove the

appearance of adult and child prostitution is equally sanctionable as there has been ample

evidence in other courts to prove otherwise, and Backpage's attorneys were part of these

proceedings too.

Even if counsel for Backpage try to claim ignorance as to the false nature of the

claims when they were initially filed, the Seventh Circuit has interpreted 28 U.S.C. § 1927 as the

appropriate source of authority "to impose a continuing duty upon attorneys to dismiss claims

that are no longer viable." *Intellect Wireless, Inc. v. Sharp Corp.*, 87 F. Supp. 3d 817, 848–49

(N.D. Ill. 2015).  Its attorneys also cannot claim that they could not act because of their duty to

Backpage to keep confidential Backpage's illegal conduct.  *Cleveland Hair Clinic, Inc. v. Puig*,

200 F.3d 1063 (7th Cir. 2000) (concluding that the district court did not abuse its discretion in

sanctioning an attorney for providing false information and failing to disclose relevant

information when awarding attorneys' fees and costs incurred as a result of bad conduct, in

which the Court cited to a comment to Rule of Professional Conduct 3.3 which states the "duty

to protect client confidentiality does not come before the duty to be honest with the court").

There is too much evidence of illegality for counsel not to have been cognizant of

the false pleadings and deceit.  The Sheriff requests, if not already sufficient by this written

motion and attached evidence, limited discovery to prove that Backpage's counsel knew the

pleadings, discovery responses, filings and statements in open Court were false when made, followed by an evidentiary hearing, supplemental briefing and an award to promote justice.

WHEREFORE, for the foregoing reasons, the Sheriff requests that this Court enter an order:

1. permitting limited discovery;

2. holding an evidentiary hearing on sanctions;

3. permitting supplemental briefing on the appropriateness and amount of sanctions; and

4. for any other relief the Court deems appropriate.

Respectfully submitted,

THOMAS J. DART,
SHERIFF OF COOK COUNTY, ILLINOIS

By: Paul J. Kozacky
        One of his attorneys

Paul J. Kozacky
Alastar S. McGrath
Jerome R. Weitzel
KOZACKY WEITZEL MCGRATH, P.C.
55 West Monroe Street, 24th Floor
Chicago, Illinois 60603
(312) 696-0900