UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

United States of America, )
Plaintiff, ) CR-18-0422-PHX-SPL
vs. ) Phoenix, Arizona
) October 5, 2018
Michael Lacey, ) 10:50 a.m.
James Larkin, )
Scott Spear, )
John Brunst, )
Andrew Padilla, )
Joye Vaught, )
Defendants. )

BEFORE: THE HONORABLE STEVEN P. LOGAN, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HEARING ON PENDING MOTIONS - VOLUME I

(Pages 1 through 60, inclusive.)

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

For the Government:

U.S. Attorney's Office
By: PETER SHAWN KOZINETS, ESQ.
ANDREW C. STONE, ESQ.
MARGARET WU PERLMETER, ESQ.
KEVIN M. RAPP, ESQ. (Telephonic)
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004

U.S. Attorney's Office
By: JOHN JACOB KUCERA, ESQ. (Telephonic)
312 North Spring Street, Suite 1200
Los Angeles, CA 90012

U.S. Department of Justice
By: REGINALD E. JONES, ESQ. (Telephonic)
1400 New York Avenue NW, Suite 600
Washington, DC 20530

For the Defendant Lacey:

Liptsitz Green Scime Cambria
By: PAUL JOHN CAMBRIA, JR., ESQ.
42 Delaware Avenue, Suite 120
Buffalo, NY 14202

For the Defendants Lacey and Larkin:

Davis Wright Tremaine
By: ROBERT CORN-REVERE, ESQ.
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006

Davis Wright Tremaine
By: JAMES C. GRANT, ESQ.
1201 3rd Avenue, Suite 2200
Seattle, WA 98101

For the Defendant Larkin:

Bienert Miller & Katzman
By: THOMAS HENRY BIENERT, JR., ESQ.
WHITNEY Z. BERNSTEIN, ESQ.
903 Calle Amanecer, Suite 350
San Clemente, CA 92673

Schulte Roth & Zabel
By: SEETHA RAMACHANDRAN, ESQ.
919 Third Avenue, Suite 2013
New York, NY 10022

For the Defendant Spear:

Feder Law Office
By: BRUCE S. FEDER, ESQ.
2930 East Camelback Road, Suite 160
Phoenix, AZ 85016

For the Defendant Brunst:

Kimerer & Derrick
By: MICHAEL D. KIMERER, ESQ.
1313 East Osborn Road, Suite 100
Phoenix, AZ 85014

Bird Marella Boxer Wolpert Nessim
Drooks Lincenberg & Rhow
By: ARIEL A. NEUMAN, ESQ.
1875 Century Park E, Suite 2300
Los Angeles, CA 90067

For the Defendant Padilla:

Piccarreta Davis Keenan Fidel
By: MICHAEL L. PICCARRETA, ESQ.
2 East Congress Street, Suite 1000
Tucson, AZ 85701

For the Defendant Vaught:

Karp & Weiss
By: STEPHEN M. WEISS, ESQ.
3060 North Swan Road
Tucson, AZ 85712

For Henze Cook Murphy, PLLC:

Mitchell Stein Carey Chapman
By: LEE DAVID STEIN, ESQ.
ANNE MICHELLE CHAPMAN, ESQ.
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004

THE CLERK: Criminal case 18-422, United States of America versus Michael Lacey and others.

This is the time set for hearing on pending motions.

Please announce your presence for the record.

MR. KOZINETS: Thank you. Peter Kozinets from the U.S. Attorney's Office for the government. With me here is Andrew Stone and Margaret Perlmeter. In addition we have on the phone Kevin Rapp from our office, John Kucera from the U.S. Attorney's Office in the Central District of California, and Reginald Jones from the Criminal Division at main justice.

THE COURT: Good morning to all of you.

MR. KOZINETS: Good morning.

MR. CAMBRIA: Good morning, Your Honor. Paul Cambria on behalf of Michael Lacey.

THE COURT: Good morning.

MR. CORN-REVERE: Good morning, Your Honor. Robert Corn-Revere on behalf --

THE COURT: I'm sorry, sir. I need you to speak into a microphone, if you would, please.

MR. CORN-REVERE: Okay. Good morning, Your Honor. Robert Corn-Revere on behalf of defendants James Larkin and Michael Lacey.

THE WITNESS: Good morning to you as well.

MR. GRANT: Good morning, Your Honor. Jim Grant on behalf of defendants Michael Lacey and James Larkin.

THE COURT: Good morning.

MR. BIENERT: Good morning, Your Honor. Thomas Bienert and Whitney Bernstein on behalf of defendant Jim Larkin, who is present in court on bond.

And I will point out, we also have a paralegal, but I'd have Ms. Ramachandran, who is sitting here on the asset forfeiture issues, if we get to them in a substantive way today. So she may be joining us.

THE COURT: Good morning to all of you.

MR. FEDER: Bruce Feder for Scott Spear, who is in the audience.

MR. WEISS: Morning, Your Honor, Steve Weiss on behalf of Joye Vaught, and I waive her presence.

THE COURT: Good morning to you.

MR. PICCARRETA: Good morning, Judge Logan. Mike Piccarreta on behalf of Andrew Padilla, and I have waived his presence in our pleading.

THE COURT: Good morning to you all as well.

MR. KIMERER: Good morning, Your Honor. Michael Kimerer and Ariel Neuman on behalf of Jed Brunst, who is present in the courtroom at this time.

THE COURT: Good morning to you all as well.

As you all know, at this -- I'm sorry.

MR. STEIN: Good morning, Your Honor. Lee Stein and Anne Chapman on behalf of the law firm of Henze Cook and

Murphy. And Tom Henze and Janey Henze are here as well.

THE COURT: Good morning to all of you. Thank you.

As you are all aware, we are here this morning because I have several questions about the pending issues.

I plan to cover the following today: The Government's Motion to Disqualify Counsel, which is Document Number 118. I have the Government's Motion to Resolve Attorney-client Privilege Issues, which is Document Number 195. I have Defendant's Lacey's Motion for Disclosure of Documents Related to Carl Ferrer's Waiver of Privilege. I have Defendants Lacey and Larkin cross-motion to obtain discovery and address privilege issues.

I also have defendant Padilla's Motion for Itemization of Brady Giglio Material, which is Document 273. And last I have the Government's application for an order regarding criminal forfeiture of property in government custody.

Again, I am going to ask you all if -- there's a number of questions that I have, and when I call for an attorney to respond to some questions, I think it would be easier if you would approach the lectern and speak directly from the lectern. That would be very, very helpful.

But before we get to that, Mr. Stone, I have Document Number 331, which was filed yesterday. It is a supplement of Defendant Lacey and Larkin's opposition to the United States' Motion to Disqualify Counsel. Have you had a chance to read

through this 15-page document?

MR. STONE: We did, Your Honor.

THE COURT: Was it the government's intent to file a motion to strike the filing as an improper sur-reply?

MR. STONE: Obviously we haven't done so yet, but it crossed our mind when it was filed at noon yesterday.

THE COURT: Well, who is the author of this? If you would please stand.

MR. GRANT: I am, Your Honor, Mr. Grant.

THE COURT: Sir, is there any reason why you filed this so late?

MR. GRANT: Yes. The reason is -- two different rationales for filing the paper. One, is because the government raised a number of new issues in connection with their reply, which we -- fact issues that we had no opportunity to respond to.

They filed a supplement without leave. We did not object to their supplement. But we also wanted to make sure that the Court was up to speed in terms of what's happened, because the motions have been pending as long as they have been, circumstances of various cases.

