UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-SPL |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 5, 2018 |
| Michael Lacey, | ) | 10:50 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
|_____| ) | |

BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HEARING ON PENDING MOTIONS - VOLUME II

(Pages 61 through 136, inclusive.)

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2     For the Government:

 3                 U.S. Attorney's Office
                   By: PETER SHAWN KOZINETS, ESQ.
 4                     ANDREW C. STONE, ESQ.
                       MARGARET WU PERLMETER, ESQ.
 5                     KEVIN M. RAPP, ESQ. (Telephonic)
                   40 North Central Avenue, Suite 1200
 6                 Phoenix, AZ  85004

 7                 U.S. Attorney's Office
                   By: JOHN JACOB KUCERA, ESQ. (Telephonic)
 8                 312 North Spring Street, Suite 1200
                   Los Angeles, CA  90012
 9
                   U.S. Department of Justice
10                 By: REGINALD E. JONES, ESQ. (Telephonic)
                   1400 New York Avenue NW, Suite 600
11                 Washington, DC  20530

12     For the Defendant Lacey:

13                 Liptsitz Green Scime Cambria
                   By: PAUL JOHN CAMBRIA, JR., ESQ.
14                 42 Delaware Avenue, Suite 120
                   Buffalo, NY  14202
15
       For the Defendants Lacey and Larkin:
16
                   Davis Wright Tremaine
17                 By: ROBERT CORN-REVERE, ESQ.
                   1919 Pennsylvania Avenue NW, Suite 800
18                 Washington, DC  20006

19                 Davis Wright Tremaine
                   By: JAMES C. GRANT, ESQ.
20                 1201 3rd Avenue, Suite 2200
                   Seattle, WA  98101
21

22

23

24

25
```

```
 1    For the Defendant Larkin:

 2              Bienert Miller & Katzman
              By: THOMAS HENRY BIENERT, JR., ESQ.
 3                 WHITNEY Z. BERNSTEIN, ESQ.
              903 Calle Amanecer, Suite 350
 4            San Clemente, CA  92673

 5            Schulte Roth & Zabel
              By: SEETHA RAMACHANDRAN, ESQ.
 6            919 Third Avenue, Suite 2013
              New York, NY  10022

 7
      For the Defendant Spear:
 8
              Feder Law Office
 9            By: BRUCE S. FEDER, ESQ.
              2930 East Camelback Road, Suite 160
10            Phoenix, AZ  85016

11    For the Defendant Brunst:

12            Kimerer & Derrick
              By: MICHAEL D. KIMERER, ESQ.
13            1313 East Osborn Road, Suite 100
              Phoenix, AZ  85014
14
              Bird Marella Boxer Wolpert Nessim
15             Drooks Lincenberg & Rhow
              By: ARIEL A. NEUMAN, ESQ.
16            1875 Century Park E, Suite 2300
              Los Angeles, CA  90067
17
      For the Defendant Padilla:
18
              Piccarreta Davis Keenan Fidel
19            By: MICHAEL L. PICCARRETA, ESQ.
              2 East Congress Street, Suite 1000
20            Tucson, AZ  85701

21    For the Defendant Vaught:

22            Karp & Weiss
              By: STEPHEN M. WEISS, ESQ.
23            3060 North Swan Road
              Tucson, AZ  85712
24

25
```

```
 1    For Henze Cook Murphy, PLLC:

 2                Mitchell Stein Carey Chapman
               By: LEE DAVID STEIN, ESQ.
 3                   ANNE MICHELLE CHAPMAN, ESQ.
               2 North Central Avenue, Suite 1450
 4             Phoenix, AZ  85004

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1      THE COURT:  This Court will come to order.  All

2  parties present when the Court last closed are present again.

3      Linda, thank you for helping us out this morning.

4      I was looking at some of the information that was

5  placed on the record, and the attorney for Padilla, you

6  indicated that DWT needs to present the evidence related to the

7  First Amendment issues.  My question is do you expect DWT to be

8  involved in examining witnesses or presenting evidence on First

9  Amendment or privacy related issues at trial?

10      MR. PICCARRETA:  I don't expect that.  We will present

11  the evidence at trial.  The criminal trial lawyers will present

12  the criminal evidence at trial, but they will be involved in

13  the motion hearings and legal arguments related to it.  At

14  least that's my understanding.

15      THE COURT:  Okay.  I appreciate that.  Thank you very

16  much.  All right.  That takes us to the next motion.  It's

17  government's motion to resolve attorney-client privilege

18  issues, which is document number 195.  Mr. Stone, I'll give you

19  ten minutes on this.

20      MR. STONE:  Thank you, Your Honor.  The issue

21  presented on the government's motion to resolve the

22  attorney-client privilege is what privilege exists after a

23  corporation and the CEO of the corporation has pled guilty and

24  then waived that corporation's attorney-client privilege.

25      That's the issue that's presented to the Court.  And

| | |
|---|---|
| 1 | the practical import of that question is that there are |
| 2 | currently 10,733 e-mails that are segregated into the |
| 3 | government's filter review, which may or may not be privileged. |
| 4 | THE COURT:  Well, let me ask you a question about |
| 5 | that, and I'll let you -- I'll give you some additional time. |
| 6 | Approximately how many of those privileged e-mails at issue |
| 7 | were found to be non-privileged by Judge Campbell's order?  Do |
| 8 | you know? |
| 9 | MR. STONE:  How many of those e-mails that are |
| 10 | currently segregated were found to be non-privileged? |
| 11 | THE COURT:  Correct. |
| 12 | MR. STONE:  Zero, in terms of the specific e-mails, is |
| 13 | my understanding, Your Honor.  Because the e-mails that Judge |
| 14 | Campbell found to be non-privileged were then turned over to |
| 15 | the government. |
| 16 | THE COURT:  Well, how many e-mails do you anticipate |
| 17 | are outside of the scope of Judge Campbell's order? |
| 18 | MR. STONE:  So Judge Campbell's order deals with our |
| 19 | second independent reason why all these e-mails should be |
| 20 | turned over to the prosecution team.  And that's a subject |
| 21 | matter waiver that Backpage has waived with respect to the |
| 22 | privilege. |
| 23 | Judge Campbell found a number of communications by |
| 24 | Backpage or between Backpage and its attorneys when they |
| 25 | included third-party PR firms, public relation firms, and Judge |

1    Campbell found that those particular e-mails were not

2    privileged.

3            Now, under the law, which is clear and I don't think

4    is in dispute here, is when a subject matter has been waived,

5    then all of the e-mails or all of the communications related to

6    that particular subject matter now no longer have the

7    privilege.  And that makes sense because the attorney-client

8    privilege is set up to permit clients to engage in frank and

9    honest conversations with their attorneys.  And when it doesn't

10   matter if a third party sees those communications, then there's

11   no reason for those communications to be kept secret to the

12   world.

13           So the subject matter -- and this is the second,

14   again, the second independent reason why these attorneys or

15   these communications and e-mails should be turned over to the

16   prosecution team -- is the subject matter as pointed out in the

17   government's papers are very broad.

18           THE COURT:  I'm sorry.  Speaking of your papers, why

19   is the order from the Washington State Court persuasive if none

20   of the privileged documents were actually disclosed?

21           MR. STONE:  So that's the third independent reason,

22   Your Honor, and I would submit that that's not as strong as the

23   first two.  So I wouldn't spend much time arguing about the

24   implied waiver that Backpage had when they had their in-house

25   counsel submit to a factual deposition up there.  It was a

```
 1    30(b)(6) deposition in a civil case.  They ended up settling

 2    the case before the witness answered additional questions

 3    that they had claimed the privilege.

 4              THE COURT:  Can't we distinguish that Washington case

 5    from this case?

 6              MR. STONE:  Well, the way that it shakes out and the

 7    way that the defendants have argued it is that, hey, look, that

 8    was an implied waiver, and it never actually was effectuated,

 9    so that shouldn't be of any import here.

10              THE COURT:  Because it was never effectuated?

11              MR. STONE:  Yes.  But I would say the number one

12    reason why these e-mails should be turned over, Your Honor, is

13    because the CEO of the company that has also pleaded guilty has

14    waived the corporate privilege.

15              Now, I'm going to put a small timeline on the machine

16    here and see if we can get it.

17              THE CLERK:  If you use the wheel at the top on the

18    front.

19              MR. STONE:  Thank you.

20              THE COURT:  All the way up top, silver.  There you go.

21              MR. STONE:  I appreciate it.  So this is the primary

22    argument that I'd like to focus on, is the fact that Carl

23    Ferrer has been the owner of Backpage since April 22nd, 2015.

24    He has waived the corporate privilege, so that any

25    communications between Backpage and its attorneys no longer
```

1    exist.  It doesn't have the privilege anymore.

2           And defendants have raised two arguments for why -- or

3    they've raised several arguments for why this doesn't -- that

4    this hasn't -- that the CEO's waiver of the privilege hasn't

5    actually effectuated the waiver.

6           The first is an argument that pertains to

7    communications pre-sale, before April 22nd, 2015.

8           Now, it's black letter law that when a company is

9    sold, the ability to assert or waive the privilege transfers in

10   the sale.

11          So at one point Backpage was owned by some of the

12   defendants.  It's now owned by Carl Ferrer.

13          They talk about all the various holding companies and

14   things like that.  I don't think that really matters.  We're

15   talking about Backpage, the corporation here, that runs the Web

16   site that holds the privilege when they have communications

17   with its attorneys.

18          So the Supreme Court has made clear in *Weintraub* that

19   once the sale has occurred, the new owner can waive the

20   privilege.  And that's what's happened here.  And that's for 90

21   percent or over 90 percent of the communications all deal

22   pre-April 22nd, 2015.  That's 9,405 documents that are in the

23   filter review right now are dealing with these pre-sale

24   communications.

25          The argument, as I best understand it from the

1    defendants on this issue, is that Mr. Ferrer didn't have the

2    ability to waive the privilege pre-sale because he wasn't the

3    owner, and he doesn't gain any rights post-sale because Village

4    Voice Holding Companies still -- they controlled the privilege

5    initially, and they can control it afterwards.

6              THE COURT:  Mr. Stone, why shouldn't this Court just

7    go ahead and err on the side of caution and keep these specific

8    e-mail communications privileged?

9              MR. STONE:  Because there's no need under the law or

10   under the facts of the case.  There's just absolutely no need

11   for the e-mails that occurred pre-sale.  Post-sale there's some

12   arguments that the defendants have made that sort of muddy the

13   waters, and we can talk about that.  That's dealing with the

14   final 1,300 communications or so.

15             But pre-sale there just isn't a valid argument for why

16   the Court shouldn't issue an order that states that that

17   privilege has been waived and that the prosecution team is

18   permitted to review them, and they become part of the

19   discovery.

20        (Phone ringing.)

21             THE COURT:  Hold on just a minute.

22             THE CLERK:  There's feedback.

23             THE COURT:  We need to hang it up.  They must have it

24   on a speaker phone.

25             I'm sorry, Mr. Stone.  Go ahead.

1          MR. STONE:  So taking --

2          THE COURT:  Lisa, this is the reason why we won't

3    grant anymore requests to call in.  This was a one-time thing.

