1  Paul F. Eckstein (#001822)
   PEckstein@perkinscoie.com
2  Daniel C. Barr (#010149)
   DBarr@perkinscoie.com
3  John H. Gray (#028107)
4  JHGray@perkinscoie.com
   PERKINS COIE LLP
5  2901 North Central Avenue, Suite 2000
6  Phoenix, Arizona 85012-2788
   Telephone: 602.351.8000
7  Facsimile: 602.648.7000
8  DocketPHX@perkinscoie.com

9  Kathleen E. Brody (#026331)
   KBrody@acluaz.org
10 ACLU Foundation of Arizona
11 3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
12 Telephone: 602.650.1854

13 *Attorneys for Amicus ACLU of Arizona*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>  v.<br><br>Michael Lacey, et al.,<br><br>        Defendants. | No. CR-18-422-PHX-SMB<br><br>**ACLU OF ARIZONA'S *AMICUS CURIAE* BRIEF REGARDING FIRST AMENDMENT CONSIDERATIONS** |

## I. Amicus ACLU of Arizona's Interest

The ACLU of Arizona, the state affiliate of the national American Civil Liberties Union ("ACLU"), is a statewide nonpartisan, nonprofit organization of over 14,000 members throughout Arizona dedicated to protecting the constitutional rights of all. The fight for freedom of speech has been a bedrock of the ACLU's mission since the organization was founded in 1920, driven by the need to protect the constitutional rights of conscientious objectors and anti-war protesters. The ACLU's work to protect freedom of expression has continued over the last century, including consistent efforts to combat censorship of private citizens and the media. The ACLU of Arizona frequently files amicus curiae briefs in state and federal courts on a wide range of civil liberties and civil rights issues. The ACLU of Arizona files this amicus brief to advise the Court on important First Amendment principles implicated by this prosecution.

## II. Introduction

The First Amendment's guarantee of freedom of speech prohibits the government from prosecuting someone for making another person's speech available to the public without proving that the defendant either specifically intended to further unlawful activity or knew the specific contents of the unlawful speech. The Supreme Court protected those freedoms during the newspaper, bookstore, and periodical age (the "Print Age"). That precedent has stood into the Internet Age and should not be washed away simply because the speech at issue here appeared in an online forum rather than in a newspaper classified section, magazine advertisement, or adult section of a bookstore. Rather, that precedent is even more relevant and more justified in the Internet Age, where the volume of material published each hour exceeds the material published in the Print Age each year.

If people fear the sword of criminal liability when they provide an online forum where others might post both protected and unprotected speech, then they will self-censor and restrict even protected speech out of fear of prosecution. Alternatively, they will shut down their websites completely because the burden of manually checking every single third-party post and trying to judge for themselves which posts can stay or go would be

impractical to any business. To avoid this chilling effect, the Court should refuse to impose criminal liability absent proof beyond a reasonable doubt that the defendants specifically intended to further unlawful activity or knew the content of each allegedly illegal post.

### III. The First Amendment's longstanding protection against criminal liability for distributing speech should apply no matter the medium.

The Supreme Court has long cautioned against imposing criminal liability against a person for distributing others' speech without showing something more than mere high-level knowledge or risk that the speech might relate to illegal conduct. In *Smith v. California*, the Supreme Court considered whether the government could impose criminal liability on a bookseller for selling obscene books without first showing that the bookseller knew the contents of those particular books. 361 U.S. 147, 150–54 (1959). The Court held it unconstitutional to "dispens[e] with any requirement of knowledge of the contents of the book on the part of the seller." *Id.* at 153.[1]

By explaining the free speech concerns of imposing criminal liability on a person who distributes another's speech, the Court indicated that the First Amendment protects a defendant who does not know what *each* allegedly obscene book said. According to the Court, under the fear of criminal prosecution, the bookseller would "tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature." *Id.*; *see also id.* at 150-51 (cautioning against applying criminal statutes where doing so has "the collateral effect of inhibiting the freedom of expression, by making the individual more reluctant to exercise it"). In other words, the First Amendment forecloses criminal liability when the bookseller's only alternative is to "make himself aware of the contents of *every book* in his shop" and try to guess if he or she will face criminal liability for allowing that speech to reach the public's eye. *See id.* (emphasis added). That demand "would be altogether unreasonable." *Id.*

---

[1] Specific intent to further unlawful activity may also pass muster under the First Amendment as an alternative mens rea standard.

But, as *Smith* found, the cost does not end with the one who distributes the speech: the true cost falls on the public. "[B]y restricting [the bookseller,] the public's access to reading matter would be restricted. If the contents of bookshops and periodical stands were restricted to material of which their proprietors had made an inspection, they might be depleted indeed." *Id.* The bookseller would self-censor to allow only that "material with which he could familiarize himself" "in the face of his absolute criminal liability." *Id.* The end result is that the public is deprived of *both* protected and unprotected speech. *See id.*

That *Smith* examined a strict liability statute does not disrupt its guidance here. The Supreme Court outlined the chilling effect on speech where the government imposes criminal liability without showing that the defendant at least knew about the allegedly unlawful speech at issue. *Id.* ("By dispensing with any requirement of knowledge of the contents of the book on the part of the seller . . . [e]very bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop. It would be altogether unreasonable to demand so near an approach to omniscience.") (citation omitted); *see also Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 493 (1962) (extrapolating from *Smith* that the First Amendment requires that the allegedly improper speech was "shown to" the defendant to allow the "opportunity to judge for himself as to its alleged obscenity").

