Thomas H. Bienert, Jr. (CA State Bar No. 135311, *admitted pro hac vice*)
    tbienert@bmkattorneys.com
Whitney Z. Bernstein (CA State Bar No. 304917, *admitted pro hac vice*)
    wbernstein@bmkattorneys.com
BIENERT KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Attorneys for James Larkin*

Gary S. Lincenberg (CA State Bar No. 123058, *admitted pro hac vice*)
    glincenberg@birdmarella.com
Ariel A. Neuman (CA State Bar. No. 241594, *admitted pro hac vice*)
    aneuman@birdmarella.com
Gopi K. Panchapakesan (CA State Bar No. 279586, *admitted pro hac vice*)
    gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

*Attorneys for John Brunst*

Additional counsel listed on following page

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CASE NO. 2:18-cr-00422-SMR |
| Plaintiff, | **DEFENDANTS' MOTION TO COMPEL DISCOVERY** |
| vs. | |
| Michael Lacey, *et al.*, | Assigned to Hon. Susan M. Brnovich, Courtroom 506 |
| Defendants. | |

Robert Corn-Revere (D.C. State Bar No. 375415, *admitted pro hac vice*)
    robertcornrevere@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4225
Facsimile: (202) 973-4499

James C. Grant (WA State Bar No. 14358, *admitted pro hac vice*)
    jamesgrant@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104-1610
Telephone: (206) 757-8096
Facsimile: (206) 757-7096

*Attorneys for Michael Lacey and James Larkin*

Paul J. Cambria, Jr. (NY State Bar No. 1430909, *admitted pro hac vice*)
    pcambria@lglaw.com
Erin E. McCampbell (NY State Bar No. 4480166, *admitted pro hac vice*)
    emccampbell@lglaw.com
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite #120
Buffalo, NY 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580

*Attorneys for Michael Lacey*

Bruce Feder (AZ State Bar No. 004832)
    bf@federlawpa.com
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, AZ 85016
Telephone: (602) 257-0135
Facsimile: (602) 954-8737

*Attorneys for Scott Spear*

David Eisenberg (AZ State Bar No. 017218)
    david@deisenbergplc.com
DAVID EISENBERG, P.L.C.
3550 N. Central Avenue, Ste. 1550
Phoenix, Arizona 85012
Arizona State Bar No. 017218
Telephone: (602.237.5076

*Attorneys for Andrew Padilla*

Additional counsel listed on following page

Joy Bertrand (AZ State Bar No. 024181)
    joyous@mailbag.com
JOY BERTRAND, ESQ.
PO Box 2734
Scottsdale, Arizona 85252-2734
Telephone: 602-374-5321
Fax: 480-361-4694

*Attorneys for Joye Vaught*

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT……………………………………………………..1

II.   INTRODUCTION ............................................................................................. 1

III.  BACKGROUND.............................................................................................. 3

   A.  The Government's Seizures of Backpage's I.T. Systems, Servers, Databases, and Data. 3

   B.  Defendants Requested that the Government Preserve the Backpage I.T. Systems, Servers, Databases, and Data in a Fully Functional Format. .................................................. 4

   C.  The Government's Production of "Imaged" Data. ....................................... 5

   D.  Defendants Requested Specific Data from Backpage's Servers and Databases............. 7

   E.  The Government Refused to Provide Any Discovery in Response to Defendants' Requests................................................................................................. 8

IV.   ARGUMENT................................................................................................... 9

   A.  Defendants Are Entitled to Discovery of Information That May Be Material to Their Defense................................................................................................. 9

   B.  Access to the Actual Data and Databases from the Backpage Servers, in a Functional Format, is Unquestionably Material to the Defense............................................ 9

      1.   Information Regarding Backpage's Moderation Practices. ....................... 10

      2.   Information Regarding the Alleged "Victim" Ads Referenced In the Indictment. ... 11

      3.   Information Regarding the Backpage Website Generally is Material to Preparing the Defense............................................................................................... 13

      4.   Information Regarding Backpage's Alleged Aggregation Practices.......................... 14

      5.   Information Regarding Alleged "Reciprocal Link" Agreement. .............................. 15

   C.  The Government's Purported Justifications for Denying Critical Discovery to Defendants Fall Flat................................................................................ 16

V.    CONCLUSION ............................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Backpage.com, LLC v. Cooper,*
   939 F. Supp. 2d 805 (M.D. Tenn. 2013)............................................................... passim

*Brady v. Maryland,*
   373 U.S. 83 (1963) ............................................................................................... 9

*Giglio v. United States,*
   405 U.S. 150 (1972) ............................................................................................. 9

*Strickler v. Greene,*
   527 U.S. 263, 119 S. Ct. 1936 (1999) ................................................................... 9

*United States v. Hernandez-Meza,*
   720 F.3d 760 (9th Cir. 2013) ................................................................................ 9

*United States v. Soto-Zuniga,*
   837 F.3d 992 (9th Cir. 1992) ................................................................................ 9

**Statutes**

18 U.S.C. § 1952 ............................................................................................................ 1

**Rules**

Fed. R. Crim. P. 16(a)(1)(E)(i) ..................................................................................... 9

