1   MICHAEL BAILEY
    United States Attorney
2   District of Arizona

3   KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
    MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
4   PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
    ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
5   Assistant U.S. Attorneys
    40 N. Central Avenue, Suite 1800
6   Phoenix, Arizona 85004-4408
    Telephone (602) 514-7500
7
    JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
8   Special Assistant U.S. Attorney
    312 N. Spring Street, Suite 1200
9   Los Angeles, CA 90012
    Telephone (213) 894-3391
10
    BRIAN BENCZKOWSKI
11  Assistant Attorney General
    Criminal Division, U.S. Department of Justice
12
    REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
13  Senior Trial Attorney, U.S. Department of Justice
    Child Exploitation and Obscenity Section
14  950 Pennsylvania Ave N.W., Room 2116
    Washington, D.C. 20530
15  Telephone (202) 616-2807
    Attorneys for Plaintiff
16

17              IN THE UNITED STATES DISTRICT COURT

18              FOR THE DISTRICT OF ARIZONA

19  United States of America,                    No. CR-18-422-PHX-SMB

20                    Plaintiff,

21          v.                             **UNITED STATES' RESPONSE TO
                                           BRUNST'S MOTION TO DISMISS
22                                            INDICTMENT (Doc. 746)**

23  Michael Lacey, et al.,

24                    Defendants.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Preliminary Statement**

Defendant John Brunst's motion is a disguised—and unauthorized—sur-reply in support of the motion to dismiss he previously filed with three other defendants.   In Doc. 561, Brunst moved to dismiss the Superseding Indictment (Doc. 230 or SI) for failing to allege "specific intent" to promote or facilitate a "business enterprise" involved in prostitution.  (*See* Doc. 561, Mot. to Dismiss at 26-37 and n.33.)  Brunst's latest motion makes the exact same arguments.  (Doc. 746, Mot. at 1-12).[1]  LRCiv 7.2 permits motions, responses and replies in civil and criminal cases; it does not authorize sur-replies.  LRCiv 7.2(a)-(d).  Because Doc. 746 "does not conform in all substantial respects with the requirements of" LRCiv 7.2, and is not authorized by the rule, it should be summarily denied.  LR Civ 7.2(i).  *See, e.g., CWT Canada II LP v. Danzik*, 2019 WL 79001, at *12 (D. Ariz. Jan. 2, 2019) ("Under [LRCiv] 7.2, parties are entitled to file one reply motion. If a party wants to file a sur-reply, it must seek leave of court….  Because CWT did not have the right to a sur-reply and did not obtain leave, the Court will not consider its reply.").

Even if not summarily denied, Doc. 746 fails to meet Brunst's heavy burden of demonstrating the SI fails to put Defendants on notice of the charges against them.  *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  First, Brunst mistakenly asserts that the SI fails to identify the "business enterprises" Defendants promoted or facilitated.  Brunst concedes the Travel Act contains no definition of "business enterprise"; at most, courts have construed the term to mean a "continuous course of conduct."  (Doc. 746, Mot. at 7.)  The bar for establishing a continuous course of conduct is not high; evidence of multiple sales of illegal goods or services suffices.  *See, e.g., United States v. Kaiser*, 660 F.2d 724, 731 (9th Cir. 1981) ("evidence of repeated sales of heroin was sufficient to establish a continuous course of criminal conduct").  The SI describes several continuous prostitution businesses that Defendants promoted or facilitated.  These ventures include the prostitution services offered by a prostitute known as "P.R.," who advertised

---

[1] Brunst's latest motion has been joined by Defendants Michael Lacey, James Larkin, Scott Spear and Andrew Padilla.  (Docs. 751, 754, 755, 757.)

on Backpage for five years and received support and assistance from the highest levels of Backpage's management; the victims described in the SI, all of whom were sold repeatedly by pimps or traffickers via multiple Backpage ads; and the prostitutes featured in Backpage's "GFE" or "Girlfriend Experience" ads, whose services were often advertised with per-session prices or references to customers reviews (indicating past and intended future sales).  Simply put, the SI describes scores of continuous prostitution ventures.

Second, the SI adequately alleges that each Defendant intended to promote or facilitate these ventures.  Counts 2-51 track the language of the Travel Act and allege that Defendants used the internet "with intent" to promote or facilitate unlawful activity by publishing each of the 50 ads detailed in Counts 2-51.  (SI¶201.)  These ads involved 10 ads placed by P.R.; 15 ads used to sell several of victims described in the SI; and 25 "GFE" ads that marketed ongoing prostitution services.  While Brunst intimates the SI should have used the words "specific intent," he fails to cite any case dismissing a Travel Act indictment for failing to use that phrase rather than "intent."  The Ninth Circuit—and multiple other Circuits—agree that pleading "intent" is sufficient.  *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981); *see United States v. Palfrey*, 499 F. Supp. 2d 34, 43 (D.D.C. 2007) (the Fifth, Seventh, Eighth, Ninth and D.C. Circuits have upheld Travel Act convictions "based on virtually identical indictments").

