MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-18-00422-PHX-SMB |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT FOR GRAND JURY ABUSE OR, IN THE ALTERNATIVE, FOR DISCLOSURE OF GRAND JURY TRANSCRIPTS** |
| vs. | |
| Michael Lacey, et al., | **(Doc. 780)** |
| Defendants. | |

**Preliminary Statement**

To obscure substantial evidence of their facilitation of underage prostitution via Backpage, Defendants have filed a motion to dismiss the Superseding Indictment (Doc. 230 or SI) for grand jury "abuse" that is marked by fundamental misunderstandings of the

law and the facts. Defendants are charged with Travel Act and money laundering violations arising from their operation of a criminal enterprise—Backpage.com, LLC—that facilitated and promoted prostitution, including adult and child prostitution. The SI and an abundance of intertwined evidence (which Defendants will have the opportunity to challenge at trial) shows how Backpage made child prostitution easier. While much of that evidence was uncovered as a result of U.S. Senate and grand jury subpoenas enforced over Backpage's objections in 2016 and 2017, Backpage and its executives were long aware of it. For nearly a decade, Backpage was under enormous pressure to reduce child sex trafficking on its website; and while the company took some steps that would not seriously impact its bottom line, Backpage's executives viewed child prostitution as an inevitable cost of doing business as a prostitution website. As the President of the Auburn Theological Seminary wrote to Defendants Lacey and Larkin in early January 2011: "We understand from the statements you made in our meeting that your company takes it as a given that a certain number of teens and children will be trafficked for sex—in spite of the safeguards you have put in place—by those who pay your Web site a fee, and that is unacceptable to us." (Exh. D at 5.)

In the ensuing years, Backpage's executives refused to adopt numerous recommended measures to reduce child prostitution on their website. In 2011, for example, they declined to implement steps such as: (1) not publishing ads with the phrase "New in Town"—a widely-recognized code "used by pimps who shuttle children to different locations where they do not know anyone and cannot get help"; (2) identifying the use of prepaid credit cards as indicative of potential trafficking ads; and (3) determining if the same phone number was used in numerous different ads, another indicator of potential prostitution or trafficking. (SI¶¶100-101.) In 2013, Backpage failed to follow several recommendations from the National Center for Missing and Exploited Children (NCMEC) to prevent the trafficking of children, including age-verification measures and prohibiting anonymous payment methods and unverified email addresses and phone numbers. (SI¶134.) In 2014, NCMEC repudiated any suggestion that Backpage was a sincere anti-

trafficking ally, stating in an amicus brief that "Backpage publicizes carefully selected operational processes as a subterfuge to avoid increased scrutiny, while providing traffickers with easy access to an online venue to sell children for sex. . . . Backpage's stated interest in doing something meaningful to stop child sex trafficking ads on its site is apparently overridden by the enormous revenue it generates from its escort ads, including ads selling children for sex." (SI¶140.)  In 2016, the First Circuit recognized that three minor victims who had been raped more than 1,900 times as a result of being trafficked via Backpage had "made a persuasive case" that "Backpage has tailored its website to make sex trafficking easier." *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 17, 29 (1st Cir. 2016).  In 2017, the U.S. Senate Subcommittee on Permanent Investigations issued a 50-page report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING, which concluded that virtually all of Backpage's "adult" ads were solicitations for prostitution and "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking. . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."  (SI¶151.)[1]  In 2018, Backpage.com, LLC and its CEO, Carl Ferrer, entered guilty pleas and admitted that the great majority of Backpage's revenue-generating ads were for prostitution; soon thereafter, Backpage's Sales and Marketing Director Daniel Hyer pleaded guilty to Travel Act conspiracy and admitted, *inter alia*, that he and other Backpage employees (including co-defendant Andrew Padilla) used the term "models" in intra-company emails to refer to persons in Backpage ads who appeared to be underage—this was "to avoid looking bad in

---

[1] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf (hereinafter SR).  The Report's 840-page Appendix is available at https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf.

a lawsuit." (CR 271 at 10.) As explained below, the discovery in this case is replete with even more evidence concerning Backpage's facilitation of adult and underage prostitution.

