## Index of Exhibits

**Exhibit 1**      April 26, 2018 letter sent to the government

**Exhibit 2**      May 2, 2018 letter sent to the government

**Exhibit 3**      May 1, 2018 letter sent to the government

**Exhibit 4**      May 3, 2018 letter received from government counsel

**Exhibit 5**      May 14, 2018 letter received from government counsel

**Exhibit 6**      May 18, 2018 letter received from government counsel

**Exhibit 7**      Order dated October 12, 2018 (Dkt. 338) ("Logan Order I")

**Exhibit 8**      Order dated October 18, 2018 (Dkt. 345) ("Logan Order II")

**Exhibit 9**      April 5, 2018 Memorandum of Interview, as revised and adopted on February 5, 2019

**Exhibit 10**    April 17, 2018 Memorandum of Interview, as revised and adopted on February 5, 2019

**Exhibit 11**    May 10, 2018 Memorandum of Interview, as revised and adopted on February 5, 2019

**Exhibit 12**    July 23, 2018 Memorandum of Interview, as revised and adopted on February 5, 2019

**Exhibit 13**    July 26, 2018 Memorandum of Interview, as revised and adopted on May 13, 2019

**Exhibit 14**    December 14, 2018 Memorandum of Interview, as revised and adopted on May 13, 2019

**Exhibit 15**    February 5, 2019 Memorandum of Interview

**Exhibit 16**    May 13, 2019 Memorandum of Interview

# Exhibit 1

PICCARRETA DAVIS KEENAN FIDEL PC
LAWYERS

MICHAEL L. PICCARRETA
JEFFERSON KEENAN
LOUIS S. FIDEL

BARRY M. DAVIS
(1948-2016)

April 26, 2018

2 EAST CONGRESS STREET, SUITE 1000
TUCSON, ARIZONA 85701
(520) 622-6900
FAX (520) 622-0521
WWW.PD-LAW.COM

**VIA EMAIL: Kevin.Rapp@usdoj.gov**

Kevin Rapp, Esq.
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Ste. 1200
Phoenix, AZ 85004-4408

      Re:    Backpage

Dear Kevin:

     It is my understanding that Carl Ferrer has indicated to the government that he is waiving the attorney-client privilege on behalf of himself, Backpage, and the other entities he controls. If that is not the case, please let me know.

     Also, regardless of whether Mr. Ferrer and the entities he controls waive the attorney-client privilege as to themselves, such a waiver or waivers would not waive the privilege of any other individuals or entities, nor would it waive any privileges held jointly by Mr. Ferrer and/or his entities and other individuals or entities, whether in materials seized by the government or as to any other privileged communications. These joint privileges held by the various parties require that the government not review any materials concerning communications with counsel in the various civil cases, or any communications concerning Davis Wright Tremaine LLP, Henze Cook Murphy, PLLC, Rusing Lopez & Lizardi, PLLC, or Don Moon, Esq. Any government officials who are inspecting or reviewing such materials or communications, including members of the taint team, should be so advised.

                             Sincerely,

                             Michael L. Piccarreta

MLP:mh
cc:    Paul Cambria, Esq. (via email: pcambria@lglaw.com)
      Mike Kimerer, Esq. (via email: mdk@kimerer.com)
      Bruce Feder, Esq. (via email: bf@federlawpa.com; fl@federlawpa.com)
      KC Maxwell, Esq. (via email: kmaxwell@bgrfirm.com)
      Steve Weiss, Esq. (via email; sweiss@karpweiss.com)

# Exhibit 2

PICCARRETA DAVIS KEENAN FIDEL PC
LAWYERS

MICHAEL L. PICCARRETA
JEFFERSON KEENAN
LOUIS S. FIDEL

BARRY M. DAVIS
(1948-2016)

2 EAST CONGRESS STREET, SUITE 1000
TUCSON, ARIZONA 85701
(520) 622-6900
FAX (520) 622-0521
WWW.PD-LAW.COM

May 2, 2018

VIA EMAIL

Dominic Lanza (Dominic.Lanza@usdoj.gov)
Kevin Rapp (Kevin.Rapp@usdoj.gov)
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Ste. 1200
Phoenix, AZ 85004-4408

     Re:    United States v. Lacey, et al.

Dear Dom and Kevin:

     It was mentioned in court this week that the government has set up, through the Justice Department, an interoffice taint team to review certain information, presumably from computers relative to Backpage and presumably for the purpose of segregating all potential privileged communications. On behalf of Mr. Padilla and the other defendants (unless they specifically indicate to the contrary), we are preserving any and all privileges along with any and all objections to the use of interoffice taint teams. This objection is not directed to you personally, it is simply a general objection to use of any interoffice taint team regardless of who is the assigned taint attorney. I also object to any federal law enforcement agents obtaining, reviewing, discussing and using any attorney-client privileged information in the course of any investigation. If, in fact, this has occurred, those agents should be removed from the investigation and any attorney-client privileged information that they were involved with in any manner whatsoever should be sealed and excised from the file.

     Accordingly, on behalf of Mr. Padilla and the other named defendants, we are asserting all privileges, including attorney-client privilege, and objecting to the government's use of "taint team" type procedures with regard to documents or any

PICCARRETA DAVIS KEENAN FIDEL PC

other tangible or intangible objects that may possibly contain attorney-client privileged information.

As stated by Judge Bury,

> liberal use of taint teams should be discouraged because they present "inevitable and reasonably foreseeable risks that privileged information may be leaked to prosecutors." (Renzi's Objection at 25 (citing *In re Grand Jury Subpoenas,* 454 F.3d 511, 523 (6th Cir. 2006)). "That is to say, the government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint team attorneys will make mistakes or violate their ethical obligations." *Id.*

*United States v. Renzi,* 722 F.Supp.2d 1100, 1112 (D.Ariz. 2010).

Other courts have been equally critical of the practice, if not more so. "When considering the purposes of the attorney-client privilege, it is obvious that no governmental entity should intentionally review privileged material without the express approval of the court." *United States v. Pedersen,* 2014 WL 3871197, at *29 (D.Ore. 2014). "It would be a rare defendant who would feel comfortable speaking openly with his defense attorney knowing that somebody from the government, even a filter team attorney, was reviewing those communications." *Id.* Moreover, "taint team" procedures should only be used as a last resort. *Id.,* at *31 ["If there is a feasible means to segregate privileged material without risk of accidental review and without use of a taint team, such means should be employed"].

In *United States v. Neill,* 952 F.Supp. 834 (D.D.C. 1997), the court held that "the government's affirmative decision to invoke these procedures constitutes a *per se* intentional intrusion" into the attorney-client relationship. *Id.* at 840-41. Accordingly,

> Where the government choses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special masters, ...it bears the burden to rebut the assumption that tainted material was provided to the prosecution team.

PICCARRETA DAVIS KEENAN FIDEL PC

*Id.* at 841 [numerous citations omitted].

I think the most prudent course is to have a special master, a magistrate, or the district court review any possibly privileged materials to decide whether they are provided to government attorneys and agents. The defendants would request an opportunity to have input prior to the disclosure of any potentially privileged material.

I am therefore asserting Mr. Padilla's and the other named defendants' attorney-client privileges, objecting to the use of internal / governmental / justice department "taint team" procedures, and requesting *in camera* review by the court, a magistrate, or a special master of any documents that possibly contain privileged information including attorney-client privileged information.

Sincerely,

Michael L. Piccarreta

MLP:bp

cc:    Tom Bienert (via email: tbienert@bmkattorneys.com)
       Paul Cambria (via email: pcambria@lglaw.com)
       Bruce Feder (via email: bf@federlawpa.com; fl@federlawpa.com)
       Mike Kimerer (via email: mdk@kimerer.com)
       Gary Lincenberg (via email: gsl@birdmarella.com)
       KC Maxwell (via email: kcm@kcmaxlaw.com)
       Steve Weiss (via email: sweiss@karpweiss.com)
       John Kucera (via email: john.kucera@usdoj.gov)
       Margaret Perlmeter (via email: Margaret.perlmeter@usdoj.gov)
       Reginald Jones (via email: reginald.jones4@usdoj.gov)

# Exhibit 3

# PICCARRETA DAVIS KEENAN FIDEL PC
### LAWYERS

MICHAEL L. PICCARRETA
JEFFERSON KEENAN
LOUIS S. FIDEL

BARRY M. DAVIS
(1948-2016)

May 1, 2018

2 EAST CONGRESS STREET, SUITE 1000
TUCSON, ARIZONA 85701
(520) 622-6900
FAX (520) 622-0521
WWW.PD-LAW.COM

VIA EMAIL

Dominic Lanza (Dominic.Lanza@usdoj.gov)
Kevin Rapp (Kevin.Rapp@usdoj.gov)
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Ste. 1200
Phoenix, AZ 85004-4408

   Re:  United States v. Lacey, et al.

Dear Dom and Kevin:

   I have been asked by the defendants to request early production by the government of the following categories of documents as soon as possible so that they can be made part of the record in regards to the government's motion for disqualification. These requested documents, which are attached to this letter, are necessary in order to properly prepare the response and also prepare whatever related motions need to be filed and heard with the government's motion. I would hope that we could receive some or all of whatever records can be gathered together as quickly as possible.

