# EXHIBIT

# A



NATIONAL
CENTER FOR
**MISSING &
EXPLOITED**
C H I L D R E N®

Charles B. Wang International
Children's Building
699 Prince Street
Alexandria, VA  22314-3175
U.S.A.

Telephone 703.224.2150

Facsimile 703.224.2122

www.missingkids.com

www.cybertipline.com

From the desk of
John Ryan
Chief Executive Officer

June 6, 2013

BY HAND
Don Moon, Esq.

Dear Mr. Moon,

As you know, the National Center for Missing & Exploited Children
(NCMEC) is the nation's congressionally-designated resource center on
issues of missing and exploited children.  In the fourteen years since we
began operation of the CyberTipline, a centralized mechanism for reporting
suspected child sexual exploitation, NCMEC has worked closely with the
online industry and law enforcement to reduce the proliferation of child
pornography on the Internet.  This collaboration has led to the development
of sound practices and techniques with regard to online child pornography.
Many of these sound practices may be applicable to combating the problem
of child sex trafficking through online classified ad websites.

The operation of online classified ad websites that include an "adult" section,
or advertisements related to adult entertainment, escorts, body
rubs/massages, BDSM/fetish, or other similar categories, creates risks for
children to be exploited and trafficked online.  However, there are steps that
can help prevent the victimization of these children.

NCMEC offers the following recommendations to companies that own or
operate online classified ad websites and want to take measures to reduce the
likelihood of child sex trafficking on their websites.  The recommendations
listed below should be considered as part of a dynamic approach that will
evolve as technology changes and offenders develop new strategies to exploit
and traffic children online.

Companies that want to optimize preventative measures should both enforce
their terms of service and implement the following:

1) At the time an ad is created and submitted by a user, but prior to the
   ad being posted online:
   - Take steps internally to verify the identity and age of the user
     who has submitted the ad
   - Take steps internally to verify the identity and age of any
     individual depicted in the ad
     - For example, develop an internal process to compare
       the visual characteristics of an individual depicted in
       an ad with their photo in a government issued
       identification card that they provide

Other Offices
California
Florida
New York
Texas

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000059**

DOJ-BP-0004601955

Don Moon, Esq.
June 6, 2013
Page 2

- Prohibit the use of gift cards, pre-paid credit cards or other anonymous purchasing tools as a form of payment for the ads
- Require and validate a user's email address when they are creating/submitting an ad
- Require and validate a phone number when a user is creating/submitting an ad
- Capture the user's IP address at the time an ad is created/submitted
- Ensure the ad is compliant with established Terms of Service
- Enforce a no nudity policy for images contained within ads
- Implement a moderator review system to examine all submitted ads for possible child sexual exploitation
- If a user changes an existing ad, prior to the ad being re-posted, capture the updated IP address and conduct an additional moderator review for Terms of Service violations

2) Prior to an ad being posted, if a possible minor is believed to be featured within a submitted ad or an ad is believed to involve possible child sexual exploitation:
- Not post the ad or allow it to go "live" on the site
- Conduct searches of internal systems to identify and review all other ads which may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers
- Report the possible child sexual exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)
- Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process
- Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal. These hashes can be utilized to prevent future Terms of Service violations
- Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future Terms of Service violations

3) Once an ad has been posted publicly, if there is suspected child sexual exploitation within the ad:
- Remove the ad from public view
- Conduct searches of internal systems to identify and review all other ads which may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers
- Report the possible child sexual exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000060

DOJ-BP-0004601956

Don Moon, Esq.
June 6, 2013
Page 3

- Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process
- Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal. These hashes can be utilized to prevent future Terms of Service violations.
- Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future terms of service violations

NCMEC recognizes that there is not a single solution to eliminate child sex trafficking and addressing this problem requires a multi-faceted approach. Based on NCMEC's experiences, robust enforcement of terms of service combined with the implementation of these operational recommendations will have a significant impact on combating child sex trafficking within online classified ad sites.

We strongly urge all classified ad website operators with an interest in preventing their sites from being used to victimize children to implement these recommendations.

Sincerely,


John D. Ryan
Chief Executive Officer


*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000061

# **M E M O R A N D U M**

To: John D. Ryan

CC: Staca Shehan

From: Don Bennett Moon

Re: Technology and Adult Advertising Standards

## 1.      Introduction

I appreciated the opportunity for Liz McDougall and me to meet with Staca and other NCMEC staff to discuss the first-cut online adult advertising standards proposals you provided to me in our meeting with Senator DeConcini in June. Health issues have taken me out of service for much of the time since, but those have now been attended to and I look forward to resuming our dialogue.

