**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United States of America,        )
                                 )    No. CR-18-0422-PHX-SMB
          Plaintiff,             )
                                 )
          vs.                    )    Phoenix, Arizona
                                 )    September 2, 2021
Michael Lacey,                   )    1:05 p.m.
James Larkin,                    )
Scott Spear,                     )
John Brunst,                     )
Andrew Padilla,                  )
Joye Vaught,                     )
                                 )
          Defendants.            )
_____ )


**BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 2 - P.M. SESSION**


Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                       **A P P E A R A N C E S**

2    For the Government:

3
         U.S. ATTORNEY'S OFFICE
4        By:  **Mr. Peter S. Kozinets**
              **Mr. Kevin M. Rapp**
5             **Ms. Margaret Wu Perlmeter**
              **Mr. Andrew C. Stone**
6        40 North Central Avenue, Suite 1200
         Phoenix, Arizona 85004
7

8        U.S. DEPARTMENT OF JUSTICE
         By:  **Mr. Reginald E. Jones**
9        1400 New York Avenue, NW, Suite 600
         Washington, DC 20530
10

11
     For the Defendant Lacey:
12
         LIPSITZ GREEN SCIME CAMBRIA
13       By:  **Mr. Paul J. Cambria, Jr.**
              **Ms. Erin E. McCampbell-Paris**
14       42 Delaware Avenue, Suite 120
         Buffalo, NY 14202
15

16   For the Defendant Larkin:

17       BIENERT KATZMAN
         By:  **Mr. Thomas H. Bienert, Jr.**
18            **Ms. Whitney Z. Bernstein**
         903 Calle Amanecer, Suite 350
19       San Clemente, CA 92673

20

21

22

23

24

25

                     UNITED STATES DISTRICT COURT

```
 1   For the Defendant Spear:

 2       FEDER LAW OFFICE
         By:  Mr. Bruce S. Feder
 3       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
 4

 5   For the Defendant Brunst:

 6       BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
         LINCENBERG & RHOW
 7       By:  Mr. Gopi K. Panchapakesan
              Mr. Gary S. Lincenberg
 8       1875 Century Park E, Suite 2300
         Los Angeles, CA 90067
 9

10   For the Defendant Padilla:

11       DAVID EISENBERG, PLC
         By:  Mr. David S. Eisenberg
12       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
13

14   For the Defendant Vaught:

15       JOY BERTRAND, LLC
         By:  Ms. Joy M. Bertrand
16       P.O. Box 2734
         Scottsdale, AZ 85252
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1

**I N D E X**

2                                                              PAGE

3    JURY VOIR DIRE                                              5

**P R O C E E D I N G S**

THE COURT:  All right.  Thank you.  Have a seat.

And before the next counsel starts, Juror 63, I had a follow-up question with you about your grand baby.

So there was some dispute about whether you said you planned to go in October when your daughter has the baby or for the month of October.  Did you have a plan?

PROSPECTIVE JUROR:  We -- the plan is that I will be there for the whole month of October.

THE COURT:  Okay.

PROSPECTIVE JUROR:  She wants me there before and then after.

THE COURT:  And this is your daughter's first child?

PROSPECTIVE JUROR:  Right, first child.

THE COURT:  All right.  You don't need to ask any followup.

Who is next over here?

Okay.

MR. FEDER:  Good afternoon.  My name is Bruce Feder. It's my honor to represent this young man in front of me, Scott Spear.  Let me do some follow-up questions, if I can.

First of all, I know you all sat downstairs and listened to these questions yesterday, but I want to -- it's an important concept in our law, and I want to make sure that we're all on the same page, and so I want to talk to Numbers --

1    Juror Numbers 64, 73, 79, 80, and 91.

2              Start with 64.

3              PROSPECTIVE JUROR:  64.

4              MR. FEDER:  There were three questions, I think they

5    were questions 43 A, B, and C, about jurors' attitudes toward

6    the presumption of innocence, whether or not a defendant would

7    be expected to testify, and whether or not the burden of proof

8    on the government is too hard.

9              Do you recall those questions?

10             PROSPECTIVE JUROR:  I do.

11             MR. FEDER:  And I think today your answer is, even

12   though you had checkmarked one of those questions as being the

13   defendant should have to testify or the burden is too hard,

14   that you said you no longer believe that.  Is that true?

15             PROSPECTIVE JUROR:  Correct.  That's correct.

16             MR. FEDER:  When you say you no longer believe that,

17   does that mean that if you are selected as a juror, that

18   basically the slate will be clean and you will require -- that

19   you believe in the presumption of innocence and will enforce

20   it?

21             PROSPECTIVE JUROR:  Yes.

22             MR. FEDER:  That you do not believe that the burden of

23   proof, the high burden of proof put on prosecutors to prove

24   their case, that that's what -- what it ought to be?

25             PROSPECTIVE JUROR:  No.  I believe the prosecution has

1    the burden of proof.

2              MR. FEDER:  And you're good with that, right?

3              PROSPECTIVE JUROR:  Yes.

4              MR. FEDER:  You believe in that?

5              PROSPECTIVE JUROR:  Yes.

6              MR. FEDER:  And, similarly, that you -- you have no

7    expectation and will not hold it against an accused person in

8    any way if they don't testify?

9              PROSPECTIVE JUROR:  Correct.

10             MR. FEDER:  Thank you very much.

11             Number 73.

12             PROSPECTIVE JUROR:  73.

13             MR. FEDER:  Do you want me to ask the questions again

14   or do you want to just answer them?

15             PROSPECTIVE JUROR:  No, you don't have to ask the

16   question again.

17             Yeah, the burden of proof is on the prosecution.  I

18   believe that, absolutely.

19             MR. FEDER:  And you're -- you're going to apply that

20   if you are a juror, correct?

21             PROSPECTIVE JUROR:  Absolutely.

22             MR. FEDER:  You have no question in your mind?

23             PROSPECTIVE JUROR:  No question.

24             MR. FEDER:  Same question with the presumption of

25   innocence.  Are you going to apply that presumption that all of

1   these folks here are innocent unless the prosecutors can prove

2   guilty beyond a reasonable doubt?

3        PROSPECTIVE JUROR:  Yes.

4        MR. FEDER:  Similarly, are you -- are you going to

5   expect in any fashion or hold it against them in any way if

6   they don't testify?

7        PROSPECTIVE JUROR:  No.

8        MR. FEDER:  That's all I have.  Thanks.

9        79.

10       THE COURT:  79 is not here.

11       MR. FEDER:  80.

12       PROSPECTIVE JUROR:  Juror 80.  Yes, I do understand

13  that the emphasis is put on the prosecution to establish their

14  case beyond a reasonable doubt.  I'd like to think that I would

15  not have any sort of preconceived notions about why a defendant

16  was not testifying on their behalf.  I think there is a variety

17  of reasons as to why defendants would not do that, so I'd like

18  to think that I'd be, you know, fair and impartial if the

19  defendants were to not testify on their own behalf.

20       MR. FEDER:  Maybe this is just a figure of speech, and

21  I apologize for asking you about it, but a lot of us use:  I

22  think, I might, or sort of.  Sometimes I use -- they're wiggle

23  words.  When you say, I think, what does that mean?

24       PROSPECTIVE JUROR:  I would certainly do my best.  I

25  mean, I've never been in this situation before and it's hard to

1    say how you would think or how you would act, you know, in an

2    unfamiliar situation.

3         MR. FEDER:  You don't know me, I don't know you, none

4    of us know you, so you have to give us your -- I think the

5    phrase has been -- your brutal honesty about whether or not,

6    deep inside, it's not I think, but I will.

7         PROSPECTIVE JUROR:  Yes, I think I will.  I will be

8    impartial and fair to both sides.

9         MR. FEDER:  Okay.  Thank you.

10        And 91.

11        PROSPECTIVE JUROR:  91.  Same questions?

12        MR. FEDER:  Same questions.

13        PROSPECTIVE JUROR:  I think I might have clicked the

14   box incorrectly, but I believe I can be impartial and fair to

15   both sides.

16        MR. FEDER:  When you say fair and impartial to both

17   sides, let's say that today Judge Brnovich said, Juror

18   Number 91, I want you to vote, guilty or not guilty?  What's

19   your vote?

20        PROSPECTIVE JUROR:  Based on zero evidence, I couldn't

21   give you a vote right now.

22        MR. FEDER:  Do you understand that because of the

23   presumption of innocence, where they are presumed innocent,

24   that means that there has to be evidence to get beyond that

25   presumption?  Do you understand that?

1          PROSPECTIVE JUROR:  Yes, I understand that.

2          MR. FEDER:  Similarly, there has to be proof beyond a

3     reasonable doubt to get anywhere close to a guilty verdict,

4     right?

5          PROSPECTIVE JUROR:  I understand that.

6          MR. FEDER:  So given the fact that you have not heard

7     any kind of information on this case, what's your verdict if

8     called upon to give it today?

9          PROSPECTIVE JUROR:  This very second I would have to

10    -- well, I think the case would be dismissed at that point in

11    time if we were asked.  We wouldn't be asked to vote.

12         MR. FEDER:  Wouldn't it have to be not guilty right

13    now?

14         PROSPECTIVE JUROR:  You're putting words in my mouth,

15    sir.

16         MR. FEDER:  Well, I don't want to do that.  I want you

17    to give me your words.

18         PROSPECTIVE JUROR:  My word is I would have to hear

19    the data and understand it and analyze it and make my decision

20    based on the data provided.  Right now, I have no data.

21         MR. FEDER:  But if there is a presumption of

22    innocence, isn't that where you would have to start?

23         PROSPECTIVE JUROR:  If there is -- if -- if I was --

24    if Her Honor was to say right now what are we going to do, I'd

25    say I would have to abstain because I have no evidence, no

1   information whatsoever to base my opinion on.

2           MR. FEDER:  So it's going to be hard for you to say

3   right now, if there is a presumption of innocence, I have to

4   say they're innocent?

5           PROSPECTIVE JUROR:  That's a very, very large

6   hypothetical I'm not prepared to answer at this time.

7           MR. FEDER:  Okay.  Thank you.

8           Number 88.

9           PROSPECTIVE JUROR:  Juror 88.

10          MR. FEDER:  Thank you.  Juror Number 88, have we --

11  has anybody asked you about the hardship that you indicated?

12          PROSPECTIVE JUROR:  No.

13          MR. FEDER:  Is there a hardship?

14          PROSPECTIVE JUROR:  No.

15          MR. FEDER:  Are you a CFO of a company that you're

16  retiring from?

17          PROSPECTIVE JUROR:  Yes, I am.

18          MR. FEDER:  Tell me if I'm reading from the wrong

19  questionnaire.  It says, I am retiring from the company at the

20  end of the year and will be training my replacement --

21          PROSPECTIVE JUROR:  Yes.

22          MR. FEDER:  -- during the last quarter, which means, I

23  assume, now, right?

24          PROSPECTIVE JUROR:  Yep.

25          MR. FEDER:  Is this trial, if you were selected, going

1  to interfere with your ability to serve out your term as the

2  CFO of your company and train your replacement?

3          PROSPECTIVE JUROR:  Well, I thought about that.  I've

4  actually been training her for a whole year for it.  We just

5  need to get to one last little piece which is critical to the

6  company, but I don't see any problem.

7          MR. FEDER:  Is that maybe what you referred to

8  initially where you said the problem has been solved?

9          PROSPECTIVE JUROR:  Yes.

10         MR. FEDER:  Okay.  Great.  Thank you.

11         You indicated in your questionnaire that you had heard

12  of Backpage.  Is that anymore than I've heard of a lot of

13  things or something specific?

14         PROSPECTIVE JUROR:  I -- I mean, I've heard of it and

15  that's all.

16         MR. FEDER:  Okay.  You indicated that you're -- I

17  think the question is something to the effect of feelings

18  regarding a website's responsibility for content posted by

19  users.

20         PROSPECTIVE JUROR:  Yep.

21         MR. FEDER:  And your answer was:  I think they should

22  be responsible for the content.  I don't know how to do that,

23  but I think they should.

24         PROSPECTIVE JUROR:  Well, since I've been in here for

25  two days almost, I -- it's sort of like telephone deal versus a

1  website, you know.  Like, I hate robo calls, but I can't do

2  anything about it, in terms of shutting down, you know, the --

3  the phone system.  So I think the way you're --

4          Are you asking me what I think we should do?

5          MR. FEDER:  Well, I guess I'm asking you a question of

6  are you going to impose a burden on these folks that's --

7          PROSPECTIVE JUROR:  No.

8          MR. FEDER:  -- an impossible one?

9          PROSPECTIVE JUROR:  No.  I got it.

10          MR. FEDER:  And then there is the question, of course,

11  of whether or not that should be some kind of civil case or an

12  injunction case, as opposed to bringing the heaviest load, and

13  that is a criminal case.

14          PROSPECTIVE JUROR:  Yes, I understand.

15          MR. FEDER:  I think that's all.  Thanks.

16          PROSPECTIVE JUROR:  Thanks.

17          MR. FEDER:  Number 90, I think behind you -- oh, there

18  she is.

19          PROSPECTIVE JUROR:  90.

20          MR. FEDER:  Perfect.  You follow up the exact question

21  I just asked this gentleman.  They should be held

22  accountable -- I'm sorry, a website -- your feeling is that a

23  website has responsibility for content posted by users, and

24  your answer was they should be held accountable if they know

25  illegal activity is occurring, right?

1          PROSPECTIVE JUROR:  Yes.

2          MR. FEDER:  Do you have any feelings as to what it is

3    they have to do in order to know?

4          PROSPECTIVE JUROR:  Well, just due diligence.  I'm

5    sure there is plenty of software out there to catch keywords,

6    things like that -- I mean, obviously, things are going to get

7    through.  It's not possible to catch everybody doing

8    everything, but there are certain things you can do as far as

9    software, I'm sure.

10         MR. FEDER:  Does that make you think that the

11   Facebooks and the Googles and the big players in the internet

12   are not doing everything they should be doing?

13         PROSPECTIVE JUROR:  I honestly don't know.  Couldn't

14   tell you.  I don't do a lot of social media.  I mean, I have,

15   like, LinkedIn, that's it, so I don't really play around too

16   much in social media.

17         MR. FEDER:  So you're not going to get called as an

18   expert on social media, right?

19         PROSPECTIVE JUROR:  Definitely not.

20         MR. FEDER:  Okay.  Thanks.

21         Do you think if you were selected as a juror, because

22   of your feelings of whether a website should be responsible,

23   that you're going to hold -- even though you don't know the

24   answers -- you're going to hold these people to an unreasonable

25   standard?

1          PROSPECTIVE JUROR:  No.  I'm into laws and facts.  I
2     watch a lot of Dateline.

3          MR. FEDER:  I'm sorry?

4          PROSPECTIVE JUROR:  I said I watch a lot of Dateline.
5     All I use is facts and laws, so I would be just fine.

6          MR. FEDER:  You're confident inside yourself?

7          PROSPECTIVE JUROR:  Absolutely, yes.

8          MR. FEDER:  Great.  Thank you very much.

9          Number 91.  Again, sir, you gave a reason why you have
10    concerns about serving.  I want to make sure that you've at
11    least been asked about it.

12         Did you say I have a concern that missing ten weeks of
13    work and the need for me to pick up missed duties upon return?

14         PROSPECTIVE JUROR:  Correct.  That's correct.

15         MR. FEDER:  Could you be a little bit more specific?
16    I mean, are you going to get paid if you miss ten weeks of
17    work?

18         PROSPECTIVE JUROR:  I believe I will be paid, yes.

19         MR. FEDER:  Is there somebody that can step in and
20    help to do the things that you would ordinarily be doing?

21         PROSPECTIVE JUROR:  At this time, there is nobody else
22    doing the work that I do.

23         MR. FEDER:  How big a company is this?

24         PROSPECTIVE JUROR:  It's General Dynamics.  It's an
25    electrical company.

1          MR. FEDER:  I mean, have you discussed this at all

2  with your supervisors and about the problem that this would --

3          PROSPECTIVE JUROR:  Yeah, I have discussed it with

4  them, but they basically said let's wait and see what happens.

5          MR. FEDER:  Would that -- if you were chosen, would

6  that be on your mind to a point where it would interfere with

7  your ability to be a juror?

8          PROSPECTIVE JUROR:  No.  It would just mean I would

9  have to do some things in the evenings and weekends.

10          MR. FEDER:  I think I forgot which juror it was was

11  talking about -- I think the lawyer was talking about having

12  worked last night until 12:30 and he was exhausted just from

13  one day of doing that, much less some months of doing that.  Is

14  that a concern for you?

15          PROSPECTIVE JUROR:  It's not.  I don't think it would

16  be that many hours, just be some elective after the trial dates

17  and on the weekend.

18          MR. FEDER:  You understand there is some days a week

19  we go five days a week, four days a week, three days a week, et

20  cetera?

21          PROSPECTIVE JUROR:  Yes, I understand that.

22          MR. FEDER:  Here was the question:  Government should

23  investigate or prosecute provider of platform that promotes or

24  facilitates prostitution?  And your answer was:  Yes, until it

25  is a controlled environment -- that's in quotes -- some

1  protection needs to be provided to those forced into the

2  business.

3          What does that mean to you?

4          PROSPECTIVE JUROR:  I'm sorry, I couldn't quite hear

5  you.

6          MR. FEDER:  The answer that I have on your

7  questionnaire is you said, yes.  And then it said, until it is

8  a controlled environment, some protection needs to be provided

9  to those forced into the business.

10          PROSPECTIVE JUROR:  And what was the question that I

11 was asked?

12          MR. FEDER:  The question was should the government

13 investigate and prosecute providers of platforms that promote

14 or facilitate prostitution?

15          PROSPECTIVE JUROR:  I believe that answer feeds back

16 to an earlier one with questions of legality and whether it

17 should be legal or not, so controlled environment meaning

18 something more of an environment that allows people to do what

19 they want, not the platform provider, but the business being

20 provided.

21          MR. FEDER:  I'm still not quite understanding what

22 you're saying.

23          PROSPECTIVE JUROR:  One of the earlier questions was

24 what was my opinion on prostitution, right?

25          MR. FEDER:  Yeah.  Your answer to that one was that

1    you believed prostitution ought to be legalized because it's

2    the world's oldest profession, so to speak.  No amount of

3    effort will ever completely stop it.  Legalize it and provide

4    safety to all.

5            PROSPECTIVE JUROR:  Correct.  So my answer below feeds

6    back into that answer.  So if it's -- if it's everybody has a

7    safe environment, then there is an obligation to be able to

8    provide protection to anybody who is forced into the business.

9            MR. FEDER:  Into what business?

10           PROSPECTIVE JUROR:  Into the prostitution business.

11   That's what -- that was the feedback.

12           I misunderstood the question.

13           MR. FEDER:  Okay.  Well, as you stand here today, do

14   you think the internet sites have a responsibility to keep

15   anything illegal off of their site?

16           PROSPECTIVE JUROR:  I believe they have an amount of

17   responsibility to ensure information provided on their site,

18   whoever provides it is providing protection to people that are

19   involved in the business, in the business being advertised.

20           MR. FEDER:  Does that mean absolute?  Try your best?

21   What is it to you that you believe is the -- your -- at least

22   is the basis of your answer to this question?

23           PROSPECTIVE JUROR:  So, as I said earlier, I think --

24   I believe I misunderstood the question, or provided a different

25   answer than the question asked.

1          As a platform provider, as an advertising platform

2    provider, is that what we're talking about?

3          MR. FEDER:  Well, there is a difference between a

4    user, somebody that sends an ad --

5          PROSPECTIVE JUROR:  Correct.

6          MR. FEDER:  -- versus the site where the ad is sent.

7    Those are two distinct things.

8          PROSPECTIVE JUROR:  Correct.  So the platform provider

9    of the ad has some amount of culpability and understanding, in

10   that if there is one IP or one service address that's putting

11   in a thousand ads, there should be some sort of investigation

12   of what's going on there.

13         MR. FEDER:  Okay.  I got it.  Thank you.  Thank you.

14         Are you versed in social media and internet sites?

15         PROSPECTIVE JUROR:  I've created an internet site for

16   a volleyball club I used to be a part of.

17         MR. FEDER:  Were you able to implement any kinds of

18   ways of keeping off bad content or undesirable content?

19         PROSPECTIVE JUROR:  I was the sole poster, so

20   everything that got posted had to go through me.

21         MR. FEDER:  I got it.  I understand.

22         All right.  Thank you.

23         92.  I know.  I know.  It's okay.  I'll be gentle.

24         PROSPECTIVE JUROR:  Juror Number 92.

25         MR. FEDER:  I must have missed you on my first

1    question, and that is you answered:  Too hard to convict the

2    accused, I agree.

3              Do you remember?

4              PROSPECTIVE JUROR:  I think sometimes that happens.

5              MR. FEDER:  Well, we have actually pretty standard --

6    a standard constitution that hasn't changed in many years, and

7    some standard laws that talk about this idea of a presumption

8    of innocence; that the government has a heavy burden of getting

9    past that presumption, and then another heavy burden of proving

10   the guilt beyond a reasonable doubt, and that defendants don't

11   have any obligation whatsoever to put on any evidence, but

12   merely to test what the government asserts.

13             PROSPECTIVE JUROR:  Yeah.

14             MR. FEDER:  Right?

15             PROSPECTIVE JUROR:  Yeah.

16             MR. FEDER:  And then if a defendant chooses to

17   testify, they can, if they don't, they don't have to, and you

18   are not to take anything about that to heart.  You're not to

19   use it in any way against them.

20             PROSPECTIVE JUROR:  Yeah.  Oh, I understand that, but,

21   I mean, when the question was asked, it's like that's just how

22   I felt at the time.

23             MR. FEDER:  But these are -- these are our laws.

24             PROSPECTIVE JUROR:  Yeah.

25             MR. FEDER:  And you say it's too hard to convict.  Are

1   you able to completely put that aside, don't even consider that

2   feeling, and apply the laws of our country?

3             PROSPECTIVE JUROR:  Yeah.  I was a juror before, so

4   I've done that.

5             MR. FEDER:  Do you enjoy being a juror?

6             PROSPECTIVE JUROR:  Did I enjoy it?  It was a murder

7   trial.  It was interesting.

8             MR. FEDER:  You also indicated that, in regard to

9   whether or not you have strong feelings about escorts -- I know

10  you've heard a lot of information about that.

11            PROSPECTIVE JUROR:  Yeah.

12            MR. FEDER:  So I'm not going to keep on pounding it

13  in -- but your answer was, it may be legal, but I think it's

14  wrong and breaks up marriages, but you said that you've not

15  been personally affected, thank goodness.

16            Understanding that theory being an escort can be

17  legal --

18            PROSPECTIVE JUROR:  Uh-huh.

19            MR. FEDER:  -- an escort can get a license from some

20  of the cities in this town, are you going to be able to apply

21  that and only that and not your personal beliefs against

22  escorts?

23            PROSPECTIVE JUROR:  Yes, because not everybody has got

24  the same moral code that I do, so I'm not going to push my

25  moral code on somebody else.

UNITED STATES DISTRICT COURT

1           MR. FEDER:  In other words, you will follow the law,

2     be a fair and impartial juror, and try to leave your morality

3     out of your decision making?

4           PROSPECTIVE JUROR:  Yes.

5           MR. FEDER:  Thanks.  Don't sit down.

6           I know you were probably just playing around, but in

7     answer to the question of:  Do you believe prostitution should

8     be legalized?  You said, hell, no.  It's just wrong.  Is that

9     just --

10          PROSPECTIVE JUROR:  Well, I -- I think it's wrong,

11    but, again, I know other people have different beliefs on it

12    than I do.

13          MR. FEDER:  Going back to what you've already talked

14    about, you're going to apply the law, you're not going to let

15    your judgments about any of this stuff have an effect on your

16    ability to be a fair and impartial juror?

17          PROSPECTIVE JUROR:  Yes.

18          MR. FEDER:  Your feelings about response -- website

19    responsibility for content posted by users.  Your answer was,

20    I'm again conflicted.  These entities allow some horrible

21    things to be posted which restricts religious views.

22          PROSPECTIVE JUROR:  Well, I thought -- the Facebook

23    police got me one time for posting something about -- the

24    Facebook police got me one time for posting something about

25    Jesus, so I think if they have the time to do that, they've got

1  the time to find and get rid of some of this other stuff that's

2  out there.

3          MR. FEDER:  So you, in your opinion, in that

4  situation, they went overboard?

5          THE COURT:  Mr. Feder, you need to move back a little.

6  Thank you.

7          MR. FEDER:  I keep hitting this thing.

8          In that case, you think that the social media site

9  went overboard and was too strict, right?

10          PROSPECTIVE JUROR:  Well, I mean, it wasn't illegal or

11  anything, so why punish me when there is people posting illegal

12  things out there.  Go after them.  Leave me alone.

13          MR. FEDER:  But you understand the predicament that a

14  social media site is in, where some people are unhappy about

15  them being too restrictive, and other people are unhappy about

16  them being not restrictive enough?

17          PROSPECTIVE JUROR:  Well, that comes to whether it's

18  illegal or not.  That's the key.  I mean, if something is

19  illegal, then I believe they've got the responsibility to pull

20  it, but, I mean, if it's not, there is -- as far as I know, we

21  still have freedom of speech.

22          MR. FEDER:  And you, again, will bring your best juror

23  to the jury box with you and be fair and impartial, and leave

24  these moral feelings, or ethical feelings, or just personal

25  feelings outside, as far as being -- being able to follow the

1    law?

2                PROSPECTIVE JUROR:  Yes.  I totally believe in the

3    constitution.

4                MR. FEDER:  Great.  Thank you very much.

5                PROSPECTIVE JUROR:  Is that it?

6                MR. FEDER:  Yes, that's all I have.  Thanks.

7                MR. LINCENBERG:  While we're on Juror Number 92, just

8    ask one quick followup, it's just a quick followup.  You

9    indicated that your son is an Arizona state trooper?

10               PROSPECTIVE JUROR:  Yes.

11               MR. LINCENBERG:  Congratulations.  And we're going to

12   have some law enforcement officials testifying in this case.

13               PROSPECTIVE JUROR:  Yes.

14               MR. LINCENBERG:  Do you believe that you will give any

15   additional deference to their credibility because they work as

16   law enforcement officials?

17               PROSPECTIVE JUROR:  They're people like we are, so you

18   have to take what they say and, you know, what anybody else

19   says.  They're all going to be on the same playing field.

20               MR. LINCENBERG:  Okay.  So the fact that your son is a

21   state trooper won't even give you a little more of an edge

22   towards believing their testimony?

23               PROSPECTIVE JUROR:  No.

24               MR. LINCENBERG:  Okay.  Thank you very much.

25               Number 91, I also had just one or two follow-up

1   questions.  I found a lot of your answers thoughtful about the

2   responsibility of platform providers, and I wanted to ask if at

3   all, going into your thinking, if you're familiar at all with

4   the protections for platform providers provided by Section 230

5   of the Communications Decency Act?

6           MS. PERLMETER:  Objection.

7           THE COURT:  Yeah.  You can ask about his general

8   opinions, but not about some specific.

9           MR. LINCENBERG:  All right.  Well, are your opinions

10  informed at all by any -- any understanding of protections

11  under the law?

12          PROSPECTIVE JUROR:  I'm not aware of the exact -- I'm

13  not aware of the exact wording of those laws.

14          MR. LINCENBERG:  Does anybody in the room have any,

15  what you might believe is, greater understanding than the

16  average about the laws that govern content that is posted on

17  platforms?  Just raise your hand.

18          MS. PERLMETER:  Objection.

19          MR. LINCENBERG:  Your Honor, I think this is a

20  perfectly legitimate area of inquiry.

21          THE COURT:  Yes, but it -- side bar.

22          (The following proceedings were held at side bar.)

23          THE COURT:  Okay.  So my objection is that this is a

24  general question into a new area that was not in the

25  questionnaire, and this is only for follow up.

1          MR. LINCENBERG:  Right.  So this deals with feelings

2     regarding website responsibility or content posted by users.

3     Number 91, obviously, has a lot of thought.  He's a bright guy.

4     He has a lot of thought that goes into that area.  He's created

5     platforms and the like and --

6          THE COURT:  Created one website.

7          MR. LINCENBERG:  Created one website, sure, and has a

8     lot of thoughtful responses.  And I'm trying to get a sense of

9     whether any of the jurors have any greater expertise in this

10     area than the average person.  I don't know what could be more

11     pertinent.

12          THE COURT:  Well, that's not the question you asked.

13     You started asking about Section 230.

14          MR. LINCENBERG:  That was with him, right.

15          THE COURT:  And, well, then you turned to the jury and

16     asked them.

17          MR. LINCENBERG:  So, first of all, I think the 230

18     question was appropriate, but the Court wanted me to change it

19     to understanding of the laws, so I did so.  And then when I

20     turned to the jurors, I asked about understanding -- any

21     greater understanding of the laws in the area.  I didn't even

22     talk specifically about 230 in that question.  And I can

23     rephrase it again to keep it more general, more general nature.

24          THE COURT:  Except that we have already covered

25     people's thoughts about websites in the questionnaires.  This

1    is opening up a whole new area.

2           MR. LINCENBERG:  It's dealing with question 76.  We

3    had a discussion, and I want to see if anybody else has an

4    answer that would be different.

5           THE COURT:  Different than what?

6           MR. LINCENBERG:  Different than his answer.  Where he

7    said he doesn't have any particularized knowledge in that area,

8    I want to see if anybody has any particularized knowledge in

9    that area.

10          There is going to be a lot of testimony about Section

11   230 and the First Amendment and the like, and I want to see if

12   anybody is going to have or has any particularized knowledge in

13   the law.

14          THE COURT:  Okay.

15          (The following proceedings were held in open court.)

16          MR. LINCENBERG:  So, ladies and gentlemen, my question

17   again, that was followup on my question to Juror 91, was if

18   anybody in the room has any particularized knowledge about the

19   laws that govern content or protections for content platforms

20   on the internet?  If you do, please raise your hand.

21          (No response.)

22          MR. LINCENBERG:  Okay.  And, Juror Number 88, while

23   I'm on this side of the room, I wanted to also follow up with

24   you.

25          You indicated that, in your questionnaire, you advised

1    us that you're one of the owners of your company and currently

2    serving as the CFO.  I represent Mr. Brunst who was the CFO of

3    a company that at one point owned Backpage, later sold it, and

4    so I'm very interested in hearing a little bit more about your

5    background and your work history in that regard.

6             PROSPECTIVE JUROR:  Okay.  Can you hear me now?

7             MR. LINCENBERG:  Yes.

8             PROSPECTIVE JUROR:  Okay.  My early career was in the

9    real estate development business in Boulder, Colorado.  And I

10   got my undergraduate degree at the University of Colorado and

11   went to work for a home builder for about ten years, probably

12   more like 15, actually, but then got a headhunter job here in

13   Phoenix and went to work for a REIT, real estate investment

14   trust.  And that real estate investment trust --

15            MS. PERLMETER:  I'm sorry.  I don't mean to interrupt

16   the juror.  I'm having difficulty hearing.  If he could hold

17   the mic closer.

18            PROSPECTIVE JUROR:  Yeah, no problem.  My apologies.

19            When I transitioned down here, I went to work for

20   REIT, Real Estate Investment Trust.  My job there was to -- I

21   was the valuation team captain, if you will.  I was a vice

22   president of a group of people that valued the real estate that

23   we bought across the United States.  And we ultimately set the

24   final purchase price on all of -- all the properties that we

25   acquired.

1        MR. LINCENBERG:  Was that a large REIT?

2        PROSPECTIVE JUROR:  Yes.

3        MR. LINCENBERG:  What was the name of the REIT?

4        PROSPECTIVE JUROR:  It was called Franchise Finance

5   Corporation of America.

6        MR. LINCENBERG:  Can you give me a very general sense

7   of perhaps either the valuation of the REIT or the size of the

8   holdings, just to get a sense?

9        PROSPECTIVE JUROR:  It was sold for five billion.

10        MR. LINCENBERG:  Okay.  And in your role, you were

11   serving as the CFO of that REIT?

12        PROSPECTIVE JUROR:  No, no.

13        MR. LINCENBERG:  What was your role at that time?

14        PROSPECTIVE JUROR:  I was vice president in charge of

15   real estate valuation.

16        MR. LINCENBERG:  You said that with a company -- a

17   large company, I would assume you would have quarterly meetings

18   or yearly meetings, something of the sort?

19        PROSPECTIVE JUROR:  Yep.

20        MR. LINCENBERG:  And at those meetings, I assume that

21   there would be a number of different executives --

22        PROSPECTIVE JUROR:  Yep.

23        MR. LINCENBERG:  -- who would come and they would

24   address things in their area of the company?

25        PROSPECTIVE JUROR:  For sure.

1           MR. LINCENBERG:  All right.  And you had your role in

2    that company and dealt with property valuations, as I

3    understand it?

4           PROSPECTIVE JUROR:  Right.

5           MR. LINCENBERG:  And I assume that you viewed your

6    responsibility at that time as being focused on doing your job

7    as well as you could with regard to the valuations?

8           PROSPECTIVE JUROR:  Sure.

9           MR. LINCENBERG:  And did you assume that the other

10   folks in management would have had primary role for their

11   various responsibilities?

12          PROSPECTIVE JUROR:  Of course.

13          MR. LINCENBERG:  All right.  And so I take it when you

14   would do due diligence in preparation for a meeting, it was

15   generally in your area and not in everybody else's area?

16          PROSPECTIVE JUROR:  Correct.

17          MR. LINCENBERG:  Okay.  Now, I assume a company of

18   that size also employed outside counsel?

19          PROSPECTIVE JUROR:  Yes.

20          MR. LINCENBERG:  All right.  And was outside counsel

21   at that company in part involved in providing compliance

22   recommendations, for example?

23          PROSPECTIVE JUROR:  Of course.

24          MR. LINCENBERG:  All right.  And did you generally

25   defer to the advice of outside counsel in terms of being a

1     greater expert in what the law was than yourself, for example?

2               PROSPECTIVE JUROR:  Many times.

3               MR. LINCENBERG:  All right.  Okay.  Now, I believe

4     that when we started, there was a -- you were, I think, one of

5     the gentlemen who raised your hand that said that there was

6     some information in addition to advising the Court -- correct

7     me if I'm wrong -- I wrote down a note that you said some

8     circumstances changed and that you have more availability now

9     than you thought.  Is that what that was referring to?

10              PROSPECTIVE JUROR:  Yes, because -- yes.  I had

11    requested a postponement of my service and I revoked that

12    request.  And the circumstances changed in the last couple of

13    days where I felt more comfortable with my staff and with the

14    person in particular who is replacing me at the end of the

15    year.

16              MR. LINCENBERG:  Thank you very much.

17              PROSPECTIVE JUROR:  You're welcome.

18              MR. LINCENBERG:  I'd like to ask some questions of

19    Juror Number 67.  And let me -- let me, before I ask this, just

20    ask again.  You may have heard me ask this of the earlier

21    sessions where I mention that on behalf of Mr. Brunst, I'm

22    going to be reserving my opening statement.  I'll be giving my

23    opening statement after the close of the government's case and

24    before the defense case.

25              And I asked the question of the jurors earlier, first

