Thomas H. Bienert, Jr. (CA Bar No.135311, *admitted pro hac vice*)
Whitney Z. Bernstein (CA Bar No. 304917, *admitted pro hac vice*)
BIENERT KATZMAN LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
tbienert@bklwlaw.com
wbernstein@bklwlaw.com
*Attorneys for James Larkin*

Paul J. Cambria, Jr. (NY Bar No. 1430909, *admitted pro hac vice*)
Erin McCampbell (NY Bar. No 4480166, *admitted pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Additional counsel listed on next page

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al.*,<br><br>        Defendants. | Case No. 2:18-cr-00422-PHX-SMB<br><br>**DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE**<br><br>(Oral argument and evidentiary hearing requested) |

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

David Eisenberg (AZ Bar No. 017218)
DAVID EISENBERG PLC
3550 N. Central Ave., Suite 1155
Phoenix, Arizona 85012
Telephone: (602) 237-5076
Facsimile: (602) 314-6273
david@deisenbergplc.com
*Attorney for Andrew Padilla*

Joy Malby Bertrand (AZ Bar No. 024181)
JOY BERTRAND ESQ LLC
P.O. Box 2734
Scottsdale, Arizona 85252
Telephone: (602)374-5321
Facsimile: (480)361-4694
joy.bertrand@gmail.com
*Attorney for Joye Vaught*

# Table of Contents

I.    INTRODUCTION. ...........................................................................................1

II.   THE GOVERNMENT'S ACTIONS CAUSED A MISTRIAL AND HAVE
      LEFT DEFENDANTS IN AN UNTENABLE POSITION. ................................1

      A.   The government knew that impermissibly introducing evidence of child sex
           trafficking would trigger a motion for mistrial. ...................................1

      B.   Jury selection made clear that jurors who could fairly deliberate about
           prostitution *could not* be fair and impartial in deliberating about sex and child
           trafficking.........................................................................................3

      C.   The government used its opening to provoke a mistrial motion...................3

      D.   The government's case offered proof of none of the elements of the crimes
           charged and was faltering. ...................................................................4

      E.   The government goaded Defendants into moving for a mistrial with
           repeated, obvious, and calculated violations of this Court's clear rulings
           with each witness. ...............................................................................5

           1.   Brian Fichtner.................................................................................5

           2.   Jessika Svendgard ..........................................................................6

           3.   Nacole Svendgard ...........................................................................7

           4.   Expert witnesses ............................................................................7

      F.   The Court granted a mistrial. ................................................................10

      G.   The government's conduct, coupled with the government's overbroad asset
           freezes, puts Defendants in an untenable position. ................................11

III.  THE DOUBLE JEOPARDY CLAUSE REQUIRES DISMISSAL OF THE
      SUPERSEDING INDICTMENT WITH PREJUDICE. .................................12

IV.   THE COURT'S SUPERVISORY AUTHORITY ALLOWS DISMISSAL WITH
      PREJUDICE. ..............................................................................................17

           1.   The government's misconduct at trial warrants dismissal with
                prejudice. ....................................................................................18

           2.   The government's *Brady* violations warrant dismissal with prejudice.
                ..................................................................................................19

3. The government's now-admitted privilege invasions warrant dismissal. ..............................................................22

4. The government's privilege invasions were on top of a pattern and practice of violating the Court's orders and Defendants' privileges. ..............................................................24

B. The government's misconduct was flagrant. ....................................25

C. The Defendants suffered substantial prejudice. .............................26

V. THE DUE PROCESS CLAUSE PROVIDES ANOTHER BASIS FOR DISMISSAL WITH PREJUDICE. ..............................................................27

VI. CONCLUSION..............................................................29

TABLE OF CONTENTS

# Table of Authorities

Cases                                                                                                          Page(s)

*Arizona v. Washington*,
  434 U.S. 497 (1978).................................................................................................... 12, 13, 26

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
  868 F.3d 104 (2d Cir. 2017) ........................................................................................... 16

*Green v. United States,*
  355 U.S. 184 (1957)......................................................................................................12, 13

*Oregon v. Kennedy*,
  456 U.S. 667 (1982)................................................................................................ 13, 14, 15

*Tibbs v. Florida*,
  457 U.S. 31 (1982).......................................................................................................12, 16

*United Stated v. Kessler*,
  530 F.2d 1246 (5th Cir. 1976)............................................................................................ 15

*United States v. Aguilar*,
  831 F. Supp. 2d 1180 (C.D. Cal. 2011)................................................................. 18, 26, 27

*United States v. Bundy*,
  968 F.3d 1019 (9th Cir. 2020)........................................................................17, 22, 25, 26

*United States v. Chapman*,
  524 F.3d 1073 (9th Cir. 2008)......................................................................19, 20, 22, 26

*United States v. De Rosa*,
  783 F.2d 1401 (9th Cir. 1986)........................................................................................... 25

*United States v. Dinitz*,
  424 U.S. 600 (1976) .......................................................................................................... 13

*United States v. Gaytan*,
  115 F.3d 737 (9th Cir. 1997)........................................................................................12, 13

*United States v. Jorn*,
  400 U.S. 470 (1971).....................................................................................................12, 13

*United Stated v. Kessler,*

530 F.2d 1246 (5th Cir. 1976) ............................................................................. 15

*United States v. Kojayan,*

8 F.3d 1315 (9th Cir. 1993) .................................................................. 18, 27, 28, 29

*United States v. Lopez-Avila,*

678 F.3d 955 (9th Cir. 2012) ............................................................................ 17, 18

*United States v. Martin,*

561 F.2d 135 (8th Cir. 1977) ............................................................................ 14, 15

*United States v. Owen,*

580 F.2d 365 (9th Cir. 1978) ................................................................................. 17

*United States v Pederson*

2014 WL 3871197 (D. Or. Aug. 6, 2014) .............................................................. 25

*United States v. Sterba,*

22 F. Supp. 2d 1333 (M.D. Fl. 1998) .................................................................... 14

*United States v. Weems,*

49 F.3d 528 (9th Cir. 1995) .................................................................................. 12

*Valle Del Sol Inc. v. Whiting,*

709 F.3d 808 (9th Cir. 2013) ................................................................................ 16

**Statutes**

U.S. Const. Amend. V ............................................................................................ 12

**Rules**

Fed. R. Crim. Proc. 16 ..................................................................................... 20, 23

## I.     INTRODUCTION.

This case involves a pattern of repeated and brazen government misconduct, culminating in a mistrial.  It is time for the Court to address the government's serial misconduct and dismiss the indictment with prejudice.  There are three bases for dismissal: First, the Double Jeopardy Clause, triggered by the government's actions which caused the mistrial; Second, the Court's inherent supervisory powers, which give the Court discretion to fashion an appropriate remedy, including dismissal; Third, the Due Process Clause, triggered by the misconduct underlying the government's trial actions, pre-trial privilege invasions, and discovery abuses.  These are not the inadvertent acts of inexperienced prosecutors – this misconduct was committed by seasoned prosecutors, collectively with decades of experience.[1]  Each basis alone supports dismissal; in combination, the case for dismissal is even stronger.

## II.    THE GOVERNMENT'S ACTIONS CAUSED A MISTRIAL AND HAVE LEFT DEFENDANTS IN AN UNTENABLE POSITION.

### A.    The government knew that impermissibly introducing evidence of child sex trafficking would trigger a motion for mistrial.

This Court's pre-trial rulings on Defendants' motions *in limine* (*e.g.*, Docs. 908, 927, 928) set forth the following clear limits:

- **Third-party crimes:**  The government could present evidence of "the crimes of third parties" "*only*" "to the extent that they gave Defendants' notice that prostitutes were advertising on Backpage.com." "[T]he specific details of crimes committed by third parties are *irrelevant* to whether Defendants violated the Travel Act" . . . . and the Government *will not be allowed to introduce evidence* showing the details of the crimes."  (Doc. 1156 at 4-5 (emphasis added).)

- **Sex trafficking:**  The government could present evidence of sex trafficking to "prove Defendants were aware Backpage.com was being used to facilitate sex trafficking" by showing "notice to Defendants that the website was being used for illegal purposes," but, "[o]f course," *the government was not permitted to "linger on the details of the abuse sex trafficking victims suffered."*  (*Id.* at 3-4) (emphasis added).)

---

[1]     Kevin M. Rapp was admitted to practice in 1992.  Reginald E. Jones is a Senior Trial Attorney the Department of Justice, where he has been for 11 years.  Before that he was in private practice with a national law firm.

- **Backpage's reputation:**  The government could present evidence about Backpage's reputation only to show "Defendants' notice and prove Defendants' intent to facilitate an unlawful activity," but, "[o]f course, witnesses will not be allowed to offer *reputation testimony untethered* to communications with Backpage or Defendants as the reputation evidence, standing alone, *would not be relevant to the crimes charged and would be hearsay*."  (Doc. 1165 at 6 (emphasis added).)

