Exhibit F

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United States of America,      )
                               )    No. CR-18-0422-PHX-SMB
            Plaintiff,         )
                               )
            vs.                )    Phoenix, Arizona
                               )    September 8, 2021
Michael Lacey,                 )    9:00 a.m.
James Larkin,                  )
Scott Spear,                   )
John Brunst,                   )
Andrew Padilla,                )
Joye Vaught,                   )
                               )
            Defendants.        )
_____  )


          BEFORE:   THE HONORABLE SUSAN M. BRNOVICH, JUDGE


          REPORTER'S TRANSCRIPT OF PROCEEDINGS

          TRIAL - DAY 4 - A.M. SESSION




Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Government:

3
     U.S. ATTORNEY'S OFFICE
4    By:  **Mr. Peter S. Kozinets**
          **Mr. Kevin M. Rapp**
5         **Ms. Margaret Wu Perlmeter**
          **Mr. Andrew C. Stone**
6    40 North Central Avenue, Suite 1200
     Phoenix, Arizona 85004
7

8    U.S. DEPARTMENT OF JUSTICE
     By:  **Mr. Reginald E. Jones**
9    1400 New York Avenue, NW, Suite 600
     Washington, DC 20530
10

11
     For the Defendant Lacey:
12
     LIPSITZ GREEN SCIME CAMBRIA
13   By:  **Mr. Paul J. Cambria, Jr.**
          **Ms. Erin E. McCampbell-Paris**
14   42 Delaware Avenue, Suite 120
     Buffalo, NY 14202
15

16   For the Defendant Larkin:

17   BIENERT KATZMAN
     By:  **Mr. Thomas H. Bienert, Jr.**
18        **Ms. Whitney Z. Bernstein**
     903 Calle Amanecer, Suite 350
19   San Clemente, CA 92673

