Exhibit K

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-SMB |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 13, 2021 |
| Michael Lacey, | ) | 8:53 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 7 - A.M. SESSION


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1              A P P E A R A N C E S

2    For the Government:

3              U.S. Attorney's Office
               By: PETER SHAWN KOZINETS, ESQ.
4                  KEVIN M. RAPP, ESQ.
                   MARGARET WU PERLMETER, ESQ.
5                  ANDREW C. STONE, ESQ.
               40 North Central Avenue, Suite 1200
6              Phoenix, AZ  85004

7              U.S. Department of Justice
               By: REGINALD E. JONES
8              1400 New York Avenue NW, Suite 600
               Washington, DC  20530

9

10   For the Defendant Lacey:

11             Lipsitz Green Scime Cambria
               By: PAUL JOHN CAMBRIA, JR., ESQ.
12                 ERIN E. MCCAMPBELL PARIS, ESQ.
               42 Delaware Avenue, Suite 120
13             Buffalo, NY  14202

14   For the Defendant Larkin:

15             Bienert Katzman
               By: THOMAS HENRY BIENERT, JR., ESQ.
16                 WHITNEY Z. BERNSTEIN, ESQ.
               903 Calle Amanecer, Suite 350
17             San Clemente, CA  92673

18   For the Defendant Spear:

19             Feder Law Office
               By: BRUCE S. FEDER, ESQ.
20             2930 East Camelback Road, Suite 160
               Phoenix, AZ  85016

21
     For the Defendant Brunst:
22
               Bird Marella Boxer Wolpert Nessim Drooks
23             Lincenberg & Rhow
               By: GOPI K. PANCHAPAKESAN, ESQ.
24                 GARY S. LINCENBERG, ESQ.
               1875 Century Park E, Suite 2300
25             Los Angeles, CA  90067

UNITED STATES DISTRICT COURT

3

```
 1    For the Defendant Padilla:

 2              DAVID EISENBERG, PLC
                By: DAVID S. EISENBERG, ESQ.
 3              3550 North Central Avenue, Suite 1155
                Phoenix, AZ  85012
 4
      For the Defendant Vaught:
 5
                JOY BERTRAND ESQ, LLC
 6              By: JOY MALBY BERTRAND, ESQ.
                P.O. Box 2734
 7              Scottsdale, AZ  85252

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

4

1                              <u>INDEX</u>

2    <u>SUMMARY OF COURT PROCEEDINGS</u>                       <u>PAGE</u>:

3    Proceedings Outside the Presence of the Jury            5
     Proceedings Outside the Presence of the Jury          114
4


5


6


7                       <u>INDEX OF WITNESSES</u>

8    <u>WITNESSES FOR THE</u>        <u>Direct</u>      <u>Cross</u>    <u>Redirect</u>
     <u>GOVERNMENT</u>:                          (Bienert)
9
     FICHTNER, Brian                        14         95
10

11


12


13


14


15


16


17


18


19


20


21


22


23


24


25

UNITED STATES DISTRICT COURT

1        (Proceedings outside the presence of the jury:)

2            THE COURT:  Okay.  We're on the record outside the

3    presence of the jury.  At 9:37 last night defendants filed a

4    motion in limine which, one, motions in limine deadline has

5    passed a long time ago.  There's also a request for a Daubert

6    hearing in here, which the substantive motion deadline passed

7    in 2019, I think.  So that request is denied.

8            However, the scope of Dr. Cooper's testimony seems to

9    be an issue.  Who's handling Dr. Cooper?

10           MR. JONES:  I am, Your Honor.

11           THE COURT:  Okay.  Mr. Jones, the noticed areas of

12   testimony are really all outside the scope of the areas that I

13   authorized.  So what do you plan on having her testify about?

14           MR. JONES:  Well, we'll have her testify, Your Honor,

15   you know, she's familiar, as we indicated, I think, as the

16   Court indicated in 1081, you know, how human trafficking, how

17   sex trafficking occurs online.  And as we indicated,

18   Dr. Cooper's familiar with how victims are trafficked on

19   Backpage.  And her opinions will be based on her education,

20   training, and her clinical and forensic experiences treating

21   victims of sex trafficking, as indicated in 1081 on Page 5.

22           Also, Dr. Cooper will testify as pertains to the

23   terminology, to explain the terminology and vernacular often

24   used in the trafficking and prostitution industry, which the

25   Court has deemed relevant as well.  And as the government

1    indicated -- it's also in criminal record 1081 -- Dr. Cooper

2    could explore terms unique to the vernacular of prostitution

3    and sex trafficking.  Such information is not common to the

4    knowledge, and it's helpful to the jury.

5           So those are the two areas that the government will

6    focus Dr. Cooper's -- will encompass Dr. Cooper's testimony.

7           One other point, Your Honor, similar but unrelated,

8    whenever the Court would like me to --

9           THE COURT:  Is it related to Dr. Cooper?

10          MR. JONES:  Yeah.  We just wanted to -- We understood

11   the Court's order on last week regarding the relationship

12   between traffickers and pimps and their victims and common

13   methods sex traffickers use to maintain control of their

14   victims that the Court deemed is -- isn't relevant anymore to

15   this case.  We would like to point out, though, that the

16   defendant on Friday afternoon, in cross-examination of one of

17   our victims, tended to open the door, attacking the credibility

18   of the victim based on her allegedly lying to law enforcement.

19          And as the Court is aware, you know, often in the

20   trafficking industry, a way a pimp maintains control over their

21   victims is through, you know, force and fear and loyalty.  And

22   so those are methods of control.

23          Also during the jury selection in this case, the

24   defendants also kind of talked around the fact that they may

25   try to elicit testimony on cross-examination from victims on

7

1    the fact that they use substance abuse -- substance abuse was

2    used while they were trafficked as well as it pertains to their

3    credibility.  And also, you know, the fact -- the relationship

4    between traffickers and pimps and how pimps maintain control

5    over their victims, as the Court is also aware, you know, the

6    use of substance abuse, you know, them being hooked on and

7    addicted to substance abuse is a way that they maintain control

8    over them.

9          And so the government will not elicit testimony from

10   Dr. Cooper in that respect since it's not prepared to, but we

11   also do not believe the defense should be able to open the door

12   to that when they start to cross-examine some of our victims

13   during this trial.

14         THE COURT:  Okay.  I just asked you if what you were

15   going to ask me about related to Dr. Cooper, and you just told

16   me it doesn't.

17         MR. JONES:  Well, no.  The second part, yeah, it does

18   relate.  We initially were going to have Dr. Cooper testify to

19   that fourth issue, but based on the Court's ruling last week,

20   we've now tailored her testimony to those -- to the two issues

21   that the Court deemed relevant for her -- relevant for expert

22   testimony in this case, and that is how sex trafficking occurs

23   online and the explanation of kind of the terminology and the

24   vernacular often used in the trafficking and the prostitution

25   industry.

1          THE COURT:  Okay.  Ms. Bertrand.

2          MS. BERTRAND:  Good morning, Your Honor.  First, as to

3    Dr. Cooper testifying regarding terminology used in sex

4    industry ads, there's two problems with that.  First, they

5    never noticed that as a topic of her testimony.  I'm looking at

6    the government's notice here in 422.

7          It says, "She'll talk about how a victim can fall into

8    the world of sex trafficking through the grooming process, the

9    harmful lasting impact of sex trafficking on its victims,

10   relationship and loyalty of a child -- a child sex trafficking

11   victim may have with her trafficker, common ways a sex

12   trafficker can use force, fraud and coercion, and reasons why

13   child sex trafficking is cited as the most underreported form

14   of child abuse."  That has nothing to do with translating

15   terminology in these ads.

16          Next -- I think we talked about this last week in a

17   couple other contexts -- the interpretation of these ads is an

18   ultimate issue for the jury to decide.  And we've already sat

19   through hours of Mr. Fichtner's testimony where he's telling us

20   what's going on in those ads and how he interprets them.  It

21   would be duplicative.  But it's also not -- That is for the

22   jury to decide.  But, most importantly, they never noticed

23   that.

24          So at this point Dr. Cooper's testimony, as they've

25   noticed it, is not relevant anymore.  And this idea that we

9

1    opened the door regarding asking the jury follow-up questions

2    about a question in the jury questionnaire doesn't open the

3    door to them preemptively putting on this witness.  They even

4    said she might be a rebuttal witness.  Maybe that will be the

5    case in November or December.

6              But for now they have not shown a basis to support any

7    of the noticed testimony.  And this is about what the

8    government gives notice to.

9              They've also had nearly three years to amend this

10   notice.  We requested an updated notice from them in July.

11   They refused to give one.  They are now stuck with the topics

12   they noticed, and none of them are relevant.

13             MR. JONES:  Your Honor, just briefly, the defense has

14   been put on notice that -- for both of those areas as it

15   pertains to Dr. Cooper.  In fact, you know, the government

16   mentioned the fact that Dr. Cooper could testify to the

17   vernacular and terminology often used in the sex trafficking

18   and prostitution industry.  In criminal record 958, Page 5, the

19   Court, in ruling on the expert motion in document 1081, Page

20   16, pointed out point blank "Dr. Cooper could explain certain

21   terms unique to the vernacular of the prostitution and sex

22   trafficking subculture.  Such terms include 'new in town,'

23   'roses,' 'amber alert,' 'GFE,' 'PSE,' 'incall,' 'outcall,'

24   'Lolita,' and others.  Such information is not common for most

25   jurors and would be helpful."

1          So that's to Mrs. Bertrand's first point.

2          To her second point, as it pertains to how human

3     trafficking occurs through online media, you know, this was

4     also litigated.  And the government indicated in its motion,

5     the Court in its ruling, that Dr. Cooper is familiar with how

6     victims are trafficked on Backpage, and her opinions will be

7     based on her education, training, and her clinical and forensic

8     experiences treating victims of sex trafficking, you know, all

9     relevant information.  And it goes to how sex trafficking

10    occurs through online media, Your Honor.

11          THE COURT:  I'm looking at the Doc 1081.

12          MR. JONES:  Page 16 discusses the vernacular, sex

13    trafficking, and Dr. Cooper's proposed testimony in that area.

14          THE COURT:  It does say that, but I don't know if I

15    just used the wrong name or if that came from your response.

16          MR. JONES:  It did, Doc 958.

17          THE COURT:  Because it was -- let's see -- Christina

18    Decoufle that was noticed for talking about the language.  All

19    right.  So the motion to preclude her testimony is denied.  Of

20    course if she testifies about terminology, then your other

21    expert is not going to be allowed to testify about that.

22          MR. JONES:  Understood, Your Honor.

23          THE COURT:  And you will not be allowed to get into

24    the relationship between a trafficker and the victim at this

25    point.  I agree that there is potential that the defense may

```
 1    have already opened the door or may in the future.  So you can

 2    reurge it at a later time for rebuttal if necessary.

 3              MR. JONES:  Thank you, Your Honor.

 4              THE COURT:  Do we have our jurors?

 5              THE CLERK:  I'm sorry?

 6              THE COURT:  Do we have our jurors?

 7         (The Court and clerk confer off the record.)

 8              THE COURT:  While she is -- do I still have everybody?

 9    Nobody left?

10              While she's getting the jurors, a juror did hand some

11    questions to Elaine at the end of the day, which I assume were

12    for Jessika, which was my fault that I didn't ask.  So I'm just

13    going to let you know what the questions are.

14              The first one reads:  "Did Jessika Svendgard have a

15    legal license to work as an escort?"

16              And then the second question reads:  "Do all escorts

17    who take out ads on Backpage have license to work as escorts?"

18              MR. LINCENBERG:  Your Honor, this is Mr. Lincenberg.

19    Which juror submitted that note?

20              THE COURT:  I don't know.  It's not signed because I

21    tell them not to.

