Seetha Ramachandran (NY Bar No. 3944121, *admitted pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3455
Facsimile: (212) 969-2900
sramachandran@proskauer.com

Thomas H. Bienert, Jr. (CA Bar No.135311, *admitted pro hac vice*)
Whitney Z. Bernstein (CA Bar No. 304917, *admitted pro hac vice*)
BIENERT KATZMAN LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
tbienert@bklwlaw.com
wbernstein@bklwlaw.com
*Attorneys for James Larkin*

Additional counsel listed on next page

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:18-cr-00422-PHX-SMB |
| Plaintiff, | **MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND RELEASE FUNDS TO DEFENDANTS** |
| vs. | |
| Michael Lacey, *et al.*, | (Oral argument requested) |
| Defendants. | |

Paul J. Cambria, Jr. (NY Bar No. 1430909, *admitted pro hac vice*)
Erin McCampbell (NY Bar. No 4480166, *admitted pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

# Table of Contents

I.     INTRODUCTION ............................................................................................ 1

II.    RELEVANT FACTUAL BACKGROUND ..................................................... 3

    A.    The Government Wrongly Seized the Entirety of an Untainted Account.... 3

    B.    The Government Cannot Trace Loan Payments Tied to the Sale of Backpage's Foreign Operations to Illegal Activity............................................. 3

    C.    The Government Impermissibly Seized Over $10 Million in Funds from Attorney Retainer Accounts..................................................................... 4

    D.    Even Under its Own Flawed Theory Regarding "Adult" Ads, the Government Has Over-Seized Defendants' Funds.......................................... 5

III.    ARGUMENT ................................................................................................ 7

    A.    The Government May Not Seize Legitimate, Untainted Assets Pre-Trial.... 7

    B.    The Government Cannot Trace the Four Asset Categories to Crimes Alleged in the Indictments and Therefore Lacks Probable Cause to Support Their Forfeiture. ................................................................................... 9

        1.    "Proceeds Traceable to" ................................................... 9

        2.    Property "Involved In" Money Laundering......................................... 13

    C.    The Court Can Order the Release of Four Limited Categories of Untainted Assets in the Interest of Justice. ......................................................... 15

    D.    Defendants Are Entitled to Cost and Fee Reimbursement In Light of a Mistrial Caused by the Government. .................................................... 15

IV.    CONCLUSION............................................................................................ 16

**Table of Authorities**

**Cases**                                                           **Page(s)**

*620,349.85 U.S. Currency*, No. 13-CV-3966-RJD-SMG,
2015 WL 3604044 (E.D.N.Y. June 5, 2015) ................................................... 13

*Arizona v. Washington*,
434 U.S. 497 (1978) .................................................................................. 15

*Backpage.com LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ................................................................... 10

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 805 (D. Tenn. 2013) .......................................................... 10

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 1262 (W.D. Wash. 2012) ................................................... 10

*Caplin & Drysdale, Chartered v. United States*,
491 U.S. 617 (1989) .................................................................................... 8

*Doe v. Backpage.com LLC*,
104 F. Supp. 3d 149 (D. Mass. 2015) ..................................................... 10

*Fed. Trade Comm'n v. Johnson*,
No. 210CV02203MMDGWF, 2015 WL 8751693 (D. Nev. Dec. 14, 2015) ................ 8

*Honeycutt v. United States*,
581 U.S. ___, 137 S. Ct. 1626 (2017) ....................................................... 7

*Kaley v. United States*,
571 U.S. 320 (2014) ................................................................................. 7, 8

*Luis v. United States*,
578 U.S. 5, 136 S. Ct. 1083 (2016) ..................................................... 7, 8, 15

*United States v. $3,148,884.40 U.S. Currency*,
76 F. Supp. 2d 1063 (C.D. Cal. 1999) ..................................................... 14

*United States v. $8,221,877.16 in United States Currency*,
330 F.3d 141 (3d Cir. 2003) ................................................................... 7, 9

*United States v. $448,342.85,*

    969 F.2d 474 (7th Cir. 1992) ..................................................................... 12, 13

*United States v. Abhishek Krishnan's Real & Pers. Prop.,*

    469 F. Supp. 3d 481 (E.D.N.C. 2020) ..................................................... 14

*United States v. All Funds,*

    832 F. Supp. 542 (E.D.N.Y. 1992) ........................................................... 13

*United States v. Bornfield,*

    145 F.3d 1123 (10th Cir. 1998) .........................................................9, 11, 13

*United States v. Cosme,*

    796 F.3d 226 (2d Cir. 2015) ..................................................................9, 11

*United States v. Cosme,*

    No. 17-1759-CR(L), 2021 WL 2964322 (2d. Cir. July 15, 2021) ........... 12

*United States v. Crozier,*

    777 F.2d 1376 (9th Cir. 1985) ................................................................. 7

*United States v. Grant,*

    No. S4-05-CR-1192, 2008 WL 4376365 n.1 (S.D.N.Y. Sept. 25, 2008) ......................... 9

