# EXHIBIT A

EXECUTION VERSION

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

between

**Village Voice Media Holdings, LLC**

and

**Voice Media Group, Inc.**

dated as of

November 8, 2012

10152751v.6

DEFENSE 017699

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as of November 8, 2012, is entered into between Village Voice Media Holdings, LLC, a Delaware limited liability company ("**Seller**") and Voice Media Group, Inc., a Colorado Corporation ("**Buyer**").

## RECITALS

WHEREAS, Seller owns all of the issued and outstanding membership interests (the "**Interests**"), of New Times Media, LLC, a Delaware limited liability company (the "**Company**"); and

WHEREAS, the Company directly or indirectly owns certain subsidiaries set forth on Schedule 1-A (the "**Included Subsidiaries**") which are engaged in the ownership, publication and distribution of alternative newspapers in print or online electronic versions (the "**Newspaper Business**");

WHEREAS, the assets which are exclusively used in the Newspaper Business will on the Closing Date be owned by the Company and/or its Included Subsidiaries;

WHEREAS, Seller also owns and operates an online classified advertisement business through backpage.com and bigcity.com, including without limitation, the related software engines and payment gateway solutions and all related technology, intellectual property and domain names related thereto and also owns certain other inactive entities listed on Schedule 1-B (the "**Excluded Subsidiaries**") (collectively, the "**Excluded Business**");

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller; all of Seller's right, title and interest in and to the Interests of the Company on the terms and conditions set forth herein;

WHEREAS, certain assets of the Company and/or its subsidiaries are used in or are reasonably necessary for the operations of both the Newspaper Business and the Excluded Business (the "**Shared Assets**");

WHEREAS, Seller and Buyer shall determine how to separate each of the Shared Assets on or prior to the Closing;

WHEREAS, prior to the Closing, Seller will: (A) transfer to one or more of its Affiliates (other than the Company and the Included Subsidiaries) (i) all assets and liabilities of the Company and/or its Included Subsidiaries that relate to or are used in the Excluded Business or to any other business of the Seller other than the Newspaper Business, including, without limitation, the Excluded Subsidiaries, and (ii) all cash of the Company and Subsidiaries other than as expressly set forth herein, and (B) transfer to the Company and the Included Subsidiaries certain assets (other than cash) and liabilities currently held by Seller or the Excluded Subsidiaries which exclusively relate or are exclusively used in the Newspaper Business;

10152751v.6

DEFENSE 017700

WHEREAS, prior to the Closing, Seller shall retain the right to (i) sell SF Weekly, L.P. and Seattle Weekly, LLC or (ii) discontinue such operations, at its sole option, and in the event that Seller exercises either option, the Purchase Price shall be adjusted as set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Acceleration Payment**" has the meaning set forth in **Section 2.02(e)**.

"**Advances**" has the meaning set forth in **Section 9.01**.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Ancillary Loan Documents**" has the meaning set forth in **Section 2.02**.

"**Audited Financial Statements**" means the financial statements which have been audited by a nationally recognized accounting firm.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Arizona are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Restricted Business**" has the meaning set forth in **Section 5.10**.

"**Closing**" has the meaning set forth in **Section 2.05**.

"**Closing Date**" has the meaning set forth in **Section 2.05**.

"**Closing Cash Balance**" has the meaning set forth in **Section 2.03**.

"**Closing Working Capital**" has the meaning set forth in **Section 2.03(d)**.

"**Closing Working Capital Statement**" has the meaning set forth in **Section 2.03(d)**.

-3-

DEFENSE 017701

"**Code**" means the Internal Revenue Code of 1986, as amended, and the corresponding provisions of any successor federal income tax code.

"**Company**" has the meaning set forth in the recitals.

"**Company Intellectual Property**" has the meaning set forth in **Section 3.07(b)**.

"**Credit Agreement**" has the meaning set forth in **Section 2.02(a)**.

"**Disputed Amounts**" has the meaning set forth in **Section 2.03(g)(iii)**.

"**Deductible**" has the meaning set forth in **Section 7.04(a)**.

"**Denver Lease**" means that Lease dated March 26, 1999 between 999 Broadway, L.L.C. as landlord and New Times, Inc. as tenant for certain space located at 959 Broadway and 969 Broadway, Denver, Colorado as amended and supplemented, amended and restated or otherwise modified, which lease was assumed by Denver Westword, LLC.

"**Direct Claim**" has the meaning set forth in **Section 7.05(c)**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Disclosing Party**" has the meaning set forth in **Section 2.02 c (ii)**.

"**Dollars or $**" means the lawful currency of the United States.

"**EBITDA**" shall have the meaning set forth in the Credit Agreement.

"**Earn out Calculation**" has the meaning set forth in **Section 2.02(c)(i)**.

"**Earn out Calculation Objection Notice**" has the meaning set forth in **Section 2.02(c)(ii)**.

"**Earn out Calculation Delivery Date**" has the meaning set forth in **Section 2.02 (c)(i)**.

"**Earn out Calculation Statement**" has the meaning set forth in **Section 2.02(c)(i)**.

"**Earn out Payment**" has the meaning set forth in **Section 2.02(b)**.

"**Employees**" means those Persons employed by the Company or the Subsidiaries immediately prior to the Closing.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"**Estimated Closing Working Capital Statement**" has meaning set forth in **Section 2.03(c)**.

"**Excluded Business**" has the meaning set forth in the recitals.

DEFENSE 017702

"**Excluded Information**" has the meaning set forth in **Section 3.14**.

"**Excluded Subsidiaries**" has the meaning set forth in the recitals.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Guarantees**" means Seller's guaranty of the following real property leases: (i) Denver Lease; (ii) Houston Lease; (iii) LA Office Lease; and (iv) OC Lease.

"**Houston Lease**" means that Office Lease Agreement dated September 19th, 1997 between Dasu Limited Liability Company, as landlord and Houston, Press LP as tenant for certain space on the first floor of the building located at 1621 Milam, Houston, Texas, as amended and supplemented, amended and restated or otherwise modified.

"**Included Subsidiaries**" has the meaning set forth in the recitals.

"**Indemnified Party**" has the meaning set forth in **Section 7.04**.

"**Indemnifying Party**" has the meaning set forth in **Section 7.04**.

"**Independent Accountant**" has the meaning set forth in **Section 2.02(c)(ii)**.

"**Insurance Policies**" has the meaning set forth in **Section 3.12**.

"**Intellectual Property**" has the meaning set forth in **Section 3.07(a)**.

"**Interests**" has the meaning set forth in the recitals.

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of John E. Brunst, Scott Spear, James Larkin and Michael G. Lacey and expressly excludes the knowledge of Scott Tobias, Jeff Mars, or any other shareholder of Buyer.

"**LA Office Lease**" means that Office Lease dated July 31, 2007 between Sepulveda Group, Inc. as landlord and LA Weekly, LP as tenant for the building located at 3861 Sepulveda Boulevard, Culver City, California, as amended and supplemented, amended and restated or otherwise modified.

DEFENSE 017703

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Losses**" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees and shall specifically exclude all punitive, incidental, consequential, special or indirect damages, including loss of profits, anticipated earnings, future revenue or income, loss of business or business reputation or opportunity or diminution of value or any other form of damages calculated or based upon a multiple of revenues or earnings.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition,  or assets of the Company, or (b) the ability of Seller to consummate the transactions contemplated hereby; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) any changes, conditions or effects in the United States economy or securities or financial markets in general; (ii) changes, conditions or effects that affect the industries in which the Company operates; (iii) any change, effect or circumstance resulting from an action required or permitted by this Agreement; (iv) any matter of which Buyer is aware on the date hereof ; (v) the effect of any changes in applicable Laws or accounting rules or the interpretation thereof, including GAAP; (vi) any change, effect or circumstance resulting from the announcement of this Agreement; (vii) conditions caused by acts of terrorism or war (whether or not declared) or any natural or man-made disaster or acts of God; or (viii) changes, conditions or effects resulting from the ownership or operation by the Seller and the Company of Backpage.com

"**Newspaper Business**" has the meaning set forth in the recitals.

"**Nondisparagement Period**" has the meaning set forth in **Section 5.11**.

"**OC Lease**"  means that Office Lease dated September 25, 2009 between Legacy Partners I, Costa Mesa LLC as landlord and OC Weekly, LP as tenant for certain space on the first floor of the Building located at 2975 Red Hill Avenue, Costa Mesa, California, as amended and supplemented, amended and restated or otherwise modified.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, and consents required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" has the meaning set forth in **Section 3.06(a)**.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pledge and Security Agreements**" has the meaning set forth in **Section 2.02(a)**.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

DEFENSE 017704

"**Promissory Notes**" mean the Term A Promissory Note, the Term B Promissory Note, the Term C Promissory Note and the Revolving Note.

"**Purchase Price**" has the meaning set forth in **Section 2.02**.

"**Real Property**" means the real property owned, leased or subleased by the Company or any of the Subsidiaries, together with all buildings, structures and facilities located thereon.

"**Receiving Party**" has the meaning set forth in **Section 5.08(c)**.

"**Receiving Period**" has the meaning set forth in **Section 2.02(c)(ii)**.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Period**" has the meaning set forth in **Section 5.09(a)**.

"**Resolution Period**" has the meaning set forth in **Section 2.03(g)(ii)**.

"**Revolving Note**" has the meaning set forth in **Section 2.04 (a)(v)**.

