# EXHIBIT C

CREDIT AGREEMENT

dated as of January 17, 2013

between

VOICE MEDIA GROUP, INC.

as the Borrower

and

BROADWAY CAPITAL CORP., LLC

as the Lender

10157063v.12

DEFENSE 017644

# TABLE OF CONTENTS

ARTICLE I      DEFINITIONS AND ACCOUNTING TERMS ................................................1

    SECTION 1.1    Defined Terms .........................................................................1

    SECTION 1.2    Use of Defined Terms ............................................................16

    SECTION 1.3    Cross-References...................................................................16

    SECTION 1.4    Accounting and Financial Determinations. ...........................16

ARTICLE II     COMMITMENTS, BORROWING PROCEDURES, NOTES .........................17

    SECTION 2.1    Commitments .........................................................................17

        SECTION 2.1.1    Revolving Loan Commitment..............................................17

        SECTION 2.1.2    Term Loan A Commitment....................................................17

        SECTION 2.1.3    Term Loan B Commitment.....................................................17

        SECTION 2.1.4    Term Loan C Commitment.....................................................17

    SECTION 2.2    Reduction of the Revolving Loan Commitment Amount ...................18

    SECTION 2.3    Borrowing Procedure ............................................................18

ARTICLE III    REPAYMENTS, PREPAYMENTS, INTEREST AND FEES .........................18

    SECTION 3.1    Repayments and Prepayments; Application...........................................18

        SECTION 3.1.1    Repayments and Prepayments ...............................................18

        SECTION 3.1.2    Application...........................................................................19

    SECTION 3.2    Interest Provisions ................................................................19

        SECTION 3.2.1    Rates....................................................................................19

        SECTION 3.2.2    Default Rates........................................................................20

        SECTION 3.2.3    Payment Dates .....................................................................20

ARTICLE IV     TAXES AND MISCELLANEOUS....................................................................20

    SECTION 4.1    Taxes .....................................................................................20

    SECTION 4.2    Payments, Computations, etc. ...............................................21

    SECTION 4.3    Setoff ....................................................................................22

ARTICLE V      CONDITIONS PRECEDENT TO CREDIT EXTENSIONS............................22

    SECTION 5.1    Initial Credit Extension .........................................................22

        SECTION 5.1.1    Resolutions, etc....................................................................22

        SECTION 5.1.2    Effective Date Certificate ....................................................23

        SECTION 5.1.3    Delivery of Notes .................................................................23

        SECTION 5.1.4    Financial Information............................................................23

DEFENSE 017645

SECTION 5.1.5    Solvency, etc ................................................................23

SECTION 5.1.6    Guaranties ................................................................23

SECTION 5.1.7    Pledge and Security Agreements .................................23

SECTION 5.1.8    Intellectual Property Security Agreements and Related Documentation................................................................24

SECTION 5.1.9    Filing Agent, etc................................................................24

SECTION 5.1.10  Insurance ................................................................24

SECTION 5.1.11  Purchase Agreement ................................................24

SECTION 5.1.12  All Credit Extensions................................................24

SECTION 5.1.13  Compliance with Warranties, No Default, etc ........25

SECTION 5.1.14  Satisfactory Legal Form................................................25

ARTICLE VI    REPRESENTATIONS AND WARRANTIES................................25

SECTION 6.1    Organization, etc ................................................................25

SECTION 6.2    Due Authorization, Non-Contravention, etc .........................25

SECTION 6.3    Government Approval, Regulation, etc.................................26

SECTION 6.4    Validity, etc ................................................................26

SECTION 6.5    Financial Information ................................................26

SECTION 6.6    Litigation, Labor Controversies, etc................................26

SECTION 6.7    No Material Adverse Change ................................................27

SECTION 6.8    Subsidiaries ................................................................27

SECTION 6.9    Ownership of Properties ................................................27

SECTION 6.10  Taxes ................................................................27

SECTION 6.11  Pension and Welfare Plans................................................27

SECTION 6.12  Accuracy of Information ................................................28

ARTICLE VII  COVENANTS ................................................................28

SECTION 7.1    Affirmative Covenants ................................................28

SECTION 7.1.1    Financial Information, Reports, Notices, etc ...........................28

SECTION 7.1.2    Maintenance of Existence; Compliance with Laws.................30

SECTION 7.1.3    Maintenance of Properties ................................................30

SECTION 7.1.4    Insurance ................................................................30

SECTION 7.1.5    Books and Records ................................................31

SECTION 7.1.6    Environmental Law Covenant ................................................31

SECTION 7.1.7    Use of Proceeds................................................31

10157063v.12

DEFENSE 017646

SECTION 7.1.8    Future Guarantors, Security, etc ...............................................31

SECTION 7.1.9    Assignment of Promissory Notes...............................................32

SECTION 7.2    Negative Covenants .............................................................................32

SECTION 7.2.1    Business Activities....................................................................32

SECTION 7.2.2    Indebtedness..............................................................................32

SECTION 7.2.3    Liens...........................................................................................33

SECTION 7.2.4    Financial Convents.....................................................................34

SECTION 7.2.5    Investments ................................................................................37

SECTION 7.2.6    Restricted Payments, etc ...........................................................38

SECTION 7.2.7    Compensation Restrictions .......................................................39

SECTION 7.2.8    Issuance of Capital Securities ...................................................39

SECTION 7.2.9    Consolidation, Merger, etc.........................................................39

SECTION 7.2.10    Permitted Dispositions ............................................................39

SECTION 7.2.11    Transactions with Affiliates ....................................................40

SECTION 7.2.12    Restrictive Agreements, etc ....................................................40

SECTION 7.2.13    Sale and Leaseback .................................................................40

SECTION 7.2.14    Modification of Certain Agreements .......................................40

SECTION 7.2.15    No Material Adverse Change...................................................40

ARTICLE VIII  EVENTS OF DEFAULT.............................................................................41

SECTION 8.1    Listing of Events of Default .................................................................41

SECTION 8.1.1    Non-Payment of Obligations .....................................................41

SECTION 8.1.2    Breach of Warranty....................................................................41

SECTION 8.1.3    Non-Performance of Certain Covenants and Obligations .......41

SECTION 8.1.4    Non-Performance of Other Covenants and Obligations..........41

SECTION 8.1.5    Default on Other Indebtedness...................................................41

SECTION 8.1.6    Default under the Purchase Agreement ....................................41

SECTION 8.1.7    Judgments ..................................................................................41

SECTION 8.1.8    Pension Plans.............................................................................42

SECTION 8.1.9    Change in Control......................................................................42

SECTION 8.1.10    Bankruptcy, Insolvency, etc....................................................42

SECTION 8.1.11    Impairment of Security, etc.....................................................43

SECTION 8.1.12    Change in Management ...........................................................43

SECTION 8.2    Action if Bankruptcy ...........................................................................43

10157063v.12

DEFENSE 017647

SECTION 8.3    Action if Other Event of Default ....................................................43

ARTICLE IX    MISCELLANEOUS PROVISIONS................................................................43

SECTION 9.1    Waivers, Amendments, etc................................................................43

SECTION 9.2    Notices, Time ..................................................................................44

SECTION 9.3    Indemnification .................................................................................44

SECTION 9.4    Survival .............................................................................................46

SECTION 9.5    Severability........................................................................................46

SECTION 9.6    Headings ............................................................................................46

SECTION 9.7    Execution in Counterparts, Effectiveness, etc....................................46

SECTION 9.8    Governing Law; Entire Agreement .....................................................46

SECTION 9.9    Successors and Assigns ......................................................................47

SECTION 9.10    Other Transactions .............................................................................47

SECTION 9.11    Forum Selection and Consent to Jurisdiction......................................47

SECTION 9.12    Waiver of Jury Trial ...........................................................................47

SECTION 9.13    Confidentiality....................................................................................48

SCHEDULE A    -    Disclosure Schedule
SCHEDULE B    -    Term Loan A Amortization Schedule
EXHIBIT A-1    -    Form of Revolving Note
EXHIBIT A-2    -    Form of Term Note
EXHIBIT B    -    Form of Borrowing Request
EXHIBIT C    -    Form of Effective Date Certificate
EXHIBIT D    -    Form of Compliance Certificate
EXHIBIT E    -    Form of Subsidiary Guaranty
EXHIBIT F-1    -    Form of Borrower Pledge and Security Agreement
EXHIBIT F-2    -    Form of Subsidiary Pledge and Security Agreement
EXHIBIT F-3    -    Form of Shareholders' Pledge and Security Agreement
EXHIBIT G    -    Form of Solvency Certificate
EXHIBIT H    -    Organizational Chart

10157063v.12

DEFENSE 017648

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT, (the "Credit Agreement"), dated as of January 17, 2013 (the "Effective Date"), is between VOICE MEDIA GROUP, INC., a Colorado corporation (the "Borrower") and BROADWAY CAPITAL CORP., LLC, a Delaware limited liability company (the "Lender").

## W I T N E S S E T H:

WHEREAS, the Borrower and Village Voice Media Holdings, LLC ("VVMH") have entered into a Membership Interest Purchase Agreement (the "Purchase Agreement"), dated as of November 8, 2012, pursuant to which Borrower has purchased all of the membership interests of NT Media (the "Transaction");

WHEREAS, pursuant to that certain Assignment and Assumption Agreement dated as of January 10, 2013, VVMH has transferred and assigned to the Lender all of its right, title and interest in, to and under the Purchase Agreement and to all proceeds of the Transaction;

WHEREAS, the Lender has accepted the transfer and assignment of the Purchase Agreement and assumes and agrees to keep, perform and fulfill all of the terms, covenants, conditions and obligations of VVMH under the Purchase Agreement, including but not limited to entering into this Credit Agreement and all related documents;

WHEREAS, the Borrower has requested that the Lender make available for the purposes specified in this Credit Agreement a term loan facility to finance the purchase price of the Transaction and a revolving credit facility for working capital purposes;

WHEREAS, the Lender is willing to make available to the Borrower such credit facilities upon the terms and subject to the conditions set forth herein;

WHEREAS, all Obligations (as hereinafter defined) hereunder shall be secured by all assets of the Borrower and all assets of and equity interests in the Borrower's Subsidiaries (as hereinafter defined);

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1     Defined Terms. The following terms (whether or not underscored) when used in this Credit Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Acquisition" means, any transaction or series of transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of 50% of the

10157063v.12

DEFENSE 017649

Capital Securities of any Person (other than a Person that is a Subsidiary), or otherwise causing any Person to become a Subsidiary or (c) a merger or consolidation or any other combination with another Person (other than a Person that is a Subsidiary); provided that the Borrower or one of its Subsidiaries is the surviving Person; provided further that the term "Acquisition" shall not include the formation by the Borrower or any of its Subsidiaries of a wholly owned Subsidiary.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person. "Control" of a Person means the power, directly or indirectly,

> (a)    to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of managers, directors, managing members or general partners (as applicable); or

> (b)    to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"Authorized Officer" means, relative to any Obligor, those of its officers, general partners, managers, or managing members (as applicable) whose signatures and incumbency shall have been certified to the Lender pursuant to Section 5.1.1.

"Borrower" is defined in the preamble.

"Borrower Pledge and Security Agreement" means, collectively, (a) that certain Borrower Pledge and Security Agreement, dated as of the date hereof, between the Borrower and the Lender, and (b) any supplemental Foreign Pledge Agreements delivered pursuant to the terms of this Credit Agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Borrowing" means the Loans made by Lender on the same Business Day and pursuant to the same Borrowing Request in accordance with Section 2.3.

"Borrowing Request" means a Loan request and certificate duly executed by an Authorized Officer of the Borrower substantially in the form of Exhibit B hereto.

"Business Day" means any day which is neither a Saturday or Sunday nor a legal holiday on which banks are authorized or required to be closed in Phoenix, Arizona.

"Capital Expenditures" means, for any period, the aggregate amount of (a) all expenditures of the Borrower and its Subsidiaries for fixed or capital assets made during such period which, in accordance with GAAP, would be classified as capital expenditures and (b) Capitalized Lease Liabilities incurred by the Borrower and its Subsidiaries during such period.

"Capital Securities" means, with respect to any Person, all shares, membership interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, including any certificated interest in any beneficial ownership of such Person, whether now outstanding or issued after the Effective Date.

10157063v.12

DEFENSE 017650

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Cash" means cash on hand held in U.S. dollars.

