# EXHIBIT G

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

VERMILLION HOLDINGS, LLC

AND

UGC TECH GROUP C.V.

DATED AS OF APRIL 22, 2015

## TABLE OF CONTENTS

Page

**ARTICLE I PURCHASE OF THE ASSETS;ASSIGNMENT OF THE BACKPAGE LICENSE**..................................................................................................... 2

    1.1.   Purchase of the Assets .................................................................................. 2

    1.2.   Assignment of Backpage License................................................................. 2

    1.3.   Purchase Price ............................................................................................... 2

    1.4.   Closing .......................................................................................................... 2

    1.5.   CSC Subsidiary............................................................................................. 2

    1.6.   Additional Consideration............................................................................... 2

    1.7.   Closing Deliveries......................................................................................... 2

**ARTICLE II REPRESENTATIONS AND WARRANTIES OF SELLER** ............................ 4

    2.1.   Organization and Qualification of Seller ...................................................... 4

    2.2.   Organization and Qualification of the Subsidiaries ...................................... 4

    2.3.   Authority ....................................................................................................... 4

    2.4.   Capitalization ................................................................................................ 4

    2.5.   No Conflict.................................................................................................... 5

    2.6.   Backpage License. ........................................................................................ 5

    2.7.   Brokers' and Finders' Fees ........................................................................... 6

    2.8.   Taxes............................................................................................................. 6

    2.9.   Ownership of Assets ..................................................................................... 6

    2.10.  Ownership of Assets ..................................................................................... 6

    2.11.  No Other Representations.............................................................................. 7

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF PURCHASER**................. 7

    3.1.   Organization of Purchaser............................................................................. 7

    3.2.   Authority ....................................................................................................... 7

    3.3.   No Conflict.................................................................................................... 7

    3.4.   No Legal Actions .......................................................................................... 8

    3.5.   Investigation by Purchaser............................................................................ 8

    3.6.   Solvency........................................................................................................ 8

    3.7.   Brokers' and Finders' Fees ........................................................................... 8

    3.8.   No Other Representations.............................................................................. 8

**ARTICLE IV COVENANTS**.............................................................................................. 8

    4.1.   Preservation of Records ................................................................................ 9

i

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 4.2. | Transfer Taxes | 9 |
| 4.3. | Further Assurances | 9 |
| 4.4. | Confidentiality. | 9 |
| 4.5. | Director and Officer Indemnification and Insurance. | 9 |
| 4.6. | Tax Covenants | 10 |
| 4.7. | Release of Guarantees and other Obligations. | 12 |
| **ARTICLE V INDEMNIFICATION** | | 12 |
| 5.1. | Survival of Representations and Warranties | 12 |
| 5.2. | Indemnification. | 13 |
| 5.3. | Limitations. | 14 |
| 5.4. | Procedures. | 15 |
| 5.5. | Recoveries | 17 |
| 5.6. | Exclusive Remedy | 17 |
| 5.7. | Treatment of Indemnification Payments | 17 |
| **ARTICLE VI DEFINITIONS; CONSTRUCTION** | | 17 |
| 6.1. | Definitions. | 17 |
| 6.2. | Construction | 21 |
| **ARTICLE VII GENERAL PROVISIONS** | | 22 |
| 7.1. | Amendment; Waiver | 22 |
| 7.2. | Expenses | 22 |
| 7.3. | Public Announcements | 22 |
| 7.4. | Notices | 22 |
| 7.5. | Entire Agreement | 23 |
| 7.6. | Severability | 24 |
| 7.7. | Specific Performance | 24 |
| 7.8. | Successors and Assigns; Assignment; Parties in Interest | 24 |
| 7.9. | Governing Law; Venue. | 24 |
| 7.10. | Waiver of Jury Trial | 25 |
| 7.11. | Other Remedies | 25 |
| 7.12. | Conflict with Loan Documents. | 25 |
| 7.13. | Counterparts; Electronic Delivery | 25 |

TABLE OF CONTENTS
(continued)

Page

**Exhibit**

Exhibit A    Form of Earn-out Agreement
Exhibit B    Form of Membership Interest Assignment Agreement
Exhibit C    Form of Loan Agreement
Exhibit D    Form of Note

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement, dated as of April 22, 2015 (this "Agreement"), is entered into by and between Vermillion Holdings, LLC, a Delaware limited liability company ("Seller"), and UGC Tech Group C.V., a Dutch limited partnership ("Purchaser"). (Unless the context otherwise makes clear, capitalized terms used in this Agreement are defined in ARTICLE VI.)

## BACKGROUND

A.      The Company and the Subsidiaries are engaged in the business of owning, operating, hosting and providing administrative support services to an online general classified website and other speech generated by third parties outside the United States of America (the "Business").

B.      Seller is the owner of a ninety-nine percent (99%) membership interest in Classified Strategies Coöperatief U.A., a Dutch cooperative association with excluded liability ("CSC"), with all rights and obligations attached thereto, including the membership account kept by CSC (together, the "CSC Interest").

C.      Seller is the owner of all of the outstanding shares (the "CSL Shares") of Classified Solutions Ltd., a United Kingdom corporation ("CSL")

D.      Seller is the owner of all of the outstanding shares (the "BEI Shares") of Backpage Enterprises, Inc., a Quebec Corporation ("BEI").

E.      Seller is the Licensee under an Intellectual Property License with Backpage.com, LLC, a Delaware limited liability company ("Backpage"), dated as of the date hereof, pursuant to which Backpage licenses to Seller certain software, trademarks, URL's and trade secrets (the "Backpage License").

F.      Seller desires to sell the CSC Interest, the CSL Shares, and the BEI Shares (collectively, the "Assets") to Purchaser and assign and transfer the Backpage License to Purchaser at the Closing, and Purchaser desires to purchase the Assets from Seller and assume and accept the transfer of the Backpage License from Seller at the Closing, in each case on the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the mutual representations, warranties and agreements contained herein, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE OF THE ASSETS; ASSIGNMENT OF THE BACKPAGE LICENSE

1.1.     Purchase of the Assets.  At the Closing, on the terms and subject to the conditions of this Agreement, Seller will sell and transfer to Purchaser, and Purchaser will purchase and accept from Seller, all of Seller's right, title and interest in and to the Assets, free and clear of any Liens.

1.2.     Assignment of Backpage License.  At the Closing, on the terms and subject to the conditions of this Agreement, Seller will transfer and assign to Purchaser the Backpage License and Purchaser will accept and assume the Backpage License from Seller.

1.3.     Purchase Price.  The purchase price (the "Purchase Price") for the Shares and the assignment of the Backpage License shall be Seventy Four Million Three Hundred Thousand U.S. Dollars (US\$74,300,000.00).  At the Closing, Purchaser shall pay to Seller, in accordance with Section 1.7(b)(i), an amount equal to the Purchase Price by Purchaser's execution and delivery to Seller of the Note (the "Closing Date Payment").

1.4.     Closing.  The closing of the purchase and sale of the Shares and the assignment of the Backpage License (the "Closing") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "Closing Date").  The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 11:00 pm PST on the Closing Date.

1.5.     CSC Subsidiary.  At the Closing, CSC shall own and hold directly One Hundred Percent (100%) of the shares (the "PS Shares") of Payment Solutions, B.V., a Dutch private limited liability company ("PS")

1.6.     Additional Consideration.  As additional consideration for the sale of the Shares and assignment of the Backpage License, Seller and Purchaser shall enter into the Earn-out Agreement in the form attached hereto as Exhibit A (the "Earn-out Agreement").

1.7.     Closing Deliveries.

(a)     At the Closing, Seller shall deliver to Purchaser:

(i)     The Membership Interest Assignment Agreement in the form attached hereto as Exhibit B (the "Membership Interest Assignment Agreement"), duly executed by Seller;

(ii)     one or more certificates duly endorsed by Seller and in proper form for transfer to Purchaser, or accompanied by duly executed stock powers by Seller, evidencing all of the CSL Shares and the BEI Shares;

(iii)     resignations of the directors, officers and managers of CSC, CSL, BEI and PS affiliated with Seller effective as of the Closing;

2

(iv)     written evidence reasonably satisfactory to Purchaser that all consents and approvals set forth on Schedule 1.7(a) have been obtained;

(v)     the Loan Agreement and the Loan Documents in the form attached hereto as Exhibit C (collectively, the "Loan Agreement"), duly executed by Seller;

(vi)     the Earn-out Agreement, duly executed by Seller;

(vi)     a certificate of the Secretary (or equivalent officer) of Seller (A) certifying that the attached to such certificate are true and correct copies of its (I) Constitutional Documents, as amended and in effect on the Closing Date, and (II) the resolutions of the Managing Member or the Board of Managers of Seller, duly adopted and in effect, which authorizes the execution, delivery and performance of this Agreement and the transactions contemplated hereby; and (B) certifying as to the incumbency of the officer(s) of Seller executing this Agreement and the Ancillary Documents;

(vii)     a certificate of good standing and existence for Seller issued by the Secretary of State of the State of Delaware; and

(viii)     such other documents, instruments or agreements necessary to effectuate the transactions contemplated by this Agreement.

(b)     At the Closing, Purchaser shall deliver to Seller:

(i)     the Closing Date Payment evidenced by a promissory note made payable to Seller in the form attached hereto as Exhibit D (the "Note");

(ii)     the Membership Interest Assignment Agreement, duly executed by Purchaser;

(iii)     the Loan Agreement, duly executed by Purchaser;

(iv)     the Earn-out Agreement, duly executed by Purchaser;

(v)     a certificate of the Secretary (or equivalent officer) of Purchaser (A) certifying that attached to such certificate are true and complete copies of its (I) Constitutional Documents, as amended through and in effect on the Closing Date; and (II) the resolutions of the General Partner or the Board of Purchaser, duly adopted and in effect, which authorizes the execution, delivery and performance of this Agreement and the transactions contemplated hereby; and (B) certifying as to the incumbency of the officer(s) of Purchaser executing this Agreement and the Ancillary Documents;

(vi)     a certificate of good standing and existence or equivalent for Purchaser issued by the Netherlands; and

(vii)     such other documents, instruments or agreements necessary to effectuate the transactions contemplated by this Agreement.

3

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to and qualified by the matters disclosed in the disclosure letter dated the date of this Agreement and delivered herewith to Purchaser (the "Disclosure Letter") referencing the appropriate Section or subsection of this ARTICLE II, Seller hereby represents and warrants to Purchaser that the statements contained in this ARTICLE II are true and correct as of the date of this Agreement.

2.1.    Organization and Qualification of Seller.  Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Seller has all requisite limited liability company power and authority to own, lease and operate its properties.

2.2.    Organization and Qualification of the Subsidiaries .  CSC is s Dutch cooperative association with excluded liability duly formed, validly existing and in good standing under the laws of Netherlands.  CSL is a limited company duly formed, validly existing and in good standing under the laws of the United Kingdom.  BEI is a corporation duly formed, validly existing and in good standing under the laws of Quebec.  PS is a private limited liability company duly formed, validly existing and in good standing under the laws of the Netherlands. Each of the Subsidiaries has all requisite power and authority to own, lease and operate its properties and to carry on the Business and is duly qualified to do business and is in good standing in each jurisdiction in which the conduct of its business or the ownership, leasing, holding or use of its properties makes such qualification necessary, except such jurisdictions where the failure to be so qualified or licensed or in good standing would not reasonably be expected to have a Material Adverse Effect.  Seller has made available to Purchaser a true and correct copy of each Subsidiary's Constitutional Documents, each as amended to date.  None of the Subsidiaries are in violation of their respective Constitutional Documents.  Seller holds a ninety-nine percent (99%) interest in CSC.  Seller is the sole owner and shareholder of CSL and BEI and CSC is the sole owner and shareholder of PS.

2.3.    Authority.  Seller has the requisite limited liability company power and authority, to execute and deliver this Agreement and to perform its obligations hereunder.  The execution, delivery and performance by Seller of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated to be performed by Seller under this Agreement and the Ancillary Documents have been duly authorized by the necessary limited liability company action on the part of Seller.  This Agreement and the Ancillary Documents constitute the legal, valid and binding obligation of Seller and are enforceable against Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or affecting the enforcement of creditors' rights in general and by general principles of equity.

2.4.    Capitalization.

(a)    Seller is the record owner and has good and valid title to the CSC Interest, the CSL shares, and the BEI Shares free and clear of all Liens.  CSC is the record owner and has good and valid title to the PS Shares.  The CSL Shares constitute 100% of the total issued and

4

outstanding shares of CSL. The BEI Shares constitute 100% of the total issued and outstanding shares of BEI. The PS Shares constitute 100% of the total issued and outstanding shares of PS. The CSC Shares, the BEI Shares and the PS Shares have been duly authorized and are validly issued, fully-paid and non-assessable. Upon consummation of the transactions contemplated by this Agreement, Purchaser shall own the CSC Interest, the CSL Shares and the BEI Shares free and clear of all Liens, except any Liens against pursuant to the Loan Agreement.

(b)    The CSC Interest, the CSL Shares, and the BEI Shares were issued in compliance with applicable Laws. The CSC Interest, the CSL Shares, and the BEI Shares were not issued in violation of the Subsidiaries' respective Constitutional Documents or any other agreement, arrangement or commitment to which Seller or the Subsidiaries are a party and are not subject to or in violation of any preemptive or similar rights of any Person.

(c)    There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to any ownership interests in each of the Subsidiaries or obligating Seller or any of the Subsidiaries to issue or sell any membership interest, shares of stock (including the Shares), or any other interest, in the Subsidiaries.    Other than as set forth in the Subsidiaries' Constitutional Documents. there are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the CSC Interest, the CSL Shares or the BEI Shares.

2.5.    No Conflict; Consents.    Except for the receipt of the consents listed in Section 2.5 of the Disclosure Letter, the execution, delivery and performance by Seller of this Agreement and the Ancillary Documents and the consummation by Seller of the transactions contemplated hereby and thereby do not, with or without the giving of notice or the lapse of time or both, (i) result in the creation of any Lien upon the Assets or any of the properties or other assets of the Subsidiaries or the Business, (ii) conflict with the Subsidiaries' Constitutional Documents, each as amended to date,    (iii) conflict with, or result in a violation of any Law to which the Subsidiaries or the Business or any of the Subsidiaries' or the Business' properties or assets are subject, or (iv) require the Consent of any Person under, conflict with, result in a material violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of, or create in any party the right to accelerate, terminate, modify or cancel any, material Contract to which Seller or any of the Subsidiaries is a party or by which Seller or any of the Subsidiaries is bound or to which any of their respective properties and assets are subject, or any License affecting the Business or the assets or properties of the Subsidiaries.    Section 2.5 of the Disclosure Letter lists each Consent, required by any Governmental Entity and each Consent under any material Contract that is required by, or with respect to, the Seller or any of the Subsidiaries in connection with the execution and delivery of this Agreement and the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby, except for (i) notices and filings required under the HSR Act, (ii) matters arising out of or related to the identity, acts or omissions of Purchaser and its Affiliates, and (iii) any filings that are required under any applicable federal, state or foreign securities Laws.

2.6.    Backpage License.    The Backpage License is in full force and effect and is valid, binding and enforceable against the parties thereto. No default by Seller or the other party

thereto has occurred. No event, occurrence or condition exists which, with the lapse of time, the giving of notice or both, or the happening of any further event or condition, would become a default by Seller or by the other party thereto.

2.7.   Brokers' and Finders' Fees.   No investment banker, broker, finder or other intermediary is entitled to any fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Documents based on arrangements made on behalf of Seller or any of its Affiliates for which Purchaser or any of its Affiliates will have any liability or obligation.

2.8.   Taxes.   Except as set forth in Section 2.8 of the Disclosure Letter,

(a)   all material Tax Returns required to be filed by the Subsidiaries have been timely filed (taking into account all valid extensions) and all material Taxes due and owing by the Subsidiaries, whether or not shown on any Tax Return, have been paid. All such Tax Returns are true, complete and correct in all material respects. None of the Subsidiaries is currently the beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business.

(b)   All Taxes required to be withheld or collected by the Subsidiaries from amounts owing or paid to any employees, shareholders, creditors or other third parties have been duly withheld or collected and have been paid over to the applicable Taxing authority.

(c)   No extensions or waivers of statute of limitations have been given or requested with respect to any material Taxes of the Subsidiaries. There are no ongoing actions, suits, claims, investigations or other legal proceedings by any Taxing authority against the Subsidiaries.

(d)   There are no Tax Liens upon any assets or property of the Subsidiaries except for Liens for current Taxes not yet due and payable.

(e)   Each Subsidiary is currently taxed as a disregarded entity for federal income tax purposes.

(f)   The Subsidiaries are not and have never been a party to any tax-sharing agreement with any Person.

2.9.   Ownership of Assets.   Each Subsidiary is the owner of and has good and marketable title to all of its respective assets, free and clear of all Liens other than Permitted Liens.

2.10.   Ownership of Assets.   Except for Current Liabilities, the Subsidiaries do not have any liabilities of any kind whatsoever, whether or not known, accrued, contingent, absolute or otherwise in excess of $100,000.

QB\34412138.5

2.11.    No Other Representations.  Except for the representations and warranties made in this ARTICLE II, neither Seller nor any other Person (including the Subsidiaries or any director, officer, manager, employee, Affiliate, advisor, agent or other representative of Seller or the Subsidiaries) makes or has made to Purchaser or any other Person any representation or warranty, express or implied, relating or with respect to this Agreement, the transactions contemplated thereby, Seller, the Subsidiaries or their businesses, operations, properties, and liabilities or obligations, whether arising by statute or otherwise in Law, including any implied warranty of merchantability, fitness for a particular purpose or otherwise.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the date of this Agreement as follows:

3.1.    Organization of Purchaser.  Purchaser is a Dutch limited partnership duly organized, validly existing and in good standing under the Laws of the Netherlands.  Purchaser has all requisite power and authority to own its properties and to carry on its business as now being conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the conduct of its business or the ownership, leasing, holding or use of its properties makes such qualification necessary, except such jurisdictions where the failure to be so qualified or licensed or in good standing would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement and the Ancillary Documents or to consummate the transactions contemplated hereby or thereby in a timely manner.

3.2.    Authority.  Purchaser has all requisite power and authority to execute and deliver this Agreement and the Ancillary Documents and to perform all of its obligations hereunder and thereunder.  The execution, delivery and performance by Purchaser of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated to be performed by it under this Agreement and the Ancillary Documents have been duly authorized by all necessary and proper action on its part.  This Agreement and the Ancillary Documents constitute the legal, valid and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or affecting the enforcement of creditors' rights in general and by general principles of equity.

3.3.    No Conflict; Consents.  The execution, delivery or performance by Purchaser of this Agreement and the Ancillary Documents and the consummation by Purchaser of the transactions contemplated hereby and thereby do not and will not, with or without the giving of notice or the lapse of time or both, (i) conflict with Purchaser's Constitutional Documents, each as amended to date, or (ii) conflict with, or result in a breach or violation of or a default under any material Contract of Purchaser or any Law, License or other requirement to which Purchaser or any of its properties or assets are subject.  No consent, waiver, approval, order or authorization of, or registration, declaration or filing with, or notice to any Governmental Entity or other Person is required by, or with respect to, Purchaser in connection with the execution and delivery of this Agreement and the Ancillary Documents or the consummation of the transactions

7

contemplated hereby or thereby, except for (i) notices and filings as may be required under the HSR Act, (ii) matters arising out of or related to the identity, acts or omissions of Seller and its Affiliates, and (iii) any filings that are required under any applicable federal, state or foreign securities Laws.

3.4.   No Legal Actions.   There is no Legal Action pending or, to the knowledge of Purchaser, threatened, against or affecting Purchaser or any of its properties or assets that could reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the Ancillary Documents or to consummate the transactions contemplated hereby or thereby in a timely manner.

3.5.   Investigation by Purchaser.   Purchaser has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition, technology and prospects of the business and operations of the Subsidiaries and the Business, which investigation, review and analysis was done by Purchaser and, to the extent Purchaser deemed appropriate, by its representatives and advisors. Purchaser acknowledges that Carl Ferrer, an Affiliate of Purchaser, has been the Chief Executive Officer of the Business for several years and has intimate knowledge of the Business, and the Subsidiaries' assets, liabilities, operations and personnel.   In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations of Seller or its Affiliates, except the specific representations and warranties set forth in ARTICLE II.

3.6.   Solvency.   Immediately after giving effect to the Closing, the Subsidiaries (i) will be able to pay their respective debts (including a reasonable estimate of the amount of all contingent liabilities) as they become due and payable, (ii) will own property or other assets which have a fair saleable value equal to or greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities), and (iii) will have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud current creditors of Purchaser or the Subsidiaries.

3.7.   Brokers' and Finders' Fees.   No investment banker, broker, finder or other intermediary is entitled to any fee or commission in connection with the transactions contemplated by this Agreement based on arrangements made on behalf of Purchaser or any of its Affiliates for which Seller, its Affiliates, or the Subsidiaries will have any liability or obligation.

3.8.   No Other Representations.   Except for the representations and warranties contained in this ARTICLE III, neither Purchaser nor any other Person acting on its behalf makes or has made any representation or warranty, express or implied. Purchaser has not made any representation or warranty, expressed or implied, as to the accuracy or completeness of any information regarding Purchaser or otherwise, other than those representations and warranties expressly made in this ARTICLE III.

## ARTICLE IV
## COVENANTS

QB\34412138.5

4.1.     Preservation of Records. Purchaser shall not, for a period of at least six (6) years following the Closing Date, destroy or cause to be destroyed, or permit the Subsidiaries to destroy or cause to be destroyed, any material books or records, including financial records, relating to the pre-Closing financial operations (i.e. all accounting records, such as, accounts payable records, banking records, journal entries, etc., balance sheet, income statement, general ledger, etc.) of the Subsidiaries or the Business without first obtaining the consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned  (or providing to Seller notice of such intent and a reasonable opportunity to copy such books or records, at its expense, at least thirty (30) days prior to such destruction). In addition, following the Closing and until the Note is paid in full, Purchaser and the Subsidiaries shall maintain all other records of the Subsidiaries and the Business, including customer information, in accordance with the Subsidiaries' record retention policy that was in place as of the Closing Date and Purchaser shall make no changes or amendments to the record retention policy without the prior written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned.

4.2.     Transfer Taxes. Any and all transfer, documentary, sales, use, stamp, registration and other Taxes and fees payable in connection with the consummation of the transactions contemplated by this Agreement shall be paid by Purchaser when due, and Purchaser shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and Seller shall, cooperate as and to the extent reasonably requested by Purchaser in the preparation and execution of any such Tax Returns and documentation.

4.3.     Further Assurances. Following the Closing, each of the Parties shall  execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

4.4.     Confidentiality. From and after the Closing, Seller and Purchaser shall, and shall cause their respective Affiliates to, hold, and shall use their reasonable best efforts to cause their respective Representatives to hold, in confidence the terms of this Agreement and the transactions related hereto. If a Party or any of its Affiliates or its Representatives are compelled to disclose any information related to the terms of this Agreement or the transactions related hereto by judicial or administrative process (including by subpoena) or by other requirements of Law, such Party shall promptly notify the other Party in writing and shall disclose only that portion of such information which the Party is advised by its counsel in writing is legally required to be disclosed, *provided that* such disclosing Party shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

4.5.     Director and Officer Indemnification and Insurance.

(a)     Purchaser agrees that all rights to indemnification, advancement of expenses and exculpation by the Subsidiaries now existing in favor of each Person who is now, or has been at any time prior to the Closing Date, an officer, director or manager of the Company, as provided in the Constitutional Documents of any Subsidiary, in each case as in effect on the Closing Date, or pursuant to any other agreements in effect on the

Closing Date, shall survive the Closing Date and shall continue in full force and effect in accordance with their respective terms.

(b)     The Subsidiaries shall, and Purchaser shall cause the Subsidiaries to (i) maintain in effect for a period of six (6) years after the Closing Date, if available, the current policies of directors' and officers' liability insurance maintained by the Subsidiaries immediately prior to the Closing Date (provided that the Subsidiaries may substitute therefor policies, of at least the same coverage and amounts and containing terms and conditions that are not less advantageous to the directors, officers and managers of the Subsidiaries when compared to the insurance maintained by the Subsidiaries as of the date hereof), or (ii) obtain as of the Closing Date "tail" insurance policies with a claims period of six (6) years from the Closing Date with at least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the directors and officers of the Subsidiaries, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

(c)     The obligations of Purchaser and the Subsidiaries under this Section 4.5 shall not be terminated or modified in such a manner as to adversely affect any director, officer or manager to whom this Section 4.5 applies without the consent of such affected director, officer or manager (it being expressly agreed that the directors, officers and managers to whom this Section 4.5 applies shall be third-party beneficiaries of this Section 4.5, each of whom may enforce the provisions of this Section 4.5.

(d)     In the event Purchaser, the Subsidiaries or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in either such case, proper provision shall be made so that the successors and assigns of Purchaser or the Subsidiaries, as the case may be, shall assume all of the obligations set forth in this Section 4.5.

4.6.     Tax Covenants.

(a)     Without the prior written consent of Seller, Purchaser and the Subsidiaries shall not, to the extent it may affect, or relate to, the Business, make, change or rescind any Tax election, amend any Tax Return, or take any position on any Tax Return that would have the effect of increasing the Tax liability or reducing any Tax asset of the Subsidiaries (after the Closing Date) in respect of any Pre-Closing Tax Period.

(b)     In the case of any taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes based on or measured by income or receipts of the Business for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date, and the amount of any Taxes of the Business for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire Straddle

QB\34412138.5

Period multiplied by a fraction the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(c)     Seller shall, at its expense, prepare and timely file, or cause to be prepared and timely filed, all Tax Returns relating to, and pay all Taxes levied or imposed on, the Business for any Pre-Closing Tax Period. Purchaser shall, at its expense, prepare and timely file, or cause to be prepared and timely filed, all Tax Returns relating to, and pay all Taxes levied or imposed on, the Business for any Straddle Period, provided that all such Tax Returns shall be provided to Seller for review and approval at least fifteen (15) Business Days prior to filing and Seller shall pay Purchaser for the portion of such Taxes deemed to relate to a Pre-Closing Tax Period pursuant to Section 4.6(b) at least two (2) Business Days prior to Purchaser filing the Tax Return.

(d)     Seller and Purchaser shall cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Section 4.6 and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Seller shall control any such any audit, litigation or other proceeding with respect to Pre-Closing Tax Periods and Purchaser shall control any such any audit, litigation or other proceeding with respect to Post-Closing Tax Periods. The prior written consent of Seller shall be required prior to the concession of any issue (or decision to no longer appeal or litigate such issue) arising in any audit, litigation or other proceeding with respect to a Post-Closing Tax Period to the extent that resolution of such issue could or is reasonably expected to have the effect of increasing the Tax liability or reducing any Tax asset of the Company (after the Closing Date) in respect of any Pre-Closing Tax Period.

(e)     Any refunds or credits of Taxes of any Subsidiary plus any interest received with respect thereto (net of any Taxes imposed on such interest) from the applicable Taxing authority for any Pre-Closing Tax Period and the Pre-Closing Straddle Period (excluding refunds or credits arising by reason of the carryback of any items attributable to any period or portion thereof beginning after the Closing Date) received within three (3) years of the payment of the Tax shall be for the account of Seller and shall be paid by Purchaser to Seller within ten (10) Business Days after Purchaser or any Subsidiary receives such refund or after the relevant Tax Return is filed in which a credit is applied against Purchaser's, any Subsidiary's or any of their successor's liability for Taxes. For purposes of this Section 4.6(e), where it is necessary to apportion any such refund, credit or reduction between Purchaser and Seller for a Straddle Period, such refund, credit or reduction shall be apportioned in the same manner that a comparable or similar Tax liability would be apportioned pursuant to Section 4.6(b). If any refunds or credits or any related interest previously paid to Seller pursuant to this Section 4.6(e) is required to be repaid to a Taxing authority or is subsequently disallowed by a Taxing authority, Seller shall be required to repay to Purchaser such previously paid amounts within three (3) Business Days prior to the due date for such Tax.

11

(f)      All Tax-sharing agreements or similar agreements with respect to or involving any Subsidiary shall be terminated as of the Closing Date and, after the Closing Date, no Subsidiary shall be bound thereby or have any liability thereunder.

(g)      The Parties shall treat the sale of the Assets by Seller as contemplated by this Agreement as a sale of assets owned by the Seller and each Subsidiary for U.S. income Tax purposes as of the Closing Date.  Within forty-five days after the Closing Date, Seller shall prepare in consultation with Purchaser and deliver to Purchaser an allocation of the Purchase Price (and any other relevant items) among such assets for U.S. income Tax purposes.  The Parties agree to file all Tax Returns in accordance with such treatment and consistent with the purchase price allocation pursuant to this Section 4.6(g) and shall not take any position inconsistent therewith, except as required by Law.

4.7.      Release of Guarantees and other Obligations.  Within 120 days after the Closing Date, Seller, Purchaser and their Affiliates shall cause Seller and its Affiliates (other than CSC, CSL, BEI and PS) and any members, managers, principals or officers of Seller or its Affiliates to be released from any guarantees or other obligations arising under any Contracts related to the Business to which the Company or any member, manager, principal or officer of Seller or its Affiliates is a party.  Purchaser shall indemnify and hold Seller or its Affiliates harmless from any losses resulting from any guarantees.

