Exhibit N

Case 2:18-mj-00722-DJH Document 1366-16 Filed 10/26/21 Page 2 of 120
Case 2:18-mj-00722-DUTY *SEALED* Document 4 *SEALED* Filed 03/28/18 Page 1 of 2
Page ID #:172

# United States District Court

**CENTRAL** **DISTRICT OF** **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Any and all funds held in Republic Bank of
Arizona Accounts: #11101889, #11402592;
#11101938; #11002912 and #11402500

**AMENDED SEIZURE WARRANT**

**CASE NUMBER:**  2:18-MJ-00722

TO:  United States Postal Service  (USPIS)  and any Authorized Officer of the United States, Affidavit(s) having been made before me by POSTAL INSPECTOR LYNDON A. VERSOZA  who has reason to believe that in the District of Arizona there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

Any and all funds held in Republic Bank of Arizona Accounts: #11101889, #11402592; #11101938; #11002912 and #11402500

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under  18 U.S.C. § 981 (a)(1)(A) and (C)

**concerning a violation of Title**  18   **United States Code, Sections**  1952, 1956, and 1957.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

   Republic Bank of Arizona   is ordered to deliver said funds immediately and forthwith upon presentation of this warrant to the law enforcement agent serving the warrant, in the form of a cashier's check made payable to the United States Marshals Service.

YOU ARE HEREBY COMMANDED to seize within 14 days the property specified, serving this warrant and making the seizure in the daytime - 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to the undersigned judicial officer as required by law.

**3/28/18  6:30 p.m.**
_____
**Date and Time Issued**

Los Angeles, California
_____
**City** and State

_Patrick J. Walsh_

**Hon. PATRICK J. WALSH, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

**JOHN J. KUCERA/smb**

| RETURN | | |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PROPERTY SEIZED PURSUANT TO THE WARRANT

## CERTIFICATION

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and will be returned through a filing with the Clerk's Office.*

*Date*: _____

_____
*Executing Officer's Signature*

_____
*Printed Name and Title*

# United States District Court

ORIGINAL

_____ CENTRAL _____ DISTRICT OF _____ CALIFORNIA _____

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Any and all funds held in Republic Bank of Arizona Accounts: #11101889, #11402592; #11101938; #11002912 and #11402500

**AMENDED APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT**

**CASE NUMBER:** 2:18-MJ-00722

I, **LYNDON A. VERSOZA**, being duly sworn, depose and say:

I am a United States Postal Inspector with the United States Postal Inspection Service, and I have reason to believe that in the District of _____ ARIZONA _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

Any and all funds held in Republic Bank of Arizona Accounts: #11101889, #11402592; #11101938; #11002912 and #11402500

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981 (a)(1)(A) and (C)

concerning a violations of Title  18  United States Code, Sections 1952(a)(3)(A) and (b), 1956 and 1957.

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

Continued on the attached sheet and made a part hereof.     X  Yes __ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

_3/28/18_____
Date

_____
City and State

**Hon. PATRICK J. WALSH, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

_Patrick J. Walsh_____
Signature of Judicial Officer

John Kucera:smb

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state
as follows:

### I.   TRAINING AND EXPERIENCE

1.    I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005.  Currently, I am responsible for investigating
criminal violations of money laundering and structuring laws,
such as when United States Postal Service ("USPS") Money Orders
or the United States Mail are used as a means to launder or
structure funds.  During my career as a Postal Inspector, I have
participated in or investigated financial violations including
money laundering, darknet investigations, digital currency
investigations, structuring, bank, wire and mail fraud, and
identity theft.  In addition, I have received both formal and
informal training from USPIS and other agencies regarding money
laundering and financial crimes.  For approximately five years
prior to investigating money laundering, I was assigned to
investigate child exploitation and sex trafficking.  In that
assignment, I worked both independently and in a task force
where I led and participated in investigations related to crimes
involving the exploitation of children and sex trafficking.

2.    Prior to my service as a U.S. Postal Inspector, I attended the University of Southern California in Los Angeles, where, in 2001, I received a bachelor's degree.  While in college, I was the website administrator for a non-profit media company in Los Angeles where, among other things, I learned about domain names, domain name servers, and remote hosting. Following college, from 2002 to 2005, I served as a law enforcement officer with the U.S. Immigration and Naturalization Service, which later became U.S. Customs and Border Protection. There, among other things, I worked on cases involving human smuggling and international sex trafficking.

3.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

## II.   <u>SUMMARY AND PURPOSE OF AFFIDAVIT</u>

4.    This affidavit is made in support of applications for warrants to seize all funds held in certain SUBJECT ACCOUNTS and certain SUBJECT DOMAINS, all owned or controlled by "Backpage.com" (referred to herein as "Backpage"), associated entities, and the owners and operators of each.

### A.  <u>Background</u>

5.    This case is being investigated by the USPIS, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service-Criminal Investigation ("IRS-CI"), with assistance from the Los Angeles Joint Regional Intelligence Center.

6.    The focus of the investigation has been on violations by Backpage, its associated entities, and the owners and operators of each of Title 18, United States Code, Sections 1952(a)(3)(A) and (b)(i)(1) (Interstate and Foreign Travel in Aid of Racketeering Enterprise); and Title 18 U.S.C. §§ 1956 and 1957, (Money Laundering).

7.    From speaking with other agents in this investigation, and reviewing emails, internal documents, and other records related to this investigation, I know the following:

    a.   Backpage.com, LLC, incorporated in Delaware in 2004, is an internet-based company that allows customers to post on-line classified advertisements. These advertisements include sections dedicated to a variety of matters, including adult,

- 3 -

automotive, community, dating, jobs, local places, musicians,
rentals and services.  Backpage receives between 75 million to
100 million unique internet visitors per month.

      b.    Backpage realizes profits in the tens of millions
of dollars per year from adult advertisement.  Historically,
adult ads, where Backpage advertisers post sex trafficking ads,
constitute less than ten percent of all advertisements posted on
the website.  However, the adult ads generate over 90 percent of
Backpage's revenue.  In short, Backpage derives almost all its
revenue and profits from adult service ads, including
advertising for sex trafficking.[1]

      c.    In or about 2004, operators Michael Lacey
("Lacey"), James Larkin ("Larkin"), and Carl Ferrer ("Ferrer")
created Backpage.  There were also two minority owners; John
Brunst ("Brunst"), who owned 5.67 percent; and Scott Spear

---

[1] According to Backpage accounting records, for the period May 1
to May 31, 2014, over 90% of Backpage's revenues derived from
what they characterized as "adult entertainment."  Backpage's
internal documents suggest that this 90% figure has been
consistent since its 2004 inception.
  For example, between October 6, 2014, and May 31, 2015,
Backpage grossed almost $105 million from advertising "adult
entertainment."  During this same period, Backpage grossed only
$1.6 million from all other advertisements combined.  Assuming
that Backpage has accurately estimated that 90% of its revenues
are generated from "adult" and "escort" ads, Backpage has
generated as much as $500 million in prostitution-related
revenue since 2004.

("Spear"), who owned 4.09 percent.  From 2004 until 2015, Lacey and Larkin oversaw the website's policies and strategic direction.  In 2015, Lacy and Larkin purportedly sold all or substantially all of their interests in Backpage to Ferrer.[2] However Lacey and Larkin retained significant control over the website, and both Lacey and Larkin continue to receive tens of millions of dollars of annual distributions of Backpage revenue.

d.    While not an original owner, Ferrer was one of the original officers of Backpage, having initially served as Backpage's vice-president, and later as CEO.  Ferrer is also the CEO of several Backpage related entities in the Netherlands, including "Website Technologies," "Amstel River Holdings," and "Ad Tech BV."

e.    Michael Thomas Gage ("Gage") has no formal position at Backpage, but is the President, Chief Executive Officer, Treasurer, and Secretary of another Backpage controlled entity, "Posting Solutions," a wholly owned subsidiary of Backpage that receives payments from Backpage advertisers. According to his social media profile, Gage is also the Chief

---

[2] From my review of financial records related to Ferrer's 2015 agreement to purchase Backpage, it appears that, through a series of loans from other Backpage Operators to be repaid by Ferrer, Ferrer agreed to purchase Backpage for approximately $400 million.

- 5 -

Financial Officer of Website Technologies.  Based on emails he has sent and wire transfer information, Gage appears to control much of the international and domestic financial transactions of Backpage and its related entities.

      f.    Daniel Hyer ("Hyer") at one time was the Sales and Marketing Director of Backpage.  He remains an account signatory for Backpage controlled entities, including Website Technologies.

    8.    Throughout this affidavit, the individuals identified in paragraphs 7(c) through (f), along with others not named in this affidavit, are collectively referred to as the "Backpage Operators."

    9.    Based on a review of publicly available materials obtained in the course of the investigation, and my review of the Backpage website, I have learned the following:

      a.    The majority of the paid advertisements on the Backpage website relate to prostitution activities in violation of 18 U.S.C. §§ 1591 and 1252.

      b.    As further described below, Backpage itself, as well as its operators, who are in control of the SUBJECT ACCOUNTS and SUBJECT DOMAINS (as those terms are defined below), is in the business of promoting the trafficking of children and adults for sex.  Sex trafficking of adults is a violation of 18 U.S.C. § 1952, and sex trafficking of children is a violation of

18 U.S.C. 1591, each of which statutes is a Specified Unlawful activity ("SUA") within the meaning of federal law. (*see* 18 U.S.C. § 1956(c)(7)(vii)).

c. The SUBJECT ACCOUNTS (all of which are located in the United States) have received wire transfers from places outside of the United States or have received funds traceable to wire transfers from places outside of the United States, which funds Backpage would then use to promote sex trafficking, in violation of 18 U.S.C. § 1956(a)(2)(A) (International Money Laundering). Some of the SUBJECT ACCOUNTS have received transfers or deposits in excess of $10,000 traceable to the SUA, in violation of 18 U.S.C. § 1957 (Money Laundering Spending Statute).

d. The SUBJECT DOMAINS are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation of internet domain names for Backpage. A domain registrar serves to ensure that a registered domain name, like each of the SUBJECT DOMAINS, is not double sold. Additionally, a domain registration will allow the owner of the domain to direct internet traffic to a company's webserver. The SUBJECT DOMAINS have been acquired and maintained with funds traceable to the money laundering scheme described herein, specifically with funds from SUBJECT ACCOUNT 1, and the SUBJECT DOMAINS are the mechanism Backpage uses to promote the

- 7 -

prostitution and sex trafficking activity described below.

10.  From my review of publically available materials and bank statements obtained in the course of this investigation, I have learned the following:

a.  Verizon Digital Media Services in Los Angeles, California ("Verizon") provides various media solutions for internet related activities, including web acceleration, commerce acceleration, cloud security and video streaming.  Based on my training and experience, I know that these type of services would be necessary for a high-volume website like Backpage to operate efficiently and handle internet traffic without delay for the end user.

b.  Beginning when the account was opened in February 2017, and continuing until at least December 2017, SUBJECT ACCOUNT 1 has directed $570,530 dollars to Verizon to pay for Backpage related expenses.

B.  SUBJECT ACCOUNTS

11.  This affidavit is offered in support of applications for warrants to seize all funds held in the following U.S. bank accounts (hereinafter referred to collectively as the "SUBJECT ACCOUNTS"):

a.  SUBJECT ACCOUNT 1: Prosperity Bank account number 216887188, is a business bank account held in the name of "Posting Solutions LLC."  Gage is identified in the records of

- 8 -

Case 2:18-cr-00422-SBL Document 1366-16 Filed 10/26/21 Page 13 of 120
Case 2:18-cr-00422-DJH *SEALED* Document 24-1 *SEALED* Filed 03/28/19 Page 10 of
117 Page ID #:183

the account as the President, Chief Executive Officer, Treasurer, and Secretary of Posting Solutions LLC, and is the sole signatory on SUBJECT ACCOUNT 1.  As further described below, SUBJECT ACCOUNT 1 is one of Backpage's main operating accounts, used to receive funds from customers paying for Backpage advertising, including advertising to promote sex trafficking.

   b.   SUBJECT ACCOUNT 2A: Compass Bank Account number 6738453873 is a business bank account held in the name of "Cereus Properties LLC."  Spear is the sole signatory on the account.

   c.   SUBJECT ACCOUNT 2B: Compass Bank Account number 6745023825 is held in the name of Brunst.

   d.   SUBJECT ACCOUNT 3A: National Bank of Arizona Account number 45000178 is a checking account held in the name of Spear.

   e.   SUBJECT ACCOUNT 3B: National Bank of Arizona Account number 45000151 is a checking account held in the name of Spear.

   f.   SUBJECT ACCOUNT 3C: National Bank of Arizona Account number 46003645 is a checking account held in the name of Spear.

   g.   SUBJECT ACCOUNT 4: Live Oak Bank Account Number 75600050642523 is a checking account held in the name of Spear.

- 9 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 14 of 120
Case 2:18-ap-00422-DD-1 SEALED Document 49 SEALED Filed 08/28/19 Page 11 of 7
117 Page ID #5184

      h.    SUBJECT ACCOUNT 5A: Ascensus Broker Dealer Services Account Number 367726943-01 is an account held in the name of Natasha Spear, Spear's adult daughter.

      i.    SUBJECT ACCOUNT 5B: Ascensus Broker Dealer Services account Number 549755280-01 is an account held in the name of Natasha Spear.

      j.    SUBJECT ACCOUNT 6: First Federal Savings & Loan of San Rafael account number 51103620 is an account held in the name of Lacey.

      k.    SUBJECT ACCOUNT 7A: Republic Bank of Arizona account number 11101889 is an account held in the name of Larkin.

      l.    SUBJECT ACCOUNT 7B: Republic Bank of Arizona account number 11402592 is an account held in the name of Larkin.

      m.    SUBJECT ACCOUNT 7C: Republic Bank of Arizona account number 11002912 is an account held in the name of Ferrer.

      n.    SUBJECT ACCOUNT 7D: Republic Bank of Arizona account number 11402500 is an account held in the name of Ferrer.

      o.    SUBJECT ACCOUNT 7E: Republic Bank of Arizona account number 11101938 is an account held in the name of Larkin.

- 10 -

p.   SUBJECT ACCOUNT 8A: Bank of America Account number 0000483072278225 is a checking account held in the name of Troy Larkin, James Larkin's adult son.

q.   SUBJECT ACCOUNT 8B: Bank of America Account number 0000005091387054 is an account held in the name of Ramon Larkin, James Larkin's adult son.

r.   SUBJECT ACCOUNT 8C: Bank of America Account number 0000001294879342 is a checking account held in the name of Hyer.

s.   SUBJECT ACCOUNT 8D: Bank of America Account number 0000488039130071 is a savings account held in the name of Hyer.

t.   SUBJECT ACCOUNT 9: San Francisco Fire Credit Union Account Number 75600050642523 is held in the name of Lacey.

u.   SUBJECT ACCOUNT 10: Ally Bank Account Number 2153056292 is an account held in the name of Spear.

v.   SUBJECT ACCOUNT 11: Branch Banking and Trust Bank account number 1440001710218 is an account held in the name of Gage.

w.   SUBJECT ACCOUNT 12A: Green Bank Account number 3094832 is an account held in the name of Ferrer.

x.   SUBJECT ACCOUNT 12B: Green Bank Account number 5501194293 is an account held in the name of Ferrer.

- 11 -

Case 2:18-cr-00422-DJH Document 1366-16 Filed 10/26/21 Page 16 of 120
Case 2:18-mj-04222-DUTY *SEALED* Document 1-9 *SEALED* Filed 03/28/19 Page 13 of
117 Page ID #:186

      y.   SUBJECT ACCOUNT 13: Plains Capital Bank account number 5501801098 is an Interest on Lawyers Trust Account ("IOLTA") held in the name of Phillip Linder, identifying April Ferrer (who is or was Carl Ferrer's spouse) as the sole beneficiary.

    C. <u>SUBJECT DOMAINS</u>

   12.  This affidavit also supports an application for a warrant to seize the following domain names managed by "Ascio Technologies," incorporated in Delaware, the domain registrar for the SUBJECT DOMAINS, (hereinafter, collectively referred to as "SUBJECT DOMAINS"):

      a.   atlantabackpage.com

      b.   backpage.be

      c.   backpage.com

      d.   backpage.com.br

      e.   backpage.cz

      f.   backpage.dk

      g.   backpage.ee

      h.   backpage.es

      i.   backpage.fi

      j.   backpage.fr

      k.   backpage.gr

      l.   backpage.hu

      m.   backpage.ie

- 12 -

Case 2:18-cr-00422-SMB Document 1366-16 Filed 10/26/21 Page 17 of 120
Case 2:18-mj-08221-DUTY *SEALED* Document 1-1 *SEALED* Filed 03/28/18 Page 14 of
117 Page ID #:187

n.   backpage.it

o.   backpage.lt

p.   backpage.mx

q.   backpage.net

r.   backpage.no

s.   backpage.pl

t.   backpage.pt

u.   backpage.ro

v.   backpage.si

w.   backpage.sk

x.   backpage.us

y.   backpage-insider.com

z.   bestofbackpage.com

aa.  bestofbigcity.com

bb.  bigcity.com

cc.  chicagobackpage.com

dd.  denverbackpage.com

ee.  newyorkbackpage.com

ff.  phoenixbackpage.com

gg.  sandiegobackpage.com

hh.  seattlebackpage.com

ii.  tampabackpage.com

## III.  **APPLICABLE LAW**

13.  There is probable cause to believe that the SUBJECT

- 13 -

Case 2:18-cr-00422-SVL Document 1366-16 Filed 10/26/21 Page 18 of 120
Case 2:18-mj-00422-DUTY *SEALED* Document 1-9 *SEALED* Filed 08/28/19 Page 15 of
117 Page ID #:188

ACCOUNTS and SUBJECT DOMAINS are subject to seizure and forfeiture by the United States under the following provisions:

a.    18 U.S.C. § 981(a)(1)(A), because those SUBJECT ACCOUNTS and SUBJECT DOMAINS are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds).  Pursuant to 18 U.S.C. § 981(a)(1)(A), any property involved in a transaction, or attempted transaction, in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to forfeiture to the United States; and

b.    18 U.S.C. § 981(a)(1)(C), because those SUBJECT ACCOUNTS and SUBJECT DOMAINS constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.

