GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

KENNETH POLITE
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (D.C. Bar No. 1620183, reginald.jones4@usdoj.gov)
Senior Trial Attorney
Criminal Division, U.S. Department of Justice
1400 New York Ave N.W., Suite 1200
Washington, D.C. 20005
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>    v.<br><br>Michael Lacey, et al.,<br><br>        Defendants. | No. CR-18-00422-PHX-DJH<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND RELEASE FUNDS (Doc. 1366)** |

**INTRODUCTION**

Federal actions are governed by rules. These rules set forth orderly and predictable procedures, and thus ensure equal treatment across all litigants. While courts may craft exceptions to these rules where necessary, these exceptions are narrowly construed and carefully guarded to ensure fairness and predictability. In a criminal action, these rules dictate that questions of guilt precede questions of forfeiture—including the forfeitability of seized assets—unless and until a defendant establishes that her Sixth Amendment rights are actually in peril. Despite this well-settled structure, Defendants Lacey, Larkin, Spear, and Brunst have moved to "Partially Vacate Seizure Warrants" without attempting to follow these rules or make a showing of their purported need, despite having been told in this action and others what showing is required. This is a transparent effort to release another party's money into their hands, purportedly to pay legal fees Defendants have not itemized, explained, or even promised to actually pay. The Motion should be denied.

**FACTUAL BACKGROUND**

A.   **The Backpage/Ferrer Actions**

On April 5, 2018, Backpage.com, LLC and several related entities (collectively "Backpage") pleaded guilty to an information charging one count of money laundering and admitted that Backpage, which operated Backpage.com, "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," "[t]he great majority of these advertisements [were], in fact, advertisements for prostitution services," and after "banks, credit card companies, and other financial institutions refused to do business with Backpage" the company "found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities." *United States v. Backpage, LLC, et al*, Case No. CR-18-465, Doc. 8-2 at 11-12. At the same time, Backpage's CEO, Carl Ferrer, pleaded guilty to a money laundering and Travel Act conspiracy, admitted to a largely similar factual basis, and agreed to cooperate with the government. *See United*

*States v. Ferrer*, Case No. CR-18-464, Doc. 7-2, at 12-14 (collectively with CR-18-465, the "Backpage Actions").

As part of their plea agreements, Backpage and Ferrer agreed to pay $500 million in restitution to victims directly or proximately harmed by Backpage (including, for example, victims trafficked on Backpage), and in furtherance of this restitution, agreed to forfeit a range of assets traceable to or involved in their crimes. *See, e.g.,* CR-18-465, Doc. 8-2 at 6-8. As part of two Preliminary Orders of Forfeiture, Backpage agreed to forfeit a substantial amount of cryptocurrency, approximately 260 internet domain names, a number of corporate bank accounts, and certain funds held in Interest on Lawyers Trust Accounts funded by Backpage (the "IOLTA Funds"):

- Davis Wright Tremaine LLP IOLTA account x3414 ($6.25 million)
- Perkins Coie LLP IOLTA account x1235 ($2.9 million)
- Rusing Lopez & Lizardi IOLTA account x1363 ($5.25 million)
- Prince Lobel Tye LLP Citibank account x1369 ($100,000)
- Copeland, Franco, Screws & Gill, P.A. IOLTA account x2052 ($100,000)
- Wayne B. Giampietro LLC IOLTA account x5397 ($100,000)
- Walters Law Group IOLTA account x4381 ($100,000)
- Akin Gump Strauss Haeur & Feld LLP IOLTA account x7941 ($250,000)
- Thompson Coburn LLP IOLTA account x3332 ($100,000)

*See* CR-18-465, Docs. 22, 42, 44. On June 29, 2018, moving defendants (hereinafter "Defendants") filed petitions seeking the IOLTA Funds. *See* CR-18-465, Docs. 61-64, 73.

**B.     The CDCA Civil Seizure Warrants and Civil Forfeiture Actions**

Between March and November of 2018, magistrate judges in the Central District of California ("CDCA") found probable cause to issue warrants to seize a range of assets involved in or traceable to Backpage's operations. On June 1, 2018, Defendants filed a motion to vacate the seizure warrants on First Amendment grounds, *see In re Seizure Warrants*, CDCA Case No. 18-cv-6742, and on June 10, 2018, Lacey filed an additional motion in the same action seeking to release certain purportedly-untainted funds. CDCA

Case No. 18-cv-6742, Doc. 22.  The motion to vacate was denied on December 20, 2019 (*id.*, Doc. 130), and Lacey's motion for return of funds was resolved through stipulation.

