Seetha Ramachandran (NY Bar No. 3944121, *admitted pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3455
Facsimile: (212) 969-2900
sramachandran@proskauer.com

Thomas H. Bienert, Jr. (CA Bar No.135311, *admitted pro hac vice*)
Whitney Z. Bernstein (CA Bar No. 304917, *admitted pro hac vice*)
BIENERT KATZMAN LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
tbienert@bklwlaw.com
wbernstein@bklwlaw.com
*Attorneys for James Larkin*

Additional counsel listed on next page

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:18-cr-00422-PHX-DJH |
| Plaintiff, | **REPLY IN SUPPORT OF MOTION TO PARTIALLY VACATE SEIZURE WARRANTS AND RELEASE FUNDS TO DEFENDANTS** |
| vs. | |
| Michael Lacey, *et al.*, | |
| Defendants. | (Oral argument requested) |

Paul J. Cambria, Jr. (NY Bar No. 1430909, *admitted pro hac vice*)
Erin McCampbell (NY Bar. No 4480166, *admitted pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

The government's response asks the Court to ignore the law, which only allows the government to seize *tainted* property pre-trial. The government wrongly argues that Defendants should not be permitted to challenge its seizures – even where it has seized *untainted* property – short of a *Monsanto* showing. While the government is completely wrong on the law, the fact is Defendants have an urgent need for funds – both to pay mounting defense costs (due in part by a mistrial caused entirely by the government's misconduct), and in some cases, for basic living expenses. The government does not even attempt to address the comprehensive evidence that Defendants have offered proving that certain assets *are not traceable to any alleged criminal activity*. Instead, the government brushes off the Defendants' motion and argues that it had probable cause to seize those funds for reasons that include, incredibly, its own cooperator's "consent" to "forfeit" funds in attorney retainer accounts set aside for these Defendants' defense, *while allowing him to keep* identical funds designated for his own defense in both criminal and civil cases. The government's actions have grave constitutional implications under the Sixth Amendment, and Defendants respectfully ask this Court to release the assets identified in their Motion (Dkt. 1366) ("Mot.").

I.   **THE LAW DOES NOT REQUIRE A *MONSANTO* SHOWING WHERE THE GOVERNMENT SEIZES UNTAINTED ASSETS; NEVERTHELESS, DEFENDANTS CAN DEMONSTRATE THEIR OVERWHELMING NEED FOR FUNDS TO PAY FOR THEIR DEFENSE.**

   A.   *Luis* **Applies Because the Government Seeks Continued Restraint of Defendants' Untainted Property.**

To seize these assets, the government must trace the property at issue to the crimes alleged. Mot. at 7 (citing *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1090-92 (2016); *Honeycutt v. United States*, 581 U.S. ___, 137 S. Ct. 1626, 1633 (2017); *Kaley v. United States*, 571 U.S. 320, 323-24 (2014)). The restraint of untainted assets, especially those needed to retain counsel, greatly prejudices criminal defendants and has the potential to violate their Sixth Amendment right to counsel of choice. *See Kaley*, 571 U.S. at 336-37 (right to retain counsel of choice prior to a criminal trial is of "vital interest" to defendants and is the "root meaning" of the Sixth Amendment that "matters profoundly," and the wrongful deprivation of this right is a "structural error" that "pervades the entire trial"); *United States v. Bissell*, 866 F.2d 1343, 1354 (11th Cir. 1989).

The government incorrectly insists that the Defendants cannot even challenge the restraint of these assets without proving, under *Monsanto*, that they have a need for funds to pay for their defense. *See* Dkt. 1384 ("Gov't Opp'n") at 6. But the government mischaracterizes the controlling law and ignores the Supreme Court's decision in *Luis*. In *Luis*, the Supreme Court clarified that *Monsanto* (and its companion case *Caplin & Drysdale)* "relied critically upon the fact that the property at issue was 'tainted,' and that title to the property therefore had passed from the defendant to the Government before the court issued its order freezing (or otherwise disposing of) the assets." *Luis*, 136 S. Ct. at 1090. *United States v. Chamberlain*, 868 F.3d 290, 291 (4th Cir. 2017) (finding that its reliance on *Monsanto* in interpreting criminal forfeiture statute to embrace both tainted and untainted assets "now appears misplaced" given the "important distinction" between tainted and untainted assets articulated in *Luis*). Despite what the government claims, the law does not allow it to seize untainted funds and does not put the onus on Defendants to prove that they need the funds for counsel as a precondition to challenging that unlawful seizure. If that were true, the government could seize assets pretrial with no justification whatsoever, and criminal defendants would have no way to challenge that unlawful seizure without first demonstrating the need for funds to pay counsel. That is not the law, and it never has been the law. The government is not authorized to seize untainted funds pretrial – period. *Honeycutt,* 137 S. Ct. at 1632 (finding that forfeiture statutes limit forfeiture to tainted property, "that is, property flowing from … or used in … the crime itself"); *Luis*, 578 U.S. at 136 S. Ct. 1083, 1090-92 (2016) (finding that a criminal defendant's untainted assets belong to the defendant and are protected from government interference pre-trial); *United States v. Thompson*, 990 F.3d 680, 689-90 (2021) (holding that "[u]nder Section 981, forfeiture cannot extend beyond the tainted property and proceeds traceable to it").

