UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-DJH |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | December 3, 2021 |
| Michael Lacey, | ) | 9:01 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

ORAL ARGUMENT


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1              A P P E A R A N C E S

2    For the Government:

3              U.S. Attorney's Office
               By: PETER SHAWN KOZINETS, ESQ.
4                  KEVIN M. RAPP, ESQ.
                   MARGARET WU PERLMETER, ESQ.
5                  ANDREW C. STONE, ESQ.
               40 North Central Avenue, Suite 1200
6              Phoenix, AZ  85004

7              U.S. Department of Justice
               By: REGINALD E. JONES
8              1400 New York Avenue NW, Suite 600
               Washington, DC  20530

9              U.S. Department of Justice
10             By: DANIEL G. BOYLE, ESQ. (Telephonic)
               312 North Spring Street, 14th Floor
11             Los Angeles, CA  90012

12

     For the Defendant Lacey:
13
               Lipsitz Green Scime Cambria
14             By: PAUL JOHN CAMBRIA, JR., ESQ.
               42 Delaware Avenue, Suite 120
15             Buffalo, NY  14202

16   For the Defendant Larkin:

17             Bienert Katzman
               By: THOMAS HENRY BIENERT, JR., ESQ.
18                 WHITNEY Z. BERNSTEIN, ESQ.
               903 Calle Amanecer, Suite 350
19             San Clemente, CA  92673

20   For the Defendant Spear:

21             Feder Law Office
               By: BRUCE S. FEDER, ESQ.
22             2930 East Camelback Road, Suite 160
               Phoenix, AZ  85016
23

