Gary S. Lincenberg *(admitted pro hac vice)*
   glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
   aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
   gkp@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant John Brunst

Paul J. Cambria, Jr. *(admitted pro hac vice)*
   pcambria@lglaw.com
Erin McCampbell Paris *(admitted pro hac vice)*
   eparis@lglaw.com
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580

Attorneys for Defendant Michael Lacey

*[Additional counsel listed on next page]*

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CASE NO. 2:18-cr-00422-PHX-DJH |
|       Plaintiff, | **DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS TO COURT RULINGS DURING FERRER TESTIMONY** |
|     vs. | |
| Michael Lacey, et al., | |
|       Defendants. | |

3893354.2

1   Eric W. Kessler, 009158
        eric.kesslerlaw@gmail.com
2   Kessler Law Group
    6720 N. Scottsdale Rd., Suite 210
3   Scottsdale, AZ  85253
    Telephone: (480) 644-0093
4   Facsimile: (480) 644-0095

5   Bruce S. Feder, 004832
        bf@federlawpa.com
6   FEDER LAW OFFICE, P.A.
    2930 E. Camelback Road, Suite 160
7   Phoenix, Arizona 85016
    Telephone: (602) 257-0135
8
    Attorney for Defendant Scott Spear
9
    David Eisenberg, 017218
10      david@deisenbergplc.com
    DAVID EISENBERG PLC
11  3550 N. Central Ave., Suite 1155
    Phoenix, Arizona 85012
12  Telephone: (602) 237-5076
    Facsimile: (602) 314-6273
13
    Attorney for Defendant Andrew Padilla
14
    Joy Malby Bertrand, 024181
15      joy.bertrand@gmail.com
    JOY BERTRAND ESQ LLC
16  PO Box 2734
    Scottsdale, Arizona 85252
17  Telephone: (602) 374-5321
    Facsimile: (480) 361-4694
18
    Attorney for Defendant Joye Vaught

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS
TO COURT RULINGS DURING FERRER TESTIMONY

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Admission of Exhibits Under the Rule of Completeness That Establish
        Defendants' Good Faith ................................................................................. 5

        A.      Exhibit 616 (November 2010 Correspondence Between Jim Larkin,
                Steve Suskin, and Representatives of BMO) ..................................... 7

        B.      Responses to the State AG Letters ..................................................... 9

        C.      Exhibit 836 (July 2016 Correspondence Between Liz McDougall and
                *The Wall Street Journal*) ................................................................ 10

II.     Ferrer's Prior Statements Regarding the California Criminal Complaints Are
        Classic Impeachment. ................................................................................ 11

        A.      Ferrer Personally Waived the Attorney-Client Privilege as to the
                Impeachment Material. .................................................................... 14

        B.      The Format of the Prior Inconsistent Statements Is Irrelevant. ........ 15

III.    Reference to Attorney Advice and Prior Litigation ................................. 16

IV.     CONCLUSION ......................................................................................... 18

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Arthur v. Gallagher Bassett Servs., Inc.*,
  No. CV 09-4882 SVW (CWX), 2010 WL 11596468, at *6 (C.D. Cal.
  June 1, 2010) ................................................................................................................ 8

*Beech Aircraft Corp. v. Rainey*
  488 U.S. 153, 109 S. Ct. 439 (1988) ........................................................................ 5, 6

*United States v. Cedeno-Cedeno*
  No. 14CR3305, 2016 WL 4376845 (S.D. Cal. Aug. 17, 2016) .................................... 8

*United States v. Collicott*
  92 F.3d 973 (9th Cir. 1996) ........................................................................................ 6

*United States v. Monroe*
  943 F.2d 1007 (9th Cir. 1991) .................................................................................. 15

*United States v. Morgan*
  555 F.2d 238 (9th Cir. 1977) .................................................................................... 13

*United States v. Ortega*
  203 F.3d 675 (9th Cir. 2000) ...................................................................................... 6

**Statutes**

47 U.S.C.A. § 230 ............................................................................................... 7, 8, 11

18 U.S.C. § 1952 ........................................................................................................ 9

**Other Authorities**

Fed. R. Evid.
  106 ................................................................................................................ 5, 6, 7, 9
  401 .................................................................................................................... 5
  402 .................................................................................................................... 5
  801(d)(1)(A) ................................................................................................... 15, 16

U.S. Const. amend. I ................................................................................................ 11

Defendants file this brief to address certain rulings that restricted defense counsel's ability to let the jury hear the truth and impeach Ferrer.

## I.      Admission of Exhibits Under the Rule of Completeness That Establish Defendants' Good Faith

Federal Rule of Evidence 106 states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, ***at that time***, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." (emphasis added).  Because different courts have exercised judgment differently in this respect, Rule 106 has been amended to clarify that the rule should not be construed narrowly.  Effective December 1, 2023, the clarifying amendment states: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. ***The adverse party may do so over a hearsay objection***." (emphasis added).  The Advisory Committee Notes regarding the amendment state:

> [T]he amendment provides that if the existing fairness standard requires completion, then that completing statement is admissible over a hearsay objection. Courts have been in conflict over whether completing evidence properly required for completion under Rule 106 can be admitted over a hearsay objection. ***The Committee has determined that the rule of completeness, grounded in fairness, cannot fulfill its function if the party that creates a misimpression about the meaning of a proffered statement can then object on hearsay grounds and exclude a statement that would correct the misimpression.*** (emphasis added.)

