GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>               Plaintiff,<br><br>     v.<br><br>Michael Lacey, et al.,<br><br>               Defendants. | CR-18-422-PHX-DJH<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS TO COURT RULINGS DURING FERRER TESTIMONY (Doc. 1840) AND DEFENDANT SPEAR'S JOINDER (Doc. 1841)** |

Defendants' Brief in Support of Objections to Court Rulings During Ferrer Testimony (Doc. 1840) seeks reconsideration of several rulings. LRCiv 7.2(g)(1) states:

> The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence. Any such motion shall point out with specificity the matters that the movant believes were overlooked or misapprehended by the Court, any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order. No motion for reconsideration of an Order may repeat any oral or written argument made by the movant in support of or in opposition to the motion that resulted in the Order. Failure to comply with this subsection may be grounds for denial of the motion.

*See also* LRCrim 12.1(a). Defendants' brief does not show "manifest error" or "new facts or legal authority that could not have been brought to [the Court's] attention earlier with reasonable diligence." LRCiv 7.2(g)(1). For several reasons, Defendants' brief does not warrant reconsideration of any prior rulings.

## I. Fed. R. Evid. 106 Applies to Specific Statements—Not Entire Categories of Evidence—and Defendants Cannot Use It to Litigate Their "Good Faith" Defense.

Fed. R. Evid. 106 provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Rule 106 has a singular purpose: to prevent a party from distorting the meaning of a proffered statement by introducing only part of the statement, while omitting other part(s) necessary to demonstrate the statement's truthful meaning. *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (Rule 106 "codified the common law Rule of Completeness, which exists to avert 'misunderstanding or distortion' caused by introduction of only part of a document") (quoting *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 172 (1988)). The Rule does not require introducing "*any* unedited writing or statement merely because an adverse party has introduced an edited version." *Id*. If a complete statement doesn't "serve to correct a misleading impression" in the edited statement, Rule 106 "will not be applied[.]" *Id.*

*Rainey* illustrates the Rule's purpose. (*Cf.* Doc. 1840 at 5-6.) In *Rainey*, a plaintiff wasn't permitted to testify about the central thrust of a letter he had written about the plane crash at issue—namely, that the crash was caused by catastrophic power failure. 488 U.S. at 170-71. When examined by opposing counsel as an adverse witness, the plaintiff testified about misleadingly quoted snippets from the letter that discussed other potential causes. But when examined by *his* counsel, the court wouldn't allow him to be questioned about the main topic of his letter. *Id*. The Supreme Court held that "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible[.]" *Id*. at 172.

Courts evaluate application of Rule 106 on a statement-by-statement basis; the Rule is not meant to be used in a generalized, broad-brush fashion to determine that entire categories of evidence must be introduced whenever an adverse party asserts that such evidence is needed to bolster that party's theory or defense. To that end, the Ninth Circuit has consistently held that Rule 106 should not be construed broadly to require the admission of an entire, complete writing or statement simply because an edited version is admitted. *Vallejos,* 742 F.3d at 905 (the district court correctly explained that "[j]ust because somebody is putting in part of a transcript . . . does not mean for the sake of completeness, everything comes in"); *United States v. Liera-Morales*, 759 F.3d 1105, 1111 (9th Cir. 2014) (affirming exclusion of defendant's exculpatory statements because the admitted portions were neither taken out of context nor misleading: "The district court carefully and thoroughly considered the government's proffered statements from the post-arrest interview and correctly determined that those statements were neither misleading nor taken out of context."); *United States v. Lopez-Figueroa*, 316 F. App'x 548, 549-50 (9th Cir. 2008) (affirming the exclusion of defendant's statements because they weren't necessary to explain the admitted portions); *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (affirming exclusion of defendant's statements under Rule 106 because they did not serve to correct an out-of-context prior statement: "[I]t is often perfectly proper to

admit segments of prior testimony without including everything, and adverse parties are not entitled to offer additional segments just because they are there and the proponent has not offered them.") (citation omitted); *United States v. Dorrell,* 758 F.2d 427, 434-35 (9th Cir. 1985) (no Rule of Completeness violation where an edited version of a confession did not "distort[ ] the meaning of the statement") (internal quotation marks omitted); *United States v. Burreson*, 643 F.3d 1344, 1349 (9th Cir. 1981) (affirming exclusion of the entirety of prior testimony because the portions appellants wished to admit were irrelevant).