One, in particular, the government mentioned the Washington State case, the J.S. case, that case has now progressed much further. The order that the Court -- or that the government talks about has actually been stayed pending

appeal, and the appeal is pending. So we wanted the Court to have a full picture of where matters stand today.

THE COURT: Okay. I just want to let all the parties know, please make sure that you read the Court's order, in terms of your filings, so you don't have something very, very important that gets stricken from the record.

If you do need some additional time, you need to reach out to the Court and let me know. This is a case that has a lot of different pleadings, and I certainly appreciate and respect the work of all parties, but it makes it very difficult for the Court to respond to anything if I only have a number of hours to deal with it right before a hearing.

The first thing I want to take up is the Government's Motion to Disqualify Counsel. Do I have any argument from the government?

MR. KOZINETS: Yes, Your Honor. Good morning.

THE COURT: Since we have so many lawyers that are present, what would be very, very helpful to me is when you come to the lectern, if you can tell me who you are again that would be great.

MR. KOZINETS: Sure. I am Peter Kozinets from the U.S. Attorney's Office. The Davis Wright and Henze Cook law firms have a very stark conflict of interest, and there are these forming points that warrant disqualification here.

The first point is that Seattle state court order that

was just discussed. In a case brought by two minor victims who had been trafficked by Backpage, the state court judge sua sponte ordered the Davis Wright firm disqualified under the ethical rules, pointing that they had jointly represented Mr. Ferrer, Mr. Lacey, Mr. Larkin, Backpage, and a number of entities, in several cases throughout the country, that those cases were substantially related to the trafficking and tort claim issues in the Washington court, and also to the issues in this court, and that because of all of that, there's a, quote, high possibility that the Davis Wright firm, quote, will encounter an impermissible conflict of interest jeopardizing the effective administration of justice if they continue to represent Mr. Lacey and Larkin.

We recognize that order has -- is now under appeal, but because it was entered sua sponte, that really emphasizes how strongly the Court felt about these issues.

Secondly, in criminal cases, the law is clear that in precisely this kind of situation, disqualification is required where you have a former client who is now expected to be a key prosecution witness and counsel for that former client now seeks to represent a current defendant in the case.

This sort of factual scenario is addressed in multiple cases cited in our brief. The Moscony case is just a great example.

Very briefly, Your Honor, a real estate firm's

employees were under federal investigation. One law firm represented all those employees. When two employees were indicted, one of those defendants sought to hire that law firm to represent him in the criminal case, but because two of the other employees who had also been jointly represented were going to be key prosecution witnesses, the government moved to disqualify, the District Court granted the motion, the Court of Appeals affirmed finding there was an actual obvious conflict of interest.

THE COURT: Counsel, I will allow you to finish with your argument, and I'm very, very familiar with all of the pleadings that have been filed in the case. We have gone over those numerous times.

I need to focus on a few questions that I need answered. First, does Ferrer's waiver of attorney-client privilege in the proffer agreement constitute a waiver of the confidential privileged information sought to be protected by this motion to disqualify?

MR. KOZINETS: No, Your Honor. And the reasons for that are many, but the key reason why that kind of waiver is really immaterial, is that the ethical rule of confidentiality sweeps far broader than the evidentiary attorney-client privilege.

This proffer agreement relates to evidentiary privilege, it doesn't relate to counsel's ethical duty to

maintain in confidence all information it learned about Mr. Ferrer in the course of its multi-year, multi-jurisdictional representation of him, personally and in connection with other Backpage defendants.

And that -- kind of the broad scope of the disqualification rule has been expanded by more recent Arizona cases, including the Foulk case, Arizona Ethics Opinion 91-05, which addresses precisely the scenario we have here. A witness formerly -- the same scenario addressed in that Moscony case.

We also have an independent duty of loyalty that these lawyers continue to owe to their former client. That's been independently recognized in the law, and that is separate and unrelated to this privilege waiver notion.

So the conflict though really is so extreme and stark in this case because this isn't a situation where you just have one relevant former representation of Mr. Ferrer. Instead what you have is a multi-year litigation campaign waged by these two law firms over five to six years throughout the country in which they frequently communicated with Mr. Ferrer, met with him, drafted written testimony for him and/or prepared him for oral testimony in different proceedings.

The whole point of that legal strategy was to consistently deny any knowledge of any wrongdoing regarding rampant prostitution advertising on the Backpage website. And that strategy has now essentially collapsed. Because you have

Mr. Ferrer and Mr. Hyer, the sales manager, pleading guilty and essentially admitting that Backpage was principally in the prostitution advertising related business.

And as a consequence of that, you have litigants in these other cases who are starting to file motions for sanctions involving these issues.

So in that Washington state court, for instance, the state court judge who disqualified Davis Wright also imposed a $200,000 sanction on Davis Wright's clients.

In the hearing involving that sanctions issue, Davis Wright lawyers pointed the finger back to Mr. Ferrer and said that he may be subject to cross-examination or discovery about his prior inconsistent statements. Prior inconsistent statements including many declarations that the Davis Wright firm drafted for Mr. Ferrer and filed in these other proceedings.

Similarly -- just real briefly, Your Honor. Similarly, in Chicago Federal Court, there's another case called Backpage versus Dart, where there's currently pending a motion for sanctions directly against the Davis Wright firm.

And in their response to that motion, Davis Wright asserted that Ferrer, quote, will have to answer for differences between his plea agreement and his prior testimony, including the declarations that Davis Wright prepared.

So you have a conflict that is -- it's difficult to

imagine a starker conflict with lawyers expressly reserving the right to impeach their former client with testimony that they drafted for him.

Mr. Ferrer hasn't consented to that conflict. He hasn't waived that conflict, and disqualification is necessary for those reasons as well.

THE COURT: Sir, can you provide the Court with the government's understanding of the joint defense agreement and your position on how that agreement impacts this motion to disqualify?

MR. KOZINETS: Yes. Yes, Your Honor. So from our reading of the pleadings, it looks like the defendants have pointed to three different types of agreements.

One is a December 12th, 2016 engagement letter, or what might be called a joint representation agreement, where Davis Wright agreed to jointly represent Backpage, the company, plus Mr. Ferrer, Mr. Lacey, and Mr. Larkin.

And what we know from that agreement, to the extent it is quoted in Mr. Ferrer's letter to Davis Wright terminating their representation of him, it requires Davis Wright to withdraw if a conflict arises between those three individuals.

Broader, says that in the event of that kind of conflict, Davis Wright could continue to represent Backpage itself, but Backpage itself has also pleaded guilty in this proceeding, and Davis Wright no longer represents Backpage

itself. So that's that first agreement.

The second agreement they call a Common Interest in Litigation Management Agreement, dated December 30th, 2016. Common interest sounds like a joint defense agreement.

Joint defense agreements are agreements that are entered to allow separately represented parties to share information with each other's attorneys without losing the attorney-client privilege. And those provisions typically must be clear and explicit in order to provide notice to the clients of what rights they're waiving.

That's recognized in the Stepney case. United States versus Stepney, from the Northern District of California, 2003. The JDA should identify the signatory attorneys who the client is seeking not to seek disqualification of. And they must be clearly drafted to ensure that the client can get informed consent.

Our understanding is that Davis Wright Tremaine, nor any other outside counsel, signed this common interest agreement. In fact, in the pleading filed yesterday, shortly before noon, page 8, footnote 6, Davis Wright says it did not draft that agreement and it had no role whatsoever in its negotiation or execution.