4    Go ahead.

5          MR. STONE:  Your Honor, taking defendants' argument to

6    its logical conclusion here, at one point the Village Voice

7    Holdings owned a lot of other entities beyond Backpage and

8    including a number of newspapers and publications, including

9    Village Voice in New York.  They sold those -- They sold those,

10   as I understand it, 2012, 2013, to focus solely on the

11   ownership of Backpage.

12         THE COURT:  Okay.  I'm just a little -- I'm just a

13   little confused.  When I read through document number 195

14   several times, I had some questions.  But in light of what

15   happened in this courtroom earlier today, if the privilege has

16   been waived as to these privileged documents, doesn't that now

17   work against the government's argument about the

18   disqualification of DWT?

19         MR. STONE:  No, Your Honor, because we're talking

20   about different privileges.  We're talking about Backpage's

21   corporate privilege, and we're talking previously about Carl

22   Ferrer being represented individually by both law firms that we

23   had discussions about.

24         THE COURT:  So it's the government's position that

25   disqualification is required and outside of the Court's

1    discretion?  You're not saying that?

2          MR. STONE:  I'm sorry.  I didn't track that.  That

3    it's not required outside the Court's discretion?

4          THE COURT:  Correct.

5          MR. STONE:  I would say given the case law that we had

6    noted, that when there are issues that are raised, as in this

7    case, where you have -- .

8      (Phone ringing.)

9          THE COURT:  Go ahead, Mr. Stone.

10          MR. STONE:  In this case you have an individual who

11    has pled guilty whose personal attorneys represented him

12    previously and who then --

13      (Phone ringing.)

14          THE COURT:  Just hang it up.  This is disrupting the

15    hearing.

16      (Phone ringing.)

17          THE CLERK:  I know.  It won't hang up.

18          THE COURT:  My apologies to all of you.  I know your

19    time is incredibly valuable, and the United States Government

20    was requesting an opportunity to call in because I had moved

21    the hearing from the 4th to the 5th.  And we certainly have

22    qualified counsel here today, two tremendous federal

23    prosecutors.  But I wanted to allow some others to call in.

24    But it appears that we're having some technical difficulty, so

25    I apologize to everyone in the courtroom.  Go ahead.

1          MR. STONE:  And the distinction that I was making,

2     Your Honor, is that with respect to this issue and to resolve

3     the attorney-client privilege, we're talking strictly about the

4     corporation's privilege.  And before Mr. Kozinets was arguing

5     the disqualification motion, we're talking about the fact that

6     both law firms had represented Carl Ferrer individually,

7     including before the Senate in the PSI case.

8          And that's the distinction, is that you would have

9     attorneys who helped prepare declarations over the years for

10    Mr. Ferrer, who then are going to help take part in factual

11    parts of this case, factual aspects.

12         Even this First Amendment motion that the defendants

13    keep raising that they're going to file eventually is going to

14    involve factual components.  And certainly DWT, Davis Wright

15    Tremaine, has information based on its personal representation

16    of Carl Ferrer on those issues.

17         And so the cases that have been cited suggest that the

18    government needs to raise this to the Court because of the

19    potential conflict.

20         But here, in resolving the attorney-client privilege,

21    we're talking just about the corporation.  And anything that

22    occurred pre-sale absolutely the Court should issue an order

23    that states those e-mails and correspondence do not have a

24    privilege that attaches to them.

25         Post-sale the argument is a little different.  The

1    argument that defendants assert suggests that from the moment

2    that the company was sold on April 22nd, 2015, from that moment

3    there was an oral agreement for joint representation between

4    and among Backpage, Mr. Ferrer, and at least Mr. Lacey and

5    Mr. Larkin and possibly others.

6            And that includes any representation from any attorney

7    for Backpage.  That's what they've argued in their papers.  And

8    then they point to three documents which are on the screen

9    here, this December 12, 2016, engagement agreement that's just

10   between DWT, Ferrer, Lacey, and Larkin, and then the common

11   interest and joint defense agreements, which has been

12   discussed, I think, quite a bit already.

13           But the change that occurred between these events,

14   between the sale and then 20 months later when these agreements

15   are memorialized, is that in September or October, 2016, the

16   California Attorney General filed criminal charges against

17   Mr. Ferrer, Mr. Lacey, and Mr. Larkin as individuals.  And we

18   heard defense attorneys earlier today state that was -- those

19   were individually -- those were filed against those particular

20   individuals, which then led to all these joint representation

21   agreements.

22           THE COURT:  So, Mr. Stone, based on the government's

23   understanding, doesn't the joint defense agreement cover

24   Ferrer's waiver of attorney-client?

25           MR. STONE:  Well, we haven't seen any of these

1    agreements.  But there is an attachment -- I believe it's the

2    first attachment to the disqualification motion -- and in a

3    footnote Mr. Ferrer's attorneys quote a line from that

4    engagement letter which suggests -- or engagement agreement

5    which states that if there is a conflict, then Davis Wright

6    Tremaine, if there's a conflict between Backpage, Ferrer,

7    Lacey, and Larkin, then Davis Wright Tremaine can continue to

8    represent Backpage.

9            And those are common statements in engagement letters.

10   In my time in private practice we certainly had engagement

11   letters that would state that when it's joint representation,

12   if there's a conflict, then the law firm can continue to

13   represent the company.

14           But of course that's not what happened here.  The

15   company has pled guilty, and Mr. Ferrer has pleaded guilty.

16           So the argument for the 1,300 communications that are

17   post-Backpage sale is that there were these joint

18   representation agreements that stretched to every single

19   attorney that communicated with Backpage and that they were

20   oral, and then they were memorialized by these agreements that

21   the government hasn't seen.

22           The government has a hard time believing that's the

23   case, but, again, we're in the dark because we haven't seen

24   these.  They've been submitted to the Court in camera.  But

25   importantly there are no communications in the government's

1    filter review that postdate December, 2016.

2           So if the Court determines that really the beginning

3    of these joint representations occurred sometime around when

4    these -- when these agreements were memorialized, then the

5    Court would have no trouble issuing an order that every e-mail

6    that's in the filter review right now should be turned over to

7    the prosecution team for review and for disclosure.

8           I'll be happy to answer any questions, but I want to

9    keep it as brief as possible.

10          THE COURT:  Mr. Stone, thank you for that.  Lisa --

11     (The Court and Clerk confer off the record.)

12          THE COURT:  Mr. Stone, the other lawyers that

13   represent the United States Government that are calling in on

14   the phone, do they have -- any of them have a speaking role?

15          MR. STONE:  Yes, Your Honor.  The only one who does is

16   Mr. Kucera, who is the forfeiture attorney out of the Central

17   District of California.  And he would argue the forfeiture

18   motion that's pending before you.

19          THE COURT:  Okay.  I appreciate that.  Thank you.

20     (Phone ringing.)

21          THE COURT:  Lisa, maybe you can send an e-mail to

22   Sally, and she can come in here and figure this out.

23     (The Court and Clerk confer off the record.)

24          THE COURT:  Is there any defense counsel that would

25   like to place something on the record as it relates to the

1    government's motion to resolve attorney-client privilege,

2    document number 195?  Sir, are you coming to speak for the

3    group?

4              MR. GRANT:  I believe I am this time, Your Honor.

5              THE COURT:  Outstanding.  I'll give you five minutes.

6    Go ahead.

7              MR. GRANT:  Thank you, Your Honor.

8              THE COURT:  And, sir, for the record your name.

9              MR. GRANT:  I'm sorry, Your Honor.  Jim Grant on

10   behalf of Messrs. Larkin and Lacey.

11        I can't start without noting the irony of the

12   government's argument that we just heard the argument this

13   morning that said that my firm should be disqualified because

14   Mr. Ferrer had not waived attorney-client privilege.  Now the

15   government is arguing that in fact he's waived all

16   attorney-client privilege.

17        And he uses that as a predicate for what I have to

18   suggest is a wholly unprecedented motion.  In essence the

19   Court -- the government is asking the Court to say that all

20   privileges are waived as to all defendants without regard to

21   any specific communications, the context of those

22   communications, who was representing whom, who held the

23   privileges, and what the communications were.

24        I have never seen a case ever where that's ever been

25   permitted and certainly not based on a string of promises as

1    what the government has offered here.

2            Again, we have to go back to understand exactly what

3    the relationship between the parties was, who held the

4    privileges, and at what periods of time.

5            And we've talked about some of this, and it's in the

6    papers, so I won't belabor it.  But in fact up to the time of

7    the sale of Backpage in April of 2015, Village Voice Media

8    Holdings was the parent company.  Village Voice Media Holdings

9    was the entity that hired, retained, and managed counsel.

10   Village Voice Media Holdings is the one that held the

11   privileges.  To the extent that there were privileges with

12   Backpage, they were joint.  But Village Voice Media Holdings is

13   the privilege holder.  Village Voice Media Holdings exists

14   today and still holds all of those privileges.

15           At the point in time when Backpage is sold to

16   companies managed by Mr. Ferrer, from that point forward, now

17   the parties are governed by the joint representation

18   agreements.

19           Mr. Stone put up his timeline suggesting that the

20   agreement somehow didn't cover before December, 2016.  Your

21   Honor, I suggest you read the agreements themselves.

22           Exhibit B to the declaration -- it's on the first

23   page -- exactly says that all the agreements covered the

24   existing understandings between the parties, and this was

25   merely memorializing them in writing.

1          The law of the Ninth Circuit is very clear that a

2    joint defense or a joint representation agreement does not need

3    to be stated in writing.  It can be oral.  And in fact that was

4    always the case here.  There always was an agreement later

5    memorialized in writing, which *United States versus Gonzalez* is

6    the case I was referring to.

7          So Mr. Ferrer can waive privileges that he holds.  For

8    example, he can waive privileges for his personal

9    communications with Ms. Clarence and her firm or other

10   attorneys who represented him personally.  That is not Davis

11   Wright.  That is not any of the counsel that represented the

12   companies collectively and the parties collectively under the

13   joint representation agreements.

14          THE COURT:  So it's the defendants' position that the

15   joint defense agreement prevents Ferrer from waiving

16   attorney-client privilege in his capacity as CEO of Backpage?

17          MR. GRANT:  The agreement expressly says -- and I'm

18   referring to the joint representation agreement, which is the

19   Common Interest and Litigation Management Agreement,

20   Exhibit B -- expressly says that the parties hold the privilege

21   collectively, and no party, either Mr. Ferrer, nor

22   Backpage.com, nor any other corporate party that he owns, will

23   waive that privilege or disclose any privileged communications

24   to any other party.

25          So for the period of time from when the sale occurs,

UNITED STATES DISTRICT COURT

1    Mr. Ferrer is contractually obligated.  He's bound.  He's

2    precluded.  He cannot waive those privileges, because the

3    nature of the joint representation is that the parties

4    collectively share the privileges.  They're working with their

5    common counsel.  You have to share the privileges in order to

6    effectively represent them all jointly.  And that's recognized

7    in the law as well.  That's the nature of what a joint

8    representation is.

9          So you share those privileges among yourselves, but

10   you keep them secret, you keep them from disclosure to third

11   parties.

12         That's the distinction -- Let me go back.  I'm saying

13   what he can waive.