The Supreme Court's warning in *Smith* has stood the tests of time and practical application. Of particular relevance here, the Supreme Court addressed the free speech consequences of objectionable advertisements in periodicals in *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 493 (1962). The *Manual Enterprises* Court analyzed the Comstock Act, which imposed criminal and civil penalties against anyone who transmitted obscene periodical advertisements through the mail. The Court held that the company's president could not be liable under the law where there was "no evidence that any of this material was shown to him" so that he "was afforded no opportunity to judge for himself as to its alleged obscenity." *Id.* Channeling *Smith*'s warning, the Court explained, "Since publishers cannot practicably be expected to investigate each of their advertisers, and since the economic

consequences of an order barring even a single issue of a periodical from the mails might entail heavy financial sacrifice, a magazine publisher might refrain from accepting advertisements from those whose own materials could conceivably be deemed objectionable by the Post Office Department." *Id.* As with the bookstore in *Smith*, the end result is to "deprive such materials, which might otherwise be entitled to constitutional protection, of a legitimate and recognized avenue of access to the public." *Id.*

Courts have built on *Smith* in similar contexts, consistently recognizing the chilling effect on speech of imposing liability on distributors who do not know the contents of each item of allegedly unlawful speech.[2] *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 67, 69 (1994) (striking down statute that prohibited distributing visual images of minors engaged in sexually explicit conduct, noting first that Supreme Court precedent required that "the defendant possess knowledge of the *particular* fact that *one performer* had not reached the age of majority at the time the visual depiction was produced" and that "some form of scienter is to be implied in a criminal statute even if not expressed") (emphasis added); *Hunt v. State of Okl.*, 683 F.2d 1305, 1307–08 (10th Cir. 1982) (requiring that the government prove that a criminal defendant "had knowledge of the contents of the material he distributed, and that he knew the character and nature of the materials"); *cf. Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 687-90 (8th Cir. 1992) (relying on *Smith* in civil context, striking down statute that prohibited renting or selling violent videos to minors without requiring knowledge or intent, noting that "any statute that chills the exercise of First Amendment rights must contain a knowledge element" and warning that a defendant wanting "to avoid criminal liability" would "have to view the contents of *every video* in their stores" and instead would choose to "limit videos available to the public to the videos the dealers have viewed") (emphasis added).[3]

---

[2] Whether the solicitation advisements cited in the superseding indictment are protected under the First Amendment is beyond the scope of this brief.
[3] The First Amendment standard in civil cases might be lower than in criminal cases, but civil cases are at least instructive by analogy where courts found that statutes infringe on free speech rights *even* in the civil context.

1    Only the medium has changed—from the bookstores and periodical pages to the
2    Internet—but the First Amendment should still protect a defendant from liability where that
3    defendant did not at least know the specific contents of the speech at issue. Commentators
4    have echoed this view and urged courts not to restrict First Amendment protections in the
5    online criminal context. The prime example appeared in the *Stanford Law & Policy Review*
6    and referenced the ongoing Backpage dispute. Lawrence G. Walters, *Shooting the*
7    *Messenger: An Analysis of Theories of Criminal Liability Used Against Adult-Themed*
8    *Online Service Providers*, 23 Stan. L. & Pol'y Rev. 171 (2012). That article explained that
9    "criminal liability has never been extended to mere advertisers of individuals who later
10   engage in prostitution." *Id.* at 194. Rather, the First Amendment should protect an online
11   "advertising forum for such individuals that may later engage in unlawful conduct." *Id.*
12   Issuing the same warning that *Smith* gave decades ago for booksellers, the article explained
13   that online service providers would behave no differently than the Supreme Court
14   anticipated booksellers would behave if under the threat of criminal prosecution for the
15   material they distribute. When internet companies face "uncertain or intolerable legal
16   exposure," they would be "inclined to cease offering a forum for communication if the risks
17   are too high to justify the anticipated profit. The forum of communication will then cease
18   to exist." *Id.* at 174. The article emphasized the importance of this First Amendment battle,
19   arguing that potential "criminal liability for [online service providers] . . . must be clarified
20   if the Internet is to continue to function, free of government-encouraged self-censorship."
21   *Id.* at 190-91.

22   **IV.   Conclusion**

23   The Court should hold the government to its burden to prove beyond a reasonable
24   doubt that the defendants knew that specific advertisements in question solicited illegal
25   conduct: it should not to open the door to criminal liability merely for providing an online
26   forum where others might have posted improper content. Because the "fundamental
27   freedoms of speech and press have contributed greatly to the development and well-being
28   of our free society and are indispensable to its continued growth[,] . . . [t]he door barring

federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." *Smith*, 361 U.S. at 155. Even when the government aims at preventing prurient conduct, the Court should not "open[] that door too far." *Id.* This is not to say that every website operator can escape criminal liability. But the Supreme Court has long established that the proper amount to "open the door" is to require at least knowledge of the specific problematic content, if not also specific intent to further criminal conduct, and not to impose an impossible burden leading to state-mandated self-censorship.

Dated:  May 28, 2019

**PERKINS COIE LLP**

By: *s/ Daniel C. Barr*
Paul F. Eckstein (#001822)
Daniel C. Barr (#010149)
John H. Gray (#028107)
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

**ACLU FOUNDATION OF ARIZONA**
Kathleen E. Brody
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013

*Attorneys for Amicus ACLU of Arizona*

**CERTIFICATE OF SERVICE**

☒   I hereby certify that on May 28, 2019, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Marie van Olffen*

78204-0012/144495907.3