## I.   **PRELIMINARY STATEMENT**

Defendants have moved to dismiss the government's Superseding Indictment, as it fails to allege crimes against Defendants under governing standards of the First Amendment and the Travel Act, 18 U.S.C. § 1952.  *See* Dkt. 561 (Defendants' Motion to Dismiss).  Defendants believe that dispositive motion will obviate discovery issues in the case, as the case should be dismissed.  However, the case is currently governed by a scheduling order that Defendants cannot meet, among other reasons, because the government has not met its discovery obligations.  At its status conference on April 23, 2019, the Court suggested that changing the scheduling order because of discovery issues would be premature absent a motion to compel missing discovery.  The parties are appearing next week to discuss the scheduling order with the Court, and the government has still not remedied significant discovery issues.  Thus, Defendants file the instant Motion to Compel Discovery.

## II.   **INTRODUCTION**

The government has refused to provide Defendants with the most basic discovery at the heart of the case, namely Backpage servers and the databases and material that existed on those servers, in a functional and operational format.  The government seized Backpage.com's I.T. systems – and all the servers, databases, and data they contained and that ran the website – at the outset of this case.  Shortly after the seizures, Defendants notified the government of the importance of preserving the website systems and data intact.  The government seized 106 servers in all, and, to date, has produced only "images" of data from five of the servers while allowing Defendants to look at the outside of some of the other servers.[1]  However, what Defendants need (and have requested) is the databases and information on those servers, with all of the connections, software and systems operational so they can access, search, view, and analyze information about the website and its actual operations.

This information is critical to Defendants' ability to prepare their defense.  The

---

[1] These figures relate to physical servers; a single physical server could (and did) host numerous virtual servers.

government acknowledged the materiality of this data in its warrant applications to seize the servers, but now denies Defendants any useful access to that data. The functioning databases provide ready access to backend information about any given ad, enable searches for related ads, reflect moderation for ads, provide payment information, and more. For example, where the government challenges particular user ads, the databases and systems can be used to display the ads, to determine if Backpage edited, blocked, or removed the ads, and to determine if Backpage reported the ads to authorities. While the government claims Backpage routinely edited ads to eliminate terms "indicative of prostitution," the databases can be used to show that Backpage actually employed automated filters to screen the millions of ads posted each month for thousands of inappropriate terms, references, and links and for malicious content (as is customary for websites), and also blocked and removed large numbers of ads entirely. *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 814 (M.D. Tenn. 2013) (Backpage blocked and removed 1,000,000 ads per month as of April 2012).

At the April 23, 2019 status conference, the government said it had asked Defendants to identify data they wanted to be extracted from Backpage's servers and committed to provide such data. On May 23, 2019, Defendants sent the government a detailed letter identifying specific requests for information needed, while requesting, first and foremost, that the government provide access to the servers and databases with the same functionality and in the same condition and configuration as when they were seized, to enable Defendants to search, collect, and analyze information for themselves. *See* Exh. A. Contrary to its representations to the Court, the government responded with a blanket refusal, asserting that it had no obligation to extract data as requested by Defendants. Exh. B. As for Defendants' request for access to the functioning servers, databases, and systems that ran the Backpage website, the government said nothing.

Defendants therefore ask the Court to compel the government to provide Defendants access to Backpage's systems, servers, databases, and data, functioning as they did at the time of their seizure, or, alternatively, to recreate the databases and systems to allow functional access to the data and information as it existed at the time of the government's seizures. Defendants

2

further request that the Court compel the government to produce the data and information identified in Defendants' May 23, 2019 letter, which is summarized (along with explanations for relevance of the respective requests) in Exhibit L.

## III.   **BACKGROUND**

### A.   **The Government's Seizures of Backpage's I.T. Systems, Servers, Databases, and Data.**

The government began seizing Backpage servers and databases at the same time that it issued the first indictment in this case and arrested Defendants.  On April 5, 2018, the government obtained a warrant from Magistrate Judge Willett of this Court to seize servers hosted by DesertNet for Backpage, located in Tucson, and the government apparently executed that warrant on April 6, 2018.  *See* Exh. C at 1.  The government reportedly seized the servers maintained by Backpage itself, located in Dallas, on or about April 11, 2018.  The government has since made additional seizures of other servers hosted by another vendor in Amsterdam in June 2018, although it is apparently still awaiting receipt of most of the evidence seized.  Altogether, the government has said it has 46 of Backpage's servers – 5 from Dallas, 32 from Tucson; and 9 from Amsterdam.  Exh. D at 1-2.

In its April 2018 search warrant application regarding the servers hosted by DesertNet,[2] the government represented that these servers "contain *current and historical* content of the ads that were posted on Backpage."  Exh. C at 11 (emphasis added).  The application also stated that "[t]he servers contain *all versions of an advertisement* that a user attempts to post on Backpage.  If an ad is stripped of certain words or if a photograph is removed, the server will maintain the original form of the ad.  The server also maintains payment information."  *Id.* (emphasis added).  The government further represented to the court that the servers would be "seized for an off-site search for evidence" and assured that copies of the servers would be preserved as necessary to preserve all evidence as it originally existed.  *Id.*; *see also id.* at 11-12 ("It is anticipated that mirror copies or images of such evidence will be made *if the failure to do so could otherwise potentially alter the original evidence*." (emphasis added)).  It was

---

[2] DesertNet was the primary domestic host for Backpage's data and systems.

on that basis that the magistrate judge granted the government's application to seize the servers.