At the pleading stage, the government is not required to lay out its theory of the case and supporting evidence; rather, the indictment need merely put the defendants on notice of the charged crimes.  The 92-page, 211-paragraph SI far surpasses this minimal notice pleading requirement, and Brunst's recycled motion to dismiss should be denied.

### **Factual Background**

The SI's factual allegations must be taken as true at this stage.  *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  Defendants Lacey, Larkin, Spear and Brunst were, for large periods of the history of Backpage.com, LLC (Backpage), the owners of Backpage and/or its corporate parents. (SI ¶¶ 2-4, 27, 29-32.)  They constituted the control group that set Backpage's polices and directed the company's operations and employees

for most of Backpage's existence.  From 2004-15, Lacey and Larkin oversaw Backpage's policies and strategic direction.  (SI¶2.)  Spear served as the Executive Vice President of one of Backpage's parent companies.  (SI¶3.)  Brunst served as the Chief Financial Officer of Backpage and several parent companies.  (SI¶4.)  In 2015, these individuals purported to sell their ownership interests in Backpage for around $600 million, yet they each "retained a significant financial interest in" and "significant operational control over Backpage following these transactions."  (SI¶¶30-31.)

The SI states prostitution is illegal in 49 states and most of Nevada.  (SI¶ 33).  Nevertheless:

> 9.     …the BACKPAGE DEFENDANTS **were aware that the vast majority of the "adult" and "escort" ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity**.  For example, during Backpage's early years of operation, the company's employees were actually trained to–and paid bonuses for– identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' future business….

> 10.    Backpage also employed other business strategies that were **specifically intended to promote and facilitate prostitution**.  For example, for several years, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit 'reviews' of their encounters with prostitutes, including descriptions of prices charged for particular sex acts….

> 11.    In addition to **affirmatively creating prostitution-related content** and **intentionally soliciting prostitution-related business**, Backpage also utilized a **variety of strategies to conceal** the true nature of the ads being posted on its website.   Most notably, Backpage periodically used computerized filters and human 'moderators' to edit the wording of (or block) ads that explicitly offered sexual services in return for money.  The BACKPAGE DEFENDANTS admitted—in internal company documents and during private meetings—that, despite these editing practices, they knew the overwhelming majority of the website's ads still involved prostitution….

(SI¶¶9-11 (emphasis added); *see also* SI¶¶34-152.)

Count 1 of the SI alleges Lacey, Larkin, Spear, Brunst, Hyer, Padilla, and Vaught, and others known and unknown, "knowingly and intentionally" entered into a conspiracy with others to commit Travel Act offenses for the object of obtaining money, and that "overt acts were committed in furtherance of the conspiracy," including but not limited to

1   those described in paragraphs 1-194 of the SI.  (SI¶¶195-199.)

2       Counts 2-51 allege Lacey, Larkin, Spear, Brunst, Padilla, and Vaught, and others
3   known and unknown, "used the mail and any facility in interstate and foreign commerce
4   **with intent** to otherwise promote, manage, establish, carry on, and facilitate the promotion,
5   management, establishment, and carrying on of an unlawful activity, to wit: prostitution
6   offenses in violation of the laws of the State in which they are committed and of the United
7   States, including but not limited to [A.R.S.] Section 13-3214, and thereafter performed and
8   attempted to perform an act that did promote, manage, establish, carry on, and facilitate the
9   promotion, management, establishment, and carrying on of the unlawful activity" by
10  publishing the 50 ads described in Counts 2-51.  (SI¶ 201.)  As explained in Doc. 649,
11  Resp. at 16-19 (incorporated by this reference), these ads marketed the sale of women or
12  minors using well-understood but coded references to prostitution.  (SI¶ 201.)

13      The 50 ads fall into three categories.  First, 15 of the 50 depict specific victims.  (SI
14  Counts 2, 4-5, 12-17, 19-24.)  Each victim was repeatedly sold through multiple ads.
15  (SI¶¶ 160-176.)  For example, Victim 5 was sold through Backpage ads in Massachusetts
16  and Rhode Island between 2011 and 2016; she was a juvenile during much of this period
17  and had a pimp.  (SI¶164.)  Victim 11 was sold through Backpage ads between 2014 and
18  2015 in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New
19  Mexico and Utah; her trafficker forced her to work full time as a prostitute.  (SI¶170.)
20  Victim 16 was sold via Backpage ads in Michigan in 2015, until she was murdered by a
21  customer.  (SI¶175.)  Victim 17 was sold through Backpage ads in Arizona and California
22  in 2015 and 2016; she averaged ten customers a day; and an associate of her pimp drafted
23  her ads.  (SI¶ 176.)  Backpage personnel coached victims or pimps regarding the ads and/or
24  edited the text or images.  (*E.g.,* SI¶160 (Victim 1); SI¶163 (Victim 4); SI¶ 164 (Victim 5);
25  SI¶166 (Victim 7); SI¶ 170 (Victim 11); SI¶ 172 (Victim 13).)