Nevertheless, throughout the instant motion, Defendants cherry-pick paragraphs from the SI, construe them out of context, juxtapose them with excerpts from reports of witness interviews, and then attempt to argue that the Grand Jury was misled. In addition, Defendants rehash several arguments from their prior motions based on First Amendment and *mens rea* considerations—arguments this Court recently rejected. (*See* Doc. 793.) Moreover, Defendants fail to articulate a particularized need for the disclosure of the Grand Jury transcripts. Defendants' motion should be denied.

## Factual Background

On March 28, 2018, the Grand Jury returned a 61-page Indictment. (Doc. 3.) On July 25, 2018, the Indictment was supplanted by the 92-page, 100-count SI. The first 48 pages of the SI describes in great detail who was charged, the elements of the offenses, what entities were used by Defendants, the illegal objects of the charged Travel Act and money laundering conspiracies, the manner and means used by Defendants to achieve those illegal ends, and 156 overt acts in furtherance of the conspiracies. The remainder of the SI details specific Travel Act and money laundering substantive counts. As explained above and further developed in the Argument below, Defendants were repeatedly placed on notice that their criminal enterprise facilitated both adult and child prostitution.

## Argument

**I.     Defendants' Assertions of Grand Jury "Abuse" Are Unavailing.**

Defendants' request that the SI be dismissed for grand jury "abuse" should be denied. "The Court's power to dismiss an indictment on the ground of prosecutorial misconduct is frequently discussed but rarely invoked." *United States v. Samango,* 607 F.2d 877, 881 (9th Cir. 1979). The prosecution may exercise wide discretion in grand jury proceedings. *United States v. Kaplan,* 554 F.2d 958, 970 (9th Cir. 1977). Critically here, a district court "cannot grant a motion to dismiss an indictment if the motion is 'substantially *founded upon and intertwined with evidence concerning the alleged*

*offense.*'" *United States v. Lunstedt,* 997 F.2d 665, 667 (9th Cir. 1993) (emphasis added) (quoting *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir. 1986) (alterations omitted)). Rather, a court can only grant such a dismissal if it is "'entirely segregable' from the evidence to be presented at trial." *Lunstedt*, 997 F.2d at 667 (citation omitted). Otherwise, "the motion falls within the province of the ultimate finder of fact and must be deferred [to the jury]." *Id.* "[A] motion requiring factual determinations may be decided before 'trial [*only*] if trial of facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *Id.* (quoting *United States v. Covington,* 395 U.S. 57, 60, (1969)).

Moreover, "the law presumes, absent a showing to the contrary, that a grand jury acts within the legitimate scope of its authority." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 300 (1991) (citing *United States v. Mechanik,* 475 U.S. 66, 75, (1986) (O'Connor, J., concurring) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.")); *United States v. Ruppel,* 666 F.2d 261, 268 (5th Cir. 1982) (applying "the presumption that the grand jury and the prosecutor have properly performed their duties" to reject defendant's claim of grand jury abuse); *cf. In re Antitrust Grand Jury Investigation,* 714 F.2d 347, 350 (4th Cir. 1983) ("What governs the decision of this case is the polestar that a court should not intervene in the grand jury process absent a compelling reason."). A presumption of regularity attaches to grand jury proceedings, and a defendant carries a heavy burden when claiming an abuse occurred before the grand jury. *See United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983); *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980). Bare allegations, or unsubstantiated or speculative claims of impropriety, are insufficient. *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980).[2]

---

[2] Furthermore, prosecutors are not constitutionally obligated to present exculpatory evidence to the grand jury. In *United States v. Williams*, 504 U.S. 36 (1992), the Supreme Court held that the federal court's supervisory powers over the grand jury did not include the power to make a rule allowing the dismissal of an otherwise valid indictment where the

Despite the heavy burden in showing irregularities in the Grand Jury proceedings, Defendants erroneously assert the government abused the grand jury process when presenting this case to the Grand Jury in three ways: (1) by wrongfully accusing Defendants of facilitating child sex trafficking; (2) misrepresenting documentary evidence; and (3) incorrectly and/or incompletely instructing the grand jury on the law. (Doc. 780, Mot. at 1.) These assertions are incorrect.