   I am willing to modify my request for ease of production or clarify it if you have any questions.

           Sincerely,

           Michael L. Piccarreta

MLP:mh
Enclosure
cc:  Tom Bienert (via email: tbienert@bmkattorneys.com)
   Paul Cambria (via email: pcambria@lglaw.com)
   Bruce Feder (via email: bf@federlawpa.com; fl@federlawpa.com)
   Mike Kimerer (via email: mdk@kimerer.com)
   Gary Lincenberg (via email: gsl@birdmarella.com)
   KC Maxwell (via email: kmaxwell@bgrfirm.com)
   Steve Weiss (via email: sweiss@karpweiss.com)

## LIST OF DOCUMENTS

1.      All communications between the USAO or any other governmental law enforcement authorities and Carl Ferrer or his counsel concerning DWT's representation of any Backpage parties (this and all of the following requests include any and all communications between Carl Ferrer, his counsel, or any other government representative).

2.      All documents including engagement letters, common interest or joint defense agreements or related communications among counsel, parties or others related to joint representation or defense of Backpage parties that have been provided to the government by Mr. Ferrer or his counsel.

3.      All communications with Mr. Ferrer or his counsel about representation or putative conflicts of counsel, including all correspondence that has been received from April 5, 2018, onward.

4.      Any documents that reflect the date upon which Mr. Ferrer's counsel first had communications with the government related to possible cooperation or with the intention of exploring possible cooperation.

5.      All correspondence, documents, writings, tangible or electronic, that were provided by the law firm of Clarence Dyer & Cohen (CDC) to any representative of the government in relation to the criminal and civil resolution of the legal issues relating to Carl Ferrer, Backpage, or any of its related entities.

6.      Any correspondence, documents, writings, tangible or electronic, that were provided to any government representatives by the law firm of CDC in relation to the criminal and civil resolution of the legal issues relating to Carl Ferrer, Backpage, or any of its related entities.

7.      All reports, FBI Form 302s, or other memoranda prepared by the USAO or any federal law enforcement agency relating to information provided by Carl Ferrer or his legal counsel to the government relating to the entering of a negotiated civil and/or criminal agreement or provided to the government subsequent to entering into a plea agreement.

8.      All written agreements between Carl Ferrer, Backpage, or any related entities and the government, or any of its cooperating governmental entities relating to the investigation of Mr. Ferrer, Backpage or any of its related entities that have not previously been provided.

9.      Any notes, memoranda, or summaries of any oral conversations or telephone calls between any representative of the government and any representatives of CDC or Carl

Ferrer related to the negotiated civil and/or criminal resolution of the legal issues relating to Carl Ferrer, Backpage, or any of its related entities, whether prior or subsequent to the negotiated resolution of these matters.

10.     Copies of any tapes or electronic memorialization of any conversations, interviews, discussions with the law firm of CDC or Carl Ferrer related to the negotiated resolution of the case or subsequent to the negotiated resolution of the case.

11.     Any written or recorded statements or testimony provided by Carl Ferrer about the operations of Backpage, or any of its related entities, or any of the defendants.

12.     All communications with the USAO or any other government authorities to and from lawyers representing plaintiffs in litigation against Backpage, its employees, or related entities.

# Exhibit 4



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:    (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:  (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:  (602) 514-7450 |

May 3, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

<u>VIA EMAIL</u>

Re:    *Your Letter of April 26, 2018*

Dear Mike:

We wish to respond to your April 26, 2018, letter.  The letter begins with the following statement:   "It is my understanding that Carl Ferrer has indicated to the government that he is waiving the attorney-client privilege on behalf of himself, Backpage, and the other entities he controls.  If that is not the case, please let me know."

On this issue, your understanding is not fully accurate.  It is true that Mr. Ferrer has executed a broad waiver of the *corporate* attorney-client privilege possessed by Backpage.com, LLC and various other Backpage-related entities.  Enclosed with this letter is a copy of the waiver agreement.  However, as you will see, the waiver agreement makes clear that Mr. Ferrer has not waived his *individual* attorney-client privilege, either as to his current criminal defense attorneys or to the prior attorneys who represented him on an individual basis.

Your letter also states that "regardless of whether Mr. Ferrer and the entities he controls waive the attorney-client privilege as to themselves, such a waiver or waivers would not waive the privilege of other individuals or entities, nor would it waive any privileges held jointly by Mr. Ferrer and/or his entities and other individuals or entities, whether in materials seized by the government or as to other privileged communications."

Once again, we do not fully agree.  On the one hand, it is true that, to the extent Mr. Ferrer or any of the Backpage entities entered into a joint defense agreement ("JDA") with others, there may be restrictions on the ability to unilaterally waive JDA-derived privileges. For this reason, we have taken steps to avoid the disclosure of any JDA-protected material. However, when it comes to communications covered by Backpage's corporate attorney-client privilege (or by the corporate attorney-client privilege held by any of Backpage's

predecessor/related entities), the law makes clear that Mr. Ferrer—as Backpage's CEO and 100% owner since 2015—is empowered to waive the corporation's privilege, as he has done here. *See generally Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.  New managers . . . may waive the attorney-client privilege with respect to communications made by former officers and directors.  Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.").

Furthermore, once the corporate privilege has been so waived, it is very difficult for an individual corporate employee (such as your client, Mr. Padilla) to prevent the disclosure of communications that were previously covered by the privilege.  In *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010), the Ninth Circuit addressed this issue in detail, noting that "[o]ne of these special problems" that arises in the context of the corporate attorney-client privilege "is that corporate officers, directors, and employees who communicate with corporate counsel on behalf of the corporation may later attempt to claim a personal attorney-client privilege regarding those communications after the corporation has waived its own privilege." *Id.* at 1156.  The *Graf* court held that a corporation is ordinarily "*free to obtain information from its officers, employees, and consultants about company matters and then control the attorney-client privilege, waiving it when necessary to serve corporate interests*," and that an employee may prevent such a disclosure only under limited circumstances. *Id.* at 1160-61 (emphasis added).  Specifically, once the corporate privilege has been waived, an individual employee may prevent disclosure only by establishing the following five factors:  "*First*, they must show they approached counsel for the purpose of seeking legal advice.  *Second*, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities.  *Third*, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise.  *Fourth*, they must prove that their conversations with counsel were confidential.  And *fifth*, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company." *Id.* at 1160 (citation omitted) (emphasis in original).

Here, we have not seen any evidence suggesting these five factors are satisfied.  If you are aware of any such evidence (such as proof that Mr. Padilla, while working at Backpage, had discussions with corporate counsel about purely personal matters unrelated to the general affairs of Backpage and made clear he was seeking legal advice in an individual capacity), please let us know.

Finally, you may also be aware (through your discussions with co-counsel) that Backpage has, in the past, voluntarily shared certain privileged materials with third parties. Such disclosure provides an independent basis, apart from the written waiver agreement, for concluding that the corporate attorney-client privilege has been waived. *See, e.g., In re Pac.*

May 3, 2018
Page 3 of 3

*Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012) ("[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege.").

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs

## WAIVER OF ATTORNEY CLIENT PRIVILEGE

I, Carl Ferrer, state the following in my capacity as sole owner and manager of Dartmoor Holdings LLC, which wholly owns and operates Backpage.com LLC (of which I am Chief Executive Officer), Website Technologies LLC, IC Holdings LLC, Posting Solutions LLC, and Postfaster LLC, hereafter referred to as "the Companies." I am authorized to waive each of the Companies' attorney-client privilege and am doing so because I believe executing such waiver is in each of the Companies' best interest.

I further state that, being represented by counsel and being fully advised as to this matter, I hereby voluntarily waive all aspects of the attorney-client privilege, on behalf of the Companies, which otherwise may have applied to communications, documents and information that I or the Companies have provided to law enforcement or which law enforcement may already have in its possession from other sources, as follows:

 a. All communications related to the "adult," "escort," "dating," and "services" sections of the Companies' websites, including but not limited to company policies, moderation practices, age verification practices, legality, content, and compliance with law enforcement.

 b. All communications related to the Companies' financial activity, including but not limited to the sale of Backpage.com in 2015, all loans and financing agreements related to the sale of that company in 2015, monetization of the Companies' websites, payment processing, credit card processing, banking, and payment of loans.

 c. All communications regarding the relationship between the Companies (including their current owner and employees) and their former owners and officers, including but not limited to, James Larkin, Michael Lacey, John ("Jed") Brunst and Scott Spear, as well as communications between the Companies (including their current owner and employees) and Don Bennett Moon.

I further state that, in addition to the foregoing waiver, I hereby voluntarily waive, on behalf of the Companies, all aspects of the attorney-client privilege which otherwise may have applied to the Companies' relationship with any attorney ("previous attorneys") who was retained to represent the Companies in connection with various matters related to the subjects listed above. This attorney-client privilege waiver is meant to apply to all communications between the Companies and any attorney representing them at any time; all acts undertaken by others acting on the Companies' attorneys' behalf taken in connection with representing the

Companies related to the subjects listed above; and any and all documents generated through their representation of the Companies that belong to the Companies.