It has long been my view that a close collaboration between stakeholders on crafting a set of industry standards has much to offer in terms of minimizing child exploitation and more effectively identifying, arresting and prosecuting those who prey on children. As I indicate in the Conclusion, I believe the involvement of a public interest public policy concern, The O'Connor House, founded by retired Justice Sandra Day O'Connor, might provide a valuable platform to move the search for meaningful, workable, standards forward.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000062**

As noted in a discussion of your first-cut proposals with Staca and NCMEC staff, I do not believe online standards can be productively separated from the First Amendment concerns of the Internet speech and privacy communities, nor from the unambiguous pronouncements of the federal courts on these issues. However, when I promised Staca that I would furnish a Memo setting out where I think those pronouncements would most impact potential industry standards, it did not occur to me that I was volunteering for a task that would cause the repeated destruction of draft after draft—as being too preachy, or too dense, or insufficiently optimistic about the road ahead. What follows does not completely arrest those concerns but I am hopeful it might be of modest worth as we move forward.

Please permit me to begin with a little history.

## 2.      Background

Following the Kent State shootings in 1970, Michael Lacey and Jim Larkin (with colleagues who would later depart for other pursuits) founded a free mimeographed anti-war newspaper called *New Times* at Arizona State University. At the time, the local daily newspapers—the *Arizona Republic* and *Phoenix Gazette*—were firmly pro-war and traditional advertisers had no interest in patronizing the *New Times* in a state with the highest percentage of military retirees in the nation and a multi-billion dollar military base and defense contractor-driven economy. Consequently, the advertisers needed to sustain *New Times* weekly exercise in free speech were small nightclubs, stereo stores, music and movie venues, and other concerns catering to a younger clientele. The "backpage" referred to the classified advertising section at the back of the paper.

Over a decade after beginning *New Times*, Lacey and Larkin acquired their second paper—*Westward* in Denver. Other papers followed and a merger of *New Times* holdings with five *Village Voice* newspapers in 2006 brought the national total to 16 papers in all. The combined company—Village Voice Media

Holdings—has won four Pulitzer Prizes and numerous other awards for excellence in journalism and public service.  I joined the board of the company as its only outside director following the 2006 merger.

From its inception, the company has vigorously defended First Amendment rights in a variety of contexts across the country. It successfully challenged on First Amendment grounds a misdemeanor conviction for publishing an advertisement for abortion services [1]. It successfully challenged a regulation restricting the distribution of its newspapers on university campuses [2]. And no media company in America has been more aggressive in pursuing the public's right to public information and public records exposing the decisions and conduct of public officials [3].  The company successfully argued a seminal case before the Texas Supreme Court reaffirming and expanding the right to publish satire that holds public officials up to ridicule [4]. And Lacey and Larkin recently won a far-reaching victory in the Ninth Circuit United States Court of Appeals, under the Civil Rights Act, constricting police and prosecutor immunity for First Amendment retaliatory conduct—a case that arose after they published grand jury information and were subjected to late-night arrests at their homes for an alleged violation of grand jury secrecy laws [5].

The foregoing is by no means an exhaustive list of the fights Lacey and Larkin have fought in furtherance of First Amendment values over many years. It does, however, speak to the basic proposition that their commitment to First Amendment values is neither situational nor of recent vintage.

[1] See *State v. New Times, Inc.*, 511 P.2d 196 (Ariz. App. 1973).

[2] See *New Times, Inc. v. Arizona Bd. of Regents*, 519 P. 2d 169 (Ariz., 1974).

[3] See, e.g., *Phoenix New Times, L.L.C. v. Arpaio,* 177 P.3d 275 (Ariz. App. 2008).

[4] *New Times, Inc. v. Isaacks*, 146 S.W. 3d 144 (2004)

[5] *Lacey v. Maricopa County*, 693 F. 3d 896 (2012)

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

Earlier this year, Lacey and Larkin sold their newspapers and online news platforms. Their company retains Backpage.com.

It has been said by critics that all the owners of Backpage care about is money. I would note that the reason I agreed to sit on the company's board is that I know better than that. I watched this journalistic enterprise lose large, lucrative, national advertising accounts over the years—Anheuser Busch, J.C. Penney, Coors—because they wouldn't soften or sacrifice their principles or content even when they knew a given story, or series, or review, would cause their profit arrow to point south. I have had differences of opinion with Lacey and Larkin over the years—I am probably less a First Amendment absolutist than they—but I respect their views, and their willingness to fight for them, enormously.