```
1   of all, I have a concern if there is anybody who sort of comes
2   to quick decisions on things and then tends to stay with that
3   as opposed to keeping an open mind.  And we've had some jurors
4   who have said I have sort of formed an opinion of this case
5   based upon just what I've heard during voir dire.  And so
6   that's my question for those of you who are in the room right
7   now.
8          Is there anybody who believes that you either have
9   formed an opinion of the case or would likely form an opinion
10  early in the case, and that you would probably stick with that
11  opinion?  If so, please raise your hands.
12         MS. PERLMETER:  Objection.  This is a new question.
13         THE COURT:  The objection is overruled.
14         MR. LINCENBERG:  Raise your hand if that applies to
15  anybody.
16         (No response.)
17         MR. LINCENBERG:  Okay.  I want to make sure that
18  everybody --
19         Yes, Juror -- what's your number?
20         PROSPECTIVE JUROR:  87.
21         MR. LINCENBERG:  Go ahead, 87.  I think you need the
22  microphone.
23         PROSPECTIVE JUROR:  87.  I just heard there is some
24  comments that there might be some things involving children.
25  And, with that being the case, I know that, you know, anybody
```

1   that's participated in crime that hurts children, I don't think

2   I'll be able to overcome my -- my bias towards that.

3          MR. LINCENBERG:  Okay.  I appreciate that.  I

4   appreciate that.

5          PROSPECTIVE JUROR:  I'm a mom.

6          MR. LINCENBERG:  Right.  I understand.  Anybody else?

7          (No response.)

8          MR. LINCENBERG:  Okay.  Now, if we could maybe give it

9   back to 67.

10          And, Juror 67, I want to pick up and I'm going to

11   start with you, although my question is really going to be

12   applying to everybody, if you can keep this question in mind.

13          The prosecutor in her voir dire questions used the

14   term victim.  And my question, and I'll first ask you since I

15   know you were a victim of an offense, whether when the

16   prosecutor uses the term victim, that causes any of you to

17   infer that a particular witness, such as a prostitute, that the

18   troubles of that particular witness were caused by the internet

19   platform owners where that person advertised?  Does anybody

20   infer that from when the prosecutor uses the term victim to

21   describe a prostitute who may be testifying as a witness?

22          MS. PERLMETER:  Objection.

23          THE COURT:  The objection is sustained.

24          Mr. Lincenberg, you can follow up with Juror 67.

25          MR. LINCENBERG:  Well, Juror 67, let me ask that

```
1    question more directed towards you.  I know that you were
2    forthright about a difficult thing in your life of having been
3    a victim of an offense when you were -- when you were younger.
4    And if in the course of this trial the prosecutor describes
5    somebody who is testifying as a victim, will that lead you to
6    infer that the place where that person advertised her services
7    should be responsible?
8            MS. PERLMETER:  Objection.
9            THE COURT:  The objection is overruled.
10           PROSPECTIVE JUROR:  I'm Juror 67.  So, yes, I was a
11   victim, but I also don't view it as that any longer.  I
12   overcame the situation.  I am a grown woman now.  I'm
13   accomplished.  And hearing anything, it's not going to change,
14   you know, my thought process.  I'm a very fair person.  I
15   manage a lot of employees.  And when situations come up, I
16   analyze, take in the information and go from there.
17           MR. LINCENBERG:  All right.
18           PROSPECTIVE JUROR:  So previously -- no.  Is my
19   experience going to change the way I view things, no.
20           MR. LINCENBERG:  I appreciate that.  So the fact that
21   they may use the term victim, and we're the ones sitting at the
22   defense table, is not going to immediately cause you to assume
23   that whatever led this person into prostitution, that my client
24   is responsible for it?
25           PROSPECTIVE JUROR:  That's correct.
```

1          MR. LINCENBERG:  Okay.  Anybody have a different view

2     of that?  Please let me know.

3          MS. PERLMETER:  Objection.

4          THE COURT:  Objection is overruled.

5          (No response.)

6          MR. LINCENBERG:  Okay.  And, Juror 67, let me follow

7     up.  You had, in response to the questionnaire, you indicated

8     that you did not believe prostitution should be legalized

9     because it could potentially divert from individuals pursuing

10    other career goals if it was legalized.  Can you explain what

11    you mean by that, what your feelings were?

12         PROSPECTIVE JUROR:  I guess when it comes to,

13    obviously, we've all heard the difference between the

14    prostitution and the escort legalization and whatnot, so my

15    perspective is, you know, I think that everybody does have a

16    choice in what they do, but there are other avenues that they

17    can pursue to earn money.

18         MR. LINCENBERG:  Okay.  And in question 69 you were

19    asked about whether the government should investigate or

20    prosecute providers of platforms that promote or facilitate

21    prostitution.  And the answer -- the note I have down is you

22    said, yes, more resources should be utilized as long as

23    prostitution is illegal.  And I wanted to ask for you to

24    explain what you meant by that as well, since this question

25    focuses on platforms, whether it's newspapers or internet

1  platforms where prostitutes had, apparently, advertised.

2  PROSPECTIVE JUROR:  Well, again, I think, you know,

3  you're specifically asking about prostitution, so I would think

4  that -- I'm sorry.  Can you repeat the question?  I apologize.

5  MR. LINCENBERG:  Sure.  I'm really just trying to get

6  a little more of your thought about why, if this -- if my notes

7  are correct, you felt that more resources should be used to

8  investigate or prosecute platforms where prostitutes have,

9  apparently, advertised?

10  PROSPECTIVE JUROR:  Well, I guess if it's like

11  factual, right, that the -- that it is -- there are prostitutes

12  being advertised specifically, but if it's not proven, you

13  know, there is nothing, you know, to put the resources to.  I

14  guess in my mind when I answered that question, as other people

15  have said, there are things where you are like -- when you do

16  post something online that -- or if you upload a video, it is

17  automatically reviewed for, I don't know what type of content,

18  I'm not an expert in that, but it will tell you, hey, your

19  video will be uploaded in a -- in a few minutes, so I'm

20  assuming they're doing a check.

21  So I guess that's where I say, like, resources.  You

22  know, if it's something in that nature where, if there is the

23  keywords, if there is specific things that maybe the platform

24  does not want to use, but then they, on the other side of that,

25  I can't -- or I guess no one really can control what somebody

1    would like to say, freedom of speech so...

2            MR. LINCENBERG:  So you're saying, if I understand you

3    right, the business that runs the platform should have

4    compliance steps to try to take out words that might constitute

5    sex for money?

6            PROSPECTIVE JUROR:  I mean, it just depends on, I

7    guess I would say what they were looking to have on the

8    website.

9            MR. LINCENBERG:  Okay.  All right.  Thank you for your

10   explanations.  That's helpful.

11           Juror 68.  Sir, thank you for coming in with an

12   explanation of various things, it was very helpful to hear, and

13   it led me to have a few follow-up questions.

14           Let me -- let me start with bitcoin.  So as I

15   understand it, you had, at one point, bought some bitcoin.

16           PROSPECTIVE JUROR:  Good afternoon.

17           MR. LINCENBERG:  Good afternoon.

18           PROSPECTIVE JUROR:  I'm Juror 68.  Yes, I made a

19   number of purchases until I had a little over two bitcoin.

20           MR. LINCENBERG:  Okay.  And you then indicated that

21   you sold them and at some point developed some ethical concerns

22   with the technology?

23           PROSPECTIVE JUROR:  I transferred the two bitcoins to

24   my son-in-law, future son-in-law, as a wedding gift, and then I

25   retained a fraction of a bitcoin, then I sold those.

1          MR. LINCENBERG:  Okay.  So my question is this:  Do

2     you believe that there is anything wrong with a company

3     accepting payment through bitcoin?

4          PROSPECTIVE JUROR:  No.

5          MR. LINCENBERG:  Okay.  And let me ask, have you ever

6     paid for anything with your bitcoin or was your purchase just

7     an investment?

8          PROSPECTIVE JUROR:  Just an investment.

9          MR. LINCENBERG:  Do you ever know of any friends or

10    family members who have used bitcoin in transactions?

11         PROSPECTIVE JUROR:  Of course, my son-in-law after he

12    lost his password but then recovered it, obviously, used the

13    two bitcoins that I -- that I had given him.

14         MR. LINCENBERG:  Okay.  If you heard evidence in this

15    case that one of the forms of payment that was accepted by

16    Backpage was bitcoin, would that raise any ethical concerns in

17    your mind that would cause you to have any bias?

18         PROSPECTIVE JUROR:  As I mentioned in my answer, I

19    think there is a record or correlation of bitcoin being used by

20    actors who have an interest in anonymity, and that's why, for

21    example, bitcoin was a method of payment on -- so just a, for

22    instance, that's why it's also used when people produce ransom

23    money.

24         MR. LINCENBERG:  Right.

25         PROSPECTIVE JUROR:  Can it be used by legitimate

1    business or legitimate transactions, absolutely, there is not

2    fundamental there.

3        MR. LINCENBERG:  And you understand there is thousands

4    of legitimate businesses that accept bitcoin as payment?

5        PROSPECTIVE JUROR:  Absolutely.  I wouldn't have,

6    obviously, myself, owned bitcoin if I felt that it was

7    fundamentally always a matter of illegal use or supporting

8    crime.

9        MR. LINCENBERG:  All right.  Let me ask you about --

10   you indicated that, I believe, you work for AETNA?

11       PROSPECTIVE JUROR:  Yes, CVS Health Net.

12       MR. LINCENBERG:  CVS.  Do you have any concerns, work

13   wise or otherwise, with being able to serve on the jury?  My

14   note may be wrong.  I had written down that you either were

15   going to or had asked your manager.

16       PROSPECTIVE JUROR:  I'm so glad you asked.  So during

17   the break I received a message from a manager salaried

18   employees can serve on a jury as long as you like, as long as

19   needed, without a reduction in their salary.  So on that score,

20   no hardship concern.

21       MR. LINCENBERG:  Okay.  Thank you, sir.

22       Juror 69.

23       PROSPECTIVE JUROR:  Juror 69.

24       MR. LINCENBERG:  Good afternoon.  I understand from

25   your answers to the questionnaire that you had some concerns

1    about serving.  Rather than going through your answers when you

2    gave them, if you could just help us and lay those out for us.

3           PROSPECTIVE JUROR:  So I'm a high school math teacher,

4    and my concern was, with serving, was just what my students

5    would be doing while I'm gone.  And I did not know that there

6    would be some weeks that there would be three or four-day

7    trials where we'd be asked to report.  I don't know if I would

8    have to -- like, let's say I had to report Monday through

9    Wednesday and not a Thursday/Friday, do I have to go into my

10   classroom that Thursday because I didn't report here?  Do I

11   have to, like, plan for that?

12          So I just have some concerns, like, as far as, like,

13   picking up where I left off in the interim, or when it comes to

14   an end, that's only -- that's my only concern.

15          MR. LINCENBERG:  Okay.  So if you had to serve four

16   days a week, five days a week, you would be able to do that?

17          PROSPECTIVE JUROR:  Yeah.  If I had to serve four days

18   a week, and let's say Friday I didn't, like, I don't know if I

19   would be obligated to go into work that Friday, if I would

20   receive payment that Friday.  If I had to serve Monday through

21   Thursday, and since I didn't have jury duty on Friday, if I

22   would have to go into work.  I would have to prepare something.

23   And, as a teacher, it is difficult to go in and out of working,

24   just, like, coordinating.  That's an unknown for me.  I have no

25   idea what that would be like.

1        MR. LINCENBERG:  And so since the time of the

2   questionnaire, did you find out any answers to that?

3        PROSPECTIVE JUROR:  Well, as a Mesa Public Schools

4   employee, I do get jury duty salary, but as far as the

5   logistics of, like, am I just not working until the trial is

6   over, or if I have to go in throughout the week, I didn't find

7   that out until yesterday.  And I haven't been able to ask, I

8   don't know who knows, like, if that's even what the protocol is

9   for that, or even, like, the two-week break that they mentioned

10  in November, I don't know if I would be required to go and

11  teach.  Because even that is, like, the week preceding that I

12  would have to prepare what I'm doing with my students for those

13  times where I'm there, and then preparing them for when I

14  leave.  Again, that's just the unknowns that I have.

15       MR. LINCENBERG:  Okay.  There was a question asked of

16  you about whether you agreed to, and are comfortable with,

17  wearing a mask.  And you said no, of course, none of us enjoy

18  this, but I want to explore it a little bit with you.

19       Certainly, there is some who have a harder time with

20  it.  If you can just give us your thoughts on that.

21       PROSPECTIVE JUROR:  I can wear a mask.  Like, I've

22  taught through this all last year.  Is it my preference, no.  I

23  do find myself, like, if I'm in the classroom and I have to

24  talk through this, like, at length, I find myself maybe talking

25  less than I would before.  Like, I don't want to be speaking --