- **Prostitution lifestyle:**  The government could present testimony from prostitutes about "how ads were created, drafted, edited, and paid for," but *not* "*testimony of their time as prostitutes*."  "Testimony from people involved in prostitution is *only* relevant as it relates to their use of Backpage.com and notice to Defendants that prostitutes were using their website. *Testimony concerning the lifestyle and impact that prostitution had on witnesses' lives is* **irrelevant** *to the crimes charged and may unduly prejudice Defendants.*"  (Doc. 1156 at 5-6, 18 (emphasis added).)

- **"Expert" testimony on sex trafficking:**  As modified by the Court at trial, the government could present one witness to testify about how law enforcement conducts trafficking investigations, with a focus on how investigations shifted from craigslist.com to backpage.com, and an explanation of terminology often used in trafficking and prostitution industry.  (Doc. 1081 at 17; *infra* at 8:8-11.)  This Court barred both sides from, inter alia, presenting expert testimony:  (a) "*about general sex trafficking patterns*;" (b) "*the role Backpage played in causing trauma to victims trafficked through its website*;" and (c) "*the benefits of shutting Backpage down or opinion testimony that the adult section of Backpage.com serves no legal purpose*."  (*Id.* at 18 (emphasis added).)

  - **Sharon W. Cooper, M.D.:**  The government was permitted to present an explanation of "certain terms unique to the vernacular of the prostitution and sex trafficking subculture."  (Doc. 1081 at 16; *infra* at 8:8-16.)

Moreover, this Court ruled that this case is *not* about promoting prostitution in general, nor is it about what Backpage did or did not do; rather, the case had to focus on what *each Defendant* purportedly did to intentionally further specific business enterprises' prostitution offenses in the *charged counts*.  This Court ruled that:

- "[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."  (Doc. 946 at 13.)

- "[T]his case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity."  (Exhibit N at 38.)

MOTION TO DISMISS WITH PREJUDICE

**B.** **Jury selection made clear that jurors who could fairly deliberate about prostitution *could not* be fair and impartial in deliberating about sex and child trafficking.**

To pick a jury in this case, the Court and the parties reviewed over 340 completed jury questionnaires. The questionnaires revealed that potential jurors were much less likely to be fair and objective if the trial involved sex trafficking and child sex trafficking than if it involved the consensual crime of prostitution. Responses during the three days of courtroom voir dire confirmed this. (Exhibit A at 33, 52-54, 67, 88, 142, 163, 214, 234; Exhibit B at 5; Exhibit C at 17-18, 122.) As neither sex trafficking nor child sex trafficking were charged in this case, the questionnaires and voir dire demonstrated the critical importance of keeping such irrelevant, unfairly prejudicial testimony away from the jury.

**C.** **The government used its opening to provoke a mistrial motion.**

In addition to the court's specific and clear pre-trial rulings on the scope of admissible evidence, when defense counsel received a copy of the visual presentation to accompany the government's opening, defense counsel became concerned that the government would not adhere to those rulings, as the presentation made clear that the government intended to focus its opening on trafficking. Thus, on the day the parties were scheduled to open, Defendants raised their concerns with the Court. The Court issued a warning, clarifying yet again, that the government counsel "aren't prohibited from using the word trafficking," but "do need to be careful that [the government's] whole opening is not focused on this idea that that's all that Backpage was about." (Exhibit D at 31.) The government said it "understood" (*id.*), but then ignored those rulings and, from the outset of trial, poisoned the jury during its opening by focusing on child sex trafficking, knowing the effect explosive, inadmissible, and prejudicial evidence involving child sex trafficking would have on the jury. (*See* Exhibit E.)

Predictably, and with no other option, Defendants were forced to move for an acquittal or, in the alternative, a mistrial, as the government's opening beat the drum of child sex trafficking and made repeated conclusory assertions about the alleged extent of child and sex trafficking purportedly found on the site (with no ability or intention to prove such contentions). (*See* Doc. 1272 at 1-2.) While denying Defendants' motion, the Court issued a prescient warning to the

3

government, noting that the motion "may have more merit if the government fails to support [its opening arguments] in their case in chief." (Exhibit F at 10.) Moreover, the litigation of this motion made it unmistakably clear to the government that Defendants would move for a mistrial if it continued to engage in such misconduct.

### D. The government's case offered proof of none of the elements of the crimes charged and was faltering.

The government's trial presentation was noticeably weak. Presumably starting with its strongest witness, the government opened with California law enforcement officer, Brian Fichtner. Fichtner took the jury through the website itself, with the goal of establishing that the ads on the site were all for prostitution. (Exhibit G at 56.) He failed woefully at that task, conceding that he knows of no officers making any arrests based solely on an ad posted to Backpage. (Exhibit J at 116-18.) Further, he conceded he could not tell if any of the ads he recorded in his video involved prostitution, because none of the ads included language of an offer of a sex act for money – a critical fact showing the ads were facially legal, thereby establishing Defendants' defense under the First Amendment. (Exhibit K at 56-86.) He also conceded, with respect to the fake ad he posted, that the ad did not offer sex for money. The ad was taken down as soon as it was reported to Backpage as an ad purportedly associated with prostitution. Backpage prohibited him from reposting the ad in any city after it was removed. (Ex. J at 107-109, 112-13.) In other words, Backpage's protocols for removing prostitution ads from the site worked. Fichtner also testified that, in his conversation with Carl Ferrer, Ferrer offered to remove the ad personally and appeared eager to learn how the officer detected the ad as being one for illegal services. Ferrer then provided Agent Fichtner with tools and resources on how to use the website for law enforcement investigations and prosecutions. (*Id.* at 107-13.).

As its second witness, the government called a woman who had been featured in advertisements on the website. But her ads are not among the 50 charged ads, and she had never spoken to any Defendant at all, let alone about her ads or the operation of the website. (Exhibit I at 19-21.) Moreover, she had no foundational knowledge as to the ads that purportedly featured her. She testified that, when the ads were created, they purposely included multiple lies to comply

with the website's terms of use.  (*Id.* at 21-38.)  The government then called her mother, who likewise provided no information about the 50 charged ads or any count in the Superseding Indictment.  (*Id.* at 54-76.)  Like many of the other witnesses on the government's lengthy witness list, their testimony was offered only to inflame the jury.

Finally, over the Defendants' objection, the government called a purported child sex trafficking expert, Dr. Sharon Cooper, even though there are no child sex trafficking charges.  The government elicited from Dr. Cooper long narratives that went well beyond the topics on which the Court permitted expert testimony.  Moreover, the government repeatedly elicited testimony from Dr. Cooper that was squarely prohibited by the Court's orders (Docs. 1081 and 1156), including:

- testimony that could only be construed as commentary about Backpage's reputation as the preferred site for child sex trafficking, "untethered to communications with Backpage or Defendants" (Doc. 1165 at 7) and thus not showing notice to any Defendant; and

- testimony that could only be interpreted as commentary on the benefits of shutting down Backpage (as well as also being reputational testimony untethered to communications with Backpage or Defendants), as Dr. Cooper testified that when she was with the National Center for Missing and Exploited Children ("NCMEC"), Backpage "became the most common, for at least ten years, site that we saw victims sold for sex by sex traffickers". (Exhibit L at 23-24.)

As the Court narrowed the scope of the testimony the government was permitted to elicit from its witness and as it became clear those witnesses could not help prove the elements of the Travel Act offenses—or, like Fichtner, actually undermined the government's case—the government elicited more and more testimony about child sex trafficking to intentionally goad Defendants into moving for a mistrial, to get a do-over to better present its case.

**E.    The government goaded Defendants into moving for a mistrial with repeated, obvious, and calculated violations of this Court's clear rulings with each witness.**

**1.    Brian Fichtner**

On direct examination, the government's first witness presented the jury with a video of the website at issue and testified that the ads on the website were for illegal prostitution services. (Ex. G at 56, 60-77.)   However, on cross examination days later, Agent Fichtner fell apart and

essentially conceded the lack of a crime by these Defendants.  He admitted that: (i) he did not even know his state's definition of the crime of prostitution (Ex. K at 67-68, 73-77); (ii) **he could not determine whether an ad was for prostitution on the face of an ad without more** (*Id.* at 68-69, 72, 79-85); and (iii) **he had never arrested anyone for promoting or soliciting prostitution based on an ad alone** (*Id.* at 94-95; Ex. J at 116-18).  Fichtner's devastating admissions on cross examination undermined the government's entire case.  Well aware that testimony about child sex trafficking would force a mistrial, the government played its 'do-over card' on its subsequent witness, eliciting inadmissible and inflammatory testimony regarding child sex trafficking.