20

21

22

23

24

25

```
 1   For the Defendant Spear:

 2       FEDER LAW OFFICE
         By:  Mr. Bruce S. Feder
 3       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
 4

 5   For the Defendant Brunst:

 6       BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
         LINCENBERG & RHOW
 7       By:  Mr. Gopi K. Panchapakesan
              Mr. Gary S. Lincenberg
 8       1875 Century Park E, Suite 2300
         Los Angeles, CA 90067
 9

10   For the Defendant Padilla:

11       DAVID EISENBERG, PLC
         By:  Mr. David S. Eisenberg
12       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
13

14   For the Defendant Vaught:

15       JOY BERTRAND, LLC
         By:  Ms. Joy M. Bertrand
16       P.O. Box 2734
         Scottsdale, AZ 85252
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

<u>**P R O C E E D I N G S**</u>

1

2          THE COURT:  Thank you.  Please be seated.

3          Okay.  We're on the record outside the presence of the

4    jury.  We have all counsel and defendants present.

5          Before I rule on the motion for mistrial, which was

6    argued on Friday, and supplemental pleadings were filed on

7    Tuesday, which I have read and considered, for the government,

8    in your response, when talking about Ms. Svendgard's statement,

9    the government asserted that they had a good faith belief for

10   believing that she would testify consistent with Mr. Stone's

11   statement during his opening, because Mr. Stone's statement is

12   not consistent with the 302s.

13         MR. STONE:  Mr. Jones, but yes.

14         THE COURT:  Sorry.  Mr. Stone, you wrote the response,

15   Mr. Jones gave the opening.

16         And I want to know why you say that, because I have

17   the 302 from the initial interview, and then there is a 302

18   from June when, apparently, the prosecutor and the FBI go over

19   her statement, and she doesn't make any -- it says, Nacole does

20   not make any corrections other than the person who trafficked

21   J.S.  so she didn't make any corrections to her statement about

22   Mr. Lacey.

23         MR. STONE:  Yes, Your Honor.  I think the discrepancy

24   comes from, in the 302, where the line suggests that the

25   statement was made to reporters.  I don't have the 302 --

1          THE COURT:  Yes, it says --

2          MR. STONE:  -- in front of me.

3          THE COURT:  -- she corrected her previous statement to

4    identify by picture Lacey as the one to have made this comment

5    to reporters outside of the U.S. Senate hearing.

6          MR. STONE:  And the comment itself that Mr. Jones

7    discussed in his opening statement, besides using effing

8    instead of the actual word, was identical, was the same.  So

9    the only discrepancy is who that statement was directed

10   towards.

11         And the 302 may not be a model of clarity, but the

12   government believes in good faith that when Ms. Svendgard

13   testifies, she will testify consistently with how Mr. Jones

14   conveyed the statement and how it was made.  And if there is a

15   discrepancy, she did adopt that 302 in the subsequent meeting

16   with the FBI, as Your Honor suggests, and so that would be

17   fodder for cross-examination.

18         THE COURT:  Well, but I guess my question is why do

19   you believe in good faith that she's going to do that, when

20   after the prosecutor met with her to go over the 302, she

21   doesn't make any changes?  And the 302 clearly says that he

22   made the comment to reporters outside the U.S. Senate hearing.

23         MR. STONE:  Yes, Your Honor.  And I believe the way

24   that the testimony will come in is that there were reporters

25   and there were a group of people outside of the hearing at the

1   time, including Ms. Svendgard, and so the comment was made and

2   reporters were also there outside of the -- outside of the

3   hearing.

4           THE COURT:  Okay.  There is a big difference to Mr. --

5   her testifying that Mr. Lacey said it to her versus Mr. Lacey

6   said it to a group of reporters.

7           MR. STONE:  Just a moment, Your Honor.

8           Your Honor, we believe that her testimony will be that

9   the statement was directed towards her.  There was a scrum,

10  there was a large group of people outside of the hearing,

11  including reporters.  And, again, the 302, not a model of

12  clarity, but she will clarify on the stand that she believed

13  the statement was made -- directed towards her.  And reporters

14  were also there.

15          THE COURT:  Okay.  So let me make this clear.  This

16  is -- this is actually one -- one, potentially, problematic

17  statement made in the opening.  And I would rather have a

18  mistrial now than when she testifies, so if you have some

19  un-clarity about it, I want to know now.

20          MR. STONE:  No, there is -- we don't have -- the only

21  thing that's not clear is the 302, Your Honor.  We -- we

22  believe that when she testifies, she will testify absolutely

23  consistent with how Mr. Jones made the opening statement.

24          That statement was made outside of the Senate hearing

25  to Ms. Svendgard when reporters were also present.

1          THE COURT:  Okay.  All right.  Let me go over the

2     ruling.

3          So, first, Mr. Cambria made a claim that the

4     government violated Rule 16 for failure to disclose the

5     statement of Nacole Svendgard, citing Rule 16.

6          One, it was disclosed.  There is an argument about

7     whether it was timely or not, but it was disclosed.

8          Second, the Court finds that this is a statement made

9     to a third party, not a government agent, and that's not

10    covered by Rule 16 but covered by the Jencks Act, pursuant to

11    U.S. v Hoffman, 794 F.2d 1429, which is a Ninth Circuit case.

12    So the Court finds that does -- is not problematic.

13         The defendants' argument that the government's

14    reference to other acts evidence violated Rule 404(b), all

15    uncharged acts mentioned in the opening statement as alleged

16    are all in furtherance of the charge conspiracy not subject to

17    Rule 404(b)'s notice requirement.

18         Pursuant to U.S. v Cruz-Ramirez, U.S. v Risk, and U.S.

19    v Kirby, which are all Ninth Circuit, defendants' argument that

20    the government failed to make a prima facie case in opening and

21    somehow waived their right to continue is not logical.  The

22    government doesn't even have to make an opening statement, so

23    the failure to provide sufficient proof is not grounds for a

24    mistrial.

25         U.S. v Welch recognized the fact that the government

1    doesn't even have to make an opening statement.  What is not

2    allowed is blatant misrepresentations, which is why I asked the

3    government about this statement.

4         The argument that the government committed error by

5    referencing child trafficking -- and the defense mentioned a

6    couple of times in their pleadings that the Court admonished

7    the government on this issue.  I didn't admonish the government

8    to do -- not to do anything.  I emphasized, or reminded them of

9    the previous order, which was simply that they don't go into

10   any details or accuse -- or reference any third-party crimes,

11   but the fact that child trafficking and sex trafficking

12   occurred on the website was not precluded by my earlier order.

13   The Court has previously found that child sex trafficking and

14   adult sex trafficking is a subset of prostitution, so that was

15   not precluded.

16        The defense also made statements in the written motion

17   that misrepresented the Court's order again regarding

18   precluding statements of Backpage representatives or Attorney

19   Moon.  I haven't precluded anything.  That order simply denied

20   the government's request to deem them admissible pretrial.  So

21   they weren't admitted pretrial, but they also weren't

22   precluded.  So the government didn't ignore an order of the

23   Court.

24        The defense argument regarding the definition of

25   prostitution, I probably could have been -- handled better, but

1    the government didn't couch that in terms of a legal definition

2    but a general concept.  The jury has been told that the Court

3    instructs them as to the law, and that legal definitions will

4    be given to the jury later.

5            The argument that the government has conflated or

6    confused escorts versus prostitutes, one is legal and one is

7    not, the government didn't confuse them, they simply said that

8    it is their belief that the evidence will show that the escort

9    ads are really for prostitution.  So it's their perspective,

10   it's their statement of what they believe the evidence will

11   show, which is not an issue for a mistrial.

12           The defendants' allegation that the government argued

13   strict liability or general intent as sufficient to convict

14   defendants, that is not what I heard during the argument.  I

15   reread the transcript.  They made general arguments about

16   notice from outside entities, but it wasn't the basis for

17   imposing liability.  Imposing liability was their whole

18   argument.  That was not mentioned at all by the defense about

19   the three strategies on how they believe the evidence will show

20   the defendants intended to promote, which was ad moderation,

21   content -- I forget what the two are, but there were three

22   strategies emphasized in the opening statement.  And those, if

23   proven, is certainly circumstantial evidence of intent.

24           Defendants' argument about adult revenue for illegal

25   prostitution, which defendants claim was a staggering

1    misrepresentation, first, the government never said that all

2    94 percent was from illegal, but they kept emphasizing that the

3    majority of it was from illegal acts, which the government

4    contends that they have evidence to support, specifically from

5    testimony of Carl Ferrer.  And if that's true, then that would

6    not be grounds for mistrial.  So some of these arguments may

7    have more merit if the government fails to support them in

8    their case in chief, but at this time they are premature.

9         And with respect to the misstatements from Nacole

10   Svendgard, which is what we talked about a minute ago, or what

11   I was asking the government about, I do believe that's an

12   issue.  The government has stated that they have a good faith

13   basis for believing that the 302 is wrong, so I'm not going to

14   grant a mistrial at this point.

15        The comment on defendants' right to remain silent, I

16   see how that could be construed as a comment on defendants'

17   right to remain silent, although it's less clear if you view it

18   from the perspective of a juror who has been grilled during

19   voir dire about the right to remain silent, the judge just

20   instructed them on the right to remain silent, and the

21   government made one statement that the defendants can't deny

22   that the ads are for prostitution.  So assuming it is a comment

23   on the right to remain silent, under the Griffin standard, it's

24   not prejudicial error.  It wasn't manifestly intended to call

25   attention to defendants' failure to testify as in the context

1    of the whole opening statement.  It was an isolated statement

2    that I assume will not be repeated, and so the motion for

3    mistrial is denied.

4            Mr. Bienert, is he here?

5            MS. BERNSTEIN:  Yes, Your Honor.  And, Your Honor,

6    under -- we appreciate that it sounds like the Court has taken

7    a lot of time to evaluate these arguments.  If you'll indulge

8    me for one moment to supplement our record and perhaps even

9    change your mind.

10           THE COURT:  No.

11           MS. BERNSTEIN:  There is just one point that hasn't

12   been argued in these papers, and I think based on Your Honor's

13   ruling, and based on the government's response, that this has

14   now become a very big issue.

15           THE COURT:  You're making a new argument?

16           MS. BERNSTEIN:  It's not about the mistrial, Your

17   Honor.  It's about what this now means going forward for the

18   evidence.

19           THE COURT:  Okay.

20           MS. BERNSTEIN:  Your Honor has allowed the government

21   to get away with their whole opening, and the government also

22   defends their entire opening.  Much of the government's opening

23   focused on allegations around 2010, 2011, 2012, and the

24   government is stating that certain things did or did not occur.

25           We had issues in this case, because as the Court and

1    the government well knows, the Department of Justice in the

2    Western District of Washington investigated Backpage,

3    subpoenaed unknown number of documents, deposed unknown number

4    of witnesses, and produced two memos that Judge Logan had

5    initially ruled on, and were brought again to Your Honor's

6    attention when they were reported in the press.  I've never

7    read those memos myself, but my understanding is that those

8    memos show that there is absolutely no evidence of criminal

9    liability during that time frame.

10          The government's response to our repeated demands for

11   the Jencks and Brady contained either in those memos or in the

12   facts that underlie those memos, has been their assertion,

13   never checked by any court, that things are different.  They

14   base their indictment on different things.  First of all,

15   that's a statement that no one has ever been able to evaluate

16   because no one has seen the underlying facts.

17          I think what's also clear is that the government's

18   playing a little fast and loose with what facts do and don't

19   say, and seems to interpret things quite broadly, as based on

20   their commenting on defendants' right to remain silent and

21   their interpretation of Ms. Svendgard's statement.

22          We're very concerned about what happened in the

23   Western District of Washington, that the Department of Justice

24   has made multiple party admissions that activities that were

25   occurring at Backpage at that time did not give rise to

1    criminal liability, that there was no evidence of any

2    criminality.

3          If the memos are protected by some work product

4    privilege, that doesn't protect the underlying facts, that

5    doesn't protect the depositions of everyone they deposed for

6    that investigation, it doesn't protect the number of documents

7    that they subpoenaed.  The Department of Justice did a robust

8    investigation, and subpoenaed some of the defendants sitting

9    here, deposed some of the very defendants sitting here.  We

10   have repeatedly asked for this and the government has made this

11   a big issue.

12         If the Court is going to allow the government to

13   allege that those three things are what the evidence will show,

14   I don't think that's what the evidence will show, and I think

15   the Department of Justice knows that.  And we need the ability

16   to be able to cross examine their witnesses, to get the Jencks

17   statements, and to get the Brady contained in those underlying

18   facts.

19         THE COURT:  Okay.

20         MR. STONE:  Just briefly.  This one is an easy one,

21   Your Honor.

22         THE COURT:  Okay.

23         MR. STONE:  2012 was the Western District of

24   Washington investigation.  And as Your Honor just pointed out,

25   this case is about the prostitution marketing strategies that

1    the government continually has alleged and believes the

2    evidence will show.  Again, defendants in their motion didn't

3    use any of those terms once, didn't talk about it one time.

4           The 2012 investigation didn't have any of the internal

5    e-mails and didn't know about these prostitution marketing

6    strategies.  Without knowledge of the prostitution marketing

7    strategies, there is no case.  This case is about the

8    prostitution marketing strategies.  And so if it wasn't known

9    then, it's clear that the government would have a different

10   conclusion than now when there has been a sea change in terms

11   of the evidence that has been made aware and put into the

12   government's possession.

13          So this case is about content aggregations, reciprocal

14   link agreement, super affiliates, and moderation.  And those

15   were issues that the government wasn't aware of in 2012.

16          MS. BERNSTEIN:  Your Honor, that is a factual

17   assertion.  No one has seen these underlying documents.  And if

18   the evidence shows that the government was in fact aware of

19   these allegations in 2012, we have a really big issue.  And I

20   contend that that's what the evidence will show.

21          THE COURT:  We'll take this up later.  We have our

22   jury here.

23          So, Mr. Bienert, are you ready?

24          MR. BIENERT:  Your Honor, I'm going to make this very

25   quick, it's just timely.  I'll make it in less than a minute,

1   if I may, less than a minute.

2          THE COURT:  No.  Honestly, what are you going to bring

3   up that needs to be brought up before your co-counsel does an

4   opening statement?

5          MR. BIENERT:  That the government gave us notice this

6   morning that one of their three witnesses for this week is not

7   on for this week, so people spent all weekend preparing for

8   these three witnesses, and they could have told us beforehand

9   this person has travel issues.  And this is the problem with

10  the 48-hour notice thing, that they're playing it so that when

11  we get to court on the day that this witness may be called, we

12  start hearing this.

13         So we can discuss this later, but I wanted to make a

14  record this morning, because we just got notice less than an

15  hour ago.

16         THE COURT:  Okay.  Notice that someone is going to be

17  called later not that someone new is going to be called?

18         MR. BIENERT:  Well, they then added a couple new names

19  for this week.

20         THE COURT:  We'll talk about it later.

21         MR. BIENERT:  Thank you.

22         THE COURT:  That could have waited.

23         MR. BIENERT:  The second thing is, with regard to

24  their Svendgard point, we never got any 302.  Mr. Stone is

25  saying they know that this witness is going to testify

1  differently, and it's mind boggling that here we are in the

2  middle of this argument, and all the sudden we hear that a

3  witness has changed her story and that's not contained in the

4  302.

5          THE COURT:  You can bring that up when the witness

6  testifies.

7          MR. BIENERT:  Thank you, Your Honor.

8          THE COURT:  We are not going to have these continual

9  delays.

10          MR. BIENERT:  But this --

11          MS. BERNSTEIN:  Your Honor, it's not a delay, it's --

12          THE COURT:  Ms. Bernstein.

13          I'm going to have everybody here at 8:30 every day so

14  that we can discuss all these matters before the jury is here.

15  I don't want the jury waiting a half an hour every day for us.

16          MR. BIENERT:  Makes sense.  Mr. Stone made the

17  argument this morning, I just wanted to respond, but I get it,

18  Your Honor.  I understand you're wanting to move forward.

19          THE COURT:  Elaine, is our jury here?

20          MS. BERTRAND:  Your Honor, I'm not going to make a

21  motion, but could we -- this seems like a good time, especially

22  with the government saying that witnesses are changing

23  testimony, in light of the motion to dismiss, or mistrial, that

24  the -- we are all clear that the witnesses for the government

25  will not be in the courtroom, will not know of the proceedings

1    before they testify, that they will be sequestered.

2          THE COURT:  So you're invoking the rule for the

3    exclusion of witnesses?

4          MS. BERTRAND:  Yes.