22              MR. LINCENBERG:  Oh, okay.

23              THE CLERK:  They're all here.  They're coming --

24              MS. PERLMETER:  Your Honor, did Elaine --

25              THE COURT:  One second.  I have an issue on another
```

1      case.

2          (The Court and clerk confer off the record.)

3              THE COURT:  Yes?

4              MS. PERLMETER:  This is in regards to witness Special

5      Agent Tera Mackey who the United States believes will testify

6      sometime today.  So last week the defense, last Thursday the

7      defense, in document number 1291, which was their response to

8      the United States' memo regarding certain aspects of Nacole

9      Svengard's testimony, in their memo they mention that Tera

10     Mackey was a defendant in a civil lawsuit filed in the Eastern

11     District of California.  That was a civil lawsuit filed by a

12     pro se litigant against then Governor Jerry Brown and a bunch

13     of other people.  It was a complaint filed in 2017.  It was

14     dismissed in 2018.

15             The government moves to preclude the defense from

16     mentioning this lawsuit when they question Special

17     Agent Mackey.

18             MR. LINCENBERG:  Your Honor, this is Mr. Lincenberg.

19     I know that Ms. Bernstein is going to be doing the examination

20     of Ms. Mackey, and she's not in the courtroom.

21             THE COURT:  She's up there.

22             MR. LINCENBERG:  Oh, do you want to speak to it?

23             MS. BERNSTEIN:  Your Honor, we were using that as an

24     example as to how the existence of a lawsuit does not mean

25     there's any merit whatsoever.  I don't know the circumstances

1    behind why Ms. Mackey was sued for $59 million by an inmate,

2    but as it was dismissed, don't presume that gave merit to the

3    claim.  So we were using that as an example for Nacole

4    Svendgard.  We do not plan to get into it with her.

5            THE COURT:  Okay.  The government's motion is granted

6    under Rule 401.

7            MS. PERLMETER:  Thank you.

8            THE COURT:  And we are starting with your cross,

9    correct?

10           MR. BIENERT:  Yes, Your Honor.

11           THE COURT:  Do you have that agent?

12           One of the jurors is not here, so I'm going to step

13   out.

14      (Proceedings recessed from 9:11 a.m. until 9:16 a.m.

15   Proceedings in the presence of the jury:)

16           THE COURT:  We are back on the record with the jury

17   present.  Agent Fichtner, you're still under oath from last

18   week.  Do you understand?

19           THE WITNESS:  Yes, I do.

20           THE COURT:  Okay.  Mr. Bienert.

21           MR. BIENERT:  Your Honor, I apologize.  I can get

22   started, but can I ask Ms. Elaine, madam clerk, for that

23   microphone that I cannot be wedded to this one here.  I'm going

24   to start from here, but I'm going to move around this little

25   area.  Thank you.

1          BRIAN FICHTNER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

2                          CROSS-EXAMINATION

3    BY MR. BIENERT:

4    Q.  Agent Fichtner, my name is Tom Bienert, and I represent

5    Mr. Larkin, one of the defendants in this case.

6             So when you were on the stand being questioned by

7    government counsel, he asked you if you were familiar with the

8    laws of California relating to prostitution, right?

9    A.  Yes.

10   Q.  And you said you were, correct?

11   A.  Yes.

12   Q.  And then you basically gave us a definition of prostitution

13   when he asked you about it, right?

14   A.  Yes.

15   Q.  And what you said was under California prostitution laws,

16   quote, you cannot solicit or arrange sex for money, right?

17   A.  Correct.

18   Q.  I hope this works.  I assume that people can hear me.

19   Okay.  Thank you.

20             Sir, that's all you said, right?  You didn't give any

21   other definition of prostitution or terms of it when you were

22   being questioned by the government counsel, did you?

23   A.  No.

24             MR. KOZINETS:  Objection.

25             THE COURT:  What's the objection?

1          (Reporter interrupts for clarification.)

2              MR. KOZINETS:  Misstates prior testimony.

3              THE COURT:  The objection's overruled.

4    Q.  (BY MR. BIENERT)  Sir, you never gave us any terms of what

5    it means to commit prostitution in California other than you

6    cannot solicit or arrange sex for money, right?

7    A.  That was the summary I gave, yes.

8    Q.  Summary.  Sir, prostitution is a specific crime with

9    specific elements, right?

10             MR. KOZINETS:  I'm sorry.  Objection.  Foundation.

11             THE COURT:  The objection's overruled.

12   Q.  (BY MR. BIENERT)  Right?

13   A.  I assume every law has specifics to it.

14   Q.  Okay.  Well, you were here to talk about prostitution,

15   right?

16   A.  Correct.

17   Q.  That's the reason you're on the stand, right?

18   A.  One of the reasons, yes.

19   Q.  Okay.  And California has specific terms to establish

20   prostitution, and they include, one, the defendant solicited

21   that another person engage in an act of prostitution, right?

22   A.  I don't know the law verbatim.

23   Q.  Well, sir, you got up here and told us you've been

24   investigating, among other things, sex crimes and prostitution

25   for many years, right?

1    A.   No, I did not.

2    Q.   Okay.  Well, when Mr. Kozinets asked you if you were

3    familiar with the laws of prostitution in California, you said

4    yes, right?

5    A.   Yes.

6    Q.   You didn't hedge your bets and say I don't know a lot about

7    it, did you?

8    A.   No.

9    Q.   You know, sir, that in order to convict someone of

10   prostitution or solicitation of prostitution, then someone has

11   to solicit or ask someone, another person, if they would like

12   to engage in an act of prostitution, right?

13   A.   Solicit, engage, or arrange to engage.

14   Q.   In an act of prostitution, right?

15   A.   Again, I don't know the exact law verbatim, if that's --

16   Q.   Does that sound generally right?

17   A.   Okay.  Yes.

18   Q.   And, in addition, to be able to charge someone or convict

19   of prostitution, one would have to show that the defendant

20   intended to engage in an act of prostitution with another

21   person, right?

22             MR. KOZINETS:  Objection, Your Honor.

23             THE COURT:  What's your objection?

24             MR. KOZINETS:  Foundation.  I'm sorry.  Can we do a

25   side bar?

1           THE COURT:  Yes.

2       (Bench conference on the record as follows:)

3           MR. KOZINETS:  Your Honor, this is Peter Kozinets.  On

4    direct examination, Special Agent Fichtner was asked for his

5    general understanding of prostitution law in the State of

6    California, and he gave a general answer.  He is not a lawyer.

7    He is not somebody who is in a position to testify about the

8    details of the law.

9           MR. BIENERT:  Mr. Bienert speaking.  Your Honor, he is

10   the one who asked the question, and it was literally are you

11   familiar with the laws of prostitution in California --

12          MR. KOZINETS:  It was general.

13          THE COURT:  Stop.

14          MR. KOZINETS:  I'm sorry.

15          MR. BIENERT:  -- and he said yes.  The definition that

16   he gave was misleading.  It was overly general.  It did not

17   even get close to what prostitution is.  I'm entitled to ask

18   this witness questions about that, because if these jurors

19   don't get an understanding of prostitution, they're being

20   misled, and it's the issue in the case.  I'm allowed to

21   cross-examine him about what he said to this jury Friday.

22          THE COURT:  Well, and he's clarified he doesn't know

23   the specific language of the statute, so any further

24   questioning is really argument.  And I'm going to instruct them

25   on what the law is, not you through questioning him.

1          MR. BIENERT:  But I am allowed to go back into what it

2    is, and I can certainly ask.  If he says he doesn't know, he

3    can say that.  But he -- it is grossly improper for

4    Mr. Kozinets to have this witness tell the jurors that

5    prostitution is sex for money when that is not even close to

6    what the definition is.  It is a subset of that.  And

7    everything that is outside of that subset is not prostitution.

8    And I'm going to show this witness and through this witness

9    that the ads that he spent a day talking to the witness about

10   are in the subset of sex that is not prostitution.  That's

11   exactly what impeachment is, and it goes directly to

12   undermining the whole point that Mr. Kozinets had him testify

13   about.

14         THE COURT:  Well, you can ask him about the ads, but

15   he's already admitted that he doesn't know the exact language

16   of the statute.

17         MR. BIENERT:  But he doesn't have to say it exactly.

18   If he says that I'm generally correct, we go from there.  This

19   jury -- Here's what's going to happen.  I'm going to show him

20   ads.

21         THE COURT:  Yes.

22         MR. BIENERT:  And I'm going to point out why they're

23   not prostitution.  But if the jury hasn't heard anything about

24   what the definition of prostitution really is, it means

25   nothing.  Now, I am totally fine I can give Your Honor the

1    California criminal procedure model instructions on

2    prostitution, and I would be more than happy if Your Honor read

3    them to the jury.  That would be fine.  And then I don't have

4    to ask him about it.  I go from there.

5             But it's unfair and improper for me to be questioning

6    this witness to show that what he said is overly general, the

7    ads complained about are illegal, non-prostitution ads, without

8    being able to show what prostitution is.

9             So I just -- Alternatively I would say I have the

10   California criminal jury instructions with me.  I would ask

11   that you give them, Your Honor, now, and you instruct the jury

12   as to what it really is.

13            MR. KOZINETS:  This is Peter Kozinets.  Special

14   Agent Fichtner's direct examination involved showing the jury

15   what the Backpage website actually looked like in 2015,

16   including the escort section.  He did not testify as to

17   alternate legal conclusions.  In fact, there were objections

18   whenever he approached making such comments.  And so the notion

19   that it's even, I think, properly within the scope of

20   cross-examination to ask him specifics of California law

21   involving prostitution and how they apply to these ads is

22   simply inappropriate for this witness.

23            MR. LINCENBERG:  That's not accurate.

24            THE COURT:  Stop.  The objection is sustained.  As I

25   remember his testimony, he was not allowed to testify about

1    whether this was sex for money or not or any ultimate legal

2    conclusion.  So the objection is sustained.

3              MR. LINCENBERG:  May I be heard?

4              THE COURT:  You can be heard later.

5         (End of bench conference.)

6    Q.  (BY MR. BIENERT)  Just want to make sure I'm heard.

7              Sir, you testified Friday you went through all of

8    these ads, many of them, and you basically said that you

9    believed they were prostitution based on looking at the ads,

10   right?

11   A.  That is one of the factors, yes.

12   Q.  But if I'm understanding you now, you're basically telling

13   us that you don't really know what the definition of

14   prostitution is in California, right?

15   A.  Verbatim?

16             MR. KOZINETS:  Objection.  Argumentative.

17             THE COURT:  The objection's overruled.

18             THE WITNESS:  647(b) of the California Penal Code

19   basically states if you solicit, engage, or arrange to engage

20   in prostitution, it's a violation of the lewd conduct in

21   California.

22   Q.  (BY MR. BIENERT)  And what is a lewd act in California?

23   A.  I don't know the legal term behind the lewd act, but if you

24   negotiate for sex, that would be an act of prostitution.

25   Q.  Sir, you just cited Section 647(b), which is the statute in

FICHTNER - CROSS