*United States v. Haleamau,*

    887 F. Supp. 2d 1051 (D. Haw. 2012) ................................................... 12

*United States v. Monsanto,*

    491 U.S. 600 (1989) ............................................................................. 7, 8

*United States v. Seher,*

    562 F.3d 1344 (11th Cir. 2009) .............................................................. 13

*United States v. Tencer,*

    107 F.3d 1120 (5th Cir. 1997) ................................................................ 13

*United States v. Unimex, Inc.,*

    991 F.2d 546 (9th Cir. 1993) ................................................................. 8

**Statutes**

18 U.S.C. § 981(a)(1)(A) ............................................................................9, 11, 13

TABLE OF AUTHORITIES

1    18 U.S.C. § 981(a)(1)(C) .................................................................... 9

2    18 U.S.C. §§ 981, 982 ................................................................ 7, 9, 11

3    18 U.S.C. § 983(c)(3) ...................................................................... 13

4    18 U.S.C. § 984 ........................................................................ 13, 14

5    21 U.S.C. § 853(e) ............................................................................ 7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

TABLE OF AUTHORITIES

## I.  INTRODUCTION

The government has seized and restrained more than $135 million of liquid assets from Defendants, their family members, and various companies owned by Defendants, plus tens of millions of dollars in real estate and other illiquid assets, plus over $10 million in attorneys' funds. To understand the sheer breadth of the government's seizures here, Backpage.com's aggregate revenues over the years exceeded $500 million (Doc. 230 at ¶ 1)—meaning the 50 charged ads accounted for roughly 0.0001% to 0.0002% of Backpage's revenues.  In other words, roughly 99.9998% to 99.9999% of Backpage's revenues are not derived from the charged ads.[1]  But that is an issue for another day.

Counsel for defendants Lacey, Larkin, Brunst, and Spear ("Defendants")[2] have continued to prepare for and try this case even as they are incurring substantial debt to do so.[3]  Now facing the prospect of a second trial, following a mistrial caused by the government's misconduct (*see* Docs. 1355, 1355-14), defense counsel requires additional funds to effectively continue.  Even their ability to challenge the full scope of overbroad and unlawful pretrial seizures is curtailed by the lack of funds.[4]

For the sake of judicial efficiency, to fund the continued defense of this case and to ensure continuity of counsel, and in the interest of time – as a second trial is fast approaching – this motion does not address all of the government's improper seizures but is instead limited to seeking the release of some of the specific, identifiable, and untainted funds, funds that the government has not traced, and cannot trace, to alleged illegal activity.  These include: (1) over $400,000 unrelated

---

[1]  From the millions of adult-oriented classified ads that ran on Backpage.com over the years, the government identified and charged just one (1) ad that expressly offered sex in exchange for money. None of the forty-nine other charged ads expressly offered sex in exchange for money, nor did any other Backpage.com ad that the government has identified in its disclosures to the defense. The solitary sex for money ad charged in the indictment was a free ad, which generated absolutely no revenue for Backpage.com.

[2]  Defendants Padilla and Vaught were deprived of their counsel of choice when the government refused to return funds and previously received appointed counsel. Docs. 565, 566.

[3]  Doc. 1355-13, Exh. L at 74:18-21 ("You know, every one of us who are paid counsel are under water in this case . . . .").

[4]  Importantly, Carl Ferrer has been permitted to keep funds set aside for his attorney's fees. *See United States v. Ferrer*, Case No. 2:18-cr-00464-PHX-SMB, Doc. No. 7-2 at 9:7-10.

to Backpage.com, seized from an account holding only loan payments from the sale of newspaper businesses and rent from the sublease of an office building to the buyer of the newspapers, Voice Media Group ("VMG Depository Account Funds"); (2) assets seized that relate to revenues from Backpage.com's operations outside of the United States ("Foreign Loan Payments"); (3) over $10 million seized from attorney trust accounts ("Attorney Retainer Funds"); and (4) assets seized that relate to revenues from Backpage's non-adult advertising, as the government concedes that advertising was lawful ("Non-Adult Advertising Proceeds"). Because the government has failed to show that any of these four categories of assets are traceable to the crimes alleged in the indictment or the civil complaint,[5] the government lacks probable cause to support their forfeiture of these assets.

The Court should partially vacate the seizure warrants that currently restrain these assets and order the release of these limited sets of assets to the Defendants.[6] While the property was seized pursuant to civil seizure warrants (because of the government's choice to file its civil complaints in different district from the criminal case), and there is a pending civil forfeiture case as to some of these assets, that case has been properly stayed pending the outcome of this criminal proceeding. Thus, the government's current forfeiture focus is in the criminal case, where the government has noticed the potential forfeiture of some of these civilly seized properties in the indictment. Further, this Court is best positioned to evaluate the relevant facts and equities, including the Defendants' Sixth Amendment right to counsel and the need for continuity of

---

[5]    First Amended Consolidated Master Verified Complaint for Forfeiture, *United States v. $1,546,076.35 In Bank Funds Seized From Republic Bank of Arizona Account '1889, et al.*, No. 18-8420 (C.D. Ca. June 1, 20210), ECF No. 108 (the "Complaint").