"**Sale of the Newspaper Business**" shall mean: (i) any sale, lease or exchange, in one or more a series of related transactions, of all or substantially all of the assets of the Newspaper Business acquired hereunder, (ii) sale of more than 50% of the equity interests or voting control of Buyer or (iii) any consolidation or merger of the Buyer in which the Buyer is not the continuing or surviving corporation or pursuant to which shares of stock of the Buyer would be converted into cash, securities or other property, other than a consolidation or merger of the Buyer in which holders of its common stock immediately prior to the consolidation or merger have substantially the same proportionate ownership of common stock of the surviving corporation immediately after the consolidation or merger as immediately before, or (iv) any other transaction that results in a change of control of substantially all of the operations acquired hereunder.  For the purpose of determining whether a Sale of the Newspaper Business has occurred, the sale of any of the partnership interests, membership interests, or the assets of SF Weekly, L.P. or Seattle Weekly, LLC does not act to reduce the total assets of the Buyer.

"**Schedule Supplement**" has the meaning set forth in **Section 5.03**.

"**Security Deposits**" has the meaning set forth in **Section 3.06(d)**.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Restricted Business**" means the ownership, publication and distribution of alternative newspapers in print or  in online electronic versions associated with the print publication business in any geographic region currently covered by the Newspaper Business and activities reasonably related thereto provided however that Seller Restricted Business shall not include and Seller and its Affiliates shall be permitted to continue to engage in the ownership and operation of the classified advertisement business of backpage.com and bigcity.com.

"**Shared Assets**" has the meaning set forth in recitals.

-7-

10152751v.6

DEFENSE 017705

"**Statement of Objections**" has the meaning set forth in **Section 2.03(g)(ii)**.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Term A Promissory Note**" has the meaning set forth in **Section 2.02(a)**.

"**Term B Promissory Note**" has the meaning set forth in **Section 2.03(d)(i)**.

"**Term C Promissory Note**" has the meaning set forth in **Section 2.02(d)**.

"**Third-Party Claim**" has the meaning set forth in **Section 7.05(a)**.

"**Transaction Documents**" means this Agreement, the Transition Services Agreement, the Credit Agreement, the Promissory Notes, the Ancillary Loan Documents and any other documents related to the transaction contemplated hereby.

"**Transition Services Agreement**" means an agreement in such form as is mutually agreed to by the parties, pursuant to which the parties will provide certain transition services to each other, if required.

"**Undisputed Amounts**" has the meaning set forth in **Section 2.03(g)(iii)**.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"**Working Capital**" has the meaning set forth in **Section 2.03(c)**.

## ARTICLE II
### PURCHASE AND SALE

**Section 2.01   Purchase and Sale**.  Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Interests for the consideration specified in **Section 2.02**.

**Section 2.02   Purchase Price**.  The aggregate purchase price for the Interests (the "**Purchase Price**") shall be as follows:

-8-

DEFENSE 017706

(a) **Initial Purchase Price**.  Twenty Seven Million Dollars ($27,000,000) will be paid via delivery of a promissory note, in the form set forth as Exhibit A-2 to the Credit Agreement (the "**Term A Promissory Note**") pursuant to the credit agreement in the form set forth as Exhibit A  hereto (the "**Credit Agreement**") and which obligations will be secured pursuant to the terms of  certain Pledge and Security Agreements set forth as Exhibit F-1, Exhibit F-2, and Exhibit F-3 of the Credit Agreement (the "**Pledge and Security Agreements**") and certain ancillary loan documents set forth as exhibits to the Credit Agreement (the "**Ancillary Loan Documents**").  The Purchase Price shall be subject to adjustment pursuant to **Section 2.03, 7.06** and **Section 9.01**.

(b) **Earn-out**.  As additional consideration for the Interests, Buyer shall pay to Seller an amount (the "**Earn-out Payment**"), equal to (A) the EBITDA for the fiscal year ended December 31, 2016 and; multiplied by (B) 2.75; provided however that in the event of a Sale of the Newspaper Business by Buyer on or before December 31, 2016 or at the election of Buyer pursuant to Section 2.02(e) below, the Earn-out Payment shall be accelerated and fixed at an amount equal to Ten Million ($10,000,000.00) Dollars plus interest at a rate of twelve (12%) percent per annum compounded annually from the Closing Date to the date of the Sale of the Newspaper Business and shall thereupon be immediately due and payable.

(c) **Procedures Applicable to Determination of the Earn-out Payments.**

(i) On or before March 1, 2017 (the "**Earn-out Calculation Delivery Date**"), Buyer shall prepare and deliver to Seller a written statement (the "**Earn-out Calculation Statement**") setting forth in reasonable detail its determination of EBITDA for the year ended December 31, 2016 and its calculation of the resulting Earn-out Payment (in each case, an "**Earn-out Calculation**").

(ii) Seller shall have 30 days after receipt of the Earn-out Calculation Statement (the "**Earn-out Review Period**") to review the Earn-out Calculation Statement and the Earn-out Calculation set forth therein. During the Earn-out Review Period, Seller and its accountant shall have the right to inspect Buyer's books and records during normal business hours at Buyer's offices, upon reasonable prior notice and solely for purposes reasonably related to the determinations of EBITDA and the resulting Earn-out Payment. Prior to the expiration of the Review Period, Seller may object to the Earn-out Calculation set forth in the Earn-out Calculation Statement by delivering a written notice of objection (an "**Earn-out Calculation Objection Notice**") to Buyer. Any Earn-out Calculation Objection Notice shall specify the items in the applicable Earn-out Calculation disputed by Seller and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. If Seller fails to deliver an Earn-out Calculation Objection Notice to Buyer prior to the expiration of the Earn-out Review Period, then the Earn-out Calculation set forth in the Earn-out Calculation Statement shall be final and binding on the parties hereto. If Seller timely delivers an Earn-out Calculation Objection Notice, Buyer and Seller shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of the EBITDA and the Earn-out Payment. If Buyer and Seller are unable to reach agreement within 30 days after such an Earn-out Calculation Objection Notice has been given, all unresolved disputed items shall be promptly referred to an impartial nationally recognized firm of independent certified public accountants, other than Seller's Accountants or

10152751v.6

DEFENSE 017707

Buyer's Accountants, appointed by mutual agreement of Buyer and Seller (the "**Independent Accountants**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items with respect to the Earn-out Calculation as promptly as practicable, but in no event greater than 60 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Earn-out Calculation Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Buyer and Seller shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by Buyer and Seller, and not by independent review. The resolution of the dispute and the calculation of EBITDA that is the subject of the applicable Earn-out Calculation Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by Seller and Buyer in proportion to the amounts by which their respective calculations of EBITDA differ from EBITDA as finally determined by the Independent Accountant.

(d)      **Timing of Payment of Earn-out.** Any Earn-out Payment that Buyer is required to pay pursuant to **Section 2.02(b)** hereof shall be paid in full no later than 30 Business Days following the date upon which the determination of EBITDA for the fiscal year ended December 31, 2016 becomes final and binding upon the parties as provided in **Section 2.02(c)(ii)** (including any final resolution of any dispute raised by Seller in an Earn-out Calculation Objection Notice). Buyer shall pay to Seller the applicable Earn-out Payment (i) in cash by wire transfer of immediately available funds to the bank account of Seller or (ii) through delivery of a promissory note in the amount of the Earn-out Payment bearing interest at a rate of twelve (12%) percent and with a maturity date four years after such date (the "**Term C Promissory Note**"), which Term C Promissory Note shall be subject to the Credit Agreement.

(e)      **Acceleration upon Buyer's Election.** At any time after the Closing Date, Buyer may, in its sole discretion, elect to make a payment (the "**Acceleration Payment**") to Seller in accordance with **Section 2.02(b)** hereof, which, upon payment thereof, shall fully release and discharge Buyer, its successors and assigns from any further liability or obligation with respect to the Earn-Out pursuant to this **Section 2.02**.

(f)      **Post-closing Operation of the Newspaper Business.** Subject to the terms of this Agreement, the Credit Agreement, the Ancillary Loan Documents and the other Transaction Documents, subsequent to the Closing, Buyer shall have sole discretion with regard to all matters relating to the operation of the Newspaper Business; provided, that Buyer shall not, directly or indirectly, take any actions in bad faith that would have the purpose of avoiding or reducing any of the Earn-Out hereunder.  Notwithstanding the foregoing, Buyer has no obligation to operate the Company or any of the Included Subsidiaries in order to achieve any Earn-Out or to maximize the amount of any Earn-Out.

(g)      **Allocation of Purchase Price**.  Within sixty (60) days after the Closing Date, Sellers shall deliver a schedule allocating the Purchase Price (the "**Allocation Schedule**" ). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code. The

-10-

DEFENSE 017708

Allocation Schedule shall be deemed final unless Buyer notifies Sellers in writing that Buyer objects to one or more items reflected in the Allocation Schedule within thirty (30) days after delivery of the Allocation Schedule to Buyer. In the event of any such objection, Sellers and Buyer shall negotiate in good faith to resolve such dispute; provided, however, that if Sellers and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within thirty (30) days after the delivery of the Allocation Schedule to Buyer, such dispute shall be resolved by Independent Accountants (who may but need not be the same Independent Accountants appointed pursuant to **Section 2.02(c)(ii)**. The fees and expenses of such Independent Accountants shall be borne equally by Sellers and Buyer. Sellers and Buyer agree to file all their respective federal, state and local tax returns in accordance with the Allocation Schedule.