"Cash Equivalent Investment" means, at any time:

> (a)      any direct obligation of (or unconditionally guaranteed by) the United States or a State thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States or a State thereof) maturing not more than one year after such time;

> (b)      commercial paper maturing not more than 270 days from the date of issue, which is issued by a corporation (other than an Affiliate of any Obligor) organized under the laws of any State of the United States or of the District of Columbia and rated A 1 or higher by S&P or P 1 or higher by Moody's;

> (c)      any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by any bank organized under the laws of the United States (or any State thereof) and which has (x) a credit rating of A2 or higher from Moody's or A or higher from S&P and (y) a combined capital and surplus greater than $500,000,000; or

> (d)      any repurchase agreement having a term of 30 days or less entered into with Lender or any commercial banking institution satisfying the criteria set forth in clause (c) which

>> (i)      is secured by a fully perfected security interest in any obligation of the type described in clause (a), and

>> (ii)     has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder.

"Casualty Event" means the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"CEO" means the Chairman and Chief Executive Officer of and for the Borrower with respect to its and its Subsidiaries' operations. The current CEO is Scott Tobias.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Recovery Act of 1980, as amended.

"Change in Control" means

DEFENSE 017651

(a)     the failure of the Principal Shareholder (or trusts created and controlled by the Principal Shareholder) as of the date of this Agreement, to directly or indirectly collectively own beneficially and of record on a fully diluted basis at least 40% of the issued and outstanding Capital Securities of Borrower, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document);

(b)     the failure of the Shareholders as of the date of this Agreement, to directly or indirectly collectively own beneficially and of record on a fully diluted basis at least 60% of the issued and outstanding Capital Securities of Borrower, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document);

(c)     any person or group (within the meaning of Sections 13(d) and 14(d) under the Exchange Act), other than the Permitted Holders, shall become the ultimate "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the outstanding Capital Securities of the Borrower, collectively, beneficially and of record on a fully diluted basis;

(d)     less than a majority of the members of the Board of Directors of the Borrower shall be persons who were nominated and approved by the Board of Directors of the Borrower as of the Effective Date;

(e)     Scott Tobias no longer serves as a member of the Borrower's Board of Directors; provided that in event that Scott Tobias (i) dies, (ii) is disabled to the extent that he cannot reasonably continue his duties or (iii) is terminated for "cause", the Board of Directors of the Borrower shall have not more than 90 days after such event to propose a successor acceptable to Lender in its sole discretion.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Commitment" means, as the context may require, the Term Loan A Commitment, Term Loan B Commitment, the Term Loan C Commitment or the Revolving Loan Commitment.

"Commitment Termination Date" means, as the context may require, the Term Loan A Commitment Termination Date, the Term Loan B Commitment Termination Date or the Revolving Loan Commitment Termination Date.

"Commitment Termination Event" means

(a)     the occurrence of any Event of Default with respect to the Borrower described in clauses (a) through (c) of Section 8.1.10; or

(b)     the occurrence and continuance of any other Event of Default and the declaration of all or any portion of the Loans to be due and payable pursuant to Section 8.2.

-4-

DEFENSE 017652

"Compliance Certificate" means a certificate duly completed and executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit D hereto, together with such changes thereto as the Lender may from time to time reasonably request for the purpose of monitoring the Borrower's compliance with the financial covenants contained herein.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person. The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Copyright Security Agreement" means any Copyright Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit C to any Pledge and Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Credit Agreement" has the meaning provided in the preamble.

"Credit Extension" means the making of a Loan by Lender.

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"Default Rate" is defined in Section 3.2.2.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as Schedule A, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Lender.

"Disposition" (or similar words such as "Dispose") means any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of transactions.

"Dollar" and the sign "$" mean lawful money of the United States.

"EBITDA" means, for any applicable period, the sum of

DEFENSE 017653

(a)      the aggregate of all amounts which would be included as net income on the consolidated financial statements of the Borrower and its Subsidiaries for such period exclusive of all amounts in respect of any extraordinary gains and extraordinary losses, all non-cash income, plus

(b)      all fees, costs and expenses payable by the Borrower or any of its Subsidiaries incurred prior to the Effective Date in connection with the transactions contemplated herein and in the Purchase Agreement, plus

(c)      all severance payments paid to terminated employees of the Borrower or any of its Subsidiaries prior to the first anniversary of the Effective Date,

(d)      with the consent of the Lender in its sole discretion, other one-time, non-recurring non-operating gains and losses; plus

(e)      to the extent deducted in determining the amount in clause (a) through (f) above, the sum of (i) amounts attributable to amortization, (ii) income tax expense, (iii) Interest Expense, (iv) depreciation of assets, and (v) other non-cash expenses (including goodwill amortization included under Federal Accounting Standard Board (FASB) rules 141 and 142).

"Effective Date" is defined in the preamble.

"Effective Date Certificate" means the certificate executed and delivered by an Authorized Officer of the Borrower pursuant to the terms of this Credit Agreement, substantially in the form of Exhibit C hereto.

"Environmental Laws" means all applicable federal, state or local statutes, laws, ordinances, codes, rules, regulations and guidelines (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to sections of ERISA also refer to any successor sections thereto.

"Event of Default" is defined in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Filing Agent" is defined in Section 5.1.9.

"Filing Statements" is defined in Section 5.1.9.

"Fiscal Quarter" means the period of three consecutive months ending on the last day of each March, June, September or December.

10157063v.12

DEFENSE 017654

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2013 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"Foreign Pledge Agreement" means any supplemental pledge agreement governed by the laws of a jurisdiction other than the United States or a State thereof executed and delivered by the Borrower or any of its Subsidiaries pursuant to the terms of this Credit Agreement, in form and substance satisfactory to the Lender, as may be necessary or desirable under the laws of organization or incorporation of a Subsidiary to further protect or perfect the Lien on and security interest in any Collateral (as defined in a Pledge and Security Agreement).

"Foreign Subsidiary" means any Subsidiary that is not a U.S. Subsidiary.

"Free Cash Flow" means, the result, if positive number, of the following: Borrower's EBITDA for the previous four Fiscal Quarters minus (i) interest paid in cash during such period; minus (ii) any amounts paid for Capital Expenditures during such period; minus (iii) income taxes paid; minus (iv) amounts repaid on the Revolving Line of Credit during such period; minus (v) principal payments made with respect to Term Loan A and Term Loan B during such period.

"GAAP" is defined in Section 1.4.

"Governmental Authority" means the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guaranty" means, as the context may require, the Subsidiary Guaranty, and any other guaranty agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Guarantor" means each Subsidiary Guarantor and any other Person executing a guaranty of any Obligation owed hereunder to the Lender.

"Hazardous Material" means

(a)    any "hazardous substance", as defined by CERCLA;

(b)    any "hazardous waste", as defined by the Resource Conversation Recovery Act, as amended; or

(c)    any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) regulated by Environmental Laws.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under currency exchange agreements, interest rate swap agreements, interest rate cap agreements

DEFENSE 017655

and interest rate collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates or currency exchange rates.

"Herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"Impermissible Qualification" means any qualification or exception to the opinion or certification of any independent public accountant as to any financial statement of the Borrower

(a) which is of a "going concern" or similar nature;

(b) which relates to the limited scope of examination of matters relevant to such financial statement; or

(c) which relates to the treatment or classification of any item in such financial statement and which, as a condition to its removal, would require an adjustment to such item the effect of which would be to cause the Borrower to be in Default.

"Indebtedness" of any Person means:

(a) all obligations of such Person for borrowed money or advances, including wire transfers and automatic clearing house (ACH) advances, and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(b) all Capitalized Lease Liabilities of such Person;

(c) for purposes of Section 8.1.5 only, all other items which, in accordance with GAAP, would be included as liabilities on the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(d) net Hedging Obligations of such Person;

(e) whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Person), and indebtedness secured by (or for which the holder of such indebtedness has an existing right. contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) obligations arising under Synthetic Leases; and

DEFENSE 017656

(g) all Contingent Liabilities of such Person in respect of any of the foregoing.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" is defined in Section 9.3.

"Indemnified Parties" is defined in Section 9.3.

"Interest Coverage Ratio" means, for any period the ratio of:

(a) EBITDA for such period; to

(b) Interest Expense for such period.

"Interest Expense" means, for any applicable period, the aggregate interest expense (both accrued and paid and net of interest income paid during such period to the Borrower and its Subsidiaries) of the Borrower and its Subsidiaries during such applicable period, including the portion of any payments made in respect of Capitalized Lease Liabilities allocable to interest expense.

"Investment" means, relative to any Person,

(a) any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person;

(b) Contingent Liabilities in favor of any other Person; and

(c) any Capital Securities held by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or equity thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Knowledge" means the actual knowledge of any natural person.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, to secure payment of a debt or performance of an obligation.

"Loan Documents" means, collectively, this Credit Agreement, the Notes, the Subsidiary Guaranty, any Pledge and Security Agreement, any additional guarantee or security agreement

DEFENSE 017657

subsequently executed, each agreement pursuant to which the Lender is granted a Lien to secure the Obligations and each other agreement, certificate, document or instrument delivered in connection with any of the aforementioned documents, whether or not specifically mentioned herein or therein.

"Loans" means, as the context may require, the Revolving Loan or the Term Loans.

"Mandatory Prepayment" means each payment required by clauses (e) and (f) of Section 3.1.1.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance, or properties of the Borrower and its Subsidiaries taken as a whole, (b) the rights and remedies of Lender under any Loan Document or (c) the ability of any Obligor to perform its Obligations under any Loan Document.

"Net Casualty Proceeds" means, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by the Borrower, or any of its Subsidiaries in connection with such Casualty Event (net of all reasonable and customary collection expenses thereof), but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a first priority Lien permitted by clause (c) of Section 7.2.3 on the property which is the subject of such Casualty Event. In the event the Casualty Event includes loss of tangible assets that are necessary for and are being replaced for the continued operation of existing business, the amount required to repair or replace the damaged, destroyed or condemned property shall be deducted from Net Casualty Proceeds.

"Net Debt Proceeds" means, with respect to the sale or issuance by the Borrower or any of its Subsidiaries of any Indebtedness to any other Person after the Effective Date which is not expressly permitted by Section 7.2.2, the excess of (i) the gross cash proceeds actually received by such Person from such sale or issuance, over (ii) all reasonable and customary arranging or underwriting fees and commissions, and all legal, investment banking, brokerage, accounting and other professional fees, sales commissions and disbursements and other reasonable and customary closing costs and expenses actually incurred in connection with such sale or issuance other than any such fees, commissions or disbursements paid to Affiliates of such Person in connection therewith.

"Net Disposition Proceeds" means the gross cash proceeds (including, without limitation, any earn-out payments) received by the Borrower or its U.S. Subsidiaries from any Disposition and any cash payment received in respect of promissory notes or other non-cash consideration delivered to the Borrower or its U.S. Subsidiaries in respect thereof, minus the sum of (i) all reasonable and customary legal, investment banking, brokerage, accounting and other fees and expenses incurred in connection with such Disposition, (ii) all Taxes actually payable or estimated by the Borrower to be payable with respect to the period ending 12 months after such Disposition, and (iii) payments made by the Borrower or its U.S. Subsidiaries to retire Indebtedness (other than the Credit Extensions) where payment of such Indebtedness is required in connection with such Disposition and any severance payment made in connection with such Disposition; provided, however, that if the amount of any estimated Taxes pursuant to clause (ii)

-10-

10157063v.12

DEFENSE 017658

exceeds the amount of Taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Disposition Proceeds.

"Net Equity Proceeds" means with respect to the sale or issuance after the Effective Date by the Borrower to any Person of its Capital Securities, warrants or options or the exercise of any such warrants or options, the excess of:

> (a)     the gross cash proceeds received by the Borrower from such sale, exercise or issuance, over
>
> (b)     all reasonable and customary underwriting commissions and legal, investment banking, brokerage and accounting and other professional fees, sales commissions and disbursements actually incurred in connection with such sale or issuance which have not been paid to Affiliates of the Borrower in connection therewith.

"Non-Excluded Taxes" means any Taxes other than net income and franchise Taxes imposed with respect to Lender by any Governmental Authority under the laws of which Lender is organized or in which it maintains its principal place of business.

"Note" means, as the context may require, the Revolving Note or a Term Note.

"NT Media" means New Times Media, LLC, a Delaware limited liability company.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower and each other Obligor arising under or in connection with a Loan Document or the Purchase Agreement and the principal of and premium, if any, and interest (including interest accruing during the pendency of any proceeding of the type described in Section 8.1.10, whether or not allowed in such proceeding) on the Loans.