# ARTICLE V
# INDEMNIFICATION

5.1.      Survival of Representations and Warranties.

(a)      The representations and warranties of Seller contained in this Agreement shall survive the Closing and shall remain in full force and effect until the date that is twelve (12) months from the Closing Date; provided, however, (i) the representations and warranties of Seller contained in Sections 2.1, 2.2, 2.3, 2.4, and 2.7 (collectively, the "Seller's Fundamental Representations") shall survive for five (5) years following the Closing Date, and (ii) the representations and warranties of Seller contained in Section 2.8 shall survive until the expiration of the applicable statute of limitations.  None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from and Indemnified Party to the Seller prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

(b)      The representations and warranties of Purchaser contained in this Agreement shall survive the Closing and shall remain in full force and effect until the date that is twelve (12) months from the Closing Date; provided, however, that the representations and

warranties in Sections 3.1, 3.2, 3.5 and 3.7 (collectively, "Purchaser's Fundamental Representations" shall survive for five (5) years following the Closing Date. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from and Indemnified Party to the Purchaser prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

5.2.    Indemnification.

(a)    Subject to the other provisions of this ARTICLE V, after the Closing Seller shall indemnify, defend and hold harmless Purchaser and its Affiliates (including the Company) and their respective Representatives (collectively, the "Purchaser Indemnitees") against any Losses incurred or suffered by a Purchaser Indemnitee as a result of, with respect to, or in connection with:

(i)    any breach of any representation or warranty of Seller set forth in this Agreement or any of the Ancillary Documents;

(ii)    any failure by Seller to fully perform, fulfill or comply with any covenant set forth in this Agreement or any of the Ancillary Documents to be performed, fulfilled or complied with by Seller; and

(iii)    any fraud or intentional misrepresentations by Seller.

(b)    Subject to the other provisions of this ARTICLE V, after the Closing Purchaser and the Company shall indemnify, defend and hold harmless Seller and its Affiliates and their respective Representatives (collectively, the "Seller Indemnitees") against any and all Losses incurred or suffered by a Seller Indemnitee as a result of, with respect to, or in connection with:

(i)    any breach of any representation or warranty of Purchaser set forth in this Agreement or any of the Ancillary Documents;

(ii)    any failure by Purchaser to fully perform, fulfill or comply with any covenant set forth in this Agreement or any of the Ancillary Documents to be performed, fulfilled or complied with by Purchaser;

(iii)    subject to Section 5.2(a)(i), the conduct, ownership, use, condition, possession or operation of the Business or the Subsidiaries, prior to, on or after the Closing Date;

(iv)    any Legal Action that (a) any Subsidiary is subject to as of the Closing Date, and/or (b) the Seller, any Seller Affiliate, any Seller Representative, or any Seller Affiliate Representative is a party to relating to the Business on or after the Closing Date; and

(v)    any fraud or intentional misrepresentations by Purchaser.

(c)    For purposes of this ARTICLE V, if any representation or warranty of a Party contained in this Agreement, is qualified in any respect by materiality, in all material

13

respects, Material Adverse Effect or words of like import, such materiality, in all material respects, or Material Adverse Effect qualifiers or other qualifiers of like import shall be ignored in determining whether a breach of any representation or warranty has occurred and in determining the amount of any resulting Loss.

      5.3.    Limitations.

          (a)    The indemnification obligations of Seller to the Purchaser Indemnitees for (i) a breach of a representation and warranty that is not a Seller's Fundamental Representation under Section 5.2(a)(i) shall not exceed US$350,000, and (ii) a breach of a representation and warranty under Section 5.2(a)(i) that is a Seller's Fundamental Representation shall not exceed \$1,250,000. Notwithstanding the foregoing, the indemnification obligations of Seller to the Purchaser Indemnitees for any fraudulent or intentional misrepresentations shall not be subject to any dollar amount limitations.

          (b)    No claims may be made by the Purchaser Indemnitees for indemnification pursuant to Section 5.2(a)(i) unless and until the aggregate amount of Losses for which the Purchaser Indemnitees are entitled to seek to be indemnified pursuant to Section 5.2(a)(i) exceeds US$125,000 at which time Purchaser shall be entitled to indemnification for all such Losses in excess of US$125,000; provided however, that the limitation set forth in this Section 5.3(b) shall not apply to any claim brought for breach of any Purchaser's Fundamental Representation, or (ii) any fraudulent or intentional misrepresentation.

          (c)    The indemnification obligations of Purchaser to the Seller Indemnitees for (i) a breach of a representation and warranty that is not a Purchaser's Fundamental Representation under Section 5.2(a)(i) shall not exceed US$350,000, and (ii) a breach of a representation and warranty under Section 5.2(b)(i) that is a Purchaser's Fundamental Representation shall not exceed \$1,250,000. Notwithstanding the foregoing, the indemnification obligations of Purchaser to the Seller Indemnitees for any fraudulent or intentional misrepresentations shall not be subject to any dollar amount limitations.

          (d)    No claims may be made by the Seller Indemnitees for indemnification pursuant to Section 5.2(b)(i) unless and until the aggregate amount of Losses for which the Seller Indemnitees are entitled to seek to be indemnified pursuant to Section 5.2(b)(i) exceeds US$125,000, at which time the Seller Indemnities shall be entitled to indemnification for all such Losses in excess of US$125,000; provided however, that the limitation set forth in this Section 5.3(d) shall not apply to any claim brought for breach of (i) any Fundamental Representation, or (ii) any fraudulent or intentional misrepresentation.

          (e)    Notwithstanding the fact that any Indemnified Party may have the right to assert claims for indemnification under or in respect of more than one provision of this Agreement in respect of any fact, event, condition or circumstance, no Indemnified Party shall be entitled to recover the amount of any Losses suffered by such Indemnified Party more than once, regardless of whether such Losses may be as a result of a breach of more than one representation, warranty or covenant.

14

(f)      Except with respect to actions indemnified pursuant to Section 5.2(b)(iii) and (iv), No Party shall be entitled to be indemnified hereunder for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, except to the extent that a Party is required to indemnify a third party for such damages.

(g)      Any payment due and owing from Seller pursuant to Section 5.2(a) shall first be paid by a set-off against the most current amounts owed to Seller or its Affiliate under the Note.

(h)      Except as provided in subsection (g) above, no Party shall have any right to set-off any amount to which it claims to be entitled from any other Party, including any amounts that may be owed under this ARTICLE V or otherwise, against amounts otherwise payable under any provision of this Agreement.

5.4.    Procedures.

(a)      If any Party believes at any time that it is entitled to be indemnified under this Agreement, such Party (the "Indemnified Party") shall promptly deliver to (i) Seller, in the case of claims for indemnification being asserted by or on behalf of a Purchaser Indemnitee, and (ii) Purchaser, in the case of claims for indemnification being asserted by or on behalf of a Seller Indemnitee, a certificate (a "Claim Certificate") that (x) states that the Indemnified Party has paid or properly incurred Losses and the amount thereof, or reasonably anticipates that it may or will incur Losses, for which such Indemnified Party is entitled to indemnification under this Agreement, and the estimated amount thereof, and (y) specifies in reasonable detail, to the extent practicable, each individual item of Loss included in the amount so stated, the date (if any) such item was paid or properly incurred the basis for any anticipated liability and the nature of the misrepresentation, default, breach of warranty or breach of covenant or claim to which each such item is related and, to the extent computable, the computation of the amount to which such Indemnified Party claims to be entitled hereunder; provided, however, that no delay on the part of the Indemnified Party in delivering a Claim Certificate shall diminish the rights of the Indemnified Party to be indemnified hereunder except to the extent that the delay shall increase the amount of such claim or Loss or the expenses incurred in connection therewith, and then only to such extent.

(b)      If Seller, in the case of indemnification claims by a Purchaser Indemnitee, or Purchaser, in the case of indemnification claims by a Seller Indemnitee (in either case, the "Responding Party"), objects to a claim of an Indemnified Party in respect of any claim or claims specified in any Claim Certificate, the Responding Party shall deliver a written notice to such effect to the Indemnified Party within thirty (30) days after receipt of the Claim Certificate by the Responding Party. Thereafter, the Responding Party and the Indemnified Party shall attempt in good faith to agree upon their respective rights within thirty (30) days after receipt by the Indemnified Party of such written objection with respect to each of such claims to which the Responding Party has objected. If the Indemnified Party and the Responding Party agree with respect to any of such claims, the Indemnified Party and the Responding Party shall promptly prepare and sign a memorandum setting forth such agreement. Should the Indemnified Party and

15

the Responding Party fail to agree as to any particular item or items or amount or amounts, then the Indemnified Party shall be entitled to pursue its available remedies for resolving the claim for indemnification.

(c)     If a claim for indemnification hereunder is based on, or results from, a claim by a third party for which a Purchaser Indemnitee or a Seller Indemnitee would be entitled to indemnification hereunder (a "Third-Party Claim"), the Responding Party may elect to assume and control the defense of such Third-Party Claim with counsel selected by the Responding Party and reasonably acceptable to the Indemnified Party by providing written notice thereof to the Indemnified Party within thirty (30) days after the receipt of notice of the related Claim Certificate from the Indemnified Party; provided that if the Note remains outstanding at the time a Seller Indemnitee makes an indemnification claim against Purchaser related to a Third Party Claim, the Seller Indemnitee shall have the right in its sole discretion to approve the counsel selected by the Purchaser to handle the Third Party Claim. If the Responding Party assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Responding Party, it being understood that the Responding Party shall control such defense; provided, however, that any legal expenses subsequently incurred by the Indemnified Party in connection with the defense of such Third-Party Claim shall not constitute Losses hereunder unless, in the reasonable opinion of counsel to the Indemnified Party, (i) there are legal defenses available to an Indemnified Party that may not be used by the Indemnifying Party in controlling such defense, or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, in which case the Indemnifying Party shall be liable for the reasonable fees and expenses of one counsel to the Indemnified Party. If the Responding Party does not assume the defense of any Third-Party Claim or, upon petition by the Indemnified Party, the appropriate court rules that the Responding Party failed or is failing to vigorously defend such Third-Party Claim, the Indemnified Party may assume the defense of such claim and any legal expenses subsequently incurred by the Indemnified Party in connection with such defense shall constitute Losses hereunder; provided, however, that in any such event, the Responding Party may participate in, but not control, the defense of such Third-Party Claim at the Responding Party's sole cost and expense. If the Responding Party assumes the defense of any Third-Party Claim, the Indemnified Party shall reasonably cooperate with the Responding Party in such defense. Such cooperation shall include (i) the retention of, and provision to the Responding Party and its counsel of, any records or other information in the possession or control of the Indemnified Party which may be relevant to such Third-Party Claim and (ii) making employees of the Indemnified Party and its Affiliates available to provide additional information and explanation of any material provided hereunder and, if necessary, to testify in connection with any related Legal Action, all at the cost and expense of the Responding Party.

(d)     The Responding Party shall not admit any liability with respect to, or settle, compromise or discharge, any Third-Party Claim without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed), and the Indemnified Party shall consent to any settlement, compromise or discharge of a Third-Party Claim which the Responding Party may recommend which by its terms unconditionally releases the Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and does not impose any obligation or restriction upon the Indemnified Party, provided that if Seller is the Party seeking indemnification from Purchaser and the proposed settlement,

16

compromise and/or discharge by Purchaser jeopardizes in any way the ability of Purchaser and its Affiliates to pay the Loan and Note pursuant to their terms, Seller shall have the sole right to reject and not approve any such settlement, compromise and/or discharge. The Responding Party shall not, without the written consent of the Indemnified Party, enter into any settlement, compromise or discharge or consent to the entry of any Judgment which imposes any obligation or restriction on the Indemnified Party or any of its Affiliates or does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party and its Affiliates of an unconditional release from all liability with respect to such Third-Party Claim.

5.5.    Recoveries. Each Indemnified Party shall, with respect to any Losses, use its commercially reasonable efforts to obtain recovery from applicable insurance policies and from third parties pursuant to indemnification (or otherwise) with respect thereto. Any amount payable under this ARTICLE V by the Responding Party shall be net of any amounts that the Indemnified Party actually recovers (i) under applicable insurance policies, net of any reasonable and documented costs and expenses incurred in the collection of same, or (ii) from third parties pursuant to indemnification or otherwise, in each case with respect to such Losses, provided that any cash Tax benefit realized by an Indemnified Party shall be specifically excluded.

5.6.    Exclusive Remedy. Except (i) for claims for injunctive and other equitable relief, (ii) for claims based on willful misconduct or fraud, and (iii) claims related to a breach or default under the Loan Agreement and related documents, the sole and exclusive remedy of any Indemnified Party for money damages for any matters relating to this Agreement or the consummation of the transactions contemplated hereby shall be the rights to indemnification set forth in this ARTICLE V. No Representative of Seller or its Affiliates shall have any liability under or with respect to this Agreement.

5.7.    Treatment of Indemnification Payments. Any indemnification payments pursuant to this ARTICLE V shall be treated by all Parties and their Affiliates as an adjustment to the Purchase Price for all Tax purposes and no Party shall, or shall permit any of its Affiliates to, take any position contrary to such treatment unless otherwise required by applicable Tax Law.

## ARTICLE VI
## DEFINITIONS; CONSTRUCTION

6.1.    Definitions. For the purposes of this Agreement:

"Affiliate" means, with respect to the Person to which it refers, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person. For the purpose of this definition, the term "control" of a Person means the power to direct, or cause the direction of, the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control" have correlative meanings.

"Agreement" is defined in the Preamble.

"Ancillary Documents" means the Earn-out Agreement, the Loan Agreement, the Loan Documents and the Note.

17

QB\34412138.5

"Assets" is defined in Recital F.

"Backpage" is defined in Recital E.

"Backpage License" is defined in Recital E.

"BEI" is defined in Recital D.

"BEI Shares" is defined in Recital D.

"Business" is defined in Recital A.

"Business Day" means any day of the year on which national banking institutions in the State of New York are open to the public for conducting business and are not required to close.

"Claim Certificate" is defined in Section 5.4(a).

"Closing" is defined in Section 1.4.

"Closing Date" is defined in Section 1.4.

"Closing Date Payment" is defined in Section 1.3.

"Consent" means any consent, approval, waiver, filing, authorization or notice.

"Constitutional Documents" means, as to any Person, the constitutional or organizational documents of such Person, including any charter, certificate or articles of incorporation, certificate of formation, articles of association, bylaws, trust instrument, partnership agreement, limited liability company agreement or similar document.

"Contract" means any written or oral agreement, contract, mortgage, indenture, lease, license, instrument, document, obligation or commitment that is legally binding, including all amendments, modifications and supplements thereto, provided, however, that the term Contract does not include purchase orders entered into in the ordinary course of business.

"Current Liabilities" means accounts payable, accrued Taxes, accrued expenses, and other current liabilities, but excluding any deferred Tax liabilities and the current portion of long term debt, determined in accordance with GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Financial Statements of the Subsidiaries for the most recent fiscal year end as if such accounts were being prepared as of a fiscal year end.

"CSL" is defined in Recital C.

"CSL Shares" is defined in Recital C.

"CSC" is defined in Recital B.

"CSC Interest" is defined in Recital B.

"Disclosure Letter" is defined in the preamble to ARTICLE II.

"Earn-out Agreement" is defined in Section 1.6.

"GAAP" means generally accepted accounting principles in the United States as in effect on the date of this Agreement.

"Governmental Entity" means any court, administrative agency or commission or other federal, state, county, local or foreign governmental entity, instrumentality, agency or commission.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indemnified Party" is defined in Section 5.4(a).

"Judgment" means, with respect to any Person, any final non-appealable order, injunction, judgment, stipulation, award, decision, decree, verdict, ruling or other similar requirement enacted, adopted, entered, issued, made, rendered, promulgated or applied by a Governmental Entity or arbitrator that is binding upon or applicable to such Person.

"Law" means any federal, state, foreign or local law, statute, ordinance, rule, order, regulation, writ, injunction, directive, Judgment, treaty, decree or administrative or judicial decision.

"Legal Action" means any claim, demand, action, suit or proceeding of any nature, civil, criminal, administrative, regulatory or otherwise, in Law or in equity, by or before any court, tribunal, arbitrator or other Governmental Entity.

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, proxy, voting trust or agreement, transfer restriction under any stockholder or similar agreement, mortgage, easement, encroachment, right of way, or encumbrance of any nature whatsoever.

"Loan" means the principal advance of $74,300,000 made by Seller to Purchaser pursuant to the Loan Agreement and as further evidenced by the Note.

"Loan Documents" means any document or agreement executed in connection with the Loan Agreement other than the Note.

"Loan Agreement" is defined in Section 1.7(a)(v).

"Losses" means, without duplication for purposes of recovery, losses, liabilities, damages, penalties, costs and expenses, including reasonable attorneys' fees and expenses, expenses of investigation and defense, and the cost of enforcing any right to indemnification under this Agreement.

QB\34412138.5

"Material Adverse Effect" means any result, occurrence, fact, change, event or effect that has or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, operations or financial condition of the Company.

"Membership Interest Assignment Agreement" is defined in Section 1.7(a).

"Note" is defined in Section 1.7(b)(i).

"Parties" means Purchaser and Seller and "Party" means any of the Parties.

"Permitted Liens" means, with respect to any Person, Liens for (i) Taxes, assessments and other governmental charges, if such Taxes, assessments or charges are not due and payable or the Person is contesting them in good faith and has established adequate reserves for them, (ii) workmen's, repairmen's or other similar Liens incurred in the ordinary course of business in respect of obligations which are not overdue, (iii) minor title defects and recorded easements which do not, individually or in the aggregate, impair the continued use, occupancy, value or marketability of title of the property to which they relate, assuming that the property is used on substantially the same basis as such property is currently being used in the conduct of the Business, (iv) pledges or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other programs required by applicable Law, and (v) any Lien against or affecting leased property which is not a violation of the lease for such property.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Entity or other entity.

"Pre-Closing Straddle Period" means with respect to a Straddle Period, the period of the Straddle Period that extends before the Closing Date through (and including) the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date.

"PS" is defined in Section 1.5.

"PS Shares" is defined in Section 1.5.

"Purchase Price" is defined in Section 1.3.

"Purchaser" is defined in the Preamble.

"Purchaser Indemnitees" is defined in Section 5.2(a).

"Purchaser's Fundamental Representations" is defined in Section 5.1(b).

"Representative" means, with respect to any Person, any and all directors, managing members, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Responding Party" is defined in Section 5.4(b).

"Seller" is defined in the Preamble.

"Seller's Fundamental Representations" is defined in Section 5.1.

"Seller Indemnitees" is defined in Section 5.2(b).

"Straddle Period" is defined in Section 4.6(b).

"Subsidiary" shall mean CSC, CSL, BEI or PS individually and "Subsidiaries" shall mean collectively CSC, CSL, BEI and PS.

"Tax" means any federal, state, local income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, capital profits, lease, service, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium or property tax, surcharge, any other similar governmental fee, and any other assessment or charge constituting a tax, together with all interest, penalties, additions to tax and additional amounts with respect thereto.

"Tax Returns" means all returns, declarations, reports, claims for refund, information statements and other documents relating to Taxes, including all schedules and attachments thereto, and including all amendments thereof.

"Third-Party Claim" is defined in Section 5.4(c).

6.2.    Construction.

(a)    Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in the construction or interpretation of this Agreement.

(b)    The words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation".

(c)    Except as otherwise indicated, all references in this Agreement to "Articles", "Sections", "Exhibits" and "Schedules" are intended to refer to the Articles and Sections of this Agreement, and to the Exhibits and Schedules to this Agreement, including the Disclosure Letter, as the context may require. All such Exhibits and Schedules, including the Disclosure Letter, shall be deemed a part of, and are hereby incorporated by this reference into, this Agreement.

21

(d)    The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

## ARTICLE VII
## GENERAL PROVISIONS

7.1.    Amendment; Waiver. This Agreement may be amended by the Parties only by execution of an instrument in writing signed by Purchaser and Seller. At any time prior to the Closing, Purchaser, on the one hand, and Seller, on the other, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the other Party, (ii) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto or (iii) waive compliance with any of the agreements or conditions for the benefit of such Party contained herein. Any agreement by any Party to any such extension or waiver shall be valid only if, and to the extent set forth in an instrument in writing signed on behalf of such Party. No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

7.2.    Expenses. Except as otherwise specifically provided herein, each Party shall bear all fees, costs and expenses (including attorneys' and accountants' fees, costs and expenses) incurred by such Party in connection with the transactions contemplated by this Agreement.

7.3.    Public Announcements. No public release or announcement concerning this Agreement or the transactions contemplated hereby shall be issued by any Party without the prior written consent of Seller, except as such release or announcement may be required by applicable Law or the rules or regulations of any applicable Governmental Entity to which the relevant Party is subject, in which case the Party required to make the release or announcement shall use its reasonable best efforts to provide the other Party reasonable time to comment on such release or announcement in advance of such issuance, it being understood that the final form and content of any such release or announcement, to the extent so required, shall be at the final discretion of the disclosing Party.

7.4.    Notices. All notices required or permitted to be given hereunder shall be in writing and may be given in person or by United States mail, by delivery service or by electronic transmission. Any notice directed to a Party to this Agreement shall become effective upon the earliest of the following: (i) actual receipt by that Party; (ii) delivery to the designated address of that Party, addressed to that Party; or (iii) if given by certified or registered United States mail, twenty-four (24) hours after deposit with the United States Postal Service, postage prepaid, addressed to that Party at its designated address. The designated address of a Party shall be the address of that Party shown below or such other address as that Party, from time to time, may specify by notice to the other Party.

(a)    if to Purchaser, to:

UGC Tech Group C.V.
2501 Oak Lawn Avenue
Suite 700
Dallas, Texas 75219
Attention: Carl A. Ferrer
Email: carl.ferrer@backpage.com

with a copy (which shall not constitute notice) to:

Bell Nunnally & Martin LLP
3232 McKinney Avenue
Suite 1400
Attention: Larry L. Shosid
Dallas, Texas 75204
Telephone: 214-740-1424
Facsimile: 214-740-5724
Email: lshosid@bellnunnally.com

(b)    if to Seller to:

Vermillion Holdings, LLC
8901 East Pima Center Parkway
Suite 145
Attention: Jed Brunst
Scottsdale, Arizona 85258
Telephone: 480-800-3282
Facsimile: None
Email: jed.brunst@cereusproperties.com

with a copy (which shall not constitute notice) to:

Quarles & Brady LLP
One South Church Avenue
Suite 1700
Attention : Susan Boswell
Tucson, Arizona 85701
Telephone: 520-770-8713
Facsimile: 520-770-2222
Email: susan.boswell@quarles.com

7.5.    Entire Agreement.    This Agreement, the Exhibits and the Schedules hereto, including the Disclosure Letter, constitute the entire agreement among the Parties with respect to

QB\34412138.5

the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof.

7.6.     Severability.  In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision will be interpreted so as reasonably to effect the intent of the Parties.   The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the greatest extent possible, the economic, business and other purposes of such void or unenforceable provision.

7.7.     Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to injunctive relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which the Parties are entitled at Law or in equity.

7.8.     Successors and Assigns; Assignment; Parties in Interest.  Seller may at any time assign Seller's rights in this Agreement, the Loan Agreement, the Loan Documents, and the Note and be relieved of all liability under this Agreement and such Affiliate shall assume all of Seller's obligations under this Agreement.  Without limiting the foregoing, Purchaser hereby acknowledges that immediately following the Closing, Seller will assign this Agreement, the Loan Agreement and the Note to Shearwater Investments., LLC, an Affiliate of Seller and Purchaser will   honor such assignment by Seller.   Borrower may not sell or assign this Agreement, or any other agreement with Seller or any portion thereof, either voluntarily or by operation of Law, without the prior written consent of Seller, which consent Seller may give or withhold in its sole and absolute discretion. This Agreement shall be binding upon Seller and Purchaser and their respective legal representatives and successors. All references herein to Purchaser shall be deemed to include any successors, whether immediate or remote.  In the case of a joint venture or partnership, the term "Purchaser" shall be deemed to include all joint venturers or partners thereof, who shall be jointly and severally liable hereunder.

7.9.     Governing Law; Venue.

(a)     This Agreement shall be governed by the internal Laws of the State of Delaware applicable to contracts made and to be performed entirely within such state, without regard to conflict of Laws principles.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF DELAWARE SITTING IN NEW CASTLE COUNTY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH

24

ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY OTHER PARTY OR THEIR RESPECTIVE PROPERTIES IN THE COURTS OF ANY JURISDICTION.

7.10. Waiver of Jury Trial. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTIES HAS REPRESENTED, EXPRESSLY OR OTHERWISE THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.10.

7.11. Other Remedies. Except as otherwise provided herein, any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

7.12. Conflict with Loan Documents. Notwithstanding anything contained herein to the contrary, if there is any conflict or inconsistency between this Agreement and the Loan Agreement or any Loan Document, the Loan Agreement and Loan Document shall control over the terms of this Agreement.

7.13. Counterparts; Electronic Delivery. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any signature page delivered by facsimile or electronic image transmission shall be binding to the same extent as an original signature page. Any Party that delivers a signature page by facsimile or electronic image transmission shall deliver an original counterpart to any other Party that requests such original counterpart, it being understood and agreed that the failure to deliver any such original counterpart upon request shall not affect the binding nature of the signature page delivered by facsimile or electronic image transmission.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized representative as of the date first written above.

**PURCHASER:**

**SELLER:**

**UGC TEC GROUP C.V.,** a Dutch limited partnership

**VERMILLION HOLDINGS, LLC,** a Delaware limited liability company

By:     CF Holdings GP LLC, its sole general partner

By:_____
Name:  John E. Brunst
Title    President

By:_____
Name: Carl A. Ferrer
Title    Chief Executive Officer

[Signature Page - Purchase and Sale Agreement]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized representative as of the date first written above.

**PURCHASER:**

**SELLER:**

**UGC TEC GROUP C.V.,** a Dutch limited partnership

**VERMILLION HOLDINGS, LLC,** a Delaware limited liability company

By:    CF Holdings GP LLC, its sole general partner

By: _____

Name:   John E. Brunst
Title    President

By:_____
Name: Carl A. Ferrer
Title    Chief Executive Officer

[Signature Page - Purchase and Sale Agreement]

QB\34412138.5

## EXHIBIT A

Earn-out Agreement

(see attached)

## EXHIBIT B

Membership Interest Assignment Agreement

(see attached)

## EXHIBIT C

Loan Agreement

(see attached)

## EXHIBIT D

Note

(see attached)

## EXHIBIT A

Earn-out Agreement

(see attached)

## EARN-OUT AGREEMENT

This Earn-out Agreement (this "Agreement") is entered into as of April 22, 2015 (the "Effective Date") by and between Vermillion Holdings, LLC, a Delaware limited liability company ("Seller") and UGC Tech Group, C.V., a Dutch limited partnership ("Purchaser"). Seller and Purchaser may be referred to collectively as the "Parties" and individually as a "Party."

### RECITALS

A.    Seller and Purchaser are parties to a Purchase and Sale Agreement dated as of April 22, 2015 (the "Purchase Agreement") pursuant to which Seller sold to Purchaser (i) a ninety-nine percent (99%) membership interest (the "CSC Interest") in Classified Strategies Coöperatief U.A., a Dutch cooperative association with excluded liability ("CSC"), (ii) all of the issued and outstanding shares (the "CSL Shares") of Classified Solutions Ltd., a United Kingdom limited company ("CSL")), (iii) all of the issued and outstanding shares (the "BE Shares") of Backpage Enterprises Inc., a Quebec corporation ("BE"), and the transfer and assignment to UGC of an Intellectual Property License with Backpage.com, LLC, a Delaware limited liability company, dated as of April 22, 2015 (the "Backpage License") (the CSC Interest, the CSL Shares, and the BE shares shall be collectively referred to as the "Assets")

B.    Seller and Purchaser are parties to a Loan Agreement dated as of April 22, 2015 (the "Loan Agreement") pursuant to which Purchaser is obligated to Seller for certain obligations, including, but not limited to, the amount of US$74,300,000 to acquire the Assts and the assignment and transfer of the Backpage License and the amount of US$2,705,592.50 to refinance the Cracker Loan for a total loan amount of $77,005,592.50 (the "Loan"). The Loan is evidenced by the Loan Agreement and certain other documents executed in conjunction with the Loan (collectively, the "Loan Documents").

C.    Immediately upon consummating the Loan, Seller will contribute all of Seller's right, title and interest in and to the Loan, the Purchase Agreement and the Loan Documents to its wholly owned subsidiary, Shearwater Investments, LLC, a Delaware limited liability company ("Shearwater"). Upon such contribution, Shearwater shall become the lender under the Loan and will succeed to all the rights of Seller, including the rights of Seller under this Agreement.

D.    Seller is selling the Business (defined below) to Purchaser pursuant to the Purchase Agreement

E.    The Purchase Agreement provides that Seller shall receive additional consideration for the Assets and the assignment and transfer of the Backpage License pursuant to an earn-out based upon the EBITDA of the Business during the Calculation Period (defined below) or in the event of a sale of the Business prior to the Calculation Date (defined below).

F.    Seller and Purchaser have agreed that determination and payment of the earn-out contemplated by the Purchase Agreement is to be in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and of the respective covenants and provisions herein contained, in the Purchase Agreement and the Loan Documents, Seller and Purchaser agree as follows:

## ARTICLE 1

## DEFINITIONS

Capitalized terms used in this Agreement that are not otherwise defined herein shall have the meaning ascribed to those terms in the Purchase Agreement.   For purposes of this Agreement, the terms listed below have the following meanings.

1.1    "Accelerated Earn-out Payment" means the additional consideration to be paid by Purchaser to Seller upon a Sale calculated in accordance with Section 2.3 below.

1.2    "Additional Promissory Note" means the promissory note in the form attached hereto as Exhibit A executed by Purchaser in favor of Seller in the amount of the Earn-out Payment which shall be payable in equal monthly installments of principal and interest commencing thirty (30) days after the Earn-out Payment is determined together with interest at the Prime Rate plus one percent (1%) per annum calculated on the basis of a 360-day year with any amounts of unpaid principal and all interest accrued thereon due and payable twenty-four (24) months following the date of the Additional Promissory Note. The Additional Promissory Note shall be subject to the terms of the Loan Agreement.