14.  Title 18 U.S.C. § 1956 prohibits, among other things, financial transactions involving the proceeds of SUAs -- committed or attempted (1) with the intent to promote further predicate offenses; (2) with the intent to evade taxation; (3) knowing the transaction is designed to conceal the source, location, ownership or control of the proceeds; or (4) knowing the transaction is designed to avoid anti-laundering financial

- 14 -

Case 2:18-cr-00422-DJH   Document 1366-16   Filed 10/26/21   Page 19 of 120
Case 2:18-cr-00422-SPL   Document 249   *SEALED*   Filed 08/28/19   Page 16 of
117   Page ID #:189

reporting requirements.  18 U.S.C. § 1956(h) prohibits two or
more parties agreeing to accomplish the unlawful purpose of
money laundering.

15.  Title 18 U.S.C. § 1957 prohibits a party from
knowingly engaging in a monetary transaction in excess of
$10,000 with property that is criminally derived from some SUA.

16.  Title 18 U.S.C. § 1956(a)(2) (International Money
Laundering for Promotion) makes it a crime to transport,
transmit, or transfer, or attempt to transport, transmit, or
transfer, monetary instruments or funds (including funds that
are not criminal proceeds) from the United States to or through
a place outside the United States, or to the United States from
or through a place outside the United States, with the intent to
promote some SUA, as that term is defined in 18 U.S.C. §
1956(c)(7).

17.  The "Travel Act," 18 U.S.C. § 1952(a), an SUA,
prohibits, in part, the use of the mail or any facility in
interstate or foreign commerce with the intent to otherwise
promote, manage, establish, carry on, or facilitate the
promotion, management, establishment, or carrying on of any
unlawful activity, by any person who thereafter performs or
attempts to perform an act to promote, manage, establish, carry
on, or facilitate the promotion, management, establishment and
carrying on of such unlawful activity.  "Unlawful Activity," as

- 15 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 20 of 120
Case 2:18-cr-00422-DJH *SEALED* Document 49 *SEALED* Filed 08/28/19 Page 17 of
117 Page ID #:190

defined in 18 U.S.C. § 1952(b), includes prostitution offenses
in violation of the laws of the state in which such acts are
committed or in violation of the laws of the United States.
Prostitution is illegal in the State of California. (*See, e.g.*,
Cal. Penal Code § 647(b).)

18. Sex trafficking of juveniles or any person by means of
force, fraud or coercion, is a violation of 18 U.S.C. § 1591, an
SUA.

**IV.** **DIGITAL CURRENCY/BITCOIN**

19. Digital currency (also known as crypto-currency) is
generally defined as an electronic-sourced unit of value that
can be used as a substitute for fiat currency (*i.e.*, currency
created and regulated by a sovereign government). It exists
entirely on the Internet and is not stored in any physical form.
It is not issued by any government, bank, or company, but is
instead generated and controlled through computer software
operating on a decentralized peer-to-peer network. Digital
currency is not illegal in the United States and may be used for
legitimate financial transactions. However, it is often used to
conduct illegal transactions, such as the sale of controlled
substance, or as in this investigation, to purchase ads to
promote prostitution.

20. Bitcoin is a type of digital currency accepted by
Backpage. Bitcoin payments are recorded on a public ledger that

- 16 -

Case 2:18-cr-00422-SBL  Document 1366-16  Filed 10/26/21  Page 21 of 120  Page 18 of
Case 2:18-mj-00422-SBL  SEALED  Document 4-1  SEALED  Filed 03/28/19  Page 18 of
117  Page ID #:291

is maintained by peer-to-peer verification, and is thus not
maintained by a single administrator or entity.  Individuals can
acquire Bitcoins either by "mining" them or purchasing Bitcoins
from other individuals.  An individual can "mine" Bitcoins by
allowing his/her computing power to verify and record the
Bitcoin payments into a public ledger.  Individuals are rewarded
for this by being given newly created Bitcoins.  Bitcoins can be
bought and sold in fractions.

21.  Backpage also accepts other digital currencies,
including Litecoin, Bitcoin Cash, and Ether.  Sometimes called
"alt-coins," because they are alternatives to Bitcoins, these
digital currencies were created after Bitcoin to address
perceived weaknesses or problems with Bitcoin technology.  Based
on my review of Backpage transactions, the majority of
Backpage's digital currency transactions are in Bitcoin.

22.  An individual can send and receive Bitcoins through
peer-to-peer digital transactions or by using a third-party
broker.  Such transactions can be done on any type of computer,
including laptop computers and smart phones.

23.  Digital currency is generally stored in digital
"wallets," which essentially store the access codes that allows
individuals to conduct digital currency transactions on the
public ledger.  To access digital currency on the public ledger,
an individual must use a public address (or "public key") and a

- 17 -

private address (or "private key").  The public address can be analogized to a bank account number, while the private key is like a password used to access an online account.

24.  Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not.  If, however, an individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. For these reasons, digital currency transactions are described as "pseudonymous," meaning they are partially anonymous.

## V. STATEMENT OF PROBABLE CAUSE

### A. Buying a Backpage Ad

25.  In February 2018, I visited Backpage.com and, posing as an advertising purchaser, engaged in the regular process of posting an ad in the Backpage "Dating" section, which is one of the places on Backpage.com where prostitution ads are commonly found.  Through this process, I learned the following:

a.   A person looking to post an advertisement on Backpage (an "advertiser") must first create an account.  Once an account is created, the advertiser clicks on a link called "Post an ad," which will then toggle certain categories regarding where the ad should be posted (e.g., "Los Angeles," "Riverside," etc.) and under what category the ad should appear

- 18 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 23 of 120
Case 2:18-mj-00422-DUTY *SEALED* Document 1-9 *SEALED* Filed 03/28/19 Page 20 of
117 Page ID #:493

(*e.g.*, "Dating," "Adult," etc.).  The advertiser also has the
option to post pictures and videos.  In the adult sections,
opting to post in more than one geographical area, or opting to
post more frequently occurring ads will increase the
advertisement price.  Currently, Backpage.com charges $5 per ad
posted in the adult sections.  In some of the non-adult and non-
dating sections I checked, there was no charge at all to post an
ad.

      b.   Once an advertiser selects the desired options,
he or she is required to enter a phone number, a link to a
social media page (such as Facebook), and an email address.  The
Backpage website claims to verify the advertiser's phone number
before he or she can continue on to actually purchasing an ad.

      c.   In order to pay for Backpage ads, an advertiser
must first buy "credits."  Backpage offers several ways for an
advertiser to acquire credits:

      i.   A Backpage advertiser may mail gift cards,
checks, and money orders to "Posting Solutions" at a P.O. Box in
Dallas, Texas (as further described below, this P.O. Box is
associated with Posting Solutions and SUBJECT ACCOUNT 1).[3]

---

[3] I have reviewed the cash purchase of USPS money orders
subsequently directed to this P.O. Box.  Between September 2014
and June 2016, several millions of dollars in money orders were

ii.     Backpage directly accepts credit card payment through a third-party credit card payment processor.

iii.     Backpage also accepts several types of digital currency (specifically, Backpage accepts Bitcoin, Bitcoin Cash, Litecoin, and Ethereum).  If the advertiser selects this option, Backpage provides a digital currency wallet address where the advertiser can send the electronic transfer of the digital currency.

iv.     Backpage also accepts cash, but only through third party payment processors.  Based on information gathered during this investigation, I believe that once the third-party payment processor receives cash, it converts the cash into digital currency and then electronically transfers that digital currency to a Backpage digital currency wallet.

26.  Digital Currency is processed through the subject accounts in the following way:

a.   When Backpage receives digital currency, it will aggregate the digital currency and then transfer it to a third-

---

purchased in what appears to have been structured transactions (*i.e.*, transactions carried out in a manner intended to avoid certain reporting requirements that USPS maintains for money order purchases greater than $3000).  Based on my review, hundreds of these money orders include email addresses with words consistent with prostitution, such as "sex" or "sexy."

Case 2:18-cr-00422-SMB Document 1366-16 Filed 10/26/21 Page 25 of 120
Case 2:18-mj-04229-DUTY *SEALED* Document 4-1 *SEALED* Filed 03/28/19 Page 22 of
117 Page ID #:195

party exchanger like GoCoin.[4]

     b.   In exchange for the digital currency, the exchanger transfers U.S. dollars from its foreign bank accounts into Backpage operating accounts, such as SUBJECT ACCOUNT 1. The exchanger, if it so elects, may then sell its Bitcoin on various Bitcoin markets.

    27.  I reviewed records obtained from GoCoin. From this review, I estimate that between 5 to 10 percent of the ads posted on Backpage.com are ads within the Central District of California (including Los Angeles and Orange Counties). For example, between January 10 and February 3, 2016, approximately 500,000 ads were posted on Backpage.com and paid for with Bitcoin, for which Backpage received over $3,840,000 in revenue. Of these approximately 500,000 ads, approximately 28,400 were posted only in LosAngeles.Backpage.com, Ventura.Backpage.com, SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and SanGabrielValley.Backpage.com. These specific ads generated approximately $184,479 in revenue.

---

  [4] GoCoin is a digital currency exchanger that converts Bitcoin, Litecoin and another digital currency into fiat currency, like the U.S. Dollar or the Euro. GoCoin is owned by Manx Broadcasting Corporation, based in the Isle of Man. GoCoin has offices in Singapore and Santa Monica, California and appears to hold bank accounts in several countries outside the United States.

Case 2:18-cr-00422-SPL   Document 1366-16   Filed 10/26/21   Page 26 of 120
Case 2:18-mj-04222-DUTY *SEALED*   Document 4 *SEALED*   Filed 03/28/18   Page 23 of
117   Page ID #:196

B. <u>Backpage Promotion of Prostitution and Sex Trafficking</u>

28.   I have reviewed several Backpage ads that were used to sell minors for sex and forcibly traffic adult women for sex.   I have also reviewed the criminal records of certain of the pimps and sex traffickers, most of whom were convicted after having used Backpage to advertise their victims.   From this review, I learned the following:

a.   Between 2014 and 2015, a pimp sold S.F., a minor girl, for sex.   The pimp advertised S.F. on Backpage's "Escort" section in the Los Angeles area of California and in Arizona.   The ad contained phrases such as "New In Town" and "Sexy Dark Asain Bombshell with a Nice & Tight {Booty}."   The ad selling S.F. on Backpage included multiple pictures showing her legs, stomach, shoulders and buttocks.   Later, the pimp was arrested and convicted on state sex trafficking charges, and sentenced to 196 years imprisonment.

b.   Between 2014 and 2015, the same pimp sold A.C., a minor girl, for sex.   In November 2014, at the age of 17, A.C. was first sold for sex through a Backpage ad using phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire."   The Backpage ad selling A.C. included pictures of her showing her legs, stomach, shoulder, and buttocks, and posed her in sexually provocative positions.

c.   Between November 2015 and December 2015, in a

- 22 -

different incident, a pimp drove two women and four minor girls
(T.S., S.L., K.O., and R.W.) from Columbus, Ohio to a hotel in St.
Charles, Missouri. The next day, the pimp told the girls to post
ads on Backpage.com. Some of the girls took calls and engaged in
paid sex acts with Backpage customers who responded to the ads.
The ads the girls posted included pictures of themsitting on the
bed showing their buttocks. Another image I saw was of a naked
girl's body pressed against a mirror. Other pictures appeared
more mundane, such as images of girls posing clothed in front of a
mirror. However, these ads used phrases like "I'm sweet as a
treat maybe even sweeter" and "not a lot need to be said. my pic
are 100% real." In 2017, this pimp was convicted on sex
trafficking charges and a federal court sentenced him to 300
months in prison.

     d.   In or around 2010, in Washington, J.S., a minor
girl, was sold for sex through the use of Backpage ads. J.S.'s
pimp drafted the ads that were placed a Backpage that contained
words and phrases such as, "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and
"IT WONT TAKE LONG AT ALL." The ads also included pictures of
J.S. in provocative positions showing her breasts and buttocks.
On March 29, 2011, the pimp who sold J.S. for sex was sentenced to
over 26 years imprisonment on charges related to sex trafficking.

     e.   Between in or around 2011 and 2016, a female
victim, D.O., who was between the ages of 14 and 19 during those

- 23 -

years, was sold for sex through Backpage ads.  D.O.'s female pimp
instructed D.O. that Backpage was the safest place to advertise
because Backpage did not require age verification.  D.O.'s
Backpage ads included words and phrases that were indicative of
prostitution, such as "roses" (money) and "back door" (anal sex).
Some of the customers who responded to D.O.'s Backpage ads forced
D.O. to perform sexual acts at gunpoint, choked her to the point
of having seizures, and gang-raped her.[5]

    29.  I have reviewed documents and reports from multiple
state and government agencies and authorities regarding Backpage's
promotion of sex trafficking and prostitution.  From these
reports, and from my review of internal Backpage correspondence
following Backpage management receiving these reports, I am aware

---

[5] Using these examples, I also reviewed financial transactions
for some of these ads.  Using email addresses and other
identifiers associated with the Backpage ads, I reviewed GoCoin
records for some of these transactions.  From these records, I
found bitcoin payments associated with the email addresses used
to post the ads, which transactions were processed by GoCoin.
For example, in the case involving victims S.F. and A.C.
(described in paragraphs 28(a) and (b)) prosecuted in Arizona,
the bitcoin payments for these ads were made in November and
October 2015.   In the case involving T.S., S.L., K.O., and R.W.
(described in paragraph 28(c)) prosecuted in Missouri, the
bitcoin payments were made in October and November 2015.  As
described in paragraph 48 of this affidavit, between December
2015 and June 2016, over 130 wires from Slovakia from GoCoin,
totaling over $16.8 million was sent to a Website Technologies
account at Branch Bank & Trust Company account number
1440001712008.  Between December 2015 and October 2016, 32 wires
totaling $48 million were sent from the BBT Account to a Cereus
Properties Account 9361116211 at Arizona Bank and Trust, which
made its way into SUBJECT ACCOUNTS 3A, 3B, and 3C.

Case 2:18-cr-00422-SMB Document 1366-16 Filed 10/26/21 Page 29 of 120
Case 2:18-cr-00422-DLR *SEALED* Document 24 *SEALED* Filed 08/28/19 Page 26 of
117 Page ID #:199

that all levels of Backpage management are aware of Backpage's
role in promoting criminal activity.  For example:

> a.  On September 21, 2010, a group of state attorneys
general wrote a letter to Backpage observing that "ads for
prostitution—including ads trafficking children—are rampant on the
site," and arguing that "[b]ecause Backpage cannot, or will not,
adequately screen these ads, it should stop accepting them
altogether."  The state AGs acknowledged that this step would
cause Backpage to, "lose the considerable revenue generated by the
adult services ads," but stated that "no amount of money can
justify the scourge of illegal prostitution, and the misery of the
women and children who will continue to be victimized in the
marketplace provided by backpage."

> b.  Following this letter, on September 25, 2010,
Ferrer wrote an email explaining that Backpage was unwilling to
delete ads that included terms indicative of prostitution because
doing so would "piss[] off a lot of users who will migrate
elsewhere" and force Backpage to refund those customers' fees.

> c.  In January 2017, the U.S. Senate Subcommittee on
Permanent Investigations ("Subcommittee") conducted a lengthy
investigation into sex trafficking and Backpage.  I have reviewed
the Subcommittee's 50-page report entitled "Backpage.com's Knowing
Facilitation of Online Sex Trafficking."  This report concluded,
among other things, that virtually all of Backpage's "adult" ads

- 25 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 30 of 120
Case 2:18-cr-00422-DJH *SEALED* Document 49 *SEALED* Filed 08/28/19 Page 27 of
117 Page ID #:200

are actually solicitations for illegal prostitution services and
that "Backpage has maintained a practice of altering ads before
publication by deleting words, phrases, and images indicative of
criminality, including child sex trafficking . . . .  Those
practices served to sanitize the content of innumerable
advertisements for illegal transactions—even as Backpage
represented to the public and the courts that it merely hosted
content others had created."  In response to the Subcommittee's
report, Backpage purported to shut down the "adult" section of its
website.  However, based on my review of several thousands of
Backpage ads, I believe that the prostitution ads simply migrated
to other sections of the website, where they remain to this day.

     d.   On August 5, 2011, Backpage received a letter from
the mayor of Seattle.  This letter warned, "Seattle Police have
identified an alarming number of juvenile prostitutes advertised
on Backpage.com since January 2010," and explained that Backpage
was dissimilar from other companies whose products and services
are "occasionally or incidentally" utilized by criminals because
"[y]our company is in the business of selling sex ads" and "your
services are a direct vehicle for prostitution."  The letter also
recommended that Backpage require in-person age verification for
all of the "escorts" depicted in its ads.  Based on knowledge
gained through this investigation, I do not believe that Backpage
has ever instituted an in-person age verification.