On September 28, 2018, in the Central District of California, the United States filed verified complaints for forfeiture *in rem* based on the seizure warrants and, pursuant to Supplement Rule G(3) of the Federal Rules of Civil Procedure, obtained arrest warrants *in rem* over the assets at issue there. *See, e.g.*, Ex. 1 (Arrest Warrant *in rem* authorizing seizure of $407,686.14 in Bank Funds Seized from Compass Bank Account '4862). Beginning on or about May 22-24, 2019, Defendants filed claims to the assets at issue in these civil forfeiture actions. *See, e.g.,* CDCA Case No. 18-cv-8420 ("Civil Actions" or "Civ. Act."), Docs. 31, 36. The Civil Actions were consolidated on January 14, 2020, and on June 1, 2020, the United States filed a First Amended Consolidated Master Complaint for Forfeiture ("FACMC"). *See* Civ. Act., Doc. 108.  On July 1, 2020, Defendants filed two motions to dismiss the FACMC, which Judge Klausner denied on December 1, 2020. *See* Civ. Act., Doc. 170. On January 13, 2021, the parties stipulated to stay the Civil Actions, and a stay was granted on January 20, 2021.  *See* Civ. Act., Docs. 188-189.

**C.     This Criminal Case**

On March 28, 2018, a grand jury in this District returned an indictment charging Defendants (and others) with knowingly facilitating prostitution and engaging in money laundering designed to conceal misconduct and evade law enforcement, and in July of 2018, the grand jury issued a First Superseding Indictment (the "SI"). *See United States v. Lacey, et al.*, Case No. CR-18-422 (the "Criminal Action" or "Crim. Act."), Doc. 230. On February 11, 2019, Defendants moved to dismiss the SI based on purported interference with certain defendants' Sixth Amendment rights (Doc. 456), which the Court denied on May 2, 2019, although the Court granted certain counsel permission to withdraw for non-payment, and appointed CJA counsel for nonmoving defendants. *See* Doc. 559. Trial in the Criminal Action began on September 1, 2021, and on September 14, 2021, the Court granted a mistrial. *See* Doc. 1308. Trial is now set for February 9, 2022. *See* Doc. 1377.

On October 26, 2021, Defendants moved this Court to "partially vacate the seizure warrants that currently restrain [certain] assets and order the release of these limited sets of assets." Mot at 2. The Motion seeks the release of four subsets of assets, defined with varying degrees of specificity (the "Seized Assets"):

1. $407,686.14 in Bank Funds Seized from Compass Bank Account 4862, held in the name of Voice Media Group (the "VMG Funds");
2. "Over $10 Million" in funds seized from a series attorney trust accounts (the IOLTA Funds, as defined above);
3. Undefined seized funds purportedly from non-adult advertising on Backpage (the "Non-Adult Advertising Funds"); and
4. Undefined seized funds purportedly relating to revenues from outside of the United States (the "International Funds").

Only one moving defendant submitted a declaration in support of the Motion (defendant Brunst), and that lone declaration (1) does not disclose any defendant's ability to pay counsel, (2) does not disclose how much any defendant purportedly needs to fund their defense, and (3) does not commit to actually pay counsel with any funds released.

**RELEVANT LAW**

*Criminal Forfeiture*

Forfeiture in a criminal action is governed by Federal Rule of Criminal Procedure 32.2. Under Rule 32.2(a), the United States must provide notice of its intent to pursue forfeiture in the indictment or information, and upon a guilty plea or guilty verdict, the Court or Jury must determine what property is subject to forfeiture and "whether the government has established the requisite nexus between the property and the offense." Rule 32.2(b)(1)(A). Upon a determination that property is subject to forfeiture, a court must enter a Preliminary Order of Forfeiture ("POF") "without regard to any third party's interest in the property," as the determination of any potential third-party interest in property "must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)." Rule 32.2(b)(2); *see also United States v. Lazarenko*, 476 F.3d 642,

649 (9th Cir. 2007) ("A third party claiming an interest in property subject to forfeiture may not intervene in a trial or appeal of a criminal case involving the forfeiture.").

Where a third party asserts an interest in the subject property, the court must hold an ancillary proceeding to determine the ownership of the property, as set forth in 21 U.S.C. § 853(n). *See* Rule 32.2.(c); *see also* Stefan D. Cassella, *Asset Forfeiture Law in the United States* (2d ed. 2013), § 23-2 ("Cassella") ("[T]he one and only purpose of the ancillary proceeding is to determine the ownership of the property"). A third party has no standing to contest forfeiture outside of the confines of the ancillary proceeding, and even in the ancillary proceeding, the third party must still establish threshold standing to assert any purported ownership interest. *See* Rule 32.2(c)(1)(A). At the ancillary proceeding, the burden is on the third party to establish either that (1) the third party had a preexisting interest in the subject property superior to the convicted defendant, or (2) was an innocent owner of the property. *See* 21 U.S.C. § 853(n)(6)(A-B).