Here, just like in *Luis*, the government seeks continued restraint of Defendants' "*untainted* property, without any showing of any equivalent government interest [to that shown by the government in *Monsanto* and *Caplin*] in that property." *Id.* at 1092 (emphasis added). In both *Luis* and more recently in *Honeycutt*, the Supreme Court held that defendants have a right to challenge the pretrial restraint of property on the ground that it is not related to the alleged criminal activity, without having to demonstrate a need for the assets to pay counsel. *See Honeycutt*, 137 S. Ct. at

1633 ("§ 853(e)(1) authorizes pretrial freezes 'to preserve the availability of property described in subsection (a) ... for forfeiture.' Pretrial restraints on forfeitable property are permitted only when the Government proves, at a hearing, that (1) the defendant has committed an offense triggering forfeiture, and (2) 'the property at issue has the requisite connection to that crime.'") (quoting *Kaley*, 571 U.S. at 323-24); *Luis*, 136 S. Ct. at 1090.

Furthermore, courts have reviewed probable cause findings even where no Sixth Amendment right is implicated. *See, e.g.*, *United States v. Bikundi*, 125 F. Supp. 3d 178, 190-91 (D.D.C. 2015) (holding that defendant had a due process right to pretrial judicial review of the traceability of assets seized pursuant to probable cause warrants and subject to a grand jury finding of probable cause of forfeitability where no Sixth Amendment right was at stake, but defendant needed assets for household support). As such, this Court's decision to review the government's seizure of Defendants' **un**tainted assets does not hinge on them invoking the Sixth Amendment.

The government offers nothing – beyond an overbroad and conclusory claim that it has probable cause to seize assets – to establish that the four limited categories of assets Defendants seek to have released are traceable to any alleged criminal activity. The government argues that *Monsanto* applies simply because a magistrate judge in the Central District of California found that there was probable cause to issue warrants to seize "a range of assets involved in or traceable to Backpage's operations." Gov't Opp'n at 2. But the government fails to show that it has probable cause to believe the **four specific subsets of assets** that Defendants seek to have released are traceable to the alleged criminal activity. Nor is the government correct to suggest that the "law of the case" precludes Defendants' motion. Gov't Opp'n at 8-9. This Court has never ruled that these specific four categories of assets are tainted or that the government has a basis upon which to seize them pre-trial. The Order that the government asserts Defendants are attempting to "sidestep" merely held that the Defendants' claims regarding the government's seizures "should be taken up" in the Central District of California, stating in *dicta* that "this case, **at least at this point**, is much more like *Monsanto* and *Caplin*." Dkt. 559 at 6-7 (emphasis added). But the case now is at a different point and the government has now affirmatively stated that it does "not object" to the pre-trial seizure of these assets being taken up *in this Court* (Dkt. 1366-12 at 4) and

refuse to address anything with Defendants given this pending Motion (*see, e.g.*, Mot. at 2, n.6).

Moreover, to the extent the government argues that a grand jury's finding of probable cause precludes Defendants' motion, the Supreme Court has specifically reserved judgment on the availability of pretrial review of a grand jury's probable cause finding as to whether the property at issue has a requisite connection to the crime. *Kaley*, 134 S. Ct. at 1095 & n.3. In doing so, the Supreme Court noted that the tracing of assets is a "technical matter far removed from the grand jury's core competence and traditional function." *Id.* at 1099 n.9. In any event, no grand jury has made such a finding in this case. Further, given the constitutional rights at stake and the prejudice to Defendants, judicial review of the government's seizures of Defendants' untainted assets is critical. The need for review is heightened by the fact that the probable cause findings referenced in the government's Opposition were made *ex parte*, "increas[ing] the risk of an erroneous finding of probable cause about forfeitability, when the burden of establishing such probable cause indisputably rests with the government." *Bikundi*, 125 F. Supp. at 187.