24

25

```
 1    For the Defendant Brunst:

 2              Bird Marella Boxer Wolpert Nessim Drooks
              Lincenberg & Rhow
 3              By: GARY S. LINCENBERG, ESQ.
              1875 Century Park E, Suite 2300
 4              Los Angeles, CA  90067

 5    For the Defendant Padilla:

 6              DAVID EISENBERG, PLC
              By: DAVID S. EISENBERG, ESQ.
 7              3550 North Central Avenue, Suite 1155
              Phoenix, AZ  85012
 8
      For the Defendant Vaught:
 9
                JOY BERTRAND ESQ, LLC
10              By: JOY MALBY BERTRAND, ESQ. (Telephonic)
              P.O. Box 2734
11              Scottsdale, AZ  85252

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  This is case number CR 18-422,

2    United States of America versus Michael Lacey and others, on

3    for oral argument.  Counsel, please announce your presence for

4    the record.

5          MR. KOZINETS:  Good morning, Your Honor.  Peter

6    Kozinets on behalf of the United States of America.  Appearing

7    with me is Kevin Rapp, Andrew Stone, Margaret Perlmeter, and

8    Reginald Jones, and on the phone we have Daniel Boyle.

9          THE COURT:  All right.  Good morning, counsel.

10          MR. KOZINETS:  Good morning.

11          MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

12    on behalf of Michael Lacey, who is present today.

13          MR. BIENERT:  Good morning, Your Honor.  Thomas

14    Bienert and Whitney Bernstein on behalf of defendant James

15    Larkin, who is present in court today.

16          THE COURT:  Good morning.

17          MR. LINCENBERG:  Good morning, Your Honor.  Gary

18    Lincenberg on behalf of Mr. Brunst, who is present in court.

19          MR. FEDER:  Bruce Feder on behalf of Scott Spear, who

20    is also present.  Good morning.

21          THE COURT:  Good morning.

22          MR. EISENBERG:  Good morning, Your Honor.  David

23    Eisenberg on behalf of Andrew Padilla.  As he resides in Texas,

24    Your Honor, we would waive his presence today.

25          THE COURT:  All right.  So noted, and good morning to

UNITED STATES DISTRICT COURT

1    you.

2              MS. BERTRAND:  Good morning, Your Honor.  Sorry.  Joy

3    Bertrand appears for Joye Vaught.  We waive her appearance for

4    today, and thank you for allowing me to appear by phone.

5              THE COURT:  All right.  Good morning to you.  Is there

6    anyone else on the phone?  All right.

7              MR. LINCENBERG:  I believe somebody is on the phone.

8    Mr. Boyle from the government is on the phone.

9              MR. KOZINETS:  We have announced for him.

10             THE COURT:  All right.  All right.  So the Court has

11   previously set parameters for the oral argument.  And who is

12   going to argue on behalf of the joint motion to dismiss?

13             MR. BIENERT:  From the defense side, Your Honor, more

14   than one of us will argue.  I'm Mr. Bienert.  I'm going to be

15   primarily addressing the double jeopardy issue.  And there will

16   also be some comment on that by Mr. Cambria and I believe

17   Mr. Feder.  And then Mr. Lincenberg is going to be talking

18   about sort of the due process, misconduct issue.

19             THE COURT:  How are you going to present the

20   arguments?  Are you going first with the double jeopardy

21   argument, Mr. Bienert?

22             MR. BIENERT:  Yes, Your Honor.

23             THE COURT:  And just to be clear, I permitted you, in

24   the entirety of the argument, 20 minutes.  And so be mindful of

25   the time.

1      MR. BIENERT:  We understand your time limits.  And

2  just so Your Honor knows, I notice your court is a little

3  different in that the clock is behind me.  If it's all right,

4  I'm going to have my phone open so I can see the time when I'm

5  standing.

6      THE COURT:  That's fine.  All right.  And you may

7  proceed, and you may proceed from the podium.  Thank you.

8      MR. BIENERT:  Your Honor, when I'm standing at the

9  podium, am I allowed to take my mask off?

10      THE COURT:  Yes, you may.  And I guess I just would --

11  I'm not going to make the assumption that everyone is

12  vaccinated, but I think the majority at least of the

13  government, from my understanding of all of the federal

14  prosecutors who have come before me as well as the CJA panel,

15  they have all, my understanding is, been vaccinated.  Some of

16  them have been boostered.  But I just want to make the

17  observation that if you are vaccinated, I certainly do not have

18  a problem with you removing your mask, especially during the

19  oral argument.

20      MR. BIENERT:  Thank you, Your Honor.  And I have no

21  problem saying I am vaccinated.  I even got my booster a couple

22  days ago.

23      THE COURT:  All right.

24      MR. BIENERT:  May I begin, Your Honor?

25      THE COURT:  You may.

1           MR. BIENERT:  I'll just get my phone out for time.

2           So, Your Honor, as indicated, I'm going to be speaking

3      about the double jeopardy aspect.  And basically we believe

4      that an objective reading of the facts and what happened at

5      trial establishes that the government did intend to goad a

6      mistrial, which is why the double jeopardy should apply here.

7           I'm going to talk a little bit about just some of the

8      overall themes in the case that I think give important

9      background, since Your Honor is new to the case.  I am going to

10     address your specific question about the court Ms. -- Judge

11     Brnovich's comment about not intentional.  And I'm just going

12     to hit some of the high points that are in our brief about her

13     findings and why we believe it establishes what we say.

14          So, first of all, background tension in the case that

15     I think is just really important, you know, one of the few

16     things the government and I agree on is there's a lot of

17     motions, a lot of background, a lot of discussion about many

18     issues.

19          And one of the big ticket themes, Your Honor, that has

20     permeated this case that if we go forward you will to have deal

21     with is I think we all agree that if the government puts on a

22     case that shows individualized knowledge by each individualized

23     defendant about the ads in question and that they were

24     intend -- that they showed prostitution and were intended to

25     promote it, then that's the type of case they're allowed to put

1    on.  But the big fight is on other stuff.

2        We believe, the defendants, that the government has

3    repeatedly tried to make this case about something else:  A

4    generalized Backpage did a lot of prostitution ads, you can

5    tell it by looking at the ads, and everybody knew it.

6        There's been a tremendous amount of fighting over that

7    issue.  And I would submit to Your Honor that if you look at

8    Judge Brnovich's rulings in a continuum over the course of a

9    year and a half or so, there's a lot back and forth on that.

10        And the one thing that I would plant to Your Honor is

11    common sense, what happens in real life as a judge.  When

12    you're dealing with things early on, they're concepts about

13    what may or may not happen at trial.  And when the trial

14    happens, things start to crystallize, because for the first

15    time the Court actually sees the real evidence and what's

16    really happening as opposed to giving, for example, the benefit

17    of the doubt during a hearing months earlier that the

18    government would or wouldn't put something on.

19        So what I would submit to you is the big ticket

20    tension is the government continually wanting to talk about

21    things like child trafficking, victimization, everyone can tell

22    these ads are for prostitution versus our saying, "No, no, no,

23    no.  It has to be particularized.  It needs to be about these

24    defendants and their knowledge of the counts and the evidence

25    in the case."

1          And I would submit to you that Judge Brnovich's

2     earlier rulings were sort of saying I'm not going to say you

3     can't do any of the generalized stuff at all, but you've got to

4     tie it into these specific ads and these specific defendants,

5     and you can't go too far with it because it's inflammatory.

6          And once we got actually to trial, what starts

7     happening is over and over again, beginning with the opening

8     bell and the opening statements, is the government repeatedly

9     was talking about inflammatory victimization, child

10    trafficking, which, number one, Judge Brnovich kept recognizing

11    you're going over the line, but, number two, was never tied to

12    any defendant.

13         Not a single witness that was called -- And, frankly,

14    I would submit, Your Honor, at the end of the trial it wouldn't

15    have been any different.  But through all of these things that

16    you were looking at that happened in the trial at the time the

17    mistrial was declared, nothing put on tied to any defendant in

18    this case.

19         THE COURT:  Well, let me just make an observation.  In

20    looking at the record, the trial record, isn't it true that

21    only four witnesses -- I think I saw the lodged witness list --

22    only four witnesses testified, and only roughly two, maybe a

23    little over two days of actual testimony occurred.

24         MR. BIENERT:  That's right, yes.

25         THE COURT:  And so you're asking the Court to base the

1    opinion on that record.

2            MR. BIENERT:  Yes, Your Honor, on the record we have.

3            THE COURT:  All right.  But you concede that there

4    were 76, I think, witnesses that are listed on the government's

5    witness list?

6            MR. BIENERT:  There were.  But here's the deal.  When

7    it comes to mistrial and then of course a separate issue in

8    this case was there goading or not, it's not about what else

9    was out there.  It's about what specifically was done.  I mean,

10   I'll remind Your Honor the *Kennedy* case, which Mr. Cambria is

11   going to talk about, the seminal case that dictates this, was

12   about one line, one question, one line, in an overall case.

13           The point is the question is was something done on

14   this record that shows, number one, that it was worthy of a

15   mistrial but, two, that it was intended to goad.

16           And I'll explain to you why I believe that was

17   established here.

18           THE COURT:  Well, I think really the question that I

19   have here is the question I asked you to focus your argument

20   on.  Judge Brnovich presided over the matter.  Judge Brnovich

21   had the case for over two years.  Judge Brnovich listened and

22   saw the evidence.  But yet she did not make the type of finding

23   that you're asking me to make.  And she made specific

24   statements using examples of specific witnesses.  I think in

25   her order she mentioned three.  And she said I don't find

1    prosecutorial misconduct here.  I don't know how it is that I

2    can find something different, given the fact that I did not sit

3    through the trial.  It's really something remarkable that

4    you're asking me to do.

5              MR. BIENERT:  And here's why I don't think it is.

6    Number one, the reason Judge Brnovich didn't make findings on

7    this issue was this issue was never raised.  We didn't raise a

8    double jeopardy issue in front of Judge Brnovich.  She wasn't

9    addressing whether double jeopardy applies.  We weren't talking

10   about *Kennedy*.  We weren't talking about goading.  In fact, she

11   didn't even have a hearing or anything to determine any of

12   that.  At the time --

13             THE COURT:  Couldn't she sua sponte make that

14   determination?  Did it have to be raised in a motion?

15             MR. BIENERT:  Well, it certainly didn't have to.  I

16   think she could have made it on her own, but I think certainly

17   before one would conclude whether there was or wasn't goading,

18   to say there couldn't have been, there needs to be some sort of

19   further addressment.

20             Remember, what Judge Brnovich found was that a motion

21   for mistrial should be granted.  She did not get into what the

22   ramifications were or weren't of that.

23             But let me tell you what I would submit to Your Honor

24   the limited record we have does suggest.  You know, words of

25   course, as we always say in this business --

1          THE COURT:  Let me back up and say I'll tell you what

2     she said after she -- after she discusses at least three

3     examples of witness testimony:  "Although I don't see any of

4     these as intentional misconduct."

5          And so doesn't that erase at least the three that

6     she's talking about?

7          MR. BIENERT:  No.  What it does is it means that she

8     is saying, to the degree that she's opining at all, I would

9     submit what it says is she is not making a finding that any of

10    these individual prosecutors have committed misconduct such

11    that they could or should be subject to the individualized to

12    them ramifications that could come from that.  And I would

13    submit to Your Honor, as Your Honor may recall -- and my

14    understanding of your background is you were U.S. Attorney; I

15    was at a U.S. Attorney's Office for ten years -- if there was

16    misconduct, a judicial observation of misconduct, then under

17    the DOJ manual or, as we used to call it, the U.S. Attorney's

18    Manual at Section 1-4.310, there must be a referral by the

19    U.S. Attorney or the individual AUSA to the Office of