In other words, an email cannot selectively be redacted to omit necessary context on the basis that the redacted, exculpatory portion of the email is hearsay.

Under Rule 106, "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rules 401 and 402."  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172, 109 S. Ct. 439, 451 (1988).  In *Rainey*, a case involving the crash of a Navy training aircraft, one of the plaintiffs (both of whom were surviving spouses of the pilots) was called as an adverse witness during the defendant's case.  The Supreme Court held that the

trial court abused its discretion in restricting the cross-examination of plaintiff (by his own counsel) by precluding questioning regarding certain aspects of a letter the plaintiff wrote to the Navy that were not covered on direct examination. *Id*. at 170. Specifically, "read in its entirety," the letter was "fully consistent" with plaintiff's theory that the accident was caused by a power failure. *Id.* By not permitting plaintiffs' counsel to delve into the entire letter, "[i]t is plausible that a jury would have concluded from this information that [plaintiff] did not believe in his theory of power failure and had developed it only later for purposes of litigation." *Id*. at 171. The Supreme Court affirmed the Court of Appeals' ruling that it was "***reversible error*** for the trial court to have prohibited cross-examination about additional portions of [plaintiff's] letter which would have put in context the admissions elicited from him on direct." *Id*. at 160-161, 175 (emphasis added).

At Dkt. 1776, the government relies on several cases for its objection to the admission of purported "self-serving" hearsay. Those cases are readily distinguishable. *United States v. Ortega*, 203 F.3d 675, 679 (9th Cir. 2000) involved a post-crime confession to the government. The Ninth Circuit held that a defendant cannot introduce self-serving statements through a government interviewer by mixing in mitigating circumstances to an inculpatory confession. *Id*. at 682. Further, the defendant's statement was an "unrecorded oral confession," and therefore not subject to Rule 106, which "applies only to written and recorded statements." *Id*.

Likewise, in *United States v. Collicott*, 92 F.3d 973, 977 (9th Cir. 1996), the Court held that Rule 106 did not apply to certain statements made by a witness to law enforcement because (1) "no writing or recorded statement was introduced by a party," (2) the statements made by the witness to law enforcement were otherwise inadmissible hearsay, and (3) "the complete statement did not serve to correct a misleading impression of a prior statement created by taking [the witness'] comments out of context." *Id*. at 983. None of these cases apply to an *email* that has been selectively redacted by the Government to exclude *admissible* hearsay. And the Government ignores the clarifying amendment to Rule 106, which makes clear the impropriety of its redactions.

A.     **Exhibit 616 (November 2010 Correspondence Between Jim Larkin,**
**Steve Suskin, and Representatives of BMO)**

On September 15, 2023, Exhibit 616a was admitted during the direct examination of Carl Ferrer over Brunst's FRE 106 objection.  09/15/23 Tr. at 12-13.  The Government introduced certain portions of Exhibit 616a to show that Brunst was involved with, and on notice of, certain issues being raised by Bank of Montreal (BMO).  The Court denied the defense request to admit the entire exhibit during direct examination.  The Court told defense counsel, "you can discuss it in your examination of the witness."  *Id.* at 12:25-13:2.

Under the rule of completeness, the unredacted email (set forth at Exhibit 616) should have been admitted on direct examination.  During cross, Brunst's counsel was not permitted to introduce the redacted portion and was not permitted to ask about key portions—including Larkin's statement to his subordinates and the bank that Backpage's operations were lawful.  *See* 09/27/23 PM Tr. at 123:18-21, 124:20-126:13 (severely limiting what counsel could reference in his cross-examination of Ferrer).

Exhibit 616a is a series of back-and-forth emails between Spear, Larkin, and Mary Latta of BMO, copying Brunst.  In connection with Brunst, the Government used the e-mail to highlight that the content was shared with Brunst.  The government elicited testimony from Ferrer that Backpage's communications with BMO merely "created the impression that we're shutting down these [adult] categories . . . .  So the whole thing is a sham."  09/15/23 Tr. at 14:5-16.  The unredacted email makes clear that the communications to BMO started with an email from Larkin to BMO, and then, in response to a question from BMO, Spear added more detail.

The redacted portion of the e-mail thread—Larkin's email to BMO that was part of the email chain copied to Brunst—tells BMO, *inter alia*, about moderation steps, that Backpage's operations are lawful, and that Connecticut AG Blumenthal is attacking Backpage as part of an attack on the Communications Decency Act (CDA) in a "political dance" to help him get elected to the Senate.  By redacting Exhibit 616a to present an

incomplete email to the jury, the Government successfully left the jury with the false impression that Brunst was made aware of the site being used for illegal purposes, while hiding the underlying email from Larkin advising Brunst and others that Backpage's operations were "clearly lawful."

The redacted portion of the email gives critical context to the notice provided to Brunst.  This notice provided by the redacted portion of the email, which is relevant to Brunst's mental state, is a non-hearsay purpose.  *See Arthur v. Gallagher Bassett Servs., Inc.*, No. CV 09-4882 SVW (CWX), 2010 WL 11596468, at *6 (C.D. Cal. June 1, 2010) ("An out-of-court statement offered for any purpose other than to prove its truth - i.e., to prove the defendant's state of mind or the effect on the listener - is not hearsay").  Further, Defendants should have been permitted to cross-examine Ferrer regarding any impression he formed about Larkin's email to BMO, *i.e.*, the ***same basis*** for the Government's admission of the ***unredacted*** portion of the communication.  *See id.; see also United States v. Cedeno-Cedeno*, No. 14CR3305, 2016 WL 4376845, at *8 (S.D. Cal. Aug. 17, 2016) ("Out-of-court statements introduced to show the effect on the listener are not hearsay."); 09/15/23 Tr. at 15:6-8, 17:10-11 (regarding Mr. Spear's e-mail to Ms. Latta, the Government asked Mr. Ferrer what he understood "that statement to mean").