Other Circuits have similarly held that Rule 106 "permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988). Further, just because an excluded portion is relevant, does not necessarily mean that it is necessary to qualify, explain or place into context. *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996) (affirming exclusion of statements as self-serving exculpatory statements by the defendant that did not explain or qualify the rest of the statement originally offered by the United States), *abrogated on other grounds as recognized in United States v. Mojica-Baez*, 229 F.3d 292, 310 n.12 (1st Cir. 2000); *United States v. Langford*, 647 F.3d 1309, 1331 (11th Cir. 2011) (affirming exclusion of transcript of defendant's testimony in SEC hearing because defendant failed to identify what specific portions would qualify, explain or place into context the portions that were introduced by the United States). To the extent Defendants contend that any statements offered against them are taken out of context, the burden is on them to provide an explanation regarding what specific additional statements should be introduced so as to "qualify, explain, or place into context the portion already introduced." *Branch*, 91 F.3d at 728.

Defendants' reference to the Rule 106 amendment that takes effect on December 1, 2023 (absent contrary Congressional action) does not change this calculus. (*See* Doc. 1840 at 5.) The amended rule states: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement— that in fairness ought to be considered at the same time. The adverse party may do so over

a hearsay objection." Fed. R. Evid. 106 (amended). As the Advisory Committee explains, allowing an adverse party to introduce a completing statement "over a hearsay objection" is rooted in the Rule's core purpose of allowing correction of "a misimpression about the meaning of a proffered statement[.]" Fed. R. Evid. 106, Advisory Committee Notes. The Committee offered this example to illustrate what the amendment is designed to address:

> [A]ssume the defendant in a murder case admits that he owned the murder weapon, but also simultaneously states that he sold it months before the murder. . . . [A]dmitting only the statement of ownership creates a misimpression because it suggests that the defendant implied that he owned the weapon at the time of the crime—when that is not what he said.

Fed. R. Evid. 106, Advisory Committee Notes.

> Critically, however:

> The amendment does not give a green light of admissibility to all excised portions of statements. **It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression.** The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106. So, for example, the mere fact that a defendant denies guilt before later admitting it does not, without more, mandate the admission of his previous denial. *See United States v. Williams*, 930 F.3d 44 (2d Cir. 2019).

Fed. R. Evid. 106, Advisory Committee Notes (emphasis added). It is not clear that the amended language reflects any change in Ninth Circuit law. *See, e.g.*, *United States v. Lopez*, 4 F.4th 706, 715 (9th Cir. 2021) (recognizing that "[p]ortions of a document or recording are admissible under Rule 106 notwithstanding the bar on hearsay evidence when offered "to correct a misleading impression in the edited statement" introduced by an opposing party) (quoting *Vallejos*, 742 F.3d at 905).

Doc. 1776 provides additional briefing and caselaw (beyond those discussed in Doc. 1840 at 6) demonstrating why Defendants' self-serving statements are not admissible under Rule 106—particularly where they are not required to clarify a misimpression caused by using only part of a statement or document. (*See* Doc. 1776 at 3-4 (collecting cases).) The United States incorporates that briefing and caselaw here.[1]

---

[1] Defendants can't distinguish *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996),

## A.      Exhibit 616a (November 2010 Correspondence with BMO)

In September 2023, the parties litigated the redactions reflected in Exhibit 616a—particularly regarding a portion of the email thread written by James Larkin. (*See, e.g.*, Doc. 1776 at 6.) As the United States argued:

> The United States redacted this portion because (a) it introduces topics, including the Communications Decency Act, that the Court has ruled aren't admissible, and (b) it contains inadmissible self-serving hearsay. (*See* Doc. 1643 at 10 ("To date, no party has provided the Court with case precedent holding that the CDA immunizes criminal activity like that alleged here. It follows that a jury should not be told that the CDA does. To do so is a misstatement of law and will lead to jury confusion.").)
>
> [¶] Defendants cannot introduce self-serving statements made by former-Defendant Larkin, including misstatements. . . .