So the fact that Davis Wright wasn't a party is important. It is important because it means that under the Stepeny case, the chances of any sort of informed consent were

greatly, greatly compromised.

There's a third JDA -- a third agreement, which is actually called the Joint Defense Agreement, which Your Honor perhaps may be referring to, dated, I think, June, 2017.

And again, a JDA is a limited kind of agreement which just allows sharing of confidential information among separately represented counsel.

The fact that Mr. Ferrer might have been involved in one or two JDAs is really irrelevant. The key issue is whether he was represented by Davis Wright Tremaine directly, as established in that December -- that first agreement, that December 12th, 2016 agreement.

And that agreement clearly sets forth that Davis Wright is required to withdraw in the event of a conflict such as the one we have here.

I'm happy to address further why there was no informed consent to any waiver that might appear in any of these agreements.

THE COURT: Well, counsel, what objection would the United States Government have to allowing Davis Wright Tremaine and Henze Cook Murphy law firms to continue with the representation in their limited roles that were outlined in the pleadings, since the defendants have already conceded that they will not participate as it relates to the trial preparation?

MR. KOZINETS: The government objects, Your Honor,

because the law is clear that this kind of proposed limited representation is just not permitted under the ethical rules.

The federal cases cited by briefs on both sides, from the defense and from the government, contain cases where courts have explicitly rejected the use of co-counsel to kind of avoid these types of conflict issues. Those are the Chesire cases, the Williams case, and also the United States versus Locascio case.

THE COURT: And what's your understanding, counsel, of their limited role?

MR. KOZINETS: Well, that's another really good question, Your Honor, because it's really not clear.

THE COURT: Have you talked to them about it?

MR. KOZINETS: Yes, we have. So the Henze Cook firm has expressed an interest in limiting representation to forfeiture issues and supervised release issues.

And we understand just from the pleadings, that the Davis Wright firm would not serve as trial counsel, but this is just simply not permitted under the case law, and under Arizona cases as well.

The Roosevelt Irrigation District case from this Federal Court in 2011 expressed grave concerns about screening attorneys and emphasized that the screened attorney must have no role in a new case posing a conflict.

Arizona Ethnics Opinions 91.05 prohibits precisely

this kind of concept as well, finding there is a complete prohibition. An attorney may not represent the defendant in the current criminal proceeding where this kind of conflict is involved.

The Court's rules also do not allow limited representation in a criminal case. The local rules provide that when an attorney or a law firm enters a Notice of Appearance, it shall be deemed responsible as attorney of record in all matters in the case.

These proposals would also create monitoring problems, practical monitoring problems. We really have no way of enforcing any sort of limited representation agreement.

So the case law recognizes really that in these conflict situations, the law really doesn't -- the law is extremely concerned about whether an attorney who has worked on a case in the past can really screen themselves from using that knowledge in their subsequent representation.

And in this Arizona Ethics Opinion, the State Bar Ethics Committee expressly stated, the use of co-counsel won't solve the conflict because these kinds of scenarios, quote, necessarily -- because lawyers, quote, necessarily will engage in many communications about the criminal defense of the defendant. They will have to coordinate their facts, coordinate their theories, and coordinate their arguments. And that is absolutely the case here and further underscores the

government's objection to that limited representation.

THE COURT: Well, counsel, would the government expect an order from this Court to prevent HCM and DWT from acting as an adviser in this role as well?

MR. KOZINETS: Yes, Your Honor.

THE COURT: So you see adviser and limited role representation as the same thing?

MR. KOZINETS: Yes, because it is really impossible to monitor that kind of scenario, and it's really impossible to know whether these law firms will be using, either consciously or even unconsciously, information, knowledge, that they have from their prior representations.

I think that's particularly the case here where we have Davis Wright, for instance, which communicated over several years with Mr. Ferrer, drafted declarations for him. For all we know, that firm still has within its files, the record of its communications, knowledge about those communications.

And the law recognizes that it's really impossible to disregard that kind of knowledge. You can't really unring the bell, so to speak, once you've had that kind of very close, continuing and extensive relationship with a former client.

THE COURT: Well, counsel, give me some feedback as it relates to how I can enforce what you are asking me to do as it relates to these firms from being somewhat involved in this

case.

Because I see an adviser role, I also see a limited role, and obviously, I can order the parties that you cannot, you know, talk to these clients that you've assisted in the past, but what do you -- what do you see as the textbook answer for this?

MR. KOZINETS: The textbook answer, Your Honor, is that a limited role or advisory role representation is just strictly and absolutely prohibited.

Again, I would direct the Court to the Arizona Ethics Opinion 91.05, which recognized that Ethical Rule 1.9(a) takes a broad prophylactic approach that flatly prohibits the lawyer from even entering a relationship where misuse of former client confidence is possible.

THE COURT: Before you indicted these individuals, did they have any kind of pre-indictment roles? Or was this something where -- refresh my memory, did you have an indictment that was sealed and the parties didn't know about it? Sometimes the government will work with parties before indicting criminal defendants.

MR. KOZINETS: Yes, Your Honor. The government did have pre-indictment communications, but not with -- to my knowledge, those communications were with criminal defense counsel.

THE COURT: Okay. Mr. Stone, do you have any

additional information on that? You can just speak into the microphone.

MR. STONE: From back here, Your Honor?

THE COURT: Just go to the lectern with your partner there.

MR. STONE: Your Honor, I just wanted to supplement the record on that particular issue, is that there was some intensive pre-indictment litigation in this case that involved the government and compliance with a subpoena that went before Judge Campbell, and in that case, both, I believe, Henze Cook and certainly Davis Wright Tremaine were involved in that litigation.

THE COURT: I appreciate that.

Counsel, is there anything else that you wanted to place on the record as it relates to the government's motion, which is Document Number 118?

MR. KOZINETS: We would just like to reserve the right to respond to any argument offered by the defense.

THE COURT: This is your last chance, as it relates to 118.

MR. KOZINETS: The only thing that I would add, Your Honor, is that in 1988, the U.S. Supreme Court recognized the importance of taking up disqualification issues.

In the Wheat versus United States case, the government objected to a conflict presented in that case and moved to

disqualify, the government's motion was granted. And the Court recognized that the Sixth Amendment right to choose one's own counsel is circumscribed in several important respects.

And in discussing different scenarios, the Supreme Court said, quote, nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party.

The Court also said that district courts must be allowed substantial latitude to address these issues, and even to refuse conflict waivers where there's an actual conflict or a serious potential for conflict. Because the district courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.

So in this context, Your Honor, we would respectfully submit that the Government's Motion to Disqualify should be granted.

And just one other further point. There was some argument about whether these defendants are adequately represented, even without these two additional law firms.

And I would just like to point out that the defendants are represented by at least six, maybe more than six, law firms that have very experienced, very knowledgeable criminal defense attorneys from Arizona to California, all the way to New York. So this isn't a case where they will experience severe hardship

from granting a motion such as this.

THE COURT: But that's in your opinion?

MR. KOZINETS: It's the -- it is the government's position that that hardship will not materialize here for those reasons, and also because really, the issues, the legal issues that these firms have worked on, are really kind of now in the past. The landscape of the litigation has now shifted from kind of legal, more theoretical issues, to much more factual issues about specific knowledge, trial issues that call for representation by experienced criminal defense lawyers.