14         So he could waive as to his communications with

15   Ms. Clarence.  It's entirely unclear, based on what the

16   government has said, whether he's purporting to do that, he's

17   not purporting to do that.  As Mr. Cambria points out, his

18   proffer agreement says he is; the government says he's not.

19   That's one of the issues for disclosure, and I think that's a

20   motion we'll come to in a bit.

21         He could also waive privileges as to his

22   communications with counsel after April 6 of 2018.  That's the

23   period when he withdrew from the joint representation.  And at

24   that point forward it's fair game for Mr. Ferrer as to his

25   personal attorneys or any other attorneys he retains at that

1    point to waive those privileges.

2         But he cannot waive privileges that he did not hold.

3    And so for the period of time that Backpage.com was a

4    subsidiary of Village Voice Media Holdings, they collectively

5    held the privilege, or Village Voice Media Holdings actually

6    controlled the privileges, the parent.

7         Mr. Ferrer can't waive that privilege.  He doesn't

8    have any right to do it.  And that's established in the case

9    law.

10        If you take a look at the cases that the government

11   has cited, they all have to do with situations where you have

12   the subsidiary or the purchaser of the subsidiary suing the

13   former parent, and there's a dispute between them.

14        Courts have held in that consequence, because,

15   remember, all that privileged information is shared between the

16   parties before, one party can't prevent the other from waiving

17   the privilege.  The privilege is basically open-ended between

18   those parties.

19        But the cases are also very clear that where you have

20   a parent and a subsidiary, even after a sale, in that

21   circumstance the privileged communications cannot be disclosed

22   to a third party unless all parties consent.

23        That's the nature of the privilege as well.  And the

24   case law is very clear.  The government miscited basically

25   three or four cases.  If you go read them, they all hold that

1    as to that third party, not in the inter -- it's called

2    inter se or inter se circumstance, but as to third parties, the

3    privilege can't be waived unless there's consent of all.

4         So Mr. Ferrer cannot waive privileges as to

5    Backpage.com for the period that it was a subsidiary.  He

6    doesn't hold that privilege singularly and doesn't have the

7    power to do it.  And he cannot waive the privilege as to the

8    period of time, the subject of the joint representation

9    agreements.  And, again, that's expressly called out in the

10   joint representation agreements.

11        I want to talk briefly about Judge Campbell's order

12   because the Court had asked a question about that.  This,

13   again, is a wholly unprecedented idea.  The notion that when

14   Judge Campbell entered his order holding that certain

15   communications were not subject to privilege and others were,

16   let me separate the two groups out.

17        First of all, the government had challenged

18   communications with a Mr. Hemanshu Nigam.  Mr. Nigam is an

19   attorney who was retained by Backpage or to work with Backpage

20   in connection with their moderation techniques.  He formerly

21   was a board member of the National Center of Missing and

22   Exploited Children, NCMEC.  He was recommended by NCMEC.  They

23   brought him in to work on the best ways to make sure that they

24   moderated the content on the Web site.

25        THE COURT:  I'm sorry, Mr. Grant.  I need to just go

| | |
|---|---|
| 1 | back to -- I was looking at my notes about something that you |
| 2 | had just placed on the record a few minutes ago, and I just |
| 3 | need some clarification. |
| 4 | You made an argument about when Ferrer -- How do you |
| 5 | pronounce his name? |
| 6 | MR. GRANT:  Ferrer. |
| 7 | THE COURT:  When Ferrer as the CEO, he was 100 percent |
| 8 | owner of Backpage, and do you have anything to support the |
| 9 | proposition that he had no control over the company's |
| 10 | privileged communication?  I mean, it seems incredible that he |
| 11 | would transfer -- I mean, wouldn't that go with the company?  I |
| 12 | mean, what's the position on that? |
| 13 | MR. GRANT:  So you're asking about the period of time |
| 14 | after Mr. Ferrer purchases the company?  Is that -- Do I have |
| 15 | that right? |
| 16 | THE COURT:  Yes. |
| 17 | MR. GRANT:  After the time that he purchases the |
| 18 | company, he's now subject to the joint representation |
| 19 | agreements. |
| 20 | THE COURT:  Right. |
| 21 | MR. GRANT:  So to the extent that the company had |
| 22 | privileges before -- Let me take a step back.  You've got to |
| 23 | look at the two different time periods.  In the period that |
| 24 | Backpage is a subsidiary of Village Voice Media Holding, for |
| 25 | that period of time they hold privileges together.  All right. |

1    So Mr. Ferrer purchases the interest in Backpage.  This is

2    where the case law says that thereafter, although he's

3    purchased Backpage, he can't waive the privileged

4    communications that predate that purchase without the consent

5    of Village Voice Media Holdings.  He doesn't have a unilateral

6    right to do it.

7              Now, let me shift to the post-sale period.

8              After Mr. Ferrer purchases Backpage or his companies

9    do, now he enters into the joint representation agreement.

10             And in large measure, Your Honor, the nature of the

11   relationships and management of litigation and counsel and the

12   like didn't change.  They were memorialized.  They were written

13   down now in an agreement as opposed to the nature of the

14   parent/subsidiary relationship, but in that agreement --

15             THE COURT:  So are you saying the transfer of those

16   rights would not be included in the purchase --

17             MR. GRANT:  No, I'm not saying that.  I'm not saying

18   that the transfer of rights as to attorney-client privilege

19   didn't pass to Backpage in the purchase.  It did.  That's fine.

20   But the problem is that those rights were jointly held with

21   Village Voice Media Holdings before.  They continued to be

22   jointly held by Village Voice Media Holdings thereafter.  And

23   the law is clear, very clear that Backpage could not

24   unilaterally waive the privilege for those jointly held

25   privileges.  That's the difference.

1          Does that respond to your question?

2          THE COURT:  Yes.  Go ahead.  You have another minute.

3          MR. GRANT:  All right, Your Honor.  Thank you.  As to

4    Judge Campbell's order, this again is a wholly unprecedented

5    concept.  Judge Campbell, as I said, held that the privilege

6    claims were appropriate as to Mr. Nigam and his work.  He was

7    acting as an attorney.  And some 300 or so documents he said

8    should not be produced.  It held that -- He held that

9    communications having to do with public relations firms,

10   between attorneys and public relation firms, that those were

11   not properly withheld as privileged, and he required that they

12   be produced.

13         We produced those documents.  We object to his ruling,

14   but we produced the documents in good faith, as is the standard

15   rule when a Court compels you to produce documents and says

16   you've waived privilege as to those documents, fair enough.  We

17   abide by the Court's decision.

18         But what the government's trying to say now is that

19   because those documents had to be produced, that thereby

20   constitutes a subject matter waiver of anything mentioned in

21   any regard in those documents.  That is not the law, Your

22   Honor.

23         The subject matter waiver concept only applies in a

24   circumstance where a party affirmatively uses attorney-client

25   communications in a case, for example, for their tactical

1    advantage.  Say I have this attorney-client communication, and

2    I want to use it because I think it advantages me in this case.

3    When a party does that, courts have held in some circumstances

4    that then the fairness principle applies.  You can't waive as

5    to a certain communication and try to take advantage of that

6    and not waive as to subject matter.

7            Courts are very careful with that, though, as to what

8    that subject matter is.  That's not what happened here.  This

9    is not a circumstance where Backpage or Village Voice Media

10   Holdings or any party voluntarily disclosed these materials.

11   It was because Judge Campbell directed that we had to disclose

12   these materials.

13           And that is the full extent of the -- I don't want to

14   exactly call it a waiver of privilege.  But the extent of what

15   needs to be produced is what has been produced.

16           If you were to take this concept and say that if this

17   Court were to compel production of specific documents, that

18   order then thereby takes any subject matter in those documents

19   and means that's a blanket waiver as to the subject matter.  No

20   one would ever be in a position to safely or carefully be able

21   to make privilege claims.  You'd always be at risk.  But if

22   you're wrong, the Court's then going to say all your privileges

23   are waived.  That's not the law, Your Honor.

24           As I said, there are further issues here that are part

25   of this motion having to do with the request for disclosure

1    from the government and process for how the Court properly

2    should address these privilege issues.  We've asked, for

3    example, that the Court simply halt this taint team review

4    process and allow the parties a fair opportunity for us to

5    understand what the government has actually done, what kind of

6    communications they've actually had, what perhaps has already

7    been disclosed, what communications there have been with

8    Mr. Ferrer in that regard, what communications there have been

9    with third parties now as well.

10            That's the nature of the relief we requested.  It's in

11   our reply brief, I believe, on the last section.  I'm happy to

12   address that as well, but I think my minute was up about three

13   minutes ago.

14            THE COURT:  I think it's also sufficiently pled.

15            MR. GRANT:  Thank you, Your Honor.

16            THE COURT:  Mr. Stone, I'll give you a few minutes.

17            THE CLERK:  Do it now?

18            THE COURT:  Whenever.

19            THE CLERK:  Because it might ring.

20            MR. STONE:  Thank you, Your Honor.  Just two quick

21   points.

22            The first one is I think the Court was right to be

23   confused about when someone purchases a corporation, that the

24   attorney-client privilege wouldn't transfer.  And I think

25   Mr. Grant conceded that it would.  But he suggested that there

1    were jointly held privileges there, meaning that the Village

2    Voice Holdings -- because that was the parent company --

3    jointly held privileges with Backpage pre-sale.  And so

4    post-sale it still had those privileges, which is analogous to

5    saying Village Voice Holdings, which once owned the Village

6    Voice, the publication in New York, the newspaper, that after

7    that sale occurred in 2012 or 2013, any time that Village Voice

8    was in a dispute at some point, Village Voice Holdings could

9    say, no, we have the joint privilege here too, so you can't --

10   you can't waive or assert any privilege with respect to any

11   corporate communications without us saying it as well or

12   without us agreeing to it as well.

13           It's confusing, I think, at that point, Your Honor.

14           So, again, with respect to any pre-sale

15   communications, that waiver is clear.  Those are gone.

16           And the second point is that it seems to me that

17   defense counsel confused the waiver question on the Judge

18   Campbell ruling.  It's not that it was a third-party disclosure

19   because the Court ordered Backpage to turn over the documents.

20   It was that Backpage turned over the documents to the

21   third-party public relations firm in the first place.  That's

22   where the subject matter waiver occurred.  It didn't occur

23   after the Court issued an order.  I mean, I think it's clear

24   that it occurred because they gave it to these third parties

25   who aren't protected by the privilege.  Once you do that,

1    there's a subject matter waiver, and case law is clear that

2    they don't get to then assert the privilege on those issues.

3              Thanks, Your Honor.

4              THE COURT:  Thank you very much.

5              That takes us to the next motion.  It's a defense

6    motion.  It's defendants Lacey and Larkin's cross-motion to

7    obtain discovery and address privilege issues, which is

8    document number 235.  And 235, it appears, serves as both the

9    response to document number 195 and as a separate cross-motion.

10             Which defense counsel plans to argue?

11             Sir, I know your name, but for the record, if you

12   could place it on the record again please.

13             MR. CAMBRIA:  Yes, Your Honor.  Paul Cambria.

14   Mr. Grant got to some of this.  Our position is that Mr. Ferrer

15   has waived in writing his personal lawyer-client relationship.