The government recently reaffirmed its view of the materiality of the server databases. In its May 31, 2019 status report, the government reported that, working with Backpage's former Chief Technology Officer, it had confirmed that the databases contained all underlying data relating to a given ad, including: any "filters that were applied to ads," "[m]oderation changes or actions that would apply to all ads," moderator action logs, "[i]mages that were deleted by a moderator," and the original versions of ads posted to Backpage.com. *See* Government Status Report, Dkt. 626-4 at 13-14.

The government more recently revealed that it had seized 60 additional servers located in Amsterdam through the Mutual Legal Assistance Treaty ("MLAT") process. Transcript of April 23, 2019 Hearing, Dkt. 577 at 23:19-23:24. Although the government's representations about these servers have been inconsistent and confusing,[3] it has said that they primarily contain ad payment information. *Id.*; *see also* Exh. D. More specifically, that they housed a "Payment Processing Island," ("PPI") including, among other things: purchases of "Backpage credits that could later be used to pay for ads or upgrades" made via credit cards, prepaid debit cards, bitcoin, money orders, or gift cards; use of these credits to pay for ads; and direct payments for ads. Dkt. 626-4 at 17.

At the April 23, 2019 status conference, the government stated that it would be receiving the remaining Amsterdam servers within six weeks, Dkt. 577 at 23:19-23:21, and in its May 31 status report, the government indicated it would receive the servers last week. Dkt. 626 at 3-4. Defendants have been provided no further information about these servers and do not know if the government has even transferred them to the United States yet.

**B.      Defendants Requested that the Government Preserve the Backpage I.T. Systems, Servers, Databases, and Data in a Fully Functional Format.**

The Backpage.com website was online until April 6, 2018, when the government began

---

[3] In a December 10, 2018 letter, the government represented that it had located 31 servers in Amsterdam, but said they "did not contain pertinent data." Exh. E at 2. The government later reversed course, saying there were actually 60 servers in Amsterdam and they "contain payment processing data." Exh. D at 2.

its seizures of servers and other evidence.  The government, of course, could – and presumably did – disable the website by redirecting the D.N.S. servers for the website to a server controlled by the government and by disabling connections to the Internet, while preserving all the systems, servers, databases, and data intact.  Indeed, as noted above, in obtaining the DesertNet warrant the government assured the Court that it would preserve all evidence on the servers. *See* Exh. C at 11-12.

At the outset of this case, Defendants advised the government that they believed the Backpage servers contained exculpatory information important to their defense, and that they would need access to databases and systems with the same functionality as when they were seized.   Exh. F ("These items contain evidence which we believe is exculpatory to the defendants.  It is critical when we gain access to these items that we are able to access the servers in the same condition and configuration as when they were seized. . . . Accordingly, we request whatever individual or entities are maintaining this evidence that they maintain it in the same condition as it was seized and received by the government and take all steps to maintain its integrity.").

### C.     The Government's Production of "Imaged" Data.

Of the 106 servers seized by the government, it has produced "imaged" data from only five of them.  The government made that production on March 8, 2019 – more than three months after its Rule 16 deadline for disclosures, *see* Dkt. 131 at 1, by providing 56 disks containing over 69 terabytes of data.  Dkt. 627 at 4.  The government has not made clear what this production supposedly encompasses, except that it contains "imaged" data concerning ads from the Backpage.com website (*e.g.*, it is unclear whether this contains only ads that were live on the website when it was seized; some or all of the archived ads Backpage held; or what, if any, other information that may have been contained on these servers).  As regards the 41 other servers in the government's possession, it has only allowed Defendants' counsel to look at the unconnected, non-functioning server components sitting on tables in Pocatello, Idaho and Tucson, Arizona.  *See* Dkt. 577 at 28:12-29:13.

The "imaged" data of ads the government has produced is not what appeared on the

Backpage.com website.  Websites are made up of data and images drawn from numerous interrelated databases connected by specific software, systems, and algorithms.  *See* Exh. E (government's explanation that one Backpage server contained "over 100 separate databases to house, organize, and store data" to run the website).  Without the databases and software to connect and run the website, data from any page on a site – such as a user's ad posted on Backpage – is just a pile of disconnected data.