26      Second, 10 of the 50 ads were posted by P.R., who had extensive communications
27  with Ferrer, a co-conspirator.  (SI Counts 3, 6-11, 18, 25-26; SI¶132.)  P.R.'s email address
28  included the phrase "provider4u," and her ads used coded prostitution terms such as "50

Red Roses Special," which indicated per-session pricing of $50.  (SI¶ 132; *see also* SI¶¶ 160, 161, 164, 167, 201.)   P.R. corresponded with Ferrer from 2010-2012 about Backpage's removal of explicit photos from her ads.  (SI¶ 132.)  Ferrer repeatedly restored her posting privileges and advised her on how to get her ads published on Backpage.  (SI¶ 132.)  Padilla and Vaught received emails about her ads.  (SI¶ 132.)  P.R. posted more than a dozen new ads from October 2012 through November 2015.  (SI¶132.)

Third, the remaining 25 ads involve Backpage ads containing the prostitution-identifier "GFE" or "Girlfriend Experience."  (SI Counts 27-51.)  Defendants, including Spear, Padilla and Vaught, acknowledged "GFE" is a "coded sex act for money" term and one of several "solid sex for money terms" or "sex phrases and coded terms."  (SI¶¶148-149.)  Many of the charged GFE ads reference reviews on websites like The Erotic Review (TER), indicating the advertised persons had engaged in sex-for-money transactions in the past and sought similar future transactions.  (*See, e.g.*, SI¶201, Count 29 ("Mind blowing Tiffany….Soft GFE…Im real and reviewed"), Count 31 ("Erectile Dysfunctional G F E Provider….You can find a few current reviews at T3R xxxxx#" and "I have been EROS authenticated"), Count 36 ("Real & Reviewed Girlfriend").)  Several include per session pricing, indicating multiple unlawful transactions were being sought.  (*See* SI¶201, Count 32 ("PRE-BOOKING SPECIAL ~ - 100"), Count 35 ("(G).(F).(E). 30 min/$180"), Count 36 ("250 GFE"), Count 47 ("gfe Hh [half-hour]: $160 H [hour]: $220").)  Law enforcement notified Backpage that "nearly all the cases we find associated with [Backpage] involve pimp controlled prostitution."  (SI¶144.)[2]  To the extent not discussed above, the United States incorporates by reference its SI summary in Doc. 649, Resp. at 4-12.

---

[2] Defendants or their co-conspirators assisted others who posted multiple ads, including:

- Licks Alot—a prostitute who corresponded with Ferrer about Backpage's removal of pictures from one of her ads because, as he explained, "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong"; Ferrer allowed her ad to remain online and offered a free upgrade.  (SI¶ 91.)

- Dollar Bill—an affiliate who presented thousands of prostitution ads to Backpage and earned fees.  Dollar Bill was featured in Backpage management agendas.  Ferrer advised him on how to wordsmith ads; Padilla was also involved.  (SI¶¶59-67.)

1

## __Argument__

2      An indictment is sufficient if it meets two constitutional requirements: first, it

3 contains the elements of the offense charged in sufficient detail to fairly inform the

4 defendant of the crime against which he or she must defend; and second, it safeguards the

5 defendant from a subsequent prosecution of the same offense. *Resendiz-Ponce*, 549 U.S.

6 at 108. An indictment that tracks the language of a criminal statute "is often sufficient."

7 *Id*. at 109. But even if more is required, the indictment need only "contain a few basic

8 factual allegations [to] accord[ ] defendants adequate notice of the charges." *United States*

9 *v. Cecil*, 608 F.2d 1294, 1296-97 (9th Cir. 1979) (dismissing a "rather barren" indictment

10 that provided almost no factual context).

11      Brunst cannot be heard to argue that the 211-paragraph SI is insufficiently thorough

12 to put Defendants on notice of the charges. "While detailed allegations might well have

13 been required under common-law pleading rules…they surely are not contemplated by

14 Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite

15 written statement of the essential facts constituting the offense charged.'" *Resendiz-Ponce*,

16 549 U.S. at 108. Indeed, Fed. R. Crim. P. 7(c)(1)'s pleading requirements have been

17 "construed…to require little more than that the indictment give the defendants sufficient

18 notice of the crime." *United States v. Buckley*, 689 F.2d 893, 899 n.5 (9th Cir. 1982); *see*

19 *id*. at 895 (indictment need only "provide a minimally adequate description of the charge").

20 Consistent with Rule 7(c)(1)'s notice pleading policy, an indictment "should be: (1) read

21 as a whole; (2) read to include facts which are necessarily implied; and (3) construed

22 according to common sense." *Id*. *See United States v. Bernhardt*, 840 F.2d 1441, 1443-

23 47 (9th Cir. 1998) (reversing dismissal of fraud indictment); *United States v. O'Donnell*,

24 608 F.3d 546, 555-56 (9th Cir. 2010) (reversing dismissal of campaign finance indictment).