### A. Defendants Knowingly Allowed Ads Facilitating Child Sex Trafficking.

Defendants' primary argument is that the government presented "explosive and irrelevant evidence of child sex trafficking to the Grand Jury." (Doc. 780, Mot. at 11.) Defendants cherry-pick paragraphs from the SI and juxtapose them with reports of interviews in a futile effort to show that the Grand Jury was prejudiced and misled. (Doc. 780, Mot. at 6-11.) Yet Defendants fail to address an avalanche of "intertwined" evidence demonstrating that they *knew* they were facilitating child sex trafficking.

Defendants were repeatedly notified by law enforcement, researchers, the news media, the U.S. Senate and others about the prevalence of prostitution ads—including child sex trafficking ads—on Backpage's "adult" section. (*See, e.g.*, SI¶¶74, 86, 89, 97,105, 109, 111, 127, 131, 134, 140-141, 144, 151, 155; Doc. 271 at 9-10).) Moreover, Defendants were repeatedly sued by underage trafficking victims, and confronted by religious and anti-child sex trafficking organizations urging them to adopt particular safeguards or shutter the "adult" section of their website. (*See, e.g.*, Exhs. C, D and E; SI¶134.) Despite numerous requests, Defendants refused to adopt proposals or implement software that could identify underage trafficking victims. (*See, e.g.* SI¶¶100-101, 106, 109, 113, 130-131, 134, 136; *see also* Preliminary Statement, *supra*.) In addition, countless

---

prosecutor failed to introduce substantial exculpatory evidence to a grand jury. Following *Williams*, other courts have rebuffed efforts to challenge indictments because of an alleged failure to present exculpatory evidence. *See, e.g.*, *Lapena v. Grigas*, 736 F. App'x 651, 655 (9th Cir. 2018) ("There is no federal right to have exculpatory evidence presented before a grand jury."); *United States v. Isgro*, 974 F.2d 1091, 1096 (9th Cir. 1992) (government under no duty to disclose exculpatory testimony from former trial); *United States v. Casas*, 425 F.3d 23, 38 (1st Cir. 2005); *United States v. Waldon*, 363 F.3d 1103 (11th Cir. 2004); *United States v. Byron*, 994 F.2d 747, 748 (10th Cir. 1993).

cases and arrests appeared in press reports on a regular basis involving prostitution or trafficking linked to Backpage. (*See, e.g.*, SI¶ 150.) What follows is a non-exhaustive sampling of that evidence that the government will present at trial.

        1.    *Law Enforcement, Non-Governmental and Religious Organizations*

References to Defendants' knowledge of child sex trafficking was properly included in the SI because Defendants were repeatedly confronted by organizations seeking to persuade them to shut down Backpage's "adult" section and/or adopt safeguards in response to the prevalence of underage prostitution ads on their website. For example, Defendants had meetings and exchanged correspondence with law enforcement, religious and anti-trafficking organizations about these topics, including: (1) Auburn Theological Seminary (*see* Exh. D); (2) Polaris (*see* Exh. E); and (3) the National Association of Attorneys General (NAAG). (SI¶¶74, 111).[3] Defendants cannot plausibly claim that they were not aware that the website included postings of trafficked children.

In 2011, Backpage hired former U.S. Department of Justice attorney Hemu Nigam of SSP Blue (Safety, Security & Privacy Consulting Services) in an effort to address, among other things, the proliferation of ads that featured child sex trafficking on Backpage. Nigam accompanied Defendants Lacey, Larkin and Spear to meetings with NCMEC and/or Polaris on March 1, 2011.[4] During these meetings, Defendants were confronted with ads featuring underage trafficking victims. (*See, e.g.*, Doc. 446 at 12; Doc. 446-1 at 41-62.) Following those meetings, on April 25, 2011, Nigam provided Defendants a matrix of action items recommended by SSP Blue to minimize illegal postings. (*See* SI¶100). One of those action items was that the phrase "New in Town" was indicative of child sex

---

[3] The August 31, 2011 letter from NAAG, "Re: Backpage.com's ongoing failure to effectively limit prostitution and sexual trafficking activity on its website," is available at http://www.naag.org/assets/files/pdf/signons/Backpage%20WG%20Letter%20Aug%202011Final.pdf.