I further state that this waiver does not apply in any respect to any aspect of the Companies' representation by David Botsford of Botsford & Roark LLP, or to any aspect of my personal attorney-client relationship with attorneys who have represented me in the past or who currently represent me in an individual capacity, including, but not limited to, Nanci Clarence, Jonathan Baum and Shaneeda Jaffer of Clarence, Dyer & Cohen, and the Law Offices of E.G. Morris.

_4/5/2018_
DATED

Carl Ferrer

# Exhibit 5



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:  (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:  (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:  (602) 514-7450 |

May 14, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

<u>VIA EMAIL</u>

    Re:    *Your Letter of May 1, 2018*

Dear Mike:

    I wish to respond to a letter you sent on May 1, 2018, requesting the production of certain categories of documents.  As an initial matter, and as discussed during our May 4 meeting, the relevance of the materials you are requesting is unclear.  The motion pending before the Court seeks to determine whether the DWT and HCM law firms have a conflict of interest.  The materials you have requested do not, in many instances, have any apparent connection to that topic.  We are happy to provide additional consideration to your request if you can articulate why they might be subject to discovery under the relevant rules of criminal discovery.

    I would further note that it appears, based on the nature of your requests, that you believe it was improper for the United States to enter into a cooperation-based plea agreement with Mr. Ferrer because he was a member of a joint defense agreement ("JDA") and/or you suspect the United States has improperly obtained JDA-protected information from Mr. Ferrer. Through this letter, I wish to explain why neither premise is valid.

    The courts have recognized that a JDA participant must retain the ability to plead guilty and cooperate and that the government has a strong, legitimate interest in considering such requests.  For example, in *United States v. LeCroy*, 348 F. Supp. 2d 375 (E.D. Pa. 2005), the court recognized that "[a] JDA is not an escape-proof prison" and that "the right of the grand jury to get the facts, and the right of [a JDA participant] to decide to cooperate with the grand jury, are paramount."  *Id.* at 382, 386.  The courts have further recognized that a JDA participant is free to disclose liability-generating matters in which he personally participated, even if those matters are also the subject of JDA-related sharing and discussion.  *See, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) ("[W]hat the parties call a 'joint

May 14, 2018
Page 2 of 4

defense' privilege is more aptly termed the 'common interest' rule. Even when that rule applies, however, a party always remains free to disclose his own communication."); *United States v. Balsiger*, 2013 WL 3490873, *11 (E.D. Wisc. 2013) ("Balsiger and Currey cannot stop . . . another person . . . from waiving its privilege as to its own communications simply because the communication was shared with them or their counsel as part of the joint defense."); *United States v. Bekaert Steel Wire Corp.*, 1985 WL 25747, *3 (D. Md. 1985) (rejecting JDA-related claim where cooperator "Neri was not called before the grand jury to answer questions about what he may have learned through defense counsel; he was called to testify about events in which he had actively participated. . . . Neri participated in several meetings and had an ongoing relationship with the principals in the case for several years. It was that information that the government sought, not the substance of any communications between counsel.").

For these reasons, the courts have stated that, when engaging in cooperation-related discussions with a JDA participant, the government should simply take reasonable steps to prevent the receipt of any JDA-protected information. *See, e.g., United States v. Salvagno*, 306 F. Supp. 2d 258, 272-73 (N.D.N.Y. 2004). Here, the United States has taken extensive efforts to do so. The United States' first meeting with Mr. Ferrer did not take place until the morning of April 5, 2018. The proffer agreement (enclosed as Exhibit A) specifically stated that Mr. Ferrer should not discuss JDA-protected material, this instruction was reiterated on several occasions during the proffer, and Mr. Ferrer's attorneys have confirmed that no such material was discussed on April 5. The requirement not to disclose any JDA-protected material was also reiterated in the cooperation addendum to Mr. Ferrer's plea agreement (which is currently under seal but will be produced to you in the future), and Mr. Ferrer's counsel have confirmed that no JDA-protected material has been discussed during Mr. Ferrer's subsequent interviews by the government. Finally, the government also has not received a copy of the actual JDA or any other common interest agreement (we have avoided doing so, in an abundance of caution, precisely because we wish to avoid any grey areas).

Furthermore, even if (contrary to the government's best efforts) Mr. Ferrer had somehow disclosed JDA-protected information during his discussions with the government, the timing of his proffer undermines any claim of prejudice. As noted, the United States did not meet with Mr. Ferrer, or receive a proffer of information from Mr. Ferrer's counsel, until April 5, 2018. As a result, no information from Mr. Ferrer was used to obtain the March 28, 2018 indictment or obtain any of the search warrants in this case. Moreover, as you know from our extensive "reverse proffer" to you in December 2017, the theory underlying the indictment has long been transparent.

Courts have concluded that when (as here) the government establishes that it has taken steps to avoid the disclosure of JDA-protected information, the cooperator's counsel has averred that no such disclosure has occurred, and the defendant merely suspects (notwithstanding those avowals) that he was prejudiced by an improper disclosure, there is no entitlement to an evidentiary hearing. *See, e.g., United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) (affirming district court's denial of evidentiary hearing, where defendants

May 14, 2018
Page 3 of 4

alleged that government had obtained JDA-protected information from a cooperator, because the "government presented evidence of the steps it took to insulate the [prosecutors] from any knowledge gained by [the cooperating witness] from his contact with the codefendants after he agreed to cooperate" and the defendants "did not present any evidence to suggest that [the cooperating witness] revealed any privileged information to the government"); *Salvagno*, 306 F. Supp. 2d at 272 ("[T]he court denies defendants' motion requesting an order directing an evidentiary hearing.    Defendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom.    Moreover, the government avers that it neither sought nor accepted any [such] information."); *United States v. Anderson*, 288 F.3d 335, 338 (7th Cir. 2002) (affirming denial of evidentiary hearing, where defendant alleged that cooperators shared privileged information with the prosecution, because the defendant had "not alleged with sufficient detail, definitiveness, or specificity" the privileged matters that were allegedly disclosed).

Finally, to the extent your letter reflects a belief that the government's decision to file the disqualification motion was somehow improper, that belief is incorrect.  The potential conflict-of-interest issues in this case did not even come to my attention until April 8, during a phone call with Mr. Larkin's former attorneys (who simply inquired if the government had any concerns about the anticipated representation arrangements in the case).  We did not initially recognize the seriousness of those issues, as evidenced by the fact that the government did not object when the HCM firm represented Mr. Lacey during various hearings on the week of April 9-13 or when various DWT lawyers filed notices of appearance during the week of April 9-13.

Once the conflict-of-interest issues became more apparent to us, we conducted legal research.  This research confirmed that the DWT and HCM firms were, in fact, laboring under deep conflicts of interest.  Nevertheless, due to the sensitivity of the issues, we sought to engage in a meet-and-confer process before filing anything with the Court.  Among other things, we mentioned our concerns to Mr. Cambria and Ms. Henze Cook during a phone call on April 23, sent an email to Mr. Cambria and Ms. Henze Cook on April 24 identifying the various cases and ethical rules supporting our concerns, and participated in a conference call with you and other members of the defense team on April 25.  During this call, we specifically asked if there were any written agreements in which Mr. Ferrer had agreed to waive the DWT and HCM firms' conflicts of interests so they could represent Messrs. Lacey and Larkin.  None were mentioned.

The case law makes clear that prosecutors should bring conflict-of-interest issues to the Court's attention as soon as they become apparent, and courts have faulted prosecutors (and reversed convictions) for failing to do so or waiting to do so until the eve of trial.  *See, e.g., United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) ("We add a final note.  The reversal here is the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. . . .  We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future."); *United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000).

May 14, 2018
Page 4 of 4

That is simply what we have done here. Indeed, before filing the motion, the United States consulted with Mr. Ferrer's counsel, primarily to confirm that the factual representations contained in the motion were accurate. During these discussions, Mr. Ferrer's counsel stated that Mr. Ferrer did not wish to be a party to the motion. As a result, the United States filed the motion on its own behalf, in the interest of protecting the integrity of the trial. *See, e.g., United States v. Kight*, 2017 WL 4619024, *13 n.19 (N.D. Ga. 2017) ("[T]he Court rejects Kight's argument that the Government, without Lankford's permission, is precluded from seeking Armstrong's disqualification or that Lankford was required to join in the Government's Motion."); *United States v. Culp*, 934 F. Supp. 394, 399 (M.D. Fla. 1996) (granting government's disqualification motion and stating that defense counsel's "argument that the Government lacks standing to raise the issue of a potential conflict gives short shrift to the respective interests of the Government and the Court in ensuring that judgments remain intact on appeal. . . . [Counsel's] challenges to the Government's standing betray a conception of the interests at stake in this motion which is both unduly narrow and overly simplistic.").