**3.      Legal and Political Context for Industry Standards**

As a host of third-party generated content, Backpage has voluntarily implemented reasonable measures to counter use of its service to exploit men, women and children—and is constantly looking for ways to improve. But it has steadfastly refused to succumb to statutory and regulatory censorship of its hosted content.

The company has established its immunity from civil claims under the Communications Decency Act 6. It has enjoined the enforcement of three state criminal statutes on CDA and First Amendment grounds— laws the courts found would plainly chill free speech rights by subjecting Backpage and other online hosts to state criminal liability for not ascertaining the age of persons depicted in advertisements posted by users 7. And it has established that the First Amendment is not a stranger to the attempted

6 *M.A. v. Village Voice Media Holdings*, LLC, 809 F. Supp. 2d 1041 (2011)

7 *Backpage.com, L.L.C. v. McKenna*, 881 F. Supp. 2d 1262 (2012); *Backpage.com. L.L.C. v. Cooper,* 2013 WL 1558785 (M.D. Tenn. Jan. 3, 2013); *Backpage.com, L.L.C. v. Hoffman,* 2013 WL 4502097 (D. N.J. Aug. 20 2013). The Internet Archive—the online equivalent of the American Library Association—was

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

application of federal criminal law to online user content, that First Amendment anonymity rights are not a stranger to online adult advertising, and that the authority of government to investigate in First Amendment space is fundamentally more constricted than in normal investigative contexts.

I am not new to politics or public policy. I have run for and held public office as an elected prosecutor. I have prosecuted crimes against children. I have written statutes and industry regulations. And I have put forward First Amendment values in trial and appellate courts. So I understand why Backpage's ability to assert the importance of Internet speech and privacy rights in the political and public policy arenas, or gain the slightest acknowledgement of its efforts to rescue trafficked children and aid law enforcement, is nil 8. Put another way, I understand why there was not a single "no" vote for blatantly unconstitutional laws intended to protect children by chilling online speech in the Washington, Tennessee and New Jersey legislatures.

That said, it is clear that law enforcement and academic researchers in the area of child sex trafficking and technology 9, Internet service providers and technology experts, and the online speech and privacy community, all bring important perspectives to any discussion of industry standards.

represented by the Electronic Frontier Foundation as co-plaintiff with Backpage in consolidated complaints in *McKenna* and *Hoffman*.

8 In this connection, I would be remiss if I did not gratefully acknowledge your pointing out the company's role in generating NCMEC "reports [that] have led to arrests of suspects for child sex trafficking and the rescue of child victims" in your letter to Congressman Frank Wolf of January 28, 2013, and what Liz McDougall informs me were fair comments about the company, and about our differences on a couple of issues, in your keynote speech at the recent Attorneys General Summit in Milwaukee.

9 The work of Dr. Jennifer Lynne Musto, Dr. danah boyd, Dr. Mital Thakor, and Dr. Mark Latonero, among others, in the area of technology and human trafficking, for example, provides valuable insights into the underlying challenges.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000066

DOJ-BP-0004601962

The Electronic Frontier Foundation, the Center for Democracy & Technology, and many other Internet speech and privacy groups, have recently been active both in the federal courts and in the public policy arena. A coalition letter to several members of Congress in opposition to a recent NAAG request to amend the Communications Decency Act—a request aimed squarely at Backpage—is instructive on this point 10. I believe that the increasing strength of the online speech and privacy community and other industry actors makes it impossible to craft and implement widely-applicable industry standards for adult advertising content that ignore how speech and privacy rights have been applied to the Internet by the courts.

Yet it is my view that protecting children and protecting First Amendment values need not be incongruent and there is no reason to fear fact and law-based technological solutions. As the President has said, regarding the promise of technological solutions to fight human trafficking: "Just as [traffickers] are now using technology and the Internet to exploit their victims, we're going to harness technology to stop them" 11. This is not to say the task will be easy—I have struggled with the appropriate balance between online speech and privacy rights, and child protection goals—but I believe a balance can be struck.

I also believe that absolutist approaches are inherently destructive of meaningful dialogue and solutions. I appreciate the opportunity to briefly set out some threshold concerns, against the backdrop of the June first-cut list regarding standards you provided, that we believe must inform any collaborative effort aimed at crafting a strong and workable set of industry standards.