```
1    like, in my experience, talking for -- in my experience,
2    talking for, like, multiple hours at a time.  I like the breaks
3    of not talking.  So am I comfortable wearing one, no.  I
4    would -- I will.  During lengthy conversations, though, I don't
5    want to talk at length through one.  I just find myself not
6    talking as much.
7              MR. LINCENBERG:  Okay.
8              PROSPECTIVE JUROR:  I like to talk but --
9              MR. LINCENBERG:  Okay.  Now, with regard to the
10   question about your feelings regarding website responsibility
11   for content posted by users, my notes indicate that you said
12   that you think that some of the websites have gotten so large
13   it's borderline impossible for them to know anything that's on
14   their site.  Can you expound on that a bit?
15             PROSPECTIVE JUROR:  Yeah.  If you have ten people
16   posting on your website, you could check what they're saying.
17   If you have, like, six million videos uploaded every day, like
18   you people will get through that, like, there is -- I don't
19   think that there is a possible way.
20             Like, even my wife, when she posts a TikTok, as a
21   therapist, she can't put the word suicide anywhere, because
22   then it will tag it.  So if she types sewer slide, like, then
23   it doesn't, so there are ways around it.  And there is no way
24   that you could ever police all of it.  So, yeah, it just
25   depends on the size and the ability.
```

1           MR. LINCENBERG:  Okay.  And what are your thoughts

2     about the responsibilities of the website platforms --

3           PROSPECTIVE JUROR:  Well --

4           MR. LINCENBERG:  -- to prevent things from being

5     posted?

6           PROSPECTIVE JUROR:  I'm not sure on, like, the legal

7     responsibilities, as far as, like, yesterday, and, like --

8     like, the bare minimum that I know, I don't think they have a

9     legal responsibility to do that.  Like, if I was running a

10    website, or one of my friends was running a website, I think it

11    would be something that I would want to do just on my site,

12    but, like, do I think that they should be doing something,

13    maybe, but is it, like, do they have to, no.  I don't know.

14          MR. LINCENBERG:  Okay.  You heard my colleague,

15    Mr. Feder, asking a number of jurors about whether you would be

16    able to, when you come into this trial, and would presume our

17    clients innocent unless and until you heard evidence beyond a

18    reasonable doubt to the contrary.  Do you believe in that?

19          PROSPECTIVE JUROR:  Yeah.

20          MR. LINCENBERG:  And so, as we're sitting here today,

21    if the judge were to instruct the jury that a defendant is

22    presumed innocent unless and until proven otherwise, at this

23    time, would you vote not guilty?

24          PROSPECTIVE JUROR:  I'd have no reason not to.

25          MR. LINCENBERG:  Okay.  And is there anything else

1    that we should know in connection with the issues that we've

2    discussed with a number of the different jurors that would be

3    helpful in just understanding if you have any biases or

4    concerns that we should be aware of?

5         PROSPECTIVE JUROR:  I don't think anything has came up

6    for me, other than the -- the question of, like, being

7    mindfully present as a juror, that's the only one really.  Just

8    with what I said about, you know, I've known my students for a

9    couple weeks now, and, like, what's going on there and what

10   would happen when I come back to pick up the pieces months

11   later.

12        Because there is a teacher shortage, and even the last

13   two days, like yesterday and today, my students didn't have a

14   set substitute.  So, like, even if I were to go back tomorrow,

15   it feels like I'm picking up the pieces.  And if I don't go

16   back tomorrow, when I go home tonight, I have to try to find

17   another sub, make lesson plans, get them ready, so that -- that

18   juggle is the only questions that I have.

19        MR. LINCENBERG:  So I -- I truly understand and

20   sympathize with that concern.  If you were on the jury, would

21   those concerns, do you think, in any way inhibit you from

22   giving your full attention to what's going on in the courtroom,

23   the testimony?

24        PROSPECTIVE JUROR:  It depends.  If I was, like, you

25   started the trial and then you don't have to work until it's

1    totally over, there is a piece of me that thinks maybe at the

2    end when I'm coming back, my mind would start thinking about,

3    like, well, what are you going to do December 17th or

4    January 14th when you come back?  Like, what is your plan

5    moving forward?  And my brain might shift to that, I don't

6    know.  I've never been in that position.  I'm just going off

7    of, like, when I've taken vacations before, the last day or two

8    of the vacation I might start being, like, well, what am I

9    doing when I get back Monday?  That's just part of who I am

10   and, like, that's, like, who I am as a person with my career

11   so...

12            MR. LINCENBERG:  Well, I mean, given your important

13   responsibilities, every week is going to be a little different

14   in the courtroom, depending on holidays and this and that.  But

15   if most weeks are four or five days a week, I think you've

16   heard there is a couple weeks off in November, it's going to be

17   that type of schedule.  As best you can tell us under that type

18   of schedule, will you be able to -- I know you don't know for

19   sure, but as best you can tell us, will you be able, you know,

20   will you -- do you think you'll be able to fully focus on the

21   testimony or not?

22            PROSPECTIVE JUROR:  I can't be certain that if on a

23   Friday we were finishing and I knew I was going to be in my

24   classroom Monday, if towards the end of the day, like, I would

25   start thinking about my lesson for Friday, because if I --

1    like, I would need to spend time on Saturday or Sunday to get

2    ready for that Monday, that's -- I can't say that my mind

3    wouldn't do that.

4            MR. LINCENBERG:  Okay.  I appreciate you trying to

5    work through these uncertain questions.

6            Juror 71.  Good afternoon.  Juror 71, you were a

7    person who in the questionnaire had indicated that a defendant

8    should have to prove his innocence.  Do you recall that?

9            PROSPECTIVE JUROR:  Yes.

10           MR. LINCENBERG:  Okay.  Can you explain what you mean?

11           PROSPECTIVE JUROR:  It's -- I raised my children and I

12   was raised that way too as a child.  If -- so if a student came

13   up to you and accused you of saying something or doing

14   something and you did not do that, you speak up.  You don't

15   stay quiet.  The others around watching think, oh, they must be

16   guilty because they're not defending themselves.  So I just

17   believe that -- I know if it was me, I would not sit quietly

18   and not stand up and say something.

19           MR. LINCENBERG:  Okay.

20           PROSPECTIVE JUROR:  If it's a lie and I know it's not

21   true, it's in me to speak up and defend myself.  And I've

22   taught my kids to be that way.  Don't be shy.  Don't -- if it's

23   not true, speak up, speak out.  Don't sit down and let somebody

24   else control that, because they may take it in an area where

25   you -- you're not happy with, that it is not true, so I would

1  like to see defendants stand up and say something.

2          MR. LINCENBERG:  Right.  And I appreciate -- this is

3  what I want.  There is no right or wrong answer, just looking

4  for your honest opinion.

5          So as you come into this case, given all that you've

6  heard, that defendant doesn't need to present any evidence or

7  testify or anything, if a defendant did not do so, it sounds

8  like you would view that negatively?

9          PROSPECTIVE JUROR:  Could you say that again?

10          MR. LINCENBERG:  Yes.  It sounds like -- suppose I --

11  I'm a lawyer.  I'm in this case.

12          PROSPECTIVE JUROR:  Yes.

13          MR. LINCENBERG:  You're on the jury, and you've,

14  basically, indicated that if somebody is innocent, they should

15  stand up and talk and so forth?

16          PROSPECTIVE JUROR:  Uh-huh.

17          MR. LINCENBERG:  If my client did not do so, it sounds

18  like you'd have a little bias against him, assume there must be

19  some --

20          PROSPECTIVE JUROR:  I would wonder why, because, to

21  me, it's human nature to stand up and say, no, I didn't do

22  this, and try to explain how did this come about, you know.

23  It's -- to me, it's just human nature.  And when they don't,

24  there is a little bit of a, hmm.

25          MR. LINCENBERG:  All right.  So even though the judge

1   might instruct you that a defendant doesn't need to testify and

2   so forth, that would just run counter to your intuitions, fair?

3             PROSPECTIVE JUROR:  Yes.

4             MR. LINCENBERG:  All right.  And so --

5             PROSPECTIVE JUROR:  And -- and as -- at the time, I

6   may have that little prejudice towards them, but when you start

7   seeing the evidence, it could really turn the other direction.

8   And it's like, yeah, a person is innocent until proven guilty,

9   but the fact that they are not free to wander the city, they're

10  being held somewhere and there is evidence, I can't really say,

11  no, he's absolutely innocent until proven guilty, but he is not

12  guilty either.  It's kind of like they're floating in this

13  limbo.  And I just want to see that there is -- if there is no

14  evidence, then turn the guy loose.  Why are you holding him?

15  But there is -- they claim that there is evidence, I'd like to

16  see it.

17            MR. LINCENBERG:  Right, sure.  So if you were in my

18  shoes, would it be reasonable for me to infer that if I -- if I

19  -- let's say I didn't even give an open -- I mentioned I was

20  going to give an opening statement.  Let's say I didn't give an

21  opening statement or a closing statement or anything, just left

22  it to the jury to decide if there was sufficient guilt, it

23  sounds like that would not be a strategy that would win you

24  over?

25            PROSPECTIVE JUROR:  No.  I'd like to hear your opening

1    statement, or if you save it until the end, I'd like to hear

2    from you.  I want to hear everything.

3              MR. LINCENBERG:  Right, right.  And if you don't hear

4    everything from both sides, it sounds like you're likely to go

5    with the side that you heard more from?

6              PROSPECTIVE JUROR:  Well, then why are we all here if

7    both sides had nothing to say and there is no evidence then?

8              MR. LINCENBERG:  Okay.  Okay.  In -- in the jury

9    questionnaire, question number 76 was asking about feelings

10   regarding website responsibility for content posted by users,

11   and you said there was a lot of hypocrisy with those websites.

12   Can you explain what you meant by that?

13             PROSPECTIVE JUROR:  Well, they lay down the rules but

14   they don't make it for everybody.  They pick and choose.  Okay.

15   You broke the rule, so we're kicking you off, or we're kicking

16   off your -- what you posted, but then you turn and you see

17   other stuff that is offensive, hateful, and that's okay.  So,

18   to me, rules shouldn't just -- you pick and choose who has to

19   follow the rules.  That's what I don't like.

20             MR. LINCENBERG:  Right.  Okay.  Thank you for your

21   honesty.

22             PROSPECTIVE JUROR:  Okay.

23             MR. LINCENBERG:  Appreciate it.

24             And the last person I wanted to ask some questions of

25   was Juror Number 80.

1          THE COURT:  I think 80 is --

2          MR. LINCENBERG:  No, 80 is --

3          THE COURT:  Oh, 80 is still here.  Sorry.

4          PROSPECTIVE JUROR:  Juror 80.

5          MR. LINCENBERG:  Hi, Juror 80.

6          PROSPECTIVE JUROR:  Hello.

7          MR. LINCENBERG:  I don't want to retread some of the

8   areas, but I just want to make sure I understand the hardship

9   position of you.  I believe that you had some child care

10  issues, did not believe that your husband could cover for you

11  and that this would really create a problem.  Is that fair?

12         PROSPECTIVE JUROR:  Yes, that is fair.  I would say

13  both my husband and I have pretty demanding jobs.  We both work

14  50 to 60 hours as it is.  We flexed our schedule since COVID

15  started so that he goes in early and I do drop off and take

16  care of the kids in the morning, he does pick up while I stay

17  later in the evenings.  And that's been working well enough.

18  So I think it would be extremely challenging for him to still

19  meet his work commitments if I asked him to do both of those

20  things.

21         And then I further confirmed with my employer that

22  they do not offer payment during jury service, so if it was a

23  long-term jury service, I'd be, you know, a little more

24  concerned about monetary concerns, as I do, you know,

25  contribute more than half of the household income.

1          MR. LINCENBERG:  Okay.  Thank you.

2          Your Honor, nothing further.

3          MR. EISENBERG:  May I proceed, Your Honor?

4          THE COURT:  Yes.

5          MR. EISENBERG:  Thank you.

6          Ladies and gentlemen, I represent Mr. Padilla, that's

7   the gentleman third from my right.  And I apologize to him, I

8   forgot to introduce myself to your prior two panels.

9          Juror 82.

10          PROSPECTIVE JUROR:  Juror 82.

11          MR. EISENBERG:  Yes, sir.  Good afternoon, sir.  On

12   your juror questionnaire you listed some answers, so I'm going

13   to go through them and I'll ask you some questions about them.

14   Okay?

15          First one is, with the length of the trial, would the

16   length of the trial create an undue hardship?  Now, I'm not

17   sure if you've been asked these questions before, but I don't

18   have an answer for that.  So could you explain what that would

19   be?

20          PROSPECTIVE JUROR:  So I messaged my employer on

21   break, and my employer can only find that I would be covered

22   for ten days.  I'm the sole provider.  And my apartment complex

23   just became under new management, and they are looking at

24   anyone that misses two months' rent will be evicted.  So a

25   lengthy trial would mean I can't afford rent and I'd be at risk

```
 1   of losing my house.

 2          MR. EISENBERG:  Do you have roommates or people that

 3   you live with?

 4          PROSPECTIVE JUROR:  I do not.  I'm going through a

 5   nasty divorce right now that my spouse just took one of the

 6   cats and left.

 7          MR. EISENBERG:  And you're also going through a

 8   bankruptcy, as I understand it?

 9          PROSPECTIVE JUROR:  Yes.

10          MR. EISENBERG:  How far have you come in the

11   bankruptcy situation?

12          PROSPECTIVE JUROR:  It should be going through in

13   front of the judge either this month or next month.  We've

14   already done the 60 days after the meeting of the creditors.

15          MR. EISENBERG:  And, in terms of your employment,

16   what's the situation right now?

17          PROSPECTIVE JUROR:  Right now I actually took a leave

18   of absence for seven days the first of this month so that I can

19   de-stress after having worked through this COVID as a pharmacy

20   tech and --

21          MR. EISENBERG:  So you're under a good deal of stress,

22   to say the least?

23          PROSPECTIVE JUROR:  Yes.

24          MR. EISENBERG:  Right.  As a pharmacy technician, I

25   see that you wrote down here that you have close contact with
```

1    COVID-19.

2         PROSPECTIVE JUROR:  Right now we're averaging 1 to 10

3    patients every day coming in saying that they're confirmed

4    positive.

5         MR. EISENBERG:  Though these are people who have --

6    they actually have evidence that they --

7         PROSPECTIVE JUROR:  That they are saying they are

8    laboratory confirmed COVID.

9         MR. EISENBERG:  And that's per day?

10        PROSPECTIVE JUROR:  That's about per day.

11        MR. EISENBERG:  Is that typical?  Let's see, is it

12   CVS?

13        PROSPECTIVE JUROR:  I work for Walgreens.

14        MR. EISENBERG:  Walgreens.  If you know, is that

15   typical for all the Walgreens in the area?

16        PROSPECTIVE JUROR:  I do not know.  I work at a

17   24-hour store, the only one in Mesa, so we see a lot more

18   volume than other stores.

19        MR. EISENBERG:  All right, sir.  I'm going to shift a

20   little bit to your academic background.  I see that you have

21   put down that you have some law and legal training and that you

22   studied administration of justice in community college; is that

23   correct?

24        PROSPECTIVE JUROR:  Yes.  I am two classes away from

25   getting associate's, but switched focus over to nursing because

1    I am not very fond of public speaking.

2         MR. EISENBERG:  Okay.  And so you're not pursuing your

3    law training?

4         PROSPECTIVE JUROR:  I have switched focus to go

5    towards nursing.

6         MR. EISENBERG:  Okay.  Did you, at one time, want to

7    be a law enforcement officer?

8         PROSPECTIVE JUROR:  I actually applied for Mesa police

9    in either '19 or '20, and actually was injured on my job and

10   was unable to go to the physical test.

11        MR. EISENBERG:  All right.  So you don't have any

12   future plans of joining the force?

13        PROSPECTIVE JUROR:  No.

14        MR. EISENBERG:  Okay.  My last question for you

15   concerns something that I think you were asked about at length,

16   and I'm not going to repeat it, but I want to go one step

17   further with it.  It has to do with your answers about

18   expecting a defendant to testify.  In your form that you filled

19   out, you said that you would agree with that.

20        However, during the voir dire, you were asked

21   questions about the defendant's right not to have to testify.

22   Do you remember that?

23        PROSPECTIVE JUROR:  Yes.

24        MR. EISENBERG:  And that the defendant is presumed

25   innocent and so forth.

1          PROSPECTIVE JUROR:  Yes.

2          MR. EISENBERG:  Okay.  The one question that I want to

3    take a little bit further is if the defendant doesn't testify,

4    and it comes to the end of the case and you feel that the

5    government -- and I know it's a hypothetical -- the government

6    hasn't proven to your satisfaction beyond a reasonable doubt,

7    which is the standard, that the crime -- that the defendant is

8    guilty, would you return a verdict of not guilty?

9          PROSPECTIVE JUROR:  If they have not met the burden of

10   proof without a reasonable doubt, then I would vote not guilty.

11         MR. EISENBERG:  Thank you, sir.  Appreciate it.

12         And the only question I have -- the only other

13   question I have is for Number 80.

14         PROSPECTIVE JUROR:  Juror 80.

15         MR. EISENBERG:  Actually, ma'am, I think you did

16   answer the series of questions that this gentleman asked --

17   that I just asked this gentleman about Fifth Amendment

18   privilege, that sort of thing.

19         PROSPECTIVE JUROR:  Yep.

20         MR. EISENBERG:  Okay.  I'm going to ask you the same

21   question I asked him.  Although I think you did -- oh, yes,

22   here it is.

23         In response to your -- the question that presented to

24   you about the perspective that you give a defendant during a

25   criminal case -- I think I have this right -- the last question

1    had an answer that I can be fair in this -- and I think you

2    were referring to a trial -- but you said, I believe so.

3            Now, you're shaking your head yes?

4            PROSPECTIVE JUROR:  Yes.

5            MR. EISENBERG:  Okay.  Do you have any kind of -- want

6    to change that, do you, because when you say I believe so,

7    that's sort of -- is it just an intellectual thing or do you

8    really mean it?

9            PROSPECTIVE JUROR:  I really mean it.  I would hear

10   all the facts and circumstances -- I'm not an analyzer by

11   trade, so very logical, and just like to think through

12   everything.  So I would, you know, consider all the facts and

13   circumstances presented and the information provided by the

14   judge, and make the best decision that I could with the

15   information presented and follow the, you know, law that all

16   the defendants are presumed innocent unless proven guilty

17   beyond a reasonable doubt.

18           MR. EISENBERG:  Suppose the defendants didn't testify

19   and felt the government hadn't produced the case beyond a

20   reasonable doubt, is he guilty or innocent?

21           PROSPECTIVE JUROR:  Innocent.

22           MR. EISENBERG:  Thank you.  I have no further

23   questions.

24           THE COURT:  Okay.  Ms. Bertrand.

25           MS. BERTRAND:  Good afternoon.  I'm Joy Bertrand.  I

1    represent Joye Vaught.

2            And you heard me yesterday talk to the two other

3    groups of folks about the importance of being more than honest,

4    but being totally straightforward with us about, not only your

5    thoughts about these questions -- and I know that it's a grind

6    to sit here and listen and answer -- but also your feelings

7    about being here.  And like I told the other two groups, I'm

8    only one-seventh of all of this -- that's Ms. Vaught -- but if

9    you don't want to be here, tell us and I'll do what I can to

10   see that you don't have to be here.

11           Let's start with Juror 76.

12           Hi.  Juror 76, excuse me if you already answered this

13   and I just didn't hear it.  How big is your nonprofit that you

14   work for?

15           PROSPECTIVE JUROR:  We're about 76 employees.

16           MS. BERTRAND:  76.

17           PROSPECTIVE JUROR:  But my team is two people.

18           MS. BERTRAND:  You and another person?

19           PROSPECTIVE JUROR:  Yes.

20           MS. BERTRAND:  And it sounds like with these events

21   coming up that, if you're serving jury duty here, you would

22   have to work nights and weekends to get your other job

23   responsibilities done.  Is that accurate?

24           PROSPECTIVE JUROR:  Correct.  And the end of the year

25   is really a big time for us with our annual report that we have

UNITED STATES DISTRICT COURT

```
 1   to do, and I'm the one who creates all the content for that,

 2   and I would still need to do that.