**2.     Jessika Svendgard**

This Court significantly limited the scope of Jessika Svendgard's testimony prior to her taking the stand.  It reaffirmed that it had already ruled that "you [AUSA Rapp] can't go into the life of her while she was being trafficked." (Ex. G at 105.)  Government counsel assured the court that he would comply with this ruling and would not "tend to dwell on . . . the day-to-day life as being pimped out and trafficked."  (*Id.*)  This Court ruled that Ms. Svendgard could testify about being "trafficked by her pimp through Backpage and that she filed suit," but not about anything for which she had no foundational knowledge.  (Ex. I at 65, 67.)

Ms. Svendgard's testimony did not stay within the confines of what this Court said was permissible.  She testified repeatedly that she was trafficked at the hands of a pimp for "105 days" (*id.* at 80-82), and that she was raped (*id.* at 77).[2]  The government solicited testimony concerning her so-called "prostitution lifestyle," including details about an altercation, attempted escape, and hiding under a mattress at a hotel.  (*Id.*)  At a sidebar on defense counsel's objection, the government brazenly defended this questioning.  (*Id.*)  This Court reminded the government that it had already been "told . . . not to go into the life of a victim," and that the line of questioning at issue was "beyond" the limited topic of the details of how her ads were posted on Backpage.  (Ex.

---

[2]    The government not only elicited testimony that emphasized her 105 days of being trafficked and raped—on at least nine occasions, it did so by posing questions that repeated and emphasized her objectionable testimony.  (Ex. I at 80, 81, 82, 90; Ex. Ex. J at 14, 18, 19, 51.)  For example, immediately after Ms. Svendgard testified that she was raped, Mr. Rapp asked:  "In the *105 days* that you were with Mr. Hopson, how many times would that [being raped] happen, Jessika?"  (Ex. I at 82.)

1    I at 77.)  This Court warned government counsel to "be very careful" (*id.* at 78), reminding the

2    government that "these details are violating my order that you not go into the sort of details of her

3    life as a prostitute" (*id.* at 79).

4         But the government persisted.  Defense counsel objected more than 27 times.  After the

5    irrelevant, inflammatory, and prejudicial testimony was heard by the jury, this Court repeatedly

6    sustained objections to (a) questions and answers that violated this Court's clear orders on the

7    limits of her testimony or (b) testimony for which there was no foundation.  (*Id.* at 74, 77, 80-81,

8    82, 83, 84, 84-85, 85, 86, 87, 88); Ex. J at 16, 52.)

9              **3.    Nacole Svendgard**

10        This Court recognized that much of Nacole Svendgard's testimony would be "irrelevant

11   and hearsay" (Ex. I at 14) and that she could testify only: that her daughter was trafficked on

12   Backpage, but could not discuss the prosecution of her daughter's pimp; about her meetings with

13   elected officials and why she had them, but not the substance of the meetings; that she appeared

14   before Congress, and about her purported encounter with Lacey, but not about the substance of

15   her Congressional testimony.  (*Id.* at 14-15.)  But, in contravention to the boundaries this Court

16   placed on Mrs. Svendgard's testimony, the government repeatedly asked about the prosecution of

17   Baruti Hopson (Ex. J at 56-58), an amicus brief filed in the civil litigation (*Id.* at 61), and a course

18   she taught for parents on trafficking (*Id.* at 77).  Defendants repeatedly objected to the solicitation

19   of evidence that fell outside the scope of the limitations this Court set earlier that day.  (*Id.* at 55-

20   58, 60-61, 65-67.)

21             **4.    Expert witnesses**

22        Agent Fichtner resumed testifying after Mrs. Svendgard.  His admissions on cross

23   examination completely undermined the government's position that the jury could conclude that

24   racy adult ads that did not expressly solicit sex for money were ads for illegal prostitution on their

25   face.  With its central argument crumbling, the government knew exactly how to get a do-over of

26   its case: focus on child sex trafficking, and Defendants will move for a mistrial.  So, as its fourth

27   witness, the government called Dr. Sharon Cooper, a self-proclaimed "developmental and forensic

28   *pediatrician*." (Ex. L at 5, 8-25 (emphasis added).)

1    Previously, the government discussed its intention to present purported sex trafficking

2  expert Christina DeCoufle.  At that time, the government reassured this Court several times that

3  the government did not "intend to focus on child sex trafficking *at all*," and that, although this

4  particular expert had experience with victims of such conduct, the government could "phrase her

5  testimony in a way that does not highlight children and she can talk about sex trafficking, human

6  trafficking and prostitution as a whole."  (Ex. G at 111-12 (emphasis added).)  This Court ruled

7  that the witness could "talk about [her] investigation[s] *without talking about child sex

8  trafficking*" (*id.* at 112 (emphasis added)) and ordered the government to "direct her to do so"

9  (*id.*).  Further, this Court modified its prior order (Doc. 1081) and precluded the government from

10  soliciting testimony about "the relationship between traffickers and pimps and their victims

11  including the common methods a sex trafficker uses to maintain control over a victim" as not

12  relevant.  (Ex. L at 114.)

13    Although Ms. DeCoufle never testified before this Court declared a mistrial, Dr. Cooper

14  did.  Defendants moved to preclude her testimony (Doc. 1300), and this Court denied the motion,

15  ruling that the government could solicit testimony from her on the vernacular affiliated with

16  prostitution.  (Ex. K at 10-11.)

17    But as soon as Dr. Cooper took the stand, the clear focus of her testimony was the online

18  sexual exploitation of children.  Defense counsel objected.  (Ex. L at 8-10.)  At a sidebar, this Court

19  clarified that the government could not go into the "relationship between traffickers and pimps

20  and that whole psychology," but could solicit testimony about how "sex trafficking occurs on the

21  internet."  (*Id.* at 10.)  After this ruling, Dr. Cooper continued to testify about child sex trafficking,

22  with the government eliciting this narrative testimony through what often were open-ended

23  questions that did not preview the objectionable testimony to come—preventing the defense from

24  objecting before the jury heard the objectionable testimony.  For example, in discussing her

25  credentials, Dr. Cooper repeatedly detailed her experience with victims of child sex trafficking as

26  the basis for her expert opinions.  (*Id.* at 5, 8-25.)  Over the course of her inflammatory testimony,

27  Defendants objected more than 50 times.  The Court, too, attempted to keep the witness on topic.

28  (*Id.* at 19; 20 (asking the government whether the question at issue had anything to do with "ads").)

MOTION TO DISMISS WITH PREJUDICE

At one of many sidebars, defense counsel objected to her testimony under Rules 702, 401, and 403.  (Ex. L at 26.)  Further, defense counsel moved for a mistrial, asserting that:

> [T]he entire direct was geared toward saying children, children, children, children, children.  That's all we heard about.  I did this with children.  I did that, I this, they can't consent, they can't this, that.  I move for a mistrial.  I think that we are absolutely prejudiced at this point.  These people think that this is a children case, and in—at the very minimum, this Court should instruct the jury that . . . .  There is no charge of trafficking children.  There is no charge of children prostitution.  There are none of those crimes if you will.  And these jurors are being led to believe that this is all about children.  And that's all she is talking about.  And you can tell she's a professional witness.  She's got all the, you know, the long narratives.  Any kind of question she just goes on, and on, and on, and on, and I just think you have to stop it, Your Honor, and I think we are prejudiced irretrievably.

(*Id.* at 26-27.)

The Court did not rule on the mistrial motion and instead told the government to "move on" from the topics at issue, cautioning the government that it was getting "close to a 403 violation."  (*Id.* at 28.)  Further, the Court explained that using the phrase "sex trafficking" was acceptable but that the government and its witnesses must "stay away from the child sex trafficking."  (*Id.* at 29.)  The Court warned government counsel to "be careful" and "direct your witness a little bit, because she could very well go off on a tangent into something."  (*Id.*)

The government ignored the Court's warnings and marched ahead, soliciting testimony that fell outside the scope of the topics permitted by this Court.  (Ex. L at 32, 33, 35, 36, 37, 40, 52, 53.)  Astoundingly, the government repeatedly asked questions about the relationships between traffickers and those they traffic – *a topic this Court clearly precluded*.  (*See, e.g.*, *id.* at 46 (striking answer), 48 (sustaining objection to testimony about prostitutes viewing themselves as married to their pimps).)  In further violation of the Court's rulings, the government intentionally pressed forward, eliciting testimony about the so-called "prostitution lifestyle."  (*Id.* at 48 (discussing STDs).)  Equally as troubling, Dr. Cooper was asked about and opined on the ultimate issues the jury must determine.  (*Id.* at 41 ("[W]hen we see it in writing, for example, on an online classified ad, *we know right away that this is going to be the selling of a person for sex*."); 44 (When the term "100 percent independent is cited on a classified ad, it is for the purpose of *promoting*

the buyer to believe that *this is prostitution*." (emphasis added)).)