5          THE COURT:  Does the government understand?

6          MR. STONE:  Yes.  With the one exception is we have a

7    financial summary witness who is an agent, we'd ask that he be

8    able to sit in on the proceedings, which is standard.

9          THE COURT:  And any alleged victims are, of course,

10   allowed too.

11         MR. STONE:  Thank you, Your Honor.

12         (9:27 a.m., the jury entered the courtroom.)

13         THE COURT:  Thank you.  Please be seated.

14         And good morning, everybody.  Welcome back.  I hope

15   you had a nice weekend.

16         We're going to start with the defense openings.

17   Before we do that, I just wanted to let you know that since

18   some of you are sitting in the back in different bleacher-type

19   seats, we will be rotating you every once in a while so that

20   you all share in the back seats and get a different

21   perspective.

22         So, just for those of you in the back, I don't know

23   how comfortable those seats are, but we will be rotating you.

24         Mr. Bienert.

25         MR. BIENERT:  Thank you, Your Honor.

1          Good morning, everyone.  My name is Thomas Bienert and

2    I represent defendant, James Larkin.  And so I'm going to talk

3    to you now about the defense perspective, and I'm going to talk

4    about some general themes --

5          And I assume this is not so loud it's bothering

6    people.  It works.

7          I'm going to talk about some general defense themes,

8    then I'm going to talk about my client, Mr. Larkin.

9          First of all, this is a case about free speech and the

10   limits on the government to prosecute those who provide a

11   location, a platform for other people to place legal speech.

12   Now, the government, the prosecutor, Mr. Jones, said, by my

13   count, 18 times in his opening to you:  Why'd they do it?

14   Why'd they do it?  And he repeatedly said -- his version that

15   he wants you to believe -- greed.  And we'll talk about that.

16         But there is a good reason they did it.  They didn't

17   do it for greed.  The short answer is they did it because these

18   defendants, starting with my client, Mr. Larkin, and his

19   partner, Mr. Lacey, have spent 50 years as journalists always,

20   always, always standing up for the right of everyone to speak

21   legally as long as it was legal speech.  That's why they did

22   it.

23         Mr. Larkin, if you can stand up.

24         This is my client, Jim Larkin.

25         And if we can go ahead and put this up.

1        He's not a pornographer.  He's not a pimp.  He's not a

2    pedophile.  He is not a trafficker.  He's a journalist.  And

3    since the early 1970s, he has written newspapers.  He has won,

4    along with his colleagues at the paper, they have been

5    nominated for thousands of journalism awards.  They've even won

6    a Pulitzer Prize.  Thousands of awards.  Real journalism.  And

7    he does -- everything that is going on in this case, it's for

8    one simple principle right here, Article I, First Amendment:

9    Congress shall make no law -- if you look at the second line --

10   prohibiting the free exercise -- strike that -- abridging the

11   freedom of speech or the press.  That's the First Amendment.

12   Legal speech is allowed in this country, that's why he did it,

13   and that's the same thing he's been doing for 50 years.

14       Thank you, Mr. Larkin.

15       What you're going to learn is that Mr. Larkin and

16   Mr. Lacey and the people who worked at their paper, in 50 years

17   have learned that if people aren't allowed to speak freely

18   about what's lawful, even if people don't like it, that's when

19   the government abuses its power.  That's when people who can't

20   stand up for themselves, who don't have a voice, get stifled.

21   And, ironically, this case, you will see from the evidence, is

22   an abuse of power.

23       The first thing I'm going to point out, the vast

24   majority of what the prosecutor told you the evidence will show

25   you is flat out untrue.  Flat out untrue.  What you're going to

1  see from the evidence here is that the deception -- and I use

2  that word because Mr. Jones used it about 20 times -- deception

3  repeatedly was made by the government in the things they talked

4  to you about, what they said this case is about, and what they

5  will tell you that the evidence is going to show.  There is the

6  deception, and I'm going to talk to you about some of that.

7       First, first deception, escort does not equal

8  prostitution.  What you'll see the government did repeatedly,

9  and they will do this entire trial, is that they will

10  repeatedly take something that is legal, escort and escort ads,

11  and simply replace the word prostitution where it said escort.

12  And it is on this basis that Mr. Jones makes all these totally

13  inaccurate, unprovable, and you will never hear evidence to

14  establish that all of these ads are prostitution, or all of

15  these ads, or most of them, are prostitution.  No.  They're

16  all, every ad he showed you, they're all legal escort ads.  And

17  we're going to look at that.

18       The second big deception, trafficking.  An evil word.

19  All of us would agree with that.  Trafficking, children being

20  trafficked against their will, women being trafficked against

21  their will.  By my count, he said the word child or child

22  trafficking 47 times in his opening.  He then went on, for good

23  measure, another 13 times and just said trafficking in general.

24       You will not see a single, not one, example of any of

25  these six defendants ever knowingly involved in trafficking

1   anyone, man, woman, or child.  It doesn't exist.  And, by the

2   way, it's a federal crime to traffic children or adults.  That

3   crime is not charged here.  It's not why we're here.

4       If they had a trafficking case against these

5   defendants, you would have seen it.  It's a dodge.  It is

6   deception.  And we know why.  We all spent three days here

7   talking about people's views, and not a single person here said

8   I'm in favor of trafficking.  Of course not.  No one is in

9   favor of trafficking, but it's a lightning bolt.  It gets you

10  riled up.  Please watch the evidence and ask yourself with each

11  witness, where is the trafficking, where is anybody, any

12  defendant that purposefully or even knowingly helping push

13  someone against their will for anything?  You won't see it.  In

14  fact, what you're going to see is quite the opposite.

15      Support from the law enforcement community.  Backpage

16  was the number one referral and helper to law enforcement in

17  catching traffickers.  No one did more to catch traffickers

18  than Backpage.  Here's some examples.

19      *I wanted to personally thank you again for all you*

20  *have done to assist with this matter.  I know your company is*

21  *vilified nationally because it is an easy target.  I've told*

22  *numerous people that Backpage is law enforcement friendly and*

23  *does not support human trafficking.*

24      *I've even mentioned how if Backpage is ever shut down,*

25  *another website will take over, likely overseas, that will not*

1    *be so helpful to law enforcement.  While I don't agree with*

2    *online prostitution advertisement, the line between legal and*

3    *illegal is incredibly gray.*

4           *There will always be a demand for sex, illicit or*

5    *otherwise, and thus there will always be a venue where people*

6    *go to find it or advertise it.  I'd rather have a partnership*

7    *than an adversarial relationship with your company, so that*

8    *when the need arises, we can work together to go after those*

9    *that are exploiting and trafficking others.*  That's the Denver

10   Police Department.

11          Here's the FBI in 2012.  *Thank you.  I appreciate your*

12   *proactive efforts to protect our children.  Again, thank you.*

13          The FBI again in 2012.  *Thank you very much for*

14   *forwarding this.  It's great to know you guys are behind us in*

15   *catching up with these pimps.*

16          And the next two the same thing.  FBI child

17   exploitation task force, 2015.  *There is a violent pimp*

18   *associated with these postings that was arrested and his two*

19   *victims have been rescued and are doing well.  Can't do this*

20   *without your help.*

21          Cleveland, 2015.  *Hello and thanks for the quick*

22   *response.  We recovered a young girl last night.  She's been*

23   *missing for more than a year.  By the way, they can be removed*

24   *now.*

25          Backpage, you will learn, went so far to assist law

1    enforcement that they put ads up or kept ads up to help them

2    find people.  It is deception to say that Backpage was ever

3    trying to hurt any children or knew about it.  Whenever they

4    learned, they tried to help.

5          And let me say this.  This word children is being

6    thrown around.  You guys are going to see a lot of scantily

7    clad people, probably more than you need to, but,

8    unfortunately, that's what the case is about.  But here's what

9    you will never see.  You will never see someone who looks like

10   an underage child in any of those ads.  Every one of these ads

11   looks like a mature young woman, and they all have on them --

12   they represent that they're over 18.  And you'll see them.  But

13   get -- you must know, there is no children, per se.  Now,

14   illegal, and certainly people under 18 should not be victimized

15   or trafficked, but nothing here would ever alert them.  And

16   we'll talk about it more.

17         Now, let's talk a little bit about what the case is

18   about from Backpage's perspective.  Because, of course, before

19   you can really assess the defendants, you've got to know a

20   little about them.

21         Now, what the government has done here is they take

22   this one slice of all of a big empire of newspapers in history

23   and they just focus on it, like the Zapruder film in the

24   Kennedy assassination, when you watch that frame, by frame, by

25   frame.  And what they know it does, and what you're going to

1    see, is it blows everything up, as though all everybody at

2    Backpage and the newspapers ever did was look at pictures of

3    children.  Not true.  Backpage is a publication, as I indicated

4    to you.  These are newspaper people.

5           And what they have done all along -- we can come back

6    to that -- the point I wanted to make here is what the evidence

7    will show you is when Backpage was confronted with after-the-

8    fact anecdotes, hey, there was somebody trafficked here, this

9    is an illegal person -- an illegal act going on with this, they

10   would repeatedly add to the things they did to try to catch

11   people better.

12          But what they would not do, because they're First

13   Amendment absolutists, was they would not shut down legal

14   speech.  So they came up with a three-pronged approach, and you

15   will see it consistently:  Allow all ads that are legal, even

16   if it's content that maybe the folks at the company aren't into

17   themselves; do not allow ads that are illegal to post; and

18   then, help law enforcement catch those that try to do bad

19   things.  And you'll see that that's what they did, repeatedly,

20   trying to strike a balance between not throwing the First

21   Amendment out, but being responsible to help catch people who

22   abuse it.  Because, of course, there is a big difference

23   between consenting adults who voluntarily participate in escort

24   services, stripping, sensual massage, all these types of things

25   that are legal, and people who are doing things against their

1    will.

2           So, for starters, every Backpage -- every person who

3    goes to Backpage would see posting rules.  And they all

4    basically said, you can't post here unless you're going to

5    follow the rules.  You got to agree.  Don't put obscene

6    information on here.  Don't do soliciting for illegal

7    prostitution.  And, of course, don't put anything on here that

8    exploits any minors or assists in human trafficking.  And it

9    says all in red here:  If you do this with minors, you're going

10   to be subject to prosecution.  And that's exactly what they

11   tried to do.

12          So let's go back and learn a little bit about how we

13   get here.  As I said to you, Mr. Lacey and Mr. Larkin founded,

14   here in Phoenix, the Phoenix New Times, back in the early '70s,

15   kind of anti-government, anti-Vietnam War publication that

16   grew.  And I've got a copy, a random copy.  This one is from

17   1991.  But, basically, it has kind of hard-hitting journalism.

18          The front page here highlights an article by Mr. Lacey

19   where he's basically challenging the then police chief, Ruben

20   Ortega, on whether or not he is unfairly attacking minorities.

21   And there is a bunch of other articles in here.  There is also

22   movie reviews, cooking reviews, advertisements for everything

23   from stereos, to TVs, to adult services.

24          And Backpage comes from the back page, literally.  And

25   what you'll see is -- come back to that.  The back page was

classified ads.  And they allowed classified ads, as long as

they were legal, in a wide variety of things.  So if we just

look at this one.  Just say no to baldness.  Something near and

dear to me 20 years ago.  Obviously, hasn't worked.  And I'll

submit to you that, at the end of this case, you'll realize

these defendants are no more responsible for what the third

parties said about their adult advertising ads, than the guys

who advertise to guys like me that they could cure my baldness.

They don't work on baldness.  They don't sit there and see how

it works.  They simply provided space, like a bulletin board,

for people who want to pay to post their legal ads.

Other ads, just random, bankruptcy, divorce, $95.  A

lot more expensive than that now.  Speak with a psychic.  And,

oh, yes, several adult ads.  And these are just three of them:

Dial a stripper; striptease; girls, girls, girls.  There are

plenty of them here.  This goes all the way back.  It's all

part of their First Amendment view that we will offer a

location for people who don't normally have a voice to voice

it.  That's what this newspaper was.

It all comes back right here, First Amendment.  Free

speech.  If it's legal, they're going to allow it; if it's not

legal, they won't.  It's that simple.

And, by the way, this business model is one that they

followed from the Village Voice from New York, which, by the

way, they owned.  Village Voice was started by famous

1    playwright, Norman Mailer.  It was owned for about ten years by

2    Rupert Murdoch of Fox, who started Fox news and is the big Fox

3    empire.  It is another legitimate paper.  And the key to these

4    alternative papers is, one of my favorite words, they are free.

5           I see some of you don't have the blessing of youth

6    anymore like me, and we're all old enough to remember juggling

7    those frickin' quarters and dimes and dollar coins to try to

8    get a newspaper.  And, with me, the machine would always shut

9    on my hand.  You had to pay for papers.  People who didn't have

10   discretionary money didn't get papers.  These guys wanted to

11   make it available to everyone free.  So these ads, baldness,

12   bankruptcy, criminal defense attorneys, liposuction, you name

13   it, and even adult services is what caused it to be free for

14   everyone else, especially those that normally didn't get a

15   chance to get the newspaper.  And it's a business model that

16   worked very well.

17          First of all, again, just to go back, when I mentioned

18   awards, they didn't just get nominated for awards, they

19   literally won, these journalists, over 1,800 journalistic

20   awards:  Pulitzer Prize, James Beard awards, investigative

21   reporter awards, the Livingston.  All of these are very well

22   recognized, established awards for journalism.

23          This model grew and soon it expanded to 17 newspapers

24   nationwide, all following the same model.  So if you look at

25   this, it's kind of a messy chart, this is an organization chart

UNITED STATES DISTRICT COURT

1   of VVM, Village Voice Media, which is the company that owned

2   all these papers.  And up here in the left you'll see the

3   owners.  But the bottom line is Mr. Lacey and Mr. Larkin were

4   almost equal owners, and then two of the defendants, Scott

5   Spear and Jed Brunst, were smaller owners, and then a couple of

6   their sons, elder children, had a very small percentage.  And

7   what they did, they owned and ran 19 different companies, 19

8   companies all over the country.

9        And you'll see that they had newspapers in Houston,

10  Dallas, San Francisco, Oakland, Los Angeles, Denver, Miami, the

11  list goes on, and on, and on.  And, significantly, one of the

12  many companies, which is in the -- the long row going across,

13  the third from the right -- should have blown it up for you,

14  but I didn't -- is Backpage.  Backpage is simply 1 of 19

15  companies that these four men were above.

16       And, significantly, my client, who was the CEO of the

17  mothership company, Village Voice Media, had a thousand

18  employees all over the country.  Backpage was based in Dallas

19  for almost all of the relevant time here.  My client was based

20  here in Phoenix.  So the point is -- and I'm not backing off

21  from this.  You're going to see my client was generally aware

22  of what was going on at Backpage, but he wasn't sitting there

23  doing the day-in, day-out work.  He wasn't looking at ads.  He

24  wasn't going in and verifying that, for example, when the guy

25  who actually was the CEO of Backpage, a guy named Carl Ferrer,

1    what exactly he was doing, except to monitor things,

2    continually provide them what they needed, and said follow the

3    rules.  And he would be updated on what the rules were and what

4    they were doing.

5           But, please know, this idea that someone who is

6    running 19 companies all over the country with a thousand

7    employees is going to be sitting down and looking at, for

8    example, the particular ad by a particular young lady in

9    wherever, Chicago, just not how the business worked.  It was

10   setting up standards to be followed and insisting that they be

11   followed.  And they were.  They insisted on it.

12          Now, let's talk a little bit just on the personal

13   side, because this whole company is flourishing.  My client,

14   Mr. Larkin, Jim, he's the Phoenix guy.  He grew up here, spent

15   his whole life here.  Went to Catholic high school here.  Went

16   to Phoenix Community College.  And that's when he wound up

17   thereafter getting into journalism with Mr. Lacey.

18          He's got six children.  I'm going to ask if they can

19   stand up.  And his wife Molly.  We have several here.

20          He raised six children.  You're looking at his wife

21   Molly and four of them.

22          You guys can all have a seat.

23          In his personal life, he does not participate or

24   partake in the kind of activities that you are going to hear

25   about today, much like he never participated or partook in many

1   of the activities that his newspaper allowed to be printed

2   about, or people to send in advertisements.  But he followed a

3   big rule, the First Amendment means something.  Because, in his

4   experience, if you don't allow it, when you start letting the

5   government decide what you can and can't say, think, or write,

6   even when it's legal, the government wins and the little man

7   loses.  That's his motive.

8           And, you know what, you're going to hear a lot of ugly

9   stuff here, because the government's only going to focus on it,