```
1    California that deals with making prostitution illegal, right?
2    A.   Correct.
3    Q.   And the statute says that it is prostitution if you engage
4    in a lewd act, right, for money?
5    A.   For money.
6    Q.   Right?
7    A.   Yes.
8    Q.   And then the very same section goes on to define lewd act
9    by reference to California Supreme Court cases, right?
10   A.   If you say so.
11   Q.   Well, are you saying you don't know?
12   A.   I am not an attorney.  I don't know the complete law, no.
13   Q.   Okay.  Is it true, sir, that in California, in order to
14   have prostitution, it must involve for money touching the
15   genitals, buttocks, or female breast, having contact with the
16   other person?  Right?
17   A.   I'm sorry.  Is that a question referencing what is said in
18   647(b)?
19   Q.   I'm asking you, since you just referenced the term lewd
20   act, which is what you need to be guilty of prostitution,
21   right?
22   A.   That's what it falls under 647(b).  It is what it falls
23   under in the California Penal Code.
24   Q.   And 647(b), according what you just said, says prostitution
25   equals a lewd act for money, right?
```

1    A.   Yes.

2    Q.   And is it true, sir, that the definition of a lewd act,

3    which is further defined, is touching the genitals, buttocks,

4    or female breast, having contact with the other person for

5    sexual gratification?

6    A.   Further defined in 647(b)?

7    Q.   Further defined in the California Supreme Court and set

8    forth at 647(b) in the criminal jury instructions?

9              MR. KOZINETS:  Objection.  Foundation.

10             THE COURT:  The objection's overruled.  You can answer

11   if you know.

12             THE WITNESS:  I don't know.

13   Q.   (BY MR. BIENERT)  Okay.  So we're back to what I started

14   with after our little side bar.  You just spent all this time

15   supposedly telling everyone here what you think or don't think

16   is prostitution about those ads, but the true facts are you

17   don't even know what the definition of a lewd act which equals

18   prostitution in California is?  Right?

19             MR. KOZINETS:  Objection.  Argumentative and misstates

20   prior testimony.

21             THE COURT:  The objection's sustained.

22   Q.   (BY MR. BIENERT)  You don't know what the definition of a

23   lewd act is in California, do you?

24             MR. KOZINETS:  Objection.  Asked and answered.

25             MR. BIENERT:  I had an objection, and I rephrased it

1  because he didn't answer because you sustained it.

2          THE COURT:  He answered that before the last question.

3  The objection's sustained.

4  Q.  (BY MR. BIENERT)  Okay.  Do you agree with me, sir, that in

5  order to assess these ads to make an independent judgment for

6  anyone looking at them, one would need to have an understanding

7  of what a lewd act is that constitutes prostitution in

8  California?

9  A.  Yes.

10  Q.  And you don't have that?

11  A.  The legal definition?  I don't know it as a legal

12  definition.

13  Q.  The truth is, sir, a lot of things that could be

14  characterized as sex or sexual conduct in California are not

15  prostitution, right?

16  A.  I'm not sure what you're referring to.

17  Q.  Well, an escort or an adult services provider or an adult

18  performer or a sensual massage artist could appear with a

19  paying client buck naked, and that is not prostitution, right?

20  A.  I assume that those are licensed, and they're not crossing

21  the line of 647(b).  Yes, I guess it's legal.  I don't know.

22  Q.  Meaning no touchy in the genitals, right?

23          MR. KOZINETS:  I'm sorry.  Objection.  Just form,

24  foundation.

25          THE COURT:  The objection's sustained.

1    Q.   (BY MR. BIENERT)   If the person who is nude, dancing,

2    moving around naked, sensually rubbing the other person's back

3    for money is not touching the genitals of that person, it is

4    not prostitution in California, right?

5              MR. KOZINETS:   Objection.   Foundation.

6              THE COURT:   It's the ultimate question.   The

7    objection's sustained.

8    Q.   (BY MR. BIENERT)   You also mentioned, when you were

9    answering a minute ago, you said if that person is licensed,

10   you assumed it would be okay.   What license were you referring

11   to?

12   A.   What I referred to earlier, which is just what I know in

13   the Sacramento County area.   I know they require a business

14   license and a special license for certain professions.

15   Q.   Well, sir, that's only to become a licensed member of that

16   profession, like escort, adult performer, or stripper, right?

17   That's what the licensing requirement is for, correct?

18   A.   If you say so.

19   Q.   Well, do you know one way or the other?

20   A.   I have a brief overview of it.   I don't know it inside and

21   out, no.

22   Q.   So when you got up here on Friday, and you talked to us

23   about the escort rules and regulations in Sacramento, you

24   didn't really -- you don't really know those either, right?

25             MR. KOZINETS:   Objection.   Argumentative.

1           THE COURT:  The objection's overruled.

2           THE WITNESS:  Like I said, I just know a summary of

3    it.  I have a basic understanding of it.

4    Q.  (BY MR. BIENERT)  Well, you knew enough in your basic

5    understanding for when Mr. Kozinets asked you about the

6    Sacramento city regulations about escort, you gave answers,

7    right?

8    A.  For the county, yes.

9    Q.  So let's talk about licensing.  Whether one -- Strike that.

10          The Sacramento code talks about under what

11   circumstances certain adult performers and service persons can

12   work with a license in Sacramento, correct?

13   A.  I assume they do.

14   Q.  And it basically covers strippers, escorts, adult

15   performers, sensual massage artists, among others, correct?

16          MR. KOZINETS:  Objection.  Foundation.

17          THE COURT:  The objection's overruled.

18          THE WITNESS:  Again, I assume they do.  I don't know

19   it completely.

20   Q.  (BY MR. BIENERT)  But whether or not -- Strike that.

21          And it defines types of behavior that equate to what

22   strippers, escort service providers, adult performers, and

23   sensual massage artists do, correct?

24   A.  I don't know it in that depth.

25   Q.  Well, one thing you do know is whether or not someone has a

1    license or not is a totally separate issue than whether

2    someone's conduct violates a specific law like prostitution,

3    true?

4    A.   Somebody's conduct is what violates 647(b), correct.

5    Q.   Sir, I need a license to drive my car, and I can't drive my

6    car drunk.   But if when I got out of court today and I'm stone

7    sober and I drive and get caught by a cop with no license, that

8    doesn't make me guilty of driving under the influence of

9    alcohol, does it?   They're different concepts, right?

10   A.   Yes.

11   Q.   So licensing is a totally different issue.   Let me back up.

12          Licensing to be an escort, for example, and whether

13   one has paid the money to the City of Sacramento to be an

14   escort and get a license is a totally different issue than

15   whether someone actually committed prostitution, right?

16   A.   Yes.

17   Q.   But when you were asked questions by Mr. Kozinets, you

18   seemed to draw a relationship between escort and prostitution,

19   right?   That's the way he asked you the questions and you

20   answered, true?

21          MR. KOZINETS:   I'm sorry.   Objection.   Argumentative.

22   Form.

23          THE COURT:   The objection's sustained.

24   Q.   (BY MR. BIENERT)   Sir, he asked you about escorts.

25   Obviously I hadn't spoken to you yet.   Right?

1    A.  Yes.

2    Q.  And he asked you about escorts right on the heels of going

3    over things that related to prostitution, true?

4    A.  "Right on the heels," you mean?

5    Q.  Well, yes or no.  If you don't know, say so.

6    A.  Yes.

7    Q.  What you were suggesting, sir, is that if someone did not

8    have an escort license, then they must be doing illegal

9    prostitution, right?  That's what you were trying to convey on

10   Friday.  True?

11           MR. KOZINETS:  Objection.  Form.

12           THE COURT:  The objection's overruled.

13           THE WITNESS:  No.  I was separating the two.

14   Q.  (BY MR. BIENERT)  Okay.  Because had someone gotten that

15   misimpression, had someone in this room thought that failure to

16   have an escort license equaled prostitution, they would be

17   confused, correct?

18   A.  Ask that one more time.  I'm sorry.

19   Q.  Sure.  Had someone in this room mistakenly believed, based

20   on your questioning from Mr. Kozinets, that the failure to have

21   an escort license in Sacramento meant they were doing illegal

22   prostitution, they would be confused and incorrect, true?

23           MR. KOZINETS:  Objection.  Misstates prior testimony.

24   Form.  Argumentative.

25           THE COURT:  The objection's overruled.

1          THE WITNESS:  Now, if you're asking if they're not a

2    licensed escort, which means they're a prostitute, no.

3    Q.  (BY MR. BIENERT)  Correct.  That's just not the way it

4    works, right?  Prostitution has to be proven on a stand-alone

5    basis if someone can establish the elements of prostitution,

6    whatever they are, true?

7    A.  Stand-alone, yes.

8    Q.  And it's a totally different issue than whether someone is

9    or isn't an escort, adult services provider, dancer, massage

10   artist, or adult performer, and whether they do or don't have a

11   license, true?

12   A.  Yes.

13   Q.  Now, you were asked by Mr. Kozinets some example questions

14   related to escort.  For example, he said something to you like

15   did you see any ads and all those things on Backpage you looked

16   at where somebody said let's go have a cup of coffee?  Do you

17   remember that?

18   A.  Yes.

19   Q.  And you said no.  Right?

20   A.  I said no.

21   Q.  And he also said did you see anybody on that Backpage

22   website saying how about we go on a date and go to dinner?  Do

23   you remember that?

24   A.  Yes.

25   Q.  And you said no?  Right?

1   A.  I said no.

2   Q.  And what you were trying to convey through that questioning

3   was a suggestion that these ads were not escort ads, right?

4   A.  I was answering his questions.

5   Q.  All right.  By the way, let's talk about answering his

6   question.  You have never seen me, spoken to me, or

7   communicated before with me in your life, right?

8   A.  No.

9   Q.  In fact, you've never had communication with anybody on

10  what I'll call the defense crew side of the courtroom, true?

11  A.  True.

12  Q.  But you spent a lot of time with Mr. Kozinets before your

13  testimony, right?

14  A.  I spent time with Mr. Kozinets.

15  Q.  How many meetings and communications have you had with

16  Mr. Kozinets before you came to testify, ballpark?

17  A.  Several.

18  Q.  What does several mean?  More than 20?

19  A.  No.  Less than 20.

20  Q.  More than ten?

21  A.  Could be.

22  Q.  And you spent many, many hours with him either

23  communicating, talking on the phone, or meeting, right?

24  A.  Yes.

25  Q.  40 hours or more?

1    A.  I didn't keep track.  I'm sorry.

2    Q.  It could be as much, right?

3    A.  It could be as much.

4    Q.  You could have spent literally one week of your work time

5    with Mr. Kozinets for purposes of preparing your testimony

6    right here in front of all of us, right?

7    A.  Yes.

8    Q.  Well, when you gave these -- Did this answer -- So, first

9    of all, none of the questions that he asked you came as a

10   surprise, did they?

11   A.  None of them?  I -- Yes, I guess not all questions that he

12   asked were the questions he had asked before.

13   Q.  You guys went over in advance what you were going to talk

14   about from the witness stand, true?

15   A.  Yes.

16   Q.  And you knew, among other things, that you were going to be

17   asked about and give testimony about escorts as it relates to

18   the codes in Sacramento, true?

19   A.  Yes.

20   Q.  Well, let's look at the Sacramento city code.  And if we

21   could, just for purposes of the witness, if we could have IM4

22   put up on the screen.  And I apologize, Your Honor.  It's the

23   first time I'm doing this in your court.  My understanding is

24   we give it our own designation, and once it is on the screen,

25   your madam clerk will give it an actual court number.  But if

1    I'm missing that, I want to make sure I'm doing it right.

2              THE COURT:  It should have already been --

3         (The Court and clerk confer off the record.)

4              THE COURT:  So, yes, Mr. Bienert, for impeachment

5    material, if it is admitted, it will get a number.  If it is

6    not admitted, it will not get a number.

7    Q.  (BY MR. BIENERT)  Okay.  Sir, can you take a look at what I

8    am referring to as IM4 in front of you.  And, by the way, as

9    usual, I screwed up.  Let's try changing this a little to IM16,

10   one six, IM16.  I wish I were 16 but IM16.

11             Do you see that in front of you, sir?

12   A.  Yes.

13   Q.  And IM16, do you recognize this as being part of Sacramento

14   adult business codes?

15   A.  For the city code?

16   Q.  Yeah.

17   A.  I'm not familiar with Sacramento city code.

18   Q.  Well, sir, they have these codes for the counties, the

19   cities all over the state, true?

20   A.  Yes.

21   Q.  And at least as it relates to adult related services, the

22   codes are pretty well the same from the city, the county, and

23   others, true?

24   A.  I don't know.

25   Q.  Well, is it true, sir, that -- And if we can, just for

1    purposes of the monitor, go to the second page of IM -- Oh,

2    wait.  I'm sorry.  Go back right where we are.

3              Is it true, sir, that there's a definition of escort

4    about a third of the way down?

5    A.  Yes.

6    Q.  Is it true, sir, that an escort is someone who escorts or

7    accompanies others to or about social affairs, entertainment,

8    or places of amusement, right?

9    A.  Yes, that's what it says.

10   Q.  And that of course would be:  Hey, do you want to go to

11   dinner?  Hey, how about we go to Starbucks?

12             That would fall under that prong of escort, right?

13   A.  Sounds like it, yes.

14   Q.  But is it also true that an escort is someone who, quote,

15   keeps company with others about any place of public resort or

16   within any private quarters, right?

17   A.  That's what it says, yes.

18   Q.  Well, sir, you understand that an escort isn't necessarily

19   just about going to dinner or Starbucks, but an escort can go

20   to someone's house, right?

21   A.  Yes.

22   Q.  And an escort can go to a hotel room with someone, right?

23   A.  Any private quarters it says, yes.

24   Q.  So an escort can go to my house, true?

25   A.  Yes.

1  Q.  And I can go to the escort's house or private quarters,

2  right?

3  A.  Yes.

4  Q.  And we can all do that with me paying the escort money,

5  true?

6  A.  Yes.

7  Q.  Escorts are paid for their services, right?

8  A.  Yes.

9  Q.  And for purposes of every single thing that you went over

10  with us the other day in this courtroom, the portion of the

11  escort definition, if applicable at all, was this second part.

12  It was about what advertisers do or don't do when they're in

13  private quarters, right?

14  A.  I'm sorry.  Restate that again.

15  Q.  Sure.  Is it true, sir, that for all of the stuff that you

16  went over with us on Friday and I think even Thursday, none of

17  it had to do with this issue of escorts or whatever they were

18  going to dinner or Starbucks, right?

19  A.  All the stuff we went over?  The ads?

20  Q.  Yeah.

21  A.  No.

22  Q.  Those ads had to do with what does or doesn't happen behind

23  private closed doors, right?

24  A.  I don't know.  I'd have to look back at the ads, but, yes,

25  I guess, in a sense, yes.

1    Q.  Let me ask you this, sir.  When you told us all here this

2    information about escort and limited the question and answer to

3    dinner and Starbucks, why didn't you tell us that an escort is

4    allowed to go into private places and do things for money?

5            MR. KOZINETS:  Objection.  Form.  Misstates prior

6    testimony.

7            THE COURT:  The objection's overruled.

8            THE WITNESS:  I was not asked.

9    Q.  (BY MR. BIENERT)  Well, you knew in advance you were going

10   to be asked about the escort provisions of the codes dealing

11   with adult services, right?

12   A.  Yes.

13   Q.  And you had meetings with Mr. Kozinets about it, right?

14   A.  Yes.

15   Q.  When you met with Mr. Kozinets outside of this courtroom,

16   did you let him know that the term escort didn't just apply to

17   things like dinner and Starbucks but applied to escorts being

18   paid to go into, for example, people's houses?

19   A.  I don't know if it was stated that way, in people's houses.

20   Q.  Well, would you have in any way, shape, or form suggested

21   to this gentleman right here for the government, the

22   prosecutor, by the way, so no one is confused, the term escort

23   also goes a lot beyond dinner and coffee, but it includes

24   things like being paid to go to someone's private quarters?

25           MR. KOZINETS:  Form.

1              THE COURT:  The objection's overruled.

2              THE WITNESS:  I think the way I described the escort

3     was one person hiring another person to spend time as long as

4     they didn't violate the law.

5     Q.  (BY MR. BIENERT)  Okay.  So you may not have educated him

6     that escort includes going into private quarters for money?

7     A.  You mean the city code here?  I did not know the city code.

8     Q.  Well, sir, you knew and full well understood that that is

9     also how it is defined in the Sacramento County code, right?

10    A.  Again, I don't know the code verbatim.

11    Q.  But you did give questions and answers related to escort

12    when he asked you questions, true?

13    A.  I did give answers when he asked.

14    Q.  When he asked you the questions, why didn't you tell us all

15    that you really didn't know those rules?

16    A.  I gave a summary of the rules.

17    Q.  Well, you sure left out the part about going to private

18    quarters, didn't you?

19              MR. KOZINETS:  Objection.  Argumentative.

20              THE COURT:  The objection's sustained.  Mr. Bienert,

21    you need to remain closer.

22    Q.  (BY MR. BIENERT)  Sure.  And, by the way, this whole idea

23    of an escort, these codes don't just limit things to escorts.

24    They talk about adult performers, right?  I'm just talking

25    about your general knowledge now independent of this document.

1              Is it true, sir, that you understand that these county

2    or city codes dealing with adult services also deal with things

3    like adult performers, right?

4    A.  I believe so.

5    Q.  And they deal with things like strippers, true?

6    A.  Adult performers, I believe so.

7    Q.  Yeah.  It's all in the same general category of adult

8    services, right?

9    A.  Yes.

10   Q.  And not only is it lawful to engage in such services, but

11   when one wants to get a license for such adult services, they

12   walk into a government building like a police department, say

13   I'm an escort or an adult performer, and I want to get a

14   license to do that.  Right?

15   A.  Yes.

16   Q.  So, in other words, the law enforcement folks are the ones

17   who actually receive and have access to their information so

18   it's known that these types of services are legal and can be

19   performed in that jurisdiction, right?

20   A.  That's my understanding in Sacramento County, is they

21   approve the application.

22   Q.  And when they approve the application, they give money to

23   the county, right?

24   A.  I don't know the financial transaction of the application.

25   Q.  Well, is it your understanding that in order for an escort

1    adult services provider, stripper, sensual massage artist to

2    get a license, they pay money to the county?

3    A.  I would assume they do.

4    Q.  And the county takes that money, doesn't it?

5    A.  I assume they do.

6    Q.  County doesn't say, "Whoa, whoa, whoa.  I'm concerned you

7    could do something illegal.  Your money's not good here," does

8    it?

9    A.  I don't know what they say, but they probably don't say

10   that.

11   Q.  They keep the money, right?

12   A.  I assume.

13   Q.  Sir, let's talk a little bit about your exhibits, your

14   video.  And if we could pull up, just for your own edification

15   and the government and the Court, I will represent to you that

16   we took your video and went through it and just made some still

17   photos so we don't have to wait for everything to go those

18   seconds.  What I'm proposing to do, unless there is a problem

19   with it, is direct you on the your only screen to screenshots

20   to look at.  And once we confirm that they are from your video,

21   I will ask you questions.

22   A.  Okay.

23   Q.  All right.  So, first, if we could go ahead and put up what

24   I'm calling IM17.  And I'm going to want you to look at this

25   and tell us if you agree that this is a screenshot of what you

1    put up in your video at 20 seconds.

2    A.  It looks like it, yes.

3           MR. BIENERT:  Your Honor, I'd ask if we can publish

4    what is IM17 so the jurors can see it.

5           THE COURT:  Which exhibit is this part of?

6           MR. BIENERT:  It's part of Government's Exhibit 489A

7    at 20 seconds.

8           THE COURT:  Okay.  All right.  You may publish it.

9    Q.  (BY MR. BIENERT)  So, sir, this is the Backpage kind of

10   table of contents, and of course it shows there are many, many,

11   many types of ads at Backpage, right?

12   A.  Yes.  I think there's 11 categories.

13   Q.  So for purposes of your undercover, as you're calling it,

14   you went ahead, and you chose what categories to hone in on and

15   use, right?

16   A.  I chose, yes, those categories.

17   Q.  All right.  And so you chose to hone in on adult and

18   escorts in particular, right?

19   A.  Yes.

20   Q.  And then of course somewhere over here in the

21   buy/sell/trade, you would have presumably, under furniture, you

22   would have chosen to hone in on that one, right?

23   A.  Yes.

24   Q.  But suffice it to say there are thousands of ads a month in

25   many categories on the Backpage website, true?

1    A.   I don't know the numbers, but I would guess so.

2    Q.   And, by the way, is it true that until July of 2015,

3    Backpage always required people posting in the adult section to

4    actually pay something for the ad?

5    A.   Yes.

6    Q.   And is it true, sir, that by requiring people to pay for

7    the ad, it gets a credit card number that allows Backpage, if

8    ever necessary, to have a lead on who bought the ad, true?

9    A.   Not always.

10   Q.   I'm sorry?

11   A.   Not always.

12   Q.   Okay.  Well, I'm -- Did you once -- You've given some

13   declarations under oath in this case, right?

14   A.   Yes.

15   Q.   Is it true, sir, that you gave a declaration under oath in

16   this case where you said until July, 2015, Backpage required

17   that people actually pay for each adult ad?

18   A.   Yes.

19   Q.   And did you indicate in that same declaration that it was

20   usually with credit card?

21   A.   I don't know if I said that.

22   Q.   Well, as you sit here now, is that a true statement, that

23   it was typically credit card?

24   A.   That I don't know.

25   Q.   Okay.  By the way, if I'm following what you were doing,

1  you were sitting here in present time, September, 2021, showing

2  us a video of what the Backpage Sacramento website looked like

3  to you in this example with 489A on March 6, 2015, true?

4  A.  Yes.

5  Q.  But you understood from your investigation that the

6  Backpage website was an interactive, operable website where one

7  could look for all different types of things on the website,

8  right?

9  A.  Yes.

10  Q.  And you understood, sir, that that website was intact and

11  existing as of 2018 when the government seized it, true?

12  A.  I believe it was.  I was not part of the investigation at

13  that time.

14  Q.  Anybody from the government ever -- By the way, it's your

15  understanding that the government has all the gizmos and

16  components that actually are the website, right?

17  A.  I'm sorry.  Say that one more time.

18  Q.  Is it your understanding, sir, that the government, these

19  guys over here, have the hard drives, the computers, all the

20  components that are the website?

21          MR. KOZINETS:  Objection.  Foundation.

22          THE COURT:  The objection's overruled.

23          THE WITNESS:  I do not know what evidence the

24  government here has.

25  Q.  (BY MR. BIENERT)  Has anybody from the government ever

1    asked you to look at the website, to look at it and tell them

2    if it looked like it did when you saw it?

3    A.  I'm sorry.  State that one more time.

4    Q.  Did anyone over at the government side here ever ask you to

5    look at the Backpage website as it was whenever they took it in

6    2018?

7    A.  No.

8    Q.  All right.  Now, if we can go to what I am going to call

9    IM18.  We can just put it up on the screen solely for the

10   witness.

11           I'd ask you to look at this and tell me if you

12   recognize it as your video screenshot at 33 seconds.

13   A.  I don't know the time, but it looks like a screenshot of my

14   video.

15           MR. BIENERT:  Your Honor, I'd ask if we can publish

16   what I'm calling IM18.

17           THE COURT:  Any objection?  All right.  You may

18   publish it.

19           MR. BIENERT:  And, by the way, before I get too far

20   ahead of myself, I am going to ask to move into evidence what

21   was IM17, the screenshot at 20 seconds that we went over a few

22   moments ago.  And if it's allowed in, I would want to get, I

23   guess, the proper exhibit number for it.

24           MR. KOZINETS:  No objection.

25           THE COURT:  Okay.

1          MR. BIENERT:  And just to be expedient, if it's

2    easier, Your Honor, for the staff and for your madam clerk,

3    look, I can do all of this at the end, but I don't know if it's

4    better to do it as I go or at the end.

5          THE COURT:  Why don't we do it all at the end.

6          MR. BIENERT:  That's fine, so she doesn't have to keep

7    getting up and down.

8    Q.  (BY MR. BIENERT)  All right.  So let's go back to IM18,

9    which is now on the screen, and this is a still shot of what

10   you showed us on the video that you took from March 6, 2015,

11   right?

12   A.  Yes.

13   Q.  And basically it has a big listing of a whole bunch of ads

14   that are under the adult section and specifically under the

15   section called Sacramento escorts.  Do you see that?

16   A.  Yes.

17   Q.  And if we look over at the very right-hand side, the second

18   entry in, there's something called Children of the Night.  And

19   that's something that you were asked about by Mr. Kozinets and

20   commented on, correct?

21   A.  Yes.

22   Q.  And he basically had you say it makes reference to turning

23   tricks and asked you what that meant, true?

24   A.  Yes.

25   Q.  Well, sir, is it true that Children of the Night is a

1    non-profit organization that actually helps people who are

2    victimized by trafficking?

3    A.   Yes.

4    Q.   And is it true that Children of the Night is there to try

5    to help people who feel like they're being pressured or

6    involuntarily engaging in adult activities, even prostitution,

7    as opposed to people who are doing it consensually?

8    A.   On this website, yes.

9    Q.   And are you aware of the fact that Children of the Night

10   advertises in a lot of different medium, not just Backpage?

11   A.   I don't know.

12   Q.   Were you aware that Backpage contributed millions of

13   dollars to Children of the Night to help in its mission of

14   helping people who have been victimized by trafficking?

15   A.   I don't know what money Backpage gives Children of the

16   Night.

17   Q.   Did you know that they gave any money to Children of the

18   Night?

19   A.   I don't know.

20   Q.   You certainly don't quarrel with the fact that if one is

21   really trying to help with the situation of people

22   involuntarily being engaged in the sex business, that a good

23   place to place such ads and reach an audience would be on a

24   page that has escorts, which could be legal adult services, but

25   to see if there are people there who might need help?  True?