[6]    Indeed, the government has agreed that this Court is the appropriate forum to litigate these issues, and has refused to even discuss the possibility of an out-of-court resolution regarding the restraint of the four categories of assets at issue because this Court is considering the matter. Exh. L (Email from Scott Garringer Chief of the Criminal Division, U.S. Attorney's Office, Central District of California, to counsel for Defendant Larkin, October 18, 2021) ("I have reviewed your requests and the four categories of assets you seek to be returned . . . we are not going to intervene in the negotiations, particularly given the currently-pending briefing schedule on the motion you informed the Court you would be filing, which we do not want to delay.").

MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND
RELEASE FUNDS TO DEFENDANTS

counsel through a second trial that only became necessary due to the government's misconduct at the first trial.

## II. RELEVANT FACTUAL BACKGROUND

### A. The Government Wrongly Seized the Entirety of an Untainted Account.

The government seized $407,686.14 from an account held by Cereus Properties, LLC ("Cereus").[7] That account ("VMG Account") exclusively held proceeds from Defendants' January 2013 seller-financed sale of their sizeable print newspaper business (including, e.g., *The Village Voice*) to Voice Media Group (VMG), a media company based in Denver, Colorado. Declaration of Jed Brunst ("Brunst Decl.), ¶ 2, Exh. A. Through Medalist, Defendants sold their newspaper business to VMG for $27 million. *Id.* Because the sale was seller-financed, Medalist received the purchase price for the sale over time in the form of loan payments. The corresponding promissory note was held by another one of Medalist's subsidiaries, and the loan payments went to Cereus Properties. *Id.*, ¶¶ 3-4, Exh. B, Exh. C.

Before filing this motion, Defendants sought the release of these funds from the government. Exh. K. The government initially refused, citing several 2017 deposits that the government claims, without proof, were tainted. Exh. J. As the account ledger demonstrates, the only deposits into the account in fact came from VMG and either were payments on "notes receivable," *i.e.*, payments on the loan that financed VMG's purchase of the newspapers, or "rent" that VMG paid to sublease an office building. Brunst Decl., ¶ 5, Exh. D.[8] The funds transferred to the VMG Account were completely unrelated to Backpage.com, and the government has zero evidence to the contrary.

### B. The Government Cannot Trace Loan Payments Tied to the Sale of Backpage's Foreign Operations to Illegal Activity.

As the government knows, Defendants, through Medalist, sold the Backpage.com business

---

[7] Cereus is an entity held by Medalist Holdings, Inc. ("Medalist"). Medalist is primarily owned by Defendants.

[8] A government supervisor later conceded that, as to these funds, "there may be room to negotiate" with the line prosecutor. Exh. J. But the defense should not have to "negotiate" the release of funds that are clearly untainted.

MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND
RELEASE FUNDS TO DEFENDANTS

to Carl Ferrer, in two *seller-financed* transactions, to two different entities that respectively held Backpage's domestic and foreign operations. The foreign sale is relevant for the purposes of this motion. In April 2015, Medalist sold Backpage's foreign classified advertising business to an entity owned and controlled by Ferrer. Exh. M ("Quigley Decl."), ¶ 4. In short, the sale of Backpage's foreign operations involved the sale and assignment of a license to operate Backpage abroad.[9] Brunst Decl., ¶¶ 6-8, Exhs. E-G. Ferrer, through his entity ("UGC"), purchased that foreign license for $74.3 million. *Id.*, Exh. G (Ferrer signed each of these documents as CEO). A corresponding Purchase and Sale Agreement and Loan Agreement reflects that the sale was seller-financed. *Id.*, Exh. H. The Loan Agreement covers Backpage's "Foreign Operations." *Id.*, p. 1.

Under the loan documents, and as Defendants' internal accounting reflects, they received a stream of loan payments in connection with their sale of Backpage's foreign operations and a separate stream of payments in connection with their sale of Backpage's U.S. operations. *Id.*, ¶ 10, Exh. I (accounting ledger). As the ledger demonstrates, through 2018 (when the indictment issued and the loan payments ceased), the total payments on both loans amounted to more than $172 million. *Id.* Of that amount, **$76.3 million,** *or nearly 45%*, was payments from UGC *on the foreign loan with funds derived from Backpage's foreign operations*. *Id.*

There are no charges here, nor allegations in the government's Complaint, concerning Backpage's hosting of adult classified advertising in foreign countries or revenues from foreign ads. Importantly, despite being well-aware of the separate sales of the Backpage.com domestic and foreign operations to Ferrer's entities, the government's affidavits supporting the seizure warrants said *absolutely nothing* about the separate sales, the agreements documenting the sales, the promissory notes, or the payments on those notes—but just mentioned a "purported" sale.

### C.    The Government Impermissibly Seized Over $10 Million in Funds from Attorney Retainer Accounts.

The government also seized over $10 million held in trust by lawyers for Defendants or their companies—retainers that would have been used, in large part, to pay Defendants' legal fees

---

[9]    The "Intellectual Property License" granted the seller of the license the right to operate Backpage in "all countries world-wide, *except for the United States of America*." Brunst Decl., Exh. E at 2.

defending this action.[10]

Ferrer's entities owed substantial money to a Medalist subsidiary under the purchase money promissory notes. Quigley Decl., ¶ 4. In 2017 and 2018, Medalist deposited funds into the Rusing Lopez & Lizardi ("RLL") trust account in anticipation of future litigation. *Id.* To fund those deposits, Medalist directed Ferrer's entities to pay certain sums they owed Medalist's subsidiary under the notes directly to RLL. *Id.*, ¶ 5. Ferrer's entities transmitted $2 million in payments on the domestic debt to RLL and over $3.2 million in payments on the foreign debt to RLL. *Id.*, ¶¶ 6-8, Exh. A.