### Section 2.03   Purchase Price Adjustments.

(a)      **Adjustment related to SF Weekly and Seattle Weekly**.  Prior to the Closing, Seller shall retain the option to (i) sell SF Weekly, L.P., or Seattle Weekly, LLC (or the assets thereof) to third parties, or (ii) discontinue operation of SF Weekly, L.P. and Seattle Weekly, LLC and dissolve such entities. In the event that both SF Weekly, L.P. and Seattle Weekly, LLC are not among the Included Subsidiaries at Closing, the Purchase Price set forth in **Section 2.02(a)** shall be increased by the sum of One Million ($1,000,000) Dollars.

(b)      **Estimated Closing Working Capital**.  At least five Business Days before the Closing, Seller shall prepare and deliver to Buyer a statement setting forth its good faith estimate of the working capital of the Company (excluding cash and cash equivalents) based upon the balance sheet of the Company prepared in a manner consistent with the financials of the Company (the "**Working Capital**"), which statement shall contain an estimated balance sheet of the Company as of the Closing Date (without giving effect to the transactions contemplated herein), a calculation of Estimated Closing Working Capital (the "**Estimated Closing Working Capital Statement**"), and a certificate of the Chief Financial Officer of Seller that the Estimated Closing Working Capital Statement was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end as if such Estimated Closing Working Capital Statement was being prepared and audited as of a fiscal year end.

(c)      **Closing Working Capital Statement**.  Within 30 days after the Closing Date, Buyer shall prepare and deliver to Seller (A) a statement setting forth its calculation of closing working capital, excluding cash and cash equivalents (the "Closing Working Capital"), which statement shall be based upon the financial statements of the Company as of the Closing (the "**Closing Working Capital Statement**"), and (B) a certificate of the Chief Financial Officer of Buyer that the Closing Working Capital Statement was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end, subject to the modifications and limitations.

10152751v.6

DEFENSE 017709

If the Closing Working Capital is a positive number, Buyer shall pay such amount to Seller by providing a promissory note to Seller pursuant to the Credit Agreement with a principal balance equal to the Closing Working Capital which will bear interest at a rate of seven and one half (7.5%) percent per annum and have a maturity date of December 31, 2020 (the "**Term B Promissory Note**"). If the Closing Working Capital is a negative number, Seller shall pay such amount to Buyer by decreasing the principal balance of the Term A Promissory Note by an amount equal to the negative Closing Working Capital (collectively, together with the adjustment in Section 2.03(c), the "**Post-Closing Adjustment**").

(d)     **Security Deposit Adjustment**.  The Company and the Included Subsidiaries are parties to certain leases pursuant to which the Seller or one of its Affiliates has provided Security Deposits.  The amount of the Security Deposit for each of the leases is set forth on **Schedule 3.06(d)**.  To the extent that any of the leases relate to property that is to be occupied by the Company or the Included Subsidiaries after the Closing and the Security Deposits are required to be maintained by Seller with respect thereto, the principal balance of the  Term B Promissory Note shall be increased by an amount equal to the sum of all such Security Deposits and such Security Deposits, to the extent released by the applicable lessors, will be used to pay down the Promissory Note upon receipt.

(e)     **Estimated Cash Balance at Closing.**  At least five Business Days before the Closing, Seller shall prepare and deliver to Buyer a statement setting forth its good faith estimate of the cash and cash equivalents of the Company based upon the balance sheet of the Company prepared in a manner consistent with the financials of the Company (the "**Cash Balance**"), which statement shall contain an estimated balance sheet of the Company as of the Closing Date (without giving effect to the transactions contemplated herein), a calculation of Estimated Closing Cash Balance (the "**Estimated Closing Cash Balance**"), and a certificate of the Chief Financial Officer of Seller that the Estimated Closing Cash Balance was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end.  On or prior to the Closing, Seller shall withdraw a portion of the Cash Balance such that Two Million Five Hundred Thousand ($2,500,000) Dollars remains in the accounts of the Company.

(f)     **Closing Cash Balance**.  Within 15 days after the calendar month end after the Closing, Buyer shall prepare and deliver to Seller (A) a statement setting forth its calculation of cash and cash equivalents of the Company (the "**Closing Cash Balance**"), which statement shall be based upon the financial statements of the Company as of the Closing (the "**Closing Closing Cash Balance**"), and (B) a certificate of the Chief Financial Officer of Buyer that the Closing Cash Balance was prepared in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Audited Financial Statements for the most recent fiscal year end, subject to the modifications and limitations.

-12-

DEFENSE 017710

(i)      If the Closing Cash Balance is in excess of Two Million Five Hundred Thousand ($2,500,000) Dollars, Buyer shall pay such amount to Seller in cash by wire transfer within 30 days after the final determination of such number. If the Closing Cash Balance is less than Two Million Five Hundred Thousand ($2,500,000) Dollars, Seller shall pay such shortfall amount to Buyer in cash or by wire transfer within 30 days after final determination of such number (the "**Post-Closing Cash Adjustment**").

(g)      **Examination and Review**.

(i)      Examination. After receipt of the Closing Working Capital Statement and/or the Closing Cash Balance, respectively, Seller shall have 30 days (each a "**Review Period**") to review the Closing Working Capital Statement and/or the Closing Cash Balance. During the Review Period, Seller and Seller's Accountants shall have full access to the relevant books and records of Buyer, the personnel of, and work papers prepared by, Buyer and/or Buyer's Accountants to the extent that they relate to the (A) Closing Working Capital Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Working Capital Statement as Seller may reasonably request for the purpose of reviewing the Closing Working Capital Statement and to prepare a Statement of Objections (defined below) and (B) Closing Cash Balance and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Cash Balance as Seller may reasonably request for the purpose of reviewing the Closing Cash Balance and to prepare a Statement of Objections (defined below), *provided, that* such access shall be in a manner that does not interfere with the normal business operations of Buyer.

(ii)      Objection. On or prior to the last day of such Review Period, Seller may object to the Closing Working Capital Statement and/or the Closing Cash Balance by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item or amount and the basis for Seller's disagreement therewith (the "**Statement of Objections**"). If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital Statement and/or the Closing Cash Balance and the related Post-Closing Adjustments and Post-Closing Cash Adjustments, as the case may be, reflected in the Closing Working Capital Statement and/or the Closing Cash Balance shall be deemed to have been accepted by Seller. If Seller delivers the Statement of Objections before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within 30 days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and/or the Post-Closing Cash Adjustment and the Closing Working Capital Statement and/or the Closing Cash Balance with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

(iii)      Resolution of Disputes. If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in a Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**" and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to the Independent Accountants (which may be different from any Independent Accountant appointed under **Section 2.03(g)(iii)**) who, acting as experts and not arbitrators, shall resolve the Disputed

-13-

DEFENSE 017711

Amounts only and make any adjustments to the Post-Closing Adjustment or the Post-Closing Cash Adjustment, as the case may be, and the Closing Working Capital Statement and/or the Closing Cash Balance. The parties hereto agree that all adjustments shall be made without regard to materiality. The Independent Accountants shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Working Capital Statement, the Closing Cash Balance, and the Statement of Objections, respectively.

      (iv)    <u>Fees of the Independent Accountants.</u> Seller shall pay a portion of the fees and expenses of the Independent Accountants equal to 100% multiplied by a fraction, the numerator of which is the amount of Disputed Amounts submitted to the Independent Accountants that are resolved in favor of Buyer (that being the difference between the Independent Accountants' determination and Seller's determination) and the denominator of which is the total amount of Disputed Amounts submitted to the Independent Accountants (that being the sum total by which Buyer's determination and Seller's determination differ from the determination of the Independent Accountants). Buyer shall pay that portion of the fees and expenses of the Independent Accountants that Seller is not required to pay hereunder.

      (v)    <u>Determination by Independent Accountants.</u> The Independent Accountants shall make a determination as soon as practicable within 30 days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Working Capital Statement, the Closing Cash Balance, the Post-Closing Cash Adjustment and/or the Post-Closing Adjustment shall be conclusive and binding upon the parties hereto.

    (h)    **Adjustments for Tax Purposes.** Any payments made pursuant to **Section 2.03** shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

    **Section 2.04    Transactions to be Effected at the Closing.**

    (a)    At the Closing, Buyer shall deliver to Seller:

      (i)    the executed Term A Promissory Note;

      (ii)    the executed Pledge and Security Agreements;

      (iii)    the executed Transition Services Agreement, if required by either party;

      (iv)    the executed Credit Agreement;

      (v)    the executed revolving note with respect to the line of credit contemplated by Section 6.02(i) hereof (the "**Revolving Note**")

      (vi)    the executed Ancillary Loan Documents;

      (vii)    the Term B Promissory Note, if required at Closing; and

10152751v.6

DEFENSE 017712

(viii)   all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to **Section 6.03** of this Agreement.

(b)   At the Closing, Seller shall deliver to Buyer:

(i)   Membership interest certificates evidencing the Interests, free and clear of all Encumbrances, duly endorsed in blank or accompanied by powers or other instruments of transfer duly executed in blank, with all required transfer tax stamps affixed thereto;

(ii)   the executed Pledge and Security Agreements;

(iii)   the executed Transition Services Agreement, if required by either party;

(iv)   the executed Credit Agreement;

(v)   the executed Ancillary Loan Documents;

(vi)   the minute books and membership interest certificates and ownership records for each of the Company and the Included Subsidiaries; and

(vii)   all other agreements, documents, instruments or certificates required to be delivered by Seller at or prior to the Closing pursuant to **Section 6.02** of this Agreement.

**Section 2.05   Closing**.  Subject to the terms and conditions of this Agreement, the purchase and sale of the Interests contemplated hereby shall take place at a closing (the "**Closing**") to be held no later than Five Business Days after the last of the conditions to Closing set forth in **Article VI** have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), at the offices of White and Williams LLP, One Penn Plaza, Suite 4110, New York, New York 10119, or at such other time or on such other date or at such other place as Seller and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "**Closing Date**").