"Obligor" means, as the context may require, the Borrower, the Shareholders and each Subsidiary.

"Organic Document" means, relative to any Obligor, as applicable, its certificate of incorporation, bylaws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Obligor's partnership interests, limited liability company interests or authorized shares of Capital Securities.

"Other Taxes" means any and all stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of any Loan Document.

"Patriot Act" is defined in Section 9.14.

"Payment Date" means the first day of each month, or, if any such day is not a Business Day, the next succeeding Business Day.

DEFENSE 017659

"PBGC" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA (other than a multiemployer plan as defined in Section 4001(a)(3) of ERISA), and to which the Borrower or any corporation, trade or business that is, along with the Borrower, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Permitted Holders" means each of the Principal Shareholders and any of their respective Affiliates.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Pledge and Security Agreement" means, as the context may require, the Borrower Pledge and Security Agreement, the Shareholders' Pledge and Security Agreement, the Subsidiary Pledge and Security Agreement and any other pledge and security agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Pledged Subsidiary" means each Subsidiary in respect of which the Lender has been granted a security interest in or a pledge of (i) any of the Capital Securities of such Subsidiary or (ii) any intercompany notes of such Subsidiary owing to the Borrower or another Subsidiary.

"Prepayment Fee" is defined in Section 3.3.

"Prime Rate" means the interest rate published by the *Wall Street Journal* from time-to-time as the "prime rate" charged by national banks in the United States.

"Principal Shareholder" means,  Scott Tobias and his estate, spouse, ancestor, and lineal descendants, the legal representatives of any of the foregoing and the trustee of any bona fide trust of which the foregoing are the sole beneficiaries or grantors.

"Purchase Agreement" means that certain Membership Interest Purchase Agreement dated as of November 8, 2012, as amended or modified from time-to-time.

"Release" means a "release", as such term is defined in CERCLA.

"Resource Conservation and Recovery Act" means the Resource Conservation and Recovery Act. 42 U.S.C. Section 6901, et seq., as amended.

"Restricted Payment" means the declaration or payment of any dividend (other than dividends payable solely in Capital Securities of the Borrower or any Subsidiary and dividends payable solely to the Borrower or one or more Subsidiary Guarantors) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous

DEFENSE 017660

fund for, the purchase, redemption, defeasance, retirement or other acquisition of any class of Capital Securities of the Borrower or any Subsidiary or any warrants or options to purchase any such Capital Securities, whether now or hereafter outstanding, or the making of any other distribution in respect thereof, either directly or indirectly, whether in cash or property, obligations of the Borrower or any Subsidiary or otherwise.

"Revolving Loan" is defined in Section 2.1.1.

"Revolving Loan Commitment" means, the Lender's obligation to make Revolving Loans pursuant to clause (a) of Section 2.1.1.

"Revolving Loan Commitment Amount" means, on any date, $2,500,000, as such amount may be reduced from time to time pursuant to Section 2.2.

"Revolving Loan Commitment Termination Date" means the earliest of:

(a)     December 31, 2015;

(b)     the date on which the Revolving Loan Commitment Amount is terminated in full pursuant to the terms of this Credit Agreement; and

(c)     the date on which any Commitment Termination Event occurs.

Upon the occurrence of any event described in the preceding clauses (b) or (c), the Revolving Loan Commitments shall terminate automatically and without any further action.

"Revolving Note" means a promissory note of the Borrower payable to Lender, in the form of Exhibit A-1 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to Lender resulting from outstanding Revolving Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"SEC" means the Securities and Exchange Commission.

"Shareholders" means Scott Tobias, Jeffrey Mars, Christine Brennan, Kurtis Barton, Josh Fromson, Stuart Folb, Gerard Goroski, and Andrew Vandevoorde, or such additional or replacement Shareholders of the Borrower from time to time.

"Shareholders' Pledge and Security Agreement" means that certain Shareholders' Pledge and Security Agreement, executed and delivered by each of the Shareholders pursuant to the terms of the Credit Agreement, in the form attached hereto as Exhibit F-3.

"Solvent" means, with respect to any Person and its Subsidiaries on a particular date, that on such date (a) the fair value of the property of such Person and its Subsidiaries on a consolidated basis is greater than the total amount of liabilities, including contingent liabilities,

-13-

DEFENSE 017661

of such Person and its Subsidiaries on a consolidated basis, (b) the present fair salable value of the assets of such Person and its Subsidiaries on a consolidated basis is not less than the amount that will be required to pay the probable liability of such Person and its Subsidiaries on a consolidated basis on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it or its Subsidiaries will, incur debts or liabilities beyond the ability of such Person and its Subsidiaries to pay as such debts and liabilities mature, and (d) such Person and its Subsidiaries on a consolidated basis is not engaged in business or a transaction, and such Person and its Subsidiaries on a consolidated basis is not about to engage in business or transaction, for which the property of such Person and its Subsidiaries on a consolidated basis would constitute an unreasonably small capital. The amount of Contingent Liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability.

"Stated Maturity Date" means December 31, 2020.

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person. Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower.

"Subsidiary Guarantor" means each Subsidiary that has executed and delivered to the Lender the Subsidiary Guaranty.

"Subsidiary Guaranty" means the Subsidiary Guaranty, executed and delivered by an Authorized Officer of each U.S. Subsidiary pursuant to the terms of this Credit Agreement, in the form attached as Exhibit E hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Subsidiary Pledge and Security Agreement" means, collectively, (a) that certain Subsidiary Pledge and Security Agreement, executed and delivered by an Authorized Officer of each U.S. Subsidiary pursuant to the terms of the Credit Agreement, in the form attached as Exhibit F-2 hereto, and (b) any supplemental Foreign Pledge Agreements delivered pursuant to the terms of this Credit Agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"Taxes" means all income, stamp or other taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected,

-14-

DEFENSE 017662

withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Term Loans" means, collectively, Term Loan A, Term Loan B, and Term Loan C.

"Term Loan A" means the financing provided by the Lender in regards to its Term Loan A Commitment following the Effective Date in the Term Loan A Commitment Amount.

"Term Loan A Amortization Schedule" means Schedule B attached hereto.

"Term Loan A Commitment" means Lender's obligation (if any) to make the Term Loan A pursuant Section 2.1.2.

"Term Loan A Commitment Amount" means $28,000,000.00.

"Term Loan A Note" means a completed Term Note in the amount of the Term Loan A Commitment as evidence of Term Loan A.

"Term Loan B" means the Credit Extension provided by the Lender pursuant to Section 2.1.3 hereof.

"Term Loan B Commitment Amount" has the meaning given to such term in Section 2.1.3.

"Term Loan B Note" means a completed Term Note in the amount of the Term Loan B Commitment as evidence of Term Loan B.

"Term Loan C" means the Credit Extension provided by the Lender pursuant to Section 2.1.4 hereof.

"Term Loan C Commitment" has the meaning given to such term in Section 2.14.

"Term Loan C Note" means a completed Term Note in the amount of the Term Loan C Commitment as evidence of Term Loan C.

"Term Note" means one or more promissory notes of the Borrower payable to Lender, in the form of Exhibit A-2 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to the Lender resulting from outstanding Term Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Termination Date" means the date on which all Obligations have been paid in full in cash and all Commitments shall have terminated.

"Trademark Security Agreement" means any Trademark Security Agreement executed and delivered by any Obligor substantially in the form of Exhibit B to any Pledge and Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

10157063v.12

DEFENSE 017663

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Delaware; provided, that if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non perfection of the security interests granted to the Lender pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than Delaware, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non perfection.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"U.S. Subsidiary" means any Subsidiary that is incorporated or organized under the laws of the United States or a state thereof.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Welfare Plan" means a "welfare plan", as such term is defined in Section 3(1) of ERISA.

"Wholly Owned Subsidiary" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by applicable laws) are owned directly or indirectly by the Borrower.

SECTION 1.2    Use of Defined Terms. Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Credit Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

SECTION 1.3    Cross-References. Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

SECTION 1.4    Accounting and Financial Determinations.

(a)    Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under Section 7.2.4 and the definitions used in such calculations) shall be made, in accordance with those generally accepted accounting principles ("GAAP") applied in the preparation of the financial statements for the Borrower prior to the Effective Date. Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Borrower and its Subsidiaries, in each case without duplication.

(b)    As of any date of determination, for purposes of determining the Interest Coverage Ratio (and any financial calculations required to be made or included within such ratio), the calculation of such ratio and other financial calculations shall include or exclude, as

10157063v.12

DEFENSE 017664

the case may be, the effect of any assets or businesses that have been acquired or Disposed of by the Borrower or any of its Subsidiaries pursuant to the terms hereof (including through mergers, consolidations) as of such date of determination, as determined by the Borrower on a pro forma basis in accordance with GAAP, which determination may include one-time adjustments or reductions in costs, if any, directly attributable to any such permitted Disposition (i) as reasonably approved by the Lender, (ii) giving effect to any such permitted Disposition as if it had occurred on the first day of the applicable measurement periods, and (iii) giving effect to any mandatory prepayment hereunder with respect to such permitted Disposition as if it had occurred on the first day of the applicable measurement periods.

## ARTICLE II
## COMMITMENTS, BORROWING PROCEDURES, NOTES

SECTION 2.1        Commitments. On the terms and subject to the conditions of this Credit Agreement, the Lender agrees to make Credit Extensions as set forth below.

SECTION 2.1.1        Revolving Loan Commitment.

(a)        From time to time on any Business Day occurring from and after the Effective Date but prior to the Revolving Loan Commitment Termination Date, Lender agrees that it will make loans (each "Revolving Loan") to the Borrower in an aggregate outstanding principal amount not at any time to exceed the Revolving Loan Commitment Amount.

(b)        On the terms and subject to the conditions hereof, the Borrower may from time to time borrow, prepay and reborrow pursuant to the Revolving Loan Commitment provided that the aggregate outstanding principal amount of all Revolving Loans shall not at any time exceed the Revolving Loan Commitment Amount.

SECTION 2.1.2        Term Loan A Commitment.  On the date hereof and pursuant to the Term Loan A Note the Lender shall advance Term Loan A to the Borrower to fund its acquisition of the membership interests in NT Media pursuant to the Purchase Agreement.

SECTION 2.1.3        Term Loan B Commitment.  Provided that a Commitment Termination Event has not occurred, pursuant to the Term Loan B Note, the Lender shall permit the Borrower to finance its obligation to pay the "Post Closing Adjustment" due to Lender pursuant to Section 2.03(c) and (d) of the Purchase Agreement (the "Term Loan B Commitment"). In such event, Borrower shall deliver the Term Loan B Note to Lender on or before the date which is thirty (30) days after the date on which a final determination of the amount of the Post Closing Adjustment is made.

SECTION 2.1.4        Term Loan C Commitment.  Provided that a Commitment Termination Event has not occurred, pursuant to the Term Loan C Note, the Lender shall permit the Borrower to finance its obligation to pay the "Earn-out Payments" due to Lender pursuant to Sections 2.02(b),(c),(d) and (e) of the Purchase Agreement (the "Term Loan C Commitment"). In such event, Borrower shall deliver the Term Loan C Note to Lender on or before the date which is thirty (30) days after the date on which a final determination of the amount of the Earn Out Payments is made.

DEFENSE 017665

SECTION 2.1.5

SECTION 2.2        Reduction of the Revolving Loan Commitment Amount. The Borrower may, from time to time on any Business Day occurring after the Effective Date, voluntarily reduce the amount of the Revolving Loan Commitment Amount or the Term Loan Commitment Amount on the Business Day so specified by the Borrower; provided, however, that all such reductions shall require at least one Business Day's prior notice to the Lender and be permanent, and any partial reduction of any Commitment Amount shall be in a minimum amount of $250,000.00 and in an integral multiple of $250,000.00

SECTION 2.3        Borrowing Procedure. By delivering a Borrowing Request to the Lender on or before 10:00 a.m. on a Business Day, the Borrower may from time to time irrevocably request, on not less than three Business Days' notice and no more than once per week, that a Borrowing be made in a minimum amount of $250,000.00 and an integral multiple of $250,000.00 or in the unused amount of the applicable Revolving Loan Commitment Amount on the terms and subject to the conditions of this Credit Agreement. Each Borrowing shall be made on the Business Day specified in such Borrowing Request. The Lender shall make such funds available to the Borrower by wire transfer to the accounts the Borrower shall have specified in its Borrowing Request.