1.3    "Base Purchase Price" means the amount of the purchase price paid by Purchaser to Seller pursuant to the Purchase Agreement plus the refinance of the Cracker Loan for a total Base Purchase Price of US$77,005,592.50.

1.4    "Business" has the meaning ascribed to such term in Recital A to the Purchase Agreement.

1.5    "Calculation Date" shall be the later of April 22, 2021 or when the Loan is paid in full.

1.6    "Calculation Period" means the twelve (12) month period immediately preceding the Calculation Date.

1.7    "Depreciation" means the total amounts added to depreciation, amortization, obsolescence, valuation and other proper reserves, as reflected on the Business' financial statements and determined in accordance with GAAP, consistently applied.

1.8    "Due Date" means fifteen (15) days after the earlier of: (i) receipt by Purchaser of written notice from Seller that the Earn-out Calculation has been accepted without objection, or (ii) resolution of any dispute regarding the Earn-Out Calculation pursuant to Section 3.2 below.

1.9    "Earn-out Calculation" has the meaning set forth in Section 3.1 below.

1.10    "Earn-out Calculation Delivery Date" means, as applicable, (i) thirty (30) days following the Calculation Date, or (ii) thirty (30) days prior to the Sale Closing Date if the Earn-out Payment becomes due as a result of a Sale.

1.11    "Earn-out Payment" has the meaning set forth in Section 2.1 below.

1.12    "EBITDA" means, for any period, (a) the sum for such period on a consolidated and cumulative basis of: (i) Net Income, plus (ii) Interest Charges, plus (iii) foreign, federal and state income taxes, plus (iv) Depreciation, plus (v) non-cash extraordinary losses and other non-cash expenses (including impairment charges included under Federal Accounting Standard Board (FASB) Rules 141 and 142), minus (b) the sum for such period of: (i) extraordinary gains, (ii) interest income, and (iii) income or loss attributable to equity in any Affiliate or Subsidiary, in each case to the extent included in determining Net Income for such period.

1.13    "GAAP" means generally accepted accounting principles in the United States of America set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination; provided, however, that interim financial statements or reports shall be deemed in compliance with GAAP despite the absence of footnotes and fiscal year-end adjustments as required by GAAP.

1.14    "Interest Charges" means, for any period, the sum of: (a) all interest, charges and related expenses payable with respect to that fiscal period to a lender in connection with borrowed money or the deferred purchase price of assets that are treated as interest in accordance with GAAP, consistently applied, plus (b) the portion of capitalized lease obligations with respect to that fiscal period that should be treated as interest in accordance with GAAP.

1.15    "Net Income" means the net income (or loss) of the Business for such period as determined in accordance with GAAP, consistently applied, excluding any extraordinary gains and any gains from discontinued operations.

1.16    "Net Sale Proceeds" means, with respect to a Sale (a) the cash proceeds actually received in respect of such sale minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) except the fees and out-of-pocket expenses of brokers, investment bankers, attorneys, advisors or any other party retained by Sale Seller or Sale Buyer who is entitled to be paid a fee in connection with such event, (ii) usual and customary closing costs that are typical for a sale of assets or a business similar to the Sale, and (iii) the amount of all payments made from such proceeds to repay the Loan.  For the avoidance of doubt, the fees and out-of-pocket expenses of Sale Seller's brokers, investment bankers, attorneys, advisors or any other party retained by Sale Seller or Sale Buyer who is entitled to be paid a fee in connection with such event shall not be deducted from the sale proceeds in order to determine Net Sales Proceeds.

1.17    "Prime Rate" means the interest rate published by the *Wall Street Journal* from time-to time as the "prime rate" charged by national banks in the United States.

1.18    "Sale" means a sale of the Business whether by merger, consolidation, sale of all of the equity interests that own or operate the Business, or sale of all of the assets of the Business that occurs between the date of Closing and prior to the Calculation Date.

1.19    "Sale Buyer" means the buyer in a transaction that constitutes a Sale under the terms of this Agreement.

1.20    "Sale Closing Date" means the date on which a Sale closes.

1.21    "Sale Seller" means the seller in a transaction that constitutes a Sale under the terms of this Agreement.

## ARTICLE 2

## EARN-OUT PAYMENT

2.1    Earn-out Calculation. As additional consideration for the purchase of the Assets and assignment and transfer of the Backpage License, Purchaser shall pay to Seller the Earn-out Payment, which shall either be (A) the sum calculated pursuant to Section 2.3 below in the event of a Sale on or before the Calculation Date, or (B) calculated as follows: (i) the EBITDA for the Calculation Period multiplied by (ii) five (5) (the "Business Value") minus (x) the applicable Base Purchase Price. The product of the foregoing calculation shall be multiplied by thirty percent (30%), the product of which shall be the Earn-out Payment due to Seller payable in accordance with Section 2.2 below. By way of example only, if EBITDA for the Calculation Period is $30 million, the business value would be $150 million ($30 million x 5 = $150 million) minus the Base Purchase Price (assuming it to be $75 million) = $75 million. In this case the Earn-out Payment will be $22.5 million.

2.2    Payment of Earn-out Payment. The Earn-out Payment (other than an Accelerated Earn-out Payment under Section 2.3 below) shall be paid on or before the Due Date by delivery to Seller of either: (i) payment in full in cash of immediately available funds, or (ii) the Additional Promissory Note.

2.3    Accelerated Earn-out Payment. If a Sale occurs at any time after the Effective Date and before the Calculation Date, Purchaser shall pay an Accelerated Earn-out Payment to Seller calculated as follows: (i) if on the Sale Closing Date, the outstanding principal amount due under the Loan is equal to or greater than fifty percent (50%) of the original Loan amount, Purchaser shall pay to Seller: (x) all amounts remaining due on the Loan, including all principal, accrued interest, attorneys fees, costs, expenses and other amounts remaining unpaid pursuant to the terms of the Loan, plus an amount equal to (y) the Net Sale Proceeds minus the principal amount remaining unpaid on the Loan just prior to the determination of the Accelerated Earn-out Payment multiplied by fifty percent (50%); or (ii) if on the Sale Closing Date, the outstanding principal amount due under the Loan is less than fifty percent (50%) of the original loan amount, Purchaser shall pay to Seller: (x) all amounts remaining due on the Loan, including all principal, accrued interest, attorneys fees, costs, expenses and other amounts remaining unpaid on the Loan, plus an amount equal to (y) the Net Sale Proceeds minus the principal amount remaining unpaid on the Loan just prior to the determination of the Accelerated Earn-out Payment multiplied by thirty percent (30%). The Accelerated Earn-out Payment shall be paid in cash by

-4-

wire transfer of immediately available funds to the bank account of Seller on the Sale Closing Date.

2.4     Example of Accelerated Earn-out Payment. By way of example only, the original Loan amount is $75 million and on the Sale Closing Date, the outstanding principal balance under the Loan is equal to $50 million (an amount greater than fifty percent (50%) of the original Loan amount) and the Net Sale Proceeds are $100 million, Seller would receive $25 million as an Accelerated Earn-Out Payment ($100 million minus $50 million = $50 million x 50% = $25 million) plus all amounts remaining unpaid under the Loan. If a Sale occurs on the Sale Closing Date, the outstanding principal balance of the Loan is equal to $30 million (an amount less than fifty percent (50%) of the original Loan amount) and the Net Sales Proceeds are $100 million, Seller would receive $21 million as an Accelerated Earn-Out Payment ($100 million minus $30 million = $70 million x 30% = $21 million).

## ARTICLE 3

### PROCEDURES APPLICABLE TO DETERMINATION
### OF THE EARN-OUT PAYMENT

3.1     Determination of EBITDA. Following the Effective Date and continuing through the Calculation Date or the Sale Closing Date, as applicable, Purchaser shall maintain separate accounting books and records for the Business. On or before the Earn-out Calculation Delivery Date, Purchaser shall prepare and deliver to Seller the Earn-out Calculation Statement setting forth in reasonable detail its determination of the EBITDA for the Calculation Period and the Earn-out Calculation of the resulting Earn-out Payment (the "Earn-out Calculation Statement"). Purchaser shall calculate the EBITDA in accordance with GAAP as consistently applied by Purchaser.

3.2     Review by Seller. Seller shall have thirty (30) days after receipt of the Earn-out Calculation Statement (the "Earn-out Review Period") to review the EBITDA and the Earn-out Calculation. During the Earn-out Review Period, in addition to any rights of Seller under the Purchase Agreement and the Loan Documents, Seller and its accountants shall have the right to review and inspect Purchaser's books and records for purposes reasonably related to the determination of EBITDA and the resulting Earn-out Payment due Seller. Prior to the expiration of the Earn-out Review Period, Seller may object to the EBITDA and Earn-out Calculation Statement by delivering a written notice of objection (an "Earn-out Calculation Objection Notice") to Purchaser setting forth Seller's calculation of EBITDA and the Earn-out Payment. If Seller fails to deliver an Earn-out Calculation Objection Notice to Purchaser prior to the expiration of the Earn-out Review Period, then the EBITDA and the Earn-out Payment due Seller set forth in the Earn-out Calculation Statement shall be final and binding on the Parties hereto. If Seller timely delivers an Earn-out Calculation Objection Notice, Purchaser and Seller shall negotiate in good faith to resolve the disputed items and agree upon the resulting amount of the EBITDA and the Earn-out Payment due Seller.

If Purchaser and Seller are unable to reach final agreement within thirty (30) days after the date of the Earn-out Calculation Objection Notice, all unresolved disputed items shall be promptly referred to an impartial nationally recognized firm of independent certified public accountants, other than Seller's accountants or Purchaser's accountants, appointed by mutual

agreement of Purchaser and Seller (the "Independent Accountants"). The Independent Accountants shall be directed to render a written report on the unresolved disputed items with respect to the EBITDA and Earn-out Calculation as promptly as practicable, but in no event greater than sixty (60) days after the submission date to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Earn-out Calculation Objection Notice.

If unresolved disputed items are submitted to the Independent Accountants, Purchaser and Seller shall each furnish to the Independent Accountants such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountants may reasonably request. The Independent Accountants shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement, the Purchase Agreement and the Loan Documents and the presentations by Purchaser and Seller, and not by independent review. The resolution of the dispute and the calculation of EBITDA and the Earn-out Payment due Seller that is the subject of the applicable Earn-out Calculation Objection Notice by the Independent Accountants shall be final and binding on the Parties. The fees and expenses of the Independent Accountants shall be borne by Seller and Purchaser in proportion to the amounts by which their respective calculations of EBITDA and the Earn-out Payment due Seller differ from the EBITDA and Earn-out Payment as finally determined by the Independent Accountants.

## ARTICLE 4

### MISCELLANEOUS

4.1     Amendment; Waiver. This Agreement may be amended by the Parties only by execution of an instrument in writing signed by Purchaser and Seller. No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

4.2     Entire Agreement. This Agreement and the Loan Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. This Agreement is the result of negotiations between Seller and Purchaser and have been reviewed (or have had the opportunity to be reviewed) by counsel to all such parties, and are the products of all parties. Accordingly, this Agreement shall not be construed more strictly against Seller merely because of Seller's involvement in its preparation.

4.3     Cooperation. During the Term, each Party will cooperate with and assist the other Party in taking such acts as may be appropriate to enable all Parties to effect compliance with the terms of this Agreement and to carry out the true intent and purposes hereof.

4.4     Notices. All notices required or permitted to be given hereunder shall be in writing and may be given in person or by United States mail, by delivery service or by electronic transmission. Any notice directed to a Party to this Agreement shall become effective upon the

-6-

QB\34738906.1

earliest of the following: (i) actual receipt by that Party; (ii) delivery to the designated address of that Party, addressed to that Party; or (iii) if given by certified or registered United States mail, twenty-four (24) hours after deposit with the United States Postal Service, postage prepaid, addressed to that Party at its designated address. The designated address of a Party shall be the address of that Party shown below or such other address as that Party, from time to time, may specify by notice to the other Parties.

    (a)    if to Purchaser, to:

> UGC Tech Group C.V.
> 2501 Oak lawn Avenue
> Suite 700
> Dallas, Texas 75219
> Attention: Carl A. Ferrer
> Email: carl.ferrer@backpage.com

> with a copy (which shall not constitute notice) to:

> Bell Nunnally & Martin LLP
> 3232 McKinney Avenue
> Suite 1400
> Dallas, Texas 75204
> Attention: Larry L. Shosid, Esq.
> Telephone: 214-740-1424
> Facsimile: 214-740-5724
> Email: lshosid@bellnunnally.com

    (b)    if to Seller to:

> Vermillion Holdings, LLC
> 8901 East Pima Center Parkway
> Suite 145
> Scottsdale, Arizona 85258
> Attention: John E. Brunst
> Telephone: 480-800-3282
> Facsimile: N/A
> Email: jed.brunst@cereusproperties.com

> with a copy (which shall not constitute notice) to:

> Quarles & Brady LLP
> One South Church Avenue
> Suite 1700
> Tucson, Arizona 85701
> Attention: Susan Boswell, Esq.
> Telephone: 520-770-8713

Facsimile: 520-770-2222
Email: susan.boswell@quarles.com

4.5     Severability.  In the event that any provision of this Agreement or the application
thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or
unenforceable, the remainder of this Agreement will continue in full force and effect and the
application of such provision will be interpreted so as reasonably to effect the intent of the
Parties.  The Parties further agree to replace such void or unenforceable provision of this
Agreement with a valid and enforceable provision that will achieve, to the greatest extent
possible, the economic, business and other purposes of such void or unenforceable provision.

4.6     Index and Captions.  The captions of the Articles and Sections of this Agreement
are solely for convenient reference and shall not be deemed to affect the meaning or
interpretation of any Article or Section hereof.

4.7     Successors and Assigns; Assignment; Parties in Interest.  Seller may at any time
assign Seller's rights in this Agreement and be relieved of all liability under this Agreement and
such assignor shall assume all of Seller's obligations under this Agreement.  Without limiting the
foregoing, Purchaser hereby acknowledges that immediately following the Effective Date, Seller
will assign this Agreement to Shearwater, and Purchaser will  honor such assignment by Seller.
Purchaser may not sell or assign this Agreement, or any portion thereof, either voluntarily or by
operation of law, without the prior written consent of Seller, which consent Seller may give or
withhold in its sole and absolute discretion.  This Agreement shall be binding upon Seller and
Purchaser and their respective legal representatives and successors.  All references herein to
Purchaser shall be deemed to include any successors, whether immediate or remote.  In the case
of a joint venture or partnership, the term "Purchaser" shall be deemed to include all joint
venturers or partners thereof, who shall be jointly and severally liable hereunder.

4.8     Governing Law; Venue.

(a)     This Agreement shall be governed by the internal laws of the State of
Delaware applicable to contracts made and to be performed entirely within such state, without
regard to conflict of laws principles.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND
UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE
NONEXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE
STATE OF DELAWARE SITTING IN NEW CASTLE COUNTY, AND ANY APPELLATE
COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF
OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT
OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY
AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH
ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE OR,
TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE
PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR
PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER
JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER
PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT

THAT ANY PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY OTHER PARTY OR THEIR RESPECTIVE PROPERTIES IN THE COURTS OF ANY JURISDICTION.

4.9   Waiver of Jury Trial.   EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY TRANSACTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTIES HAS REPRESENTED, EXPRESSLY OR OTHERWISE THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4.9.

4.10   Other Remedies.   Except as otherwise provided herein, any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

4.11   Counterparts; Electronic Delivery.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any signature page delivered by facsimile or electronic image transmission shall be binding to the same extent as an original signature page. Any Party that delivers a signature page by facsimile or electronic image transmission shall deliver an original counterpart to any other Party that requests such original counterpart, it being understood and agreed that the failure to deliver any such original counterpart upon request shall not affect the binding nature of the signature page delivered by facsimile or electronic image transmission.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, the parties have hereunto caused this Agreement to be executed as of the Effective.

**SELLER:**

VERMILLION HOLDINGS, LLC, a Delaware limited liability company

By:_____
Name:  John E. Brunst
Title:    President

**PURCHASER:**

UGC TECH GROUP, C.V. a Dutch limited partnership, represented by CF Holdings GP LLC, its sole general partner

By:_____
Name:   Carl A. Ferrer
Title:  Managing Director

# EXHIBIT A

Additional Promissory Note

(see attached)

QB\34738906.1

**EXECUTION VERSION**

**PROMISSORY NOTE**
(Earn-out Agreement - Foreign Sale)

(US) [$_____]                                                              _____, 20__

To:     SHEARWATER INVESTMENTS, LLC, a Delaware limited liability company
("Holder"), as the successor-in-interest to Vermillion Holdings, LLC, a Delaware limited
liability company ("Vermillion"), the original seller under that certain Purchase and Sale
Agreement dated as of April 22, 2015 between Vermillion and UCG Tech Group C.V., a
Dutch limited partnership ("Maker") as purchaser (the "Purchase Agreement"). Maker is
giving this Note to Holder in connection with the Earn-out Agreement dated as of April
22, 2015 by and between Vermillion and Maker (the "Earn-out Agreement") that was an
ancillary document to the Purchase Agreement. Capitalized terms used in this Note and
not other defined herein shall have the meaning given to those terms in the Earn-out
Agreement or the Loan Agreement, as applicable. In connection with the Purchase
Agreement, Vermillion and Maker entered into a Loan Agreement dated as of April 22,
2015 pursuant to which Vermillion loaned Maker [$74,300,000] (the "Loan Agreement")
and this Note is the Additional Promissory Note referenced in the Loan Agreement.


        FOR VALUE RECEIVED, Maker  promises to pay to the order of Holder (together with
all subsequent holders of this Note, "Payee"), by wire transfer pursuant to the wire instructions
attached hereto as  Schedule A, or such other place as Payee may from time to time designate in
writing, the Principal (defined below), together with interest on the Principal calculated on a
daily basis (based on a 360-day year) from the date of this Note on the Principal balance from
time to time outstanding, and all other sums payable hereunder. As used herein, the term
"Principal" shall mean the stated face amount of this Note, together with the payment of all other
indebtedness, obligations and liabilities of Maker or any other Obligor to Payee, individually or
collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become
due, now existing or hereafter arising under or in respect of this Note, or any other instruments or
agreements executed and delivered pursuant to or in connection with this Note.

        Principal, interest and all other sums payable hereunder shall be paid in lawful money of
the United States of America as follows:

        A.      Interest shall accrue on the unpaid Principal balance of this Note from the date of
this Note until paid at the Prime Rate plus one percent (1%) per annum calculated on the basis of
a 360-day year.

        B.      [Payee may adjust the payment timing to provide for continuing payments on the
first or last day of each month, at Payee's election] Commencing on the date thirty (30) days after
the date of this Note and continuing on the same date each month thereafter until [_____,
20___], Maker shall make equal monthly principal and interest payments of
[$_____] to Payee.

      C.      The entire balance of this Note, including all Principal and interest, along with any other amounts payable hereunder, shall be due and payable on the earlier of the following ("Maturity"): (i) [_____, 20\_\_] or (ii) acceleration upon an Event of Default (as such term is defined in the Loan Agreement).

      All payments on this Note shall be applied first to the payment of any costs, fees or other charges incurred in connection with the Principal indebtedness evidenced hereby, next to the payment of accrued interest, if any, and then to the reduction of the Principal balance, or in such other manner and order as Payee, in its sole discretion, may elect.

      Maker shall have the option to prepay this Note, in full or in part, at any time without penalty. Unless Payee, in its sole discretion, elects another manner of application, any partial prepayments (i) shall be applied to the amounts owing on this Note in inverse order of maturity, and (ii) shall not give rise to any adjustment in the amount of, or any delay in the timing for payment of, the required monthly payments under this Note.

      This Note is also a "Note" as that term is defined in the Loan Agreement, and it is subject to all of the terms and provisions of the Loan Agreement that are applicable to a Note. This Note is secured by, among other things, a Security Agreement, dated as of April 22, 2015, between Holder and Maker.

      Time is of the essence of this Note. Upon the failure by Maker to pay any amount when due hereunder, or upon any Event of Default, as defined in the Loan Agreement, (i) the rate of interest hereunder shall increase to twelve percent (12%) per annum (the "Default Rate") until paid in full or until such Event of Default, if capable of being cured, is fully cured by Maker, and (ii) Payee may exercise any rights and remedies in such order and manner as Payee, in its sole discretion, shall determine. Maker shall pay all costs and expenses, including reasonable attorneys' fees and court costs, incurred in the collection or enforcement of all or any part of this Note. Failure of Payee to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of the continuance of any existing default after demand for strict performance hereof.

      Each party that is a Maker hereunder: (a) agrees to be jointly and severally bound, (b) waives demand, diligence, presentment for payment, protest and demand, and notice of extension, dishonor, protest, demand and nonpayment of this Note, (c) consents that Payee may extend the time of payment or otherwise modify the terms of payment of any part or the whole of the debt evidenced by this Note, at the request of any other person primarily liable hereon, and such consent shall not alter nor diminish the liability of any person, and (d) agree that Payee may setoff at any time any sums or property owed to any of them by Payee.

      This Note shall be binding upon Maker and its successors and assigns and shall inure to the benefit of Payee and its successors and assigns.

      This Note is subject to the express condition that at no time shall Maker be obligated, or required, to pay interest on the Principal balance at a rate which could subject Payee to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Payee is permitted to charge. If, by the terms of this Note, Maker is, at any time, required or

2

obligated to pay interest on the Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance. Subject to the foregoing provisions in this paragraph, Maker agrees to an effective rate of interest that is the rate stated herein plus any additional rate of interest resulting from any other charges in the nature of interest paid or to be paid by or on behalf of Maker, or any benefit received or to be received by Payee, in connection with this Note.

This Note shall be governed by the applicable law provided for in the Earn-out Agreement. Maker agrees that the sole and exclusive venue for any action or claim arising out of, or any dispute in connection with, this Note, or the performance or enforcement hereof, also shall be governed by the forum selection and consent to jurisdiction provisions set forth in the Earn-out Agreement. Maker hereby consents to such jurisdiction and venue, and hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

TO THE EXTENT PERMITTED BY APPLICABLE LAW, MAKER WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS NOTE, OR THE PERFORMANCE OR ENFORCEMENT HEREOF. Except as prohibited by law, Maker waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. Maker (i) certifies that neither Payee nor any representative, agent or attorney of Payee has represented, expressly or otherwise, that Payee would not, in the event of litigation, seek to enforce the foregoing waivers or other waivers contained in this Note, and (ii) acknowledges that, in accepting this Note, Payee is relying upon, among other things, the waivers and certifications contained in this paragraph.

[Signature appears on following page.]

3

DATED as of the date first written above.

UGC TECH GROUP  C.V., a Dutch limited partnership

By:   CF Holdings GP LLC, its sole general partner

By: _____

Name:  Carl A. Ferrer
Title:   Chief Executive Officer

## SCHEDULE A

### Wire Instructions

BMO Harris Bank N.A.
Chicago, IL
ABA #071000288
Account Name: Camarillo Holdings, LLC
A/C #4377172
8776 East Shea Blvd., #106-617
Scottsdale, AZ 85260

## EXHIBIT B

Membership Interest Assignment Agreement

(see attached)

## MEMBERSHIP INTEREST ASSIGNMENT AGREEMENT

This Membership Interest Assignment Agreement (this "Agreement") is dated as of April 22, 2015 by and between VERMILLION HOLDINGS, LLC, a Delaware limited liability company ("Assignor"), UGC TECH GROUP C.V., a Dutch limited partnership ("Assignee"), and CLASSIFIED STRATEGIES COÖPERATIEF U.A., a Dutch cooperative association with excluded liability (the "Company").

### RECITALS

Assignor is the owner of a ninety-nine percent (99%) membership interest in the Company, with all rights and obligations attached thereto, including the membership account kept by the Company for Assignor (together the "Interest"). Pursuant to that certain Purchase and Sale Agreement, dated as of April 22, 2015, between Assignor and Assignee (the "Purchase Agreement"), Assignor desires to assign and transfer the Interest to Assignee, and Assignee desires to accept the Interest from Assignor, on the terms and conditions set forth herein.

By written resolution of the 22 day of April, 2015, all members of the Company resolved to consent to the assignment of the Interest from Assignor to Assignee in accordance with article 4 paragraph 3 of the articles of association of the Company.

### AGREEMENTS

In consideration of the Recitals and mutual agreements which follow, the parties agree as follows:

1. In full consideration of the assignment described in this Agreement, Assignee has paid to Assignor the Closing Date Payment, as defined in the Purchase Agreement, the receipt and sufficiency of which Assignor hereby acknowledges.

2. Subject to the terms of this Agreement and the Purchase Agreement, Assignor hereby assigns to Assignee, and Assignee hereby accepts the assignment from Assignor of, the Interest. From and after the date hereof, Assignor shall no longer be a member of the Company, and Assignee shall replace the Assignor as a member of the Company.

3. The Company is governed by the Articles of Association dated as of July 16, 2013, a copy of which has been given to Assignee.

4. Assignor makes no representations or warranties regarding the Interest except those set forth in Article II of the Purchase Agreement.

5. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall be deemed one and the same instrument. Signatures sent via

facsimile or e-mail transmission shall be deemed original signatures for purposes of creating a binding Agreement.

6.     This Agreement may be amended only by a writing signed by all of the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

[Signature on next page]

**ASSIGNOR:**

VERMILLION HOLDINGS, LLC

By: _____
Name: John E. Brunst
Title: President


**ASSIGNEE:**

UGC TECH GROUP C.V.

By: CF HOLDINGS GP LLC, acting in its capacity
of general partner for the benefit and on behalf of
UGC Tech Group C.V.
On behalf of CF HOLDINGS GP LLC
Name:
Its:


**COMPANY:**

CLASSIFIED STRATEGIES COÖPERATIEF
U.A.

By: _____
Name:   John Edwin Brunst
Its:  Board Member A


By: _____
Name:   Three Rivers Management B.V.
Its: Board Member B
On behalf of Three Rivers Management B.V.:
Name:  Ewout J.F. Langemeijer
Its:  Managing Director


[Signature page to Membership Interest Assignment Agreement]

**EXHIBIT C**

Loan Agreement

(see attached)

**EXECUTION VERSION**

## **LOAN AGREEMENT**

(UGC Foreign Operations)

This LOAN AGREEMENT (this "Agreement"), dated on or about April 22, 2015 (this "Effective Date"), is entered into by and between UGC TECH GROUP C.V., a Dutch limited partnership, ("Borrower"), and VERMILLION HOLDINGS, LLC, a Delaware limited liability company ("Original Lender").

### RECITALS:

A.      Borrower, as buyer, and Original Lender, as seller, are parties to that certain Purchase Agreement of even date herewith (the "PSA"), pursuant to which Original Lender has agreed to sell to Buyer, and Buyer has agreed to purchase from Original Lender, certain business operations, which consist of the ownership and operations of an online general classified advertising website (the "Acquired Business") for the Purchase Price.

B.      Borrower and its Affiliates (i) have substantial prior and successful experience in operating and managing the Acquired Business on behalf of Original Lender and its Affiliates, and (ii) are familiar with all aspects of the Acquired Business.

C.      Borrower desires to obtain the Loan from Original Lender to finance the payment of the Purchase Price, the payment and refinancing of the Cracker Loan, and all of the undertakings and obligations in the PSA and the Transaction Documents.

D.      In light of the foregoing, and in particular taking into account the substantial prior and successful experience of Borrower and its Affiliates in operating and managing the Acquired Business, Original Lender is willing to extend a loan to Borrower for the Purchase Price on the terms and conditions set forth herein.

E.      Immediately upon consummating the Loan, Original Lender will contribute the Loan to its wholly owned Subsidiary, Shearwater Investments, LLC, a Delaware limited liability company (the "New Lender") all of Original Lender's right, title and interest in and to the Loan, the PSA and the Transaction Documents. Upon such contribution, New Lender shall become the lender on the Loan, and from and after the time of such contribution, all references in this Agreement to "Lender" shall be deemed to refer to New Lender.

F.      The transactions under the PSA are contemplated to close immediately prior to the transactions under this Agreement. In that regard, the parties contemplate that (i) the closing of the PSA transactions will occur (and will be deemed to occur) as of 11 p.m. PST on the Effective Date, and (ii) the closing of the transactions under this Agreement will occur (and will be deemed to occur) as of 11:01 p.m. PST on the Effective Date..

NOW THEREFORE, in consideration of the premises, and the mutual covenants and agreements set forth herein, Borrower agrees to borrow from Lender, and Lender agrees to lend to Borrower, subject to and upon the following terms and conditions:

## AGREEMENTS:

1.    DEFINITIONS.

      1.1    Defined Terms.  For the purposes of this Agreement, the following capitalized words and phrases shall have the meanings set forth below.

      "Amstel" shall mean Amstel River Holdings, LLC, a Delaware limited liability company.

      "Amstel Member Documents" shall mean (i) that Limited Liability Company Agreement of Amstel River Holdings, LLC, dated as of April 14, 2015, and (ii) that Limited Liability Company Membership Interest Restriction Agreement, dated on or about the date hereof.

      "Affiliate" of any Person shall mean (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any officer or director of such Person.  A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract, ownership of voting securities, membership interests or otherwise.

      "Additional Consideration Agreement" shall have the meaning set forth in Section 3.1 hereof.

      "Atlantic" shall mean Atlantische Bedrijven, C.V., a Dutch limited partnership (English translation is Atlantic Holdings C.V.).

      "Atlantic Loan" shall have the meaning given to that term in the Atlantic Loan Agreement.

      "Atlantic Loan Agreement" shall mean that Loan Agreement (Backpage US Operations) of on or about even date between Lender and Atlantic.