30.   I have reviewed internal documents, emails, and correspondence among Backpage employees and management.  From those emails I have learned that Backpage has instituted policies and procedures designed to maintain its promotion of sex trafficking and prostitution, but which "sanitize" some of the language Backpage customers use to advertise in order to make the advertising of sex trafficking less overt.  From my review of Backpage documents, I know that Backpage refers to this practice as "moderation."  For example:

a.   In April 2008, Ferrer wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]"[6] and result in "lost pageviews and revenue."  Thus, Ferrer instructed Backpage's technical staff to edit the wording of such ads by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

b.   On October 8, 2010, a Backpage manager sent an email threatening to fire any Backpage employee who acknowledged, in writing, that a customer was advertising prostitution:

---

[6] Craigslist is a competing internet based advertising company that features classified ads.

- 27 -

"Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

     c.   On October 16, 2010, the same Backpage manager again sent an email to a large group of Backpage employees that contained two attachments providing guidance on how to "moderate" ads. The first was a PowerPoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be approved or disapproved by a Backpage moderator. These instructions included "Approve. Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve. Rear shot okay. Transparent wet panties okay." The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication. The Backpage manager concluded the email by stating, "[I]t's the language in ads that's really killing us with the Attorneys General. Images are almost an afterthought to them."

     d.   On October 16, 2010, the same Backpage manager sent a separate internal email explaining, "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases

with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

      e.   On October 25, 2010, Ferrer sent an email acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

      f.   On October 27, 2010, a different Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers.

      g.   On June 7, 2011, Ferrer received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, Ferrer acknowledged this might be "some kind of bizarre new code word for an under aged person." Ferrer then forwarded this exchange to a Backpage manager and instructed that the term "amber alert" be added to Backpage's "strip out" list. I believe that this email indicates that Backpage did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage, but merely required that such ads be edited before publication.

      h.   On August 31, 2011, Backpage managers exchanged emails in which they discussed a list of 100 "solid sex for money terms." Later emails indicate that this list of terms would

change but, in general, the list prohibited use of certain terms
that Backpage management and employees too closely identified with
the obvious promotion of sex trafficking and prostitution.

      i.  Based on knowledge gained during this investigation
and my training and experience, I believe that this manager
acknowledged that a large proportion of the ads originally
submitted by Backpage's customers contained text and pictures that
were indicative of sex trafficking.  Nevertheless, Backpage would
still publish those ads after editing them to appear less obvious
in promoting illegal activity.  Using the words the Backpage
manager used in the email described in paragraph 30(d) above, I
believe that Backpage sex trafficking ads have adapted to
Backpage's moderation policy by using "phrases with nuance" when
promoting sex trafficking.  Also, based on knowledge gained during
this investigation, and my training and experience, I believe
that, following the implementation of "moderation," Backpage's
list of prohibited terms needed to change and evolve to adjust to
the reality of Backpage advertisers' use of new code words to
promote prostitution.  That is, once a coded word or phrase not
previously associated with sex-for-money would become too familiar
and associated with certain sex trafficking activities in the
Backpage community of advertisers, Backpage's "moderation" policy
would need to adapt by adding such words or phrases to the
"blocked" list or risk being too obvious in its promotion.

- 30 -

Case 2:18-cr-00422-SPL Document 1366-46 Filed 10/26/21 Page 35 of 120
Case 2:18-mj-04422-SEALED Document 49 *SEALED* Filed 08/28/19 Page 32 of
117 Page ID #:205

31.  Based on my review of several thousand Backpage ads and internal Backpage documents and correspondence, I believe that Backpage's policy of "moderation" only caused ads explicitly promoting sex trafficking to become more coded and implicit in the ads' purpose.  I have reviewed several thousand Backpage ads posted in the various "adult" categories of Backpage (including "massage," "dating," "escort" and others).  From this review, I learned the following:

a.  Well over half of the Backpage classified ads in these categories use terms and phrases that, in my training and experience, I believe to be consistent with sex trafficking and prostitution.  These terms and phrases include, "roses" (money, *e.g.*, "150 roses/half hour"), "in-call" (where the customer goes to the prostitute's location), "outcall" (where the prostitute goes to the customer's location), "GFE" (girlfriend experience), and "PSE" (porn star experience).

b.  Other Backpage ads use language that can be mostly free of coded language, but that include sexually provocative pictures.  In my training and experience, the sexually suggestive images included in these ads are typical of ads for prostitution. For example, one such ad posted in Backpage's Los Angeles dating section depicted images of a woman on a bed with her buttocks presented in a sexual manner; another included a picture of a woman's cleavage; others included pictures of women posing in

- 31 -

Case 2:18-cr-00422-DJH Document 1366-16 Filed 10/26/21 Page 36 of 120
Case 2:18-mj-04422-DUTY *SEALED* Document 4-1 *SEALED* Filed 03/28/19 Page 36 of
117 Page ID #:206

sexual positions wearing lingerie and pictures of a woman bending over revealing her naked buttocks.

      c.   Based on knowledge gained through this investigation, and my training and experience, I believe that Backpage's policy of moderation has had its intended effect. Moderation has caused and allowed otherwise neutral or innocuous terms to be understood within the Backpage community as coded language for sex trafficking and prostitution. Because of this evolving use of coded terms, a reader of such ads who is familiar with the particular vocabulary used in Backpage "adult" ads may readily identify coded terms and images indicating an ad for prostitution, while an uninitiated reader may not understand these terms at all, or at least not as being associated with sex-for-money.

    32.   Notwithstanding many Backpage advertisements' use of seemingly innocuous language in promoting prostitution, based on my conversations with law enforcement officers around the country and from my review of law enforcement officers' statements and reports regarding Backpage, I believe that the majority of Backpage ads that appear in the traditionally "adult" categories (such as "escort," "massage," or "body rubs") are actually advertisements promoting sex trafficking or prostitution. For example, in August 2015, the Detective-Sergeant in charge of the Seattle Police Department's Vice/High Risk Victims Unit and Human

Trafficking Task Force made a sworn statement that provided, in

pertinent part,

> Since 2014, the Seattle Police Department has made arrests
> that include hundreds of related charges, such as charges
> for patronizing a prostitute/sexual exploitation, hundreds
> of charges for prostitution, dozens of charges [of]
> Promoting Prostitution, up to 100 charges for Commercial
> Sexual Abuse against a Minor and have investigated dozens
> of rape reports involving victims who are prostitutes and
> one murder of a prostitute. As a result of hundreds of
> investigations, the Seattle Police Department Vice/High
> Risk Victims Unit has found that Backpage.com has become
> the primary web site in Seattle/Washington State for those
> looking to solicit a prostitute, post prostitution ads or
> traffic prostitutes and minors.
>
> Vice/High Risk Victims Unit Detectives also make use of
> this site to respond to ads posted under the 'escorts' and
> 'body rubs' categories posing as male customers and
> successfully arrest females and males who charge
> undercover operatives money in exchange for sex.  To date,
> no Detective within the Seattle Police Department's
> Vice/High Risk Victims Unit has ever found a legitimate
> 'escort', (person who charges simply for companionship
> with no offer of sex) or 'masseuse', (person offering
> legitimate and licensed massage therapy rather than sex)
> while responding to ads placed in these categories on
> Backpage.com.
>
> As stated previously, every time the Seattle Police
> Department Vice/High Risk Victims Unit has responded to an
> ad in the adult section of Backpage.com, we have found
> that the ad was a posting for illegal activity. The
> Seattle Police Department Vice/High Risk Victims Unit has
> not once found that the individual posting or responding
> to one of our decoy ads in the adult section of
> Backpage.com was in fact seeking any type of innocent,
> legal activity. In my professional experience, the adult
> section of Backpage.com not only contains ads for illegal
> activity, including prostitution, solicitation and
> trafficking, but it is a primary source for such ads and
> is well known for that purpose in the sex trafficking
> industry in the city of Seattle and State of Washington.

Additionally, in August 2015, the Sergeant Detective who is

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 38 of 120
Case 2:18-cr-00422-DJH SEALED Document 49 SEALED Filed 08/28/19 Page 35 of
117 Page ID #:208

Commander of the Human Trafficking Unit ("HTU") for the Boston,

Massachusetts Police Department made a sworn statement that

provided, in pertinent part,

> Since 2009, the [HTU] has made numerous arrests that
> include enticement of a minor into prostitution, sex
> trafficking of a minor, sex trafficking of an adult,
> forcible rape . . . and sex for a fee for soliciting a
> prostitute.

> As a result of investigations, the HTU has found that
> Backpage.com is the go-to Web site in Boston for those
> looking to solicit a prostitute, post prostitution ads,
> and recruit and traffic young women and minors.  The
> detectives have been able to identify numerous would-be
> exploiters by setting up decoy ads and responding to ads
> on the site.  The have arrested pimps, traffickers and
> buyers who facilitate prostitution and fuel the harmful
> and violent sex trade.  Backpage.com is the number one
> site that detectives go to in order to look for underage
> girls who are on the run and are being commercially
> sexually exploited by pimps.

> Since 2010, the HTU has arrested over 100 buyers of sex of
> both adults and minors through Backpage.com ads
> exclusively in hotel stings.

> Since 2013, 12 individuals have been charged in federal
> court for sex trafficking of both minors and adults.  In
> all these aforementioned cases, Backpage.com played a
> pivotal role in facilitating these crimes.

> Detectives of the HTU often get tips about illegal
> activity concerning ads posted on the escort, adult and
> massage sections of Backpage.com.  In almost every case
> detectives have found that in fact there was illegal
> activity which resulted in fines, arrests, or further
> investigations of sex trafficking.

> Therefore, in my professional experience as a law
> enforcement officer for over thirty years, the adult
> section of Backpage.com not only contains ads for illegal
> activity, including prostitution, solicitation and
> trafficking, but it is also the primary source for such
> ads and well known for that purpose in the sex trafficking

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 39 of 120
Case 2:18-mj-04228-DUTY *SEALED* Document 4-1 *SEALED* Filed 03/28/19 Page 36 of
117 Page ID #:209

industry in Boston, Massachusetts. Backpage.com's adult
section provides a vehicle and anonymity for its users who
exploit and traffic young women and girls. . . . It is my
humble opinion that the adult section of Backpage.com
serves no legitimate service and nearly all the cases we
find associated with it involve pimp controlled
prostitution.

33. Almost all "adult"-type Backpage ads list phone numbers

or emails for a potential customer to use to make contact with the

advertiser. I have compared a sample of phone numbers and emails

found within Backpage ads with phone numbers and emails that

frequently are included in the memo section of some of the checks

that Backpage advertisers use to pay Backpage for those ads. From

my review, I have found that very often the same number and/or

email appears in multiple Backpage ads as the contact information

to make an appointment. For example:

        a. A $25 USPS Money Order purchased on June 15, 2017,

in Duarte, California, made payable to "Posting Solutions PO BOX

802426, Dallas, TX," and thereafter deposited into SUBJECT ACCOUNT

1, included writing on the money order listing a phone number and

the words "Dulce Latina." From a search of Backpage ads, I found

almost 800 advertisements listing the same phone number found on

the $25 USPS Money Order.

        b. A $20 USPS Money Order purchased in Sacramento,

California, and later deposited into SUBJECT ACCOUNT 1, included

writing listing a phone number and the words "love my lips." From

a search of Backpage ads, I found almost 1300 advertisements

- 35 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 40 of 120
Case 2:18-mj-00422-DUTY *SEALED* Document 4 *SEALED* Filed 03/28/19 Page 37 of
117 Page ID #:210

listing the same phone number found on the $20 USPS Money Order.

      c.  A $150 Wells Fargo Bank Money Order, purchased in Arizona, and made payable to "Posting Solutions," included an email and the words, "red hot stuff". From an internet search of the email address listed on this $150 money order, I found advertisements on several female escort websites that directed customers to contact an Arizona phone number ending in 2397. I then searched Backpage.com for this phone number and found approximately 760 ads that included this same phone number. My review of these Backpage ads revealed images indicative of prostitution. For example, one such ad posted on Backpage's "massage" section included sexual images such as a woman lying on a bed wearing lingerie and a woman laying naked on her stomach. One of the ads describes, "Pampering provider | Body Rub Massage | Body Shampoo | Body Scrub | 4 hands | Walk ins or appointment." From my training and experience, I know that legal massage advertisements do not typically depict sexual images. This advertisement depicted sexual images and included terms like "4 hands," which I know to be coded language describing a massage given to a customer by two women. Such advertisements are often indicative of prostitution.

    34.  Despite the fact that several thousand Backpage ads shared the exact same phone number or email address to contact the advertiser, these same ads included sexually suggestive images of

hundreds of *different* women. Based on my training and experience, multiple different women do not share the same email address or phone number when posting ads for dating. Rather, in my training and experience, such ads are consistent with ads posted by pimps or prostitution agencies that are using the same phone number or email to advertise several different women (or girls) to prospective prostitution clients.

35. On March 28, 2018, a grand jury returned a 93 count indictment charging certain Backpage Operators with criminal violations of 18 U.S.C. § 371 (Conspiracy), § 1952 (Travel Act—Facilitation of Prostitution), § 1956 (Money Laundering), § 1957 (Financial Transactions Involving Illicit Proceeds), and including Forfeiture Allegations pursuant to 18 U.S.C. §§ 981 and 982 (seeking criminal forfeiture of, among other assets, the SUBJECT ACCOUNTS and the SUBJECT DOMAIN NAMES). A copy of that indictment is attached hereto (as Exhibit A) and incorporated herein as though fully set forth.

C. THE SUBJECT ACCOUNTS

1. SUBJECT ACCOUNT 1

 i. Foreign Transfers Into SUBJECT ACCOUNT 1

36. While Backpage accepts payments for ads from third-parties, for the purpose of this affidavit, I will focus on advertising payments made via the Posting Solutions' P.O. BOX using cash, money orders, or digital currency.

37.    From my review of Posting Solutions' application for the USPS Dallas, Texas P.O. BOX, I learned that it was registered to "Website Technologies, LLC/Backpage.com."  Also listed on the P.O. BOX Application were the names of several Backpage Operators, including Ferrer.

38.    I have reviewed bank records for SUBJECT ACCOUNT 1. Based on my review, I know the following:

    a.    On February 15, 2017, Posting Solutions LLC, located at 13601 Preston Rd., Ste. 801E, Dallas, Texas 75240, opened Prosperity Bank account number 216887188 (SUBJECT ACCOUNT 1, which lists Gage as the sole signatory on the account).

    b.    Gage is the President, Chief Executive Officer, Treasurer and Secretary of Posting Solutions LLC.

39.    Based on my knowledge of this investigation, having spoken to law enforcement personnel, and my review of the financial records, when an advertiser purchases an ad for prostitution using digital currency, the payments to Backpage (and certain subsequent expenditures) then proceed in the following manner:

    a.    A "poster" of a prostitution ad on backpage.com would pick a payment method, for example, through Bitcoin payments as previously described above.

    b.    The poster would already have Bitcoin or Backpage would direct the poster to a third-party exchanger in order to buy

- 38 -

Bitcoin.

      c.   Backpage would then provide the poster with a wallet address to send the specific amount of Bitcoin.

      d.   The poster would receive credit to then post ads on Backpage.

      e.   In batches, generally valued in hundreds of thousands of dollars, Backpage would sell the Bitcoin to a third party exchanger, frequently "GoCoin," in order to convert the Bitcoin into U.S. or foreign currency, which GoCoin generally holds in foreign bank accounts.

      f.   GoCoin would wire funds from these foreign accounts to either 1) Backpage controlled foreign accounts, or 2) Backpage controlled domestic operating accounts.

      g.   Backpage operators would hold these receiving accounts in the names of entities controlled by Backpage, such as Ad Tech BV, Posting Solutions (SUBJECT ACCOUNT 1 is held in the name of Posting Solutions), Website Technologies, or Cereus Properties (SUBJECT ACCOUNT 2A is held in the name of Cereus Properties).

      h.   These funds that originated from foreign transactions would be used to pay for services, like Verizon in Los Angeles, or would be transferred to Backpage Operators' accounts and accounts held in their family members' names.

    40.  I have reviewed records of wire transfers from countries

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 44 of 120
Case 2:18-mj-02225-DUTY *SEALED* Document 4 *SEALED* Filed 08/28/19 Page 41 of
117 Page ID #:214

outside the United States deposited into the SUBJECT ACCOUNT 1.
Just for the period of August 1 through September 1, 2017, SUBJECT
ACCOUNT 1 received over $2.7 million in wire transfers from
outside the United States.  For example:

      a.   On or about August 16, 2017, a company called
"Binary Trading SG PTE LTD" ("Binary Trading") wired $535,500 from
an account in Singapore into SUBJECT ACCOUNT 1.  Based on my
review of records related to this transaction, Binary Trading is a
name used by GoCoin.[7]

      b.   On or about August 17, 2017, Binary Trading wired
another $528,500 from a Singapore account into SUBJECT ACCOUNT 1.

      c.   On or about August 30, 2017, a company named
"TRILIX PTE LTD," listing the same Singapore address as Binary
Trading and GoCoin, in four wires ranging from $385,450 to
$492,250, sent approximately $1,717,750 from a Singapore account
into SUBJECT ACCOUNT 1.  Memo lines from these wires list "GC" or
"GC FOR INTERNET SERVICES."  I understand "GC" to mean GoCoin.

     ii.  <u>SUBJECT ACCOUNT 1 Payments for Backpage Operations</u>

   41.  I have reviewed outgoing payments from SUBJECT ACCOUNT 1
and found that substantial percentages of these payments are for
the operation of Backpage.com.  For example, between July and

---

   [7]  Further, according to GoCoin's website, GoCoin maintains
offices at the Singapore address listed on the $535,500 wire
from "Binary Trading."