### *Civil Forfeiture*

Following the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), civil forfeitures are largely governed by 18 U.S.C. §§ 981 and 983, as well as Supplemental Rule G of the Federal Rules of Civil Procedure ("Rule G"). A civil forfeiture action generally begins with the United States filing a verified complaint against a defendant *res*, which is then seized pursuant to an arrest warrant, *see* Rule G(3)(b), and proceeds much as an ordinary civil case would (through motion practice, discovery and trial). 18 U.S.C. § 981 also includes a statutory stay provision, which permits either the government or a claimant/defendant to stay a civil forfeiture action until the conclusion of a parallel criminal case. *See* 18 U.S.C. § 981(g)(1-2).

### *The "Monsanto Hearing"*

Under the statutory structure described above, a criminal determination of guilt will almost always precede any adjudication on the forfeitability of seized assets, in order to "promote[] the goals of res judicata: fairness, finality, and avoidance of duplicate judicial proceedings." *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139,

1152 (9th Cir. 2011) (describing statutory design that criminal proceedings advance ahead of a parallel civil forfeiture actions). This is because forfeiture is "an aspect of punishment imposed following conviction of a substantive criminal offense." *Libretti v. United States*, 516 U.S. 29, 39 (1995).

In 1989, the Supreme Court decided two cases addressing how to balance this statutory design against a defendant's Sixth Amendment right to counsel of their choosing. In *United States v. Monsanto*, 491 U.S. 600, 614 (1989), the Court held that pre-trial asset restraints based on probable cause are constitutionally permissible, even when a defendant seeks to use those assets to pay for counsel. And in *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989), the Court held that "[w]hatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond the individual's right to spend his own money." (quotation omitted).

Post-*Monsanto*, a criminal defendant may seek a limited hearing to challenge the probable cause for an asset restraint (a "*Monsanto* hearing")—but the defendant is entitled to such a hearing only if he first shows that such assets are *needed* to pay for his counsel of choice. Thus, the defendant must make an initial showing of a potential Sixth Amendment injury. In *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993), for example, the Ninth Circuit held that the burden is squarely on the movant to establish a "substantial claim" of a Sixth Amendment injury through "sufficiently definite, specific, detailed, and nonconjectural" affidavits. In *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013), the Second Circuit similarly held that, to qualify for *Monsanto* hearing, a defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his counsel and other living expenses. *Accord, United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998) ("[a]s a preliminary matter, a defendant must demonstrate . . . she has no assets, other than those restrained, with which to retain private counsel"); *United States v. Farmer*, 274 F.3d 800, 804-05 (4th Cir. 2001); *see also* Cassela, § 17-6 ("Under *Jones* and *Farmer*, a defendant has a right to a post-restraint, pre-trial hearing if he makes two threshold showings: 1) that he has no assets other than those

subject to the restraining order with which to exercise his Sixth Amendment right to counsel or to pay for living expenses; and 2) that there is a bona fide reason to believe that the court (or the grand jury) erred in finding probable cause to believe that the restrained property would be subject to forfeiture if the defendant is convicted.").

Moreover, courts have imposed strict guardrails to prevent defendants from using *Monsanto* as a general pre-trial discovery device or a fishing expedition into the government's case. In *Kaley v. United States*, 571 U.S. 320, 324 (2014), the Supreme Court held that a *Monsanto* hearing is not a forum to relitigate a grand jury's probable cause finding—but is limited to challenging the alleged nexus between the seized property and the charged offense.

In *Luis v. United States*, the Supreme Court addressed a related issue: "Whether the pretrial restraint of a criminal defendant's legitimate, untainted assets (those not traceable to a criminal offense) needed to retain counsel of choice violates the Fifth and Sixth Amendments." 136 S. Ct. 1083, 1088 (2016). The defendant there allegedly dissipated alleged fraud proceeds pre-indictment, and the government obtained an order restraining her admittedly-untainted property. *See id*. The defendant argued this restraint violated her Sixth Amendment rights, and the Supreme Court agreed, holding that the defendant had "a Sixth Amendment right to use her own 'innocent' property to pay a reasonable fee for the assistance of counsel." *Id*. at 1096. *Luis* hinged on the fact that the property was indisputably untainted and "belong[ed] to the defendant, pure and simple." *Id*. at 1090.