> **B.  Defendants Require the Release of Funds to Pay for Defense Costs and, in Some Cases, Living Expenses.**

While Defendants have a right to judicial review of the traceability of their seized untainted assets separate from the Sixth Amendment, Defendants show through sworn declarations, submitted *in camera* and under seal, that they have a dire need for these funds to pay for their defense, and that they will use these funds for that purpose. These declarations directly address the questions that the government raised regarding Defendants' ability to fund their defense. *See* Gov't Opp'n at 11. As set forth in the declarations, defense counsel are currently owed substantial amounts of earned legal fees for work that has already been done and costs that have already been incurred. The declarations also provide an estimate for the cost of a second trial, which is an unexpected additional expense Defendants will incur entirely due to the government's misconduct, to the extent the case is not dismissed.

The government argues that because Defendants have retained a "veritable who's who of the Southern California bar," there are no Sixth Amendment issues. But the experience and reputation of the counsel that Defendants have chosen to represent them is irrelevant to whether

the government has violated Defendants' Sixth Amendment right to counsel of choice. Defense counsel were retained well before the government seized the vast majority of Defendants' assets that would have been used to pay their defense costs. And despite not being paid, Defendants' lawyers have continued to defend their clients, and have done so in the face of numerous recusals and a mistrial caused by the government's misconduct, which have made this case even more expensive to defend. If funds are not released to pay Defendants' counsel, they may need to withdraw from the representation because they simply cannot afford to continue the representation in light of the mounting costs. This is exactly the Sixth Amendment concern that that Supreme Court addressed in *Luis*. *See Luis*, 136 S. Ct. at 1089 ("the government would undermine the value of [defendant's Sixth Amendment] right by taking from [defendant] the ability to use the funds she needs to pay for her chosen attorney").

## II. THE GOVERNMENT LACKS PROBABLE CAUSE TO SEIZE THE LIMITED CATEGORIES OF ASSETS DEFENDANTS SEEK TO HAVE RELEASED.

When the government finally addresses the four specific categories of assets at issue, it gives Defendants' evidence short shrift and reveals just how little it knows about the tens of millions of dollars it haphazardly seized from Defendants. Rather than rebut the *evidence* and *sworn declarations* offered by Defendants, the government responds with innuendo. For example, calling a check a "Tainted Check" or an account a "pass-through" account doesn't make it so. And in response to an *unrebutted sworn declaration* establishing that the over $10 million in attorney retainer funds the government seized were in fact earmarked for the defense of cases just like this one and were sourced from, among other places, untainted insurance proceeds from one of the largest insurers in the country, the government merely claims that Backpage pled guilty and stops there. As to the funds the government admits came from non-adult advertisements, the government fudges the numbers – it has never claimed, as it now speculates, that "100 percent" of Backpage's revenue came from prostitution ads. Gov't Opp'n at 16. And yes, contrary to the government's cavalier response, in the face of over $100 million in seizures, 5% or 10% makes a difference where the government has seized virtually all of Defendants' assets. *Id.* Finally, as to the Foreign Loan Payments, again, in the face of *sworn declarations* and contemporaneous legal

and accounting documents establishing that (a) the Backpage business was sold in two seller-financed transactions, one relating to Backpage's domestic operations and the other relating to its foreign operations; (b) the foreign entity was engaged only in foreign operations; and (c) Defendants received separate streams of loan payments from the domestic and foreign entities, the government again deigns not to engage with these fact-based arguments, instead responding with insults, like calling Defendants' argument a "fiction" or referring to the foreign loan agreement as "so-called international notes." Gov't Opp'n at 17.

It is nothing short of stunning that the federal government would indiscriminately seize funds that are demonstrably untethered to any criminal conduct, and then respond so flippantly in the face of evidence that it overreached. The only "fiction" here is the government's purported diligence in seizing these assets.