20    Professional Responsibility based on judicial findings or

21    statements concerning attorney professional misconduct.  That's

22    Section 1-4.310 of the U.S. Attorney's Manual.

23          In other words, there's a difference, Your Honor,

24    between what happens in a particular case to the defendants,

25    whether the case gets dismissed, goes forward, whatever, and

1    what if anything could or could not happen to individual

2    prosecutors as a result of their activities.

3            First of all, this issue, this issue of double

4    jeopardy, of goading, it simply was never raised.  It wasn't

5    mentioned.  It's not in the record.  No one raised it.  It was

6    not at issue when she made her comments.

7            So there is just no way, I would submit, that one can

8    say that her comment was a comment on whether there was goading

9    for a mistrial.

10           However, if we are, I would submit, sort of reading

11   tea leaves, the one thing she mentions, while she doesn't

12   mention goading, she doesn't mention double jeopardy, she

13   mentions misconduct.  And there's a specific rule on that.  And

14   that rule has to do with these prosecutors.  Has nothing to do

15   with the defendants or whether the case goes forward.

16           That is why her comments, number one, they weren't

17   against the backdrop of this motion, which was never raised,

18   and, number two, they, if we're seeing what they seem to relate

19   to, that's what it relates to.  And I will just say

20   anecdotally, Your Honor, I've been part of dozens of cases

21   where judges will make findings dismissing cases, considering

22   it, whatever, and then they make a statement on the record

23   about what their views are of the individual prosecutor's

24   actions.  That's a different issue.  And it's certainly not one

25   that you can conclude or any of us can from that statement

1    about misconduct that that's a finding about goading.

2              And we also can't ignore the other things she said.

3    As Your Honor points out, she said several things right before

4    that.  And it's the things that she said before that -- One

5    thing she did was her comments, whatever result they lead to,

6    were very succinct.  Right.  They cover two pages.

7              But as Your Honor said, she mentions very strong

8    things that I would submit an objective review of can only lead

9    to this wasn't an accident.  This wasn't a mistake.  What the

10   prosecutors put on here was purposeful.  She constantly says

11   they repeatedly abused her leeway.

12             She notes that when they were going over the sexual

13   trauma to a victim witness, Ms. Svendgard, she says it three

14   times over and over and over again.  They talked about -- and

15   this was the prosecutor's questioning -- the 105 days of being

16   trafficked on Backpage.

17             She talks about multiple examples, as your Court

18   notes, all of which she is saying I told you not to do this,

19   and you turned around, and you did it.

20             I would submit, Your Honor, that objectively the only

21   thing we see there is that it was purposeful.  So then the

22   question is what was the setting when it was done?

23             Remember, I'd submit there's two avenues to this case:

24             The one we all agree was proper:  What evidence do you

25   have that these ads were for prostitution and these defendants

1    knew it?

2          The one I would say is improper:  Child sex

3    trafficking, people harmed, without any link to the defendants.

4          The reason Fichtner is so important is their number

5    one witness, Special Agent Fichtner, who was there to talk

6    about here's the site, here's what it looked like, this is the

7    window that anybody looking at the site would see like these

8    defendants.  And he said in direct that's prostitution.

9          But on cross he fell apart:  Well, it really isn't

10   prostitution.  Yeah, escort's legal.  No, I can't tell from

11   looking at these whether they're escort or prostitution.  You

12   would need more, like to know what happened in the hotel room,

13   et cetera.  I agree with you no arrests were made off of this

14   because you couldn't tell if it's prostitution or not.

15          That gutted their case, Your Honor.  If that guy was

16   believed, the case is over, because you can't make a case based

17   on the ads, which is what their whole case is about.

18          That's why at that moment they knew they were in real

19   trouble.  So then what do they put on?  Ms. Svendgard and her

20   mom.  They admitted:  Never met any of these defendants in my

21   life, know nothing about them.  My ads were facially legal.  I

22   said I was over 18.  Two policemen arrested me for prostitution

23   and believed I was over 18.

24          Nothing there to suggest an illegal ad.  Nothing to

25   suggest anything about these defendants.

1        Then the piece de resistance:  When Judge Brnovich

2   said, enough, I can't do this anymore, they put on the expert

3   who literally every word out of her mouth was child trauma,

4   child trafficking, the psychological effects of children being

5   harmed, none of which had anything to do with these defendants.

6   And they had been warned not to do it.  Why'd they do it?

7        They were supposed to put a different witness on, but

8   after Agent Fichtner blew apart on them, they doubled down, and

9   they knew it would be a mistrial.

10       THE COURT:  Let me just mention that you're about ten

11  minutes, as I can see, into your time.

12       MS. BIENERT:  Yep, you've obviously heard enough from

13  me, so I will sit.  Anyway, those are the answers as best I can

14  in the allotted time.

15       THE COURT:  All right.  Thank you.

16       MR. BIENERT:  Thank you, Your Honor.

17       THE COURT:  And who am I hearing from next?

18       MR. BIENERT:  I think Mr. Cambria.

19       THE COURT:  And I'll give you some leeway just because

20  I need to understand the context of the arguments as well.

21       MR. BIENERT:  Thank you, Your Honor.

22       MR. CAMBRIA:  Good morning, Your Honor.

23       THE COURT:  Good morning.

24       MR. CAMBRIA:  I am also vaccinated.  To address

25  specifically how could you make a different finding, before

1      Judge Brnovich was a mistrial motion which I made, and all she

2      had to decide was was there prejudice.  It didn't matter how it

3      got there.  It could have been intentional, could have been

4      accidental, could have been reckless.  It didn't matter.  So

5      that issue was never before her.

6             When we look at the *Kennedy* case, the Supreme Court, I

7      think there, laid out the procedure.  And Justice Rehnquist at

8      the time said inferring the existence or nonexistence of intent

9      from objective facts and circumstances is a familiar process in

10     our criminal justice system.  And that's what they did.  They

11     had a hearing.  Prosecutor testified under oath.

12            Here we don't have any denials of what we're saying.

13     And if we look at the objective facts here found by Judge

14     Brnovich, none of them support a lack of intent to goad.  They

15     all support an intent to goad.

16            And the reason is, as was indicated here by

17     Mr. Bienert, the First Amendment presumes that speech is lawful

18     and unless it's illegal on its face, unless it's illegal on its

19     face.

20            Here Fichtner made it very clear that none of these

21     were illegal on their face.  We asked him if he would arrest

22     based on any of them.  He said no.  We asked him if anybody had

23     ever arrested based on the ad alone.  He said no.

24            So then what happens at that point is -- look at the

25     objective finding -- she says I gave you leeway, and repeatedly

1    she said from the opening to each and every witness you abused

2    that leeway.

3           That's an objective fact.  It supports us.

4           We have a situation where they knew that we would move

5    for a mistrial.  We moved for one at their opening.  We've

6    objected to everything every time there was something in there

7    about kids.  They knew what our reaction would be.

8           And they continued, even though they knew our

9    reaction.  They knew what the warning was from the judge.  They

10   continued to put in this prejudicial proof.

11          And so the objective facts, if we use this test that

12   the Supreme Court set out, the objective facts support an

13   intent to goad us into doing a mistrial.  Not one of those

14   objective facts supports the lack of that intent on the part of

15   the prosecution.  And that's what's important here.

16          And the minimum, the minimum before, we respectfully

17   submit, we could have you deny our motion would be to have such

18   a hearing at that point, because we currently now only have the

19   findings made by Judge Brnovich, none of which had to do with

20   goading at all.  But they did have to do with the conduct of

21   the prosecution and the situation on the defense side.

22          She made each one of these findings.  Each one of

23   those findings support us and support the intent to goad.

24          They knew what our reaction would be.  They reacted

25   purposely as a result of that.  And by her saying they did it

1    over and over and over, that's a circumstance.  Under *Kennedy*,

2    that's a circumstance you could use to show an intent.  It's

3    not an accident.  This wasn't a one-off situation like in

4    *Kennedy*.  There was one comment there:  Well, you did that

5    because you knew he was a crook.

6         THE COURT:  But I think, if I understand your pleading

7    correctly, you sort of lump in not just what happened at the

8    trial, but you lump in these other issues in asking me to

9    exercise supervisory authority.  For example, you talk about

10   not only the trial misconduct, concealment of discovery

11   materials, and so on.

12        And so it seems to me, again, that the hardest part of

13   this exercise is those matters.  If you're asking me to

14   consider them in making this decision, they had already been

15   determined by not only Judge Brnovich but Judge Logan, many of

16   the things that you put into your pleading as a basis to rule

17   in your favor.

18        And so how am I supposed to parse this out if, for

19   example, you're also including the concealment of discovery

20   materials for the Western District of Washington investigation?

21   You're also including the privilege invasions, which have

22   already been ruled upon, at least if my review of the record.

23        MR. CAMBRIA:  My --

24        THE COURT:  So I'm a little bit confused as to how all

25   of that should be considered by me if Judge Brnovich and Judge

1    Logan have previously reviewed some of this, made specific

2    findings.  And I guess whoever's going to address this issue, I

3    want to ask a question about the specific examples, for

4    example, specific examples of what was the ongoing violations

5    that you're alleging.

6            MR. CAMBRIA:  Okay.  First part -- And Mr. Lincenberg

7    is going to answer that precise question.  But the first part

8    is this:  Neither Brnovich nor Logan ever had before them the

9    discrete issue that we are relying on for due process here

10   because it occurred, first of all, at trial, and, secondly,

11   there was never a specific objective finding or an issue before

12   Brnovich as to whether or not there was an intent to goad

13   demonstrated by the circumstances and the facts that had

14   developed as of that time.

15           So they made no decisions on that.  And we're saying

16   at this point that all the objective facts support us on that.

17           THE COURT:  So I can disregard all of the other

18   arguments that you're making under your supervisory authority?

19           MR. CAMBRIA:  No, no, no.  And Mr. Lincenberg will

20   address that.  I think he's going to show that there was a

21   pattern here.

22           But what I'm saying is we don't have a decision by

23   either Logan or Brnovich on the discrete issue we're raising on

24   double jeopardy.  And he'll explain why the supervisory,

25   et cetera, is relevant.

1          MR. LINCENBERG:  Your Honor, Gary Lincenberg.  And I'm
2  vaccinated and boosted.
3          Your Honor, I think the Court's question is a good
4  one.
5          THE COURT:  Thank you.
6          MR. LINCENBERG:  And if I were in Your Honor's shoes,
7  jumping into a case like this with this history and trying to
8  learn a lot in a short period of time, I would be struggling
9  with the same thing, because Your Honor has to say, well, how
10  much deference do I give to prior rulings?  How do they fit in?
11  And why did the defense include these as part of the double
12  jeopardy motion?
13          And part of the reason we included it as part of the
14  double jeopardy motion is because when you look at *Oregon*
15  *versus Kennedy* and some of its progeny such as the *Fern's* case,
16  courts have said if we're trying to opine what is an intent of
17  the prosecution, we should also be looking at a full record.
18          So in *Oregon versus Kennedy* -- and the concurring
19  opinions discuss this as well -- well, there was one question.
20  Some of these cases say, look, I've been watching this
21  prosecutor for years in this case, and this was a one-off.  I
22  don't find some pattern here.
23          Now, Your Honor says, okay, Mr. Defense Lawyer, but if