The exhibit also highlights why precluding references to the CDA—a defense to state civil and criminal cases—also leads to a completely misleading presentation of evidence.  As the Court has now seen, the Government has relied heavily on ***State Attorneys General*** communications with Backpage.  The government has squarely put at issue what Backpage's responses to these AGs ***actually were***.  08/31/23 Tr. at 169:9-13 ("These defendants also received letters from the National Association of Attorneys General. They received a number of those letters. And one of their responses was, look at our moderation program. Look at how we're reducing prostitution on our website."); 09/12/23 PM Tr. at 48:18-25; 09/13/23 AM Tr. at 69:7-13; 09/13/23 PM Tr. at 76:6-79:3, 82:5-85:4 (Ferrer testifying that the response to the AGs was "deceptive, highly misleading"), 93:9-94:4; 09/14/23 AM Tr. at 17:2-17, 31:24-32:2, 53:5-59:20, 86:12-15.

The AG letters plainly are not notice of a Federal Travel Act violation; at most, they are notice of a potential prosecution under state law as to which the CDA was a defense.

Any rational juror would wonder (1) why Backpage was never charged by an AG at the time the letters were sent (it was only in late 2016 when the State of California brought charges against Larkin, Lacey, and Ferrer) and (2) whether Backpage had any viable defenses to the AG's accusations at the time, and if so, what Backpage said in response. The government therefore should not be allowed to create the misimpression for the jury that Backpage (1) did nothing in response to the AG letters or (2) lacked legal recourse against the State AGs, when they had a complete defense under the CDA.

**B.     Responses to the State AG Letters**

As noted above, the government put in several letters from State Attorneys General regarding the content on the Backpage site.  *See* Exhs. 52, 119, 902.  Over objections under Rule 106, the Court allowed the AG letters in, without admitting the corresponding responses from Backpage's attorney, Samuel Fifer.  In ruling on the objection (Mr. Feder stated, "I would also ask under Rule 106 for the other letters responsive to this to be shown to the jury"), the Court stated, "You can do that when it's your turn, so overruled." 09/13/24 PM Tr. at 82:16-19.  But the defense was not permitted to put into evidence the responsive letters from Backpage at Exhibits 487 and 5019.  09/26/23 PM Tr. at 15-18.

Under Rule 106, and because the government has "opened the door," there are several bases for the admission of Backpage's responses to the AG letters.  First, the government put the responses at issue by eliciting testimony from Ferrer regarding the fact that there were responses, that the "owners" (*i.e.*, certain of the Defendants) provided the responses, and that the responses were purportedly "deceptive" and "highly misleading." 09/13/23 PM Tr. at 84:15-19.  Therefore, at a minimum, defense counsel should have been permitted to admit the responses and ask Ferrer point-by-point as to what portions he considered to be deceptive.

Second, the AG letters themselves reference Backpage's responses and therefore put them at issue.  *See* Exh. 52 at 1 ("Thank you for your recent letter notifying us of

9

additional changes backpage has implemented in order to respond to our concerns . . . ."),
("As you indicated in your recent letter to us, you found that once you began charging for
ads in the adult services section of the site . . . ."); Exh. 119 at 1 ("This letter is in response
to Backpage.com's assurances . . . ), *id.* at 3-4 (addressing Backpage's "representations"
made in prior responsive letters).

Third, the Court held that the AG letters are "being offered for the knowledge of
certain defendants as to what was going on at Backpage as alleged in the indictment."
09/14/23 AM at 66:21-67:1.  But the indictment merely alleges the Government's side of
the story.  The defense is entitled to respond to the indictment's charges and what
purportedly was in their "knowledge" by putting in the responsive letters.  This is
particularly the case as to Brunst.  Ferrer testified that he did not consult with Brunst on the
responses to the AG letters.  09/27/13 AM Tr. at 92:21-93:5.  The responses themselves
are therefore critical to show Brunst's state of mind as to Backpage's position vis-à-vis the
AGs and the steps he understood Backpage to be taking to address the AG's concerns.
There is no testimony that Ferrer told Brunst the responses were deceptive or misleading.
Therefore, Brunst's reliance on the responsive letters would not amount to "self-serving"
hearsay—the letters instead go to his understanding as the CFO of the holding company
that outside counsel had been retained to engage in a cooperative dialogue with the State
AGs, which provided him comfort that any legal issues posed by the AG letters were being
sufficiently addressed.