(Doc. 1776 at 6.) While Defendants now argue they should have been able to introduce and ask the government's first witness about the Larkin portion of the email chain, Defendants do not show "manifest error" or "new facts or legal authority that could not have been brought to [the Court's] attention earlier with reasonable diligence." LRCiv 7.2(g)(1). None of the authorities Defendants cite were decided since September 2023. (*Cf.* Doc. 1840 at 5-8.) The Court's findings regarding the CDA remain law of the case—and Defendants have failed, as before, to show how that statute immunizes them from federal criminal liability. (*See, e.g.*, Doc. 840 at 4-12; Doc. 1643 at 9-10.)

Defendants' assertion that Larkin's blanket statement that Backpage's operations were "clearly lawful" left the jury with an incomplete picture of Defendant Brunst's mental state also fails. (*Cf.* Doc. 1840 at 8.) The United States introduced Exhibit 616a to show that Brunst and others were aware of questions *raised by BMO* about Backpage.com's activities. Admission of Larkin's self-serving statements wasn't necessary to correct any misimpression on that score. And Defendants' apparent argument that they weren't

---

or *United States v. Ortega*, 203 F.3d 675, 679 (9th Cir. 2000), on the basis that they discuss statements or transcripts, not emails. (*Cf.* Doc. 1840 at 6.) Rule 106 applies to all "writing[s] and recorded statement[s]," and the amended Rule will "cover all statements," including unrecorded ones. Fed. R. Evid. 106, Advisory Committee Notes.

allowed to introduce (or question Mr. Ferrer about) the unredacted exhibit, Exhibit 616, isn't supported by the transcript of the September 27, 2023 proceedings. The daily transcripts show that Defendant Brunst's counsel didn't seek to move Exhibit 616 into evidence, and didn't seek to ask follow-up questions after the Court permitted preliminary yes-or-no questions relating to certain statements that counsel asked about. *See* 09/27/23 PM Daily Tr. at 119-121.

Defendants' related claim that the state attorneys general (AG) letters "are notice of a potential prosecution under state law as to which the CDA was a defense" misses the mark. (Doc. 1840 at 8-9.) The United States introduced the letters to show that Backpage.com and Defendants were put on notice of the AGs' observation that prostitution ads were rampant on Backpage's adult-escorts section. Admission of the letters, by themselves, did not "open the door" to any discussion by Backpage or its representatives about the CDA—a statute that this Court has repeatedly found has no application to this federal criminal prosecution. (*See, e.g.*, Doc. 840 at 4-12; Doc. 1643 at 9-10.)

## B.      Responses to the State AG Letters

The Court informed Defendants that they could seek to have Backpage's responses to the AG letters admitted "when it's your turn[.]" (Doc. 1840 at 9; 09/13/23 PM Daily Tr. at 74.) But this was not a pre-ruling on the responses' admissibility—rather, it was an invitation for the defense to seek to have the letters admitted. When Defendant Spear's counsel offered Exhibits 487 and 5019 into evidence, the Court sustained the United States' hearsay objections to each exhibit. (09/26/23 PM Daily Tr. at 12-15.) Defense counsel did not indicate that the letters weren't being offered for the truth; nor did counsel identify any possible hearsay exceptions. (09/26/23 PM Daily Tr. at 12-15.)