A lot of the First Amendment and Internet law issues have already been resolved and resolved really against these defendants through substantial litigation in the District of Columbia, in the Senate Permanent Subcommittee on Investigations case against Backpage, through extensive litigation, grand jury investigation in the District of Arizona before Judge Campbell, where he recognized that there's really no First Amendment protection for the knowing publication of prostitution advertisements, from the internal discovery that has now been obtained, pulling back the curtain on Backpage's internal practices, from the indictments that have been issued in this case and from the -- the guilty pleas as well, of Mr. Ferrer and Mr. Hyer and Backpage, which essentially admit that this was a prostitution related advertising business.

THE COURT: Thank you very much.

MR. KOZINETS: Thank you, Your Honor.

THE COURT: Next, I want to take up Defendant Lacey's response in defense of HCM, which is Document Number 174, whoever that lawyer is that will argue. I also want the lawyer for 176 to come forward. That's HCM's response, and defendant Lacey and Larkin's response in defense of DWT, which is Document Number 180. And of course Defendant Padilla's response in defense of W -- I'm sorry, DWT Document Number 177.

MR. BIENERT: Your Honor, Thomas Bienert for Mr. Larkin. If I may approach?

May I just comment on Your Honor's --

THE COURT: Can you come up to the microphone so we have a recording?

MR. BIENERT: Yes, Your Honor. In terms of the documents that you referenced, if it's okay with Your Honor, I am individual counsel for Mr. Larkin, and I am going to address Document 180.

But Mr. Grant of Davis Wright Tremaine will address some of the substantive allegations and the waivers and that sort of stuff, in terms of the documents at issue. And then we have individual counsel in the other documents you reference that would come next, if that's okay?

THE COURT: Well, the reason why I wanted all the counsel up -- and we'll do it one by one if that's the easiest way to go about it, is I have some questions that I pose to all

of you, and I am just curious what your positions may be.

But if you feel you want to place the positions on the record individually, I would appreciate that as well.

So go ahead.

MR. BIENERT: Thank you, Your Honor. And I think I am going to kind of start where counsel left off, namely, the reason there are multiple law firms representing my client, and the harm to my client if they get the order that they are seeking.

Number one, he points out that we have lawyers, and I assume he is alluding somewhat to my firm, from California, to here, to New York.

Well, we have California counsel. Ms. Bernstein and I, we are criminal counsel. We will be trial counsel. We will try this case. But we are not First Amendment lawyers. This is a First Amendment case.

The primary issue that is just kicking along with the indictment is -- it's a First Amendment case, the defense is -- largely rides on First Amendment issues.

Government counsel is, unfortunately just inaccurate when he says the First Amendment issues have been decided. Your Honor will be seeing a lot of motions coming relating to the First Amendment aspect.

But plain and simple, this is our position. Our clients are not guilty, because what is alleged here against

our clients is not a crime as it relates to them. Why? Because of the First Amendment.

The First Amendment issues make clear that publishers are not responsible for any criminal acts of people who take out ads in their published materials.

Now, the government disputes that, I get it, but that is the main principle of our defense -- before we even get to all of the factual issues. So first and foremost, the First Amendment issues infect this case from cradle to grave.

Number two, my client absolutely wants his First Amendment counsel who frankly are among, if not the best in the country, in this case. It is very nuancey. It is very substantive. And this particular firm has successfully represented Backpage on at least nine different matters, and I think seven or eight different districts, where -- against allegations just like these. Courts have held and dismissed cases because, as a matter of law, publishers are not responsible, civilly or criminally, for the acts of people who place ads in their publication. That's our defense.

So we need First Amendment counsel. I am a pretty quick study, I'd like to think, but I am nowhere near the counsel that Mr. Grant is and Mr. Corn-Revere, when it comes to First Amendment issues.

So my client needs them. He wants them. To the degree that the Arizona ethical rule kind of goes in two

directions, Your Honor. 1.9 looks to the old client, in this case, Mr. Ferrer. 1.7 points to the current client, my client. He waives any conflict that there could be under 1.7 in having assistance from a counsel for several of us who is a First Amendment specialist.

So he would like that. I would like to reiterate that my client definitely is going forward with his right, as noted in the case law, to have counsel of his choice. And unfortunately, I don't agree with the government that somehow First Amendment issues aren't significant.

Finally, just from a case management, from a time and expense, as the government points out, Davis Wright Tremaine has a history of several years on the very issues in this case, for Backpage, and it makes absolutely no sense.

It's a definite detriment to my client to lose that institutionalized -- about that company, to lose the expertise about the company's issues, and frankly, just from a financial standpoint, to have to somehow start from scratch on the First Amendment issues.

So on that point, I would submit that he's entitled to his Sixth Amendment right, and it would certainly trump any concern the government has.

Only one other point on that and then I'm going to sit and turn it to over to Mr. Grant. And that is this, I think the single most significant feature of this issue -- well,

there are two. They're the fact that Mr. Ferrer waived all of these issues, and Mr. Grant will talk about that. But that sets it apart from any and every case cited by the government.

And number two, it is Exhibit B to Mr. Piccarreta's motion, where he attaches the letter from the government responding to issues about this conflict of interest. And the government acknowledges that Mr. Ferrer refused to join in this Motion to Disqualify.

So the person who they claim should have the concern under 1.9 and certain case law, has affirmatively said he's not joining in this motion. I think Mr. Grant can give a good explanation to the Court of maybe why he's saying that, because frankly he's waived that right several times.

But the simple reality is, under the case law where Your Honor has to acknowledge on the one hand a criminal defendant's right to counsel of his choice, and on the other hand factor in, well, what happens if I keep this counsel here, the only purported victim of this, if we can even use that terminology, would be Mr. Ferrer, who has affirmatively decided not to be a part of a motion to recuse counsel.

So on that, Your Honor, I would submit that that's sort of the particularized position of Mr. Larkin. And then Mr. Grant will be speaking for Mr. Larkin and others on the other issues.

THE COURT: I appreciate that. Thank you very much.

MR. BIENERT: Thank you, Your Honor.

MR. GRANT: Morning, Your Honor.

THE COURT: Good morning to you.

MR. GRANT: Your Honor, on behalf of Defendants Larkin and Lacey, let me sort of outline the things that I wanted to discuss.

The Court --

THE COURT: Sir, what defense motion are you related to?

MR. GRANT: At this point, I am addressing, I think it's 180 is our opposition. This is the Motion for Disqualification from the government as it relates to Davis Wright Tremaine.

THE COURT: Go ahead.

MR. GRANT: And I was going to say this, there are three different things that I wanted to touch on, but given that the Court has sort of questions in mind, let me lay out the topic, and then if there are specific questions in those topics that you would like to address, or anything else, of course --

THE COURT: Well, what I want is -- I just want the defenses' position, since there are so many different defendants that are here, I want all the positions, and then I have some questions to pose to all of you, is what I would like to do.

MR. GRANT: Fair enough. Your Honor, the three things that I wanted to touch on are to make sure the Court first understands the relationship of the parties, many different parties, and the nature of the agreements they entered into about joint representation.

Second is the application of the appropriate rules of professional conduct which expressly allow the kind of representation that Davis Wright did jointly on behalf of all of the defendants.

And the third point, I just want to come back to something that Mr. Kozinets was saying about the JS case and the sua sponte order that had been entered in that case. This is the Washington State trial court, the decision that's pending on appeal and has already been stayed.

So first of all, Your Honor, I think it's very important to understand what the parties are, what their relationships were.