16   We said that.

17             However, another layer of waiver can be had as a

18   result of discussions or subjects that he has taken up with the

19   various government authorities.  And they've disclosed to us

20   that he's agreed to be debriefed by Texas, California, and the

21   federal government, and that supposedly there's a supplemental

22   cooperation agreement.

23             Our position is the record needs to be clear as to all

24   of the subjects that he has also discussed with those entities

25   because each and every one of those would constitute another

1    layer of waiver.  And without privileges, there's no basis for

2    the disqualification.

3              As to what Mr. Grant said concerning jointly held

4    privileges, we also need to know and we need discovery of all

5    the subjects that he has taken up with these various entities

6    to determine whether or not he has attempted to waive a

7    privilege that he has no right to waive.

8              THE COURT:  Well, sir, let me ask you this:  What

9    evidence do the defendants believe might be recovered as it

10   relates to this requested discovery?

11             MR. CAMBRIA:  Well, what we need to know first is what

12   subjects he's discussed with the government.  And then once we

13   determine what the subjects are, we can then come back to the

14   Court with your permission obviously and say, Your Honor, he

15   had no right to discuss these; this is privileged information;

16   it's now been acquired by the government; and then we discuss

17   what the remedy would be.

18             THE COURT:  Well, in the government pleadings, they

19   provide information about the filter team process that they

20   have in place.  What specific concerns do the defendants have

21   about this filter team?

22             MR. CAMBRIA:  Well, a couple of things there.  First

23   of all, you know, the government has asked that we trust, if

24   you will, the filter process.  And some courts have indicated

25   that that isn't an appropriate situation, that masters should

1    be appointed or magistrates should supervise, and obviously

2    that is a consideration, and we've raised it.

3         Kind of the ironic part about that is when we talked

4    about limited involvement, law only, of Davis Wright Tremaine,

5    for example, not cross-examination counsel -- the same thing

6    with Henze Cook -- the government says, well, how can we trust

7    that you're going to keep those things separate?  At the same

8    time their position is but you can trust that we'll keep

9    separate the taint team from the prosecution team.  I would

10   think we should both have the same consideration there.

11        THE COURT:  But you're not seeking -- you're certainly

12   not seeking this information to pursue any civil litigation

13   against Ferrer, are you?

14        MR. CAMBRIA:  No, no, no, no.  What we're trying to do

15   is determine whether or not subjects have been discussed with

16   the government or other third parties that Mr. Ferrer had no

17   authority to waive the privilege on because it was jointly held

18   or it wasn't his at all.  And we know that he's been debriefed

19   by at least three agencies.  And so we need to know what those

20   subjects were.

21        And once we know those subjects, then we can come back

22   to this Court and say, for example, he discussed this, however

23   he did not have the authority to waive those privileges, and

24   for that reason whoever has been exposed to that information,

25   we now ask the Court for an appropriate remedy.  So we need to

| | |
|---|---|
| 1 | know, first of all, all the things that he's discussed |
| 2 | subject-wise so that we can make that determination and also to |
| 3 | have another layer of waiver.  Obviously everything he's |
| 4 | discussed with third parties he's waived. |
| 5 | THE COURT:  I appreciate that. |
| 6 | MR. CAMBRIA:  Thank you. |
| 7 | THE COURT:  Is there any argument from the government? |
| 8 | MR. KOZINETS:  Just a moment, Your Honor. |
| 9 | THE COURT:  Sure. |
| 10 | MR. KOZINETS:  Your Honor, I couldn't -- |
| 11 | THE COURT:  I'm sorry.  Before you start, I just have |
| 12 | a question for you.  Has this investigation team been reviewing |
| 13 | this privileged material during the time that this motion's |
| 14 | been pending, do you know? |
| 15 | MR. KOZINETS:  I do not know.  Do you mean the taint |
| 16 | team? |
| 17 | THE COURT:  Correct. |
| 18 | MR. STONE:  No, Your Honor.  There was a letter, I |
| 19 | believe, by Mr. Piccarreta in May that suggested that they had |
| 20 | issues with the government's filter team.  At that point we |
| 21 | ceased all activity with the filter team in preparation for the |
| 22 | Court resolving it.  And that's why we brought some of these |
| 23 | motions here today, Your Honor. |
| 24 | THE COURT:  And obviously that was May of 2018 of |
| 25 | course? |

1      MR. STONE:  Yes, Your Honor.

2      THE COURT:  Go ahead.

3      MR. KOZINETS:  Your Honor, I'm prepared to address

4  this discovery request as it relates to the disqualification

5  issues, if Your Honor would like to hear about that.

6      THE COURT:  Sure, go ahead.  You have two minutes.

7  You can use it whatever way you would like to.

8      MR. KOZINETS:  Okay.  Thank you, Your Honor.  It's our

9  position we think it's clearly laid out in our response brief

10  to the defense motion for discovery on Carl Ferrer's

11  attorney-client privilege that that request is really

12  immaterial and irrelevant.  It's irrelevant and immaterial

13  because the attorney-client privilege is limited in scope.

14  It's an evidentiary privilege.

15      But the disqualification issue involves these ethical

16  rules that cast a far broader net and apply to all confidences,

17  whatever their source, that relate to a client representation.

18      So this notion of did he waive privilege in a

19  corporate capacity, in a personal capacity, that is all truly

20  irrelevant.  And, moreover, it's irrelevant because ethical

21  Rule 1.9(a) also protects the undivided duty of loyalty that

22  these attorneys continue to owe to Mr. Ferrer.  And that has

23  been reaffirmed in numerous cases that we've cited in our

24  brief, including the *Trone* case from the Ninth Circuit, the

25  *Fawell*, *Touchcom*, and *Selby* cases as well.

1          In the *T.C. Theatre* case, the foundational case that

2     the Arizona appellate courts have recognized as the seminal

3     case in the area of ER 1.9(a), in that case *T.C. Theatre* held

4     that a lawyer's duty of absolute loyalty does not end with his

5     retainer, but it continues.

6          So for all of those reasons, we respectfully submit

7     that these issues really don't impact the disqualification.

8     They pertain to determination of the extent to which the

9     corporation waived the privilege and document review issues but

10    not to disqualification.

11         THE COURT:  Thank you very much.

12         MR. KOZINETS:  Thank you.

13         THE COURT:  Is there anything else from the defense on

14    the motion that we've been discussing?

15         MR. CAMBRIA:  Your Honor, Paul Cambria again.  May I

16    just respond to that last comment that he made?

17         THE COURT:  Go ahead.

18         MR. CAMBRIA:  Where he says that the -- it's not

19    relevant to disqualification, as I indicated, 1.9 itself

20    requires the presence of a confidence.  The ethics opinions

21    that they rely on require the presence of a confidence.  The

22    Supreme Court of Arizona requires the presence of a confidence.

23    So all those things are clearly not just relevant but the most

24    relevant.  Thank you.

25         THE COURT:  Thank you.  That takes us to the next

1    motion, which is defendant Lacey's motion for disclosure of

2    documents related to Carl Ferrer's waiver of privilege as to

3    material to disqualification, which is document No. 202.

4         Who would like to argue that one, or would you like to

5    just rest on the pleading?

6         And, sir, again, since we have so many lawyers in the

7    courtroom, if you could tell us who you are.

8         MR. GRANT:  This is Mr. Grant again, Your Honor.  And

9    I have to confess I'm not real good with docket numbers, so I'm

10   not sure which one we're on.  Mr. Cambria just argued the

11   motion as to disclosure related to the disqualification motion.

12        THE COURT:  Right, the cross-motion to obtain

13   discovery and address the privilege issues.

14        MR. GRANT:  Okay.  I believe most of his comments were

15   directed towards the issue of the privilege issues.  There

16   additionally is a cross-motion is a little bit broader than

17   that, and Mr. Cambria touched on it, but there are some other

18   issues there as well.  I'm happy to address those.

19        THE COURT:  Do you want to go back to that one?

20        MR. GRANT:  I guess I am going back, Your Honor.  I

21   apologize.  It's my docket numbers I'm not sure what 180 is

22   versus --

23        THE COURT:  I'm sure you have people in the back of

24   the courtroom keeping track of all of this.  Maybe they can,

25   you know, pass you some notes or something so when we have a

1    listing of all the documents, that would be helpful.  But go

2    ahead.

3              MR. GRANT:  I confess my flaw, Your Honor.

4              THE COURT:  That's all right.

5              MR. GRANT:  Just as to the issue of the cross-motion,

6    Mr. Cambria pointed out the need for information concerning

7    Mr. Ferrer's actual waivers is pretty patent here, because it's

8    not clear the government even understands what privileges he

9    had to waive or didn't waive.  I won't belabor that.

10             But additionally here, from what we've seen of the

11   government's misunderstandings of the privileges and apparent

12   cooperation with plaintiff's counsel with Backpage in various

13   civil litigation, there's a lot more that we've suggested

14   disclosure should be provided as to.

15             For example, Mr. Ferrer's declaration that was

16   submitted by the government in fact discusses his

17   communications with counsel, my firm.  That raises issues and

18   concerns about exactly what the government has been doing and

19   disclosing.

20             Then I mentioned briefly as well that Mr. Ferrer's

21   counsel sends this unsolicited letter on April 24 of 2018 to

22   courts across the country apparently trying to create or

23   generate some sort of issue about disqualification of counsel.

24   We believe and have good reason to believe in coordination with

25   the government we need disclosures and discovery as to that.

1    We also know plaintiff's counsel in various cases have directly

2    coordinated with the government, and we've seen it.  We've seen

3    the meetings.

4            So there are a fair number of communications here that

5    we need the government to disclose to us so we can understand

6    exactly what they've been doing and coordinating both as to

7    privilege but also as to otherwise taking advantage of or

8    potentially prejudicing the defense.

9            The government's communications with the plaintiff's

10   counsel in the various civil cases, Your Honor, is not

11   privileged.  They can't claim that that's in some fashion

12   material information that cannot be disclosed.  And we're

13   certainly entitled to that information, not to sue Mr. Ferrer,

14   but for purposes of defense of the various cases and for

15   purposes of the possibility that there are other remedies that

16   should be appropriate here for whatever has been disclosed.

17           So, Your Honor, that's part of what our motion is on

18   the cross-motion side of this.  It has to do with coordination

19   with Backpage, a recent stay motion that was filed in the

20   District of Florida, another one that was filed in Texas court,

21   all of which have the hallmarks or earmarks of having been

22   provided by the government, not by Backpage.

23           So we need to understand those things, because

24   obviously the government's efforts towards the defendants,

25   whether it's here in this court or it's in ancillary

1    proceedings, that potentially prejudice their interests is

2    relevant for purposes of the defense of this case.  That's all

3    I wanted to add, Your Honor.

4              THE COURT:  Thank you very much.

5              MR. GRANT:  Thank you.

6              THE COURT:  Mr. Stone.

7              MR. STONE:  Very briefly, Your Honor.

8              THE COURT:  I'm sorry.  Just one moment.  Lisa.

9              THE CLERK:  It dropped again.

10             THE COURT:  The call dropped again?

11             THE CLERK:  She's calling back again.

12             THE COURT:  We'll try to reconnect once they get back

13   on.