This is demonstrated by comparing the government's produced "image" data for a given ad to the ad as it actually appeared on the website and in Backpage's systems when they were operational.  Exh. I is one version of an ad referenced in the government's indictment, as it appeared on Backpage.com.  *See* Superseding Indictment ("SI") ¶ 201, Count 2 (Dkt. 230). Exhibit J is the government's "imaged" data for this ad, consisting of a series of spreadsheets containing more than 500 data fields and cross-references to information and images contained in other files.  Searching for and attempting to connect all the other linked data and images for the ad (assuming this is contained in the government's production) would take inordinate effort, and still it would be all but impossible to recreate the ad as it actually appeared.[4]

The government's "image" production also does not provide connections to backend administrative data available and used within Backpage's systems and databases when they were functional.  Exhibit K illustrates this; it contains a screenshot of the administrator view for an ad on the website (also called the "ad object editor"), showing the dozens of data fields that were available in Backpage's systems for each ad, including regarding whether an ad was edited, blocked, removed, or reported to NCMEC or other authorities.  While the government's "imaged" data for a given ad refers to these data fields, in the systems and databases as they existed before the government's seizures, this information could be accessed for any ad by

---

[4] The government has separately produced copies of ads cited in the indictment, but not from the Backpage servers and databases, which the government holds.  Instead, the government has produced what appear to be partial copies of ads from cell phone screenshots, what appear to be partial copies of ads that appear to have been copied and pasted from the website, copies of ads from the Wayback Machine, www.archive.org, and copies of ads that were provided by Backpage when cooperating with law enforcement authorities.  *See, e.g.*, Exh. H.

clicking a hyperlink, rather than performing a complicated search through millions of records.

Defendants do not know the current status of the Backpage systems, servers, databases, and data, but the government's statements have underscored that its production of "raw database files cannot be simply reviewed or loaded into a viewer to reconstruct the data." Exh. E at 2; *see also* Dkt. 626-4 at 17 (data from Amsterdam servers concerning payment transactions may not be connected to given ads or users). This has been confirmed by the "data images" produced by the government. The government's production gives Defendants ***none*** of the functionality of the website or its databases and systems as they existed pre-seizure.

**D.    Defendants Requested Specific Data from Backpage's Servers and Databases.**

At the April 23 status conference, the government represented that it had asked Defendants to identify information they wanted to be extracted from the Backpage servers, and the government committed to provide such requested information. The government's counsel stressed this point. *See* Dkt. 577 at 24:18-24:21 ("Your Honor, but we went a step further. We said, hey, can you articulate to us what else on these servers that you would like extracted and we can look for it and provide it to you."); *id.* at 25:5-25:7 ("We've asked them repeatedly, hey, is there anything we haven't provided[?]"); *see also* Exh. G ("So if there is specific data . . . that you believe is material to your defense, please let us know and *we will attempt to locate that data for you*." . . . "[W]e believe it would be most efficient for all parties if you could consult with Defendants and provide the government specific server data . . . that you believe is material to your defense." (emphasis added)).

Shortly after that status conference, Defendants wrote the government and made specific requests for data and information they needed to be extracted. Exh. A. The letter emphasized that "[w]hat Defendants most need is access to the Backpage.com I.T. systems, servers, and databases, functioning as they existed at the time of the government's seizures." *Id.* at 1; *see also id.* at 3 (request no. 1). The letter went on to specify 28 categories of information, along with explanations of the relevance of the requested information (although Defendants have no obligation to establish relevance). *See* Exh. A. For example, to respond to the

7

government's allegations that Backpage supposedly edited ads to take out terms "indicative of prostitution," Defendants sought information about Backpage's **actual** moderation practices to block and remove ads entirely (and to show that Backpage did not edit the text of ads as the government has alleged).  *See id.* at 4-5.  Defendants also sought information related to the alleged "victim ads" referenced in the indictment to show, for example, that, far from promoting or facilitating any illegality, Backpage actually blocked ads and cooperated with law enforcement authorities.  *Id.* at 9-11.

### E.     The Government Refused to Provide Any Discovery in Response to Defendants' Requests.

On June 3, 2019, the Government responded to Defendants' requests, refusing to produce any information in response to any request.  The government provided several unfounded (and some blatantly false) reasons for its refusal, including that: (1) Defendants "waited over a year after the indictment and discovery" to make their requests, despite Defendants' May 1, 2018 request to preserve databases and systems in a functional format, *see* Exh. F; (2) the government does not intend to inspect servers it believes contain no "unique" data, despite having not examined the servers to know their contents; (3) the government has no obligation to analyze Backpage's servers to determine whether the requested information exists, notwithstanding its commitment to extract and provide data if Defendants would identify what they needed; (4) it has no obligation to identify responsive material located on the servers or produce such material in a searchable format because this material was "provided to the government by the defense," although all of this information was seized from Backpage and its vendors and none of it came from Defendants; and (5) rather than provide discovery in this case, the government insists Defendants should search for the information they seek from data and information relating to prior civil cases against Backpage (despite that Defendants were not parties to those cases when Backpage produced documents in them).  Exh. B at 1-4.  Concerning Defendants' request for access to a functioning version of the Backpage systems, servers, and databases, the government said nothing.

IV. **ARGUMENT**

A. **Defendants Are Entitled to Discovery of Information That May Be Material to Their Defense.**

Federal Rule 16(a) requires the government to make available, upon a defendant's request, documents and other materials "within the government's possession, custody, or control" that are either "material to preparing the defense," or that the government intends to use in its case-in-chief. Fed. R. Crim. P. 16(a)(1)(E)(i). To obtain discovery under Rule 16, "[a] defendant needn't spell out his theory of the case"; "[n]or is the government entitled to know in advance specifically what the defense is going to be." *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013). "The test is not whether the discovery is admissible at trial, but whether the discovery may assist [the defendant] in formulating a defense." *United States v. Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 1992) ("it behooves the government to interpret the disclosure requirement broadly"). Instead, all that is required is that the defendant make an initial showing of materiality, which is a "low threshold" satisfied by a presentation of facts that tends to show the government is in possession of information that may be helpful to the defense. *Hernandez-Meza*, 720 F.3d at 768.