25 As shown below, the detailed SI far surpasses Rule 7(c)(1)'s notice pleading requirements.

26      Nor can Brunst's motion be used to test the sufficiency of the government's

27 *evidence*. At the motion to dismiss stage, "[t]he Government need not allege its theory of

28 the case or supporting evidence, but only the essential facts necessary to apprise a

defendant of the crime charged." *Buckley*, 689 F.2d at 897; *see also United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (Rule 12(b) motion "is not the proper way to raise a factual defense"). Particularly where the government may prove its case through circumstantial evidence, the indictment should not be dismissed for failure to allege liability with specific facts: "The indictment stage of the proceedings is not the appropriate time to require the Government to present its proof." *Buckley*, 689 F.2d at 900.

## I.   THE SI ALLEGES THAT DEFENDANTS PROMOTED OR FACILITATED SEVERAL UNLAWFUL PROSTITUTION ENTERPRISES.

Brunst asserts the SI fails to apprise Defendants of the charges against them because it "does not identify any criminal 'business enterprise.'" (Doc. 746, Mot. at 6.) Brunst fails to support this assertion with any discussion of the detailed allegations of unlawful conduct in the SI. In fact, the SI identifies scores of illegal prostitution enterprises.

As Brunst admits, the Travel Act contains no definition of "business enterprise"; at most, courts have construed the term to mean a "continuous course of conduct." (Doc. 746, Mot. at 7.) Repeated sales of illegal goods or services suffice to establish a continuous course of conduct. *See also Kaiser*, 660 F.2d at 731 ("repeated sales of heroin was sufficient" to constitute a Travel Act "business enterprise"); *United States v. Muskovsky*, 863 F.2d 1319, 1327 (7th Cir. 1988) ("So long as the illegal activity is not an isolated or sporadic event, which the prostitution here was not, a business enterprise has been shown for purposes of the Travel Act."); *cf. United States v. Donaway*, 447 F.2d 940, 944 (9th Cir. 1971) (a single horse-racing bet, legal under state law, is insufficient to establish continuous course of conduct).

In *Tavelman*, the Ninth Circuit held that "[n]either evidence of large-scale operations nor long-term duration is required to support a Travel Act conviction…. Instead, what must be shown is evidence of a continuous enterprise and one act in interstate commerce in furtherance of that enterprise." 650 F.2d at 1140. Based on a prior transaction proved at trial that involved a large quantity of cocaine, the jury "could reasonably find [that the two defendants promoted] a continuous course of criminal activity." *Id*.

The SI describes numerous prostitutes, pimps and traffickers who engaged in continuous criminal activity.  These ventures include the prostitution services offered by "P.R.," who repeatedly advertised on Backpage over five years.  (SI¶132 and Counts 3, 6-11, 18, 25-26.)  Her ongoing prostitution business qualifies as a "continuous course of conduct."  *See Kaiser*, 660 F.2d at 731.  Similarly, the victims identified in the SI were all repeatedly sold via multiple Backpage ads, and most were sold over a period of months or years in multiple states.  (SI¶¶160-76 and Counts 2, 4-5, 12-17, 19-24.)  Their repeated sales likewise establish a "continuous course of conduct."  Backpage's "GFE" ads included per-session prices, referenced reviews on sites like The Erotic Review (indicating unlawful transactions had occurred in the past and were being sought for the future), or were not limited to isolated, one-off sales.  (SI¶¶148-49 and Counts 27-51.)  These ads, too, reflected repeated criminal conduct.  Moreover, nearly every prostitute who advertised on Backpage was controlled by a pimp or a trafficker.  (*See, e.g.*, SI¶144.)  The SI includes still further examples of ongoing prostitution ventures, including Dollar Bill's bulk prostitution advertising business (for which he earned fees) and Licks Alot's prostitution services.  (SI¶¶59-67, 91.)  Particularly when viewed through the notice pleading standards that apply at the motion to dismiss stage, the SI's allegations are more than sufficient to identify the "business enterprises" Defendants allegedly promoted or facilitated.  *See Buckley*, 689 F.2d at 895 (indictment need only "provide a minimally adequate description of the charge").

Brunst's contrary arguments are unavailing.  First, he erroneously asserts that the government must prove Defendants promoted a singular, organized business, rather than the separate enterprises associated with the ads in the SI.  (*Cf.* Doc. 746, Mot. at 6.)  While "the legislative history of the Travel Act indicates it was aimed at combating organized crime, it has been clearly established that its reach is not limited to that end."  *United States v. Davis*, 780 F.2d 838, 843 (10th Cir. 1985).  The Supreme Court and other courts have applied the statute well beyond the realm of "organized crime."  *See, e.g., Perrin v. United States*, 444 U.S. 37, 50 (1979) (upholding Travel Act conviction of defendant who engaged in scheme to steal data from a geological exploration company); *Tavelman*, 650 F.2d at

1138 (drug transactions by two defendants); *United States v. Welch*, 327 F.3d 1081, 1091 (10th Cir. 2003) (rejecting argument that Travel Act counts were insufficient because they failed to allege defendants were "members of a criminal enterprise or organized crime").