[4] NCMEC helps locate children reported missing and assists physically and sexually abused children. It distributes photos of missing children, accepts tips and information from the public, and coordinates these activities with state and federal law enforcement agencies. http://www.missingkids.org/. Polaris is a Washington, D.C.- based organization that combats human trafficking, including child sex trafficking. https://polarisproject.org/.

trafficking and should put moderators on heightened alert that the ad may involve underage prostitution. (SI¶100.) Defendants failed to implement this action item and others recommended by Nigam. (SI¶101.) Many of the ads referenced in the SI and included as substantive counts included the term "New in Town" years *after* Nigam recommended this term be banned. (*See* SI¶¶169, 171, 201, Counts 12-15, 29.)

### 2. *Civil Lawsuits*

Defendants were further on notice of the spread of underage trafficking ads on Backpage as evidenced by numerous civil suits filed by underage victims. At trial, the government expects at least six victims (some referenced in the SI) to testify that they were trafficked repeatedly when underage after being posted on Backpage. Several of these victims are known to Defendants because they filed civil suits against several of them in an array of jurisdictions.[5] For example, Backpage was sued in 2012 in *J.S. v. Village Voice Media Holdings et al.*, a case involving three plaintiffs who were underage when they were trafficked on Backpage. After losing a motion for summary judgment, Backpage settled on the eve of trial.[6] Numerous other civil cases involving child victims have been filed against Backpage or its executives since 2012. (*See* Exh. C (listing several cases).)

### 3. *Lacey Repeatedly Acknowledged Child Sex Trafficking on Backpage*

Defendant Lacey's knowledge of Backpage's facilitation of child sex trafficking is evidenced in part by his response to numerous press reports that criticized Backpage as a trafficking hub. He characterized such trafficking as isolated instances and acknowledged that Backpage's efforts to prevent child sex trafficking was "not perfect, by any means." (SI¶121.) He repeatedly complained to other Backpage principals and public relations

---

[5] *See* e.g., *J.S., v. VVMH ,LLC*, No. 12-2-11362-4 (Wash. Super. Ct., Pierce Cty.) (Victim 4, age 15); *Jane Doe v. Medalist Holdings*, No. MCC1700068 (Cal. Super. Ct., Riverside Cty.) (Victim 13, age 15); and *Jane Doe Nos. 1,2 & 3 v. Backpage.com, LLC* , 17-cv-11069 (D. Mass) (Victim 8, age 15).

[6] Travelers Property Casualty Co. later sought to deny Backpage's claim of indemnification of the settlement amount, arguing that it had no duty to indemnify and citing exclusions that bar coverage for *intentional acts*. (*See Traveler Property Casualty Company of America v. Village Voice Media Holdings LLC, et al.*, 2:17cv03994 (D. Ariz.), Doc. 1.)

firms about the onslaught of negative publicity from numerous murders and the proliferation of child sex trafficking cases linked to Backpage.

For example, in response to a CNN news report critical of Backpage, Lacey attempted in May 2011 to argue that the FBI child sex trafficking statistics referenced in the story were inflated, writing: "[T]he reporter has overall FBI arrests for all hookers," and the "FBI uses 1.5% to 2% to qualify juvenile arrests." (*See* Doc. 516-6 at 2.) In discussing how to respond to an inquiry by *New York Times* reporter Nicholas Kristoff about a 13-year-old who had been trafficked on Backpage, Lacey acknowledged in January 2012 that child sex trafficking occurred on Backpage but equated underage sex trafficking victims to "underage people using phony I.D. to get into bars"; he wrote that "thousands of people patronize local bar [sic] legally,  you dont [ sic] close it when someone underage deceives the owner of the bar." (Doc. 516-7 at 2.) Later that month, in complaining about a highly-publicized Kristoff column entitled "*Where Pimps Peddle Their Goods*" that detailed a Backpage child sex trafficking victim's story,[7] Lacey acknowledged that Backpage ran ads that involved child sex trafficking, stating, "of course there are kids who get through the system, as there are in bars." (Doc. 516-8 at 2.) Again, Lacey seemed to equate Backpage child sex trafficking victims (several of whom were murdered) to underage individuals who sneak into bars. References to child sex trafficking in the SI are further supported by this intertwined evidence and did not, as argued by the defense, "unfairly and unduly taint the grand jury proceedings."