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs

# PROFFER/INTERVIEW AGREEMENT

The ground rules and conditions for any proffer/interview are set forth in this document, which is 3 pages.

The parties to this Agreement are the First Assistant United States Attorney through her Assistant U.S. Attorneys, Kevin M. Rapp, Dominic Lanza, Margret Perlmeter and Reginald Jones, Trial Attorney, Department of Justice, Kirsta Leeburg Melton, Assistant Attorney General, State of Texas, Randy Mailman, Deputy Attorney General, Office of the Attorney General, State of California, ("the Prosecution") and Carl Ferrer and Mr. Ferrer's counsel, Nanci Clarence and Jonathan Baum.

This Agreement binds the U.S. Department of Justice, and the Attorney Generals' Offices for the States of California and Texas.

1.   The purpose of any proffer/interview is to evaluate oral and written statements and proffered information given by Mr. Ferrer and his agents (including but not limited to his attorneys) concerning his involvement with Backpage.com and related entities. Mr. Ferrer agrees to proffer information or participate in any interview on an entirely voluntary basis. Mr. Ferrer also understands and agrees that he is not compelled in any way to participate in this interview.

2. Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC as to communications with any attorney or law firm that represented Backpage.com, or any related entity, where such communications concerned or related to Backpage.com or any related entity. This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer voluntarily agrees to provide all documents and other material that may be relevant to the investigation and that are in his possession or control. However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter. Mr. Ferrer understands that his proffer/interview and any benefit he may receive from information he provides to the prosecution does not depend on his waiver of the attorney-client privilege.

3.   The agreement is explicitly contingent upon Mr. Ferrer providing truthful statements and truthful information.   In any interview or proffer, Mr. Ferrer and his agents will completely and truthfully answer all questions, will provide complete and truthful information relating to any and all matters, and will make no material misstatements or omissions of facts.   Mr. Ferrer further understands that he will neither attempt to protect any person or entity nor falsely implicate any person or entity, through false information or omission. Nevertheless, no truthful statements made by or truthful information provided by Mr. Ferrer or his agents during the interview, or otherwise proffered, will be used directly against Mr. Ferrer during any litigation or proceeding instituted by the Prosecution.   The Prosecution will be the ultimate arbiter of the truthfulness of any statement or information.

4. Nothing in paragraph 4 above, however, prevents the Prosecution from making derivative use of and pursuing any investigative leads (i.e. fruits) suggested by any statements made by or other information proffered or provided by Mr. Ferrer or his agents. In other words, except as expressly stated above, Mr. Ferrer understands and agrees that there are no limitations whatsoever on the use the Prosecution can make of the testimony and information provided in any interview or otherwise proffered by Mr. Ferrer or his agents, either orally or in writing, both before and after any interview of Mr. Ferrer. Mr. Ferrer expressly waives any right to challenge the derivative use of any statements or information provided during the interview or otherwise proffered by Mr. Ferrer or his agents. It is the intent of this agreement that such derivative use is proper and the Prosecution and Mr. Ferrer hereby agree that Federal Rule of Criminal Procedure 11(f), and Federal Rules of Evidence 408 and 410 and, do not govern such derivative use in any litigation or other proceedings. This provision is necessary to eliminate any need or argument for a *Kastigar* hearing at which the Prosecution would have to prove that the evidence it would introduce at trial, or any other proceedings, is not associated with or tainted by any statements made by or other information provided by Mr. Ferrer during any interview, or was otherwise proffered to the Prosecution by Mr. Ferrer or his agents.

5. If Mr. Ferrer is a witness at any trial or other proceeding relating to the information he provides to investigating agents, and offers testimony materially different from any statements or other information provided during the interview or otherwise proffered by Mr. Ferrer or his agents, the Prosecution may cross-examine witnesses (including Mr. Ferrer) and introduce rebuttal evidence concerning any statements or other information provided during any interview or otherwise proffered by Mr. Ferrer or his agents. In addition, the Prosecution reserves the right to prosecute Mr. Ferrer for perjury, false official statement or obstruction of justice to the fullest extent provided by law. If such a prosecution occurs, the Prosecution can use directly, and derivatively, in their case-in-chief, in cross-examination and in rebuttal, any statements and information provided by Mr. Ferrer, whether directly or indirectly through his agents, or derivatively linked to the statements and other information Mr. Ferrer or his agents supplied in any interview or other proffer by Mr. Ferrer or his agents. This provision is needed to ensure that Mr. Ferrer does not abuse the opportunity for an interview or proffer of information, does not make materially false statements to a government agency either orally or in writing (directly or indirectly), and does not commit perjury when testifying at trial or in any other legal proceeding

6. Mr. Ferrer understands that the law (specifically, *Brady v. Maryland*) requires that the Prosecution provide any person against whom charges are brought, all information which tends to mitigate or negate the person's guilt as to the offenses charged. Therefore, Mr. Ferrer understands that if *Brady* material is developed or produced from the interview or in any proffer, then the Prosecution would be required to disclose this information to the appropriate defendants and/or their attorneys at the time the obligation is imposed on the Prosecution. This provision is included to permit the Prosecution to comply with its discovery obligations and is not intended to discourage Mr. Ferrer from providing information to the Prosecution.

7. With the exception of providing required notice under the Joint Defense Agreement in this case, Mr. Ferrer will not, personally or through any other person (including but not limited to his attorneys), disclose the existence of this agreement or any interview or proffer, or anything otherwise said during the interview or proffered to the Prosecution, or any information relating to

Mr. Ferrer's cooperation with the Prosecution (except that if an attorney for another putative or actual defendant asks Mr. Ferrer's counsel or successors whether Mr. Ferrer is cooperating with the United States, counsel or successors may confirm the fact that Mr. Ferrer is cooperating, but will not disclose any other information about Mr. Ferrer's cooperation).

8.   This document is the full and complete Agreement of the parties with regard to any interview or proffered information.   No other promises, representations or agreements have been made by or between the parties with regard to any proffer/interview or the underlying matters referenced in this written agreement. The parties shall at all times act in good faith to accomplish their intent in entering into this Agreement. Any dispute between the parties as to whether either party has failed to fulfill any of its obligations under this Agreement shall be submitted to and decided by the United States District Court for the District of Arizona.

AGREED:                          ELIZABETH A. STRANGE
                                 First Assistant United States Attorney

4/5/18
DATE                             KEVIN M. RAPP
                                 DOMINIC LANZA
                                 MARGRET PERLMETER
                                 Assistant U.S. Attorneys


DATE                             REGINALD E. JONES, Trial Attorney
                                 U.S. Department of Justice
                                 Child Exploitation and Obscenity Section

4/5/18
DATE                             KIRSTA LEEBURG MELTON
                                 Assistant Attorney General,
                                 Office of the Attorney General, State of Texas

4/5/18
DATE                             RANDY MAILMAN,
                                 Deputy Attorney General,
                                 Office of the Attorney General, State of California

4/5/18
DATE                             CARL FERRER

4/5/18
DATE                             NANCI CLARENCE, ESQ.
                                 JONATHAN BAUM, ESQ.

# Exhibit 6



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:  (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:  (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:  (602) 514-7450 |

May 18, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

<u>VIA EMAIL</u>

     Re:   *Your Letter of May 7, 2018*

Dear Mike:

     During our meeting on May 4, I raised the government's concern that the funds Backpage.com, LLC ("Backpage") previously wired into your law firm's IOLTA account, apparently to pay for the future criminal defense of Andrew Padilla (the estimated amount of funds is $750,000), may be tainted and subject to forfeiture under federal law.  Due to the potential sensitivity of this issue, and in the hope of gaining an understanding of all of the relevant facts before pursuing any action, I asked if there were any indemnification agreements in place between Backpage and Mr. Padilla.  In response, on May 7, you provided a copy of Backpage's Amended and Restated Limited Liability Company Agreement ("Agreement").

     I have now had a chance to review the Agreement.  Unfortunately, it does not address all of my concerns.  As an initial matter, it is not clear to me that Mr. Padilla is even covered by the Agreement's indemnify provisions.  Section 9.1(a) of the Agreement requires Backpage to "defend and indemnify any Covered Person or Related Party" in certain lawsuits.  This language raises the question whether Mr. Padilla qualifies as a "Covered Person" or "Related Party."

     As for the term "Covered Person," section 1.1 of the Agreement states that it "means any of the following Persons: (i) any former, current or future Member, (ii) the Manager, or (iii) any former, current or future officer."  It doesn't appear to me that Mr. Padilla would fall into any of these three subcategories.  *First*, the term "Member" is defined by section 1.1 of the Agreement as "IC Holdings, LLC, a Delaware limited liability company."  Mr. Padilla is obviously not the same thing as IC Holdings LLC, so that definition doesn't fit.  *Second*, the term "Manager" is defined by section 1.1 of the Agreement as having "the meaning attributed to it in the Preamble," and the Preamble identifies the manager as "Carl Ferrer."  Mr. Padilla

is not Carl Ferrer, so this definition doesn't fit, either.  *Third*, and finally, the term "officer" is defined in section 3.6 of the Agreement as being limited to the subset of individuals who are formally "designated" by the Manager (*i.e.,* Carl Ferrer) to serve as officers.  Here, although Mr. Padilla may have held certain supervisory responsibilities within Backpage, we don't believe he was ever formally designated as an officer of the company.  If you have any documentation suggesting otherwise, we would appreciate a chance to review it.