## 4.     Problem Definition 12

10 See https://www.cdt.org/letter/coalition-letter-congress-section-230

11 B.H. Obama, *Remarks by the President to the Clinton Global Initiative* (September 25, 2012).

12 Some of the sourcing which underpins this Memo is taken from Liz McDougal's *Submission to the Governor's Task Force on Human Trafficking* in Phoenix on September, 11, 2013.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

Our discussion with Staca and staff about the initial standards proposal quickly produced what I think was a reasonable consensus that the initial scope of the websites that would be included in your first-cut standards needs refinement. A focus on classified websites that have an "adult" section, and "similar categories", for example, is both vague and under-inclusive.

The defined scope of standards would be improved with more precision and an embrace of the notion that "[t]echnological-facilitated trafficking [has] spread across multiple online sites and digital platforms" [including] "social networking sites, search engines, generalized classified services, specialized adult websites, interactive gaming technologies and, increasingly, mobile technologies"13.

The same advertisers and the same or similar ads found on Backpage can usually be found among a multitude of other websites, including classified sites such as MyRedBook, AdultSearch, EroticMugShots, LocalEscortPages, MyProviderGuide, FindHotEscorts, and nsaPals 14.

Even the most kid-oriented online services are being used to facilitate minor sex trafficking, including to "make connections with minors, advertise minors for sex, record sexual videos and images of minors for advertising, and transfer payment for commercial sex with a minor 15". These services include Facebook,

13 Id., at 3.

14 Id. This finding is consistent with the results regularly discovered from voluntary work Backpage undertakes and provides to law enforcement. In addition to searching its own databases in response to government requests, Backpage employs researchers to scan the World Wide Web for further evidence to help support a rescue, arrest or conviction. Typically, the same ad or advertiser is found on numerous other websites. Id., at FN 8.

15 M. Latonero, et al., *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, U.S.C. Annenberg School for Communications & Journalism (Nov. 2012), at 8.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000068

DOJ-BP-0004601964

MySpace and Tagged 16. Indeed, research undertaken as early as 2008 identified Facebook as a leading source for sex trade clientele in New York City—providing 25% of clients in the city's sex trade compared to only 3% from Craigslist 17.

So technology standards that apply to Backpage's "adult" section, but not to Craigslist's "casual encounters" section, or to any kind of profile, post, message or image on Facebook or Twitter, for example, would be profoundly under-inclusive and ineffective when, between the Internet and mobile technologies, most content resides on multiple sites and migrates freely between platforms18.

This definitional issue is an instance in which the perfect is the enemy of the good. I am convinced that defining the scope of standards in a way that proves effective is doable. I would suggest beginning with something along the lines of the CDA's definition of "interactive computer service provider", which would ensure inclusion of social networking sites, search engines, generalized classified services, specialized adult websites, interactive gaming technologies and, potentially, mobile technologies, with the added specification that the service or app include advertisements, solicitations, listings, reviews, profiles, forums or categories related to "adult entertainment, dating, escorts, massage, personals or other similar categories". I am sure my proffered suggestion would benefit from refinement.

5.      Imposing an Online Regulatory Obligation to "Know Your Customer"

16 Id., at 8, 23.

17 See S. Venkatesh, *How Tech Tools Transformed New York's Sex Trade*, Wired Magazine (Jan. 31, 2011). Dr. Ventatesh expected the Facebook percentage to grow by 2011.

18 d. boyd, *Combating Sexual Exploitation Online: Focus on the Networks of People, Not the Technology*, (Oct. 19, 2010), at 2-3.

As you know, the courts have been not been indifferent to society's obligation to protect children. The United States Supreme Court has said that there is "a compelling interest in protecting the physical and psychological well-being of minors"[19].  No court I am aware of has quarrelled with the basic proposition that "the protection of our young from sexual abuse may be among the most important functions of a civilized society"[20].  Yet, time and again, courts have struck down content-based laws that chill protected speech despite the laws' child protection goals. In virtually every instance a failure to properly balance competing values, or acknowledge practical effects, underpinned the decision.

Laws imposing age and identity verification requirements for online speech are among those that have repeatedly failed judicial scrutiny.

It has been sixteen years since the United States Supreme Court first considered the constitutional implications of age and identity verification on the Internet[21]. In striking down the enforcement provisions, i.e. the "decency" provisions, of the Community Decency Act, a 7-2 Court found that the government had "offered no evidence that there was a reliable way to screen [online] recipients and participants for age[22]". The Court further found, inter alia, that the "prohibitively expensive" cost of trying to verify age and identity would have a catastrophically chilling impact on protected Internet speech rights[23]. Despite many advancements in Internet-related technologies, this basic finding has not changed and no court has found otherwise.