 3           MS. BERTRAND:  So in addition to the events coming up,

 4   you also participate in putting together an annual report?

 5           PROSPECTIVE JUROR:  Yes.

 6           MS. BERTRAND:  That's for a 501c3 nonprofit.  That's a

 7   big undertaking.

 8           PROSPECTIVE JUROR:  Donors, yeah.

 9           MS. BERTRAND:  Do you think that that needs -- those

10   are real work demands.  Do you think that those will create a

11   distraction from your ability to participate here?

12           PROSPECTIVE JUROR:  A hundred percent I'll be focused

13   on what I need to work on that night.

14           MS. BERTRAND:  Sure.  I -- I can imagine.  And I bet

15   if you had to work on it that night, it would also keep you

16   from getting rested?

17           PROSPECTIVE JUROR:  Yeah.

18           MS. BERTRAND:  In straightforward terms, do you think

19   it would be an undue hardship, given your specific work

20   considerations, to sit on this jury?

21           PROSPECTIVE JUROR:  Yes, I think I would be extremely

22   stressed.  And I think it would put an undue hardship on my

23   organization that gave me this opportunity less than a month

24   ago and to leave them for three months.

25           MS. BERTRAND:  So on top of these things, you just
```

1    started here?

2             PROSPECTIVE JUROR:  Yeah.

3             MS. BERTRAND:  Thank you.

4             Juror 77, in the back.

5             PROSPECTIVE JUROR:  I'm Juror 77.

6             MS. BERTRAND:  Hi.  Nice to meet you.  Make sure -- I

7    get a sense you're probably soft spoken, so make sure you

8    really talk through that mask.

9             PROSPECTIVE JUROR:  Okay.

10            MS. BERTRAND:  I have your answers to the

11   questionnaire in front of me.  And I thought it was a fair

12   comment one of the other -- one of your colleagues said, look,

13   I don't remember what I put on there.  I can kind of tell you,

14   so I'll give you back some of the language if you need it.

15            One of the things I thought was interesting, and it's

16   something that I think a lot of folks struggle with is, you

17   were asked:  Do you believe that you can determine whether

18   someone is credible?  And your response was, no, not certain I

19   know how to tell if someone is lying.  It seems that lying

20   could be part of this world.

21            Does that sound correct?

22            PROSPECTIVE JUROR:  I don't recall exactly those

23   words, but I understand what it is.  I mean, I've been lied to

24   directly to my face before, and I can usually find a factual

25   way to prove that it's a lie or not, but I can't tell they're

1    lying.  I mean, I'm not a very good liar.  My wife tells me

2    that all the time.  But other people can lie to me and I don't

3    know the difference.

4         MS. BERTRAND:  Well, that's not necessarily a bad

5    trait that you're trusting.  And I bet there is other folks

6    here in this room who can say, yes, I've had people smoke me

7    too.

8         You are a supervisor at Honeywell?

9         PROSPECTIVE JUROR:  Yes.

10        MS. BERTRAND:  So what do you do in your work

11   environment to ferret out if someone is telling the truth?

12        PROSPECTIVE JUROR:  Well, usually in the work

13   environment it's about the work that's done and it's pretty

14   easy to tell.  I'm technically -- I'm a trained engineer, and

15   they're all engineers that work for me, so I can tell if

16   someone is giving me smoke and mirrors or the facts.

17        MS. BERTRAND:  Because whatever you're working on

18   doesn't work?

19        PROSPECTIVE JUROR:  Yeah, right.

20        MS. BERTRAND:  Or they don't show up with their part

21   of the work product?

22        PROSPECTIVE JUROR:  Right.

23        MS. BERTRAND:  Then you noted in your answers that you

24   have followed the Me Too -- news about Me Too, about

25   prostitution, sex, and human trafficking reports, and then

1   said, especially with the border crises in Arizona and the sex

2   traffic associated with large events, parenthetically, like the

3   Super Bowl in the Phoenix area.  Do you recall?

4       PROSPECTIVE JUROR:  I've heard about the Super Bowl

5   stuff on the news quite a bit and the Super Bowl time of year.

6   And then, yeah, there is a lot of border traffic which is

7   constantly in the news, talks about trafficking minors and

8   things over the border, and trafficking even non minors, but

9   into the sex trade so -- but from what I learned yesterday,

10  that's not what this case is really about.

11      MS. BERTRAND:  Right.  Correct.  I was curious -- it

12  struck me, because I was curious to know, I hate to say it,

13  we've got so many problems on the border, which border crises

14  you were referencing?  Was it the onslaught of immigrants

15  waiting to be let in?  Was it the violence on the border?  How

16  do you define that border crisis?

17      PROSPECTIVE JUROR:  Well, that's all crises, I think,

18  but the part that I was referring to when I was answering the

19  questions was, you know, the drop houses where they find, you

20  know, 45 people stuffed in a garage somewhere.

21      MS. BERTRAND:  So in terms of human trafficking, it

22  was about, criminal immigration terms, the pollos and the

23  coyotes being trafficked?

24      PROSPECTIVE JUROR:  Yep.

25      MS. BERTRAND:  And that includes some children.

1                What about the Me Too movement have you followed?

2                PROSPECTIVE JUROR:  It's interesting that I would have

3      written that down, because I don't really mean -- there is not

4      a lot of depth in that, in my thing of it, except I've just

5      heard about it a lot.  I've heard about it a lot on the news.

6      I've got two grown daughters and a wife, so I -- I just hear

7      about it quite a bit.  I don't have a lot of specific details,

8      but it seems like people come out of the woodwork, you know,

9      the -- the expectations have changed over time, and that's --

10     that's just the world.  The expectations have changed over time

11     and -- and we're now getting worried about things that have

12     happened 20 years ago.

13               MS. BERTRAND:  Yeah.  I follow.

14               Especially since there are three women that you love,

15     your two daughters and your mom -- your wife, excuse me -- in

16     the context of Me Too.  What has changed since -- you know, Me

17     Too has been around, what, about three years now, four years --

18     what's changed for you since the Me Too movement has taken on a

19     life of its own?

20               PROSPECTIVE JUROR:  Personally, nothing for me really.

21     I just have watched, you know, kind of from the outside, but

22     nothing personally has happened in my life about it.

23               MS. BERTRAND:  Has it changed how you see the lives

24     that your wife and your daughters live?

25               PROSPECTIVE JUROR:  No, I don't think so at all.

1          MS. BERTRAND:  Then you also noted that you have seen

2   reports about prostitution and sex or human trafficking.  Can

3   you say a little bit more about that?

4          PROSPECTIVE JUROR:  Well, just like I say, just the

5   news.  The one that really comes to mind is the Super Bowl,

6   and, like, during Barrett-Jackson and all those times when

7   there is big fancy events going on in Arizona, how much -- how

8   prevalent it is just kind of -- I've never been exposed to it.

9   I had no idea it was so prevalent, but it just shocks me that

10  it is.

11         MS. BERTRAND:  I think it shocks a lot of people.

12  There is a -- there is a saying in that world of, if a woman

13  comes up to you at a hotel bar and says, are you here for the

14  convention, that's a clue.

15         PROSPECTIVE JUROR:  Yeah, I've seen that on a TV show

16  or something before, but I've never experienced anything like

17  that actually so...

18         MS. BERTRAND:  It is, I think for a lot of people, a

19  totally different world.  Have you formed opinions about that

20  world just from what you know about it?

21         PROSPECTIVE JUROR:  Not really, just my eyes are a

22  little bit more open, more nervous about it, I guess.

23         MS. BERTRAND:  More nervous.  Can you say more about

24  that?

25         PROSPECTIVE JUROR:  Well, I -- I go to events like

1   Barrett-Jackson and stuff and I -- I just worry if someone were

2   to approach me like that, I would almost instantly feel nervous

3   about it now instead of just feeling that it was just a

4   friendly person, and I used to be more naive about it I guess.

5            MS. BERTRAND:  Yeah.  Your eyes are a little bit more

6   opened, like you said.

7            You noted in a couple of your responses that -- I'm

8   going to just kind of make it in a general sense -- sex work

9   and the sex industry is illegal and a bit sick.

10           PROSPECTIVE JUROR:  Yep.

11           MS. BERTRAND:  I noticed you kind of shrugged your

12   shoulders like you're a little nervous about saying that.  I

13   think there is a lot of people that would agree with you.

14   There is parts of it that are really not wholesome.

15           PROSPECTIVE JUROR:  Right.

16           MS. BERTRAND:  And you've heard the lawyers talking

17   with people over the past two days about this.  This is more

18   than simply using medical terms for body parts and technical

19   terms for different types of sex acts.  This stuff is gross.

20           MS. PERLMETER:  Objection.  Could counsel please ask a

21   question.

22           THE COURT:  Ms. Bertrand.

23           MS. BERTRAND:  So since you've noted it's a little bit

24   sick to think about, what is your take on -- what's your

25   feeling about serving on this jury where we're going to be

talking about this type of content for 10 to 12 weeks?

PROSPECTIVE JUROR:  As far as I understand what the trial is about, and it's only just from the last couple days of listening, it's more about sort of the responsibility of an internet provider or a Facebook type provider on the internet and not about the acts that might be associated with it.

So the first thing I think of is why do we have to talk about all that icky stuff, why do we have to see all these pictures, and is someone trying to get everybody's emotions riled up instead of sticking to the facts?  That's really -- that's been going through my mind quite a bit the last few days.

MS. BERTRAND:  Understanding I don't have a lot of control over what other people do here.  What if this is -- what if that content is part of this case and is the reality of this case, how would that affect your ability to be fair and impartial?

PROSPECTIVE JUROR:  Okay.  So, yeah, I would be uncomfortable, but as people have said, uncomfortable around strangers, I'm more comfortable around people I don't know talking about stuff like that than people I do know, so I would be okay with it.

MS. BERTRAND:  Okay.  Your Honor, let me just check real quick.  I may be done.

Juror 64, hi.  It's hard for me to -- for me to see

1    some of you guys.

2              And I think Juror 74 also had a similar conversation.

3              PROSPECTIVE JUROR:  64.

4         MS. BERTRAND:  64, yes, you're 64.  Hello.  Regarding

5    the defendant's right to stay silent, that continues through a

6    criminal prosecution.  You noted that the -- while everyone

7    understands that is their right, they can do that, there is a

8    lot of rights we have that don't necessarily mean we agree with

9    people exercising them.  I believe your words were that it

10   creates an environment, or it creates an atmosphere and a

11   perception that this person's giving up and not defending

12   themselves.  And I think Juror 64 said something similar.

13             Having listened to our conversation today, let's talk

14   about that.  And it may be that intellectually you understand

15   that, but in your heart it still bothers you.  What's your take

16   on that?

17             PROSPECTIVE JUROR:  It doesn't necessarily bother me,

18   it's just that if a person is accused of something and doesn't

19   react, does not defend themselves, then that creates a

20   perception that they've given up and they're guilty or whatever

21   the -- that they -- they've given up and that they're not

22   defending themselves so that they are -- they're agreeing with

23   whatever the accusation might be.

24             MS. BERTRAND:  Sure.

25             PROSPECTIVE JUROR:  But in a courtroom situation, by

```
1    just the mere fact that they've brought legal counsel, that's a
2    defense.  They're defending themselves.  They don't necessarily
3    have to testify, they are defending themselves.  There is a
4    difference.
5              MS. BERTRAND:  I follow you.  I got it.
6              PROSPECTIVE JUROR:  That's the thought I had on that.
7              MS. BERTRAND:  Okay.  Juror 74, having heard this, I
8    think you said something similar.  And I loved your answer.  I
9    teach --
10             THE COURT:  Juror 74 is gone.
11             MS. BERTRAND:  Oh, I'm sorry.  71.  I thought that was
12   a 4.  Excuse me.  Sorry.  It was folded.  I apologize.
13             I loved your response, you know, I tell my kids to
14   stand up for yourself.
15             MS. PERLMETER:  Objection.  I'd ask counsel to please
16   ask a question of the juror.
17             THE COURT:  Ms. Bertrand, what's your question?
18             MS. BERTRAND:  I'm about to ask a question.
19             What's your take on what Juror 64 said?  There is a
20   difference between what you intellectually understand and in
21   your heart.
22             PROSPECTIVE JUROR:  I agree with him.  I agree with
23   him.  To me it's just -- it's something that you have learned
24   when you were little.  I know your mothers probably taught all
25   of you, stand up for yourself, don't just back off and let
```

1    people attack you verbally -- well, little kids -- not that

2    they're going to hurt you, but you're being insulted and you

3    need to speak up for yourself.  If no one is going to, it falls

4    on you to do it as a child.  And as you grow up, it's -- I've

5    always followed that.  If someone really, truly believes that I

6    said something bad, like in the workplace, I will approach them

7    and then let's talk it out because I don't feel I said

8    anything, and then it usually gets resolved.

9          So when someone just sits there and won't say

10   anything, I just -- it's just a little bit -- something clicks,

11   like, why not that, oh, you know, it's that you're not

12   innocent.  It's just something as a mother, why don't you?  And

13   then I want to see -- then I want to continue and see what they

14   bring forward to show that this person is innocent or guilty.

15         MS. BERTRAND:  Sure.  I hear what you're saying.  And

16   I think one thing you said just now is that, you know, that

17   they need to bring forth something to show that they're --

18   they're innocent.  And, again, sometimes this is what the brain

19   hears, and the heart.

20         MS. PERLMETER:  Objection.  There is no question.

21         THE COURT:  She's getting to it.

22         Ms. Bertrand.  Go ahead.

23         MS. BERTRAND:  So we were saying defendants do not

24   have to prove their innocence.  They don't have to show their

25   innocence.  The job in this room remains with the prosecution

1   to rule out doubt, that is it, and either they are successful

2   at it or they're not.  That's the juror's decision.  That's

3   different from someone proving their innocence.  What's your

4   feeling about that distinction?

5          PROSPECTIVE JUROR:  I -- I just feel that everyone

6   wants to hear from this person, everyone's in the courtroom

7   because of this person, so they want to watch their demeanor

8   when they stand up and/or when they speak.  A lot of times what

9   they say can turn people's opinion in their favor, sometimes

10  right away.

11         Women are really good at reading facial expressions

12  and tones of voices, whether the tears are real or not, and

13  it's -- you can see if it's phony.  I mean, it can happen, or

14  it cannot, it just -- as a woman, I want to see that, because

15  we've been trained to -- to know when a child is telling the

16  truth or sick or happy or sad, and you can just see the facial

17  expressions.  And I want to see this defendant speak.  That's

18  all.

19         MS. BERTRAND:  Thank you.  Before I wrap up, we've all

20  been listening to these conversations this afternoon.  Having

21  heard everything this afternoon, is there anything any one of

22  you want to follow up about or share with us before we are

23  done?

24         (No response.)

25         MS. BERTRAND:  Thank you, Your Honor.

1          THE COURT:  Okay.  So we have about six more people

2    downstairs to talk to, so I'm going to ask you to go downstairs

3    and we'll let you know as soon as we can.  Thank you.

4          (The prospective jurors left the courtroom.)

5          THE COURT:  Okay.  Counsel, you can take a ten-minute

6    break and then we'll come back and do strikes before we bring

7    up the last six.

8          (Recess taken, 2:41 p.m. - 2:56 p.m.)

9          THE COURT:  We are back on the record outside the

10   presence of the jury.

11          Before I get to cause, for hardship I would excuse

12   Juror 63.

13          Is there any objection?

14          MR. LINCENBERG:  No, Your Honor.

15          THE COURT:  And Ms. --

16          MS. PERLMETER:  No objection.

17          THE COURT:  Okay.  And then the other one for hardship

18   was 80.

19          MR. LINCENBERG:  No objection.

20          MS. PERLMETER:  We had posed questions this morning.

21   I know she said it was difficult, it doesn't -- it's not going

22   to be ideal, but she does have both of her in-laws here, and we

23   had asked if she could inquire about whether or not they would

24   be able to pitch in.

25          THE COURT:  But then she added this afternoon that her

```
1    employer won't pay, which created a financial hardship, so over

2    your objection --

3              MS. PERLMETER:  That's right.

4              THE COURT:  -- I'm going to strike Juror 80.

5              Okay.  Let me just check -- oh, there was one more.  I

6    had 82 said he verified with his employer that they would only

7    pay ten days and it would be a financial hardship and he talked

8    about losing his apartment.

9              MS. PERLMETER:  No objection.

10             MR. LINCENBERG:  No objection.

11             THE COURT:  Okay.  Juror 82 will be struck.

12             Okay.  I have one more, 87 because of her health

13   concerns.  She's immunocompromised.

14             MS. PERLMETER:  No objection.

15             MS. BERNSTEIN:  No objection, Your Honor.

16             THE COURT:  Thank you.  Juror 87 will be struck.

17             Okay.  That was all of them.  Any motions for cause

18   from the government?

19             MS. PERLMETER:  Your Honor, we would move to strike

20   Juror Number 75.  Juror Number 75's wife works with Michael

21   Lacey's brother at Village -- at WMG is what the questionnaire

22   says.  She has worked there for 13 years.  Her job is accounts

23   receivables and payables, something to do with ads.