Predictably, and without any other option, the defense renewed the motion for a mistrial based on Dr. Cooper's outrageous testimony.  (Ex. L at 66-67.)  Defense counsel explained that the prejudicial testimony was "snowballing," in that "[e]very single time the government continues to beat the drum of child sex trafficking, the prejudicial effect and the difficulty that – the jurors would have to objectively evaluate the evidence gets tougher and tougher."  *Id.* at 67-68.  Moreover, of all the testimony presented, there was "no connection of anything to any defendant or any ad in the indictment."  *Id.* at 68.

This Court indicated that it had "concerns that the government has crossed that line several times even after at sidebar I warned you not to do it."  (*Id.* at 74.)  Further, this Court had "concerns that the testimony elicited from the victim [Svendgard] went beyond what it should have," a problem that was compounded by the fact that "the testimony of Dr. Cooper" also "went well beyond what we had talked about prior to her testifying."  (*Id.*)

### F.     The Court granted a mistrial.

The following day, this Court granted the motion for mistrial.  This Court recognized that, while it had given the government some "leeway," from the "opening and with every witness thereafter," the government "abused that leeway."  (Exhibit M at 4.)   Observing that "[t]he government, as prosecutors are held to a higher standard, and their goal is not to win at any cost, but to win by the rules," (*id.* at 4) the Court identified several instances of the government's blatant disregard for its rulings:

- "[J]ust after we had a discussion about the expert Christina DeCoufle" the government "agreed to minimize the focus on child sex trafficking and refer to the more general sex trafficking.  *Mr. Jones then proceeded to question Dr. Cooper solely on child sex trafficking*."

- "In addition to Dr. Cooper just *emphasizing child sex trafficking above everything else*, she talked about the overwhelming majority of victims being trafficked . . . on Backpage, which although may be true, is similar to the reputation evidence that we talked about prior to trial, which I said would be allowed as long as it was tethered to some communication with the defendants, and that *was not tethered to any communication with the defendants*."

- "There was an order that the government stay away from the day in the life of a prostitute or victim.  With Jessika Svendgard, *the government solicited answers that went into the abuse by her trafficker*."

- "Also, with Jessika Svendgard, *the government emphasized the 105 days over, and over, and over again*.  She also talked about being *raped* more than once, which raises a whole new emotional response from people."

- "[T]here were other witnesses that also talked about the reputation of Backpage *untethered from communications with the defendants*."

(Ex. M at 4-5 (emphasis added).)  These examples of the government's failures to comply with the Court's orders cannot be viewed in isolation, because they came *after* the government's opening statement which, by itself, came "close to causing a mistrial" due to the government's disregard of the Court's orders.  (*Id.* at 5.)

This Court then brought in the jury – the product of substantial resources, careful analysis, and a months-long effort deployed by the Court and the parties both before and during trial – and released the members of the jury from their service.

### G.    The government's conduct, coupled with the government's overbroad asset freezes, puts Defendants in an untenable position.

Defendants cannot withstand the expense and insecurity of retrial, as the government well knows.  At the outset of this case, the government seized virtually all of Defendants' assets.  When that did not choke the life out of the defense, the government then seized about $16 million from attorney retainer accounts, including from prominent national firms like Davis Wright Tremaine and Perkins Coie, causing Defendants Andrew Padilla and Joye Vaught to lose their counsel of choice and depriving the remaining Defendants of most of the funds that had been set aside for their defense.  *See, e.g.*, Exhibit P. Another particularly egregious restraint includes the seizure of about $400,000 held in an account that received only loan payments, rent, and the like tied to Lacey, Larkin, Brunst, and Spear's seller-financed sale of numerous newspaper businesses (notably, *The Village Voice*).  (*Id.*)  The government inexplicably has referred to the account in question as a "pass-through" account, without any evidence.  *Id.*  Defendants have been forced to try to defend themselves with their remaining assets, in a novel and unprecedented prosecution that now has

spanned three-and-a-half years.  Defendants now have incurred enormous trial costs, which cannot be recouped and most of which will be duplicated in a retrial.  These wasted expenditures have further diminished Defendants' already depleted assets.

Moreover, Defendants, several of whom are elderly and have health issues, have lived under the cloud of an indictment since April 2018, causing strain on them and their relationships and impacting their ability to provide for themselves, their health, and their stability.  The Superseding Indictment subjects Defendants – who came to the trial expecting the government would fail to establish a single violation of law – to continuing embarrassment, expense, and ordeal.

## III.   THE DOUBLE JEOPARDY CLAUSE REQUIRES DISMISSAL OF THE SUPERSEDING INDICTMENT WITH PREJUDICE.

The Double Jeopardy Clause protects against multiple criminal prosecutions for the same offense.  *See* U.S. Const. Amend. V.  The protections of the Clause attach once a jury is empaneled and sworn.  *See United States v. Jorn*, 400 U.S. 470, 479 (1971) (plurality opinion).[3]  At that point, the defendant has the right to have his or her case presented to and decided by that jury.  *See United States v. Gaytan*, 115 F.3d 737, 742 (9th Cir. 1997) (citing *Arizona v. Washington*, 434 U.S. 497, 503 (1978)).  "[A]s a general rule, the prosecutor is entitled to *one*, and *only one*, opportunity to require an accused to stand trial."  *Arizona*, 434 U.S. at 505 (emphasis added).  The core of the double jeopardy's prohibition on multiple prosecutions "is denying the prosecution a second opportunity to supply evidence which it failed to muster in the first proceeding."  *United States v. Weems*, 49 F.3d 528, 531 (9th Cir. 1995) (*citing Tibbs v. Florida*, 457 U.S. 31 (1982)).  Moreover, multiple trials "enhanc[e] the possibility that even though innocent [a defendant] may be found guilty."  *Gaytan*, 115 F.3d at 742 (quoting *Green v. United States,* 355 U.S. 184, 187 (1957)) (alterations in original).

The Double Jeopardy Clause prevents prosecutors from depriving a criminal defendant of the right to have his or her guilt or innocence determined in a single trial.  The underlying and "deeply ingrained" policy served by this Clause is that the Federal Government, with "all its resources and power, should not be allowed to make repeated attempts to convict an individual for an alleged offense."  *See Green,* 355 U.S. at 187.  As the Supreme Court observed, "[a] power in

---

[3]      Unless otherwise noted, internal citations and quotation marks have been omitted in all citations.

government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial." *Jorn,* 400 U.S. at 479.  When prosecutors force a trial to reset once it has begun, a criminal defendant is unconstitutionally subjected to "embarrassment, expense and ordeal," compelled to "live in a continuing state of anxiety and insecurity," and exposed to an enhanced possibility that "even though innocent he may be found guilty." *Green,* 355 U.S. at 187-188.

When a trial terminates prior to verdict, the circumstances of the termination determine whether retrial is barred by the Double Jeopardy Clause.  Ordinarily, the Clause does not prevent retrial when the defendant moves for a mistrial.  *See Oregon v. Kennedy*, 456 U.S. 667, 673 (1982) (plurality opinion).  There is a well-established exception from this rule, however, if a mistrial results from government misconduct.  *See id.*  The Supreme Court has made clear that, if the prosecution engages in bad-faith tactics to bait the defendant into moving for a mistrial, the Double Jeopardy Clause bars the government from retrial.  *See id.* (recognizing that retrial is barred when the "government conduct in question is intended to goad the defendant into moving for a mistrial"); *United States v. Dinitz*, 424 U.S. 600, 611 (1976) (indicating that retrial is barred when the underlying error at issue was "motivated by bad faith or undertaken to harass or prejudice" the defendant); *Jorn*, 400 U.S. at 485 (indicating that "prosecutorial . . . overreach" provides a basis for barring retrial under the Double Jeopardy Clause).

This protection for defendants from bad-faith prosecutorial tactics is important because, when a trial is terminated before verdict, "a second prosecution may be grossly unfair." *Arizona*, 434 U.S. at 504.  A retrial "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." *Id.*  This "danger of unfairness to the defendant exists whenever a trial is aborted before it is completed." *Id.*; *see also Green*, 355 U.S. at 187 (Multiple trials "enhance the possibility that even an innocent [defendant] may be found guilty.").  Defendants should not "be required to live in a continuing state of anxiety and insecurity, without a definite resolution of the criminal charges against them." *Gaytan*, 115 F.3d at 742 (*citing Dinitz*, 424 U.S. at 606)); *see also Kennedy*, 456 U.S. at 676-77 (recognizing that the Clause secures a

1    defendant the "freedom from extended anxiety, and the necessity to confront the government's

2    case only once").