10  not going to show you all the stuff that isn't ugly.  But I'm

11  going to tell you, I will be standing in front of you in, I

12  don't know, Monday, Tuesday -- oh, yeah, four months, we're

13  going to sit here and listen to all this, nothing -- you're not

14  going to have anything earth shattering.  At the end of the

15  day, you're going to be right back where I told you you would

16  be, I predict.

17          But here is where it's going to come down.  This is

18  the whole case right here.  We'll call it the Larkin and Lacey

19  method:  Legal, illegal.  An ad that is legal, it can run.  An

20  ad that is not legal, what do you think?  Let's do this one in

21  red.  Cannot be put up in illegal form.  There it is.

22          You know what's interesting -- and I'll come back to

23  this -- Mr. Jones talked for two hours, he never showed you a

24  single ad that was an illegal ad on its face.  He never showed

25  you a single ad that any one of these six defendants,

1    especially Mr. Larkin, ever saw, ever knew anything about.  The

2    people in the ads, they didn't know.  The purported businesses

3    that are supposed to show you that there was a business

4    enterprise of prostitution, had no idea.  This entire case is

5    totally untethered from these defendants, and, in particular,

6    my client.

7          This entire case is because this is controversial

8    stuff, and I grant you that.  Many people don't like it.  Many

9    people don't like that adult services can be legal, and now

10   that the internet is there, that it's everywhere.  But

11   controversial does not equal illegal.  They're just not even

12   related.  One is totally different than the other.  And what

13   you're going to see here is -- and you'll have your own views.

14   You're entitled to them.  You may like, dislike, be neutral on

15   this type of adult consensual services, but that's a different

16   issue than what's illegal.  It's not illegal.

17         But let's continue.  So the newspapers were

18   flourishing.  Everything was good.  In the late '90s -- and I

19   want to say this.  There is all this talk about greed.  In the

20   1990s, Mr. Larkin and Mr. Lacey and the other two owners,

21   they -- Mr. Brunst and Mr. Spear -- they sold a big interest in

22   VVM, the big company that owned all the papers.  And they kept

23   control of them, but they sold it.  And you know what they

24   made, certainly my client, millions.  My client was a wealthy

25   man before the turn of the century, before Backpage.com was

1    even a blip on the screen, before any of the facts you'll hear

2    in this case.  He didn't need the money.  And everything you

3    heard about, and you will hear about here, was not for money.

4    And I'll come back to that in a bit.

5          But, as anybody over 30 years old knows, times were a

6    changing at the turn of the century, right?  Old people like me

7    used to love to get up every day and get my morning coffee and

8    read my paper, but it became harder and harder to do because

9    the internet took over and all of these newspapers weren't

10   doing as well as they used to.  Everything was going online.

11   So all Backpage.com is is the papers aren't going to keep going

12   as hard copy papers all in one place, so they get put online.

13         So all 17 of these newspapers, each one becomes an

14   online newspaper, and all of the advertising for them, instead

15   of being at the back page of each paper, becomes its own online

16   back page.  Hence the name, Backpage.com.  And the money from

17   Backpage.com is what was used to pay for, among other things,

18   these other 17 and 18 newspapers, just like they were in the

19   old days.

20         Now, the government, again, just tries to make it

21   sound like the whole world was about these escort ads, but it

22   wasn't.  Here's a table of contents of Backpage, and it covers

23   everything.  You could put ads in there for pretty well

24   anything you can imagine:  Local places, events and things to

25   see and do; community things, childcare, classes, buy, sell,

1    trade.  They talked about an old sofa.  I think we're going to

2    hear a lot about an old sofa.  You could sell a car.  Sell your

3    car.  Musicians, I want to play music, I want to hear music,

4    and so on, and so on, and so on.

5          And, significantly, over here, one of these sections

6    is called adult.  There it is, adult.  Now, they're going to

7    make this whole thing seem like that's all anybody ever spoke

8    about or talked about, not true.  It was part of a bigger

9    puzzle.  But there was certainly emphasis on this, and we'll

10   talk about it.

11         But one of the other deceptions that the government

12   repeatedly did is this idea that 94 percent of the money was

13   from adult and prostitution.  No.  What you're going to learn

14   is 85 percent of the ads, over 80 percent of the ads were in

15   these other categories.  Adult, though, people would pay more

16   for adult.  Now, what does that tell you?  Again, no judgment

17   here.  The reality is, there is a high demand for consensual,

18   lawful adult voluntary services.  The proof is in the pudding,

19   right.  A lot of people call about it.  A lot of people

20   interested in it.

21         We're not -- none of us are naive enough not to

22   realize, you can go anywhere any time, from a news shop, to a

23   7-11, to online, and you can see adult stuff in this day and

24   age.  It's there.  Backpage got its share of it.  In

25   particularly, as they told you, one of the few things we agree

1    on, these guys weren't looking to make a lot of money on this.

2    They were trying to keep their papers afloat.  And then when

3    Craigslist decided to shut down its adult services, poof,

4    Backpage, I mean, Backpage got big.  And what's that

5    expression, drinking water from a firehose.

6          And what you're going to see is during that time

7    frame, I'll call it 2010, 2011, flood of new stuff going on,

8    lots of reactions to try to address what was happening, to

9    address it responsibly, and to keep trying to walk that line

10   between:  We believe in the First Amendment.  We're not going

11   to give up the fact that people can have speech and say what

12   they want in an ad, if it's legal, but we are going to try to

13   police this stuff.

14         And what you're seeing is in 2000, kind of '9 or '10

15   to 2012, this sort of increase, continual revamping of the way

16   they can police this site.  Changes made all the time.  And, by

17   the way, one of the things you'll learn in this case, changes

18   not only that are consistent with what everyone else in the

19   internet space was dealing with, but were cutting edge, at the

20   forefront.

21         These changes where people were grappling with, where

22   do we draw lines, what do we allow or not allow online, were

23   all happening in the new millennium.  That first decade, 2000

24   to 2015, it's like, this is new.  How do we do it?  And people

25   are figuring it out as they go.  But what you're going to hear

1    about Backpage, always, always, always with the advice of

2    experts, lawyers, consultants, people who would come in and

3    say, here's how you can and should do this properly.

4            Now, what's interesting is this is how everything gets

5    paid for, remember, the newspapers.  One of the slides that

6    Mr. Jones put up to try to make it sound nefarious, and it was

7    nice of them to put -- you know, news flash, my client's

8    e-mails don't have a mugshot of him next to them all the time.

9    You're going to see -- I'm going to tell you right now, you

10   will see so many little digs and tweaks by these guys that are

11   done for no reason other than to make everyday common

12   activities look nefarious.  They put his mugshot here.  It

13   wouldn't normally be there.  But this is an e-mail he had.  And

14   let's look at this earth-shattering e-mail.

15           *Congratulations to Carl.  Another great month.  You're*

16   *leading the way for the whole VVM enterprise onto the Web.*

17   That's in 2008.  This is Mr. Larkin saying, hey, Carl Ferrer,

18   who is running the online stuff, wow, you're getting a lot of

19   business.  That's great.  Every businessman and every

20   businesswoman in every business wants to succeed.  This e-mail

21   tells you nothing to suggest that they're acting illegally.

22   They are getting business.  Doesn't shed any light on whether

23   it's good or bad.

24           But here's what it does support.  You're leading the

25   way for the whole VVM enterprise, in other words, Backpage

1    online is the same in the online world as Backpage in the hard

2    copies.  It's just instead of being in 17 different handheld

3    papers, it's in one place for all of them.

4          Now, as I said, things started really getting big when

5    Craigslist shut down.  And you'll hear a lot about Craigslist

6    shutting down.  Bottom line is they weren't doing anything

7    illegal either, but there was a lot of pressure.  Don't get me

8    wrong, there were a lot of people saying, Craigslist, there is

9    a lot of stuff on your site that we don't like.  You should

10   shut down your adult section.  And you'll hear that after

11   several years, they did.

12         Now, as an aside, much of Craigslist's adult section

13   just went over to its personals, but a lot of adult stuff came

14   over to Backpage.  But, again, these were adult ads that were

15   within the legal services, on their face, not illegal.  And

16   we'll talk more about that.

17         But, significantly, again, on the so-called greed

18   factor, my client, Mr. Larkin, he didn't want to keep doing

19   this.  You will learn that from about 2011 on he was trying to

20   sell the companies, the newspapers and the Backpages.  He

21   wanted to spend more time with the family over here.  And so

22   from 2011 on, all of these companies were constantly on the

23   sale block.

24         Now, of course, selling newspapers, selling a big

25   company, it's not like me selling a car, so it takes a while.

1    And what you're going to learn is there was a lot of different

2    meetings with legitimate investors and buyers who knew full

3    well what these companies were over sales the whole time.  And

4    what ultimately happened was in 2012, the newspaper part --

5    which, frankly, was easier to sell because it didn't have all

6    the reputational risk, which I'll talk about -- sold.

7          And then in 2015, after several almosts with

8    established companies, who always at the end said, you know,

9    there is so many people saying we don't like this, we're going

10   to back out, they relented and they agreed to sell it to

11   Mr. Ferrer, who had always wanted it.  He created it.  He

12   started it.  He ran it.  And they finally said, all right,

13   we'll work a deal with you to buy it.

14         So in 2012, Mr. Larkin, Mr. Lacey, and the other two

15   owners sold it.  Carl Ferrer's baby even more.  But -- so

16   another big deception is this idea that somehow these guys kept

17   involved running things after 2015, they didn't.  But what you

18   will learn is this was what's called a seller-financed sale.

19   Sales price for this company was over $500 million.  Mr. Ferrer

20   didn't have $500 million in his pocket.  So they did what

21   companies often do, they sold it with him having to pay them

22   back over time.

23         So what you'll learn is, like any bank or lender, they

24   did stay on top of financial stuff:  We want to know what's

25   happening with the money.  We want to know that you're making

1    your payments to us.  But they didn't have anything to do with

2    running it.  And you won't see anything that shows to the

3    contrary.  That's a deception when he told you that, that they

4    kept running it after, they didn't.

5          And what you'll also learn is that the structure of

6    this was the same structure they used when they sold the

7    newspapers in 2012 to a company out of Denver.  In other words,

8    this is a legitimate, valid, proper structure.

9          The other thing you'll learn is even Backpage got

10   loans -- I mean, Backpage, sorry, sorry.  Strike that.  VVM had

11   a $130 million loan from the Bank of Montreal to pay for all

12   this stuff, which they paid back every dime.  But, again, the

13   bankers there were getting information from VVM all the time to

14   make sure that their $130 million would be repaid.  That's very

15   different than running a company.

16         What you're going to see here about the way the

17   company originated, what Mr. Larkin's MO was for 40 years, is

18   that it's real simple, it's this simple line:  Legal is

19   allowed, not legal isn't.  And he followed it consistently.

20   But he continued every year, they kept beefing up more, and

21   more, and more the number of people who would screen the ads to

22   try to make sure that anyone who could be victimized, if the ad

23   looked like it was illegal or a victim, they would refer it to

24   law enforcement.

25         Backpage had over 100 employees, 100 employees who

UNITED STATES DISTRICT COURT

1    came in every day and just screened ads.  And you'll see there

2    is all kinds of training, Mr. Jones showed you some of it,

3    training these people for what to look at to make sure that the

4    ads -- no ads were going out that were illegal.  And if ads had

5    things in them that were indicia of trafficking, we alert law

6    enforcement.  And then there were groups that collect the

7    information and alert law enforcement, they would alert them as

8    well.

9              And, once again, more law enforcement accolades.  *This

10   is great.  You guys go above and beyond when handling subpoenas

11   and assisting law enforcement.  It's truly appreciated.*

12   Columbus Police, 2012.

13             *Good afternoon.  Thanks for a quick response.  The

14   subpoena was in response to an investigation that was initiated

15   due to a tip sent to NCMEC by your site and about possible

16   child prostitution.  The tip was received by NCMEC on

17   January 22nd, 2014.  NCMEC generated tip number* -- blah, blah,

18   blah.  *The female pictured in the ad was determined to be a

19   17-year-old runaway.  She has been recovered and returned to

20   her family.  A case is underway for human trafficking and

21   suspects have been identified.*  Tallahassee Police Department.

22   That 17-year-old runaway was saved by Backpage, because they

23   looked at these ads, and when they saw things that looked like

24   they could be trafficking, they reported it.

25             *Thank you very much for your assistance.  I'm with the*

UNITED STATES DISTRICT COURT

1    *Toronto Police Department.  We deal with numerous hospitals,*

2    *banks, cell phone companies, et cetera.  You guys have been by*

3    *far the best and easiest to deal with.  Your law enforcement*

4    *guide was a tremendous assistance.  Thanks again.*  Toronto

5    Police Department, 2013.

6           *Thank you for your help.*  From Hennepin County

7    Sheriff.  *Your response has been outstanding compared to most*

8    *other companies.*

9           And, finally, Philadelphia.  In essence, *I want to*

10   *pass along the good news that we've indicted someone*

11   *trafficking minors.  The help you provided in a grand jury was*

12   *instrumental.*  Again, Backpage is helping solve the problem by

13   having a hundred people look at these things and turn them

14   over.

15          If you had any question, there is e-mails, and I want

16   you to look out for these, there are e-mails that are really

17   windows into the mind of someone.  I'm going to tell you right

18   now, the government will never show you, never, an e-mail that

19   shows a criminal intent by my client James Larkin.  Won't

20   happen.  They're going to put a lot of things up that they're

21   going to distort, and we'll be able to explain every one and

22   show that they're taking it out of context, if they even have

23   them.

24          But here's a window into my client, and Backpage, and

25   Mr. Lacey, and all of these guys.  E-mail from staff from -- to

1    all the staff at Backpage and the papers from Jim Larkin and

2    Scott Spear, another one of the defendants.  *Because we believe*

3    *in the First Amendment right to free speech, we have agreed to*

4    *run an advertisement in next week's papers from the Rebecca*

5    *Project attacking Backpage.com.*

6            Think about that.  My client and Mr. Spear, who is

7    sitting at the end of this table, said, we believe so much in

8    the First Amendment, that we're going to run an ad by somebody

9    who is trying to say Backpage is awful and get rid of it.  In

10   other words, we're going to run an ad saying what these guys

11   are saying because the First Amendment matters.  That's why

12   they did all this.  You can't cut back on the First Amendment

13   or else anyone can be sitting in a room like this.  There is

14   your window into my client.  That's 2010.

15           Now, let's talk specifics, legal or not, adult ads,

16   legal versus illegal.  What people need to understand is a lot

17   of adult activity is legal.  I mean, whether some people think

18   that's a good thing, some people think it's bad, some people

19   just don't care.  Voluntarily adult activities are quite broad:

20   Pornography, stripping, sex shows.  You can get a naked maid

21   here in Phoenix, you'll learn.  You can call up somebody to

22   come clean your house buck naked.  Who knows what goes on when

23   they're there, but, boy, it's legal to advertise.

24           So what you need to keep your eye on the prize on,

25   that these guys don't want you to, with the wave of a hand --

42

1    actually, it was his left hand -- Mr. Jones did a lot of this,

2    because all of this was prostitution, all of this was

3    prostitution.  No, add the word escort.  That's what he's

4    saying is prostitution, but he's wrong.  Prostitution has

5    specific meanings.  It's a state-by-state statute.  At the end

6    of this case, the Court will tell you the specific meanings,

7    but basically they're precise.

8         For example, in Arizona, prostitution involves someone

9    agreeing, in exchange for money or compensation, to engage in

10   sexual conduct with another person.  And they define sexual

11   conduct.

12        Sexual conduct means sexual contact, sexual

13   intercourse, oral sexual contact, or sadomasochistic abuse.

14   And, again, we warned all you all in advance, unfortunately,

15   we're going to have to talk granular about sex acts in here, so

16   we're all adults, but it's important distinctions.

17        The bottom line is there is a line that makes

18   something illegal, and the line is, generally, and this -- we

19   just talked about Arizona, but it's going to be intercourse,

20   and, of course, because lawyer types and politicians don't want

21   to leave anything to chance, they want to define it, they

22   define it.  Arizona says, sexual intercourse means penetration

23   into the penis, vulva, or anus by any part of the body or an

24   object.

25        Okay.  So can't do intercourse, that would be

1   prostitution if you do it for money.  They also say oral sexual

2   conduct, oral conduct with the penis, vulva, or anus.  Okay.

3   No, I'll just call it, oral sex.  And then the other one,

4   sexual conduct, the fondling or manipulation of any part of the

5   genitals, anus, or female breast.  So how about, don't touch

6   the private parts.  All right.  Don't touch the other person's

7   privates.  There it is.  You're not going to see a single ad

8   that advertises any of that.

9          If an ad said $50 for intercourse, oral sex,