```
 1   A.  I think --
 2           MR. KOZINETS:  Objection.  Form.
 3           THE COURT:  The objection's sustained.
 4   Q.  (BY MR. BIENERT)  When this was highlighted -- Strike that.
 5           You don't see any illegality or problem, do you, from
 6   a legal standpoint, with Backpage allowing an ad for Children
 7   of the Night to be on its website, do you?
 8   A.  I think it's appropriate to put something like this on
 9   Backpage's website.
10   Q.  And to the degree that Children of the Night puts these
11   types of ads in other places, everything from other websites to
12   billboards to sides of buses, you believe that would be
13   appropriate too, right?
14   A.  To put it anywhere?  Sure.
15   Q.  Now, you talked a lot about numbers with Mr. Kozinets.  He
16   went over with you page by page by page counting ads.  Do you
17   remember that?
18   A.  Yes.
19   Q.  And if I was following it correctly, you got to the point
20   where you said to the effect, yes, it appears like there were
21   about 300 ads that came in in 27 hours during the time that you
22   started your undercover investigation until a later time.  Do
23   you recall that?
24   A.  Yes.
25   Q.  Now, first of all, let's talk about those ads.  Is it true,
```

1    sir, that a lot of the ads that were coming in during those 27

2    hours were the same ads that had been on the page when you had

3    looked at it earlier, but because they had paid for the upgrade

4    to have it repeatedly posted, it just appeared again, true?

5    A.   I don't know.

6    Q.   But you do know that Backpage, like many websites, allows

7    people to upsell or upgrade to let their ad run many times,

8    right?

9    A.   Yes.

10   Q.   In fact, that's what you did.  When you went in, you could

11   have posted your adult section ad for $10, but you made a

12   decision to continue to upsell and upgrade to get a bunch of

13   different services that made the ad appear more often, right?

14   A.   More often or at the top of the list.  My understanding is

15   it took it to the top of the list.  I don't know if it reposted

16   it over and over.

17   Q.   Okay.  Whatever it was, you took steps to make that price

18   go from $10 to $111, I think, right?

19   A.   Yes.

20   Q.   And whatever this was, it was to get more prominent

21   visibility on Backpage than one actually had to do if they

22   didn't want to, true?

23   A.   Yes.

24   Q.   But, regardless, the point of your testimony is there were

25   a lot of ads that went up on Backpage during that 27-hour time

1    frame, right?

2    A.   Yes.

3    Q.   Sir, is it also true that in that same time frame, March,

4    2015, there are thousands and thousands of escort ads or ads

5    that look a lot like the Backpage ones on other sites that are

6    readily available as well?

7    A.   There were other ads on the website, yes.

8    Q.   But there are other websites that readily in Sacramento

9    advertised similar type services, true?

10            MR. KOZINETS:   Foundation.

11            THE COURT:   The objection's overruled.   You can answer

12   if you know.

13            THE WITNESS:   I assume there was.

14   Q.   (BY MR. BIENERT)   Well, I mean, you're a guy who

15   investigates this type of behavior, true, at least in March of

16   2015, right?

17   A.   Yes.   I was investigating Backpage in 2015.

18   Q.   Well, in investigating Backpage, did you want to understand

19   the area in which they operated to, for among other reasons,

20   say what are these guys seeing that's out there, and how might

21   that affect what they're thinking about the legality of what

22   they're doing?

23            MR. KOZINETS:   Form.

24            THE COURT:   The objection's overruled.

25            THE WITNESS:   Yes.   But the others weren't --  I was

UNITED STATES DISTRICT COURT

1    not investigating the others at that time.

2    Q.   (BY MR. BIENERT)  Well, sir, let me ask you if you've heard

3    of any of these and whether they in fact were advertising the

4    same type stuff at the same times.  AdultSearch.com?

5    A.   I am not familiar with that one, no.

6    Q.   AdultLook.com?

7    A.   I was not familiar with that one.

8    Q.   CallEscort.org?

9    A.   Not familiar.

10   Q.   Eros.com?

11   A.   Not familiar with it.

12   Q.   EroticMonkey.com?

13   A.   I'm not familiar.

14   Q.   EscortAffair.com?

15   A.   I am not familiar with that one.

16   Q.   Escort Alligator or Escort Babylon?

17   A.   I am not familiar with those.

18   Q.   You never looked at any of those sites?

19   A.   Of those?  No.

20   Q.   And, sir, I've just named for you one, two, three -- eight

21   websites, and we have only gotten to the E's.  Is it true to

22   say that whichever cites you looked at, you knew and understood

23   that at the time that you were investigating Backpage, there

24   were literally dozens and dozens of outlets available online to

25   people in Sacramento that advertised escorts and things that

1    were a lot more blatant than that?  True?

2              MR. KOZINETS:  Foundation.

3              THE COURT:  The objection's sustained.

4    Q.  (BY MR. BIENERT)  Did you look at, let's call it in the

5    entire year of 2015, did you look at any websites that dealt in

6    the area of adult services other than Backpage?

7    A.  EvilEmpire.com.

8    Q.  And that's one that you affiliate with Carl Ferrer, right?

9    A.  And Backpage.

10   Q.  Right.  When Carl Ferrer owned Backpage, right?

11   A.  Amongst others, I believe.

12   Q.  Well, sir, is it true that you gave a declaration in the

13   past under oath, and you specifically pointed out that at one

14   point Carl Ferrer started Evil Empire, right?

15   A.  I believe so.  I don't remember exactly.

16   Q.  You also pointed out in a declaration under oath that you

17   knew or understood sometime in 2015ish time frame, that four of

18   the defendants here who owned Village Voice Media, which owned

19   Backpage, sold Backpage to Carl Ferrer?

20   A.  That's my understanding.

21   Q.  And is it true, sir, that what Carl Ferrer did with Evil

22   Empire was after he became the owner of Backpage, having had it

23   sold to him by the defendants?

24   A.  I don't know.

25   Q.  All right.  So other than Evil Empire, that's the only

1    other website you can think of that you looked at in an entire

2    calendar year, other than Backpage, while you were doing this

3    investigation?  Am I understanding that right?

4    A.  No.

5    Q.  What other ones did you look at?

6    A.  I'm sure I looked at Craigslist.

7    Q.  Okay.  Because Craigslist was still in existence and

8    frankly is to this day, true?

9    A.  Yes.

10   Q.  And one could find on Craigslist adult services classified

11   ads, true?

12   A.  On this day?

13   Q.  2015, yes.

14   A.  In 2015?

15          I think by then they had taken down their adult

16   services section.

17   Q.  My question's different, sir.  If we go back and look at --

18   Why don't we look at Exhibit -- Let's go back to Exhibit IM17.

19   Can we pull that up to the jury.

20          It's already been displayed, Your Honor.

21          So, sir, once again, there's a whole lot of different

22   things on Backpage, true?

23   A.  Yes.  There's different categories.

24   Q.  And there were a lot of different categories on Craigslist,

25   true?

50

1    A.   Yes.

2    Q.   And if we look, just by example, on Backpage, over here,

3    the third column, we have dating and adult.  Do you see that?

4    A.   Yes.

5    Q.   So let's focus on dating.  Women for men, men for women

6    et cetera, that is another place where ads, classified ads,

7    addressing sexual activities appears in both Backpage and

8    Craigslist, true?

9             MR. KOZINETS:  Objection.  Vague as to time.  Form.

10            THE COURT:  The objection's sustained.

11   Q.   (BY MR. BIENERT)  Well, in 2015, you understood that --

12   let's just say Craigslist -- Craigslist still had a personals

13   or dating section, right?

14   A.   I think so.

15   Q.   And Craigslist had many explicit ads in sections that were

16   no longer called adult services but were on Craigslist

17   nonetheless under things like dating or services.  Is that

18   true?

19   A.   They may have.

20   Q.   Well, you looked at Craigslist.  Is it true that you would

21   have actually seen ads of that ilk on Craigslist during

22   calendar year 2015?

23   A.   Yeah.  I can't remember the -- what all was in the -- were

24   in those ads at that time but -- but possibly, yes.

25   Q.   Now, sir, so far, other than Craigslist, we've been talking

1    about I guess what I would say non-household term websites,

2    right, Adult Search, Escort Alligator.  Those, would you agree,

3    are not commonly widely known websites?

4    A.  I don't know.

5    Q.  But you do know that Facebook is extremely well known,

6    right?

7    A.  Yes.

8    Q.  And in 2015 as well as through today, one can go on

9    Facebook and get escort pages, true?

10   A.  I'm not on Facebook, so I don't know.

11   Q.  How about Google Groups?  One can go on Google Groups and

12   get escort chat rooms all about adult services, right?

13          MR. KOZINETS:  Objection.  Beyond the scope.

14          MR. BIENERT:  Response.

15          THE COURT:  The objection's overruled.

16          THE WITNESS:  I don't know.

17   Q.  (BY MR. BIENERT)  Is it true, sir, that if one types in

18   Google Groups today, you get over 3,000 groups dedicated to

19   talking about escorts?

20   A.  I don't know.

21   Q.  Google.  If one just goes to Google and types in Sacramento

22   escorts, thousands and thousands of escort ads, right?

23          MR. KOZINETS:  Objection.  Counsel is testifying.

24          THE COURT:  The objection's sustained.

25          MR. BIENERT:  I'm sorry, Your Honor.  I couldn't hear

1    you.

2              THE COURT:  Sustained as to that question.

3    Q.  (BY MR. BIENERT)  Instagram has adult ads on it, right?

4    A.  I'm not on Instagram.  I don't know.

5    Q.  LinkedIn, adult ads?

6    A.  I'm not on LinkedIn.  I don't know.

7    Q.  Snapchat, TikTok, Tinder, all of them, right?

8    A.  I don't know.

9    Q.  Because you didn't look?

10   A.  I'm not on those apps.

11   Q.  Now, let me bring it back to what you were on.  You spent

12   time telling us here about how many ads there were, 300 in a

13   27-hour period, which could have included re-ads.  You told us

14   about that.  But the reality is what you did know, whether you

15   took the time to look at particular escort ad sites or not, is

16   there were thousands of others on other websites available.

17   True?

18   A.  I don't know.

19   Q.  You also, is it true, sir, that most of these other

20   websites, things like Google or Facebook, which you've used in

21   the past, right?

22   A.  Yes.

23   Q.  They don't even ask for age verification, do they?

24             MR. KOZINETS:  Objection.  Foundation.

25             THE COURT:  The objection's overruled.  You could

1    answer if you know.

2          THE WITNESS:  I don't know.

3    Q.  (BY MR. BIENERT)  Well, you do know you were asked by

4    Mr. Kozinets about the issue of age verification.  Do you

5    remember that?

6    A.  Yes.

7    Q.  And you do know that Backpage actually did say do not enter

8    this site unless you're 18, true?

9    A.  Yes.

10   Q.  And Backpage said if you are under 18, you can't post on

11   our ad site at all, right?

12   A.  That's what the rules said, I believe.

13   Q.  And there were other rules about not trafficking people,

14   things of that ilk, are literally on Backpage, true?

15   A.  Yes.

16   Q.  And what it does is it requires at least anyone going on

17   Backpage and posting an ad has to at least represent that

18   they're not doing any of those things, true?

19   A.  Yes.  It's on the honor system.

20   Q.  But Facebook and Google, they don't even ask for an honor

21   system, do they?

22          MR. KOZINETS:  Foundation.

23          THE COURT:  The objection's sustained.

24   Q.  (BY MR. BIENERT)  Well, when you went on Facebook, have you

25   ever had to represent that you were over 18?

1      A.   I'm not on Facebook.

2      Q.   I thought you said a minute ago you've used Facebook?

3      A.   As a -- Yes, but not as a user like an account or creating

4      one.

5      Q.   It's a simple question, sir.  Have you ever gone on

6      Facebook and had to represent that you were 18 or older?

7      A.   No.

8      Q.   Same thing with Google.  Ever have to represent that you're

9      18 or over to use Google?

10     A.   No.

11     Q.   YouTube, ever have to represent that you're over 18 to use

12     YouTube?

13     A.   I don't know if --

14     Q.   Is it true, sir, that on YouTube, you can see escort ads,

15     right?

16     A.   I don't know.

17     Q.   Did you -- Is it true, sir, that on YouTube, you can

18     actually find videos that tell you how to find escort ads and

19     where they are?

20          MR. KOZINETS:  Foundation.

21          THE COURT:  The objection's overruled.

22          THE WITNESS:  I don't know.  I haven't looked.

23     Q.   (BY MR. BIENERT)  Would it concern you if one could go on

24     YouTube and watch videos that tell one how to find all the

25     adult activities on the website or on the Internet to be able

1    to do whatever sexual activities people want, legal or illegal?

2              MR. KOZINETS:  Objection.  Argumentative.

3              THE COURT:  The objection is sustained for relevance.

4    Q.  (BY MR. BIENERT)  All right.  Let's start talking now about

5    some of these ads that you went over with us.  Now, first of

6    all, you're generally familiar with the indictment in this

7    case, right?

8    A.  In this case?

9    Q.  Yeah.

10   A.  Very limited.  Generally.

11   Q.  Do you have an understanding that there are particular ads

12   that are specifically referenced in the indictment as part of

13   the charged case, right?

14   A.  If you say so.

15   Q.  Well, no.  If you don't know, just say.

16   A.  I don't know.

17   Q.  Do you know one way or the other whether or not any of the

18   ads that you went over with us on the stand on Thursday and

19   Friday are actually charged in the indictment?

20   A.  I don't know.

21   Q.  So if we can pull up just for your own ability to see what

22   I'm calling IM20, which is a screenshot of Exhibit 48 -- Strike

23   that.

24              It's a screenshot of Exhibit 489 at 37 seconds.

25              Sir, tell me if you recognize that as a screenshot

1   from your video that you went over with us.

2   A.   Yes.

3            MR. BIENERT:   Your Honor, if we could please publish

4   what I'm calling IM20.

5            THE COURT:   Yes.

6   Q.   (BY MR. BIENERT)   All right.   So this is young, sexy TyTee

7   Time, and this is under the Sacramento escorts page, right?

8   A.   Yes.

9   Q.   It's someone who says her name is TyTee.   Do you see that?

10  A.   Yes.

11  Q.   And it says on here -- Actually I'm not seeing what I

12  thought I'd see, so I may have gotten it wrong.   The bottom

13  line is let's look at this ad.   Sir, there is no offer of a sex

14  act involving touching the genitals of another in exchange for

15  money on this page, is there?

16  A.   I do not see anything about touching genitals.

17  Q.   And if you look at all these pictures on the right, what is

18  depicted in each of these pictures is something that if

19  somebody wanted to pay TyTee to come to their house, she could

20  in person do everything that's depicted in these pictures and

21  more for pay, right, and it wouldn't be prostitution?

22  A.   No.

23  Q.   Okay.   So show me what's depicted in this picture that she

24  would not be able to do as an escort for pay in Sacramento

25  County and would equal prostitution.

1    A.   It's just containing similar content, but nothing in it do

2    I see that crosses the line into prostitution.

3    Q.   Right.   This is a legal ad, right?

4              MR. KOZINETS:   Objection.

5              THE COURT:   The objection's sustained.

6    Q.   (BY MR. BIENERT)   Let me rephrase it, Your Honor.

7              This is an ad that from your experience and training

8    you would not feel you could refer to a district attorney to

9    charge TyTee with prostitution.   True?

10   A.   Based on the ad alone?

11   Q.   Right.

12   A.   No.

13   Q.   Let's go to the next ad, which I will call IM19, and it is

14   a screenshot from your Exhibit 489 at 53 seconds.   And take a

15   look at that and let me know if you agree that's what it is.

16   A.   Yes.

17   Q.   And if we put this -- Publish it to the jury?

18   A.   Yes.

19   Q.   So this one is Exotic Ebony, is what she calls herself,

20   right?

21   A.   Yes.

22   Q.   And, first of all, you pointed out where it says up here

23   60QK special.   Do you see that?

24   A.   Yes.

25   Q.   Top right?

FICHTNER - CROSS                                                     58

1          And you basically said, well, that's saying $60 for

2    some increment of time, right?

3    A.   Based on other similar advertisements, yes, that's similar

4    content for money for a segment of time.

5    Q.   Right.   And, by the way, escorts, people who go out to

6    people's houses and get naked and do various things that are

7    short of prostitution, charge for their time, right?

8    A.   Yes.

9    Q.   And so do strippers, right?

10   A.   I guess, yes.

11   Q.   So do people who do these types of things at bachelor

12   parties, right?

13   A.   Yes.

14   Q.   In other words, the more money you pay, the more time you

15   get with that person, right?

16   A.   Yes.

17   Q.   For whatever's going on in that room.   True?

18   A.   For whatever's going on.

19   Q.   In other words, whether it winds up being legal or not --

20   I'm trying not to give you an overly restrictive definition.

21   The point is whatever is going on in that room, whether it's

22   escort, other legal service, or, frankly, crossed into illegal

23   prostitution, all of those categories often charge for their

24   time and get paid for it, right?

25   A.   Okay.   Yes.

UNITED STATES DISTRICT COURT

1   Q.  Now, one of the things that you pointed out is these

2   pictures over here.  First of all, none of these pictures are

3   illegal pictures, right?  And when I say illegal, I mean

4   illegal to be on the Internet.

5   A.  Unless they're underage.

6   Q.  Okay.  Let me say this.  Every single thing I'm asking you

7   about deals with someone who is at least 18.  Let's get that

8   out to be very clear.  Okay.  So thank you for the

9   clarification.

10              MR. KOZINETS:  Objection.  Foundation.

11              THE COURT:  Well, so your statement is not that these

12   ads aren't children under 18, but your statement is that for

13   purposes of these questions?  Is that what you're saying?

14              MR. BIENERT:  Exactly, Your Honor.

15              THE COURT:  Okay.  So for purposes of these questions,

16   he's asking the witness to assume they're 18.

17   Q.  (BY MR. BIENERT)  So for someone who is of legal age and

18   can give legal consent, none of these photos are illegal to

19   have on a website, on a classified website ad, right?

20   A.  Not that I know of.

21   Q.  And, by the way, one of the pictures which you called out,

22   far right in the middle right under I love my clients, is looks

23   like a person holding an adult toy, if I'm able to understand

24   what that is.  Far right in the middle right there.  Is that

25   what that looks like to you?  Is that what you told us?

FICHTNER - CROSS                                    60

1    A.  That's what it appears to be.

2    Q.  And there's nothing illegal about someone posting a picture

3    of them with an adult toy, true?

4    A.  Not that I know of.

5    Q.  It also would not be prostitution in the State of

6    California if Exotic Ebony for pay came to my private house and

7    put on a show for me with an adult toy as long as I didn't

8    touch her genitals and she didn't touch mine, right?

9    A.  I don't think so.

10   Q.  It's not prostitution, is it?

11   A.  No.

12   Q.  If we can go to the next exhibit, which I'm going to call

13   IM22, and just for the witness to look at, and tell me if you

14   agree with me, sir, that this is a screenshot of your Exhibit

15   489 at the one minute and 14 second time frame.

16   A.  Yes.

17          MR. BIENERT:  So, Your Honor, if we could please

18   publish Exhibit IM22.

19          THE COURT:  Yes.

20          THE CLERK:  I'm sorry.  I didn't hear you.

21   Q.  (BY MR. BIENERT)  So this ad I'm going to call Gorgeous

22   Nubian, because that's what she calls herself, once again,

23   nothing about any of these photographs that indicates that they

24   are -- Strike that.  Nothing about these photographs is illegal

25   to post on the Web, true?

UNITED STATES DISTRICT COURT

FICHTNER - CROSS                                61

1   A.   True.

2   Q.   And one thing that you did hone in on in this, do you

3   remember if we go over here and we have the area that says

4   seeking reviews, do you see that?

5   A.   Yes.

6   Q.   You specifically focused on that with Mr. Kozinets, who

7   highlighted it for you and asked you words to the effect of

8   what does that mean, right?

9   A.   Yes.

10  Q.   And you said, oh, that means they want to be reviewed, and

11  then you said on, for example, the Erotic Review?  Isn't that

12  what you told us?

13  A.   Yes.

14  Q.   Why did you say the Erotic Review?  It's not here, is it?

15  A.   It's not where?

16  Q.   In this ad.

17  A.   It is not.

18  Q.   There's no reference to the Erotic Review, right?

19  A.   Not in the ad.

20  Q.   And is there anything on this Gorgeous Nubian page that you

21  can press or anything that would get you to the Erotic Review?

22  A.   Not that I see.

23  Q.   So why did you choose the Erotic Review out of -- Let me

24  back up.  The truth is there's a whole bunch of Web sites and

25  places one can go to review an escort, true?

1    A.   I assume.

2    Q.   I mean, for example, there's AdultSearch.com and people who

3    are, quote, verified, right?

4    A.   I don't know that one.

5    Q.   There's EscortNoFakes.com that provides reviews of escorts,

6    right?

7    A.   I don't know that one.

8    Q.   StrippersToGo.com in Sacramento gives reviews of strippers

9    and adult workers, right?

10   A.   I don't know.

11   Q.   How about Tumblr, whose description is make stuff, look at

12   stuff, talk about stuff, find your people?  You can get an

13   Erotic Review there for escorts, right?

14   A.   I don't know.