Further, in July 2012, three Medalist subsidiaries were named as defendants in a civil action in Washington state. Counsel for Medalist sought reimbursement for defense costs from a Travel's insurance policy Medalist had obtained for itself and its subsidiaries. *Id.*, ¶ 12. In 2018, Traveler's agreed to reimburse legal fees exceeding $1.7 million and other defense costs exceeding $400,000— a total of more than $2.1 million—which it wired to Perkins Coie's trust account on March 15, 2018. *Id.*, ¶¶ 13-17. The government seeks to forfeit approximately $2.9 million from the Perkins Coie trust account, but roughly 75% of those funds were the Traveler's insurance reimbursement. *Id.*, ¶ 18.

On behalf of Defendants, counsel for Medalist also arranged trust deposits with numerous other law firms in connection with pending or anticipated litigation, with those deposits funded by Backpage-associated entities pursuant to contractual obligations to advance defense costs for Defendants and their companies. *Id.*, ¶ 19. A substantial portion of the trust deposits the government seized here, including the RLL trust deposits, were sourced from Backpage's foreign operations, namely loan payments in connection with the sale of Backpage's foreign operations. *Id.*[11]

### D. Even Under its Own Flawed Theory Regarding "Adult" Ads, the Government Has Over-Seized Defendants' Funds.

The government seized at least $136 million in liquid assets, and the true value of the total

---

[10]    The companies were obligated to advance defense costs to Defendants.

[11]    Counsel in this case generally were retained ***before*** the seizures of the IOLTA accounts and Defendants' personal assets.

assets is likely much higher,[12] under a flawed theory that *all* of Backpage.com's "adult" ads, and all revenue from those ads, was criminal. For that reason, the government's seizures are completely untethered to the *de minimis* proceeds Backpage received from the 50 charged ads.

But the government has never proven that any, let alone all, of the "adult advertisements" on Backpage.com were criminal. The government's seizures all were supported by the affidavits of U.S. Postal Inspector Lyndon Versoza. Versoza admitted that many Backpage ads had "seemingly innocuous language," but claimed their "otherwise neutral or innocuous terms" were a "coded language for sex trafficking and prostitution," showing the ads related to unlawful conduct. Exh. N ("Versoza Affidavit"), ¶ 31. In stark contrast, the government's lead witness in the recent mistrial, Special Agent Supervisor Fichtner, *testified it was not possible to tell whether any of the scores of classified ads he presented at trial* (ads similar to those described in the Versoza's Aff.) *actually related to unlawful conduct*. *See, e.g.*, Doc. 1355-12 at 94-95.

Even assuming *arguendo* that the government's position is accurate, the government itself admits that it has no claim to non-adult and admittedly untainted revenue. *See infra*, Section II(B)(1)(d); Complaint at ¶ 107 (arguing that "more than 90 percent of Backpage's revenue" "[b]etween 2004 and April 2018" came from Backpage.com's "adult category"); Doc. 1355-6 at 26 ("And speaking of revenue, evidence will show that during the time of this letter at the end of 2010, these defendants were generating -- Backpage was generating $30 million a year in revenue, the vast majority of which, more than 94 percent, from fees they were charging customers to post their prostitution ads on the website."). The government offers no basis to establish that the non-adult revenue is forfeitable. These seizures are overbroad, even under the government's own theory, and the portion of the seized liquid assets attributable to non-adult advertising must be returned.

---

[12] This is because (a) this amount does not include the numerous real properties the government has seized, (b) most assets have appreciated since the seizures, and (c) Defendants lack the exact amount seized, as the government has not identified the amount seized in certain instances, alleging only that it has seized "any and all funds in the account;" these seizures are thus unaccounted for in this total.

MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND
RELEASE FUNDS TO DEFENDANTS

## III. ARGUMENT

### A. The Government May Not Seize Legitimate, Untainted Assets Pre-Trial.

To seize or otherwise restrain property pretrial, the government is required to trace the property directly to the offense giving rise to the forfeiture.[13] The Supreme Court has made clear that the government may not seize or otherwise restrain property pre-trial unless those seizures or restraints are supported by probable cause to believe that the specific property is traceable to the alleged criminal activity, and therefore will be forfeitable.[14] Probable cause determinations are subject to plenary review, and the government must release any property it fails to show is subject to forfeiture.