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this **Article III** are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller**.  Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware. Seller has all necessary limited liability company power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all limited liability company action on the

-15-

DEFENSE 017713

part of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 3.02   Organization, Authority and Qualification of the Company and the Included Subsidiaries.** The Company and each of the Included Subsidiaries is duly organized, validly existing and in good standing under the laws of their respective jurisdictions of organization and has all necessary entity power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. The Company and each of the Included Subsidiaries is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect. All corporate actions taken by the Company and each of the Included Subsidiaries in connection with this Agreement will be duly authorized on or prior to the Closing.

**Section 3.03   Capitalization.**

(a)   The authorized membership interests of the Company consists of 100% of the membership interests of the Company (**Membership Interests**") all of which are issued and outstanding and constitute the Interests. All of the Interests have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances, other than those Encumbrances set forth in **Section 3.03(a)** of the Disclosure Schedules.

(b)   There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the equity interests of the Company or obligating Seller or the Company to issue or sell any membership interests of, or any other interest in, the Company. The Company does not have any outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights. There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Interests other than the Amended and Restated Limited Liability Company Agreement of Village Voice Media Holdings, LLC or the Limited Liability Company Agreement of the Company.

**Section 3.04   Included Subsidiaries.**

(a)   At the Closing the Company will own 100% of the equity interests of the Included Subsidiaries. At the Closing, the Company will not own or control, directly or indirectly, any equity interest in any corporation, association, or business entity other than the Included Subsidiaries. All of the equity interests in the Included Subsidiaries have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially directly or indirectly (through one or more of the Included Subsidiaries) by the

DEFENSE 017714

Company, free and clear of all Encumbrances, other than those Encumbrances set forth in **Section 3.04(a)** of the Disclosure Schedules.

(b)     There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the membership interests, partnership interests, or capital stock of the Included Subsidiaries or obligating Seller, the Company, or the Included Subsidiaries to issue or sell any membership interests in, partnership interests in, capital stock of, or any other interest in, the Included Subsidiaries. The Included Subsidiaries do not have any outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights. There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Interests other than the Limited Liability Company Agreement or Partnership Agreement, as applicable, of each of the Included Subsidiaries.

**Section 3.05   No Conflicts; Consents**.  The execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of formation or limited liability company agreement or limited partnership agreement of Seller, the Company or any of the Included Subsidiaries; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Company or any of the Included Subsidiaries; or (c) except as set forth in **Section 3.05** of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any material Contract, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller, the Company or any of the Included Subsidiaries in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

**Section 3.06   Title to Assets; Real Property**.

(a)     The Company and each of the Included Subsidiaries have, or as of the Closing will have, a valid leasehold or ownership interest in, all Real Property and tangible personal property and other assets used in or necessary for the operation of the Included Business other than the Shared Assets and other than as set forth on Section 3.06(a) of the Disclosure Schedule.  All such properties and assets (including leasehold interests) are free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

(i)     those items set forth in **Section 3.06(a)** of the Disclosure Schedules;

(ii)     liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures;

-17-

DEFENSE 017715

(iii)    mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business;

(iv)    easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property;

(v)    liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; or

(vi)    other imperfections of title or Encumbrances, if any, that have not had, and would not have, a Material Adverse Effect.

(b)    To the Seller's Knowledge, **Section 3.06(b)** of the Disclosure Schedule lists all of the material assets, contracts, leases, licenses, benefit plan and other agreements that constitute Shared Assets. **Section 3.06(b)** of the Disclosure Schedule also lists the status of each of the Shared Assets after the Closing.

(c)    **Section 3.06(c)** of the Disclosure Schedules lists all real property leases of the Included Subsidiaries;

(d)    **Section 3.06(d)** sets out a list of all security deposits or other similar amounts held by third parties on behalf of the Company or the Included Subsidiaries (the "**Security Deposits**").

(e)    As of the Closing, the Company and the Included Subsidiaries will own or have the right to use all assets reasonably necessary to conduct the Newspaper Business.

**Section 3.07    Intellectual Property**.

(a)    "**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) internet domain name registrations; and (vi) other intellectual property and related proprietary rights, interests and protections.

(b)    **Section 3.07(b)** of the Disclosure Schedules lists (i) all patents, patent applications, trademark registrations and pending applications for registration, copyright registrations and pending applications for registration, and internet domain name registrations owned by the Company and the Included Subsidiaries and (ii) each license agreement pursuant to which the Company licenses any rights with respect to any of the foregoing, and( iii) lists the status of such intellectual property rights after the Closing. Except as set forth in **Section 3.07(b)** of the Disclosure Schedules, or as would not have a Material Adverse Effect, the Company or the Included Subsidiaries owns or has the right to use all Intellectual Property reasonably necessary to conduct the Newspaper Business (the "**Company Intellectual Property**").

-18-

DEFENSE 017716

(c)        Except as set forth in **Section 3.07(c)** of the Disclosure Schedules, or as would not have a Material Adverse Effect, to Seller's Knowledge: (i) the Company Intellectual Property as currently licensed or used by the Company and/or the Included Subsidiaries, and the Company's conduct of the Included Business as currently conducted, do not infringe, violate or misappropriate the Intellectual Property of any Person; and (ii) no Person is infringing, violating or misappropriating any Company Intellectual Property.

**Section 3.08    Legal Proceedings; Governmental Orders.**

(a)        Except as set forth in **Section 3.08(a)** of the Disclosure Schedules, to the Seller's Knowledge, there are no actions, suits, claims, investigations or other legal proceedings pending or, threatened in writing against or by the Company or the Included Subsidiaries affecting any of their respective properties or assets (or by or against Seller or any Affiliate thereof and relating to the Company or the Included Subsidiaries), which if determined adversely to the Company or the Included Subsidiaries (or to Seller or any Affiliate thereof) would result in a Material Adverse Effect.

(b)        Except as set forth in **Section 3.08(b)** of the Disclosure Schedules, to the Seller's Knowledge there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Company, the Included Subsidiaries or any of their respective properties or assets which would have a Material Adverse Effect.

**Section 3.09    Compliance With Laws; Permits.**

(a)        The Company and the Included Subsidiaries are in compliance with all Laws applicable to each such entity or its business, properties or assets, except where the failure to be in compliance would not have a Material Adverse Effect.

(b)        All Permits required for the Company and the Included Subsidiaries to conduct the Newspaper Business have been obtained and are valid and in full force and effect, except where the failure to obtain such Permits would not have a Material Adverse Effect.

**Section 3.10    Taxes.**

(a)        Except as set forth in **Section 3.10** of the Disclosure Schedules, to the Seller's Knowledge:

(i)        The Company and the Included Subsidiaries have filed (taking into account any valid extensions) all material Tax Returns required to be filed by the Company and the Included Subsidiaries. Such Tax Returns are true, complete and correct in all material respects. Neither the Company nor any Included Subsidiary is currently the beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business. All material Taxes due and owing by the Company or any of the Included Subsidiaries have been paid or accrued.

(ii)        No extensions or waivers of statutes of limitations have been given or requested with respect to any material Taxes of the Company or any of the Included Subsidiaries.

10152751v.6

DEFENSE 017717

(iii)     There are no ongoing actions, suits, claims, investigations or other legal proceedings by any taxing authority against the Company or any of the Included Subsidiaries.

(iv)     Neither the Company nor any of the Included Subsidiaries is a party to any Tax-sharing agreement.

(b)     All material Taxes which the Company or any of the Included Subsidiaries are obligated to withhold from amounts owing to any employee, creditor or third party have been so withheld and remitted and paid, or accrued for amounts not yet due and payable (and adequate reserves therefor are set forth in the financial statements).

**Section 3.11   Liabilities**.  At Closing there will be no liabilities or obligations of the Company or any of the Included Subsidiaries on the books and records of such entities which do not relate to or were not incurred in connection with the Newspaper Business.  As of the Closing, the Company and the Included Subsidiaries will not be liable for any amounts owed with respect to borrowed money from any third party financial institution relating to the period prior to the Closing.

**Section 3.12   Insurance**.   Section 3.12 of the Disclosure Schedules sets forth a list, as of the date hereof, of all material insurance policies maintained by the Company or any of the Included Subsidiaries or with respect to which the Company or any Included Subsidiary is a named insured or otherwise the beneficiary of coverage (collectively, the "**Insurance Policies**"). Such Insurance Policies are in full force and effect on the date of this Agreement and all premiums due on such Insurance Policies have been paid, except as would not have a Material Adverse Effect.

**Section 3.13   Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.14   No Other Representations and Warranties**.  Except for the representations and warranties contained in this **Article III** (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Company and the Included Subsidiaries furnished or made available to Buyer and its Representatives or as to the future revenue, profitability or success of the Company" or the Included Subsidiaries, or any representation or warranty arising from statute or otherwise in law. The equity owners of Buyer at Closing are current members of management of the Newspaper Business and may be in possession of or have access to material, non-public information not known to Seller (the "**Excluded Information**") and Seller shall not be deemed to have Knowledge of such Excluded Information nor to have any obligation to obtain or discover such Excluded Information.