## ARTICLE III
## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1        Repayments and Prepayments; Application. The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

SECTION 3.1.1        Repayments and Prepayments. The Borrower shall repay in full the unpaid principal amount of the Revolving Loan, together with all accrued and unpaid interest and all other amounts due with respect to the Revolving Loan in 59 equal monthly payments commencing on the Payment Date in the month immediately following the Revolving Loan Commitment Termination Date and in one final payment equal to the then outstanding principal, accrued interest and fees under the Revolving Loan on the Stated Maturity Date. The Borrower shall repay the Term Loans in accordance herewith, but in any event on or before the Stated Maturity Date.  Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)        From time to time on any Business Day, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of the Revolving Loan. Each prepayment of the Revolving Loan made pursuant to this section shall be without premium or penalty. Until the Revolving Loan Commitment Termination Date, amounts repaid on the Revolving Loans may be reborrowed.

(b)        On each date when the aggregate outstanding principal amount of the Revolving Loan exceeds the Revolving Loan Commitment Amount (as it may be reduced from time to time pursuant to this Credit Agreement), the Borrower shall make a mandatory prepayment of the Revolving Loan in an aggregate amount equal to such excess.

DEFENSE 017666

(c)      Commencing on April 1, 2016, on each Payment Date thereafter, the Borrower shall make a scheduled payment of principal in an amount equal to the amount set forth in the Term Loan A Amortization Schedule; provided that if Term Loan B is then outstanding, each payment set forth on the Term Loan A Amortization Schedule shall be allocated *pro rata* to Term Loan A and Term Loan B. All amounts outstanding on Term Loan A and Term Loan B shall be repaid in full on the Stated Maturity.

(d)      To the extent not repaid pursuant to Sections 3.1.1(a), 3.1.1(f) and 3.1.2, principal outstanding under Term Loan C shall be paid in full, together with all accrued but unpaid interest and any outstanding fees and costs on the Stated Maturity Date.

(e)      Within two (2) Business Days after receipt by the Borrower or any of its Subsidiaries of any Net Disposition Proceeds, Net Casualty Proceeds, Net Equity Proceeds or Net Debt Proceeds, the Borrower shall make a Mandatory Prepayment of the Loans in an amount equal to (i) 100% of such Net Disposition Proceeds, Net Casualty Proceeds, or Net Debt Proceeds, as applicable and (ii) 50% of Net Equity Proceeds, to be applied as set forth in Section 3.1.2. On the first Payment Date following the end of each Fiscal Quarter, the Borrower shall make a Mandatory Prepayment of the Loans in an amount equal to 75% of the Free Cash Flow with respect to such Fiscal Quarter, to be applied as set forth in Section 3.1.2.

(f)      Immediately upon any acceleration of the Stated Maturity Date of any Loans pursuant to Section 8.2 or Section 8.3, the Borrower shall repay all the Loans, unless, pursuant to Section 8.3, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

SECTION 3.1.2      Application. Amounts prepaid pursuant to Section 3.1.1(e) and (f) or any voluntary prepayment shall be applied (i) first, to repayment of the Revolving Loans, (ii) second, to a mandatory prepayment of the outstanding principal amount of (A) Term Loan A or (B) if Term Loan B is then outstanding, Term Loan A and Term Loan B *pro rata* (with the amount of such prepayment of the Term Loans being applied ratably to the remaining amortization payments of such Term Loans in inverse order of maturity), and (iii) third, to the repayment of Term Loan C.

SECTION 3.2      Interest Provisions. Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.2.1      Rates.

(a)      Term Loans.   The outstanding principal amount of Term Loan A shall bear interest at the fixed rate of seven and one-half percent (7.5%) per annum, accruing from the date hereof but payable monthly in arrears commencing on the February, 2014, Payment Date, with interest accruing prior to December 31, 2013 capitalized and added to the principal balance of Term Loan A.  The outstanding principal amount of Term Loan B shall have interest at the fixed rate of seven and one half percent (7.5%) per annum, accruing from the date of origination Term Loan B but payable monthly, in arrears commencing on the February, 2014 Payment Date with interest accruing prior to December 31, 2013 capitalized and added to the principal amount of Term Loan B.  The outstanding principal balance of Term Loan C shall bear interest at the rate

DEFENSE 017667

of twelve percent (12%) per annum, accruing from the date of origination but payable monthly in arrears commencing on the February, 2014 Payment Date with interest accruing prior to December 31, 2013 capitalized and added to the principal amount of Term Loan C. All amounts due under the Term Loans shall be payable without setoff, counterclaim or any other deduction. This agreement contemplates the accrual and payment of interest on capitalized interest.

(b)     Revolving Loan.  The outstanding principal amount of the Revolving Loan shall bear interest at the fixed rate of the Prime Rate plus three percent (3%) per annum, payable monthly in arrears commencing on the February, 2014 Payment Date with interest accruing prior to December 31, 2013 capitalized and added to the principal balance on the Revolving Loan.  All amounts due under the Revolving Loan shall be payable without setoff, counterclaim or any other deduction.

SECTION 3.2.2     Default Rates. After the date on which any Event of Default has occurred and for so long as such Event of Default is continuing, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on all outstanding Obligations, including overdue interest fees  and other monetary payments due to the Lender, at a rate per annum equal to, subject to applicable law, the rate of interest that otherwise would be applicable to such Loan plus two percent (2%) per annum (the "Default Rate").

SECTION 3.2.3     Payment Dates. Interest accrued on each Loan shall be payable, without duplication:

(a)     on the Stated Maturity Date therefor;

(b)     on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan on the principal amount so paid or prepaid;

(c)     on each Payment Date; and

(d)     upon  acceleration of the Stated Maturity Date pursuant to Section 8.2 or Section 8.3, immediately upon such acceleration.

## ARTICLE IV
## TAXES AND MISCELLANEOUS

SECTION 4.1     Taxes. The Borrower covenants and agrees as follows with respect to Taxes.

(a)     Any and all payments by the Borrower under each Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes. In the event that any Taxes are imposed and required to be deducted or withheld from any payment required to be made by any Obligor to or on behalf of Lender under any Loan Document, then:

(i)     if such Taxes are Non-Excluded Taxes, the amount of such payment shall be increased as may be necessary so that such payment is made, after withholding or deduction

-20-

DEFENSE 017668

for or on account of such Taxes, in an amount that is not less than the amount provided for in such Loan Document; and

(ii)     the Borrower shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b)     In addition, the Borrower shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c)     As promptly as practicable after the payment of any Taxes or Other Taxes, and in any event within 45 days of any such payment being due, the Borrower shall furnish to the Lender a copy of an official receipt (or a certified copy thereof) evidencing the payment of such Taxes or Other Taxes.

(d)     The Borrower shall indemnify Lender for any Non-Excluded Taxes and Other Taxes levied, imposed or assessed on (and whether or not paid directly by) Lender whether or not such Non-Excluded Taxes or Other Taxes are correctly or legally asserted by the relevant Governmental Authority. Promptly upon having knowledge that any such Non-Excluded Taxes or Other Taxes have been levied, imposed or assessed, and promptly upon notice thereof by Lender, the Borrower shall pay such Non-Excluded Taxes or Other Taxes directly to the relevant Governmental Authority.  Borrower shall indemnify Lender for any incremental Taxes that may become payable by as a result of any failure of the Borrower to pay any Taxes when due to the appropriate Governmental Authority or to deliver to the Lender, pursuant to clause (c), documentation evidencing the payment of Taxes or Other Taxes. With respect to indemnification for Non-Excluded Taxes and Other Taxes actually paid by Lender or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date Lender makes written demand therefor. The Borrower acknowledges that any payment made to Lender or to any Governmental Authority in respect of the indemnification obligations of the Borrower provided in this clause shall constitute a payment in respect of which the provisions of clause (a) and this clause shall apply.

SECTION 4.2     Payments, Computations, etc.

(a)     All payments shall be made without setoff, deduction or counterclaim not later than 11:00 a.m. on the date due in same day or immediately available funds to such account as the Lender shall specify from time to time by notice to the Borrower. Funds received after that time shall be deemed to have been received by the Lender on the next succeeding Business Day. All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days for the actual number of days elapsed. Payments due on other than a Business Day shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

(b)     Except as otherwise set forth in a Loan Document, all payments made under any Loan Document shall be applied upon receipt (i) first, to the payment of all Obligations owing to

10157063v.12

DEFENSE 017669

the Lender (including the fees and expenses of counsel to the Lender), (ii) second, after payment in full in cash of the amounts specified in clause (i), to the ratable payment of all interest and fees owing with respect to the Credit Extensions and all costs and expenses owing to the Lender pursuant to the terms of the Credit Agreement, until paid in full in cash, and (iii) third, after payment in full in cash of the amounts specified in clauses (i) and (ii), and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus.

SECTION 4.3        Setoff. Borrower agrees that Lender shall have a right to set off against any obligations owed by the Lender to Borrower or its Subsidiaries pursuant to the Purchase Agreement, or any other agreements entered into in connection therewith; provided that all amounts so offset shall be applied pursuant to Section 3.1.2 hereto, but with respect to the Term Loans, such amounts shall be applied to the Obligations in accordance with the terms of the Loan Documents.  The Lender agrees promptly to notify the Borrower and the Lender after any such setoff and application made by the Lender; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.

## ARTICLE V
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

SECTION 5.1        Initial Credit Extension. The obligations of the Lender to fund the initial Credit Extension hereunder shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Article.

SECTION 5.1.1        Resolutions, etc. The Lender shall have received from each Obligor, as applicable and unless otherwise noted (i) a copy of a good standing certificate, dated a date reasonably close to the Effective Date, for each such Person and (ii) a certificate, dated the Effective Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, members, manager, managing member or general partner, as applicable, as to

(a)        resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing, to the extent relevant, the execution, delivery and performance of each Loan Document to be executed by such Person;

(b)        the incumbency and signatures of those of its officers, members, manager, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person;

(c)        an irrevocable proxy granting the Lender such member's or partner's right to vote or take any other action under such Organic Documents upon any Event of Default and prior to any foreclosure on such equity interests; provided that the Lender shall not be entitled to exercise such rights until five (5) days after the Borrower receives notice of an Event of Default resulting from the default by any Obligor in the due performance or observance of its obligations under Sections 8.1.4 and 8.1.6 and such Event of Default shall continue unremedied; and

(d)        the full force and validity of each Organic Document of such Person and copies thereof;

DEFENSE 017670

upon which certificates Lender may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, members, manager, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

SECTION 5.1.2    Effective Date Certificate. The Lender shall have received the Borrower Effective Date Certificate, dated the Effective Date and duly executed and delivered by an Authorized Officer of the Borrower, in which certificate the Borrower shall agree and acknowledge that the statements made therein shall be deemed to be true and correct representations and warranties of the Borrower as of such date, and, at the time each such certificate is delivered, such statements shall in fact be true and correct. All documents and agreements required to be appended to the Borrower Effective Date Certificate shall be in form and substance reasonably satisfactory to the Lender.

SECTION 5.1.3    Delivery of Notes. The Lender shall have received, duly executed and delivered the Revolving Note and the Term Loan A Note by an Authorized Officer of the Borrower.

SECTION 5.1.4    Financial Information. etc. The Lender shall have received a consolidated business and financial plan for Borrower and its Subsidiaries, in form reasonably satisfactory to the Lender, including (a) a capital expenditure schedule and (b) financial projections. Such updated consolidated and financial plan shall be prepared by a senior financial officer of Borrower, which shall be distributed to the Lender.

SECTION 5.1.5    Solvency, etc. The Lender shall have received a solvency certificate in the form of Exhibit G hereto, duly executed and delivered by the chief financial or accounting Authorized Officer of the Borrower, dated as of the Effective Date.

SECTION 5.1.6    Guaranties. The Lender shall have received from each Subsidiary Guarantor, the Subsidiary Guaranty, or any other guaranty of the Obligations hereunder, duly authorized, executed, acknowledged and delivered by an Authorized Officer of each such Person.

SECTION 5.1.7    Pledge and Security Agreements. The Lender shall have received from each Obligor, the Pledge and Security Agreement, duly executed by each such Obligor, together with:

(a)    certificates (in the case of certificated Capital Securities that are securities (as defined in the UCC)) evidencing all of the issued and outstanding Capital Securities held by such Obligor in its U.S. Subsidiaries, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, as well as any other confirmation and evidence reasonably satisfactory to the Lender that the security interest therein has been transferred to and perfected by the Lender for the benefit of the Lender in accordance with Articles 8 and 9 of the UCC and all laws otherwise applicable to the perfection of the pledge of such Capital Securities; and

(b)    copies of Filing Statements naming such Obligor as a debtor and the Lender as the secured party, or other similar instruments or documents to be filed under the UCC of all

-23-

DEFENSE 017671

jurisdictions as may be necessary or, in the opinion of the Lender, desirable to perfect the security interests of the Lender pursuant to such Pledge and Security Agreement.