      "Bankruptcy Code" shall mean the United States Bankruptcy Code, as now existing or hereafter amended.

      "Business Day" shall mean any day other than a Saturday, Sunday or a U.S. federal holiday.

      "Capital Expenditures" shall mean any expenditure or commitment to expend money for any purchase or other acquisition of any asset that has a useful life of more than one (1) year and that, in accordance with GAAP, would be classified as a fixed or capital asset on a consolidated balance sheet of Borrower and the Subsidiary Guarantors.

      "Capital Securities" shall mean, with respect to any Person, all shares, interests, units, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the date hereof,

2

including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"Change in Control" shall mean the occurrence of any of the following events: (a) the Ferrer Parties shall cease to own and control, directly or indirectly, 100% of the outstanding Capital Securities of Borrower; (b) Borrower shall cease to own and control, directly or indirectly, 100% of each class of the outstanding Capital Securities of each Subsidiary Guarantor in existence as of the Effective Date and each Subsidiary of Borrower created after the Effective Date; (c) at any time following the creation of the Ferrer Trusts, Ferrer shall cease to be the sole trustee of each of the Ferrer Trusts, or (d) the granting by any of the Ferrer Parties or by April Ferrer, directly or indirectly, of a security interest in any ownership interest in Borrower, which could result in a change in the identity of the individuals or entities in control of Borrower. For the purpose hereof, the terms "control" or "controlling" shall mean the possession of the power to direct, or cause the direction of, the management and policies of Borrower by contract or voting of securities or ownership interests.

"Change in Law": The occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty (including any rules or regulations issued under or implementing any existing law); (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Closing" and "Closing Date" shall have the meanings give to those terms in Section 2.2 hereof.

"Closing Note" shall mean that promissory note of even date herewith for the stated principal amount of $77,005,592.50, maturing on the Maturity Date, duly executed by Borrower and payable to the order of Lender, together with any and all amendments, restatements, renewals, extensions, modifications and/or replacement notes with respect thereto, including without limitation any modification, amendment and/or restatement of the Closing Note to evidence the Post-Closing Adjustment.

"Code": The Internal Revenue Code of 1986, as it may be amended or supplemented from time to time and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean, severally and collectively, as the context requires, the Borrower Collateral and the Subsidiary Collateral, as those terms are defined in Section 5.1 hereof.

"Control Agreement(s)" shall mean, severally and collectively, as the context requires, each of the control agreements listed in Section 3.1 hereof and any other control agreement hereafter provided in connection with the Loan. Each Control Agreement shall be a tri-party deposit account, securities account or commodities account control agreement by and among the applicable Obligor, Lender and the depository, securities intermediary or

3

commodities intermediary, in form and substance satisfactory to Lender and in each instance providing to Lender both (a) "control" of such deposit account or securities or commodities account within the meaning of Articles 8 and 9 of the UCC, and (b) the right and ability to access electronically such deposit account or securities or commodities account for the sole purpose of monitoring electronically all account activity.

"Cracker Loan" shall mean that loan from Remnant Corp. LLC to Borrower, as evidenced by a Promissory Note dated January 14, 2015 for the stated principal amount of (US) $2,655,000, and with a payoff amount as of the Effective Date, inclusive of interest of $50,592.50, of $2,705,592.50.

"Debt" shall mean, as to any Person, without duplication, (a) all indebtedness of such Person; (b) all borrowed money of such Person (including principal, interest, fees and charges), whether or not evidenced by bonds, debentures, notes or similar instruments; (c) all obligations to pay the deferred purchase price of property or services; (d) all obligations, contingent or otherwise, with respect to the maximum face amount of all letters of credit (whether or not drawn), bankers' acceptances and similar obligations issued for the account of such Person, and all unpaid drawings in respect of such letters of credit, bankers' acceptances and similar obligations; (e) all indebtedness secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided, however, if such Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the fair market value of the property subject to such Lien at the time of determination); (f) the aggregate amount of all capitalized lease obligations of such Person; (g) all contingent liabilities of such Person, whether or not reflected on its balance sheet; (h) [reserved]; (i) all Debt of any partnership of which such Person is a general partner; and (j) all monetary obligations of such Person under (i) a so-called synthetic, off-balance sheet or tax retention lease, or (ii) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment). Notwithstanding the foregoing, Debt shall not include trade payables and accrued expenses incurred by such Person in accordance with customary practices and in the ordinary course of business of such Person not to exceed, in the aggregate, $500,000.

"Default Rate" shall have the meaning set forth in the Note.

"Depreciation" shall mean the total amounts added to depreciation, amortization, obsolescence, valuation and other proper reserves, as reflected on a Person's financial statements and determined in accordance with GAAP, consistently applied.

"Disability" shall mean, with respect to Ferrer, any Disability as that term is defined in the Employment Agreement.

"Earn-out Agreement" shall have the meaning given to that term in the PSA.

"EBITDA" shall mean, for any period with respect to Borrower on a consolidated basis, the sum for such period of: (i) Net Income, plus (ii) Interest Charges, plus (iii) all charges

4

against income for foreign, federal and state income Taxes, <u>plus</u> (iv) Depreciation, <u>plus</u> (iv) non-cash extraordinary losses and other non-cash expenses (including any impairment charges in accordance with Federal Accounting Standard Board (FASB) Rules 141 and 142 and any other non-cash charges in accordance with any FASB promulgation), <u>minus</u> (b) the sum for such period of: (i) extraordinary gains, (ii) interest income, and (iii) income or loss attributable to equity in any Affiliate or Subsidiary, in each case to the extent included in determining Net Income for such period.

"<u>Employee Plan</u>" includes any pension, stock bonus, employee stock ownership plan, retirement, profit sharing, deferred compensation, stock option, bonus or other incentive plan, whether qualified or nonqualified, or any disability, medical, dental or other health plan, life insurance or other death benefit plan, vacation benefit plan, severance plan or other employee benefit plan or arrangement, including those pension, profit-sharing and retirement plans of such Person described from time to time in the financial statements of such Person and any pension plan, welfare plan, Defined Benefit Pension Plans (as defined in ERISA) or any multi-employer plan, maintained or administered by such Person or to which such Person is a party or may have any liability or by which such Person is bound.

"<u>Employment Agreement</u>" shall mean that Employment Agreement between Ferrer, as employee, and Website Technologies LLC, as employer, of on or about even date herewith.

"<u>Environmental Laws</u>" shall mean all present or future foreign, federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative or judicial orders, consent agreements, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case relating to any matter arising out of or relating to public health and safety, or pollution or protection of the environment or workplace, including any of the foregoing relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, discharge, emission, release, threatened release, control or cleanup of any Hazardous Substance.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations thereunder, as from time to time in effect.

"<u>Event of Default</u>" shall mean any of the events or conditions which are set forth in <u>Section 9</u> hereof.

"<u>Excess Cash Flow</u>" shall mean, for any applicable period, measured as of the end of such period, the following sum:

> [EBITDA] for the applicable period   <u>minus</u>   [all of the following, to the extent paid in cash during such period: (i) Interest Charges paid during the period, (ii) Capital Expenditures paid during the period, (iii) income Taxes paid during the period by any Obligor, the holders of the

> Capital Securities of any Obligor or by the beneficiaries of the Ferrer Primary Trust, which are the direct or indirect result of its ownership in Borrower, and (iv) principal payments on the Loan].

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended from time to time, and the rules and regulations thereunder, as from time to time in effect.

"Ferrer" shall mean Carl A. Ferrer.

"Ferrer Parties" shall mean, severally and collectively, Ferrer, Amstel, Kickapoo River Investments LLC, a Delaware limited liability company, Lupine Holdings, LLC, a Delaware limited liability company, CF Acquisitions LLC, a Delaware limited liability company, CF Holdings GP LLC, a Delaware limited liability company, and any Affiliates of any of the foregoing individuals or entities that at any time own any interest, direct or indirect, in Borrower; provided, however, that the Ferrer Parties shall not include April Ferrer. Further, from and after the creation of the Ferrer Trusts, the "Ferrer Parties" shall include the Ferrer Trusts.

"Ferrer Primary Trust" shall mean the Primary Trust, as defined in and established pursuant to The Vicky Ferrer Family Trust Agreement or such trust that serves as the primary trust pursuant to the documentation hereafter created to establish the Ferrer Trust.

"Ferrer Trusts" shall mean, collectively, the following trusts to be created after the date hereof, together with any other or different trusts to which Ferrer intends to convey any membership interest in Amstel, subject to the requirements of this Agreement: The Vicky Ferrer Family Trust Agreement, and the Primary Trust, the Divorce Trusts and the GST Exempt Trusts, all as to be defined in the The Vicky Ferrer Family Trust Agreement.

"Fixed Charge Coverage Ratio" shall mean, for Borrower, together with the Subsidiary Guarantors, on a consolidated basis for the applicable measurement period, the ratio of (a) EBITDA for such period to (b) the sum of the Fixed Charges for such period.

"Fixed Charges" shall mean, for Borrower, together with the Subsidiary Guarantors, on a consolidated basis for the applicable measurement period, the sum of (a) all regularly scheduled payments of principal on outstanding Debt, (b) Capital Expenditures, (c) Interest Charges, and (d) Taxes, in each case, actually paid in cash during such period.

"GAAP" shall mean generally accepted accounting principles in the United States of America set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination; provided, however, that interim financial statements or reports shall be deemed in compliance with GAAP despite the absence of footnotes and fiscal year-end adjustments as required by GAAP.

"Governmental Authority" shall mean any court, board, agency, commission, office, department, bureau, instrumentality or authority of any nature whatsoever or any

6

governmental unit (foreign, federal, state, commonwealth, county, district, municipality, city or otherwise) whether now or hereafter in existence.

"Guarantor(s)" shall mean, severally and collectively, as the context requires, the Ferrer Parties with respect to the Ferrer Guaranty, as defined in Section 3.1 hereof, the Subsidiary Guarantors with respect to the Subsidiary Guaranty, as defined in Section 3.1 hereof, the other Affiliates of Borrower that are party to the Other Affiliate Guaranty, as defined in Section 3.1 hereof, with respect to that Guaranty, and any other guarantor that hereafter provides a guaranty in connection with the Loan.

"Guaranty(ies)" shall mean, severally and collectively, as the context requires, the Ferrer Guaranty, the Subsidiary Guaranty, and the Other Affiliate Guaranty, as those terms are defined in Section 3.1 hereof, and any other guaranty hereafter provided in connection with the Loan.

"Hazardous Substances" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, radon gas and mold; (b) any chemicals, materials, pollutant or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous substances", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or release of which is prohibited, limited or regulated by any Governmental Authority or for which any duty or standard of care is imposed pursuant to, any Environmental Law.

"Indemnified Party(ies)" shall mean, severally and collectively, as the context requires, each of Lender and any parent corporation, Affiliate or Subsidiary of Lender, and each of their respective officers, directors, employees, attorneys and agents, and all of such parties and entities.

"Intellectual Property" shall mean the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, patents, trade names, domain names, service marks and trademarks, and all registrations and applications for registration for any of the foregoing and all licensees thereof, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Charges" shall mean, for any period, the sum of: (a) all interest, charges and related expenses payable with respect to that fiscal period to a lender (including Lender) in connection with borrowed money or the deferred purchase price of assets that are treated as interest in accordance with GAAP, consistently applied, plus (b) the portion of capitalized lease obligations with respect to that fiscal period that should be treated as interest in accordance with GAAP.

7

"Investment" shall mean, with respect to any Person, any investment in another Person, whether by acquisition of any debt or equity security, by making any loan or advance, or by becoming obligated with respect to a contingent liability in respect of obligations of such other Person.

"IP License" shall mean that Intellectual Property License, dated of on or about even date herewith, between Backpage.com, LLC and Lender, pursuant to which Backpage.com, LLC has licensed certain software, trademarks, URL's and trade secrets, together with the sublicense issued thereunder from Lender to Borrower, and also together with any further sublicenses expressly allowed thereunder and granted in accordance therewith issued by Borrower to any Affiliates of Borrower.

"Lender" shall mean New Lender and Original Lender, severally or collectively, as the context requires.

"Liabilities" shall mean at all times all liabilities of such Person that would be shown as such on a balance sheet of such Person prepared in accordance with GAAP.

"Lien" shall mean, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person (including an interest in respect of a capital lease) which secures payment or performance of any obligation and shall include any mortgage, lien, encumbrance, title retention lien, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"Loan" shall mean all amounts that may be advanced at any time, and from time to time, by Lender for the payment of any Obligations, as evidenced in any Note.

"Loan Documents" shall mean each of the agreements, documents, instruments and certificates set forth in Section 3.1 hereof, and any and all such other instruments, documents, certificates and agreements from time to time executed and delivered by Borrower, the Guarantors or any of their Subsidiaries for the benefit of Lender in connection with the Loan or pursuant to any of the foregoing, and all amendments, restatements, supplements and other modifications thereto.

"Material Adverse Effect" shall mean (a) a material adverse change in, or a material adverse effect upon, the assets, business, properties, prospects, condition (financial or otherwise) or results of operations of Borrower, Guarantors or any of their respective Subsidiaries, (b) a material impairment of the ability of any Obligor to perform any of the Obligations under any of the Loan Documents, or (c) a material adverse effect on (i) any substantial portion of the Collateral, (ii) the legality, validity, binding effect or enforceability against any Obligor of any of the Loan Documents, (iii) the perfection or priority of any Lien granted to Lender under any Loan Document, or (iv) the rights or remedies of Lender under any Loan Document.

"Maturity Date" shall mean the earlier of (a) March 31, 2021, or (b) acceleration by Lender upon an Event of Default.

8

"Net Cash Proceeds" means, with respect to any event, (a) the cash proceeds actually received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) any reduction in (or refund of) the amount of any applicable reserves, (iii) in the case of a casualty, insurance proceeds, and (iv) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, and (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments made from such proceeds to repay Debt secured by such assets and required to be paid in connection with the sale, transfer or other disposition, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by Lender). Further, with respect to an event of the nature described in item (b) of the definition of "Prepayment Event", the Net Cash Proceeds shall be further adjusted to exclude the portion of any proceeds, if any, that Lender, in its sole discretion, allows to be used for restoration or replacement of the subject property or asset.

"Net Income" shall mean, with respect to a Person for any period, the net income (or loss) of such Person for such period as determined in accordance with GAAP, consistently applied, excluding any extraordinary gains and any gains from discontinued operations.

"Non-Excluded Taxes" shall have the meaning set forth in Section 2.4(a) hereof.

"Note" shall mean, severally and collectively, as the context requires, each and every promissory note and other written evidence of indebtedness evidencing Borrower's obligation to repay the Loan, including, without limitation, (i) the Closing Note (including any modification, amendment and/or restatement of the Closing Note to evidence the Post-Closing Adjustment), (ii) any additional note to evidence the Post-Closing Adjustment, and (iii) any note or other documentation evidencing the additional Purchase Price required to be paid pursuant to the Earn-out Agreement, including without limitation, if applicable, the Additional Promissory Note (as defined in the Earn-out Agreement); together with any and all renewals, extensions, modifications or replacement notes with respect to any of the foregoing.

"Obligations" shall mean the Loan, all indebtedness evidenced by the Note, all interest accrued thereon (including interest which would be payable as post-petition in connection with any bankruptcy or similar proceeding, whether or not permitted as a claim thereunder), any fees due Lender hereunder, any expenses incurred by Lender hereunder, including without limitation, all liabilities and obligations under this Agreement, under any other Transaction Document, and any and all other liabilities and obligations owed by the Obligors to Lender from time to time, howsoever created, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, or due or to become due, together with any and all renewals, extensions, restatements or replacements of any of the foregoing.

"Obligor(s)" shall mean, severally and collectively, as the context requires, Borrower, Guarantors, any accommodation endorser, any third party pledgor, and any other party liable with respect to the Obligations.  For purposes of Articles 5, 6 and 7 hereof, the term "Obligor" also shall be deemed to include the Subsidiaries of each Obligor.

"OFAC" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Ordinary Course" means, with respect to any Obligor, the ordinary course of such Obligor's business as conducted on the Closing Date and, as may be modified from time to time thereafter in the good faith, reasonable business judgment of such Obligor.

"Organizational Identification Number" means, with respect to a Person, the organizational identification number assigned to such Person by the applicable Governmental Authority of the jurisdiction of organization of such Person.

"Other Taxes" shall mean any present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies which arise from the execution, delivery, enforcement or registration of, or otherwise with respect to, this Agreement or any of the other Transaction Documents.

"Permitted Liens" shall mean only (i) Liens granted to Lender; and (ii) the Lien of Taxes and assessments not past due or delinquent.

"Person" shall mean any natural person, partnership, limited liability company, corporation, trust, joint venture, joint stock company, association, unincorporated organization, government or agency or political subdivision thereof, or other entity, whether acting in an individual, fiduciary or other capacity.

"Pledge Agreement(s)" shall mean, severally and collectively, as the context requires, the Ferrer Pledge Agreement, the Amstel Pledge Agreement, the Kickapoo/Lupine Pledge Agreement, the Atlantic Pledge Agreement and the CF Pledge Agreement, as those terms are defined in Section 3.1 hereof, and any other pledge agreement hereafter provided in connection with the Loan.

"Post-Closing Adjustment" shall mean the sum of (i) the Post-Closing Adjustment as that term is defined in the PSA, plus (ii) the amount of the Closing costs in connection with the Obligations that are funded by Lender.

"Prepayment Event" means:

(a)     any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of Borrower or any of its Subsidiaries outside the Ordinary Course; or

(b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of Borrower or any of its Subsidiaries; or

10

(c)     the incurrence by Borrower or any of its Subsidiaries of any Debt, other than Debt permitted hereunder; or

(d)     any infusion of capital into Borrower or any other Obligor or any Subsidiary of any Obligor pursuant to the issuance or sale of any Capital Securities (provided that the foregoing shall not limit the complete prohibition on the sale or issuance of such Capital Securities set forth in Section 7.6 hereof); or

(e)     any sale of any of the Capital Securities of Borrower, of any other Obligor, of any Subsidiary of any Obligor, or of any Affiliate of any of the foregoing.

"Prohibited Liens" shall mean all Liens other than Permitted Liens.

"PSA" shall have the meaning given to that term in the Recitals to this Agreement.

"Purchase Price" shall mean the full purchase price owing from Borrower to Lender under the PSA, which includes all of the following components: (i) a base purchase price of $77,005,592.50, which includes the an assumption of the Cracker Loan in an amount of $2,705,592.50, (ii) any further purchase price owing by virtue of the Post-Closing Adjustment, and (iii) any further purchase price owing pursuant to the Earn-Out Agreement.

"Sanctioned Country" shall mean a country subject to a sanctions program identified     on     the     list     maintained     by     OFAC     and     available     at http://www.treas.gov/offices/enforcement/ofac/sanctions/index.html, or as otherwise published from time to time.

"Sanctioned Person" shall mean (i) a person named on the list of Specially Designated  Nationals  or  Blocked  Persons  maintained  by  OFAC  available  at http://www.treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time, or (ii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Security Agreement(s)" shall mean, severally and collectively, as the context requires, the Borrower Security Agreement and the Subsidiary Security Agreement, as those terms are defined in Section 3.1 hereof, along with any other security agreement hereafter provided in connection with the Loan.

"Security Documents" shall mean the Security Agreements and all other documents required by Lender to grant and perfect the liens and security interests required herein.

"SPE Covenants" shall mean those covenants set forth on Schedule A attached hereto.

"Subsidiary" and "Subsidiaries" shall mean, respectively, with respect to any Person, each and all such corporations, partnerships, limited partnerships, limited liability

11

companies, limited liability partnerships, joint ventures or other entities of which or in which such Person owns, directly or indirectly, such number of outstanding Capital Securities as have more than 50.00% of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity.  Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of Borrower.

"Subsidiary Guarantor(s)" shall mean, severally and collectively, as the context requires, each and all of the following entities:  Ad Tech Holdings GP BV, a Dutch private limited liability company; Ad Tech Cooperatief U.A., a Dutch cooperative association; Ad Tech BV, a Dutch private limited liability company; Classified Solutions, LTD, a United Kingdom limited company; Classified Strategies Cooperatief U.A., a Dutch cooperative association; Payment Solutions, B.V., a Dutch private limited liability company; and Backpage Enterprises Inc., a Canadian corporation.  Further, the term "Subsidiary Guarantors" also shall include any future Subsidiaries of Borrower that enter into a separate Guaranty or a joinder to the Subsidiary Guaranty after the Effective Date.

"Taxes" shall mean any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings, and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing.

"Transaction Documents" means the Loan Documents, the PSA and any other instruments, documents, certificates and agreements from time to time executed and delivered by Borrower, the Guarantors or any of their Subsidiaries for the benefit of Lender in connection with the transactions contemplated in the PSA, and all amendments, restatements, supplements and other modifications to the PSA or any of the other foregoing documents.

"UCC" shall mean the Uniform Commercial Code in effect in the state of Delaware from time to time.

"Unmatured Event of Default" shall mean any event which, with the giving of notice, the passage of time or both, would constitute an Event of Default.

"Voidable Transfer" shall have the meaning set forth in Section 11.19 hereof.

"Wholly-Owned Subsidiary" shall mean any Subsidiary of which or in which a Person owns, directly or indirectly, one hundred percent (100%) of the Capital Securities of such Subsidiary.

1.2   Accounting Terms.  Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP.  Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to Lender pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with sound accounting practices and GAAP as used in the preparation of the financial statements of each Obligor and any Subsidiaries on the date of this Agreement.  If any changes in accounting principles or practices from those used in the preparation of the financial statements are hereafter occasioned by the promulgation of rules,

Case 2:18-cr-00422-DJH   Document 1366-9   Filed 10/26/21   Page 71 of 132


regulations, pronouncements and opinions by or required by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successor thereto or agencies with similar functions), which results in a material change in the method of accounting in the financial statements required to be furnished to Lender hereunder or in the calculation of financial covenants, standards or terms contained in this Agreement, the parties hereto agree to enter into good faith negotiations to amend such provisions so as equitably to reflect such changes to the end that the criteria for evaluating the financial condition and performance of Obligors will be the same after such changes as they were before such changes; and if the parties fail to agree on the amendment of such provisions, Borrower will furnish financial statements in accordance with such changes, but shall provide calculations for all financial covenants, perform all financial covenants and otherwise observe all financial standards and terms in accordance with applicable accounting principles and practices in effect immediately prior to such changes. Calculations with respect to financial covenants required to be stated in accordance with applicable accounting principles and practices in effect immediately prior to such changes shall be reviewed and certified by Borrower's accountants.

   1.3 Other Terms Defined in UCC. All other capitalized words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined therein.

   1.4 Other Interpretive Provisions.

     (a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms. Whenever the context so requires, the neuter gender includes the masculine and feminine, the single number includes the plural, and vice versa.

     (b) Section and Schedule references are to this Agreement unless otherwise specified. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

     (c) The term "including" is not limiting, and means "including, without limitation".

     (d) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".

     (e) Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Transaction Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Transaction Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

QB\156257.00002\34590879.8

(f)     To the extent any of the provisions of the other Transaction Documents are inconsistent with the terms of this Agreement, the provisions of this Agreement shall govern.

(g)     This Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are separate and distinct, and each shall be performed in accordance with its terms.

2.     LOAN.

2.1     Loan.

(a)     Loan. Subject to the terms and conditions of this Agreement and the other Loan Documents, and in reliance upon the representations and warranties of Borrower set forth herein and in the other Loan Documents, Lender hereby makes the Loan to Borrower. The Loan is being made in a single advance, in the form of a credit, for the purpose of paying the Purchase Price under the PSA and for the payment and refinancing of the Cracker Loan. The Cracker Loan is held by Lender's Affiliate, Remnant Corp., LLC, and Lender shall pay off the Cracker Loan by an advance of $2,705,592.50 on the Note that is made in the form of a credit constituting an inter-company payment to Remnant Corp., LLC. The Loan shall be used by Borrower solely for the foregoing purposes. The Loan shall be due in full on the Maturity Date, unless the Obligations under the Loan are otherwise accelerated as provided in this Agreement.

(b)     Loan Principal and Interest and Payments. Payments of principal and accrued interest on the Loan shall be payable as set forth in the Note. Without limiting the preceding sentence, the Closing Note shall provide for the payment by Borrower in arrears of any quarterly Excess Cash Flow; provided, however, that payments of Excess Cash Flow shall not be required at any time when all of Obligations have been paid in full, other than the Additional Note (as defined in the Earn-Out Agreement).

(c)     Optional and Mandatory Prepayments. Borrower may from time to time prepay the Loan, in whole or in part, without any prepayment penalty whatsoever; provided that any prepayment of the entire principal balance of the Loan shall include accrued interest on such Loan to the date of such prepayment. In the event and on each occasion that any Net Cash Proceeds are received by or on behalf of Borrower or any of its Subsidiaries in respect of any Prepayment Event, Borrower shall, immediately after such Net Cash Proceeds are received by Borrower, prepay the Obligations in an aggregate amount equal to 100% of such Net Cash Proceeds.

(d)     Loan Fees. On or before the Effective Date, Borrower shall pay to Lender an initial Loan administration fee of $15,000.00, which fee shall be nonrefundable and shall be fully earned as of the Effective Date. Commencing on July 1, 2015 and on or before the first day of each calendar quarter thereafter, Borrower shall pay to Lender an additional Loan administration fee of $15,000.00 ($60,000.00 annually) (each, a "Loan Administration Fee"), which Loan Administration Fee shall be nonrefundable and shall be fully earned as of its due date. Borrower also shall pay ongoing future fees for certain additional administrative and professional services provided by Lender pursuant to the Consulting Agreement.

2.2     Closing. The closing of the transactions contemplated herein (the "Closing") shall take place on the Effective Date through the electronic exchange of executed documents. The date on which the Closing occurs is referred to herein as the "Closing Date".

2.3     Collection of Funds. All payments made by any Obligor hereunder or under any of the Loan Documents shall be made without setoff, counterclaim, or other defense. All payments due under the Loan must be made by wire transfer or other immediately available funds.

2.4     Taxes.

(a)     All payments made by Obligors under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future Taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income Taxes and franchise Taxes (imposed in lieu of net income Taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein. If any such non-excluded Taxes, levies, imposts, duties, charges, fees, deductions or withholdings (collectively, "Non-Excluded Taxes") or Other Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary (after payment of all Non-Excluded Taxes and Other Taxes) so that Lender receives an amount equal to the sum it would have received had no such deductions been made.

(b)     Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     At the request of Borrower and at Borrower's sole cost, Lender shall take reasonable steps to (i) contest its liability for any Non-Excluded Taxes or Other Taxes that have not been paid, or (ii) seek a refund of any Non-Excluded Taxes or Other Taxes that have been paid by Lender.

(d)     Whenever any Non-Excluded Taxes or Other Taxes are payable by Borrower, promptly thereafter Borrower shall send to Lender a copy of an official receipt received by Borrower showing payment thereof. If Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate Governmental Authority or fails to remit to Lender the required receipts or other required documentary evidence or if any Governmental Authority seeks to collect a Non-Excluded Tax or Other Tax directly from Lender for any other reason, Borrower shall indemnify Lender on an after-tax basis for any incremental Taxes, interest or penalties that may become payable by Lender.

(e)     The agreements in this Section 2.4 shall survive the satisfaction and payment of the Obligations and the termination of this Agreement.

2.5     Post Closing Transfer to Ferrer Primary Trust. Borrower has indicated that Ferrer desires to convey his membership interest in Amstel into the Ferrer Primary Trust following Closing. Borrower acknowledges that such a conveyance will constitute an Event of Default if

15

consummated without the consent of Lender. Lender has indicated that it will consider providing approval of such a post-closing transfer, subject to all of the following requirements:

(a) All documentation for the Ferrer Trusts must be provided to Lender for review in advance of their creation, and must be in form and content satisfactory to Lender;

(b) The Ferrer Trusts must become direct obligors under the Ferrer Guaranty pursuant to a guaranty joinder or other documentation in form and content acceptable to Lender;

(c) The Ferrer Trusts must collaterally assign their interests in the Amstel membership interest to Lender pursuant to an assignment joinder or other documentation in form and content acceptable to Lender;

(d) Each of the Ferrer Trusts must appoint Ferrer as sole trustee;

(e) Each of the Ferrer Trusts must prohibit April Ferrer and any other beneficiaries of any of the Ferrer Trusts from asserting any management or control over the Ferrer Trusts pursuant to documentation in form and content acceptable to Lender;

(f) The Ferrer Trusts must indemnify Lender and all Lender Affiliates pursuant to an indemnification in form and content acceptable to Lender, and including without limitation indemnification from any loss or damage arising from any one or more of the following: (i) the creation of the Ferrer Trusts, (ii) the transfer of the Amstel membership interest or any other property into the Ferrer Trusts, (iii) the management or assertion of control by any party other than Ferrer of any assets in the Ferrer Trusts, (iv) any adverse tax consequence to Amstel or any other Borrower Affiliate arising by virtue of the creation, continuation, operation, or management of the Ferrer Trusts (including without limitation the revocation of Amstel's Subchapter S election), or (v) any actions taken by the Ferrer Trusts to impede or delay the rights or remedies provided to Lender under the Loan Documents.

(g) Lender shall be provided with an opinion of counsel, in form and substance satisfactory to Lender, covering, at a minimum, (i) the due formation and valid existence of the Ferrer Trusts, (ii) the enforceability of the transfers of the Amstel membership interest and any other property into the Ferrer Trusts, (iii) that none of (a) the transfer of the Amstel membership interest or any other property into the Ferrer Trusts, (b) the management or assertion of control by any of the Ferrer Trusts over any such assets, nor (c) the retention of Ferrer as sole trustee of each of the Ferrer Trusts, will impact the anticipated tax treatment of Amstel (including its Subchapter S election) or any other Borrower Affiliates, (iii) the enforceability of the ownership and control restrictions precluding April Ferrer and any other beneficiaries of the Ferrer Trusts from asserting any management or control over the Ferrer Trusts.