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 45 of 120
Case 2:18-cr-00422-SPL *SEALED* Document 49 *SEALED* Filed 03/28/19 Page 42 of
117 Page ID #:215

October, 2017, SUBJECT ACCOUNT 1 wired over $1.1 million to pay for the following:

      a.    Between July and October 2017, SUBJECT ACCOUNT 1 wired $570,530 to Verizon Digital Media Services in Los Angeles.

      b.    On August 4, 2017, SUBJECT ACCOUNT 1 wired $4,137 to "Netnames," also known as ASCIO, to pay for the registration renewal of all the SUBJECT DOMAINS, including Backpage.com.

      c.    In August 2017, SUBJECT ACCOUNT 1 sent numerous automated clearinghouse payments to "Netchex Tax Prep Clients" totaling over $437,000. From a review of their website, I learned Netchex is a human resources company that provides payroll and other such services to Backpage.

      d.    Within a one-week period beginning on August 2, 2017, SUBJECT ACCOUNT 1 wired approximately $77,800 to S&W Payroll Services. An online search of S&W Payroll indicated that S&W Payroll is owned by Netchex. As stated above, Netchex is a human resource service, and S&W Payroll appears to be Netchex's payroll division.

      e.    On August 11, 2017, SUBJECT ACCOUNT 1 wired $5,319.79 to the Telesign Corporation, located in Marina del Ray, California. According to their website, Telesign is a communications platform that delivers security for websites.

      f.    On August 18, 2017, SUBJECT ACCOUNT 1 wired $1,497 and $6,984, respectively, to two separate data backup companies

- 41 -

for Backpage's on-line data backup.

42. Based on my review of bank records for SUBJECT ACCOUNT 1 throughout the existence of the account, these types of transactions and expenditures were typical.

    2. SUBJECT ACCOUNT 2A

        i. Transfers From SUBJECT ACCOUNT 1

43. From my review of bank documents, I have learned that SUBJECT ACCOUNT 2A is a Compass Bank business bank account owned by "Cereus Properties LLC," identifying Spear as the sole signatory. My review revealed that this account was funded with transfers from SUBJECT ACCOUNT 1. On average, during each month of 2017, SUBJECT ACCOUNT 1 transferred several hundred thousand dollars into SUBJECT ACCOUNT 2A. For example:

a. On July 25, 2017, SUBJECT ACCOUNT 1 sent two wire transfers totaling about $566,562.47 to SUBJECT ACCOUNT 2A.

b. On August 8, 2017, SUBJECT ACCOUNT 1 sent a wire totaling $62,198.51 to SUBJECT ACCOUNT 2A.

c. On August 31, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling $487,491.45 to SUBJECT ACCOUNT 2A.

d. On September 15, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling $91,672.67 to SUBJECT ACCOUNT 2A.

e. On October 2, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling $471,766 to SUBJECT ACCOUNT 2A.

        ii. Foreign Transfers into SUBJECT ACCOUNT 2A

44. I have reviewed financial records from a foreign bank in the Netherlands (the "Foreign Account"). I have also reviewed emails related to this account. From my review of these records, I learned the following:

a. The Foreign Account was opened in March 2015 and is held in the name of Ad Tech BV, a Netherlands based company, and identifies Ferrer as the CEO and Gage as the CFO.

b. From March 2015 through November 2017, Foreign Account A received millions of dollars from Binary Trading SG PTE, Limited, the same company GoCoin used to wire funds into SUBJECT ACCOUNT 1. In an April 4, 2017, email to employees of the bank that maintains the Foreign Account, Gage explained,

Binary Capital is our trading partner, they hold money in trust for Go Coin [sic]. Rather than incurring 3 sets of wire fees which make our transactions unprofitable, they act as our agent and disburse payments directly from our trust account to our merchant.

c. During this same period, Foreign Account A wire transferred several million dollars into SUBJECT ACCOUNT 2A. For example, an April 25, 2017, an email from Gage to individuals at the bank holding the Foreign Account directed the bank to wire "USD $2,337,048" to SUBJECT ACCOUNT 2A. Thereafter, I reviewed a wire record and confirmed that on April 25, 2017, the Foreign Account wired $2,337,048 into SUBJECT ACCOUNT 2A, as Gage directed in his email. In reviewing the records, I found the following additional wires sent to SUBJECT

- 43 -

ACCOUNT 2A:

       i.    In December 2016, the Foreign Account wired approximately $1 million dollars to SUBJECT ACCOUNT 2A.

       ii.    On February 28, 2017, the Foreign Account wired $2,324,390 into SUBJECT ACCOUNT 2A.

       iii.    On March 30, 2017, the Foreign Account A wired $2,247,858 into SUBJECT ACCOUNT 2A.

       iv.    On May 31, 2017, the Foreign Account wired $2,335,076 to SUBJECT ACCOUNT 2A.

       v.    On June 28, 2017, the Foreign Account A wired $2,324,390 to SUBJECT ACCOUNT 2A.

       vi.    July 27, 2017, the Foreign Account A wired $10,928 to SUBJECT ACCOUNT 2A.

    iii.    SUBJECT ACCOUNT 2A Payments for Backpage Operations

45.  I then reviewed SUBJECT ACCOUNT 2A records for payments to promote Backpage operations.  From March through December 2017, SUBJECT ACCOUNT 2A paid over $9,000 to "Cox Communications," an internet services company that provides voice-over-internet phone and cable services.  I believe that Backpage uses Cox Communications to facilitate its internet presence and promote its sale of prostitution advertising.

    3. SUBJECT ACCOUNT 2B

46.  I reviewed records SUBJECT ACCOUNT 2A and SUBJECT ACCOUNT 2B.  On February 2, 2018, SUBJECT ACCOUNT 2A wired

transferred \$135,956.59 into SUBJECT ACCOUNT 2B.  I am aware of no other funding sources for SUBJECT ACCOUNT 2B.

    4. SUBJECT ACCOUNTS 3A, 3B, 3C

47.  I have reviewed records for SUBJECT ACCOUNT 3A as well as the following accounts:  Branch Banking & Trust account number 1440001712008, belonging to Website Technologies (as detailed above, a Backpage controlled entity), held in Arizona ("BBT Account"); Arizona Bank & Trust account number 9361116211 belonging to Cereus Properties, held in Arizona ("AZBT Account").  From this review, I learned the following:

    a.  Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over \$2.5 million to the BBT Account in the United States.

    b.  On January 15, 2016, the BBT account wired \$189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.

    c.  Between January 21, 2016, and August 31, 2016, in approximately 27 wires, the BBT Account transferred approximately \$48 million to the AZBT Account.

    d.  Between March 1, 2016, and July 1, 2016, the AZBT Account wired \$892,426 into SUBJECT ACCOUNT 3A.

48.  According to records for SUBJECT ACCOUNTS 3A, 3B, and 3C:

- 45 -

      a.   On September 14, 2017, SUBJECT ACCOUNT 2A wired $50,162.05 into SUBJECT ACCOUNT 3A.

      b.   On October 12, 2017, SUBJECT ACCOUNT 3A wired approximately $21,500 into SUBJECT ACCOUNT 3B.

      c.   On January 5, 2018, SUBJECT ACCOUNT 3A wired approximately $600,000 into SUBJECT ACCOUNT 3C.





### 5. SUBJECT ACCOUNT 4

49.  From my review of the records for SUBJECT ACCOUNT 4 (belonging to Spear), I learned that on or about March 16, 2016, SUBJECT ACCOUNT 3A transferred $250,000 into SUBJECT ACCOUNT 4

Case 2:18-cr-00422-DJH Document 1366-16 Filed 10/26/21 Page 51 of 120
Case 2:18-mj-04221-DUTY *SEALED* Document 1-1 *SEALED* Filed 03/28/18 Page 48 of
117 Page ID #:221

as an opening deposit.  On March 20, 2018, Live Oak Bank

confirmed that these funds have remained in SUBJECT ACCOUNT 4

since the account was opened.

      6. <u>SUBJECT ACCOUNT 5A and 5B</u>

    50.  I have reviewed financial records related to SUBJECT

ACCOUNTS 5A and 5B, held in the name of Natasha Spear, Scott

Spear's adult daughter.  From this review, I learned the

following:

        a.   On February 23, 2017, SUBJECT ACCOUNT 3A wired

approximately $50,000 into SUBJECT ACCOUNT 5A.

        b.   On the February 23, 2017, SUBJECT ACCOUNT 3A

wired $50,000 into SUBJECT ACCOUNT 5B.

      7. <u>SUBJECT ACCOUNT 6</u>

    51.  From my review of financial records related to SUJBECT

ACCOUNTS 2A, 2B and 6, I learned the following:

        a.   On October 2, 2017, SUBJECT ACCOUNT 2A wired

approximately $297,795 into SUBJECT ACCOUNT 6.



8. <u>SUBJECT ACCOUNTS 7A through 7E</u>

52.  From my review of financial records of SUBJECT ACCOUNTS 2A and 2B, 7A through 7D, and 12A, I learned the following:

        a.  On July 6, 2017, SUBJECT ACCOUNT 2A wired $971,651.51 into SUBJECT ACCOUNT 7A.

        b.  On July 28, 2017, SUBJECT ACCOUNT 7A wired $400,000 into SUBJECT ACCOUNT 7B.

53.  From my review of financial records of SUBJECT ACCOUNTS 1 and 7C, and those concerning the Veritex Bank account ending in -1462, held in the name of Posting Solutions ("Account -1462"),[8] I learned the following:

    a.  On January 13, 2017 and January 20, 2017, a GoCoin account in Singapore wired a total of approximately $1,318,800 into Account -1462.

    b.  In February 2017, Account -1462 wired a total of $5,395 to Verizon, in Los Angeles.

    c.  On August 8, 2017, SUBJECT ACCOUNT 1 wired $62,000 into SUBJECT ACCOUNT 12A.

───────────────

[8] Veritex Bank is a U.S. bank located in Dallas, Texas.  Posting Solutions opened Veritex Bank account -1462 on or about January 5, 2017.

Case 2:18-cr-00422-SMB Document 1366-16 Filed 10/26/21 Page 53 of 120
Case 2:18-mj-08422-SEALED Document 2-1 SEALED Filed 03/28/18 Page 50 of
117 Page ID #:223

d. On November 3, 2017, SUBJECT ACCOUNT 12A wired $100,000 to SUBJECT ACCOUNT 7D.

### 9. SUBJECT ACCOUNTS 8A, 8B, 8C, and 8D

54. From my review of the records for SUBJECT ACCOUNTS 2A and 2B, 8A, and 8B, I learned the following:

a. On February 2, 2018, SUBJECT ACCOUNT 2A wired $28,337 into SUBJECT ACCOUNT 8A.

b. Also on February 2, 2018, SUBJECT ACCOUNT 2A wired $28,337 into SUBJECT ACCOUNT 8B.

55. From my review of SUBJECT ACCOUNTS 1, 8C, and 8D, I learned the following:

a. On August 2 and August 8, 2017, SUBJECT ACCOUNT 1 wired $33,700 and $44,000, respectively, to S&W Payroll, a company Backpage uses to pay its employees.

b. Between August 11, 2017, and December 1, 2017, S&W Payroll wired a total of $207,125.81 into SUBJECT ACCOUNT 8C.

c. Between November 3, 2017, and December 8, 2017, SUBJECT ACCOUNT 8C wired $57,500 into SUBJECT ACCOUNT 8D.

### 10. SUBJECT ACCOUNT 9

56. From my review of the records for SUBJECT ACCOUNTS 2A 2B, and 9, I learned that on February 2, 2018, SUBJECT ACCOUNT 2A wired $734,603.70 into SUBJECT ACCOUNT 9.

11.     SUBJECT ACCOUNT 10

57.  From my review of records for SUBJECT ACCOUNTS 2A and
10, I learned that on February 2, 2018, SUBJECT ACCOUNT 2A wired
$94,154.89 into SUBJECT ACCOUNT 10.

12.     SUBJECT ACCOUNT 11

58.  From my review of SUBJECT ACCOUNTS 1, 8C, 8D, and 11,
as well as Account -1462 (as described above, a Posting
Solutions' Veritex Bank account), I learned the following:

        a.   On January 4, 2017, GoCoin's Singapore account
wired $489,500 into Account -1462, and on January 20, 2017,
GoCoin's Singapore account directed two additional wires, for
$358,150 and $470,150, respectively, into Account -1462 (for a
total of $1,317,800 wired from GoCoin's Singapore account into
Account -1462).

        b.   On January 24, 2017, Account -1462 wired
approximately $1.3 million into S&W Payroll.

59.  On January 27, 2017, an S&W Payroll account wired a
total of $9,913.53 into SUBJECT ACCOUNT 11.

13.     SUBJECT ACCOUNTS 12A and 12B

60.  From my review of financial records for SUBJECT
ACCOUNTS 1, 12A, and 12B, I learned the following:

        a.   On August 8, 2017, SUBJECT ACCOUNT 1 wired
$62,000 into SUBJECT ACCOUNT 12A.

- 50 -

61.  On December 8, 2017, SUBJECT ACCOUNT 12A wired $20,000 into SUBJECT ACCOUNT 12B.

### 14.    SUBJECT ACCOUNT 13

62.  From my review of financial records for SUBJECT ACCOUNTS 1, 12A, and 13, I learned the following:

        a.    In January 2017, SUBJECT ACCOUNT 1 wired $62,000 into SUBJECT ACCOUNT 12A.

        b.    On August 16, 2017, SUBJECT ACCOUNT 12A wired $20,000 into SUBJECT ACCOUNT 13.

### 15.    SUBJECT DOMAINS

63.  From my review of records from Ascio Technologies ("ASCIO"), the domain registrar for the SUBJECT DOMAINS, I learned the following:

        a.    ASCIO is a domain registrar that manages the reservation of internet domain names for Backpage, and ASCIO is the registrar for over 300 domain names registered by Ferrer and Backpage.com, LLC.

        b.    On or about August 4, 2017, SUBJECT ACCOUNT 1 wired $4,147 to ASCIO/WMB Inc. as payment for the renewal of the SUBJECT DOMAINS.  From my training and experience and review of online sources, I know that, in general, to reach a website on the Internet, a person types an address into a web browser or computer.  That address is usually in the form of a name or a number and has to be unique so computers can locate the

- 51 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 56 of 120
Case 2:18-mj-04122-DUTY *SEALED* Document 1-3 *SEALED* Filed 03/28/18 Page 53 of
117 Page ID #:226

website.  The Internet Corporation for Assigned Names and
Numbers or "ICANN," coordinates these unique identifiers across
the world with registrars.  Domain renewal fees are paid
annually and are in part used to maintain this service.  This
allows visitors to be pointed to Backpage controlled servers
when they point their web browser to addresses such as
www.backpage.com.

      c.   In order to maintain an on-line presence,
companies like Backpage must renew their domains yearly,
generally for a fee.  Without this payment, the domain could be
resold to others and Backpage customers would not be able to
find the Backpage servers when the customer types the domain
name in their web browser.

    64.  Of the over 300 domain names registered by
Backpage.com LLC and/or Ferrer, all of which I reviewed, I
believe the 35 SUBJECT DOMAINS are specifically used to promote
and advertise prostitution for the following reasons:

      a.   I visited each of the SUBJECT DOMAINS and found
that, with the exception of "Backpage-insider.com", the SUBJECT
DOMAINS that begin with the word "Backpage" automatically
redirected my internet browser to Backpage.com.  These
particular SUBJECT DOMAINS act and appear exactly as
Backpage.com.

- 52 -

b.   I visited Backpage.com and navigated to the Los Angeles/Dating/Women for Men section.  I clicked on the first ad listed (Post ID 142685832).  This ad contained approximately one dozen pictures of women posing sexually, many on a bed wearing lingerie.  Super-imposed over a few of the images was the text: "JENNY HERE TODAY – FBSM – BETTER THAN NURU."  An open source search for "FBSM" indicated that FBSM is code language for "Full Body Massage."  An open source search for "NURU" produced the following description:

> NURU is a Japanese erotic massage technique in which one or more masseuses would rub their body against the client's body after both parties are nude.

c.   Based on this review, I believe this to be an advertisement in promotion of prostitution.  From my further review, I observed thousands of other ads that posted similar content consistent with advertising prostitution.

65.  I also attempted to visit Backpage-Insider.com, bestofbackpage.com, bestofbigcity.com, but these domains did not have a landing page and were unavailable.

66.  On March 22, 2018, I visited bigcity.com and, similar to Backpage.com, I found sexual content and additional advertisements promoting prostitution.  On the initial landing page for bigcity.com, there was a disclaimer noting that the website included sexual content.

- 53 -

Case 2:18-cr-00422-DJH Document 1366-16 Filed 10/26/21 Page 59 of 120
Case 2:18-mj-04223-DUTY *SEALED* Document 4 *SEALED* Filed 03/28/18 Page 55 of
117 Page ID #:228

67.  I also attempted to visit chicagobackpage.com,
denverbackpage.com, newyorkbackpage.com, phoenixbackpage.com,
sandiegobackpage.com, seattlebackpage.com, and
tampabackpage.com.  Each of these domains automatically directed
me to a landing page with links to other websites with sexual
content, including Backpage.com.