In sum, *Monsanto* and *Luis* each provides a defendant with the opportunity to use untainted funds to pay for their defense if needed. As shown below, regardless of whether *Monsanto* or *Luis* applies, Defendants must first establish—through sworn declarations or affidavits—that they cannot pay for their counsel of choice without access to the seized assets. Defendants' Motion must be denied because they have failed to make this necessary threshold showing, and their remaining assertions are likewise deficient.

# ARGUMENT

**I.       This Court Has Already Held that *Monsanto* Applies.**

Defendants admit they have not attempted to make a M*onsanto/Unimex* showing. Instead, they argue the Motion is not governed by *Monsanto* because (they assert) the Seized Assets are "legitimate and untainted." Mot. at 8.[1] Yet almost two years ago, this Court held that the seizures at issue "were based on the CDCA's finding of probable cause," and that "[u]nlike in . . . *Luis*, the Government is not attempting to prevent Defendants from using assets it believes are untainted." Crim. Act., Doc. 559 at 7.

Nothing has changed since that decision. Defendants' motion to vacate the seizure warrants in the Civil Actions was denied, and the magistrate judges' findings of probable cause have not been overturned. It continues to be true that "given the probable cause findings, this case, at least at this point, is much more like *Monsanto* and *Caplin*." *Id*. at 7. As this Court recognized in Doc. 559:

> Allowing pretrial restraint of assets is consistent with "the long-recognized and lawful practice of vesting title to any forfeitable assets, in the United States, at the time of the criminal act giving rise to forfeiture." *Caplin*, 491 U.S. at 627. This ensures any "ill-gotten gains" will not dissipate before conviction and protects the community's interest in recovery. *Monsanto*, 491 U.S. at 616. The Supreme Court affirmed these rulings as recently as 2014 when it decided *Kaley*. 571 U.S. at 371 ("So again: With probable cause, a freeze is valid.").
>
> Here, the seizures were based on the CDCA's finding of probable cause. Pretrial restraints based on probable cause to believe that the assets will be ultimately forfeited does not offend the Fifth or Sixth Amendment.

Crim. Act., Doc. 559 at 7.

Despite this law of the case,[2] Defendants now simply assert that the Seized Assets are untainted, and accordingly, this case is governed by *Luis* rather than *Monsanto*. But

---

[1] Defendants admit that they would have to make a showing of a Sixth Amendment injury otherwise. *See* Mot. at 15 ("These assets are not 'loot, contraband, or otherwise 'tainted'' and, therefore, Defendants are not required to make a showing under *Monsanto* that they have been deprived of counsel").

[2] Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court or a higher court in the identical case, absent a material change in circumstances." *Ticketmaster L.L.C. v. Prestige Entm't W., Inc*.,

Defendants cannot sidestep this Court's prior Order (Doc. 559), the CDCA's probable cause findings, and the *Monsanto* and *Unimex* cases, simply by ignoring these orders and decisions. The weakness of Defendants' position is particularly obvious in light of the relief requested: an order vacating the seizure warrants.³ The Motion implicitly admits that the Seized Assets were restrained based on a finding of probable cause by a magistrate judge, and yet somehow, the word "magistrate" does not appear a single time in the Motion. In short, despite this Court's prior holding and their own admission that they would need to make a showing under *Monsanto/Unimex* (*see* note 1, *supra*), Defendants have simply chosen not to do so. On this basis alone, the Motion should be denied.

The Court should not turn a blind eye to what Defendants are attempting. If granted, their Motion would nullify *Monsanto*: No rational defendant would ever follow the procedures set by courts post-*Monsanto* when they could ignore a magistrate's finding of probable cause, and instead just assert that seized funds are untainted and obtain a hearing to try to release assets—all without showing that they even intended to use such assets to fund their defense. Nothing in the Motion justifies such a radical change in the law.⁴

---

315 F. Supp. 3d 1147, 1166 (C.D. Cal. 2018) (*citing Thomas v. Bible*, 983 F.2d 152, 154–155 (9th Cir. 1993)). This doctrine "encourages the conservation of limited judicial resources and promotes consistency by allowing court decisions to govern the same issues in subsequent stages of the same case." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261 (9th Cir. 2020).