**A. Defendants' Attorney Retainer Accounts Are Not Traceable to Criminal Activity and the Government Has not Shown Otherwise.**

The government does not even attempt to trace the attorney retainer accounts to criminal activity, nor did it ever obtain a seizure warrant that endeavored to do so. It also ignores a sworn declaration establishing: (a) Defendants directed loan payments from their sale of Backpage to be paid to Rusing Lopez & Lizardi ("RLL") to be kept in trust in anticipation of future litigation—and more than 60% of the funds directed to RLL were payments on the foreign loan; and (b) about 75% of the $2.9 million the government seized from Perkins Coie was insurance proceeds from Traveler's insurance company. At a minimum, those retainer funds should be released.

The government's main response is that Carl Ferrer, Backpage's CEO, pled guilty on behalf of himself and Backpage, and "forfeited" these assets. *See* Gov't Opp'n at 2, 14. In other words, the government claims that it need not meet its burden to trace attorney retainers designated for ***Defendants' legal fees*** because its own cooperating witness – who will testify against Defendants and receive a reduced sentence – "consented" to their forfeiture. And even worse, the government wrongly claims that Defendants have no right to challenge that seizure because they are merely third parties asserting an interest in those funds. This claim violates basic principles of due process.

Criminal forfeitures are *in personam*, which means a defendant can only forfeit his own

interest in property. *See United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018). Where a defendant has no interest in an asset, he has no incentive to challenge its forfeiture. In fact, courts have recognized that a defendant who "consents" to the forfeiture of someone else's assets actually enjoys a windfall because someone else's assets will be used to reduce his own obligation to satisfy a forfeiture judgment. *See id.* at 557 ("The defendant will not end up with the property either way, and he might actually get a windfall if the money he owes is paid off with someone else's property"). That incentive is even stronger for a defendant like Ferrer, who is testifying for the government as a cooperating witness, because he must follow the government's instructions in order to receive 5K credit. Under 21 U.S.C. §853(n), third parties can assert an interest in property subject to forfeiture in a criminal case and have a right to an ancillary hearing, typically held after the defendant's sentencing. That is because third parties are generally not permitted to intervene in a criminal case. But here, the parties who can assert that interest are Ferrer's co-defendants who have been charged as part of the same criminal matter – not third parties.[1] Moreover, because Ferrer is testifying for 5K credit, the government has sole control over when he will be sentenced, which will presumably be after Defendants' criminal trial is over. In fact, the government has continued Ferrer's sentencing **seven** times. Case 2:18-cr-00464-DJH, Dkt. 111. Preventing Defendants from challenging the seizure and forfeiture of their attorneys' retainer accounts – money that they need to defend themselves in this criminal case – until after their criminal trial raises grave constitutional concerns under the Sixth Amendment and as a matter of due process. Courts have found that, in some cases, postponing the ability of claimants to challenge a pretrial restraint until after forfeiture has been ordered (at sentencing) violates due process. *See United States v. Crozier,* 777 F.2d 1376, 1382-84 (9th Cir. 1985) (finding that section 853(e)'s provision for restraining orders on the filing of an indictment violates due process by not allowing a criminal defendant or a third party to challenge a restraining order unless and until after forfeiture has been

---

[1] Defendants filed third-party petitions shortly after the government included them in Ferrer's Preliminary Order of Forfeiture because they had to preserve their ability to challenge the forfeiture if they were forced to litigate their interest through an ancillary hearing. The statutory deadline for filing a petition is 30 days after a claimant receives notice of the Preliminary Order of Forfeiture. *See* 21 U.S.C. § 853(n)(2).

1  ordered); *United States v. Siegal*, 974 F. Supp. 55, 58 (D. Mass. 1997) (finding that the due process
2  clause required the court to afford third parties "a timely pretrial opportunity to challenge the
3  restraining order as 'clearly improper' on the ground the property was not available for forfeiture"
4  because otherwise they would be unable to challenge the restraint for another six months).

5      The government's actions are especially troubling because Ferrer quite obviously had no
6  interest in funds that were specifically set aside for Defendants' legal expenses.  In fact, *the*
7  *government allowed Ferrer to access and use $2,310,000.00 of similar funds* that were set
8  aside for *his defense* and the defense of his companies – not only in the criminal case *but also*
9  *in numerous civil cases* (where there is no Sixth Amendment right to counsel) – even though
10 the funds had exactly the same source and purpose as the funds in Defendants' attorney retainer
11 accounts.  Case 2:18-cr-00464-DJH, Dkt. 23.  The government also agreed not to forfeit Ferrer's
12 Frisco, Texas home, on the grounds that it was not purchased with funds deriving from Backpage
13 (Case 2:18-cr-00464-DJH, Dkt. 7), but restrained real estate owned by Defendants – acquired long
14 before they earned money from Backpage – on the theory that their payment of incidental expenses
15 (such as taxes) related to those properties with funds derived from Backpage rendered them tainted
16 assets subject to forfeiture.  The government's hypocrisy is astounding – the Court should not
17 condone such disparate treatment, merely because Ferrer is a cooperating witness.