24  there's a pattern, how does that help you if a prior judge
25  ruled against you on the invasion of privilege?

1          And the reason it helps is if the Court looks into

2     those prior occasions and also conducts an evidentiary hearing,

3     what the Court would see is as follows:

4          So, for example, with the privilege invasion, we

5     argued hard, fervently believe that there was an improper

6     invasion of privilege.  Judge Brnovich ruled against us.

7          One of the prosecution's key arguments was that there

8     was a difference between documents and discussing privileged

9     issues when we're interviewing Mr. Ferrer.  There was nothing

10    on their face about any of this stuff.

11         Well, then the government comes in at the beginning of

12    trial and moves to preclude our advice of counsel defense

13    saying, hey, they just turned over a document in discovery that

14    on its face is dealing with this privileged issue.  Well, that

15    contradicted one of the arguments that they were using on the

16    underlying motion as to why they could question Mr. Ferrer.

17    Because if the Court -- and this would take some time -- but if

18    the Court looks at the interview memos and the discussions of

19    them in our underlying motion to dismiss for invasion of the

20    privilege, on its face the government is invading privileged

21    areas.

22         And so that's why in response to their motion about

23    precluding the advice of counsel defense in which in their

24    pleading they say look at this, on its face it's dealing with

25    what looks like attorney-client privileged information, well,

1    that's why their interviews were improper.

2          And the second part specifically as it relates to Your

3    Honor's decision on this motion is the Court has to decide were

4    these prosecutors knowingly violating Judge Brnovich's orders?

5          Because intent is not -- In looking at intent, you

6    know, you say, well, what is intent?  Is it -- Do they know

7    that the natural and probable consequences of what they're

8    doing may be construed by the Judge as violating the orders?

9    And even that, some courts will look at reckless disregard.

10   Reckless disregard can satisfy intent.  Are they being --

11   recklessly disregarding this idea?

12         You've seen in the pleadings how that clearly is the

13   case.  And Judge Brnovich found as much when she said, Page 4

14   of this transcript of her reasoning, that I told the government

15   to keep away from child sex trafficking with Dr. Cooper.

16   Mr. Jones then proceeded to question Dr. Cooper solely on child

17   sex trafficking.

18         There was an order to the government stay away from

19   the day in the life of a prostitute or victim, and then with

20   Jessika Svendgard they did just that.

21         They're knowingly or recklessly disregarding Judge

22   Brnovich's orders.

23         We have a history here.  The *Kennedy* case, the *Fern's*

24   case, other cases say Your Honor should look at the overall

25   history, and that history shows intentional invasions of the

1    privilege.

2              Why do we include the Brady violations?  Because even

3    recently the government, after for years saying we've provided

4    all Brady, comes up and produces last, you know, way after the

5    fact, a legal memo from Arnold & Porter law firm to a potential

6    buyer saying we can buy this company because none of what is

7    happening there is illegal.

8              And then they say, well, we didn't think it was

9    relevant or we didn't think it was a good opinion, so we didn't

10   produce it.  We had in the history of this case --

11             THE COURT:  When was that produced?

12             MS. BERNSTEIN:  It was never produced.

13             MR. LINCENBERG:  It was never produced.  It was never

14   produced.  They later admitted it was never produced.

15             THE COURT:  I'm sorry.  So how do you know about it?

16             MR. LINCENBERG:  Do you want to answer that question?

17             MS. BERNSTEIN:  Good morning, Your Honor.  Whitney

18   Bernstein.  We were produced segments of the grand jury

19   testimony by Charles Craig, and in the grand jury testimony

20   they reference this exhibit that was used at the grand jury.

21             MR. KOZINETS:  Your Honor, I'm sorry.  I believe that

22   the actual grand jury transcript is under court seal.

23             THE COURT:  All right.  So just generally how do you

24   know?

25             MR. LINCENBERG:  That's how we knew.

1        MS. BERNSTEIN:  In the grand jury transcript that we

2   received, they referenced this letter as an exhibit, which is

3   how we're aware of its existence.  We've asked for that

4   document, the advisory opinion from the Arnold & Porter

5   attorneys, many times and have not received it.  The government

6   concedes as much in its response.

7        THE COURT:  All right.

8        MR. LINCENBERG:  Thank you, Ms. Bernstein.

9        THE COURT:  I'm sorry.  Remind me again when that was

10  discovered or when you learned about this.

11       MS. BERNSTEIN:  When we learned about the grand jury

12  testimony?

13       THE COURT:  Yes, the letter.

14       MS. BERNSTEIN:  The grand jury testimony was produced,

15  I believe -- I would have to check, Your Honor.  I don't want

16  to speak out of turn.  We had asked for the letter, the opinion

17  letter, in a series of e-mails and a series of letters, which

18  are part of the record with docket 1281.  And the government

19  addresses why they didn't produce it in their response to

20  docket 1281 as well as in the response to this motion at 1395.

21       THE COURT:  All right.

22       MR. LINCENBERG:  And, Your Honor, the other example

23  that we provide is intentionally not following a taint team

24  protocol of which there was a big hearing a couple of years

25  ago.

1          THE COURT:  And I read the order on it.

2          MR. LINCENBERG:  And so if the Court -- And this Court

3     is approaching it in somewhat of a vacuum.  And Judge Brnovich

4     had some of the history.  Some of it was even predating her.  I

5     believe Judge Brnovich would have been quite upset and would

6     have looked at this in the context Judge Brnovich had not yet

7     ruled on our renewed motion to dismiss.  And Judge Brnovich,

8     you know, Judge Brnovich recused herself.  We don't know why.

9          It may have been that she didn't feel comfortable

10    addressing these issues.  This was in the middle of a motion to

11    dismiss on double jeopardy grounds that's pending.

12         And now the Court has the unenviable task of trying to

13    recreate things and how much deference do I give when Judge

14    Brnovich lays out what is clearly knowing violations of her

15    orders at trial and then makes a generalized statement -- but,

16    looking at the prosecutors, don't worry, I'm not saying

17    misconduct -- which we believe is something that the Judge was

18    saying, because I'm not suggesting anything.  That has to go

19    back to OPR.  We don't know exactly what the Judge's intent

20    was, but that's logical.

21         That last sentence should not be given deference as

22    some finding that there wasn't knowing conduct here.

23         Judge Brnovich had not been presented with *Oregon*

24    *versus Kennedy* where the Court said, you know, one of the

25    things we're looking to is there was an evidentiary hearing in

1    which the prosecutor testified.  Well, the prosecutors in this

2    case, in opposition to our motion, have suggested that they

3    instructed these witnesses in a certain way and put the fault

4    on the witnesses.

5          Well, how is -- There's no declarations to that

6    effect.  How is Your Honor to decide what deference to give to

7    their pleading in that regard without hearing from these

8    witnesses:  Were you in fact instructed in that way?  Did you

9    violate this order?

10          It's hard to believe that Dr. Cooper would have

11   violated an instruction that the prosecutors gave her or -- I

12   don't know what Ms. Svendgard would have done.

13          But if -- There certainly should be no deference to a

14   prosecutor's statement in that regard.

15          THE COURT:  Let me turn to the issue of concealment of

16   materials regarding the Western District of Washington.  You

17   say that much of that investigation overlapped in time with the

18   case here.  And I want to know what evidence and what period of

19   time that you're referring to.  Because I know that Judge Logan

20   previously found, as to at least some of the documents that

21   were being argued about at a particular time, that some of the

22   documents in the government's possession involving that Western

23   District of Washington investigation, that the time and the

24   investigation was not the same.  I read that clearly in his

25   order.

1        And now you have this new allegation that they haven't

2  turned over overlapping investigative materials.

3        MR. LINCENBERG:  So, Your Honor, the -- First of all,

4  one of the investigators from that Washington case is on the

5  government's witness list, number one.

6        Number two, the Western District of Washington case I

7  believe was in the 2012-2013 time frame.  This is a conspiracy

8  which is charged as going back to, I believe, 2004.

9        There is clearly overlap.  And the main issue that

10  occurred earlier in time was that the government inadvertently

11  disclosed to us a memo from the U.S. Attorney's Office in the

12  Western District of Washington concluding that there's no crime

13  here, that this is not a case that can be brought criminally.

14        And they then moved for a clawback, and that was

15  clawed back.

16        THE COURT:  I'm aware of that.

17        MR. LINCENBERG:  What our discovery relates to is the

18  facts and the evidence underlying that, the evidence underlying

19  that.  The government had said, well, that's -- that's not --

20  that's not evidence.  And our response is, well, but there's

21  evidence that underlies that that we're looking for.  Did you

22  want to add on that?

23        MS. BERNSTEIN:  Yeah.  Your Honor, Whitney Bernstein.

24  I wanted to directly address your question about the timing.

25  Judge Logan's finding was that the -- we had been asking for

1    the memorandum.  Judge Logan's finding was that it was

2    protected by work product privilege.  Sorry.  I'm vaccinated

3    and boostered as well.  That it's protected by work product

4    privilege, and that, as Your Honor said, was different.

5          The government -- That was years before the government

6    put on its case.  We renewed our request for the underlying

7    factual material as Brady after the government's opening, which

8    focused almost exclusively on the time frame leading up to

9    2012.

10         The Western District of Washington investigation

11   concluded around 2012-2013, I believe, is the date of those

12   memos, and the government's opening and the evidence that they

13   put on with their four witnesses focused almost exclusively on

14   that.  Fichtner's video was about 2015.  The video was

15   presented to the jury as a way to show what the website looked

16   like.  It wasn't substantive evidence of what had been

17   happening at that time.  And so our motion was renewed because

18   in fact the government was alleging that Backpage was

19   engaged -- that Backpage and our clients vicariously were

20   engaged in a series of hiding facts and of doing aggregation,

21   of doing moderation, of doing certain things during the time

22   frame that the Western District of Washington investigated.

23   And that was why the overlap came, and we renewed after the

24   motion -- after the opening.

25         MR. LINCENBERG:  Your Honor, the last thing that I

1       would then say and why we also cite supervisory powers as an

2       independent basis of authority is because there's overlap.  The

3       Court is looking at prosecutorial conduct.  And I frame it more

4       in terms of violating court orders.

5               And I -- It's got to be difficult to go back in time

6       to 2019 when defense counsel, without having received any

7       Jencks, the government is coming into court and saying, Judge,

8       let us go into the issue of attorney-client communications

9       because Mr. Ferrer has waived the privilege for Backpage.  The

10      defense opposes that.  And Judge Logan rules our way because of

11      these overriding joint representation agreement privileges.

12              And unknown to Judge Logan during these hearings is

13      that the government is continuing to question Mr. Ferrer on the

14      identical attorney-client privilege communications.  Identical.

15              And when we raise in court, Judge, we don't have

16      Jencks, but we have a sneaking suspicion, given what the

17      government's doing here, that this may be going on, the

18      government stands silent.  I believe this is in October of

19      2018, if I have my timing right.  They stand silent and

20      continue to interview Mr. Ferrer about these same issues.

21              This is a pattern of violating court orders.  And it's

22      relevant to the Court making an assessment under *Oregon versus*

23      *Kennedy* as well as under court supervisory powers as to whether

24      or not the case should be dismissed either on the basis of

25      double jeopardy or misconduct in connection with violating