**C.**    **Exhibit 836 (July 2016 Correspondence Between Liz McDougall and**
        ***The Wall Street Journal*)**

Over objection by the defense, the Court admitted Exhibit 836a, a heavily redacted
version of Exhibit 836, for the purpose of showing that WSJ was communicating with
Backpage's General Counsel regarding *The Erotic Review*.  09/22/23 AM Tr. at 42-44.  In
the redacted portion of the email, which prompts the WSJ response that was admitted,
Ms. McDougall says to the WSJ reporter, for example, "[Y]our questions and observations
about TER numbers are concerning because they suggest you may not have a good

understanding of the complexities of moderating third-party content online."  The government should not be permitted to cherry-pick what it unilaterally deems to be admissible hearsay and keep out exculpatory hearsay that provides necessary context.  As Mr. Ferrer is later copied into the e-mail exchange, defense counsel should have been permitted to ask him about his reaction to Ms. McDougall's redacted comments to WSJ.

## II.     Ferrer's Prior Statements Regarding the California Criminal Complaints Are Classic Impeachment.

The Court did not permit Mr. Lincenberg to use GL-CF-36 (May 18, 2017 email from Ferrer to James Grant and Daniel Quigley[1]) and GL-CF-37 (Ferrer's prior inconsistent statements) to impeach Ferrer.  On September 26, 2016, the California Attorney General filed a criminal complaint against Lacey, Larkin, and Ferrer charging pimping and related crimes.  Exh. 5917.  After the court dismissed the complaint,[2] California then came back on December 23, 2016, and charged these same individuals with the same pimping and related crimes, while adding money laundering charges.  Exh. 5919.  California subsequently amended its complaint to include additional money laundering charges premised on bank fraud, after which the court dismissed the pimping and related charges and the money laundering charges based on pimping, leaving just the money laundering charges premised on bank fraud.  (Those charges were pending at the time of the federal indictment and are currently stayed.).

The money laundering charges in the California case are based on the same

---

[1]  Mr. Quigley, an attorney, represented Medalist Holdings, Inc. (f/k/a New Times, Inc.) and its subsidiaries—the companies owned by Larkin and defendants Lacey, Brunst, and Spear.  Mr. Quigley did not represent Ferrer in the California criminal cases.

[2]  In dismissing the complaint, the California court expressly stated that the prosecution implicated the First Amendment, even though the court resolved the case on statutory grounds under the CDA and did not need to reach the constitutional issue presented.  Exh. 5324 at 4 (stating that "The First Amendment is implicated" and "Indeed, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA.  Congress expressly intended to relieve online publishers from liability for publishing third-party speech").

allegations as those made by the Government here.  For example, the California criminal complaint alleges:

- The creation of Classified Solutions, Website Technologies, and PostFastr.  *Id.* at 2.

- "Ferrer applied for a merchant account with the payment processor Stripe for the classified site Postfastr.com.  He omitted any reference to Backpage.com, but planned to use the account to process Backpage transactions."  *Id*. at 3.

- "In early 2015, Defendant Ferrer received notice from American Express that the company would not process Backpage transactions after May 1, 2015. Defendant Ferrer directed Backpage personnel to 'bury' a message notifying users that American Express would not be accepted, but to process any American Express payments that Backpage users attempted."  *Id.* (also discussing the use of "credits").

As part of Ferrer's Plea Agreement here, he pled guilty to money laundering in the California state criminal case.  Exh. 5994-2 at 3.  On April 12, 2018, Ferrer pled guilty in California to conspiracy to commit money laundering and three substantive money laundering counts. Exh. A at ¶ 1.  In the California plea agreement, Ferrer stipulated that "Because of the nature of the revenue stream, several financial institutions refused to process payments for advertisements on Backpage.com.  However, Defendant created new merchant accounts, manipulated billing descriptors, misled financial institutions, and created shell companies in order to circumvent the financial institutions' unwillingness to process Backpage.com's commercial sex and other transactions."  *Id*. at ¶ 2.

These allegations are precisely what the Government has tried to demonstrate in the instant case.  For example, Ferrer has testified here as follows:

- Regarding banking, "Q. Did you do anything to try to conceal the fact that Backpage was the ultimate recipient of the credit card transactions, the revenue? THE WITNESS: Yes. We created holding companies."  09/12/23 PM Tr. at 71:15-20.

12

- "Posting Solutions was another shell company similar to, like, Website Technologies, very generic sounding company that we could open bank accounts with."  09/21/23 PM Tr. at 89:8-10.

- Referring to the use of "credits":  "[W]e can direct them to PostFaster and there they can buy credits and the credits they buy in PostFaster will automatically appear under Backpage so we can manage their ad through PostFaster."  09/20/23 PM Tr. at 99:21-100:8.

- Ferrer testified that Backpage changed "billing descriptors" so "Chase won't know or Chase won't figure it out for a while and the transaction will go through."  09/20/23 PM Tr. at 21:14-22:8.

But in response to the allegations in the California case, Ferrer made contemporaneous statements completely at odds with his testimony on direct examination. Counsel attempted to impeach Ferrer with three of those statements:  (1) that when a payment processing contract is filled out and months are spent vetting the contract, there is no disguising of the transaction; (2) there is no evidence of fraudulent merchant bank applications; and (3) a money laundering charge is an attempt to "legislate by prosecution" regarding government pressure to cut off unpopular speech.  GL-CF-37 at 1.  The document notes "CARL COMMENT," followed by the prior inconsistent statements. Because counsel was cut off from using GL-CF-37, counsel never even got to use the other impeachment material from the document.[3]  For example, there are further prior inconsistent statements at the end of the document regarding the purpose of Website Technologies and "standard practice" regarding payment processing.  *Id.* at 44.  These statements are plainly inconsistent with Ferrer's trial testimony.  *See United States v. Morgan*, 555 F.2d 238, 242 (9th Cir. 1977) (prior inconsistent statement admissible "whenever a reasonable man could infer on comparing the whole effect of the two

---

[3]  Moreover, in addition to GL-CF-37, there are other documents of a similar nature which Ferrer prepared, in the same time frame, that also contain statements directly at odds with his trial testimony in this case.