Defendants' present assertion—that the letters should have come in under Rule 106—lacks merit. (*Cf.* Doc. 1840 at 9-10.) For one thing, Defendants fail to identify any specific, allegedly misleading statements in the AGs' letters that would justify admitting Backpage's responses. If Defendants contend that any statements offered against them are taken out of context, the burden is on them to provide an explanation regarding what

specific additional statements should be introduced so as to "qualify, explain, or place into context the portion already introduced." *Branch*, 91 F.3d at 728. *See also Vallejos*, 742 F.3d at 905 ("[I]f the 'complete statement [does] not serve to correct a misleading impression' in the edited statement that is created by taking something out of context, the Rule of Completeness will not be applied to admit the full statement."). Yet Defendants have not identified any specific statements in the AG letters that are incomplete or distorting; nor have they explained how the response letters would correct any specific misimpressions in the AG letters.

Rather, Defendants are trying to use Rule 106 as a vehicle for litigating their state-of-mind defenses. Defendants assert, for example, that the response letters are "critical to show Brunst's state of mind as to Backpage's position vis-à-vis the AGs and the steps he understood Backpage to be taking to address the AG's concerns." (Doc. 1840 at 10.) But if Brunst wants to establish good faith reliance on lawyer advice or some other state-of-mind defense, he will have to do far more than simply point out that Backpage hired counsel to write responses to the AG letters. (*See, e.g.*, Doc. 1643 at 12-13.) For now, the record contains no testimony that Brunst relied on the responses in any way. (*Cf.* Doc. 1840 at 10 (simply asserting, without pointing to any evidence, "Brunst's reliance on the responsive letters").) Brunst thus has no basis to assert the letters "go to his understanding . . . that outside counsel had been retained . . . which provided him comfort that any legal issues posed by the AG letters were being sufficiently addressed." (Doc. 1840 at 10.)

Defendants' assertions that the United States or the AGs "put [Backpage's responses] at issue" is likewise insufficient to trigger Rule 106. (*Cf.* Doc. 1840 at 9-10.) These assertions don't show how any specific statements in the AGs' letters were false, incomplete, or misleading. Nor do they show how admission of the responsive letters would "serve to correct," *Vallejos*, 742 F.3d at 905, or "qualify, explain, or place into context," any such specific statements. *Branch*, 91 F.3d at 728. And at least one of the letters, Exhibit 487, contains a lengthy discussion of the CDA and prior litigation—topics precluded by Doc. 1643 and other rulings. (*See, e.g.*, Doc. 1643 at 8-11.)

### C.     Exhibit 836 (July 2016 Wall Street Journal Correspondence)

The redacted version of this July 11, 2016 email chain—Exhibit 836a—consists of a request from a *Wall Street Journal* reporter to a Backpage representative for a response from the company about the presence of TER (The Erotic Review) numbers in Backpage ads. In the redacted exhibit, the reporter asks: "Hi Liz. We do need to get an answer on the TER numbers pretty soon." (*See* Ex. 836a.) Defendants' brief does not show how this request for comment, in itself, is misleading in any way, or how the use of an unredacted (or less redacted) version of Exhibit 836a would correct any misimpression caused by the reporter's simple request for comment. Defendants seem to want to introduce their theory of the case by offering Liz McDougal's hearsay response to the reporter, packaged as a Rule 106 explanation. But Defendants don't articulate how McDougal's *response* would (or even could) correct a misleading impression from the reporter's mere request for comment. And Defendants' suggestion is rife with the kinds of "double hearsay" or "hearsay within hearsay" problems that Defendants have raised in other circumstances.

## II.     Defendants Should Be Barred from Using Carl Ferrer's Attorney-Client Privileged Communications About the California State Prosecution for Impeachment in this Federal Criminal Trial.

### A.     The Proposed Impeachment Material Is Protected by Ferrer's Attorney-Client Privilege, and Ferrer Hasn't Waived the Privilege.

During Ferrer's cross-examination, Brunst's counsel sought to use a privileged attorney-client communication for impeachment purposes, designated GL-CF 36 and 37. As described in Doc. 1844, the communication is an email dated May 18, 2017 from Ferrer to two of his lawyers at the time, James Grant of Davis Wright Tremaine LLP and Dan Quigley of Rusing Lopez & Lizardi, PLLC. The subject line of the email is "Comments on California – Attorney Client Privileged." The email contains two attachments, including a document containing Ferrer's comments on the amended Criminal Complaint in the California criminal case, *People of the State of California v. Carl Ferrer, Michael Lacey, and James Larkin*, Case No. 16FE019224 (Cal. Super. Ct.). (Doc. 1844 at 2.) When Ferrer sent the email, Grant personally represented him in that California criminal case (*see* Doc.