It's not just that there is a Backpage.com and then there are three other individuals, Mr. Ferrer, Mr. Larkin, and Mr. Lacey. And, in fact, I heard Mr. Kozinets refer to that, and the government sort of lumped things together repeatedly. Backpage is not a single entity. It never has been.

From its founding in 2004 until 2015, April 2015, Backpage.com was a subsidiary of a company owned by other entities of Mr. Larkin and Mr. Lacey. The company is Village

Voice Media Holdings. That was the parent company. That company still exists today. There has been a name change, but the company that was still exists and the parent company is there.

Throughout that period of time from 2004 -- let's say 2008 to 2015, Mr. Ferrer held roles as essentially an employee of the company. He was first vice president, and then later he was a CEO of Backpage.com. But at all times, the company was controlled, owned by those Voice Media Holdings.

From 2010 to 2015, there was, I think the government alluded to, there were a number of different lawsuits filed against Backpage.com and Village Voice Media Holdings, and other cases that were brought and prosecuted by the companies.

My firm began representing Backpage and Village Voice Media in 2012. But at all times, the litigation, the retention of counsel, the management of counsel, was the responsibility of Village Voice Media Holdings. They held the privilege. They had the responsibility.

Mr. Ferrer's role throughout that time was as a corporate representative. As would be true in any corporation, we have to deal with the employees, the officers, the directors, in order to be able to defend the corporation, and that's what we did.

And throughout that time, there were no instances ever where there had been personal charges or claims brought against

Mr. Ferrer or against any other individual. It was all in the corporate capacity. And at no time throughout that period, or at any time, did Mr. Ferrer ever request of Davis Wright that it represent him in a personal capacity.

THE COURT: Well, Mr. Grant, let me ask you this. And my apologies for interrupting you. I will allow you to finish.

But what is your specific position on the current state or the plain text of the ethical rules and the ethical opinions that actually require or may require disqualification under these circumstances?

MR. GRANT: The plain text of the rule, and we're talking about obviously 1.7 and 1.9.

THE COURT: Correct.

MR. GRANT: The plain text of the two rules is that when there's a situation that there has not been informed consent provided by a party, that in certain circumstances the Court may rule that there can be disqualification.

We have a situation here where Mr. Ferrer expressly provided his informed consent. He did it both in his capacity originally as a representative of Backpage, and in that role he was not being personally represented. But secondly, he did it expressly in the joint representation agreements. And let me touch on that.

There are three different agreements. Two of them are joint representation agreements. The third is a joint defense

agreement. There's a difference between those things.

The joint representation agreements were -- have to do with a single counsel, in this case, Davis Wright Tremaine, although the agreements are broader than just Davis Wright, representing a number of different parties.

The ethical rules specifically contemplate that happening. They recognize that that's actually a beneficial arrangement in a lot of circumstances. It's more efficient, it provides for a common defense.

But at the same time, they recognize that in order to do that, it's incumbent on counsel, and the parties, to spell out the nature of the relationship and understand that there could be conflicts. And, in fact, that's exactly what happened in this case.

THE COURT: Well, tell me about the limited role that Mr. Kozinets had talked about on the record? Tell me about this -- the definition of the limited role, if you can.

MR. GRANT: Well, first of all, Your Honor, it's not necessary under these circumstances that there be a limited role. I have to say that at the outset. Because under the circumstances, the agreement that Mr. Ferrer entered into, and not just him, but all of his companies, was that if in fact he were to withdraw from the joint representation, this is, by the way, Exhibit B in the in camera declaration, if he were to withdraw from the joint representation, then Davis Wright or

any other counsel could continue to represent Larkin, Lacey, or other Medalist parties -- that's the name of their companies.

And he could not and would not seek to disqualify them, and he waived all conflicts related to that representation, either in the past, in the present, or in the future.

It's very broad and very specific waiver of conflict issues, and recognition for the continuing joint representation.

And I commend the Court, look at the express language of Exhibit A and Exhibit B to the declaration. They very clearly spell this out.

But let me answer your question, I apologize it took me a lead-up to get there.

In terms of limitations, what we have said throughout is that we have been counsel on First Amendment issues, we've been counsel on Internet issues, and related issues that have to do with Internet publishers. That's part of our expertise, Your Honor. But -- and we have said that we're not going to be lead counsel for this case.

Each one of the defendants, at all times, since there has been any threat or actual charges brought against them individually, each one of the defendants has always had his own personal counsel. That was true in the California -- previously. It is true still here today. And those are the

lead trial counsel for purposes of defendants throughout this case.

So the role that we would anticipate having -- certainly is to participate in connection with those counsel, but, again, not to cross-examine Mr. Ferrer. There are other very capable counsel who can and will do that, and not to act as the lead trial counsel, because each defendant should have his own lead trial counsel for purposes of this case.

So that's the limited role that I think is appropriate under these circumstances. And Mr. Kozinets' comments that you can't have any sort of lesser alternative than outright disqualification, I'd say, Your Honor, that's not what the law of Arizona says.

The Alexander case in Arizona suggests that there are five different factors you look at to determine whether the extreme remedy of disqualification is appropriate or not.

And can the Court suggest that there are other means or other ways to manage the issue? And here I would suggest the Court may want to consider the question of cross-examination of Mr. Ferrer. I understand that. But beyond that, any greater limitations as to the role of Davis Wright, and again, I am focusing on my firm, Your Honor, I think are inappropriate.

And I would offer a parallel to that. And this will take me to the Washington State case. First of all, I have

to -- the government points to the JS case and the sua sponte disqualification order there as though that should be indicative of what this court should do. There are a couple of major problems with that.

First of all, as I said, it was a sua sponte order. The Court heard no motion. The Court did not read the joint defense agreements in connection with the proceedings. The Court permitted no argument. And under Washington State law, a sua sponte dismissal like that is more or less per se reversible. The Court of Appeals of Washington State will have to address that issue.

But at the same time, another court in Massachusetts considered the same issue. This is Judge Sorokin's order, which we provided to you, and actually did read the joint representation agreements, did consider them, and held that in fact disqualification was not appropriate.

The Court said in that circumstance that he wanted confirmation from the clients, Mr. Larkin and Mr. Lacey, that they wanted to continue with representation of Davis Wright Tremaine. They said, yes, we do. And the Court further said, well, I will consider it down the road if there's any issue here having to do with cross-examination of Mr. Ferrer. But it is not appropriate under the ethics rules to disqualify Davis Wright outright.

I have to point out one other thing about this use of

the state court cases. It is apparent that what's happened here is the government has been using and coordinating with plaintiff's counsel in the various state civil cases in order to pursue this idea of disqualification.

Keep in mind, Your Honor, Mr. Ferrer has not moved for disqualification in any case, not in any of the civil cases, not in this case, not in the Grand Jury proceedings, the situation was a bit different there, but the government knew of Davis Wright's involvement.

And throughout all -- and in fact has said, specifically in the Washington State case, that Backpage and Mr. Ferrer cannot support and will not support a motion for disqualification.

So we have this circumstance where Ferrer and Backpage are saying, we are not seeking disqualification, and there's a reason for it. They can't. Because Backpage and Ferrer both agreed in the Common Interest Litigation Management Agreement that they would not do so.

But we have the government, through Mr. Ferrer's counsel, sending letters to 15 different courts. It's not a motion, not a Request to Disqualify, it's just a letter, sort of unsolicited, saying, hey, there's an issue here. Mr. Ferrer doesn't consent to continued representation by Davis Wright Tremaine.