14             Mr. Stone, go ahead.

15             MR. STONE:  Just want to push back on just a couple of

16   issues.  One is this idea that was raised now and then earlier

17   this morning that the government is using these civil cases as

18   a stalking horse somehow and that the government was behind a

19   sua sponte order in a Washington State Court to disqualify the

20   counsel here.

21             Some of the attorneys that we're talking about here

22   represent victims, victims that are identified or at least that

23   are part of the indictment, the superseding indictment.  And as

24   Your Honor's well aware, victims have statutory rights here,

25   and certainly there will be conversations between victims and

1     their attorneys and the government attorneys.

2            The only other issue is related to this filter team or

3     taint team.  This is something that has been signed off by two

4     different magistrate judges on search warrants that they signed

5     orders.  So defendants cite cases that suggest the government

6     just can't go out and set up a filter team without any

7     supervision.  But here we don't have that because we have this

8     Court and two different magistrate judges giving authority for

9     the government to do what it did with respect to the filter

10    team.

11           So if there are no other questions, we'll rest on the

12    papers.

13           THE COURT:  Thank you very much.  I'll go back to the

14    defendant Lacey's motion for disclosure of documents related to

15    Ferrer's waiver of privilege as material to disqualification.

16    Is there any other defense counsel that wanted to place an

17    argument on the record?

18           It appears to be sufficiently pled, but I'll allow you

19    to argue if you would like to.  Anyone?  Is there anything the

20    government would like to place on the record as it relates to

21    that issue?

22           MR. KOZINETS:  Your Honor, the *Alexander* case figures

23    into that pleading, and if I may, I'd like to address that and

24    one or two other issues.

25           THE COURT:  Well, let me ask the government is the

1    government aware of any information or documents that have not

2    already been submitted to the Court such as the proffer

3    agreement that would be helpful in determining the validity of

4    this waiver?

5         MR. KOZINETS:  No, Your Honor.

6         THE COURT:  That takes us to the defendant Padilla's

7    motion for itemization of Brady/Giglio material, which is

8    document number 273.

9         MR. PICCARRETA:  Thank you, Judge.

10        THE COURT:  You're welcome.

11        MR. PICCARRETA:  Mike Piccarreta on behalf of

12   Mr. Padilla.  Judge, I know you've probably heard thousands of

13   motions for disclosure of Brady material, and I'll try and

14   briefly explain why this case is a little bit different.

15        The government in this case has provided us -- and

16   I'll ballpark it -- ten and a half million documents.  99.99

17   percent of them are really irrelevant to most anything other

18   than a business running a business.  They have also -- we've

19   asked for them to provide us some of the hot documents.  By hot

20   documents, supposedly the important ones.  We've received

21   some of those.  We've asked for the advertisements on all the

22   documents mentioned in the indictment.  We've received some of

23   those.

24        So if you try and walk in our shoes a little bit,

25   there is insufficient time even if it would be beneficial to go

1    through this thing document by document.  The government has

2    these on a Relativity program.  And they have offered a

3    suggestion how we can purchase a similar program at government

4    expense.  And we're going to look into that.

5            THE COURT:  I'll tell you what.  I know this is --

6    I've certified it as a complex case.  Do you believe that if I

7    provided the defendants with more time to review this

8    discovery -- it obviously is voluminous -- do you think that

9    would resolve this issue that concerns you?

10           MR. PICCARRETA:  Well, it won't reserve this issue,

11   and I think we may at some point ask for more time.  But this

12   issue -- Here's the issue.  I'm not asking them to go through

13   ten and a half million documents, find the Brady material, hand

14   it over to me, and do all of the work.

15           THE COURT:  Well, sir, let me do this.  And my

16   apologies for interrupting you.  I'll just ask the government

17   have you separately identified or classified any of this as

18   exculpatory information?

19           MR. KOZINETS:  My understanding is that in the

20   production to the defense, that we've provided them with

21   electronically searchable documents that --

22           THE COURT:  That's not an answer to my question.

23           MR. STONE:  I'll just add is that it's a little

24   unclear what the exculpatory material would look like.  Now,

25   certainly they have raised some issues that, hey, they've

1    received awards from various law enforcement officials.  There

2    was some communications and some relationships with Backpage

3    and various other organizations in terms of the National Child

4    Exploitation Center, NCMEC.  They responded to subpoenas when

5    subpoenas were provided and things like that.  That's all -- I

6    don't think they need us to show them those documents.  I mean,

7    that's something they're very familiar with.  They cite them

8    back to us in a lot of the various pleadings.

9            Now, what's at issue in this case -- and let's set

10   aside this First Amendment issue that they have raised because

11   that's a legal issue that the Court will rule on at some

12   point -- is a factual issue.  Did they know that the vast

13   majority of these advertisements that went up on this Web site

14   were for prostitution.

15           So that is what is clearly articulated in the

16   90-plus-page superseding indictment.  And there's lots of

17   material that's given as support for that.  And I think as

18   Mr. Piccarreta is going to get to, some of those documents have

19   already been turned over with respect to the superseding

20   indictment.  And there are others that we were turning over,

21   and I think today there's a disclosure.

22           So there's a continuing disclosure from the government

23   to defense on all these particular issues.  But with respect to

24   Brady or exculpatory, we're unsure what that would look like,

25   Your Honor.

1        MR. PICCARRETA:  Judge, I just don't think they

2    answered your question.  We've cited in our pleadings that

3    they --

4        THE COURT:  No.  Actually I think they did.  They

5    didn't drill down to answer my specific question.  But I think

6    Mr. Stone -- and correct me if I'm wrong -- has basically said

7    they've turned over a lot of information, and whatever you

8    believe you can use to defend your clients is in that

9    information.  But they don't have a specific log that they can

10   outline this is why we believe your client's guilty, and these

11   are the areas in the ten million documents that you need to

12   specifically look at.  I might be wrong.

13       MR. STONE:  The only quibble I would have with that,

14   Your Honor, is that I think we have provided and are providing

15   that latter part.  The -- With respect to each specific

16   defendant, here are the documents that relate to your

17   defendant, why we think the allegations and the facts support

18   the charges in the superseding indictment.

19       What they have asked for is the converse of that,

20   which is give us all the documents that help our clients that

21   would be Brady material or possibly Giglio.  And that's where

22   the government's having difficulty identifying those documents,

23   because we're not sure what those particular documents would

24   look like.

25       THE COURT:  So it's your position that you don't know

UNITED STATES DISTRICT COURT

1    if it exists.

2         MR. STONE:  We don't know, and certainly we wouldn't

3    want to be in a position to give our best guess only to have

4    them then do their due diligence, because they have to because

5    that's what they're required to as criminal defense attorneys,

6    and then turn around and say you missed all these other

7    documents that we think we can use.

8         THE COURT:  If you do have exculpatory information,

9    I'm sure it's your position that you'll turn that over

10   immediately.

11        MR. STONE:  100 percent.  The exculpatory material is

12   absolutely going over to the extent there is anything

13   exculpatory.  And we are doing our review as required under

14   Brady, Giglio, and Rule 16 to determine what we might have in

15   our investigative files, and that's going over.  What they're

16   arguing, I believe, is we need to look at what's already been

17   turned over and then identify a list of Brady documents.

18        THE COURT:  And just to make sure we're clear --

19   Mr. Stone, thank you for that -- it's my understanding from

20   your document number 273 that you're seeking an order from me

21   requiring the government to produce an itemized list of

22   exculpatory documents present in the discovery provided to all

23   of the defendants.

24        The government's position from their response appears

25   to be that they provided voluminous discovery and that the

1    government, you argue, has declined to offer the defendants a

2    little of Brady material present in the discovery.  And

3    accordingly you move for an order requiring the government to

4    identify the Brady evidence for the defendants, which you

5    believe is supported by precedent.  Is that a good summary of

6    your position?

7            MR. PICCARRETA:  It's a little more.  No.  As I

8    understand -- I'm not asking them to affirmative -- Well, they

9    have Brady obligations no matter what.

10           THE COURT:  Right.

11           MR. PICCARRETA:  And they've just affirmed in court

12   they're aware of it; they're going to give it to us 100

13   percent.

14           What I'm asking:  Under the Department of Justice

15   manuals and memorandums, one of which came out after the

16   Stevens case, which the Court may be familiar with, U.S.

17   Attorneys, any investigators were instructed to do certain

18   things.

19           And they were instructed that when they review a case,

20   the agents or the U.S. Attorneys are to go through the

21   disclosure, and if they locate certain exculpatory materials,

22   certain Brady materials to segregate them, and not just throw

23   them in with 10.4 million documents, because that's like a

24   needle in the haystack.  What I'm asking --

25           THE COURT:  So again, Mr. Stone, if you have

1    exculpatory documents, you will pull them out and let them know

2    you need to be aware of this document?  Or is it your argument

3    from your pleading that the government has produced the

4    discovery in an industry standard searchable format, and the

5    defense is required to find whatever they can use to help their

6    clients?

7            MR. STONE:  The problem is, Your Honor, is that we

8    don't know what to look for necessarily in terms of what they

9    can use at trial and what their defenses are.  I mean, we've

10   heard about the First Amendment.  We understand that one.

11           But anything would be at trial, because the First

12   Amendment is not going to be at trial presumably if we get to a

13   trial.  And so we have given these documents --

14           Now, this isn't 30 years ago where there's 50 boxes of

15   documents that have been handed over.

16           THE COURT:  So you can't go through ten million

17   documents and just parcel out everything that you believe might

18   be favorable or helpful to the defense?

19           MR. STONE:  We don't believe that we have the

20   obligation to do so.  And clearly the case law would support

21   that.  In all circuit court cases they have found that the

22   government doesn't have that specific obligation.

23           MR. PICCARRETA:  And I'm saying, Judge, if they do

24   that, what they're instructed to do under the justice

25   department manual and memorandums, if they have pulled out

1    documents, if in the course of their investigation preparing

2    Carl Ferrer for trial, which I can't imagine you wouldn't say,

3    "We found these 12 e-mails.  What's the story with that?

4    What's the story with that?  We're concerned about that," that

5    is what has to be produced.

6            I'm not asking them to start from scratch and go

7    through it.  But if they do conduct, in the course of their

8    investigation -- They've had it for five years.  And so I'm

9    assuming, if they're looking for bad stuff, and it's the

10   largest investigative force, I've been told, of the cases in

11   the district, that I would think the FBI agent would pull out

12   some documents and go "Hey, what about these?  We'd better be

13   concerned about them."

14           If they do that, if they have pulled out documents, if

15   there is a chance it's exculpatory, that's what I want

16   produced.  Not do our work for us.

17           And one of the things that brought up the motion is

18   when I read the Department of Justice manual and the

19   memorandums.