The government has a duty to disclose both exculpatory and impeaching evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); United States Attorneys' Manual ("USAM") § 9-5.001(B) ("Government disclosure of material exculpatory and impeachment evidence is part of the constitutional guarantee to a fair trial."). Moreover, the government's duty to disclose *Brady* material includes evidence "known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999). "In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [a] case, including the police." *Id.*

B. **Access to the Actual Data and Databases from the Backpage Servers, in a Functional Format, is Unquestionably Material to the Defense.**

Access to the actual databases and data from the Backpage website, in the functional form that existed when the government seized the servers, is crucial to Defendants' defense of

9

this case.  In the indictment and its pleadings and arguments, the government does not provide copies of the ads about which it complains—but merely offers its characterizations of ads on Backpage.com and practices of the website.[5]  Defendants seek access to and disclosure of the *actual* databases, information, and ads to respond to the government's mischaracterizations.  This data and information are unquestionably material, as explained below.

### 1.  Information Regarding Backpage's Moderation Practices.

A central theme of the government's indictment is its allegations that Backpage purposely edited ads to remove terms "indicative of prostitution" and then ran the ads.  *See* SI ¶¶ 11, 68.  Defendants seek data from Backpage's systems to show the website's actual practices, which expressly prohibited ads for prostitution (or other illegal acts), used automated filtering to flag thousands of potentially offensive or inappropriate terms, phrases, URLs, etc. (as many websites do), employed upwards of 100 moderators to review ads, and blocked or removed approximately 1,000,000 ads per month.  *See Cooper*, 939 F. Supp. 2d at 814.  Among other things, Defendants seek discovery of the actual ads and data because, despite its broad allegations, the government has not identified any ads that were edited as the government alleges, while Defendants believe the data will show that Backpage regularly blocked improper ads outright.  Defendants' requests concerning moderation data are clearly relevant to the government's allegations about Backpage's practices.  *See* Exh. L at 2-7 (requests nos. 7-13).

In its June 3 letter, the government inexplicably responds that Defendants' requests regarding moderation are "based on the false premise that each original ad is available in the database for review to determine what changes, if any, were made to it."  Exh. B at 6.  The government's position is entirely at odds with its prior representations.  As noted above, when

---

[5] Indeed, in many instances the government offers its characterizations of others' characterizations of or accusations about Backpage.  The government's reliance on the report of the U.S. Senate Permanent Subcommittee on Investigations is an example, as that report contained numerous mischaracterizations of and inaccuracies regarding Backpage's moderation practices, which the government now repeats and embellishes here.  Of course, the Senate Report and its purported facts and conclusions clearly would not be admissible as part of the instant case.

the government sought permission to seize the Tucson servers, it told Magistrate Judge Willett that the servers contain "historical" content regarding ads posted on the website, "all versions of an advertisement," the "original form" of an ad, the filters applied to ads, any "moderation changes or actions" made to a given ad, moderator action logs, and images deleted by a moderator.  Exh. C at 11-12; *see* Dkt. 626-4 at 13-14.

### 2.     Information Regarding the Alleged "Victim" Ads Referenced In the Indictment.

Defendants also seek access to a functioning version of the Backpage systems, servers, and databases to investigate and respond concerning the 50 alleged "victim" ads referenced in the Superseding Indictment.  Exh. L at 9-11 (requests 26-29); *see* SI ¶¶ 160-176, 201.  This, too, is unquestionably material to the defense.  As discussed at length in Defendants' Motion to Dismiss (Dkt. 561), the government's allegations that Defendants generally were aware that some ads for prostitution appeared on Backpage.com does not suffice to establish criminal liability.  The government instead must prove Defendants' *mens rea* as to specific ads, *i.e.*, that Defendants knew in advance that a given ad was for an illegal act and participated in and specifically intended to bring about the illegal act.

The government seems to think it is sufficient to produce some copies of these ads but not the underlying data about the ads or other related ads or Backpage's actual actions concerning the ads.  As discussed above, many of the copies of the ads the government has produced do not come from Backpage's systems and databases, but are a hodge-podge of image captures from the Wayback Machine and other sources, along with copies of ads that Backpage appears to have previously supplied as part of Backpage's extensive cooperation with law enforcement authorities in response to subpoenas or other requests.

Information such as this – *i.e.*, that Backpage reported an ad to law enforcement or to the National Center for Missing and Exploited Children ("NCMEC") – is one of many pieces of data about any given ad within Backpage's databases and systems as they existed when the government effected its seizures.  As noted, this information was readily available within the functioning systems.  *See* Exh. K, p. 3 (listing of fields within the "object editor").  But, more

than that, the databases and systems enabled searches about related ads, users and their conduct (*e.g.*, users could be identified and cross-referenced by email addresses or credit card numbers), and Backpage's actions (*e.g.*, if Backpage blocked, removed or reported other ads).