Second, Brunst does not cite a single case dismissing a Travel Act indictment for failing to contain the phrase "business enterprise." His cases involve challenges to the sufficiency of *the evidence*, not the indictment. (Doc. 746, Mot. at 7-10.) *See, e.g., United States v. Brennan*, 394 F.2d 151, 152-53 (2d Cir. 1968) (affirming convictions based on sufficiency of evidence; indictment not at issue); *United States v. Corbin*, 662 F.2d 1066, 1071-73 (4th Cir. 1981) ("No evidence was introduced to prove that [defendants] had distributed drugs before or planned to distribute drugs in the future."); *United States v. Gallo*, 782 F.2d 1191, 1194 (4th Cir. 1986) ("The government's evidence showed more than an isolated, sporadic transaction."). Brunst's remaining cases are likewise inapposite. (Doc. 746, Mot. at 7-10.) *See, e.g.*, *United States v. James*, 210 F.3d 1342, 1346 (11th Cir. 2000) (discussing plea colloquy, not indictment); *United States v. Corona*, 804 F.2d 1568, 1569-71 (11th Cir. 1986) (addressing impact of hung jury on double jeopardy); *United States v. Rogers*, 389 F. Supp. 3d 774, 785-93 (C.D. Cal. 2019) (denying motion to dismiss). Brunst's motion should be denied.[3]

## II.   INTENT IS A JURY QUESTION.

### A.   The Indictment Properly Alleges Intent.

Whether a defendant had the requisite criminal intent "is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274 (1952); *see Takahashi v. United States*, 143 F.2d 118, 122 (9th Cir. 1944) ("knowledge and intent are always questions of fact for the jury"). This rule applies to Travel Act cases. *United States*

---

[3] Brunst curiously asserts the SI does not allege facts that could constitute an "enterprise" as defined in a separate statute, RICO. (*See* Doc. 746, Mot. at 6, citing 18 U.S.C. § 1961(4).) RICO states that the term "enterprise" "includes *any individual*, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). As discussed above, the SI alleges that all of the victims identified therein were trafficked by pimps, many of whom had associates, and that nearly all prostitution cases concerning Backpage involved pimp-controlled prostitution. (SI ¶¶ 144, 160-76.) Moreover, even under the RICO definition Brunst cites, an "individual" counts as an "enterprise." *Id.*

1    *v. Graham*, 581 F.2d 789, 790 (9th Cir. 1978).

2         Because intent is a trial-based determination in Travel Act cases, the requirements

3    for pleading intent at the motion to dismiss stage are relatively light.  As the Ninth Circuit

4    has recognized, "[a]n indictment under the Travel Act requires allegations of each of the

5    three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with

6    intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that

7    unlawful activity."  *Tavelman*, 650 F.2d at 1138.  *Tavelman* found sufficient a Travel Act

8    indictment that alleged: "[O]n July 20, 1979: (1) the defendants traveled interstate…(2)

9    with the intent to promote a violation of 21 U.S.C. § 841(a)…and (3) thereafter knowingly

10   performed acts facilitating that unlawful activity."  650 F.2d at 1138.  The court held these

11   allegations "are sufficient to state violations of 18 U.S.C. § 1952(a)(3)."  *Id.*  Accordingly,

12   alleging that Defendants had an "intent to promote an unlawful activity" is sufficient.  *Id.*

13   This is precisely what the SI alleges.  (SI¶ 201.)  No other magic words are required.

14        At least five other Circuits share this view.  *See, e.g., United States v. Welch*, 327

15   F.3d 1081, 1090 (10th Cir. 2003) ("As set forth by the Act's plain language, the elements

16   necessary to sustain a Travel Act conviction are (1) travel in interstate or foreign commerce

17   or use of the mail or any facility in interstate or foreign commerce, (2) with the intent to

18   promote, manage, establish, carry on, or facilitate the promotion, management,

19   establishment, or carrying on of the enumerated unlawful activity, and (3) performance of

20   or an attempt to perform an act of promotion, management, establishment, or carrying on

21   of the enumerated unlawful activity."); *United States v. Childress*, 58 F.3d 693, 719  (D.C.

22   Cir. 1995) (essential elements of a Travel Act charge are: "(1) interstate travel or use of a

23   facility in commerce (2) with the intent to promote an unlawful activity and (3) that the

24   defendant thereafter performed or facilitated the performance of an overt act in furtherance

25   of the unlawful activity"); *Muskovsky*, 863 F.2d at 1326 ("A Travel Act violation occurs

26   when a person uses any facility in interstate commerce with intent to promote or facilitate

27   an unlawful activity and thereafter promotes or facilitates the illegal activity"); *Palfrey*,

28   499 F. Supp. at 43 (citing Fifth, Seventh, Eighth, Ninth and D.C. Circuit decisions).