**B.    Defendants' Disagreements with the Import and Weight of Various Items of Evidence Underscore Precisely Why Trial Is Necessary.**

Defendants' assertion that the government "misled" the Grand Jury with respect to the SI's descriptions of certain items of evidence or information is unavailing. (Doc. 780, Mot. at 5-11.) Defendants cite SI¶81 as an example, and discuss an October 16, 2010 email from Padilla insisting that "if an ad makes a clear reference for sex a moderator should

---

[7]    https://www.nytimes.com/2012/03/18/opinion/sunday/kristof-where-pimps-peddle-their-goods.html

delete the ad." (Doc. 780, Mot. at 10.) But this misses the point, as Backpage's "moderation" practices sanitized such ads by removing only the most overt references to sex-for-money terms or images while still conveying the illegal message. Indeed, in the same email discussed by Defendants, Padilla wrote: "I'd still like to avoid Deleting ads when possible," "we're still allowing phrases with nuance," and "in the case of lesser violations, editing should be sufficient." (Doc. 780, Exh. 16.) The Senate Report is replete with additional incriminating Padilla emails. (*See, e.g.*, SR 28 (describing October 25, 2010 email to a moderation supervisor in which Padilla wrote: "[Your team] should stop Failing ads…. Your crew has permission to edit out text violations and images and then approve the ad."); SR 28-31.) In all events, by late October 2010, Backpage's default response to ads proposing illegal transactions was simply to edit out the evidence of illegality and approve the ad. (SR 28; *see also* Doc. 271 at 10 (Hyer plea agreement).) Put simply, the SI's discussion of "moderation" was not misleading or inaccurate.[8]

The SI properly included allegations that Defendants' moderation practices made child sex trafficking easier. Defendants were well aware that the moderation practices stripped out coded terms indicative of child sex trafficking (*e.g.*, 'Lolita,' 'new in town,' 'sweet young thing,' 'young,' 'amber alert,' among others) and continued to post the underlying ads and receive revenue from the postings. (*See* SI¶¶13-14, 85, 95, 104, 116.) For example, Defendants Andrew Padilla and Joye Vaught (with the knowledge of other Defendants) routinely removed terms indicative of child sex trafficking but continued to publish the ad (as opposed to refusing to publish the ad all together) or even refused to remove the ad when a complaint was lodged that the person featured in the ad was underage. (*See* SI¶¶85, 95, 116, 120, 123-125, 133.)

---

[8] The Senate Subcommittee on Permanent Investigations also obtained testimony from current and former Backpage moderators. One former moderator testified that all of the employee-moderators knew that the ads they reviewed offered sex for money, and that moderators "went through the motions of putting lipstick on a pig, because when it came down to it, it was what the business was about"; another former moderator testified "everyone" knew that Backpage's adult advertisements were for prostitution, and "[a]nyone who says [they] w[ere]n't, that's bullshit." (SR 36-37.)

Defendants' criticisms of other items of evidence discussed in the SI are similarly unavailing. By way of a few examples only, Defendants assert that certain recent statements from Ferrer and three Backpage emails (from July, September and October 2011) provide "overwhelming" evidence that Defendants did not facilitate underage prostitution and fully cooperated with organizations like NCMEC. (Doc. 780, Mot. at 7.) The three emails—all from 2011—substantially predate the developments outlined in the Preliminary Statement and additional evidence summarized above (which is not exhaustive) showing NCMEC's repudiation of Backpage (*see* SI¶140), Lacey's acknowledgements that child prostitution existed on Backpage, and the deluge of notice and criticism Backpage executives received for years regarding Backpage's facilitation of child sex trafficking and refusal to adopt to numerous recommended safeguards.