Because Mr. Padilla does not, in our view, qualify as a "Covered Person," his remaining avenue for indemnification would be to qualify as a "Related Party."  In our view, he doesn't seem to fall within this definition, either.  Section 1.1 of the Agreement defines the term "Related Party" as "with respect to a Covered Person, any shareholder, officer, director, employee, member, manager or partner of a Covered Person or any Person for which the Covered Person serves in any of such capacities, as the case may be."  Although it might seem, at first blush, that the inclusion of the term "employee" would be sufficient to cover Mr. Padilla, the analysis is more complicated than that.  The only "employees" covered by this language are individuals employed by a "Covered Person."  And as noted in the prior paragraph, the universe of individuals and entities who might qualify as "Covered Persons" under the Agreement are (1) IC Holdings LLC, (2) Carl Ferrer, and (3) any individuals who were formally designated by Mr. Ferrer to serve as officers of Backpage.  It's my understanding that Mr. Padilla wasn't employed by any of these individuals and entities—instead, he was employed by Backpage.

This analysis of the coverage language of the Agreement also obscures a broader issue.  The money that Backpage wired into your IOLTA account was, in our view, tainted and subject to forfeiture before it ever arrived.  As you know, the Backpage entity has entered a guilty plea to the crime of conspiracy to commit money laundering (*see* CR 18-465-PHX-DJH).  Additionally, the judge in the Central District of California who issued the seizure warrants in this case has previously agreed with the government's view that Backpage's account at 216887188—which is the account that was used to wire the funds into your IOLTA account—is tainted and that funds passing through that account are subject to forfeiture.  It has been the law for many decades that a criminal defendant does not have a Sixth Amendment right to use tainted funds to pay for his defense.  *See, e.g., Kaley v. United States*, 134 S.Ct. 1090, 1096-97 (2014) ("Even prior to conviction (or trial)—when the presumption of innocence still applies—the Government [may] constitutionally . . . freeze assets of an indicted defendant 'based on a finding of probable cause to believe that the property will ultimately be proved forfeitable.'") (citation omitted); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989) ("A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice. . . .  [T]he Government does not violate the Sixth Amendment if it seizes [criminal] proceeds and refuses to permit the defendant to use them to pay for his defense."); *id.* at 631 ("[T]here is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense."); *United States v. Monsanto*, 491 U.S. 600, 616 (1989) ("[I]f the Government may,

May 18, 2018
Page 3 of 3

post-trial, forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, after probable cause is adequately established, the Government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial."). *See also Luis v. United States*, 136 S.Ct. 1083, 1090 (2016) (recognizing there are Sixth Amendment limitations on the pretrial seizure of untainted assets but reaffirming that "[t]he Government may well be able to freeze, perhaps to seize, assets of the . . . 'tainted' kind before trial").

These principles suggest to us that, regardless of the existence or applicability of any indemnification contract between Backpage and Mr. Padilla, the funds in your IOLTA account are tainted and subject to forfeiture. If you are aware of any case law suggesting that the presence of an indemnification contract alters this analysis, we would be very eager to review it—we have not found any.

After you have had a chance to consider, I would welcome the opportunity to discuss these matters further with you.

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs

# Exhibit 7

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-SPL |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

On April 25, 2018, the Government filed a motion (the "Motion") to disqualify the law firm of Henze Cook Murphy ("HCM") from representing Defendant Michael Lacey ("Lacey") and the law firm of Davis Wright Tremaine ("DWT") from representing Lacey and Defendant James Larkin ("Larkin"). (Doc. 118) The Motion was fully briefed on July 2, 2018, and the Court heard oral argument at a hearing on October 5, 2018. As set forth below, the Court finds that Carl Ferrer ("Ferrer") expressly waived his right to seek disqualification of HCM and DWT in previous joint representation and joint defense agreements; accordingly, the Motion is denied.

## I. Procedural Background

On March 28, 2018, a federal grand jury returned a ninety-three count indictment against several Defendants, including Lacey and Larkin, alleging that the Defendants engaged in various crimes related to the operation of the website Backpage.com, including conspiracy, facilitating prostitution, and money laundering. (Doc. 3) The indictment also

1   includes forfeiture allegations.[1]  *Id.*  Lacey and Larkin were arrested on April 6, 2018.  The

2   docket reflects that attorneys from DWT entered appearances on behalf of Lacey and

3   Larkin, and attorneys from HCM entered appearances on behalf of Lacey.

4       On April 5, 2018, Ferrer pleaded guilty to conspiracy to facilitate prostitution and

5   money laundering.  (CR 18-464-SPL, Doc. 7)  The charges against Ferrer were based on

6   his work at Backpage.com ("Backpage").  (Doc. 118 at 6)  On April 13, 2018, Ferrer sent

7   letters to DWT and HCM asking that the firms comply with their ethical duties to him, as

8   a former client, and withdraw from representing Lacey and Larkin.  (Doc. 118, Exs. A and

9   B)  On April 20, 2018, DWT sent Ferrer a letter stating that they would "withdraw from

10  representation in all matters and cases as counsel for you, Backpage.com, LLC, and all

11  related entities owned or controlled by you . . . ."  (*Id.* at Ex. U)  HCM states that it withdrew

12  from its representation of Backpage.com and Ferrer on October 17, 2017.  (Doc. 176 at 7)

13  Neither DWT nor HCM withdrew from their representation of Lacey and Larkin in this

14  matter.

15      The Government asserts that, before filing the Motion, it met with various defense

16  counsel in an attempt to resolve its concerns regarding potential conflicts of interest.  (Doc.

17  118 at 2; *see also* Doc. 176 at 8 (HCM states that it retained counsel to meet with the

18  Government to discuss HCM performing a limited role representing Lacey))  The parties

19  were not able to resolve these issues, and the Government filed the Motion.  (Doc. 118)

20      **A.      Briefing on the Motion to Disqualify**

21      On June 6, 2018, after receiving extensions of time to respond, Defendants filed

22  responses to the Motion.  (Docs. 130, 134, 147, 149, 154, 156, 160, 162, 163, 172, 174,

23  176, 177, 180)  Lacey filed a response in opposition to the Government's Motion directed

24  at HCM, through his separately retained trial counsel.  (Doc. 174)  HCM also filed a

25  response in opposition to the Motion, through its separate counsel.  (Doc. 176)  On June

26  13, 2018, the Government filed a reply to Lacey's and HCM's responses.  (Doc. 192)

27  ///

28  ---
[1]  On July 25, 2018, the grand jury returned a 100-count superseding indictment against the
Defendants.  (Doc. 230)

On June 6, 2018, Lacey and Larkin, through separate counsel, also filed a joint response to the Government's Motion directed at DWT. (Doc. 180) On June 13, 2018, the Government filed a reply to Lacey's and Larkin's response to the Motion directed at DWT. (Doc. 193) On July 2, 2018, the Government filed a supplement to that reply. (Doc. 207) Defendant Andrew Padilla ("Padilla"), through separate counsel, also filed a response in opposition to the Government's Motion directed at DWT (Doc. 177), and the Government filed a reply to Padilla's response. (Doc. 194) In addition, several Defendants filed joinders to the various responses to the Motion.[2] On October 5, 2018, the Court heard argument on the pleadings, and the arguments made by each party were taken under advisement.

## II. Motion to Disqualify

The Government argues that each firm's prior representation of Ferrer presents an incurable conflict of interest that should disqualify both firms from participation in this case. Relying on Ethical Rule 1.9(a) of the Arizona Rules of Professional Conduct (Duties to Former Clients), the Government asserts that HCM and DWT have incurable conflicts of interest because (1) they previously represented Ferrer in substantially related matters, (2) Ferrer's interests as their former client are materially adverse to the interests of their current clients, Lacey and Larkin, because Ferrer has pleaded guilty to criminal conduct related to his work at Backpage and is cooperating with the Government in its pursuit of criminal charges against other Backpage principals, including Lacey and Larkin,[3] and (3)

---

[2]   Defendant Joye Vaught ("Vaught") filed a joinder to Padilla's response to the Government's Motion directed at DWT (Doc. 178), and a joinder to Lacey's and Larkin's response to the Motion directed at HCM. (Doc. 186) Defendant John "Jed" Brunst ("Brunst") filed a joinder to Lacey's and HCM's responses to the Motion directed at HCM, and a joinder to Padilla's response to the Motion directed at DWT. (Doc. 181) Padilla filed a joinder to Lacey's and HCM's responses to the Motion directed at HCM, and a joinder to Lacey's and Larkin's response to the Motion directed at DWT. (Doc. 184) Lacey and Larkin filed separate joinders to Padilla's response to the Motion directed at DWT. (Docs. 188, 190) Finally, Defendant Scott Spears ("Spears") filed a joinder in Lacey's and HCM's responses to the Motion directed at HCM, a joinder to Lacey's and Larkin's response to the Motion directed at DWT, and a joinder in Padilla's response to the Motion directed at DWT. (Doc. 191)