[19] *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)

[20] *U.S. v. United States District Court for the Central District of California*, 858 F. 2d 534, 541 (9th Cir. 1988)

[21] See *Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997)

[22] Id., at 855-856.  The Court's holding was unanimous on this absence of screening technology.

[23] Id., at 876-877.

In a successful 2012 injunctive action by Backpage and the Internet Archive against enforcement of a Washington law that imposed on Backpage, and other online services, the Hobson's Choice between criminal liability for publishing third-party content leading to sex with a minor, or conducting age-verification as an affirmative defense to liability, the United States District Court for the Western District of Washington stated the online verification problem thusly:

> At first blush, requiring publishers to check identification before publishing an escort ad seems as commonsensical as requiring bar owners to check identification before allowing patrons to enter the door. The latter is an identification requirement related to conduct —drinking alcohol in a bar. The former is an identification requirement... related to speech. Since there is no constitutional right to drink alco-hol, courts tasked with upholding the Constitution care little if a bar's identification process results in a line forming outside the door, or causes some restaurants to stop serving liquor. However, because there is a constitutional right to free speech, the Constitution cannot permit similar collateral consequences in the First Amend-ment context.24

It is those "collateral consequences" that I believe cannot be ignored in an effort to craft industry standards to better protect kids and put predators in jail.

The collateral consequences of user age and identification verification regulations for U.S.-based online service providers—who frequently host tens of millions of posts, or more, annually—would include queues of posts awaiting verification for so long that content would be outdated and irrelevant by the

24 *McKenna, supra., at 1277.*

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000071

time authentication allowed public display. Other services would simply ban the content altogether because they cannot perform or afford a verification process. This is precisely the kind of speech-chilling collateral consequence condemned in cases like *Reno* and *McKenna*.

There is also an endless variety of reasons why law-abiding citizens may want to post adult content, including advertisements, online without their identities being known—may wish to speak anonymously. Fear of public ridicule, family circumstances, or employment considerations, are obvious examples. Even if distasteful to some, this speech is protected. Indeed, adult postings, including specifically those on Backpage, are not run-of-the-mill "commercial speech" entitled to only truncated scrutiny under the First Amendment25.

Popular speech seldom *needs* First Amendment protection. But a website hosting unpopular content that has been conscripted into a "you must know your customer" policy of not allowing—strictly forbidding—anonymous speech will be out of business in short order, and will deserve that fate.

The concept of anonymous speech as a bedrock First Amendment principle is as old as it is well settled26. *Reno* taught that there is "no basis for qualifying the level of First Amendment protection that should be applied" to the Internet27. Accordingly, "the constitutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded28".

Backpage has worked hard to balance the anonymity and free speech rights of users and the protection of children from exploitation and abuse. In working with law enforcement, Backpage has endeavored to operate on the basis that "non-party disclosure is ...appropriate in the exceptional case where the

25 Id., at 1280-82; Cooper, supra., at 20-21.

26 Upon authoring the *Federalist Papers*, Madison, Hamilton and Jay signed them "Publius"

27 *Reno*, supra, at 870.

28 *Doe v 2themart.com Inc.*, 140 F. Supp. 2d 1088, 1097 (W.D. Wash. 2001).

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000072

compelling need for the discovery sought outweighs the First Amendment rights of the anonymous speaker29". As a company with deep roots in defending the First Amendment, we understand that we have failed when we prepare and send a NCMEC report, out of concern for child protection, only to later learn from law enforcement, as we often do, that our concern was misplaced. But the very nature of balancing competing interests is that failures—whether caused by too much intrusion into the user experience, or too little—will occur.

**6.      Gift or Prepaid Cards and other "Anonymous Purchasing Tools"**

The suggestion in the draft standards for an outright ban on the use of "anonymous purchasing tools", such as gift or prepaid credit cards, also carries with it legal and practical collateral consequences that I do not believe can be ignored in assessing workable and effective industry standards.

As you know, in 2008 NCMEC and NAAG released a Joint Statement with Craigslist under which Craigslist implemented, inter alia, a requirement that, in its "erotic services" (later "adult") category, "[p]ersons wishing to post ads ... will be required to pay a fee using a valid credit card" 30. It was the considered and collective opinion of NCMEC and NAAG that this change would (1) "reduce ad volume significantly", (2) "encourage more responsible use", (3) "provide[] additional identifying information" in order to "enable Craigslist to block the accounts of persons who violate Craigslist's terms of use", and (4) assist law enforcement by providing additional evidence available "through a subpoena process". The 2008 Joint Statement made no distinction between traditional, debit, or prepaid cards.