24             Based on his answers, we think there is too close a

25   relationship between this juror and the defendants and we ask
```

1   that he be excused.  And he -- and he could -- he doesn't know

2   who the witnesses are, but based on what his wife's job is,

3   there is a chance that he could know or know of some of the

4   witnesses that the government plans to call.

5           MS. BERNSTEIN:  Your Honor, this is the juror who when

6   asked if he would not speak to his wife about this case for

7   many months, said that it would be a blessing.  He expressed

8   that it would cause -- he has no opinions.  He has no preformed

9   opinions.  He has no trouble not talking to his wife about it.

10  He would welcome that opportunity.  And so I don't think there

11  is any cause justification to excuse this juror at this point.

12          MS. PERLMETER:  And he may not talk to his wife about

13  the trial going forward, but he may have knowledge

14  institutionally that he can't erase.

15          MS. BERNSTEIN:  Also, just as a factual point of

16  clarification, Mr. Lacey's brother has nothing to do with his

17  company, so that's not even accurate.

18          THE COURT:  Nothing to do with WGN?

19          MS. BERNSTEIN:  Correct.

20          THE COURT:  Well, he obviously thinks there is some

21  relationship.  I mean, he might be wrong about that, but he

22  thinks there is a relationship and I -- that's the important

23  part, and that she thinks -- or he thinks his wife's boss is

24  his brother, which I suppose we could clarify, but, okay, let

25  me think about that one.  Because he didn't say anything

1   directly but --

2           MS. PERLMETER:  Just because there is going to be some

3   evidence about the New Times and, you know, the evolution of,

4   you know, the case from -- through time, and it could --

5   potentially, it could be a problem that we could --

6           MS. BERNSTEIN:  Well, Your Honor, I don't think we're

7   striking every law enforcement officer because there is going

8   to be law enforcement witnesses.  I mean, this juror said that

9   he would welcome not speaking to his wife about it.

10          THE COURT:  I said I was going to think about it.

11          Any other motions?

12          MS. PERLMETER:  No, Your Honor.

13          THE COURT:  From the defense.

14          MS. BERTRAND:  Your Honor, the defense moves to strike

15  Juror 76.  This is our juror who just got the job with the

16  nonprofit and was explicit she won't be able to do this and

17  maintain her new job responsibilities.

18          THE COURT:  Is there any objection from the

19  government?

20          MS. PERLMETER:  No objection.

21          THE COURT:  Juror 76 will be struck.

22          MR. LINCENBERG:  And we would ask that Juror 71 be

23  stricken.  Juror 71 indicated that she expects the defendant to

24  prove his innocence.  She stated that she has been taught,

25  she's taught her children that if they're accused of something,

1   they have to stand up and defend themselves.  If it was me, I

2   would speak up.  If the defendants don't speak up, I would,

3   essentially, hold it against them.  We spent a fair amount of

4   time on that.

5          I think she was pretty forthright in her views and

6   there is cause to strike her.

7          THE COURT:  Any objection?

8          MS. PERLMETER:  Your Honor, so she talked about --

9   what she talked about is pretty much what many people teach

10  their kids, you stand up for yourself, you speak up, just,

11  basically, don't be bullied.

12         And she did talk about how she expects defendants to

13  testify, but then she also at the end agreed with juror -- the

14  juror who spoke before her, which I think was Juror Number 64,

15  when he said, you know, the fact that they brought in counsel

16  is a voice that they're showing that they're defending

17  themselves.

18         And then she went on to talk about a lot of other

19  things, but she also did reiterate that she understands that a

20  defendant is innocent until proven guilty.  Both sides have a

21  job to do.  She -- she did not say anything that would put her

22  -- she did not say that she could not be fair and impartial,

23  and she did not say she would hold it against the defendant if

24  he did not testify.

25         She said a lot of other things, but just

1      institutionally growing up, you know, what she has learned and

2      what she has thought, how she has felt, but she did not say she

3      would not follow the law as instructed by the Court.

4              THE COURT:  Over objection, Juror 71 is going to be

5      struck.

6              Was there anymore from the defense?

7              MR. LINCENBERG:  Juror 69.  Your Honor, Juror 69 is

8      the gentleman who is the high school math teacher.  And I will

9      admit it was kind of hard to figure out where -- where he was

10     going.  He had a lot of uncertainty.  And this was a close call

11     as to whether we, frankly, believe there was cause.  And at the

12     end of the day, we -- I do believe there is cause, because he

13     really couldn't even commit to that he would have his attention

14     focused on this case and that his concerns were going to be

15     elsewhere.  And it sounds like he sort of hasn't planned this

16     out with his teaching, and he's likely to be thinking about his

17     lesson plans and finding substitutes and the like throughout

18     the day.  So we do think that there is cause to strike Juror

19     69.

20             MS. PERLMETER:  Your Honor, we would object to that.

21     Juror Number 69 right now has an issue with his employer that

22     he needs to work out.  He needs to figure out if he's going to

23     be required to report to work on the days that the Court

24     doesn't have trial, the two weeks that the Court is not having

25     trial.

1          To expect a juror to come into this courtroom every

2     day and think only about the trial and to have no other outside

3     thoughts is a little bit unreasonable.  I think it is

4     reasonable for a person, as he described, you know, if the two

5     days -- the last two days of your vacation, you kind of think

6     about, you know, what you might be doing come the following

7     work week.  He did not say that he would not pay attention.  He

8     did not say he would not be distracted.  He did not say he

9     would be unable to consider the evidence.

10          THE COURT:  Okay.

11          MR. FEDER:  Judge, one other thing.  This is the

12    fellow I believe that was talking about even after a couple of

13    days he's already exhausted from having to do stuff at night

14    because of his service here.  If he's going to be exhausted,

15    he's going to have a difficult time being an attentive juror.

16          THE COURT:  Was that him?

17          MS. PERLMETER:  I don't remember him saying that.  I

18    remember the attorney, Juror Number 27, saying that he was

19    tired.

20          THE COURT:  Yeah.

21          MR. LINCENBERG:  That was a different juror.  I don't

22    recall him saying that, but I do part ways with government

23    counsel.  This isn't somebody that we all expect that

24    somebody's mind may drift at times.  This is somebody who was

25    pretty forthright in saying, you know, with all of his math

1    teaching responsibilities and the like, and that he -- that he

2    had serious concerns about whether he would be focusing on this

3    case.  And it's important for us -- to him -- for him to focus

4    on the case.

5            THE COURT:  Okay.  That motion to strike Juror 69 is

6    denied.  I agree that it was a close call, but ultimately I

7    guess I came out the other way.  He did not seem to indicate

8    that it was as severe as you described it, and that's just

9    based on my observations.  So it's a judgment call and that's

10   the way that I'm calling it.

11           Any other?

12           MS. BERNSTEIN:  Yes, Your Honor.  Juror Number 83 was

13   the gentleman with 30 years of law enforcement who teaches a

14   criminal justice class whose class meets for eight weeks.  He

15   teaches them the rules of evidence and on criminal justice

16   policy.  He has experience with prostitution stings which will

17   -- we spoke pretty extensively about.

18           When Your Honor directed me to stop questioning him, I

19   asked him if he thought he would be a good juror for this case,

20   he said he's surprised that I'm even talking to him.  He would

21   try his best, but, no, so I think there is cause for that

22   juror.

23           MS. PERLMETER:  I don't -- disagree with that recount.

24           MS. BERNSTEIN:  Is it possible to get a transcript?  I

25   was taking contemporaneous notes while he was speaking.

1          THE COURT:  I assume the government objects because

2    you stood up.

3          MS. PERLMETER:  We object.  He stated on his own that

4    -- several times that he understood his rights, that he spent

5    -- it's basically been his lifelong duty to protect the rights

6    and the constitution to everyone that he comes into contact

7    with.  He has no hardship because he can do his class over Zoom

8    on Wednesdays.  When he was asked --

9          MR. LINCENBERG:  And our notes --

10         THE COURT:  Can you please let her finish.

11         MR. LINCENBERG:  Yes.  I'm sorry.

12         MS. PERLMETER:  He said I don't see it as any

13   different.  I see both sides.  I can step up and do my job.  I

14   have experience.  It would be difficult for me to get rid of my

15   life experience.  And then the Court instructed that we don't

16   leave our common sense and our experience at the door.  He said

17   he would do his best.  He says, I know I can always be fair.  I

18   stand up for the protection of everyone's rights.  I will be as

19   fair as I possibly can.

20         And then as to:  Are you right for this case?  He

21   said, I have concerns, considering my history in law

22   enforcement.  However, that would apply to any case that he was

23   called to serve on because of his history of law enforcement.

24   So if he is struck because he is a law enforcement, then we are

25   basically suggesting that somebody with a history with law

1    enforcement can't ever serve, but my notes do not reflect that

2    he said no, I would not be a good fit for this jury.

3         MS. BERNSTEIN:  And, Your Honor, that's not at all

4    what we're suggesting, that anyone who is law enforcement can

5    never be on a jury.  And as Your Honor knows, there are plenty

6    of jurors that don't involve law enforcement.  There is still

7    potential former law enforcement in our panel as well.  This

8    was a person who was very candid and forthright.

9         He did explain many times he has spent a long career

10   trying to be a fair officer of the law and a fair police

11   officer, but he did say that it is definitely concerning to him

12   to sit on this jury.  And when we had our side bar and we came

13   back and I asked him the final question, he said he is

14   surprised that I'm even talking to him.  He would try to do his

15   best, but, no, he did not think he should be on this jury.

16        THE COURT:  Mr. Lincenberg, did you want to say

17   something?

18        MR. LINCENBERG:  No.  I think that Ms. Bernstein

19   covered it.  My notes were definitely concerning.

20        THE COURT:  Okay.  Well, I don't remember him saying

21   no.  What I thought he said was, no, you might not want me to

22   be on it, but I -- the definitely concerning part is -- I

23   actually think he'd be a great juror, but given his answer to

24   that one question, the motion is granted and 83 will be struck.

25        Any others from the defense?

1           MR. LINCENBERG:  Your Honor, I think that's it.  Can I

2    mention two things?  One is -- well, two questions before you

3    bring in the next panel.

4           THE COURT:  Yeah, one second.

5           With respect to Juror 75, over objection, I'm going to

6    strike Juror 75.

7           And what was your question?

8           MR. LINCENBERG:  So my first question was does Juror

9    Number 78 who came late --

10          THE COURT:  Is not coming.

11          MR. LINCENBERG:  He is not coming.  Okay.  That

12   answers that.

13          And the second one was there is a juror in the next

14   panel, Juror 94, that I raised with government counsel as to

15   whether government counsel would stipulate to 94.  Government

16   counsel said that she would not.  And I would encourage the

17   Court to look at the questionnaire before we get into

18   questioning.

19          This person is basically saying, I am the most biased

20   person in the world, in short.  And I'm concerned, frankly,

21   about having to get all of his answers into the record.  I can

22   go through the questionnaire briefly with the Court, but the

23   answers:  Very strong.  This material is a trigger for me

24   because of my past experiences, as my father investigated those

25   activities and I was exposed to the terrible negative things

1    that occurred with sex trafficking and prostitution.

2          Will you be able to deliberate?  Not sure.  I don't

3    get involved in that world because of what I saw when I was

4    young when my father was investigating --

5          THE COURT:  Mr. Lincenberg, can I stop you for just a

6    second, because I am going to do some math here.  I'm not sure

7    we even need the last six.  I think we barely made it to the

8    number we need, but so just give me a second.

9          MR. LINCENBERG:  Okay.

10         THE COURT:  Okay.  Elaine and I are getting different

11   numbers, so I'm going to go over with you the ones that I

12   believe are remaining and see if you guys have any difference

13   to make sure we didn't make a mistake, because I think the

14   number remaining are less than if I went through the ones we

15   struck.

16         Is that going to work?  Do you have --

17         MR. LINCENBERG:  That would be helpful.

18         THE COURT:  Okay.  Juror 1, Juror 3, Juror 4, and

19   that's it on the first page.

20         Well, do they have the same pages?

21         MS. BERNSTEIN:  Yes, Your Honor.  And that's

22   consistent with what we have.

23         THE COURT:  On the second page, Juror 10, 11, 12, 13,

24   15, and 18, correct?

25         MS. BERNSTEIN:  Correct.