3        To determine whether the prosecutor goaded the defendant into moving for a mistrial,

4    courts must review the objective facts and circumstances of the case. *See Kennedy*, 456 U.S. at 675

5    (plurality opinion) (explaining that courts can "infer[] the existence or nonexistence of intent from

6    objective facts and circumstances"); *id.* at 679-80 (Powell, J., concurring) ("Because subjective

7    intent often may be unknowable, I emphasize that a court – in considering a double jeopardy

8    motion – should rely primarily upon the objective facts and circumstances of a particular case.").

9    For example, courts have even found goading where the government engaged in a course of

10   secretive conduct, as the government's intent could objectively be inferred from the circumstances.

11   *See United States v. Sterba*, 22 F. Supp. 2d 1333, 1343 (M.D. Fl. 1998).  Notably, Justice Powell

12   recognized that a "***sequence of overreaching***" by the prosecution is objective proof of the

13   prosecution's intent to goad the defense into a mistrial.  *See Kennedy*, 456 U.S. at 680 (Powell., J.,

14   concurring) (emphasis added).  Further, the government engages in "prosecutorial overreaching"

15   when the government puts "irrelevant and highly prejudicial material" before the jury.  *United States*

16   *v. Martin*, 561 F.2d 135, 139-40 (8th Cir. 1977).  Under those circumstances, the intent to provoke

17   a mistrial is inferred from the conduct of the government's attorneys.  *See id.*

18       The objective facts and circumstances of this prosecution show the government

19   intentionally goaded Defendants into moving for a mistrial.  This is not a case of isolated or

20   occasional misconduct by the government.  Instead, a seasoned prosecutorial team (*see supra* at 1

21   n.1) repeatedly and plainly violated this Court's pretrial orders and trial rulings.  The government

22   repeatedly ignored the Court's orders and warnings, and presented evidence of child sex trafficking,

23   the repeated rape of teenagers, and the trauma that victims purportedly suffered—all untethered

24   to Defendants or a single charge against them.  Mistrial was the natural and foreseeable

25   consequence of the government's course of conduct.  That conduct has Constitutional

26   implications.  To hold otherwise, would allow "a prosecutor [to] have the option of first trying his

27   case with inadmissible, prejudicial, and irrelevant evidence—that is, committing known error—in

28   hopes of 'getting away' with it, with the ability to retry the case properly if the first trial is aborted

MOTION TO DISMISS WITH PREJUDICE

by a mistrial." *United Stated v. Kessler*, 530 F.2d 1246, 1253 (5th Cir. 1976).  Indeed, the repeated and contemptuous violations of this Court's rulings constitutes the very "sequence of overreaching" by the prosecution that Justice Powell recognized as objective proof of the prosecution's intent to goad the defense into moving for a mistrial.  *See Kennedy*, 456 U.S. at 680 (Powell., J., concurring).

First, the prosecution did not need to speculate as to whether Defendants would move for a mistrial (and whether the Court would grant such a motion).  There could not be a stronger record of Defendants putting the government on notice of what would provoke a mistrial motion than in this case—or of a court warning the prosecution about the risk of a mistrial motion being granted.  That notice came from the Defendants' pre-trial motions, the Court's pre-trial rulings, the defense's objections during trial, and the Court's rulings and warnings directed toward the government during trial.  Defendants' position, and the Court's rulings, were unmistakable.

Second, mistrial was the natural and foreseeable consequence of the government's pattern of misconduct.  No attorney disobeys a court dozens of times at trial by "mistake"—much less a seasoned prosecutorial team (*see supra* at 1 n.1).  Critically, courts have found the intent to goad the defense into a mistrial based on the government putting "irrelevant and highly prejudicial material" before the jury, even with misconduct much less egregious than the government's misconduct here.  *See Martin*, 561 F.2d at 139-40 (reversing conviction under the Double Jeopardy Clause).  Here, rather than attempt to prove its charges, the government instead sought to infect the trial with nothing but "irrelevant and highly prejudicial material" during its opening and with the testimony of *each* witness.  The government, undeterred by the more than 100 objections in five days and the Court's repeated direction to the government to stop, would return from a sidebar and simply press forward, as if the sidebar never happened.  An isolated act of misconduct may tend to show the government simply made a mistake.  Repeated, bald violations of Court rulings can support only a finding that the government intended to provoke a mistrial.

Third, the government's case was failing *on the merits*.  Based on their questionnaire responses and voir dire, the seated jurors were troubled about child sex trafficking—for which there are no charges—but much less so about prostitution.  (Ex. A at 33, 52-54, 67, 88, 142, 163,

214, 234; Ex. C at 17-18, 122.)  That is why the government infected the case with the former, ignoring the latter.  The government never wanted to make this case about the actual charges in the indictment – it even objected to the defense's statement in opening argument that the government had to meet its burden of proving specific intent as to each charged ad by showing beyond a reasonable doubt that each Defendant had actual knowledge of the charged ads.[4]  (Ex. G at 25.)  Not a single government witness connected any Defendant to any of the charged ads. In fact, Agent Fichtner testified that the ads posted on Backpage did not, on their face, call for unlawful transactions but could indeed relate to legal escort, stripper, and other adult services.  As such, the publication of those ads was  presumptively protected by the First Amendment.[5]  His testimony demonstrated why the government could not obtain a conviction of the charged offenses based on admissible evidence.

Indeed, each day, the government presented ***zero*** evidence to establish the charged offenses.  Seeing the writing on the wall, the government deliberately injected the trial with evidence of sex trafficking and child trafficking, including irrelevant, heart-rending stories of rape and abuse of teenage girls – evidence it knew would force Defendants to move for a mistrial and thereby enable the government to regroup and try again.  Not only would a new trial allow the government a retooling of its faltering case, but, like any second prosecution, the government also would have an opportunity to reshape its case in the wake of this Court's various trial rulings and Defendants' opening statements, and to rehearse its revised presentation of proof, thereby increasing the government's chances of obtaining a conviction.  *See, e.g., Tibbs*, 457 U.S. at 41 (noting that the Double Jeopardy Clause "prevents the State from honing its trial strategies and

---

[4]     The government objected that counsel's statements on the grounds:  "argumentative and misstates the law."  The Court sustained the objection, without stating which objection was sustained.  (Ex. G at 25.)

[5]     *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 114 (2d Cir. 2017) ("[T]he First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would necessarily constitute an illegal act. However, if, as here, there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech.") (emphasis in original) (citing *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 822 (9th Cir. 2013)); *accord* Doc. 1222-2.

MOTION TO DISMISS WITH PREJUDICE

perfecting its evidence through successive attempts at conviction").  Mistrial was the natural and foreseeable result of the government's conduct.  The government's repeated violations of this Court's orders were too frequent and too brazen to be swept aside, as if they were inadvertent mistakes.  Five seasoned prosecutors obviously knew that their violations of this Court's orders would leave Defendants no choice but to move for a mistrial.  Having provoked a mistrial by willfully and repeatedly ignoring this Court's rulings, the government should not be afforded a second bite at the apple.

## IV.   THE COURT'S SUPERVISORY AUTHORITY ALLOWS DISMISSAL WITH PREJUDICE.

A Court may dismiss an indictment under its supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (affirming dismissal with prejudice where government violated its *Brady* obligations); *see United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) ("Under its inherent supervisory powers, a federal court is empowered to dismiss an indictment on the basis of governmental misconduct. As such, dismissal is used as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature.").  "The remedy of dismissal with prejudice, which is strong medicine for the entire prosecutorial group, is available pursuant to a district court's supervisory powers over the attorneys who practice before it." *United States v. Lopez-Avila*, 678 F.3d 955, 965-66 (9th Cir. 2012).

A court can exercise this remedy "even if the conduct does not rise to the level of a due process violation." *Bundy*, 968 F.3d at 1030.  Under a court's supervisory powers, an indictment can be dismissed with prejudice "for prosecutorial misconduct only if there is (1) flagrant misbehavior and (2) substantial prejudice." *Id.* at 1031.  Here, the Court should exercise its supervisory powers to dismiss the case based on the government's (1) misconduct, as detailed above and below, (2) concealment of discovery materials from the Western District of Washington investigation, and (3) privilege invasions in blatant violation of Judge Logan's court orders, coupled with its contemporaneous concealment from Judge Logan and the defense of these on-going

1    invasions.

2         *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1182 (C.D. Cal. 2011) is instructive.  There,

3    although the court denied several motions to dismiss and readily admitted that "most district judges

4    are reluctant" to grant motions that "allege governmental misconduct," the cumulative effect of

5    the government's conduct over the course of the entire case was too severe for the court to

6    overlook.  There, as is the case here, the government obtained privileged communications between

7    a defendant and counsel and also made an incomplete disclosure of certain *Brady* material.  *Id.* at

8    1191-94.  Under its supervisory powers, the court found that "overall the Government's conduct

9    was improper" and, therefore, vacated defendants' convictions and dismissed the indictment.  *Id.*

10   at 1206.  The Court's supervisory powers are likewise implicated here.