10   manipulating your privates, that's an illegal ad, but you're

11   not going to see that.  When the ad doesn't say that, it's not

12   illegal.  And, you know what, you'll probably hear some

13   examples later, I'm going to spare it to you now, but you can

14   let your mind wander.  And you can realize there is a heck of a

15   lot of things people can do for money that are sexual that

16   don't do this.

17          And I'll just give at least one example.  Come out and

18   strip naked in front of you and dance around, even touch you in

19   certain places, just stay away from these.  That's what these

20   ads are.  They're varying degrees of escort ads, they are not

21   this.  You won't see it.  Backpage screened, think of these

22   numbers, hundreds of millions of ads, hundreds of millions, and

23   you will see few, if any, ads that actually have this.

24          One of the biggest issues in this case is what you

25   don't see, because what you don't see is a reminder of just

1    what a good job they're doing.  You're going to see children

2    being saved, traffickers being stopped, and you're not going to

3    see ads like this, because they did their jobs, and every one

4    of these six people took it seriously.  These ads were not

5    prostitution.

6              By the way, in another thing that -- incredible that

7    they wouldn't really let you know this --

8              Let me go back here.  I might have jumped ahead.  I'm

9    somehow way ahead.  I'm sorry.  I'm going to come back to

10   these.  I think in my excitement I'm pressing buttons without

11   realizing it, so let's go back.  We'll talk about these in a

12   minute.

13             City of Scottsdale escort application.  Not only is

14   escort services legal, but pretty well all big cities in the

15   country actually have departments of escort services, places

16   where people sign up people who do escorts, which is the kind

17   of stuff I talked about that doesn't involve the banned items,

18   and they get a license and they can go out and, guess what they

19   do, they pay money to the city.  The city gets taxed -- gets

20   money from them and uses it to pay for expenses.  Escort is

21   legal, it just is.  And things that fall short of this

22   prostitution are legal, they are not illegal ads.

23             All right.  Let's talk about a couple of examples so

24   we can put this in perspective.  These are a couple of the

25   counts in the indictment.  The government didn't even bother

1    showing them to you.  But here's one, this is a lady, I'll just

2    call her Brianna L.  Says she's 26.  She's certainly an adult.

3    And she basically says she's the hottest in town.  This will

4    show you what their ads look like.  She puts this up herself.

5    Somebody at Backpage looks at it, it does not -- you'll be able

6    to see these later -- but nowhere in here does it say anything

7    about intercourse, oral sex, touch privates.

8         I love what I do.  Pleasing you is my mission.  Says

9    she's ready.  No explicit language.  She literally says in it,

10   this ad is not in any form an ad for solicitation of

11   prostitution, and then it gives her information to call her.

12   And, by the way, everything that she is depicting, frankly, in

13   all of these -- let me keep going.

14        Now this, these pictures here, you will learn, are

15   pictures that the moderators at Backpage removed.  They took

16   them down from the ad.  So when the ad went out, it showed

17   these, but it did not show the other pictures of the lady in a

18   little bit more provacative poses.

19        Now, very important point, these other ads' pictures

20   are legal too.  They're not obscene.  They're not showing

21   intercourse, oral sex, or touching privates, but Backpage tried

22   to put some standards in.  They chose to say, you know, we

23   don't want graphic sex, and we don't want things that get too

24   graphic, so they would bounce them, because they moderate.

25        But what you'll also see is this box up to the left,

UNITED STATES DISTRICT COURT

1    this is all the kinds of information that Backpage would get

2    for administrative data.  And you'll see that it includes how

3    much the ad was paid, so this was $7.  And you'll see typically

4    these ads cost 7 to 10 bucks, ish.

5              You'll see there is an invoice.  You'll see

6    significantly over to the top right, you'll see there is an

7    e-mail address, Alexis Fox 23 @ G mail.  You'll go to this page

8    which gives additional information that Backpage keeps.

9    Significantly, at the bottom left, it shows the IP address

10   where this came from.  And, at the bottom right, it shows the

11   credit card reference.

12             And then it also shows the people who actually -- it

13   gives these numbers -- it says approved and it gives a code,

14   467360, who actually reviewed this.  And if you go back and if

15   you look at these pictures that were removed, it's kind of hard

16   to see, but in the top left on that white box, at the bottom --

17   at the bottom it says, deleted by BP 45, another one says

18   deleted by system, deleted by system.  In other words, BP 45 is

19   a number that corresponds to an actual Backpage employee.  So

20   you can actually see who deleted this and looked at it and said

21   it was okay or not okay.  They're looking at these things.

22             But, significantly, this blue page is all information

23   that Backpage keeps so they can help police catch bad guys.  If

24   there was a concern that someone was acting illegally, they've

25   got a credit card number, they've got the IP address where it

1    came from, they've got the e-mail address that was used for it,

2    and sometimes they get a phone number, but not always.  All of

3    that, by design, is for Backpage to be able to help law

4    enforcement if they see anything that looks involuntary or like

5    trafficking or underage or if the police need anything.

6    Totally legal.  Zero illegal about that.

7            And, by the way, you will never hear that my client or

8    any of these defendants knew anything about this ad, this lady

9    Brianna, who goes by Alexis.  What you'll know is the ad

10   follows the standards that they insisted be followed and that's

11   it.  They don't know anything about it.

12           So if Brianna turns out to go above and beyond the

13   legal services that are encompassed in this ad, we don't know.

14   The government won't know unless Brianna or someone who had sex

15   with -- who had intercourse, oral sex, or no touch privates

16   with her, comes forward and says they did it.  But the ad

17   itself, which of course is Backpage's only window into this, is

18   a legal ad.  All of them are.

19           Similarly, the next one, one of the counts, Jordan is

20   her first name -- and she goes by a different name on here, I

21   don't remember what it is but -- sexy, erotic playmate.  The

22   girl you need to see.  She says she's 20 years old.  She is of

23   age, certainly looks it.  No allegation she's not.  She's got

24   clothes on.  Frankly, she doesn't have to for it to be a legal

25   ad, but she does.  Slippery when wet.  These are stripper

1    terms.  More pictures.

2          I do not offer specials and I'm sexy.  I'll make your

3    dreams come true.  Call me.  Exotic suite.  Someone could call

4    that number and go to that very hotel where she is, and she

5    could do everything she's doing there and more with no clothes

6    on and it's legal.  And they can pay her for it, as long as

7    she's not doing intercourse, oral sex, or touching her own or

8    their privates, or letting them touch her or her touch them.

9    And this ad doesn't say that.  It's a legal ad.

10          Again, you're not seeing illegal ads because Backpage

11   monitored for them.  The only thing advertised was legal escort

12   services.  And, once again, here's all the information, e-mail

13   address, IP address of where the internet stuff comes to, where

14   it comes from, credit card.  And she paid $12 for her ad.  This

15   is legal.  And you're going to see this over and over again by

16   the ads that are shown.

17          Once again, ad posting rules.  I already went over

18   them with you, but telling people:  Act legally.

19          Now, couple things, you heard a lot about this so-

20   called moderation, which the government talked a lot about, and

21   other counsel will talk about that.  I'm not going to talk

22   about it much, but, again, in this 2008, 2009, '10, '11, '12,

23   things are changing.  This is all new.  And the website had

24   gotten way bigger than anybody expected.

25          With advice of lawyers and experts and consultants,

1    they were continually adding more things on.  And you will hear

2    that they changed.  Again, there were over a hundred people

3    they got looking at these things.  And what you'll see is my

4    client, in the limited involvement he had in things, was let's

5    do whatever it takes to do it right.  Here's another window

6    into my client.

7          2009, Carl Ferrer sends to Scott Spear, his boss.

8    Mr. Spear is in between my client and the Backpage folks,

9    because my client is not part of Backpage, he's just part of

10   the parent company.  Ferrer says, hey, we want to do adult

11   content abuse abatement.  We want to start doing more things to

12   try to catch people who abuse the website.  And he lays out a

13   plan.  We want to remove sex act pics, more coded terms, et

14   cetera.

15         So this goes to Mr. Spear, who writes to my client,

16   Carl's plan, this is well thought out.  And what does

17   Mr. Larkin say back, I agree.  We should implement this

18   immediately, thoughtfully, and deliberately.

19         What you're going to see over, and over, and over

20   again is Mr. Larkin, as the head of the parent company running

21   19 companies, as suggestions were made, as advice was given to

22   make things better, to screen things better, he said, sure, and

23   they threw a lot of money at this and a lot of people.  Not the

24   actions of somebody who is trying to act illegally.

25         Now, so far what I've told you about is as though it's

1    just these guys' views, but they didn't just operate in a

2    vacuum.  My client and the others were getting constant

3    feedback as to what was legal and what wasn't that went into

4    his brain and his decision making to ensure that he always was

5    comfortable that they were staying on the legal side of the law

6    and continuing to do protected First Amendment activities.

7            So there is going to be various influences on him in

8    that, some indirect, some direct.  In terms of indirect, I

9    mean, just taking kind of things out there, as I told you, they

10   had a loan from the Bank of Montreal for 130 million.  One

11   thing about this business, and this kind of makes your job a

12   lot easier, the proof is in the pudding, the ads -- you'll see

13   the ads -- and the only thing that the Backpage folks provided

14   to any advertiser are the ads, right.  They're not out there

15   with the escorts.  They're not out there with somebody wanting

16   to do business.  They're not listening in.  They say, here's

17   space.  For 7 to 12 bucks you can get space for a sofa or for

18   your ad if it's legal.  So their only window is the ad itself.

19           Well, that window is visible to everyone.  In other

20   words, if you're the Bank of Montreal and you're debating

21   whether to do business with Backpage, you can see what it does.

22   It's right there.  And they did.  And all of these companies,

23   like the Bank of Montreal, dealt with them like a legitimate

24   company, lent them $130 million, had regular meetings about

25   where are you?  Are you going to pay it?  Where is -- how is it

1    going?  We need to get paid.  And they paid every dime.  They

2    had a lot of exchanges like that with big reputable companies

3    that, again, confirmed to Mr. Larkin and the others, yeah, this

4    is all legal.  No one is treating this like it's not.

5        They had various potential sales.  I'll talk to you

6    about them more in the evidence, but there were multiple

7    meetings from 2011 to 2015 with big companies, big players,

8    hedge funds, who were like, hey, this is a profitable company,

9    we think we want to buy it.  And they would get to the brass

10   tacks, but there was a lot of negative press, and they would

11   say, you know, we're going to take a pass.  We don't want to

12   deal with the reputational issues, because people will say

13   we're an adult business.

14       How about seeing what other companies were doing?

15   This isn't in a vacuum.  The whole time these defendants are

16   doing what they're doing at Backpage, they're familiar with

17   Craigslist and Google and Twitter and Facebook -- I don't even

18   know what the other one is, that shows what a dinosaur I am --

19   but social media out there, and this stuff, these adult ads,

20   revealing ads, escort ads, they're everywhere.  Again,

21   continually confirming, this is a legitimate business.  It's

22   legal speech of other people.

23       But then, not only did they have indirect, they had

24   direct input to corroborate their view that they're acting

25   legally under the First Amendment and they can continue to

1    allow legal speech.

2         Department of Justice.  There is Lady Justice in the

3    halls of the Department of Justice headquarters in Washington,

4    D.C.  Mr. Larkin on the right, Mr. Lacey in the middle, and

5    Mr. Ferrer, who was the CEO and person running Backpage, they

6    went and they met with the Department of Justice.  They

7    literally sat down with them in 2011 and said, here's what

8    we're doing.  Here are the things we're trying to add in to

9    better catch bad guys.  Tell us if we're doing anything wrong.

10   Tell us what we can do to do better.  They never told them they

11   were doing anything wrong.

12        They certainly never told them they were acting

13   illegally.  In fact, afterwards one of the DOJ attorneys wrote

14   the lawyer -- they're there with lawyers, this isn't just going

15   out on your own, there are lawyers involved in all of this --

16   wrote them, *Your presentation was very professional and I*

17   *learned a lot.  Thanks a lot.*  Again, confirming that this is

18   consistent with their abiding belief, this is legal speech and

19   we are not going to be the guys who stop people from legal

20   speech.

21        Once again, they're at the FBI, they're meeting with

22   DOJ.  More attaboys.  *Thank you very much.  The information you*

23   *provided was helpful.  Unfortunately, Clearwire does not feel*

24   *the same as your company when it comes to the safety of people.*

25   *Clearwire is a company that the St. Louis County Police*

1    *Department was trying to get information from.  Unlike*

2    *Backpage, they didn't give it.*

3          *I'm very happy and always have been with the level of*

4    *cooperation I get when dealing with Backpage.  Please leave the*

5    *ad up and any future ad they may post, as our investigation is*

6    *ongoing.  Again, thank you for your quick response and your*

7    *company's help with attempting to locate a very dangerous*

8    *subject.*  That's 2013.

9          2014.  *I have never received records back this quick.*

10   *Thank you for your fast response.  I do know -- I do not know*

11   *how you can improve on that portion of your service.*

12         FBI, 2014.  *That was the most expedient response ever*

13   *from a provider, ten minutes.  Thank you.  Simply incredible.*

14   *The individual depicted in the advertisement was successfully*

15   *recovered and identified as a juvenile.  Thank you again for*

16   *the hard work.*

17         Next one, security investigations.  *Thank you.  This*

18   *is above and beyond what we expected and incredibly helpful.*

19   Homeland Security.

20         Backpage continually showed we're going to let

21   anything that's legal, we're not going to let things that are

22   illegal.  We're going to do everything we can to help catch the

23   bad guys.  We're about voluntary, consensual, legal adult acts.

24   They don't stand for trafficking.  It's just a deception.  This

25   whole trafficking thing is just to inflame you on something

1    that just doesn't exist.

2          Lawyers, you'll hear Mr. Ferrer -- and I'll talk about

3    him in a minute -- their witness is going to tell them how he

4    told them, we had lawyers the whole time telling us that our

5    moderation practices were legal, that we were protected by the

6    First Amendment.

7          MR. JONES:  Objection.

8          THE COURT:  The objection is overruled.

9          MR. JONES:  A continuing objection, Your Honor.  This

10   issue -- just a continuing objection, Your Honor.  This issue

11   has been litigated.

12         THE COURT:  The objection --

13         MR. BIENERT:  No, it hasn't, Your Honor.  That's a

14   false statement.

15         THE COURT:  Mr. Bienert, the objection is overruled.

16         MR. BIENERT:  Okay.  You will hear that their chief

17   witness said, yeah, we had lawyers telling us the whole time

18   this is protected activity, and the way we moderate or look at

19   ads and what we do with them is legal.  Again, that's what

20   happened.  My client is like, look, I'm not going to give up

21   anybody's First Amendment rights, but I want to do it legally.

22   But there is more.

23         These guys didn't just rely on the word of lawyers,

24   they went to court.  They went to court to make sure that

25   courts agreed that they were acting legally.  Every single year

1    from 2011 through 2016 my client and the others at Backpage had

2    at least one court look at an actual case involving Backpage,

3    and the kind of pictures that the government is showing you

4    here, and say this is protected activity, this is legal, and

5    throw the case out.

6         2011, a case called M.A. versus Village Voice Media.

7    I need the glasses for this one.  The mother of a young girl,

8    who turned out to have been a teenager and was trafficked, sued

9    Village Voice Media, the parent company.  By the way, if you

10   look up here and you see at the caption, M.A., a minor, versus

11   Village Voice Media, look under where it says M.A., a minor, by

12   and through her natural mother and next friend, P.K.  You know

13   who that is?  That's the lady they showed you in the very first

14   slide of his presentation.  Pride.  I think her last name was

15   -- Kubiiki Pride.  This is her lawsuit.

16        She went to court and said, I am taking a position

17   that Backpage is responsible for what happened to my daughter.

18   And they alleged that Backpage posted many advertisements which

19   included explicit nude photographs advertising services as an

20   escort for sex and got paid money for doing it.

21        They allege, defendants knew that there were explicit

22   sexual photographs posted on the site, that the postings were

23   for advertisements for prostitution, that minors were included

24   in them, and that their internet service was being used to do

25   this.  They literally said -- they literally allege, defendant

1    aided and abetted, Backpage aided and abetted the pimps who

2    were trafficking this young girl in the crime of facilitating

3    prostitution, exploitation of children, and child pornography.

4    They went on to say as their evidence, well, Backpage had been

5    told in the past about this kind of thing.

6         The Court rejected the argument.  The Court threw the

7    case out.  The Court said this is a two count civil action

8    where M.A. seeks to hold defendants, Village Voice Media,