15   Q.   How about the Yellow Pages?  Is it true that one can go to

16   the Yellow Pages and look for reviews of escorts,

17   YellowPages.com?

18   A.   I don't know.

19   Q.   Reddit.com?

20   A.   I don't know.

21   Q.   And my wife's personal favorite for everything in the

22   world, Yelp?  Is it true, sir, that I can go on Yelp and get a

23   review of escorts in Sacramento?

24   A.   I don't know.  They cover everything else.  Maybe.

25   Q.   You never looked, did you?

1    A.  On Yelp?

2    Q.  Right.

3    A.  I don't recall.

4    Q.  So I am trying to understand why of all the things that

5    could have come out of your mouth, the one thing that you said

6    was the Erotic Review, even though it's not on this page at

7    all?

8    A.  Because that's one that I had looked at.

9    Q.  And it's one that you looked at because you've worked with

10   these guys, who have told you that they want to make an issue

11   in this case of the Erotic Review, right?

12             MR. KOZINETS:  Objection.  Form.  Argumentative.

13             THE COURT:  The objection's sustained.

14   Q.  (BY MR. BIENERT)  You understood from these guys that the

15   Erotic Review is something they want to talk about here, right?

16             MR. KOZINETS:  Same objections.

17             THE COURT:  The objection's overruled.

18             THE WITNESS:  I'm sorry.  Overruled?

19             THE COURT:  You can answer it, yes.

20             THE WITNESS:  No.  I knew of the Erotic Review before

21   I knew these gentlemen.

22   Q.  (BY MR. BIENERT)  My question is different.  In your many

23   hours of discussions with people over here for the government,

24   one of the topics you discussed with them was the Erotic

25   Review, right?

1    A.   We did discuss the Erotic Review.

2    Q.   You knew it would be part of the case that they'd put in

3    front of a jury here, right?

4    A.   I don't know.

5    Q.   But for whatever reason, out of all the things that do

6    review escorts, the only one that you cited was the Erotic

7    Review when you were being questioned, true?

8    A.   I think I referenced Yelp, but --

9    Q.   You referenced Yelp when he was questioning you on Friday?

10   A.   I think it was like Yelp.  I made a sim -- kind of an

11   example Erotic Review is like a Yelp.

12   Q.   All right.  Well, thank you.

13   A.   If I remember correctly.

14   Q.   All right.  Let's go to what I'm calling IM23.  And if you

15   can look at that and tell me if you agree that it is a

16   snapshot, a screenshot, of your Exhibit 489A at about the

17   120 -- one-minute-and-29-second time frame.

18   A.   Yes.

19           MR. BIENERT:  So, Your Honor, if we could please

20   publish?

21           THE COURT:  Yes.

22   Q.   (BY MR. BIENERT)  Thank you.  So we can now all look at

23   this together.

24           So, once again, this one I'm going to call Jessica

25   because that is what she says, right?  It says, hey, I'm

1    Jessica.  Do you see that?

2    A.  Yes.

3    Q.  And if we look at these pictures, there is nothing illegal

4    about posting these pictures on the website, is there?

5              If we can just get to the pictures right now, we'll

6    come back to the text.

7    A.  Again, if they're an adult, no.

8    Q.  Assuming that this person is over 18, right, or 18 or over,

9    true?

10   A.  True.

11   Q.  Okay.  And, by the way, just to be clear, Backpage chose to

12   try to get rid of nudity at different times, but the reality is

13   nude pictures can be posted in ads like this, true?

14             MR. KOZINETS:  Objection.  Form.

15             THE COURT:  The objection's overruled.

16             THE WITNESS:  I assume.  I don't know.  I assume.

17             MR. BIENERT:  Well --

18             THE WITNESS:  Yes.

19   Q.  (BY MR. BIENERT)  Is it true, sir, that if someone were

20   posting a classified ad just like this one, but the young, red

21   headed woman was buck naked, it would still be legal or --

22   strike that -- it would still in and of itself be something

23   that from your perspective you could not cite as illegal,

24   right?

25   A.  Yes.

FICHTNER - CROSS                              66

1   Q.   And in fact when one goes to what we'll call the personal

2   sections of a lot of these websites, there are really explicit

3   pictures with people naked and showing their privates, right?

4   A.   I'm sorry.   Say that one more time.

5   Q.   Sure.   When one goes to the personal section of something

6   like, for example, Tinder, there are explicit pictures of naked

7   people on the site, and that is not illegal to do as you

8   understand it?

9   A.   I have not been on Tinder.

10  Q.   Have you seen other websites where a woman can literally

11  post a naked picture of herself and -- excuse my language --

12  say do you want to fuck tonight?

13  A.   Are there other websites like that?   I'm sure there are.

14  Q.   And the fact that some woman chooses on Tinder or otherwise

15  to post a picture like that of herself and say that does not in

16  and of itself make that an illegal ad, true?

17  A.   Not that I know of.

18  Q.   And, by the way, a naked picture of Jessica saying words to

19  the effect of I want to F tonight, that's not what these ads

20  show at all, is it?

21  A.   Not in those words.

22  Q.   Now, speaking of words, if we come over here to where it

23  says my ultimate goal, and we go down to ask about my two-girl

24  show, do you see that?

25  A.   Yes.

1    Q.   "My ultimate goal is to give you the best experience you

2    deserve.   I as well love to be pleased."   It shows a tongue.

3    "Ask about my two-girl shows."   Do you see that?

4    A.   Yes.

5    Q.   That, sir, in and of itself does not indicate that this ad

6    is for prostitution, does it?

7    A.   That alone indicate it?

8    Q.   Right, right.

9    A.   Not alone.

10   Q.   In fact, in California, according to the law that guides

11   these things, two women -- Let me back up.

12          I can pay two women to come to my house and have sex

13   with each other in front of me and please one another as long

14   as I, the payor, am not touching their genitals and neither of

15   them are touching mine, right?

16   A.   I don't know for sure.

17   Q.   But you're pretty sure I'm right, aren't you?

18   A.   Probably.

19   Q.   As a guy who has a badge and a gun who is given the ability

20   to go out and arrest people when you in good faith think they

21   have and you can prove that they've committed a crime, you

22   recognize that you wouldn't think you could arrest this young

23   woman for those activities with that alone, right?

24          MR. KOZINETS:   Objection.   Argumentative.

25          THE COURT:   The objection's overruled.

UNITED STATES DISTRICT COURT

FICHTNER - CROSS                    68

1        THE WITNESS:  Can you repeat it one more time?

2   Q.  (BY MR. BIENERT)  Sure.  With this language here, which

3   flat out says I like to be pleased and shows a tongue and says

4   ask about my two-girl shows, you don't believe that is

5   sufficient to establish to you under the laws of California

6   that it is prostitution such that you could arrest her, right?

7   A.  Based on this alone?

8   Q.  Right.

9   A.  No.

10  Q.  Right.  You need more than the ad, right?

11  A.  Yes.

12  Q.  And I'll take it a step further, sir.  Is it true that in

13  California -- and I apologize for being graphic -- but not only

14  could Jessica and her friend have sex with each other and

15  pleasure one another while I am paying them, but I could touch

16  myself while they do it?

17  A.  Probably.

18  Q.  It's not prostitution, is it?

19  A.  I don't think so.

20  Q.  And the reason is because Jessica and her pleasurable

21  friend would not be touching my genitals, and I would not be

22  touching theirs?  True?

23  A.  If that's what was happening, yes.

24  Q.  Right.  And unless you're in the room with Jessica and her

25  friend for the two-girl show, you don't know one way or the

1    other, do you?

2    A.  No.

3    Q.  Go to the next ad, IM24.

4            You take a look at this, sir, and tell me if you agree

5    that this is a screenshot of your Exhibit 489A at the

6    one-minute-and-58-second mark.

7    A.  Yes.

8            MR. BIENERT:  Your Honor, may we please publish IM24?

9            THE COURT:  Yes.

10   Q.  (BY MR. BIENERT)  Sexy Lexy is what she calls herself,

11   right?

12   A.  Yes.

13   Q.  Once again, nothing about the pictures that is illegal to

14   put on the Net, right?

15   A.  No.

16   Q.  It does not propose someone paying money for touching of

17   that person's genitals or letting that person touch them, does

18   it?

19   A.  You mean are there pricing and timing commits like the

20   other ones?  No.  It does have a rose emoji, which I've seen in

21   other advertisements, indicates some sort of payment.

22   Q.  Right.  So this indicates payment, but it doesn't indicate

23   payment for touching the genitals of the person paying, does

24   it?

25           MR. KOZINETS:  Objection.  Form.  Foundation.

70

1              THE COURT:   The objection's overruled.

2              THE WITNESS:   No.

3    Q.   (BY MR. BIENERT)   Now, one of the things that it says here,

4    if we look at it, it says in all capitals incalls only.   Do you

5    see that?

6    A.   Yes.

7    Q.   Now, you were asked by Mr. Kozinets about this idea of

8    incalls and outcalls, right?

9    A.   Yes.

10   Q.   And incalls just means you come to me, you, the customer,

11   come to me, and outcalls mean I, the escort or whatever she is,

12   will go to you, right?

13   A.   That's my understanding.

14   Q.   And that term incalls and outcalls simply refers to whether

15   the professional goes to the client or vice versa, but that

16   term applies to people who are in the legal adult categories as

17   well, right?

18   A.   It can.

19   Q.   In other words, if my young 22-year-old -- and I'm not

20   saying he would do this -- were doing a bachelor party and were

21   hiring a legal adult services provider, he would talk to her

22   about whether she would be willing to do an outcall to come to

23   the place where the bachelor party's being held, right?

24   A.   Yes.

25   Q.   And the escort or person may say, okay, I'll do that, or

1    they may say, like this one, "Nope.  Incalls only.  I don't go

2    to strange places.  You need come to me."  Right?

3    A.  Yes.

4    Q.  If we can go to the next exhibit, IM25.

5             THE COURT:  Counsel, before you start the new exhibit,

6    we're going to take our morning recess.

7             MR. BIENERT:  Thank you, Your Honor.

8             THE COURT:  So please remember the admonition, and

9    we'll come get you in about 20 minutes.

10        (The jury exited the courtroom at 10:40 a.m.)

11            THE COURT:  Mr. Lincenberg, did you want to put

12   anything on the record about the side bar?

13            You guys can have a seat.  I'm going to stand.

14            MR. LINCENBERG:  Your Honor, not at this time, but

15   thank you for asking.

16            THE COURT:  Okay.  So we'll recess.  And just so you

17   know, we'll probably go to 12:15 and take a 15-minute later

18   lunch.  It will still be long enough.  And then at the end of

19   the day, I think I want to talk about the motion -- I guess it

20   was the government's motion about the defense of reliance on

21   advice of an attorney.  But we'll do that after the jury's done

22   for the day.  We're at recess.

23        (Proceedings recessed from 10:42 a.m. until 11:04 a.m.

24   Proceedings in the presence of the jury:)

25            THE COURT:  We are back on the record with the jury

1    present.  Mr. Bienert.

2            MR. BIENERT:  Thank you, Your Honor.  I just want to

3    make sure I can be heard from the microphone.  Okay.

4    Q.  (BY MR. BIENERT)  So, Agent Fichtner, we were just

5    finishing up with Sexy Lexy, and we talked about the incalls.

6    So we will now move to the next exhibit, which is IM25, if we

7    can put that up on the screen just for Agent Fichtner.  And,

8    sir, look at it and tell me if you agree that it is a still

9    shot from your Exhibit 489 at two minutes and ten seconds.

10   A.  Yes.

11           MR. BIENERT:  Your Honor, I'd ask if we can publish

12   IM25.

13           THE COURT:  Yes.

14   Q.  (BY MR. BIENERT)  All right.  So here we are looking again

15   at a lady who calls herself exotic bootylicious blonde Shyla

16   James.  So this is Shyla, right?

17   A.  Yes.

18   Q.  And, again, Shyla is fully clothed.  There's nothing about

19   these pictures that is illegal to have on the Web, right?

20   A.  I don't know if she's fully clothed, but nothing in the

21   pictures themselves are illegal.

22   Q.  Okay.  And there's nothing in the language that says an

23   offer of a prohibited sex act, namely, touching the genitals of

24   another who is paying them, true?

25   A.  Nothing directly saying that.

1   Q.  Right.  Those words aren't there, are they?

2   A.  Those words are not there.

3   Q.  Now, there is a -- interestingly, she calls herself bronzed

4   kissed.  Do you see that at the top?

5   A.  Yes.

6   Q.  And while she seems to be talking about her complexion,

7   let's talk about that.  It is not prostitution for an escort

8   who is paid to kiss the payor, is it, on the lips?

9   A.  I don't know.

10  Q.  Well, it's not touching the genitals.  You do know that,

11  right?

12  A.  Is it for sexual gratification?  I don't know.

13  Q.  And that goes back to the fact that as you sit here now,

14  your testimony is you don't know enough about the California

15  prostitution laws to tell us whether they are limited to

16  touching the genitals or not, do you?

17  A.  I don't know the full verbiage and legal definition behind

18  the prostitution.  I am not an attorney.

19  Q.  No.  But you're somebody who goes out and arrests people

20  with a badge and a gun based on those laws, right?

21  A.  Based on probable cause, correct.

22  Q.  To violate a law, right?

23  A.  Correct.

24  Q.  You're certainly not suggesting that in your job as a

25  supervisory special agent, you would need to be an attorney to

1    have in mind what the elements are you need to arrest someone?

2    A.   If they negotiate or engage in or solicit and commit an

3    overt act, yes.

4    Q.   An overt act of touching someone's genitals for the purpose

5    of sexual gratification, right?

6    A.   I'm not sure it's only limited to that.

7    Q.   Because you just don't know, do you?

8    A.   I don't think it is.

9    Q.   Okay.  And the good news is we have a judge, and we will

10   get instruction on what the law is, right?

11   A.   I'm sure the judge knows.

12   Q.   And if it turns out that you're wrong -- Let me ask you

13   this.  Have you been laboring all of these years since 2015 in

14   doing your job, has it been your view that you could go out and

15   actually arrest someone for kissing for pay?

16          MR. KOZINETS:  Objection.  Argumentative.

17          THE COURT:  The objection's sustained.

18   Q.   (BY MR. BIENERT)  Well, have you ever sought a prostitution

19   charge based on someone offering to kiss someone in exchange

20   for money?

21   A.   On that alone, no.

22   Q.   By the way, speaking of the rules, you said to us, if I'm

23   following this, I presented you with the Sacramento city rules

24   that apply to escort, and you said you're only familiar with

25   the Sacramento County rules?  Did I hear you right?

1   A.   I was not familiar with the Sacramento city rules, correct.

2   Q.   But you told us you were familiar with the Sacramento

3   County rules, right?

4   A.   Somewhat, yes.

5   Q.   Sir, is it true that Sacramento County doesn't have rules

6   about escorts?  They don't regulate escorts, does it?

7   A.   That's not my understanding.

8   Q.   Well, let me ask it to you very directly.  When you sat

9   here under oath and you told us you were familiar with the

10   Sacramento County rules on escorts, what rules did you have in

11   mind?

12   A.   The exact, like, code section?

13   Q.   How about where could I go on the Internet and type in and

14   see those rules?

15   A.   It's on their county website.

16   Q.   And it is your testimony that Sacramento County has

17   specific rules that define the contours of escort and adult

18   services and the like?

19   A.   It was explained to me when I had contacted the county that

20   they were in need of a special license, and they kind of

21   described the process of getting that license.

22   Q.   Okay.  So you have never looked at the rules yourself?

23   A.   No.

24   Q.   And what you're saying is someone who happened to work for

25   the county, which, by the way, is called Sacramento County,

1   right?

2   A.   Correct.

3   Q.   Sacramento's one of those unusual jurisdictions where the

4   county and the city have the same name?

5   A.   Correct.

6   Q.   And so somebody who you believe was a county employee told

7   you what they believed were the laws relating to escort, right?

8   A.   I don't know if it was the law as much as it was the

9   process --

10  Q.   The process.

11  A.   -- to get a license for an escort.

12  Q.   But they never represented to you that those were county

13  rules versus, for example, city rules, did they?

14  A.   Yes, because I asked them if it was the same for the city,

15  and they said they did not know because they work for the

16  county.

17  Q.   So just so I'm clear, all that testimony that you gave

18  about what you did or didn't understand about the Sacramento

19  County or city rules regulating to escorts, all of that was

20  just told to you by someone else without you even looking at

21  it, right?

22  A.   It was explained to me, yes.

23  Q.   So you don't even have personal knowledge of eyeballing the

24  rules, do you?

25  A.   For an escort?

1    Q.  Yeah.

2    A.  No.  I did not enforce escort code.

3    Q.  Or for an adult performer?

4    A.  I do not enforce adult performers.

5    Q.  Or for a sensual massage artist?

6    A.  I do not.

7    Q.  And, frankly, even for a prostitute, right?

8    A.  What do you mean?

9    Q.  You never looked up what it means under California law to

10   engage in a lewd act?

11   A.  The legal definition under California law?

12   Q.  Yeah.

13   A.  I mean, I looked up the definition of a lewd act, but was

14   it described under a California legal document?  I don't know.

15   Q.  Well, I'm a little confused, because I thought you said you

16   didn't know the definition.  So since you looked it up, I'm

17   going to go back and ask you what I tried to ask you a couple

18   hours ago.

19          Is it true, sir, that the California law defining a

20   lewd act says it must be genitals, buttocks, female breast that

21   come in contact with some part of the body of the other for the

22   purpose of sexual arousal or gratification of the customer or

23   the prostitute?

24          MR. KOZINETS:  Objection, foundation, and just what

25   was raised previously.

FICHTNER - CROSS                                    78

1          MR. BIENERT:  He just gave the exact opposite answer.

2    He just said he did look at it.

3          THE COURT:  Mr. Bienert, there's no argument.  The

4    objection's overruled.

5    Q.  (BY MR. BIENERT)  So let's go back to two hours ago.  So

6    you did look at what the definition is of a lewd act in

7    California, right?

8    A.  Under a legal document, no.  I said that.

9    Q.  Why don't you tell us all, so we're clear, where is it that

10   you looked at something defining what a lewd act is under

11   California law to equal what California law says is

12   prostitution.

13   A.  I don't know exactly or remember exactly where the

14   definition came from, but I don't personally recall the

15   verbiage of the California law.  But if that's what you read,

16   then that's what it is.

17   Q.  Right.  Genitals.  Correct?

18   A.  If that's -- I think it said other than that.

19          MR. KOZINETS:  Just objection, foundation.

20          THE COURT:  The objection's sustained.

21   Q.  (BY MR. BIENERT)  The bottom line, sir, is none of us in

22   this room should ever think that you're somebody we should be

23   relying on for what the law is or isn't in California about

24   prostitution, true?

25          MR. KOZINETS:  Objection.  Argumentative.

UNITED STATES DISTRICT COURT

1          THE COURT:  The objection's sustained.

2    Q.  (BY MR. BIENERT)  All right.  Let's go back to beautiful,

3    exotic Shyla James and the question that started this.  Is it

4    true, sir, then given what you've just clarified for us, you do

5    not know that the California -- whether California law makes it

6    illegal for an escort, who could be naked as a jaybird, to kiss

7    someone on the lips for money, do you?

8    A.  I need more than that probably.

9    Q.  Next we go to IM26, and if you can look at that and tell me

10   if you recognize it as a screenshot from your Exhibit 489 video

11   at two minutes and 37 seconds.

12   A.  Yes.

13          MR. BIENERT:  And, Your Honor, if we can please

14   publish that.

15          THE COURT:  Yes.

16   Q.  (BY MR. BIENERT)  So this is Katelynn, who is running

17   specials, right?

18   A.  Yes.

19   Q.  And basically, once again, there's nothing in these

20   photographs that is illegal to post on a website photograph, is

21   there?

22   A.  Not alone, no.

23   Q.  And there's nothing in this language where it says money in

24   exchange for touching of the genitals of the payor or letting

25   the payor touch her genitals, is there?

1   A.  Not those words, no.

2   Q.  In fact, she talks about being the, quote, perfect

3   companion, right?

4   A.  She does say perfect companion.

5   Q.  Let's go ahead and keep up number 26 or, I should say,

6   IM26, this picture.  And if we can just go to the overall ad,

7   the overall ad of Katelynn.  How old is Katelynn?

8   A.  I do not know.

9   Q.  Well, what's your estimate?

10  A.  I try not to guess by pictures.  I do not know.

11  Q.  Because you can't tell from a picture unless it's someone

12  who is clearly a prepubescent child, right?

13  A.  There's a difference between prepubescent and these

14  pictures, yes.

15  Q.  And every single photograph you went over with us is

16  someone who at least biologically -- and we've only seen, I

17  think, photos of women that I can recall -- biologically a

18  mature, developed woman, right?

19  A.  Of the ones we've gone over so far?

20  Q.  Yeah.

21  A.  It appears to be that way.  I do not know though.

22  Q.  And, by the way, I'm not hiding anything, am I?  I just put