So far, the government has avoided accountability for its excessively broad seizures with the tautologous argument that its civil seizures are unreviewable because the same assets are subject to a restraining order in the criminal case pending before this Court.[15] But that is wrong[16] and, in any event, restraining orders cannot establish probable cause for these indiscriminate and overbroad forfeitures. Rather, they merely allow the government to restrain the assets pending the criminal trial based on a probable cause showing in the civil cases.[17] Where the government failed to trace the assets to the crimes alleged in the indictment or the Complaint, as is the case here, there never was a lawful basis for their pretrial restraint to begin with. Under these circumstances, the government cannot continue to restrain the assets at issue.[18]

---

[13] 18 U.S.C. §§ 981, 982; *United States v. $8,221,877.16 in United States Currency*, 330 F.3d 141, 158 (3d Cir. 2003).

[14] *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1090-92 (2016); *Honeycutt v. United States*, 581 U.S. ___, 137 S. Ct. 1626, 1633 (2017); *Kaley v. United States*, 571 U.S. 320, 323-24 (2014).

[15] *See In re Any & All Funds Held in Republic Bank of Arizona Accts. 1889, et al.*, Case No. 18-06742-RGK (C.D. Cal.), Doc. No. 53 at 6.

[16] Significantly, most assets the government seized from Defendants, their families, or their companies are *not* subject to a criminal restraining order or preliminary order of forfeiture.

[17] 21 U.S.C. § 853(e) (allowing for pretrial seizure of assets based in part on a finding that there is "probable cause to believe that the property to be seized would, in the event of a conviction, be subject to forfeiture"); *see United States v. Crozier*, 777 F.2d 1376, 1382 (9th Cir. 1985) ("the court may enter a restraining order against property which may be subject to forfeiture under federal drug laws").

[18] *See Luis*, 136 S. Ct. at 1092 (distinguishing its prior cases -- *United States v. Monsanto*, 491 U.S.

The government also has erroneously argued that Defendants must make the showing required by *United States v. Monsanto* to successfully move for the release of any assets before trial. But *Monsanto* applies where the government **has probable cause** to seize defendant's assets or, in other words, where the property itself is tainted.[19] Here, because Defendants seek the release of legitimate, untainted funds for which the government **does not have probable cause** to believe are subject to forfeiture, a showing under *Monsanto* or *Unimex* is not required. The Supreme Court has made clear that where untainted funds are concerned – even funds that might be deemed "substitute assets" following a conviction – the government cannot impose any restraints pretrial absent a showing of probable cause.[20] While a defendant's need for counsel is one factor the Court can consider in deciding whether to vacate a pretrial restraint, it is not an evidentiary burden that a defendant must clear to get judicial review where the assets at issue are legitimate and untainted, as is the case here. In *Luis*, the Supreme Court distinguished defendant Luis' circumstances from those at issue in *Monsanto* and *Caplin & Drysdale*, noting that those cases involved the pretrial restraint of *tainted* assets.

Defendants' urgent need for defense funds in the face of a second trial is one important reason why they are bringing this motion now. Because the government has failed to allege sufficient evidence to show that it has probable cause to believe these four limited categories of

---

600 (1989) and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) -- by emphasizing that in those cases the seizure of defendant's assets before trial was permitted only because the government had *probable cause* to believe the property was proceeds of, or traceable to, a crime).

[19]  *See Luis*, 136 S. Ct. at 1106-1107. In *Monsanto*, the Supreme Court held that a defendant was not entitled to unfreeze seized assets before a trial in order to pay for counsel, as long as the assets were seized pursuant to a finding of probable cause to believe the assets were forfeitable. *Fed. Trade Comm'n v. Johnson*, No. 210CV02203MMDGWF, 2015 WL 8751693, at *2 (D. Nev. Dec. 14, 2015) (citing *Monsanto*, 491 U.S. at 615)). The Ninth Circuit has applied *Monsanto* while recognizing two exceptions to this rule -- defendants can access the assets held in receivership if the defendant can show (1) they have been deprived of counsel or (2) the government has engaged in "specific instances of abuse." *Id.* (quoting *United States v. Unimex, Inc.*, 991 F.2d 546, 549-50 (9th Cir. 1993)).

[20]  *Kaley*, 571 U.S. at 327. *See Luis*, 136 S. Ct. at 1091-92 (rejecting the contention that "property—whether tainted or untainted—is subject to pretrial restraint, so long as the property might someday be subject to forfeiture" and instead, finding that where the government cannot show probable cause to believe property is the proceeds of, or traceable to, a crime, the government may not restrain it pretrial).

assets will be subject to forfeiture upon conviction, it cannot continue to restrain those assets under any circumstance.  The burden does not fall on Defendants to make a showing that they are entitled to judicial review.  *United States v. Cosme*, 796 F.3d 226, 233-34 (2d Cir. 2015) (requiring a judicial finding of probable cause if a defendant protests restraints on his property and noting that "[t]he government's switch from civil forfeiture to criminal forfeiture in this case does not immunize it from having to demonstrate probable cause").

>    **B.**    **The Government Cannot Trace the Four Asset Categories to Crimes Alleged in the Indictments and Therefore Lacks Probable Cause to Support Their Forfeiture.**

The Complaint articulates three theories of forfeiture.  The first, under 18 U.S.C. § 981(a)(1)(C), alleges that the defendant assets are subject to forfeiture because they "constitute, and are derived from, proceeds traceable to" alleged criminal activity.  The second and third theories, under 18 U.S.C. § 981(a)(1)(A), seek forfeiture of property alleged to have been "involved in" money laundering.  Complaint ¶¶ 145-47.  None of these theories supports the restraint of the four asset categories at issue here.