10152751v.6

DEFENSE 017718

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this **Article IV** are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the state of Colorado. Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02   No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of the Articles of Incorporation or Bylaws of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

**Section 4.03   Investment Purpose.** Buyer is acquiring the Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Interests are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Buyer is able to bear the economic risk of holding the Interests for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

10152751v.6

DEFENSE 017719

Section 4.04   **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

Section 4.05   **Legal Proceedings**.  There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

Section 4.06   **Independent Investigation**.  The equity owners of Buyer at Closing are current members of management of the Newspaper Business, are actively involved in the day to day operations of the Newspaper Business and have substantial knowledge of such business and operations including, its assets, liabilities, condition, results of operations, business, and prospects and may be in possession of or have access to the books and records of the Company and the Included Subsidiaries. Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer consulted and engaged its own expert advisors and has relied solely upon its own experience and knowledge of the Newspaper Business and its own  investigation and is not relying on Seller with respect thereto except to the extent of  express representations and warranties of Seller set forth in **Article III** of this Agreement (including the related portions of the Disclosure Schedules); and (b) neither  Seller nor any other Person has made any representation or warranty as to Seller, the Company, the Included Subsidiaries, or this Agreement, except as expressly set forth in **Article III** of this Agreement (including the related portions of the Disclosure Schedules).  Buyer agrees that to the extent that it has knowledge of any Excluded Information (as defined in Section 3.14) which would render any of Seller's representations and warranties under Article III untrue in any material respect, Buyer has promptly made such information available to Seller.  As of the date hereof, Buyer has no knowledge of any material breach of any representations or warranties made by Seller in this Agreement or any other conditions or considerations that would excuse Buyer from the timely performance of its obligations hereunder.

### ARTICLE V
#### COVENANTS

Section 5.01   **Conduct of Business Prior to the Closing**.  From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall, and shall cause the Company to conduct the business of the Company in the ordinary course of business.

Section 5.02   **Access to Information**.  From the date hereof until the Closing, Seller shall, and shall cause the Company to: (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the Real Property, properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company; (b) furnish Buyer and its Representatives with such financial, operating and other data and information

-22-

DEFENSE 017720

related to the Company as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller and the Company to cooperate with Buyer in its investigation of the Company; *provided, however,* that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the normal operations of the Company.

**Section 5.03   Supplement to Disclosure Schedules**.  From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**"), and each such Schedule Supplement shall be deemed to be incorporated into and to supplement and amend the Disclosure Schedules as of the Closing Date. In the event that Seller supplements or amends the Disclosure Schedules, Buyer shall have the right to notify Seller if it determines in good faith that any such items that has a Material Adverse Effect. In the event of such a notice,  Seller, in its sole discretion shall have the option to indemnify Buyer for such items pursuant to **Section 7.02(d)** hereof or to terminate this Agreement pursuant to **Section 8.01(c)(iii)**. If the parties disagree as to whether an updated or supplemented item has a Material Adverse Effect they shall act in good faith to attempt to resolve any such disagreement in a mutually acceptable manner.

**Section 5.04   Resignations**.  Seller shall deliver to Buyer written resignations, effective as of the Closing Date, of the officers and directors of the Company and the Included Subsidiaries set forth on **Section 5.04** of the Disclosure Schedules requested by Buyer at least five Business Days prior to the Closing.

**Section 5.05   Reorganization**.  Prior to the Closing, the Seller shall take all action, reasonably necessary in order to accomplish the transfer of the Newspaper Business, and the retention of the Excluded Business, including as set forth below, and the Buyer shall cooperate (and shall cause its officers and employees to cooperate) with the Seller to accomplish the same.

(a)   To the extent that any contracts, leases or other assets or liabilities related solely to or are used solely in the Newspaper Business and are held in the name of any entity other than the Companies or the Included Subsidiaries, the Seller shall cause all right, title and interest in and to such item to be assigned and transferred to the Company and/or the applicable Included Subsidiary and the Company and/or the applicable Included Subsidiary shall assume all liabilities and obligations related thereto, including all such contracts, real estate, auto or other leases or other obligations related to the Newspaper Business.

(b)   The Seller shall take all action necessary to eliminate all extraordinary intercompany payables and receivables between the Seller, the Company and the Included Subsidiaries.

(c)   The Seller shall take all action necessary to distribute upstream all cash of the Company or the Subsidiaries as of the Closing other than the Closing Cash Balance.

(d)   To the extent that any contracts, leases or other assets or liabilities are used by or are reasonably necessary for the operations of the Seller or the Excluded Business or any other business of the Seller other than the Newspaper Business are held in the name of the

-23-

DEFENSE 017721

Company or any of the Included Subsidiaries including but not limited to those assets set forth on **Section 5.05(d)** of the Disclosure Schedule, such assets shall be retained by the Seller or the Seller shall cause all right, title and interest in and to such items to be assigned and transferred to the Seller or its Affiliates (other than the Company or the Included Subsidiaries) and the Seller or such other Excluded Subsidiary as shall be designated by Seller shall assume all liabilities and obligations related thereto, including the equity interests in, and assets and liabilities of, Backpage.com, LLC, and any other assets or liabilities relating thereto. For avoidance of doubt, the parties agree that (i) Buyer is acquiring only the trademarks and tradenames expressly listed on Schedule 3.07(b) and is not acquiring (A) any right, title or interest in or to any of the trademarks or tradenames utilized in the Excluded Business or (B) any right, title or interest in or to any trademark or trade names utilized in any other business of Seller, and (ii) all assets of Backpage.com, LLC and Bigcity.com including but not limited to software engine and payment gateway, and all related technology and intellectual property are expressly excluded from the transaction.

(e)     In conjunction with the transaction, the Seller will vacate the premises located at 1201 E Jefferson Street, Phoenix, Arizona and New Times, Inc. will lease such premises directly to Buyer or Buyer's designee on mutually satisfactory terms consistent with the form of lease agreement previously provided to Buyer.

(f)     The parties also acknowledge that the Seller has acquired various assets for the benefit of its Subsidiaries.  To the extent these assets relate to or are used solely in the business of one or more of the Included Subsidiaries, these assets will be transferred to the Company or the appropriate Included Subsidiary at or prior to Closing.  However, to the extent that any such assets are Shared Assets that are used by or are reasonably necessary for the operations of Seller or any of the Excluded Subsidiaries (e.g. web servers), ownership of such assets shall be retained by Seller and Buyer shall enter into new agreements for such assets unless otherwise specified on **Section 3.06(b)** of the Disclosure Schedule.

(g)     The parties will cooperate and use reasonable commercial efforts to obtain prior to Closing all necessary insurance, employee benefits, licenses and other similar items necessary for the Company and the Included Subsidiaries to operate on a stand-alone basis, independent of the Seller and its other operations.  To the extent permissible by the terms of the Seller's current contracts, agreements, or arrangements relating to the foregoing, if such matters cannot be completed on a timely basis, the parties will negotiate in good faith certain interim arrangements for a transitional period following the Closing pursuant to the terms of the Transition Services Agreement.  To the extent that Seller has guaranteed any leases or other obligations of the Company and the Included Subsidiaries and the counterparties to such leases or other obligations will not accept a substitute guarantee from the Buyer and/or the owners thereof, then the parties shall negotiate in good faith reasonable terms upon which Seller will continue to provide such guarantees.

(h)     At the Closing, the Seller will enter into agreements assigning the Company Intellectual Property as set forth on **Section 3.07(b)** of the Disclosure Schedule.

**Section 5.06   Mass Layoffs**.  Buyer shall not, and shall cause the Company not to, take any action following the Closing with respect to the Company or the Included Subsidiaries that

-24-

DEFENSE 017722

could result in WARN Act liability to Seller.  Buyer shall be solely responsible for any severance obligations resulting from the transactions contemplated hereby.

### Section 5.07    Employees; Benefit Plans.

(a)    The Buyer shall cause all employees engaged primarily in providing services on behalf of the Newspaper Business who are not currently employees of the Company or an Included Subsidiary thereof to become employees of one or more of such entities and for all obligations relating thereto (including all employee benefits, earned vacation time, and perquisites) to be assigned and assumed by such entities.  Unless otherwise mutually agreed upon by the Buyer and the related employee, such employees will be "at-will" employees.

(b)    This **Section 5.07** shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this **Section 5.07**, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this **Section 5.07**. Nothing contained herein, express or implied, shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement. The parties hereto acknowledge and agree that the terms set forth in this **Section 5.07** shall not create any right in any Employee or any other Person to any continued employment with the Company, Buyer or any of their respective Affiliates or compensation or benefits of any nature or kind whatsoever.

### Section 5.08    Confidentiality.

(a)    At all times after the date hereof, Seller will treat as confidential and will safeguard any and all information, knowledge and data relating to the business of Buyer and its Affiliates (including without limitation, the Company and the Included Subsidiaries), that has become or becomes known to Seller as a result of its relationship with Buyer or the transactions contemplated by this Agreement.  With respect to all such information, knowledge or data, (i) Seller will use the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information, knowledge and data as Seller uses in the protection of other proprietary information of Seller, and (ii) nothing contained in this **Section 5.08(a)** will prevent the disclosure of any such information, knowledge or data to any directors, officers, employees, agents and representatives of Seller to whom such disclosure is necessary or desirable in the conduct of the Excluded Businesses if such Persons are informed by Seller of the confidential nature of such information and are directed by Seller to comply with the provisions of this **Section 5.08(a)**.