The Lender and its counsel shall be satisfied that (i) the Lien granted to it, in the collateral described above is a first priority (or local equivalent thereof) security interest, subject, in certain cases, to Liens permitted hereunder; and (ii) no Lien exists on any of the collateral described above other than the Lien created in its favor pursuant to a Loan Document or Liens permitted hereunder.

SECTION 5.1.8    Intellectual Property Security Agreements and Related Documentation. The Borrower shall have delivered and the Lender shall have received Item 5.1.8 of the Disclosure Schedule identifying (a) all patents, copyrights and trademarks owned by any Obligor and (b) each Patent Security Agreement, Copyright Security Agreement or Trademark Security Agreement (each, an "IP Security Agreement"), as applicable, by date and document number with respect to each such patent, copyright or trademark. Obligors shall provide the IP Security Agreement dated as of the date hereof, duly executed and delivered by such Obligor. The Borrower shall further identify in Item 5.1.8 of the Disclosure Schedule each Person that is a licensee of any such patent, copyright or trademark under a licensing agreement. Any Obligor that is a licensee of any such patent, copyright or trademark shall have granted to the Lender a security interest in its rights under each such licensing agreement.

SECTION 5.1.9    Filing Agent, etc. All Uniform Commercial Code financing statements or other similar financing statements and Uniform Commercial Code (Form UCC 3) termination statements required pursuant to the Loan Documents (collectively, the "Filing Statements") shall have been delivered to NRAI or another similar filing service company acceptable to the Lender (the "Filing Agent"). The Filing Agent shall have acknowledged in a writing reasonably satisfactory to the Lender and its counsel (i) the Filing Agent's receipt of all Filing Statements, (ii) that the Filing Statements have either been submitted for filing in the appropriate filing offices or will be submitted for filing in the appropriate offices within ten days following the Effective Date and (iii) that the Filing Agent will notify the Lender and its counsel of the results of such filings within 30 days following the Effective Date.

SECTION 5.1.10    Insurance. The Lender shall have received, certificates of insurance and declaration pages of the updated insurance policies (or binders in respect thereof), which include adequate business interruption insurance, from one or more insurance companies reasonably satisfactory to the Lender, evidencing coverage required to be maintained pursuant to each Loan Document and endorsements naming the Lender as loss payee. Such copies of declaration pages of each such policy is to be provided in addition to any certificates of insurance that reflect or name the Lender as loss payee.

SECTION 5.1.11    Purchase Agreement. All conditions precedent to the closing of the transactions contemplated by the Purchase Agreement shall have been satisfied in the sole discretion of the Lender.

SECTION 5.1.12    All Credit Extensions. The obligation of Lender to make any Credit Extension shall be subject to and the satisfaction of each of the conditions precedent set forth below.

-24-

DEFENSE 017672

SECTION 5.1.13     <u>Compliance with Warranties, No Default, etc</u>. Both before and after giving effect to any Credit Extension (but, if any Default of the nature referred to in <u>Section 8.1.5</u> shall have occurred with respect to any other Indebtedness, without giving effect to the application, directly or indirectly, of the proceeds thereof) the following statements shall be true and correct:

(a)     the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); provided that where a representation and warranty is already qualified as to materiality, the materiality qualifier in this clause shall be disregarded for purposes of this condition; and

(b)     no Default shall have then occurred and be continuing.

SECTION 5.1.14     <u>Satisfactory Legal Form</u>. All documents executed or submitted pursuant hereto by or on behalf of any Obligor shall be reasonably satisfactory in form and substance to the Lender and its counsel, and the Lender and its counsel shall have received all information, approvals, opinions, documents or instruments as the Lender or its counsel may reasonably request.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Credit Agreement and to make Credit Extensions hereunder, the Borrower represents and warrants to Lender as set forth in this Article (it being understood that (a) for purposes of the representations set forth in Sections 6.1, 6.3 and 6.5 through 6.12, such representations made as of the Effective Date shall only relate to the Borrower (and not NT Media or any Subsidiaries of NT Media) but thereafter shall apply to all Obligors and (b) for purposes of the representations set forth in <u>Sections 6.6, 6.7, 6.10 and 6.11</u>, such representations only relate to the period commencing immediately following the Effective Date.

SECTION 6.1     <u>Organization, etc</u>. Each Obligor is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, and has full power and authority and holds all requisite governmental licenses, permits and other approvals to enter into and perform its Obligations under each Loan Document to which it is a party, to own and hold under lease its property and to conduct its business substantially as currently conducted by it, except where the failure to be so qualified or to possess the requisite license, permit or approval could not reasonably be expected to result in a Material Adverse Effect.

SECTION 6.2     <u>Due Authorization, Non-Contravention, etc</u>. The execution, delivery and performance by each Obligor of each Loan Document executed or to be executed by it are in each case within such Person's powers, have been duly authorized by all necessary action, and do not

DEFENSE 017673

(a)    contravene any (i) Obligor's Organic Documents, (ii) or, except as set forth in Item 6.2 of the Disclosure Schedule, result in a default under any contractual restriction binding on or affecting any Obligor, (iii) court decree or order binding on or affecting any Obligor or (iv) law or governmental regulation binding on or affecting any Obligor; or

(b)    result in, or require the creation or imposition of, any Lien on any Obligor's properties (except as permitted by this Credit Agreement).

SECTION 6.3    <u>Government Approval, Regulation, etc</u>. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those that have been, or on the Effective Date will be, duly obtained or made and which are, or on the Effective Date will be, in full force and effect or those approvals, the failure to obtain which, could not reasonably be expected to result in a Material Adverse Effect) is required for the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party. Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SECTION 6.4    <u>Validity, etc</u>. Each Loan Document to which any Obligor is a party constitutes the legal, valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 6.5    <u>Financial Information</u>. The consolidated financial statements of the Borrower and its Subsidiaries furnished to the Lender pursuant to <u>Section 5.1.4</u> have been prepared in accordance with GAAP consistently applied, and present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended. All balance sheets, all statements of income and of cash flow and all other financial information of the Borrower and its Subsidiaries furnished pursuant to <u>Section 7.1.1</u> have been and will for periods following the Effective Date be prepared in accordance with GAAP consistently applied with the financial statements delivered pursuant to <u>Section 5.1.4</u>, and do or will present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

SECTION 6.6    <u>Litigation, Labor Controversies, etc</u>.  There is no pending or, to the Knowledge of the Borrower or any of its Subsidiaries, threatened in writing litigation, action, proceeding or labor controversy

(a) except as disclosed in <u>Item 6.6</u> of the Disclosure Schedule, affecting the Borrower, any of its Subsidiaries or any other Obligor, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect, and no adverse development has occurred in any labor

DEFENSE 017674

controversy, litigation, arbitration or governmental investigation or proceeding disclosed in Item 6.6 of the Disclosure Schedule; or

(b) which purports to affect the legality, validity or enforceability of any Loan Document.

SECTION 6.7        No Material Adverse Change. Except as disclosed in Item 6.7 of the Disclosure Schedule, there has been no change that has had a Material Adverse Effect since the Effective Date. The Borrower and each other Obligor, taken as a whole on a consolidated basis, before and after giving effect to each Credit Extension are Solvent.

SECTION 6.8        Subsidiaries. The Borrower has no Subsidiaries, except those Subsidiaries which are identified in Item 6.8 of the Disclosure Schedule, or which are permitted to have been organized or acquired in accordance with Sections 7.2.5 or 7.2.10. A true and correct copy of the organizational chart that lists all Subsidiaries and the Shareholders of the Borrower, including each such Person's general partner or managing member if a limited partnership or limited liability company, respectively, as of the Effective Date is attached hereto as Exhibit H to this Credit Agreement.

SECTION 6.9        Ownership of Properties. The Borrower and each of its Subsidiaries own (i) in the case of owned real property, good and marketable fee title to, and (ii) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims, except for Liens permitted pursuant to Section 7.2.3.

SECTION 6.10        Taxes. The Borrower and each of its Subsidiaries have filed all tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, except (a) any such Taxes which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books and (b) immaterial amounts of Taxes so long as no material property of the Borrower or any Subsidiary is at impending risk of being seized, levied upon or forfeited.

SECTION 6.11        Pension and Welfare Plans. During the period from the Effective Date and prior to the date of any Credit Extension hereunder, no steps have been taken to terminate any Pension Plan, and no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA. No condition exists or event or transaction has occurred with respect to any Pension Plan which might result in the incurrence by the Borrower or any member of the Controlled Group of any liability which could reasonably be expected to have a Material Adverse Effect, or any fine or penalty. Except as disclosed in Item 6.11 of the Disclosure Schedule, neither the Borrower nor any member of the Controlled Group has any Contingent Liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA.

DEFENSE 017675

SECTION 6.12       Accuracy of Information. None of the factual information heretofore or contemporaneously furnished in writing to Lender by or on behalf of any Obligor in connection with any Loan Document or any transaction contemplated hereby contains any untrue statement of a material fact, or omits to state any material fact necessary to make any information not misleading, and no other factual information hereafter furnished in connection with any Loan Document by or on behalf of any Obligor to Lender will contain any untrue statement of a material fact or will omit to state any material fact necessary to make any information not misleading on the date as of which such information is dated or certified.

## ARTICLE VII
## COVENANTS

SECTION 7.1       Affirmative Covenants. The Borrower agrees with Lender that from and including the Effective Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.1.1       Financial Information, Reports, Notices, etc. The Borrower will furnish Lender copies of the following financial statements, reports, notices and information:

(a)       as soon as available and in any event within (i) ten (10) days after the last day of each month, unaudited consolidating balance sheet of the Borrower and its Subsidiaries, a consolidating statement of income and cash flow of the Borrower and its Subsidiaries for such month and for the period commencing at the end of the previous Fiscal Year and ending with the end of such month, together with a comparison to the results of the same period for the prior year and the Borrower shall cause its counsel to provide, upon request and in any event no later than monthly, a detailed report regarding the status of any uninsured, material litigation; provided however, that Borrower shall not be required to disclose any details regarding any such litigation to the extent Borrower determines in good faith and upon advice of counsel that exclusion of such details from the litigation report is reasonably necessary to preserve the attorney-client privilege, and (ii) fifteen (15) days after the end of each Fiscal Quarter of each Fiscal Year, an unaudited consolidating balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Quarter and consolidating statement of income and cash flow of the Borrower and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, including, in each case, in comparative form the figures for the corresponding Fiscal Quarter or month, as applicable, in, and year to date portion of, the immediately preceding Fiscal Year, certified as complete and correct by the chief financial or accounting Authorized Officer of the Borrower;

(b)       as soon as available and in any event within one hundred twenty (120) days after the end of each Fiscal Year, a copy of the audited consolidated balance sheet of the Borrower and its Subsidiaries, together with (i) the related audited consolidated  statements of income and audited cash flow of the Borrower and its Subsidiaries for such Fiscal Year, and reconciled to the financial information provided by the Borrower with respect to its fourth Fiscal Quarter, setting forth in comparative form the figures for the immediately preceding Fiscal Year and audited (without any Impermissible Qualification) by independent public accountants acceptable to the Lender and (ii) to the extent there is a discrepancy between the financial statements delivered

-28-

DEFENSE 017676

pursuant to clause (a)(ii) and clause (b), a statement of reconciliation conforming the former to the latter;

(c)    concurrently with the delivery of the quarterly financial information pursuant to clauses (a) and (b), a Compliance Certificate, executed by the chief financial or accounting Authorized Officer of the Borrower, showing compliance with the financial covenants set forth in Section 7.2.4 and stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Borrower or an Obligor has taken or proposes to take with respect thereto);

(d)    as soon as available and in any event within thirty 30 days after the end of each Fiscal Year, a copy of the Borrower's annual budget, setting forth in comparative form the figures for the immediately preceding Fiscal Year;

(e)    as soon as possible and in any event within three (3) Business Days after the Borrower or any other Obligor obtains Knowledge of the occurrence of a Default a statement of an Authorized Officer of the Borrower setting forth details of such Default and the action which the Borrower or such Obligor has taken and proposes to take with respect thereto;

(f)    as soon as possible and in any event within three (3) Business Days after the Borrower or any other Obligor obtains Knowledge of (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy or (ii) the commencement of any material litigation, action, proceeding or labor controversy, notice thereof and, to the extent the Lender requests, copies of all documentation relating thereto;

(g)    promptly after the sending or filing thereof, copies of all reports, notices, prospectuses and registration statements which any Obligor files with the SEC or any national securities exchange;

(h)    immediately upon obtaining Knowledge of (i) the institution of any steps by any Person to terminate any Pension Plan, (ii) the failure to make a required contribution to any Pension Plan if such failure is sufficient to give rise to a Lien under Section 302(f) of ERISA, (iii) the taking of any action with respect to a Pension Plan which could result in the requirement that any Obligor furnish a bond or other security to the PBGC or such Pension Plan, or (iv) the occurrence of any event with respect to any Pension Plan which could result in the incurrence by any Obligor of any material liability, fine or penalty, notice thereof and copies of all documentation relating thereto;

(i)    promptly upon receipt thereof, copies of all "management letters" submitted to the Borrower or any other Obligor by the independent public accountants referred to in clause (b) in connection with each audit made by such accountants;

(j)    such other financial and other information as Lender may from time to time reasonably request (including information and reports in such detail as the Lender may request with respect to the terms of and information provided pursuant to the Compliance Certificate); and

DEFENSE 017677

(k)     Borrower shall deliver to the Lender weekly after the Effective Date a rolling 13-week cash flow forecast in the form reasonably required by the Lender and substantially similar to the Cash Flow Forecast currently prepared, that shall detail all sources and uses of cash on a weekly basis and shall report any variances from the previous period. Borrower and its advisors shall participate on monthly (or more frequently as the Lender may request) conference calls with the Lender, such conference calls to be scheduled for the week after the Lender has received the monthly financial statements of the Borrower as required under Section 7.1. l (a).