3. CLOSING DELIVERABLES. Concurrently with the execution and delivery of this Agreement, Borrower shall cause all of the following documents and deliverables to be executed (as applicable) and delivered to Lender, all of which must be satisfactory to Lender and Lender's counsel in form, substance and execution:

3.1    Loan Documents.

    (a)    Loan Agreement.  This Agreement executed by Borrower.

    (b)    Note.  The Closing Note executed by Borrower.

    (c)    Security Agreements.

        (i)    Borrower Security Agreement.  A valid and effective security agreement dated on or about the date of this Agreement, executed by Borrower, granting Lender a valid and enforceable security interest in all of its personal property, subject to no prior Liens except Permitted Liens (the "Borrower Security Agreement").

        (ii)    Subsidiary Security Agreement.  A valid and effective security agreement dated on or about the date of this Agreement, executed by each Subsidiary Guarantor, granting Lender a valid and enforceable security interest in all of the personal property of each such Subsidiary Guarantor, subject to no prior Liens, except Permitted Liens (the "Subsidiary Security Agreement").

    (d)    Guaranties.

        (i)    Ferrer Guaranty.  A Continuing Conditional Guaranty dated on or about the date of this Agreement, executed by the Ferrer Parties to and for the benefit of Lender, with a disclaimer from April Ferrer (the "Ferrer Guaranty").

        (ii)    Subsidiary Guaranty.  A Continuing Unconditional Guaranty dated on or about the date of this Agreement, executed by each and every Subsidiary Guarantor (the "Subsidiary Guaranty").

        (iii)    Other Affiliate Guaranty.  A Continuing Unconditional Guaranty dated on or about the date of this Agreement, executed by Atlantic, CF Holdings GP LLC, a Delaware limited liability company, and CF Acquisitions LLC, a Delaware limited liability company (the "Other Affiliate Guaranty").

    (e)    Pledge Agreements.  Borrower shall provide, and cause to be provided, all of the following pledge agreements, provided, however, that Lender may exclude or further limit the scope of any such pledge agreements at its election:

        (i)    Ferrer Pledge Agreement.  A Pledge Agreement dated on or about the date of this Agreement, executed by Ferrer, pledging 100% of the membership interests in Amstel (but limited to only 65% of the indirect membership interest in Borrower), as more specifically described therein with a consent from April Ferrer (the "Ferrer Pledge Agreement").

        (ii)    Amstel Pledge Agreement.  A Pledge Agreement dated on or about the date of this Agreement, executed by Amstel, pledging 100% of the membership interests in Kickapoo River Investments LLC, a Delaware limited liability company, and Lupine Holdings, LLC, a Delaware limited liability company (but limited to only 65% of the indirect membership interest in Borrower), as more specifically described therein. (the "Amstel Pledge Agreement").

17

(iii) Kickapoo/Lupine Pledge Agreement. A Pledge Agreement dated on or about the date of this Agreement, executed by Kickapoo River Investments LLC, a Delaware limited liability company, and Lupine Holdings, LLC, a Delaware limited liability company, pledging 100% of the membership interests in Atlantic (but limited to only 65% of the indirect membership interest in Borrower), as more specifically described therein. (the "Kickapoo/Lupine Pledge Agreement").

(iv) Atlantic Pledge Agreement. A Pledge Agreement dated on or about the date of this Agreement, executed by Atlantic, as pledgor, pledging 100% of the membership interests in each of CF Holdings GP LLC, a Delaware limited liability company, and CF Acquisitions LLC, a Delaware limited liability company (but limited as to each such entity to only 65% of the indirect membership interest in Borrower), as more specifically described therein (the "Borrower Pledge Agreement").

(v) CF Pledge Agreement. A Pledge Agreement dated on or about the date of this Agreement, executed by CF Holdings GP LLC, a Delaware limited liability company, and CF Acquisitions LLC, a Delaware limited liability company, each as pledgor, pledging 100% of the membership interests in Borrower (the "CF Pledge Agreement").

(f) Control Agreements. Fully executed Control Agreements with each bank or financial institution holding any deposit accounts with respect to all such accounts, all in form and content acceptable to Lender; provided, however, that if any such Control Agreements are not executed by the Closing Date, the Closing may still occur with Lender's written consent to accepting such Control Agreements as a post-closing item, such consent not to be unreasonably withheld. If Lender consents to accepting such Control Agreements as a post-closing item, if such Control Agreements are not delivered to Lender within thirty (30) days after the Closing Date, the failure of Borrower to deliver such Control Agreements to Lender shall be an immediate Event of Default without any further requirement for notice or opportunity to cure.

(g) Collateral Assignment of Services and Cost Sharing Agreement. A Collateral Assignment of Services and Cost Sharing Agreement, executed by Borrower and Atlantic, in the form prepared by and acceptable to Lender.

(h) Collateral Assignment of License Agreement. A Collateral Assignment of License Agreement, executed by Borrower, in the form prepared by and acceptable to Lender, which document shall collaterally assign to Lender all of the rights of Borrower in and to the IP License.

(i) Employment & Non-compete Agreements.

(i) Ferrer Employment & Non-compete Agreement. An Employment & Non-compete Agreement, executed by Ferrer, in the form prepared by and acceptable to Lender.

(ii) Hyer Employment & Non-compete Agreement. An Employment & Non-compete Agreement, executed by Dan Hyer, in the form prepared by and acceptable to Lender; provided, however, that if such Employment & Non-compete Agreement is not executed by the Closing Date, the Closing may still occur with Lender's written consent to accepting such

18

Employment and Non-compete Agreement as a post-closing item, such consent not to be unreasonably withheld.  If Lender consents to accepting such Employment and Non-compete Agreement as a post-closing item, if such Employment & Non-compete Agreement is not delivered to Lender within ninety (90) days after the Closing Date, the failure of Borrower to deliver such Employment & Non-compete Agreement to Lender shall be an immediate Event of Default without any further requirement for notice or opportunity to cure.

           (iii)    <u>Kiapig Employment & Non-compete Agreement</u>.  An Employment & Non-compete Agreement, executed by Joe Kiapig, in the form prepared by and acceptable to Lender <u>provided, however, that</u> if such Employment & Non-compete Agreement is not executed by the Closing Date, the Closing may still occur with Lender's written consent to accepting such Employment and Non-compete Agreement as a post-closing item, such consent not to be unreasonably withheld.  If Lender consents to accepting such Employment and Non-compete Agreement as a post-closing item, if such Employment & Non-compete Agreement is not delivered to Lender within ninety (90) days after the Closing Date, the failure of Borrower to deliver such Employment & Non-compete Agreement to Lender shall be an immediate Event of Default without any further requirement for notice or opportunity to cure.

      3.2    <u>Organizational and Authorization Documents</u>.

           (a)    <u>Borrower</u>.  Copies of (i) the organizational documents of Borrower; (ii) resolutions of Borrower approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is party and the transactions contemplated hereby and thereby; (iii) signature and incumbency certificates of the officers, members, managers and/or partners of Borrower, executing this Agreement and the other Loan Documents, each of which Borrower hereby certifies to be true and complete, and in full force and effect without modification, it being understood that Lender may conclusively rely on each such document and certificate until formally advised by Borrower of any changes therein; and (iv) if requested by Lender, good standing certificates in the state of organization of Borrower.

           (b)    <u>Subsidiary Guarantors</u>.  For each Subsidiary Guarantor, copies of its (i) organizational documents; (ii) resolutions approving and authorizing the execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; (iii) signature and incumbency certificates of its officers, members, managers and/or partners executing any of the Loan Documents, each of which Borrower hereby certifies to be true and complete, and in full force and effect without modification, it being understood that Lender may conclusively rely on each such document and certificate until formally advised by Borrower or the applicable Subsidiary Guarantor of any changes therein; and (iv) if required by Lender, a good standing certificate in its state of organization and in each other state requested by Lender.

           (c)    <u>Other Affiliate Parties</u>.  For each other Affiliate providing any pledge, assignment, guaranty or other agreement in connection with the Loan (including, without limitation, Amstel River Holdings, LLC, CF Holdings LLC, CF Acquisitions LLC, and Atlantic), copies of its (i) organizational documents; (ii) resolutions approving and authorizing the execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; (iii) signature and incumbency certificates of its officers,

members, managers and/or partners executing any of the Loan Documents, each of which Borrower hereby certifies to be true and complete, and in full force and effect without modification, it being understood that Lender may conclusively rely on each such document and certificate until formally advised by Borrower or the applicable entity of any changes therein; and (iv) if required by Lender, a good standing certificate in its state of organization.

      3.3    Perfection Certificate. A perfection certificate in form and substance satisfactory to Lender.

      3.4    Insurance. Evidence satisfactory to Lender of the existence of insurance required to be maintained pursuant to Section 7.5, together with evidence that Lender has been named as a Lender's loss payee and as an additional insured on all related insurance policies.

      3.5    Additional Documents. Such other certificates, financial statements, schedules, resolutions, opinions of counsel, notes and other documents which are provided for hereunder or which Lender shall require.

## 4.    NOTE.

      4.1    Note. The Loan shall be evidenced by the Note. At the time of the disbursement of the Loan, or a repayment made in whole or in part thereon, a notation thereof shall be made on the books and records of Lender. All amounts recorded shall be, absent demonstrable error, conclusive and binding evidence of (i) the principal amount of the Loan advanced hereunder, (ii) any accrued and unpaid interest owing on the Loan and (iii) all amounts repaid on the Loan. The failure to record any such amount or any error in recording such amounts shall not, however, limit or otherwise affect the obligations of Borrower under the Note to repay the principal amount of the Loan, together with all interest accruing thereon.

## 5.    SECURITY FOR THE OBLIGATIONS.

      5.1    Security for Obligations.

      (a)    Borrower Collateral. As security for the payment and performance of the Obligations, Borrower does hereby pledge, assign, transfer, deliver and grant to Lender a continuing and unconditional first priority security interest in and to any and all property of Borrower, of any kind or description, tangible or intangible, wheresoever located and whether now existing or hereafter arising or acquired, as more particularly described in the Security Agreement (all of which property, along with the products and proceeds therefrom are individually and collectively referred to as the "Borrower Collateral").

      (b)    Subsidiary Collateral. As security for the payment and performance of the Obligations, Borrower shall cause each Subsidiary Guarantor to pledge, assign, transfer, deliver and grant to Lender a continuing and unconditional first priority security interest in and to any and all property of such Subsidiary Guarantor, of any kind or description, tangible or intangible, wheresoever located and whether now existing or hereafter arising or acquired, as more particularly described in the Subsidiary Security Agreement (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "Subsidiary Collateral").

20

5.2     Financing Statements. Borrower shall, and shall cause each Subsidiary Guarantor to, at Lender's request, at any time and from time to time, execute and deliver to Lender such financing statements, amendments and other documents and do such acts as Lender deems necessary in order to establish and maintain valid, attached and perfected first priority security interests in the Collateral in favor of Lender, free and clear of all Liens and claims and rights of third parties whatsoever, except Permitted Liens. Borrower hereby irrevocably authorizes, and shall cause each Subsidiary Guarantor to irrevocably authorize, Lender at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto. Borrower further ratifies and affirms its authorization for any financing statements and/or amendments thereto, executed and filed by Lender in any jurisdiction prior to the date of this Agreement. In addition, Borrower shall and shall cause each Subsidiary Guarantor to, make appropriate entries on its books and records disclosing Lender's security interests in the Collateral.

5.3     Additional Collateral. Borrower acknowledges that the intent is for the Collateral at all times to include all of the assets of Borrower. Consequently, Borrower agrees that it shall deliver to Lender immediately upon demand, such other collateral as Lender may from time to time request, and does hereby grant to Lender a continuing security interest in such other collateral, which, when pledged, assigned and transferred to Lender shall be and become part of the Collateral. Lender's security interests in all of the foregoing Collateral shall be valid, complete and perfected whether or not covered by a specific assignment.

5.4     Other Actions as to any and all Collateral. Borrower further agrees to take any other action reasonably requested by Lender to ensure the attachment, perfection and first priority of, and the ability of Lender to enforce, Lender's security interest in any and all of the Collateral. Borrower further agrees to indemnify and hold Lender harmless against claims of any Persons not a party to this Agreement concerning disputes arising over the Collateral.

6.     REPRESENTATIONS AND WARRANTIES.

To induce Lender to make the Loan, Borrower makes the following representations and warranties to Lender, each of which shall survive the execution and delivery of this Agreement.

6.1     Organization; Name; Books and Records. Each of Borrower, Guarantor and their Subsidiaries is duly organized, existing and in good standing under the laws of the jurisdiction of its formation, with full and adequate power to carry on and conduct its business as presently conducted. Each of Borrower, Guarantor and their Subsidiaries is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities require such qualification or licensing, unless the failure to be so licensed or qualified would not have a Material Adverse Effect. The exact legal name of Borrower is as set forth in the first paragraph of this Agreement, and Borrower currently does not conduct, nor has it during the last five (5) years conducted, business under any other name or trade name. Each location where any Obligor keeps any Collateral and/or any books and records concerning any Collateral or it business is set forth on Schedule 6.1.

6.2     Authorization. Borrower has full right, power and authority to enter into this Agreement, to make the borrowings and execute and deliver the Loan Documents as provided

QB\156257.00002\34590879.8

herein and to perform all of its duties and obligations under this Agreement and the other Loan Documents. Each other Obligor has full right, power and authority to enter into the Loan Documents to which it is a party and to perform all of its duties and obligations under the Loan Documents to which it is a party. The execution and delivery of this Agreement and the other Loan Documents will not, nor will the observance or performance of any of the matters and things herein or therein set forth, violate or contravene any provision of law or of the organizational documents of Borrower or any other Obligor. All necessary and appropriate action has been taken on the part of each Obligor to authorize the execution and delivery of this Agreement and the Loan Documents to which it is a party.

6.3     Validity and Binding Nature.  This Agreement and the other Loan Documents are the legal, valid and binding obligations of each Obligor, as the case may be, enforceable against such Obligor in accordance with their terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

6.4     Consent; Absence of Breach.  The execution, delivery and performance of this Agreement, the other Loan Documents and any other documents or instruments to be executed and delivered by Borrower and/or any other Obligor, as the case may be, in connection with the Loan hereunder, do not and will not (a) require any consent, approval, authorization of, or filings with, notice to or other act by or in respect of, any Governmental Authority or any other Person (other than any consent or approval which has been obtained and is in full force and effect); (b) conflict with (i) any provision of law or any applicable regulation, order, writ, injunction or decree of any court or Governmental Authority, (ii) the organizational documents of any Obligor, or (iii) any material agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon any Obligor or any of it properties or assets; or (c) require, or result in, the creation or imposition of any Lien on any asset of any Obligor, other than Liens in favor of Lender.

6.5     Ownership of Properties; Liens.  Each Obligor is the sole owner of all of its properties and assets that are encumbered by the Security Documents, free and clear of all Liens, charges and claims, other than Permitted Liens.

6.6     Equity Ownership.  All issued and outstanding Capital Securities of each Obligor are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than those in favor of Lender, if any, and such Capital Securities were issued in compliance with all applicable foreign, federal and state laws concerning the issuance of securities. As of the date hereof, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Capital Securities of any Obligor.

6.7     Intellectual Property.  Each Obligor owns and possesses or has a license or other right to use all Intellectual Property as are necessary for the conduct of the business of such Obligor as currently conducted, without any infringement upon rights of others, and no material claim has been asserted and is pending by any Person challenging or questioning any Obligor's use of any Intellectual Property or the validity or effectiveness of any Intellectual Property owned or licensed by any Obligor nor does Borrower know of any valid basis for any such claim.

6.8     Financial Statements. All financial statements submitted to Lender have been prepared in accordance with sound accounting practices and GAAP on a basis, except as otherwise noted therein, consistent with the previous fiscal year and present fairly in all material respects the financial condition of such Person and the results of the operations for such Person as of such date and for the periods indicated. Since the date of the most recent financial statement submitted by Borrower to Lender, there has been no material change in the financial condition or in the assets or liabilities of Borrower or any other Person for which financial statements were submitted.

6.9     Litigation and Contingent Liabilities. Except for any litigation, arbitration, proceeding, demand, charge, claim, petition or governmental investigation to which Lender or a Lender Affiliate was party prior to Closing, there is no litigation, arbitration proceeding, demand, charge, claim, petition or governmental investigation or proceeding pending, or to the knowledge of Borrower, threatened, against any Obligor. Except for any litigation, arbitration, proceeding, demand, charge, claim, petition or governmental investigation to which Lender or a Lender Affiliate was party prior to Closing, no Obligor has any material guarantee obligations, contingent liabilities, liabilities for Taxes, or any long-term leases or forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives.

6.10     Event of Default. No Event of Default or Unmatured Event of Default exists or would result from the incurrence by any Obligor of any of the Obligations hereunder or under any of the other Loan Documents, and no Obligor is in default (without regard to grace or cure periods) under any other contract or agreement to which it is a party.

6.11     Adverse Circumstances. No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or to the knowledge of Borrower, after due inquiry, threatened litigation or proceeding or basis therefor) exists which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect upon any Obligor.

6.12     Environmental Laws and Hazardous Substances. No Obligor has generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Substances, on or off any of the premises of such Person (whether or not owned by it) in any manner which at any time violates any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder. Borrower will, and will cause each Obligor to, comply in all material respects with all Environmental Laws and will obtain all licenses, permits certificates, approvals and similar authorizations thereunder. There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any Governmental Authority or any other Person, nor is any pending or, to the best of Borrower's knowledge, threatened, and Borrower shall promptly notify Lender upon becoming aware of any such investigation, proceeding, complaint, order, directive, claim, citation or notice, and shall take prompt and appropriate actions to respond thereto, with respect to any non-compliance with, or violation of, the requirements of any Environmental Law by any Obligor, or the release, spill or discharge, threatened or actual, of any Hazardous Material or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Material or any other environmental, health or safety matter, which affects any such Person or its business,

23

operations or assets or any properties at which such Person has transported, stored or disposed of any Hazardous Substances. No Obligor has any material liability, contingent or otherwise, in connection with a release, spill or discharge, threatened or actual, of any Hazardous Substances or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Material. Borrower further agrees, and agrees to cause each Obligor, to allow Lender or its agent reasonable access to its properties to confirm compliance with all Environmental Laws, and Borrower shall, following determination by Lender that there is non-compliance, or any condition which requires any action by or on behalf of Borrower, any Obligor or their respective Subsidiaries in order to avoid any non-compliance, with any Environmental Law, at Borrower's sole expense, cause an independent environmental engineer acceptable to Lender to conduct such tests of the relevant site as are appropriate, and prepare and deliver a report setting forth the result of such tests, a proposed plan for remediation and an estimate of the costs thereof.

6.13    Solvency, etc. As of the date hereof, and immediately prior to and after giving effect to the issuance of the Loan hereunder and the use of the proceeds thereof, (a) the fair value of the assets of each Obligor is greater than the amount of its liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated as required under the Section 548 of Bankruptcy Code, (b) the present fair saleable value of the assets of each Obligor is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (c) each Obligor is able to realize upon its assets and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (d) no Obligor intends to, or believes that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature, (e) no Obligor is engaged in business or a transaction, or is about to engage in business or a transaction, for which its property would constitute unreasonably small capital, (f) the transfers and conveyances made to Lender are for fair consideration and are for reasonably equivalent, contemporaneous and new value, and (g) the transfers and conveyances made to Lender pursuant to the Loan Documents: (i) will not enable Lender to receive more than it would receive in a Chapter 7 bankruptcy of each or any of Borrower or Guarantors had the transfers or conveyances not been made; (ii) Lender is not an insider of any of Obligors within the meaning of Bankruptcy Code § 101(31); and (iii) the transfers and conveyances made to Lender in connection with the Loan cannot be avoided under any applicable state or federal fraudulent conveyance statutes, including Bankruptcy Code § 548 or any other similar federal or state law providing for avoidance of transfers to creditors.

6.14    ERISA Obligations. All Employee Plans of each Obligor meet the minimum funding standards of Section 302 of ERISA and 412 of the Internal Revenue Code where applicable, and each such Employee Plan that is intended to be qualified within the meaning of Section 401 of the Internal Revenue Code of 1986 is qualified. No withdrawal liability has been incurred under any such Employee Plans and no "Reportable Event" or "Prohibited Transaction" (as such terms are defined in ERISA), has occurred with respect to any such Employee Plans, unless approved by the appropriate Governmental Authorities. Each Obligor has promptly paid and discharged all obligations and liabilities arising under the Employee Retirement Income Security Act of 1974 ("ERISA") of a character which if unpaid or unperformed might result in the imposition of a Lien against any of its properties or assets.

24

6.15     Labor Relations.  There are no strikes, lockouts or other labor disputes or, to the knowledge of Borrower, after due inquiry, threatened against any Obligor.  The hours worked by and payment made to employees of any Obligor have not been in violation of the Fair Labor Standards Act or any other applicable law.  No unfair labor practice complaint is pending against any Obligor or, to the knowledge of Borrower, after due inquiry, threatened before any Governmental Authority.

6.16     Enforceable Liens.  The liens, security interests and assignments created by the Security Documents will, when granted and recorded or filed, be valid, effective, properly perfected and enforceable liens, security interests and assignments.

6.17     Lending Relationship.  The relationship hereby created between Borrower and Lender is and has been conducted on an open and arm's length basis in which no fiduciary relationship exists, and Borrower has not relied and is not relying on any such fiduciary relationship in executing this Agreement and in consummating the Loan.

6.18     Business Loan.  The Loan is for business purposes, and the making of the Loan, together with the interest rate, fees and charges as contemplated hereby, is not subject to the Truth In Lending Act, 12 U.S.C. 1601 et seq., as amended from time to time, and do not, and when disbursed shall not, violate the provisions of any consumer credit laws or the usury laws of any state or jurisdiction which may have jurisdiction over this transaction, Borrower or any property securing the Loan.

6.19     Taxes.  Each Obligor has timely filed all Tax returns and reports required by law to have been filed by it and has paid all Taxes, governmental charges and assessments due and payable with respect to such Tax returns, except any such Taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on such Obligor's books, are insured against or bonded over to the satisfaction of Lender and the contesting of such payment does not create a Lien on the Collateral which is not a Permitted Lien.  There is no controversy or objection pending, or to the knowledge of Borrower, threatened in respect of any Tax returns of any Obligor.  Each Obligor has made adequate reserves on its books and records in accordance with GAAP for all Taxes that have accrued but which are not yet due and payable.

6.20     Compliance with Regulation U.  No portion of the proceeds of the Loan shall be used by Borrower, or any Affiliate of Borrower, either directly or indirectly, for the purpose of purchasing or carrying any margin stock, within the meaning of Regulation U as adopted by the Board of Governors of the Federal Reserve System or any successor thereto.

6.21     Governmental Regulation.  Borrower is not, or after giving effect to any Loan, will not be, subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act or the Investment Company Act of 1940 or to any foreign, federal or state statute or regulation limiting its ability to incur indebtedness for borrowed money.

6.22     Bank Accounts.  The only deposit accounts and operating bank accounts of Borrower and the Guarantor Subsidiaries are those that are subject to the Control Agreements

listed in Section 3.1 hereof. Neither Borrower nor any Guarantor Subsidiary has any deposit account or operating bank account that is not subject to a Control Agreement in favor of Lender.

      6.23   [Reserved.]

      6.24   Complete Information. This Agreement and all financial statements, schedules, certificates, confirmations, agreements, contracts, and other materials and information heretofore or contemporaneously herewith furnished in writing by Borrower to Lender for purposes of, or in connection with, this Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of any Obligor to Lender pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made (it being recognized by Lender that any projections and forecasts provided by Borrower are based on good faith estimates and assumptions believed by Borrower to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

      6.25   Anti-Terrorism. No Obligor or its representative constituents or Affiliates is a "specially designated national" or "blocked person" (as those terms are defined by the US Office of Foreign Assets Control), or is in violation of any laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "Patriot Act").

      6.26   OFAC Covenant. None of the Obligors or any of their Affiliates (i) is a Sanctioned Person, (ii) has more than 15% of its assets in Sanctioned Countries, or (iii) derives more than 15% of its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Countries. The proceeds of any Loan will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

      6.27   Enforceable Guaranty. Each Guaranty constitutes a legal, valid and binding obligation of each Guarantor named therein according to the terms thereof.

      6.28   Licenses. Each Obligor has obtained and there remain in full force and effect all licenses, permits, consents, approvals and authorizations necessary or appropriate for the management and operation of its properties, unless the failure to do so would not have a Material Adverse Effect.

      6.29   FCPA. Neither Borrower nor any other Obligor has taken any action, directly or indirectly, that would result in a violation of the FCPA or any other applicable anti-corruption law.

6.30    Full Disclosure.  None of the representations or warranties made by Borrower or any other Obligor in this Agreement or any of the other Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of Borrower or any other Obligor in connection with this Agreement or any of the other Loan Documents, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

7.    AFFIRMATIVE COVENANTS.

Borrower agrees that from and after the date of this Agreement and until all Obligations are paid in full:

7.1    Compliance with Lender Regulatory Requirements; Increased Costs.  If Lender shall reasonably determine that any Change in Law, or compliance by Lender or any Person controlling Lender with any request or directive (whether or not having the force of law) of any Governmental Authority, central bank or comparable agency has or would have the effect of reducing the rate of return on Lender's or such controlling Person's capital as a consequence of Lender's obligations hereunder to a level below that which Lender or such controlling Person would have achieved but for such Change in Law or compliance (taking into consideration Lender's or such controlling Person's policies with respect to capital adequacy) by an amount deemed by Lender or such controlling Person to be material or would otherwise reduce the amount of any sum received or receivable by Lender under this Agreement or under any Note with respect thereto, then from time to time, upon demand by Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail), Borrower shall pay directly to Lender or such controlling Person such additional amount as will compensate Lender for such increased cost or such reduction, so long as such amounts have accrued on or after the day which is one hundred eighty (180) days prior to the date on which Lender first made demand therefor.

7.2    Existence.  Borrower shall, and shall cause each other Obligor to, at all times (a) preserve and maintain its existence and good standing in the jurisdiction of its organization, (b) preserve and maintain its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary, and (c) continue as a going concern in the business which Obligor is presently conducting.  If Borrower does not have an Organizational Identification Number and later obtains one, Borrower shall promptly notify Lender of such Organizational Identification Number.

7.3    Compliance With Laws.  Borrower shall use the proceeds of the Loan for the purposes explicitly permitted herein and not in contravention of any requirements of law and not in violation of this Agreement, and shall comply in all respects, including the conduct of its business and operations and the use of its properties and assets, with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits.  In addition, and without limiting the foregoing sentence, Borrower shall continuously be in compliance with Sections 6.25 and 6.26 above.

7.4    Payment of Taxes and Liabilities.  Borrower shall pay, and cause each other Obligor to pay, and discharge, prior to delinquency and before penalties accrue thereon, all property and other Taxes, and all governmental charges or levies against it or any of the Collateral, as well as claims of any kind which, if unpaid, could become a Lien on any of its property; provided that the foregoing shall not require any Obligor to pay any such Tax or charge so long as it shall contest the validity thereof in good faith by appropriate proceedings and shall set aside on its books adequate reserves with respect thereto in accordance with GAAP and, in the case of a claim which could become a Lien on any of the Collateral, such contest proceedings stay the foreclosure of such Lien or the sale of any portion of the Collateral to satisfy such claim.

7.5    Maintain Insurance.  Borrower shall at all times maintain, and cause each other Obligor to maintain, with insurance companies reasonably acceptable to Lender, such insurance coverage as may be required by any law or governmental regulation or court decree or order applicable to it and such other insurance, to such extent and against such hazards and liabilities, including employers', public and professional liability risks, as is customarily maintained by companies similarly situated, and shall have insured amounts no less than, and deductibles no higher than, are reasonably acceptable to Lender.  Borrower shall, and shall cause each other Obligor, to furnish to Lender a certificate setting forth in reasonable detail the nature and extent of all insurance maintained by each such Person, which shall be reasonably acceptable in all respects to Lender. Borrower shall, and cause each other Obligor, to, cause each issuer of an insurance policy to provide Lender with an endorsement (i) showing Lender as Lender's loss payee with respect to each policy of property or casualty insurance and naming Lender as an additional insured with respect to each policy of liability insurance; and (ii) providing that thirty (30) days notice will be given to Lender prior to any cancellation of, material reduction or change in coverage provided by or other material modification to such policy.  Borrower shall execute and deliver to Lender a collateral assignment, in form and substance satisfactory to Lender, of each business interruption insurance policy maintained by Borrower.

In the event Borrower either fails to provide Lender with evidence of the insurance coverage required by this Section 7.5 or at any time hereafter shall fail to obtain or maintain or cause to be maintained any of the policies of insurance required above, or to pay or cause to be paid any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligation or default by Borrower hereunder, may at any time (but shall be under no obligation to so act), obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto, which Lender deems advisable.  This insurance coverage (a) may, but need not, protect such Person's interests in such property, including the Collateral, and (b) may not pay any claim made by, or against, such Person in connection with such property, including the Collateral. Borrower may later cancel, or cause to be cancelled, any such insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained, and caused to be obtained, the insurance coverage required by this Section 7.5.  If Lender purchases insurance for the Collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges that may be imposed with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the principal amount of the Loan owing hereunder.  The costs of the insurance may be more than the cost of the insurance any Person may be able to obtain on its own.