68.  Based on the above, there is probable cause to believe
that funds wire transferred into the SUBJECT ACCOUNTS have been
used to support and maintain each of the SUBJECT DOMAINS that
promote prostitution.  Therefore, each of the SUBJECT DOMAINS is
subject to seizure and forfeiture pursuant to 18 U.S.C. §
981(a)(1)(A), because those SUBJECT DOMAINS are involved in, and
traceable to, one or more transactions or attempted transactions
in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h)
(International Money Laundering for Promotion and Money
Laundering Conspiracy, respectively), and 18 U.S.C. § 1957
(Financial Transactions Involving Illicit Proceeds).

## VI.    CONCLUSION

69.  For the reasons stated above, there is probable cause
to believe that the SUBJECT ACCOUNTS and SUBJECT DOMAINS are
subject to seizure and forfeiture by the United States under the
following provisions:

a.    18 U.S.C. § 981(a)(1)(A), because each of the
SUBJECT ACCOUNTS and SUBJECT DOMAINS are involved in, and

- 54 -

Case 2:18-mj-00722-DUTY Document 1366-16 *SEALED* Filed 10/26/21 Page 59 of 120
Case 2:18-mj-00722-DUTY *SEALED* Document 4-1 *SEALED* Filed 03/28/19 Page 56 of 117 Page ID #:229
Case 2:18-mj-00722-DUTY *SEALED* Document 2 *SEALED* Filed 03/28/18 Page 56 of 117 Page ID #:100

traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds); and

   b. 18 U.S.C. § 981(a)(1)(C), because those SUBJECT ACCOUNTS and SUBJECT DOMAINS constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.

_____
Lyndon Versoza
U.S. Postal Inspector

Subscribed to and sworn to me
this 28th day of March, 2018

_____
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | | |
| Plaintiff, | | **INDICTMENT** |
| v. | VIO: | 18 U.S.C. § 371<br>(Conspiracy)<br>Count 1 |
| 1.  Michael Lacey<br>Counts 1-70, 81, 83-84, 86, 88-92 | | 18 U.S.C. § 1952(a)(3)(A)<br>(Travel Act—Facilitate Prostitution)<br>Counts 2-51 |
| 2.  James Larkin<br>Counts 1-68, 80, 87 | | 18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money Laundering)<br>Count 52 |
| 3.  Scott Spear<br>Counts 1-68, 71-78, 85, 93 | | |
| 4.  John "Jed" Brunst<br>Counts 52-70, 78-84, 86-93 | | 18 U.S.C. § 1956(a)(1)(B)(i)<br>(Concealment Money Laundering)<br>Counts 53-62 |
| 5.  Dan Hyer<br>Counts 1-68 | | 18 U.S.C. § 1956(a)(2)(A)<br>(International Promotional Money Laundering)<br>Counts 63-68 |
| 6.  Andrew Padilla<br>Counts 1-51 | | |
| 7.  Joye Vaught<br>Counts 1-51 | | 18 U.S.C. § 1957(a)<br>(Transactional Money Laundering)<br>Counts 69-93 |
| Defendants. | | |
| | | 18 U.S.C. §§ 981, 982<br>21 U.S.C. § 853, 28 U.S.C. § 2461<br>(Forfeiture Allegations) |

THE GRAND JURY CHARGES:

A.    <u>Introduction</u>

1.    The website www.backpage.com ("Backpage") is notorious for being the

internet's leading source of prostitution advertisements. Backpage derives the overwhelming majority of its revenue from such ads. These practices have enabled Backpage to earn over $500 million in prostitution-related revenue since its inception.

2.　　Backpage was created in 2004 by defendant MICHAEL LACEY ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F. From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction. Additionally, LACEY and LARKIN have retained significant control over the website (and have continued receiving tens of millions of dollars of Backpage-related distributions) since purportedly selling their interests in Backpage in 2015.

3.　　Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%.

4.　　Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%.

5.　　Defendant DAN HYER ("HYER") joined Backpage's marketing department in or around 2006 and served as Backpage's Sales and Marketing Director.

6.　　Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager.

7.　　Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8.　　The defendants identified above are referred to at times in this indictment as the "BACKPAGE DEFENDANTS."

9.　　As explained in detail below, the BACKPAGE DEFENDANTS have utilized a variety of strategies to make it appear that the prostitution ads appearing on Backpage are actually ads for "escort" services, "adult" companionship, dating, or other lawful activities. For example, Backpage purports to bar customers from offering illegal services

- 2 -

1    and has periodically used computerized filters and human "moderators" to edit the wording

2    of (or block) ads that explicitly offer sexual services in return for money.

3         10.    These strategies are a fiction designed to conceal the true nature of

4    Backpage's ads and customers.    Indeed, the BACKPAGE DEFENDANTS have

5    admitted—in internal company documents and during private meetings—that they know

6    the overwhelming majority of the website's ads involve prostitution.    In one internal

7    document, LACEY actually bragged about the company's contributions to the prostitution

8    industry:  "Backpage is part of the solution.  Eliminating adult advertising will in no way

9    eliminate or even reduce the incidence of prostitution in this country. . . .  For the very first

10   time, the oldest profession in the world has transparency, record keeping and safeguards."

11        11.    Notwithstanding    these    private    admissions,    the    BACKPAGE

12   DEFENDANTS have taken pains to mislead the public, regulators, and law enforcement

13   officials concerning the supposed sincerity of Backpage's efforts to prevent the publication

14   of prostitution-related ads.  For example, after reviewing LACEY's written description of

15   Backpage's contributions to the prostitution industry and editing practices, LARKIN

16   instructed C.F. to prevent "any of the information in this being made public."  PADILLA,

17   who helped supervise Backpage's moderators, threatened to fire any employee who

18   acknowledged in writing that the "escorts" depicted in the website's ads were actually

19   prostitutes:  "Leaving notes . . . implying that we're aware of prostitution . . . is enough to

20   lose your job over."   And in one internal document, Backpage's media strategy was

21   described simply as "Do not acknowledge the prostitution."

22        12.    Many of the ads published on Backpage depicted children who were victims

23   of sex trafficking.  Once again, although Backpage has sought to create the perception that

24   it diligently attempts to prevent the publication of such ads, the reality is that Backpage has

25   allowed such ads to be published while declining—for financial reasons—to take necessary

26   steps to address the problem.  For example, for several years, Backpage's official policy,

27   when presented with an ad featuring the prostitution of a child, was to delete the particular

28

Attachment A

words in the ad denoting the child's age and then publish a revised version of the ad. Such editing, of course, did nothing to change the fact the ad featured the prostitution of a child— it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps trafficking children) evade detection.

13.    Backpage has also contributed to the proliferation of ads featuring the prostitution of children in other ways. For example, an anti-sex trafficking organization once suggested that Backpage provide an automatic warning message whenever a customer searched for particular terms indicative of the prostitution of a child. In response, C.F. acknowledged the proposal was a good one but declined to adopt it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AGs [state attorneys general] so it has little PR value. It is a low priority." Backpage has also claimed it does everything in its power to alert the National Center for Missing and Exploited Children ("NCMEC") whenever it becomes aware that a child is being advertised on its website. However, the BACKPAGE DEFENDANTS implemented policies to artificially limit such referrals. In one email, PADILLA instructed VAUGHT that "if we don't want to blow past 500 [referrals to NMCEC] this month, we shouldn't be doing more than 16 per day." In another training document, moderators were instructed not to send emergency alerts to NCMEC in response to complaints filed by the grandparents and other extended family members of children being advertised on the website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

14.    Virtually every dollar flowing into Backpage's coffers represents the proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped processing payments for Backpage and some banks closed Backpage's accounts out of concern they were being used for illegal purposes. In response, the BACKPAGE DEFENDANTS have pursued an array of money laundering strategies. These strategies have included (a) instructing customers to send checks and money orders to particular Post Office box, depositing those payments in bank accounts held in the name of entities with

- 4 -

no apparent connection to Backpage, and then giving customers a corresponding "credit" on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank accounts held in foreign countries and then redistributing the funds to certain BACKPAGE DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the United States (to conceal the nature of those funds and promote Backpage's ongoing operations), and (c) converting customer payments, and the proceeds of Backpage's business, into and out of cryptocurrency.

15.     The BACKPAGE DEFENDANTS have also engaged in other financial transactions designed to conceal their misconduct and evade seizure by law enforcement. For example, in November 2016, LACEY asked employees of an Arizona-based bank for advice on how to move his assets "offshore" to protect them from seizure by the government.  Soon afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank accounts in the United States to an overseas bank account in Hungary.

16.     For all of these reasons, the BACKPAGE DEFENDANTS are charged in this indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment, transactional, and international promotional money laundering (18 U.S.C. §§ 1956 and 1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

B.     Backpage's Origins, Ownership, and Control

17.     LACEY and LARKIN are the founders of the *Phoenix New Times*, an alternative newspaper based in Arizona.  Over time, LACEY and LARKIN acquired several other alternative newspapers, which they came to operate through an entity called Village Voice Media Holdings ("VVMH").  Additionally, SPEAR served as VVMH's Executive Vice President and BRUNST served as VVMH's Chief Financial Officer.

18.     The publications within the VVMH newspaper chain routinely featured illegal prostitution ads.  In fact, more than 30 years ago, a federal court affirmed the conviction of the operator of a prostitution business (which masqueraded as a massage parlor) for publishing ads in the classified section of the *Village Voice*. *See United States*

- 5 -

*v. Sigalow*, 812 F.2d 783 (2d Cir. 1987).  The conviction was for violating 18 U.S.C. § 1952, one of the same crimes charged in this indictment.

19.    By 2000, the rise of the internet—and, in particular, the website www.craigslist.com ("Craigslist"), which offered free classified ads—began to significantly disrupt VVMH's business model, which depended on classified advertising revenue for survival.

20.    LACEY and LARKIN, with assistance from C.F., sought to address this threat by creating Backpage.  Their decision to create Backpage was later described in an internal company document as follows: "In 2004, in response to the Craigslist threat that was decimating daily newspapers, VVM launched its own online classified site, Backpage.com, named after the back page of VVM's print publication."

21.    During its first few years of operation, Backpage accounted for only a fraction of VVMH's overall revenue.  In January 2006, for example, VVMH estimated that Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage had "tremendous upside potential."

22.    This prediction proved prophetic.  By 2008, Backpage was generating over $5 million in annual profit.  This annual profit figure increased to over $10 million in 2009.

23.    In 2010, Craiglist chose to shut down its "adult" section due to the prevalence of ads for prostitution and other illegal services.  The BACKPAGE DEFENDANTS, sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share of this market.  In one internal document, LARKIN commented:  "Craigslist has folded . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . . We have with the Village Voice probably the longest run of adult content advertising in the US and it is, like it or not, in our DNA."

24.    This push was successful.  In internal documents, Backpage stated that it experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."  Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

- 6 -

Attachment A

over $78 million in 2012.

25.     These figures dwarfed the profits that VVMH's print publications were generating.  In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS decided to get rid of VVMH's publishing business so they could focus on Backpage's further development and expansion.  Accordingly, in or around November 2012, the BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as Backpage's parent companies.

26.     Following these transactions, LACEY held an ownership interest in Medalist (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest of approximately 43%, BRUNST held an ownership interest of approximately 6%, and SPEAR held an ownership interest of approximately 4%.

27.     Backpage's annual profits continued to skyrocket during and after these changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

28.     In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities.  These Dutch entities included Atlantische Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526 million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas operations for around $77 million.

29.     In fact, these Dutch entities were controlled by C.F., who borrowed most of the $600 million from entities controlled by the sellers to finance the purchase.  Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

30.     Additionally, LACEY, LARKIN, SPEAR, and BRUNST retained significant operational control over Backpage following these transactions.  For example, the April

- 7 -

2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F. to provide the lenders with full access to Backpage's books and records, required C.F. to provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited C.F. from opening any new bank accounts on Backpage's behalf without the lenders' consent.

C.    Backpage's Knowledge And Facilitation Of Prostitution Ads

31.    By 2008, if not earlier, the BACKPAGE DEFENDANTS were aware that the overwhelming majority of the website's "adult" ads involved prostitution. Nevertheless, the BACKPAGE DEFENDANTS made a financial decision to continue displaying those ads.

32.    The BACKPAGE DEFENDANTS also sought to sanitize the ads by editing them—that is, by removing terms and pictures that were particularly indicative of prostitution and then publishing a revised version of the ad. This process was sometimes referred to as "moderation."

33.    For example, in April 2008, C.F. wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]" and result in "lost pageviews and revenue." Thus, he instructed Backpage's technical staff to edit the wording of such ads, by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

34.    On February 26, 2009, C.F. received an email from the classified-ads manager of a newspaper within the VVMH chain asking why Backpage's terms of service purported to prevent customers from "suggest[ing] an exchange of sexual favors for money" in light of the fact that "[c]learly everyone on the entire backpage network breaks the rules." In response, C.F. didn't dispute the author's characterization and explained that Backpage had simply added the terms of service at the behest of "our attorney in SF" in an

Attachment A

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 69 of 120
Case 2:18-mj-04422-DUTY-SEALED Document 24-9 *SEALED* Filed 08/28/19 Page 65 of 7
117 Page ID #:238
Page ID #:0238

1   attempt to avoid liability in civil lawsuits.

2       35.     On May 25, 2009, SPEAR received an email summarizing a plan to begin

3   "remov[ing] sex act pics and coded terms" from Backpage ads.  Later that day, C.F.

4   forwarded this email to HYER with the explanatory note that "We do not intend to be a

5   craig[slist] here, just get out the most egregious stuff."

6       36.     On March 8, 2010, C.F. testified in federal court (the United States District

7   Court for the Southern District of Florida) in the criminal trial of a pimp who had used

8   Backpage to post prostitution ads.  During his testimony, C.F. acknowledged the defendant

9   had used the email address "Youngpimpin86" when posting the ads.  C.F. also

10  acknowledged that the ads described one so-called escort as "five-foot-three, with a small

11  waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described

12  a different so-called escort as "discrete, sincere and extremely naughty. I am the type of

13  girl who absolutely adores a man who understands the many desires of a young beautiful

14  woman and how to accommodate a variety of fantasies."  This episode provided notice to

15  Backpage that it was implausible to pretend such ads were merely offering lawful escort

16  services.

17      37.     On September 1, 2010, PADILLA sent an email to HYER and C.F. stating

18  that customers who engaged in "extreme and repeat" violations of Backpage's posting rules

19  would have their ads deleted and be banned from the website.  However, PADILLA also

20  stated the bans would only be temporary and that "we'll do everything we can to affect

21  only the worst apples."

22      38.     On September 1, 2010, SPEAR received an email acknowledging that

23  Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]"

24  and "Remove any illegal text in escorts [ads] to include any code words for sex act for

25  money."

26      39.     On September 21, 2010, a group of state attorneys general wrote a letter to

27  Backpage.   This letter observed that "ads for prostitution—including ads trafficking

28

- 9 -

children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether." The letter acknowledged that this step would cause Backpage to "lose the considerable revenue generated by the adult services ads" but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized, in the marketplace provided by backpage."

40.     On September 25, 2010, C.F. wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees. Thus, C.F. announced that Backpage would "go back to having our moderators remove bad content in a post . . . ."

41.     On September 30, 2010, C.F. testified in federal court (the United States District Court for the District of Minnesota) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. acknowledged that Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based defendant had therefore "traveled across state lines."

42.     On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd) threatening to fire any Backpage employee who acknowledged, in writing, that a customer was a prostitute: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . .  This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

43.     On October 16, 2010, PADILLA sent an email to a large group of Backpage employees (including HYER and VAUGHT). The email had two attachments that provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be

- 10 -

approved or disapproved by a Backpage moderator.  These instructions included "Approve. Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve.  Rear shot okay.  Transparent wet panties okay."  The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication.  PADILLA concluded the email by stating: "[I]t's the language in ads that's really killing us with the Attorneys General.  Images are almost an afterthought to them."

44.    On October 16, 2010, PADILLA sent a separate internal email (which also included HYER and VAUGHT as recipients).  In this email, PADILLA explained that "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

45.    On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act."  This email also explained that, after the "sex act pics are removed," the "ad text may stay."

46.    On October 26, 2010, HYER and PADILLA received an email explaining: "We will not remove ads with vaginas or penis showing, just the images unless they are a frequent offender.  We will not remove ads with rates under an hour, just the text with the minimum rates.  Users need time to react to this change."

47.    On October 27, 2010, PADILLA sent an email to the head of a group of contractors from India who had been hired to moderate Backpage's adult ads.  In this email, PADILLA criticized the contractors for deleting too many ads, stated that this approach was bad for business, and instructed the contractors to simply edit the ads to remove the more-obvious language:  "As long as your crew is editing and not removing the ad entirely, we shouldn't upset too many users.  Your crew has permission to edit out text violations and images and then approve the ad."

48.    On October 27, 2010, HYER sent an internal email stating that Backpage

- 11 -

Attachment A

was "editing 70 to 80%" of the ads it received from customers. In other words, HYER acknowledged that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of prostitution and that Backpage was still choosing to publish those ads after editing them.

49. On November 4, 2010, C.F. sent an email to Backpage's India-based moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have 15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.*, state attorneys general] later this week so cleaning up old stuff is important."

50. On November 17, 2010, HYER and PADILLA received an email acknowledging that the term Lolita is "code for under aged girl" but explaining that this term could simply be stripped out from ads (as opposed to refusing to publish the ad). The email also explained that customers should be allowed to include their identification numbers from a notorious prostitution website, The Erotic Review: "[A]llow users to put in TER IDs (just no live links)."

51. On November 30, 2010, LARKIN, SPEAR, and other Backpage representatives participated in a conference call with representatives from NCMEC. During this call, the Backpage representatives were advised that a large portion of the ads on Backpage were blatant prostitution ads, that many of those ads featured children, and that the posting of such ads was illegal in every state.