³ As a matter of procedure, vacating the seizure warrants is actually a moot point, as the seizure warrants currently do not restrain anything: as detailed above, the VMG Funds are subject to an arrest warrant (*see* Ex. 1) and the IOLTA Funds are subject to the amended POF (*see* CR-18-465, Doc. 44), each of which authorize the government's retention of these assets, so vacating the seizure warrants would be largely academic. Defendants seem to miss this point, and confusingly argue that "[t]o date, the government has failed to file any legal instrument that would authorize the continued restraint of these [IOLTA Funds]" (Mot. at 11), but a POF permits the government to seize and retain forfeitable property. *See* Rule 32.2(b)(3)("The entry of a preliminary order of forfeiture authorizes the Attorney General (or a designee) to seize the specific property subject to forfeiture").

⁴ For the same reasons, Defendants are also not entitled to fee reimbursement (Mot. at 16-17), and have not cited a single case holding that the government is responsible for the

**II.     Even Under *Luis*, Defendants Have Failed to Carry Their Burden.**

Even if the Court were to consider the Motion under *Luis* (and it should not), Defendants still fail to meet their burden. As the Supreme Court stated in *Luis*, "the pretrial restraint of legitimate, untainted assets *needed to retain counsel of choice* violates the Sixth Amendment" 136 S. Ct. at 1088 (emphasis added). Post-*Luis*, courts have held that the Supreme Court meant what it said in using the word "needed": much like with *Monsanto*, a defendant seeking relief under *Luis* must show that she actually *needs* restrained funds to retain counsel of choice. Defendants are certainly aware of such precedent, because Judge Klausner expressly rejected their arguments to the contrary in the CDCA:

> Defendants next argue that the pre-trial restraint of their assets is depriving them of their right to counsel of their choice as guaranteed under the Supreme Court's holding in *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016). As Defendants have made no showing in this motion that they lack other funds to pay counsel, the Court disagrees. . . .
>
> Claimants have made no attempt at such a showing. Their motion makes no reference to their present availability of funds, and the Court cannot find anything in the hundreds of pages of exhibits that they have submitted from which it can draw any inference on the subject. As such, the Court finds that Defendants have failed to make the necessary prima facie showing to justify a hearing on release of funds to pay for counsel.

Civ. Act., Doc. 131 (internal citations omitted). Multiple courts have agreed that there is no Sixth Amendment injury under *Luis* absent a showing that a defendant actually needed restrained funds to retain counsel. *See, e.g., United States v. Lindell*, 766 F. App'x 525, 528–29 (9th Cir. 2019) ("Even assuming there were untainted funds in the IRA during the criminal proceedings, Defendants have failed to clearly demonstrate that those funds were needed to pay for counsel of choice."); *United States v. Jones*, 844 F.3d 636, 641, n.1 (7th Cir. 2016) (no *Luis* error where defendant "has not shown a bona fide need for the restrained assets"); *United States v. $89,866.18*, No. 2:16-CV-42-JEM, 2021 WL 1560813, at *2 (N.D. Ind. Apr. 21, 2021) ("Beyond a vague assertion of bona fide need and a statement of the amount of fees he currently owes his counsel of choice, Claimants have

---

costs of a mistrial they themselves moved for. *See* Doc. 1308. Defendants cite only a single case, *Arizona v. Washington*, 434 U.S. 497, 503–04 (1978), which says nothing about fees.

- 10 -

not established that [defendant] has no other method of obtaining funds to pay his attorneys in the criminal case. Until a showing is made, the Court need not address the extent to which some of the forfeited funds may be untainted by the alleged fraud.").

The Motion does not attach any declarations from Defendants explaining how much they need to pay counsel or prepare for trial, what their trial budget might be, what expenses they intend to pay from any released funds, what would become of any unspent or excess funds not ultimately paid to counsel, or even swearing that they will actually use any funds released to pay counsel. *See Kaley*, 571 U.S. 320, 355 (2014) (Roberts, J., dissenting) ("[W]e are not talking about all of a defendant's assets that are subject to forfeiture—only those that the defendant can show are necessary to secure his counsel of choice."). On the present record, the Court could just as easily conclude that Defendants simply intend to spirit any released funds out of the country and beyond this Court's jurisdiction.

Even if Defendants had attempted to make such a showing of need, it is difficult to see how they could have succeeded, as post-*Luis*, courts have generally held that a defendant suffers no Sixth Amendment injury under *Luis* where he or she was competently represented by counsel of choice. *See Marshall*, 754 F. App'x at 160 ("Because Marshall was represented by the counsel of his choice, there was no need for the seized funds and, thus, no *Luis* error."); *United States v. Gordon*, 657 F. App'x 773, 778 (10th Cir. 2016) ("*Luis* needed the funds to obtain counsel of her choice. Here, Gordon did not need the assets to retain counsel as he, in fact, had retained counsel of his choice and that counsel thoroughly and vigorously represented him at trial") (citations and alterations omitted). For nearly three years, Defendants have been vigorously represented by a veritable who's who of the Southern California bar, including counsel from three leading trial boutiques, noted First Amendment attorneys, and multiple former federal prosecutors and federal defenders. There is no indication in the Motion that any defense counsel intend to withdraw, nor have Defendants or counsel explained how any purported lack of funds would functionally impair their defense. While Defendants vaguely assert they "lack funds to pay the hard costs necessitated by a second trial, are unable to mount a constitutionally effective