18     **B.**    **The Government Fails to Trace the Funds in the VMG Account to Alleged Criminal Activity.**

19     The *unrebutted facts* establish that the VMG depository account is not traceable to any
20 alleged criminal activity, and the government has never made a showing to the contrary.
21 Defendants have demonstrated that the *only deposits* into the VMG depository account came
22 from the sale of Defendants' print newspaper businesses and were VMG's payments on the
23 corresponding note or rent to sublease an office building, both of which are completely unrelated
24 to Backpage.  Brunst Decl., Exh. D. (Dkt. 1366-6).

25     Calling the seizure of these funds a "closer question" appears to be the government's way
26 of admitting that it was wrong to seize these funds.  Gov't Opp'n at 16.  And calling something a
27 money laundering transaction or a "pass-through account" does not make it so.  The government
28

feigns ignorance, calling Defendants' evidence "newly-disclosed." *Id.* at 16.  Again, just because the government ignored evidence to the contrary in seizing funds it should not have seized in the first place is not an actual response to Defendants' unrebutted evidence.  And no, these are not matters for "civil discovery" or "trial" -- the government has already agreed to litigate the seizure of these assets *now, before this Court* (Dkt. 1366 at 2 n.6).

As to the purported "Tainted Check," the government's argument is a non-starter.  That check merely was reimbursed to VMG for legal fees that VMG incurred in connection with civil suits related to Backpage.com.  Declaration of John Brunst in Support of Reply, Exh. A.  As part of the November 8, 2012 sale agreement between Village Voice Media Holdings ("VVMH") and VMG, VVMH (which held Backpage and was owned by Defendants) agreed to indemnify VMG against any claims relating to Backpage (VVMH did not sell Backpage to VMG; it only sold the newspapers).  *See* Dkt. 1366-3 (purchase agreement) at Article VII.  And as the government admits, the reimbursement check *was not even paid from the seized account in question*.  In short, there is zero evidence that the reimbursement somehow rendered the VMG's bank account a "pass-through" account.  The government's argument is baffling – it points to a $83,063.12 check paid to indemnify VMG for legal expenses, a check that did not touch the seized account, and $944,729.25 in separate, admitted *loan and rent payments* from VMG regarding Defendants' seller-financed sale of newspaper businesses, and asks the Court to rule that these two sets of distinct, unrelated transactions, neither of which was illegal to begin with, somehow equate to money laundering and taint the entire seized account.  Indeed, for the government's specious argument to be true, Voice Media Group, a media company that owns papers like the *Phoenix New Times*, would have to be a money launderer.  That obviously is not the case, and there is not, nor can there be, any allegation that Defendants "controlled" VMG.

**C.   The Government Fails to Show That Foreign Loan Payments Are Traceable to Alleged Criminal Activity.**

Defendants have shown, through detailed documentation and contemporaneous accounting records, that Backpage's post-sale foreign operations generated a separate stream of loan payments totaling tens of millions of dollars.  *See* Brunst Decl., Exh. I (Dkt. 1366-11).  That

is not a "fiction" – it is what the unrebutted evidence shows. Gov't Opp'n at 17. The government acknowledges that, with respect to the assets seized relating to revenues from Backpage.com's operations outside of the United States, "what matters is where the payments [on international notes] were sourced from." *Id.* at 17. But the government ignores that principle and fails to offer any evidence establishing that such note payments were sourced from or traceable to alleged illegal activity in the United States. It is not Defendants that ask the Court to rely on an unproven "assumption," (*id.*), but rather the government that asks the Court, without a shred of evidence, to assume that every single dollar generated by Backpage's post-sale foreign operations was generated from unlawful activity in the United States. It does not matter that Carl Ferrer had Backpage enter a guilty plea stating that the "majority" of Backpage's ads were ads for prostitution. *Id.* at 17. The Travel Act is not an extraterritorial statute: it does not proscribe business enterprises involved in alleged prostitution in foreign countries. And in any event, the government offers nothing to show that loan payments tied to the sale of Backpage's foreign operations came from a domestic source.