```
1    court orders.
2            And the best way to get a full understanding is to
3    have an evidentiary hearing where the Court takes testimony to
4    further delve into these issues.
5            Thank you, Your Honor.
6            THE COURT:  All right.  And I think, Mr. Feder, you
7    were going to say something?  And I'll give you about five
8    minutes.
9            MR. FEDER:  It won't take five minutes.
10           THE COURT:  I'll give you two minutes.
11           MR. FEDER:  Bruce Feder for Mr. Spear, vaccinated and
12   had breakthrough COVID and my booster --
13           THE COURT:  Well, unfortunately --
14           MR. FEDER:  -- so I'm in good shape, I think.
15           THE COURT:  -- I'm sorry to hear that.
16           MR. FEDER:  If the Court's not going to give us a
17   hearing, which we strongly request, and you want to look at the
18   objective facts of what happened in this trial, everybody in
19   this courtroom, the lawyers, are experienced.  And when a judge
20   or another lawyer says your witness is going over the
21   boundaries, what do you do?  You go -- You ask the court, if
22   it's in court, you ask the court may I have a couple of minutes
23   with my witness to tell she or he that I don't want her going
24   into these areas anymore.
25           And if you look at the transcript -- And I'm
```

1    specifically going to recommend to the Court look at -- it's

2    Day 6, September 10 -- look at Pages 77 to 90.  In those pages,

3    number one, at Page 90, the prosecutor tells the court we

4    prepared this witness -- and this is Jessika Svendgard -- and

5    then during those pages, in argument about that they're going

6    into improper areas, the prosecutor's arguing with the judge,

7    well, she's entitled to get her story out.  And the judge says,

8    no, she isn't, not if these are areas that the motions

9    in limine addressed.

10          Then we end the bench conference, and there is no

11   conference with the witness Jessika Svendgard.  There is no

12   request to the court to do anything like that.  The prosecutor

13   goes back right away, immediately into the areas that the judge

14   had in limine'd and the judge had told the prosecutor at the

15   bench not to go back into.

16          That's the evidence of the objective facts of this

17   being -- whether it's reckless disregard or intent to goad into

18   a mistrial.  That's just one example.

19          And I would encourage the Court to look at the bench

20   conferences that we had with Dr. Cooper that's a similar

21   situation.

22          So this is not accidental by any means.  And all one

23   really has to do is read the transcripts, which Judge Brnovich

24   did and made her findings.

25          Thank you, Judge.

1          THE COURT:  Thank you.

2          Who is arguing for the government?

3          MR. KOZINETS:  Your Honor, I will be primarily arguing

4     for the government, although with respect to certain more

5     detailed areas such as privilege, I will turn to other members

6     of the team.

7          THE COURT:  Thank you.

8          MR. KOZINETS:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         MR. KOZINETS:  We've heard a lot of talk about a lot

11    of issues.  But I want to be clear, for purposes of the double

12    jeopardy motion, the only standard that applies is the standard

13    from the *Kennedy* case.  That standard requires that the

14    prosecutors acted deliberately with intent to terminate the

15    trial.  It's a very high standard.  As the Ninth Circuit has

16    recognized, it is rarely met.  In the 40 years since *Kennedy*

17    was decided, there hasn't been a single reported Ninth Circuit

18    case finding that the standard has been met in these

19    circumstances.  And the defendants in their papers for that

20    40-year period cite only one case, a 1998 case from Florida,

21    which goes that far.  Nothing else.  And that involved

22    intentional obscuring of a witness's true identity and

23    eliciting false testimony, circumstances having nothing to do

24    with this case.

25         Now, the *Kennedy* court clarified that prior cases

1    recognizing a broader standard are no longer good law.

2            So it rejected the notion that other types of conduct

3    can satisfy this double jeopardy standard, including

4    prosecutorial overreach, bad faith conduct, and harassment.

5            And indeed on Page 675 to 676 of the *Kennedy* decision,

6    Justice Rehnquist writes "Prosecutorial misconduct that might

7    be viewed as harassment or overreaching, even if sufficient to

8    justify a mistrial on the defendant's motion, is not enough."

9    That doesn't satisfy the standard.

10           Here -- And Justice Stevens in his concurrence at Page

11   690 actually kind of underscored the notion that you really

12   need a finding of deliberate prosecutorial misconduct in order

13   to meet the *Kennedy* standard.  That's at Page 690 of the

14   decision.

15           And here the trial judge, who observed the prosecutors

16   for two and a half years, was in the trial, expressly found

17   that there had been no intentional misconduct.  The trial judge

18   then set a new trial date.

19           The defendants didn't even mention this in their

20   opening motion here.  And it really is, Your Honor, fatal to

21   their claim.  It's fatal to their claim for several reasons.

22           First, it's consistent with the record in this case.

23   The prosecution never intended for this case to come to an

24   abrupt end.  We had prepared for three and a half years.  We

25   had arranged for witnesses from across the country, 90 percent

1    of our 76 witnesses, to travel here and scheduled them to

2    testify over the course of this planned ten-week trial.  We

3    produced more than --

4           THE COURT:  Let me ask you a question, Mr. Kozinets.

5    Looking at the transcript, it appeared to me that at least one

6    of the prosecutors, after Judge Brnovich issued her ruling with

7    respect to the particular testimony about the day in the life

8    of a prostitute, seemed to emphasize and reemphasize a number

9    of times that that witness was trafficked or assaulted or

10   something of that nature, even after the court's admonishment.

11   And how isn't that intentional?

12          MR. KOZINETS:  Okay.  Thank you, Your Honor.

13          The -- The reference to 105 days was a reference to

14   the period of time that that victim, Jessika Svendgard, had

15   been advertised on Backpage.  And it served to distinguish the

16   period of time where she had also been involved in prostitution

17   but was with effectively another pimp and was not involved in

18   Backpage.

19          There was no objection to references to 105 days

20   during that testimony.  There certainly was no motion for

21   mistrial that was made based on that testimony.

22          And it was not something that was viewed by the

23   prosecutor as getting into excessive details about the daily

24   life of the victim.  Again, it was just a shorthand for

25   referring to the period of time that she was on Backpage.

1          And getting into kind of the specifics of the witness

2    testimony for purposes of the double jeopardy claim, I want to

3    point out just a couple of quick things.

4          The first defense counsel got up here and said that,

5    essentially, that the government somehow strategized to provoke

6    a mistrial after Special Agent Fichtner had been

7    cross-examined.  And then defense counsel said at that point

8    the government called Jessika and Nacole Svendgard to testify.

9    That's actually not the timeline in the record.  It's just not

10   the sequence of events.

11         Agent Fichtner's cross-examination didn't even begin

12   until the afternoon of Friday, September 10th.

13         The Svendgards -- So he hadn't been cross-examined at

14   all before the Svendgards testified.  There was a break in his

15   examination because the Svendgards had traveled across the

16   country, and they were allowed to testify during the day.  So

17   there's no causal connection whatsoever between the Svendgards'

18   testimony and any sort of alleged motivation on the

19   government's part to try to seek a mistrial.  That just doesn't

20   make any sense at all.

21         On this issue of causation, the crux of the

22   cross-examination that the defense is claiming led -- allegedly

23   led to the government seeking a mistrial or trying to instigate

24   some sort of mistrial is a cross-examination that occurred on

25   Monday morning, September 13th.

1          But the government, the government informed the

2    defense on Friday, September 10th, before that

3    cross-examination had occurred, that it was going to call

4    Dr. Cooper next after Agent Fichtner.  So there is no

5    conceivable way the government could have plotted to somehow

6    scuttle the trial based on what happened at that Monday morning

7    cross-examination when it already informed the defense that she

8    was going to be the next witness.  It just doesn't make any

9    sense.  So --

10          THE COURT:  Let me ask you what did the government do

11   with respect to the Svendgard witnesses to ensure that the

12   Court's admonishment about what they could testify to, that

13   they would be aware of that?  What specifically as to each of

14   those witnesses did the government do, if anything?

15          MR. KOZINETS:  Right.  Well, I think, you know, I

16   don't know that there was a particular conference with the

17   witness, but here's what happened.  Okay.  Mr. Rapp was --

18          THE COURT:  Mr. Rapp.

19          MR. RAPP:  Yes, thank you, and I am actually

20   vaccinated.

21          With respect to Mrs. Svendgard, there's two periods of

22   time that she was trafficked.  The first was ten days.  During

23   that ten days she was raped repeatedly.  We discussed that with

24   her that's not coming into evidence, and of course it didn't.

25          The second was the 105 days.

1        THE COURT:  When you say, "We discussed it with her,"

2   what do you mean?

3        MR. RAPP:  Yes.  We, look, we understand -- So I think

4   I have to back up on this witness, because this witness is well

5   known to the defense.  This witness sued these defendants

6   in 2000 --

7        THE COURT:  I understand the context of the testimony

8   was that Judge Brnovich said if you can then somehow

9   demonstrate through foundation that they had knowledge of this

10  and the knowledge was -- or maybe I'm misinterpreting some

11  other testimony -- but that the suit actually gave them

12  knowledge.

13       MR. RAPP:  Yes, yes.  She was 15 at the time she was

14  trafficked.  She filed suit in 2012.  Two other plaintiffs in

15  that lawsuit were 13 at the time they were trafficked.  This

16  plays out a little bit in the exchange with the court because

17  that case proceeds in the State of Washington.  It goes up to

18  the Washington State Supreme Court.  That Supreme Court gives a

19  very unfavorable ruling to the defendants in that discovery can

20  go forward.  It pushes forward for discovery.  And I think this

21  is important about the witness, because they actually depose

22  this witness.  And they know from the deposition.  Their

23  general counsel was present.  They paid Perkins Coie to

24  represent them to defend this case.  They know that this victim

25  was trafficked twice for ten days with this woman that we talk

1  about to a point in her testimony that introduces her to the

2  notion of prostitution.  They know that during that ten days,

3  she's in a house, and she's raped repeatedly by three or four

4  men.  None of that comes into evidence during the trial,

5  obviously not.

6          THE COURT:  Well, now, get back to my question, my

7  original question.  What if anything did the government do to

8  prepare this witness to abide by Judge Brnovich's order?

9          MR. RAPP:  Right.  "You're not going to, Jessika,

10 you're not going to talk about the fact that you were raped

11 during that ten-day time frame.  That's not relevant to this

12 case."

13         All right.  Now let's jump ahead.

14         You were now trafficked for 105 days, and during those

15 105 days, you were posted repeatedly on Backpage by your pimp.

16 And that comes into evidence.  That's Exhibit 211.  Those

17 postings come into evidence.  They span that 105 days from

18 June, 2010, to approximately September of 2010.

19         During that time frame, she is beat up repeatedly by

20 her pimp.  Her pimp is 35.  She's 15.  Or strike that.

21 She's -- Her pimp is 32.  She's 15.

22         She's repeatedly beat up by her pimp.  She is forced

23 to be posted on Backpage.  Sometimes he directs her to be

24 posted on Backpage.  He takes her to meet with the clients.

25         "You're not going to talk about the fact that you were

1    beat up by your pimp.  It is not relevant to this case.  What

2    is relevant is the fact that you were posted and reposted for

3    that 105 days and that this pimp had indicators or indicia of a

4    business enterprise.  Namely, he paid for your hotel room.  He

5    allowed to you stay at the apartment.  He used the proceeds

6    from prostitution to pay for your food, for your clothing.  He

7    had a digital camera to take pictures of you to post you on

8    Backpage, which is certainly relevant to the case."  But

9    there -- And he gives her lots of instructions about what type

10   of sex activities she could engage in with the customers.  None

11   of that comes in.

12           THE COURT:  Now, let me ask you the same question with

13   regard to Dr. Cooper.