13

1    statements that they had been produced by inconsistent beliefs.") (quoting 4 Weinstein's

2    Evidence, Matthew Bender, P. 801-76 801-76.1 (1976)).

3        Sustaining the Government's objections, the Court precluded this impeachment,

4    reasoning that the statements may be privileged, it is unclear who authored the statements,

5    the document had strike-outs, the notes may have been a draft, and the statements were not

6    under oath.  09/27/23 PM Tr. at 59-65; 09/28/23 AM Tr. at 65-71.  But the Court refused

7    to allow counsel to address some of these questions through examination of Ferrer, and

8    none of these are proper reasons to keep out the impeachment.

9    **A.**    **<u>Ferrer Personally Waived the Attorney-Client Privilege as to the</u>**

10           **<u>Impeachment Material.</u>**

11       First, as part of his Proffer/Interview Agreement with the Government, Ferrer

12   waived any privileges applicable to the impeachment material:

13       Mr. Ferrer ***voluntarily waives all claims of attorney-client privilege,***
         ***whether in his personal or official capacity as the Chief Executive Officer***
14       ***of Backpage.com, LLC as to communications with any attorney or law***
         ***firm that represented Backpage.com, or any related entity, where such***
15       ***communications concerned or related to Backpage.com or any related***
         ***entity.*** This waiver does not apply to Mr. Ferrer's current attorneys, Nanci
16       Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer
         voluntarily agrees to provide all documents and other material that may be
17       relevant to the investigation and that are in his possession or control.
         However, Mr. Ferrer shall not disclose any documents or information
18       protected by the Joint Defense Agreement in this matter. Mr. Ferrer
         understands that his proffer/interview and any benefit he may receive from
19       information he provides to the prosecution does not depend on his waiver of
         the attorney-client privilege.

20

21   Exh. 6177 at ¶ 2 (emphasis added) (previously filed at Dkt. 940-2 at 23).

22       There can be no dispute that Ferrer waived privilege as to the impeachment

23   material, given that the material reflects his comments to attorneys regarding the California

24   criminal complaint that concerns his role as the former CEO of Backpage.  Ferrer's

25   counsel points to a *separate* waiver that concerns only privileges held by various corporate

26   entities.  Dkt. 1825.  But the waiver at issue deals with privileges held by ***Ferrer*** in his

27   "personal or official capacity."

28       Second, as part of a June 2017 Joint Defense/Common Interest and Confidentiality

1  Agreement entered into by the Defendants and Ferrer, Ferrer agreed:

> Any client signatory who enters into a cooperation agreement with the government or **who testifies as a witness** in any civil, administrative, or criminal proceeding arising from the Case[4] **consents to any other signatory using for defense purposes any information or material contributed by the client or by his or her attorney**. **This specifically permits use of contributed information or material in cross-examining the witness and permits the presentation of their information or material by the defense at any point of the proceedings**. Each undersigned attorney has explained fully to his or her client the limitations on direct use of the information obtained pursuant to this Agreement. Each Party represents that he/it has considered the foregoing and believes the benefits of being a signatory to this Agreement outweigh any of the limitations imposed by this Agreement.

Exh. B at ¶ 6 (redacted version of JDA).[5]

This provision of the JDA plainly permits Defendants to use Ferrer's prior statements—even assuming they are privileged and there has been no waiver—for impeachment purposes.

### B.    The Format of the Prior Inconsistent Statements Is Irrelevant.

Prior statements need not be under oath to be used for impeachment purposes. "A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness." *United States v. Monroe*, 943 F.2d 1007, 1012 (9th Cir. 1991) (citations and quotation marks omitted) (holding that the district court's ruling that "prior inconsistent statements could not be introduced for impeachment purposes since they had not been given under oath pursuant to Fed. R. Evid. 801(d)(1)(A) . . . *was clearly*

---

[4]    The JDA defines "Case" as "all matters relating to the case of the Arizona federal grand jury investigation and any related proceedings."

[5]    The JDA was previously provided to the Court for *in camera* review in opposition to the Government's Motion to Resolve Attorney-Client Privilege Issues.  Dkt 345 at 4 n.3. A redacted version of the JDA is attached hereto.  In that Order, the Court stated that it "declines to address the issue of whether Ferrer had authority to waive Backpage's corporate attorney-client privilege based on the Defendants' argument that the attorney-client privilege was owned and later shared with Village Voice Media Holdings, LLC." *Id*. at 4 n.4.  In any event, the Court has never decided the issue of whether, pursuant to the JDA, Defendants may use joint-defense material contributed by Ferrer for the purpose of cross-examining Ferrer.

1    *erroneous*") (emphasis added).

2          Further, the Court's concerns regarding the format of the statements could have

3    been addressed through cross-examination of Ferrer.  *Id*. ("The prior statements may have

4    been oral and unsworn, and the making of the previous statements may be drawn out on

5    cross-examination of the witness himself, or if on cross-examination the witness has

6    denied making the statement, or has failed to remember it, the making of the statement

7    may be proved by another witness.") (citations and quotation marks omitted).  These issues

8    flagged by the Court go to weight and can be further explored on re-direct.  The

9    Government seeks to hold Defendants liable for money laundering under *Pinkerton* based

10   on Ferrer's supposed crimes; therefore, the defense should be allowed to bring out that

11   Ferrer himself did not believe he committed any crimes (and that he just said he did to get

12   the benefits of his deal with the Government).