1827 at 5), and Mr. Quigley personally represented him in a civil case in this court, *Sojourner Center v. Backpage.com LLC, et al.*, Case No. 2:17-cv-00399-GMS. (Doc. 1844 at 2.) As Ferrer has explained, Quigley appeared for Ferrer personally in that case, and Ferrer considered him to be his lawyer. (Doc. 1844 at 2.)

Defendants do not explain how they came into possession of this privileged material. Nor do they seriously dispute that it meets all requisites needed to qualify as a privileged attorney-client communication. (*See* Doc. 1840 at 14-16); *United States v. Christensen*, 828 F.3d 763, 802 (9th Cir. 2016). Instead, Defendants assert that Ferrer waived the privilege over this communication by signing a Proffer/Interview Agreement (the Proffer Agreement) and a Joint Defense Agreement (JDA). (Doc. 1840 at 14-16.) Yet neither agreement operated to waive Ferrer's privilege over this communication—and it certainly did not authorize any of Ferrer's personal attorneys to violate their duties of confidentiality and loyalty to him by handing over these materials to Defendants.[2]

> **1.      This Court Has Already Recognized that Ferrer's Confidences as a Former Client Should Be Preserved.**

First, this is not the first time that the parties have litigated these issues in this case. In October 2018, Judge Logan carefully reviewed the Proffer Agreement, the Joint Defense Agreement and other agreements relating to the United States' motion to disqualify Grant and his law firm, Davis Wright Tremaine (DWT), from representing Defendants Lacey and Larkin in this case. (*See* Doc. 338 at 6, 10.) The motion was based, among other things, on Grant's former representation of Ferrer in the California criminal case. (Doc. 118 at 3.)

In the Court's October 12, 2018 Order denying disqualification, Judge Logan emphasized "it has been made clear that neither HCM [another law firm that personally represented Ferrer] nor DWT will participate as trial counsel in this matter, **and both firms have stated that neither firm will participate in cross-examining Ferrer**." (Doc. 338 at 9-10 (emphasis added).) The Court then stated:

---

[2] The United States has standing to address these arguments, as explained in Doc. 1842.

1
2
3

Moving forward, **the Court will rely on the representations of HCM, DWT, and their respective counsel that the firms will continue to preserve the confidences of Ferrer as a former client**, create ethical walls where necessary, refrain from engaging in trial preparation or participating as trial counsel, and only participate in the limited capacity set forth in the pleadings, without an order from the Court.

4

(Doc. 338 at 10 (emphasis added).)  Cross-examining Ferrer on his attorney-client

5

communications with DWT is flatly contrary to this directive—and underscores the grave

6

ethical and professional concerns posed by the attempted use of such material here.

7
8

   **2.**  **The Proffer Agreement Did Not Waive Privilege Over Ferrer's Personal Attorney-Client Communications.**

9

  Ferrer's Proffer Agreement, executed on April 5, 2018, did not waive his personal

10

privilege over the May 18, 2017 email and attachments. (*Cf.* Doc. 1840 at 14-15.)

11

Defendants point to the agreement's second paragraph, which states:

12
13
14
15
16
17
18

Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC **as to communications with any attorney or law firm that represented Backpage.com, or any related entity,** where such communications concerned or related to Backpage.com or any related entity. This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer voluntarily agrees to provide all documents and other material that may be relevant to the investigation and that are in his possession or control. **However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter.** Mr. Ferrer understands that his proffer interview and any benefit he may receive from information he provides to the prosecution does not depend on his waiver of the attorney-client privilege.

19

(Doc. 174-2 at 2 ¶ 2 (emphasis added).)