So they have sort of planted this seed of this

disqualification order in various courts. That's part of the reasons -- we will come to the disclosure motions that we've brought. That's part of the reason we want to know exactly what coordination has taken place and how that came about.

Because in part, federal law actually expressly prohibits the government from pursuing this sort of use of the civil cases as a ruse to try to set up a Motion for Disqualification or other purposes in this case.

18 U.S.C. 3509(k) which incidentally was cited by Backpage in a pleading we believe brought by or with coordination of the government, says that the government cannot -- not only in its civil actions where the parallel criminal proceedings such as this must be stayed, but that the government cannot even mention the civil action in the context of the criminal case, and yet that's exactly what the government is doing here. They sort of set up these stalking horses of these other cases in order to pursue their disqualification motion here.

Fundamental point though, Your Honor, is that under Rules 1.7 and 1.9, well taken in pieces, 1.9 has to do with the consent of the existing clients. Here we have Mr. Larkin and Mr. Lacey, both of whom agreed that they want to continue with the representation of Davis Wright.

1.7 says, if there is informed consent, and it can be -- prior informed consent, as is the case here, under the

December agreement with Davis Wright and then further under the joint interest agreement, the common interest agreement in December of 2016, then joint representation is permissible, and disqualification is inappropriate.

Other questions?

THE COURT: I don't. Thank you very much.

Just to make sure I am clear with all of you, if -- the pleadings are very, very detailed. If you don't feel the need to make an argument on the record, you don't -- I am not requiring you to do that, but if you would like to -- we are going to have to try to limit the time for you to place your information on the record, or we will be here through Sunday.

So, sir, if you will step forward and tell me who you are, and I will give you 10 minutes.

MR. CAMBRIA: Thank you, Your Honor. My name is Paul Cambria, and I represent Mr. Lacey.

I did file the opposition in 180. And Your Honor has put your finger precisely on the Achilles heel in the government's disqualification motion when you asked the question about waiver in the proffer agreement.

Here is why. They are relying on 1.9, and they refer you to ethics opinions with regard to 1.9. And specifically, I would like to read this language to you from the ethics opinion that dealt precisely with that issue.

It is as follows: It says, one must remember that

ER1.9(a) is designed to protect W -- the witness. It is intended to give the witness the assurance that her lawyer client confidences will not be used against her. 1.9 specifically requires the existence of confidences that have not been waived.

And in addition to that, there has been mention here of the Alexander case. Well, Alexander is the Supreme Court of Arizona interpreting 1.9. And we know that 1.9 requires two things.

It requires not only the lawyer's situation, but it requires that the matter be in a same or substantially related matter.

And the Alexander case, the Court said there that where there are no confidences, the substantially related aspect is taken out of the mix.

Here's what the Court said: The present case does not involve any disclosures of confidential information from -- they name a law firm -- thus the substantial relationship test is not applicable.

So here, the very rule that the government is relying on, 1.9, in the ethics opinion that they are also relying on, it is clear there must be the existence of a confidence. The Supreme Court of Arizona has said that in order for it to be substantially related, there must be a confidence.

And so then we move to the actual meat of the

argument, if you will. It is the proffer agreement. Now, this proffer agreement is drafted by the government. Their words, they are trying to back away and say, oh, well, it wasn't supposed to be a waiver of personal privileges. It clearly says that it was. It is clearly drafted by them.

Mr. Ferrer had two personal attorneys not in any way connected with any of us, or any of the history of us, advise him and sign as witnesses to this waiver. He used the waiver obviously to his advantage in the proffer. Because as we all know in proffers, the government wants to make sure, number one, that they ask about all of the information; and number two, they want to be in a position where they can use that information.

So that's why they put in that proffer agreement a waiver, so that somewhere down the line, somebody couldn't say, oh, well, he told you something that's privileged, you can't use it, you used it, et cetera. That's their design. That's why they are there.

So Mr. Ferrer uses the waiver to his advantage in the proffer agreement, but -- and the government uses the waiver to their advantage, and then here today they come in here and say, oh, no, that's not a waiver, that's not what it says it is, because now we want you disqualified.

Well, 1.9 requires a confidence. Alexander interpreted it. It requires a confidence. They are all

waived. They are waived. If they are waived, this can't happen, a disqualification can't happen.

And here's the other thing. They cite a number of cases. He cited the irrigation case and so on. Your Honor, those are civil cases. They do not have a right of counsel under this Sixth Amendment in a criminal case context. Those are civil cases.

And it's interesting because when you look at those cases, because they are civil, there is actually parties, one against the other. Here, Mr. Ferrer is going to be a witness. Whatever happens in this case, whether it be an acquittal or a conviction, has no impact, or shouldn't have any impact, on Mr. Ferrer, unless the government is prepared to say, we are going to give him this sentence if we get a conviction, and he is going to get that sentence if we get an acquittal. I doubt they're going to take that position here for us. So that means that really there's no impact on him.

So now he has clearly waived all of his confidences with all prior lawyers under the plain language of that proffer agreement. He used it to his advantage. They drafted it. And so now we have the benefit of it.

THE COURT: Just to let you know, you have about two minutes left.

MR. CAMBRIA: Thank you, Your Honor.

So in the end, in the end, the question now is, I have

the Henze Cook law firm that I have asked that they can play a limited role here.

And the limited role is as follows: We have conditions on bail that require reporting on financial transactions and so on. That's what I've asked that they be allowed to do.

And the other part is, in connection with forfeitures, they've seized all of my client's liquid assets and strangled us, as far as trying to defend ourselves. We are working our way through that.

We have a case under decision now in Los Angeles where they originally got their seizure orders, and all I have asked is that the Henze Cook firm, who have been personal business lawyers and so on for my client, be able to supply me with financial information and things like that, banking records, tracing, et cetera. Nothing whatsoever to do with the defense of this case. In any event, everything has been waived.

Thank you, Your Honor.

THE COURT: Sir, thank you very much. Is there anyone else? Mr. Stein, come on up.

He got up first, sir. I'm sorry.

MR. PICCARRETA: He was quicker than I am.

THE COURT: He is very fast.

MR. STEIN: I would have to take that.

Good morning, Your Honor. Lee Stein on behalf of

Henze Cook Murphy. I would just first like to urge the Court to consider the positions of Davis Wright Tremaine and Henze Cook Murphy separately. Their facts and circumstances are different, and I think the analysis is different.

Let me also say, Your Honor, that I think the government has the legal standard exactly backwards. Disqualification is not required. There's no automatic rule. That's within the Court's discretion.

And here we have fashioned a limited role carefully for the Henze Cook Murphy firm so we avoid the issues of 1.9.

THE COURT: Well, Mr. Stein, let me go back to about 57 minutes ago.

MR. STEIN: Okay.

THE COURT: What is a limited role?

MR. STEIN: Yes.

THE COURT: Because the government has no idea what it means.

MR. STEIN: I will tell you, Your Honor. It is to work with pretrial services and the Court, if necessary, on issues of release. And you might wonder, why do you need to be counsel of record to do that? And it's because pretrial services won't talk to them if they are not counsel of record.

Ms. Henze has been dealing with Justin Lauby, the pretrial services officer, on paying bills and providing information, that sort of thing, to ensure compliance. And

Mr. Lacey is -- he is 70 years old. He's got a complicated life, and he's in a fight for his life, and he wants people standing next to him who he trusts. And so having him in this limited role, they are not trial counsel, they won't be preparing cross-examination, they won't be sitting at counsel table. They are here in the criminal case to ensure his compliance with pretrial release conditions and to make sure that he is complying at all times. And that would be the limited role. Nothing else. And that doesn't put Mr. Lacey's interest materially adverse to Mr. Ferrer's interest. And so 1.9 is not implicated in that capacity.