20           THE COURT:  I'm sorry.  My apologies again for being

21   rude.  Can you provide me with some authority that would give

22   me an opportunity to order something so extraordinary?  Because

23   if the United States Government has said we have ten million

24   documents, we've given everything in the case over to the

25   defense, if you don't find what exculpates your client, are you

| | |
|---|---|
| 1 | then saying it would be -- it was their responsibility for not |
| 2 | notifying you of what you should have known to help your own |
| 3 | client?  If they handed it over, wouldn't you agree it's your |
| 4 | responsibility to go through everything? |
| 5 | MR. PICCARRETA:  It depends.  What their |
| 6 | responsibility is if they become aware -- that's my |
| 7 | distinction -- in the course of their preparing for trial and |
| 8 | preparing for the investigation or having scores of agents and |
| 9 | investigators go through the 10.4 million documents, then I |
| 10 | would presume that in the course of that, they did what they |
| 11 | were supposed to do according to the manual and pulled out |
| 12 | some. |
| 13 | THE COURT:  Now, when you say if they're aware, are |
| 14 | you basing your argument on the fact that this is complex |
| 15 | litigation, ten million documents?  Would you be making the |
| 16 | same argument if they gave you a thousand pages of discovery? |
| 17 | MR. PICCARRETA:  No.  And the cases, I've cited the |
| 18 | Court the case of -- Here's where it ends up.  It's within the |
| 19 | District Court's discretion as a matter of trial management and |
| 20 | what they call fundamental fairness to order the government to |
| 21 | produce certain things. |
| 22 | And what the cases also say is that -- |
| 23 | THE COURT:  My apologies again.  Has the United States |
| 24 | Government made it through the ten million documents in the |
| 25 | case? |

1    MR. STONE:  Well, as what's done in this day and age

2    is that we have it in searchable form, and there's keyword

3    searches and things like that.  Now, my understanding, in terms

4    of a lot of the documents, were from servers that were taken

5    from the Philippines, is that right, and there's -- and we have

6    that information.  It's in our possession.  And we handed it

7    over to the defense exactly how --

8            THE COURT:  I'm sorry.  You said they were taken from

9    the Philippines?  Is that what you said?

10           MR. STONE:  CoStar, CoStar, which is a company that

11   Backpage used there that was -- had an association with

12   Backpage.  And there were servers taken out of the Philippines

13   that the government has in its possession and has turned those

14   over just as we have it.  So --

15           THE COURT:  Thank you.

16           MR. PICCARRETA:  And, Judge, what they have given to

17   us as-is is useless.  It is only if you can afford to use the

18   Relativity program, which we've received estimates to load and

19   search, assuming you had the time to look at 10.4 million,

20   price range is anywhere from $400,000 to $450,000 to $800,000

21   to do that, not including the lawyer time to look at it.

22           So we are in a situation where, A, the government, you

23   know -- it's a multi-prong attack -- seized the money, give

24   them the disclosure in an unusual format.  To make it usable

25   they have to spend $400,000 to $800,000 of money that they

UNITED STATES DISTRICT COURT

1    won't give us.  And we're sort of at a loss on it.  Now, the

2    government has made --

3         THE COURT:  Do you really think that was a tactical

4    decision made on the part of the government?

5         MR. PICCARRETA:  Well, subtract the motive.  I think

6    it was definitely a tactical thing to a multi-prong attack to

7    seize assets of the defendants, to render them impecunious, to

8    disqualify the most qualified counsel, to give us disclosure,

9    which is, you know, they just gave it to us, but that would

10   cost hundreds and hundreds of thousands of dollars.  Forget

11   about the motive.  It's the same thing like disqualification.

12        The result is one, two, three punch of devastating

13   that impacts the Sixth Amendment.  And I've said in the

14   pleadings I'm not, you know, we can all form our opinions.  I

15   don't want to start making accusations.  But there's a pattern

16   of behavior that severely prejudices the defendant's Sixth

17   Amendment rights.

18        At what point does it come to the point where we stand

19   before you and make a motion to dismiss, which is coming.  The

20   other thing is the seizure of trust accounts of David Wright

21   Tremaine and another law firm.

22        THE COURT:  But you're certainly not making an

23   argument that the United States Government is engaging in some

24   form of prosecutorial misconduct?

25        MR. PICCARRETA:  I'm not making that argument at this

1    time.  All I'm saying is we have these one, two, three, four

2    incidents.  My eyes are open.  We'll see how the case

3    progresses.

4            But at some point if there's enough that I say I

5    believe in good faith that we've now got four instances, and

6    let's say we move to five or six or seven, I definitely will

7    bring it to the Court's attention.  I'm not sure what time --

8    right now what remedy I'd ask, because it depends on the

9    circumstances.  All I'm saying is there's been a one, two,

10   three, four punch that has attempted to impact our Sixth

11   Amendment rights.

12           And with this issue on the Brady material, there have

13   been courts -- I cited them right in the pleadings -- that

14   district court judges, you know, for trial management say, no,

15   government, you've got to itemize the Brady material.  Other

16   courts have said, no, defense, you do it yourself.

17           There's a circuit court for *Skilling*, the famous Enron

18   case, and they said in that case because the government

19   provided the hot docs, which they're in the midst of doing, but

20   also gave them a list of documents relevant to the defense,

21   that there was no harm.

22           And the government keeps pointing to their indexes

23   when they gave us the documents.  Let me show you by way of

24   example.  You see the thing at the top of the page there?

25           That's the index for 10.4 million documents, the

1    things with the bullet points.  And the only reason I'm showing

2    it to you is they've pointed out how they've been giving us

3    indexes with the stuff and how that ameliorates it.  So that's

4    the index for 10.4 million documents.

5           THE COURT:  I'm sorry.  Where do you --

6           MR. PICCARRETA:  Right where I have the pink stick-em

7    next to it.  There's a list of bullet points.

8           THE COURT:  Right.

9           MR. PICCARRETA:  That's the index that the government

10    refers to in their pleadings as support of, "Well, we've given

11    you documents.  And not only that, we've given you an index on

12    it.  What are you complaining about?"

13           And I just want the Court to be aware of when we say

14    index, you know what we're talking about.  We're not talking

15    about index with any detail.  We're talking about eight or nine

16    bullet points for 10.4 million documents.

17           And I'll show you I summarized the rest of the indexes

18    for the second disclosure, the third disclosure, and the fourth

19    disclosure.

20           Just so the record's clear on it, you know, the second

21    disclosure had two bullet points, the third had one, and the

22    fourth had four, and the top had, I think, eight.

23           So that's the index that they're using to support

24    their argument on providing this.

25           But, Judge, I just think you have to -- I would

1    request you do this.  I would like you to say, government,

2    you're ordered to itemize the Brady material and provide it to

3    the defendants as you become aware of it.  And that way you're

4    not requiring them to search all the documents.

5           But in the course of preparing the case -- and they've

6    been investigating this for five years -- and under their

7    obligations, which are in the pleadings under Department of

8    Justice manual and the *Stevens* memorandum, put duties on U.S.

9    Attorneys to go through the documents and pull out the Brady

10   material.

11          THE COURT:  Just one minute.  Mr. Stone, is this

12   possible?

13          MR. STONE:  Well, it seems to me --

14          THE COURT:  If you have any of your FBI agents behind

15   you, you can certainly ask.

16          MR. STONE:  Well, I already did confer with the two

17   agents that we have here as to the question of as the agents

18   are going through the material, have they pulled anything out

19   with the idea that, hey, this is exculpatory.  We don't have

20   any of that.  So that's the short answer.  It sounded like

21   Mr. Piccarreta was saying as they go along, they may have

22   identified some documents that would go towards Brady or

23   exculpatory; we just want a list of those documents.  We don't

24   have those.  So any order would require us to go through the

25   ten million documents.

1          THE COURT:  Well, you said that you talked to your

2     agents about this issue.  And obviously you've been a federal

3     prosecutor for a long time.  That's your responsibility.  They

4     don't have law degrees.  Well, some of them do.  But they don't

5     have Bar cards where a defense counsel can call the State Bar

6     or file a document that says, hey, this lawyer engaged in

7     prosecutorial misconduct.

8          So is it enough that they tell you, hey, we have this

9     document that might qualify under what you told us to pull out,

10    or is that your responsibility?

11         MR. STONE:  Your Honor, I think I was just parroting

12    Mr. Piccarreta's request when he was suggesting that agents are

13    going through the material.  But, no, it speaks just as well to

14    the attorneys and what our review that we have done

15    collectively, the prosecutors on this case, is that we have not

16    identified or segregated a document or a subset of documents

17    that would be identified as Brady.

18         THE COURT:  But if you do find some, the defense is

19    asking if you could put them on notice of what they are and

20    where they can find them within the ten million documents that

21    you've provided to them.  Is that possible?

22         MR. STONE:  If we come across documents that fall into

23    Brady or exculpatory, just to identify those to the defendants,

24    we could do that, Your Honor.

25         THE COURT:  Thank you very much.  Would that satisfy

1    the defense, Mr. Piccarreta?

2         MR. PICCARRETA:  Well, I'd say --

3         THE COURT:  The problem you have now is you don't know

4    what you don't know.

5         MR. PICCARRETA:  Yeah.  And I don't know what they're

6    doing.  But I think minimally that order, you know, should be

7    there.  I mean, here's the thing.  Here's our difficulty too is

8    the lack of funds to do what's needed with the Relativity

9    program.  But the government has suggested -- and I assume they

10   won't oppose it -- that we will be able to get these funds from

11   the government to do that.

12        So I might --

13        THE COURT:  Well, I'll tell you what.  For the record

14   tell me about that.  How does that work?

15        MR. PICCARRETA:  Well, can I let someone else tell you

16   who's had responsibility for that?

17        THE COURT:  Absolutely.  Sir, I know your name, but

18   for the record, if you could place it on the record again.

19        MR. WEISS:  I will.  Thank you, Your Honor.  Steve

20   Weiss representing Joye Vaught.  Just recently I followed up --

21   followed up on a statement made at Page 12 and over into 13 by

22   the government's filing document 294.  And it was their

23   response to Mr. Piccarreta's motion for Brady and Giglio

24   material.

25        And what they say is that under the Criminal Justice

1    Act, we could apply for funds sufficient to be able to do the

2    search that is required.  So having gotten the citation, I

3    looked at the judicial guidelines.  And in fact there are funds

4    available for litigation support in this area.  And that

5    applies even to defendants who are able to retain counsel.

6              THE COURT:  That's not only for indigent defendants.

7              MR. WEISS:  It's not.  Even if you're able to retain

8    counsel, you can obtain these funds.  And there's a process by

9    which you have to go through.

10             And it seemed to me, frankly, reading all these

11   guidelines and trying to put them together and see how they

12   work, it seemed to me that this might be an onerous process.

13   And I wanted to see how it practically worked.  So I was able

14   to gain the name of somebody who is supposedly the person in

15   the know.

16             And I was able to talk with her very briefly -- she

17   was in an airport getting ready to leave -- and discussed it

18   with her and came away with the impression that we can do this

19   by filing the appropriate application with all of the necessary

20   numbers that it's going to take, which are pretty extraordinary

21   numbers.

22             THE COURT:  Did you talk to this person about the

23   amount of documents?  Did you mention the ten million document

24   number and that we've had someone estimate that it could cost

25   anywhere from $400,000 to $800,000?