This information and functionality are crucial to allow the defense to address the government's allegations that Backpage's actions concerning given ads were supposedly criminal. The need for access to such data has been demonstrated in prior cases in which Backpage was able to refute allegations of government authorities and others. Examples include:

- In a case in Washington, the government offered an affidavit from a police detective claiming that Backpage had knowingly run ads concerning a girl after being notified she was underage. However, Backpage was able to show that it actually reported the initial ad to NCMEC, and removed and blocked other ads concerning the individual (making additional reports to NCMEC and blocking the email addresses used to post the ads). Backpage did not detect the other ads the detective identified (but had not reported to Backpage) because they were posted in another city using still another email address.

- In another case, an investigator with the Cook County sheriff's office claimed Backpage edited a "sting ad" he posted on the website to take out references that the individual featured in the ad was 14 years old. Based on information from its systems and the history of the ad, Backpage was able to show that the investigator actually edited the ad to include the 14-year-old age reference (users could edit their ads after they cleared Backpage's moderation and appeared online), and Backpage had immediately reported the ad to NCMEC.

- In a California civil case, the plaintiff alleged that traffickers posted ads about her and Backpage edited the ads "to make it less obvious that the ads were for sex." However, using the databases and search tools then available, Backpage determined that none of the ads had been edited and three ads concerning the plaintiff were blocked by moderators within minutes of being posted, while a fourth ad remained

1    online as part of Backpage's cooperation with law enforcement.[6]

2    In its June 3 letter, the government responds concerning Defendants' requests about the

3    predicate ads by stating only that it intends to have law enforcement officials and other witnesses

4    testify regarding how the ads were obtained and that the screenshots of the ads are authentic.

5    Exh. B at 7.  That the government seeks to cut corners to put on its case is not a valid

6    justification for denying the requested discovery and strangling Defendants' constitutional right

7    to defend themselves.

8          **3.      Information Regarding the Backpage Website Generally is
                    Material to Preparing the Defense.**
9

10   Defendants have also requested access to the functioning databases and systems (or that

11   the government extract information from the databases) to be able to show comparative and

12   analytic information about the Backpage.com website and its practices as a whole.  *See* Exh. L

13   at 3-4 (requests 2-6).  This is important for a number of reasons.

14   First, metrics regarding Backpage's ads and ad revenues as a whole are relevant to show

15   that Backpage.com was a general purpose classified advertising website and that it generated

16   many millions of dollars in revenue from non-adult ads.  The government has refused to

17   produce such information, contending that this proposition is "to put it mildly, at odds with"

18   emails the government has collected and its claims and characterizations.  Exh. B at 5.  The

19   government's one-sided view of the evidence it hopes to present at trial is obviously not a reason

20   to deny Defendants discovery that is material to assisting them in challenging that view.

21   Second, Defendants seek information regarding ads Backpage reported to NCMEC, as

22   these reports show that Backpage sought to prevent misuse of the website and potential harm to

23   youths.  The government has alleged that Backpage's referrals to NCMEC were not in good faith

24   and were "artificially limit[ed]."  *See* SI at ¶ 13.  However, Defendants believe the government is

25   aware that NCMEC and/or law enforcement complained that Backpage was making too many

26

27   ─────────────────
     [6] Law enforcement authorities in many instances asked Backpage not to notify users of warrants

28   or remove ads so as not to interfere with ongoing investigations, and Backpage complied with
     these requests as well.

such referrals (as many ads referred by Backpage ultimately were determined not to relate to minors), and yet Backpage continued to refer ads of concern (which the data about Backpage's referrals will reflect). On this point, the government responded in its June 3 letter that it has produced interviews of NCMEC personnel and emails, adding that "you are free to conduct your own analysis of the servers' data." Exh. B at 6. But that is precisely the point: Defendants cannot meaningfully analyze server data unless it is provided in a functional, useable form.

Third, Defendants seek information regarding Backpage's cooperation with law enforcement (Backpage received literally hundreds of commendations, including one from FBI Director Robert Mueller), as they rebut the government's allegations that Defendants "took pains to mislead . . . law enforcement officials." SI ¶ 12. The government has refused to produce this information too, again contending that its view of the evidence precludes any obligation to do so. Exh. B. at 5 ("we obviously do not share your view that Backpage engaged in cooperation with law enforcement"). The government gets it backwards, as it implicitly admits when it states that "whether Backpage was sincerely cooperating with law enforcement is ultimately a jury question." *Id.* The government's confidence that its view of Backpage's cooperation with law enforcement will prevail at trial is not a valid basis to deny discovery of information that allows Defendants to investigate and challenge that view.

Fourth, documents referenced in the indictment, including all emails regarding such documents, are manifestly material. To the extent such material exists and has not yet been produced, the government should be required to produce this material immediately.