1    In *Welch*, a case involving alleged bribery regarding the selection of Salt Lake City

2    for the 2002 Winter Olympics, the indictment alleged defendants violated the Travel Act

3    by making monetary transfers with the "intent to…promote...or facilitate the promotion"

4    of the crime of bribery under Utah law.  *Welch*, 327 F.3d at 1097.  Reversing dismissal, the

5    Tenth Circuit found these allegations sufficient.  The court noted: "At trial, Defendants will

6    be free to argue before the jury that they facilitated these transfers…absent the requisite

7    intent to promote bribery…. That argument, however, is premature because at this stage

8    we accept the indictment's allegations as true."  *Id*.   So too, here: the SI alleges each

9    Defendant acted "with intent" to promote the specified unlawful activities.  (SI¶201).  At

10   trial, Brunst and his colleagues can argue to the jury that they ran a $500 million

11   prostitution solicitation website without intending to promote or facilitate prostitution

12   services.   But allowing them to "improperly wander beyond the four corners of the

13   indictment to argue their case" at this stage is prohibited.  *Welch*, 327 F.3d at 1097.

14                **B.      Brunst's Cases Are Inapposite.**

15   Brunst's primary case to the contrary, *United States v. Gibson Specialty Co.*, 507

16   F.2d 446 (9th Cir. 1974), predates *Tavelman* and is inapposite.  (Doc. 746, Mot. at 9-10.)

17   First, *Gibson* isn't a sufficiency of the indictment decision.  The parties stipulated to the

18   evidentiary facts, and Ninth Circuit considered the sufficiency of the evidence, not the

19   indictment.  The court wrote: "[W]e take the view that the stipulated facts represent the

20   sum of the prosecution's case.  Thus, rather than the sufficiency of the indictment, the

21   sufficiency of the government's proof has been tested."  *Gibson*, 507 F.2d at 449 n.5.  The

22   indictment's language was not even discussed or analyzed.

23   Second, the stipulated evidence in *Gibson* showed that the defendants, Chicago-

24   based manufacturers, merely filled orders for goods (punchboards, pulltabs, and bingo

25   refills) submitted by distributors in Montana.  *Id*. at 451-55.  These facts lack anything

26   approaching the allegations in the 92-page SI in this case.  As the SI alleges, Defendants

27   published prostitution solicitations that are illegal throughout the United States.  (SI¶33;

28   *see also* SI¶¶9-11; 34-152, 160-76, 201.)   Defendants' calculated willingness to venture

into such territory on behalf of their customers cannot be overemphasized.  As explained by the Ninth Circuit, "the degree of disfavor in which prostitution is held in our society, as reflected in law," "is *sui generis*":  "Forty-nine of the fifty states today prohibit all sales of sexual services.  The federal government acknowledges the link between prostitution and trafficking in women and children, a form of modern day slavery."  *Coyote Pub.*, 598 F.3d at 600-01.  This "genuine objection to buying and selling [adults and children for sex] means that *in the context of prostitution an advertisement is an integral aspect of the harm to be avoided*.  In contract terms, an advertisement is an invitation to deal and may operate as an offer…."  *Id.* at 604 (emphasis added).[4]

Without communicating an offer to sell an adult or child for sex, no sale can occur.  Defendants sought to make succeed their customers' prostitution businesses by publishing these offers, which directly promoted and facilitated the customers' unlawful ventures.  Moreover, the SI alleges several specific instances in which Backpage employees assisted prostitutes and pimps in connection with the sale and posting of these unlawful solicitations, and/or edited the text or images.  (*See, e.g.*, SI¶¶ 59-67, 91, 132, 160, 163, 164, 166, 170, 172.)  This is a far cry from *Gibson*.

Defendants' willful plunge into the "niche" market (SI¶50) of illegal online prostitution solicitations is documented throughout the pages of the SI.  Defendants deliberately pursued an array of business practices to dominate the market.  (SI¶¶9-152.) These practices included: (1) aggregation, or publishing free ads and attempting to enlist future business from the featured prostitutes (SI¶¶9, 34-44); (2) reciprocal link

---

[4] The Supreme Court has long recognized that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008) (citing *Pittsburg Press Co. v. Pittsburg Comm'n on Human Relations*, 413 U.S. 376, 388 (1973)).  *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 822 (9th Cir. 2013), recognized the continuing validity of the *Pittsburg Press* rule that "'[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal…is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.'" (quoting *Pittsburg Press*, 413 U.S. at 389).  The Ninth Circuit has since held the First Amendment "extends no protection" at all to prostitution solicitations.  *Erotic Service Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, 459-60; *see also Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 603-04 (9th Cir. 2010) (upholding ban on prostitution ads).

partnerships, which involved inserting links or allowing customers to reference third-party websites that reviewed and further promoted the customers' illegal services (SI¶¶10, 34, 45-58); (3) affiliate relationships, through which Backpage secured bulk prostitution advertising from "super-affiliates" like Dollar Bill (SI¶¶59-67); (4) moderation, the process of "sanitizing" customers' solicitations by removing the most overt references to prostitution (or most explicit images) while still conveying the unlawful message (SI¶¶11, 3468-152); and (5) providing anonymous payment and posting methods that made it easier to conduct unlawful activities via the website (SI¶¶134, 138, 184-88).  Again, *Gibson* doesn't come anywhere close to involving such facts.