As an example of additional evidence demonstrating Defendants' failure to regularly report underage trafficking ads to NCMEC, Victim 13 was fifteen years old when she was trafficked between April and September 2015. (*See* SI¶ 172 and Count 23; Victim 13's posting is attached as Exh. A and FBI 302 interview attached as Exh. B.) Victim 13's postings were not referred to NCMEC by a Backpage moderator. At trial, the government will demonstrate that Victim 13 was not an anomaly; rather, numerous underage victims, including other victims detailed in the SI, were advertised for sex on Backpage—and their ads were not referred to NCMEC.

Victim 13's posting explicitly solicited prostitution, stating, "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head." (SI¶¶172 and 201, Count 23.) Her ad included coded terms indicative of underage trafficking, namely mentioning "young" four times within the text of the posting and a reference to "lil mama." (*See* Exh. A.)

Victim 13 is expected to testify that in September 2015, after having been trafficked at the age of 15 for several weeks, she began to receive emails from Backpage in response to her posts. The emails directed her to remove the term "young"; she followed that direction and simply reposted her ad without the prohibited term. In addition to Victim

13's ad, the SI contains references to sixteen other victims, many underage, whose Backpage ads included explicit or veiled references to sex for money. (*See* SI¶¶160-176.) Many of these victims are expected to provide similar testimony regarding their postings that included terms indicative of being underage, and that they engaged in numerous sex acts on a daily basis and received compensation that mostly went to their pimp or trafficker. Other victims discussed in the SI were murdered by their customers; one was killed while attempting to escape from her trafficker. (SI¶165, 173 174, 175.)

Further, Defendants' assertions that Backpage documents addressing, for example, the "Dallas Plan" were inaccurately described in the SI are unavailing. Other evidence intertwined with that discussed in the SI demonstrates that the Dallas/aggregation plan involved the creation of prostitution ads in an effort to expand Backpage's prostitution advertising business. (*See, e.g.*, Doc. 271 at 9 (Hyer plea agreement) ("I knew that the majority of the ads that I and others at Backpage were creating through the aggregation process were actually offering illegal prostitution services.").) Similarly, Defendants' spin on what phrases like "plausible deniability" meant in other Backpage documents, or their refusal to acknowledge that they understood "GFE" (Girlfriend Experience) as a coded sex-for-money term, are quintessential disagreements about the evidence that Defendants can advance at trial—and not indicia of grand jury "abuse." (*See* Doc. 780, Mot. at 8-10.)

Defendants' quibbles with the government's descriptions of certain items of evidence are not the stuff of grand jury "abuse"; if Defendants take a different view of the import or weight or meaning of evidence, the proper forum for resolving their disputes is trial—not a motion to dismiss. *See United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (a motion to dismiss cannot be used as a vehicle for challenging the government's proof); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002); *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993). *Cf. United States v. Hoeffener*, 2018 WL 2996317, at *8 (E.D. Mo. May 9, 2018) ("[s]omething more is needed than mere disagreement with the agent's descriptions of the images or the desire for a greater context" to trigger a *Franks* hearing).