[3]   The Government appears to use "Backpage" to refer generally to the website Backpage.com. (*See* Doc. 118 at 1–2, 6) The Government asserts that Lacey, Larkin, and Ferrer are the founders of the website Backpage.com, and then refers to their "work at

- 3 -

Ferrer has not given informed consent, confirmed in writing, to allow HCM and DWT to represent Lacey and Larkin. (Doc. 118 at 2, 8)  The Government also argues that HCM's and DWT's continued representation of Lacey and Larkin in this matter would violate Ethical Rule 1.7(a)(2) of the Arizona Rules of Professional Conduct (Conflicts of Interest: Current Clients) because there is a significant risk that the firms' representation of Lacey and Larkin would be materially limited by their responsibilities to their former client Ferrer.  (*Id*. at 8–9)

## A.    Applicable Standards

This Court applies the Arizona Rules of Professional Conduct to evaluate the conduct of attorneys admitted or authorized to practice before it and, therefore, the Court applies these rules to resolve the Government's motion to disqualify.[4]  *See* LRCiv 83.2(e); *Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*, 810 F. Supp. 2d 929, 944 (D. Ariz. 2011) ("this Court applies the Arizona ethical rules when evaluating motions to disqualify counsel.") (citations omitted); *Amparano v. ASARCO, Inc*., 93 P.3d 1086, 1092 (Ariz. Ct. App. 2004) (courts have "looked to the ethical rules for guidance on disqualification motions.").

The preamble to the Arizona ethical rules explains that the rules are designed to provide guidance to lawyers and a structure for regulating conduct, but cautions that "the purpose of the [r]ules can be subverted when they are invoked by opposing parties as procedural weapons."  Ariz. R. Sup. Ct 42, preamble at ¶ 20.  In addition, the Arizona Supreme Court has stated that "[o]nly in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent." *Alexander v. Superior Court,* 685 P.2d 1309, 1313 (Ariz. 1984).  "The burden is on the moving party to

---

Backpage," and "Backpage-related lawsuits."  (*Id*. at 2, 3)  The Government also sets forth the factual basis from Ferrer's plea agreement in *United States v. Ferrer*, CR 18-464-SPL, in which Ferrer stated, in part, that in 2004 he co-founded "the website www.Backpage.com ('Backpage'), along with M.L [Michael Lacey] and J.L. [James Larkin]."  (Doc. 118 at 6)

[4]  The Arizona Rules of Professional Conduct, also referred to as the Arizona ethical rules, are set forth in Rule 42 of the Rules of the Supreme Court and are cited by rule number and the abbreviation "ER."  *See* Ariz. R. Sup. Ct. 42.

show sufficient reason why an attorney should be disqualified from representing his [or her] client." *Id*.

### 1. Ethical Rule 1.9(a)—Duties to Former Clients

Ethical Rule 1.9(a) states that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." ER 1.9(a). For a conflict to exist pursuant to this provision, the moving party must show: (1) the existence of an attorney-client relationship; (2) that the former representation was "the same or substantially related" to the current litigation; and (3) that the current client's interests are "materially adverse" to the former client's interests. *Roosevelt*, 810 F. Supp. 2d at 944 (citing *Foulke v. Knuck*, 784 P.2d 723, 726–27 (Ariz. Ct. App. 1989)).

### 2. Ethical Rule 1.7(a)—Concurrent Conflicts of Interest

Ethical Rule 1.7(a)(2) states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." ER 1.7(a)(2). "Notwithstanding the existence of a concurrent conflict of interest . . . a lawyer may represent a client if each affected client gives informed consent, confirmed in writing." ER 1.7(b). However, even with consent, concurrent conflicts are allowed only if "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client," "the representation is not prohibited by law," and "the representation does not involve the assertion of a claim by one client against another client represented by the same lawyer in the same litigation or other proceeding before a tribunal." ER 1.7(b)(1)-(3). Thus, representation may be undertaken, despite the existence of a conflict, only if the conflict is "consentable." *Id*.; Cmt 2 (2003 Amendments).

///

### B.    The Joint Representation Agreement and Joint Defense Agreement

In response to the Motion, Lacey and Larkin argue that Ferrer previously waived any right to seek disqualification of counsel or assert a conflict of interest against DWT pursuant to certain confidential joint representation and joint defense agreements. (Doc. 180 at 12–13)  Specifically, the Defendants argue that Ferrer was party to a Common Interest and Litigation Management Agreement (the "JRA"), or joint representation agreement, and a joint defense agreement (the "JDA") in which Ferrer waived his right to seek disqualification of counsel in the event that he withdrew from either of the confidential agreements. (Doc. 180 at 13–14)  The JRA was executed by Ferrer on behalf of several corporate entities including Backpage, and the JDA was executed by Ferrer and HCM attorneys on behalf of Ferrer, among other parties.  Both the JRA and JDA were provided to the Court for *in camera* review.

The Ninth Circuit has long recognized that the joint defense privilege is "an extension of the attorney-client privilege," and joint defense agreements allow parties with cohesive interests to share information without waiving confidentiality. *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012).  The "joint defense privilege" is designed to facilitate communication among joint parties regarding matters that are important to protect their interests in litigation.  The concept of a joint defense is not technically a privilege in and of itself, but instead constitutes an exception to the rule on waiver where communications are disclosed to third parties. *Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964).  A joint defense agreement can be written or oral, but joint defense agreements cannot extend greater protections than the legal privileges on which they rest. *Stepney*, 246 F. Supp. 2d 1069, 1079–80 (N.D. Cal. 2003).

Courts generally encourage parties to enter into written joint defense agreements that, under the advice of separate counsel, allow each defendant the opportunity to fully understand his rights prior to entering into the agreement. *United States v. Almeida*, 341 F.3d 1318, 1327 (11th Cir. 2003); *Stepney*, 246 F. Supp. 2d at 1084–86.  It is well settled that waivers of rights in joint defense agreements are valid to cure conflicts with the ethical

rules. *Stepney*, 246 F. Supp. 2d at 1085 (recognizing that waiver provisions are appropriate to avoid conflicts). Additionally, ER 1.10(c) provides that a disqualification prescribed by ER 1.9 may be waived by the impacted client under the conditions stated in ER 1.7. ER 1.10(c). Ethical Rule 1.7 states that the affected client must give "informed consent, confirmed in writing" to waive a conflict of interest. ER 1.7(b). Informed consent "denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." ER 1.0(e); *See also Roosevelt*, 810 F. Supp. 2d at 957 (citing ER 1.7 stating informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client).

The Court finds that the express terms of the JRA and JDA[5] are fatal to the Government's argument for disqualification because the content of these agreements demonstrates that Ferrer waived his right to pursue disqualification against HCM, DWT, and other parties identified in these agreements. Both the JRA and the JDA anticipated circumstances in which a party to either agreement chose to withdraw. Without directly quoting the language of the JRA, it is clear to the Court that the plain language of the agreement prevents Ferrer from seeking disqualification of counsel based on any conflict arising out of the JRA. Similarly, by joining the JDA, the plain language of the agreement demonstrates that Ferrer waived his right to assert that any attorney party to the JDA is barred from continuing his or her representation under the agreement. Per the terms of the JDA, Ferrer waived his right to seek disqualification as to both HCM and DWT, which were both parties under the terms of the JDA.[6] Ferrer executed the JRA and JDA in his

---

[5] Importantly, the Government does not dispute the existence or validity of either agreement. (Doc. 193 at 7)

[6] The Court recognizes that neither Lacey (Doc. 174) nor HCM (Doc. 176) raised the issue of the JDA in their responses to the Motion in defense of HCM. However, the clear terms of the JDA demonstrate that HCM was party to the JDA along with DWT.

individual capacity and on behalf of Backpage when appropriate. It is undisputed that Ferrer signed the JDA under advice of counsel. (Doc. 193 at 8) Therefore, the Court finds that these agreements are valid and enforceable, and that Ferrer's signatures demonstrate his intent to abide by the terms of these agreements.

The Government argues that the JRA and JDA are not controlling because the agreements were not signed by DWT. (Doc. 193 at 7) The Court finds that this argument is unavailing and irrelevant because Ferrer signed the agreements, and, per the terms of each agreement, Ferrer waived his right to seek to disqualify HCM and DWT or assert any future conflicts of interest. The Government has only provided the Court with precedent in which no joint defense agreements were present, save for a brief summary of the *Henke* case, making each case relied on in the Motion substantively distinguishable from the facts at issue. To cure this defect, the Government relies on *U.S. v. Ross*, a case inapplicable to circumstances involving a joint defense agreement, for the proposition that it is within the Court's discretion to refuse to accept a conflict waiver where the interests of justice require. *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994) (stating that trial courts may refuse waivers of conflicts of interest to ensure adequacy of representation, to protect integrity of court, and to preserve trial judge's interest to be free from future attacks over adequacy of waiver and fairness of trial). However, the Court declines to exercise its discretion to disregard Ferrer's waiver at this time.