29 Id., at 1095

30 *Joint Statement between Attorneys General, National Center for Missing and Exploited Children, and Craigslist* (2008).

Prepaid cards comprise a small percentage of those used for Backpage ads. Some prepaid cards require consumers to provide personal identifying information at point of sale and some do not. In many instances gift cards are used for the direct deposit of government benefits and one common feature of these cards is that a phone number is needed to get regular text updates on their balance.

To verify whether prepaid card data is in fact valuable to investigations, I asked our law enforcement support staff for a few examples of where prepaid card evidence has assisted in cases against pimps and traffickers. Three examples are illustrative of the evidentiary value of prepaid cards that NCMEC and NAAG appear to have foreseen when they demanded card usage in the 2008 agreement with Craigslist.

In the first example, the card used for a Backpage ad was in a trafficker's possession when he was arrested. In the second, the same prepaid card used to pay for an ad was used to pay the defendant's phone bill. And in the third, a card found in the defendant's possession was used for ads in several states and helped provide the evidentiary trail to make an interstate case involving trafficking and money laundering.

The same basic investigative principle—where a prepaid phone number is used and law enforcement can be provided with other ads using the same prepaid phone number, or where a combination of email address, phone number and credit, debit or prepaid card numbers will aid an investigation to find related ads by a user—applies across the board. Pushing this content to free services—such as Craigslist personals, social networking sites, chat forums and offshore sites 31—is at variance with the clear objectives of the 2008 Joint Statement, and its underlying enforcement and prosecutorial goals.

31 A San Francisco Bay Area vice detective who worked on a number of child trafficking cases gave his review of the decision of Craigslist to drop its Adult category. "Craigslist Adult Section gets shut down and what happened? Now they go to RedBook. Now I can't even get a response from RedBook because they're based out of the country." *2012 Annenberg Report, at 26-27.* I would recommend that anyone who sees the migration of US adult advertising content offshore as an abstract threat to protecting children from sexual exploitation and prosecuting traffickers in the US confer with Irish and Finnish law

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000074

People who commit crimes using the Internet may indeed use a prepaid card in furtherance of those crimes, just as they may use prepaid cell phones or unlicensed guns. But prepaid cards are by no means associated solely with criminal conduct. They are used by people with no access to banks because of poor credit. They are common "thank you" gifts, are used to avoid online identify theft and fraud, and to avoid disclosure of infidelity or sexual preference—and a host of other personal and private reasons unrelated to illegality.

To the extent a user employs a prepaid card to protect his or her anonymity in putting forth lawful online speech, this is an exercise of First Amendment rights in its purest form. How best to balance First Amendment values, the value of the evidentiary trails NAAG and NCMEC hoped to, and did, create as a result of the 2008 Joint Statement with Craigslist mandating credit card usage, and the protection of children from abuse and exploitation, all factor into a search for meaningful industry standards.

7.      **Conclusion**

As you will have gathered by now, I am not of the view that online speech prohibitions of debatable efficacy that are blatantly unconstitutional if dressed as laws ought to be entitled to wholesale online application by virtue of being dressed as "best practices".  I do believe, however, that there is considerable room for discussion and negotiation towards feasible measures if we avoid absolutist approaches, share knowledge, involve the speech and privacy and technology communities, and commit to hard work on a complex subject.

enforcement. Both nations succeeded in driving this content offshore by law, with quite striking investigative consequences.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000075

DOJ-BP-0004601971

Toward this end, I have been in consultations in recent months with a friend of long-standing, Lucia Fakonas Howard, who is a board member of The O'Connor House in Phoenix, about online technology and adult content standards/best practices. On her website, Justice O'Connor describes O'Connor House as "a center for problem solving and for bringing together groups with divergent views". While I have not spoken with Justice O'Connor directly, Lucia informs me that online standards are something she would like OCH to help move forward. I note in this connection that Justice O'Connor's interest in technology as a potential protector of children was clearly expressed in her concurring and dissenting opinion in *Reno v. ACLU*.

I regard you highly as a policy player who seeks light over heat. Our interactions with your staff have been productive and characterized by collegiality, even in a couple of areas where we do not agree. This is very much in keeping with the overriding theme of OCH and I am hopeful we can talk before I leave for Europe later this month about setting in motion efforts to craft online standards with the participation of OCH and relevant stakeholders.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*