```
1              THE COURT:  On the next page, Juror 19, 21, 22, 23,
2    and 25.
3              MS. BERNSTEIN:  Correct.
4              MS. PERLMETER:  Could you please say that again?
5              THE COURT:  On the third page?
6              MS. PERLMETER:  Yes.
7              THE COURT:  Juror 19, 21, 22, 23, and 25.
8              MS. BERNSTEIN:  That's what we have, Your Honor.
9              MS. BERTRAND:  Judge, is Juror 20 struck?
10             THE COURT:  What did she ask?
11             MS. BERNSTEIN:  Ms. Bertrand asked if Juror 20 was
12   struck, and Juror 20 has been excused.
13             MS. BERTRAND:  Got it.  Thank you.
14             THE COURT:  On page 4, Juror 28, 32, 33, and 35.
15             MS. BERNSTEIN:  Correct.
16             THE COURT:  On page 5, Juror 41, and 43.
17             MS. BERNSTEIN:  Correct.
18             THE COURT:  On page 6, Juror 49, 53, and 54.
19             MS. BERNSTEIN:  Correct.
20             THE COURT:  Page 7, Juror 55, 57, 58, and 62.
21             MS. BERNSTEIN:  Correct.  That's what we have, Your
22   Honor.
23             THE COURT:  On page 8, Juror 64, 65, 66, 67, 68, and
24   69.
25             MS. BERNSTEIN:  Correct.
```

1          THE COURT:  Page 9, Juror 73, 77.

2          MR. LINCENBERG:  Wait.  That is correct.

3          MS. BERNSTEIN:  That's correct.

4          THE COURT:  And that's all, right?

5          MS. BERNSTEIN:  Correct.

6          THE COURT:  And page 10 is Juror 84, 85, 88, and 90.

7          MS. BERNSTEIN:  Correct.

8          THE COURT:  And then 91 and 92.

9          Okay.  Then --

10          MS. BERNSTEIN:  Your Honor, I don't believe we've

11   called 92 yet.  92 is the beginning of the next -- oh, I'm

12   sorry.  I'm sorry.  Yes, that's correct.

13          MR. LINCENBERG:  84, 85 -- what were the others from

14   that page?

15          THE COURT:  88 and 90.  I did actually say 91 and 92,

16   but was --

17          MS. BERNSTEIN:  I don't think 93 was a part of this

18   panel.  That is correct, Judge.

19          THE COURT:  Elaine, can I use your pencil?

20          MS. PERLMETER:  I'm checking my chart, Your Honor.  If

21   I could please have a minute.

22          THE COURT:  We have to bring the last six up.  We're

23   only at 42.

24          Okay.  We do need to bring the last six up, so,

25   Mr. Lincenberg, you can finish.

1          MR. LINCENBERG:  I wanted to go through 94, because if

2     we need to question 94, I'd like to do it at side bar so he's

3     not -- so as not to pollute the panel.

4          So I was saying that with regards to Juror Number 94,

5     in response to question 87, in addition to saying he's on an

6     emergency team with the bankruptcy court and so forth, under 1

7     F for hardships, with 87 he says this material is very much a

8     trigger for me based on my past experiences, as my father

9     investigated these activities and I was exposed to the terrible

10    negative things that occurred with sex trafficking and

11    prostitution.

12         He said, with regards to deliberations, I don't -- I'm

13    not sure because I don't get involved in that world because of

14    what I saw when I was young when my father was investigating

15    this.

16         Question number 80 he says, my father investigating --

17    yes.  Is there anything about facilitating prostitution or

18    money laundering that would make it difficult to be fair or

19    impartial?  Yes.  My father investigating all this filth and I

20    have already seen what it can do to people.

21         Do you have any beliefs affecting your ability to sit

22    in judgment?  Yes.  He did not give his explanation.

23         Question 89, I am way too biased in this type of

24    criminal activity.

25         Question 48, my father was a police officer.  Do you

1   think this experience would prevent you from being fair and

2   impartial?  Yes.  I have a deep concern and bias against any

3   type of sex trafficking and prostitution as I have seen dirt

4   had in these case files, how terrible and sick this is.

5           Question 41 --

6           THE COURT:  Okay.  Mr. Lincenberg, I'm going to allow

7   the questioning to occur separate from the others unless the

8   state agrees to strike the juror now.

9           MR. LINCENBERG:  Thank you.

10          THE COURT:  Government, sorry.

11          MS. PERLMETER:  We would like an opportunity to

12  question the juror.

13          THE COURT:  Okay.

14          MS. PERLMETER:  A lot of people have --

15          THE COURT:  Okay.  That's fine.  We're going to do it

16  outside the presence of the other jurors.

17          Ms. Bernstein, did you have something else?

18          MS. BERNSTEIN:  I'm a little concerned if we're going

19  to run past 4:00 o'clock, I'd like to swap out with other

20  counsel.

21          THE COURT:  You want to swap out?

22          MS. BERNSTEIN:  Yeah.  I'm going to need to leave no

23  later than 4:00 o'clock for a break.  So if we can break then,

24  I'm happy to sit here.  If you plan to keep going past 4:00

25  o'clock, I'm going to swap out with counsel.

1          THE COURT:  I mean, it's six people.  I don't -- it

2    could take it past 4:00, so if you want to, that's fine.  There

3    he is.

4          MS. BERNSTEIN:  Okay.  We'll be switching.  Thank you.

5          (Next panel of prospective jurors entering the

6    courtroom.)

7          THE COURT:  Okay.  Welcome to the courtroom.  I know

8    you've been waiting a long time.  I'm sorry you guys randomly

9    got put at the end of the list, so thank you for your patience,

10   and we'll try to move quickly.

11         I know I've given the instruction to the other jurors

12   before, and hopefully you've heard them, but just a couple

13   things I want to touch on.  Just so you understand that we're

14   not trying to be impersonal, we're using your numbers to

15   identify you so that your name is not in the record, because

16   everything said here in court is taken down by the court

17   reporter, so don't be offended when we refer to you by number.

18         Also, when you answer, I need you to state your number

19   so that we know who is talking for the record.

20         We ask that you be honest and candid in your answers.

21   We're just trying to find a jury that can be fair and impartial

22   in this case.  Not everybody is suited for a case involving

23   drugs because of their experiences, or a civil medical

24   malpractice case, because they've had a similar experience, so

25   that's why we ask all these questions.  It's not intended to

1    pry unnecessarily into your private lives and affairs.

2            Let's see.  My question before I let the attorneys

3    follow up with you on your questionnaire is since you filled

4    out the questionnaire, has anything changed that would impact

5    your ability to sit as a juror on this case?

6            Just get to a clean piece of paper.

7            Juror 98, did you raise your hand?

8            PROSPECTIVE JUROR:  Yes, I did.

9            THE COURT:  Okay.  98, 99, and 96.

10           Okay.  Juror 96, what's changed?

11           Oh, forgot we're using the microphones so we can all

12   hear you.

13           PROSPECTIVE JUROR:  Okay.  Like this.  Okay.

14           THE COURT:  Perfect.

15           PROSPECTIVE JUROR:  When I filled out the

16   questionnaire, I believe I represented myself as the owner of a

17   software company.  As of about ten days ago, I sold that on to

18   a bigger software company, so we're in the middle of the

19   integration of two companies right now.  So that's what's

20   changed also.  I am an employee now.

21           THE COURT:  Okay.  And in this transition, is that

22   going to affect your ability to be available for trial?

23           PROSPECTIVE JUROR:  Well, I imagine every day will

24   look a lot like last night, which was up until about ten, you

25   know, sending spreadsheets and PowerPoint text to my new

1   corporate overlords so...

2           THE COURT:  Okay.

3           PROSPECTIVE JUROR:  After a month of that, I'll be

4   tired, I guess is my point.

5           THE COURT:  And are you going to get paid?

6           PROSPECTIVE JUROR:  Oh, yeah.

7           THE COURT:  Okay.  All right.  Thank you.

8           Juror 98.

9           PROSPECTIVE JUROR:  98.  I am a City of Phoenix

10  employee, and due to COVID, there has been some classes that

11  have had to be canceled and rescheduled.

12          Anyhow, I have two classes I need to take by the end

13  of the year in order to maintain my ADEQ certifications.  One

14  is a three-day and one is a one-day.  One is scheduled for this

15  month, later on this month, the other is scheduled for sometime

16  in November.

17          THE COURT:  Do you want -- which one is first, the

18  three-day or the one-day?

19          PROSPECTIVE JUROR:  I believe the three-day is later

20  on this month.

21          THE COURT:  Do you know the dates?

22          PROSPECTIVE JUROR:  The one on November is the 8th,

23  the one in September, that's the 24th, but the other one in

24  November is 8, 9, and 10.

25          THE COURT:  So September 24th, November 8, 9, 10?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  Well, those are all days we are not

3     going to be in trial, miraculously, so all right.  Thank you.

4          Juror 99.

5          PROSPECTIVE JUROR:  Number 99.  Since the

6     questionnaire, I have been asked to chair an upcoming expo for

7     the Surprise Regional Chamber of Commerce.  And I have also

8     been elected to a community coalition that works with the

9     elementary schools in El Mirage, and the school year is just

10    starting.  And the expo is due to occur on November 7th.

11         Additionally, there are added work stresses.  We've

12    since launched a project at work.  We have a team of about nine

13    people, six of which are technically proficient.  And I'm on a

14    team of three that handle the primary workload when it comes to

15    troubleshooting and facilitating reporting back to our

16    engineering team, and that team of nine is responsible for 8 to

17    9,000 machines within our work environment.

18         We're also trying to upscale so that we have some

19    scaleability and flexibility and it's not all reliant within

20    our team and trying to get some certifications done by the end

21    of the year.

22         THE COURT:  Who do you work for?

23         PROSPECTIVE JUROR:  American Express.

24         THE COURT:  Is there a -- I mean, American Express is

25    a big company.  So is there a specific office here in Phoenix?

1          PROSPECTIVE JUROR:  So we're primarily working from

2     home, but there are efforts to try to work to return to office.

3     And because we handle machines and we're globally present,

4     there are some times when our schedule has to shift.  For

5     instance, we just shifted from having to do two to three weeks

6     of alternating overnight to support UK and India and other

7     regions.  And that's between the three of us that are on

8     operations.

9          THE COURT:  Okay.  Thank you.

10         From the government.

11         MS. PERLMETER:  Hi.  Juror Number 97, please.

12         I guess it's the end of the day, so let me introduce

13    myself again because you guys have not met me.  My name is

14    Peggy Perlmeter.  I am one of the assistant United States

15    attorneys that will be working this case representing the

16    interests of the United States.  So thank you for sticking with

17    us the past few days.

18         And, Juror Number 97, please.

19         PROSPECTIVE JUROR:  Juror Number 97.

20         MS. PERLMETER:  Thank you.  So in our quest to find

21    the best fit jurors for this case, we have -- I'm not sure if

22    you, perhaps, may have heard, but we have asked some people

23    about some general concept about what a criminal defendant is

24    allowed to do or is required to do, and, more importantly, what

25    he's not required to do.

1          And one of those things -- one of the things that a

2     criminal defendant does not have to do is testify on his own

3     behalf, or her behalf, at trial.  A defendant has a right to

4     remain silent and his or her choice to exercise that right

5     cannot be used against him or her.

6          In your questionnaire, sir, you appear to have checked

7     the box that says that you would expect a criminal defendant to

8     testify.  And so now I'm just asking what your thoughts are

9     about that.

10          PROSPECTIVE JUROR:  So, I mean, just because of the

11     fact that I wasn't sure, I mean, to me it's not a yes or no

12     question.  It's more of an, it depends on the circumstances.

13     So if you were to tell me, hey, this person committed X crime

14     or violated such law and that's all you have, no, I don't -- I

15     would not -- not a -- not a, what you call it, not guilty.

16          If you provided substantial evidence to where, like,

17     okay, you have provided enough to, okay, yeah, I believe you

18     100 percent that that person has indeed committed X crime or

19     broken such law, then, yes, I would plead guilty, so, to me,

20     it's not a yes or no question, to be honest.

21          MS. PERLMETER:  If a defendant chooses to exercise his

22     or her right to remain silent and did not testify on his or her

23     own behalf at trial, would you hold it against him or her?

24          PROSPECTIVE JUROR:  No, I wouldn't, because, I mean, I

25     believe the fact that if the person doesn't have anything

1    against you, there is really no need for you to say anything at

2    all.  If you can remain silent on your side and just let them

3    go, and if they can't prove anything against you, I have no

4    reason to say anything really.

5         MS. PERLMETER:  And while a defendant may personally

6    stay silent and, you know, sit in their chair and not, you

7    know, make a peep, there will be lawyers in court that will be

8    questioning witnesses and handling exhibits and introducing

9    evidence, and sometimes their voices can be heard that way.

10        Would you hold it against a defendant if they

11   presented no evidence at trial, because one of the concepts

12   here is that the burden of proof in a criminal case is that the

13   proof -- the burden of proof resides on the United States.

14   It's up to the United States to prove that defendants have

15   committed crimes that the United States levies on them.

16        Do you understand that concept?

17        PROSPECTIVE JUROR:  Yes, I do.

18        MS. PERLMETER:  Okay.  So would you be okay rendering

19   a verdict in a case when a criminal defendant decides not to

20   present any evidence?

21        PROSPECTIVE JUROR:  Yeah, I would be able to provide a

22   verdict.  It's their choice to provide any evidence against --

23   to prove their innocence or whatever they choose.  It's up to

24   them if they choose to.

25        MS. PERLMETER:  And if they choose to do nothing,

1    would you hold that against them?

2         PROSPECTIVE JUROR:  That's perfectly fine.  That's

3    their option.

4         MS. PERLMETER:  Thank you very much, Juror Number 97.

5         Juror Number 99.  Hello.  I have --

6         PROSPECTIVE JUROR:  Number 99.

7         MS. PERLMETER:  I have the same question for you.  In

8    your questionnaire, you kind of check that box where you

9    indicated you expected a criminal defendant to testify.  So

10   we've been in court for a couple of days now, do you still have

11   that belief, and please talk to us about that.

12        PROSPECTIVE JUROR:  I think, when answering the

13   questionnaire, it was coming more from -- of an opinion not

14   necessarily a recognition of the law and how you would -- how

15   you would determine innocence or guilt according to that,

16   especially in light of the past two days.

17        MS. PERLMETER:  Okay.  So if a criminal defendant

18   decided to remain silent and not testify and not present any

19   evidence, would you hold it against him or her?

20        PROSPECTIVE JUROR:  No.

21        MS. PERLMETER:  Okay.  Thank you very much, sir.

22        And Juror Number 98.

23        PROSPECTIVE JUROR:  98.

24        MS. PERLMETER:  I have the same questions for you.  In

25   your questionnaire you had indicated or made the checkmarks

1    that you would expect the defendant to testify.  What do you

2    think about that concept now?

3              PROSPECTIVE JUROR:  I believe it's the defendant's

4    right to testify or not to testify.

5              MS. PERLMETER:  So if a defendant elected to not

6    testify, would you hold that against him or her?

7              PROSPECTIVE JUROR:  No, I wouldn't.

8              MS. PERLMETER:  All right.  Thank you very much, Juror

9    Number 98.

10             Nothing further, Your Honor.

11             THE COURT:  From the defense.  Ms. Bernstein, are you

12   starting?

13             MS. BERNSTEIN:  Yes, Your Honor, I'm going to start.

14             I just have a question for Juror Number 97.

15             PROSPECTIVE JUROR:  Juror 97.

16             MS. BERNSTEIN:  Sorry, more than one question.  The

17   prosecutor who just spoke to you explained that, and I think

18   you agreed, that if the defendants themselves don't testify,

19   they will -- and I'm paraphrasing here -- but they will,

20   nonetheless, be speaking through their attorneys.  Do you

21   remember that?

22             PROSPECTIVE JUROR:  Yes.

23             MS. BERNSTEIN:  I also want to be clear and kind of

24   educate everyone here that there is no obligation for anyone on

25   this side of the room to do anything.  We could all sleep

1  through the whole trial and the presumption rests very squarely

2  on this table and it never ever crosses the line over to us.

3          Do you understand that?

4          PROSPECTIVE JUROR:  Yes.  That's basically what I

5  meant by saying -- I mean, you guys can -- I mean, you can say

6  something or say nothing when the trial happens, that's

7  perfectly fine with me.  You know, it's up to them to provide

8  the evidence to make us believe 100 percent that you guys did

9  commit whatever they're accusing you of.

10          MS. BERNSTEIN:  It can be a confusing concept in the

11  law.  I just want to be clear.

12          PROSPECTIVE JUROR:  I understand.

13          MS. BERNSTEIN:  It doesn't always track what we do in

14  our outside world, but the legal system is different.  That's

15  what I wanted to clarify.  Thank you.

16          PROSPECTIVE JUROR:  You said you had two questions.

17          MS. BERNSTEIN:  I dropped the second one.  Thank you

18  though.

19          PROSPECTIVE JUROR:  Okay.

20          THE COURT:  Okay.  Who is next?  Anyone?

21          Okay.  Does anybody else have any other questions?

22          MR. FEDER:  Number 98.

23          PROSPECTIVE JUROR:  98.

24          MR. FEDER:  Juror 98, according to the questionnaire I

25  have for you, you indicate that the length of the trial could

1   cause undue hardship.

2           PROSPECTIVE JUROR:  I don't recall, no.

3           MR. FEDER:  All right.  You indicated that you work

4   for the City of Phoenix, right?

5           PROSPECTIVE JUROR:  Yes.

6           MR. FEDER:  And --

7           PROSPECTIVE JUROR:  Single dad, you know, teenager at

8   home, don't want to leave him unattended.

9           MR. FEDER:  Is your son -- is it your son?  Yes, your

10  son lives with you?

11          PROSPECTIVE JUROR:  Yes, he does.

12          MR. FEDER:  Goes to school, I assume?

13          PROSPECTIVE JUROR:  Not right now.

14          MR. FEDER:  You're the sole provider of income for

15  your household, according to this questionnaire?

16          PROSPECTIVE JUROR:  Yes.

17          MR. FEDER:  Are you going to get paid if you're in a

18  three or four-month trial?

19          PROSPECTIVE JUROR:  I'm not sure.  I haven't checked

20  into the whole policy on that.  I'm not sure.  I'd have to ask

21  my supervisor.  He's looking into that.

22          MR. FEDER:  I assume if you were not going to get paid

23  for the entirety for being here for however long this trial

24  lasts, that that would be a big impediment for you?

25          PROSPECTIVE JUROR:  Yeah, three or four months

1   wouldn't work for me.

2          MR. FEDER:  Well, I mean, even if you are paid, is

3   there another hardship that you would have in regard to your

4   son or your household?

5          PROSPECTIVE JUROR:  No, not that I can think of right

6   now.

7          MR. FEDER:  Okay.  You also indicated that you have

8   got a concern about the delta virus and the close proximity to

9   jurors.

10          PROSPECTIVE JUROR:  No, I don't recall that.  I mean,

11   I got a hard time being here right now as it is but --

12          MR. FEDER:  You have some kind of respiratory problem?

13          PROSPECTIVE JUROR:  No, no, just the masks.  I usually

14   use a paper mask.

15          MR. FEDER:  The masks are trouble.

16          You indicate that you're -- that you -- another reason

17   for not serving is, again, your financial obligations, number

18   one, and that your teenage son requires adult supervision?

19          PROSPECTIVE JUROR:  Yeah, you know, like everybody

20   else who has teenage kids, you don't want to leave them

21   unattended too long.  With the other job, if anything happens,

22   it's easier for me to take time off.  If I were to be locked in

23   a courthouse --

24          MR. FEDER:  Does he -- I mean, you know, you said he

25   lives at home and he's not going to school.  Is he home during

1   the day?

2          PROSPECTIVE JUROR:  Yeah, he's -- I think he's working

3   part time.

4          MR. FEDER:  Okay.  I mean, does he need more

5   supervision than most other 18-year-olds do?

6          PROSPECTIVE JUROR:  I don't know anymore than that,

7   just him being a teenager, you know, I just like to keep an eye

8   on him.

9          MR. FEDER:  Okay.  I think you had gone through that

10  you don't -- you now understand that you -- an accused does not

11  have to testify, right?

12         PROSPECTIVE JUROR:  Yeah, I understand that.

13         MR. FEDER:  And that he or she does not have to prove

14  his or her innocence, correct?

15         PROSPECTIVE JUROR:  Right.

16         MR. FEDER:  That the burden of proof is always on

17  these folks and not anywhere behind me, correct?

18         PROSPECTIVE JUROR:  Right.

19         MR. FEDER:  And that you no longer think that an

20  accused has to testify, correct?

21         PROSPECTIVE JUROR:  Yes.

22         MR. FEDER:  Here's the question for you, though.  When

23  you went through this questionnaire, I assume you read the

24  questions, right?

25         PROSPECTIVE JUROR:  Yeah, I tried to.

1          MR. FEDER:  And until you came in and listened to

2     what's been being talked about the last couple of days, you did

3     believe all that, that defendants have to prove their innocence

4     and that they should be required to testify, true?

5          PROSPECTIVE JUROR:  Right.

6          MR. FEDER:  Is just because you heard what you've

7     heard over the last couple of days, is that going to overcome

8     what you thought initially when you filled out this

9     questionnaire?

10          PROSPECTIVE JUROR:  Yeah.  Well, it's been a little

11     bit more of an education just being in here listening to all

12     the different views and opinions.  Like I said, the defendant,

13     I believe it's his right whether he wishes to testify or not.

14          MR. FEDER:  Well, it's always a choice what we do in

15     the world, correct?

16          PROSPECTIVE JUROR:  Yes.

17          MR. FEDER:  Here's the real issue, though, and that

18     is, is it going to have the slightest effect on your ability to

19     be fair and impartial and to apply the law when you believe, or

20     at least have believed that a defendant has to prove their

21     innocence, number one, and that they have to testify, number

22     two?

23          PROSPECTIVE JUROR:  No.  You just have to go with what

24     the law states.

25          MR. FEDER:  Is it going to put them back a couple of

1   steps or are you going to feel like they have to prove

2   something to you?

3           MS. PERLMETER:  Objection.  He's asking the same

4   question multiple times.

5           PROSPECTIVE JUROR:  No, I'm -- no, I'm fine.

6           MR. FEDER:  Question 69 you said -- the question was,

7   government should prosecute businesses that provide a platform

8   to facilitate prostitution.  Sounds like they used to -- you

9   used to read New Times, right?

10          PROSPECTIVE JUROR:  Yeah.  Honestly, there is an

11  online Backpage.  I don't know anything about it.  The only one

12  I know about is the one that was physically on the back page of

13  the New Times magazine.

14          MR. FEDER:  The newspapers that used to be in the red

15  stands and pick them up --

16          PROSPECTIVE JUROR:  Right, every Wednesday.

17          MR. FEDER:  -- get Best of Phoenix.

18          PROSPECTIVE JUROR:  Right.  Right.

19          MR. FEDER:  But you said in here -- so you're saying

20  that the only Backpage that you knew of was the actual Backpage

21  of the print newspaper?

22          PROSPECTIVE JUROR:  Right.

23          MR. FEDER:  But then you went on to say, I'm quoting

24  here, but you tell me if this is wrong, that Backpage has

25  always been a little shady, end quote.

1        PROSPECTIVE JUROR:  Yeah, just from reading it.  I

2   mean, you know, anybody reading it could guess what it -- what

3   it was, just -- that's what it looked like to me.  It just

4   seemed kind of shady and sketchy.

5        MR. FEDER:  Well, shady and sketchy, what does that

6   mean to you?

7        PROSPECTIVE JUROR:  Just like some of the personal

8   ads.

9        MR. FEDER:  Well, they have lawyer -- lawyer

10  advertising, right?

11       PROSPECTIVE JUROR:  They have all kinds of stuff.

12       MR. FEDER:  Abortion clinics, things like that, true?

13       PROSPECTIVE JUROR:  Sure, sure.  Clean fill, if you

14  wanted.

15       MR. FEDER:  So I'm trying to figure out what it is,

16  when you refer to shady, what does that mean?  What kinds of

17  ads?

18       PROSPECTIVE JUROR:  I'm saying personal ads, so far

19  as, you know, women advertising themselves, people advertising

20  themselves.

21       MR. FEDER:  People wanting to go meet other people,

22  people wanting to --

23       PROSPECTIVE JUROR:  Ads for prostitution.  That's what

24  it looked like for me.  That's what it sounded like to me.

25       MR. FEDER:  What made it sound like that to you?

UNITED STATES DISTRICT COURT

1        PROSPECTIVE JUROR:  Hey, my name is Candy.  I'm blah,

2    blah, blah for this and that, it's $25 an hour or whatever,

3    something like that.  It's kind of sketchy.

4        MR. FEDER:  Did you see any overt sex-for-money ads on

5    there or just something that suggested to you?

6        PROSPECTIVE JUROR:  Really suggest, recommend hard,

7    really hard, yeah.  Like I said, I looked through it.  It's

8    kind of entertaining, sometimes went through it.  That was it.

9        MR. FEDER:  But you have never seen the digital

10   Backpage, correct?

11       PROSPECTIVE JUROR:  Digital website, no, never seen

12   it.

13       MR. FEDER:  Does shady mean dishonest to you or what

14   does it -- give me another word that's the equivalent of that.

15       PROSPECTIVE JUROR:  Shady might be, like I say, maybe

16   unlawful or --

17       MR. FEDER:  And, again, unless it says sex for money,

18   it's not illegal, it's just a suggested ad, right?

19       MS. PERLMETER:  Objection.

20       PROSPECTIVE JUROR:  Right.

21       MS. PERLMETER:  Multiple questions.

22       THE COURT:  The objection is sustained.

23       Do you want a side bar?

24       MR. FEDER:  Sure.

25       (The following proceedings were held at side bar.)

1          THE COURT:  So that question was overtly defining for

2    this juror what a prostitution ad is, which is part of the

3    question for the trial, so that's why I think the question is

4    improper.

5          MR. FEDER:  I have to discover whether they can make

6    the distinction between something that's merely suggestive and

7    something that's actually illegal.

8          THE COURT:  Well, you can ask that without giving him

9    your opinion about what is a prostitution ad.

10         MR. FEDER:  I'll ask it that way.  Thanks.

11         THE COURT:  Okay.

12         (The following proceedings were held in open court.)

13         MR. FEDER:  Let me ask it to you this way.

14         What's the distinction to you between an ad that you