11           **1.       The government's misconduct at trial warrants dismissal with
                         prejudice.**

12

13        A court's use of its supervisory powers to dismiss charges is a critical tool to ensure that

14   prosecutors play by the rules.  *United States v. Kojayan*, 8 F.3d 1315, 1323-24 (9th Cir. 1993) ("The

15   prosecutor's job isn't just to win, but to win fairly, staying well within the rules"; the government's

16   actions did not "inspire our confidence that this kind of thing won't happen again.").  In *Lopez-*

17   *Avila*, 678 F.3d at 958-961, the prosecutor misquoted impeachment material, resulting in a mistrial.

18   The Ninth Circuit remanded, inviting the district court to consider the remedies of dismissal with

19   prejudice and/or disciplining the prosecutor.  *Id.* at 965.  On remand, District Judge Jorgenson

20   dismissed the indictment with prejudice, finding that dismissal was necessary to deter such conduct

21   from occurring again in the future:

22           The question now is not whether AUSA Albert will ever engage in the same
             conduct again, but rather what is the U.S. Attorney's office doing to ensure
23           that *none* of their attorneys will do so . . . .  At this juncture, in light of the
             Ninth Circuit Court of Appeal's clear directive, this case is not simply about
24           the mistake of one AUSA, but rather the prosecuting office as a whole.

25   *See* Exhibit O at 7 (*U.S. v. Lopez Avila*, Case No. 4:10-cr-00035-CKJ-HCE, D. Ariz., Dismissal

26   Order) (emphasis in original).

27        Here, the government repeatedly elicited testimony about sex trafficking, child trafficking,

28   and rape despite the Court's pre-trial rulings and the many times during trial where the Court made

---

18

MOTION TO DISMISS WITH PREJUDICE

clear that the government was crossing the line.  In response to Defendants' initial motion for mistrial, which this Court nearly granted, the government did not back off or show remorse, but instead doubled down, crossing the line again and again, despite the Court's repeated warnings. Responding to the mistrial motion the Court ultimately granted, the government argued that "[t]his is a specific intent crime" and Dr. Cooper "never commented on the six defendants' mental state." (Ex. L at 72-73).  Its response only served to demonstrate that the evidence was irrelevant to proving specific intent of the Defendants and was merely being offered to inflame the jury.  *Id.* None of the government's witnesses ever testified about the 50 charged ads, any knowledge by any of the six Defendants about any of those 50 ads or any business enterprises related to them, or any actions by any of the six Defendants related to those 50 ads or any business enterprises related to them.  *Id.*  Under these circumstances, as the Ninth Circuit has made clear, this Court is compelled to consider what remedy is necessary to punish and deter such misconduct.  Ordering a mistrial, without more, unfairly prejudices the Defendants more than the government.

## 2.    The government's *Brady* violations warrant dismissal with prejudice.

A court may dismiss an indictment with prejudice to the extent the government impermissibly withholds discoverable materials.  *See United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008).  In *Chapman*, the government had produced hundreds of thousands of pages of discovery, repeatedly representing it was complying with its obligations.  But as the case progressed, "hints of discovery violations" surfaced.  *Id.* at 1078.  When pressed by the Court for proof of compliance, the government said it would produce additional copies of discovery in an "abundance of caution."  *Id.* at 1078-79.  That additional production demonstrated that, despite the government's representations, there had not been complete discovery.  The district court deemed the government's conduct "unconscionable" and dismissed the indictment with prejudice.  *Id.* at 1080.  The Ninth Circuit affirmed, holding that the district court had properly exercised its supervisory powers.  *Id.* at 1084-85 (noting that "[t]he AUSA repeatedly represented to the court that he had fully complied with *Brady* and *Giglio,* when he knew full well that he could not verify these claims.").

Here, the government's discovery violations are akin to those in *Chapman*.  The government

inexplicably claims that the underlying, non-privileged factual materials from an investigation in which another U.S. Attorney's Office declined to prosecute Backpage are irrelevant and do not constitute *Brady* or Rule 16 material because it has unilaterally decided that this non-prosecution was misguided.  Doc. 1328 at 3.  But the government does not dispute that (a) the prior investigation covered the same time period that much of the government's anticipated trial presentation in this case (as previewed in its opening statement and the indictment) and (b) based on a review of that evidence, the government declined to prosecute Backpage and the Defendants. Clearly the defense is entitled to review all of that same factual material, including obviously any material, relevant, impeaching, or exculpatory evidence.  *See* Fed. R. Crim. Proc. 16(a)(1)(E)(i) (upon a demand by the defense, the government must produce information that "is material to preparing the defense"); *United States v. Bagley,* 473 U.S. 667, 676 (1985) (defense is entitled to all evidence that "is favorable to the accused" or may be "material either to guilt or punishment," including "impeachment evidence.").  Defendants have specifically demanded this evidence *ad nauseum* throughout the case, and the government has continuously refused to produce the materials.  (Doc. 1281 at Ex. G; 1283 at Ex. A-F; 1284 at Ex. H-J.)  The government may not assume the conclusion it must prove—that Defendants were acting criminally—to justify withholding discovery that undermines this unproven conclusion—that DOJ investigated and found the opposite—by claiming that later-gathered evidence would have changed DOJ's prior conclusion.  (Doc. 1326 at 10.)

    Further, as was the case in *Chapman*, conspicuously absent from the government's filings on this issue is any kind of verification that it has turned over all non-privileged materials from the DOJ's earlier investigation.  For example, one news outlet reported:

> The seizure of Backpage also made it more difficult for law enforcement to find and help actual victims of trafficking. In memos published by Reason, two assistant U.S. attorneys for the Western District of Washington wrote that Backpage was "remarkably responsive to law enforcement requests and often takes proactive steps to assist in investigations," and FBI Agent Steve Vienneau called the company "very cooperative at removing these advertisements at law enforcement's request."[6]

---

[6]    *See* https://www.vice.com/en/article/5dbvdb/mistrial-backpage-case-lacey-larkin; *see also*

Another news outlet reported that, in connection with the W.D.W.A. investigation, the government "reviewed more than 100,000 documents and interviewed more than a dozen witnesses . . .  but failed to find a smoking gun," noting that the memos stated "'[i]t was also anticipated that we would find numerous instances where Backpage learned that a site user was a juvenile prostitute and Backpage callously continued to post advertisements for her.  To date, the investigation has revealed neither.'"[7]

Yet the government has never confirmed that it has produced all non-privileged materials from the W.D.W.A. investigation regarding Backpage's cooperation with law enforcement, let alone the more than 100,000 documents it apparently reviewed and the summaries/notes of the more than dozen witness interviews it conducted.   And in the nine pages of material the government produced for Vienneau (the lead agent on the W.D.W.A. investigation and also a government witness in *this case*), there is not a hint of any of his factual conclusions, only the euphemism that "[w]riter requests this case be closed due to investigative priorities and lack of available resources to address this matter."  (Exhibit R (filed under seal).)

Significantly, the government also has ***admitted*** to withholding a non-privileged legal opinion from Arnold & Porter, an international law firm, concluding that a prospective purchaser of Backpage would have no criminal exposure based on adult advertising on Backpage.  Why did the government withhold this?  Prosecutors unilaterally concluded that the opinion was based on a "flawed legal analysis."  Doc. 1328 at 13 n.7.  As the prospective purchaser explained before the W.D.W.A. grand jury (that did not return any indictment), Arnold & Porter reportedly opined that "there would not be . . . criminal liability" from adult advertising if the buyer were to purchase and operate Backpage.  (Exhibit Q at 110:19-113:22 (filed under seal).)  Defendants are only aware of this specific material, exculpatory, and impeaching document because the Arnold & Porter e-mail was used as an exhibit during the prospective buyer's grand jury testimony.  *Id.*  The government produced the transcript but refuses to produce the email with the legal opinion.  This is precisely

---

*https://gizmodo.com/as-trial-for-backpages-founders-begins-their-free-spee-1847645022*.

[7]    *See https://www.thedailybeast.com/backpagecom-founders-michael-lacey-and-james-larkin-go-on-trial-over-sex-worker-ads*.

the type of relevant, exculpatory information to which the defense is entitled and that would have informed its defense of the case. *See Chapman*, 524 F.3d at 1083 ("One attorney noted that she would have opened the case differently had she known about the impeaching information."); *Bundy*, 968 F.3d at 1041 ("Someone in the government made a conscious choice to withhold these documents. It may not have been a malicious choice, but it also was not a matter of simple oversight. At best, the government failed to appreciate the relevance of the evidence. At worst, it sought to handicap the defendants by withholding evidence directly relevant to mens rea. In either circumstance, the government fell well short of its obligations to work toward fairly and faithfully dispensing justice rather than simply notching another win."). These clear discovery violations necessitate dismissal. *See Bundy*, 968 F.3d at 1019 ("The district court concluded that dismissal with prejudice was appropriate because the government withheld key evidence favorable to the defense until after trial was underway—in clear violation of its duties under *Brady*—and dismissing without prejudice would allow the government to cure its mistakes, to the detriment of the defendants.").