9    liable for the victimization by this woman who trafficked her.

10        The Court ruled, plaintiff artfully and eloquently

11   attempts to phrase her allegations to avoid the reach of a law

12   called Section 230 -- which gives immunity to website hosts

13   like Backpage, an extension of the First Amendment -- and says,

14   the allegations, however, don't distinguish the complained of

15   actions from any other website that posted such content.

16   Congress has decided to make websites immune from this.  It is

17   for Congress to change the policy that gives rise to such

18   immunity.  It is hereby ordered that the case is dismissed.

19        What the court said is this is legal under the First

20   Amendment and Section 230.  If Congress wants to change the

21   laws, they need to.  But they haven't.  The plight of this

22   mother is horrific, but Backpage wasn't knowledgeable of it,

23   didn't know anything about the little girl.  Backpage saw an ad

24   -- and you'll see the ad, if they present it to you -- and

25   you'll see that it's not an ad that shows a little girl.  It's

1     an ad that shows a mature adult woman who claims she's over 18.

2          Again, what was my client told by a court, this is

3     protected activity.  You are still within the First Amendment.

4     And the court specifically said, the creation by Backpage of an

5     adult category does not impose liability for Backpage on

6     Backpage for ads in that category.

7          Neither notice or profit make Backpage liable for the

8     content and consequences of the ads posted by McFarland.

9     McFarland was the trafficker, the person who, of course,

10    without Backpage knowing, was behind the ads and victimizing

11    this young girl.  That was in 2011.

12         The very next year, 2012, another case, Backpage

13    versus McKenna.  This one was in the Western District Federal

14    Court in Seattle.  And, basically, Washington State put

15    together a law, basically, trying to regulate commercial ads

16    like the ones on Backpage, saying that it, basically, wanted to

17    stop abuse of minors.

18         They alleged, through their law enforcement

19    declarations, that moderators would be aware that someone

20    looked young and they didn't remove the ad.  The Court said,

21    when an online service provider publishes advertisements that

22    can employ coded language, a reasonable person could believe

23    that facts exist that do not, in fact, exist.  An advertisement

24    for escort services may be just that.  In other words, the fact

25    that an ad is sexy, the fact that it has some coded words --

1    and what's the one they talked to you about, GFE, girlfriend

2    experience is what they told you.  What did they tell you?

3    That means somebody who is willing to kiss, that's what they

4    told you.

5            First of all, we'll see what the evidence is as to

6    whether any of these defendants even knew what the government

7    claims GFE is.  But let's assume they did, you know, we can go

8    back to the old kissing booth at the county fair, the reality

9    is kissing is not illegal.  Someone can go out and kiss

10   someone, crazily enough, for money, legal activity.  This court

11   flat out said it.

12           The next one, the third-party publication of offers to

13   engage in illegal transactions does not fall within the

14   well-defined and narrowing limited classes of speech that fall

15   outside of the First Amendment protection.  In other words,

16   these ads by third parties are First Amendment protected.  And

17   what did the court do?  The court threw out the case under the

18   First Amendment.  Dismissed the case.  I'm sorry, declared that

19   the law that they were trying to impose was illegal, and then

20   they granted Backpage's request, saying, this is protected

21   activity.  You can't do what you're trying to do.

22           2014, the next year.  Here's another case.  Backpage

23   versus Robert Cooper.  This one is in Nashville, Tennessee.

24   This was a lawsuit to, basically, have another law saying we're

25   going to regulate ads if we think they could involve children.

1    The courts, basically, said this law is preempted, both by this

2    statute Section 230, and it also likely violates the First

3    Amendment.  It's protected activity.

4          Once again, that is what these defendants are being

5    told in real time.  And what the court here said was, this law

6    could impose liability for advertisements, notices,

7    announcements, and online postings that don't involve minors at

8    all, or appears suggestive without actually involving a paid-

9    for-sex act.

10          For instance, a description on a Backpage.com posting

11   for escort services with someone who is, quote, barely legal,

12   unquote, could fall under the sweep of the statute even though

13   the person who posted it could be 25 years old.  The statute

14   might also apply to someone who is 25 on a paid dating website

15   that is coy and playful, but has no connection to prostitution,

16   much less child prostitution.

17          And, by the way, I mean, what the court is saying here

18   is you can't tell from these ads what age somebody really is.

19   And if somebody looks like a mature adult and the ad is

20   otherwise legal, it's protected.

21          The next case, next year, 2014, Backpage versus

22   Hoffman.  This case in New Jersey -- and, by the way, this case

23   and a couple of the others, I want to stress, and we'll show

24   you this during trial, the judges didn't make these rulings in

25   a vacuum.  They were actually sent, as part of the cases,

1    Backpage pictures, Backpage ads.  You're going to see the ads

2    look like the ads in this case.  So when the judges said, this

3    is protected activity, this is not illegal, they're looking at

4    ads like the ones we're looking at.  Again, telling my client

5    and all of the defendants this remains, indeed -- I'm going to

6    pull it up on my little legal category -- it's lawful speech.

7    This case, again, was thrown out under the First Amendment,

8    saying this is protected activity.

9         There is another case in Boston, the Jane Doe case.

10   This case, like the others, this one alleged that Backpage

11   defendants knew that a significant percentage of the

12   advertisements of escorts were prostitution and involved

13   minors.  And the court said -- by the way, this court, I would

14   submit you'll see, really, in one line, captures what the case

15   is about.  In this litigation, two important public policies

16   collide head-on, the suppression of child sex trafficking and

17   the promotion of a free and open internet.  That is what this

18   is about.

19        And what you'll see the court ruled is, don't

20   misunderstand, the plight of a child who is trafficked is

21   awful, but whether one agrees with its stated policy or not,

22   Congress has made the determination that the balance between

23   suppression of trafficking and freedom of expression, the old

24   First Amendment, tips in favor of the latter, in other words,

25   the First Amendment.

1          Putting aside any judgment, these are legal practices

2     and it stays that way unless Congress changes it.  And the

3     court, the second amended -- the dismissal of the second

4     amended complaint is allowed.  The court said this is not a

5     valid lawsuit.  Once again, telling these guys they acted

6     legally.

7          This cases -- sometimes cases go up to the next level

8     on appeal.  This case went up on appeal.  Here's the First

9     Circuit looking at the same case.  So it goes district court,

10    appellate courts, the circuit courts, which cover several

11    states, and then right above them is the supreme court.

12         In this one, once again, the court said, the

13    appellants' core argument is that Backpage has tailored its

14    website to make sex trafficking easier, but Congress did not

15    sound an uncertain trumpet when it enacted this act that

16    involved Section 230, and it chose to give broad protection to

17    internet publishers.

18         Goes on to say, if the evils that the appellants have

19    identified are deemed to outweigh the First Amendment values

20    that drive this law, the remedy is through legislation not

21    litigation.  Once again, confirming that these ads, when they

22    are legal and on their face look like adult consensual conduct,

23    they are legal.  Once again, telling my client he's acting

24    properly.

25         And then, finally, the last case I'm going to talk

1    about here because it covers so much ground that we'll hear

2    here, is a case called Dart.  This is an appellate case out of

3    Chicago.  The appellate court basically was looking at an

4    effort by the sheriff in Chicago, a guy named Dart, to lean on

5    credit card companies to not let Backpage's customers use

6    credit cards, to basically strangle them out so that they could

7    not get business.

8           The court highlighted, Backpage sought an injunction

9    saying, hey, this sheriff is not allowed to pressure credit

10   card companies to quit doing business with us.  And the court

11   agreed.  While the sheriff has a First Amendment right to

12   express his views about Backpage, a public official who tries

13   to shut down an avenue of expression of ideas and opinions

14   through actual or threatened imposition of government power or

15   sanction is violating the First Amendment.

16          The court went on to say, this sheriff is using the

17   power of his office to threaten legal sanctions against credit

18   card companies for facilitating speech and he's violating the

19   First Amendment.  The First Amendment forbids a public official

20   to attempt to suppress protected speech.  And this court was

21   looking at Backpage ads just like the one in this case.

22          The Court even went so far as to say, even entities

23   that know of the content aren't liable for what a third person

24   puts on a classified ad site.  Does a newspaper that carries an

25   advertisement for escort services or massage parlors aid and

1    abet the crime of prostitution if it turns out that some or

2    even many advertisers made money from that?  The answer is No.

3           Basically, it then ruled in favor of Backpage.  Here's

4    an interesting quote, and this is from the court here, nor is

5    the sheriff on solid ground in suggesting that everything in

6    the adult section of Backpage's website is criminal, violent,

7    or exploitive.  Fetishism, phone sex, performances by

8    striptease artists, vulgar is not violent.

9           One ad in the category of domination and fetish is for

10   the services of a professional dominatrix, a woman who was paid

11   to whip or otherwise humiliate a customer in order to arouse

12   him sexually.  And then he sites a website about talking about

13   what a dominatrix does.  I make a living as a professional

14   dominatrix.  I make a living by hitting, humiliating, dressing

15   up, verbally attacking, and otherwise fulfilling men's weird

16   fantasies about being dominated.  It's not obvious, the court

17   says, that such conduct endangers women or children or violates

18   any laws, including laws against prostitution.  Sound familiar?

19          What you're going to see here is that the evidence is

20   going to show that these ads are legal.  And no matter how much

21   the government says, they're all prostitution ads, just look at

22   them, they're not.  And the message continually being conveyed

23   to the defendants by courts who looked at the ads, who said,

24   no, these are legal.  This kind of stuff is legal.  You don't

25   have to do it, you don't have to like it, but you can't stop

1    people from allowing others to post it when it's legal.

2            I'm going to talk about a couple of -- I want to

3    address some of the things that they said a defense is, and

4    then I'm pretty well going to be wrapped up.

5            So I probably have fifteen minutes, Your Honor, just

6    so you know.

7            THE COURT:  Okay.  Thank you.

8            MR. BIENERT:  I assume I should keep going?

9            THE COURT:  Yeah.

10           MR. BIENERT:  Okay.  This is kind of in the -- talk

11   about deception, this is dirty pool, I will submit, you will

12   see from the evidence.  You may recognize this slide, because

13   this is one of the slides that Mr. Jones showed you.  New in

14   town -- and, again, my client's mugshot isn't next to these

15   documents.  You will learn, he didn't even write this document.

16   This is a long document by a consultant who, basically, they

17   paid a lot of money to come in and say, hey, help us catch bad

18   guys and do the right things.  And he gave them a big list of

19   stuff that they should think about.

20           And the guy says, new in town is often used by pimps

21   who shuttle children to locations where they do not know anyone

22   and cannot get help.  When this phrase is used, moderators

23   should be told to be on heightened alert that the images may

24   belong to someone under 18.

25           So, first of all, they suggested that this somehow

1    shows an intent to break the law by my client.  I assume that's

2    why they put his picture there, even though it wasn't there.

3    That's not what this says.

4         It just says, if you see this, pay careful attention.

5    It doesn't say that this is illegal.  It says just be looking,

6    and if this looks like someone under 18, take appropriate

7    actions.  And, again, we know they were constantly taking

8    appropriate actions.

9         More kudos.  Detroit, Flint FBI.  *Thanks for the quick*

10   *reply.  Your information resulted in the successful recovery of*

11   *a juvenile.*

12        Bureau Kings, human trafficking, special victim unit,

13   county district attorney, Kings County.  *Thank you.  You are*

14   *the best.  Have a great day.*

15        Portland Police Department.  *Information obtained*

16   *through Backpage subpoenas resulted in the successful rescue of*

17   *a female and the PPD is working to catch others.  Thanks.*

18        FBI IC unit, 2015.  *Words cannot describe how*

19   *appreciative and impressed I am by your group.  Thank you so*

20   *much.  Have a fabulous weekend.*

21        So on and so on.  Savannah, Georgia, FBI, another

22   thank you, they saved some children.

23        And, finally, ICE 2016, they had a human trafficking

24   organization.

25        Not acting illegally, but acting responsibly while

1    still staying true to their firmly held belief that the First

2    Amendment matters.

3         The FBI even gave a special recognition for the help

4    that Backpage, run by Carl Ferrer, was giving.  *The FBI is*

5    *proud to recognize Carl Ferrer, Backpage* -- he was vice

6    president in 2011, he became president at the beginning of

7    2013.  *Thank you for your outstanding cooperation and*

8    *assistance in connection with an investigation of great*

9    *importance.  The FBI's ability to carry out its investigative*

10   *responsibilities has been greatly enhanced through your help*

11   *and we are very proud of your valuable contributions.*  Acting

12   to help catch bad guys while not shutting down an avenue of

13   legal expression for people that like to express things that

14   some don't like.

15        Now, here is deception.  You may remember this.  This

16   was shown to you by Mr. Jones.  He put this up and he made a

17   big deal of it.  He said, here's an e-mail or -- in Backpage,

18   and it literally says, don't include verbiage that says suck

19   your -- private part -- or lick your -- private part -- but you

20   can edit it to say I enjoy oral.  And he made a big production

21   saying, that doesn't change anything.  It's still oral sex.

22   And you know what, if this were next to something that said $50

23   for that, I agree with him.  And that's certainly what he

24   suggested to you.

25        But what the evidence will show is, oops, look at the

1    top left.  It says, Backpage.com personals criteria.

2            I just blew it up for you.

3            This is about the personals section where this is

4    people saying they want to meet other people:  Women seeking

5    men, men seeking women, women seeking women, men seeking men,

6    all combinations.  This is not about sex for money.  This is

7    about just people who want to meet others, some of whom

8    indicate they'll do sex.  That's Tinder.  That's many websites.

9            It is absolutely 100 percent legal for people in

10   personal ads to tell people what type of sex they would do,

11   because it doesn't involve money.  Yet you will see that,

12   contrary to Mr. Jones who tried to make you think that this was

13   about the money adult ads, this is specifically in the

14   personals area.  And if you have any question about that,

15   here's all the different categories at Backpage.  And there we

16   have it, on the left is what this applies to.  Dating:  Women

17   on women, women on men, men on women.  It does not even apply

18   to the adult category on its face.  That's deception.  Just not

19   true.

20           These pictures -- I'll go through them quickly -- the

21   bottom line is, he went through a bunch of these with you.

22   These are all legal.  Guys, I think everybody here can see

23   you'll learn that this stuff is a lot tamer than what you can

24   see walking out of here and going to various newsstands,

25   stores, getting on the internet.  There is nothing illegal

1    about these ads.

2         But Backpage chose to try to set a standard where they

3    didn't want graphic sex, so they trained their people and just

4    said, hey, we're not going to let graphic sex on here, even

5    though they could.  As long as it's not linked with money for

6    graphic sex, it's legal.  Strippers can show themselves naked.

7    Personal ads can show themselves naked.

8         And here's what's also interesting.  If we zoom in on

9    the one on the left, it says, I am me @ -- it's kind of blurry,

10   we'll see it better later -- sexy -- I forget her name -- @

11   Yahoo.  In other words, this ad is giving her Yahoo address

12   where people can be in touch with her and get more:  Sexy ads,

13   information about her.  The point is, all of these websites

14   allow ads like this.  What Backpage is doing was, frankly, in

15   the adult world, mainstream, except they were cutting back on

16   some of the graphic stuff.  Totally legal.

17        They sent you a letter from states attorneys general.

18   The bottom line on this is it's neither here nor there.

19   Sometimes a key word is big.  When he said this to you, he

20   said, the state attorneys general were urging Backpage to shut

21   down its adult section, because some -- and, by the way, he

22   said -- you notice it's not everybody on there.  It said 21

23   state attorneys general.  Because some of them don't like

24   Backpage, frankly, some law enforcement do, and you'll hear

25   about that.  But the point is, state attorneys general don't

1  urge you to stop something when it's illegal.  They tell you,

2  this is illegal and we're going to indict you or charge you.

3  Urging is requesting.  It doesn't change the fact that this is

4  legal activity.

5        These I'm putting up because these actually are ads in

6  the indictment.  These are the only ones that they showed you

7  from the indictment.  Adult woman -- I'm not going to spend a

8  lot of time on it.  You'll see it later.  This is a legal ad.

9  Nothing illegal here.  There is no offer of sex -- of

10 prohibited sex act for money.  It's an escort ad.  I will spend

11 my time with you.  I'm sexy.  I -- I don't even know if it says