23  up the very ones that you chose to show us Thursday and Friday,

24  right?

25  A.  These are the ones from my video, yes.

81

1   Q.   That you highlighted and took time to talk to us about,

2   correct?

3   A.   They were highlighted, and we talked about them, yes.

4   Q.   All right.   So you can't tell us how old Katelynn is.

5   Let's go to D25 or IM25.

6        This photograph is Shyla.   If we can Zoom in on the

7   photos, how old is Shyla?

8   A.   I do not know.

9   Q.   Next we'll go to -- You certainly can't say that this is

10  someone under 18, can you?

11  A.   I don't even know if that's Shyla.

12  Q.   Right.   But all -- Because they often don't give their real

13  name, right?

14  A.   Probably, yes.

15  Q.   In fact, what you know from your experience is most of

16  these stage performers who go out and do adult stuff don't even

17  use their real name, right?

18  A.   That's my guess.

19  Q.   Which is why it's really helpful to have something where

20  you can get their credit card, their e-mail address, and other

21  identifying things that go beyond someone's stage name, true?

22  A.   Yes.

23  Q.   Let's go to D -- I'm sorry -- IM 24.   Look at the picture.

24  Tell me how old Sexy Lexy is.

25  A.   I do not know.

1   Q.  Well, you haven't even looked, but you don't need to,

2   right?

3   A.  I'm looking at it.

4   Q.  Oh, there you go.  Right.  You don't know how old Sexy Lexy

5   is, right?

6   A.  I do not.

7   Q.  And she's even got her face covered, so we have no idea

8   what her face even looks like, true?

9   A.  Correct.

10  Q.  Go to IM22, Gorgeous Nubian.  Tell me how old she is.

11  A.  I do not know or if that's Gorgeous Nubian.

12  Q.  That's the name attributed to her, right?

13  A.  If that's her in the pictures.

14  Q.  Right.  That's another thing.  In your understanding, you

15  have learned by being a cagey, supervisory, experienced

16  investigator, a lot of times people use photos that aren't even

17  theirs, right?

18  A.  Yes.

19  Q.  I mean, guys that look like me, when I go online, I make

20  myself look a lot better than I really do, right?  That's your

21  experience?

22  A.  They do.

23  Q.  Nobody's in the market for a short, bald guy from the

24  south, right?  That's not a selling feature?

25  A.  Right.  They want a young one.

1   Q.  Exactly.  I'd look like Fabio with flaming hair and all
2   that.  Right?  That's how it works?  Right?
3   A.  It can.
4   Q.  So when you were looking at a photo, and you were sitting
5   there, and your whole job is to look at thousands and thousands
6   and thousands of photos to moderate them, what you do is you
7   look at the photo, and you do the best you can to make an
8   educated, considerate, good faith judgment, right?
9          MR. KOZINETS:  Foundation.  Form.  Argumentative.
10         THE COURT:  The objection's sustained.
11  Q.  (BY MR. BIENERT)  So let's assume for the sake of argument
12  that Gorgeous Nubian really is the person in this picture.  You
13  don't know how old she is, right?
14  A.  I do not.
15  Q.  Go to IM19.  Tell me if you know how old Exotic Ebony is.
16  A.  I do not.
17  Q.  Let's go to Exhibit IM20.  Tell me if you know how old
18  TyTee is.
19  A.  I do not.
20  Q.  By the way -- And, by the way, all of these people say that
21  they're over 18 in these ads, right?
22  A.  They've entered an age over 18, yes.
23  Q.  And you agree that no one looking at this picture can
24  determine that they're under 18, right?
25  A.  If that's them in the picture.

UNITED STATES DISTRICT COURT

FICHTNER - CROSS

84

1   Q.   Right.   Based on the picture, you would not look at these

2   and say that's someone who I can establish is under 18, true?

3   A.   Correct.

4   Q.   By the way, let's look at Exhibit 490D, which is the

5   government's ad, your ad.   We can pull that up.   It's in

6   evidence.   It's in evidence, if we could publish that, sir.

7        This is your photo, right?

8   A.   Yes.

9   Q.   How old is Tera, is the name she uses?   Do you know?

10  A.   This is a fictitious ad.

11  Q.   My question is can you look at that picture and say how old

12  she is?

13  A.   It's a fictitious ad.   It's -- It's not related to the age.

14  I'm not going to give you the age of the undercover agent.

15  Q.   I'm not asking you that, sir.   I'm asking you can you look

16  at that photo, looking at it alone, and tell how old this

17  person in the picture is?

18  A.   This person here?   No.

19  Q.   Okay.   And I want to be clear I do not want anybody's

20  identity.   Let me be very clear.   But I'm just curious is this

21  someone that you actually know, or is this just an ad that you

22  got from somewhere?

23  A.   Someone we know.

24  Q.   Okay.   Let me ask you a question.   Where are the ads?   You

25  went over hundreds of ads with us, all from Backpage, right,

FICHTNER - CROSS

1    when you were on direct, looked at page after page after page

2    from March 5th, right, and then we had a whole other series

3    from September 8, right?

4    A.  Correct.

5    Q.  Hundreds of ads, true?

6    A.  True.

7    Q.  Where are the ones that say I will have intercourse, oral

8    sex, touch your genitals for money?

9    A.  Those words?

10   Q.  Yeah.

11   A.  Not in those words.

12   Q.  None of them have that, right?

13   A.  Not in those words.

14   Q.  And you were looking for it, true?

15   A.  Sure.  We were reading the ads.

16   Q.  If you saw it, you would have highlighted it for us, right?

17   A.  Those words?

18   Q.  Yeah.

19   A.  Yes.

20   Q.  And, by the way, there are websites that have those words,

21   right, not Backpage but others?

22   A.  I would assume so, yeah.

23   Q.  Well, I don't want you to assume.  Have you ever seen other

24   websites that have those words in them, like, on their face, no

25   bones about it, offer of a sex act involving genitals of the

1    other person for money?

2    A.   Yes.

3    Q.   But not on Backpage, right?

4    A.   Not in those words.

5    Q.   Now, you understood that Backpage actually did this thing

6    called moderation where they hired people to look at the ads to

7    try to screen for things, right?

8    A.   That was explained to me by Ms. McDougall.

9    Q.   When you talked to her, right?

10   A.   Correct.

11   Q.   And, by the way, let's talk about that.  So let me

12   understand this.  You're doing an investigation, and you call

13   this company, and you get two people that actually talk to you,

14   and one is the Chief Executive Officer of the company, right?

15   A.   Yes.

16   Q.   And one is the general counsel, in-house lawyer for the

17   company, right?

18   A.   Yes.

19   Q.   Have you ever called any other adult services websites or

20   businesses with a question or a concern and been able to

21   immediately get the CEO to discuss it with?

22   A.   I never tried.

23   Q.   Have you ever called any other adult services website and

24   been able to get the general counsel within a few hours' notice

25   to talk to you about your concerns?

1    A.  I never tried.

2    Q.  But you were even surprised that you were able to literally

3    get the CEO when you called him directly, right?  You didn't

4    expect that?

5    A.  That he would answer?

6    Q.  Yeah.

7    A.  I don't know.  I had his phone number.  I assume he would

8    answer.

9    Q.  Well, you certainly didn't walk away thinking that guy

10   wasn't responsive, did you?

11   A.  No.  He was responsive.

12   Q.  And you also learned in your investigation that Backpage's

13   moderation efforts worked.  They actually found things that

14   they would not allow, right?

15   A.  I wouldn't categorize that they worked.

16   Q.  All right.  Well, you spent a lot of time talking about the

17   ads you went over with us in your initial undercover, but as

18   was alluded to briefly, you did a second ad later where you

19   tried to post a more explicit ad on Backpage, right?

20   A.  Yes.

21   Q.  And you actually used a dirty word in this one, true?

22   A.  Yes.

23   Q.  We'll call it -- Well, let's not mince words.  The word

24   that you typed in in your other ad was -- get a bigger marker

25   here -- was c-u-m, right, cum?

1    A.   Yes.

2    Q.   I guess it's not on the list of George Carlin Dirty Words

3    7, but that's affiliated with a sex act and, frankly, a man's

4    ejaculation, right?

5    A.   Yes.

6    Q.   And when you type that in and you try to do an ad at

7    Backpage with this I'll call it an explicit word, it wouldn't

8    let you type the ad, right, wouldn't let it accept the ad?

9    A.   Yes.   I was expecting them to cut me out, but they didn't.

10   They just had me change the word.

11   Q.   Well, and then you changed it again, and you said, hah,

12   let's fool the computer or the moderators, and you added an M,

13   so now you had cumm, c-u-m-m, right?

14   A.   Yes.   And I received a response that said oops.

15   Q.   Right, can't do it.   That oops conveyed to you that you

16   were not allowed to post an ad with this language, right?

17   A.   Yes.   I was waiting for them to block me out, but it

18   didn't.

19        MR. BIENERT:   Your Honor, asked and answered.   Yes or

20   no.   He's giving a speech.   It's inappropriate.   I'd move to

21   strike.

22        THE COURT:   The objection's overruled.

23   Q.   (BY MR. BIENERT)   So you couldn't get in with the variance

24   of c-u-m or c-u-m-m, so you wound up writing the general

25   language word c-o-m-e, right, which has multiple meanings,

1    right?

2    A.   Yes.  It allowed me to correct it to come, c-o-m-e.

3    Q.   So Backpage was engaging, in your own experience, in

4    moderation of some sort where there was some screening so that

5    the ads couldn't say just anything you wanted, true?

6    A.   Yes.  As Ms. McDougall explained, there were a list of

7    forbidden words.

8    Q.   Have you ever heard the term GFE?

9    A.   Yes.

10   Q.   What does that mean in your experience?

11   A.   Girlfriend experience.

12   Q.   Now, first of all, that really means someone who is willing

13   to kiss on an escort or adult date or whatever type of activity

14   is going on, right?

15               MR. KOZINETS:  Objection.  Foundation.

16               THE COURT:  Well, that objection's overruled.  You can

17   answer.

18   Q.   (BY MR. BIENERT)  Do you even know?  Let me back up.  Do

19   you know what GFE means and what the significance is or isn't

20   in this sort of adult ad world?

21   A.   I think it's open to interpretation.  So is there one

22   meaning behind it?  I don't know.

23   Q.   So it's a vague word that could be suggestive of something

24   illegal but also could be something not illegal, right?

25   A.   In this content or context with these advertisements, it's

1   associated with -- it's terminology, I guess, amongst

2   prostitution and sex trafficking, yes.

3   Q.   It's also among escorts meaning they'll act like your

4   girlfriend and kiss you, right?

5   A.   You mean do they use the GFE acronym?

6   Q.   Yeah.

7   A.   I don't know.

8   Q.   Okay.  But what you do know is you went through all of

9   these ads on the March 6, 2015, video.  You didn't see a single

10  one that had that term GFE, did you?

11  A.   I think that term was in a response to an ad.

12  Q.   You say in a response to an ad.  What does that mean?

13  Explain.

14  A.   One of the undercover ads that we posted, I think we had

15  that in a response.  When we posted the ad, somebody responded

16  to the ad utilizing that acronym.

17  Q.   Right.  In other words, when you say someone, you mean

18  someone that had nothing to do with Backpage, someone who was

19  not at Backpage?

20  A.   Right.  Somebody replying to the ad.

21  Q.   Right.  So you put out an ad that didn't have the term, and

22  among the many replies -- and I assume we're going to hear from

23  your colleague -- it didn't have -- Someone may have used it,

24  but it wasn't Backpage that had that term in their ad in your

25  March 6, 2015, video, right?

1    A.  I don't know if it was in there or not.  I guess I hadn't

2    read every single ad, so I did not see it.

3    Q.  Had you seen it, you would have pointed it out for us,

4    right?

5    A.  Yes.

6    Q.  And you didn't point it out for us, right?

7    A.  Correct.

8    Q.  Sir, you do know, though, that -- Let me back up.

9          You did two basically undercover videos involving

10   Backpage.  You did a we'll call it 3-5-16 video, correct?

11   A.  Yes.

12   Q.  And then you did a --

13   A.  I'm sorry.  2015.

14   Q.  Oh, my mistake.  '15.  And then you did a 9-8-2015 video,

15   right?

16   A.  Correct.

17   Q.  And what you observed for us and what you showed us is

18   somewhere in between March 5th, 2015, and September 8th, 2015,

19   there were changes made to the website, right?

20   A.  Yes.

21   Q.  And among the changes were it started putting in videos

22   that hadn't been there before, right?

23   A.  Correct.

24   Q.  And it had a section called gallery that had not been there

25   before, right?

1    A.   I think gallery was there.   I think it was date, video and

2    date.

3    Q.   And the videos that were on there and the pictures, there

4    were many more that were explicit than you had seen in the

5    March 5th one, true?

6    A.   Yes.

7    Q.   Well, sir, is it true that between these two dates Backpage

8    was sold to Carl Ferrer in April of 2015, right?

9    A.   I don't know exactly when and how it was sold.

10   Q.   But you do know it was sold by the defendants to Carl

11   Ferrer sometime in that time frame?

12   A.   It's my understanding.   I just don't know details of it.

13   Q.   Okay.   You never arrested any of the ladies in the photos

14   that you showed us for prostitution, did you?

15   A.   In the video that I recorded?

16   Q.   Correct.

17   A.   I did not arrest any of those people in those pictures.

18   Q.   Nor did you ever submit to the DA's or the county or the

19   state office where you work to charge anyone, based on those

20   videos, any of the people in the videos to charge them for

21   prostitution, right?

22   A.   Nobody in those videos.   You're talking about the video

23   view?

24   Q.   Well, basically everything --

25   A.   From September 8th.

1    Q.  Or March 6th?

2    A.  No.

3    Q.  No arrests of any of those folks, right?

4    A.  No.

5    Q.  Now, let's go back to the codes, city or county.  Is it

6    true, sir, that the codes not only talk about the services that

7    can be allowed if one wanted to go down to see the police chief

8    or the county officials and say I'm an adult worker, and I'm

9    going to pay my fee, but they actually, in the same section,

10   they explain the legislative purpose, in other words, the

11   reason why those codes are written the way they are?  There's a

12   legislative purpose to the codes, right, the Sacramento we'll

13   call them adult services rules?

14   A.  If you say so.  I don't know.

15   Q.  You have no idea?  I'm just trying to understand.

16           MR. KOZINETS:  Objection.  Argumentative.

17           THE COURT:  The objection's overruled.

18           THE WITNESS:  I do not know.

19   Q.  (BY MR. BIENERT)  Well, were you aware, sir, that those

20   codes explicitly say why they allow the adult services

21   mentioned, and they say that it is to make sure that they don't

22   restrict or deny access by adults to adult entertainment

23   business products or adult entertainment conduct protected by

24   the First Amendment?  Had you heard that?

25   A.  I heard you read it, yes.

FICHTNER - CROSS

1    Q.  Well, when you were getting your non-personal but

2    explanation of how the escort stuff worked from somebody at the

3    county office, did that person explain to you that the reason

4    the office was engaged with people who were escorts and adult

5    services folks and the others legally is because the First

6    Amendment allowed it?

7    A.  They didn't say that, but it sounds like it.

8    Q.  Did you ever ask them, gee, is this expression in words,

9    can the First Amendment apply here?

10   A.  For escorts?

11   Q.  Yeah.

12   A.  No.

13   Q.  You don't dispute that everyone has First Amendment

14   protections, from your perspective, even if they're in the

15   adult business, right?

16   A.  Everybody has a First Amendment right.

17   Q.  By the way, let's take that to the extreme.  I, Tom

18   Bienert, hypothetically am a prostitute.  It's how I've made my

19   living.  I'm a poor man, but I try.  I, in your understanding,

20   have the same First Amendment protections as you, a law abiding

21   law enforcement citizen, when it comes to legal adult

22   activities, right?

23          MR. KOZINETS:  Objection.  Foundation.

24          THE COURT:  The objection's sustained.

25   Q.  (BY MR. BIENERT)  The truth is, sir, you didn't refer a

UNITED STATES DISTRICT COURT

1    single person in any of these ads to any DA, law enforcement

2    colleague, or anyone else because you knew and believed in

3    good faith, because you're a good faith officer, that based on

4    these ads, they did not give you probable cause to arrest

5    anyone for prostitution, right?

6    A.  We did not investigate those ads at that level, no.

7              MR. BIENERT:  That's all I have.  Thank you, sir.

8              THE COURT:  Okay.  Mr. Feder, do you have any

9    follow-up or additional questions for this witness?

10             MR. FEDER:  I do not.  Thank you.

11             THE COURT:  Okay.  Mr. Lincenberg?

12             MR. LINCENBERG:  No, Your Honor.

13             THE COURT:  Mr. Eisenberg?

14             MR. EISENBERG:  No, Your Honor.

15             THE COURT:  Ms. Bertrand?

16             MS. BERTRAND:  No, Your Honor.  Thank you.

17             THE COURT:  All right.  Redirect.

18                       REDIRECT EXAMINATION

19   BY MR. KOZINETS:

20   Q.  Good morning, Agent Fichtner.

21   A.  Good morning.

22   Q.  Or I should say Special Agent Supervisor.

23             I have put back on the screen Exhibit 489A, previously

24   admitted, fast forwarded to minute 11 and 41 seconds.

25             And I request that it be published.  Thank you.

1            Special Agent Supervisor Fichtner, I'm showing you the

2     undercover escort ad that we discussed during your direct

3     examination.  Do you see that there?

4     A.  Yes, I do.

5     Q.  And that ad didn't come out and expressly say I will

6     have -- I will exchange sexual favors with you for a hundred

7     bucks?

8            MR. BIENERT:  Objection.  Leading, Your Honor.

9          (Reporter interrupted for clarification.)

10           THE COURT:  The objection's overruled.

11           Who said that?

12           MR. BIENERT:  I did.  Mr. Bienert.

13           THE COURT:  Mr. Bienert.

14           You can answer.  Sorry.

15           THE WITNESS:  No, it did not.

16    Q.  (BY MR. KOZINETS)  But when you crafted your ad, you had in

17    mind incorporating many common elements of ads you had reviewed

18    on Backpage's adult escort section?

19    A.  Yes, I did.

20    Q.  And so let's just take a look at the text of the ad for a

21    second.

22           You incorporated language of a proposition or a

23    come-on?

24    A.  Yes, I did.

25    Q.  Language like I'll make your dreams come true?

FICHTNER - REDIRECT

1    A.   Correct.

2    Q.   And you'll leave with a smile?

3    A.   Yes.

4    Q.   You incorporated text into your ad with catch phrases that

5    you had observed as commonly appearing on these Backpage adult

6    escort ads?

7    A.   Yes.

8    Q.   Catch phrases like I'm in town for a short time?

9    A.   Yes.

10   Q.   By the way, if an escort were moving around from town to

11   town to town, under California law, wouldn't they be required

12   to be licensed wherever they were offering their services?

13            MR. BIENERT:  Objection.  First of all, it's leading,

14   but it's speculative and calls for a legal conclusion without a

15   foundation from him.

16            MR. KOZINETS:  Well, certainly within Sacramento

17   County -- I'm sorry, Your Honor.

18            THE COURT:  The objection is sustained.  You can

19   rephrase it.

20   Q.   (BY MR. KOZINETS)  Certainly within Sacramento County,

21   based on, as far as you know, an escort would need to be

22   licensed to offer their services there?

23            MR. BIENERT:  Objection.  Foundation.

24            THE WITNESS:  Yes.

25            THE COURT:  As to that question, the objection's

1   overruled.

2           THE WITNESS:  Yes.

3   Q.  (BY MR. KOZINETS)  So if they were only in town for a short

4   time, they'd have to run off to the authorities and undergo a

5   background check, get fingerprinted, prove whatever their age

6   is, and do whatever else they need to do in order to get an

7   escort license?

8           MR. BIENERT:  Objection.  Leading.

9           THE COURT:  The objection's sustained.

10  Q.  (BY MR. KOZINETS)  If they were only in town for a short

11  time and they were holding themselves out as an escort, would

12  they need to get a license in order to be a lawful licensed

13  escort in that area?

14  A.  Yes.

15  Q.  So going back to the language here, you incorporated other

16  catch phrases, right, like this one, 100 percent independent?

17  A.  Yes.

18  Q.  I'm clean and safe?

19  A.  Yes.

20  Q.  And, to the customer, please be clean and polite?

21  A.  Yes.

22  Q.  You have this phrase here real pic?

23  A.  Yes.

24  Q.  Again, something you saw come up very frequently in these

25  types of ads?

1    A.   Yes.   This advertisement is consistent with many other

2    advertisements that I viewed.

3    Q.   And then you had pricing?

4    A.   Yes.

5    Q.   Pricing tied to specific time increments?

6    A.   Yes.   Again, similar to many other advertisements.

7    Q.   And not just any kind of time increments but short time

8    increments?

9    A.   Yes.   30 minutes and one hour.

10   Q.   You included an image with the ad?

11   A.   Yes.

12   Q.   How would you describe this image?   What is this person

13   wearing?

14   A.   Lingerie.

15   Q.   Kind of maybe something that might be called a bustier, for

16   instance?

17   A.   Yes.

18   Q.   And so with all of these elements, you took this ad, and

19   you placed it in the Backpage escort section?

20   A.   Correct.

21   Q.   You sort of put it into the stream of all the other ads

22   that had similar common characteristics?

23          MR. BIENERT:  All leading, Your Honor.  Objection.

24          THE COURT:  Who is it?  Okay.

25          The objection's sustained.

FICHTNER - REDIRECT