>    **1.**    **"Proceeds Traceable to"**

The government must, but cannot, demonstrate probable cause to believe Defendants' assets are directly traceable to the criminal activity because they "constitute, and are derived from, proceeds traceable to" alleged criminal activity.  *$8,221,877.16 in United States Currency*, 330 F.3d at 158 ("under section 981, the government is ***required to trace*** the seized property directly to the offense giving rise to the forfeiture") (emphasis added).  Proceeds "traceable to" means property where the acquisition is attributable to the alleged criminal activity, rather than from money obtained from untainted sources.  *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998).  In other words, property one "would not have but for the criminal offense."  *United States v. Grant*, No. S4-05-CR-1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008).  Section 981(a)(1)(C) does not authorize the seizure and forfeiture of untainted funds solely because they have been commingled with proceeds.

The government's theory is simply that some deposits to certain bank accounts or some assets can be traced to earnings from Backpage.com. The generalized averments in the Complaint, as well as the Versoza Affidavits, at most attempt to establish that some funds in certain bank accounts or some assets can be traced to earnings from Backpage.com generally. The government simply states that certain accounts have received or been maintained with funds "traceable to" the alleged illegal activity. *See e.g.*, Versoza Affidavit, ¶¶ 9, 13. This argument is insufficient for the following reasons:

First, the government has never alleged, and cannot truthfully allege, that all revenue from Backpage.com is traceable to alleged illegal conduct. At most the government has alleged that the proceeds from certain adult advertisements are criminal proceeds, so simply showing that certain proceeds are tied to Backpage.com *generally* does not establish that the proceeds are traceable to the alleged criminal activity.

Second, while Defendants vehemently deny the allegations in this case, for purposes of restraint of assets, numerous courts have established that at least *some* of Backpage's adult content is legal in the United States. *See, e.g., Backpage.com LLC v. Dart,* 807 F.3d 229, 231 (7th Cir. 2015) ("[N]ot all advertisements for sex are advertisements for illegal sex."); *Doe v. Backpage.com LLC*, 104 F. Supp. 3d 149, 156-57 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal."); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 1262, 1282 (W.D. Wash. 2012) (escort ads have long been permitted and escort services are licensed and regulated in many states); *Backpage.com, LLC v. Cooper,* 939 F. Supp. 805, 816, 833-34 (D. Tenn. 2013) (ads on Backpage.com are protected speech under the First Amendment).

Third, the government does not even attempt to trace any of the four categories of seized assets to the alleged criminal wrongdoing that gave rise to the forfeiture. As such, the government fails to offer any facts that would tend to show that these assets were derived from the criminal activity alleged in the indictment.

### a. VMG Depository Account Funds

The VMG Account did not contain any funds traceable to earnings from Backpage.com, let alone the allegedly illegal advertisements, and the government has failed to make any showing to the contrary. The VMG Account exclusively held loan proceeds from Medalist's seller-financed sale of its print newspaper business and related rent. Therefore, the VMG Account in its entirety was untainted and the government failed to establish probable cause to believe it is subject to forfeiture.

### b. Loan Payments Tied to Sale of Backpage's Foreign Operations

The government is similarly unable to trace loan payments tied to the sale of Backpage's foreign operations to the alleged illegal activity. *See supra*, Section I(B). Further, the Complaint does not allege forfeiture of these assets based on money laundering under section 981(a)(1)(A). *See* Complaint ¶ 239. Therefore, the loan payments related to the sale of Backpage's foreign operations do not have the "requisite nexus to the [alleged criminal activity]" to be forfeitable because they are not in any way attributable to such activity. *Bornfield*, 145 F.3d at 1135. And to the extent that any such loan payments were commingled with funds from Backpage's domestic operations, section 981 does not authorize seizure of untainted funds simply because they have been commingled with allegedly tainted funds. *Id.*

### c. Attorney Retainer Funds

Similarly, a large part of the attorney retainers came from the overseas operations or overseas loan payments, and the government has no right to those seize these funds. The government has never filed a sworn, verified complaint supporting its belief that it can seize most of these funds in the nearly three years and counting that the government has held these attorney funds. To date, the government has failed to file any legal instrument that would authorize the continued restraint of these retainer accounts, and thus cannot hold these funds pretrial. Under these circumstances, the Court must order the government to return these funds to the Defendants. *Cosme*, 796 F.3d at 233-34.

### d. Non-Adult Advertising Proceeds

The government seized non-adult advertising proceeds from Defendants, their families, their company (Medalist), and their lawyers. Even assuming *arguendo* that some of Backpage.com's revenue came from classified ads relating to unlawful activity, the entirety of the earnings from Backpage.com did not come from such activity. *See supra*, Section I(D).