(b)    At all times after the date hereof until the Closing, Buyer will treat as confidential and will safeguard any and all information, knowledge and data relating to the Company, the Included Subsidiaries, the Seller and the Excluded Business, that has become or becomes known to Buyer as a result of its relationship with Seller or the transactions contemplated by this Agreement.  At all times after the Closing, Buyer will treat as confidential and will safeguard any and all information, knowledge and data relating to the Seller and the Excluded Business, that has become or becomes known to Buyer as a result of its relationship with Seller or the transactions contemplated by this Agreement. With respect to all such information, knowledge or data, (i) Buyer will use the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such

-25-

DEFENSE 017723

information, knowledge and data as Buyer uses in the protection of other proprietary information of Buyer, and (ii) nothing contained in this **Section 5.08(b)** will prevent the disclosure of any such information, knowledge or data to any directors, officers, employees, agents and representatives of Buyer to whom such disclosure is necessary or desirable in the conduct of the Newspaper Business if such Persons are informed by Buyer of the confidential nature of such information and are directed by Buyer to comply with the provisions of this **Section 5.08(b).**

(c)   Nothing contained in **Section 5.08(a) or (b)** will in any way restrict or impair the right of either party or its Affiliates (collectively, the "**Receiving Party**") to use, disclose or otherwise deal with information of the other party or its Affiliates (collectively, the "**Disclosing Party**") which: (i) is or becomes a matter of public knowledge through no fault of the Receiving Party or its agents or representatives; (ii) was already in the Receiving Party's possession at the time of disclosure of the information to the Receiving Party, and was not acquired, directly or indirectly, under any obligation of confidentiality to the Disclosing Party or to any other Person; (iii) is rightfully received by the Receiving Party from a Person having no duty of confidentiality to the Disclosing Party; (iv) was disclosed by the Disclosing Party to another Person having no duty of confidentiality to the Disclosing Party; (v) is independently developed by the Receiving Party; (vi) which is required to be disclosed by law or pursuant to the terms of a subpoena or order of a court or other governmental authority compelling such disclosure; provided, however, that the Receiving Party shall give prior notice of such request for disclosure so that the Disclosing Party may, at its own expense, seek an appropriate protective order or seek with the Receiving Party's cooperation to narrow the request or demand ; or (vii) is disclosed by the Receiving Party with the Disclosing Party's prior written consent.  The Receiving Party will have the burden of proving the applicability of any provision of this **Section 5.08(c)** to any particular set of facts.

### Section 5.09   Non-competition of Seller; Non-solicitation.

(a)   For a period of two years commencing on the Closing Date (the "**Restricted Period**"), Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Seller Restricted Business in the United States; (ii) have an interest in any Person that engages directly or indirectly in the Seller Restricted Business in the United States in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between  Company or any Included Subsidiary and customers or suppliers of the Company or any Included Subsidiary. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)   During the Restricted Period, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, solicit any employee of the Company or any of the Included Subsidiaries or encourage any such employee to leave such employment, except pursuant to a general solicitation which is not directed specifically to any such employees.

(c)   If Seller breaches, or threatens to commit a breach of, any of the provisions of this **Section 5.09**, Buyer and the Company shall have the following rights and

-26-

DEFENSE 017724

remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to Buyer or the Company under law or in equity:

(i)      the right and remedy to have such provision specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach may cause irreparable injury to each of Buyer and the Company and that money damages may not provide an adequate remedy to Buyer or the Company; and

(ii)      the right and remedy to recover from the Seller all monetary damages suffered by Buyer, the Company, or any Included Subsidiary, as the case may be, as the result of any acts or omissions constituting a breach of this **Section 5.09**.

(d)      Seller acknowledges that the restrictions contained in this **Section 5.09** are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 5.09** should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in this **Section 5.09** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 5.10   Non-competition of Buyer; Non-solicitation.**

(a)      For the purposes of this **Section 5.10**, Buyer Restricted Business means the adult services classified advertisement business anywhere in the world except that Buyer Restricted Business shall not include, and Buyer may continue to engage in, the classified advertisement business other than in adult services and may also provide its After Dark and Little Sexy Black Book classified advertisement services in connection with any of its web-based products and services and continue to sell  adult display advertising, in print and online; provided however, that if Seller sells either or both of SF Weekly, L.P. and/or Seattle Weekly, LLC on or prior to the Closing, the Buyer Restricted Business shall also include the  operation, publication and distribution of alternative newspapers in Seattle and/or San Francisco (in print and electronic version targeted at such markets), as applicable, except that Buyer may offer web based products and services not associated with print publications in Seattle and/or San Francisco, as applicable. During the Restricted Period, Buyer shall not, and shall not permit any of the Company, the Included Subsidiaries or any of their Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Buyer Restricted Business in the specified territories; (ii) have an interest in any Person that engages directly or indirectly in the Buyer Restricted Business in the specified territories in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between Seller and customers or suppliers of Seller. Notwithstanding the foregoing, Buyer may own,

-27-

DEFENSE 017725

directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Buyer is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)     During the Restricted Period, Buyer shall not, and shall not permit any of the Company, the Included Subsidiaries or any of their Affiliates to, directly or indirectly, solicit any employee of the Seller or its Affiliates or encourage any such employee to leave such employment, except pursuant to a general solicitation which is not directed specifically to any such employees.

(c)     If Buyer breaches, or threatens to commit a breach of, any of the provisions of this **Section 5.10**, Seller shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to Seller under law or in equity:

(i)     the right and remedy to have such provision specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach may cause irreparable injury to Seller and that money damages may not provide an adequate remedy to Seller; and

(ii)     the right and remedy to recover from the Buyer all monetary damages suffered by Seller or its Affiliates as the case may be, as the result of any acts or omissions constituting a breach of this **Section 5.010**.

(d)     Buyer acknowledges that the restrictions contained in this **Section 5.10** are reasonable and necessary to protect the legitimate interests of Seller and constitute a material inducement to Seller to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 5.10** should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in this **Section 5.10** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

10152751v.6

DEFENSE 017726

**Section 5.11   Non-Disparagement.** For the period during which  any sums remain outstanding under the Credit Agreement (the "**Nondisparagement Period**"), Buyer and Seller shall use their best efforts to ensure that their respective officers, directors and management employees do not  and do not cause or encourage any other individuals to make any public or private statements (whether orally or in writing)  that disparage, denigrate or malign the other party or such other party's respective Affiliates, businesses, activities, operations, affairs, reputations or prospects or any of their respective Affiliates, officers, employees, directors, partners, agents, or equityholders.

**Section 5.12   Governmental Approvals and Other Third-party Consents**.

(a)     Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)     Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 3.05** and **Section 4.02** of the Disclosure Schedules; *provided, however,* that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

**Section 5.13   Litigation Cooperation**

(a)     In connection with the defense or prosecution of any suit, action or proceeding  (including, without limitation, any governmental investigation) relating to the Buyer, Seller, the Company, the Included Subsidiaries, the Excluded Subsidiaries, the Newspaper Business or the Excluded Business each party shall (i) cooperate, and cause its respective Affiliates to cooperate, in the defense or prosecution of such suit, action or proceeding, (ii) furnish or cause to be furnished such documents, records, information and testimony, grant or cause to be granted access to all reasonably requested witnesses, and attend such conferences, discovery proceedings, hearings, trials appeals, or other proceedings, in each case as may be reasonably requested in connection therewith, and with regard to any suit, action or proceeding relation to the other party, (iii) to the extent permitted by law, provide to the other party, at least five business days prior to production or submission, (a) any documents that are to be submitted in response to a subpoena or document production request that are related to such other party , and (b) any materials that are prepared in response to any suit, action or proceeding by the party submitting such response, and (iv) take all commercially reasonable steps to make available to the other party, upon written request, its former and current employees, other personnel and agents (whether as witnesses or otherwise) to the extent that such persons may reasonably be required in connection therewith.  Any costs incurred in connection with complying with this Section shall be borne solely by the party requesting such cooperation.

(b)     Neither Seller nor Buyer, nor any Affiliate under the control of Seller or Buyer  will (and each of Seller and Buyer shall cause its respective Affiliates not to), destroy or

-29-

DEFENSE 017727

dispose of any documents, records or information for which it has received written notice that such documents, records or information are the subject of a notice or directive in effect to retain documents, records or information in connection with any suit, action or proceeding (including, without limitation any investigation by a Governmental Authority).

**Section 5.14   Books and Records**.

      (a)    In order to facilitate the transition of the Company and the Included Subsidiaries to Buyer and to allow for orderly separation of the businesses as contemplated hereunder, including without limitation, in connection with financial statement audits, governmental investigations or proceedings, tax preparation and/or audits, resolution of any claims made against or incurred by Seller or the Excluded Subsidiaries with respect to the business or assets of the Company and the Included Subsidiaries, or for any other reasonable purpose, for a period of six years after the Closing, Buyer shall:

      (i)    retain the books and records (including personnel files) of the Company and the Included Subsidiaries relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Company and the Included Subsidiaries; and

      (ii)    upon reasonable notice, afford the Representatives of Seller reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such books and records.

      (b)    In order to facilitate the transition of the business of the Company and the Included Subsidiaries to Buyer and to allow for the orderly separation of the businesses as contemplated hereby and to facilitate the resolution of any claims made by or against or incurred by Buyer, the Company or the Included Subsidiaries after the Closing, or for any other reasonable purpose, for a period of 6 years following the Closing, Seller shall:

      (i)    retain the books and records (including personnel files) of Seller, which include information relevant to the Company, the Included Subsidiaries and their respective operations for periods prior to the Closing; and

      (ii)    upon reasonable notice, afford the Representatives of Buyer or the Company reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records.

      (c)    Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this **Section 5.14** where such access would violate any Law.