SECTION 7.1.2      Maintenance of Existence; Compliance with Laws. etc. The Borrower will, and will cause each of its Subsidiaries to, preserve and maintain its legal existence and comply in all material respects with all applicable laws, rules, regulations and orders, including the payment (before the same become delinquent), of all Taxes, imposed upon the Borrower or its Subsidiaries or upon their property except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Borrower or its Subsidiaries, as applicable.

SECTION 7.1.3      Maintenance of Properties. The Borrower will, and will cause each of its Subsidiaries to, maintain, preserve, protect and keep its and their respective properties material to the conduct of its and their respective businesses in good repair, working order and condition (ordinary wear and tear excepted), and make necessary repairs, renewals and replacements so that the business carried on by the Borrower and its Subsidiaries may be properly conducted at all times, unless the Borrower or such Subsidiary determines in good faith that the continued maintenance of such property is no longer economically desirable.

SECTION 7.1.4      Insurance. The Borrower will, and will cause each of its Subsidiaries to:

(a)     maintain insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as the Borrower and its Subsidiaries; and

(b)     all worker's compensation, employer's liability insurance or similar insurance as may be required under the laws of any state or jurisdiction in which it may be engaged in business.

Without limiting the foregoing, all insurance policies behalf of the Lender as mortgagee (in the case of property insurance) or additional insured (in the case of liability insurance), as applicable, and provide that no cancellation or modification of the policies will be made without thirty days' prior written notice to the Lender and (ii) be in addition to any requirements to maintain specific types of insurance contained in the other Loan Documents. Upon the request of the Lender (but no more than once per year), the Borrower shall furnish the Lender a certificate executed and delivered by an Authorized Officer of the Borrower (and, at the request of the Lender, the insurance broker of the Borrower) setting forth the nature and extent of all insurance maintained by the Borrower and its Subsidiaries.

DEFENSE 017678

SECTION 7.1.5    Books and Records. The Borrower will, and will cause each of its Subsidiaries to, keep books and records in accordance with GAAP which accurately reflect all of its business affairs and transactions and permit Lender or any of its representatives, at reasonable times and intervals upon reasonable notice to the Borrower (but not so as to materially interfere with the business of Borrower or any of the Subsidiaries), to visit each Obligor's offices, to discuss such Obligor's financial matters with its officers and employees, and its independent public accountants (and the Borrower hereby authorizes such independent public accountant to discuss each Obligor's financial matters with Lender or its representatives upon reasonable notice to the Borrower and whether or not any representative of such Obligor is present, at the discretion of such Obligor; provided, however, the Lender will be entitled to meet with such independent public accountants without the Borrower or any of its representatives present if a Default has occurred and is continuing) and to examine (and photocopy extracts from) any of its books and records; provided, however, when no Default exists, any inspection of the Borrower's properties pursuant to this Section shall be conducted at the same time as any such inspection by the Lender. The Borrower shall pay any fees of such independent public accountant incurred in connection with Lender's exercise of its rights pursuant to this Section.

SECTION 7.1.6    Environmental Law Covenant. The Borrower will, and will cause each of its Subsidiaries to,

(a)    use and operate all of its and their facilities and properties in material compliance with all Environmental Laws, keep all necessary permits, approvals, certificates, licenses and other authorizations relating to environmental matters in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws except where failure to do so could not reasonably be expected to have a Material Adverse Effect; and

(b)    promptly notify the Lender and provide copies upon receipt of all written claims, complaints, notices or inquiries relating to the condition of its facilities and properties in respect of, or as to compliance with, Environmental Laws, and shall promptly resolve any non-compliance with Environmental Laws and keep its property free of any Lien imposed by any Environmental Law, or if such Lien is imposed, the Borrower will commence an action to remove such Lien within 30 days receipt of written notice of such Lien.

SECTION 7.1.7    Use of Proceeds. The Borrower will apply the proceeds of the Credit Extensions pursuant to the Revolving Loan for working capital and general limited liability company purposes of the Borrower and shall use the proceeds of the Term Loans solely to fulfill its obligations to the Lender under the Purchase Agreement.

SECTION 7.1.8    Future Guarantors, Security, etc. The Borrower will, and will cause each U.S. Subsidiary, as applicable, to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing mortgages) that may be required under applicable law, or that the Lender may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority (subject to Liens permitted by Section 7.2.3) of the Liens created or intended to be created by the Loan Documents. The Borrower will, or will cause any subsequently acquired or organized U.S. Subsidiary to, as appropriate (a) execute a supplement

-31-

DEFENSE 017679

to the Subsidiary Guaranty and each applicable Loan Document in favor of the Lender, (b) deliver the certificated interests of Borrower and each Subsidiary, accompanied by duly executed undated blank stock powers or other equivalent instruments of transfer acceptable to the Lender, (c) provide resolutions, amendments, or other modifications to such Subsidiary's Organic Documents permitting any member or partner, as applicable, to take any action by proxy and (d) grant the Lender an irrevocable proxy to such member's or partner's right to vote or take any other action under such Organic Documents upon any Event of Default and prior to any foreclosure on such equity interests; provided, that with respect to clause (d) above, the Lender shall not be entitled to exercise such rights until five days after the Borrower receives notice of an Event of Default resulting from the default by any Obligor in the due performance or observance of its obligations under Sections 8.1.4 or 8.1.6 and such Event of Default shall continue unremedied. In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating. or causing to be pledged or created, perfected Liens with respect to such of its assets and properties as the Lender shall designate, it being agreed that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Borrower and its U.S. Subsidiaries (including real and personal property acquired subsequent to the Effective Date). Such Liens will be created under the Loan Documents in form and substance reasonably satisfactory to the Lender, and the Borrower shall deliver or cause to be delivered to the Lender all such instruments and documents (including legal opinions, title insurance policies and lien searches) as the Lender shall reasonably request to evidence compliance with this Section.

SECTION 7.1.9     Assignment of Promissory Notes. The Borrower will, and will cause any of its Subsidiaries to, deliver and assign any promissory note received from any Disposition pursuant to clause (a) of Section 7.2.10. For the avoidance of doubt, the delivery and assignment of such promissory note shall not be considered a prepayment of any Term Loan for purposes of Sections 2.2 or 3.1.1 until the actual receipt by the Lender of cash payment under such promissory note whereupon such proceeds shall be considered Net Disposition Proceeds.

SECTION 7.2     Negative Covenants. The Borrower covenants and agrees with Lender, that until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.2.1     Business Activities. The Borrower will not, and will not permit any of its Subsidiaries to, engage in any business activity except those business activities substantially similar to those engaged in on the date of this Credit Agreement and activities reasonably incidental thereto.

SECTION 7.2.2     Indebtedness. The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, other than:

(a)     Indebtedness in respect of the Obligations;

(b)     unsecured Indebtedness (i) incurred in the ordinary course of business of the Borrower and its Subsidiaries (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate

DEFENSE 017680

reserves in conformity with GAAP have been established on the books of the Borrower or such Subsidiary) and (ii) in respect of performance, surety or appeal bonds provided in the ordinary course of business, but excluding (in each case), Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

(c)     Indebtedness (i) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of the Borrower and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower and its Subsidiaries (provided, that such Indebtedness is incurred within 60 days of the acquisition of such property), and (ii) Capitalized Lease Liabilities; provided, that the aggregate amount of all Indebtedness outstanding pursuant to this clause (c) of Section 7.2.2 shall not at any time exceed $250,000.00;

(d)     unsecured Indebtedness of any Subsidiary Guarantor owing to the Borrower or any other Subsidiary Guarantor, or Indebtedness of the Borrower owing to any Subsidiary Guarantor, which Indebtedness shall be subordinated to the Obligations on terms and conditions satisfactory to the Lender;

(e)     Indebtedness of Borrower and its Subsidiaries, not to exceed $250,000.00 in the aggregate, incurred after the Effective Date which is subordinated to the Obligations in a manner satisfactory to the Lender in its sole discretion;

(f)     other Indebtedness of the Borrower in an aggregate amount at any time outstanding not to exceed $250,000.00;

provided, however, that no Indebtedness otherwise permitted by clause (c) shall be assumed, created or otherwise incurred if a Default has occurred and is then continuing or would result therefrom.

SECTION 7.2.3     Liens. The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except:

(a)     Liens securing payment of the Obligations;

(b)     Liens securing Indebtedness of the type permitted under clause (c)(i), (c)(ii), (e) or (f) of Section 7.2.2; provided, that (i) such Lien is granted within 60 days after such Indebtedness is incurred and (ii) with respect to Indebtedness of the type permitted under clause (c)(i) or (c)(ii) of Section 7.2.2, (A) the Indebtedness secured thereby does not exceed the lesser of the cost or the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (B) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause;

(c)     Liens in favor of carriers, warehousemen, mechanics, materialmen and landlords and other similar Liens granted in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

-33-

DEFENSE 017681

(d)      Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety and appeal bonds or performance bonds;

(e)      judgment Liens in existence for less than 45 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under Section 8.1.7;

(f)      easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(g)      Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

SECTION 7.2.4      Financial Convents.