7.6     ERISA Liabilities; Employee Plans.  Borrower shall, and shall cause each other Obligor to, (i) keep in full force and effect any and all Employee Plans which are presently in existence or may, from time to time, come into existence under ERISA, and not withdraw from any such Employee Plans, unless such withdrawal can be effected or such Employee Plans can be terminated without liability to such Person; (ii) make contributions to all of such Employee Plans in a timely manner and in a sufficient amount to comply with the standards of ERISA; including the minimum funding standards of ERISA; (iii) comply with all material requirements of ERISA which relate to such Employee Plans; (iv) notify Lender promptly upon receipt by Borrower or any Obligor of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Employee Plans or the appointment of a trustee to administer such Employee Plans; (v) promptly advise Lender of the occurrence of any "Reportable Event" or "Prohibited Transaction" (as such terms are defined in ERISA), with respect to any such Employee Plans; and (vi) amend any Employee Plan that is intended to be qualified within the meaning of Section 401 of the Internal Revenue Code of 1986 to the extent necessary to keep the Employee Plan qualified, and to cause the Employee Plan to be administered and operated in a manner that does not cause the Employee Plan to lose its qualified status.

7.7     Books and Records. Borrower will, and will cause each Obligor to, keep books and records in accordance with GAAP which accurately reflect all of its business affairs and transactions and permit Lender or any of its representatives, at reasonable times and intervals upon reasonable notice to Borrower, to visit each Obligor's offices, to discuss such Obligor's financial matters with its officers and employees, and its independent public accountants (and Borrower hereby authorizes such independent public accountant to discuss each Obligor's financial matters with Lender or its representatives upon reasonable notice to Borrower and whether or not any representative of such Obligor is present, at the discretion of such Obligor; provided, however, Lender will be entitled to meet with such independent public accountants without Borrower or any of its representatives present if an Event of Default has occurred and is continuing) and to examine (and photocopy extracts from) any of its books and records. Borrower shall pay any fees of such independent public accountant incurred in connection with Lender's exercise of its rights pursuant to this Section 7.7.

7.8     Financial Statements and Budgets.  Borrower shall furnish or cause to be furnished, to Lender or its authorized representatives the following information regarding the business affairs, operations and financial condition of Borrower and each Obligor:

(a)     Within one hundred fifty (150) days after the close of each fiscal year, a copy of the audited consolidated balance sheets of Borrower and each other Obligor as of the end of such year and the related consolidated statements of income or operations, shareholders' equity and cash flows, for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by the report of a nationally-recognized independent public accounting firm reasonably acceptable to Lender, which report shall (i) contain an unqualified opinion, stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years, and (ii) not include any explanatory paragraph expressing substantial doubt as to going concern status; and

(b)     Within twenty-one (21) days after the end of each calendar month, a copy of the unaudited consolidated balance sheets of Borrower and each other Obligor as of the end of such month, and the related consolidated statements of income, shareholders' equity and cash flows, for such fiscal month and for the portion of the fiscal year then ended, together with a budget to actual reconciliation for the applicable period, with written explanations for any variances of more than 5% from the budgeted amount, with all of the foregoing certified by an appropriate officer of Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Borrower and each other Obligor, subject to normal year-end adjustments and absence of footnote disclosures.

(c)     Annually, within thirty (30) days of filing, a complete copy, including all Schedules, of each foreign and each federal income Tax return filed by or for Borrower and each other Obligor in any jurisdiction where such filing is required.

(d)     Within ninety (90) days after the close of each calendar year, personal financial statements (i) of Ferrer (which statements shall include a description of all separate and community assets of Carl A. Ferrer and April Ferrer for all periods that they are married) and (ii) from and after the time of their creation, of the Ferrer Trusts, with all such statements in form and level of detail satisfactory to Lender.

(e)     Annually, not less than thirty (30) days prior to the commencement of each new fiscal year, an annual budget for such upcoming fiscal year, including therewith quarterly and annual projections with respect to income statement and balance sheet matters and EBITDA.

(f)     Annually, not less than thirty (30) days prior to the commencement of each new fiscal year, an annual business plan for such upcoming fiscal year, including  timing of planned events and expected financial costs and outcomes.

(g)     Quarterly, not less than thirty (30) days following the end of each such fiscal quarter, statements of Excess Cash Flow for the applicable quarter.

(h)     Annually, not less than one hundred fifty (150) days following the end of the applicable fiscal year, an annualized statement of Excess Cash Flow for the applicable year.

(i)     When requested by Lender, such further information as Lender may reasonably request in writing relating to any such financial statements.

No change with respect to such accounting principles shall be made by any Obligor without giving prior notification to Lender.  Borrower represents and warrants to Lender that the financial statements delivered to Lender at or prior to the execution and delivery of this Agreement and to be delivered at all times thereafter accurately reflect and will accurately reflect the financial condition of each Person for which such financial statements were delivered. Upon reasonable notice to Borrower (with Buyer hereby agreeing that 24 hours advance notice shall in all cases be reasonable, and further provided that no notice shall be required during the continuance of an Event of Default), Lender shall have the right during business hours to inspect the books and records of each Obligor and make extracts therefrom.  Borrower agrees to advise

30

Lender promptly of any development, condition or event that would reasonably be expected to have a Material Adverse Effect on any Obligor.

7.9     Supplemental Financial Statements.     Borrower shall promptly upon receipt thereof, provide to Lender copies of interim and supplemental reports if any, submitted to any Obligor by independent accountants in connection with any interim audit or review of the books and records of any such Person.

7.10     Covenant Compliance Certificate.     Borrower shall, contemporaneously with the furnishing of the quarterly and year-end financial statements pursuant to Section 7.8, deliver to Lender a duly completed compliance certificate, dated the date of such financial statements and certified as true and correct by an appropriate officer of Borrower, containing a computation of each of the financial covenants set forth in Section 9 and stating that Borrower has not become aware of any Event of Default or Unmatured Event of Default that has occurred and is continuing or, if there is any such Event of Default or Unmatured Event of Default, describing it and the steps, if any, being taken to cure it.

7.11     Notice of Proceedings.     Borrower, promptly upon becoming aware, shall give written notice to Lender of (a) any litigation, arbitration, governmental investigation or subpoena to produce documents or witnesses or proceeding not previously disclosed by Borrower to Lender which has been instituted or, to the knowledge of Borrower, is threatened against any Obligor or to which any of their respective properties is subject, and (b) any ruling, filing, additional discovery, or change in facts, law or circumstances with respect to any previously disclosed litigation, arbitration, governmental investigation or subpoena to produce documents or witnesses or proceeding that could be reasonably expected to have a Material Adverse Effect.

7.12     Notice of Event of Default or Material Adverse Effect.     Borrower shall, promptly after the commencement thereof, give notice to Lender in writing of the occurrence of any Event of Default or any Unmatured Event of Default, or the occurrence of any condition or event having a Material Adverse Effect on any Obligor.

7.13     Environmental Matters.     If any release or threatened release or other disposal of Hazardous Substances shall occur or shall have occurred on the properties or any other assets of any Obligor, Borrower shall, or shall cause the applicable other Person to, cause the prompt containment and removal of such Hazardous Substances and the remediation of the affected property or other assets as necessary to comply with all Environmental Laws and to preserve the value of such property or other assets.   Without limiting the generality of the foregoing, Borrower shall, and shall cause each such other Obligor to, comply with any foreign, federal or state judicial or administrative order requiring the performance at the properties of Borrower or such other Person of activities in response to the release or threatened release of a Hazardous Substance.   To the extent that the transportation of Hazardous Substances is permitted by this Agreement, Borrower shall, and shall cause each such other Obligor to, dispose of such Hazardous Substances, or of any other wastes, only at licensed disposal facilities operating in compliance with Environmental Laws.

7.14     Maintenance of Property and Assets.     Borrower shall maintain, and cause each other Obligor to maintain and preserve all of its property and assets (including without limitation

all Collateral), which is used or useful in its business in good working order and condition, ordinary wear and tear excepted, and shall make all necessary repairs thereto and renewals and replacements thereof, except where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

7.15    Maintenance of Licenses, Permits and Registrations.    Borrower shall maintain, and cause each other Obligor to maintain, in full force and effect all rights and licenses necessary or beneficial in connection with carrying on its business, and all permits, licenses, consents, registrations and approvals necessary or beneficial in connection with the Collateral.

7.16    Compliance with Loan Documents.    Borrower shall make all payments of interest and principal on the Loan and shall keep and comply with, and cause each Obligor to keep and comply with, all terms, conditions and provisions of the Loan Documents to which each such Person is a party.

7.17    Lender Costs.    Borrower agrees that it shall pay all out-of-pocket and documented fees, costs and expenses incurred by Lender in connection with this transaction, including without limitation all reasonable costs of inspections, appraisals and attorneys' fees.

7.18    Maintenance of Organizational Structure and Management.    Borrower shall maintain, and cause each other Obligor to maintain, (a) its present existence at all times in good standing, and (b) Ferrer, Dan Hyer and Joe Kiapig as executive officers with day-to-day responsibility for the operations of Borrower and its Subsidiaries.

7.19    FCPA.    No part of the proceeds of the Loan will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of the FCPA or any other applicable anti-corruption law.    Borrower will maintain in effect policies and procedures designed to promote compliance by Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with the FCPA and any other applicable anti-corruption laws.

7.20    Joinder.    If Borrower, directly or indirectly, creates or acquires any Subsidiary after the Effective Date (and provided that the foregoing clause shall not be deemed to constitute the consent or agreement of Lender to any such creation or acquisition), then Borrower shall promptly, and in any event within thirty (30) days after such creation or acquisition, cause such new Subsidiary to execute and deliver to Lender, in form and content acceptable to Lender, (a) a new Guaranty or a joinder to the Subsidiary Guaranty, and (b) a new Security Agreement or a joinder to the Subsidiary Security Agreement.    Further, within the same thirty (30) day period referenced in the preceding sentence, Borrower also shall provide to Lender organizational and authority documents for such new Subsidiary, which documents shall be substantially similar to those required of Subsidiary Guarantors in Section 3.2 hereof, and which documents shall be in form and content acceptable to Lender.    Notwithstanding the foregoing, the above requirements of this Section 7.20 shall not apply to any future Subsidiaries of CF Holdings GP LLC, and CF Acquisitions LLC.

7.21     Further Assurances.  Borrower shall take, and cause each other Obligor to take, such actions as are necessary or as Lender may reasonably request from time to time to ensure that the Obligations under the Loan Documents are secured by the Collateral.

7.22     Endeavor to Refinance.  Borrower shall use its diligent, best efforts to obtain new financing to pay off the Loan in full within 180 days following the Effective Date, and if the Loan has not been refinanced by such date, Borrower will continue thereafter with the use of diligent, best efforts to cause the Loan to be refinanced in full after such date.

7.23     Payment of Atlantic Loan.  If the Loan is paid in full prior to payment in full of the Atlantic Loan, then at all times after payment of the Loan until such time as the Atlantic Loan also is paid in full, Borrower agrees as follows:

(a)     If the obligors on the Atlantic Loan, at any time or from time to time do not have sufficient capital to repay any required payments on the Atlantic Loan when due, then Borrower shall, and Borrower shall cause each other Obligor to, make one or more loans of all Excess Cash Flow to one or more of the obligors on the Atlantic Loan, as necessary to enable all required payments on the Atlantic Loan to be made in full and in a timely manner; provided, however, that such loans shall only be required to the extent that the lending Obligor is not rendered insolvent after giving effect to the applicable loan, and the applicable loan does not result in a breach of a representation, warranty, covenant or other agreement set forth in this Agreement or any other Loan Documents ("Atlantic Loan Payments"); and

(b)     Borrower shall not, and shall not permit any other Obligor to, (i) make any distribution or dividend (other than stock dividends), whether in cash or otherwise, to any of its equity holders, (ii) purchase or redeem any of its equity interests or any warrants, options or other rights in respect thereof, (iii) pay any management fees or similar fees to any of its equity holders or any Affiliate thereof, (iv) set aside funds for any of the foregoing, or (v) enter into any other transaction for the purpose of circumventing any of the prohibitions set forth in the preceding items (i) through (v).

Notwithstanding any provision in this Agreement or any other document to the contrary, the obligations of Borrower set forth above in this Section 7.23 shall survive payment and performance of the Obligations and the release of the Collateral until the Atlantic Loan is paid in full.

7.24     Other Notices.  Borrower shall promptly notify Lender of any of the following that relate to Borrower, any other Obligor, any Collateral, or any other assets of any Obligor: (a) any notice or other documentation with respect to any unpaid Taxes or other assessments or charges from any Governmental Authority in excess of $250,000; (b) any notice or other documentation with respect to any pending or threatened litigation, arbitration or other proceeding with a maximum possible exposure in excess of $250,000; (c) any notice or documentation regarding a contractual dispute or proposed cancellation, termination or modification of a contract that would reasonably be expected to have a Material Adverse Effect, (d) any subpoena request; (e) any request for information or documentation from any news or investigative agency or from any individual; and (f) any notice or documentation regarding any proceeding before any Governmental Authority if the outcome of such proceeding would

QB\156257.00002\34590879.8

reasonably be expected to have a Material Adverse Effect. Borrower shall, within three Business Days following the earlier of its receipt of, or its obtaining knowledge of, any of the foregoing items, notify Lender in writing of the same.

7.25    SPE Covenants.   Borrower shall cause each Ferrer Party that is an entity domiciled in the United States and each other Obligor that is an entity domiciled in the United States to have the SPE Covenants incorporated directly into its organizational documents.

7.26    Management and Control of Ferrer Trusts.   From and after the creation of the Ferrer Trusts, Borrower shall cause, at all times, (i) Ferrer to be the sole trustee of each of the Ferrer Trusts, and (ii) all management and control of the Ferrer Trusts to vest solely in Ferrer.

7.27    Amstel Shareholders/Members.   Borrower shall cause Amstel at all times to have only shareholders/members that qualify at all times as eligible shareholders as defined in Section 1361(b)(1) of the Internal Revenue Code, as amended.

7.28    Shared Information for Litigation and Other Adversarial Matters.   The parties acknowledge that any present or future litigation or other adversarial proceedings arising out of the business and operations of Obligors could have a material impact Lender and its Affiliates, due to the involvement of Lender and its Affiliates with such business and operations prior to the Closing of the transactions contemplated in the Transaction Documents. The parties further acknowledge that the interests of Obligors, on the one hand, and Lender and its Affiliates, on the other hand, with respect to any such litigation or other adversarial matters likely would be aligned, and that all such parties likely would be jointly interested in all aspects of such matters. Consequently, while any Obligations are outstanding, Borrower agrees that it shall direct, and shall cause each other Obligor to direct, any attorneys or other professionals retained by or otherwise representing any of them in such litigation or other adversarial matters to provide to Lender and its Affiliates full and complete disclosure of all information, documents, pleadings, discovery, proceedings, discussions and strategy with respect to such litigation or other adversarial matters (collectively, the "Shared Information"). The parties understand the foregoing agreement could give rise to a waiver by the Obligors of the attorney-client and work product privileges. The parties agree to cooperate in exploring alternatives to facilitate the requirements of this paragraph in such a manner so as to preserve, to the maximum extent reasonably possible, the attorney-client and work product privileges with respect to third parties; provided, however, that any alternative that would limit in any respect the amount of Shared Information provided to Lender and its Affiliates shall be subject to Lender's approval in its sole discretion.

8.    NEGATIVE COVENANTS.

Borrower agrees that from and after the date of this Agreement and until all Obligations are paid in full:

8.1    Debt.   Borrower shall not, and shall not permit any other Obligor to, either directly or indirectly, create, assume, incur or have outstanding any Debt (including purchase money indebtedness), or become liable, whether as endorser, guarantor, surety or otherwise, for any debt or obligation of any other Person, except:

(a)     the Obligations under this Agreement and the other Transaction Documents;

(b)     obligations of any Obligor for Taxes, assessments, municipal or other governmental charges that are current with no past due portion;

(c)     obligations of any Obligor for accounts payable incurred in the Ordinary Course that are current with no past due portion; and

(d)     obligations of any Obligor incurred in the Ordinary Course that do not exceed at any time a maximum amount of $500,000.00 in the aggregate that are current with no past due portion.

8.2     Encumbrances. Borrower shall not, and shall not permit any other Obligor to, either directly or indirectly, create, assume, incur or suffer or permit to exist any Lien or charge of any kind or character upon any property, whether owned at the date hereof or hereafter acquired, except for Permitted Liens. Borrower shall not sell, transfer, convey or create a Lien (except in favor of Lender) upon the Collateral.

8.3     Investments. Borrower shall not, and shall not permit any other Obligor to, either directly or indirectly, make or have outstanding any Investment, other than Investments existing as of the Effective Date or made after the Effective Date that in the aggregate do not exceed $250,000.00.

8.4     Transfer; Merger; Sales. Borrower shall not, and not permit any other Obligor to, whether in one transaction or a series of related transactions, (a) be a party to any merger or consolidation, or purchase or otherwise acquire any of the assets or any Capital Securities of any class of, or any partnership or joint venture interest in, any other Person, or (b) sell, transfer, convey or lease any of its assets or Capital Securities (including the sale of Capital Securities of any Subsidiary), or (c) sell or assign, with or without recourse, any receivables.

8.5     Issuance of Capital Securities. Borrower shall not, and shall not permit any other Obligor to, issue any Capital Securities.

8.6     Distributions. Subject to the following sentence, Borrower shall not, and shall not permit any other Obligor to, (a) make any distribution or dividend (other than stock dividends), whether in cash or otherwise, to any of its equity holders, (b) purchase or redeem any of its equity interests or any warrants, options or other rights in respect thereof, (c) pay any management fees or similar fees to any of its equity holders or any Affiliate thereof, or (d) set aside funds for any of the foregoing. Notwithstanding the preceding sentence, as long as there is no Event of Default (other than an Event of Default arising solely as a result of the breach of any covenant set forth in Article 9 hereof), Borrower and the other Obligors shall be entitled to make distributions in the following two situations: (i) to any Obligor, the holders of any Capital Securities of any Obligor or the beneficiaries of the Ferrer Primary Trust, to the extent, and only to the extent, that any of the foregoing parties have obligations or liabilities for Taxes (including reasonably estimated payments for Taxes) directly or indirectly related to the Acquired Business, in which event the amount of the distribution shall be an amount sufficient to cover such obligations or liabilities for Taxes (including reasonably estimated payments for Taxes);

provided that before making any such distribution, the amount of the requested distribution and the underlying calculations therefor from Borrower's independent accounting firm shall be provided to Lender in writing and Lender shall have approved the calculations for such requested distribution, such approval not to be unreasonably withheld, delayed or conditioned (and such approval shall be deemed as given by Lender if Lender does not object to the distribution in writing within ten (10) Business Days following receipt); and (ii) Atlantic Loan Payments.

8.7   Transactions with Affiliates.  Borrower shall not, and shall not permit any other Obligor to, directly or indirectly, enter into or permit to exist any transaction with any of its Affiliates or with any director, officer or employee of any Obligor, other than transactions in the Ordinary Course of, and pursuant to the reasonable requirements of, the business of such Person and upon fair and reasonable terms which are fully disclosed to Lender and are no less favorable to such Person, as the case may be, than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate or director, officer or employee of such Person.

8.8   Cancellation of Debt.  Borrower shall not, and not permit any other Obligor to, cancel any claim or debt owing to it, except for reasonable consideration or in the Ordinary Course.

8.9   Inconsistent Agreements.  Borrower shall not, and shall not permit any other Obligor to, enter into any agreement containing any provision which would (a) be violated or breached by any borrowing by such Person hereunder or by the performance by such Person of any of its Obligations hereunder or under any Loan Document to which such Person is a Party, (b) prohibit such Person from granting to Lender a Lien on any property encumbered by the Security Documents, or (c) create or permit to exist or become effective any encumbrance or restriction on the ability of any Guarantor Subsidiary to (i) pay dividends or make other distributions to Borrower or any other Guarantor Subsidiary, or pay any Debt owed to Borrower or any other Guarantor Subsidiary, (ii) make loans or advances to Borrower or any other Guarantor Subsidiary, or (iii) transfer any of its assets or properties to Borrower or any other Guarantor Subsidiary.

8.10   Use of Proceeds.  Borrower shall not, and shall not permit any other Obligor to, use any portion of the proceeds of the Loan, either directly or indirectly, for any purpose not explicitly permitted by this Agreement.

8.11   Bank Accounts.  Neither Borrower nor any other Obligor shall establish any new Deposit Accounts or other bank accounts with any bank or financial institution, unless (i) Lender consents to the new relationship with such bank or financial institution, and (ii) such bank or financial institution agrees to enter into a new Control Agreement with Lender on terms acceptable to Lender.

8.12   Due on Sale.  Except as provided herein, Borrower shall not, and shall not permit any other Obligor to, assign, transfer or convey any of its right, title and interest in any Collateral or any other property, whether real or personal, encumbered by the Security Documents, except in the Ordinary Course.

36

8.13    Business Activities; Change of Legal Status and Organizational Documents. Borrower shall not, and shall not permit any other Obligor to, (a) engage in any line of business other than the businesses engaged in on the date hereof and businesses reasonably related thereto, (b) change its name, its Organizational Identification Number, if it has one, its type of organization, its tax jurisdiction, its jurisdiction of organization or other legal structure, or (c) permit its charter, bylaws or other organizational documents to be amended or modified in any way.

8.14    No Modification of Contracts and Agreements. Borrower shall not, and shall not permit Website Technologies LLC, Ferrer or any other Obligor to, modify, amend, terminate or rescind the Employment Agreement without the prior written consent of Lender, which consent Lender may withhold in its sole and absolute discretion. Except as set forth in the preceding sentence, Borrower shall not, and shall not permit any other Obligor to, modify, amend, terminate or rescind any contract or agreement outside the Ordinary Course, without the prior written consent of Lender, which consent Lender may withhold in its sole and absolute discretion.

8.15    Sale-Leasebacks. Borrower shall not, and shall not permit any other Obligor to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets.

8.16    No Negative Pledges. Borrower shall not, and shall not permit any other Obligor to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of Borrower or any other Obligor to pay dividends or make any other distribution on any of its Capital Securities or make other payments and distributions to Borrower or any other Obligor. Borrower shall not, and shall not permit any other Obligor to, directly or indirectly, enter into, assume or become subject to any contractual obligation prohibiting or otherwise restricting the existence of any Lien upon any of the Collateral in favor of Lender.

8.17    Salaries and Bonuses. Borrower shall not, and shall not permit any other Obligor to: (a) pay salaries or compensation, including bonuses to officers, managers or directors of the Borrower or any of its Subsidiaries (including without limitation, Ferrer, Dan Hyer and Joe Kiapig) other than as commensurate with compensation policies immediately prior to the date of this Agreement; or (b) increase the salary of, or to pay any bonus (in any form, including, but not limited to, performance bonuses, retention bonuses or severance payments) to, any personnel (including without limitation, Ferrer, Dan Hyer and Joe Kiapig), unless such salary increase or bonus is expressly set forth in a budget that has been approved in writing by Lender or as otherwise approved in writing by Lender, in its sole and absolute discretion. Further, any bonus that is subject to subjective criteria, even if set forth in a budget approved by Lender, shall require further approval by Lender of the specific amount that is proposed to be paid.

8.18    No Change in Professional Advisors. Borrower shall not, and shall not permit any other Obligor to, change its legal or accounting firms, or to retain new legal or accounting firms, without advance notice to, and consent from Lender.

8.19    Amstel Member Documents. With respect to the Amstel Member Documents: (i) Borrower shall not permit, and Borrower shall cause Amstel and each party to said documents to

37

not permit, any breach or violation of such documents, and (ii) Borrower shall not permit, and Borrower shall cause Amstel and each party to said documents to not permit, any modification or amendment of such documents. If Ferrer ever ceases to be the sole manager of Amstel, then Borrower shall obtain, and Borrower shall cause Amstel and its members to obtain, the consent of Lender to any successor manager, which consent Lender may grant or deny in its sole and absolute discretion.

8.20    No Further Units or Equity Interests. From and after the Closing, Borrower shall not permit, and Borrower shall cause Amstel and each other Obligor not to permit, the issuance of any stock, membership interests, Units (as defined in the Amstel Member Documents) or any other evidence of ownership, in any such entity.

8.21    Amstel Manager. If Ferrer ever ceases to be the manager of Amstel, then Borrower shall not permit, and Borrower shall cause Amstel and all parties to the Amstel Member Documents to not permit, the appointment of a successor manager of Amstel, which successor manager is not acceptable to Lender, in its sole and absolute discretion.

8.22    No Interest of April Ferrer. Borrower shall not permit, and shall not allow Ferrer or any other Obligor to permit, directly or indirectly, (i) the transfer (or deemed transfer) to April Ferrer of any ownership, control or management rights with respect to the Acquired Business, the Collateral or of any of the Ferrer Parties, or (ii) ownership (or deemed ownership) of, control of or the right to manage any of the Acquired Business, the Collateral or of any of the Ferrer Parties to vest in April Ferrer.

8.23    No Modification of Non-Compete Terms. Borrower shall not modify, amend, waive or fail to (or elect not to) enforce any of the non-competition terms in the Employment and Non--Compete Agreements of Ferrer, Dan Hyer and/or Joe Kiapig without the prior written consent of Lender, which consent may be given or denied by Lender in its sole discretion.

8.24    Limitation on IP License Sublicenses and Transfers. Borrower shall not, without the prior written consent of Lender, (i) issue any sublicenses under the IP License to any party that is not a wholly owned Subsidiary of Borrower, or (ii) except for sublicenses allowed pursuant to the foregoing item (i), transfer or assign the IP License or any licenses provided for in the IP License, sublicense any or all of the rights and licenses provided for in the IP License, or in any other way convey and rights or interests with respect to the property and rights licensed pursuant to the IP License.

8.25    No Shop. Without the prior written consent of Lender, which consent may be given or denied by Lender in its sole discretion, Borrower shall not, and shall not permit any other Obligor to, directly or indirectly, solicit, encourage, discuss, negotiate or respond to (other than to disclose the effect of this provision) any inquiries or proposals from, provide any information to, or enter into any agreement with, any person or entity regarding (i) the sale or transfer of the Acquired Business or any portion thereof, in any form or structure whatsoever, including without limitation, any merger or consolidation, any transaction involving the issuance or sale of Capital Securities, or any transaction involving the sale or transfer of all or substantially all of the assets and/or Collateral.

38

## 9.    FINANCIAL COVENANTS.

9.1    Interest Coverage Ratio. At all times, but measured quarterly at the end of each fiscal quarter on a rolling four (4) quarter basis, Borrower, together with the Subsidiary Guarantors, on a consolidated basis, shall maintain a ratio of EBITDA to Interest Charges of not less than the following:

| Period (Rolling 4-Quarter Period Ending on Stated Date) | Interest Coverage Ratio |
|---|---|
| Period Ending September 30, 2015 | 1.75 : 1.00 |
| Period Ending December 31, 2015 | 2.00 : 1.00 |
| Period Ending March 31, 2016 | 2.00 : 1.00 |
| Period Ending June 30, 2016 | 2.00 : 1.00 |
| Period Ending September 30, 2016 | 2.25 : 1.00 |
| Period Ending December 31, 2016 | 2.50 : 1.00 |
| Period Ending March 31, 2017 | 2.50 : 1.00 |
| Period Ending June 30, 2017 | 2.75 : 1.00 |
| Period Ending September 30, 2017 | 3.00 : 1.00 |
| Period Ending December 31, 2017 | 3.25 : 1.00 |
| Period Ending March 31, 2018 | 3.25 : 1.00 |
| Period Ending June 30, 2018 | 3.50 : 1.00 |
| Period Ending September 30, 2018 | 4.00 : 1.00 |
| Period Ending December 31, 2018 | 4.65 : 1.00 |
| Period Ending March 31, 2019 | 4.65 : 1.00 |
| Period Ending June 30, 2019 | 6.25 : 1.00 |
| Period Ending September 30, 2019 | 7.25 : 1.00 |
| Period Ending December 31, 2019 | 8.00 : 1.00 |
| Period Ending March 31, 2020 | 8.00 : 1.00 |
| Period Ending June 30, 2020 | 12.00 : 1.00 |
| Period Ending September 30, 2020 | 15.00 : 1.00 |
| Period Ending December 31, 2020 | 22.00 : 1.00 |
| Period Ending March 31, 2021 | 22.00 : 1.00 |

9.2    Fixed Charge Coverage Ratio. At all times, but measured quarterly at the end of each fiscal quarter on a rolling four (4) quarter basis, Borrower, together with the Subsidiary Guarantors, on a consolidated basis, shall maintain a Fixed Charge Coverage Ratio of not less than the following:

39

| Period (Rolling 4-Quarter Period Ending on Stated Date) | Fixed Charge Coverage Ratio |
|---|---|
| Period Ending September 30, 2015 | 1.020 : 1.00 |
| Period Ending December 31, 2015 | 1.020 : 1.00 |
| Period Ending March 31, 2016 | 1.020 : 1.00 |
| Period Ending June 30, 2016 | 1.020 : 1.00 |
| Period Ending September 30, 2016 | 1.020 : 1.00 |
| Period Ending December 31, 2016 | 1.035 : 1.00 |
| Period Ending March 31, 2017 | 1.035 : 1.00 |
| Period Ending June 30, 2017 | 1.035 : 1.00 |
| Period Ending September 30, 2017 | 1.035 : 1.00 |
| Period Ending December 31, 2017 | 1.035 : 1.00 |
| Period Ending March 31, 2018 | 1.035 : 1.00 |
| Period Ending June 30, 2018 | 1.035 : 1.00 |
| Period Ending September 30, 2018 | 1.035 : 1.00 |
| Period Ending December 31, 2018 | 1.035 : 1.00 |
| Period Ending March 31, 2019 | 1.035 : 1.00 |
| Period Ending June 30, 2019 | 1.035 : 1.00 |
| Period Ending September 30, 2019 | 1.035 : 1.00 |
| Period Ending December 31, 2019 | 1.035 : 1.00 |
| Period Ending March 31, 2020 | 1.035 : 1.00 |
| Period Ending June 30, 2020 | 1.050 : 1.00 |
| Period Ending September 30, 2020 | 1.100 : 1.00 |
| Period Ending December 31, 2020 | 1.100 : 1.00 |
| Period Ending March 31, 2021 | 1.100 : 1.00 |

9.3   Leverage Ratio. At all times, but measured quarterly at the end of each fiscal quarter on a rolling four (4) quarter basis, Borrower, together with the Subsidiary Guarantors, on a consolidated basis, shall maintain a ratio of Debt to EBITDA of not greater than the following:

| Period (Rolling 4-Quarter Period | Leverage Ratio |
|---|---|

| Ending on Stated Date) | |
|---|---|
| Period Ending September 30, 2015 | 7.00 : 1.00 |
| Period Ending December 31, 2015 | 6.50 : 1.00 |
| Period Ending March 31, 2016 | 6.50 : 1.00 |
| Period Ending June 30, 2016 | 6.25 : 1.00 |
| Period Ending September 30, 2016 | 5.50 : 1.00 |
| Period Ending December 31, 2016 | 5.00 : 1.00 |
| Period Ending March 31, 2017 | 5.00 : 1.00 |
| Period Ending June 30, 2017 | 4.50 : 1.00 |
| Period Ending September 30, 2017 | 4.00 : 1.00 |
| Period Ending December 31, 2017 | 3.75 : 1.00 |
| Period Ending March 31, 2018 | 3.75 : 1.00 |
| Period Ending June 30, 2018 | 3.25 : 1.00 |
| Period Ending September 30, 2018 | 3.00 : 1.00 |
| Period Ending December 31, 2018 | 2.50 : 1.00 |
| Period Ending March 31, 2019 | 2.50 : 1.00 |
| Period Ending June 30, 2019 | 2.25 : 1.00 |
| Period Ending September 30, 2019 | 1.75 : 1.00 |
| Period Ending December 31, 2019 | 1.25 : 1.00 |
| Period Ending March 31, 2020 | 1.25 : 1.00 |
| Period Ending June 30, 2020 | 0.625 : 1.00 |
| Period Ending September 30, 2020 | 0.375 : 1.00 |
| Period Ending December 31, 2020 | 0.250 : 1.00 |
| Period Ending March 31, 2021 | 0.250 : 1.00 |

9.4     Capital Expenditures. Borrower, together with the Subsidiary Guarantors, on a consolidated basis, shall not make or become obligated to make any Capital Expenditures, except for Capital Expenditures in the Ordinary Course that in the aggregate during any fiscal year do not exceed $1,000,000.00 or in a budget approved by Lender.