52. In December 2010, HYER, PADILLA, and others exchanged a series of emails entitled "Deep cleaning strip out." These emails identified a lengthy list of terms that were indicative of prostitution and discussed plans for removing the terms from the old ads in Backpage's archives. During this exchange, C.F. stated that Backpage wasn't willing to delete the old prostitution ads because "our users love" having access them, "[s]o, best to do deep cleaning and not kill a valuable feature." C.F. later encouraged Backpage's staff to complete the project quickly to avoid scrutiny: "This task is urgent since CNN is runing [sic] a report soon."

- 12 -

53.     On January 13, 2011, HYER and PADILLA received an email summarizing instructions that had been provided to members of Backpage's technical staff. It explained that the technical staff had been instructed "not to display the moderation log" in a particular section of Backpage's database "since we pdf this page for subpoenas. I would rather not testify in court as to why my staff 'approved' . . . postings."

54.     In January 2011, LARKIN and LACEY met with a representative from NCMEC. During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective. When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

55.     On January 31, 2011, and February 1, 2011, C.F. engaged in an email exchange concerning whether to remove links to other prostitution websites (such as The Erotic Review) from expired Backpage ads. C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites). C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

56.     On February 2, 2011, C.F. sent an email acknowledging that "[t]he strip out affects almost every adult ad." In other words, C.F. acknowledged that "almost every adult ad" on Backpage was a prostitution ad that had been edited to remove the most damning text and pictures.

57.     On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted. C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong." However, C.F. proceeded to apologize to "Licks Alot" over the removal of her

- 13 -

remaining photos, allowed her ad (which was obviously for prostitution) to remain on the website, and offered her a free upgrade.

58. On February 8, 2011, C.F. testified in federal court (the United States District Court for the Middle District of Florida) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. authenticated one of the ads the defendant had placed on Backpage, whose title was "Extra horny sexy newbie," confirmed that Backpage had allowed this ad to be posted multiple times in various East Coast cities, and acknowledged that Backpage published "a lot" of similar ads. This episode provided further notice to Backpage that it was implausible to pretend such ads were merely offering lawful escort services.

59. On February 16, 2011, PADILLA sent an email to Backpage's India-based moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy on some types of violations." PADILLA acknowledged this approach would "likely" result in more "violations" but emphasized that "moderators should err on the side of the user."

60. On February 16, 2011, PADILLA sent a separate email discussing whether several terms should remain on Backpage's "filtered terms" list. During this discussion, PADILLA acknowledged—by placing quote marks around the term "companionship"—that he didn't actually believe the women being advertised on Backpage were providing lawful escort services: "[The term] implies some exchange of bodily fluids which kills our 'companionship' argument, but i don't think we've ever really gotten in trouble for it."

61. On February 22, 2011, PADILLA received an email requesting Backpage's "list of banned, stripped out adult terms." In response, PADILLA sent an Excel spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest version of the list." The enclosed spreadsheet identified over 660 words or phrases that are indicative of prostitution, including an array of terms that are suggestive of child prostitution (*e.g.,* "lolita," "fresh," "high school," "tight," "young"). The spreadsheet

- 14 -

explained that most such terms were simply to be "filtered" from the ads in which they appeared.

62. On February 23, 2011, PADILLA received an email concerning a particular ad that had recently been edited by Backpage's India-based moderators. The ad was obviously for prostitution—its title was "new-new-new-put me in your favorite position" and the poster had attempted to include two photographs that violated Backpage's posting rules. In response, the India-based moderators had deleted both of those photos, as well as a third photo that depicted the prostitute's face, and then allowed the ad to be published. The email received by PADILLA did not criticize the moderators for allowing an obvious prostitution ad to be published after editing. To the contrary, it emphasized that the ad should remain on Backpage and criticized the moderators for removing the third photo, threatening to fire them if they did it again: "2 out of 3 pics should have been removed. But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator in Phoenix if they did this."

63. In March 2011, LARKIN, LACEY, SPEAR, and other Backpage representatives met with representatives from NCMEC. During this meeting, the Backpage representatives were again advised that a large portion of the ads on Backpage were blatant prostitution ads. The Backpage representatives also were advised they could be criminally prosecuted under federal law for their conduct.

64. On April 5, 2011, PADILLA sent an email whose recipients included VAUGHT and the supervisor of Backpage's Indian moderation team. The email was entitled "relaxed image standards" and included, as an attachment, a document that displayed a series of 30 nude and partially-nude photographs. Next to each picture was an instruction as to whether it should be approved or disapproved by a moderator. One picture showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread open and her hand partially covering her crotch. The caption provided in part: "okay – but barely."

- 15 -

Attachment A

65.     Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects." The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

66.     On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded: "do it!"

67.     On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person." C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list. In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

68.     On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General. During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website. In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they called for services would be offering to go out for coffee?" A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

69.     On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-

- 16 -

Attachment A

identical email to LARKIN and LACEY, concerning the possibility of using age-verification software. In this email, C.F. acknowledged the software might be beneficial ("This might be our solution") but recommended against its wholesale adoption because it would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

70. On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage understood." In this document, LACEY bragged about Backpage's contributions to the prostitution industry: "Backpage is part of the solution. Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . For the very first time, the oldest profession in the world has transparency, record keeping and safeguards." LACEY also acknowledged that Backpage used an automatic filter to remove particular phrases from ads that were indicative of prostitution but still published the ads after editing them.

71. Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note cautioning against some of LACEY's statements "being made public" because "we need to stay away from the very idea of 'editing' the posts, as you know." C.F., in turn, revised the editorial to take out the paragraph lauding Backpage's contributions to the prostitution industry.

72. On August 5, 2011, Backpage received a letter from the mayor of Seattle. This letter warned that "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010" and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution." The letter also recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads. Afterward, Backpage declined to adopt these recommendations.

73. On August 15, 2011, PADILLA received an email containing an updated version of Backpage's moderation guidelines. This six-page document provided the

- 17 -

Case 2:18-cr-00422-DJH Document 1366-16 Filed 10/26/21 Page 77 of 120
Case 2:18-mj-00422-DUTY *SEALED* Document 2-1 *SEALED* Filed 03/28/18 Page 74 of
117 Page ID #:1247

following instructions concerning photographs: "Nude rear shots are okay as long the model is not exposing her anus or genitalia," "Transparent wet panties okay should not be able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]." The document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

74. On August 31, 2011, Backpage received a letter from the National Association of Attorneys General. This letter characterized Backpage as "a hub" for human trafficking, identified "more than 50 instances, in 22 states over three years, of charges filed against those trafficking or attempting to traffic minors on Backpage.com," and noted that "[n]early naked persons in provocative positions are pictured in nearly every adult services advertisement on Backpage.com and the site requires advertisements for escorts, and other similar 'services,' to include hourly rates. It does not require forensic training to understand that these advertisements are for prostitution."

75. On October 6, 2011, C.F. sent an email discussing various proposals for addressing "the under aged issue." With respect to one particular proposal, C.F. acknowledged it was a good one but recommended against adopting it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AG's [state attorneys general] so it has little PR value. It is a low priority."

76. In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C. On October 12, 2011, C.F. received a written copy of the firm's presentation. Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail. The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution." The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

- 18 -

Attachment A

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 78 of 120
Case 2:18-cr-00422-DJH *SEALED* Document 249 *SEALED* Filed 03/28/19 Page 75 of
117 Page ID #:1248

77.     On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children.  This email contained the following joke:  "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

78.     On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website:  "Remove ads with teens or remove the text teen from . . . ads."  The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.,* allowed those ads to remain on the website after sanitizing them).

79.     Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals.  These appraisals revealed that many of the moderators did "not report young looking escorts."  Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

80.     On February 16, 2012, PADILLA sent an email to VAUGHT stating that Backpage should limit the number of child-exploitation referrals it was making to NCMEC:  "If we don't want to blow past 500 this month, we shouldn't be doing more than 16 a day."

81.     On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com.  C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution.  In one of the ads, a customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/ condom" from a woman who "had nice breasts."  In a different ad, a customer stated that, in return for $60, he had oral and vaginal sex with a prostitute.  And in a different ad, a customer stated:  "Her bj was slow and erotic, and she was happy to go with whatever

- 19 -

position I wanted." When C.F. forwarded these materials to Backpage's staff, he was asked whether the corresponding ads appearing on Backpage's website should be removed immediately. C.F. replied that they should be allowed to remain on Backpage for another few weeks without any modification.

82. On March 15, 2012, HYER received an email concerning the ads with the copyrighted material. This email stated that the ads shouldn't be deleted and that Backpage's technical staff should merely "strip out" the names of the competing prostitution websites: "Copyright infringement issue. We need to strip out every appearance of rubmaps.com and eroticmp.com." When a staff member sought more guidance, HYER interjected: "We don't need to delete ads or users."

83. On April 7, 2012, PADILLA was informed that a woman had contacted Backpage to report that one of the "escorts" depicted on the site was only 17 years old. The woman provided the juvenile's full name and birth year and further stated that the juvenile had been attempting to recruit the complaining party's daughter (who was 15). In response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't claiming her own daughter is in the ad."

84. On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN] and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the prostitution of children on the site were "not perfect, by any means."

85. On April 25, 2012, a Backpage representative spoke at a meeting of the New York City Council's Women's Issues Committee. During this meeting, the representative stated it was better to have ads for sex work appear on Backpage than have them move to other places on the internet. The representative further stated: "I don't deny that Backpage is part of the problem, but the problem is the internet."

86. On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will. The email identified the specific phone number

- 20 -

associated with the ads (754-229-xxxx), stated that the ads appeared on a website called BackpagePics.com, and asked that the ads be removed immediately:  "This is a drugged and held against her will child who had photos taken under threat and duress . . . .  Please remove."  This email was forwarded to PADILLA by a subordinate, who asked "should we respond?"  PADILLA replied by explaining that, because the website BackpagePics.com wasn't owned by Backpage, there was no need to respond to the mother.

87.    On April 30, 2012 (three days later), the same woman wrote another email to Backpage's support department.  In this email, the woman stated that "I have contacted backpage on several occassions [sic] to remove these pictures which were posted against her will and while she was drugged and held captive.  I have yet to receive a reply."  This time, the woman provided a link to her daughter's ad on Backpage (not BackpagePics.com), which included the same phone number (754-229-xxxx) that had been included in the other ad.

88.    On May 1, 2012 (the next day), the same woman wrote a third email to Backpage's support department.  In this email, the woman included a link to another ad on Backpage depicting her underage daughter and stated:  "I also found a pix of my daughter within this url both girls are in protective custody."  Later that day, the woman received an email from Backpage's support department stating:  "The post is confirmed removed."

89.    Some of these emails were forwarded to LACEY and LARKIN.  In response, LARKIN applauded Backpage's "good solid response" to the woman and remarked:  "this whole rigamarole seems a little odd to me."

90.    On May 10, 2012, the television news station CNN ran an expose on Backpage that emphasized "how young some of these girls look" and deemed the website "a hub for the sex trade."

91.    On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage employees entitled "forbidden planet."  Enclosed with the email was an Excel spreadsheet

Attachment A

that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

92.     On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

93.     In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

94.     Between around September 2010 and October 2012, C.F. became aware that a particular Backpage customer, P.R., was posting prostitution ads. Rather than bar this customer from posting future ads, C.F. repeatedly restored her posting privileges and gave her advice on how to conform to Backpage's publication standards. The communications involving this woman's ads included the following:

•     On September 26, 2010, C.F. received an email from a woman who was obviously posting prostitution ads on Backpage. The woman, whose email address included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses special – Dont Miss out !!!") had been removed even though "[o]ther women have more explicit ads than me and they are up!" The woman continued: "I can not afford to have this ad removed. This is the only way I can get by and if its not on all the time I will not

- 22 -

be able to pay my bills . . . .  My fiancé is in jail and he is not able to help me at this point."  In response, C.F. arranged for the woman to be allowed to continue posting ads.

• On October 6, 2010, C.F. received another email from the same woman.  In this email, she complained that her most recent ad had been removed because it included an explicit picture of her body.  She provided a copy of the picture to C.F. and stated: "If the person [who removed the ad] is such a prude well maybe they should check out the other women's ads in that [escorts] section."  On November 15, 2010, C.F. wrote back to the woman to encourage her to edit the ad so it could be re-posted: "Ok, please try editing the ad now."  After this exchange, the woman was permitted to resume posting ads on Backpage.

• On June 6, 2011, C.F. received another email from the same woman.  It stated: "I would really appreciate it if you would please take the block off my ad for editing . . . .  I wont post any more objectionable pics, ok?"  In response, C.F. arranged for the woman's editing and posting privileged to be restored: "You should be able to edit now.  Please let us know if you are still having any trouble."  After this exchange, the woman resumed posting ads on Backpage.

• On July 14, 2012, C.F. received another email from the same woman.  It stated: "would you please take the edit block off my ad.  I need to change some info on it and update it.  I promise i wont put no more nude pics in it, you have my word. . . .  [M]y ad says: 50 red roses special – dont miss out."  After this exchange, the woman was allowed to continue posting ads on Backpage.

• On September 17, 2012, C.F. received another email from the same woman.  This time, she complained that Backpage was editing her ads (whose title continued to feature the obvious prostitution term "50 Red roses special") to remove the most explicit pictures.  She stated: "I would like to know why my ad in the escort section of backpage keeps getting messed with. . . .  [S]omeone keeps erasing the link to my pics on the ad. that is so wrong.  I am being deprived of income that I sorely need . . . .  There

- 23 -

are other woman posting pics on their ads that show more nudity . . . ." After this exchange, the woman was permitted to continue posting ads on Backpage.

• On October 16, 2012, the woman wrote another email to Backpage. In this email, she again complained about how Backpage was editing her ads to remove the most explicit pictures. She stated: "It is very hard for me to make any income from this ad as they continually go into my ad and remove the link from the ad that goes to my pictures. They wont allow me to post my pics on the ad yet other women with other ads show more nudity than my pictures ever did."

• This email was forwarded to VAUGHT and to PADILLA, who asked another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA received a follow-up email from his co-worker stating that the woman's ad had been posted on September 27, was still on the Backpage website, and that the pictures the woman had originally attempted to include in the ad (which had been stripped by Backpage) were "topless shots."

• Following these exchanges, between October 2012 and November 2015, the same customer was allowed to post over a dozen new ads on Backpage, many of which utilized the same identifying information, coded prostitution terms, and contact phone number as before.

95.    On January 7, 2013, VAUGHT was informed by a moderator that Backpage wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking them, but some seem to be ignored. They get 'marked as read', but nothing gets done with them. It's aggravating and irresponsible."

96.    On June 6, 2013, Backpage received a letter from NCMEC recommending the adoption of several specific security measures to prevent the trafficking of children. The recommended security measures included (a) verifying the age and identity of users who submitted adult ads, (b) verifying the age and identity of individuals depicted in photographs within adult ads, (c) prohibiting the use of anonymous payment sources such

- 24 -

Case 2:18-cr-00422-DJH   Document 1366-16   Filed 10/26/21   Page 84 of 120
Case 2:18-cr-00422-SPL   Document 249   *SEALED*   Filed 08/28/19   Page 61 of 117
Page ID #: 2254

as prepaid credit cards, and (d) requiring users to utilize verified email addresses and telephone numbers.   Afterward, Backpage declined to follow any of these recommendations.

97.   On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email notifying them that "Chase [Bank] was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking."   In response, C.F. informed the group that he intended to begin "giv[ing] users free ads if they complain while we wait on directly transactions to another processor."

98.   On September 11, 2013, a Backpage representative made a presentation to the Arizona Governor's Task Force on Human Trafficking.   Following this presentation (which took place in Phoenix), the representative was asked whether there would be any "cons" to requiring verifiable identification of all escorts being advertised on Backpage's website.   In response, the representative did not identify any financial or logistical hurdles to the adoption of such a requirement.   Instead, the representative stated that such a requirement would simply cause Backpage to lose business to other prostitution websites like myRedBook.com or to overseas prostitution websites.   During this meeting, members of the task force also provided the representative with evidence showing that Backpage's moderation efforts were ineffective at preventing the publication of prostitution ads.

99.   On April 3, 2014, PADILLA and VAUGHT were forwarded an email that had been sent to Backpage by a credit card processing company in Canada.   The email stated that "[w]e have multiple user accounts that are paying for your services for what I understand to be prostitution advertisements" and sought information about "how you are processing these transactions."

100.   On April 14, 2014, LARKIN and BRUNST received an email from C.F. discussing why Backpage had experienced "past high growth" and identifying various ideas for achieving "future growth."   This email stated that Backpage had been the beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

- 25 -

identified one particular marketplace as a key source of Backpage's customers: "[N]et loss for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the internet." In other words, the email acknowledged that the supposed "escorts" advertising on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs, hotels, and other brick-and-mortar "gathering spots" during the pre-internet age). This email also attributed Backpage's success in part to its adoption of policies that allowed customers to post ads without leaving any meaningful identifying information—in a list of Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly," "User can post paid ads without a valid email address," and "bitcoin."

101.    On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while cc'ing PADILLA). In this email, VAUGHT explained that if a moderator came across an ad containing a link to a "sex for money" website, the moderator should add the link to a list of banned terms but "don't bother removing it from the current ad."