defense, and may lose their choice of counsel in violation of the Sixth Amendment" (Mot. at 15), they do not cite any declaration or indicate that a motion to withdraw is forthcoming. On this record, the Sixth Amendment is not implicated and *Luis* is not applicable.

### III.     Defendants Have No Right to Fund Their Defense with Backpage's Money.

A defendant has "no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." Doc. 559 at 5 (quoting *Caplin & Drysdale*, 491 U.S. at 626). Here, Defendants seek to release IOLTA Funds that Backpage has already agreed to forfeit—yet Defendants have made no effort to establish that they (as opposed to Backpage) own these funds, and the proper venue for them to do so is in the ancillary proceeding.

The IOLTA Funds were included in a signed POF (*see* CR-18-465, Doc. 44), and Defendants filed petitions to the IOLTA Funds in the ancillary proceedings. *See* CR-18-465, Docs. 61-64, 73.[5] Under Rule 32.2 and 21 U.S.C. § 853(n), a third party's sole avenue for challenging a POF is to establish in the ancillary proceeding that they have a superior ownership interest in these assets. "[S]ection 853(n) is the *exclusive proceeding* in which third parties may claim interests in property subject to criminal forfeiture." *United States v. Nava*, 404 F.3d 1119, 1125 (9th Cir. 2005) (emphasis added); *Lazarenko*, 476 F.3d at 648 (9th Cir. 2007) ("Section 853(n) provides the process for vindicating a third party's interest in forfeited property. The law appears settled that an ancillary proceeding constitutes the only avenue for a third party claiming an interest in seized property.").

Even if probable cause were lacking (it is not), Defendants have made no effort to establish that they have a superior ownership interest to Backpage in the IOLTA Funds, and the exclusive venue for them to make such a showing is in the ancillary proceeding. In fact, the only mention of any POF in the Motion is an argument that "most assets the

---

[5] Defendants previously sought "reconsideration" of the amended POF (*see* CR-18-465, Doc. 45), but as described above, a third-party has no standing to object to inclusion of assets in a POF, and Defendants have since filed petitions to the IOLTA Funds.

- 12 -

government seized from Defendants, their families, or their companies are *not* subject to a criminal restraining order or preliminary order of forfeiture." Mot. at 7, n.16.[6] But the primary assets Defendants are seeking to release (the IOLTA Funds) *are* identified in Backpage's amended POF, and Defendants have already filed petitions seeking the return of those assets in the ancillary proceeding. Having chosen not to make a showing of a superior interest in the IOLTA Funds under §853(n), Defendants are not entitled to have and spend assets that Backpage has already agreed to forfeit.[7]

## IV. The United States Established Probable Cause to Restrain the Seized Assets

Finally, even if the Court were inclined to disregard the showings required under *Monsanto* and *Luis*, and to permit Defendants to challenge the forfeiture of assets they have

---

[6] It is technically correct that many assets seized from Defendants (as opposed to those forfeited by Backpage) are not subject to a POF or restraining order, but that is because (as described above) these assets are restrained pursuant to arrest warrants in the Civil Actions. *See, e.g.,* Ex. 1. The relatively small amount of forfeitable property seized from Defendants but not named in the Civil Actions was returned pursuant to a stipulation between the parties, and consisted of an estimated $1,170,000 in luxury vehicles, jewelry, art, and personal effects. *See* Docs.1036-1037. Defendants do not explain in the Motion why they are not seeking to use this returned property to fund their defense, and they have never requested permission to liquidate this property pursuant to the stipulation in order to pay their counsel. Defendants appear to be seeking to spend Backpage's forfeited money on their defense instead of liquidating their own luxury assets.