The government's only response is a reference to the vague allegations that Backpage was "fool[ing]" credit card companies, "mischaracterizing" the source of its revenue, and that the Defendants still controlled Backpage after its sale (if that were true, then how could Ferrer unilaterally plead Backpage guilty, while Defendants continue to vigorously contest the charges against them?). These allegations say nothing about Backpage's post-sale foreign operations or the specific loan payments at issue. The government's response is emblematic of its broad-brush, "seize everything first, and come up with a generic justification later" approach here.

To the extent the government relies on a commingling theory, that too is insufficient to support a finding of probable cause for the reasons explained in Defendant's Motion and above in Part II.B. *See* Brunst Decl., Exh. M (Dkt. 1366-15) (showing that Ferrer's payments on the domestic and foreign loans were made and accounted for separately). Nor does that argument address the foreign loan payments that were paid *directly* to law firms to hold in trust. The mere inclusion of a money laundering count in the indictment does not show probable cause that would justify the pretrial restraint of these assets – not under *Kaley* (as the government claims, without explanation) or any other case law.

### D. A Conspiracy Charge Does Not Support the Blanket Seizure of Defendants' Assets, Including Legitimate, Untainted Assets.

The government argues that because the Indictment includes a conspiracy count against Defendants, there is probable cause to believe that "every dollar of Backpage's revenue" was involved in the criminal activity, simply because a large percentage of Backpage's revenue may be traceable to alleged criminal activity. *See* Gov't Opp'n at 16. That is a gross misrepresentation of the traceability requirement under forfeiture law. The government is "required to trace the seized property directly to the offense giving rise to the forfeiture." *$8,221,877.16 in United States Currency*, 330 F.3d 141, 158 (3d Cir. 2003). The government cannot simply cite to its own conspiracy charge as a way to circumvent the traceability requirement and seize all of Defendants' assets. In fact, the Supreme Court has recently limited the extent to which the government can use conspiracy charges as a basis for forfeiture. *See Honeycutt*, 137 S. Ct. at 1635 (limiting forfeiture to "property the defendant himself actually acquired as a result of the crime" and holding that members of a conspiracy are not jointly and severally liable for property that one conspirator, but not the other, acquired from the crime); *United States v. Thompson*, 990 F.3d 680, 689-90 (9th Cir. 2021) (applying *Honeycutt* to Section 981 and holding that forfeited property of a conspiracy has to be "traceable" to the proceeds "derived" from the alleged crime, which "does not, and cannot under *Honeycutt*, extend to all the criminal's property, 'traceable' or not" because [s]uch an application would be inconsistent with the common law conception of forfeiture"). Thus, proceeds derived from legitimate business activity are not subject to forfeiture simply because they are associated with a business charged with other criminal activity.

## III. CONCLUSION.

For the foregoing reasons, Defendants respectfully request this Court (1) partially vacate the seizure warrants to the extent they restrain funds tied to the VMG Account and the attorney retainer funds and (2) order the government to release any seized funds traceable to the foreign loan payments or non-adult advertising proceeds.

RESPECTFULLY SUBMITTED this 16th day of November 2021,

        PROSKAUER ROSE LLP
        *s/ Seetha Ramachandran*
        Seetha Ramachandran
        Asset Forfeiture Attorney for James Larkin

        BIENERT KATZMAN LITTRELL WILLIAMS LLP
        *s/ Whitney Z. Bernstein*
        Thomas H. Bienert, Jr.
        Whitney Z. Bernstein
        Attorneys for James Larkin

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Oct. 2020) § II(C)(3), Whitney Z. Bernstein hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

        LIPSITZ GREEN SCIME CAMBRIA LLP
        *s/ Paul J. Cambria, Jr.*
        Paul J. Cambria, Jr.
        Erin McCampbell Paris
        Attorneys for Michael Lacey

        FEDER LAW OFFICE PA
        *s/ Bruce Feder*
        Bruce Feder
        Attorney for Scott Spear

        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG AND RHOW PC
        *s/ Gary S. Lincenberg*
        Gary S. Lincenberg
        Ariel A. Neuman
        Gopi K. Panchapakesan
        Attorneys for John Brunst

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*/s/ Toni Thomas*
Toni Thomas