14           What if anything did the government do to prepare

15   Dr. Cooper?

16           MR. JONES:  Good morning, Your Honor.  Reggie Jones on

17   behalf of the United States.  As the record reflects, the

18   morning before Dr. -- afternoon before Dr. Cooper's testimony,

19   the court had originally stated that Dr. Cooper could testify

20   about the victimization as well as how human trafficking occurs

21   online as well as the vernacular of sex trafficking.

22           The court the afternoon prior to her testimony said

23   that that third area how individuals are victimized was no

24   longer relevant and shouldn't be talked about by the expert.

25           After -- The morning of Dr. Cooper's testimony -- she

| | |
|---|---|
| 1 | flew in that night -- I met with her and advised her of the |
| 2 | court's orders to stay away from the victimization, which she |
| 3 | did, Your Honor. |
| 4 | She is a pediatrician, and most if not all of the -- |
| 5 | her reference to child sex trafficking during trial was during |
| 6 | her discussion of her background, what she does for a living |
| 7 | and how long she has been working in that area.  So it was |
| 8 | by -- In prepping her, we were -- I was adamant in ensuring |
| 9 | that she did not touch on any of the victimization of -- as |
| 10 | pertains to how children are victimized. |
| 11 | THE COURT:  Thank you.  You may continue. |
| 12 | MR. KOZINETS:  Thank you.  I just want to, while we're |
| 13 | on this -- Well, just to close out the Svendgards, I don't |
| 14 | think there's any real allegation regarding Nacole Svendgard's |
| 15 | testimony.  The scope of her testimony was briefed before she |
| 16 | testified.  The court set certain limits.  The prosecutor cued |
| 17 | to those limits.  And her testimony was fairly brief. |
| 18 | Also I want to talk about Dr. Cooper a little bit |
| 19 | more. |
| 20 | THE COURT:  Well, before you do that, I want to make |
| 21 | sure that -- And I've got to be cognizant of my own time here |
| 22 | because I've got other things that I've got to attend to as |
| 23 | well.  And the matter is fully briefed.  You've had extensive |
| 24 | pleadings throughout -- well, after the trial. |
| 25 | But what I want to ask you about now is did any |

1    portion of the investigation by the Department of

2    Justice/U.S. Attorney's Office in Western Washington, did that

3    overlap with the one here?

4           And I want to know, if it did, how it overlapped and

5    whether or not the government has met, in its view, its Brady

6    obligations with respect to any information.

7           MR. KOZINETS:  Your Honor, just a couple of points

8    here.  We have outlined our position on how that investigation

9    does not fit into this case in our briefing in response to the

10   motion to compel at docket 1281.

11          We've extensively briefed that matter.  And it was my

12   understanding actually that that motion wouldn't be argued

13   today but instead would be argued --

14          THE COURT:  Well, it's part of the allegation in the

15   defendants' motion.

16          MR. KOZINETS:  Right.  And so here's the way I would

17   suggest looking at that.  They've basically added that

18   allegation --

19          THE COURT:  Well, I guess, Mr. Kozinets, somebody has

20   to know.  Somebody on your prosecution team has to know whether

21   or not there's a point in which there was any overlap or if

22   there was any relevancy with respect to what happened, even if

23   it was concluded in Washington as to the timeline.

24          MR. STONE:  Your Honor, may I just ask a clarifying

25   question?  When you say overlap, what does that mean?

1          THE COURT:  It's an allegation in the defendants'

2   motion that you failed to produce information because there was

3   overlapping information in the investigation in Western

4   Washington.

5          MR. JONES:  Your Honor, Reggie -- I apologize.  I'm

6   fully vaccinated as well.  Your Honor, the Western District of

7   Washington's 2012 grand jury investigation was wholly separate

8   from the case at hand, totally separate prosecutors, totally

9   separate investigation.

10         Two inadvertently disclosed documents were

11  inadvertently disclosed to defendants from that wholly separate

12  investigation three years ago.  There was litigation on that

13  issue.  Judge Logan in camera reviewed the inadvertently

14  disclosed documents.

15         THE COURT:  And that's what I want to understand,

16  because your position is completely different from the

17  defendants in that I read Judge Logan's order to say that it

18  did not involve the same investigation.

19         MR. JONES:  Correct.

20         THE COURT:  So if the grand jury finished its

21  investigation in 2012, to your knowledge, nothing happened

22  after that?

23         MR. JONES:  Correct.  Our investigation is wholly

24  separate from their investigation, Your Honor.  And we've made

25  that clear to defendants that nothing in that 2012-2013

UNITED STATES DISTRICT COURT

1    investigation is exculpatory or impeachment materials in our

2    case.   They've litigated that again before Judge Logan.

3            Again, this is a third motion to compel Brady.  Their

4    first two denied.  Judge Brnovich, even at the trial, when the

5    defendants brought up this issue before filing their motion,

6    she stated point blank the government is the gatekeeper.

7            And so what the defendants have always tried to do in

8    this case is they've tried to decide prospectively what's

9    considered Brady.  And the law doesn't allow that.  It is the

10   government's, not the trial court or the defendant's.

11           You know, the government decides prospectively what is

12   to be considered Brady.  And we have complied with those

13   obligations in this wholly separate case, Your Honor.

14           THE COURT:  All right.  Mr. Kozinets, I'm going to

15   give you five more minutes, and then I'm going to hear the

16   rebuttal.

17           MR. JONES:  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MR. KOZINETS:  So just real briefly, getting back to

20   Dr. Cooper, the court approved Dr. Cooper's expert testimony on

21   multiple occasions.  There was a motion in limine that the

22   court decided on October 26, 2020, where, having Dr. Cooper's

23   CV showing her background as a forensic pediatrician, the court

24   approved her to testify as an expert.  Then, the morning of her

25   testimony, adjudicating a second motion in limine.  After

1    Mr. Jones outlined the areas of her testimony, the court again

2    denied the second motion in limine, allowed her to go forward.

3    Then during the foundational part of her testimony when she

4    talked about her experience as a child, you know, as a

5    physician who looked after children and who had become an

6    expert on child trafficking issues, the defense asked for a

7    side bar and objected and said, Your Honor, we're hearing too

8    much about child exploitation.  The court said I overrule the

9    objection; this is only going to foundation; I overrule it.

10            Then after Dr. Cooper finished with her foundational

11   testimony, the defense asked to voir dire the witness.  The

12   government proffered her as a reliable and relevant expert.

13            The judge denied the request to voir dire and said,

14   government, you can proceed.  And that is really where -- That

15   kind of ends the portion of Dr. Cooper's testimony where most

16   of discussion about children come up.

17            So we don't think that is any indication at all of any

18   sort of misconduct or any -- even negligence with respect to

19   Dr. Cooper's testimony.

20            Now, once she begins her substantive testimony, at one

21   point she talks about how Child Protective Services agencies

22   have supplied her with information.  There's a side bar, a Rule

23   702 objection.  The court overrules that objection, but then

24   there is a motion for mistrial based on references to children.

25            At this point the judge turns to the prosecutor and

1    says you can mention trafficking, but you can't -- don't get

2    into child-related issues from this point forward.

3         And if you look carefully at the transcript of

4    everything that occurs after that second side bar -- and this

5    is at about Page 29 of, I think, Exhibit L -- the prosecutor

6    very clearly steers away from discussion of children.  There's

7    a series of questions around Pages 37, 38, about adults, adult

8    content, adult prostitution, adult advertising.  He's not

9    talking about children.

10        The witness does mention minors once, and the

11   prosecutor promptly shifts gears to talk about vernacular

12   that's used in the prostitution industry.  And he stays away

13   from asking about any terms involving minors even though those

14   terms are mentioned in the superseding indictment, even though

15   those terms come up frequently in the internal Backpage

16   documents that we've obtained in this case and that we've made

17   as trial exhibits, terms like Amber Alert, Lolita, new in town,

18   teen, young, et cetera.  He doesn't ask about any of that.  And

19   that's essentially the end of the story with respect to

20   Dr. Cooper.

21        So we would submit that there was no -- there really

22   is no evidence, if you actually, you know, a close reading of

23   the transcript shows no evidence of any sort of purposeful

24   questioning of her talking about children.

25        With respect to -- Is there anything else Your Honor

1   would like to hear about regarding meeting the *Kennedy* standard

2   on double jeopardy?

3           THE COURT:  No.

4           MR. KOZINETS:  Okay.  With respect to other requests

5   by the defense, there's no reason to have an evidentiary

6   hearing here.  We have a huge trial record, more than a

7   thousand pages.  We've had extensive briefing.  You've heard

8   from the government now.  There's no case that requires an

9   evidentiary hearing.  They haven't cited any that require that

10  kind of relief.  And I think the record is very adequate here

11  for the Court to conclude that there was no intentional

12  strategy on the prosecution's part to cause a mistrial and that

13  there was no violation of the Court's supervisory powers.

14          They talked a little bit about recklessness.  That

15  doesn't come into play at all on the double jeopardy analysis.

16  You have to show this intent to subvert the trial.

17          With respect to supervisory relief powers, you have to

18  show flagrant misconduct, which can be willful misconduct, or

19  it can be reckless disregard of constitutional obligations.

20  But negligence, gross negligence, those things don't count.

21  And we would submit that on careful review of the transcripts

22  in this case, there's nothing that rises to that level of

23  flagrant misconduct.

24          And remember that supervisory remedy, it's a harsh

25  sanction.  It's extreme.  It's rare.  It's disfavored.  It's

1    rarely used.  The defense has a very heavy burden to establish

2    entitlement to that extreme sanction that they're seeking here,

3    and they don't come close, anywhere close to meeting it.  You

4    also look at substantial prejudice, and you look at alternative

5    remedies.

6            The government has been substantially prejudiced by

7    the mistrial.  And that in and of itself is a more than

8    sufficient consequence for any conduct giving rise to the

9    mistrial ruling.  We'll have to start over again.  We've laid

10   this out in our brief.  It is in and of itself a very severe

11   consequence.

12           There's been some discussion about the case theory in

13   the arguments we've heard from the defense about what the

14   government has to prove, et cetera and so forth.  We don't

15   agree with their characterization of the case.  And I don't

16   think I have time to get into all of that here.  But I would

17   direct your Court to Judge Brnovich's rulings on the

18   defendants' motions to dismiss.  In particular, order at doc

19   793, which provides a comprehensive discussion of the

20   government's theory of the case and why the defendants' First

21   Amendment theories don't apply here if we prove everything --

22   if the allegations in the superseding indictment essentially

23   are taken as true.

24           We had extensive oral argument about preliminary jury

25   instructions where they proffered their kind of First Amendment

1    theory of what we have to show.  That was on August 20th.

2    Judge Brnovich denied their requested motion.  She did that

3    just before -- right after the jury had been selected and

4    shortly before she delivered the preliminary instructions,

5    which did not include the defense requested instruction but did

6    include specific Pinkerton instructions, which inform the

7    government's theory of the case.

8              Finally, one other point on the merits is that the

9    merits played no role whatsoever in the mistrial decision.  And

10   this is, I think, at Exhibit L around Page 68, 69, where

11   defense counsel says to the judge we need a mistrial because

12   the government hasn't proved its case.  And the court says

13   basically:  Stop.  It's way too early to make that argument.

14   The only argument I'm considering at this point is the

15   prejudicial value of testimony that's been given.

16             So she shuts that down.  It plays no role in her

17   decision.

18             With respect to -- I realize I'm running out of time.

19             THE COURT:  Yes, you're out of time actually.  I've