13   **III.    Reference to Attorney Advice and Prior Litigation**

14          The Government has sought to use attorney advice and attorney involvement

15   regarding Backpage as a sword and a shield.  The Government has put in evidence

16   communications involving attorneys (like Steve Suskin, Liz McDougall, Don Moon,

17   Samuel Fifer, Ed McNally, Hemu Nigam, and others) as part of a tack to establish that

18   Defendants were acting in bad faith.  For example, the Government elicited testimony

19   from Ferrer that:

20   • Steve Suskin was "in-house counsel" and presented "sham" statements to CNN

21     in connection with Backpage's dealings with State AGs.  09/14/23 PM Tr. at

22     68:3-69:21.

23   • Hemu Nigam suggested responding to CNN with a statement so that the reporter

24     could "have more substance to utilize that positions Backpage.com in the best

25     light."  09/15/23 Tr. at 41:6-22.

26   • Ferrer testified to Backpage's "legal strategy" regarding its responses to the AG

27     letters (Exh. 588 at Slide 23) involved a "slow dance," the implication being that

28     Backpage's legal strategy was to deceive the AGs.  09/13/23 PM Tr. at

108:6-18.

- In connection with the use of Bank Frick, Ferrer testified that "Jed Brunst even ask[ed] that I hire a lawyer and threaten them," commenting that he thought "it was not a good strategy." 09/21/23 PM Tr. at 78:7-18.  The Government then introduced Exhibit 1230, in which Brunst tells Ferrer that he should "fire up [DLA] Piper and get them to send a letter stating that the wire is for the payment of debts owed." *Id*. at 80:19-81:8.  The Government followed up by asking Ferrer, "When you said that Mr. Brunst was suggesting you get a lawyer to go after the Frick bank, is this email, does that sort of reference that?"  Ferrer responded, "Yes . . . [DLA] Piper is who we would fire up to send a letter." *Id*. at 80:23-81:12.

But when Defendants sought to tell the other half of the story, or further illuminate for the jury the roles these individuals held with respect to Backpage, the Government objected, with the Court generally sustaining those objections.

For example, that Hemu Nigam—whom Backpage retained to oversee its moderation efforts—formerly was a state sex crimes prosecutor and then a federal Internet sex crimes prosecutor is highly relevant.[6]  That Backpage hired someone with Nigam's background undermines both the Government's claims that Defendants intended to deceive law enforcement and facilitate business enterprises involved in prostitution, as well as the implication from Ferrer's testimony that Nigam was part of a criminal conspiracy.  *See, e.g.,* 09/15/23 Tr. at 31:12-33:10 (referring to Nigam's efforts as a "sham" that would not "eliminate prostitution ads."); Exh. 938.  Defendants should be able to argue to the jury in closing, "If Defendants intended to facilitate business enterprises involved in prostitution, why would they hire someone who spent ten years as a state and federal sex crimes prosecutor to oversee Backpage's moderation practices?  Doesn't that show the opposite— that Defendants were serious about moderating the content on Backpage?"  None of this

---

[6]   https://www.venable.com/professionals/n/hemanshu-nigam

17

gets into "advice of counsel."  But when the defense probed this area, the Government's objections were sustained.  09/26/23 PM Tr. at 12:22-25.  There are at least 50 references to Nigam in Ferrer's direct testimony.  The Government chose to interject Nigam into the trial and to elicit testimony from Ferrer casting aspersions at Nigam (and Defendants' affiliation with him), but now seeks to hide his credentials from the jury.  This is particularly significant as to Brunst.  Ferrer has testified Brunst was not "affiliated or a part of the moderation department" (09/27/23 AM Tr. at 89:18-22).  But as CFO of the holding company, Brunst would have taken comfort in the fact that a former federal prosecutor was dealing with moderation, a fact that plainly goes to Brunst's good faith and lack of intent.

Further, on the Government's motion, the Court has precluded the defense from referencing prior litigation.  But the Government sought to use contemplated litigation as a fact *against* Brunst by eliciting testimony from Ferrer regarding the possible retention of DLA Piper to threaten Bank Frick, a strategy with which Ferrer said he disagreed.  The implication from this testimony is that banks were giving Backpage trouble, Brunst thought involving lawyers would be a good idea, and Ferrer disagreed.  Of course, this testimony is directly contradicted by Backpage's decision to sue Sheriff Dart to get its credit card processing back, a decision that was made when Ferrer owned the company and was CEO (and a decision that contemporaneous emails show Ferrer agreed with, *e.g.*, Exh. 6025).  But the defense has been precluded from referencing any prior litigation, even where the initiation of such litigation was in direct response to events that the Government has put at issue (like "credit card Armageddon").

## IV.  CONCLUSION

For the foregoing reasons, Defendants request that the Court permit the admission of the exhibits, impeachment material, and testimony discussed herein.