20

  The parties intended for the above language to track the approach in a formal

21

"Waiver of Attorney Client Privilege" that Ferrer contemporaneously signed (Doc. 174-2

22

at 5-6; Doc. 195-3)—that is, it would only waive Backpage's corporate attorney-client

23

privilege but not Ferrer's personal privilege. (*See* Doc 193-9 at 8 ¶ 45.) On April 5, 2018,

24

Ferrer executed a two-page "Waiver of Attorney Client Privilege." In the last paragraph of

25

that document, Ferrer made clear that he was only waiving Backpage's corporate attorney-

26

client privilege and was not waiving his personal attorney-client privilege, either with his

27

current attorneys or with any attorneys who previously represented him on an individual

28

basis: "I further state that this waiver does not apply to any aspect . . . of my personal

attorney-client relationship with attorneys who have represented me in the past or who currently represent me in an individual capacity . . . ." (Doc. 195-3 at 3.)

The Proffer Agreement waiver was meant to effectuate the same waiver. (Doc 193-9 at 8 ¶ 45.) That's why it only applied to "communications with any attorney or law firm that represented Backpage.com, or any related entity." (Doc. 174-2 at 2 ¶ 2.) It was not meant to apply to communications to attorneys and law firms that represented Ferrer in a personal capacity. (Doc. 1844 at 2; *see also* Doc. 192 at 7-8.)

Alternatively, Defendants cannot be heard to argue that any waiver in the Proffer Agreement applies to material that they claim is covered by the JDA. The waiver language in the Proffer Agreement states: "However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter." (Doc. 174-2 at 2 ¶ 2.) So, if the JDA applies to the impeachment material (it does not, as explained below), the Proffer Agreement does not waive privilege over that material. Or, in other words, if the Proffer Agreement effectuated a waiver, that waiver did not apply to materials covered by the JDA.

### 3. The JDA Does Not Apply to the Proposed Impeachment Material.

Defendants assert that, by signing the JDA, Ferrer agreed that if he were to testify as a witness in any proceeding "arising from the Case," then any other signatory may "us[e] for defense purposes any information or material contributed by [him] or by his . . . attorney. This specifically permits use of contributed information or material in cross-examining the witness[.]" (Doc. 1840 at 15.) As Defendants' heavily redacted version of the JDA attached to their brief shows, Ferrer executed the JDA on June 14, 2017. (Doc. 1840 at 35.) But Ferrer sent the impeachment material at issue to his personal counsel on May 18, 2017—before the JDA existed. (*See* Doc. 1844 at 2.) And nothing in the publicly disclosed, redacted JDA indicates that the May 2017 communication falls within the JDA's temporal scope, or that the JDA applies retroactively in any way.

Nor does anything show that the May 2017 communication falls within the JDA's substantive scope. According to Defendants, "[t]he JDA defines 'Case' as 'all matters

1    relating to the case of the Arizona federal grand jury investigation and any related
2    proceedings.'" (Doc. 1840 at 15 n.4.) Ferrer wrote the May 2017 email in response to the
3    amended criminal complaint in the California state court prosecution that had been filed
4    against him in Sacramento, California, by the California Department of Justice. (*See* Doc.
5    1844 at 2; Doc. 1827 at 2, 5; *see also* Doc. 118 at 3.) That criminal complaint alleged
6    violations of California state laws; there is no indication that that prosecution charged the
7    federal criminal law violations alleged here. (*See* Doc. 1840 at 11; *cf.* Doc. 230.)

8         And, in all events, Judge Logan carefully reviewed the complete, unredacted JDA
9    and concluded in no uncertain terms that Ferrer's former lawyers remain bound by their
10   duties to "continue to preserve the confidences of Ferrer as a former client, create ethical
11   walls where necessary, refrain from engaging in trial preparation or participating as trial
12   counsel, and only participate in the limited capacity set forth in the pleadings"—*i.e.*, as
13   "auxiliary counsel" who "will not participate at trial counsel [nor] participate in cross-
14   examining Ferrer." (Doc. 338 at 9-10.)