With respect to forfeiture, the role -- and I think Mr. Cambria explained it well, it's -- they've got a long history with Mr. Lacey. They can help with tracing assets, figuring out the financial information, sorting through that stuff, not litigating the forfeiture issues with respect to whether Mr. Ferrer is right or is not right or anything like that. It's to help Mr. Cambria sort through the forfeiture issues, that would be the limited role there.

And when the government says that's not permitted, they are just wrong. That is within your discretion to control your courtroom how you see fit, and there are many, many circumstances.

I am in one right now in another district where the Court has approved a limited role for counsel, and what's

important there is that the client, who is the defendant, agrees -- consents to that limited role after consulting with counsel.

That's happened here, and Mr. Lacey would come into court and Your Honor could question him on that and he would indicate his consent on the record, and that's to prevent an appellate case later down the road, I was not provided effective counsel because my counsel was somehow limited by a conflict of interest.

So there are cases in which the limited role of counsel is approved by the court, honored by the court, and carried out.

And I guess I would also add, Your Honor, that the cases that the government cites are really all distinguishable, and that's because those are cases involving trial counsel. Lawyers who want to be at the table, asking questions. And they say, well, you can't really be at the table and not help your co-counsel with cross-examination and that kind of stuff. That's not the case here.

THE COURT: I'm sorry for interrupting you, Mr. Stein.

Mr. Kozinets, do you agree with that last position that Mr. Stein just placed on the record?

MR. KOZINETS: With respect to --

THE COURT: Trial counsel versus limited role counsel.

MR. KOZINETS: No, Your Honor. The government

believes that the case law and the ethical rules absolutely prohibit representation in a case like this where the conflict is so extreme, based on many years of prior representation in many, many different cases. So under any conceivable kind of balancing test --

THE COURT: So your answer is, no, I disagree?

MR. KOZINETS: Correct, Your Honor.

THE COURT: Okay. Go ahead.

MR. STEIN: I would ask that the government produce one single case that didn't involve trial counsel. Every one of their cases is a trial counsel case. This is not trial counsel. I mean, that distinction is important.

And I guess -- let me address just one last issue, and then I will sit down, Your Honor. You asked some questions about monitoring and how do we make sure that this is followed. Well, we're talking about Tom and Janey Henze, who are well known in this community, who are members of the bar and if they give their word about what they will do and what role they will play in the case, the Court can believe that. There's no reason why they can't. They are members of the bar, and they've got great integrity and great respect in this community, and I think you can take their word for it.

THE COURT: Thank you very much, counsel.

Anyone else?

MR. PICCARRETA: Yes, Your Honor.

THE COURT: Sir, come on up. Tell me who you are, again.

MR. PICCARRETA: Yes, I am Mike Piccarreta from Tucson, representing Mr. Padilla.

THE COURT: Nice to see you again.

MR. PICCARRETA: Judge, we filed a separate motion, due to the importance of this issue. And I would suggest that this issue may be the most important ruling that will be made in the case, and the reason I say this, is the Ninth Circuit has said that if there's an erroneous denial of right to counsel, it's an automatic reversal without showing of prejudice. That's how serious the issue is taken.

When you look at the state cases, the words they use on this is, they bear a heavy burden to do this, to sever a defendant from the people most able to represent their interests. It could create fundamental injustice.

In some cases they say, the prosecutor has no standing to even argue it. They can present it to the court, not argue it. That it's unseemly on the state to do so, should only happen in extreme circumstances, and they shouldn't even be participating in this issue. And I've been doing this for a couple of years, and I haven't seen the vigor of a prosecution to disqualify criminal defense counsel.

Now, I am not making any aspersions as to motives, but if this motion is granted, they will gain a huge, huge tactical

advantage over the defense. The reason is, for all of the defendants, and I have been told they join in my remarks to avoid having to say, me, too, this counsel Davis Wright Tremaine has been the leading counsel on First Amendment issues, the leading counsel on Section 230 issues, issues that are going to be presented to the Court, and we need them to present them.

It would take us -- well, first of all, never would we be able to have that expertise, no matter how much time. But hundreds of hours to gain that level of knowledge that they have off the top of their heads.

There's a joint defense agreement here signed by Mr. Ferrer. And joint defense agreements in this district, I can speak to, are normally -- and there are two main areas that everyone is aware of what might happen. One, you want to keep the privilege.

But, two, if a defendant negotiates a plea and cooperates, they won't disqualify all of the other lawyers that they have shared confidences with. And they agree to do that, and that is what was agreed to do here, and that was relied upon by my client in the joint defense agreement and -- both orally and in writing, and we relied upon it for the case. We are similarly situated to Mr. Lacey and Mr. Larkin, as to Davis Wright Tremaine, because if they were the people who were going to be presenting these motions, we would be joining into their

work.

And, you know, I have had a lot of cases with joint defense agreements, and I have had a lot of cases where people cooperated, but I have never seen the government, until today, come in trying to disqualify counsel, and especially counsel that will not have a role in cross-examining the witnesses at trial.

Now, sir, we have those cases --

THE COURT: I'm sorry. I just need to go back. Tell me what your position is as it relates to the plain text of this ethical rule that we've been discussing this morning.

MR. PICCARRETA: Yes, I will. Judge, when I was bar president, one of the things we had to do was to review complaints about lawyers in the middle of litigation trying to disqualify the other one, virtually always in a civil context.

And what we did then, and I can't speak for the bar now, is that they would say, we're not going to let the bar get used as a matter of trial tactics.

When the case is over, if there's an ethical violation, we deal with it. If there's not an ethical violation, we deal with it. But during the trial thing here we have, one, a situation where there are no confidences. There's been waivers on multiple documents.

And three, Mr. Ferrer, pursuant to the joint defense agreement, has provided all sorts of information to it.

So, one, I don't think that having the Court enforce the ethical rule to gain tactical advantage in a criminal case should happen.

Two, we have the Fifth and Sixth Amendment issues that are always raised whenever they try and disqualify counsel. The bar just deals with the language of the ethical rule. And I would suggest if they think there's a violation, the bar can deal with it when the case is done.

Two, Mr. Ferrer is a witness. Davis Wright Tremaine will not be involved in the cross-examination of him. He does not have a substantial interest in the outcome of the case, apart from the fact he has waived all confidences in not just one document, not just two documents, I think they are now up to three and four.

And we relied upon those documents. When lawyers sign those documents, as Mr. Ferrer's counsel did, and then later come in before your court and try and disqualify other lawyers, I agree with the Arizona courts that said, that's unseemly.

So, Judge, I don't think Rule 1.7 applies. B, we all have independent criminal trial counsel who are going to be handling the actual courtroom, so the activities will not impact the trial itself. Three, he's waived every confidence that we can think of, both in documents and through consultation. And four, the prejudice level, the prejudice level is indescribable.

The role of these people for all of these defendants and the role to present to the Court the best possible knowledge on First Amendment. And they try and sprinkle a little fairy dust on the case and go, it's no First Amendment. Really?

They've indicted a publisher who is posting things on the web and holding them responsible for actions of third parties in cases that have been either dismissed or modified in nine separate cases, many of them federal courts. That they have a novel theory, as one federal judge has called it, of prosecution. That they have to show specific knowledge, and that's just on the facts.