1          MR. WEISS:  I don't remember if I actually talked

2     about ten million documents, but I believe I did.  But I know

3     for a fact that I said the price for just the litigation

4     support services could be as much as close to a million

5     dollars.  And I'm not sure if that's even accurate because the

6     support services in and of themselves are very expensive, and

7     then there's the whole process of attorney time to go through

8     the documents.

9          There is in fact -- and I have the notation here -- a

10    national center that does -- gets involved in this process and

11    will coordinate.  And you have to coordinate with them in terms

12    of putting this application together.

13         My information right now is rather sketchy beyond the

14    fact that it looks like it's doable.  But it's a process that

15    could take a little time, because it eventually, I believe, has

16    to be approved by -- It has to go up the ladder.

17         THE COURT:  It's approved by me but ultimately the

18    Ninth Circuit.

19         MR. WEISS:  There's a particular judge in the Ninth

20    Circuit --

21         THE COURT:  Ikuta.

22         MR. WEISS:  Okay.  And so that's the process.  That's

23    all I know right at this moment.  I just learned this

24    information, say, within the last three days.  That's all I

25    have.

1          THE COURT:  Thank you very much.

2          MR. PICCARRETA:  And, Judge, I guess, in conclusion, I

3    think that we would need a court order on this just so there's

4    no confusion.  And I would request that the court order read

5    that if -- that the government, if it locates, in the course of

6    its preparation, Brady or Giglio materials, that it is to turn

7    it over to the defense within ten days.  And I think that at

8    least for the moment will take care of it.  And we'll see where

9    we go with the litigation support.  But for us it's really

10   difficult on it.

11         THE COURT:  I'm sorry.  Just one moment.

12         Mr. Stone, again, what do you think about that, sir?

13         MR. STONE:  I don't think we need an order that

14   requires us to do what we need to do under the law and Rule 16.

15         MR. PICCARRETA:  I found that orders sometimes get

16   more results and avoids disputes later.

17         THE COURT:  So you just don't trust the government?

18         MR. PICCARRETA:  No.  Well, nothing personal, but

19   it's -- I'd like to have an order in case there is

20   non-compliance.  It's not just me complaining about a general

21   obligation.  It's me complaining about there was a court order.

22   And I think it's appropriate in this case just due to the

23   volume of materials.  And here today they espouse a theory of

24   general knowledge that if they have general knowledge that

25   third parties are prostitutes, that that forms the basis of

1    prosecution, which, by the way, isn't the law.

2         But it's helpful to hear that, because now we

3    understand a little bit more of it.  But I think really what

4    will also help is they've agreed to get us the stuff that's

5    mentioned in the indictment and the very advertisements that

6    are mentioned in the indictment.  It was promised to us -- It's

7    been promised to us they'd put it in the pleading we would get

8    it in two to four weeks, which is, like, now.

9         And getting those items would at least, as soon as

10   possible, which they've agreed, would be a beginning to help

11   understand where we believe the case has gone awry in the

12   analysis.  And it will also help us when we bring the motions

13   for you to discuss the issue of generalized knowledge versus

14   specific knowledge.

15        And I think where this is going to come up, Judge, is

16   when they are preparing witnesses for trial and they're putting

17   together their exhibits is, especially with Mr. Ferrer, is --

18   because Mr. Ferrer may have statements that he made in e-mails

19   that contradict what he's saying now.  And that's when the

20   Giglio obligations will kick in as the agents scurry through

21   all the disclosure and find things that might conflict with

22   this current version of events.

23        So, in summary, I think if the Court would order them

24   to, you know, any documents that come to their awareness,

25   provide them within ten days after locating Brady and Giglio

1    material, that would be fine for now, Your Honor.

2              THE COURT:  Counsel, wouldn't you also have that

3    extraordinary motion in your back pocket to exclude evidence

4    based on disclosure failures or motions to dismiss based on the

5    government's failure to disclose certain evidence?

6              MR. PICCARRETA:  It would depend.  It depends on the

7    circumstances.  If there's something that they're not aware of

8    and we're not aware of, that's a different issue.

9              THE COURT:  Because they're giving you ten million

10   documents.  And if they can cull through the documents and show

11   me this was handed to them in 10,000 documents, then you won't

12   win on either one of those issues.

13             MR. PICCARRETA:  Yeah.  It avoids disputes.  It avoids

14   appeals.  It avoids litigation.

15             THE COURT:  Okay.  I appreciate all of that.

16             Mr. Stone, is there anything else you or co-counsel

17   would like to place on the record about this issue?

18             MR. STONE:  The only thought I have is I don't think

19   we need an order at this juncture.  I think we're back before

20   Your Honor on a status conference later this month, and we

21   might be able to talk about discovery issues in more detail.

22   That might be a better venue to chat about this in --

23             THE COURT:  And I, quite frankly, I don't know if

24   the -- I think we have it set right now for January of 2020.

25   Is that correct?

1      MR. STONE:  That's the trial date, yes, Your Honor.

2      THE COURT:  I don't -- Is that realistic?

3      MR. STONE:  Well --

4      THE COURT:  I mean, ten million documents?

5      MR. STONE:  I think the one thing that is clear, Your

6  Honor, is that defense does need to have access to a database

7  where they can search through these documents.  We have

8  provided the information as it's always provided in these big

9  cases and has been for a decade or so.

10      THE COURT:  Have you had many cases with ten million

11  documents?  I know you tried a case in here that was 70 or 100

12  counts.  I can't recall what case it was.  But was that case --

13      MR. STONE:  That was the Audette case, Your Honor.

14      THE COURT:  Was that at least a million documents?

15      MR. STONE:  I don't think that was a document

16  intensive case, and certainly other cases that our office does,

17  they vary.  But in terms of this case, there's a huge amount of

18  documents.  No one's disputing that.  Ten million is a lot.  We

19  saw in civil litigation that amount of documents.  And how

20  they're produced in civil litigation is in this format so that

21  the other side can plug it in to a Relativity or a Concordance,

22  and then they can search.  That's what needs to happen here.

23      THE COURT:  Thank you.

24      MR. PICCARRETA:  What the courts look at is the civil

25  case is sort of on equal footing, you know, AT&T is suing

1    Mountain Bell or something like that.

2              THE COURT:  You have the resources to have a team of

3    individuals, dozens of individuals looking through ten million

4    documents.

5              MR. PICCARRETA:  And we don't have that team, and the

6    funds have been seized, where it will at least make a step

7    forward toward that team.  So that's creating some of the

8    difficulty.  Where it is now, I don't think the January 2020

9    date is realistic if you just even think about looking at those

10   documents, apart from digesting them.

11             And that's why it's going to be important as we narrow

12   the government's theory of prosecution, that might narrow the

13   field of documents.

14             I do have one experience.  I had a case with about two

15   or three million documents and had a seven- to eight-month

16   trial in state court.  And that that took a few years from

17   arraignment to trial.

18             THE COURT:  I appreciate that.  That takes us to the

19   last issue that we have this morning.  And, Mr. Stone, this is

20   the issue that the lawyer from out of town is going to argue?

21             MR. STONE:  Mr. Kucera out of the Central District of

22   California, yes, Your Honor.

23             THE COURT:  Thank you very much.

24             MR. KUCERA:  Yes, Your Honor.  I'm on the line.  John

25   Kucera on behalf of the United States.

1          THE COURT:  Sir, how do you spell your last name?

2          MR. KUCERA:  K-u-c, as in cat, e-r-a.

3          THE COURT:  Sir, I'm just going to ask you to, since

4     we have a bit of --

5          We have some attorneys walking out of the courtroom in

6     open session.  Mr. Stein?

7          MR. STEIN:  Yes, sir.

8          THE COURT:  Are you leaving us?

9          MR. STEIN:  I was planning to, Your Honor.  I didn't

10    think this issue affected us.  If you'd like me to stay, I'm

11    happy to stay.

12         THE COURT:  No.  I just -- We usually don't have

13    lawyers just walking out, but you two both have a wonderful

14    weekend, and I appreciate you coming in.  Thank you.  Is there

15    anybody else that wants to walk out?

16         MR. KUCERA:  To be fair, Your Honor, I get that a lot.

17         THE COURT:  Sir, go ahead.  This is the government's

18    application for an order regarding criminal forfeiture of

19    property in government custody, which is document number 282.

20         Sir, do you have any arguments you would like to place

21    on the record?  I thought all the motions in this case have

22    been sufficiently pled, but I'll allow you to argue.

23         Did we lose him again?

24         THE CLERK:  No.  Mr. Kucera, are you there?  I guess

25    not.

```
1           THE COURT:  Mr. Stone or Mr. Kozinets, do either one

2   of you know the arguments that your co-counsel from California

3   is trying to advance?

4           MR. STONE:  No, Your Honor.

5           THE CLERK:  Mr. Kucera?

6           MR. BIENERT:  Judge, we might be able to solve the

7   problem.

8           THE COURT:  Go ahead.  And, sir, again, I know your

9   name, but for the record.

10          MR. BIENERT:  Sure, Your Honor.  Thomas Bienert on

11  behalf of Mr. Larkin.  And I think other defendants have joined

12  this.  The one thing I do want to point out is if Your Honor

13  remembers what this particular issue is in the pleadings, it's

14  a request by the government that you in essence address this

15  now.  And our position is we've got a judge in California,

16  Judge Klausner, federal judge, who is already in the midst of

17  addressing it.

18          And the only thing I would say is given the technical

19  difficulties we're having, to the degree that Your Honor might

20  have to move this, I would just suggest -- and I realize I'm

21  the only one speaking.  Government is present, but Mr. Kucera

22  is not apparently on the phone.  But it's in the pleadings that

23  this is pending in California.

24          THE COURT:  I just need to know if the hearing that

25  was scheduled for 24 September in the Central District, if it
```

UNITED STATES DISTRICT COURT

1    went forward or not.

2                MR. BIENERT:  That's what I was going to advise you,

3    Your Honor.  He took it under submission, and so he told us we

4    didn't need to come for oral argument.  He took all the papers.

5    And we expect that he'll be issuing an order.  So I would just

6    suggest that if there's a delay, we just push this back until

7    after we hear from Judge Klausner.

8                THE COURT:  Thank you very much.

9                THE CLERK:  Are you there, Mr. Kucera?  Mr. Kucera?

10               MR. KUCERA:  Yes, I'm here.

11               THE COURT:  Mr. Kucera, we keep losing you.  Are you

12   on a hard line or cell phone?

13               MR. KUCERA:  I'm on a hard line, Your Honor.  I'm at

14   my office calling from my desk.

15               THE COURT:  Okay.  We have an echo in the courtroom.

16   It seems to be from my end, but go ahead.

17               MR. KUCERA:  I can be very brief, Your Honor.  Aside

18   from the pleadings, the only thing new to add is the factual

19   development that a week ago today last Friday, the government

20   filed civil forfeiture cases in all of the -- pertaining to all

21   of the assets that are presently before this Court relating to

22   the protective order.

23               Today we are amending those complaints and also

24   including all of the other assets that the United States has

25   sought to forfeit in this entire matter, both civilly and

1    criminally.  So complaints have now been filed on all the

2    assets that the government is seeking to forfeit at this point.