### 4. Information Regarding Backpage's Alleged Aggregation Practices.

Defendants also seek information about the government's allegations that Backpage supposedly "created" prostitution ads by contacting users who had posted ads on other websites (notably Craigslist.org) and asking if they wanted to run their ads on Backpage.com. *See* Exh. L at 7 (requests 14-16); *see also* SI ¶ 34. While the indictment alleges this sales technique (called "aggregation") occurred only in the earlier years of the Backpage.com website, *see, e.g.*, SI ¶¶ 37-42 (citing emails from 2007-2008), the government has attempted to give the impression that this occurred throughout the time that Backpage was online. Regardless, Defendants believe

the government is aware marketing solicitations like this are not uncommon, that Backpage personnel solicited ads of many types (including for jobs, therapeutic massage, sporting goods, local places, and pet sales, as well as for adult ads), and that Backpage forbade soliciting any ads that appeared to be for illegal or improper services or offers.

In this regard as well, Defendants seek discovery from the government of any ads that were actually posted on Backpage.com through aggregation, along with underlying data about these ads (*e.g.*, the websites where ads appeared previously and how the ads appeared on those sites).  Like the government's broad and vague allegations that Backpage improperly edited ads, for which the government has provided no examples that this ever happened, the government has also shown no instance of an allegedly illegal ad posted to Backpage.com through "aggregation."  Without identification of and access to actual ads and data, Defendants cannot meaningfully defend the government's aspersions.

**5.      Information Regarding Alleged "Reciprocal Link" Agreement.**

Another of the government's central attacks is its allegation that Backpage had, for a time (in 2007-2008, *see* SI ¶¶ 48-52), a "business arrangement" with theeroticreview.com ("TER"), to "post reciprocal ads on each other's websites."  SI ¶ 45.  Defendants also seek information and data from the Backpage servers and systems in this regard (*e.g.*, any banner ads or other ads run by Backpage on TER and vice-versa, all contracts between Backpage and TER, and any ads posted on Backpage.com that contained references to TER).  *See* Exh. L. at 7-9 (requests 17-25).  Again, the aim is to obtain and be able to show the actual agreements and ads, rather than merely accepting the government's characterizations.

The basis for the government's refusal to turn over this information (or provide access to Backpage's systems and databases so that Defendants can search for such information) is a familiar refrain: "[Y]ou will need to conduct your own analysis of the data."  Exh. B at 6.  Under the circumstances, this response is no response at all.  How are Defendants supposed to conduct an analysis if they do not have access to functioning versions of Backpage's systems, databases, and information?  The government has and controls all of this information.  The government's response falls well short of its Rule 16 and *Brady* obligations.

15

**C.    The Government's Purported Justifications for Denying Critical Discovery to Defendants Fall Flat.**

The government's assertions in its June 3 letter for refusing to produce the requested discovery must be rejected.  First, the government's contention that it is "struggling to understand" why Defendants "waited over a year after the indictment" to make their requests is disingenuous.  Exh. B at 1.  Defendants' counsel raised concerns about the need to preserve the Backpage systems and data intact three weeks after this case began.  Exh. F.  The government did not begin to produce material from the Backpage servers until March 2019 (three months after its disclosure deadline), and it was then that Defendants learned of the government's tack of producing disassembled "imaged" data but not any functioning or useable version of the Backpage databases and systems as they existed when they were seized.

What Defendants are "struggling to understand" is why the government has not provided Defendants with meaningful access to any of Backpage's I.T. systems and apparently waited until *April 2019* to work "diligently" with the CTO of DesertNet (the third-party that hosted Backpage's domestic servers) to gain an understanding of the data on the systems.  Dkt. 626 at 2-3; Dkt. 626-4 at ¶ 5.  There can be no good faith reason for the government to have waited a year since its seizures to engage in this process.  Nor has the government ever explained what it did to preserve the servers (and the data, databases and software they contain) to be able to access the Backpage website and backend operations as they existed and were available at the time of the government's seizures.

Second, the government's assertion now that it is not obligated to identify or provide the data and information that Defendants seek is contradictory and disturbing.  Exh. B at 2.  The government's counsel said plainly and repeatedly that they would extract and provide data and information from Backpage's servers if only Defendants would identify what they need.  Dkt. 577 at 24-25; Exh. G.  When Defendants made specific requests, the government refused to produce anything.  It is not clear whether the government's representations were a ruse intended to gather intel about potential defenses, or the government simply changed its mind, but its actions are not consistent with the obligations of Rule 16.

Third, the government's position that it need not turn over the requested information in a usable format because "much of the evidence was provided to the government by the defense," Exh. B at 3-4, is flat-wrong.  Exh. B at 3-4.  The Defendants *are not Backpage*, although the government tries to disregard or blur this fact when it suits the government's purposes.[7]  Defendants did not produce these documents, nor can the government avoid its discovery obligations by pretending otherwise.  It is similarly irrelevant that Backpage previously produced some documents in civil cases in which Defendants were not parties.  Fundamentally, the government's Rule 16 discovery obligations pertain to the data and information the government has obtained.  If the government could avoid its obligations by asserting that Defendants should go elsewhere to try to understand the government's claims and purported supporting evidence, Rule 16 and *Brady* would be nullities.