Defendants also received repeated notice that the overwhelming portion of Backpage's "adult" ads were for prostitution.  In September 2010, 21 state attorneys general wrote that "ads for prostitution—including ads trafficking children—are rampant on the site."  (SI¶74.)  In August 2011, Seattle's mayor explained that Backpage was dissimilar from other companies whose services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution."  (SI¶ 109.)  The same month, 46 state attorneys general wrote: "Nearly naked persons in provocative positions are pictured in nearly every adult services advertisement on Backpage.com and the site requires advertisements for escorts, and other similar 'services,' to include hourly rates.  It does not require forensic training to understand that these advertisements are for prostitution." (SI¶111.)  The Boston and Seattle Police Departments informed Backpage via court-filed affidavits that it had become the primary online source of prostitution advertising and sex trafficking.  (SI¶144.)  News organizations reported similar facts, and the National Center for Missing and Exploited Children repeatedly notified Backpage's management of the same issues.  (SI¶¶97, 127, 134, 140.)  In January 2017, the U.S. Senate Permanent Subcommittee on Investigations issued its report concluding, among other things, that virtually all of Backpage's "adult" ads were solicitations for illegal prostitution, and Backpage had taken an array of affirmative steps to help its customers (pimps and

traffickers) "sanitize" these ads and conceal their illegality.   (SI¶151.)   In addition, Defendants received a stream of subpoenas regarding criminal prosecutions and civil lawsuits involving victims trafficked via Backpage.   (*See, e.g.*, SI¶¶71, 76, 92, 140, 144.)   Defendants received still further notice from the financial institutions who steadily cut ties with Backpage due to the illegality of its business.   (*See, e.g.,* SI¶¶147, 178, 187, 182.)   This drumbeat of notice of illegality is entirely absent from *Gibson*.   *Cf. United States v. Vallone*, 698 F.3d 416, 457 (7th Cir. 2012) (knowledge of illegality could be inferred where defendants "had received unequivocal notice, from multiple sources and on multiple occasions, that the Aegis system was illegal"), *opinion reinstated following cert. grant on other grounds*, 752 F.3d 690 (7th Cir. 2014).

In sum, rather than run a general purpose website, Defendants—like the website operators in similar prosecutions—consciously operated their website to promote their customers' illegal services.   *See, e.g. United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) (rejecting a motion to dismiss where indictment alleged that the operator of the "Silk Road" website had "knowingly and intentionally constructed and operated an expansive black market for selling and purchasing narcotics and malicious software," separating his conduct "from the mass of others whose websites may—without their planning or expectation—be used for unlawful purposes"); *United States v. Omuro*, N.D. Cal. No. 14-CR-336, Doc. 70 at 1-3 (accepting guilty plea and convicting founder of www.myRedBook.com under the Travel Act for operating a website that hosted thousands of ads by prostitutes and generated $5 million in profits); *United States v. Hurant*, E.D.N.Y. No. 16-CR-45, Doc. 117 at 1, 6, 13-14, and Doc. 125 at 2 (accepting guilty plea and convicting founder of www.Rentboy.com for violating the Travel Act; defendant admitted he "was well aware…that the escort ads he posted…were thinly-veiled proposals of sexual services in exchange for money").   The stipulated facts in *Gibson* contained none of this.[5]

---

[5] Like Ulbricht, Defendants had a financial stake in their customers' criminal activities. While Ulbricht earned commissions on illegal sales, Backpage earned revenues from publishing its customers' prostitution solicitations—which themselves were unlawful. (SI¶177.)  *See, e.g.*, *Erotic Service Provider*, 880 F.3d at 459-60; *Coyote Pub.*, 598 F.3d at 603-04; A.R.S. § 13-3211(5) (prostitution defined in part as "*offering* to engage in sexual

1        This case is also nothing like *United States v. Du Bo*, 186 F.3d 1777, 1179-80 (9th

2    Cir. 1999), which involved a Hobbs Act indictment that on its face made no mention of

3    any allegation of criminal intent.  (*Cf*. Doc. 746, Mot. at 5.)  The indictment charged the

4    defendant only with "unlawfully" affecting commerce by the "wrongful" use of force; it

5    did not state any element of intent and therefore was "completely missing [an] essential

6    element." *Id*. at 1180.  *United States v. Omer*, 395 F.3d 1087, 1088-89 (9th Cir. 2005), is

7    similarly distinguishable—the indictment completely failed to allege the required element

8    of "materiality."  The "barren" indictment in *Cecil* 608 F.2d at 1296, contained hardly any

9    allegations at all.  Here, the 92-page SI expressly alleges intent.  (SI¶ 201.)

10       **C.**    **Brunst's Remaining Arguments Are Unavailing.**

11       Brunst also asserts the SI fails to allege any Defendant "had any knowledge of any

12   specific ad relating to a business enterprise engaged in prostitution offenses or any role in

13   Backpage.com's publication of any such ad."  (Doc. 746, Mot. at 10-11.)  Not so.  Counts

14   2-51 directly allege that each Defendant violated the Travel Act by publishing each of the

15   50 ads identified therein.  (SI¶201.)  And even if any Defendant was not personally aware

16   of each ad or involved in that ad's publication process (Backpage employed dozens of low-

17   level moderators to review ads before publication) (*see, e.g.,* SI¶¶78, 84, 93, 99, 117),

18   publication of those ads was reasonably foreseeable in light of the policies Defendants

19   implemented as part of the conspiracy charged in Count 1.  *See* 9th Cir. Model Crim. J.