### C. Defendants' Motion to Dismiss Based on First Amendment and *Mens Rea* Concerns Should Also Be Denied.

Next, Defendants rehash their First Amendment, *mens rea* and Travel Act arguments from their prior motions. (*Compare* Doc. 561, Mot. to Dismiss at 14-37 and n.33, *and* Doc. 746, Mot. to Dismiss at 1-12, *with* Doc. 780, Mot. to Dismiss at 11-15.) The government incorporates by reference its responses to those motions—specifically Docs. 649 and 776. In its October 24, 2019 Order, this Court considered and rejected Defendants' theories. (*See* Doc. 793 at 12-20 (denying Doc. 561).) As explained in Docs. 649, 776 and 793, the prostitution solicitations that Defendants published were categorically excluded from First Amendment protection; Defendants' operation of the internet's leading prostitution advertising website and related business practices (which were calculated to increase Backpage's volume of prostitution advertising and conceal or otherwise launder resulting revenues) were not protected editorial or publishing functions; Defendants intentionally promoted or facilitated prostitution, and took several overt steps in furtherance of such promotion or facilitation; and Defendants' prostitution advertising customers (including pimps, prostitutes and traffickers) were in the business of prostitution. Moreover, the SI and evidence at trial will demonstrate that Defendants deliberately operated or managed Backpage.com, LLC in an effort to increase its prostitution advertising profitability, resulting in exponential increases in profits and with full knowledge that the overwhelming majority of Backpages' revenue-generating ads promoted or facilitated prostitution. (*See, e.g.,* SI¶¶1, 9-11, 15, 22-32, 177, 192; 18-CR-464, Doc. 7-2 at 12-13 (Ferrer plea agreement); 18-CR-465, Doc. 8-2 at 11 (Backpage.com, LLC plea agreement); Doc. 271 at 8-10 (Hyer plea agreement).)

### II. Defendants Have Not Established a Particularized Need for the Grand Jury Transcripts.

Defendants' alternative request for disclosure of the Grand Jury transcripts should be denied.[9] A court may permit disclosure of grand jury materials under Rule 6(e)(3)(E)(i)

---

[9] Defendants assert the government never provided a reason for not disclosing the transcripts. (*See* Doc. 780, Mot. at 17 n.8.) That's incorrect. Despite the volume of

[formerly 6(e)(3)(C)(i)] only when the requesting party has demonstrated a "particularized need." *Douglas Oil Co. of Calif. v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979). Under this standard, the movant must demonstrate that the material sought is:

> [N]eeded to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [the] request is structured to cover only material so needed . . . . [Moreover], in considering the effects of disclosure of grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries.

*Id*. at 222; *see also United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) (emphasizing that the "trial judge should order disclosure of grand jury transcripts only when the party seeking them has demonstrated that a 'particularized need exists which outweighs the policy of secrecy'" and holding that "the district court was correct in denying Walczak's motion to discover the grand jury transcripts" because "Walczak gave two reasons why he sought discovery of the transcripts" but "[n]either reason constitutes 'particularized need'").

Disclosures will not be allowed upon a mere showing of relevance, nor for general discovery. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) ("This 'indispensable secrecy of grand jury proceedings' must not be broken except where there is a compelling necessity. There are instances when that need will outweigh the countervailing policy. But they must be shown with particularity. No such showing was made here. The relevancy and usefulness of the testimony sought were, of course, sufficiently established. . . . Yet these showings fall short."); *United States v. Evans & Associates Const. Co., Inc.*, 839 F.2d 656, 658 (10th Cir. 1988) ("The party seeking disclosure must demonstrate . . . there is a particular, not a general, need for the material. The rule is not to be used as a substitute for general discovery."); *Petrol Stops Northwest v. United States*, 571 F.2d 1127, 1129 (9th Cir. 1978), *rev'd on other grounds sub nom.*,

---

exhibits attached to their motion, Defendants neglected to include government's May 16, 2019 letter explaining (with authority) why Defendants had failed to meet their heavy burden of justifying disclosure of grand jury materials. (*See* Exh. F.) Defendants never provided any counter authority, and they failed to include the government's correspondence as an attachment to their motion—as the government requested. (*See* Exh. F at 3.)

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211(1979). In most cases, considerations such as convenience, avoidance of delay, case complexity, the passage of time, and expense, also are insufficient reasons to justify disclosure. *See Smith v. United States*, 423 U.S. 1303, 1304 (1975) (holding, where movant sought disclosure of grand jury transcripts to preserve "investigatory . . . resources" and because transcripts would be "generally useful," that "it is doubtful whether either of these reasons . . . meets the 'compelling necessity' standard of Rule 6(e)"); *United States v. Procter & Gamble*, 356 U.S. at 677, 683 (1958); *In re Sells*, 719 F.2d 985, 991 (9th Cir. 1983).