The Court finds that Ferrer waived his right to seek disqualification of HCM and DWT or to assert any conflict of interest in this case. Pursuant to the terms of the JRA and the JDA, the Court finds that Ferrer has provided DWT and HCM with the written informed consent necessary for each firm to continue its participation as counsel. The Court is confident that allowing HCM and DWT to continue their participation in this case will not run afoul of the interests of justice, and Ferrer's executed JRA and JDA provide the written informed consent necessary to satisfy ER 1.9(a) and ER 1.7(b).

///

///

**C.   Government's Arguments in Support of Disqualification**

The Court recognizes that it may be difficult for the Government to understand what it cannot see in how the terms of the JRA and the JDA distinguish this decision from the precedent and ethical opinions identified by the Government in the Motion.  First, Arizona Ethics Opinion 91-5 focuses on how ER 1.9 should be used as a shield to protect a former client, but the opinion is silent on any situation in which said former client had expressly waived his right to challenge any continued or future adverse representation by counsel.  Similarly, the *Ross*, *Moscony*, *Williams*, and *Alfonzo-Reyes* cases relied on by the Government are silent on the issue of waivers appearing in joint representation or joint defense agreements acting as blanket waivers of future conflicts.  Instead, each of the cases cited by the Government reiterates the Court's power to disregard a defendant's knowing and intelligent conflict waiver. *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994); *United States v. Moscony*, 927 F.2d 742, 750 (3d Cir. 1991) (recognizing that the presumption in favor of a defendant's counsel of choice can be overcome, and a trial court may disqualify counsel and reject the defendant's waiver of conflict-free representation); *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996) (upholding a district court's decision to disqualify a defendant's choice of counsel due to conflict of interest); *United States v. Alfonzo-Reyes*, 592 F.3d 280, 294 (1st Cir. 2010) (stating that no conflict waiver actually occurred).  The Court finds these cases unpersuasive.

The Court does not find that allowing HCM and DWT to continue to participate in this case as auxillary counsel threatens the integrity of the trial process.  The only case that the Government relies on that even mentions a joint defense agreement is the *Henke* case. *United States v. Henke*, 222 F.3d 633 (9th Cir. 2000).  In *Henke*, a client withdrew from a joint defense agreement, and his counsel moved to withdraw from the case. *Id*. at 637.  The Court denied counsel's motion to withdraw, and counsel chose not to cross-examine its former client at trial. *Id*.  The *Henke* decision addressed conflicts that require withdrawal of trial counsel. It did not address the issue of waiver under a joint defense agreement. Further, it has been made clear that neither HCM nor DWT will participate as trial counsel

in this matter, and both firms have stated that neither firm will participate in cross-examining Ferrer. (Doc. 176 at 11; Doc. 180 at 28)  Thus, the Court finds that the *Henke* case is also unpersuasive for ordering disqualification.

**D.      Conclusion**

At this time, the Court declines to decide whether the terms of Ferrer's proffer agreement waived his personal attorney-client privilege.  The Court also finds that the arguments advanced by Padilla are moot per the terms of this Order.  Moving forward, the Court will rely on the representations of HCM, DWT, and their respective counsel that the firms will continue to preserve the confidences of Ferrer as a former client, create ethical walls where necessary, refrain from engaging in trial preparation or participating as trial counsel, and only participate in the limited capacity set forth in the pleadings, without an order from the Court.  Accordingly,

**IT IS ORDERED**:

That Government's Motion to Disqualify Counsel (Doc. 118) is denied.

Dated this 12th day of October, 2018.

Honorable Steven P. Logan
United States District Judge

# Exhibit 8

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-SPL |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

On June 14, 2018, the Government filed a motion (the "Motion") to resolve certain attorney-client privilege issues. (Doc. 195)  In response, Defendants Michael Lacey ("Lacey") and James Larkin ("Larkin") filed a cross-motion (the "Cross-Motion") to prohibit the relief sought in the Motion and seek discovery. (Doc. 235)  The Motion was fully briefed on August 17, 2018, and the Cross-Motion was fully briefed on September 27, 2018.  The Court heard oral argument on the Motion and Cross-Motion at a hearing on October 5, 2018.  For the reasons set forth below, the Motion is denied, and the Cross-Motion is granted in part and denied in part.

## I.    Background

On March 28, 2018, a federal grand jury returned a ninety-three count indictment against several Defendants, including Lacey and Larkin, alleging that the Defendants engaged in various crimes related to the operation of the website Backpage.com, including conspiracy, facilitating prostitution, and money laundering.  (Doc. 3)  The indictment also

includes forfeiture allegations.[1] *Id.* On April 5, 2018, Carl Ferrer ("Ferrer"), the CEO of Backpage.com ("Backpage"), pleaded guilty to conspiracy to facilitate prostitution and money laundering. (Doc. 235 at 14; CR 18-464-SPL, Doc. 7) The charges against Ferrer were based on his work at Backpage. *Id.*

During the Government's investigation, it obtained search warrants for the email accounts of several Defendants and Backpage personnel. (Doc. 195 at 1) A filter team was put in place to identify any email communication that appeared to be privileged. (Doc. 195 at 2) The filter team conducted an initial review of the material seized by the search warrants, and it removed any items that it deemed privileged attorney-client communication from the discovery that was eventually turned over to the investigation team. *Id.*

The Government filed the Motion seeking an order stating that (i) Backpage's attorney-client privilege has been waived with respect to certain email communication obtained under the aforementioned search warrants, and (ii) the Government may have access to the communication that was classified as privileged by the filter team. (Doc. 195 at 13) In response to the Motion, the Defendants filed the Cross-Motion for an order (i) preventing the Government's review of any privileged communication, and (ii) requesting discovery of the Government's communication with Ferrer regarding the joint defense agreement and the attorney-client relationships of the Defendants. (Doc. 235 at 25, 28) In addition, several Defendants filed joinders to the Cross-Motion.[2] On October 5, 2018, the Court heard argument on the pleadings, and the arguments made by each party were taken under advisement.

## II. Motion to Resolve Attorney-Client Privilege Issues

The Government moves for an order from the Court allowing access to the privileged communication because (i) Ferrer, as CEO and 100% owner of Backpage,

---

[1] On July 25, 2018, the grand jury returned a 100-count superseding indictment against the Defendants. (Doc. 230)

[2] Defendants Scott Spears ("Spears") and John "Jed" Brunst ("Brunst") filed joinders to Lacey's response to the Motion. (Docs. 256, 252)

executed a written waiver of the company's attorney-client privilege; (ii) Judge David Campbell of the District of Arizona recently decided that Backpage had waived attorney-client privilege for several documents that were the subject of the warrants because the documents had been previously shared with third-party public relations firms and investment banks; and (iii) a Washington state court previously found that Backpage waived attorney client privilege on several similar communications when it proffered its in-house counsel, Elizabeth McDougall, as a Rule 30(b) witness for a deposition. (Doc. 195 4–9)  Each of these arguments will be addressed in turn.

## A.  Standard of Review

The Court recognizes that there is little to no precedent that is directly applicable to the facts presented in this case, and many of the issues presented by the Motion and Cross-Motion require an exercise of the Court's discretion.  As a general matter, a party is not entitled to discovery of information protected by the attorney-client privilege. *Wharton v. Calderon*, 127 F.3d 1201, 1205 (9th Cir. 1997).  It is also well settled that the intentional public disclosure of privileged communication results in waiver of the attorney-client privilege and the work product immunity "as to all other communications on the same subject." *United States v. Kerr*, 2012 WL 2919450, at 1 (D. Ariz. July 17, 2012) (*citing Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir.2010)).  However, this waiver extends only "to communications about the matter actually disclosed." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.1992).  And, the Ninth Circuit has cautioned against finding a complete waiver of the attorney-client privilege by noting that "[t]he breadth of the waiver finding, untethered to the subject-matter disclosed, constitutes a particularly injurious privilege ruling." *Hernandez*, 604 F.3d at 1101.