15   think is illegal and one that's legal on the back page that

16   we're talking about of the newspaper?

17         PROSPECTIVE JUROR:  Just, it's my opinion.  It just

18   seemed it had to do with, let's say, prostitution, and other

19   stuff didn't.  That's just what it looked like to me.

20         MR. FEDER:  But what is it about the ad that makes it

21   look like that to you?

22         PROSPECTIVE JUROR:  Just all the wording in it.  I

23   mean, you get a high school kid to read it, they probably know

24   what it's all about.

25         MR. FEDER:  If you're instructed, Number 98, that

merely suggestive ads are not illegal, are you going to be able

to follow that or are you going to be able to -- or is that

going to be something that's going to -- your idea --

MS. PERLMETER:  Objection.  The Court instructs on the

law not counsel.

THE COURT:  Okay.  So let me just ask it this way.

If you're instructed on -- if you're given an

instruction defining what is legal, what is not, and you

disagree with it, will you follow the instruction as it is even

if you disagree with it?

PROSPECTIVE JUROR:  Given by the Court?

THE COURT:  Yes.

PROSPECTIVE JUROR:  Yeah, it's something I have to go

with?

THE COURT:  Yes.

PROSPECTIVE JUROR:  Okay.  Yeah.

THE COURT:  Mr. Feder.

MR. FEDER:  I'm sorry, what was --

PROSPECTIVE JUROR:  Yes.

MR. FEDER:  And you will have no problems doing that

or hold that against the accused?

PROSPECTIVE JUROR:  No.

MR. FEDER:  There was a question about what are your

feelings regarding the internet publishing content, and your

answer was something to the effect of, very loose, you say, and

1    show just about anything.  Do you know what that means or what

2    you meant there?

3            PROSPECTIVE JUROR:  Well, yeah, you can see your --

4    find anything, just about anything on the internet.

5            MR. FEDER:  I assume by your answer that you -- that

6    you've gone on the internet and looked around?

7            PROSPECTIVE JUROR:  Yeah.

8            MR. FEDER:  And when you say very loose, just that,

9    just you mean can find anything -- anything on the internet?

10           PROSPECTIVE JUROR:  Pretty much, yeah.

11           MR. FEDER:  To you, what did you mean when you said

12   very loose?

13           PROSPECTIVE JUROR:  It's like there is no -- there is

14   no controls, no -- no limits.

15           MR. FEDER:  Is that concerning to you or just an

16   observation?

17           PROSPECTIVE JUROR:  Well, I would think most platforms

18   would want to, you know, keep an eye on what's being put on

19   their platform.

20           MR. FEDER:  Who?  Who would want to keep an eye on it?

21           PROSPECTIVE JUROR:  The owners of the platform.

22           MR. FEDER:  Okay.  That's all I have.  Thanks.

23           MR. EISENBERG:  May I proceed, Your Honor?

24           THE COURT:  Yes.

25           MR. EISENBERG:  Thank you.

I am Dave Eisenberg.  I represent Andrew Padilla.  He
is the gentleman -- the third gentleman down to my right.

Good afternoon, folks.  I want to ask some questions
of Juror 96.

PROSPECTIVE JUROR:  96.

MR. EISENBERG:  Yes, sir.  You had -- or I think the
company that you are involved with that's being sold or
transferred is called Justice Tracks?

PROSPECTIVE JUROR:  Yes.

MR. EISENBERG:  Now you're laughing.  I'm sure there
is a reason why.

PROSPECTIVE JUROR:  Well, I can just take my number
off right now, can't I?

MR. EISENBERG:  Well, maybe you -- it might be headed
in that direction.  What did Justice Tracks do?

PROSPECTIVE JUROR:  Justice Tracks is a software
company.  We make software that runs, essentially, all of the
operations of a forensic lab.

MR. EISENBERG:  So, by that, would that be testing?

PROSPECTIVE JUROR:  Well, it's, essentially, three
major areas.  It's evidence control, so chain of custody
tracking, workload management, and test -- test support, so all
of the supporting documentation.  Part of that is testing, and
then we also have another product called -- that deal with DNA,
a sample tracking system.

1          MR. EISENBERG:  And reporting, was that also one of

2     the --

3          PROSPECTIVE JUROR:  Yes.

4          MR. EISENBERG:  What's involved with reporting?

5          PROSPECTIVE JUROR:  Essentially, it's a generate --

6     report generator that takes the information that has been

7     entered into the database and then produces a piece of paper or

8     an electronic document that formats that in an easy-to-read.

9          MR. EISENBERG:  So some of the subject matter of what

10    you would be looking at would be, like, DNA?

11         PROSPECTIVE JUROR:  Sure.

12         MR. EISENBERG:  Blood?

13         PROSPECTIVE JUROR:  Yeah.

14         MR. EISENBERG:  Anything that it would be related to

15    such crimes as murder?

16         PROSPECTIVE JUROR:  Yeah.

17         MR. EISENBERG:  Are there others?

18         PROSPECTIVE JUROR:  Essentially, any crime that was

19    processed through a forensic lab.

20         MR. EISENBERG:  Okay.  And I see in relationship to

21    that question 89, your answer was, well -- the question was:

22    Any reason why you don't want to serve?  And the answer was:

23    Yes.  I wish to clearly disclose that I have a long association

24    with law enforcement through my work with forensic

25    laboratories --

1          PROSPECTIVE JUROR:  Yep.

2          MR. EISENBERG:  -- and their stakeholders.  And I am

3     assuming that that answer is no different today than it was

4     when you wrote it out?

5          PROSPECTIVE JUROR:  Yeah, that's correct.  As is, you

6     know, forensic labs are concerned with sources of bias, and I

7     wanted to be very clear and forthcoming that that is a

8     potential source of bias for me.

9          MR. EISENBERG:  In essence, is what you're saying, you

10    would be biased in favor of the people who are related to law

11    enforcement because that's what forensic labs are involved

12    with?

13         PROSPECTIVE JUROR:  I am saying I have -- yes,

14    overall, a favorable body of experience with people involved in

15    law enforcement and forensics.

16         MR. EISENBERG:  Okay.  And then you say that you have

17    spent your career in, and made your living by providing

18    services to them.  So I think what you're saying is you have

19    worked with them so long that if somebody from law enforcement

20    comes in to testify, you would tend to believe that person?

21         PROSPECTIVE JUROR:  I am saying that, yes, they are

22    credible to me, based on everything that I know about how they

23    operate and how they work.

24         MR. EISENBERG:  So, in other words, they have built-in

25    credibility?

UNITED STATES DISTRICT COURT

1          PROSPECTIVE JUROR:  Yeah.

2          MR. EISENBERG:  Okay.  26 years of providing software

3    to law enforcement, that's a long time, isn't it?

4          PROSPECTIVE JUROR:  It's a very long time.

5          MR. EISENBERG:  What are you going to be doing in your

6    retirement?

7          PROSPECTIVE JUROR:  I'm not retiring just yet.

8          MR. EISENBERG:  That's right, you sold the company.

9    What are your plans, sir?

10          PROSPECTIVE JUROR:  To keep doing what I'm doing.

11          MR. EISENBERG:  Which is related to forensics and --

12          PROSPECTIVE JUROR:  Yes, developing forensic software.

13          MR. EISENBERG:  All right.  Thank you, sir.

14    Appreciate it.

15          Number 99, you told us --

16          PROSPECTIVE JUROR:  99.

17          MR. EISENBERG:  Yes, sir.  I'm sorry.  You told us

18    about how the trial might impact you in terms of hardship, that

19    is your work with American Express.

20          PROSPECTIVE JUROR:  Yes.  And both my wife and I also

21    work full time.  We have a four-year-old and we kind of

22    alternate taking care of him.  He's not in school.  We've been

23    reluctant with coronavirus to start him in preschool or

24    anything.  She works for a university and she, at random times,

25    will have to go into the university, and then I just take over

1    on making sure that he's taken care of since we're primarily

2    working from home.

3            MR. EISENBERG:  So is that an actual hardship or are

4    you just saying that there is some times when she needs to

5    cover for the child, and then you need to cover for the child,

6    or does it really impact both of you all's work?

7            PROSPECTIVE JUROR:  I think it's something that really

8    impacts both of our work.  I have been fortunate where I

9    haven't really had to go into the office more than two or three

10   times during the pandemic, and it's been to try to address some

11   things with how we're able to deploy machines, and she's been

12   able to watch over our son because it was after she was out of

13   work.  She's been called to go to campus far more often and

14   there is not necessarily a set schedule to when she's called.

15           MR. EISENBERG:  So she's now back working?

16           PROSPECTIVE JUROR:  She's never stopped working, she's

17   just been primarily working from home, but she is the -- with

18   what the role that she does there, she gets called in to campus

19   and has had to, essentially, go back to office frequently.

20           MR. EISENBERG:  Who does she work for, sir?

21           PROSPECTIVE JUROR:  She works for Ottawa University.

22           MR. EISENBERG:  And how far is that from your house?

23           PROSPECTIVE JUROR:  It's not far from our house, but,

24   again, just with our four-year-old there and I've been assuming

25   controls and duties of watching him so...

1          MR. EISENBERG:  Do you work for American Express --

2     does your work for American Express impact the credit card

3     company, the credit card function of American Express?

4          PROSPECTIVE JUROR:  I don't work directly with

5     personal information.  I'm more just making sure people can do

6     their job on their devices.

7          MR. EISENBERG:  So do you service the devices

8     themselves?

9          PROSPECTIVE JUROR:  Yes.  So I assist in making sure

10    that software works on people's devices, or if people are

11    having problems, help to troubleshoot.

12         MR. EISENBERG:  Do you do any management with respect

13    to American Express, working in the corporate area?

14         PROSPECTIVE JUROR:  Not directly managing myself, but

15    I work with various levels, as far as throughout the

16    management.

17         MR. EISENBERG:  I'm going to switch a little bit now

18    to something that has to do with your answer to paragraph 63.

19         Your Honor, may I approach the Court?

20    THE COURT:  Yeah.

21         MR. EISENBERG:  Excuse me, sir, I'll be right back.

22         (The following proceedings were held at side bar.)

23         THE COURT:  Because he wrote private?

24         MR. EISENBERG:  Yeah.  He hasn't said -- hasn't said

25    anything, but he hasn't had a chance to say anything.  And I

1    think this is the type of subject matter that ought to be

2    pursued outside of everybody else.  It has to do with

3    pornography.  And this part here, question 63, 68, 69, they're

4    all related.

5              THE COURT:  That's fine.  We'll do it separately.

6              MR. EISENBERG:  I am not going to ask him anymore

7    questions then, Your Honor.

8              THE COURT:  Okay.

9              MR. EISENBERG:  Just have him sit down.

10             THE COURT:  Yeah.  And then I'll have -- I'll just

11   separate them.  I'll ask 94 and 99 to stay and have one of them

12   go out.

13             MR. EISENBERG:  Sure.

14             MS. BERTRAND:  We may have the same issue with 95.

15   She reports being a sex assault victim.  I'd rather not put her

16   on the spot in front of a group of people about that so...

17             THE COURT:  We've done it with other jurors, so if she

18   expresses some hesitancy, you can ask her but --

19             MS. BERTRAND:  All right.

20             THE COURT:  It's getting late.

21             MS. BERTRAND:  Okay.

22             THE COURT:  This takes a long time.

23             (The following proceedings were held in open court.)

24             MR. EISENBERG:  Thank you, Juror 99.  I'm going to

25   hold off at this point, so I'm done questioning you.  Thank

1    you, sir.

2              MR. CAMBRIA:  Thank you, Your Honor.

3              Juror 98.

4              PROSPECTIVE JUROR:  98.

5              MR. CAMBRIA:  Yes, sir.  Good afternoon, by the way.

6    You indicated that you saw the print -- a print, small

7    newspaper, and you looked at the back page of that where the

8    want ads are; is that correct?

9              PROSPECTIVE JUROR:  Yeah.

10             MR. CAMBRIA:  Yeah.  And you were telling us that you

11   thought that some of these ads were shady.  If the ad did not

12   specifically offer a sex act for money, would it be fair to say

13   that the only way you would know if, in fact, that was a sex or

14   prostitution ad is if you answered it?

15             PROSPECTIVE JUROR:  I suppose what I'm saying is some

16   of those they just --

17             MR. CAMBRIA:  I just asked that question, and if -- if

18   -- how else would you know unless you answered it?

19             PROSPECTIVE JUROR:  I didn't answer any of them.

20             MR. CAMBRIA:  Pardon?

21             PROSPECTIVE JUROR:  I didn't answer any of them.

22             MR. CAMBRIA:  No, no, no.  I didn't say you did.  What

23   I'm saying is if you saw an ad and it didn't specifically say

24   on its face, sex for money, okay, I offer this sex act for this

25   amount of money, the only way you would know whether it was an

1   actual prostitution ad is to answer the ad, would you not?

2           PROSPECTIVE JUROR:  Yes.

3           MR. CAMBRIA:  All right.  And that would be reasonable

4   to say that, wouldn't it?

5           PROSPECTIVE JUROR:  Right.

6           MR. CAMBRIA:  Okay.  You did indicate here that if

7   somebody was -- had abused drugs, that you would find that

8   person less credible.  Do you recall giving that answer?

9           PROSPECTIVE JUROR:  No, no.  If they're clean and

10  sober, I would not have a problem with their credibility.

11          MR. CAMBRIA:  But my question is, though, if you found

12  out that whatever they were testifying about, they had been

13  taking drugs during that time, wouldn't that be a fair thing to

14  think about as far as whether they're being accurate and so on?

15          Do you follow what I'm saying?

16          PROSPECTIVE JUROR:  Yeah.  Yes.

17          MR. CAMBRIA:  I'm sorry?

18          PROSPECTIVE JUROR:  Yes.

19          MR. CAMBRIA:  And would that be fair to assess that if

20  you -- in other words, okay, a person is saying X, however, we

21  now find out that during that time they were using drugs, maybe

22  they're not accurate.  That make sense?

23          PROSPECTIVE JUROR:  Yes.

24          MR. CAMBRIA:  Okay.  And that's all I have.  Thank

25  you.

1              Juror Number 97.

2              Good afternoon.

3              PROSPECTIVE JUROR:  Good afternoon.

4              MR. CAMBRIA:  If someone went on Facebook and they put

5     an ad or, you know, I don't know if it's necessarily an ad, but

6     they posted something on Facebook that ultimately led to an act

7     of prostitution, would you consider Mr. Zuckerberg, for

8     example, who owns Facebook, liable for that?

9              PROSPECTIVE JUROR:  No, I wouldn't.

10             Juror 97, by the way.

11             MR. CAMBRIA:  Would it be fair to say that the people

12    who actually posted that are the ones who should be responsible

13    for that criminal act?

14             PROSPECTIVE JUROR:  I mean, so the person who posted,

15    yeah, would be the ones -- they're the one that is actually

16    putting it up, so yes.

17             MR. CAMBRIA:  All right.  That's all I have for you.

18    Thank you, sir.

19             And 99.

20             PROSPECTIVE JUROR:  Juror 99.

21             MR. CAMBRIA:  Good afternoon.

22             I wanted to go back.  I'm reading your answer here,

23    and basically what you're saying is you and your wife have a

24    toddler and you split your time watching the toddler while the

25    other works?

1          PROSPECTIVE JUROR:  That's correct.

2          MR. CAMBRIA:  So, obviously, you are here for several

3   months.  How would you accommodate that?

4          PROSPECTIVE JUROR:  That's what I'm saying, it would

5   be a hardship to try to accommodate that.

6          MR. CAMBRIA:  Okay.  And because you both work and you

7   have a toddler?

8          PROSPECTIVE JUROR:  Yes.  In response to what the

9   judge was saying earlier, we have family in town, but my father

10  was just recently released from the hospital, and other than

11  that, it's my wife's grandmother who is 80 and she gets

12  assisted care.  Her mother is in Tucson and her uncle is in

13  Tucson so...

14         MR. CAMBRIA:  All right.  Thank you.

15         MS. BERTRAND:  Hello.  I'm Joy Bertrand.  I represent

16  Joye Vaught.

17         And I'd like to start with Juror 95.

18         Hi.

19         PROSPECTIVE JUROR:  Hello.  Juror 95.

20         MS. BERTRAND:  95?

21         PROSPECTIVE JUROR:  Yes.

22         MS. BERTRAND:  It's nice to meet you.  I'm going to

23  start out by saying you answered in response to question 89 in

24  your questionnaire, a reason to serve, that you do not want to

25  serve on this jury.  All the lawyers have that answer in front

1    of them.  I don't want to put you in an uncomfortable spot, and

2    certainly we can talk to the Court if we need to.

3            Has that answer changed in terms of your discomfort in

4    serving on this panel in this case?

5            PROSPECTIVE JUROR:  Yeah.  I don't think that would be

6    -- I guess I misunderstood the question when I answered it.  I

7    don't feel like --

8            MS. BERTRAND:  Can you talk up just a little bit?

9            PROSPECTIVE JUROR:  Yeah.  I'm sorry.

10           MS. BERTRAND:  Good.

11           PROSPECTIVE JUROR:  I don't think there is any reason

12   why I wouldn't be able to serve on this jury.

13           MS. BERTRAND:  So after listening for the past couple

14   days, you feel like you would have more comfort with it than,

15   perhaps, you initially thought?

16           PROSPECTIVE JUROR:  I don't think I understood the

17   question at first.

18           MS. BERTRAND:  Okay.

19           PROSPECTIVE JUROR:  But I am completely comfortable

20   with serving on the jury.

21           MS. BERTRAND:  All right.  You mentioned here in

22   response to question 76, the question was, feelings regarding

23   website responsibility for content posted by users.  I think

24   these websites have a responsibility to maintain certain

25   guidelines and they also should be responsible for maintaining

1     whatever guidelines or rules they established.

2              Do you remember answering --

3              PROSPECTIVE JUROR:  Yes.

4              MS. BERTRAND:  -- that way?  Can you say a little bit

5     more about what those guidelines would look like?

6              PROSPECTIVE JUROR:  I feel like whatever rules that

7     the website has established, they should follow their rules.

8              MS. BERTRAND:  Okay.  The user should or the website

9     should or both?

10             PROSPECTIVE JUROR:  The website.

11             MS. BERTRAND:  And what happens if the website does

12    follow its rules?

13             PROSPECTIVE JUROR:  They're doing what they said they

14    were doing.

15             MS. BERTRAND:  Okay.  It's not a trick question.

16             PROSPECTIVE JUROR:  No.  I -- no.  Well, no.  I wasn't

17    -- sorry.  If the website has rules, they should follow them.

18    If the website follows their rules, then I feel that the

19    website has integrity because they did what they said that they

20    were -- they were doing.

21             MS. BERTRAND:  Who should set the rules?

22             PROSPECTIVE JUROR:  The website -- I mean, the

23    website, because it's like going into a restaurant.  Like, a

24    restaurant has rules, like, no shirt, no shoes, no service.  So

25    if I go into that restaurant without a shirt on and no one does

1    anything, then I can't question the restaurant, if that makes

2    sense.

3            MS. BERTRAND:  I follow you.  That's a good -- that's

4    a good analogy.

5            PROSPECTIVE JUROR:  Thank you.

6            MS. BERTRAND:  You heard the other lawyers say that

7    the material that might be presented to jurors on these big

8    screens and in front of you on the screens in the jury box is

9    going to be -- could be quite graphic.  And I think someone

10   used the word gross.  Knowing that, and appreciating what you

11   have previously shared with the Court, how do you feel that

12   would affect you to see that kind of graphic content?

13           PROSPECTIVE JUROR:  I don't think it would affect me.

14   It's part of the evidence, so it's part of what I need to see

15   to make a decision as a juror, if that makes sense.

16           MS. BERTRAND:  Yeah, it makes sense.

17           PROSPECTIVE JUROR:  I mean, if I saw it, like, on the

18   street, it would just be something I saw, I guess.

19           MS. BERTRAND:  I follow you.

20           PROSPECTIVE JUROR:  I wouldn't be in shock.

21           MS. BERTRAND:  Yeah, after what we've been talking

22   about for two days so...

23           PROSPECTIVE JUROR:  Well, that plus, like, no matter

24   what I've been through in my life, it's still something that

25   wouldn't shock.  I mean, I would just, like, okay, that's that.

1    If that makes sense.

2            MS. BERTRAND:  Sure.

3            PROSPECTIVE JUROR:  It's like when you see a car

4    accident, you're looking, oh, look, a car accident.  Like that

5    affects some people, to me, it would just be like, okay, this

6    is something that happened.  Like, if I want to stare at it, I

7    will, if I don't -- if that makes sense.

8            MS. BERTRAND:  Yeah.  Do you feel like, given your

9    world experience, that you can hold your ground in a discussion

10   with other jurors?

11           PROSPECTIVE JUROR:  Yes, I feel that I can do that.

12           MS. BERTRAND:  You noted a couple times a concern --

13   this is in question 67 and 69 -- about protecting minors,

14   regarding should the government investigate or prosecute

15   purchasers of sex, and investigating and prosecuting providers

16   of platforms that promote or facilitate prostitution.

17           What is your distinction there?  Is there a

18   distinction between regular prostitution and protecting minors,

19   because you said it twice, so it seems important.

20           PROSPECTIVE JUROR:  I feel -- well, so when it comes

21   to minors, then definitely I think children need to be

22   protected.  They don't have their own voice in a lot of ways,

23   so society needs to protect them, whether it's their parents,

24   or sometimes the parents can't do that, so, you know, it's,

25   like, CPS is there for a reason, type of thing.  You know, we

1    need the people out there protecting children.

2              MS. BERTRAND:  Yes.

3              PROSPECTIVE JUROR:  I mean, it's two separate issues,

4    I guess.

5              MS. BERTRAND:  Prostitution itself and --

6              PROSPECTIVE JUROR:  Prostitution itself is

7    prostitution.  When it -- I mean, minors is children that have

8    no voice, because, you know, you -- when you're a minor, you

9    have limited resources, you have limited -- like, you can't

10   just, like, go and hire a lawyer as a child and have a child --

11   you know, there has to be organizations someplace to protect

12   children.

13             MS. BERTRAND:  Agreed.  Okay.

14             So to you, is it fair to say -- because you've heard

15   the discussions over the past few days, this is an important

16   distinction that there is a difference between prostitution,

17   just plain old regular prostitution, and trafficking.  Is that

18   a difference to you?

19             PROSPECTIVE JUROR:  Yeah.  I mean, I don't -- I mean,

20   trafficking can mean a lot of different things.  It can involve

21   adults and minors, from my understanding.  I mean, prostitution

22   is -- I mean, I'm not educated enough to know the difference,

23   but minor -- I mean, I guess I'm kind of confused with your

24   question.

25             MS. BERTRAND:  I might have asked a bad question.

1          PROSPECTIVE JUROR:  It's okay.

2          MS. BERTRAND:  What's the difference to you between

3     prostitution and trafficking?  You said there is a lot of

4     definitions for trafficking.

5          PROSPECTIVE JUROR:  I don't know the difference to me.

6     From what I've heard -- or, you know, trafficking is something

7     where there is people, like minors that are put into positions

8     where they're doing things against, obviously, their ability to

9     make that decision to do it.

10          MS. BERTRAND:  They're not able to consent?

11          PROSPECTIVE JUROR:  Yeah.  Whereas prostitution is,

12     from my understanding, I mean, Pretty Woman, I guess, like, you

13     know, that person that's an adult individual who makes their

14     own decisions.  And if they want to -- you know, if that's --

15     if that's what they decide based on, like, whatever, you know,

16     they are mature and they have that right to make those

17     decisions and those choices.  If that makes sense.

18          MS. BERTRAND:  Yeah, makes sense.

19          I don't think I have any other questions for you,

20     Juror 95.  Thank you.

21          PROSPECTIVE JUROR:  Okay.  Thank you.

22          MS. BERTRAND:  Does anyone, with this discussion with

23     Juror 95, agree with her about the distinction between

24     prostitution and trafficking, or disagree?

25          So, 97, agree, disagree?

1          PROSPECTIVE JUROR:  97.  I mean, I really didn't

2    understand her point and stance on it, so I can't really agree

3    or disagree with her, because I don't -- I'm not sure where she

4    stands on it, based on her answer.

5          MS. BERTRAND:  Okay.  What's your -- is there a

6    distinction to you between prostitution and trafficking?

7          PROSPECTIVE JUROR:  Yeah, two separate things to me.

8          MS. BERTRAND:  What is it in your eyes?

9          PROSPECTIVE JUROR:  So, I mean, trafficking, being

10   from Latino Mexican descent, trafficking can be -- I come to

11   know it as coyotes and stuff, transporting people across the

12   border, whether they pay for it or it's against their will, or

13   anything like that.  They're just moving one place to another.

14   That's what I consider trafficking.

15         Prostitution is someone out there, basically, trying

16   to sell their body for money.

17         MS. BERTRAND:  Okay.

18         PROSPECTIVE JUROR:  I mean, that's how I see them.

19         MS. BERTRAND:  Thank you.  Thank you.

20         Anyone else have any feelings about that distinction

21   that you want to share?

22         (No response.)

23         MS. BERTRAND:  Juror 99, I would like to talk to you

24   about your answer to question 76 regarding website

25   responsibility for content posted by users.  And you said, I

1    think there is a responsibility those websites it is -- I think

2    it was supposed to be if -- but it is promoting hate, violence,

3    harm to other individuals.

4         What would that responsibility look like in your eyes?

5         PROSPECTIVE JUROR:  Juror 99.

6         MS. BERTRAND:  Yes.

7         PROSPECTIVE JUROR:  I think that the responsibility

8    varies depending on the site and what's being offered and who

9    has access to it.  I mean, you have private sites, you have

10   sites that are invites, you have sites that you pay to be a

11   part of the public.  So depending on some of those

12   circumstances is how you would have to adjust guidelines and

13   parameters that they have in place to -- to secure it.

14        MS. BERTRAND:  You mentioned here, especially

15   regarding issues of hate, violence, and harm to others.  What

16   do you think -- and it's a big conversation we're having

17   culturally -- what should platforms do to prevent violence,

18   hate, and harm to others?

19        PROSPECTIVE JUROR:  Not being a platform owner, I

20   can't say exactly what platforms should do.  I think, to your

21   point, that it's a discussion that's going on right now, that

22   you're seeing some platforms starting to take that more

23   seriously, starting to form boards or starting to form groups

24   that help them regulate that internally and externally.  I

25   think it just -- it just depends.