At a minimum, the Court should (a) review *in camera* the underlying memos from the W.D.W.A. investigation to determine the accuracy of the government's claims that it has "searched its files for any additional factual material" related to that investigation (Doc. 1328 at 3) and to determine whether all relevant materials were produced to Defendants; (b) require the government to "verify [its] claims" about whether it made all disclosures required from its prior investigation (as opposed to merely accepting the government's facially dubious claims about the completeness of its production);[8] and (c) afford Defendants an opportunity to rebut those claims at an evidentiary hearing. *Chapman*, 524 F.3d at 1085.

### 3. The government's now-admitted privilege invasions warrant dismissal.

The government's admission that it questioned Ferrer regarding subjects that "on their face" appear to be privileged leaves no doubt that the government was playing fast and loose with

---

[8]     Indeed, the limited materials from the W.D.W.A. investigation that have been produced by the government were largely produced after repeated demands by the defense; some of those materials were produced on the eve of trial. (Doc. 1328 at 3 n.2.)

Defendants' attorney-client privilege protections.  (*See* Doc. 1234 at 1; Doc. 942 at 6-7; Doc. 1022 at 3-4 (identifying 19 separate privilege invasions).)  The government tried to keep the Ferrer memos from Defendants for as long as possible, likely to keep their privilege invasion from Defendants for as long as possible.[9]  The government vigorously denied the existence of any privilege over communications with counsel regarding First Amendment and CDA protections:

> *[T]hese statements cannot be privileged because they have not remained confidential.* Even if Defendants hadn't publicly asserted the same legal theories in scores of cases throughout the country over the last decade, Defendants revealed these theories in this case in their earliest filings. (*See, e.g.,* Docs. 23 and 26.)  *Simply put, it was no secret that Defendants would rely on First Amendment, mens rea, and CDA arguments to defend their operation of a website* whose revenue-generating business model was overwhelmingly based on advertising the sale of adults and children for sex.

(Doc. 998 at 1 (emphasis added).) Then, on the eve of trial, the government argued that Defendants cannot reference such communications because they have not waived the privilege covering them, claiming that a handful of legal memoranda that Defendants disclosed, which dealt with the same topics the government openly discussed with Ferrer, "on their face . . . appear to be protected by the attorney-client privilege."(Doc. 1234 at 2)  The hypocrisy of the government's position is shocking.  As both sides agree, these privileged communications go to the core of the government's case.  The government does not dispute that it is for this reason that the government so aggressively questioned Ferrer about them (concealing from Judge Logan that it had already invaded the privilege while its motion for permission to do just that was pending).  (Doc. 942 at 1-2; *see also* Docs. 195, 338, 345.)  Dismissal is necessary to preserve Defendants' right to have their privileged communications with counsel remain confidential and to deter the government from engaging in such conduct in the future.  Defendants also renew their request for an evidentiary hearing.

/ / /

/ / /

---

[9]   The government was to produce its initial Rule 16 disclosures by December 3, 2018, and all Jencks material by February 25, 2019. (Doc. 131.)  The government refused, forcing Defendants to move to compel.  (Doc. 662.)  This Court then ordered the government to produce the Ferrer memos by August 20, 2019 (Doc. 730, 731.)  Yet the government continued to trickle out the Ferrer memos well after that second deadline.

**4.** **The government's privilege invasions were on top of a pattern and practice of violating the Court's orders and Defendants' privileges.**

In February 2019, Defendants Larkin and Lacey moved for an order clarifying the court-approved protocol for the review of potentially privileged documents by the government filter team.  (Doc. 452.)  The motion sought an order clarifying that any documents identified as potentially privileged based on "hits" during the filtering process would have to be turned over to the defense for review and, unless the defense agreed a document was not privileged, the document could not be turned over to the prosecution team without an order of this Court.  The defense expressed concern that the government's filter team would unilaterally determine that documents identified as potentially privileged based on "hits" during the filtering process were not privileged and turn them over to the prosecution team without defense review.  (Doc. 577 at 9-10.)

At the hearing on the motion, the government argued clarification was not needed because the government's filter protocol required any "documents that are potentially protected [to] go, under this protocol, to the defense attorneys for the appropriate defendant, and then there would need to be an order from the Court before they're ever disseminated to the investigative team."  (*Id.* at 8.)  Based on the government's representations about its filter protocol, the Court denied the defense motion for clarification, finding "no need for further clarification" because the government's protocol required exactly what the defense asked for.  (*Id.* at 11-12.)

Just seven months later, in December 2019, however, the government's filter team did exactly what the defense feared and exactly what the government told the Court it would not do—it turned over to the prosecution team, *with no notice to the defense and no order from the Court, 966 documents* that had been flagged as potentially privileged because they involved emails to or from attorneys whose names were on the filter list.

Despite the obvious breach of the filtering protocol, the prosecution said nothing to Defendants or to the Court about the government's egregious breach of the filtering protocol—despite just months earlier assuring this Court that the prosecution would have no access to potentially privileged materials unless the defense agreed or the Court so ordered.  The prosecution knew perfectly well it had no right to have the 966 documents it received from the filter team—as

they were emails to or from lawyers with whom the prosecution was well acquainted, including long-time counsel to Messrs. Larkin and Lacey, former general counsels to Village Voice Media and to Backpage.com, and a prominent attorney who represented Village Voice Media for several years.  At a minimum, the prosecution's obligation of candor required it to disclose to the Court and to the defense that it failed to follow the filtering protocol—but the prosecution said nothing.

The prosecution also said nothing to the Court or to Defendants about yet another invasion of Defendants' attorney-client privileges—a clear duty the prosecution owed to this Court and Defendants.  *United States v Pederson*, 2014 WL 3871197 (D. Or. Aug. 6, 2014) ("In addition to a responsibility to avoid undue interference with a defendant's attorney-client relationship and an obligation to respect a defendant's Sixth Amendment rights, *the government has a duty to disclose the receipt of a defendant's attorney-client communications*.") (emphasis added).  Whether the transmission of 966 potentially privileged documents was inadvertent or intentional, the prosecution's failure to immediately disclose its failure to follow the filtering protocol approved by the Court plainly was intentional.  The potentially privileged nature of these documents cannot be overlooked, as each of the 966 documents plainly involves a communication with counsel known to the prosecution.

## B.    The government's misconduct was flagrant.

"Flagrant" misconduct need not be "intentional or malicious."  *Bundy*, 968 F.3d at 1038.  "[R]eckless disregard for the prosecution's constitutional obligations" is sufficient to give rise to flagrant misconduct."  *Id.*  Under this standard, "even unintentional misconduct may be sufficient," as "[t]he facts of each case determine when Government conduct has placed in jeopardy the integrity of the criminal justice system."  *United States v. De Rosa*, 783 F.2d 1401, 1406 (9th Cir. 1986).  Here, the government (1) repeatedly failed to heed the Court's rulings at trial; (2) refused to produce all relevant, non-privileged information from a federal investigation that resulted in a decision not to prosecute Backpage; (3) invaded the privilege on numerous occasions during interviews of its key cooperating witness; and (4) violated the Court's order, failed to be forthright, and invaded Defendants' sacrosanct attorney-client privilege.  Standing alone, each of these acts would qualify as flagrant.  But together, they reveal a pattern of conduct on that part of a

1    prosecutorial team that seems willing to ignore Court orders, ethical boundaries, and Defendants'

2    rights in a misguided attempt to win at any costs.  The government's actions speak for themselves

3    and "demonstrate, at best, that the Government was reckless in disregarding and failing to comply

4    with its duties." *Aguilar*, 831 F. Supp. 2d at 1209.