12 I'll -- I get paid X dollars an hour, but it could say that.

13 Totally legal.  She could do naked dancing.  She could do

14 everything short of intercourse, oral sex, and touching the

15 other person's privates or vice versa.

16        Same thing here.  This is another ad, perfectly legal.

17 It has that GFE term in it.  There's just -- as the case law

18 said to you, these terms mean nothing.  It doesn't make

19 Backpage any less protected.  It's a legal ad.

20        Same thing here.  They showed you this one.  It's

21 another legal ad.  This one is interesting because it has the

22 out call and in call.  There is nothing illegal about that.

23 That's an escort or a stripper term as well.  Out call means,

24 I'll go to you; in call means, you come to me.  That's it.

25 It's just referencing where they're willing to go do their

1   services, whether it's a stripper, a sensual massage, an

2   escort, someone who will do everything up until prostitution.

3   That's what this is advertising.

4           Remember what the court said in Dart, the Seventh

5   Circuit case, if there is anything about this ad that could be

6   legal conduct, then the ad is legal, because the law, the First

7   Amendment says, we need a space for people to put their legal

8   stuff.  There is all kinds of legal stuff from this.  There is

9   nothing illegal expressed.

10          Now, these are the other two they sent you.  Now,

11  these they told you are underage.  You can look at the ads.

12  There is nothing here that indicates underage.  They're legal

13  ads.  There is nothing illegal about the ads on their face.

14  That is a mature female.

15          Same with this one.  That's a mature female.  And if

16  it turns out that they were underage, if Backpage finds that

17  out, they immediately help law enforcement.

18          Carl Ferrer.  Carl Ferrer is a guy who the government

19  talks about is going to be a key witness.  And he is a key

20  witness because he ran the whole shebang.  Carl Ferrer was a

21  guy who handled the -- he was the head guy.  He was the CEO and

22  president of Backpage, not of the 19 companies, but of

23  Backpage.  He designed it.  He ran it.  He would report to

24  Mr. Spear above him, and my client above that, but give them

25  general information.  And they would tell him, let's talk about

1   important rules.  He was given all the legal advice and experts

2   and told to follow the rules.

3        And, frankly, as far as the Backpage folks -- or, I

4   should say, the VVM folks are concerned, he did.  Now, we'll

5   see what he has to say from the stand.  It will be interesting.

6   But, one thing is, he was the president and CEO of Backpage.

7   He's the guy who ran it.  Nobody else.

8        Here's a signature to it.  He ran Backpage from

9   Dallas, Texas.  He wasn't even in the same state as my client

10  and several of the defendants during the relevant time.  He's

11  just another of those 19 places all over the country that my

12  client checks out and tries to stay on top of in a loose

13  fashion, and says, do it right.

14       As I told you, my client and the others sold Backpage

15  to him in April of 2015.  And when they did, they resigned --

16  you'll see this is my client's resignation -- from any and all

17  companies that had anything to do with Backpage even as a

18  parent company.  And here's his resignation.  Now, you'll

19  notice, he doesn't resign from Backpage, my client, because he

20  wasn't an officer.  He wasn't involved in Backpage.  He's just

21  a guy who runs a bunch of companies, Backpage is one of them,

22  and Carl Ferrer runs it.

23       Get to my notes here.

24       I realize I got things a little out of order.  I just

25  wanted to show you, this is a declaration of Carl Ferrer.  And

1    there are many of these.  He filed lots of declarations in a

2    lot of these lawsuits.  And what you'll see is he writes,

3    Backpage prohibits illegal content, and, basically, we do all

4    we can to keep it legal.  And you will see that he swore that,

5    under penalty of perjury:  I declare under penalty of perjury

6    of the laws of the United States that the foregoing is true and

7    correct.  He did that time, and time, and time again.  So it

8    will be interesting to see what he has to say.

9         But I'll say this, if he says anything different than

10   what he told these people for, up until 2015, he's a perjurer.

11   And he's basically going to be admitting to you that, yeah, the

12   oath, the same oath he's going to take here means nothing, and

13   he will lie whenever it's convenient.  And he had a lot of

14   reasons, as you will see, that going over and working with the

15   government as of April of 2018 might be in his interest.

16        Number one, you'll see that he is doing this to try to

17   make sure he doesn't risk the same risks that these guys on

18   trial have from a criminal perspective.

19        Number two, you will see that his deal with the

20   government lets him keep his two houses, his two Mercedes, his

21   speedboat.  They took these guys' assets.

22        You'll see that in making that deal with the

23   government, he also got to -- Backpage took money, because

24   there was so much litigation, and they put it in a lawyer's

25   trust account for the clients to be able to defend themselves.

1    You'll see, they cut a deal with him where they said, oh,

2    Mr. Ferrer, you come work with us, you keep your money, your

3    lawyers get to keep it.  They took the money for our clients.

4            You'll see that he got all these benefits right away

5    by just coming over and saying, okay, I'll help you out.  But

6    what he really avoided was even bigger than that.  See, my

7    client and these guys, they're First Amendment believers.  They

8    believe this stuff to their core.  You'll learn that my client

9    got put in jail, with Mr. Lacey, simply for writing articles

10   against public officials who didn't like what they had to say.

11   They've been jailed -- not in this case -- for their belief in

12   the First Amendment.  And they had to get themselves out, and

13   then they later got it overturned and sued and won.  But that's

14   a believer.

15           Carl Ferrer is a mercenary.  He's not a First

16   Amendment guy.  He's an advertising guy, just about money.  And

17   you'll see this was a decision for him that, even independent

18   of the things that the government gave him, that these guys, if

19   you stand up against them, you have to deal with, it gets even

20   sweeter.  All this litigation, the continual having to fight

21   with people who do want to pressure you to shut down, whether

22   it's legal or not, he wiped that clean.  But you want to hear

23   about something big being wiped clean, remember, he bought

24   Backpage.

25           He owed 300, not thousand, $300 million to these guys

1    for Backpage.  How much of this $300 million do you think he's

2    paid since he made the decision to go from this table to this

3    table?  (Makes raspberry sound) zero.  You're going to hear

4    that Mr. Ferrer, by saying, okay, guys, I'll tell you, yeah,

5    yeah, yeah, we knew it was all prostitution, wipe's the slate

6    clean.  Keeps his stuff.  Gets out of debt.  Is out of

7    litigation.  So, look, stay tuned.  You will get to see him.

8    You'll get to judge for yourself.

9         But here's what you won't see -- just like they didn't

10   show it to you -- you will not see anything from Mr. Ferrer,

11   objective evidence, that shows that these defendants, in

12   particular my client, did anything wrong except say follow the

13   rules.  Stay on the line of legal speech.  You'll judge him,

14   and I'll submit to you, at the end of the case, you're going to

15   go, this ain't a guy that I'm putting any stock in.

16        Money laundering, they talked about that.  All I'm

17   going to say about that is, because we'll hear a lot about it

18   at trial, two things.  One, money laundering only applies if

19   the underlying activity that produced the money was knowingly

20   illegal.  So these guys aren't guilty of anything.  And because

21   they're not guilty of the crimes charged on the so-called

22   prostitution, then there is no issue that any of the money they

23   did was laundered, because money laundering only applies to

24   illegal money that you know is illegal.  And we'll talk about

25   that more.

1          But, secondly, you were told, oh, they're doing

2     nefarious things with credit card companies.  Remember that?

3     Well, remember the Dart case?  You will learn that the

4     government, just like Sheriff Dart who was told by the Seventh

5     Circuit Court of Appeals, you can't do this.  You can't lean on

6     credit card companies to stop working with these guys.

7          There was something called operation choke hold, where

8     the government did exactly that.  They went to banks and credit

9     card companies, and a whole host of businesses that the

10    government didn't like, all legal, but one of which was adult

11    businesses, and they said, do not let these guys run credit.

12    That's what's behind that.  Nothing sinister on these guys'

13    part.  They're running a legal business.  But the government,

14    when they had no ability to say it was illegal, certain

15    government types went and leaned on credit card companies.

16    More of that to come.

17          I finish here.  This case, because this sums it up,

18    and I showed you this already, but I just feel like it's such

19    a -- a concise statement of where we will be at the end of

20    this.  As the court in Boston said, these are important

21    policies that are colliding head-on.  First Amendment, free

22    speech, which my clients, to the core, believe in and have

23    lived in their whole life, versus, of course, trying to

24    suppress child trafficking.

25          And what this court found, and what the First Circuit

1    above it found, is right now, for the entire time this was

2    going on, the law tilted and said, nope, First Amendment

3    trumps.  A legal, on its face, ad, even if it turns out to

4    involve criminality, is protected and it's legal.  If we, as

5    citizens, want to change that through our representatives in

6    Congress, okay, and we all have a right to have an opinion on

7    that, but it doesn't give the right to change the rules and

8    bring us in a courtroom like this.

9         We've kind of come full circle here, because we're

10   talking about the constitution.  This whole case is about the

11   First Amendment.  And we are sitting in, frankly, a beautiful,

12   albeit a little hot, monument to the constitution, this

13   courthouse.

14        Her Honor told you several times, she will say it

15   again, I will repeat it, our constitution, the bedrock of our

16   country, is that these guys are all innocent.  And unless and

17   until these guys prove beyond a reasonable doubt that these

18   guys are guilty of knowingly and intentionally violating these

19   prostitution laws with these prostitutes and their so-called

20   businesses, even if you don't like what they're doing, or if

21   you like what they're doing, you must acquit.

22        At the end of the day, in this case about the First

23   Amendment that is governed by a whole host of other amendments,

24   it's going to be a no-brainer.  This activity was legal.  We

25   are here because these prosecutors don't like the activity, but

1   it doesn't make it illegal.  Backpage has been shut down since

2   April of 2018.  The only thing left is to address the innocence

3   of my client and these other five people.

4        You all didn't just fall off the cherry truck, you

5   were picked after three days.  You're a good representative of

6   the community.  Please look out for anything that ties any of

7   these defendants to any of these ads, you won't see it.  And at

8   the end of it all, I'm totally confident that you're going to

9   agree, first of all, that they are affirmatively innocent.

10  They've done nothing wrong except maintain our First Amendment

11  that we don't want to let slide at all, because then these guys

12  can take cases anywhere they want.

13       And, finally, even if you have doubt, they need to

14  prove it, they can't prove it, they won't prove it, and you

15  need to find them all not guilty.

16       Thanks a lot for your time.

17       THE COURT:  Okay.  We'll take our midmorning recess,

18  so you can take your break and we'll come get you in about

19  20 minutes.

20       (Recess taken, 11:09 a.m. - 11:32 a.m.)

21       THE COURT:  All right.  Thank you.  Please be seated.

22       And we are back on the record with the jury present.

23       Mr. Feder.

24       MR. FEDER:  Thank you.

25       Good morning.  My name is Bruce Feder.  It's my

1    privilege to represent Scott Spear, that young man down at the

2    end of the table.  It's also my privilege to be a part of this

3    group to represent all of these folks in the defense of their

4    First Amendment rights, the Sixth Amendment right to a fair

5    trial, federal statutes that protect -- or was supposed to

6    protect what the people at Backpage did, and something called

7    the rule of law, because what has happened in this court, the

8    reason why we are here, is that those rights, those laws, are

9    in grave danger.

10          Listening to Mr. Jones talk to you the other day

11   reminded me of the old proverb that, don't pay attention to the

12   thunder.  What is important is the rain, because the rain

13   waters the trees and the flowers.  Waving your arms, using

14   misrepresentations and half truths, that's thunder.  What's

15   important here is the law and the facts, and that's what the

16   rain is.  The law and the facts are the rain that this case

17   needs to be decided upon.

18          As you can tell from looking at me, I've been a lawyer

19   for over 40 years.  I've done civil cases and criminal cases.

20   One thing that I've learned is that criminal cases are in a

21   different category.  As you all probably know, there are

22   commercial cases where one business sues another business;

23   personal injury cases where red car hits green car, somebody

24   gets hurt and the injured party sues the person that recklessly

25   or negligently harmed them; divorce cases where, unfortunately,

1    couples break apart and decide who is going to have the custody

2    of their children.  Those cases have, of course, a much lower

3    burden of proof.  The criminal case in importance is up here,

4    and the civil cases are down here.

5         I'm going to try not to repeat what Mr. Bienert said

6    because it's a really good summary, I think, of what this case

7    is about and what it should not be about.  But let's talk about

8    greed for a little bit, because Mr. Jones said it quite a few

9    times, probably in hopes that it would give you some kind of

10   impetus to not listen to the law and the facts.  Last I looked,

11   capitalism still exists in this country.  It's still legal for

12   a business to try to make money.  And the more successful the

13   business, the more money it makes.  There is nothing wrong with

14   that as long as the business is legal.

15        As has been discussed with you, the business that

16   Backpage was engaged in, just as New Times was engaged in, was

17   a legal business.  And making money is fine.  There is nothing

18   absolutely wrong with it.  And nothing these people can say can

19   change that unless you allow them to.

20        As a legal business, as you -- as you heard, they had

21   a thousand employees.  They paid for their supplies.  They paid

22   for rents.  They renovated an old Phoenix elementary school at

23   12th Street and Jefferson where New Times began and where

24   Backpage began.  They did all kinds of things that a normal

25   legal business does and spent the money to do it.  They spent

1    millions to assure that they had consultants and lawyers to

2    instruct them on what they could do and what they could not do.

3          That was important to them, because none of these

4    folks over here are lawyers.  And some of these issues, some of

5    these laws, the First Amendment, Section 230, they're

6    complicated laws.  And they needed people to instruct them on

7    what they needed to do and what not to do.  People who are

8    intending not to follow the law don't spend a bunch of money on

9    lawyers, in general.

10         They also all paid their taxes and were very careful

11   to do that because of the controversy of their business, to

12   assure that the people in front of me wouldn't try to say that

13   they didn't pay their taxes.  People that commit criminal acts

14   frequently do not pay their taxes, because it will show to the

15   government what they've done and what they haven't done, how

16   much money they've made, how much money they have not made.  A

17   regular, successful, legal business.

18         Scott Spear grew up in Phoenix.  He went to college.

19   And when he came back, he was searching around, like a lot of

20   us when we get out of high school and college, for what he

21   should do with his life.  Initially, with a couple of his

22   friends, they opened up a series of record stores in Phoenix.

23   Some of you may not even remember what a record store was, but

24   they actually had vinyl disks that you played on a player that

25   had music on it.

1        After that, the stores were sold, he went into the

2   real estate business with the father of a friend of his and

3   sold real estate, until at some point he started thinking about

4   going to graduate school.  But during his record store era, he

5   had met Jim Larkin who was just starting New Times.  And

6   Mr. Larkin offered Scott a job at New Times.  And Scott had

7   been reading New Times, like a lot of us who grew up in Phoenix

8   had, and he was really impressed by that.  Because they were an

9   uncompromising weekly newspaper, not beholden to the powers in

10  Phoenix that sort of control things, and that they were not

11  afraid to put things in their newspapers that some of the

12  traditional newspapers, like the Arizona Republic, would not

13  do.

14        Strippers were okay because they are protected by the

15  First Amendment.  Controversial issues that maybe the Republic

16  would not publish because it would offend the powers that be,

17  not in New Times.  So it was a place that Scott Spear wanted to

18  go work at because it fit in with what he wanted to do with his

19  life, his philosophy, and that was to defend First Amendment

20  and to work for a new, vibrant, growing business.

21        Because he didn't have any particular skills other

22  than a college degree in liberal arts, Scott became kind of the

23  jack of all trades at Backpage.  He started doing a lot of

24  different things, some of which he had some experience in, like

25  real estate, buying real estate, you know, renting office

1    space, marketing, was involved in beginning a race that used to

2    be called the New Times 10K, was a running race where people

3    run through the streets of Phoenix.

4           New Times also had something called the Best of New

5    Times, which was a special section of New Times every year that

6    they would rate restaurants and entertainment venues, et

7    cetera, or clothing stores, et cetera, et cetera, so he did a

8    lot of different things.  And as New Times grew, as they grew

9    into 17 cities, Mr. Spear did all of this stuff for all of

10   those cities, flying around quite a bit, traveling, handling

11   their leasing agreements and some of their marketing issues, et

12   cetera.

13          Then in 2004, as you've heard, Backpage began.  And