```
 1    Q.  (BY MR. KOZINETS)  You placed it in this escort section,

 2    Backpage Sacramento adult escorts?

 3           MR. BIENERT:  Objection.  Leading.

 4           THE COURT:  The objection's sustained.

 5    Q.  (BY MR. KOZINETS)  Where did you place the ad?

 6    A.  In the adult escort section of the Sacramento region on

 7    Backpage.com.

 8    Q.  And you testified previously that you incorporated these

 9    common elements to make this ad seem like the other ads?

10           MR. BIENERT:  Objection, leading, but also asked and

11    answered multiple times.

12           THE COURT:  The objection's overruled.

13           THE WITNESS:  Yes.  I wanted to create it to fit in

14    with all the other ones, so basically used the other ones as a

15    template to create this one to make it fit in.

16    Q.  (BY MR. KOZINETS)  Now, we -- Counsel on Friday and to some

17    extent today talked about your discussions with Carl Ferrer and

18    Elizabeth McDougall in relation to this ad?

19    A.  Yes.

20    Q.  And can you remind us again the ad was live for how many

21    days?

22    A.  Ten days.

23    Q.  And in that period of time, there were a number of

24    responses to the ad?

25           MR. BIENERT:  Objection, asked and answered, Your
```

1    Honor, and leading.

2              THE COURT:  I'm sorry.  I couldn't hear the second

3    part.

4              MR. BIENERT:  Leading.

5              THE COURT:  The objection's sustained.

6    Q.  (BY MR. KOZINETS)  The ad -- Let me put it this way.  You

7    spoke -- After you spoke to the CEO, what happened to the ad?

8    A.  It was removed from the website.

9    Q.  Until that time, though, what was the status of the ad?

10   A.  It was running live for those ten days.

11   Q.  During those -- While that ad, that one ad, was taken down,

12   did Backpage continue to sell similar ads?

13   A.  Yes.

14   Q.  And were similar volumes of ads sold along the lines of the

15   ads that we looked at on March 6, 2015?

16   A.  Yes.

17   Q.  So while that one ad was taken down, Backpage was selling

18   hundreds of similar ads on a daily basis?

19             MR. BIENERT:  Objection, leading, already asked and

20   answered.

21             THE COURT:  Is that you, Mr. Bienert?

22             MR. BIENERT:  Yes.  I'm sorry.

23             THE COURT:  Maybe you could pull the microphone a

24   little bit closer.  The objection to leading is sustained.

25   Q.  (BY MR. KOZINETS)  Was there any change in the volume of

1    these similar types of ads that Backpage was selling over the

2    course of this ten-day period?

3    A.  Not that I could tell.

4    Q.  Did you, based on your experience, did you view Backpage as

5    helpful to law enforcement?

6              MR. BIENERT:  Objection.  Relevance.  Foundation.

7              THE COURT:  The objection's overruled.

8              THE WITNESS:  I did not think they were helpful to law

9    enforcement.

10   Q.  (BY MR. KOZINETS)  Can you explain why?

11             MR. BIENERT:  Same objections.

12             THE COURT:  The objection's overruled.

13             THE WITNESS:  I think they were deceiving law

14   enforcement.

15   Q.  (BY MR. KOZINETS)  How so?

16   A.  I think --

17             MR. BIENERT:  Same objections, Your Honor.  Improper.

18             THE COURT:  The objection's overruled.

19             THE WITNESS:  I think as they promoted all the

20   different things on the website, cyber tip lines were reaching

21   out or responding, I think that was just a diversion for law

22   enforcement to think that they're helping us when they were

23   allowing everything else to go on and to enhance their website.

24             MR. BIENERT:  Objection.

25             THE WITNESS:  So although they may have helped me with

1   this one advertisement in that 27-hour span, which was 300

2   advertisements, they might have helped me with one, but the

3   other 299 were still going on.

4   Q.  (BY MR. KOZINETS)  And that continued --

5           MR. BIENERT:  Objection.  No foundation.  Move to

6   strike about all the other ads.

7           THE COURT:  The objection's overruled.

8   Q.  (BY MR. KOZINETS)  And that continued day in, day out, over

9   the course of 2015?

10          MS. BERTRAND:  Objection.  Goes beyond the scope of

11  cross.

12          THE COURT:  Ms. Vaught.  The objection's overruled.

13          THE WITNESS:  Yes.

14  Q.  (BY MR. KOZINETS)  There was some discussion during some

15  part of cross-examination about the posting rules for the

16  escort section of Backpage.  And my question to you is were the

17  posting rules the same in September -- on September 8th, 2015,

18  as they were on March 6, 2015?

19  A.  I believe so, yes.

20  Q.  So, among other things, you couldn't, according to the

21  posting rules, post nude images, genitalia, simulated sex acts,

22  and similar types of images?

23  A.  Correct.

24  Q.  And you couldn't indirect or coded fashion advertise for

25  any illegal service, including, as stated in the posting rules,

```
 1    the exchange of sexual favors for money or other valuable

 2    consideration?