First, the government has never proven that any, let alone all "adult advertisements" on Backpage.com were criminal. *See* Versoza Affidavit, ¶¶ 31-32 ("I believe that the ***majority*** of Backpage ads that appear in the traditionally 'adult' categories … are actually advertisements promoting sex trafficking or prostitution") (emphasis added). In fact, numerous courts have established that at least ***some*** of Backpage's adult content is legal in the United States. *See supra*, Section 2(B)(1). As such, the government has never contended, let alone shown, that ***all*** proceeds from adult advertisements on Backpage.com are criminal proceeds.

Second, the government admits that a material percentage of Backpage's revenues were generated from non-adult advertising (*e.g.*, classified ads for cars, rentals, jobs, etc.), which the government does not contend, and cannot contend, was unlawful. *See* Complaint ¶ 107. At most, accounts containing assets related to Backpage.com's advertisements may consist of some legitimate funds and some allegedly illegitimate funds. When an account has commingled funds, the value of the illicit proceeds deposited in that account is considered traceable to the crime, not the entire account. *United States v. Cosme*, No. 17-1759-CR(L), 2021 WL 2964322, at *3-4 (2d. Cir. July 15, 2021); *see also United States v. $448,342.85*, 969 F.2d 474, 476-77 (7th Cir. 1992) (holding that money seized from a bank account must be traceable to illegal activity to be subject to forfeiture, even if account previously contained proceeds of illegal activity); *United States v. Haleamau*, 887 F. Supp. 2d 1051, 1057 (D. Haw. 2012) (explaining that in cases where funds subject to forfeiture are commingled with other property and cannot be divided without difficulty, courts within the Ninth Circuit have only ordered the forfeiture "of any other property of the defendant, up to the value of the property subject to forfeiture"). Because the government cannot seize substitute assets pre-trial, only the value of allegedly illicit proceeds deposited into the account that are traceable to the crime can be held.

**2.     Property "Involved In" Money Laundering**

When the government seeks to forfeit property on the ground that it was allegedly "involved in" money laundering under 18 U.S.C. §981(a)(1)(A), it must establish there is a "substantial connection" between the property subject to forfeiture and the underlying offense.  18 U.S.C. § 983(c)(3).  "[P]roperty 'involved in' an offense 'include[s] the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense.'"  *Bornfield*, 145 F.3d at 1135 (quoting *United States v. Tencer,* 107 F.3d 1120, 1134 (5th Cir. 1997)).  These four categories of assets were not "involved in" money laundering.

The commingling of tainted and untainted funds is not itself a basis for forfeiture.  Where tainted and untainted funds are held in a financial account, without more, only the tainted funds are subject to forfeiture, and not the entire account.  *Bornfield*, 145 F.3d at 1135 ("[T]he mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture"); *$448,342.85,* 969 F.2d at 476 ("An 'account' is a name, a routing device like the address of a building; the money is the 'property'. Once we distinguish the money from its container, it also follows that the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water."); *Tencer*, 107 F.3d at 1134 (agreeing that merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture); *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) ("the pooling or commingling of tainted and untainted funds would not by itself render the entirety of an account subject to forfeiture").

To prove that property – in this case funds in bank accounts – is property "involved in" money laundering, the government must show that the property actually *facilitated* the alleged illegal activity, which requires "more than a mere showing that tainted and untainted funds were pooled together." *U.S. v. Approximately $620,349.85 U.S. Currency*, No. 13-CV-3966-RJD-SMG, 2015 WL 3604044, at *3 (E.D.N.Y. June 5, 2015).  The government's approach here is incompatible with 18 U.S.C. § 984, which allows for the substitution of fungible property.  *United States v. All Funds*, 832

F. Supp. 542, 561-62 (E.D.N.Y. 1992) (allowing the government to seize legitimate "facilitation money"-- the seizure of all monies in an account merely because one illicit transaction was negotiated through that account--would "***completely . . . erode***" Section 984's one-year limitation on seizing funds in a commingled account) (emphasis added); *United States v. $3,148,884.40 U.S. Currency*, 76 F. Supp. 2d 1063, 1067-68 (C.D. Cal. 1999) (adopting the *All Funds* court's conclusion that the "facilitation theory is incompatible" with Section 984).

Here, the government offers no evidence suggesting that the legitimate, untainted assets at issue in this motion were commingled with any allegedly tainted funds to conceal the tainted funds, or that the assets were commingled to facilitate any alleged illegal activity.

For example, the government seeks civil forfeiture of a wholly untainted VMG Account, containing only funds earned from print newspaper proceeds, on the specious theory that those funds were tainted by commingling with funds from Backpage and therefore constitute "property involved in money laundering." But there is no evidence that anything other than untainted proceeds – loan payments from the sale of newspaper businesses and rent for the sublease of an office building – were deposited into the account.

Similarly, the government offers no facts that the "commingling" of foreign loan payments with domestic funds, or the "commingling" of non-adult advertising revenue with adult advertising revenue, was done to facilitate illegal activity, including money laundering. The mere fact that Backpage used bank accounts to hold funds from various sources – as most businesses do – does not suggest that they did so to facilitate money laundering. As for the attorney retainer accounts, those accounts are currently being held by the government without any legal process whatsoever. But, in any case, a law firm's receipt of untainted funds to pay for legal services cannot possibly be construed as a money laundering transaction.