      (d)    If at any time during or after the expiration of the six year period following the Closing, Buyer or any Affiliate under the control of Buyer makes a determination that it no longer wishes to retain all or any part of any documents, records or information relating to the ownership, operations, assets or liabilities of the Company or the Included Subsidiaries for the period on or prior to the Closing, it shall provide written notice to Seller and shall provide Seller with at least sixty (60) days to take possession of or copy such documents, records or information prior to Buyer's destruction or disposition thereof. Further, if at any time Buyer

-30-

DEFENSE 017728

discovers that it has in its possession any documents, records or information exclusively relating to the Seller or the Excluded Subsidiaries, Buyer shall promptly return such documents, records or information to Seller.

### Section 5.15   Tax Returns and Payment

(a)   Except as otherwise expressly provided herein, the Seller shall be responsible for, and shall indemnify and hold Buyer, the Company and the Included Subsidiaries harmless from and against, all Taxes of the Company and the Included Subsidiaries attributable to the Pre-Closing Tax Period, and Buyer, the Company and the Included Subsidiaries shall be responsible for, and shall indemnify and hold the Seller harmless from and against, all Taxes of the Company and the Included Subsidiaries attributable to periods other than the Pre-Closing Tax Period.

(b)   Where it is necessary to apportion between the Seller and Buyer the Tax liability of the Company and the Included Subsidiaries for a Straddle Period, such liability shall be apportioned between the period deemed to end at the close of business on the Closing Date and the period deemed to begin at the beginning of the day immediately following the Closing Date on the basis of an interim closing of the books, except that non-income Taxes that are calculated on a periodic or annual basis shall be allocated on a daily basis.

(c)   Buyer shall be responsible for preparing and timely filing all tax returns including any and all information and employee income tax reporting of the Company and the Included Subsidiaries for the tax year ended December 31, 2012 which are due after the Closing Date.  Buyer agrees to use Deloitte LLP (the current accounting firm engaged by Seller on behalf of the Company and the Included Subsidiaries) in the preparation of such tax returns and agrees to fully cooperate with Deloitte LLP and provide it with all information required to complete such tax returns. Any costs incurred related to the preparation and filing of such tax returns shall be paid by Seller.

(d)   Tax returns prepared and filed by Buyer with respect to a Pre-Closing Tax Period or a Straddle Period shall be prepared in a manner generally consistent with past practices to the extent consistent with requirements of applicable law. Buyer shall provide the Seller with a copy of such Pre-Closing Tax Period in the form proposed to be filed by Buyer at least fifteen (15) business days in advance of the due date for such tax returns and within a reasonable period of time prior to the due date for all other tax returns. Buyer shall make such corrections or changes to such Tax Returns as the Seller may reasonably request.

(e)   Buyer shall promptly notify Seller in writing upon receipt by Buyer or the Company or the Included Subsidiaries of notice of any pending or threatened Tax audits or assessments that may affect the Tax liabilities of the Company or the Included Subsidiaries for which Seller would be required to indemnify Buyer hereunder. Seller shall have the right to represent the Company's or any Included Subsidiary's interests in any Tax audit or administrative or court proceeding relating to the Pre-Closing Tax Period and to employ counsel of its choice at its sole expense, subject to Buyer's right (i) to review and approve any actions, decisions or proposed settlements that could affect Buyer's and the Company's or Subsidiary's interests, with such approval not being unreasonably withheld by Buyer; and, (ii) at Buyer's option, to

10152751v.6

DEFENSE 017729

participate fully and equally in any such Tax audit or administrative or court proceeding and to employ counsel of its choice at its sole expense.

(f)     Buyer shall pay to the Seller (i) all refunds of Taxes received after the Closing Date that are attributable to Taxes paid by the Company or the Included Subsidiaries prior to the Closing Date with respect to the Pre-Closing Tax Period, (ii) the portion of any Tax refund received after the Closing Date that is attributable to Taxes  paid by the Company prior to the Closing Date with respect to any Straddle Period (such portion allocated consistent with the principles set forth in **Section 5.15(b)**) and (iii) any Taxes (including estimated Taxes) paid by or on behalf of any of the Company and the Included Subsidiaries on or prior to the Closing Date in excess of the Taxes of the Company and the Included Subsidiaries in fact attributable to the Pre-Closing Tax Period.

**Section 5.16   Closing Conditions**.  From the date hereof until the Closing, each party hereto shall, and Seller shall cause the Company to, use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VI** hereof.

**Section 5.17   Public Announcements**.  Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements or press releases with respect of this Agreement,  the transactions contemplated hereby or the operations or proposed operations of the other party  and its subsidiaries, without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.18   Further Assurances**.  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 5.19   Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 5.20   Delivery of Additional Promissory Notes**.  In the event that Buyer is required to deliver any additional promissory notes pursuant to the terms of this Agreement or the Credit Agreement, Buyer will promptly deliver duly executed copies of such promissory notes to Seller.

10152751v.6

DEFENSE 017730

## ARTICLE VI
### CONDITIONS TO CLOSING

**Section 6.01    Conditions to Obligations of All Parties**.  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in **Section 3.05** and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in **Section 4.02**, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

(c)    Buyer and Seller shall have entered into the Transition Services Agreement, if required by either party.

(d)    The backpage.com revenue sharing agreement shall have been terminated.

**Section 6.02    Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Seller contained in **Article III** shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)    Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)    Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 6.02(a) and Section 6.02(b) have been satisfied.

(d)    Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby.

-33-

DEFENSE 017731

(e)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying the names and signatures of the officers of Seller authorized to sign this Agreement and the other documents to be delivered hereunder.

(f)     Seller shall have delivered, or caused to be delivered, to Buyer membership interest certificates evidencing the Interests, free and clear of Encumbrances, duly endorsed in blank or accompanied by powers or other instruments of transfer duly executed in blank and with all required transfer tax stamps affixed.

(g)     Seller shall have contributed to the Company or the Included Subsidiaries all Intellectual Property solely used by the Company or the Subsidiaries which is reasonably necessary to operate the Newspaper Business.

(h)     The Closing Cash Balance shall be no less than Two Million Five Hundred Thousand Dollars ($2,500,000).

(i)     Seller shall have executed the Credit Agreement (and all required deliverables pursuant thereto) which shall (i) provide for a revolving credit line for the short term financing of the Company's operations following the Closing in an amount up to Two Million Five Hundred Thousand Dollars ($2,500,000) in exchange for the delivery by the Buyer to the Seller of a promissory note evidencing such obligations, the unpaid principal balance of which shall bear interest at the prime rate plus three percent per annum and with a maturity date three years after the Closing Date and (ii) govern the terms of the financing of the Purchase Price.

(j)     The current credit facility of the Seller, the Company and the Subsidiaries, with a maturity date of December 31, 2012, shall have been satisfied in full and all Encumbrances on the Interests, the equity of each of the Included Subsidiaries and the assets of the Newspaper Business shall have been released.

(k)     On or prior to the Closing, Seller shall have changed its name and the name of any Affiliates so that it does not include the terms "village," "voice" or "new times."

**Section 6.03   Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in **Article IV** shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

10152751v.6

DEFENSE 017732

(c)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 6.03(a)** and **Section 6.03(b)** have been satisfied.

(d)     Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby.

(e)     Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement and the other documents to be delivered hereunder.

(f)     All revenue sharing arrangements between Backpage.com, LLC, the Company and the Subsidiaries shall have been terminated.

(g)     Any obligations of Seller to individuals who are to become employees of Buyer (or will continue as employees of the Company) immediately following the Closing pursuant to the Village Voice Media Holdings, LLC Equity Appreciation Plan shall have been terminated.

(h)     All of the employees listed on Schedule  5.04 who are to become shareholders or employees of Buyer shall resign as officers, directors or managers of any of the Seller or any Excluded Subsidiary, as applicable, and shall provide the Company with releases related to any and all claims arising out of or related to their prior employment with the Company.

(i)     The following documents shall have been executed by the Buyer and shall have been delivered to Seller:

        (i)     The Credit Agreement;

        (ii)    The Term A Promissory Note;

        (iii)   The Pledge and Security Agreements;

        (iv)    The Ancillary Loan Documents;

        (v)     The Transition Services Agreement;

        (vi)    The Term B Promissory Note, if required at Closing; and

        (vii)   The Revolving Note.

DEFENSE 017733

# ARTICLE VII
## INDEMNIFICATION

**Section 7.01   Survival**.  Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is one year from the Closing Date except that such time limitation shall not apply to representation and warranties contained in Sections 3.03, 3.06(a) and 3.10 which shall survive until 30 days following the applicable statute of limitations. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

**Section 7.02   Indemnification By Seller**.  Subject to the other terms and conditions of this Article VII, Seller shall indemnify Buyer against, and shall hold Buyer harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Buyer based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement;

(c)     the conduct, status, ownership, use, condition, possession or operation of any Excluded Subsidiary or related to any Excluded Business including, without limitation, backpage.com; or

(d)     subject to Section 8.01(c)(iii), any item or event added as a supplement to the Disclosure Schedules that has a Material Adverse Effect.