(a)      Interest Coverage Ratio. The Borrower will not permit the Interest Coverage Ratio for the four prior consecutive Fiscal Quarters, calculated as of the last date of each Fiscal Quarter to be less than the ratio set forth below:

| Period | Interest Coverage Ratio |
| --- | --- |
| Period ending December 31, 2015 | 1.15 : 1.00 |
| Period ending March 31, 2016 | 1.15 : 1.00 |
| Period ending June 30, 2016 | 1.25 : 1.00 |
| Period ending September 30, 2016 | 1.50: 1.00 |
| Period ending December 31. 2016 | 2.00: 1.00 |
| Period ending March 31, 2017 | 2.00 : 1.00 |
| Period ending June 30, 2017 | 2.25 : 1.00 |
| Period ending September 30, 2017 | 2.50 : 1.00 |
| Periods ending December 31, 2017 | 3.00 : 1.00 |

DEFENSE 017682

| | |
|---|---|
| Period ending March 31, 2018 | 3.00 : 1.00 |
| Period ending June 30, 2018 | 3.25 : 1.00 |
| Period ending September 30, 2018 and thereafter | 3.50 : 1.00 |

(b)    <u>EBITDA</u>. The Borrower will not permit its EBITDA to be less than:

| Period | EBITDA |
|---|---|
| January 1, 2013 – March 31, 2013 | ($1,200,000.00) |
| January 31, 2013 – June 30, 2013 | ($950,000.00) |
| January 31, 2013 – September 30, 2013 | ($775,000.00) |
| January 31, 2013 – December 31, 2013 | ($375,000.00) |

From after January 1, 2014 this covenant shall be tested at the end of each Fiscal Quarter based on a period of the preceding four (4) consecutive Fiscal Quarters as follows:

| | |
|---|---|
| Period ending March 31, 2014 | $25,000.00 |
| Period ending June 30, 2014 | $275,000.00 |
| Period ending September 30, 2014 | $800,000.00 |
| Period ending December 31, 2014 | $1,300,000.00 |

10157063v.12

DEFENSE 017683

| | |
|---|---|
| Period ending March 31, 2015 | $1,700,000.00 |
| Period ending June 30, 2015 | $1,900,000.00 |
| Period ending September 30, 2015 | $2,300,000.00 |

(c)    <u>Leverage</u>.  The Borrower's ratio of (x) EBITDA for the prior four (4) consecutive Fiscal Quarters to (y) the aggregate amount of principal outstanding on Term Loan A and the Revolving Loan on the date of calculation shall not be greater than:

| | |
|---|---|
| Period ending December 31, 2015 | 12.50 to 1.00 |
| Period ending March 31, 2016 | 12.00 to 1.00 |
| Period ending June 30, 2016 | 9.00 to 1.00 |
| Period ending September 30, 2016 | 8.00 to 1.00 |
| Period ending December 31, 2016 | 6.00 to 1.00 |
| Period ending March 31, 2017 | 6.00 to 1.00 |
| Period ending June 30, 2017 | 5.00 to 1.00 |
| Period ending September 30, 2017 | 4.00 to 1.00 |
| Period ending December 31, 2017 | 3.50 to 1.00 |
| Period ending March 31, 2018 | 3.50 to 1.00 |

-36-

DEFENSE 017684

| | |
|---|---|
| Period ending<br>June 30, 2018 | 3.00 to 1.00 |
| Period ending<br>September 30, 2018 | 2.50 to 1.00 |
| Period ending<br>December 31, 2018 | 2.25 to 1.00 |
| Period ending<br>March 31, 2019 | 2.25 to 1.00 |
| Period ending<br>June 30, 2019 | 2.00 to 1.00 |
| Period ending<br>September 30, 2019 | 1.75 to 1.00 |
| Period ending<br>December 31, 2019 | 1.50 to 1.00 |
| Period ending March 31, 2020 | 1.50 to 1.00 |
| Period ending June 30, 2020<br>and thereafter | 1.25 to 1.00 |

(d)    Capital Expenditures.  Subject (in the case of Capitalized Lease Liabilities), to clause (c) of Section 7.2.2, the Borrower will not, and will not permit any of its Subsidiaries to, make or commit to make Capital Expenditures in any Fiscal Year which aggregate in excess of $500,000.00 for each Fiscal Year; provided that to the extent that the Borrower and its Subsidiaries do make or commit to make Capital Expenditures in an amount less than $500,000.00 in any Fiscal Year, the difference between the amount made or committed and $500,000.00 may be added to the amount of the cap in the next succeeding Fiscal Year.

SECTION 7.2.5    Investments.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)    Investments existing on the Effective Date and identified in Item 7.2.5(a) of the Disclosure Schedule;

(b)    Cash Equivalent Investments;

(c)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

-37-

DEFENSE 017685

     (d)     Investments permitted as Capital Expenditures pursuant to <u>Section 7.2.4(d)</u>;

     (e)     Investments by way of contributions to capital or purchases of Capital Securities by the Borrower in any existing or newly created Subsidiary Guarantor or by any Subsidiary Guarantor in any other existing or newly created Subsidiary Guarantor or intercompany loans or advances from the Borrower to any existing or newly created Subsidiary Guarantor or from any Subsidiary Guarantor to the Borrower or any existing or newly created other Subsidiary Guarantor;

     (f)     Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

     (g)     Investments consisting of any deferred portion of the sales price received by the Borrower or any Subsidiary in connection with any Disposition permitted under <u>Section 7.2.10</u>;

     (h)     Hedging Obligations in respect of a notional amount not to exceed the aggregate outstanding principal amount of the Loans and a term not to exceed the Stated Maturity Date for Term Loans; and

     (i)     other Investments in an amount not to exceed $500,000.00 from the Effective Date;

     <u>provided</u>, <u>however</u>, that

     (i)     any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements;

     (ii)     no Investment otherwise permitted by <u>clauses (d)</u>, <u>(g)</u> or <u>(h)</u> shall be permitted to be made if any Default has occurred and is continuing or would result therefrom; and

     (iii)     notwithstanding the foregoing neither the Borrower nor any of its Subsidiaries will make, incur, assume or permit to exist any Investment in any Foreign Subsidiary.

SECTION 7.2.6    <u>Restricted Payments, etc.</u> The Borrower will not, and will not permit any of its Subsidiaries to, declare or make a Restricted Payment, or make any deposit for any Restricted Payment other than, for so long as the Borrower is a subchapter S corporation, distributions of the Borrower to its Shareholders in amounts sufficient to allow such Shareholders to make quarterly estimated tax payments in respect of their allocable shares of taxable income allocated to the shares of the Borrower, based on the highest effective federal and state income tax rates applicable to individuals resident in Colorado, taking into account the character of the income or gain; <u>provided</u> that the Borrower delivers a certificate to the Lender executed by an Authorized Officer certifying the amount of such Restricted Payment and how such amount was calculated in form and substance reasonably satisfactory to the Lender at least

DEFENSE 017686

five (5) Business Days prior (or such shorter period agreed to by the Lender) to the making of such Restricted Payment.

SECTION 7.2.7   Compensation Restrictions.  The Borrower will not, and will not permit any of its Subsidiaries to, pay salaries or compensation to officers, managers or directors of the Borrower or any of its Subsidiaries (or any of the Principal Shareholders and/or members) other than as commensurate with compensation policies immediately prior to the Effective Date.

SECTION 7.2.8   Issuance of Capital Securities. The Borrower will not issue any Capital Securities (whether for value or otherwise) to any Person other than: (i) an arms length sale of Capital Securities by the Borrower for the purpose of raising capital to fund the working capital needs of the Borrower; provided that such issuance does not result in a Change in Control;  or (ii) to the Shareholders of Borrower or its employees pursuant to an equity incentive plan.  The Borrower will not permit its Subsidiaries to issue any Capital Securities unless such Capital Securities are issued to the Borrower and immediately upon the issuance of Capital Securities, such Capital Securities (other than those issued pursuant to an equity incentive plan or other similar compensation plan) must be pledged to the Lender for the benefit of the Lender pursuant to the Loan Documents.

SECTION 7.2.9   Consolidation, Merger, etc. The Borrower will not, and will not permit any of its Subsidiaries to, liquidate or dissolve, consolidate with, or merge into or with, any other Person, or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof), except any Subsidiary Guarantor may liquidate or dissolve voluntarily into, and may merge with and into, the Borrower or any other Subsidiary Guarantor, and the assets or Capital Securities of any Subsidiary Guarantor may be purchased or otherwise acquired by the Borrower or any other Subsidiary Guarantor; provided, that in no event shall any Pledged Subsidiary consolidate with or merge with and into any other Pledged Subsidiary unless after giving effect thereto, the Lender shall have a perfected pledge of, and security interest in and to, at least the same percentage of the issued and outstanding interests of Capital Securities (on a fully diluted basis) of the surviving Person as the Lender had immediately prior to such merger or consolidation in form and substance satisfactory to the Lender and its counsel, pursuant to such documentation and opinions as shall be necessary in the opinion of the Lender to create, perfect or maintain the collateral position of the Lender therein.

SECTION 7.2.10   Permitted Dispositions. The Borrower will not, and will not permit any of its Subsidiaries to, Dispose of any of the Borrower's or such Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any Person in one transaction or series of transactions unless such Disposition is (a) inventory or obsolete, worn-out or surplus property Disposed of in the ordinary course of its business, (b) licensing of story rights, picture rights or movie rights in the ordinary course of business and consistent with past practice; or (c)(i) such Disposition is for fair market value, (ii) the cash component of the consideration for such Disposition is at least 50% of the purchase price, (iii) any note received in such Disposition is immediately endorsed and delivered to the Lender, and  (iv) the Net Disposition Proceeds from such Disposition are applied pursuant to Sections 3.1.1 and 3.1.2 when received in cash.

DEFENSE 017687

SECTION 7.2.11    Transactions with Affiliates. Except as permitted by Section 7.2.6, the Borrower will not, and will not permit any of its Subsidiaries to, enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract (i) is on fair and reasonable terms no less favorable to the Borrower or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate and (ii) is of the kind which would be entered into by a prudent Person in the position of the Borrower or such Subsidiary with a Person that is not one of its Affiliates; provided that this Section shall not restrict transactions between the Borrower and any Subsidiary Guarantor or between Subsidiary Guarantors.

SECTION 7.2.12    Restrictive Agreements, etc. The Borrower will not, and will not permit any of its Subsidiaries to, enter into any agreement prohibiting

(a)    the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b)    the ability of any Obligor to amend or otherwise modify any Loan Document; or

(c)    the ability of any Subsidiary to make any payments, directly or indirectly, to the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to restrictions contained (i) in any Loan Document and (ii) in the case of clause (a), any agreement governing any Indebtedness permitted by clause (c) of Section 7.2.2 as to the assets financed with the proceeds of such Indebtedness.

SECTION 7.2.13    Sale and Leaseback. The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person.

SECTION 7.2.14    Modification of Certain Agreements. The Borrower will not. and will not permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in, the Organic Documents of the Borrower or any of its Subsidiaries or the Operating Agreement if the result thereof would have an adverse effect on the Lender (it being agreed that any modification of any such Organic Document would not have an adverse effect on the Lender if such modification is made to effectuate a transaction otherwise permitted by the terms of any Loan Document).

SECTION 7.2.15    No Material Adverse Change. The Borrower will not, and will not permit any of its Subsidiaries to, cause or permit to occur any change that has or may be reasonably expected to have a Material Adverse Effect.

DEFENSE 017688

## ARTICLE VIII
## EVENTS OF DEFAULT

SECTION 8.1        <u>Listing of Events of Default</u>. Each of the following events or occurrences described in this Article shall constitute an "Event of Default".

SECTION 8.1.1        <u>Non-Payment of Obligations</u>. The Borrower shall default in the payment or prepayment when due of

(a)        any principal of any Loan, or

(b)        any interest on any Loan, or any other monetary Obligation, and such default shall continue unremedied for a period of three Business Days after such amount was due.

SECTION 8.1.2        <u>Breach of Warranty</u>. Any representation or warranty of any Obligor made or deemed to be made in any Loan Document (including any certificates delivered pursuant to <u>Article V</u>) is or shall be incorrect when made or deemed to have been made in any material respect.

SECTION 8.1.3        <u>Non-Performance of Certain Covenants and Obligations</u>. The Borrower shall default in the due performance or observance of any of its obligations under <u>Article VII</u> or any Obligor shall default in the due performance or observance of its obligations under (i) Article IV of the Subsidiary Guaranty (to the extent it incorporates by reference <u>Section 7.1.7</u> or <u>Section 7.2</u>), or (ii) Section 4.1, 4.2 or 4.6 of a Pledge and Security Agreement.

SECTION 8.1.4        <u>Non-Performance of Other Covenants and Obligations</u>. Any Obligor shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it and such default shall continue unremedied for a period of 45 days after the earlier to occur of (i) notice thereof given to the Borrower by the Lender or (ii) the date on which any Obligor has Knowledge of such default.

SECTION 8.1.5        <u>Default on Other Indebtedness</u>. A default shall occur in the payment, performance or observance of any obligation or condition with respect to any Indebtedness (other than Indebtedness described in <u>Section 8.1.1</u>) of the Borrower or any of its Subsidiaries or any other Obligor having a principal or stated amount, individually or in the aggregate. in excess of $500,000.00 and the effect of such default is to accelerate the maturity of any such Indebtedness.

SECTION 8.1.6        <u>Default under the Purchase Agreement</u>.  In the event that (a) there is a material misrepresentation by Borrower pursuant to Article IV of the Purchase Agreement or (b) Borrower shall be in default with respect to any covenant or any of its other obligations contained in the Purchase Agreement or any other agreements entered into in connection therewith, and as a result of such default, the Lender has the right to terminate the agreement and the transactions thereunder  and to accelerate any remaining performance of the Borrower.