## 10.     EVENTS OF DEFAULT.

Borrower, without notice or demand of any kind, shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default").

10.1     Nonpayment of Obligations. Failure to pay on or before when due (and during the continuance of such failure) any amount owing on any Note or any of the Obligations, whether by its terms or as otherwise provided herein.

QB\156257.00002\34590879.8

10.2    Breach of Warranty; Misrepresentation. Any warranty, representation, certificate or statement of any Obligor in this Agreement, the other Loan Documents or any other agreement with Lender shall be false in any material respect when made or, if such warranty, representation, certificate or statement relates to a date other than the date as of which made, then as of such date, or if any financial data or any other information now or hereafter furnished to Lender by or on behalf of any Obligor shall prove to be false, inaccurate or misleading in any material respect.

10.3    Nonperformance. Except for the events described in this Section 10 (for which the applicable notice and/or cure periods set forth in this Section 10 shall apply), any failure to perform or default in the performance of any covenant, condition or agreement contained in this Agreement and, if capable of being cured, such failure to perform or default in performance continues for a period of five (5) Business Days after Borrower receives written notice of such failure to perform or default in performance, or in the other Loan Documents or any other agreement with Lender and such failure to perform or default in performance continues beyond any applicable grace or cure period.

10.4    Default under Loan Documents. A default under any Loan Document that continues unremedied after any expressly stated notice and cure or grace period in such Loan Document.

10.5    Default under Other Debt. Any default by any Obligor or any Affiliate of any Obligor in the payment of any Debt (including other Debt owed to Lender) for any other obligation beyond any expressly stated notice and cure or grace period provided with respect thereto or in the performance of any other term, condition or covenant contained in any agreement (including any capital or operating lease or any agreement in connection with the deferred purchase price of property) under which any such obligation is created.

10.6    Other Material Obligations. Any default in the payment when due, or in the performance or observance of, any obligation of, or condition agreed to by, any Obligor with respect to any purchase or lease of goods or services, and Lender determines, in its reasonable discretion, that such default could have a Material Adverse Effect.

10.7    Bankruptcy, Insolvency, etc. Any Obligor becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or any Obligor applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such Obligor or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for any Obligor or for a substantial part of the property of any thereof and is not discharged within sixty (60) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of any Obligor, and if such case or proceeding is not commenced by such Obligor, it is consented to or acquiesced in by such Obligor, or remains undismissed for sixty (60) days; or any Obligor takes any action to authorize, or in furtherance of, any of the foregoing.

42

10.8  Judgments.  The entry of any final judgment, decree, levy, attachment, garnishment or other process, or the filing of any Lien against any Obligor which is not fully covered by insurance, but only if the aggregate amount owing with respect to such final judgments and Liens, inclusive of all costs, expenses, fees and interest, and also including any attorney's fees and costs, is in excess of $500,000.00.

10.9  Change in Control.  The occurrence of any Change in Control.

10.10  Collateral Impairment.  The entry of any judgment, decree, levy, attachment, garnishment or other process, or the filing of any Lien against, any of the Collateral and such judgment or other process shall not have been, within thirty (30) days from the entry thereof, (i) bonded over to the satisfaction of Lender and appealed, (ii) vacated, or (iii) discharged, or the loss, theft, destruction, seizure or forfeiture, or the occurrence of any deterioration or impairment of any of the Collateral or any decline or depreciation in the value or market price thereof (whether actual or reasonably anticipated), which causes the Collateral, in the sole opinion of Lender acting in good faith, to become unsatisfactory as to value or character, or which causes Lender to reasonably believe that it is insecure and that the likelihood for repayment of the Obligations is or will soon be impaired, time being of the essence. The cause of such deterioration, impairment, decline or depreciation shall include, but is not limited to, the failure by Borrower to do any act deemed necessary by Lender to preserve and maintain the value and collectability of the Collateral.

10.11  Material Adverse Effect.  The occurrence of any development, condition or event which has a Material Adverse Effect on any Obligor or any of Subsidiary of any Obligor.

10.12  Default under the PSA. In the event that (a) there is a breach of any representation or warranty by Borrower or any Obligor pursuant to the PSA, or (b) Borrower or any Obligor shall be in default with respect to any covenant or any of its other obligations contained in the PSA or any other agreements entered into in connection therewith beyond any applicable and expressly provided notice and cure or grace period.

10.13  Guaranty.  There is a discontinuance by any of the Guarantors of the Guaranty or any Guarantor shall contest the validity of such Guaranty.

10.14  Death of Individual; Disability of Ferrer.  The death or legal declaration of incompetency of Ferrer or any other Obligor who is a natural person; or the Disability of Ferrer.

10.15  Employment & Non-compete Agreement.  The failure to deliver the Employment & Non-compete Agreements as provided in Section 3.1(h) of this Agreement.

10.16  Control Agreements.  The failure to deliver the Control Agreements as provided in Section 3.1(f) of this Agreement.

10.17  Change in Management. The failure of Ferrer, Dan Hyer and Joe Kiapig to continue as Chief Executive Officer, Chief Revenue Officer, and/or Chief Technology Office, respectively, of Borrower; provided that in event that Ferrer, Dan Hyer and/or Joe Kiapig (i) dies, (ii) is disabled to the extent that he cannot reasonably continue his duties or (iii) is terminated or resigns, the Board of Directors or Managers of the Borrower shall have not more

43

than thirty (30) days after such event to propose a successor acceptable to Lender in its sole discretion.

10.18  Atlantic Default. Any breach or default under the Atlantic Loan that continues unremedied after any expressly stated notice and cure or grace period applicable thereto.

10.19  Change in Laws. Any change in laws with respect to any foreign, federal, state or local laws, rules, regulations, statutes or ordinances governing any of the Collateral or any of the business or operations of Borrower or the Subsidiary Guarantors, which Lender, in its sole discretion, believes might have a Material Adverse Effect.

11.  REMEDIES.

11.1  Generally. Upon the occurrence and during the continuance of an Event of Default, Lender shall have all rights, powers and remedies set forth in the Transaction Documents, in any written agreement or instrument (other than this Agreement and the Loan Documents) relating to any of the Obligations or any security therefor or as otherwise provided at law or in equity. Without limiting the generality of the foregoing, Lender may, at its option upon the occurrence of an Event of Default, declare all Obligations to be immediately due and payable, provided, however, that upon the occurrence of an Event of Default under Sections 10.7 or 10.9, all Obligations shall be automatically due and payable, all without demand, notice or further action of any kind required on the part of Lender. In the event that Lender, with respect to any Collateral, exercises any right of foreclosure, repurchase or other right to cause the sale of such Collateral, Lender shall be entitled to deduct from the purchase or transfer price therefor (whether payable by Lender or by any other party) the estimated amount of any taxes that Lender determines are likely to be owing in connection with such sale or transfer (with said determination to be made by Lender in its sole and absolute discretion).

11.2  Additional Remedy upon Death or Disability of Ferrer. Upon the occurrence of an Event of Default that arises due to the death or Disability of Ferrer, if at the time such Event of Default arises, the Obligations are less than 50% paid, then Lender shall have, in addition to all other remedies described above in Section 11.1, the right to retain all of the Collateral, including all of the membership and equity interests collaterally assigned to Lender, in full payment of the remaining balance of the Obligations, which remedy Lender may elect to exercise or not exercise in its sole and absolute discretion. Borrower and Obligors acknowledge and agree that if such a significant amount of the Obligations remain unpaid at the time of an Event of Default that arises due to the death or Disability of Ferrer, the inability of Ferrer to thereafter manage the Acquired Business and the Collateral will substantially decrease the value of the Collateral, and the parties have made this provision for the complete retention of the Collateral as an additional Lender remedy in such event because it would be difficult to calculate, on the date hereof, the amount of actual damages for such a breach, and the parties agree that the retention of the Collateral in full payment of the then outstanding Obligations represents a reasonable remedy to Lender for such breach. The parties further acknowledge that as additional consideration for the possible complete retention of the Collateral by Lender as an additional remedy pursuant to this Section 11.2, Lender shall cause its Affiliate to execute such documents as are reasonably necessary to consent to the change of the policy beneficiary to a new beneficiary designated by Ferrer with respect to that $10,000,000 Term Life Insurance

44

Policy, Policy No. 113000647, issued by AXA Equitable Life Insurance Company, a stock company (the "Beneficiary Change Procedure").

11.3    Matters Waived and Not Waived.    Borrower hereby waives any and all presentment, demand, notice of dishonor, protest, and all other notices and demands in connection with the enforcement of Lender's rights under the Loan Documents, and hereby consents to, and waives notice of release, with or without consideration, of any Obligor of any Collateral, notwithstanding anything contained herein or in the Loan Documents to the contrary. No Event of Default shall be waived by Lender except in writing. No failure or delay on the part of Lender in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  There shall be no obligation on the part of Lender to exercise any remedy available to Lender in any order.  Lender reserves the right to assess and collect a fee in connection with any agreement by Lender to waive the violation of any covenant contained in the Loan Documents or to waive or forego its rights and remedies upon the occurrence of an Event of Default.

11.4    Remedies Cumulative.  The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity.

11.5    Injunctive Relief.    Borrower agrees that in the event that Borrower fails to perform, observe or discharge any of its Obligations or liabilities under this Agreement or any other Loan Documents, no remedy of law will provide adequate relief to Lender, and further agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

12.    AGREEMENTS UPON BANKRUPTCY.

Borrower agrees that in the event it determines to file an insolvency proceeding or one is filed against it, Borrower will file any such proceeding in the United States Bankruptcy Court for the District of Delaware and in all events in a bankruptcy court in the United States.  In the event an insolvency proceeding is commenced against Borrower in a court other than in the United States, Borrower will seek to the fullest extent permitted by applicable law to move the proceeding to the United States Bankruptcy Court for the District of Delaware.  In the event that a proceeding brought by or against Borrower or any Obligor pursuant to Title 11 United States Code, including any amendments, modifications, replacements to the code or similar federal proceedings ("Bankruptcy Proceeding") or that an proceeding pursuant to Title 11 United States Code, Chapter 15 is commenced by or against Borrower or that the following would be applicable in any proceeding commenced in a foreign court, Borrower, stipulates and agrees that:

12.1    Borrower will execute, and Borrower will cause each other Obligor to execute, such documents as are requested by Lender to allow Lender to be granted immediate and complete relief from all bankruptcy stays and injunctions, including the automatic stay of Bankruptcy Code § 362(a), so that Lender can exercise all of its rights and remedies under the Loan Documents.  Borrower will execute, and Borrower will cause each other Obligor a to execute, any and all additional documents and take any other actions necessary for Lender to

obtain such stay relief in any Bankruptcy Proceeding. Borrower further agrees that it will take no action, and it will cause each other Obligor to refrain from taking any action, directly or indirectly, to impede or impair Lender's exercise of its right to stay relief as provided herein.

12.2    In any Bankruptcy Proceeding, Borrower acknowledges and agrees that Lender is entitled to adequate protection of its interests in the Collateral and that neither Borrower nor any other Obligor will oppose any request of Lender for adequate protection pursuant to applicable provisions of the Bankruptcy Code.

12.3    Upon the occurrence of a Bankruptcy Proceeding, and if any of the Collateral is included within the Bankruptcy Estate pursuant to, and defined in, Bankruptcy Code § 541 or is otherwise administered in the Bankruptcy Proceeding, then all rents and sales proceeds, proceeds from the Collateral (if included in the Bankruptcy Estate), accounts receivable, contracts rights, contracts and general intangibles (any other Collateral defined as "Cash Collateral" by Bankruptcy Code § 363(a)) will be deemed to be "Cash Collateral" for purposes of Bankruptcy Code § 363 and, and will be subject to the first and prior secured claims of Lender in and to such Cash Collateral. Further, Borrower acknowledges and confirms that Lender now holds, and will continue to hold, a valid and perfected first and prior lien on all rents and the proceeds of the Collateral upon the occurrence of any Bankruptcy Proceeding.

12.4    Borrower acknowledges that the Loan Documents are fully executed agreements and not an executory contracts within the meaning of Bankruptcy Code § 365. Accordingly, upon the occurrence of a Bankruptcy Proceeding prior to the full performance hereof, neither this Loan Agreement nor any documents executed in conjunction herewith may be assumed or rejected in the Bankruptcy Proceeding. In all events, if a Bankruptcy Court determines that any of the Loan Documents is an executory contract within the meaning of Bankruptcy Code § 365, Borrower acknowledges and agree that any Loan Document is a contract providing for financial accommodations by Lender, and, therefore, it is not subject to assumption without the consent of Lender and Lender is not be obligated to permit such assumption.

13.    MISCELLANEOUS.

13.1    Obligations Absolute.    None of the following shall affect the Obligations of Borrower to Lender under this Agreement or Lender's rights with respect to the Collateral:

(a)    acceptance or retention by Lender of other property or any interest in property as security for the Obligations;

(b)    release by Lender of Borrower, any Obligor or of all or any part of the Collateral or of any party liable with respect to the Obligations;

(c)    release, extension, renewal, modification or substitution by Lender of any Note, or any note evidencing any of the Obligations, or the compromise of the liability of any of the Guarantors; or

(d)    failure of Lender to resort to any other security or to pursue Borrower or any other Obligor liable for any of the Obligations before resorting to remedies against the Collateral.

46

13.2    Entire Agreement. This Agreement and the other Loan Documents (i) are valid, binding and enforceable against Borrower and Lender in accordance with their respective provisions and no conditions exist as to their legal effectiveness; (ii) constitute the entire agreement between the parties with respect to the subject matter hereof and thereof; and (iii) are the final expression of the intentions of Borrower and Lender. No promises, either expressed or implied, exist between Borrower and Lender, unless contained herein or therein. This Agreement, together with the other Loan Documents, supersedes all negotiations, representations, warranties, commitments, term sheets, discussions, negotiations, offers or contracts (of any kind or nature, whether oral or written) prior to or contemporaneous with the execution hereof with respect to any matter, directly or indirectly related to the terms of this Agreement or the other Loan Documents. This Agreement and the other Loan Documents are the result of negotiations among Lender, Borrower and the other parties thereto, and have been reviewed (or have had the opportunity to be reviewed) by counsel to all such parties, and are the products of all parties. Accordingly, this Agreement and the other Loan Documents shall not be construed more strictly against Lender merely because of Lender's involvement in their preparation.

13.3    Amendments; Waivers. No delay on the part of Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and acknowledged by Lender, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

13.4    FORUM SELECTION AND CONSENT TO JURISDICTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF DELAWARE SITTING IN NEW CASTLE COUNTY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY OTHER PARTY OR THEIR RESPECTIVE PROPERTIES IN THE COURTS OF ANY JURISDICTION.

13.5    WAIVER OF JURY TRIAL.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER BY EXECUTION HEREOF AND LENDER BY

47

ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.   THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ACCEPT THIS AGREEMENT.

13.6   Assignability.   Lender may at any time assign Lender's rights in this Agreement, the other Loan Documents, the Obligations, or any part thereof and transfer Lender's rights in any or all of the Collateral, and Lender thereafter shall be relieved from all liability with respect to such Collateral. In addition, Lender may at any time sell one or more participations in the Loan. Without limiting the foregoing, Borrower hereby acknowledges that it has received notice of, and Borrower agrees to honor, the contribution by Lender of this Agreement, the other Loan Documents and all rights with respect to the Loan to New Lender. Borrower may not sell or assign this Agreement, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender, which consent Lender may give or withhold in its sole and absolute discretion. This Agreement shall be binding upon Lender and Borrower and their respective legal representatives and successors. All references herein to Borrower shall be deemed to include any successors, whether immediate or remote. In the case of a joint venture or partnership, the term "Borrower" shall be deemed to include all joint venturers or partners thereof, who shall be jointly and severally liable hereunder.

13.7   Confirmations.   Borrower and Lender agree from time to time, upon written request received by it from the other, to confirm to the other in writing the aggregate unpaid principal amount of the Loan then outstanding under such Note.

13.8   Binding Effect.   This Agreement shall become effective upon execution by Borrower and Lender. If this Agreement is not dated or contains any blanks when executed by Borrower, Lender is hereby authorized, without notice to Borrower, to date this Agreement as of the date when it was executed by Borrower, and to complete any such blanks according to the terms upon which this Agreement is executed.

13.9   Governing Law.   This Agreement, the Loan Documents and any Note shall be delivered and accepted in and shall be deemed to be contracts made under and governed by the internal laws of the State of Delaware applicable to contracts made and to be performed entirely within such state, without regard to conflict of laws principles.

13.10 Enforceability; Severability.   Wherever possible, each provision of this Agreement and each remedy provided to Lender hereunder shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or remedy in this Agreement shall be prohibited by, unenforceable or invalid under applicable law, then, to the extent of such prohibition or invalidity (but not to any greater extent), such provision or remedy shall be severed from this Agreement and shall be ineffective; provided, however, that the severing of any provision or remedy herein shall not invalidate or impact the enforceability of the remaining provisions and remedies of this Agreement.

48

13.11 <u>Survival of Borrower Representations, Warranties and Covenants</u>. All covenants, agreements, representations and warranties made by Borrower herein shall, notwithstanding any investigation by Lender, be deemed material and relied upon by Lender and shall survive the making and execution of this Agreement and the Loan Documents and the issuance of any Note, and shall be deemed to be continuing representations, warranties and covenants until such time as Borrower has fulfilled all of its Obligations to Lender, and Lender has been indefeasibly paid in full in cash; provided, however, that those covenants that by their express terms survive the payment of the Obligations shall continue thereafter. Lender, in extending financial accommodations to Borrower, is expressly acting and relying on the aforesaid representations and warranties.

13.12 <u>Time of Essence</u>. Time is of the essence in making payments of all amounts due Lender under this Agreement and in the performance and observance by Borrower of each covenant, agreement, provision and term of this Agreement.

13.13 <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by Lender shall be deemed to be originals thereof.

13.14 <u>Notices</u>. All notices required or permitted to be given hereunder shall be in writing and may be given in person or by United States mail, by delivery service or by electronic transmission. Any notice directed to a party to this Agreement shall become effective upon the earliest of the following: (i) actual receipt by that party; (ii) delivery to the designated address of that party, addressed to that party; or (iii) if given by certified or registered United States mail, twenty-four (24) hours after deposit with the United States Postal Service, postage prepaid, addressed to that party at its designated address. The designated address of a party shall be the address of that party shown below or such other address as that party, from time to time, may specify by notice to the other parties.

Lender Address (for both Original Lender and New Lender):

> c/o Cereus Properties, LLC
> 8901 East Pima Center Parkway
> Suite 145
> Attention: Jed Brunst
> Scottsdale, Arizona 85258
> Telephone: 480-800-3282
> Facsimile: N/A
> Email: jed.brunst@cereusproperties.com

A copy of any notice to Lender also shall be provided to:

> Don Moon

P.O. Box 1513
Prescott, Arizona 86302
Telephone: 928-778-4934
Facsimile: N/A
Email: don.moom@azbar.org

-and-

Susan G. Boswell
Quarles & Brady LLP
One South Church Avenue
Suite 1700
Tucson, Arizona 85701
Telephone: 520-770-8713
Facsimile: 520-770-2222
Email: susan.boswell@quarles.com

Borrower Address:

UGC Tech Group CV
2501 Oak Lawn Avenue, Suite 700
Dallas, Texas 75219
Attention: Carl A. Ferrer
Telephone: N/A
Facsimile: N/A
Email: carl.ferrer@backpage.com

A copy of any notice to Borrower also shall be provided to:

Larry L. Shosid
Bell Nunnally & Martin LLP
3232 McKinney Avenue
Suite 1400
Dallas, Texas 75204
Telephone: 214-740-1424
Facsimile: 214-740-5724
Email: lshosid@bellnunnally.com

13.15 Release of Claims Against Lender. In consideration of Lender making the Loan, Borrower and all other Obligors do each hereby release and discharge Lender of and from any and all claims, harm, injury, and damage of any and every kind, known or unknown, legal or equitable, which any Obligor may have against Lender from the date of their respective first contact with Lender until the date of this Agreement, including any claim arising from any reports (environmental reports, surveys, appraisals, etc.) prepared by any parties hired or recommended by Lender. Borrower and all other Obligors confirm to Lender that they have reviewed the effect of this release with competent legal counsel of their choice, or have been afforded the opportunity to do so, prior to execution of this Agreement and the other Loan

50

Documents and do each acknowledge and agree that Lender is relying upon this release in extending the Loan to Borrower.

13.16   Costs, Fees and Expenses.   Borrower shall pay or reimburse Lender for all reasonable documented costs, fees and expenses incurred by Lender or for which Lender becomes obligated in connection with the negotiation, preparation, consummation, collection of the Obligations or enforcement of this Agreement, the PSA, the other Transaction Documents, and all other documents provided for herein or therein, or delivered or to be delivered hereunder or thereunder, or in connection herewith or therewith (including any amendment, supplement or waiver to any Loan Document or the PSA), or during any workout, restructuring or negotiations in respect thereof, including reasonable consultants' fees and attorneys' fees and time charges of counsel to Lender, which shall also include attorneys' fees and time charges of attorneys who may be employees of Lender or any Affiliate of Lender, plus costs and expenses of such attorneys or of Lender; and search fees, costs and expenses.   In furtherance of the foregoing, Borrower shall pay any and all stamp and other Taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Agreement, any Note, the other Loan Documents to be delivered hereunder, and agrees to save and hold Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.   That portion of the Obligations consisting of costs, expenses or advances to be reimbursed by Borrower to Lender pursuant to this Agreement, the other Loan Documents which are not paid on or prior to the date hereof shall be payable by Borrower to Lender on demand.   If at any time or times hereafter Lender: (a) employs counsel for advice or other representation (i) with respect to this Agreement, the other Loan Documents, (ii) to represent Lender in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by Lender, Borrower, or any other Person) in any way or respect relating to this Agreement, the other Loan Documents or Borrower's business or affairs, or (iii) to enforce any rights of Lender against Borrower or any other Person that may be obligated to Lender by virtue of this Agreement or the other Loan Documents; (b) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (c) attempts to or enforces any of Lender's rights or remedies under this Agreement or the other Loan Documents, the costs and expenses incurred by Lender in any manner or way with respect to the foregoing, shall be part of the Obligations, payable by Borrower to Lender on demand. Further, the parties contemplate that certain officers and employees of Lender and its Affiliates, from time to time, will provide services to Borrower and its Affiliates.   The costs and expenses incurred by Lender and its Affiliates in any manner or way with respect to the foregoing services, which costs shall include, without limitation, an allocable pro rata share of the salaries, benefits and other compensation of any nature payable to any individuals employed or retained by Lender or any of its Affiliates that assist in the providing of such services, all as determined by Lender, shall be part of the Obligations, payable by Borrower to Lender on demand.

13.17   Indemnification.   Borrower agrees to defend (with counsel satisfactory to Lender), protect, indemnify, exonerate and hold harmless each Indemnified Party from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and distributions of any kind or nature (including the disbursements and the reasonable fees of counsel for each Indemnified Party thereto, which shall also include, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of any

Indemnified Party), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any foreign, federal, state or local laws or regulations, including securities laws, Environmental Laws, commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement, any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation, execution and delivery of this Agreement or the Loan Documents, including the making or issuance and management of the Loan, the use or intended use of the proceeds of the Loan, the enforcement of Lender's rights and remedies under this Agreement or the Loan Documents, any other instruments and documents delivered hereunder, or under any other agreement between Borrower and Lender; provided, however, that Borrower shall not have any obligations hereunder to any Indemnified Party with respect to matters determined by a court of competent jurisdiction by final and nonappealable judgment to have been caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law; provided, however, that any failure to indemnify to the full extent set forth in the preceding sentence, regardless of the reason for such failure, shall constitute an Event of Default. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and failing prompt payment, together with interest thereon at the Default Rate from the date incurred by each Indemnified Party until paid by Borrower, shall be added to the Obligations of Borrower and be secured by the Collateral. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

13.18   Revival and Reinstatement of Obligations. If the incurrence or payment of the Obligations by any Obligor or the transfer to Lender of any property should for any reason subsequently be declared to be void or voidable under any foreign, federal or state law relating to creditors' rights, including provisions of Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of Lender, the Obligations shall automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

13.19   Joint and Several. If Borrower consists of more than one person or entity their liability shall be joint and several. The provisions hereof shall apply to the parties according to the context thereof and without regard to the number or gender of words or expressions used.

13.20   Patriot Act Notice. To help fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For purposes of this Section 13.20, account shall be understood to include loan accounts.

QB\156257.00002\34590879.8

13.21 Agreement Jointly Drafted. The parties agree that this Agreement shall not be construed against any party to this Agreement on the grounds that such party drafted this Agreement, but shall be construed as if all parties jointly prepared this Agreement, and any uncertainty or ambiguity shall not on such grounds be interpreted against any one party.

13.22 Advice of Counsel Obtained. Each of the parties acknowledges and represents that it has had the opportunity to consult with legal, financial, and other professional advisors as it deems appropriate in connection with its consideration and execution of this Agreement. Each undersigned party further represents and declares that in executing this Agreement, it has relied solely upon its own judgment, belief and knowledge, and the advice and recommendation of its own professional advisors, concerning the nature, extent and duration of its rights, obligations and claims; that it has reviewed its records, evaluated its position and conducted due diligence with regard to all rights, claims or causes of action whatsoever with respect to any and all other parties; and that it has not been influenced to any extent whatsoever in executing this Agreement by any representations or statements made by the other party or its representatives, except those expressly contained herein.

13.23 Construction with PSA. To the greatest extent possible, this Agreement and the other Loan Documents, on the one hand, and the PSA, on the other hand, shall be construed as consistent and as supplementing one another; provided, however, that in the event of any conflict between the terms and conditions of this Agreement or any other Loan Document, on the one hand, and the terms and conditions of the PSA, on the other hand, the terms and conditions of this Agreement and the other Loan Documents shall be controlling.

[Signatures appear on following page.]

IN WITNESS WHEREOF, Borrower and Original Lender have executed this Loan Agreement as of the date first above written.

UGC TECH GROUP C.V., a Dutch limited partnership

By:  CF Holdings GP LLC, its sole general partner

By: _____

Name:  Carl A. Ferrer

Title:  Chief Executive Officer

VERMILLION HOLDINGS, LLC, a Delaware limited liability company

By: _____

Name: John E. Brunst

Title:  President

## CONFIRMATION OF CONTRIBUTION OF LOAN

Vermillion Holdings, LLC, as Original Lender, hereby confirms that it has contributed this Loan Agreement and all right, title and interest in and to the Loan to Shearwater Investments, LLC, as New Lender, and Shearwater Investments, LLC hereby acknowledges its receipt and acceptance of such contribution.