102.    On September 4, 2014, Backpage was served with a brief that had been filed by NCMEC in a lawsuit in Washington state court. In this brief, NCMEC criticized the sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly claimed in public statements and court filings that it is working to reduce child sex trafficking on its website. The unpleasant reality is that Backpage publicizes carefully selected operational processes as a subterfuge to avoid increased scrutiny, while providing traffickers with easy access to an online venue to sell children for sex. In practice, Backpage's stated interest in doing something meaningful to stop child sex trafficking ads on its site is apparently overridden by the enormous revenue it generates from its escort ads, including ads selling children for sex."

103.    On March 17, 2015, a law enforcement officer with the California Department of Justice spoke with a Backpage representative concerning the prevalence of blatant prostitution ads on Backpage. In response, the representative did not dispute the officer's characterization and said the internet and prostitution were not going away.

Attachment A

Case 2:18-cr-00422-DLR   Document 1366-16   Filed 10/26/21   Page 86 of 120
Case 2:18-mj-00422-DUTY *SEALED*   Document 1-1 *SEALED*   Filed 03/28/18   Page 68 of 117
Page ID #:2256

104.    On July 30, 2015, a document entitled "trainingJuly2015" was distributed to Backpage's moderators. This training manual specifically told moderators that, if they saw a photograph depicting "a person [who] looks young/minor," they should "approve dont delete the ad unless it has a banned term." The training manual also identified, under the heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

105.    In or around August 2015, as part of a lawsuit in Illinois, Backpage was served with an affidavit from a detective employed by the Seattle Police Department. In this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person who charges simply for companionship with no offer of sex) or 'masseuse' (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com" and that "every time the Seattle Police Department's Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."

106.    In or around August 2015, during the same lawsuit in Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department. In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

107.    On October 7, 2015, PADILLA received an email from another Backpage employee (which was later forwarded to VAUGHT) disclosing that there were "massive numbers of live ads with banned terms and pictures out on the site."

108.    On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since

- 27 -

Case 2:18-cr-00422-DJH   Document 1366-16   Filed 10/26/21   Page 87 of 120
Case 2:18-mj-04422-DUTY-SEALED   Document 1-9 *SEALED*   Filed 03/28/19   Page 84 of 117
Page ID #:2257

2013, every single girl that was rescued was advertised on Backpage."  The email also asked:  "Why hasn't Backpage closed down the adult escort ads portion of its site like Craigslist when it's known that underage girls are being exploited via Backpage?"

109.    In or around January 2016, Company A was retained to serve as a payment processor for some of Backpage's websites.  On April 29, 2016, Company A informed C.F. that it had conducted "a review of your website, and unfortunately we had to suspend your account . . . [because] advertising of illegal activities is strictly forbidden."

110.    Beginning in or around January 2016, Backpage's moderators were instructed to stop removing ads that contained the phrase "GFE."  For example, on January 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far as I am aware we are no longer removing ads for GFE."  Similarly, on March 9, 2016, a Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA] and I talked about the GFE thing, going forward we will not be removing ads for GFE" and clarifying "this includes even gfe with price."  And again, on March 25, 2016, an email was sent to Backpage's moderation staff stating that "We are no longer removing ads for 'GFE' or 'PSE.'"

111.    In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the term "GFE" (girlfriend experience) is a coded term for prostitution.  For example:

•    On October 26, 2010, SPEAR, HYER, and PADILLA received an email from C.F. that explained:  "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

•    On May 4, 2011, HYER sent an email to PADILLA and others identifying GFE as a "code word" that should be forbidden.

•    On August 31, 2011, PADILLA and C.F. exchanged emails in which they discussed a list of 100 "solid sex for money terms."  The list included "GFE = girlfriend experience."

•    On November 2, 2011, PADILLA and VAUGHT received an email from a co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not

- 28 -

1  allowed."

2  112. HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically

3  received a "Google alert" when articles discussing Backpage appeared in the news. Many

4  of the news articles identified in these alerts discuss instances in which prostitutes who had

5  been advertised on Backpage were kidnapped, raped, or murdered.

6  113. In January 2017, after conducting a lengthy investigation, the Senate

7  Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report

8  entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." This report

9  concluded, among other things, that virtually all of Backpage's "adult" ads are actually

10  solicitations for illegal prostitution services and that "Backpage has maintained a practice

11  of altering ads before publication by deleting words, phrases, and images indicative of

12  criminality, including child sex trafficking . . . . Those practices served to sanitize the

13  content of innumerable advertisements for illegal transactions—even as Backpage

14  represented to the public and the courts that it merely hosted content others had created."

15  114. In response to the Subcommittee's report, Backpage purported to shut down

16  the "adult" section of its website. However, the prostitution ads simply migrated to other

17  sections of the website, where they remain to this day.

18  D.  International Operations

19  115. In addition to facilitating prostitution through its U.S. website, Backpage has

20  also facilitated prostitution through its websites in foreign countries. In this context,

21  Backpage often affirmatively creates the content of the illegal prostitution ads being

22  published.

23  116. Around 2013 or 2014, Backpage hired a Philippines-based company

24  (Company B) in an attempt to increase the profitability of Backpage's international

25  operations. Company B's employees were instructed to (1) visit rival prostitution websites

26  in other countries, (2) obtain the email addresses of prostitutes who were posting ads on

27  those websites (often by falsely posing as prospective customers), (3) use the information

28

- 29 -

Case 2:18-cr-00422-DJH   Document 1366-16   Filed 10/26/21   Page 89 of 120
Case 2:18-cr-00422-SRB   Document 3   *SEALED*   Document 1-1   *SEALED*   Filed 03/28/19   Page 86 of 117
Page ID #:3259

from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer. Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

117. Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States. For example, on or around November 6, 2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST. Among other things, this presentation summarized Backpage's plans for "International Planning and Expansion." One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff. American staff makes contact."

118. On August 7, 2014, HYER sent an email stating that Company B was "an efficient and cost effective way for us to bring new users to backpage." This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target. Backpage also provides sample 'scripts' and examples of phone calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email address & permission to preboard ad. 3. BPO preboards ad as public user. 4. After ad is preboarded, users receive verification link to verify the ad." This email also stated that Backpage would offer a "bonus per verified authenticated ad."

119. On April 10, 2015, a "five-year business plan" was emailed to LARKIN, BRUNST, SPEAR, and C.F. One of the goals for 2015 was "Off shore marketing staff in the Philippines to grow to 166 and main task is international market content acquisition." This email also included a separate attachment stating that HYER should be considered for promotion because "his strengths are strong marketing and revenue growth skills" and he

Attachment A

had been "heavily involved in the user experience development" and that VAUGHT should be considered for a promotion because "[h]er strengths include six years of experience managing moderators."

120.    On May 15, 2015, a Company B employee posing as a Backpage employee sent an email to an apparent prostitute.  The subject line was "Offering Free Advertisement from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade your ad with sponsor placement or automatic repost."  In response, the prostitute wrote back that she had "managed to activate my ad and could buy credits as well.  thanks for your help.  I'm traveling today to [London] how can I change my location."  This email exchange was later forwarded by HYER to C.F. with a cover note stating:  "[I]deal scenario for [Company B] agent – user activates ad, user purchases credit."

121.    On December 14, 2015, C.F. was part of an email exchange concerning an ad that had an IP address associated with Company B.  This email contained the following description of Company B's process for creating and selling prostitution ads on Backpage: (1) "Staff found lead in assigned area."  (2)  "Staff entered all relevant into [database] (phone/email/etc.)"  (3)  "Staff called lead to discuss creation of free ad"  (4)  Staff created free ad for lead (verification email sent).  (5)  Staff followed under with an email reminding lead of phone conversation and detailing verification of ad."

E.    Select Victim Summaries

122.    Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia.  Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money).  On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases.  In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words.  Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

123.    Between in or around 2009 and 2011, Victim 2 was sold for sex, through the

- 31 -

use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey, and Louisiana.  Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did not know she was being offered on Backpage.  The ads contained words and phrases to make customers believe Victim 2 was "barely legal" and also contained words and phrases indicative of prostitution, such as "roses" (money).

124.    Between in or around 2009 and 2012, Victim 3 was sold for sex, through the use of Backpage ads, in Colorado and North Dakota.  Victim 3's pimp instructed her to review existing prostitution ads on Backpage to learn how to draft her own ads.  During a portion of this period, Victim 3 was required by her pimp to make week-long trips to North Dakota to work as a prostitute.  During these trips, which would generate as much as $2,000 in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home in the care of her pimp.

125.    In or around 2010, Victim 4 was sold for sex, through the use of Backpage ads, in Washington.  During this period, Victim 4 was a juvenile (15 years old).  Victim 4's pimp drafted the ads that were placed on Backpage.  The wording of these ads was edited by Backpage before publication.  The ads contained words and phrases such as "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL" and included pictures of Victim 4 in provocative positions showing her breasts and buttocks.

126.    Between in or around 2011 and 2016, Victim 5 was sold for sex, through the use of Backpage ads, in Massachusetts and Rhode Island.  During much of this period, Victim 5 was a juvenile (14-19 years old).  Victim 5's female pimp instructed Victim 5 that Backpage was the safest place to advertise because it did not require age verification.  On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was only 17 years old.  In response, the ad was simply resubmitted with a new (false) age of 19.  On other occasions, Backpage removed provocative pictures of Victim 5 from ads and then allowed edited versions of the ads to be published.  Victim 5's Backpage ads included

- 32 -

words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex). Some of the customers who responded Victim 5's Backpage ads forced Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures, and gang-raped her.

127. In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads, in Arizona. Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particular type of hair color and build. On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman. Upon her arrival at the location, Victim 6 was stabbed to death.

128. Between in or around 2012 and 2015, Victim 7 was sold for sex, through the use of Backpage ads, in Washington and Oregon. Victim 7's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained provocative nude pictures of Victim 7.

129. Between in or around 2013 and 2014, Victim 8 was sold for sex, through the use of Backpage ads, in Maine, Connecticut, and Massachusetts. During this period, Victim 8 was a juvenile (15 years old). Victim 8's uncle, as well as his friends, placed the ads on Backpage, which included words and phrases that were indicative of prostitution, such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour. Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as well as "out-calls" (where she was raped at other locations chosen by the men paying for her).

130. In or around 2013, Victim 9 was sold for sex, through the use of Backpage ads, in Florida. Victim 9's pimp taught her how to use code words in her Backpage ads to indicate how much she was charging for certain sex acts. Victim 9 was brutally attacked by her trafficker, causing bruises and a fractured cheek bone.

131. Between in or around 2014 and 2015, Victim 10 was sold for sex, through

- 33 -

the use of Backpage ads, in California and Arizona. During some of this period, Victim 10 was a juvenile (17 years old). An associate of Victim 10's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire" and included pictures of Victim 10 in provocative positions showing her legs, stomach, shoulder, and buttocks.

132.    Between in or around 2014 and 2015, Victim 11 was sold for sex, through the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New Mexico, and Utah. The Backpage ads contained words and phrases indicative of prostitution and included pictures of Victim 11 in provocative positions. On some occasions, Backpage would remove certain explicit photos from the ads but publish the remaining text and other photos. Victim 11's trafficker gave her drugs, took her identification documents, sexually assaulted her with a firearm, and forced her to work full-time as a prostitute.

133.    In or around 2015, Victim 12 was sold for sex, through the use of Backpage ads, in California and Arizona. Victim 12 was first advertised on Backpage in San Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was being held there. Victim 12's advertisements on Backpage contained words and phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}" and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

134.    In or around 2015, Victim 13 was sold for sex, through the use of Backpage ads, in California. During this period, Victim 13 was a juvenile (15 years old). Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body. On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

135.    In or around June 2015, Victim 14 was sold for sex, through the use of a

- 34 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 94 of 120
Case 2:18-cr-00422-DJH *SEALED* Document 45 *SEALED* Filed 03/28/18 Page 91 of 117
Page ID #:3264

Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

136. In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

137. In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

138. Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp. An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

- 35 -

Case 2:18-cr-00422-DJH   Document 1366-16   Filed 10/26/21   Page 95 of 120
Case 2:18-mj-04227-DUTY *SEALED*   Document 4-1 *SEALED*   Filed 03/28/18   Page 92 of 117
Page ID #:3265

F.      Money Laundering Activities

139.    Backpage's customers have overwhelmingly used the proceeds of criminal activity (*i.e.,* money earned from pimping and prostitution) when purchasing ads on Backpage.  In addition, because Backpage's publication of such ads is an independent crime (*e.g.,* violation of 18 U.S.C. § 1952), the fees it collects from customers posting prostitution ads—estimated at more than $500 million since 2004—constitute the proceeds of unlawful activity.

140.    For these and other reasons, banks and financial institutions have repeatedly refused to do business with Backpage.  In response, the BACKPAGE DEFENDANTS have pursued a variety of money laundering strategies.  For example, on August 27, 2013, C.F. was forwarded an array of emails from Backpage customers who were complaining that their credit card companies had refused to process Backpage-related transactions.  One customer wrote:  "Have you resolved the issue of Chase Bank not honoring payment for you for ethical reasons?"  C.F. forwarded these complaint emails to LARKIN, SPEAR, and BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

141.    During a November 2013 presentation by C.F. to LARKIN, SPEAR, and BRUNST, C.F. again discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment.  Another "solution" was to "allow users to fund an account thru several other sites" that "have no adult or images."

142.    On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email entitled "Options for the future of Backpage."  This email discussed various strategies for creating new entities to process Backpage-related payments "without ever disclosing ties

- 36 -

to Backpage."

143.    On April 1, 2015, BRUNST and C.F. were informed that Mastercard was "snooping around" Backpage and might stop processing payments for Backpage. In response, C.F. offered several suggestions for setting up new payment channels that would conceal Backpage's involvement. One such proposal was to begin routing Backpage-related transactions through banks located in the country of Mauritius. In response, BRUNST stated: "Didnt we go down the Mauritius path once and the banks had the same issue with our content?"

144.    Notwithstanding these strategies, the three major credit card companies stopped doing business with Backpage. On or about April 30, 2015, Backpage learned that American Express would no longer allow its cards to be used for any purchases in Backpage's adult section. In or around July 2015, Backpage learned that Mastercard would no longer allow its cards to be used for Backpage-related transactions. When discussing this decision, MasterCard stated that it "has rules that prohibit our cards from being used for illegal activities." Around the same time, Backpage learned that Visa would no longer allow its cards to be used for Backpage-related transactions. When discussing this decision, Visa stated that its "rules prohibit our network from being used for illegal activity."

145.    Similarly, some banks closed accounts that were held by Backpage (or Backpage-related entities) out of concern the accounts were being used for illegal purposes. For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was addressed to "Backpage.com." The letter explained: "Dear Jed . . . please be advised that we have elected to close your Account with us."

146.    Backpage responded to these developments in several ways. One was to encourage customers to send checks and money orders to a Post Office box held in the name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions") and give such customers a corresponding credit on Backpage. For example, on July 31,

- 37 -

Case 2:18-cr-00422-DJH   Document 1366-16   Filed 10/26/21   Page 97 of 120
Case 2:18-ap-00222-DDA   SEALED   Document 4-1   SEALED   04/11/18   08/28/19   Page 94 of 17
Page ID #:3267
117   Page ID #:3267

2015, C.F. exchanged email correspondence with a representative from a payment processing company. In this email, C.F. identified himself as the CEO of Posting Solutions, described Backpage as a "brand" operated by Posting Solutions, and explained he was seeking to "find a way to position payments under another company."

147. The following episode provides an example of how the Posting Solutions payment process worked. On October 16, 2015, Backpage received an email from a customer complaining about her inability to pay for ads using a credit card. In response, a Backpage representative explained—in an email exchange later forwarded to VAUGHT—that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with alternative payment methods such as Bitcoin. If you are in the United States, you can also pay by check or money order. Please make payable to 'Posting Solutions.' WE CAN ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING SOLUTIONS.' Posting Solutions. Attn: Accounts. P.O. Box 192307. Dallas, TX 75219. Please send through the United States Postal Service. FedEx, UPS, or other mail delivery alternatives cannot deliver to a P.O. Box. When sending your payment please be sure to include your email address. Please do not make your payments out to backpage.com as we will no longer be able to accept them."

148. Between around September 2015 and June 2016, over $7.1 million of checks and money orders sent by Backpage customers were deposited in bank accounts held by Posting Solutions.

149. Backpage also utilized a different entity, called Website Technologies, LLC ("Website Technologies"), to process Backpage-related funds and took steps to make it appear that Backpage and Website Technologies were independent entities. For example, on March 10, 2014, BRUNST, SPEAR, and others participated in an email exchange with the subject line "Website Technologies vs Backpage (Vendors, audits, risk assessments, email)." During this exchange, one person stated "[C.F.] and I were just discussing company names and the possibility of updating our email addresses to

- 38 -

websitetechnologies.com." In response, BRUNST cautioned: "We need to think this thru or all the work to separate it from BP will be lost." Similarly, on April 3, 2014, BRUNST sent an email to SPEAR and others explaining that "[b]y May 1 we will have to be out of US Bank. We will move all banking under Website Technologies at [a different bank, BMO Harris]."

150. In many instances, Backpage-related money that was initially deposited into accounts held by Posting Solutions was later transmitted to accounts held by Website Technologies. For example:

• On October 27, 2015, C.F. received an email entitled "Two packages coming your way! (Money Orders)." The email stated that two UPS packages filled with money orders were being sent—one containing $47,647.25 of money orders made out to Backpage and the other containing $52,251.48 of money orders made out to Posting Solutions.

• Similarly, on November 16, 2015, C.F. received an email entitled "Three packages sent today $441,408.69." The email stated that three packages filled with money orders were being sent—one containing $129,193.61 of money orders made out to Backpage, another containing $244,353.63 of money orders made out to Posting Solutions, and the last containing an additional $67,861.75 of money orders made out to Posting Solutions.