[7] The POF over the IOLTA Funds in this District is the primary reason the government agreed that defendants could bring a *Monsanto* motion in this Court, as opposed to CDCA, which has *in rem* jurisdiction over many of the non-IOLTA assets pursuant to the arrest warrants there, such as the VMG Funds. *See* Ex. 1. As to these non-IOLTA assets, the government acknowledges that the Court may have jurisdictional concerns with the Motion being heard in this District as opposed to the CDCA, because the *in rem* nature of a civil forfeiture case will generally mean that the assertion of jurisdiction by one court over an asset forecloses jurisdiction in another court until the jurisdiction of the first court is released. *See Penn General Casualty Co. v. Commonwealth of Pennsylvania ex rel. Schnader*, 294 U.S. 386, 389 (1935). The United States notes this issue only because courts have an independent obligation to determine whether subject-matter jurisdiction exists. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). The United States stands by its agreement to have this Court hear the Motion in the first instance, and as noted herein, the Motion is deficient for multiple reasons and can and should be denied on non-jurisdictional grounds, so the Court need not reach this issue.

not established an ownership interest in, and to ignore both the grand jury and the magistrate judges' findings of probable cause, the United States has nonetheless still stated sufficient probable cause to restrain the Seized Assets.

Probable cause to restrain assets subject to forfeiture "is not a high bar," *Kaley*, 571 U.S. at 338, and is "less than *prima facie* proof but more than mere suspicion." *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008). The United States must merely establish reason "to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." *Id*. It is equally important to recognize what the probable cause standard is not: a *Monsanto* hearing is not a full adjudication of the merits of the government's case. Unlike a full adjudication, a probable cause hearing "serve[s] only a gateway function" and demands only "the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley*, 571 U.S. at 338 (quotation marks omitted).

### 1. The IOLTA Funds

The government has far exceeded the low bar of probable cause regarding the IOLTA Funds: Backpage has already pleaded guilty (thus establishing the commission of an offense) and admitted in a stipulated POF that the IOLTA Funds are proceeds of that offense. *See* CR-18-465, Doc. 44. It is difficult to imagine what more could be asked for than a court-accepted plea agreement and a POF establishing the forfeitability of an asset. *See Florida v. Nixon,* 543 U.S. 175, 187 (2004) ("[T]he plea is…itself a conviction."). As described above, third-parties such as Defendants simply have no right to try and unwind a criminal forfeiture under Rule 32.2. Their remedy is to try to establish a superior ownership interest in an ancillary proceeding. *See* section III, *supra*.

### 2. The VMG Funds

The United States has identified $83,063.12 in tainted funds paid by check (the "Tainted Check") through an alleged pass-through account and into the VMG account, and has provided Defendants with the check number, date, and amount—all of which Defendants attached to the Motion. *See* Doc. 1366-12, at 2 (describing flow of VMG

Funds). The funds from the Tainted Check were commingled with other the funds in that pass-through account, rendering the total amounts transferred from the pass-through into the VMG account subject to forfeiture. *See id*. at 2 (describing transfer of $944,729.25 from alleged pass-through account into the VMG account); *see also* Cassella, § 27-9(d) ("[I]f the money laundering transaction is the simple movement of commingled money from one place to another, *all* of the money involved in the transaction is subject to forfeiture."). While Defendants do not appear to dispute that the Tainted Check was deposited into the alleged pass-through account, they dispute whether the proceeds of the Tainted Check reached the VMG account and have attached records purporting to support this position. *See* Doc. 1366-6. This newly-disclosed evidence does not negate probable cause, however, and is exactly the kind of competing evidence ordinarily produced in civil discovery and then adjudicated at trial. The government acknowledges that forfeiture of the VMG Funds is a closer question than the IOLTA Funds, as it rests on a commingling theory which the government must prove at trial (while the IOLTA Funds have already been forfeited and await an ancillary proceeding). Nonetheless, the government has met the low bar of probable cause.[8]

      3.  <u>Non-Adult Advertising Funds</u>

Defendants' requested return of purported Non-Adult Advertising Funds simply ignores that they are charged with conspiracies in Counts 1 and 52, pretending instead that this case concerns only the 50 ads charged in Counts 2-51. *See* Mot. at 6 ("[T]he government's seizures are completely untethered to the *de minimis* proceeds Backpage received from the 50 charged ads."). This position is fundamentally at odds with the Superseding Indictment, which alleges a continuous criminal conspiracy dating from 2004-2018. *See* SI ¶¶ 195-99 and 202-03; *see also* Doc. 946, at 13 (May 4, 2020 Order) (the fifty ads represent specific instances of "a continuous course of conduct where Defendants

---

[8] The United States has informed Defendants that it will consider returning this asset if Defendants can provide support for their claim that the proceeds of the Tainted Check did not actually result in the VMG Funds. As of this date, these discussions remain ongoing.