20   given you a little bit more leeway.

21             MR. KOZINETS:  Is there any chance that another member

22   of the team could respond to the privilege issues?

23             THE COURT:  Very quickly.

24             MR. STONE:  I'll be very brief, Your Honor.

25             MR. KOZINETS:  Thank you, Your Honor.

1          MR. STONE:   This is specific, Your Honor, to the

2     ancillary issues of this purported invasion of privilege.   And

3     what the defense is asking you to do is to conduct a horizontal

4     appeal of Judge Brnovich's order.   That order is document 1168.

5     Every argument that is made in the motion to dismiss with

6     respect to this purported invasion of privilege and the filter

7     team issues was before Judge Brnovich.   And she issued a

8     19-page order, document 1168, that outlines why all of, in

9     her -- in her view, all of defendants' arguments had no merit.

10          So it's already been determined it certainly can't

11     provide any basis and any support for any motion to dismiss

12     here.

13          And I think it's important to note that during that

14     argument, there was a question by the judge.   Judge Brnovich

15     asked defense counsel -- Clearly defendants have been arguing

16     about these defenses.   They involve Section 230, the

17     Communications Decency Act, First Amendment, and others.

18     They've been arguing about it in cases all across the country

19     for a decade or so.   Why is there any prejudice here?

20          And defense counsel said that's easy, because not once

21     has there ever been a legal memoranda or memorandum, has that

22     been given to a third party.

23          Well, a month later in discovery -- this is Exhibit 2

24     to our response -- defendants send us a 31-page legal

25     memoranda, memorandum -- excuse me -- that is titled "Why

1      Village Voice Media's Backpage.com Service Does Not Create

2      Liability for Promoting Prostitution."

3              In response, the government filed a motion that

4      relates to advice of counsel -- advice of counsel defense.  And

5      as Your Honor knows, to assert an advice of counsel defense,

6      defendant or defendants need to waive the privilege and need to

7      show that all of the material information was shared with their

8      attorneys before the attorney rendered a decision that they

9      relied upon.

10             So the only basis for the government filing that

11     motion -- and I think there will be further litigation on that

12     particular issue before the next trial -- is you can't assert

13     an advice of counsel defense without demonstrating that that

14     attorney who wrote the memo had all the pertinent information.

15             That's it.  This is apples and oranges to any sort of

16     invasion of privilege.  As Judge Brnovich notes in Doc 1168,

17     there's an eight-step process to determine whether something

18     has been privileged.  And certainly one of those eight steps

19     would be has that privilege been maintained.  And this memo was

20     shared with banks and third parties.

21             So it has nothing to do -- What I should -- What I

22     would add is that Judge Brnovich's order, which, among other

23     things, found that the defendants failed to demonstrate that

24     these were privileged communications, the communications that

25     Carl Ferrer had with the government, and on top of that, even

1    if they were privileged, they'd been waived in a multitude of

2    ways, and this is one more that Judge Brnovich didn't even know

3    about at the time when she made this decision in May and June

4    of this year.

5           And same with the filter team, Your Honor.  They

6    complained about it in document 1029.  There's a Judge Campbell

7    order, which is document 780, Exhibit 13 at Exhibit K, which

8    ruled that these communications with third-party PR firms were

9    not privileged.  These thousand or so documents that were

10   turned over all involved third-party PR firms, many of which

11   were the same exact PR firms that were listed in Judge

12   Campbell's order.  That's all I have.

13          THE COURT:  All right.  Thank you.  Who is going to

14   provide rebuttal?

15          MR. LINCENBERG:  I believe Mr. Bienert, and then I'll

16   have a brief --

17          THE COURT:  All right.  I'm going to give you seven

18   minutes.

19          MR. BIENERT:  Thank you, Your Honor, and I'll try to

20   be quick.

21          Your Honor, you were just misled.  You specifically

22   asked the prosecutors -- you noted that the court said, Judge

23   Brnovich, called out the fact that you were violating -- that

24   she said they violated her orders with Jessika Svendgard by

25   asking about inflammatory things.

1          You basically said what's with that?  They got up here

2   20 minutes ago and said:  That never happened.  When we

3   referenced 105 days, that was just to designate a point in

4   time.  We never had her talk about rape.  In fact, we didn't

5   want her to and told her not to.

6          That's what they just said.  Here's the transcript,

7   Your Honor.

8          Ms. Svendgard's direct testimony by government at Page

9   82 asked about what happens when you meet people, when your

10  pimp had you hooked up.

11         I would be either -- "I would either be driven to

12  where they are or they would come to me."

13         Question by government prosecutor:  "And when you went

14  with them, Jessika," meaning Svendgard, "what would happen?"

15         Answer:  "I would be raped for money."

16         Question by prosecutor.  "In the 105 days that you

17  were with Mr. Hopson," her pimp, "how many times would that

18  happen, Jessika?"

19         "Three to --"

20         Objection.

21         Sustained.

22         So there's two misrepresentations to you.  They told

23  you that they didn't want her to talk about rape.  But in

24  reality, as soon as she said she was raped when she went to

25  hotels, they specifically asked her how many times a day that

1    would happen.

2            Secondly, Mr. -- counsel, Mr. Kozinets, got up here

3    and inaccurately just told you that we didn't object to any of

4    this; we had no problem with the 105 days.  Another falsity.

5            Here it is.  As soon as Mr. Rapp asked her how many

6    times she would be raped a day in the 105 days, Ms. Bernstein

7    objected, at trial, and the judge sustained it.

8            Your Honor, I can't help but note that there's a lot

9    of misinformation here.  And I think they're trying to take

10   advantage of the fact that you're new to the case.

11           The simple reality is and what is inescapable is Judge

12   Brnovich, who sat over this trial and did get a feel for things

13   after lots of representations by the government for years about

14   the propriety with which they would put things on, flat out

15   declared a mistrial because she said I can't have you

16   repeatedly violating my orders.  And she found that they did.

17           You also specifically asked about Dr. Cooper.

18   Mr. Kozinets again said, oh, well, we -- or I think it was

19   Mr. Jones just got up here and said, oh, we just tried to tell

20   you we told her not to talk about all that child stuff.

21           Well, that's not what Judge Brnovich noted.  You know,

22   if you look at Exhibit M in her two-page statement about why

23   the mistrial was granted, she calls out Mr. Jones by name.  She

24   says:  Just after we had a discussion and the government agreed

25   to minimize the focus on child trafficking, Mr. Jones then

1   proceeded to question Dr. Cooper solely on child sex

2   trafficking.

3         That's what happened, Your Honor.  If you read

4   Dr. Cooper's testimony, it was child sex trafficking over and

5   over and over again, and the judge was saying you can't do

6   that, and Mr. Jones got up and did it.

7         So they're not being honest with you right here in

8   this courtroom on the two things that you asked about.  It's in

9   the transcript.  These were wrongdoings.  They were not by

10  mistake.  That's why the mistrial was granted.

11        And while it wasn't addressed by Judge Brnovich, that

12  is why, when we put the standard up of intent to go to

13  mistrial, objectively it's met.  They repeatedly violated the

14  orders.  They went to the third rail that the court said don't.

15  And they did it right after their attempt to put on -- the

16  court allowed -- Mr. Fichtner, Agent Fichtner, blew up because

17  he said you can't show criminality based on these ads.

18        The other thing that I want to address because another

19  misleading comment by the government right here was on the

20  Western District of Washington.  I am going to have

21  Ms. Bernstein, because she was the person who dealt with that

22  issue and is far more informed.

23        MS. BERNSTEIN:  Thank you, Your Honor, and I'll be

24  brief with this.  What Judge Logan found three years ago at

25  this point was that inadvertently produced memos authored by

1    DOJ attorneys relating to a separate investigation in the

2    Western District of Washington where DOJ concluded there was no

3    evidence of criminality, Judge Logan said those inadvertently

4    produced memorandums were protected by work product, that

5    those -- that the conclusions of DOJ related to a different

6    investigation than this case.

7            And I don't want to -- I want to contain that, because

8    it is not as the government is suggesting, but it's wholly

9    separate.  That is the first time Mr. Jones has ever said that.

10           THE COURT:  Well, let me say that's what Judge Logan

11   said.  Let me quote from his order.

12           "Court finds the defendants' argument is misguided

13   because the Western District of Washington was a wholly

14   separate investigation and failed to show how the mental

15   impressions and legal analysis from attorneys not involved in

16   this case can be exculpatory."

17           So he found it was a wholly separate investigation.

18           MS. BERNSTEIN:  Your Honor, I believe that was

19   probably in 2018 or 2019.  I don't recall when Judge Logan

20   recused.  I believe the order you're referring to is at docket

21   446, I think.  I'm familiar with that.

22           THE COURT:  It was 449.

23           MS. BERNSTEIN:  449.  I'm sorry.  The issue, Your

24   Honor, is that the facts that were underlying the investigation

25   in Washington at the time Judge Logan made that decision or

1    issued that order were not what the government had then spent

2    three years producing discovery about, witnesses about, and

3    putting on their trial.

4           There's only one website, Your Honor.  It's the same

5    Backpage.com that it was back then that the government put on

6    trial now.

7           One of the very defendants in this case was called

8    before the grand jury in the Western District of Washington.

9    And I would say about 65 percent of the millions and millions

10   of pages of discovery we've received in this case pertained to

11   the 2010 to 2013 time frame that was investigated in the

12   Western District of Washington.  There's overlapping witnesses.

13   The government's given us Jencks from that grand jury

14   investigation in this trial.

15          So for the government to say that what they presented

16   at trial is wholly separate, as Judge Logan concluded years ago

17   when we were tracking an indictment that was different than

18   what the government presented, the government focused almost

19   exclusively in their opening and at trial on the time frame

20   leading up to 2013.  That's almost exclusively what they did.

21          And that was at the point at which we said to Judge

22   Brnovich how is the findings -- how are the factual issues that

23   they investigated, interviews of these defendants, interviews

24   of the same witnesses, how is that not material?

25          The government just stood up here and said in 2010, in

| | |
|---|---|
| 1 | 2011, in 2012, in 2013 this is what Backpage did; this is what |
| 2 | these defendants did.  The government knows the DOJ |
| 3 | investigated those years and came to a contrary conclusion. |
| 4 | The government also has not told us, well, these are |
| 5 | separate; that's why we're not giving it to you; we're not |
| 6 | giving it to because it's separate. |
| 7 | In fact, I'm quoting from a letter that Mr. Jones sent |
| 8 | to us in response to my request, my umpteenth request for this |
| 9 | information, and he says -- And I believe this is in the |
| 10 | record.  I can find the cite or submit this for Your Honor. |
| 11 | Mr. Jones says, "We do not share your view that the materials |
| 12 | from the Western District of Washington's 2012 to 2013 |
| 13 | investigation reveal exculpatory or impeaching information in |
| 14 | this criminal case.  As you know, the Western District of |
| 15 | Washington's investigation lacked significant evidence that we |
| 16 | have since obtained clearly demonstrating defendants' knowledge |
| 17 | and intent to facilitate prostitution." |
| 18 | And that has been the government's argument.  Until |
| 19 | today, that has been the refrain -- |
| 20 | THE COURT:  Well, couldn't -- I guess -- |
| 21 | MS. BERNSTEIN:  -- that we found more stuff. |
| 22 | THE COURT:  -- let me see if I -- Let me -- I |
| 23 | didn't -- I don't know what you read, I mean, in terms of where |
| 24 | that came from or what the prompt was for the letter. |
| 25 | But couldn't it be the case that the Western District |

1    of Washington shut down their investigation.  They made a