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (May 2023) § II(C)(3), Gary S. Lincenberg hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's*

*content and have authorized its filing.*

DATED:  October 5, 2023       Respectfully submitted,

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By: _____*/s/ Gary S. Lincenberg*_____
              Gary S. Lincenberg
       Attorneys for Defendant John Brunst

DATED:  October 5, 2023       Kessler Law Group

By: _____*/s/ Eric W. Kessler*_____
              Eric W. Kessler
       Attorney for Defendant Scott Spear

DATED:  October 5, 2023       Paul J. Cambria
Erin McCampbell Paris
Lipsitz Green Scime Cambria LLP

By: _____*/s/ Paul J. Cambria*_____
              Paul J. Cambria
       Attorneys for Defendant Michael Lacey

DATED:  October 5, 2023       Feder Law Office, P.A.

By: _____*/s/ Bruce S. Feder*_____
              Bruce S. Feder
       Attorney for Defendant Scott Spear

3893354.2

DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS
TO COURT RULINGS DURING FERRER TESTIMONY

1    DATED:  October 5, 2023          The Law Office of David Eisenberg, PLC

2                                     By:    _____/s/ David Eisenberg_____

3                                                   David Eisenberg
                                            Attorney for Defendant Andrew Padilla
4

5    DATED:  October 5, 2023          Joy Bertrand Esq. LLC

6
                                      By:    _____/s/ Joy Malby Bertrand_____
7
                                                  Joy Malby Bertrand
8                                          Attorney for Defendant Joye Vaught

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3893354.2

DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS
TO COURT RULINGS DURING FERRER TESTIMONY

Exhibit A

1     XAVIER BECERRA
      Attorney General of California
2     JAMES ROOT
      Senior Assistant Attorney General
3     RANDY MAILMAN
      Deputy Attorney General
4     State Bar No. 246134
      1300 I Street, Suite 125
5     P.O. Box 944255
      Sacramento, CA 94244-2550
6     Telephone: (916) 210-7253
      Fax: (916) 322-2368
7     E-mail: Randy.Mailman@doj.ca.gov
      *Attorneys for the People of the State of*
8     *California*

FILED / ENDORSED

APR 1 2 2018

By _____ Deputy Clerk

9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                   COUNTY OF SACRAMENTO

12

13     **PEOPLE OF THE STATE OF**
      **CALIFORNIA,**             Case No. 16FE024013

14

15                  Plaintiff,       **PLEA AGREEMENT**

16          **v.**

17     **CARL FERRER**
      (DOB: 03-16-1961) (Xref # 5094010)

18                  Defendant.

19

20

21       In order to resolve the charges against him, Carl Ferrer ("Defendant"), represented by and

22 through his attorney of record, Nanci Clarence, agree with the People as follows:

23       1.     Defendant will plead **guilty** to counts 1, 2, 3, and 12 in the First Amended

24 Criminal Complaint charging him as follows:

25            a.    Count 1 – Conspiracy to commit money laundering in violation of California

26               Penal Code sections 182 (a)(1) and 186.10(a)(1) and (2), a felony.

27            b.    Count 2 – Money laundering in violation of Penal Code section 186.10(a), a

28               felony.

1

c.   Count 3 – Money laundering in violation of Penal Code section 186.10(a), a felony.

d.   Count 12 – Money laundering in violation of Penal Code section 186.10(a), a felony.

2.      The People and Defendant stipulate to the following facts:

On or between January 1, 2013 and September 1, 2016, in the County of Sacramento and throughout the State of California, Defendant, along with Michael Lacey and James Larkin, operated multiple websites, including Backpage.com. Backpage.com offers online classified services, but its overwhelming source of income was generated by charging customers money to post advertisements in the adult escort section. Because of the nature of the revenue stream, several financial institutions refused to process payments for advertisements on Backpage.com. However, Defendant created new merchant accounts, manipulated billing descriptors, misled financial institutions, and created shell companies in order to circumvent the financial institutions' unwillingness to process Backpage.com's commercial sex and other transactions.

Between July 1, 2014 and July 31, 2014, Defendant transferred, between bank accounts, more than $563,575 in revenue generated from the sale of California based adult services section advertisements on Backpage.com, through Bank Corporation, Wells Fargo, and J. P. Morgan Chase, knowing that the money represented the proceeds of bank and wire fraud.

Between August 1, 2014 and August 31, 2014, Defendant transferred, between bank accounts, more than $1,099,309 in revenue generated from the sale of California based adult services section advertisements on Backpage.com, through Bank Corporation, Wells Fargo, and J. P. Morgan Chase, knowing that the money represented the proceeds of bank and wire fraud.

Between May 1, 2015 and May 31, 2015, Defendant transferred, between bank accounts, more than $48,288.85 in revenue generated from the sale of California based adult services section advertisements on Backpage.com, through American Express, knowing that the money represented the proceeds of bank and wire fraud.

3.      Defendant agrees to cooperate with the investigation and prosecution of co-conspirators Michael Lacey and James Larkin in Sacramento County Superior Court case number 16FE024013 by making himself available to the Attorney General's Office to assist in the investigation and prosecution, truthfully recalling and relating information regarding the case, providing truthful testimony at preliminary hearing, grand jury, trial, or other court proceeding

2

without further process of subpoena, identifying forfeitable assets, and providing access to Backpage.com transaction data.

4.     No later than five business days after entering this plea agreement, or otherwise as directed by the U.S. Attorney's Office for the District of Arizona, Defendant agrees to take all steps within his power to shut down Backpage.com in all countries where it operates.