15        Moreover, the Court correctly noted that the attachment to the May 2017 email (GL-
16   CF-37) raised serious questions about the nature and authenticity of that document,
17   including multiple strikeouts, redlines, alterations, and comments. (*See* 09/27/23 PM Daily
18   Tr. at 55-62.) Combined with the overwhelming indicia of privilege surrounding the
19   document, the Court properly precluded Defendants from using it for impeachment.
20   Defendants' brief does not warrant reconsideration.

21
22   **B.    Defendants Have Not Shown that Ferrer's Statements About the California
             Criminal Complaints Are Prior Inconsistent Statements**

23        Even apart from any waiver issue, Defendants have failed to show that Ferrer's trial
24   testimony is inconsistent with any statement made in the proposed impeachment
25   material.  A basic rule of evidence provides that prior inconsistent statements may be used
26   to impeach the credibility of a witness. But as a preliminary matter, the court must be
27   persuaded that the statements are indeed inconsistent. *United States v. Hale*, 422 U.S. 171,
28   176 (1975). The trial judge has a "high degree of flexibility" in deciding how much

1    inconsistency is enough to permit use of a prior statement for impeachment. *United States*

2    *v. Higa*, 55 F.3d 448, 453 (9th Cir. 1995). If the impeaching party fails to establish a

3    threshold inconsistency between the prior statement and the testimony at trial, the prior

4    statement lacks significant probative value and therefore must be excluded. *Hale*, 422 U.S.

5    at 176.

6         Here, Defendants sought to impeach Ferrer's trial testimony with previous

7    statements to his personal attorney in response to charges in California state court. (Doc.

8    1840 at 3.) Defendants have identified the following allegedly inconsistent statements: (1)

9    when a payment processing contract is filled out and months spent vetting the contract,

10   there is no disguising of the transaction; (2) there is no evidence of fraudulent merchant

11   bank applications; and (3) a money laundering charge is an attempt to "legislate by

12   prosecution." (Doc. 1840 at 13.) Defendants also claim there are further prior inconsistent

13   statements regarding Website Technologies and payment processing. (Doc. 1840 at 13.)

14        But Ferrer did not testify inconsistently with any statements Defendants have

15   identified.  For example, he didn't testify that about months being spent applying for or

16   vetting payment processing contracts. Nor did he testify that he submitted fraudulent

17   merchant bank applications. And he did not testify regarding his personal opinion

18   regarding money laundering charges. Allowing the defense to cross-examine Mr. Ferrer on

19   topics not discussed by the government in direct examination would be improper

20   impeachment by a prior inconsistent statement.

21        Further, the proposed areas of cross-examination would be misleading and

22   confusing to the jury.  The proposed impeachment material contains personal thoughts and

23   statements communicated by Ferrer to his personal attorney for the purpose of preparing a

24   defense to criminal charges brought by the California Department of Justice. The

25   California case is a separate case, involving charges that are separate and different from

26   those in this case. Allowing the defense to impeach Ferrer with statements written to defend

27   against different crimes in California would result in the statements being taken out of

28   context, and would be misleading and confusing to the jury. (*Cf.* Doc. 1643 at 11 (referring

- 14 -

to cases and decisions that do not involve the federal offenses charged here would confuse the jury and involve misstatements of law).)

### III. The Court Should Reject Defendants' Efforts to Relitigate Prior Rulings on Advice of Counsel and Prior Litigation.

On pages 16-18 of their brief, Defendants essentially seek to relitigate the Court's motion in limine orders regarding good faith reliance on advice of counsel and references to prior litigation. (*See* Doc. 1643 at 10-13.) First, Defendants claim that because Ferrer's testimony touched on letters or emails written by some attorneys (involving CNN's reporting or state Attorneys General communications), and because Ferrer discussed an email where he disagreed with Brunst's suggestion of hiring counsel to collect monies withheld by Bank Frick, Defendants should be allowed "to tell the other half of the story" or "further illuminate for the jury the roles these individuals held with respect to Backpage[.]" (Doc. 1840 at 16-17.) While Defendants aren't clear on what they mean, it seems they want to use all of this as a springboard for introducing testimony and evidence about the attorneys they or Backpage hired, litigation they pursued, and legal advice they received. This is clearly an attempt to circumvent or seek reconsideration of the Court's prior orders on advice of counsel and references to prior litigation. Yet Defendants have introduced no new authorities or facts sufficient to warrant reconsideration here.