There will be motions before you to dismiss this entire prosecution on First Amendment grounds, and those will be the motions that are the responsibility of Davis Wright Tremaine and will not require any cross-examination of Mr. Ferrer.

He has no -- apart from not even being here, he has no prejudice. We have insurmountable levels of prejudice, and we have Fifth and Sixth Amendment rights to be represented by counsel of our choosing. And I would submit, Judge, if they have an ethical problem, there's other places to deal with it.

Trial management problems in this courtroom are here, and I think that this is a big case. It's going to -- it's the leading First Amendment case in the country in many, many

years, and it is in this court.

And I understand their desire to get the people that know it the best off the case and the tactical advantage that will ensue. But, Judge, I urge you not to punish these defendants and severely prejudice them on this issue.

My view is, I thought the motion -- I won't say frivolous, but not well taken. And you can ask yourself, as a U.S. Attorney and as a Judge, how many of these motions do I see?

Normally, it's when we represent someone, and then they become the key witness against you when they're cross-examined. You've seen it, when they represent them on various matters with Joint Representation Agreements? Have you seen it with people with JDAs, which are frequently, where one pleads, tries to disqualify the others? You haven't.

So why are we here for this motion? Why are they willing to risk an automatic reversal if they are wrong to get these folks out of the case?

And it's troubling, and I have dealt with these issues, mostly civil lawyers are the ones who always accuse each other of a variety of things and try, you have a conflict, you have this. The criminal lawyers traditionally don't do that.

And ask yourself, how many of these have you seen, and say, on this case, this is the one? Why is that? Why Davis

Wright Tremaine?

And I am not saying that their intent is to gain a tactical advantage. I am not accusing them of improper motives. I am saying, the result of their behavior gives them huge tactical advantage. And as a result, that's why you have got pleadings this big from them.

If they were in state court, the judge would go, you have no say over who these folks' lawyer is. They have a right to counsel of their choice. They have constitutional rights. You brought it to my attention, I appreciate your hard work, I will deal with it, and I guess dealt with later.

Here, you've got pleadings a foot high trying to get rid of the lawyers of choice, and it impacts every defendant sitting here today, every defendant. Because we all understood, we all agreed orally, in writing, that everyone knew that these guys were going to do it.

And if Mr. Padilla had been the one to plead, I wouldn't get up and say, these guys have to go. Because I agreed in writing to the contrary, and that's maybe why Mr. Ferrer is not here, because he signed it.

So here's the aggrieved party, Mr. Ferrer, who is not even a party anymore, over lawyers who won't be questioning him at trial.

I have been the public criminal counsel, Judge, and I would urge you to not accept this cunning invitation to, at

this point, issue a court order that interferes with all of our Fifth and Sixth Amendment rights and would impact the whole litigation, which is going to go on, for a while, at least until January 2020, if they are acquitted, and if they are not, for years afterwards on a very, very important First Amendment case involving a publisher. And to remove the lawyers who are most acquainted with it and the most qualified, in the whole United States, from the case, is obvious, obvious, obvious prejudice.

THE COURT: I appreciate that, sir. Thank you.

Is there anyone else? Sir, come on up. Tell me your name again, and what you would like to tell me.

MR. WEISS: Yes. Thank you, Your Honor. My name is Steve Weiss, and I represent Defendant Joye Vaught, and I'll be very brief.

I've joined in the Document 180 the objection to disqualification. I certainly adopt Mr. Piccarreta's remarks. My client was a low-level employee of Backpage.com. I have not been in this case for a long period of time, just as of around April.

But one of the things that I did realize is that the case involves significant critical First Amendment issues, and that Davis Wright Tremaine lawyers are the preeminent First Amendment lawyers in the country.

For me to try and even get anywhere near that, I'd

have to try and reinvent the wheel, and I just couldn't do it.

My client wants them to continue in their role, and if they were disqualified, her Sixth Amendment and Fifth Amendment rights, as Mr. Piccarreta eloquently explained to the Court, would be violated. And so we would ask the Court to deny the motion to disqualify.

THE COURT: I appreciate that, sir. Thank you very much.

I don't think we have any additional defense counsel that wish to place -- sir, come on up. Tell me who you are.

MR. NEUMAN: Thank you, Your Honor. Ariel Nueman on behalf of Mr. Brunst, defendant number 4. I don't know if this is necessary, but I just want to officially, on the record, adopt the arguments of Mr. Weiss and Mr. Piccarreta on behalf of Mr. Brunst as well.

THE COURT: I appreciate you doing that. Thank you very much.

Is there anyone else?

MR. FEDER: I want to do the same thing, Judge -- or can I just say it from here?

THE COURT: You can stand from there, as long as you speak up, Mr. Feder.

MR. FEDER: We join in all of the --

(Courtroom phone begins to ring.)

THE COURT: Just one moment, please. The folks

calling in, I guess we lost them, and they're trying to get back to us.

THE CLERK: They should be there.

THE COURT: Okay. Thank you.

Go ahead, Mr. Feder.

MR. FEDER: Let me just add something to what Mr. Piccarreta said. I was on the state bar's professional rules committee for about 20 years, and this is the very reason why we would never, generally speaking, consider objections by one counsel against the other counsel, to oppose them during litigation is to gain strategic advantages.

It was pretty much, if you have a problem with your behavior, then you can ask us a question, but not to try to get leverage over somebody else on the other side. This is a perfect example of why the committees of the bar at least don't engage in this kind of activity.

THE COURT: I appreciate you all.

Mr. Kozinets, I will give you two minutes.

MR. KOZINETS: Thank you, Your Honor. I just want to emphasize a couple of things. First, the Wheat, Ross, Stepney, and many other criminal cases that we've cited from the U.S. Supreme Court on down, recognize that this kind of disqualification motion is eminently proper when you have an actual conflict of interest, particularly the one as stark as we have here.

With respect to the litigation in Washington State, it's actually the R.O. case, not the J.S. case. There was a sua sponte order, but my understanding is that there was a motion to reconsider that was filed before that state court judge and that was denied.

And the Massachusetts District Court order that Mr. Grant referred to actually explicitly recognizes a very severe potential for conflict arising from Davis Wright's continued representation of Mr. Lacey and Mr. Larkin there.

With respect to any notion of coordination between the government and civil cases, that is just preposterous.

THE COURT: I just have one question for you.

MR. KOZINETS: Yes.

THE COURT: One question. Did you file the motion to gain an unfair advantage over the defense?

MR. KOZINETS: No, absolutely not, Your Honor. In the Wheat case, and then in United States versus Iorizzo case, from the Second Circuit, says that where a conflict like this arises, the government actually has an affirmative obligation and should file a motion like this before trial, rather than not addressing the issue, letting a conflict-riddled trial to then occur, only to see it reversed later on appeal. So we were duty bound to raise these issues for Your Honor's consideration.

THE COURT: Thank you very much. We are going to take

our morning recess of about 15 minutes, and what I need you all to do is, as I stated before, the pleadings that I have already received and I am very familiar with, I don't need you to step up here and tell me what you've already given to me in writing.

I need you to make your best arguments, and if you would like to speak in one voice, you can certainly do that. I know all of your time is incredibly valuable, so I want to make sure we pare this all down.

So the Court is in recess until 10:45 so you can pare down your arguments.

(Recess is taken at 10:31 a.m.)

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 6th day of October, 2018.

s/Elva Cruz-Lauer
Elva Cruz-Lauer, RMR, CRR