3         The government's position is that the defendants'

4    motion in California is best described as one pursuant to

5    Rule 41(g), which is a return of property.  To the extent that

6    this Court in Arizona believes that there's any forum shopping,

7    again an allegation the government denies, but to the extent

8    Court believes that that is even optically a problem --

9         THE COURT:  Okay.  Hold on.  Hold on just a minute.

10   Why should this Court issue an order on the same warrants upon

11   which the challenges are pending in another court?

12        MR. KUCERA:  Because, Your Honor, these assets are

13   being sought pursuant to criminal forfeiture as well as civil.

14   And I believe it is almost always the case that criminal is

15   leading the charge on how these cases get resolved.

16        THE COURT:  So you agree that I should stay this

17   motion until it's resolved in the Central District of

18   California?

19        MR. KUCERA:  No, Your Honor.  The government's

20   position is -- To be fair, Your Honor, the government's

21   position is that this is not technically a necessary motion,

22   that the government already possesses these assets and does not

23   need this sort of comfort order.  I mean, it's more than a

24   comfort order but this sort of housekeeping order that

25   clarifies that these assets are also being sought and deserve

1    protection in the Arizona court pursuant to the indictment and

2    the forfeiture allegations that were filed along with that

3    indictment.

4         But now that there is a -- that there are criminal --

5    there are civil cases filed in California, the government will

6    seek to stay the case in California, which makes everything --

7    everything thereafter should be held, should be done -- As soon

8    as the government gets that motion granted, everything

9    thereafter should be done in Arizona.

10        And any motions that defendants want to make should be

11   made there, and the government would of course not object to

12   any appropriate and renewed motions before the Court in

13   Arizona.

14        THE COURT:  Is there any defense counsel that would

15   like to place a position on the record?

16        MR. BIENERT:  Yes, Your Honor.  Obviously we have

17   briefed -- Thomas Bienert again for Mr. Larkin.  Obviously we

18   have briefed this subject.  Every now and then, Your Honor,

19   while you're in the business with your clerks of going through

20   reams of paper and carefully trying to figure out,

21   intellectually decide the law, et cetera, the easiest thing is

22   to step back from what's really going on.

23        The government's position in this case is that it was

24   able to ex parte, without any of our knowledge, seize over

25   $100 million of our various clients' assets as of April, six

months ago.

And it's current position, now that we've challenged the seizures and the place they seized them, because we say it was an illegal seizure marred by misconduct, their position is we need to wait until after the trial, which at best would be in January of 2020 -- and as Your Honor indicated, there's so many documents and things in this case, it may not even happen then -- before we can even get a hearing that is adversarial to decide whether they could take our hundred million dollars.  I would submit that at a ninth grade civics class lesson, that position is offensive to what we all know is our system of due process.

But as is usually the case, there is case law that gives us the answer.  And as we point out in footnote two of document 304, this is a First Amendment case.

The First Amendment clause is very clear.  You are not allowed to seize pretrial proceeds or materials from First Amendment matters without a full evidentiary hearing.

The *Fort Wayne Books* case, Supreme Court case law says that and in particular the *Adult Video Association versus Reno* case sums it up:  "The First Amendment will not tolerate such seizures until the government's reasons for seizure weather the crucible of an adversary hearing."

We've been trying to get an adversary hearing for six months when the government had an affirmative obligation to tee

```
1    one up.  It didn't.

2         We teed one up, because not only are we entitled to a

3    hearing, but we believe they misled the judges in California

4    into getting the ex parte warrants.

5         As I stand here now, six months into it, Mr. Kucera

6    and the government still will not address the issue of our

7    adversary hearing here.  And I'll be honest with Your Honor.

8    From my client's standpoint, it doesn't matter whether some guy

9    kicked his door in at night and took his assets or whether

10   somebody used a fraud scheme or whether somebody purportedly

11   with government paper allowing an ex parte seizure did it.

12   We're entitled to a hearing to see if under the First Amendment

13   and under the laws that seizure weathers the crucible of an

14   adversary hearing.

15        And the government is going through, I would submit, a

16   circular, misleading argument to try to enable themselves to

17   keep these things without our constitutionally entitled hearing

18   by kind of playing us off one another.

19        THE COURT:  Let's do this.  What relief are you

20   requesting?  Obviously you see what the government's filed.

21   What is the defense requesting?

22        MR. BIENERT:  What I'm ask requesting from Your Honor

23   is that you deny the motion to make an order with no hearing

24   that they can unilaterally hold onto our assets until our trial

25   is over, because that's in essence what their application to
```

1    you is, and that you, among other reasons, recognize that this

2    very issue is before Judge Klausner in the Central District of

3    California where he has our paperwork on the evidentiary

4    aspects and has indicated to us that he will issue a ruling.

5              Stated another way, bedrock law says the government

6    cannot take my property without an adversarial hearing that

7    tests by a judge or a proper tribunal whether they can

8    pretrial.  It's never happened.

9              And what the government is doing is a little sleight

10   of hand, is the only place they purported to properly seize our

11   property was the ex parte warrants in California that we're

12   challenging.  But they now say because we came in and added

13   them as a notice provision forfeiture count in an indictment,

14   we can now just keep them without a hearing.

15             The bottom line is the government can't keep our

16   assets pretrial without an evidentiary hearing where we have a

17   chance to participate to establish to the appropriate court

18   that they have shown that the assets in question are likely

19   from or the probable cause that they were obtained from a

20   criminal act and that there is tracing that shows that each of

21   the dollars or equivalence of dollars that they took goes back

22   to the alleged criminality.

23             That has never happened.  We're entitled to it.  And

24   as is laid out -- I don't know if Your Honor saw it, because we

25   put at least our first salvo, the filing in California, we made

1    an exhibit to our filing here.

2          We have laid out the various ways that the ex parte

3    application process was improper.  But what's more troubling is

4    what is textbook, hornbook law is we have a right to a prompt

5    hearing on this.

6          And what's really weird about this, Your Honor -- I've

7    been doing this 32 years; I've never seen it -- this is an

8    ongoing deprivation.  From the day the government seized our

9    first dollar, we were entitled to a prompt hearing.  And we

10   still don't have it.

11         And the government's in essence telling you rubber

12   stamp that we can keep this until sometime in 2020.  And if we

13   lose the case, okay, well, we agree they get their stuff back

14   two years later, having been deprived of it all.  And if we win

15   the case, we have a right to then establish and trace it to

16   the allege -- to the crimes that if they won, they have won.

17   That's crazy.

18         So we would ask that Your Honor just decline their

19   motion, to make a ruling on this issue and allow the process to

20   work in front of Judge Klausner where it sits.

21         THE COURT:  Thank you very much.  Is there anything

22   else from the government?

23         MR. KUCERA:  Just briefly, Your Honor.  This is the

24   first I'm hearing about any type of misconduct.  Obviously any

25   specific allegation the government would be interested to hear

1    and have an opportunity to defend themselves.

2            THE COURT:  I'm sorry.  Whoa.  Whoa.  Whoa.  Stop.

3    Stop.  Stop.  That's one of the problems that we have when we

4    have someone calling in telephonically.  There's a brief echo.

5            So I need you to talk really slow so our court

6    reporter can pick up everything that you say, and we can all

7    understand what you're saying.  Can you do that?

8            MR. KUCERA:  Certainly.

9            THE COURT:  Go ahead.

10           MR. KUCERA:  Okay.  I'm just trying to understand

11   whether I was being accused of misconduct.  If I am, I think

12   that, you know, I should probably have an opportunity to flesh

13   that out with defense counsel at some point.

14           But more to the point on the motion, one of the

15   perverse things about defense position is they're asking for a

16   hearing, and they've cited no law that gives them the right to

17   a hearing.  They're making noises about the First Amendment,

18   but they're making no distinction between the proceeds of

19   criminal activity and something more akin to like a prior

20   restraint.  The government is not seeking to prohibit any type

21   of First Amendment activity.  It is seeking the proceeds of

22   criminal acts.

23           The other -- The motion that defendants have filed in

24   California state no basis for their motion other than relying

25   on one case, a case, *Roth*.  And, perversely, *Roth* is pursuant

1     to the section of the Code at 853(e) that is before Your Honor

2     21 U.S.C. 853(e).

3            That's where *Roth* gives you the opportunity for a

4     hearing.  So the hearing they're requesting is possible under

5     the law in Arizona, but no such hearing has any foundation in

6     law in the civil cases in California.

7            Potentially they might have a *Monsanto*, an opportunity

8     for a *Monsanto* or/and *Jones-Farmer* type hearing where they can

9     say that they need this money in order to pursue their criminal

10    defense.

11           But those cases require that defendants first come

12    forward with some evidence that they have no other funds that

13    have not been sought pursuant to forfeiture or have not been

14    seized.

15           We have negotiated with defense counsel and given them

16    exactly that opportunity outside of litigation to come forward

17    and provide us with any evidence that suggests that they no

18    longer have any funds to be able to defend themselves.

19           They've declined to do so, saying that it was

20    inappropriately seeking discovery from the defense.

21           So in the government's motions in California, we've

22    set forth that if they wanted to seek any motion to be heard

23    pursuant to *Monsanto* or some other articulable basis under the

24    law, the government would of course proceed.  But they've not

25    enunciated anything like that.

1          The one case that they have cited to show that they

2     get a hearing in court is *Roth*, and that case shows that they

3     should be seeking that hearing in front of this Court in

4     Arizona.

5          I will also note that under *Monsanto*, the protective

6     order that the government is seeking is considered to be

7     mandatory if the government makes its showing that these assets

8     are potentially subject to dissipation, that there's probable

9     cause to show that, and *Moffitt*, a Fourth Circuit case, shows

10    that a bill of particulars attached to an indictment is a

11    sufficient showing of probable cause to do just that.

12         Admittedly, there is not Ninth Circuit precedent, Your

13    Honor.  That being said, the government did more than simply

14    have a bill of particulars in this case.  It presented

15    evidence, substantial evidence, to the grand jury tying the

16    assets to the criminal act.

17         THE COURT:  Is there anything else from the

18    United States that's present here in Arizona?

19         MR. KUCERA:  Nothing else, Your Honor.

20         MR. STONE:  No, Your Honor.

21         THE COURT:  Is there anything from any defense

22    counsel?

23         That's a negative response from all the defense

24    counsel.

25         All of the motions are taken -- I'm sorry, sir.

1    Did --

2              Sir, for the record, I know who you are, but there's

3    a lot of you.

4              MR. BIENERT:  Thomas Bienert.  I'll close with this.

5    All the things he just said he didn't brief for you.  They're

6    briefed in California.  I could go on in a lot of ways to

7    respond to this, and I have Ms. Ramachandran, who's an asset

8    forfeiture specialist who could respond to it.

9              It hasn't been briefed.  I would submit that Your

10   Honor should not regard -- make any decisions on this on things

11   that weren't even briefed and that based on what's in front of

12   you, you should decline to take any action until we get a

13   ruling from Judge Klausner.

14             THE COURT:  The hearing's adjourned.  Everyone, have a

15   wonderful long weekend.

16             MR. KUCERA:  Thank you, Your Honor.

17        (Proceedings recessed at 12:36 p.m.)

18

19

20

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 6th day of October,

12   2018.

13

14

15                              s/Linda Schroeder
                          Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**