## V.   **CONCLUSION**

Defendants respectfully urge the Court to compel the government to provide Defendants access to Backpage's systems, servers, databases and data, with the same functionality and in the same condition as they existed at the time of their seizure, or, alternatively, in a format wherein the government restores the systems, servers, databases,  and data so they are searchable and viewable as they existed at the time of the government's seizures.  Defendants further request that the Court order the government to provide the data and information requested in Exhibit L, except as disclosure of the Backpage servers, databases and systems may allow Defendants themselves to search, obtain, and collect the requested data.

---

[7] The government has taken contrary positions elsewhere, when doing *that* suited the government's arguments.  For example, in the pending appeal before the Ninth Circuit, where Defendants' challenge the unconstitutionality of the government's seizures of Defendants' personal assets, the government has asserted that Defendants have no First Amendment rights because they "sold their shares in Backpage to Ferrer in 2015" and Backpage and Ferrer agreed to forfeit the company's assets in 2018.  *See United States v. James Larkin, et al.*, No. 18-56455, Government's Reply In Support of Motion for Remand, Dkt. 54 at 9 (9th Cir. filed April 5, 2019).  Yet, in this case, the government would have the Court believe that Defendants exerted control over Backpage at the time its servers were seized in April 2018, *three years after* Defendants sold their interests in Backpage.  Simply put, the government appears to be willing to contradict itself in an effort to deny Defendants whatever rights they seek to enforce.

DATED:  June 19, 2019                    Thomas H. Bienert, Jr.
                                         Whitney Z. Bernstein
                                         BIENERT KATZMAN, PLC

                                         By:  _/s/ Whitney Z. Bernstein_____
                                              Whitney Z. Bernstein
                                              Attorneys for James Larkin


DATED:  June 19, 2019                    Paul J. Cambria, Jr.
                                         Erin E. McCampbell
                                         LIPSITZ GREEN SCIME CAMBRIA LLP

                                         By:  _/s/ Paul J. Cambria, Jr._____
                                              Paul J. Cambria, Jr.
                                              Attorneys for Michael Lacey


DATED:  June 19, 2019                    Robert Corn-Revere
                                         James C. Grant
                                         DAVIS WRIGHT TREMAINE LLP

                                         By:  _/s/ James C. Grant_____
                                              James C. Grant
                                              Attorneys for Michael Lacey and James Larkin


DATED:  June 19, 2019                    Bruce Feder
                                         FEDER LAW OFFICE, P.A.

                                         By:  _/s/ Bruce Feder_____
                                              Bruce Feder
                                              Attorneys for Scott Spear


DATED:  June 19, 2019                    Gary S. Lincenberg
                                         Ariel A. Neuman
                                         Gopi K. Panchapakesan
                                         BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                                         DROOKS, LINCENBERG & RHOW, P.C.

                                         By:  _/s/ Ariel A. Neuman_____
                                              Ariel A. Neuman
                                              Attorneys for John Brunst

18

1   DATED:  June 19, 2019            David Eisenberg
                                     DAVID EISENBERG, P.L.C.
2

3                                    By:   */s/ David Eisenberg*
                                           David Eisenberg
4                                          Attorneys for Andrew Padilla

5

6   DATED:  June 19, 2019            Joy Bertrand
                                     JOY BERTRAND, ESQ.
7

8                                    By:   */s/ Joy Bertrand*
                                           Joy Bertrand
9                                          Attorneys for Joye Vaught

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO COMPEL DISCOVERY

### CERTIFICATE OF SERVICE

I certify that on this 19th day of June 2019, I electronically transmitted a PDF version of this document to the Clerk of the Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants listed below.

*/s/ Whitney Z. Bernstein*
Whitney Z. Bernstein

Anne Michelle Chapman, anne@mscclaw.com

Erin E. McCampbell, emccampbell@lglaw.com

Anthony R. Bisconti, tbisconti@bienertkatzman.com

Ariel A. Neuman, aan@birdmarella.com

Bruce S. Feder, bf@federlawpa.com

James C. Grant, jimgrant@dwt.com

Lee David Stein, lee@mscclaw.com

Paul J. Cambria, pcambria@lglaw.com

Robert Corn-Revere, bobcornever@dwt.com

Ronald Gary London, ronnielondon@dwt.com

Janey Henze Cook, janey@henzecookmurphy.com

John Lewis Littrell, jlittrell@bmkattorneys.com

Seetha Ramachandran, Seetha.Ramachandran@srz.com

Thomas H. Bienert, Jr. tbienert@bienertkatzman.com

Whitney Z. Bernstein, wbernstein@bienertkatzman.com

Gary S. Lincenberg, glincenberg@birdmarella.com

Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com

Michael D. Kimerer, mdk@kimerer.com

Rhonda Elaine Neff, rneff@kimerer.com

David S. Eisenberg, david@deisenbergplc.com

Joy Malby Bertrand, joyous@mailbag.com

John Jacob Kucera, john.kucera@usdoj.gov

Kevin M. Rapp, Kevin.Rapp@usdoj.com

Margaret Wu Perlmeter, Margaret.perlmeter@usdoj.gov

Reginald E. Jones, reginald.jones4@usdoj.gov

Peter Shawn Kozinets, Peter.Kozinets@usdoj.gov

Andrew C. Stone, andrew.stone@usdoj.gov