20   Instr. 8.25.  As the Supreme Court has long recognized, each Defendant is liable for the

21   reasonably foreseeable acts of his or her co-conspirators committed in furtherance of the

22   conspiracy, even if the Defendant was not personally involved in the act.  *Pinkerton v.*

23   *United States*, 328 U.S. 640, 647 (1946).  *See also, e.g*., *Salinas v. United States*, 522 U.S.

24   52, 64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate

25   the crime and others to provide support, the supporters are as guilty as the perpetrators.");

26   *United States v. Meredith*, 685 F.3d 814, 821-22 (9th Cir. 2012) (Meredith and Giordano,

27   conduct under a fee arrangement with any person for money") (emphasis added).

28

architects of a scheme to defraud IRS, were both "liable for the reasonably foreseeable actions of their co-schemers," even if they—unlike their co-schemers—did not have one-on-one interactions with or directly assist individuals who defrauded the IRS based on instructions that they provided); *United States v. Moreland*, 622 F.3d 1147, 1169 (9th Cir. 2010) (applying *Pinkerton*; "There is also sufficient evidence to uphold Moreland's convictions on the other money laundering charges…even though those transactions did not directly involve Moreland" because the transactions were committed in furtherance of the conspiracy and "the actions providing the basis for the substantive charges were reasonably foreseeable to Moreland.").

Moreover, to the extent any Backpage owner-executive deliberately ignored the prostitution ads on Backpage's website, knowledge can be inferred from such willful ignorance. *See* 9th Cir. Model Crim. J. Instr. 5.8.  But the use of these jury instructions is for trial; at the pleading stage, all that is required is that the indictment provide "a minimally adequate description" of the crime charged. *Buckley*, 689 F.2d at 899.

Finally, Brunst's money laundering argument lacks merit. (*Cf.* Doc. 746, Mot. at 11.)  Even if Brunst could avoid criminal liability on the Travel Act counts, he may still be prosecuted for money laundering as alleged in the SI. *See, e.g.*, *United States v. Thompson*, 286 F.3d 950, 972 (7th Cir. 2002) (defendant properly convicted of money laundering, even though acquitted of substantive drug offense, where evidence was sufficient for jury to conclude defendant knew funds were illegally derived); *United States v. Lalley*, 257 F.3d 751, 755-56 (8th Cir. 2001) (knowledge sufficient to support money laundering convictions can be show by evidence that defendant was deliberately ignorant of the unlawful source of funds).  As this Court has noted, "both Backpage and its former CEO Carl Ferrer pleaded guilty to numerous charges" concerning Backpage's operations. (Doc. 768, Order at 2); *see United States v. Ferrer*, CR-18-464-PHX-SMB, Docs. 7 and 7-2 (Travel Act and money laundering conspiracy pleas); *United States v. Backpage.com*, LLC, CR-18-PHX-SMB, Docs. 8 and 8-2 (money laundering conspiracy plea).  Brunst's co-Defendant, Daniel Hyer, has pleaded guilty to Count 1 of the SI. (Doc. 271.)  Brunst and

the remaining Defendants can be convicted for money laundering without being criminally liable for the activity that generated the laundered money.  (*See also* Doc. 649, Resp. at 14-16, incorporated by this reference.)[6]

**Conclusion**

The detailed SI far exceeds the minimal requirement of notice pleading.  For all of the foregoing reasons, Brunst's Motion to Dismiss (Doc. 746), like Defendants' initial motion to dismiss (Doc. 561), should be denied.

Respectfully submitted this 18th day of October, 2019.

> MICHAEL BAILEY
> United States Attorney
> District of Arizona
>
> *s/ Peter S. Kozinets*
>
> KEVIN M. RAPP
> MARGARET PERLMETER
> PETER S. KOZINETS
> ANDREW C. STONE
> Assistant U.S. Attorneys
>
> JOHN J. KUCERA
> Special Assistant U.S. Attorney
>
> BRIAN BENCZKOWSKI
> Assistant Attorney General
> U.S. Department of Justice
> Criminal Division, U.S. Department of Justice
>
> REGINALD E. JONES
> Senior Trial Attorney
> U.S. Department of Justice, Criminal Division
> Child Exploitation and Obscenity Section

---

[6] Brunst's assertions regarding a different statute, the Fight Online Sex Trafficking Act (FOSTA), repeat the same arguments he made in Doc. 561.  (*Compare* Doc. 561, Mot. at 30-31 and 41 n.40 *with* Doc. 746, Mot. at 8 n.3 and 10 n.5.)  The United States responds by incorporating here the same arguments it made in response to that motion.  (*See* Doc. 649, Resp. at 37 and n.21.)

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office

- 18 -