Defendants have not met their burden of demonstrating the particularized, specific need for grand jury materials required by *Douglas Oil* and its progeny. *First*, Defendants rely upon speculative factual misstatements before the Grand Jury as a basis for the Court to order the disclosure of the transcripts. These theoretical arguments do not establish the particularized need required for disclosure and for that reason alone Defendants' request should be denied. And, their arguments regarding the government supposedly misstating the elements of the Travel Act have already been rejected by the Court. (*See* Doc. 793.)

*Second*, Defendants argue that the Grand Jury transcripts should be produced pursuant to *Jencks, Giglio* or *Brady*. This ground lacks merit as well. Defendants presuppose that a parade of witnesses testified before the grand jury, but only two law enforcement witnesses provided testimony. It is anticipated that the government will not even call these Grand Jury witnesses to testify at trial as they have not been noticed as witnesses. Thus, no *Jencks* obligation is expected to arise.

*Third*, the request for the transcripts of the charge or instructions to the Grand Jury should be denied because Defendants have failed to articulate a basis for disclosure. *See, e.g., United States v. Barry*, 71 F.3d 1269, 1274 (7th Cir. 1995) (rejecting defendant's argument that legal instructions given to the grand jury are merely "ministerial in nature and are not 'matters occurring before the grand jury'; denying motion for disclosure); *United States v. Smith,* 105 F. Supp. 3d 255, 261 (W.D.N.Y. 2015) ("The absence of detailed allegations regarding Defendant's alleged knowledge of the conspiracy is

insufficient to create a particularized need [for the government's legal instructions to the grand jury]."); *United States v. Faltine*, 2014 WL 4370811, at *6 (E.D.N.Y. Sept. 2, 2014); (denying motion for disclosure of jury empanelment instructions).

Defendants cite *United States v. Belton* as authority for the disclosure of the charge to the Grand Jury. 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015). (Doc. 780, Mot. at 16 n.6.) *Belton* recognized that courts have reached different conclusions on this issue, but it adopted the view that to obtain the instructions to the grand jury the defendants do not have to demonstrate a particularized need. 2015 WL 1815273, at *3. *Belton* was recently rejected by *United States v. Chambers*, 2019 WL 1014850, at *3 (D. Conn. Mar. 4, 2019), which wrote:

> The Court is not persuaded that such a relaxed approach adequately protects the long-recognized goals of grand jury secrecy. . . .[10] Indeed, "[legal] instructions [given to the Grand Jury] ..., or the existence of such instructions goes to the substance of the charge being laid before the Grand Jury as well as how the Grand Jury is to proceed regarding the type and manner of produced evidence before the panel." *United States v. Larson*, 2012 WL 4112026, at *5 (W.D.N.Y. Sept. 18, 2012). Accordingly, affording these instructions the same level of secrecy as other grand jury materials is, in this Court's view, appropriate.

Other courts—including those within the Ninth Circuit—have taken a similar view. *See, e.g.*, *United States v. Stepanyan*, 2016 WL 4398281, at *2 (N.D. Cal. Aug. 18, 2016) ("courts have uniformly rejected the argument that the government's instructions or remarks to the grand jury are not entitled to secrecy"); *United States v. Morales*, 2007 WL 628678, at *4 (E.D. Cal. Feb. 28, 2007) (denying defendant's request for disclosure of government's instructions to the grand jury). Here, granting the request for the grand jury instructions would do nothing but enable Defendants to "engage in a fishing expedition in hopes of uncovering an impropriety or defect in the proceeding where they have no basis to conclude that an impropriety or defect exists." *Faltine*, 2014 WL 4370811, at *5.

## Conclusion

Having been provided both a lengthy and thorough speaking indictment and extensive discovery evidencing numerous instances in which Defendants were put on

---

[10] Citing *In re Grand Jury Subpoena,* 103 F.3d 234, 237 (2d Cir. 1996).

notice of Backpage's facilitation of underage prostitution, Defendants cannot plausibly claim that references in the SI (and "intertwined" evidence the government will present at trial) to that evidence constitute grand jury "abuse." Defendants' alternative request to obtain grand jury transcripts and/or instructions should be rejected because Defendants have failed to articulate a particularized need. Accordingly, Defendants' Motion (Doc. 780) should be denied.

Respectfully submitted this 27th day of November, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

# **CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office