## B.  Ferrer Waiver

The Government argues that it should have access to the privileged information at issue because Ferrer executed a written waiver of Backpage's attorney-client privilege as part of his cooperation with the Government. (Doc. 195 at 5)  In response, the Defendants argue that the terms of the joint defense agreement (the "JDA") between Lacey, Larkin and

Ferrer prevent Ferrer from waiving Backpage's attorney-client privilege. (Doc. 235 at 23) The Defendants also argue that the terms of the JDA prevent Ferrer from disclosing privileged information because the terms of the agreement state that privileged information cannot be disclosed by a party withdrawing from the JDA unless all parties to the agreement consent to the disclosure of the privileged information.[3] (Doc. 235 at 13)

The Court has already recognized the validity of the JDA in its earlier Order. (Doc. 338) Ferrer is bound by the terms of the JDA, which he executed during his tenure with Backpage. Based on the Court's *in camera* review of the JDA, the Court finds that the plain text of the JDA states that the materials shared between the parties to the JDA are to be protected from disclosure unless the disclosing party first obtains the written consent of all parties who may be entitled to a claim of privilege over the materials. It is undisputed that Ferrer did not obtain the written consent of the listed parties to the JDA before executing his written waiver of attorney-client privilege. On this basis, the Government's argument for access to the privileged communication fails. The Government argues that there is a distinction between joint-defense privileges and attorney-client privileges, and that the communication at issue is not covered under the JDA. (Doc. 269 at 9) However, the terms of the JDA demonstrate that the emails themselves are protected from disclosure. Ferrer's participation in the JDA not only established joint-defense privileges, but also set forth other protections for information and communication exchanged between parties to the agreement. Therefore, for the limited purpose of addressing the Government's access to the privileged emails at issue, the Court finds that the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of the JDA.[4]

---

[3] Ferrer was party to a Common Interest and Litigation Management Agreement (the "JRA"), or joint representation agreement, the JDA. (Doc. 235 at 22) The JRA was executed by Ferrer on behalf of several corporate entities including Backpage, and the JDA was executed by Ferrer, among other parties. Neither party disputes the validity of the agreements. (Doc. 269 at 9) Both the JRA and JDA were provided to the Court for *in camera* review.

[4] At this time, the Court declines to address the issue of whether Ferrer had the authority to waive Backpage's corporate attorney-client privilege based on the Defendants' argument that the attorney-client privilege was owned and later shared with Village Voice Media Holdings, LLC. (Doc. 235 at 21)

### C. Judge Campbell Order

The Government argues that an order issued by Judge David Campbell of this District (the "Campbell Order") provides an independent basis to allow the Government to access the privileged emails because the terms of the Campbell Order found that Backpage waived the privileged status of certain emails through their disclosure to third parties. (Doc. 195-8)  The Government argues that the email communication disclosed pursuant to the Campbell Order provides a subject-matter waiver for the remaining privileged communication at issue, which addresses the topics of ad moderation and acknowledgement of prostitution ads on the Backpage website. (Doc. 269 at 3)  The Defendants argue that Judge Campbell's ruling only applied to certain email communication that had been shared with third parties, and that the Campbell Order should not be stretched to allow the broad subject-matter waiver of privilege requested by the Government. (Doc. 235 at 23–24)

The Court declines to construe the terms of the Campbell Order to allow a broad subject-matter privilege waiver of the contents of the remaining emails.  It is clear to the Court that the terms of the Campbell Order were limited to determining whether Backpage waived attorney-client privilege in emails shared with specified third-party entities.  The Government does not provide sufficient case law or argument to demonstrate how the email communication disclosed as a result of the Campbell Order requires the Court to allow the disclosure of the remaining privileged communication.  The Government only vaguely mentions that the disclosed email communication contained "subjects" and then concludes that the privileged communication discusses the same subjects.  This is insufficient for the Court to justify waiving attorney-client privilege for the remaining email communication.

Furthermore, the Court finds that the *Weil* and *Hernandez* cases cited by the Government are unavailing. (Doc. 195 at 12)  In *Weil*, the party seeking to assert its attorney-client privilege unintentionally disclosed certain privileged information in discovery proceedings. *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 23 (9th Cir. 1981)  In that same matter, opposing counsel then sought to construe the

- 5 -

inadvertently disclosed information as an implied privilege waiver of other communication discussing the same subjects. *Id.* The *Weil* Court reiterated that "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *Id.* at 24. In *Hernandez*, a defendant argued that it was entitled to disclosure of the files of a plaintiff's former attorney because the plaintiff included some of the former attorney's hand-written notes as evidence in support of his response to a motion for summary judgment. *Hernandez*, 604 F.3d at 1098. While the Ninth Circuit reiterated that voluntary disclosure of privileged communication constitutes a waiver of attorney-client privilege as to communication on the same subject, the Ninth Circuit ultimately held that a blanket waiver of attorney-client privilege was inappropriate because the plaintiff had only waived his privilege as to the certain subject addressed in the hand-written notes. *Hernandez*, 604 F. 3d at 1100–1101.

The Court finds that this case is distinguishable from the *Weil* and *Hernandez* cases for several reasons. First, the *Weil* and *Hernandez* cases were civil cases in which attorney-client privilege was inadvertently waived through direct disclosure to opposing counsel. The Government has not directed the Court to any precedent in which the order of a separate court in a separate case can be used to impose a waiver of other privileged communication in a criminal case.[5] Second, the *Weil* case addresses a subject-matter waiver in the context of inadvertent, voluntary disclosure, and not the differing context of disclosure pursuant to a court order. Without supporting precedent, the Court prefers to err on the side of protecting the privileged email communication. It is clear to the Court that the privileged emails at issue were separate from the emails released to the Government through the Campbell Order; thus, some privilege remains. The Court acknowledges the Government's argument that the Campbell Order found that the Defendants had "voluntarily" shared hundreds of emails with third parties. However, at this time, the Court

---

[5] The *Hernandez* case cites *U.S. v. Nobles* for the proposition that disclosing a privileged communication results in a waiver of privilege as to all other communication on the same subject. *United States v. Nobles*, 422 U.S. 225, 239 (1975). However, the Court finds that *Nobles* is also distinguishable because the subject-matter waiver at issue was the direct result of the defendant calling an agent of his attorney as a witness, thus waiving the defendant's attorney work-product privilege. *Nobles*, 422 U.S. at 239–40.

finds that the privilege waiver found in the Campbell Order is insufficient to persuade the Court that a subject-matter waiver of all related communication is appropriate in this case.

### D. Washington Order

Finally, the Government argues that a prior order from the Washington state superior court (the "Washington Order") weighs in favor of the Court granting the Motion. In the Washington matter, a court found that Backpage had waived its attorney-client privilege on several subjects when it proffered the testimony of its in-house counsel for a deposition. (Doc. 195 at 9)  However, the parties to the Washington case reached a settlement before any privileged communication was exchanged. (Doc. 235 at 19–20)  The Defendants argue that the Washington Order does not support the Government's Motion because the settlement of that case eliminated the waiver found by the Washington state court and preserved the confidentiality of the privileged communication at issue. (Doc. 235 at 25)

The Court is not inclined to find that the Washington Order is sufficient to warrant disclosure of privileged communication in this case.  It is undisputed that no actual privileged information was disclosed pursuant to the Washington Order prior to settlement of the Washington case, and the Government does not provide any persuasive response to the Defendants' argument that no privileged information was actually disclosed pursuant to the Washington Order. (Doc. 269 at 16, stating that there is no case law on the issue) Accordingly, the Court finds that the Government's argument fails, and the Motion shall be denied.

### III.    Cross-Motion to Obtain Discovery and Address Privilege Issues

For the reasons stated above denying the Government's Motion, the Defendants' Cross-Motion will be granted in part to prohibit the Government from accessing the privileged email communication at issue. Next, the Court turns to the Defendants' discovery request in the Cross-Motion.

The Defendants seek discovery on the Government's communication with Ferrer about his dealings with counsel, which the Defendants assert are still protected under the

JDA. (Doc. 235 at 29)  The Defendants argue that discovery is necessary to see if the Defendants were prejudiced by any communication between Ferrer and the Government regarding the JDA. (Doc. 324 at 6–8)  In response, the Government argues it previously addressed the Defendants' arguments about disclosing its communication with Ferrer in a separate pleading, and additional disclosure is unnecessary. (Doc. 269 at 16)  In reply, the Defendants argue that there is evidence that Ferrer breached the JDA, and that the Government may have assisted him in doing so. (Doc. 324 at 6)  The Defendants also argue that the facts as set forth by the Government demonstrate that the Government is not effectively preserving privileged communication, and discovery is necessary to see what invasions of privilege rights have occurred. (Doc. 324 at 11)

At this time, the Court does not find that the requested discovery is necessary or helpful in this case. *Liew v. Breen*, 640 F.2d 1046, 1049 (9th Cir. 1981) (stating determinations of relevance in discovery matters are left to the trial court's discretion).  The Defendants argue that discovery is necessary to see if the Government has acted fairly and to see if there have been possible privilege violations. (Doc. 235 at 29)  The Court finds that the Defendants' concerns about fairness are unfounded at this point, and any order of discovery would unnecessarily distract from the trial process and cause an unscrupulous waste of resources. Accordingly,

**IT IS ORDERED**:

That Government's Motion to Resolve Attorney-Client Privilege Issues (Doc. 195) is denied; and

That Defendants' Cross-Motion to Obtain Discovery and Address Privilege Issues is granted in part to prohibit the relief sought in the Government's Motion and denied in part as to the requested discovery.

Dated this 18th day of October, 2018.

Honorable Steven P. Logan
United States District Judge

- 8 -

# Exhibit 9

UNDER SEAL

# Exhibit 10

UNDER SEAL

# Exhibit 11

UNDER SEAL

# Exhibit 12

UNDER SEAL

# Exhibit 13

UNDER SEAL

# Exhibit 14

UNDER SEAL

# Exhibit 15

UNDER SEAL

# Exhibit 16

UNDER SEAL