```
1              MS. BERTRAND:  All right.  I don't think I have

2     anything else.  Let me just check with my colleagues.

3              Thank you.

4              THE COURT:  All right.  We're going to finish, for the

5     most part, so I'm going to ask you to go outside, except Jurors

6     99 and 94, if you could wait outside the door, we may have some

7     follow up for you without the others present.

8              (The prospective jury panel left the courtroom.)

9              THE COURT:  Okay.  We are outside the --

10             MR. LINCENBERG:  Are we still outside the presence of

11    all the jurors?

12             COURTROOM DEPUTY:  Hold on a second.  Let me --

13             THE COURT:  Now we are muted.

14             COURTROOM DEPUTY:  Yep.

15             THE COURT:  Okay.  I'm inclined to excuse Juror 99 for

16    hardship, so that would mean we didn't have to follow up with

17    him on the other issue.

18             Does the government have any objection?

19             MS. PERLMETER:  No, Your Honor.

20             THE COURT:  Does the defense?

21             MR. LINCENBERG:  No, we don't, Your Honor.

22             THE COURT:  Juror 99 will be struck, so you can tell

23    Juror 99 --

24             COURTROOM DEPUTY:  Okay.

25             THE COURT:  -- that he's excused and bring 94 in.
```

1          COURTROOM DEPUTY:  Okay.

2          THE COURT:  Please.  Thank you.

3          And, Mr. Lincenberg, I'm going to have them go first,

4  because if they can't rehabilitate him, it's going to

5  necessitate --

6          (Prospective Juror 94 entered the courtroom.)

7          THE COURT:  Juror 94, you can come have a seat in

8  whatever seat you want that has a blue dot.  We're very

9  specific about the blue dots.

10          Can you give him the microphone?

11          MS. PERLMETER:  Hi, Juror Number 94.  Good afternoon.

12          PROSPECTIVE JUROR:  Good afternoon.  Number 94.

13          MS. PERLMETER:  So in your questionnaire, Mr. 94, you

14  had indicated that your father was a police officer for

15  30 years, he investigated sex trafficking, and he investigated

16  sex trafficking and sexually related offenses.  And you had

17  indicated that you have some biases towards that crime based on

18  what you know of what -- your father's work.

19          Do you still have those same beliefs?  Can you please

20  tell us whether or not you can sit and give these defendants

21  over here a fair shake at trial given your background.

22          PROSPECTIVE JUROR:  I would say, yes, that I could

23  give the defendants a fair shake, considering the background.

24  It was many years ago.  My father was a senior special

25  investigator for the Department of Social Services for

1    California.  He investigated those crimes but that was many

2    years ago.

3              MS. PERLMETER:  Because you indicated in several

4    places on your questionnaire that you had this concern, which

5    is why we decided to bring you in and ask you about them.

6              PROSPECTIVE JUROR:  Okay.

7              MS. PERLMETER:  So you made some comments about how

8    you think that sex trafficking -- you have seen the dirt in his

9    case files and how horrible and sick this is.  So after making

10   those statements, clearly, the defense has some concerns.  The

11   government, the United States just wants to make sure that you

12   have said that you can separate your past and be able to sit

13   fairly and impartially and consider the evidence as it is

14   brought in when making a decision about whether or not the

15   defendants have committed the crimes that the United States

16   accuses.

17             MR. LINCENBERG:  I do object to government counsel

18   saying --

19             Are all the jurors in the --

20             THE COURT:  It should be muted.

21             MR. LINCENBERG:  -- saying, clearly, the defense has

22   concerns about you.  I object to that.  We're going to raise

23   our questions, but that's just an inappropriate statement for

24   one side to be raising with a juror.

25             THE COURT:  Well --

1          MS. PERLMETER:  And to put --

2          THE COURT:  Just to clarify, it wasn't that she said

3    the defense has concerns about you, but, Ms. Perlmeter, please

4    rephrase your question.

5          MS. PERLMETER:  Sure.

6          We want to make sure that the jurors that we have as a

7    group are able to sit and consider the evidence fairly and give

8    both sides a fair trial, both the United States, as well as

9    each and every single defendant in the courtroom today.  We

10   just want to make sure that everyone that we bring into the

11   courtroom is able to do that.

12         PROSPECTIVE JUROR:  I understand.

13         MS. PERLMETER:  So you have your beliefs about

14   prostitution and you feel that it is immoral.  Would you be

15   able to listen to a case where prostitution will be discussed,

16   it will be part of the evidence, and consider it in -- consider

17   it in the context of whether or not the defendants violated

18   laws, which the Court will instruct you what the laws are?

19         We're not saying that the defendants engaged in

20   prostitution themselves, but the behavior and the context of

21   the crimes with which they have been charged with involve

22   prostitution.

23         PROSPECTIVE JUROR:  Yes, I understand that, and I can

24   separate that.

25         MS. PERLMETER:  There was a question about whether you

would be able to deliberate on the evidence, because there is

information of a sexual nature that is going to be needed to be

discussed between the jurors.  You had indicated, not sure.

Do you think after being in the other courtroom and

listening in on the proceedings the past two days, that you

will be able to sit and deliberate on the evidence and discuss

it with other jurors?

PROSPECTIVE JUROR:  Yes, I can.

MS. PERLMETER:  And what makes you have that

confidence today?

PROSPECTIVE JUROR:  I would say the confidence is that

the proceedings are not specifically about some of my biases

that are particular to what I put on the survey.  It is not

dealing with trafficking, it is not dealing with underage.  And

my opinions about prostitution and otherwise are merely moral

suggestions, and I know I have an ethical duty to perform as

the Court would order.

MS. PERLMETER:  So you also say that you're open to

serve on other cases but except this one.  I am way too biased

in this type of criminal activity.

Having written that statement, having participated in

the court proceedings the past two days, do you still feel

that?  Do you still feel that you have this bias, or can you

set it aside to be able to make -- to be able to give the

defendants a fair trial, as well as the United States?

1           PROSPECTIVE JUROR:  Yes, I can set aside the bias.

2           MS. PERLMETER:  And how do you think you're going to

3    be able to do that?

4           PROSPECTIVE JUROR:  Because I would follow the rule of

5    law in court.  I take an oath as a deputy clerk to follow the

6    oath of the court, and I would be obligated to do that.  I'm

7    very a hundred percent behind due process and that isn't

8    something that would be an issue.

9           MS. PERLMETER:  No more questions, Your Honor.

10           Sorry.  I have one more.

11           No more questions, Your Honor.

12           MR. LINCENBERG:  Hello, Juror Number 94.  Can you hear

13    me okay?

14           PROSPECTIVE JUROR:  Yes, I can.  Number 94.

15           MR. LINCENBERG:  First, Juror Number 94, have I spoke

16    -- have you spoken during the past couple of days with anybody,

17    either in the government or the jury room, about your views on

18    anything?

19           PROSPECTIVE JUROR:  Absolutely not.

20           MR. LINCENBERG:  Okay.  In your questionnaire --

21    first, let's talk about the question of hardship.  First, when

22    asked whether the length of the trial would create an undue

23    hardship, you said yes, that you're the IT director for the

24    bankruptcy court, part of an emergency team, and you're under

25    certain orders for reopening and it would put an additional

1    burden on your team.  Can you expand on that?

2           PROSPECTIVE JUROR:  I can expand on -- what I said

3    there was very accurate, to the point.  I am on an emergency

4    team.  I am the IT director for the United States Bankruptcy

5    Court for the District of Arizona.  We are currently in a

6    lockdown status, and as part of that emergency team, I need to

7    be in the office five days a week and being able to facilitate

8    access to justice for the courtrooms and for the clerk staff.

9           MR. LINCENBERG:  And so if you were to serve on this

10   jury, what -- how would that impact your team?

11          PROSPECTIVE JUROR:  It would have a great impact on

12   the team, because I am the team leader and I am the one that

13   facilitates scheduling.  I facilitate time-off requests.  And

14   currently right now I only have two people that are scheduled

15   to come in, per judge's order, so that only leaves, like, three

16   of us that can actually be on staff to support the judges for

17   keeping the courts open.

18          MR. LINCENBERG:  And in this, what you refer to as

19   phase two reopening, during this trial period, is it -- given

20   the -- sort of the post-COVID reopening, is it even more

21   stressful on your team right now?

22          PROSPECTIVE JUROR:  It would be even more stressful on

23   my team right now.  It's still up for deliberation with the

24   judges.

25          MR. LINCENBERG:  When asked whether there were any

1   reasons you would prefer not to serve on the jury in this case

2   in the questionnaire -- the questionnaire, you recall, gave a

3   general description of the case?  Do you recall that?

4           PROSPECTIVE JUROR:  Yes, I do.

5           MR. LINCENBERG:  Okay.  And you said this material,

6   referring to the material involved in this case, is, quote,

7   very much a trigger for me based on my past experience.

8           Were you being truthful when you indicated that the

9   material in this case was very much a trigger for you?

10          PROSPECTIVE JUROR:  I would, because I've had

11  experience with that in the past.

12          MR. LINCENBERG:  Okay.  And you refer to it as a

13  trigger in connection with being exposed to the, quote,

14  terrible negative things that occurred with sex trafficking and

15  prostitution.

16          Is that still an accurate answer?

17          PROSPECTIVE JUROR:  Yes, that would be an accurate

18  answer.  And more of it was the toll that it had on my father.

19          MR. LINCENBERG:  Right.  Okay.  And it had a large

20  toll on your father?

21          PROSPECTIVE JUROR:  Yes, it did.

22          MR. LINCENBERG:  Okay.  And then on the question of

23  whether you would be able to deliberate or discuss topics of a

24  sexual nature, your answer was you were not sure.  You don't

25  get involved in that world because of what you saw when you

1   were young and your father was investigating this.

2          So is being a trigger area, is that something that you

3   particularly try to avoid this area?

4          PROSPECTIVE JUROR:  That's correct, yes.

5          MR. LINCENBERG:  All right.  And when asked about

6   being -- was there anything about facilitating prostitution or

7   money laundering that would make it difficult to be fair and

8   impartial, was your answer yes?

9          PROSPECTIVE JUROR:  I believe so, yes.

10          MR. LINCENBERG:  All right.  And did you then explain

11   further by saying that your father investigating all of this

12   filth and I've already seen what it can do to people?  Is that

13   still your explanation for that?

14          PROSPECTIVE JUROR:  Yes, it is.  And the reason why I

15   -- I probably was so succinct in the words that I used is

16   because it did lead to my father's eventual suicide.

17          MR. LINCENBERG:  Oh, I'm sorry.

18          And then you were asked if there were any beliefs

19   affecting your ability to sit in judgment, and, again, you were

20   forthright and answered yes.

21          Is that still your answer?

22          PROSPECTIVE JUROR:  That's correct.

23          MR. LINCENBERG:  And, in that regard, if you were on

24   the defense side of this case, knowing what you've gone through

25   in your life, do you think that a defendant could see you as

1    being fair and impartial in light of your forthright answers to

2    these questions?

3            PROSPECTIVE JUROR:  Honestly, I would not.

4            MR. LINCENBERG:  Okay.  And to go further on question

5    number 89, when the question was:  Is there other information

6    the judges or attorneys should know?  You answered:  Yes, I

7    would be open to serve on any other case except this one.  I am

8    way too biased in this type of criminal activity.

9            Is that still an honest answer to that question?

10           PROSPECTIVE JUROR:  It is an honest answer, however, I

11   can put that bias aside should the Court need my services.

12           MR. LINCENBERG:  Okay.  You would do your best to put

13   it aside?

14           PROSPECTIVE JUROR:  Yes, I would.

15           MR. LINCENBERG:  All right.  And then when asked the

16   question:  Do you think that the experience with your father

17   would prevent you -- prevent you from being fair and impartial?

18   You answered:  Yes.  I have a deep concern and bias against any

19   of this type of sex trafficking and prostitution.

20           Is that still an honest answer?

21           PROSPECTIVE JUROR:  That is an honest answer, however,

22   I have had more information to understand that that isn't what

23   this case is about.

24           MR. LINCENBERG:  Okay.  This case is going to involve

25   witnesses who are prostitutes.

1          PROSPECTIVE JUROR:  I understand that.

2          MR. LINCENBERG:  And you understand that the

3     prosecution is going to take the position that they are victims

4     of the platform on which those prostitutes advertise?

5          Do you understand that?

6          PROSPECTIVE JUROR:  I understand, but I would not have

7     a judgment on that at this time.

8          MR. LINCENBERG:  Okay.  And when you were asked the

9     question of whether you follow criminal cases and trials in the

10    news, part of your answer was:  Just what is on the news, and,

11    yes, being in a law enforcement family and working in the

12    judiciary has a tendency for me to be a bit biased in my

13    opinions.

14         That answer wasn't even particular to this Backpage

15    matter, right?

16         PROSPECTIVE JUROR:  That's correct.

17         MR. LINCENBERG:  All right.  And when asked questions

18    about a defendant's burden in a trial when you were filling out

19    the questionnaire, you said the defendant should prove his

20    innocence, and it's too hard to convict the accused and you

21    would expect a defendant to testify.

22         Do you recall?  Am I accurately reflecting what you

23    answered in this question?

24         PROSPECTIVE JUROR:  I don't specifically recall saying

25    that.  And I would say I would amend that and say that was a

1    typo on my part.  I'm very well aware of due process and whole

2    heartily accept that.

3              MR. LINCENBERG:  So I'm looking at the questionnaire,

4    43 A, it says, do you agree or disagree with the following

5    statements:

6              And it says, A, a defendant in a criminal trial should

7    be required to prove his or her innocence.  You answered:

8    Agree.

9              And it's your testimony -- it's your statement today

10   that that was a typo?

11             PROSPECTIVE JUROR:  Yeah, that's correct.  That's not

12   correct.

13             MR. LINCENBERG:  All right.  And 43 B, again, do you

14   agree or disagree with the statement:  The criminal justice

15   system makes it too hard for the prosecution to convict people

16   accused of crimes?  You said you agree.

17             And is it your statement today that's a typo?

18             PROSPECTIVE JUROR:  That's correct.  That is

19   absolutely incorrect.

20             MR. LINCENBERG:  All right.  And 43 C:  A defendant in

21   a criminal trial should be required to -- do you agree or

22   disagree with the following statement:

23             I would expect a person charged with a crime to

24   testify in his own defense -- or his or her own defense.  You

25   said agree.

1          Was that also a typo?

2          PROSPECTIVE JUROR:  That's correct.  I do not believe

3     that they have to testify on their own behalf.

4          MR. LINCENBERG:  And then with regards to question

5     number 50, 50 asked about:  Do you, any members of your family

6     or close friends, support, volunteer, donate to, or work for

7     any groups or organizations that advocate for human trafficking

8     awareness, sex trafficking awareness, or the prevention of the

9     sexual exploitation of women?  You said, yes.

10          And then it said:  If yes, please explain.  And your

11     answer was:  Myself and my wife's family support an

12     organization in Vietnam that helps women and girls who are

13     trafficked.

14          Is -- is it -- and I appreciate your answer and I

15     appreciate your support for that organization.  Is that a

16     suggestion that this particular area is a particular area of

17     grave concern for you?

18          PROSPECTIVE JUROR:  Yes, it is.

19          MR. LINCENBERG:  Okay.  Your Honor, I have nothing

20     further.

21          Thank you, sir.

22          PROSPECTIVE JUROR:  Thank you.

23          THE COURT:  Did anybody else?

24          (No response.)

25          THE COURT:  All right.  If you can, you can just set

1   that down there and go back downstairs and we'll be with you

2   shortly.  Thank you.

3              (Prospective Juror 94 left the courtroom.)

4              THE COURT:  Motions for cause from the government.

5              MR. LINCENBERG:  Is Your Honor asking the government

6   about all of the last panel?

7              THE COURT:  Yes, the last six.

8              MS. PERLMETER:  The last --

9              THE COURT:  Yes, which there is only five left now so.

10             MS. PERLMETER:  No.

11             MR. EISENBERG:  Your Honor, excuse me, yes.  I think I

12  thought I heard the government say they didn't have any

13  motions, they did not -- oh, I'm sorry.

14             THE COURT:  Do you have any motions for cause?

15             MS. PERLMETER:  No, Your Honor, we don't.

16             THE COURT:  Okay.  You were right.

17             MR. EISENBERG:  Well, we have one, at least one, Your

18  Honor, and that's Number 96.

19             This is the gentleman who told his business is Justice

20  Tracks.  He has a relationship with law enforcement over, I

21  think it was 26, perhaps more, years.  And it would appear to

22  me, Your Honor, that he has a bias.  I think he grudgingly

23  admitted that he has a bias with respect to law enforcement,

24  and that he would take the testimony of law enforcement into

25  greater proportion than he would any other witness.

        I think his experience may have, as a profession, been

limited to forensic laboratories, but his association with law

enforcement is far more encompassing than that, so I think that

he has a bias.  His answers weren't any different than when he

was questioned.

        Any other reason why you don't want to serve?

        Yes.  I wish to clearly disclose that I have a long

association with law enforcement through my work.  And then --

that's question 89.

        I think it was question 38:  Yes.  I have a connection

to law enforcement, have a number of business acquaintances who

have become friends over the years.

        So based upon his business and his associations and

his answers to the questions, I think he is biased and we move

that he be stricken -- excused.

        THE COURT:  Government's position.

        MS. PERLMETER:  So the government's position is that

this should be denied, because this juror's experience with law

enforcement is on a business level.  You know, there has been

some mutual -- like, they've been mutually beneficial to each

other over the years.  The law enforcement has given his

company business, in exchange, his company provides data.

        This is different from someone who has a day-to-day

relationship or a tie to a detective or a patrol officer or

someone that would testify about events.  So this juror

1    indicated that he could follow the law when the Court instructs

2    about the credibility of witnesses and how it's to be

3    determined.  The government feels that he has made no

4    indication that he would be unable to follow the instructions.

5    And given that his relationship with law enforcement is, like,

6    on a business-type level, involving data, involving forensics,

7    the government feels that this motion should be denied and that

8    he can serve fairly and impartially.

9         THE COURT:  Okay.  Over objection, Juror 96 will be

10   struck.

11        Any others?

12        MR. LINCENBERG:  Your Honor, with regards to Juror 94,

13   we would ask that he be struck.  And if -- I can go through the

14   argument.  The Court just kind of heard it from the

15   questionnaire.

16        THE COURT:  You don't need to repeat it.

17        What's the government's position?

18        MS. PERLMETER:  No objection.

19        THE COURT:  94 will be struck.

20        MR. FEDER:  98, although he's changed his tune in

21   regard to requiring defendants to testify and prove their

22   innocence, he was not unequivocal in that regard, number one.

23        Number two, his comments about the paper version of

24   Backpage being shady, and I think there was another adjective

25   that he used that was derogatory, he indicates he is not a

1    neutral juror.  Especially because he didn't seem to understand

2    the difference between what was illegal and making assumptions

3    about suggestive ads being illegal.

4         THE COURT:  Well, he agreed with Mr. Cambria that he

5    wouldn't know unless he followed through with it.

6         Ms. Perlmeter.

7         MS. PERLMETER:  Your Honor, we object.  This witness

8    unequivocally stated -- I don't know where he wavered -- but he

9    clearly and firmly stated that a defendant did not have to

10   testify, that he understands the burden of proof.

11        With regards to the definition, the legal definition

12   between an escorting ad and a prostitution ad, he doesn't know

13   these things yet because the Court has yet to instruct.

14        He was asked his opinions on certain things and he

15   gave them, because he was required to answer questions, he gave

16   answers both ways.  He didn't say -- he said he could be fair.

17   He has never seen the website itself.  He was talking about the

18   actual print ad, the last page of the print ad many years ago.

19        THE COURT:  Okay.  That motion is denied.

20        Any others?

21        (No response.)

22        THE COURT:  Okay.  There is two people left -- no,

23   three.  So that gets us to exactly 45, right?

24        Okay.  So from the last six, we have Juror 95, 97, and

25   98 left.

```
 1              Everybody agrees, right?
 2              MR. LINCENBERG:  Yes, Your Honor.
 3              THE COURT:  We just did it, so I hope so.
 4              That should get us exactly to 45, which would allow 18
 5    strikes for the defense and 10 for the government, which I'm
 6    not sure whether I actually expressed that, that I was going to
 7    grant your request for additional strikes.
 8              MR. LINCENBERG:  I think you did.
 9              THE COURT:  Okay.  Because the government mentioned it
10    in response to your request to do alternating strikes, but --
11              MR. LINCENBERG:  I didn't remember if it was 9 or 10
12    for the government, but others may have a better memory.
13              THE COURT:  Okay.  Well, I had planned on 10 and 18.
14    And because I have granted your request for these additional,
15    so you now have 18 and we're only choosing 17, I'm denying the
16    request to do alternating strikes.  The extra strikes sort of
17    mitigate the concerns that were in that motion, so that motion
18    is denied and you'll do simultaneous strikes.
19              I'm going to have Elaine go downstairs and poll the 45
20    and make sure they know to come back tomorrow at 9:00 a.m., the
21    rest can go.
22              Do you have any questions about that?
23              COURTROOM DEPUTY:  No.
24              MS. BERTRAND:  Your Honor, I'd like to be heard,
25    please, about the strikes method.
```

1          THE COURT:  Okay.  I already read your motion and the

2     government's response.  I did my own research.

3          Do you have something to add to it?  I don't want you

4     just to repeat what you wrote in your motion.

5          MS. BERTRAND:  I won't.

6          THE COURT:  Okay.

7          MS. BERTRAND:  I think that the alternative that is

8     important to consider is where they do them in batches, the

9     government can do half and then we do something like that, it

10    won't take a lot of time.  I don't know that it would make any

11    difference in time.  And yet it would allow -- especially what

12    I'll call the smaller defendants in this case, like

13    Mr. Eisenberg's client, my client, to have a better ability to

14    exercise the strikes.  Otherwise, you see it even with the

15    cause strikes here, several of them are cause strikes that both

16    sides would have had, and I don't want to see either side lose

17    their ability to fully exercise their ability to strike.  We

18    have enough people on the panel to do it.

19         THE COURT:  Okay.  I did also consider that, because

20    it was in your motion, and that request is denied.

21         So we're going to send the jurors home, but I'm going

22    to have you stay until we get this done.  And -- yep.

23         And since the government is a smaller party, can you

24    guys use the room back there to do your strikes?

25         MS. PERLMETER:  Yes, we will.

1          THE COURT:  And if you guys want to split up, you can

2    use the courtroom or you can stay at your tables.

3          MR. LINCENBERG:  Your Honor, that would be great.  Can

4    we just get the government to commit that they're not going to

5    be in the balcony or --

6          THE COURT:  Yeah.  I'll clear everybody from the

7    balcony so you can talk amongst yourself.

8          So everybody up there needs to go outside, unless

9    you're part of the team.  If you're part of the team, you can

10   come in.

11         (Court stands in recess, 4:51 p.m. - 5:02 p.m.)

12         MR. LINCENBERG:  My client is not here.  I can waive

13   his --

14         THE COURT:  So my --

15         MR. LINCENBERG:  He's just in the hall.

16         THE COURT:  What my plan is, is to call them back in,

17   swear them in, and ask them to affirm everything they told us

18   is truthful.

19         MR. LINCENBERG:  That's fine.  We can stipulate to

20   that.

21         No?  Okay.

22         THE COURT:  Well, they're right outside, so I'll just

23   do it so --

24         MR. LINCENBERG:  Let me see if my client's here.

25         THE COURT:  Okay.

1          (5:04 p.m., prospective jurors entered the courtroom.)

2          THE COURT:  Okay.  We are back on the record with

3     Jurors 94 through 98.

4          Counsel, you can have a seat.

5          So, I apologize, when you came in, I didn't have you

6     sworn in, so I'm going to have you sworn in and then ask you a

7     yes or no question.

8          If you'd all stand up and raise your right hand.

9          (The prospective jurors were duly sworn.)

10          THE COURT:  Okay.  And, Juror 94, now that you've been

11     sworn in, were all of the answers that you gave earlier today

12     to the Court and counsel truthful?

13          PROSPECTIVE JUROR:  Yes, Your Honor.

14          THE COURT:  Thank you.

15          Juror 95, were all of the answers you gave earlier

16     truthful?

17          PROSPECTIVE JUROR:  Yes, Your Honor.

18          THE COURT:  Juror 96, were all the answers you gave to

19     Court and counsel earlier today truthful?

20          PROSPECTIVE JUROR:  Yes, Your Honor.

21          THE COURT:  Juror 97, were all the answers you gave in

22     response to questions by Court and counsel truthful?

23          PROSPECTIVE JUROR:  Yes, Your Honor.

24          THE COURT:  And, Juror 98, were all the answers you

25     gave here today truthful?

1          PROSPECTIVE JUROR:  Yes, ma'am.

2          THE COURT:  Anything else?

3          (No response.)

4          THE COURT:  Okay.  Thank you.  You can step outside.

5    And why don't you just wait outside and Elaine will tell you

6    what to do.

7          (5:06 p.m., prospective jurors left the courtroom.)

8          THE COURT:  So now that I have eaten up 20 minutes of

9    your time, I am willing to consider having you come back at

10   8:30 tomorrow morning if there is a request to do so.

11         MR. LINCENBERG:  We would make such a request.  Thank

12   you.

13         THE COURT:  And does the government want to say

14   anything about that?

15         MS. PERLMETER:  Sounds good.

16         THE COURT:  Okay.  All right.  So 8:30 tomorrow

17   morning to do your strikes.  I'll just have Elaine here so that

18   she can let you in and you can do your thing, and she'll just

19   let me know when you're ready and I'll come down.  Okay.

20         (Proceedings concluded at 5:07 p.m.)

21                    *         *         *

22

23

24

25

1          C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 28th day of

13   September, 2021.

14

15

16

            /s/ Christine M. Coaly_____
17          Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25