5         **C.    The Defendants suffered substantial prejudice.**

6         As the Ninth Circuit has observed, "[w]hen an initial prosecution ends in mistrial, a

7    subsequent retrial will increase the emotional and financial burden imposed on the defendant, and

8    may give the [government] an unfair opportunity to tailor its case based on what it learned the first

9    time around." *Chapman*, 524 F.3d at 1081 (the district court concluded that "the government

10   should not be permitted 'to try out its case identifying any problem area[s]

11   and then correct those problems in a retrial.'"); *see Arizona*, 434 U.S. at 503–05 ("Even if the first

12   trial is not completed, a second prosecution may be grossly unfair. It increases the financial and

13   emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved

14   accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be

15   convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before

16   it is completed."). Here, these burdens on the defense are severe.  This case was indicted over

17   three years ago, Defendants were forced to move for multiple trial continuances (some because of

18   the pandemic), and retained counsel in this case for Lacey, Larkin, Spear, and Brunst currently are

19   not being paid for their time. (Ex. L at 74; *see also* Ex. P)

20        Further, there is no lesser available adequate remedy here.  The government should not be

21   afforded the opportunity to re-tailor its case strategy and witness examinations in response to

22   Defendants' opening statements and damaging cross-examinations. *See Chapman*, 524 F.3d at 1080;

23   *Aguilar*, 831 F. Supp. 2d. at 1210 ("[T]he Government team committed many wrongful acts.  It

24   should not be permitted to escape the consequences of that conduct.  By not allowing it to benefit

25   from a 'do over,' the Court hopes that this ruling will have a valuable prophylactic effect.").

26        Further, the *Brady* and Rule 16 violations here are so severe that the most appropriate

27   remedy is dismissal.  Production of the materials now, in advance of a second trial, is not enough.

28   *See Bundy*, 968 F.3d at 1044 ("Lesser sanctions—such as a continuance to allow the defendants to

1    review discovery or declaring a mistrial and starting over—would have given the government an
2    opportunity to strengthen its case at the defendants' expense.").  The government also gained an
3    unfair advantage and insight into Defendants' trial strategy by eliciting privileged information from
4    Carl Ferrer.  And, based on Ferrer's interview memos, the government intends to introduce this
5    privileged information through him at trial.  Despite the Court's prior ruling that the defense
6    suffered no prejudice from the government's privilege invasion because of a lack of "specificity"
7    of the invasions (Doc. 1168 at 16-17), the government's recent filings prove otherwise.  If, as the
8    government now asserts, the mere reference to the "CDA" and "First Amendment," for example,
9    implicates the privilege (Doc. 1234 at 2), then there is no escaping the fact that the nineteen *specific*
10   examples of such information being disclosed by Ferrer identified by Defendants obviously
11   implicate the privilege.

12   ## V.    THE DUE PROCESS CLAUSE PROVIDES ANOTHER BASIS FOR DISMISSAL WITH PREJUDICE.

13         This Court should dismiss with prejudice under the Due Process Clause.  Prosecutorial
14   misconduct during trial deprives a defendant of due process of law and is a ground for dismissal.
15   *See Kojayan*, 8. F.3d at 1324; *cf. Aguilar*, 831 F. Supp. 2d at 1206 (dismissing indictment under court's
16   supervisory powers for, inter alia, improperly reviewing attorney-client privileged communications
17   and recklessly failing to comply with discovery obligations).  As the Ninth Circuit explained in
18   *Kojayan,* though the "normal rule, of course, is that where prejudicial error is committed at trial, the
19   case will be sent back for a retrial[;] where, as here, the error is one of prosecutorial misconduct,
20   we must" not only "assur[e] a fair trial to the defendants [in this case]" but also "assur[e] that the
21   circumstances that gave rise to the misconduct won't be repeated in other cases."  8 F.3d at 1324.
22   Because of the government's prejudicial misconduct there, the Ninth Circuit vacated the
23   conviction and remanded to district court to determine whether to retry the case or dismiss with
24   prejudice as a sanction for the government's misbehavior.[10]  *Id.* at 1325.  The Ninth Circuit
25   reasoned that "[m]uch of what the United States Attorney's office does isn't open to public scrutiny
26   or judicial review.  It is therefore particularly important that the government discharge its
27

28   ---

[10]     On remand, the district court dismissed the indictment.  *See* Doc. 109, District Court docket from *United States v. Kalfayan, et al.*, Case No. 2:91-cr-00622-2 (C.D. Cal.).

1   responsibilities fairly, consistent with due process." *Kojayan*, 8 F.3d at 1324.  That court, like this

2   Court, emphasized that "[t]he prosecutor's job isn't just to win, but to win fairly, staying well within

3   the rules." *Id.* at 1323.

4          But here, the government's approach throughout the case and trial has been to overreach,

5   abuse this Court's leeway, and win at all costs.   (Ex. M at 4 ("The government, as prosecutors are

6   held to a higher standard, and their goal is not to win at any cost, but to win by the rules."); *see also*

7   *Kojayan*, 8 F.3d at 1324 ("One of the most important responsibilities of the United States Attorney

8   and his senior deputies is ensuring that line attorneys are aware of the special ethical responsibilities

9   of prosecutors, and that they resist the temptation to overreach.").  The cumulative effect of the

10  government's continued, flagrant misconduct throughout this case should not be overlooked.  For

11  example, as discussed *supra*, throughout three plus years of discovery and in the face of repeated,

12  specific requests from Defendants, the government also intentionally withheld *Brady* and *Giglio*

13  materials related to DOJ's W.D.W.A. investigation into Backpage.com that found no evidence of

14  criminality.  (Docs. 1281, 1332.)  The requested material – including impeaching and exculpatory

15  material – should have been produced to Defendants **nearly three years ago**, and the

16  government's repeated refusal to do so compromised Defendants' trial presentation, which the

17  Ninth Circuit has repeatedly made clear is alone a basis for dismissal under the Due Process Clause.

18         Additionally, the government brazenly and unapologetically invaded Defendants' attorney-

19  client privilege.  As discussed *supra* and as set forth in Defendants' Motion to Dismiss for Invasion

20  of the Attorney-Client Privilege (Doc. 942, 979), and renewed Motion (Doc. 1238, 1239, 1248),

21  the government elicited statements from Carl Ferrer, which on their face were clearly privileged.

22  Then, even after Judge Logan rejected the government's claim that Ferrer had waived the privilege,

23  the government nevertheless continued to interview Ferrer about the very subject matter that

24  Judge Logan ruled to be privileged. (*Supra* at Section IV(3).)  The government's invasion of

25  Defendants' privilege was also rampant through its violations of and lack of candor to the Court

26  about its taint team. (*Supra* at Section IV(4).)

27  / / /

28  / / /

MOTION TO DISMISS WITH PREJUDICE

Further, the government's overbroad seizures impeded and restricted Defendants' right to present a defense. As discussed *supra* in Section II(G), the government's unreasonable seizures of Defendants' assets, attorney retainers, and funds that even the government concedes could not possibly be tainted have violated Defendants' right to counsel of choice (forcing Mr. Padilla and Ms. Vaught to obtain court appointed counsel), frustrated their ability to present a defense, and made continued litigation and a re-trial untenable.[11]

Even after causing a mistrial, the government still refuses to acknowledge wrongdoing and has not amended it witness or exhibit list in the slightest as a result of the Court's rulings at trial limiting the government's presentation. There is no reason to believe the government has learned its lesson. *See Kojayan*, 8 F.3d at 1318 ("In determining the proper remedy, we must consider the government's willfulness in committing the misconduct and its willingness to own up to it."). The prosecutors' misconduct in this case "deprived the defendants of due process of law. It contaminated their trial . . . and was [not] harmless." *Id.* at 1342-25. This Court should dismiss the indictment with prejudice.

## VI.   CONCLUSION

Under the Double Jeopardy Clause, the court's supervisory authority, or the Due Process Clause, the Court should dismiss the indictment with prejudice. At a minimum, the Court should hold an evidentiary hearing regarding the scope of the government's *Brady* violations and privilege invasions.

RESPECTFULLY SUBMITTED this 20th day of October 2021,

BIENERT KATZMAN LITTRELL
WILLIAMS LLP
*s/ Whitney Z. Bernstein*
Thomas H. Bienert, Jr.
Whitney Z. Bernstein
Attorneys for James Larkin

---

[11]      These issues will be laid out in further detail in Defendants' forthcoming motion for the release of funds.

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Oct. 2020) § II(C)(3), Whitney Z. Bernstein hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

LIPSITZ GREEN SCIME CAMBRIA LLP
*s/ Paul J. Cambria, Jr.*
Paul J. Cambria, Jr.
Erin McCampbell Paris
Attorneys for Michael Lacey

BIRD MARELLA BOXER WOLPERT
NESSIM DROOKS LINCENBERG AND
RHOW PC
*s/ Gary S. Lincenberg*
Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
Attorneys for John Brunst

FEDER LAW OFFICE PA
*s/ Bruce Feder*
Bruce Feder
Attorneys for Scott Spear

DAVID EISENBERG PLC
*s/ David Eisenberg*
David Eisenberg
Attorneys for Andrew Padilla

JOY BERTRAND ESQ LLC
*s/ Joy Bertrand*
Joy Bertrand
Attorneys for Joye Vaught

MOTION TO DISMISS WITH PREJUDICE

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*/s/ Toni Thomas*
Toni Thomas