14   Mr. Spear was assigned to try to supervise its inception and

15   what it was going to do, with the help, generally speaking,

16   from 2004 throughout the time that he was responsible for

17   supervising, with the help of lawyers on every issue.  Because

18   he is not a lawyer, he didn't understand a lot of this -- a lot

19   of the issues involved in running a classified internet service

20   provider.  Very few people at that time did, because the

21   internet, again, as you older folks might know, it hasn't been

22   around that long.  And so the internet service providers were

23   kind of feeling their way on what to do and how to do it, what

24   they could do, what they could not do.

25          Mr. Spear, being the kind of person that he is, he

1    researched.  So he looked at Craigslist, which was the, sort

2    of, premiere classified internet service provider.  He looked

3    at the big boys, Google, et cetera, to see what they were

4    doing, to try to assure that this business was doing what all

5    the other folks were doing.

6           Their intention, as you saw from the blackboard, was

7    to have a general internet site that had a lot of different ads

8    and a lot of different subject matters, part of which was the

9    adult, part of which was the personals, part of which was

10   furniture, part of which was everything.  That was their

11   intention was to be a general classified internet service

12   provider.  And Mr. Spear attempted, to the best of his ability,

13   with the help of others, to supervise Mr. Ferrer, who was the

14   person that was brought in to run Backpage, who knew about

15   classifieds, and they became, as you've heard, successful.

16          You will hear from people that Mr. Spear has certain

17   characteristics, law abiding, honest, conservative.  And the

18   40 years or so that I've been in the law practice, one thing I

19   can tell you for sure, when you get in trouble, about the only

20   good thing about it is you really learn if you have any

21   friends, because you're non friends, your acquaintances, they

22   all disappear.  Mr. Spear has people that are going to testify

23   to his good character.

24          Mr. Bienert referred a little bit to the moderation

25   issue.  Content moderation is the organized practice of

1    screening user-generated content posted to internet sites,

2    social media, and other online outlets in order to determine

3    the appropriateness of the content for a given site locality

4    and jurisdiction.

5          In essence, under the law, technically, an internet

6    service provider could have no moderation.  They could just

7    have the ads come in, and put them in and not pay any attention

8    to them.  And whatever the user who created that ad and sent it

9    in said, it's on the site.  But most internet service providers

10   like Backpage decided that they had certain standards that they

11   wanted to impose on their users, and they did.

12         Starting in 2004 it was pretty moderate.  And as the

13   years went by, as they became a little bit more successful, and

14   then even more successful still, they imposed more and more

15   standards, with one goal, and one goal, primarily, only, and

16   that is to not put anything illegal or allow anything illegal

17   on their site.  But they also decided at some point that they

18   didn't want to be just legal or illegal, they wanted to have

19   not a free-for-all on there.  And, again, they used something

20   called the Playboy standard, as opposed to the Hustler Magazine

21   standpoint.

22         There used to be a magazine, maybe it's still around,

23   called Playboy, and then there was a magazine called Penthouse,

24   and then there was a magazine called Hustler.  Playboy was,

25   let's call it, tame, although they had nude printouts in it.

85

1    And a lot of people were against Playboy.  They thought it was

2    distasteful, and some people even thought it was illegal.

3         Same thing with the next step up, which was Penthouse,

4    which was a little bit more risqué, a little bit more things

5    that a lot more people thought were distasteful.  And then we

6    got to Hustler Magazine, which was very risqué and had a lot of

7    controversy.  And there were a lot of people that thought they

8    were doing something illegal, let's stop them.  But the First

9    Amendment protected all of them just like it protects the

10   internet sites.

11        You were shown a lot of ads.  Mr. Bienert referred you

12   to the fact that every ad you saw put up by the government was

13   a legal ad.  Let me show you the risk that we run in this case.

14        Think that's an illegal ad anybody?  These people do.

15   $20 to get high and put it in the hole.  Seems like a sex organ

16   reference suggesting that you can go and get high and have sex

17   for 20 bucks, unless it's a billiards parlor saying that you go

18   and pay them $20 and you get two beers and play all the pool

19   that you want.

20        The danger of not having a clear standard of it's got

21   to be sex for money in the ad versus something that is

22   suggestive is what undermines our First Amendment.  A slippery

23   slope.  Once we go past an illegal ad, sex for money, to

24   anything other than that, kiss it good-bye.

25        And maybe some people agree with that.  Maybe some

1    people don't think we ought to have a First Amendment.  But

2    unless and until the people of this country change the

3    constitution and get rid of the First Amendment, that's what

4    the law is, and, in our humble opinion, that's what the law

5    needs to be.  Because as those cases that Mr. Bienert showed

6    you, those federal district courts and those federal courts of

7    appeals all over this country said, when it -- the comparison

8    when it is First Amendment versus something that people don't

9    like, the First Amendment prevails.

10           I don't know if any of you watch TV, because a lot of

11   you may just be looking at the internet these days and get your

12   news from there, but there is an ad that's been very prevalent

13   in Phoenix by, I think it's called the Tempe Gun Store.  They

14   have one in Tempe and one in Mesa.  And it shows people are

15   buying guns, and then at the end it's got like a symbol of two

16   machine guns shooting.  And machine guns, of course, are

17   illegal.  Is that an illegal ad showing machine guns shooting

18   that they sell illegal guns?  No.

19           And, I'm sorry, this ad, we want to put some photos on

20   it, so kind of people that are scantily dressed to spice it up

21   a little bit, once you go down the road of the slippery slope,

22   you have nothing at the end except morality police telling you

23   what to think, what to see, what to read, what to do.

24           During the progression of Backpage, they had human

25   moderators.  At some point Mr. Ferrer and some other -- their

1   IT people came up with the idea of having an auto stripout,

2   which means that the ads were automatically run through a

3   computer, initially to see if they were going to outright

4   delete the ad if it had sex for money, or send it for a better

5   review by the human moderators.  And then to assert their taste

6   standards, there were a number of words, abbreviations, et

7   cetera, that were given to all the moderators that was inputted

8   into the auto filter to either omit automatically, or to -- at

9   least to send it to a human moderator to look at it to see if

10  it passed muster under the Backpage rule of no illegality, and

11  Playboy versus Hustler Magazine standard.

12        That happened over a number of years.  And the list of

13  words, abbreviations, et cetera, became longer and longer,

14  because ads -- police would tell them about phrases that they

15  didn't know the meaning of, or attorneys general would tell

16  them about the words that they didn't want in there.  They

17  would add them to this list in order to comply with what they

18  were being asked to do, short of closing their site.

19        In 2012, instead of moderating ads, the same list of

20  words, abbreviations, symbols all of the moderators were

21  told -- because Mr. Spear was no longer supervising Mr. Ferrer,

22  but Backpage hired a lawyer, a former partner at a large law

23  firm's Seattle office, who was then, I believe, general counsel

24  for Craigslist.  She came in and took over the moderation, took

25  over -- well, by that time the aggregation was already gone --

1    took over moderation and basically what ads could be in

2    Backpage or not.  And she imposed a rule that was followed that

3    the ad is either okay or not okay.  No in-betweens.  So it's

4    either -- it's either we delete the ad outright because it has

5    words that we don't want in it, symbols that we don't want in

6    it, abbreviations that we don't want in it, or its allowed as

7    is.

8         Curiously, that was the same year that Mr. Larkin,

9    Mr. Lacey, Mr. Spear, Mr. Brunst, that New Times was sold to

10   its editors.  At that point in time, Mr. Spear's role, if you

11   will, at Backpage was quite minimum -- quite minimal.  He was

12   no longer involved in supervising Mr. Ferrer.  He was no longer

13   involved in things that he, realistically, had to learn on the

14   fly.  He was continuing to do things like the real estate and

15   things that he knew about, but his role there became a lot

16   smaller.  And, of course, smaller still when, several years

17   later, Backpage was sold to Mr. Ferrer.

18        These are some of the words that you will see used.

19   Content, of course, is what the material is on the Web.

20   Editing and stripout is taking out words, taking out phrases.

21   The word list is what I was just talking about where they had a

22   list of words, abbreviations that they didn't want on their

23   site, so they got rid of them.  And then, of course, delete

24   meant delete, the ad is gone.  If some -- if somebody paid

25   money for that ad, they weren't given their money back because

1    they had violated the terms of use that Backpage implemented.

2         This is just one page of about a nine-page terms of

3    use that Backpage had that any advertiser, when they went to

4    their website, had to scroll through these terms of use, and at

5    the end of it, essentially, put their signature on it saying, I

6    will follow these terms of use.

7         The part that Mr. Bienert showed you is down at the

8    bottom, the posting rules.  But there is also another paragraph

9    under terms of use, which says, it's forbidden, you agree to

10   refrain, stop, don't do it, while using our site, transmitting

11   any information, data, text files, software, chats,

12   communication, or other materials that is unlawful, false,

13   misleading, harmful, threatening, abusive, invasive of

14   another's privacy, harassing, defamatory, and on, and on,

15   because not only did they want to have a legal site, they

16   wanted to have a site that was as inoffensive as it could be,

17   given the circumstances and subject matter that they were

18   allowing on their site under the First Amendment.

19        And then, of course, the posting rules, similar.  If

20   somebody put an illegal ad on there and it was deleted and they

21   paid their $7 or $10, well, you don't get your $7 back, because

22   you violated their terms of use.

23        Mr. Jones talked about aggregation.  Aggregation is

24   terrible, according to the government.  If I am Jeff Bezos and

25   I own the Washington Post, and we look at the New York Times

1    and we see a big advertiser there, we, of course, want that

2    advertiser to come advertise in the Washington Post, so we

3    aggregate.  One of our people calls up that advertiser, or in

4    the internet age, e-mails them and says, hey, why don't you

5    come advertise with us.  And Mr. Jones' point was, well, they

6    were out aggregating escort ads, which equal prostitution ads,

7    and, therefore, they were trolling for prostitution ads knowing

8    that they were prostitutes.

9           First of all, they were legal ads, but the thing that

10   he didn't tell you, which is just incredible, where do you

11   think Backpage got most of their ads, that they aggregated most

12   of their ads from?  It's called Google.  It's called

13   Craigslist.  They had legal advice that aggregating is legal,

14   appropriate, as long as they're not violating some other sites

15   who say you can't take our ads, you can't contact our

16   advertisers.  But they went to Google and got Google ads for

17   escorts, among other things.  They looked for advertisers in

18   all other categories not just adult.

19          And then what do you think happened to those ads when

20   they -- when a -- when an advertiser would say, yeah, I'll put

21   a free ad on Backpage?  Even though the ad came from Google or

22   Craigslist, it had to go through Backpage's moderation process,

23   meaning we're not going to trust Google and Craigslist not to

24   have an ad that either is illegal or offends our standards, so

25   it's going to go through our process first.

1                Here's one of the slides that Mr. Jones showed you

2       with Mr. Spear's picture on it.  Of course, that picture wasn't

3       on that phrase, because that phrase was in a 10 or 15-page

4       proposal created by Mr. Ferrer and sent to Mr. Spear for his

5       review and approval.  And it's really awful what it does.

6       Mr. Spear was trying to review and approve standardized ways of

7       people working for Backpage approaching advertisers to see if

8       they could aggregate their ad.  Because he wanted to make sure

9       that it wasn't going to be haphazard, that one salesman was

10      going to say one thing, and another salesman another.  So this

11      was the way that they were allowed to approach somebody by

12      e-mail.

13               Hi, I saw your ad on the internet.  The ugly part

14      about this is, number one, putting somebody's picture by this

15      when they didn't write this is just not right.  It's

16      misrepresentative.  Second, it's trying to make something look

17      bad when it's really good.  This prosecution is about high

18      becoming low, green becoming red.  They reverse everything and

19      try to make something that is appropriate to be inappropriate,

20      to misrepresent the facts and not follow the law.  The thunder

21      that you're going to hear a lot about.

22               Similarly, you're going to hear something about some

23      affiliate programs.  Generally speaking, affiliate programs

24      are, if you send us an ad, we're going to give you a

25      commission, or we're going to give you a break on the price if

1    you send us a lot of business.  It's a novel concept, right?

2    As long as your ads are legal, there is absolutely nothing

3    wrong with that, number one.  Businesses all over this country

4    and all over the world do it, because it's a way of rewarding

5    people that send you business.

6           I think they're called social influencers.  Have any

7    of you ever heard of a social influencer?  They're all over the

8    internet now.  And they basically tell people how to cook, how

9    to dress, how to do whatever, and then they give a pitch for

10   some product.  And if one of their readers buys that product,

11   guess what they get, the social influencer gets some money for

12   sending -- for referring that person to that business.  Trying

13   to make illegal what is legal.

14          You're going to hear a lot about something called TER,

15   The Erotic Review.  The Erotic Review was another website --

16   still in business, as I understand it, not prosecuted -- that

17   had, in part, on their site, if you could get behind what's

18   called a firewall, meaning you had to be a VIP member, you

19   could see reviews of escorts and prostitutes.  And TER wanted

20   to have a link in some of the escort ads in Backpage.  So it

21   would be, hi, I'm Nicole, blah, blah, blah, TER number X, Y, Z.

22          You're going to hear the government talk about how

23   Backpage knew all about TER, they knew what it was, yada, yada,

24   yada.  They not only have incredibly unreasonable and illegal

25   expectations of Backpage for their own site, but they're saying

1    they had to go out and look at every advertiser, every link,

2    every person that wants to be on there, they had to go out and

3    investigate them.  It's kind of like telling the IRS that

4    before you send a refund to a taxpayer, you've got to go out

5    and investigate them, send out a team, every one of them.

6    Unreasonable, not appropriate, not required.

7           When Backpage was told about TER and what they were

8    about, even though they had a lot of legal business, they had,

9    potentially, some illegal business behind their firewall, they

10   took it down.  They took off any reference to TER in 2012, 2011

11   when they were told about it.  Even though they probably didn't

12   have to, they wanted to be cooperative with law enforcement,

13   with the attorneys general, with NCMEC.  They did pretty much,

14   or most of everything that they asked them to do that was

15   reasonable except closing them down.  This is really about

16   Backpage telling a governmental agency like NCMEC that they

17   weren't going to do what they told them to do.  They weren't

18   going to close a legitimate business.

19          Mr. Bienert put a lot of case law up on the board,

20   federal district courts around the country, federal courts of

21   appeal around the country.  When a business sues a business

22   saying you shouldn't be able to do that, you got to stop it,

23   they go to court and they try to get something called an

24   injunction, which means a court orders them to stop doing what

25   they're doing.

1          Most of those cases were injunctions brought by

2    Backpage against people that were doing things they thought

3    were inappropriate, and they won.  They won over and over

4    again.  The federal government didn't intervene in any of those

5    where they could have if they thought that what Backpage was

6    doing was inappropriate or illegal, but they didn't.  And if

7    the federal government thought that they were doing something

8    illegal, then why not start, since this is an experimental

9    prosecution against a First Amendment provider, why not start,

10   like most other people in this country do, with some kind of

11   civil action to enjoin?

12          MR. JONES:  Objection, Your Honor.

13          THE COURT:  What's your objection?

14          MR. JONES:  Inappropriate argument.

15          THE COURT:  It's argumentative.

16          This is opening, Mr. Feder.

17          MR. FEDER:  Okay.  When you have the law and the facts

18   on your side, you go to civil court, when you don't, you take

19   people's money so that they can't defend themselves and you

20   bring a criminal charge.  These people are not guilty.  They

21   were not guilty before this case was brought, and they're still

22   not guilty, and they will be not guilty throughout these

23   proceedings and at the end.  At the end I'm going to ask you to

24   bring the only appropriate verdict, and that is not guilty.

25          Thank you very much.

1          THE COURT:  Okay.  Before we begin the next opening

2   statement, we'll take our lunch break.  So please remember the

3   admonition.  And let's get started at 1:15.

4          (Lunch recess taken, 12:09 p.m.)

5                    *          *          *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 24th day of

13   September, 2021.

14

15

16                    /s/ Christine M. Coaly_____

17                    Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25