 3               THE WITNESS:  Correct.

 4               MR. BIENERT:  Objection.  Leading.  Asked and

 5    answered.

 6               THE COURT:  The objection to leading is sustained.

 7    Q.  (BY MR. KOZINETS)  Special Agent Supervisor Fichtner,

 8    rewound Exhibit 849A to 5 minutes 14 seconds.  Do you see that

 9    part of the video exhibit?

10    A.  Yes, I do.

11    Q.  And what part of the video exhibit is this in?

12    A.  This is the -- These are the posting rules.

13    Q.  And I'd like to direct your attention to the -- We talked

14    about the first bullet point already.  I'd like to direct your

15    attention to the second bullet point.  Can you just read that

16    one please.

17    A.  It says, "I will not post any solicitation directly or in

18    coded fashion for any illegal service, including exchanging

19    sexual favors for money or other valuable consideration."

20    Q.  And these rules, including these two bullet points, were

21    the same on March 6, 2015, as they were in September 8th, 2015?

22               MR. BIENERT:  Objection.  Leading and foundation.

23    Q.  (BY MR. KOZINETS)  Were they --

24               THE COURT:  The objection's is overruled.

25               THE WITNESS:  Yes.
```

1    Q.  (BY MR. KOZINETS)  There was some discussion about

2    California DOJ, your department, the California Department of

3    Justice, investigating Backpage.  There were a list of other

4    sites were mentioned.  Do you recall that?

5    A.  Yes.

6    Q.  And you were specifically investigating Backpage?

7    A.  Yes.

8    Q.  And why were you specifically investigating Backpage?

9              MR. BIENERT:  Objection, Your Honor.  Relevance.

10   Calls for narrative.

11             THE COURT:  The objection's sustained.

12   Q.  (BY MR. KOZINETS)  We talked about how you had formed an

13   understanding as to why your agency was investigating Backpage?

14   A.  Yes.

15   Q.  Had your agency received complaints about Backpage?

16             MR. BIENERT:  Objection.  Foundation.  Hearsay.

17   Relevance.  It calls for a conclusion.

18             THE COURT:  It's a yes or no question.  You can answer

19   yes or no.  The objection's overruled.

20             THE WITNESS:  Yes.

21   Q.  (BY MR. KOZINETS)  Do you know if that played a role in

22   your agency's decision to investigate Backpage?

23             MR. BIENERT:  All the objections before, Your Honor.

24             THE COURT:  The objection's overruled.  Yes or no.

25             THE WITNESS:  Yes.

FICHTNER - REDIRECT

1   Q.  (BY MR. KOZINETS)   What were the nature of those

2   complaints?

3              MR. BIENERT:  Same objections, Your Honor.

4              THE COURT:  The objection's sustained.

5   Q.  (BY MR. KOZINETS)   I want to talk about the issue of age

6   verification that counsel brought up.  What were the age

7   verification or were there any age verification requirements

8   before one could put up an escort ad on Backpage?

9   A.  There were no requirements.

10  Q.  So just to be clear, any sort of requirement at all to show

11  proof of age?

12  A.  I did not encounter any type of verification of the age

13  that I was posting.

14  Q.  Any sort of driver's license check or anything like that?

15  A.  No.

16  Q.  Was there any kind of in-person verification of the

17  person's age?

18  A.  No.

19  Q.  So was there any way of knowing with any certainty how old

20  somebody was who was being featured in one of these

21  advertisements?

22  A.  No.

23  Q.  Special Agent Supervisor Fichtner, I'm directing your

24  attention to one of the ads that we've been discussing.

25             This is at the one-minute-35 mark of Exhibit 0489A.

1   Do you see that ad here?

2   A.  Yes.

3   Q.  The ad has pricing increments?

4   A.  Yes.

5   Q.  Talks about hooking up?

6   A.  Yes.

7   Q.  And what is this portion here?

8   A.  It says, "I as well love to be pleased" with a tongue and a

9   splash emoji.

10  Q.  I'm now showing you another one of these ads.  This is from

11  the two-minute-two-second mark of Exhibit 489A.  Do you see

12  that on your screen?

13  A.  Yes.

14  Q.  This has that new in town language?

15  A.  Yes.

16  Q.  And it has the series of emojis here?

17  A.  Yes.

18  Q.  And, again, can you just sort of walk us through

19  descriptively what those emojis are.

20  A.  The emojis, the first one is with an open mouth emoji.

21  Next one is a rose.  The other one is a smiley face with heart

22  eyes and two splash emojis.

23  Q.  I'm not going to go through every single one of these ads.

24  Again, we've already done that here.  These ads and others that

25  you reviewed, is it your testimony that these are kind of

1    typical of the types of ads that you had seen on the escort

2    section?

3    A.  Yes.

4    Q.  Now, counsel brought up this morning another ad that you

5    had crafted where you used the word cum spelled c-u-m.  Do you

6    remember that?

7    A.  Yes.

8    Q.  And I think you explained that you had received some sort

9    of message when you tried to submit that ad?

10   A.  I did.  I received a response while posting it that said

11   oops, like I made a mistake, cum is a forbidden word in this

12   category.

13   Q.  And what did you do after you got that message?

14   A.  I went back, and I tried to correct it.

15   Q.  And --

16   A.  And I --

17   Q.  How did you correct it?

18   A.  I respelled it with c-u-m-m, and again I received the same

19   message, oops, c-u-m is a forbidden word in this category.

20   Q.  And so how did you respond to that?

21   A.  It allowed me to go back and correct it again, so I just

22   spelled it c-o-m-e, and then it accepted it.

23   Q.  Did you around that same time review or see other ads on

24   the escort section that had variations of the word cum?

25   A.  Yes.

1    Q.  I want to go back to this discussion about escorts and the

2    definition of escorts that you had provided.  Do you recall how

3    in your direct exam you testified generally that an escort is

4    someone who you can hire to spend time together with as long as

5    you're not breaking the law?

6    A.  Correct.

7    Q.  And so I would imagine if one were to engage in the

8    exchange of sexual favors for money or other valuable

9    consideration, that would be something that a lawful licensed

10   escort couldn't do?

11          MR. BIENERT:  Objection, Your Honor, to blending

12   escort with the suggestion of prostitution on the legality

13   front.

14          THE COURT:  The objection's overruled as to that

15   question.

16   Q.  (BY MR. KOZINETS)  Do you want me to ask it again?

17   A.  Yes, please.

18   Q.  So this sort of concept of lawful licensed escort also

19   involves the notion that you can't break the law; you can't

20   engage in the exchange of sexual favors for money?

21          MR. BIENERT:  Objection, leading, but also improperly

22   blending a licensing requirement with legality.

23          THE COURT:  Counsel, you can ask for a side bar.

24          MR. BIENERT:  Yes, Your Honor.

25          THE COURT:  That objection's overruled.

1          MR. BIENERT:  I'd ask for a side bar.

2          THE COURT:  Okay.  We'll do it later.

3    Q.  (BY MR. KOZINETS)  In the process of posting an adult

4    escort ad on Backpage, the process that you went through, was

5    there ever a requirement where you had to establish that you

6    had an escort license in order to post the ad?

7    A.  No.

8    Q.  Did you ever see an escort license number in any of the

9    hundreds of escort ads that you had reviewed?

10         MR. BIENERT:  Objection, Your Honor, relevance to the

11   issue at trial.

12         THE COURT:  The objection's overruled.

13         THE WITNESS:  No.

14   Q.  (BY MR. KOZINETS)  Did you encounter licensed escorts in

15   your work in law enforcement?

16         MR. BIENERT:  Same objection.

17         THE COURT:  The objection's overruled.

18         THE WITNESS:  No.

19   Q.  (BY MR. KOZINETS)  Special Agent Supervisor Fichtner, I'm

20   directing your attention to another part of the previously

21   admitted Exhibit 489A a minute or just 34 seconds into it.

22         Thank you for publishing.  I want to direct your

23   attention to the second sponsor ad.

24         Was this ad always prominently displayed on the escort

25   section whenever you reviewed it in 2015?

FICHTNER - REDIRECT

1    A.  Yes, it was.

2    Q.  Now, earlier you said I think it's appropriate to put this

3    on Backpage's website.  Do you remember that?

4    A.  Yes.

5    Q.  Why did you say that?

6              MR. BIENERT:  Objection.  Relevance.

7              THE COURT:  The objection's overruled.

8              THE WITNESS:  Because this is where they advertised

9    for prostitution.

10             MR. KOZINETS:  No further questions.

11             THE COURT:  Are there any questions from the jury?

12             Okay.

13             There's one.  And I apologize.  After the first couple

14   witnesses, I didn't ask.  If I ever forget to ask, just raise

15   your hand.

16             Counsel, can I see you at side bar?

17        (Bench conference on the record as follows:)

18             THE COURT:  So this is jury question one.  Why don't

19   you read it and then pass it.

20             MR. KOZINETS:  I'm assuming this refers to the March,

21   his undercover ad that didn't repost.

22             MR. BIENERT:  Should I --

23             THE COURT:  One second.

24             MR. KOZINETS:  Your mask.

25             THE COURT:  Thank you.  Okay.  With respect to

1    question one, what's the government's position?

2         MR. KOZINETS:  The government -- This is Peter

3    Kozinets.  The government understands the question relates to

4    the undercover sweet dreams ad in March of 2015.  We don't have

5    an objection.  I don't know what the, you know -- We don't have

6    an objection to the question.

7         MR. BIENERT:  This is Mr. Bienert speaking.  The

8    question on its face I think would be asking for a conclusion

9    about someone else's --

10       (Reporter interrupts for clarification.)

11       MR. BIENERT:  This is Mr. Bienert.  I think question

12   number one is asking this witness to talk about the mindset and

13   conclusions of a third party at Backpage, and therefore it's

14   not something he should be asking.

15       THE COURT:  I agree with defense.  This is the Judge.

16   So that question will not be asked.

17       Question two, Mr. Bienert.

18       MR. BIENERT:  Yes.  I object to this but for -- Given

19   the current status of things and the government's questioning,

20   I don't think this is an improper question.  I will say as a

21   foundational matter this witness has repeatedly said, though,

22   that he does not know the answers to the escort rules, so I

23   think it's improper for him.

24       I will say and I want to get the witness done, but

25   after the witness is gone, I do want to address the Court about

FICHTNER - REDIRECT

1    they very topic --

2            THE COURT:  Yes.

3            MR. BIENERT:  -- which is why I objected.

4            THE COURT:  No.  I have a note to talk about that.

5            What's the government's position?

6            MR. KOZINETS:  I'm not sure that this witness has, you

7    know, if there's foundation for answering.  It seems like a

8    question more for the Sacramento, you know, licensing

9    authorities.

10           THE COURT:  So I don't think he does either, but I'm

11   going to ask him do you even know how many.

12           MR. KOZINETS:  Okay.

13           THE COURT:  And then if he says no, then I'm not going

14   to ask anything further.

15           MR. KOZINETS:  Okay.

16       (End of bench conference.)

17           THE COURT:  Agent Fichtner, do you know how many

18   escort licenses were granted and registered in Sacramento

19   County at the time you did your search in March of 2015?

20           THE WITNESS:  I do not.

21           THE COURT:  Okay.  All right.  Then we're going to

22   recess for lunch, and we'll -- We're going to come back a

23   little bit later, so at 1:30.  I have some other matters to

24   take care of, so I'm going to just ensure that I have enough

25   time to do that.  So we'll come back at 1:30.  Thank you.

1      (The jury exited the courtroom at 12:14 p.m.)

2           THE COURT:  You can step down, Agent Fichtner.  All

3      right.  You can have a seat.  There's a couple things -- I just

4      want to make sure the door's shut.  Okay.  So there's a couple

5      things I want to put on the record as to two issues.

6           With respect to the questions about escorts and what

7      crossed the line, the defense had questioned this witness about

8      that very same thing, so I allowed the government to do it.

9           The second one was about whether or not Backpage was

10     helpful.  The defense, again, talked about Carl Ferrer and his

11     response and him being responsive, so I allowed the follow-up

12     questions on that.

13          With respect to the exhibits, Elaine, did you get

14     numbers for those?

15        (The Court and clerk confer off the record.)

16          THE COURT:  Okay.  So she has given them numbers

17     because you were going to move to admit them after, so do you

18     want to do that?

19          MR. BIENERT:  I do.  And maybe just to make it

20     simpler -- because by now my pages are all shuffled -- if

21     perhaps I will just say the only ones I'm going to ask to admit

22     are the ones that were these still shots from his video.  And

23     maybe I can get together with madam clerk either now or when we

24     come back in an hour and a half and show her what those numbers

25     were that I called out.  And then I would just ask that they be

1    exhibit numbers in the case.

2              MR. KOZINETS:  That's fine with us, Your Honor.

3              THE COURT:  Okay.  So if you can come back at 1:25 and

4    go over those numbers with Elaine.

5              MR. BIENERT:  Yes, Your Honor.  I do want to address

6    the two points you made, and I can do it later, but at some

7    point I need to make a record on that.

8              THE COURT:  Briefly, but go ahead.

9              MR. BIENERT:  Here's my concern.  First of all, yes, I

10   asked about the escort issue, but that's because Mr. Kozinets

11   in direct brought up the escort licensing issue.  So my cross

12   was based on him bringing it up.  And what I think he did was

13   improper, because what he did was he juxtaposed this concept of

14   prostitution with then discussing licensing for escorts, and he

15   did it in a way that suggested that if someone fails to get a

16   license, which obviously is a licensing issue, but it was

17   suggested that doing that somehow made their conduct illegal

18   such that that could make it prostitution.

19              And I believe that when he got up on redirect, he sort

20   of doubled down on that.  And I think that the note that the

21   jurors gave us, which is more innocuous -- it's just how many

22   licenses are there -- I believe that the record now is one

23   where jurors could be wrongly thinking that someone's failure

24   to get an escort license somehow makes what would have been

25   legal business that an escort could do without being

UNITED STATES DISTRICT COURT

1   prostitution, somehow turns it into prostitution.

2         And so I think there is jury confusion that was

3   prompted by the government's blending these terms.  And as I at

4   least tried to make in my driving without a license versus DUI

5   example, they're just apples and oranges.  And whether I have

6   violated licensing rules does in no way, shape, or form show

7   whether I violated DUI rules, just like if an adult entertainer

8   fails to get a license, it doesn't tell you whether she is also

9   engaged in illegal prostitution.

10        THE COURT:  All right.  And that was abundantly clear

11  from your cross.  And the opposite of that, which the

12  government went into, is just because they're licensed doesn't

13  mean what they're doing is legal.  So I see it both ways.

14        MR. BIENERT:  You know, Your Honor, I see where you're

15  going.  I would agree with you if they established that anyone

16  was licensed.  But what they seem to be doing is the opposite.

17  Their questioning, at least as I get it, is they're trying to

18  say none of these people appeared to be licensed; therefore

19  it's all bad.  That's the issue.

20        THE COURT:  Okay.  I just disagree with -- The way you

21  perceived it is different than the way I perceived it.  And

22  ultimately hopefully the jury -- I'm confident the jury can

23  distinguish the difference.

24        Okay.  All right.  I'll see you all at 1:30.

25     (Proceedings recessed at 12:19 p.m.)

1                        C E R T I F I C A T E

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 17th day of September,

12   2021.

13

14

15                              s/Linda Schroeder
                                Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25