Therefore, the government has no reason believe that the assets will be subject to forfeiture and the assets must be released at this time. *See United States v. Abhishek Krishnan's Real & Pers. Prop.*, 469 F. Supp. 3d 481, 496 (E.D.N.C. 2020) (finding that because government did not allege legitimate funds were commingled with illegitimate funds to conceal illegitimate funds nor were funds pooled to facilitate money laundering scheme, the government overreached and claimants

were entitled to partial equitable relief).

## C.    The Court Can Order the Release of Four Limited Categories of Untainted Assets in the Interest of Justice.

The above-described four categories of untainted assets constitute a minor fraction of the total assets seized by the government in this matter and the minimum of what should be released at this time. Defendants' inability to use their own untainted funds has severely handicapped their ability to effectively defend the criminal case for the past three-and-a-half-plus years when Defendants were faced with just one trial. Now, faced with a second trial because of the government's misconduct, Defendants lack funds to pay the hard costs necessitated by a second trial, are unable to mount a constitutionally effective defense, and may lose their choice of counsel in violation of the Sixth Amendment. *See Luis*, 136 S. Ct. at 1088 ("[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment. The nature and importance of the constitutional right taken together with the nature of the assets lead us to this conclusion."). Such a deprivation is especially egregious given the prospect of another months-long trial due to a mistrial that resulted entirely from the government's misconduct. *See* Docs. 1355, 1355-8.

These assets are not "loot, contraband, or otherwise 'tainted'" and, therefore, Defendants are not required to make a showing under *Monsanto* that they have been deprived of counsel or the government has engaged in specific instances of abuse in order seek the release of the four categories of funds. *Luis*, 136 S. Ct. at 1090; *see also supra*, Section II(A). By granting Defendants' motion to release these assets, the Court will enable Defendants' counsel to move forward without requiring the Court to evaluate the entire universe of seizures in this case.

## D.    Defendants Are Entitled to Cost and Fee Reimbursement In Light of a Mistrial Caused by the Government.

A court order releasing funds would help ameliorate what the Supreme Court has described as the "grossly unfair" consequences of forcing a defendant to undergo a second trial. *Arizona v. Washington*, 434 U.S. 497, 503–04 (1978). This is a massively expensive case to defend.[21] By seizing

---

[21]    The indictment presents 100 counts. Each has unique evidence. The government has nearly 80 witnesses and thousands of exhibits. The case involves experts, fourteen years of business

virtually all of Defendants' assets – including over $10 million in attorney retainer funds from firms like Davis Wright Tremaine and Perkins Coie that could have been used to pay for the defense of this case – the government already hamstrung Defendants' efforts to defend themselves.  Defense counsel had to clear their calendars for September through December of this year just for the trial part of the case.[22]   Defendants and counsel incurred substantial costs and attorney's fees,[23] including securing a rental house to work out of for four months, transportation, transcripts, experts, jury consultant, and numerous other expenses.  Defendants should not be forced to incur these costs and fees twice due to the government's misconduct; seized funds should be released sufficient to permit continuity of counsel and for defendants to obtain effective assistance of counsel.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court (1) partially vacate the seizure warrants to the extent they restrain funds tied to the VMG Account and the attorney retainer funds and (2) order the government to release any seized funds traceable to the foreign loan payments or non-adult advertising proceeds.

---

activity and correspondence to review, including an extensive history of moderation practices, a large volume of litigation documents and pre-litigation dealings with state and federal prosecutors, and years of communications with counsel.

[22]    Additionally, counsel were required to turn away other work during this time period and get other judges and opposing counsel to put off other trials and hearings, and will now have to forgo additional business during the second trial.

[23]    Much of this attorney time is unpaid as retainers for the four retained counsel ran dry at various points in time, with no funds left to conduct what would have been the remainder of the September trial, much less a whole new ramp of pre-trial and trial work for the possible February 2022 trial.

MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND
RELEASE FUNDS TO DEFENDANTS

RESPECTFULLY SUBMITTED this 26th day of October 2021,

PROSKAUER ROSE LLP
*s/ Seetha Ramachandran*
Seetha Ramachandran
Asset Forfeiture Attorney for James Larkin

BIENERT KATZMAN LITTRELL
WILLIAMS LLP
*s/ Whitney Z. Bernstein*
Thomas H. Bienert, Jr.
Whitney Z. Bernstein
Attorneys for James Larkin

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Oct. 2020) §*
*II(C)(3), Whitney Z. Bernstein hereby attests that all other signatories listed, and on whose behalf this filing is*
*submitted, concur in the filing's content and have authorized its filing.*

LIPSITZ GREEN SCIME CAMBRIA LLP
*s/ Paul J. Cambria, Jr.*
Paul J. Cambria, Jr.
Erin McCampbell Paris
Attorneys for Michael Lacey

FEDER LAW OFFICE PA
*s/ Bruce Feder*
Bruce Feder
Attorney for Scott Spear

BIRD MARELLA BOXER WOLPERT
NESSIM DROOKS LINCENBERG AND
RHOW PC
*s/ Gary S. Lincenberg*
Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
Attorneys for John Brunst

MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND
RELEASE FUNDS TO DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*/s/ Toni Thomas*
Toni Thomas