**Section 7.03   Indemnification By Buyer**.  Subject to the other terms and conditions of this **Article VII**, Buyer shall indemnify Seller against, and shall hold Seller harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Seller based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement;

(c)     any obligation arising on or after the Closing Date pursuant to the Guarantees, including without limitation, any breach of the underlying lease obligations on or

10152751v.6

DEFENSE 017734

after the Closing Date and any failure to obtain the consent of the landlord to the assignment of any of such real property leases of the Company or any of the Included Subsidiaries;

(d)     any Losses incurred by Seller related to or arising out of the lawsuit captioned Essary v. Village Voice Media Holdings, LLC and Pete Kotz; or

(e)     any Losses incurred by Seller related to or arising out of the lawsuit captioned Benneficial Innovations v. Village Voice Media Holdings, LLC which exceed $150,000 in the aggregate.  Notwithstanding anything to the contrary in this Agreement, as to the foregoing litigation in subsection(s) (d) and (e), the parties acknowledge that although Seller is the named defendant in the litigation,  the claims in the litigation relate to the operations and assets being acquired by Buyer hereunder as to which Buyer shall have the benefit after the Closing. Therefore, the parties agree that, as the named defendant, Seller will continue to have the right to control the defense of such litigation, but that any Losses incurred in connection therewith whether for costs and expenses of litigation, settlement amounts or damages will be the responsibility of Buyer. Seller will consult with Buyer prior to entering into any settlement with respect thereto, but such settlement shall not require Buyer's prior consent. Any indemnity amounts that may become due pursuant to the foregoing indemnity in subsection(s) (d) and (e) may, at the option of Buyer, be added to the Term B Promissory Note pursuant to the Credit Agreement.

Section 7.04   Certain Limitations.  The party making a claim under this Article VII is referred to as the "**Indemnified Party**," and the party against whom such claims are asserted under this **Article VII** is referred to as the "**Indemnifying Party**." The indemnification provided for in **Section 7.02** and **Section 7.03** shall be subject to the following limitations:

(a)     Except in connection with Losses claimed under **Section 5.15** or **7.02(c)** or resulting from fraud, the Seller shall not be liable to the Buyer for indemnification under **Section 7.02(a)**, until the aggregate amount of all Losses in respect of indemnification under **Section 7.02(a)** exceeds One Million Dollars $1,000,000 (the "**Deductible**"), in which event Seller shall only be required to pay or be liable for Losses in excess of the Deductible. In connection with Losses claimed under **Section 5.15** or **7.02(c)** or resulting from fraud, the Seller is liable to the Buyer for indemnification from the first dollar of Losses.

(b)     Except in connection with Losses claimed under **Section 5.15** or **7.02(c)** or resulting from fraud, the aggregate amount of all Losses for which Seller shall be liable pursuant to **Section 7.02** shall not exceed Two Million Seven Hundred Thousand Dollars ($2,700,000).

(c)     Any payments due and owing from the Seller pursuant to **Section 7.02** shall first be paid by a set-off against the most current amounts owed to it under the Promissory Note.

(d)     Payments by an Indemnifying Party pursuant to **Section 7.02** or **Section 7.03** in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party (or the Company) in respect of any such claim. The Indemnified Party shall use its commercially

-37-

DEFENSE 017735

reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses prior to seeking indemnification under this Agreement.

(e)     Payments by an Indemnifying Party pursuant to **Section 7.02** or **Section 7.03** in respect of any Loss shall be reduced by an amount equal to any Tax benefit realized or reasonably expected to be realized as a result of such Loss by the Indemnified Party.

(f)     Except in connection with fraud, in no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive damages.

(g)     Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(h)     Seller shall not be liable under this **Article VII** for any Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement if Buyer had knowledge of such inaccuracy or breach prior to the Closing.

### Section 7.05   Indemnification Procedures.

(a)     **Third-Party Claims**. If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third-Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party written notice thereof within three (3) business days of receipt. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to **Section 7.05(b)**, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third-Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to **Section 7.05(b)**, pay, compromise, defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim. Seller and Buyer shall cooperate with each other in all

-38-

DEFENSE 017736

reasonable respects in connection with the defense of any Third-Party Claim, including making available (subject to the provisions of **Section 5.08**) records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

      (b)     **Settlement of Third-Party Claims**. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), except as provided in this **Section 7.05(b)**. If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 7.05(a)**, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

      (c)     **Direct Claims**. Any claim by an Indemnified Party on account of Losses which does not result from a Third-Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim. During such 30-day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Company's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

10152751v.6

DEFENSE 017737

**Section 7.06    Tax Treatment of Indemnification Payments**.  All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 7.07    Exclusive Remedies**.  Subject to **Section 9.11**, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this **Article VII**. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this **Article VII**. Nothing in this **Section 7.07** shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to **Section 9.11** or to seek any remedy on account of intentional fraud by any party hereto.

**ARTICLE VIII**
**TERMINATION**

**Section 8.01    Termination**.  This Agreement may be terminated at any time prior to the Closing:

    (a)    by the mutual written consent of Seller and Buyer;

    (b)    by Buyer by written notice to Seller if:

    (i)    Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure cannot be cured by Seller by January 31, 2013; or

    (ii)    any of the conditions set forth in **Section 6.01** or **Section 6.02** shall not have been fulfilled, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

    (c)    by Seller by written notice to Buyer if:

    (i)    Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure cannot be cured by Buyer by January 31, 2013; or

-40-

DEFENSE 017738

(ii)      any of the conditions set forth in **Section 6.01** or **Section 6.03** shall not have been fulfilled, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to January 31, 2013; or

(iii)      if Seller supplements or amends the Disclosure Schedules as contemplated by **Section 5.03** with an item or event that has a Material Adverse Effect, Buyer notifies Seller it has determined in good faith that such supplements or amendments constitute a Material Adverse Effect, and Seller determines that it will not indemnify Buyer for such item or event, then Seller shall have the right to terminate this Agreement in its sole discretion.

(d)      by Buyer or Seller in the event that:

(i)      there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(ii)      any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 8.02   Effect of Termination**.  In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)      as set forth in **Section 5.08** and **Article IX** hereof;

(b)      that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof; and

(c)      any Advances made to Buyer under **Section 9.01** shall be forgiven, provided that such termination is not pursuant to Section 8.01(c)(i) or (ii) as a result of Buyer's failure to perform of comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it.

## ARTICLE IX
### MISCELLANEOUS

**Section 9.01   Expenses**.  Except as otherwise expressly provided herein (including **Section 5.18** hereof), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.  Notwithstanding the foregoing, Seller shall advance sums to Buyer from time to time prior to the Closing to provide Buyer with adequate funds to pay its expenses and costs in connection with the Transaction (the "**Advances**").  The amount of the Purchase Price set forth in **Section 2.02** shall be increased by the amount of the Advances.

**Section 9.02   Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a)

-41-

10152751v.6

DEFENSE 017739

when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 9.02**):

| | |
|---|---|
| If to Seller: | Village Voice Media Holdings, LLC<br>1201 East Jefferson Street<br>Phoenix, AZ 85034<br>Attention:  John E. Brunst<br>Facsimile:  (602) 229-8518 |
| with a copy to: | White and Williams LLP<br>One Penn Plaza, Suite 4110<br>New York, New York 10119-4115<br>Attention:  Lori S. Smith, Esq.<br>Facsimile:  (212) 631-4428 |
| If to Buyer: | Voice Media Group, Inc.<br>969 Broadway<br>Denver, Colorado 80203<br>Attention: Scott Tobias |
| with a copy to: | Faegre Baker Daniels LLP<br>1700 Lincoln Street, Suite 3200<br>Denver, Colorado 80203<br>Attention:  Jeffrey A. Sherman<br>Facsimile:  (303) 607-3601 |

**Section 9.03   Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

10152751v.6

DEFENSE 017740

**Section 9.04    Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05    Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.06    Entire Agreement**.  This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 9.07    Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.08    No Third-party Beneficiaries**.  Except as provided in **Article VII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.09    Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law

-43-

DEFENSE 017741

provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware.

        (b)     ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN THE CITY OF DOVER AND COUNTY OF KENT, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

        (c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10(c).

     **Section 9.11   Specific Performance**. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

     **Section 9.12   Mutual Drafting**. The parties hereto are sophisticated and have been represented by attorneys throughout the transactions contemplated hereby who have carefully negotiated the provisions hereof. As a consequence, the parties do not intend that the presumptions of laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement or any agreement or instrument executed in connection herewith, and therefore waive their effects

-44-

DEFENSE 017742

**Section 9.13   Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 9.14   No Personal Liability**.

(a)     This Agreement may only be enforced by Buyer against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against Seller and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of Seller or of any Affiliate of Seller, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of Seller under this Agreement or for any claim or action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

(b)     This Agreement may only be enforced by Seller against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against Buyer, the Company or the Included Subsidiaries and then only with respect to the specific obligations set forth herein with respect to such party. Other than as a result of fraud or, intentional breach of this Agreement by Buyer or any of its shareholders or as set forth in **Section 8.02(c)**, no past, present or future director, officer, employee, incorporator, manager, member, partner, shareholder, Affiliate, agent, attorney or other Representative of Buyer or of any Affiliate of Buyer (other than the Company and the Included Subsidiaries), or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of Buyer under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

[SIGNATURE PAGE FOLLOWS]

10152751v.6

DEFENSE 017743

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Village Voice Media Holdings, LLC

By: _____
Name: John E. Brunst
Title: Vice President and Chief Financial Officer

Voice Media Group, Inc.

By: _____
Name: Scott Tobias
Title: Chief Executive Officer

[SIGNATURE PAGE TO MEMBERSHIP INTEREST PURCHASE AGREEMENT]

-46-

DEFENSE 017744

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Village Voice Media Holdings, LLC

By: _____
Name: John E. Brunst
Title: Vice President and Chief Financial Officer

Voice Media Group, Inc.

By: _____
Name: Scott Tobias
Title: Chief Executive Officer

[SIGNATURE PAGE TO MEMBERSHIP INTEREST PURCHASE AGREEMENT]

-46-

DEFENSE 017745

**Exhibit A**

**Credit Agreement**

DEFENSE 017746