SECTION 8.1.7        <u>Judgments</u>. Any judgment or order for the payment of money individually or in the aggregate in excess of $250,000.00 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has

-41-

DEFENSE 017689

acknowledged its responsibility to cover such judgment or order) shall be rendered against the Borrower or any of its Subsidiaries or any other Obligor and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 30 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

SECTION 8.1.8    Pension Plans. Any of the following events shall occur with respect to any Pension Plan:

(a)    the institution of any steps by the Borrower, any member of its Controlled Group or any other Person to terminate a Pension Plan if, as a result of such termination, the Borrower or any such member could be required to make a contribution to such Pension Plan, or could reasonably expect to incur a liability or obligation to such Pension Plan, in excess of $500,000.00; or

(b)    a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA.

SECTION 8.1.9    Change in Control. Any Change in Control shall occur.

SECTION 8.1.10    Bankruptcy, Insolvency, etc. The Borrower, any of its Subsidiaries or any other Obligor shall

(a)    become insolvent or generally fail to pay, or admit in writing its inability or unwillingness generally to pay, debts as they become due;

(b)    apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(c)    in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, sequestrator or other custodian shall not be discharged within sixty (60) days; provided, that the Borrower, each Subsidiary and each other Obligor hereby expressly authorizes Lender to appear in any court conducting any relevant proceeding during such sixty (60) day period to preserve, protect and defend their rights under the Loan Documents;

(d)    permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by the Borrower, any Subsidiary or any Obligor, such case or proceeding shall be consented to or acquiesced in by the Borrower, such Subsidiary or such Obligor, as the case may be, or shall result in the entry of an order for relief or shall remain for sixty (60) days undismissed; provided, that the Borrower, each Subsidiary and each Obligor hereby expressly authorizes Lender to appear in any court conducting any such case or proceeding during such sixty (60) day period to preserve, protect and defend their rights under the Loan Documents; or

DEFENSE 017690

(e)     take any action authorizing, or in furtherance of, any of the foregoing.

SECTION 8.1.11     <u>Impairment of Security, etc.</u> Any Loan Document or any Lien granted thereunder shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor party thereto; any Obligor or any other party shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected first priority Lien (other than as otherwise permitted pursuant to <u>Section 7.2.3</u>).

SECTION 8.1.12     <u>Change in Management</u>. The failure of Scott Tobias to continue as CEO of the Borrower; provided that in event that Scott Tobias (i) dies, (ii) is disabled to the extent that he cannot reasonably continue his duties or (iii) is terminated for "cause", the Board of Directors of the Borrower shall have not more than 90 days after such event to propose a successor acceptable to Lender in its sole discretion.

SECTION 8.2     <u>Action if Bankruptcy</u>. If any Event of Default described in <u>Section 8.1.10</u> with respect to the Borrower shall occur, the Commitments (if not theretofore terminated) shall automatically terminate and the outstanding principal amount of all outstanding Loans and all other Obligations (including Reimbursement Obligations) shall automatically be and become immediately due and payable, without notice or demand to any Person.

SECTION 8.3     <u>Action if Other Event of Default</u>. If any Event of Default shall occur for any reason, whether voluntary or involuntary, and be continuing, the Lender, shall by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable and/or the Commitments (if not theretofore terminated) to be terminated, whereupon the Lender may cease making Revolving Loans and the full unpaid amount of all Loans and other Obligations shall become immediately due and payable, without further notice, demand or presentment, and/or, as the case may be, the Commitments shall terminate. Following the occurrence of an Event of Default, the Lender may take any action available to it under the Loan Documents, at law or in equity, to recover the Obligations due hereunder and, upon its election, obtain the appointment of a receiver to manage the affairs of the Borrower for the benefit of the Lender and creditors generally.  The Borrower hereby waives any right that it may have to object to the appointment of a receiver and any such appointment shall be without bond or other collateral.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

SECTION 9.1     <u>Waivers, Amendments, etc</u>. The provisions of each Loan Document may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Lender.

No failure or delay on the part of Lender in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on any Obligor in any case shall entitle it to any notice or

10157063v.12

DEFENSE 017691

demand in similar or other circumstances. No waiver or approval by Lender under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions. No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

SECTION 9.2        Notices, Time. All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Borrower or Lender, at its address or facsimile number set forth below its signature in this Credit Agreement, or set forth in the Lender Assignment Agreement, or at such other address or facsimile number as may be designated by such party in a notice to the other parties. Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter. Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in Section 7.1.1, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose, except with the consent of the Lender, and the Borrower acknowledges that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution. The parties hereto agree that delivery of an executed counterpart of a signature page to this Credit Agreement and each other Loan Document by facsimile shall be effective as delivery of an original executed counterpart of this Credit Agreement or such other Loan Document. Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to Arizona time.

SECTION 9.3        Indemnification. In consideration of the execution and delivery of this Credit Agreement by Lender, the Borrower hereby indemnifies, exonerates and holds Lender and its officers, directors, partners, employees and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all actions, causes of action, suits, losses, costs, liabilities, obligations, claims and damages, and expenses incurred in connection therewith (irrespective of whether any such Indemnified Party is a party to the action for which indemnification hereunder is sought), including reasonable attorneys' fees and disbursements of outside counsel, whether incurred in connection with actions between or among the parties hereto or the parties hereto and third parties, incurred by the Indemnified Parties or any of them as a result of, or arising out of, or relating to the following (collectively, the "Indemnified Liabilities"):

(a)        the entering into and performance of any Loan Document by any of the Indemnified Parties (including any action brought by or on behalf of the Borrower as the result of any determination by the Lender pursuant to Article V not to fund any Credit Extension, provided that any such action is resolved in favor of such Indemnified Party);

(b)        any breach by any Obligor under any Lease after the Effective Date or failure by any Obligor to pay any Capitalized Lease Liabilities after the Effective Date;

(c)        any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof after the Effective Date of all or any portion

-44-

DEFENSE 017692

of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

(d)       any investigation, litigation or proceeding related to any environmental cleanup, audit, compliance or other matter relating to the protection of the environment (other than any investigation, litigation or proceeding related to any such matters occurring prior to the Effective Date) or the Release by any Obligor or any Subsidiary thereof of any Hazardous Material after the Effective Date; or

(e)       the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, or releases from, any real property owned or operated by any Obligor or any Subsidiary thereof of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), regardless of whether caused by, or within the control of, such Obligor or Subsidiary, other than Hazardous Materials present, on or under, or that escaped, seeped, leaked, spilled, were discharged, emitted, or released from, any such real property which were disclosed in writing to the Lender prior to the Effective Date;

except for Indemnified Liabilities arising for the account of a particular Indemnified Party by reason of the relevant Indemnified Party's gross negligence or wilful misconduct.

The indemnification herein shall survive repayment of the Obligations and any transfer of the property of any Obligor or its Subsidiaries by foreclosure or by a deed in lieu of foreclosure for the Indemnified Liabilities described in Section 9.3(d) and (e), regardless of whether caused by, or within the control of, such Obligor or such Subsidiary. Each Obligor and its successors and assigns hereby waive, release and agree not to make any claim or bring any cost recovery action against, any Indemnified Party under CERCLA or any state equivalent, or any similar law now existing or hereafter enacted, except as permitted by the Purchase Agreement. It is expressly understood and agreed that to the extent that any Indemnified Party is strictly liable under any Environmental Laws for any Indemnified Liabilities, each Obligor's obligation to such Indemnified Party under this indemnity shall likewise be without regard to fault on the part of any Obligor with respect to the violation or condition which results in liability of an Indemnified Party. If any claim, demand, action or cause of action is asserted against any Indemnified Party, such Indemnified Party shall promptly notify the Borrower, but the failure to so promptly notify the Borrower shall not affect the Borrower's obligations under this Section unless such failure materially prejudices the Borrower's right to participate in the contest of such claim, demand, action or cause of action, as hereinafter provided. Such Indemnified Party may (and shall, if requested by the Borrower in writing) contest the validity, applicability and amount of such claim, demand, action or cause of action and shall permit the Borrower to participate in such contest. Any Indemnified Party that proposes to settle or compromise any claim or proceeding for which the Borrower may be liable for payment of indemnity hereunder shall give the Borrower written notice of the terms of such proposed settlement or compromise reasonably in advance of settling or compromising such claim or proceeding. In connection with any claim, demand, action or cause of action covered by this Section against more than one Indemnified Party, all such Indemnified Parties shall be represented by the same legal counsel (which may be a law firm engaged by the Indemnified Parties or attorneys employed by an Indemnified Party or a combination of the foregoing) selected by the Indemnified Parties; provided, that if such legal

DEFENSE 017693

counsel determines in good faith that representing all such Indemnified Parties would or could result in a conflict of interest under laws or ethical principles applicable to such legal counsel or that a defense or counterclaim is available to an Indemnified Party that is not available to all such Indemnified Parties, then to the extent reasonably necessary to avoid such a conflict of interest or to permit unqualified assertion of such a defense or counterclaim, each affected Indemnified Party shall be entitled to separate representation by legal counsel selected by that Indemnified Party, with all such legal counsel using reasonable efforts to avoid unnecessary duplication of effort by counsel for all Indemnified Parties; and further provided that the Lender (as an Indemnified Party) shall at all times be entitled to representation by separate legal counsel (which may be a law firm or attorneys employed by the Lender or a combination of the foregoing). If and to the extent that the foregoing undertakings may be unenforceable for any reason, each Obligor agrees to make the maximum contribution to the payment and satisfaction each of the Indemnified Liabilities which is permissible under applicable law. In the event that any Obligor fails to make any payment due under this section within ten (10) days after such payment is due, such amount shall be added to the principal balance of the Term Loan A Note. This indemnity does not cover any matters arising from operations, conditions, Releases, or actions occurring prior to the Effective Date or after transfer of any property of the Borrower or its Subsidiaries by foreclosure or a deed in lieu of foreclosure.

SECTION 9.4        Survival. The obligations of the Borrower under Sections 4.1 and 9.3, shall in each case survive the occurrence of the Termination Date. The representations and warranties made by each Obligor in each Loan Document shall survive the execution and delivery of such Loan Document.

SECTION 9.5        Severability. Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 9.6        Headings. The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

SECTION 9.7        Execution in Counterparts, Effectiveness, etc. This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original and all of which shall constitute together but one and the same agreement. This Agreement shall become effective when counterparts hereof executed on behalf of the Borrower and the Lender.

SECTION 9.8        Governing Law; Entire Agreement. EACH LOAN DOCUMENT (EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN A LOAN DOCUMENT) WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE. The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto.

DEFENSE 017694

SECTION 9.9         Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, (a) until the fourth anniversary of the Effective Date the consent of the Borrower shall be required for any assignment or transfer by Lender of more than fifty percent (50%) of its rights or obligations hereunder (in one or a series of transactions), and (b) the Borrower may not assign or transfer its rights or obligations hereunder without the consent of Lender.

SECTION 9.10         Other Transactions. Nothing contained herein shall preclude Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

SECTION 9.11         Forum Selection and Consent to Jurisdiction. Forum Selection and Consent to Jurisdiction. ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE LENDER, OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AT AND MAINTAINED IN THE COURTS OF THE STATE OF DELAWARE OR IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF DELAWARE AT THE ADDRESS FOR NOTICES SPECIFIED IN SECTION 9.2. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

SECTION 9.12         Waiver of Jury Trial. THE LENDER AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN)

-47-

DEFENSE 017695

LENDER OR THE BORROWER IN CONNECTION THEREWITH. THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER AND ENTERING INTO THE LOAN DOCUMENTS.

SECTION 9.13        Confidentiality.

(a)        Subject to the provisions of clause (b), Lender agrees that it is bound by the confidentiality provisions contain in Section 5.08 of the Purchase Agreement and such Section is incorporated herein by reference as if set forth in full.

(b)        The Borrower hereby acknowledges and agrees that Lender may share with any of its Subsidiaries, and such Subsidiaries may share with Lender, any information related to the Borrower or any of its Subsidiaries.

[Signature pages follow.]

-48-

DEFENSE 017696

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

VOICE MEDIA GROUP, INC.
as the Borrower

By:

Name:   Scott Tobias
Title:   Chief Executive Officer
and President

Address:   c/o Phoenix New Times, LLC
1201 E. Jefferson St.
Phoenix, AZ 85034

Facsimile No.:  (602) 532-7098

Attention:  Jeffrey Mars

[Signature Page to Credit Agreement - Borrower]

DEFENSE 017697

BROADWAY CAPITAL CORP., LLC
as the Lender

By: _____

Name:   James A. Larkin
Title:    President

Address:     c/o White and Williams, LLP
             One Penn Plaza, Suite 4110
             New York, New York 10119

Facsimile No.: (212) 244-6200
Attention: James A. Larkin

[Signature Page to Credit Agreement - Lender]

DEFENSE 017698