VERMILLION HOLDINGS, LLC, a Delaware limited liability company

By: _____

Name: John E. Brunst

Title:  President

SHEARWATER INVESTMENTS, LLC, a Delaware limited liability company

By: _____

Name: John E. Brunst

Title:  President

[Signature Page - Loan Agreement (UGC Foreign Operations)]

54

**List of Schedules**

A    SPE Covenants

Schedule A

Borrower shall cause each Affiliate entity of Borrower that is domiciled anywhere within the United States, including without limitations Amstel, Lupine Holdings, LLC, a Delaware limited liability company, Kickapoo River Investments, LLC, a Delaware limited liability company, CF Holdings GP LLC, a Delaware limited liability company, and CF Acquisitions LLC, a Delaware limited liability company, to have the following SPE Covenants incorporated directly into its Operating Agreement substantially in the form as follows as is approved by Lender:

1.      Special Member.

Upon the occurrence of any event that causes the *[last remaining Member] [the Member]* to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the *[last remaining Member] [the Member]* of all of its membership interest in the Company and the admission of the transferee pursuant to [the Section on Assignments] and [the Section on Admission of Additional Members], or (ii) the resignation of the *[last remaining Member] [the Member]* and the admission of an additional member of the Company pursuant to [the Section on Resignation] and [the Section on Admission of Additional Members]), the Person acting as the Independent Manager pursuant to [the Section on the Independent Manager] shall, without any action of any Person and immediately prior to*[last remaining Member] [the Member]* ceasing to be a member of the Company, automatically be admitted to the Company as a special Member (a "Special Member") and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member hereunder unless (i) a successor Person has been admitted to the Company as Special Member, and (ii) such successor Person has also accepted its appointment as Independent Manager pursuant to [the Section on the Independent Manager]; provided, however, that the Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member (exclusive of the Special Member). A Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the DLLCA, the Special Member shall not be required to make any capital contributions to the Company and shall not receive a membership interest in the Company. A Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the DLLCA, a Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. Prior to its admission to the Company as Special Member, such Person acting as an Independent Manager pursuant to *[the Section on the Independent Manager]* shall not be a member of the Company.

2.      Purpose of the Company.

(a)      As long as the Obligations are outstanding, the sole purpose of the Company shall be to hold a *[membership interest in the Partner LLCs which shall in turn hold partnership interests in Atlantic] [partnership interest in Atlantic] [a partnership interest in UGC]*, which shall engage only in the business of developing, designing, inventing, creating, marketing and

selling classified internet advertisements and related websites directly or indirectly only by and through the Company Related Parties.

(b)     The Company is hereby authorized to execute, deliver and perform, and *[Carl] [the Member]* on behalf of the Company, is hereby authorized to execute and deliver, the Loan Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement. The foregoing authorization shall not be deemed a restriction on the powers of the *[Members or the Managers] [Member]* to enter into other agreements on behalf of the Company.

3.     Independent Manager.

(a)     As long as the Obligations are outstanding, *[the Members and the Board of Managers] [the Member]* shall cause the Company at all times to have an Independent Manager who will be appointed by the *[Board of Managers] [Member]* and shall be acceptable to the Lender. The initial Independent Manager shall be a party to this Agreement. To the fullest extent permitted by law, including Section 18-1101(c) of the DLLCA, and notwithstanding any duty otherwise existing at law or in equity, the Independent Manager shall consider only the interests of *[the Company, Atlantic] [the Company, UGC]* and each other Company Related Party, including their respective creditors, in acting or otherwise voting on the matters referred to in [the Subsection on Material Actions in the Section on Limitations on the Company's Activities]. No resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor (i) shall have accepted his or her appointment as an Independent Manager by a written instrument, which may be a counterpart signature page to this Agreement or such other agreement (pursuant to which such Independent Manager agrees to be bound by the terms and conditions of this Agreement) approved by the *[Board of Managers] [Member]*, and (ii) shall have executed a counterpart to this Agreement. In the event of a vacancy in the position of Independent Manager, the *[Board of Managers] [Member]* shall use its best efforts to immediately appoint a successor Independent Manager. All right, power and authority of the Independent Manager shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement. Except for duties to the Company as set forth in this [Section on the Independent Manager] (including duties to the *[Members] [Member]* and *[Atlantic's, UGC's] [UGC's]* and the Company's creditors solely to the extent of their respective economic interests in the Company but excluding (i) all other interests of the *[Members] [Member]*, (ii) the interests of other Affiliates of the Company, and (iii) the interests of any group of Affiliates of which the Company is a part), the Independent Manager shall not have any fiduciary duties to the *[Managers, the Members or any Officer] [the Member or any Officer]* or any other Person bound by this Agreement. To the fullest extent permitted by law, including Section 18-1101(e) of the DLLCA, an Independent Manager shall not be liable to the Company, the *[Members, the Managers] [Member]* or any other Person bound by this Agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Manager acted in bad faith or engaged in willful misconduct. No Independent Manager shall at any time serve as trustee in bankruptcy for the Company or any Affiliate of the Company.

(b)     Notwithstanding anything to the contrary contained in this Agreement, for so long

A-2

as the Obligations are outstanding, an Independent Manager shall not be removed or replaced unless the Company provides the Lender with no less than five (5) business days' prior written notice of (i) any proposed removal of such Independent Manager, and (ii) the identity of the proposed replacement Independent Manager, together with a certification that such replacement satisfies the requirements for an Independent Manager set forth in this Agreement.

4.    Limitations on the Company's Activities.

(a)    This [Section on Limitations on the Company's Activities] is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(b)    The Member shall not, so long as any Obligation is outstanding, amend, alter, change or repeal the definition of "Independent Manager" or [the Section on the Special Member], [the Section on Purpose], [the Section on Management], [the Section on Distributions(the form of which is subject to Lender's approval)], [the Section on Exculpation and Indemnification (the form of which is subject to Lender's approval)], [the Section on Assignments (the form of which is subject to Lender's approval)], [the Section on Resignation or Withdrawal], [the Section on Admission of Additional Members], [the Section on Dissolution (the form of which is subject to Lender's approval)], [the Section on Waiver of Partition (the form of which is subject to Lender's approval)], [the Section on Third-Party Rights (the form of which is subject to Lender's approval)], [the Section on Binding Agreement (the form of which is subject to Lender's approval)], or [the Section on Amendments (the form of which is subject to Lender's approval)], or [the Schedule/Section of Definitions] without the written consent of the Independent Manager.  Subject to [this Section on Limitations on the Company's Activities], the *[Members reserve] [the Member reserves]* the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with the [Section on Amendments].

(c)    Material Action.  Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, *[the Members or any Manager] [the Member]* or any other Person, so long as any Obligation is outstanding, neither *[the Members nor any Manager] [the Member]* nor any other Person shall be authorized or empowered, nor shall they permit *[Atlantic, UGC,] [UGC]* the Company or any other Company Related Party, without the prior unanimous written consent of *[the Board of Managers and the Independent Manager] [the Member and the Independent Manager]*, to take any Material Action; provided, however, that, so long as any Obligation is outstanding, *[neither the Members nor the Managers may] [the Member may not]* authorize the taking of any Material Action unless there is at least one Independent Manager then serving in such capacity and such Independent Manager approves such Material Action.

(d)    *[Each Manager (other than the Independent Manager) and each Member] [The Member]* shall cause *[Atlantic, UGC,] [UGC,]* the Company and each other Company Related Party to do or cause to be done all things necessary to preserve and keep in full force and effect its respective existence, rights (charter and statutory) and franchises. *[Each Manager (other than the Independent Manager) and each Member] [The Member]* also shall cause each of *[Atlantic, UGC,] [UGC,]* the Company, and each other Company Related Party to:

A-3

     (i)     maintain its own separate books and records and bank accounts;

     (ii)    at all times hold itself out to the public as a legal entity separate from any other Person;

     (iii)   file its own tax returns, if any, as may be required under applicable law, to the extent (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division for tax purposes of another taxpayer, and pay any taxes so required to be paid under applicable law;

     (iv)   except as contemplated by the Loan Documents, not commingle its assets with assets of any other Person;

     (v)    conduct its business in its own name and strictly comply with all organizational formalities to maintain its separate existence;

     (vi)   [reserved];

     (vii)   pay its own liabilities only out of its own funds;

     (viii)  maintain an arm's-length relationship with each of the Member, the Company and each other Company Related Party and their respective Affiliates;

     (ix)   pay the salaries of its own employees, if any;

     (vii)   except as contemplated by the Loan Documents, not hold out its credit or assets as being available to satisfy the obligations of others;

     (viii)  allocate fairly and reasonably any overhead for shared office space;

     (ix)   except as contemplated by the Loan Documents, not pledge its assets for the benefit of any other Person;

     (x)    correct any known misunderstanding regarding its separate identity; and

     (xi)   maintain adequate capital in light of its contemplated business purpose, transactions and liabilities.

Failure of *[Atlantic, UGC,] [UGC,]* the Company, or any other Company Related Party, or *[any Member or any Manager] [the Member]*, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of *[Atlantic, UGC,] [UGC,]* the Company, or any other Company Related Party as a separate legal entity.

     (e)    So long as the Obligations are outstanding, neither the Company, *[any Member, any Manager nor any officer] [any Member, any Manager nor any officer]* shall cause or permit *[Atlantic, UGC,] [UGC,]* the Company, or any other Company Related Party to:

     (i)    except as contemplated by the Loan Documents, guarantee any obligation of any Person, including any Affiliate;

A-4

(ii)     engage, directly or indirectly, in any business other than the Business and actions required or permitted to be performed under [the Section on Purpose], the Loan Documents, or [this Section on Limitations on the Company's Activities];

(iii)    incur, create or assume any indebtedness other than as expressly permitted under the Loan Documents;

(iv)     after the Effective Date, make or permit to remain outstanding any loan or advance to, or own or acquire any partnership interests, membership interests, stock, shares, equity interests, or securities of any Person, except that the Company and each other Company Related Party may invest in those investments permitted under the Loan Documents and may make any advance required or expressly permitted to be made pursuant to any provisions of the Loan Documents and permit the same to remain outstanding in accordance with such provisions;

(v)      to the fullest extent permitted by applicable law, engage in any dissolution, liquidation, consolidation, merger, asset sale or transfer of ownership interests other than such activities as are expressly permitted pursuant to any provision of the Loan Documents and subject to obtaining any approvals required under this Agreement; or

(vi)     on and after the Effective Date, except as contemplated or permitted by the Loan Documents, dissolve, liquidate, form, acquire or hold any subsidiary (whether corporation, partnership, limited liability company or other).

For so long as the Obligations are outstanding, the Lender is and shall be an intended third-party beneficiary of the provisions of this Agreement, including, without limitation, this [Section on Limitations on the Company's Activities].

5.    Assignments. **[Each Operating Agreement will include prohibitions on the transfer of membership interests upon such terms and conditions as may be approved by the Lender].**

6.    Resignation or Withdrawal.

So long as any Obligation is outstanding, *[the last remaining Member] [the Member]* may not resign or withdraw as a member of the Company, except with the written consent of the Lender. If *[the last remaining Member] [the Member]* is permitted to resign pursuant to [this Section on Resignation], an additional member of the Company shall be admitted to the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning or withdrawing Member shall cease to be a member of the Company.

6.    Admission of Additional Members.

One or more additional Members of the Company may be admitted to the Company with

the written consent of *[the Board of Managers] [the Member]*; provided, however, that, notwithstanding the foregoing, so long as the Obligations remain outstanding, no additional Member may be admitted to the Company *[without the written consent of the Lender] [in violation of the Loan Document and the Restriction Agreement]*.

7. Third-Party Beneficiary. **[The Lender will be an express third party beneficiary of the Operating Agreement]**

8. Amendments. **[The Operating Agreement may not be amended in violation of the Loan Documents or the Section on Limitation of the Company's activities].**

9. Partition. **[The Operating Agreement will include a prohibition on a Member's right to partition the Company's property]**

10. Definitions.

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Atlantic" means Atlantische Bedrijven C.V., a Dutch limited partnership.

"Bankruptcy" (including the correlative term "Bankrupt") means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the DLLCA.

"Company Related Party" and "Company Related Parties" means (a) any US or foreign corporation, partnership, trust, limited liability company, or other legal entity of which a majority of the outstanding shares or other equity interests having the power to Control are held, directly or indirectly, by the Company, and (b) each of the following:

> *[(i) the Partner LLCs, (ii) Atlantic, (iii) CF Holdings GP LLC, a Delaware limited liability company, (iv) CF Acquisitions LLC, a Delaware limited liability company, (v) UGC, (vi) Dartmoor Holdings, LLC, a Delaware limited liability company (vii) Backpage.com, LLC, a Delaware limited*

liability company; (viii) Website Technologies, LLC, a Delaware, limited liability company; (ix) IC Holdings, LLC, a Delaware limited liability company; (x) Posting Solutions, LLC, a Delaware limited liability company, (xi) Postfaster, LLC, a Delaware limited liability company, (xii) Classified Strategies Cooperatief U.A., a Dutch cooperative association, (xiii) Classified Solutions Ltd., a United Kingdom private limited company, (xiv) Backpage Enterprises Inc., a Quebec Corporation, and (xv) other entities that are Affiliates of the Company.]

[(i) Amstel, (ii) Atlantic, (iii) CF Holdings GP LLC, a Delaware limited liability company, (iv) CF Acquisitions LLC, a Delaware limited liability company, (v) Kickapoo River Holdings, LLC, a Delaware limited liability company, (vi) Lupine Holdings, LLC, a Delaware limited liability company, (vii) UGC, (viii) Dartmoor Holdings, LLC, a Delaware limited liability company (ix) Backpage.com, LLC, a Delaware limited liability company; (x) Website Technologies, LLC, a Delaware, limited liability company; (xi) IC Holdings, LLC, a Delaware limited liability company; (xii) Posting Solutions, LLC, a Delaware limited liability company, (xiii) Postfaster, LLC, a Delaware limited liability company, (xiv) Classified Strategies Cooperatief U.A., a Dutch cooperative association, (xv) Classified Solutions Ltd., a United Kingdom private limited company, (xvi) Backpage Enterprises Inc., a Quebec Corporation, and (xvii) other entities that are Affiliates of the Company.]

"Control" (including the correlative terms "Controlled by" and "Controlling") means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Independent Manager" means a natural person selected by the Company (a) with prior experience as an independent director, independent manager or independent member, (b) with at least three (3) years of employment experience, (c) who is provided by a Nationally Recognized Service Company, (d) who is duly appointed as an Independent Manager and is not, will not be while serving as Independent Manager (except pursuant to the provisions of [the Section on Special Member] hereof, providing for the appointment of such Independent Manager to become a "Special Member" upon Member ceasing to be a member of the Company) and shall not have been at any time during the preceding five (5) years, any of the following:

(i)     a stockholder, director (other than as an Independent Manager), officer, employee, partner, attorney or counsel of the Company, any of the Company Related Parties, any Affiliate of the Company or any of the Company Related Parties, or any direct or indirect parent of the Company or any of the Company Related Parties;

(ii)     a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Amstel, the Company or any Affiliate of Amstel or the Company;

(iii)     a Person or other entity Controlling or under common Control with any such member, stockholder, partner, customer, supplier or other Person; or

(iv)     a member of the immediate family of any such member, stockholder, director, officer, employee, partner, customer, supplier or other Person.

A natural person who satisfies the foregoing definition other than clause (ii) shall not be disqualified from serving as an Independent Manager of the Company if such individual is an independent director or special manager provided by a Nationally Recognized Service Company that provides professional independent directors and special managers and also provides other corporate services in the ordinary course of its business.

"Lender" means, with respect to the Atlantic Loan and the UGC Loan, Vermillion Holdings, LLC, a Delaware limited liability company ("Vermillion"); provided, however, that immediately upon consummating the Atlantic Loan and the UCG Loan, Vermillion will contribute and assign to its wholly owned subsidiary, Shearwater Investments, LLC, a Delaware limited liability company ("Shearwater") all of Vermillion's right, title and interest in and to the Atlantic Loan and the UGC Loan. Upon such contribution and assignment, Shearwater shall become the lender on the Atlantic Loan and the UCG Loan, and from and after the time of such contribution and assignment, all references in this Agreement to "Lender" shall be deemed to refer to Shearwater or its successors and assigns.

"Loan Documents" means (a) that certain Loan Agreement dated as of April ___, 2015 and all instruments, notes, documents and certificates contemplated thereby or delivered in connection therewith by and between Atlantic and Vermillion (the "Atlantic Loan"), and (b) that certain Loan Agreement dated as of April ___, 2015 and all instruments, notes, documents and certificates contemplated thereby or delivered in connection therewith by and between UGC and Vermillion (the "UCG Loan"). As provided in the definition of "Lender", Vermillion shall contribute and assign its interests in and to the Atlantic Loan and the UTC Loan to Shearwater.

"Material Action" means (i) to consolidate or merge the Company with or into any Person, (ii) allow or cause *[Atlantic, UGC,] [UGC,]* or any other Company Related Party to consolidate or merge with or into any Person, (iii) sell all or substantially all of the assets of the Company, (iv) allow or cause *[Atlantic, UGC,] [UGC,]* or any other Company Related Party to sell all or substantially all of its assets, (v) to institute proceedings to have the Company, *[Atlantic, UGC,] [UGC,]* or any other Company Related Party, be adjudicated Bankrupt or insolvent, (vi) consent to the institution of Bankruptcy or insolvency proceedings against the Company, *[Atlantic, UGC,] [UGC,]* or any other Company Related Party, (vii) file a petition seeking, or consent to, reorganization or relief with respect to the Company, *[Atlantic, UGC,] [UGC,]* or any other Company Related Party, under any applicable foreign, federal, state, local or provincial law relating to Bankruptcy, (viii) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company, *[Atlantic, UGC,] [UGC,]* or any other Company Related Party, or a substantial part of either of their respective property, (ix) make any assignment for the benefit of creditors of the Company, *[Atlantic, UGC,] [UGC,]* or any other Company Related Party, (x) admit in writing the Company's, *[Atlantic's, UGC's,] [UGC's,],* or any other Company Related Party's inability to pay its debts generally as they become due, (xi) take action in furtherance of any such action, or,

(xii) to the fullest extent permitted by law, dissolve or liquidate the Company, *[Atlantic, UGC,]* *[UGC,]* or any other Company Related Party; provided, however, that the dissolution or liquidation of a Company Related Party specifically permitted under the Loan Documents shall not constitute a Material Action.

"Nationally Recognized Service Company" shall mean any of CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company or such other nationally recognized company that provides independent director, independent manager or independent member services and that is reasonably satisfactory to Lender, in each case that is not an Affiliate of the Company or any other Company Related Party and that provides professional independent directors and other corporate services in the ordinary course of its business.

"Obligation" shall mean the indebtedness, liabilities and obligations of the Company or any Company Related Party under or in connection with the Loan Documents or any related document in effect as of any date of determination.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to [the Section on Special Member], a person acting as Independent Manager, in such person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

"UGC" means UGC Tech Group CV, a Dutch limited partnership.

## EXHIBIT D

Note

(see attached)

**EXECUTION VERSION**

**PROMISSORY NOTE**
(UGC Foreign Operations)

(US) $77,005,592.50                                                                                April 22, 2015

To:     VERMILLION HOLDINGS, LLC, a Delaware limited liability company, as Original
        Lender, and SHEARWATER INVESTMENTS, LLC, a Delaware limited liability
        company and a wholly-owned Subsidiary of Original Lender, as New Lender; New
        Lender is the holder of the Loan pursuant to the contribution of the Loan Agreement and
        all right, title and interest in and to the Loan by Original Lender to New Lender; when
        used herein, the term "<u>Lender</u>" shall refer to Original Lender with respect to matters prior
        to such contribution and shall refer to New Lender with respect to matters from and after
        the time of such contribution

        FOR VALUE RECEIVED, the undersigned, UGC TECH GROUP C.V., a Dutch limited
partnership ("<u>Maker</u>") promises to pay to the order of Lender (together with all subsequent
holders of this Note, "<u>Payee</u>"), by wire transfer pursuant to the wire instructions attached hereto
as <u>Schedule A</u>, or such other place as Payee may from time to time designate in writing, the
Principal (defined below), together with interest on the Principal calculated on a daily basis
(based on a 360-day year) from the date of advance hereunder on the Principal balance from time
to time outstanding, and all other sums payable hereunder.  As used herein, the term "<u>Principal</u>"
shall mean the full purchase price in the amount of $77,005,592.50 owing from Maker to Payee
under the PSA (defined below), which obligation is evidenced in the stated face amount of this
Note, together with the payment of all other indebtedness, obligations and liabilities of Maker or
any other Obligor to Payee, individually or collectively, whether direct or indirect, joint or
several, absolute or contingent, due or to become due, now existing or hereafter arising under or
in respect of this Note, the Loan Agreement (defined below), the PSA Documents (defined
below) or any other instruments or agreements executed and delivered pursuant to or in
connection with any of the foregoing documents.

        Principal, interest and all other sums payable hereunder shall be paid in lawful money of
the United States of America as follows:

        A.      Interest shall accrue on the unpaid Principal balance of this Note from the date of
advance hereunder until paid at the rate of seven percent (7%) per annum.

        B.      Commencing upon May 31, 2015 and on or before the last day of each calendar
month thereafter, through and including February 28, 2021, Maker shall make monthly payments
of (i) all accrued and unpaid interest, and (ii) principal reduction payments in the amounts set
forth on <u>Schedule 1</u> of this Note.

        C.      Commencing on July 31, 2015, and on the last day of the first month following
the end of each calendar quarter thereafter (e.g., April 30 for the calendar quarter ending on
March 31), through and including January 31, 2021, Maker shall make additional payments of all

Excess Cash Flow to Payee. The payments required pursuant to this paragraph C shall not apply toward or in any way limit the payments due on the same dates pursuant to the foregoing paragraph B, with all payments under this paragraph C being in addition to the payments under the foregoing paragraph B.

D.     On or before June 1, 2016 and on or before June 1 of each calendar year thereafter, Maker shall determine the Reconciled Excess Cash Flow for the immediately preceding calendar year (the "Measurement Year"). If the Reconciled Excess Cash Flow for the Measurement Year is greater than the total amount of the actual payments of Excess Cash Flow paid by Maker to Payee for the Measurement Year, then on or before June 1 of the year immediately following the Measurement Year, Maker shall pay to Payee an amount equal to the amount by which the Reconciled Excess Cash Flow exceeds the actual payments of Excess Cash Flow for such Measurement Year. Any payment required pursuant to the preceding sentence shall not apply toward or in any way limit the payments required pursuant to the foregoing paragraphs B and C, with all payments under this paragraph D being in addition to the payments under the foregoing paragraphs B and C. If the Reconciled Excess Cash Flow for the Measurement Year is less than the total amount of the actual payments of Excess Cash Flow paid by Maker to Payee for the Measurement Year, then Maker shall be entitled to reduce the next payment of Excess Cash Flow coming due on July 31 of the year immediately following the Measurement Year by an amount equal to the amount by which the actual payments of Excess Cash Flow exceed the Reconciled Excess Cash Flow for such Measurement Year. As used herein, the term "Reconciled Excess Cash Flow" shall mean the total Excess Cash Flow for the Measurement Year as determined pursuant to an audit by a nationally recognized independent public accounting firm retained by Maker and reasonably acceptable to Payee.

E.     The entire balance of this Note, including all Principal and interest, along with any other amounts payable hereunder, shall be due and payable on the earlier of the following ("Maturity"): (i) March 31, 2021, or (ii) acceleration upon an Event of Default.

All payments on this Note shall be applied first to the payment of any costs, fees or other charges incurred in connection with the Principal indebtedness evidenced hereby, next to the payment of accrued interest, if any, and then to the reduction of the Principal balance, or in such other manner and order as Payee, in its sole discretion, may elect.

This Note is a single advance note. Maker shall have the option to prepay this Note, in full or in part, at any time without penalty. Unless Payee, in its sole discretion, elects another manner of application, any partial prepayments (i) shall be applied to the amounts owing on this Note in inverse order of maturity, and (ii) shall not give rise to any adjustment in the amount of, or any delay in the timing for payment of, the required monthly and quarterly payments under this Note. If Maker prepays in full all sums evidenced by this Note, other than the amount owing pursuant to any Additional Note (as defined in the Earn-Out Agreement), then Maker's obligation to pay the Additional Note in full shall thereafter be evidenced by the Additional Note, and Maker shall have no further payment obligations pursuant to paragraphs B through E above in this Note.

This Note is evidenced by, among other things, that Loan Agreement of even date herewith between Maker and Lender (the "Loan Agreement"), and is secured by, among other

2

things, a Security Agreement of even date herewith between Maker, as debtor, and Lender, as secured party. This Note and the Loan Agreement evidence the financing of the purchase price and certain other obligations arising in connection with the closing of the transactions contemplated in that Purchase and Sale Agreement of on or about even date herewith between Maker, as buyer, and Payee, as seller (the "PSA"). The PSA, together with the Backpage License (as defined therein) and all other documents executed in connection with either the PSA or the Backpage License are referred to herein as the "PSA Documents"). Capitalized terms used, but not defined, herein shall have the meanings given to those terms in the Loan Agreement.

Time is of the essence of this Note. Upon the failure by Maker to pay any amount when due hereunder, or upon any Event of Default, as defined in the Loan Agreement, (i) the rate of interest hereunder shall increase to twelve percent (12%) per annum (the "Default Rate") until paid in full or until such Event of Default, if capable of being cured, is fully cured by Maker, and (ii) Payee may exercise any rights and remedies in such order and manner as Payee, in its sole discretion, shall determine. Maker shall pay all costs and expenses, including reasonable attorneys' fees and court costs, incurred in the collection or enforcement of all or any part of this Note. Failure of Payee to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of the continuance of any existing default after demand for strict performance hereof.

Each party that is a Maker hereunder: (a) agrees to be jointly and severally bound, (b) waives demand, diligence, presentment for payment, protest and demand, and notice of extension, dishonor, protest, demand and nonpayment of this Note, (c) consents that Payee may extend the time of payment or otherwise modify the terms of payment of any part or the whole of the debt evidenced by this Note, at the request of any other person primarily liable hereon, and such consent shall not alter nor diminish the liability of any person, and (d) agree that Payee may setoff at any time any sums or property owed to any of them by Payee.

This Note shall be binding upon Maker and its successors and assigns and shall inure to the benefit of Payee and its successors and assigns.

This Note is subject to the express condition that at no time shall Maker be obligated, or required, to pay interest on the Principal balance at a rate which could subject Payee to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Payee is permitted to charge. If, by the terms of this Note, Maker is, at any time, required or obligated to pay interest on the Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance. Subject to the foregoing provisions in this paragraph, Maker agrees to an effective rate of interest that is the rate stated herein plus any additional rate of interest resulting from any other charges in the nature of interest paid or to be paid by or on behalf of Maker, or any benefit received or to be received by Payee, in connection with this Note.

QB\156257.00002\34539559.5

This Note shall be governed by the applicable law provided for in the Loan Agreement. Maker agrees that the sole and exclusive venue for any action or claim arising out of, or any dispute in connection with, this Note, or the performance or enforcement hereof, also shall be governed by the forum selection and consent to jurisdiction provisions set forth in the Loan Agreement.  Maker hereby consents to such jurisdiction and venue, and hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

TO THE EXTENT PERMITTED BY APPLICABLE LAW, MAKER WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS NOTE, OR THE PERFORMANCE OR ENFORCEMENT HEREOF.  Except as prohibited by law, Maker waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.  Maker (i) certifies that neither Payee nor any representative, agent or attorney of Payee has represented, expressly or otherwise, that Payee would not, in the event of litigation, seek to enforce the foregoing waivers or other waivers contained in this Note or in the Security Agreement, and (ii) acknowledges that, in accepting this Note, Payee is relying upon, among other things, the waivers and certifications contained in this paragraph.

[Signature appears on following page.]

DATED as of the date first written above.

**UGC TECH GROUP C.V.**, a Dutch limited partnership

By:   CF Holdings GP LLC, its sole general partner

By:_____
Name:  Carl A. Ferrer
Title   Chief Executive Officer

[Signature Page – Promissory Note (UGC Foreign Operations)]

## SCHEDULE A

### Wire Instructions

BMO Harris Bank N.A.
Chicago, IL
ABA #071000288
Account Name:  Camarillo Holdings, LLC
A/C #4377172
8776 East Shea Blvd., #106-617
Scottsdale, AZ  85260

## SCHEDULE 1

### Principal Payment Reductions

| Period | Amount of Required Principal Payment |
|---|---|
| Period Ending May 31, 2015 | $500,000 |
| Period Ending June 30, 2015 | $450,000 |
| Period Ending September 30, 2015 | $450,000 |
| Period Ending December 31, 2015 | $475,000 |
| Period Ending March 31, 2016 | $525,000 |
| Period Ending June 30, 2016 | $625,000 |
| Period Ending September 30, 2016 | $650,000 |
| Period Ending December 31, 2016 | $700,000 |
| Period Ending March 31, 2017 | $775,000 |
| Period Ending June 30, 2017 | $825,000 |
| Period Ending September 30, 2017 | $850,000 |
| Period Ending December 31, 2017 | $950,000 |
| Period Ending March 31, 2018 | $1,000,000 |
| Period Ending June 30, 2018 | $1,075,000 |
| Period Ending September 30, 2018 | $1,125,000 |
| Period Ending December 31, 2018 | $1,300,000 |
| Period Ending March 31, 2019 | $1,300,000 |
| Period Ending June 30, 2019 | $1,350,000 |

| | |
|---|---|
| Period Ending<br>September 30, 2019 | $1,425,000 |
| Period Ending<br>December 31, 2019 | $1,625,000 |
| Period Ending<br>March 31, 2020 | $1,650,000 |
| Period Ending<br>June 30, 2020 | $1,725,000 |
| Period Ending<br>September 30, 2020 | $1,825,000 |
| Period Ending<br>December 31, 2020 | $2,000,000 |
| Period Ending<br>February 28, 2021 | $2,000,000 |
| Period Ending<br>March 31, 2021 | Note Balance<br>Due in Full |

## Schedule 1.7(a)

Consents and Approvals

None.