• And again, on January 29, 2016, a Posting Solutions account wired $2.4 million to a Website Technologies account. PADILLA and C.F. were both authorized signers on the recipient account.

151. In addition to receiving millions of dollars from Posting Solutions, the Website Technologies accounts also served as the repository for millions of dollars of wires from international bank accounts controlled by Backpage-associated entities. For example, between January 2015 and December 2016, Website Technologies accounts received over $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein, over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland,

- 39 -

Case 2:18-cr-00422-DJH Document 1366-16 Filed 10/26/21 Page 99 of 120
Case 2:18-ap-00422-DJH-SEALED Document 249-SEALED-4 Filed 03/28/19 Page 96 of 117
Page ID #:4269

and over \$3.9 million in wire transfers from Backpage-associated bank accounts in the Netherlands.

152.   In many instances, the next stage of the money-laundering process was for money to be wired from Website Technologies accounts to bank accounts held by a different entity called Cereus Properties LLC ("Cereus Properties").   The authorized signers on the Cereus Properties accounts included SPEAR and BRUNST.   Between around December 2015 and October 2016, Website Technologies accounts sent wire transfers totaling over \$47 million to accounts held by Cereus Properties.

153.   Accounts held by Cereus Properties also received money directly from international bank accounts controlled by Backpage-associated entities.   For example, between around August 2016 and November 2016, Cereus Properties accounts received over \$11.3 million in deposits and wire transfers from Backpage-associated accounts in the Netherlands.

154.   After money reached Cereus Properties, large portions of it were funneled back to Backpage or to certain BACKPAGE DEFENDANTS.   For example, between January 2016 and January 2017, LACEY (and LACEY's family members) received distributions totaling over \$30.3 million and LARKIN separately received distributions totaling over \$21 million.

155.   Backpage also furthered its money laundering efforts through the use of bitcoin processing companies.  Over time, Backpage utilized companies such as CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or route money through the accounts of related companies.

156.   Backpage also furthered its money laundering efforts by developing ways for customers to purchase ads using gift cards issued by third-party vendors.  This process was described in a July 23, 2015, email exchange between various Backpage employees on which HYER and others were copied.  This exchange included the following:  "[W]hat if we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

- 40 -

Case 2:18-cr-00422-SPL Document 1366-16 Filed 10/26/21 Page 100 of 120
Case 2:18-cr-00422-DJH *SEALED* Document 431 *SEALED* Filed 08/13/19 Page 71 of
117 Page ID #:4270

our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to user), simultaneously adding credits/purchasing paid ad or upsells?  From the user's perspective they just input their prepaid card and get their credits or purchase."

## COUNT 1

### (Conspiracy)

157.   The factual allegations in Paragraphs 1-156 are incorporated by reference and re-alleged as though fully set forth herein.

158.   Beginning in or around 2004, and continuing through the present, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

a.   18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

### OBJECT OF THE CONSPIRACY

159.   The object of the conspiracy was to obtain money.

### MANNER AND MEANS OF THE CONSPIRACY

160.   The manner and means of the conspiracy are described in paragraphs 1-156 above, incorporated by reference and re-alleged as though fully set forth herein.

### OVERT ACTS

161.   Overt acts were committed in furtherance of the conspiracy, including but not limited to those described in paragraphs 1-156 above, incorporated by reference and re-alleged as though fully set forth herein.

In violation of 18 U.S.C. § 371.

- 41 -

## **COUNTS 2-51**

### **(Travel Act—Facilitate Prostitution)**

162.    The factual allegations in Paragraphs 1-161 are incorporated by reference and re-alleged as though fully set forth herein.

163.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
|---|---|---|
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS –19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! – |

Attachment A

| | | |
|---|---|---|
| | | 19" after deleting one picture from the originally-submitted ad |
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after |

Attachment A

| | | deleting pictures from originally-submitted ad |
|---|---|---|
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with |

Attachment A

Case 2:18-cr-00432-BHH Document 1366-16 Filed 10/26/21 Page 104 of 120
Case 2:18-cr-00432-BHH-SEALED Document 44-1 Filed 02/28/18 Page 101 of
117   Page ID #:275

| | | accompanying text "I DO NOT OFFER 40$, 50$, 60$ SPECIALS" and "IN/CALLS – ONLY" |
|---|---|---|
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN – 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |
| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW – 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!! PSE & GFE – Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New – 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton – 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model 2016 Special 'Best Looking Young Asian' . . . – 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And The Destination…..Erectile Dysfunctional G F E Provider – 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |

- 45 -

| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ~ PRE-BOOKING SPECIAL ~ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |
| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy  . . . – 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!! I'm a GFE. OutCall and Incall with exception on the Incall!! – 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG  Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish ad entitled "Real & Reviewed Girlfriend Theonesweet.weebly.com – 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS – 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20," with accompanying text "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |

- 46 -

Attachment A

Case 2:18-cr-00432-BHL Document 1366-16 Filed 10/26/21 Page 106 of 120
Case 2:18-mj-00732-SEALED Document 41-SEALED Filed 06/26/21 Page 103 of
117   Page ID #:276

| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |
| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!   Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area  Carfun  Perfect Treat   Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160  H:  $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE  Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A) and (b)(1)(i).

- 47 -

Case 2:18-cr-00422-DJH Document 1366-46 Filed 10/26/21 Page 107 of 120
Case 2:18-mj-00722-DUTY *SEALED* Document 11 *SEALED* Filed 04/22/18 Page 104 of
117   Page ID #:247

## COUNT 52

### (Conspiracy To Commit Money Laundering)

164.   The factual allegations in Paragraphs 1-163 are incorporated by reference and re-alleged as though fully set forth herein.

165.   Beginning in or around 2004, and continuing through the present, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

       a.     18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

       b.     18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

       c.     18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

       d.     18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

       e.     18 U.S.C. § 1597 (Transactional Money Laundering)

In violation of 18 U.S.C. § 1956(h).

## COUNTS 53-62

### (Concealment Money Laundering)

166.   The factual allegations in Paragraphs 1-165 are incorporated by reference and re-alleged as though fully set forth herein.

167.   On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified

- 48 -

Attachment A

unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

- 49 -

Attachment A

## COUNTS 63-68

### (International Promotional Money Laundering)

168.    The factual allegations in Paragraphs 1-167 are incorporated by reference and re-alleged as though fully set forth herein.

169.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|---|---|---|---|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

Attachment A

**COUNTS 69-93**

**(Transactional Money Laundering)**

170. The factual allegations in Paragraphs 1-169 are incorporated by reference and re-alleged as though fully set forth herein.

171. On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 69. | LACEY, BRUNST | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, BRUNST | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| 71. | SPEAR | June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |
| 72. | SPEAR | June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |
| 73. | SPEAR | Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to UBS Financial |
| 74. | SPEAR | May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |
| 75. | SPEAR | May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property |

- 51 -

| | | | | Trust |
|------|-----------------|---------------|------------------|-------------------------------------------------------------------------|
| 76. | SPEAR | Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |
| 77. | SPEAR | Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |
| 78. | SPEAR, BRUNST | Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |
| 79. | BRUNST | Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 80. | LARKIN, BRUNST | Feb. 3, 2016 | $1,507.944.00 | Cereus Properties (x6211) to Charles Schwab |
| 81. | LACEY, BRUNST | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 82. | BRUNST | Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 83. | LACEY, BRUNST | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, BRUNST | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 85. | SPEAR | July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |
| 86. | LACEY, BRUNST | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |

Attachment A

| 87. | LARKIN, BRUNST | Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |
| 88. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |
| 91. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
| 92. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| 93. | SPEAR, BRUNST | Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

In violation of 18 U.S.C. § 1957.

Attachment A

**FORFEITURE ALLEGATION ONE**

[18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.       Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Indictment. Each defendant so convicted shall forfeit to the United States the following:

a.       All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense. Such property includes, but is not limited to, the real property located at the following addresses:

i.       1100 UNION ST #0700 SAN FRANCISCO CA 94109-2019

ii.       2043 PLEASANT HILL RD SEBASTOPOL CA 95472-4947

iii.       343 PRESIDIO AVE, SAN FRANCISCO, CA 94115

iv.       2755 FILLMORE ST, SAN FRANCISCO, CA 94123

v.       5300 STELLA LANE, PARADISE VALLEY, AZ 85253

vi.       16901 COLEGROVE DR., DALLAS, TX 75248

vii.       10647 NORTH STATE ROUTE 89A, SEDONA, AZ

viii.       493 ZINFANDEL LN, ST HELENA, CA 94574

ix.       5555 N. CASA BLANCA DR, PARADISE VALLEY, AZ 85253

x.        1308 E. 56TH ST UNIT 2, CHICAGO, IL 60637

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.       Prosperity Bank account number XXXXX7188

ii.       Compass Bank Account number XXXXXX3873

iii.       Compass Bank Account number XXXXXX3825

- 54 -

1     iv.    National Bank of Arizona Account number XXXX0178

2     v.    National Bank of Arizona Account number XXXX0151

3     vi.    National Bank of Arizona Account number XXXX3645

4     vii.    Live Oak Bank Account Number XXXXXXXXXX2523

5     viii.    Ascensus Broker Dealer Services Account Number XXXXX6943-01

6     ix.    Ascensus Broker Dealer Services account Number XXXXX5280-01

7     x.    First Federal Savings & Loan of San Rafael account number XXXX3620

8     xi.    Republic Bank of Arizona account number XXXX1889

9     xii.    Republic Bank of Arizona account number XXXX2592

10     xiii.    Republic Bank of Arizona account number XXXX2912

11     xiv.    Republic Bank of Arizona account number XXXX2500

12     xv.    Republic Bank of Arizona account number XXXX1938

13     xvi.    Bank of America Account number XXXXXXXXXXXX8225

14     xvii.    Bank of America Account number XXXXXXXXXXXX7054

15     xviii.    Bank of America Account number XXXXXXXXXXXX9342

16     xix.    Bank of America Account number XXXXXXXXXXXX0071

17     xx.    San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

18     xxi.    Ally Bank Account Number XXXXXX6292

19     xxii.    Branch Banking and Trust Bank account number XXXXXXXXX0218

20     xxiii.    Green Bank Account number XXX4832

21     xxiv.    Green Bank Account number XXXXX4293

22     xxv.    Plains Capital Bank account number XXXXXX1098

23     Such property further includes, but is not limited to, the following domain names:

24     i.    atlantabackpage.com

25     ii.    backpage.be

26     iii.    backpage.com

27     iv.    backpage.com.br

28

Attachment A

Case 2:18-cr-00422-DJH   Document 1366-16   Filed 10/26/21   Page 115 of 120
Case 2:18-mj-00422-DUTY   *SEALED*   Document 1-1   *SEALED*   Filed 03/28/18   Page 112 of
117   Page ID #:285

v.    backpage.cz

vi.    backpage.dk

vii.    backpage.ee

viii.    backpage.es

ix.    backpage.fi

x.    backpage.fr

xi.    backpage.gr

xii.    backpage.hu

xiii.    backpage.ie

xiv.    backpage.it

xv.    backpage.lt

xvi.    backpage.mx

xvii.    backpage.net

xviii.    backpage.no

xix.    backpage.pl

xx.    backpage.pt

xxi.    backpage.ro

xxii.    backpage.si

xxiii.    backpage.sk

xxiv.    backpage.us

xxv.    backpage-insider.com

xxvi.    bestofbackpage.com

xxvii.    bestofbigcity.com

xxviii.    bigcity.com

xxix.    chicagobackpage.com

xxx.    denverbackpage.com

xxxi.    newyorkbackpage.com

Attachment A

1  xxxii.    phoenixbackpage.com

2  xxxiii.   sandiegobackpage.com

3  xxxiv.    seattlebackpage.com

4  xxxv.     tampabackpage.com

5          b.     To the extent such property is not available for forfeiture, a sum of

6  money equal to the total value of the property described in subparagraph (a).

7          2.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

8  Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute

9  property, up to the total value of the property described in the preceding paragraph if, as

10 the result of any act or omission of the defendant, the property described in the preceding

11 paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence;

12 (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond

13 the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

14 commingled with other property that cannot be divided without difficulty.

15                    **FORFEITURE ALLEGATION TWO**

16                      [18 U.S.C. § 982(a)(1)]

17         1.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

18 hereby given that the United States will seek forfeiture as part of any sentence, pursuant

19 Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction

20 under Counts 52 through 93 of this Indictment.  Each defendant so convicted shall forfeit

21 to the United States the following:

22         a.     All right, title, and interest in any and all property, real or personal,

23 involved in or traceable to any transaction set forth in Counts 52 through 93 of this

24 Indictment.  Such property includes, but is not limited to, the real property located at the

25 following addresses:

26   i.    1100 UNION ST #0700 SAN FRANCISCO CA 94109-2019

27   ii.   2043 PLEASANT HILL RD SEBASTOPOL CA 95472-4947

28

iii. 343 PRESIDIO AVE, SAN FRANCISCO, CA 94115

iv. 2755 FILLMORE ST, SAN FRANCISCO, CA 94123

v. 5300 STELLA LANE, PARADISE VALLEY, AZ 85253

vi. 16901 COLEGROVE DR., DALLAS, TX 75248

vii. 10647 NORTH STATE ROUTE 89A, SEDONA, AZ

viii. 493 ZINFANDEL LN, ST HELENA, CA 94574

ix. 5555 N. CASA BLANCA DR, PARADISE VALLEY, AZ 85253

x. 1308 E. 56TH ST UNIT 2, CHICAGO, IL 60637

Such property also includes, but is not limited to, funds held in the following bank accounts:

i. Prosperity Bank account number XXXXX7188

ii. Compass Bank Account number XXXXXX3873

iii. Compass Bank Account number XXXXXX3825

iv. National Bank of Arizona Account number XXXX0178

v. National Bank of Arizona Account number XXXX0151

vi. National Bank of Arizona Account number XXXX3645

vii. Live Oak Bank Account Number XXXXXXXXXX2523

viii. Ascensus Broker Dealer Services Account Number XXXXX6943-01

ix. Ascensus Broker Dealer Services account Number XXXXX5280-01

x. First Federal Savings & Loan of San Rafael account number XXXX3620

xi. Republic Bank of Arizona account number XXXX1889

xii. Republic Bank of Arizona account number XXXX2592

xiii. Republic Bank of Arizona account number XXXX2912

xiv. Republic Bank of Arizona account number XXXX2500

xv. Republic Bank of Arizona account number XXXX1938

xvi. Bank of America Account number XXXXXXXXXXXX8225

- 58 -

Attachment A

xvii.     Bank of America Account number XXXXXXXXXXXX7054

xviii.    Bank of America Account number XXXXXXXXXXXX9342

xix.     Bank of America Account number XXXXXXXXXXXX0071

xx.     San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

xxi.     Ally Bank Account Number XXXXXX6292

xxii.     Branch Banking and Trust Bank account number XXXXXXXXX0218

xxiii.    Green Bank Account number XXX4832

xxiv.    Green Bank Account number XXXXXX4293

xxv.     Plains Capital Bank account number XXXXXX1098

Such property further includes, but is not limited to, the following domain names:

i.     atlantabackpage.com

ii.     backpage.be

iii.    backpage.com

iv.     backpage.com.br

v.     backpage.cz

vi.     backpage.dk

vii.    backpage.ee

viii.    backpage.es

ix.     backpage.fi

x.     backpage.fr

xi.     backpage.gr

xii.     backpage.hu

xiii.    backpage.ie

xiv.    backpage.it

xv.     backpage.lt

xvi.    backpage.mx

- 59 -

Attachment A

xvii.    backpage.net

xviii.   backpage.no

xix.     backpage.pl

xx.      backpage.pt

xxi.     backpage.ro

xxii.    backpage.si

xxiii.   backpage.sk

xxiv.    backpage.us

xxv.     backpage-insider.com

xxvi.    bestofbackpage.com

xxvii.   bestofbigcity.com

xxviii.  bigcity.com

xxix.    chicagobackpage.com

xxx.     denverbackpage.com

xxxi.    newyorkbackpage.com

xxxii.   phoenixbackpage.com

xxxiii.  sandiegobackpage.com

xxxiv.   seattlebackpage.com

xxxv.    tampabackpage.com

        b.     To the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

        2.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52 through 93 of this Indictment shall forfeit substitute property, if, by any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or

- 60 -

Attachment A

Case 2:18-cr-00422-DJH  Document 1366-16  Filed 10/26/21  Page 120 of 120
Case 2:18-cr-00422-SPL  Document 42  *SEALED*  Filed 03/28/18  Page 117 of
117   Page ID #:290

1  deposited with a third party; has been placed beyond the jurisdiction of the court; has been

2  substantially diminished in value; or has been commingled with other property that cannot

3  be divided without difficulty.

4                                              A TRUE BILL

5

6                                              S/
                                               _____
7                                              FOREPERSON OF THE GRAND JURY
                                               Date:  March 28, 2018

8  ELIZABETH A. STRANGE
   First Assistant United States Attorney
9  District of Arizona

10 JOHN P. CRONAN
   Acting Assistant Attorney General
11 Criminal Division, U.S. Department of Justice

12
   S/
13 _____
   KEVIN M. RAPP
14 DOMINIC LANZA
   MARGARET PERLMETER
15 JOHN J. KUCERA
   Assistant U.S. Attorneys

16 REGINALD E. JONES
   Senior Trial Attorney
17 U.S. Department of Justice, Criminal Division
   Child Exploitation and Obscenity Section

18

19

20

21

22

23

24

25

26

27

28

Attachment A