facilitated 'unlawful activity,'"); Doc. 793, at 19-20 (October 14, 2019 Order) (discussing *United States v. Pinkerton*, 328 U.S. 640, 646–47 (1946), and holding that "[t]he alleged facts in the SI, taken as true, establish defendants had the specific intent to promote prostitution in violation of the Travel Act.  They conspired together to do so. The conspiracy was successful and resulted in the fifty ads for prostitution that now make up fifty counts of violating the Travel Act."); *see also* Doc. 1355-7, 9/8/21 Trial Tr. at 7:13-17 (ruling that uncharged acts—*i.e.*, those not contained within the 50 substantive Travel Act counts—were "all in furtherance of the charge[d] conspiracy" and therefore not subject to Fed. R. Evid. 404(b)'s notice requirement). The United States is entitled to forfeit both the proceeds of a substantive offense, such as those alleged in Counts 2-51, "or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C); *see also* Cassella, §15-3(b) ("[I]f the defendant is convicted of a conspiracy, all of the property involved in the entire conspiracy is subject to forfeiture, including property involved in uncharged substantive acts, and substantive acts on which the defendant was acquitted.").

      Defendants' arguments otherwise are based on a false premise that Backpage had some substantial "non-adult and admittedly untainted revenue" (Mot. at 6), but as alleged in the SI (and entitled to deference under *Kaley,* 571 U.S. at 324), "virtually every dollar flowing into Backpage's coffers represented the proceeds of illegal activity." SI ¶ 15; *see also* SI ¶ 112 ("the non-adult sections of the Backpage website were simply intended to 'allow[ ] plausible deniability,' to make the website more palatable to 'regulatory and law enforcement' officials, and to otherwise make Backpage's adult section more 'defensible.'"). Ultimately, whether Backpage was generating 90, 95, or 100 percent of its revenue from prostitution ads, considering the scope of the conspiracy alleged in the SI and admitted by Backpage, there is probable cause to believe that every dollar of Backpage's revenue was "involved in the activity subject to the specific forfeiture statute it invokes," *$493,850.00*, 518 F.3d at 1169, namely, conspiracies to violate the Travel Act and launder the proceeds of the same. *See United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (where defendant commingled fraud proceeds and legitimate crop sale proceeds, then

1 transferred commingled funds, government was entitled to total amount involved in the
2 money laundering transactions with no deduction for the amount of legitimate sales).

### 4. The International Funds

Defendants' claim to what they describe as international revenue is simply a fiction, arising from the same money laundering scheme alleged in the SI. This argument is premised on an assumption that payments on so-called international notes must have been sourced from international revenue (as opposed to domestic prostitution ads), but this assumption is not supported by anything in the Motion or the record before the Court. Regardless of how any note payments were characterized, what matters is where the payments were sourced from, and the vast majority of Backpage's revenue was from domestic prostitution advertising. *See* CR-18-465, Doc. 8-2 at 11-12 (Backpage plea admission that the "great majority of [Backpage's] advertisements [were], in fact, advertisements for prostitution services.").

As alleged in the SI and admitted by Backpage in its plea agreement, Backpage was actively mischaracterizing the sources of its revenue due to negative publicity around Backpage. *See* CR-18-465, Doc. 8-2 at 11-12 (Backpage plea admission that the company "found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities."). Indeed, the entire purported sale of Backpage to Ferrer is alleged in the SI as part of the money-laundering scheme alleged (*see* SI ¶¶ 29-32, 177-194, 204-205) and entitled to deference under *Kaley*, so even if Backpage's so-called international operations actually generated the revenue Defendants now claim, the government has nonetheless stated probable cause to believe that any note payments under the sale transaction flowed from the money laundering conspiracy alleged. To the extent that some modest portion of these payments was actually made with foreign-generated ad revenue, for the reasons stated above (*see* section IV.3 *supra*) these commingled funds are subject to forfeiture.

**CONCLUSION**

Defendants' Motion to Partially Vacate Seizure Warrants and Release Funds (Doc. 1366) should be denied.

Respectfully submitted this 9th day of November, 2021.

> GLENN B. McCORMICK
> Acting United States Attorney
> District of Arizona
>
> *s/Dan G. Boyle*
> DAN G. BOYLE
> Special Assistant U.S. Attorney
>
> KEVIN M. RAPP
> MARGARET PERLMETER
> PETER S. KOZINETS
> ANDREW C. STONE
> Assistant U.S. Attorneys
>
> KENNETH POLITE
> Assistant Attorney General
> U.S. Department of Justice
> Criminal Division, U.S. Department of Justice
>
> REGINALD E. JONES
> Senior Trial Attorney
> U.S. Department of Justice, Criminal Division

# CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/Marjorie Dieckman*
U.S. Attorney's Office