2    determination based on what they had at the time.  The

3    government then in its investigation here then takes leads or

4    information, develops new information.  Are you saying that

5    that's not what happened here?  Are you saying that they're

6    wholly relying on the prior material that was produced by the

7    grand jury and that the decision was made not to prosecute

8    because presumably there was exculpatory evidence?

9              MS. BERNSTEIN:  I don't know what the government's

10   relying on here.  I can only take the government at its

11   representations, which has been that since the Western District

12   of Washington, they claim to have unearthed additional

13   information that was not known to the investigators or to the

14   prosecutors in that district at that time.

15             And I would submit, Your Honor, that that goes to the

16   weight of the evidence when it comes in at trial.  They can

17   cross-examine people about that.  That doesn't allow the

18   government to withhold from the defense years-long

19   investigations subpoenaing dozens of witnesses before the grand

20   jury, thousands of documents.  I don't know the full extent of

21   it.  But it was an extensive investigation that concluded no

22   criminality.

23             And then the government comes here and says no, no,

24   no, in those years criminality was robust; it was occurring all

25   the time.

1          And we say, well, gosh, that's not what you found, and

2    so we are entitled to the underlying facts that supported the

3    conclusion that there was no criminality.

4          And in response they don't say no, no, no, it's

5    separate.  In response they say they didn't know everything

6    that we know now.

7          Okay.  The government can argue that.  If we present

8    some piece of evidence that was a smoking gun in 2012 that led

9    to the Western District of Washington concluding no

10   criminality, the government can say:  But you didn't know X.

11   You didn't know Y.  You didn't know Z.

12         But the government doesn't get to hide all of that

13   from us and say, no, we've decided that -- we reached a

14   separate conclusion, so we're not going to give you anything

15   that they've given.

16         It's the IRS that investigated in 2012.  It's the FBI

17   that investigated in 2012.  It's the same case agents here that

18   are sitting in the courtroom today.  It's their agencies, Your

19   Honor.  There were overlapping witnesses.  And this came up

20   again before Judge Brnovich, because in response to my endless

21   inquiries about discovery from the Western District of

22   Washington and Jencks for these witnesses, the government kept

23   taking the witnesses off their witness list.  So they

24   interviewed a number of moderators in the Western District of

25   Washington, and we hadn't been provided with their notes or all

1      of that information.

2             When we asked for it again and again, updated

3      iterations of the witness list would no longer have those

4      people on them.

5             Judge Brnovich understood that that may obviate their

6      Jencks obligations, but it doesn't obviate Brady.  If they

7      interview 15 moderators in 2012 who tell them this is what

8      we're doing, and the conclusion they make from that is that

9      there was no criminality and there's no indictment, and then

10     they come into court years later and say to the jury and to

11     Judge Brnovich in 2012 moderators were committing illegality

12     and doing things that were illegal, criminality and illegality,

13     that's not what they found then.  And we don't see any of it

14     because they do gatekeep.  We don't see any of it because we

15     don't get to know what went on there.  All we see is the tip of

16     the iceberg.  And every time we ask, there's more and more and

17     more.  The government doesn't dispute that Arnold & Porter, a

18     premier, respected law firm, told -- gave advice in 2012 to a

19     prospective buyer of Backpage that at that time -- The

20     prospective buyer was seeking advice about possible liability

21     if he purchased Backpage and was told there's no criminal

22     liability.  There's a memorandum performed -- written by a

23     summer associate.  There's e-mails about this.

24             We know that because it was in the grand jury

25     transcript that they did give to us.  So we read this and say,

1    well, gosh, can we please have that exhibit?

2              And they say:  No, no, no, no.  It's a summer

3    associate.  They didn't know what we know now.

4              That doesn't preclude turning it over.  The government

5    doesn't dispute that these things are relevant and bear on

6    this.  So this idea that it's wholly separate that Mr. Jones

7    just latched onto when Your Honor offered that to him, I just

8    want to make clear that that's not what the government's

9    argument has been.

10             THE COURT:  I think I asked him the question.  I don't

11   think I offered it to him.

12             MS. BERNSTEIN:  I'd like to make clear that that's

13   inconsistent with everything Mr. Jones has written to the

14   defense in this case about this specific issue and what's

15   before Your Honor in the rest of the record.

16             THE COURT:  All right.  Well, I will -- Did you wish

17   to say something?

18             MR. LINCENBERG:  I did, Your Honor.

19             THE COURT:  Okay.  Two minutes, and I'm going to cut

20   you off.

21             MR. LINCENBERG:  Two minutes is enough.  A couple of

22   quick points.  First, with regard to Dr. Cooper and what they

23   claim they discussed, the Court should bear in mind what we

24   have at Footnote 13 on Page 14 of the defendants' reply brief

25   where prior courts have noted Dr. Cooper doesn't really have

1   testimony relating to the elements of prostitution-related

2   offenses.  She talks about all of this trafficking stuff.  I

3   think that's relevant here.

4           Second, with regard to the filter team protocol

5   violations, Judge Campbell's order dealt with 232 e-mails where

6   a PR firm was involved.  After that we were in court for a

7   hearing.  There was a protocol that the government said they

8   would abide by in which they would not turn over to the merits

9   team -- the taint team would not turn over to the merits team

10  documents which contained attorneys' names without

11  going through the protocol which involved also giving the

12  defense an opportunity to object.  They directly violated that

13  with some 955 e-mails that they turned over.

14          THE COURT:  And I think you raised that in another

15  pleading previously.

16          MR. LINCENBERG:  Yes.  Yes.  Third, with regard to the

17  attorney-client privilege, the whole point on the renewed

18  motion is that when Judge Brnovich finds the defendants didn't

19  meet their burden of establishing privilege, because we can't

20  just assume that these topics on their face are privileged, and

21  then the government comes back and later, two years later, says

22  this is on its face privileged, that's a contradiction.

23          And that issue will either be fleshed out by the Court

24  allowing an evidentiary hearing relating to that prior to trial

25  or that misconduct will come out during Carl Ferrer's

1    testimony.  He will either testify in a hearing beforehand, or

2    at trial the Court will see that he will come out and say this

3    was clearly attorney-client communications.

4          Third -- Fourth, briefly on this recklessness point,

5    *Oregon versus Kennedy* doesn't say exactly what is meant by

6    government intending to goad.  What I'm suggesting that intent

7    is whether the government knows the natural and probable

8    consequences of what's going to come when they solicit

9    testimony in violation of orders.

10          And I'm suggesting that it's the government in many

11   cases under *Jewell* that says that that can also be satisfied by

12   reckless disregard.  I don't know if that's what the courts

13   would uphold as the definition of intent for this purpose, but

14   it is something which shows knowledge.

15          And finally I think that what really comes out of this

16   hearing is that Judge Brnovich's findings about what the

17   government did with Dr. Cooper and Jessika Svendgard are

18   inconsistent with what Mr. Jones' and Mr. Rapp's answers are of

19   the conversations they had with these witnesses.

20          Now, I don't know the truth.  I don't know what was

21   stated in meetings with Mr. Rapp and Ms. Svendgard or with

22   Mr. Jones and Dr. Cooper.

23          But whatever that truth is, it's particularly relevant

24   to the Court's decision on this motion.  And the Court should

25   not in any way defer to their claims about what was said when

1    there's no under oath testimony on that, which is in fact what

2    occurred in *Oregon versus Kennedy* and in the *Fern's* case and

3    the like where courts, in order to decide what the truth was on

4    this very important motion, had a hearing in which they took

5    testimony.

6            Thank you, Your Honor.

7            THE COURT:  Thank you.  I will take the matter under

8    advisement.

9            And let me just, on a somewhat related matter, I think

10   the Court has been, because of the number of individuals that

11   are involved here, the numbers of lawyers we have present, I

12   have been generous in giving you extensions of page limits and

13   so on and so forth.  But I do want to just make sure that

14   everyone adheres to the local rules of pleading standards.

15           I don't want to have to turn back any pleading because

16   half of what it is is in footnotes, single spaced.  All right.

17   If you're going to make the points, make them in the body of

18   your briefs.

19           Otherwise I'm going to start rejecting these very

20   lengthy pleadings that also attach hundreds of pages of

21   exhibits.

22           And with respect to that, let me just say that I'm

23   going to institute -- and if I have to issue it in a separate

24   order -- I want to make sure that you specifically pincite to

25   the referred matter that you're talking about, because I'm

1    dealing with transcripts, I'm dealing with prior orders and

2    exhibits, e-mails and so on.  If you're going to refer to it in

3    your pleading, make sure that you direct the Court to the page

4    and the lines that are relevant to the argument.  Okay?

5            And, lastly, sealing.  Study the local rule on

6    sealing.  Study the docket.  There have been some inconsistent

7    filings I've already noticed.  Some folks have attached

8    exhibits that they wish to have sealed when they are actually

9    on the public docket.  And so do pay attention to that.  I'm

10   going to myself go through that because it's quite confusing to

11   me what is sealed and what is not.  And you're referring to

12   documents as being sealed, and then I discover they're not.  So

13   be very careful about that as well.

14           And so with that, I will take the matter under

15   advisement.

16           Let me just double check is there anything further

17   from the government that you wish to raise today just in terms

18   of housekeeping matters or any issues since I have you all

19   here?

20           MR. KOZINETS:  No, Your Honor.

21           THE COURT:  Anything from defense counsel that you

22   wish to raise today in terms of a housekeeping matter?

23           MR. LINCENBERG:  Yes, Your Honor.  Can we -- The

24   defense would like just some clarification of exactly what is

25   on for hearing on the 13th.

1          THE COURT:  I don't know.  All right.  So I'm still

2     parsing through a lot of this.  And as you notice, I issued a

3     minute entry because there were prior matters that were

4     lingering on the docket before the mistrial was declared.  I

5     didn't know whether or not -- And some of that was relitigated

6     in the motion that we just heard.  And I didn't know whether or

7     not, to the extent that the Court is going to make a particular

8     finding or opine on, it might include some of that prior

9     material.

10          And I noticed the parties didn't have a reply filed

11     because obviously the mistrial occurred.  And so my guess is

12     you all thought it was moot at that point.

13          So, in any event, I'm still parsing through

14     specifically what I want to hear about.  And I want to maximize

15     the use of my time and your time to be able to focus narrowly

16     on those particular issues that I think bear hearing.

17          Mr. Feder.

18          MR. FEDER:  As it pertains to the hearing on the 13th,

19     as it stands right now, I'm supposed to be on a plane and would

20     ask to be allowed to participate by phone, but --

21          THE COURT:  Yes.

22          MR. FEDER:  -- travel plans are changing very quickly,

23     so I'm not sure where I'm going to be.

24          THE COURT:  And you may, as you have done previously

25     or some of you have done, just make a motion inquiry so that I

1    have it on the record, and I can make sure that I'm focused on

2    your particular requests.

3              MR. FEDER:  Great.  Thank you.

4              THE COURT:  All right.  There being nothing further,

5    then we are adjourned.

6        (Proceedings recessed at 10:37 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I, LINDA SCHROEDER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 7th day of January, 2022.

s/Linda Schroeder
Linda Schroeder, RDR, CRR

UNITED STATES DISTRICT COURT