5.     No later than fourteen business days after entering this plea agreement, or otherwise as directed by the U.S. Attorney's Office for the District of Arizona, Defendant agrees to take all steps within his power to forfeit, to the United States, all operating rights for all internet domains—such as Backpage, Ymas, Postfastr, and Truckrjobs—used to operate the website Backpage.com throughout the world.

6.     Defendant agrees that he will make Backpage.com data available for law enforcement and act as the declarant to authenticate business records as the custodian of records, if necessary, until the time of sentencing,

7.     The People and Defendant agree that sentencing will be scheduled for as soon as possible after Defendant has completed his cooperation and after sentencing in the federal matter.

8.     The maximum sentence that can be imposed under this plea agreement is 5 years. Admission to the factual basis contained in paragraph 2 will not be used to support the imposition of enhancements under Penal Code § 186.10 subd. (c).

9.     Pursuant to Penal Code § 1192.5, the People agree to recommend that Defendant be sentenced to a period of incarceration concurrent with and not to exceed the custodial time imposed in the matter of *United States v. Carl Ferrer*, United States District Court, District of Arizona, case number CR-18-464-PHX-DJH.  Such sentence shall be served in a federal facility. If the court in this matter, 16FE024013, determines that the Defendant has failed to satisfy the above-described obligations to cooperate and testify truthfully, Defendant may be sentenced up to the maximum term of five years in state custody. The People shall, in good faith, consider the nature and extent of Defendant's cooperation in whatever sentencing recommendation is made to

3

the Court.

10.     In lieu of a fine, Defendant agrees, pursuant to his federal plea agreement, to pay full restitution to all victims directly or proximately harmed by his conduct.

11.     The People agree to file any motion necessary in order to achieve the People's recommended sentence.

12.     Defendant understands that the Court is not bound by the terms of this agreement. However, if the Court does not follow the People's recommendations outlined in paragraph 9 above, Defendant will be permitted to withdraw the plea and no statement of Defendant received during the plea will be admitted against the Defendant in any subsequent criminal proceedings.

13.     The Defendant agrees and acknowledges that this plea waives any and all of his appellate rights.

///

4

14.     The People and the Defendant enter into this agreement with the intent to achieve a global resolution of the various criminal actions now pending against Defendant. If the Defendant's plea agreements in Texas and the federal matter in Arizona are not accepted, Defendant may the withdraw his plea of guilty to the charges set forth in paragraphs 1 and 2 above.

Dated: April ___, 2018

_____
CARL FERRER
Defendant

Dated: April ___, 2018

_____
NANCI CLARENCE
JONATHAN BAUM
Attorneys for Defendant

Dated: April ___, 2018

_____
RANDY MAILMAN
Deputy Attorney General
People of the State of California

STIPULATION SO APPROVED.  The above stipulation will be incorporated into the record, and its terms made a part of, or considered by any probationary order.

Dated: April ___, 2018

_____
JUDGE OF THE SUPERIOR COURT
LAWRENCE G. BROWN

5

Exhibit B

PRIVILEGED AND CONFIDENTIAL
JOINT DEFENSE PRIVILEGE

## JOINT DEFENSE/COMMON INTEREST AND
## CONFIDENTIALITY AGREEMENT









6.     <u>Potential Conflicts of Interest</u>.  Each Party understands and acknowledges that it is possible that any other Party may later become an adverse witness or take an adverse position in the Case.  Each Party further understands and acknowledges that the attorney(s) representing any other Party have the right, and may well have the obligation, to take actions against a Party's interests, including but not limited to, advising his or her own client to cooperate with the government, generating and disclosing evidence or information to the government or other third parties (apart from Defense Materials and other prohibited confidential disclosures pursuant to this Agreement), and cross-examining him/it at trial or other proceedings. Any client signatory who enters into a cooperation agreement with the government or who testifies as a witness in any civil, administrative, or criminal proceeding arising from the Case consents to any other signatory using for defense purposes any information or material contributed by the client or by his or her attorney. This specifically permits use of contributed information or material in cross-examining the witness and permits the presentation of their information or material by the defense at any point of the proceedings. Each undersigned attorney has explained fully to his or her client the limitations on direct use of the information obtained pursuant to this Agreement. Each Party represents that he/it has considered the foregoing and believes the benefits of being a signatory to this Agreement outweigh any of the limitations imposed by this Agreement. Therefore, as a condition precedent to the receipt of any Defense Materials or information, each attorney and client represents that he/it will not assert any future claim that any attorney who is a Party to this Agreement is barred from continuing his or her representation in this matter by virtue of his or her receipt of Defense Materials or other joint defense communications and information.





Nanci Clarence
For Carl Ferrer

Date: ___6-15-17___

Tom Henze
For Carl Ferrer

Date: ___6/30/17___

Janey Henze Cook
For Carl Ferrer

Date: ___6/30/17___

Carl Ferrer

Date: _____

Mike Kimerer
For Jed Brunst

Date: _____

Jed Brunst

Date: _____

-5-



_____     Date: _____
Nanci Clarence
For Carl Ferrer

_____     Date: _____
Tom Henze
For Carl Ferrer

_____     Date: _____
Janey Henze Cook
For Carl Ferrer

_____     Date: June, 14, 2017
Carl Ferrer

_____     Date: _____
Mike Kimerer
For Jeb Brunst

_____     Date: _____
Jeb Brunst

_____     Date: _____
Michael Piccarreta