For example, a discussion about *not* hiring counsel and *not* initiating litigation against Bank Frick comes nowhere close to overcoming the Court's rulings regarding references to prior decisions, cases, and other litigation that Defendants or Backpage actually pursued. (*See* Doc. 1643 at 10-11; *see also* Doc. 1597.) Defendants' complaint that the jury should have heard about some of the specific background/legal credentials of Hemu Nigam, an internet safety expert who advised Backpage in approximately 2010-2011, also falls short. (Doc. 1840 at 17-18.) It's not clear whether any Defendants knew the details of Mr. Nigam's background, or that Ferrer is an appropriate witness for attempting to establish that fact.

More importantly, Defendants cannot use these examples as a justification for

delving into Defendants' receipt of legal advice regarding Backpage's operations. Ferrer's testimony hardly established the four required elements for invoking a good faith reliance on advice of counsel defense. (*See* Doc. 1643 at 12-13, citing *United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977).) Defendants have cited no new legal authorities or facts sufficient to satisfy the *McLennan* test, and they should not be allowed to circumvent those requirements based on their assertions here.

## IV.    Spear's Joinder Lacks Merit.

Defendant Spear seeks reconsideration of the Court's previous ruling finding that the Communications Decency Act (CDA) is irrelevant to this case. (Doc. 1643 at 9-10.) Similar to Brunst's argument (*supra* at 2), Spear's joinder does not warrant reconsideration.

The Court previously found that "[t]o date, no party has provided this Court with case precedent holding that the CDA immunizes criminal activity like that alleged here. It follows that a jury should not be told that the CDA does. To do so is a misstatement of law and will lead to jury confusion." (Doc. 1643 at 10.) This Order tracked Judge Brnovich's previous Order on the CDA, when the Court found that the CDA lacked relevance: "This case, however, does not concern civil liability, and the CDA has 'no effect' on 'any other Federal criminal statute.' 47 U.S.C. § 230(e)(1)." (Doc. 793 at 13; *see also* Doc. 840.)

Defendant Spear posits that Judge Brnovich previously ruled that Defendants could raise issues related to the CDA. (Doc. 1841 at 2.) But Defendant Spear selectively cites Judge Brnovich's previous Order. Judge Brnovich ruled—consistent with her Orders at Docs. 793 and 840—that Defendants could not raise issues related to the CDA and how it affected criminal prosecutions:

> Defendants state that they do not intend to elicit a legal conclusion from Professor Goldman regarding whether Section 230 bars the Government charges. However, a plain reading of the disclosure shows that they intend to elicit testimony that section 230 should bar prosecution. Again, that is a policy argument outside the scope of this trial. Testimony related to the policy behind Section 230 or how it should work will be precluded.

(Doc. 1081 at 20.)

Judge Brnovich ruled that a Professor Eric Goldman, who Defendants identified as

- 16 -

a potential expert, could testify in a limited manner about Section 230—specifically, only that the law "was meant to incentivize internet providers to engage in moderation practices." (Doc. 1081 at 20.) To date, however, Defendants have not attempted to elicit testimony about how the CDA "incentivize[d] internet providers to engage in moderation practices," rather they want to argue that the CDA provided a "complete defense" to any state criminal charges. (Doc. 1840 at 9.) The Court's Orders should remain the law of the case—the CDA doesn't apply here.

## Conclusion

Defendants' requests for the admission of exhibits, impeachment material, and testimony discussed in Docs. 1840 and 1841 should be denied.

Respectfully submitted this 11th day of October, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

 s/Peter S. Kozinets
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*
Daniel Parke
Legal Assistant