GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-422-PHX-DJH |
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANT LACEY'S RULE 29 MOTION CONCERNING COUNT 100 (Doc. 2004)** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

**SUMMARY OF ARGUMENT**

Defendant Lacey's Rule 29 Motion should be denied.  Lacey's Supplement to Rule 29 Motion Concerning Count 100 (Doc. 2004 ("Supp.")) does nothing to change that fact.  To overturn the jury's verdict, Lacey must overcome the steep hurdle of showing that the evidence—"'view[ed] . . . in the light most favorable to the prosecution'"—could not have allowed "'*any* rational trier of fact'" to find that the ads proposed illegal transactions. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Defendant fails to overcome this standard.

The trial evidence, when viewed in the light most favorable to the United States, established Defendant's guilt of international concealment money laundering for directing $16.5 million in Backpage revenue to be wired from Arizona to a bank account in Hungary to create a trust for the benefit of his two sons.  Indeed, that wire to Hungary concluded a series of financial moves that resulted in the money being much more concealed than where it started—as Backpage revenue.  The trial evidence establishes Defendant Lacey's guilt for three reasons.

First, the trial evidence demonstrated Lacey's intent behind the transfer of $16.5 million to Hungary—to put assets somewhere that the government couldn't access it. Ex. 1.  That's clear both in an email Lacey sent on July 29, 2016 to his attorney ("i just want to put some assets in place where litigious parties, including government parties, can not access my accounts"), along with his November 2016 meeting at Arizona Bank & Trust that Lin Howard recounted in her testimony.  Ex. 1; 10/12/23 p.m. Tr. at 11:1-13.

Second, the $16.5 million transfer from Arizona to Hungary was "designed in whole or in part" to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" of Lacey's Backpage profits.  18 U.S.C. § 1956(a)(1)(B)(i).  Here, there is ample evidence that the transaction was designed to conceal.  For example, the Ninth Circuit has found that when evidence demonstrates "the charged money laundering transaction was the last in a series of transactions made to conceal," it is sufficient to support a concealment money laundering conviction.  *United States v. Wilkes*, 662 F.3d

524, 544-45 (9th Cir. 2011).

Third, Lacey knew Backpage's revenue was criminal proceeds. Lacey knew exactly how Backpage made its money—through promoting the business enterprises that posted millions of prostitution ads on their website. Defendant's Rule 29 Motion should be denied.

## I.      Lacey Intended to Conceal the $16.5 Million

Concealment money laundering occurs when the transaction is "designed in whole *or in part*" to conceal or disguise. 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). Courts within the Ninth Circuit have relied on this language in affirming § 1956(a)(1)(B)(i) convictions and denying Rule 29 motions. *See United States v. Singh*, 995 F.3d 1069, 1076 (9th Cir. 2021) ("We conclude, for a host of reasons, that the transactions in question had (certainly in part) a concealment purpose."); *United States v. Abouammo*, 2022 WL 17584238, at *16 (N.D. Cal. Dec. 12, 2022) (denying a Rule 29 motion on concealment money laundering counts and noting that the "money laundering statute is violated if the transaction in question is 'designed in whole *or in part*'" to conceal. 18 U.S.C. § 1956(a)(1)(B)(i)."). Even if Defendant had some other purpose in mind—to transfer money to a bank that would not close the account, for example—the United States need only prove that the transaction was designed at least "in part" to conceal. The trial evidence far exceeded this standard.

Lacey stated his clear intent behind transferring the $16.5 million to Hungary. He did so in an email to his attorney and during a meeting with his bank's Senior Vice President. It's rare for a defendant to discuss his intentions with such clarity, but Lacey's own words appear to have made the difference for the jury in finding him guilty of Count 100 when they deadlocked on nearly every other charge against him.

### A.      Trial Evidence Supports Lacey's Intent to Conceal

Lacey's meeting with Lin Howard, Senior Vice President and Senior Operations Manager at Arizona Bank & Trust, provided great insight into Lacey's mental state before he wired the money overseas. 10/12/23 p.m. Tr. at 6:1-4. Howard testified that she met

with Defendant Lacey one time for 30-45 minutes in November 2016.  10/12/23 p.m. Tr. at 8:19-10:10.  When asked how she could remember what occurred in a brief meeting that happened nearly seven years before, she testified, "Because at the start of the conversation there was a topic that was very unusual and something that I'd never been asked about before.  So it definitely has stuck with me."  10/12/23 p.m. Tr. at 10:18-20.  Howard then recounted that meeting in this manner:

> So he started the conversation by asking us if we knew how assets were seized and how assets were protected. He further went on to state that he had an attorney named John Becker who had indicated that there were some places around the world -- and he mentioned the Cook Islands in which assets were protected from seizure and then he also mentioned Nevis Island.
>
> He continued on by saying that he wanted to make it clear that he wasn't looking to avoid paying taxes, that he had a BDO he directed to make sure that all taxes were paid and no tax shelters were taken, but he was looking to see about moving a percentage of his assets offshore in order to protect them from government seizure.

10/12/23 p.m. Tr. at 11:1-13.

Howard also testified that during her over 25 years in banking she learned that Nevis Island and the Cook Islands had a reputation for being associated with tax shelters and money laundering transactions.  10/12/23 p.m. Tr. at 11:14-23; 12:7-15.  Lacey's statements "shocked" Howard—she'd never been asked these types of questions before during her long banking career.  10/12/23 p.m. Tr. at 13:18-25.

After the meeting, Howard informed her boss—the bank's president—about Lacey's statements.  10/12/23 p.m. Tr. at 15:3-5.  She did so because the conversation "shocked" her and she "never in my years in banking had anybody discuss anything like that with me.  I was suspicious why it was being brought up and it made me very uncomfortable and I wanted to make sure my boss knew."  10/12/23 P.M. Tr. at 15:6-11.

Howard's testimony is corroborated by an email Lacey sent to his attorney a few months prior.  Ex. 1.  In July 2016, Lacey wrote to his attorney John Becker: "i think i am ready to move forward with the visit to the Los Angeles lawyer you mentioned who has

expertise in off-shore." *Id*.  "[T]o revisit for just a moment, i am not interested in any tax avoidance, i just want to put some assets in place where litigious parties, including government parties, can not access my accounts." *Id*.

John Becker served as Michael Lacey's estate planning attorney in 2016 and 2017. 10/24/23 p.m. Tr. at 66:11-67:6.  Becker testified that Lacey wanted to transfer some of his money overseas.  10/24/23 p.m. Tr. at 114:11-13.  Becker, at Lacey's behest, transferred $16.5 million from Becker's law firm's trust (IOLTA) account to a bank in Hungary. 10/24/23 p.m. Tr. at 114:14-25.  Becker understood the money he wired to Hungary at Lacey's direction to have been earned from Backpage.  10/24/23 p.m. Tr. at 117:8-13. Becker also testified that in 30 years of practicing law, he had never wired millions of dollars from his IOLTA account to an overseas account.  10/24/23 p.m. Tr. at 115:6-116:7.

The testimony by Lin Howard and John Becker corroborated Lacey's own words in his email about why he wanted to send $16.5 million to Hungary—"to put some assets in place where litigious parties, including government parties, can not access my accounts." Ex. 1.  In other words, to conceal a portion of the money he earned from Backpage.

## B.     The Transaction's Purpose Was To Prevent the Government From Accessing Lacey's Accounts

Lacey's transfer to Hungary was the last in a series of transactions that had the effect of concealing the money from "government parties."  The money started as Backpage revenue and then moved through two different companies that weren't named Backpage, then to Lacey's five grantor trusts, followed by passing through his attorney's IOLTA account, and finally, to a bank in Hungary to establish a trust with his two sons as the listed beneficiaries.  Ex. 1479 at 34.  The purpose of all these transfers was to conceal the fact that it was Backpage revenue.

In his Supplement, Defendant cites *Cuellar* as the best case in support of his Rule 29 argument. Supp. at 2-3, 8, 13 (citing *Cuellar v. United States*, 553 U.S. 550 (2008). *Cuellar*, however, is inapposite.  *Cuellar* involved a defendant attempting to drive from Texas to Mexico with $81,000 stashed in a secret compartment under the floorboard.  *Id*.

at 553-54.  The money had been bundled in plastic bags and duct tape, and animal hair covered the bags.  *Id.* at 554.  The *Cuellar* Court overturned defendant's conviction for international money laundering finding that "merely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money."  *Id.* at 563.  The trial evidence in *Cuellar* demonstrated that the defendant's purpose for transporting the money to Mexico "was to compensate the leaders of the [drug trafficking] operation."  *Id.*  at 566.  Accordingly, the Supreme Court held that the defendant's transportation was not "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds."  *Id.* at 568.

These facts differ starkly from those presented at trial against Lacey.  Lacey wasn't secreting money in a car in an attempt to pay a co-conspirator; rather his international transaction involved months of planning with an objective to place it outside the reach of the government.  The facts presented at trial are much more analogous to the Ninth Circuit's decision in *Wilkes*.  662 F.3d at 544-45.

In *Wilkes*, the defendant was convicted of concealment money laundering for payments and gifts to a California congressman in exchange for government contracts.  662 F.3d at 530-31.  He transferred a $525,000 mortgage payment to the congressman in exchange for a contract; rather than transmitting the funds directly, Wilkes conducted a series of transfers, moving the money to bank accounts under different names.  *Id.*  The jury found that "the charged money laundering transaction was the last in a series of transactions made to conceal [the defendant's] $525,000 payment to [the congressman] for securing government contracts for [the defendant]."*Id.* at 547.  The *Wilkes* Court drew a distinction with the D.C. Circuit case cited by Lacey,[1] stating that "[u]nlike in *Adefehinti,* where defendants merely allocated the proceeds from a fraudulent sale of property through relatively straightforward transactions that 'amount[ed] to no more than divvying up the

---

[1] Supp. at 3 (citing *United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007)).

joint venture's gains, albeit illegally obtained,' Wilkes's effort to disguise the source of the kickback to [the congressman] was an additional act that is separately punishable under § 1956(a)(1)(B)(i)." *Id.* at 547 (citation omitted).

Here, the transactions leading to the $16.5 million wire to Hungary passed through many entities, trusts, and an attorney's account, before finally landing in a bank account in Hungary. The jury interpreted these transactions as concealment, and for good reason—the money that went to Hungary was much more concealed than if Lacey simply transferred Backpage revenue to a domestic bank account in his name.

First, the money that Lacey sent to Hungary started with Website Technologies. Ex. 1479 at 34. The evidence at trial shows that Defendants created Website Technologies so they could open bank accounts under a different name other than "Backpage." 9/21/23 p.m. Tr. at 89:8-10. Carl Ferrer testified that money that flowed through Website Technologies derived primarily "from postings in the female escorts section" on Backpage.com and that Website Technologies and Backpage were "the same company." 9/21/23 p.m. Tr. at 90:16-22 & 11:23-12:4. Website Technologies was simply a "shell company" with a "very generic sounding" name that Defendants used to "open bank accounts with." 9/21/23 p.m. Tr. at 89:8-10; *see also* 9/20/23 p.m. Tr. at 28:19-26. Defendants then worked hard to ensure that Website Technologies did not become affiliated with Backpage. 9/20/23 p.m. Tr. at 71:17-72:4 ("[Brunst] set up Website Technologies to handle payroll, 401(k) and to do leases so he wants to ensure that its reputation is protected, not affiliated with Backpage.").

Second, after Website Technologies, the Backpage revenue that made up the $16.5 million passed through Cereus Properties. Ex. 1479 at 34. Defendants Lacey, Brunst, and Spear (along with Jim Larkin) owned Cereus Properties. 9/21/23 p.m. Tr. at 90:23-25. Cereus Properties collected Backpage money Ferrer, as the nominal owner, owed to Defendants Lacey, Spear, and Brunst. 9/21/23 p.m. Tr. at 91:1-17. The source of the money that flowed from Website Technologies to Cereus Properties was the prostitution ads posted on Backpage. 9/21/23 p.m. Tr. at 91:16-17.

- 6 -

Third, the money flowed through a series of transactions from Cereus Properties to five grantor trusts controlled by Lacey. Ex. 1479 at 34. The $16.5 million was then consolidated in Becker's IOLTA account through five wires totaling $3.3 million each. *Id.* Finally, Becker wired the money out of his IOLTA account to Primus Trust Company at K&H Bank in Hungary to establish a trust for Lacey's sons.[2] *Id.*

These transactions were not "open and obvious" nor were they similar to stashing money in a car and driving it to Mexico to compensate a co-conspirator. Instead, like in *Wilkes*, "the jury apparently found that the charged money laundering transaction was the last in a series of transactions made to conceal" Lacey's criminal proceeds. 662 F.3d at 547. The additional out-of-circuit cases Lacey cites are readily distinguishable. The facts presented at trial do not involve simply converting criminal funds to liquid assets;[3] using criminal proceeds to pay for a cabin;[4] secreting money in a car to pay a debt;[5] or transferring money from a business account to a personal account.[6] Finally, Lacey's stated intent to pay taxes on his taxable income and report the Hungarian bank account to the IRS

---

[2] Lacey's argument that Becker testified the transaction was "absolutely legal" holds no weight, since Becker avowed that he knew nothing about Backpage's business practices. Becker never once reviewed the Backpage website. 10/24/23 P.M. Tr. at 117:14-20. When asked if he ever viewed Backpage's escort section, he responded emphatically, "Absolutely not." 10/24/23 p.m. Tr. at 117:20. Becker instead, "read the New York Times, Wall Street Journal, Washington Post. . . . I don't need to be spending my time reading Backpage." 10/24/23 p.m. Tr. at 117:22-24. Becker could not avow that the $16.5 million was not "proceeds of a violation or violations of the Travel Act" since he knew nothing about how his client earned this money. Doc. 1998 at 43.

[3] *United States v. McGahee*, 257 F.3d 520, 527-28 (6th Cir. 2001) (no design to conceal when defendant simply withdrew funds from his account to convert to liquid assets).

[4] *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995) (using criminal proceeds to pay for a cabin did not prove an intent to conceal).

[5] *United States v. Garcia*, 587 F.3dd 509, 517-19 (2d Cir. 2009) (facts very similar to *Cuellar*, which involved transporting money to pay defendant's debt to a drug dealer).

[6] *United States v. Blankenship*, 382 F.3d 1110, 1128-29 (11th Cir. 2004) (no concealment money laundering when defendant simply moved money from his business account into his personal bank account).

does not overcome the evidence that he intended, *at least in part*, to conceal this money from the government. *See infra* II(B).

## II.    Trial Evidence Proved Concealment

### A.    Lacey's Series of Transactions Demonstrated Concealment

Lacey's argument that the trial evidence doesn't support that his $16.5 million Hungarian transaction concealed, in part, "the nature, the location, the source, the ownership, or the control of funds" is wrong.   First, Lacey relies on the fact that his transactions were purportedly "open and obvious."  Supp. at 6, 9.  This argument doesn't square with reality.   Here's how the money flowed from Backpage revenue to Lacey:

1) Backpage.com revenue

↓

2) Website Technologies

↓

3) Cereus Properties

↓

4) Five Two-Year Annuity Trusts

↓

5) Becker & House PLLC IOLTA

↓

6) Primus Trust Company
(Binghampton Trust—Lacey's
two sons were beneficiaries) at
K&H Bank, Hungary.[7]

Contrary to Defendant's argument, these transactions were not "open and obvious." Open and obvious would have involved Backpage revenue flowing into a bank account in the company's name and then to Defendant Lacey's personal bank account.   Here, Defendant Lacey and his co-conspirators created brand-new companies for the Backpage money to flow through (Website Technologies and Cereus Properties) before Lacey sent it

---

[7] Ex. 1479; 10/17/23 a.m. Tr. at 29-31; 10/24/23 p.m. Tr. at 132:15-16.

to five separate trusts he controlled and then back through his attorney's IOLTA account before finally sending it to Hungary to create a trust for the benefit of his two sons. Defendant's international transaction caused the money to be more concealed than it had been before, which provides additional support for the jury's verdict. *See United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006).

Lacey cites the out-of-circuit *Johnson* case to support his argument. Supp. at 4. It doesn't. Rather, the *Johnson* court details the "[e]vidence to consider in determining whether a transaction was designed to conceal," which includes: "statements by a defendant probative of intent to conceal . . . using third parties to conceal the real owner; [and] a series of unusual financial moves cumulating in the transaction." 440 F.3d at 1291. Further, "[a]nother important consideration is whether 'the money is better concealed or concealable after the transaction than before.'" *Id.* All this evidence was present in Lacey's Hungarian transaction.

Trial courts within the Ninth Circuit have denied Rule 29 motions in analogous factual situations. *United States v. Chang*, 2020 WL 5702131, at *8-9 (N.D. Cal. Sept. 24, 2020); *Abouammo*, 2022 WL 17584238, at *16. In *Chang*, the defendant argued in a Rule 29 motion that the jury's verdict on concealment money laundering must be overturned because the transactions were "open," "notorious," "typical," and "easy-to-follow." *Chang*, 2020 WL 5702131, at *8. The court rejected this argument.

> But Defendant's characterization of the transfers as "open," "notorious," "typical," and "easy-to-follow" simply begs the question. At trial, the Government introduced evidence in support of its allegation that the transfers were made at least in part to conceal that money in HOC Associates, Inc.'s account . . . in order to use the money improperly on personal expenses. Although Defendant has posited innocent explanations for the transfers, it cannot be said that the jury's findings of money laundering were unreasonable or devoid of factual support.

*Id.*

In *Abouammo*, the trial court found that a concealment purpose could be found in the defendant's "choice to forego direct transfers from [foreign official] to [defendant's]

Bank of America account, and instead set up a foreign bank account in his father's name to facilitate indirect transfers." 2022 WL 17584238, at *16. Based on this evidence, the court held, "it is entirely rational for a jury to find that the purpose of Defendant's indirect transfers was to conceal that [foreign official] was the source of the funds." *Id.* Importantly, the *Abouammo* court found that the more damning transactions were not actually the charged counts, but—consistent with *Johnson*—ruled that the entire context of the transactions should be considered. *Id.* ("True, the Government only charged the transfers from Defendant's Bank Audi account to his Bank of America account and not the initial transfers from [foreign official], but the Court need not isolate charged transfers from their larger context.") (citing *Cuellar*, 553 U.S. at 566 (stating that efforts to conceal funds in transport "may suggest that the transportation is only one step in a larger plan").)

Lacey's money flow to Hungary demonstrated not only "a series of unusual financial moves," but also the "use of third parties to conceal the real owner." In addition, there's no question this transaction satisfied *Johnson*'s "important consideration" that "the money is better concealed . . . after the transaction than before." *Johnson*, 440 F.3d at 1291. The money started as Backpage revenue and, after five transactions, it landed in a Hungarian bank as money in a trust with Lacey's two sons as beneficiaries.

Other Ninth Circuit cases support the notion that a transaction need not have been particularly complicated, or involve multiple steps, to support a concealment money laundering conviction. *See, e.g.*, *United States v. Twitchell*, 69 F. App'x 892, 894 (9th Cir. 2003) ("On one of the money laundering counts, the jury also found Twitchell guilty of concealing or disguising bank fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), by transferring money from his business account at the bank into private investment accounts at the brokerage house. A reasonable jury could have found that the deposits of proceeds from the bank fraud into brokerage accounts were made to disguise or conceal the proceeds."); *United States v. Sun*, 673 F. App'x 729, 733 (9th Cir. 2016) (affirming a money laundering conviction where "[v]iewing the evidence in the light most favorable to the prosecution, a rational jury could find that Sun deposited the illegal cash proceeds from

his medical practice into his personal bank account, rather than his business account, with the purpose "to conceal or disguise the nature [or] . . . the source" of the proceeds."); *United States v. Kellum*, 119 F. App'x 32, 34 (9th Cir. 2004) (affirming concealment money laundering conviction where the defendant purchased a Wells Fargo cashier's check with a manual check drawn on a Fidelity account; "[A] rational jury could find on the government's evidence that by purchasing the Wells Fargo cashier's check, Kellum helped to conceal the Fidelity account as the source of his fraudulently-obtained assets, making it harder for federal investigators to discover the existence of the Fidelity account."); *United States v. Huy Chi Luong*, 468 F. App'x 710, 712 (9th Cir. 2012) ("A rational jury could also conclude that Luong intended to conceal the source, ownership, or control of the $5,000 he paid toward the mortgage of a piece of real property. The government produced evidence that the actual owner of the house was Luong, not his parents, whose names were on the deed, as well as evidence that the money came from teller's checks Luong had someone else purchase for him.").

### B.     Filing An FBAR Did Not Immunize Lacey From Guilt

Lacey's argument that his filing of a Report of Foreign Bank and Financial Accounts (FBAR)—18 months after sending the money to Hungary and four months after he was indicted in this matter—somehow reflects an intent not to conceal is wrong.  Informing the United States, after the fact, that Lacey controlled a Hungarian bank account that had $16.5 million as part of a trust for his sons' benefit is not inconsistent with his stated intent to "mov[e] a percentage of his assets offshore in order to protect them from government seizure."  10/12/23 p.m. Tr. at 11:1-13.

The United States needed to prove the following three elements with respect to Count 100: (1) defendant Lacey transported money from a place in the United States to or through a place outside the United States; (2) defendant Lacey knew that the money represents the proceeds of a violation or violations of the Travel Act; and (3) defendant Lacey knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the Travel Act

1  violation(s).  Doc. 1998 at 43.  A rational juror could have easily found that Lacey's stated

2  intent of "plac[ing] assets in place where litigious parties, including government parties,

3  can not access my accounts" overrides any subsequent tax filing.  Ex. 1.

4      This issue is amplified when the actual FBARs (Trial Exs. 5541, 5545, and 5546)

5  are examined.  The information included in these three tax forms is minimal.  It only

6  includes Lacey's personal information and the information for the Hungarian Trust.[8]  *Id.*

7  What these FBARs fail to report to the United States is the nature and source of the money.

8  Nowhere in any of these filings does Lacey disclose to the United States that the money in

9  his Hungarian trust emanated from Backpage revenue, *i.e.*, "from postings in the female

10  escorts section."  9/21/23 p.m. Tr. at 90:16-22.  That omission alone is sufficient for a

11  rational juror to have found that Lacey engaged in concealment money laundering.

12      This case is nothing like the *Gotti* case Lacey cites to bolster his argument.  Supp.

13  at 6 (citing *United States v. Gotti*, 457 F. Supp. 2d 411 (S.D.N.Y. 2006)).  Defendant's

14  attempt to analogize the representations made by Gotti in his plea agreement to Lacey's

15  representations in the FBAR fails.  The issue in *Gotti* was that the defendant entered into a

16  plea agreement where he "admitted that [certain] properties were acquired through income

17  obtained from racketeering activities, and the Government accepted a cash payment in lieu

18  of forfeitures of those specific properties."  457 F. Supp. 2d at 427-28.  Accordingly, the

19  court found that the "Government is now estopped from claiming that Gotti is laundering

20  money by exploiting the very asset that it released to him in exchange for a cash payment.

21  Furthermore it defies logic to allow a defendant to be charged with purchasing the same

22  property twice—first with one source of funds and then with another."  *Id.* at 428.

23      Contrast the facts in *Gotti* with Lacey's three FBAR filings that only provided the

24  foreign bank account information.  Indeed, the United States could not utilize Lacey's

25

26  ---

[8] Lacey's filings appear to satisfy the FBAR requirement, which is also minimal.
27  According to the IRS website, "For each account you must report on an FBAR, you must
keep records with this information: name on the account, account number, name and
address of the foreign bank, type of account, and maximum value during the year."
28  https://www.irs.gov/businesses/small-businesses-self-employed/report-of-foreign-bank-and-financial-accounts-fbar (last visited Dec. 19, 2023).

FBAR filings to seize the assets as material information was missing.  For example, there's nothing in this filing that ties the money to Backpage.  By eliminating the connection between the $16.5 million and Backpage, Lacey achieved his goal of concealing this money from government seizure.  Based on the evidence, especially when viewed in the light most favorable to the United States, a rational juror could easily find Lacey committed concealment money laundering.

## III.   Lacey Had Knowledge that Hungarian Trust Funds Were Proceeds of Travel Act Violations

The second element of international concealment money laundering is that Lacey "knew that the money represents the proceeds of a violation or violations of the Travel Act." Doc. 1998 at 43.  The trial evidence is overwhelming that Lacey knew how Backpage earned its revenue—through prostitution advertisements.

### A.   The $16.5 Million Need Not Be Related to the Ads in the 50 Travel Act Counts

As an initial matter, the $16.5 million at issue in Count 100 need not have been derived from one of the 50 charged ads that constitute the substantive Travel Act counts in the Superseding Indictment.  The jury simply needed to find that Lacey "knew" the money represented the proceeds of promotion of business enterprises involving prostitution offenses.  Doc. 1998 at 24, 43.  It is of no moment that the jury failed to find Lacey guilty of the substantive Travel Act counts.  Any argument to the contrary is nonsensical.  Doc. 946 at 17; *United States v. Lazarenko*, 564 F.3d 1026, 1033–34 (9th Cir. 2009) (government need not allege all the elements of the specified unlawful activity when bringing money laundering charges); *see also United States v. Golb*, 69 F.3d 1417, 1429 (9th Cir. 1995) (same); *United States v. Yagman*, 2007 WL 9724388, at *20 (C.D. Cal. May 3, 2007) (collecting cases); *United States v. Cherry*, 330 F.3d 658, 667 (4th Cir. 2003) ("It is clear that a defendant may be convicted of money laundering even if she is not a party to, much less convicted of, the specified unlawful activity."); *United States v. Richard*, 234 F.3d 763, 766-69 (1st Cir. 2000) (money laundering conviction "does not

require proof that the defendant committed the specified predicate offense"); *United States v. Martinelli*, 454 F.3d 1300, 1312 (11th Cir. 2006) ("It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity."); *United States v. Awada*, 425 F.3d 522, 525 (8th Cir. 2005) ("[T]here is absolutely no requirement that a money laundering defendant also be involved in the underlying crime."); *United States v. Mankarious*, 151 F.3d 694, 703 (7th Cir. 1998) (rejecting "the defendants' argument that the district court's dismissal of the mail fraud counts mandates the reversal of the money laundering convictions"); *United States v. Kennedy*, 64 F.3d 1465, 1479-80 (10th Cir. 1995) (affirming money laundering convictions despite acquittal of specified unlawful activity).

## B.    Lacey Knew How Backpage Earned Its Revenue

Lacey's knowledge about Backpage's business practices were made readily apparent by the trial evidence.

### 1.    Lacey's Own Words

Perhaps the best evidence supporting Lacey's knowledge are his own words. In "Backpage.com Understood," Lacey wrote in detail about Backpage's business practices, adult advertising on Backpage and Craigslist, and why—in his view—Backpage's existence was a positive for society:

> Less than a year ago, Craigslist announced it was discontinuing its adult advertising owing to pressure from the same activists who are now targeting Backpage.com.

> Nearly all the media reports concerning Backpage have failed to note that Craigslist actually still *does* feature adult advertising. A quick perusal of the "casual encounters" section of the site reveals explicit sexual language and imagery, including full nudity, and in some cases, photos of graphic sex acts. Craigslist's "therapeutic massage" category also features ads that clearly refer to prostitution, including posts from masseuses offering "outcall" services in local hotels.

> . . . .

> Still, thanks to the publicity surrounding Craigslist's purported departure

from the market last year, Backpage was swamped with a huge influx of new adult advertising.

. . . .

Backpage is part of the solution.  Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country . . . . If anything, it will simply make it far more difficult for law enforcement to arrest and prosecute those who seek to harm children.

For the very first time, the oldest profession in the world has transparency, record keeping and safeguards.  Driving adult activity back into the shadows doesn't end the activity, it ends the safeguards.

Ex. 113a (emphasis in original).

Lacey demonstrated his understanding about the types of ads Backpage published, understanding that ads that include "'outcall' services," "clearly refer to prostitution." *Id*. And that Backpage provided "transparency" for prostitution. *Id*.  In 2012, Lacey made his general feelings about prostitution clear when he wrote that, "Jim [Larkin] and I believe in legalized prostitution." Ex. 1911b.

### 2.    CNN Exposé

In late 2010, Backpage learned CNN was planning an exposé. 9/14/23 a.m. Tr. at 80:20-21. Backpage management watched and discussed the CNN report in early 2011. 9/15/23 a.m. Tr. at 43:15-44:7. It showed CNN's Amber Lyon posting an ad of herself on Backpage's escorts section, using text from a Backpage ad selling a 12-year-old girl. Ex. 1052b1. When Lyon posted, her phone "start[ed] ringing off the hook." 9/15/23 a.m. Tr. at 59:16-23.  Lacey, Brunst, and Spear tried to stop CNN from rebroadcasting the story. 9/15/23 a.m. Tr. at 60:10-62:13.

### 3.  NCMEC Meeting

In addition to Lacey's own words describing Backpage's business practices and his acknowledgment that the company earned money through prostitution advertisements, in March 2011, he also attended a meeting at the National Center for Missing and Exploited Children (NCMEC). Ex. 651; 9/19/23 a.m. Tr. at 10:24-12:1; 10/18/23 p.m. Tr. at 28:2-12.  In the meeting, NCMEC's CEO showed the Backpage attendees, including Lacey, ads

from their website and said, "Come on, these ads are prostitution." 9/19/23 a.m. Tr. at 12:20-21.   Lacey then responded that NCMEC was engaged in "mission creep," and it wasn't their mandate to be involved with prostitution.  9/19/23 a.m. Tr. at 13:2-4.  After NCMEC's CEO and Lacey argued, NCMEC then presented a series of Backpage ads to Lacey that contained links to The Erotic Review embedded in them.  9/19/23 a.m. Tr. at 16:1-21; Ex. 652a; 10/18/23 p.m. Tr. at 33:18-20 ("examples of connections between The Erotic Review and advertisements that were on Backpage").  At that meeting, NCMEC explained that the "connection should be severed between The Erotic Review and Backpage because individuals were very clearly outlining the [prostitution] activity that was occurring."  10/18/23 p.m. Tr. at 36:15-18.  Even if Lacey had plausible deniability about Backpage's relationship with The Erotic Review before March 2011, he cannot claim it thereafter.

### 4.  Auburn Theological Seminary Meeting

In December 2011, Lacey also met with representatives from the Auburn Theological Seminary. 10/11/23 p.m. Tr. at 58:8-59:23; 9/19/23 p.m. Tr. at 26:2-6. At that meeting, a representative from the seminary stated that prostitution on sites like Backpage led to child prostitution and "one child is too many." 9/19/23 p.m. Tr. at 35:19-23. In response, Lacey stated "that's not realistic policy; that's a bumper sticker." 9/19/23 p.m. Tr. at 36:1-2. Lacey also expressed frustration with the meeting, "[h]e didn't understand why religious leaders would stick their noses in his – in Backpage's business, and that he also said something to the effect of adults – consenting adults can do what consenting adults want to do.  Why would you stop them."  10/11/23 p.m. Tr. at 65:20-25.  Isaac Luria, who attended the meeting, concluded that Lacey "believed prostitution was occurring on the website and that that was legitimate."  10/11/23 p.m. Tr. at 67:21-22.

### 5.  Law Enforcement Subpoenas

During its 14-year existence, Backpage received thousands of prostitution investigation subpoenas. *See, e.g.*, 9/13/23 a.m. Tr. at 62:16-25. In April 2010, Lacey inquired in an email "is there any evidence of child trafficking anywhere?," Spear replied :

"We have had subpoenas that deal with this exact issue. . . . We get a ton of subpoenas that we comply with on a daily basis." Ex. 804.

### 6.  New York Times

In January 2012, Nicholas Kristof of the New York Times, published a column titled "How Pimps Use the Web to Sell Girls."  9/19/23 p.m. Tr. at 44:8-14; Ex. 1200.  Kristof wrote about how after Craigslist "backed out of the sector," "[p]imps then moved to Backpage.com." Ex. 1200.  Lacey read the piece and responded, "we do how many million ad and he picks out one, tells us at end of day and wants our total response by am? [O]f course there are kids who get through system[,] as there are in bars." Ex. 714a.

These examples do not encompass the entire universe of evidence proving Lacey not only knew about how Backpage earned its criminal proceeds, but was an active participant in the criminal conspiracies.  For the instant motion, however, it is sufficient that the evidence proved that Lacey knew how Backpage earned money; through promoting the businesses that paid for prostitution advertisements on their site.  Defendants made numerous arguments about why Backpage did not engage in violations of the Travel Act, but the jury—at least with respect to Defendants Brunst and Spear—rejected those arguments.  The jury carefully considered the evidence presented against Lacey too, finding him not guilty of Count 63, guilty of Count 100, and failing to reach a verdict on the remaining 82 counts.  The jury's careful consideration and work should not be overturned.  The trial evidence proving Lacey guilty of Count 100 is ample, especially when considered under the liberal *Jackson/Nevils* standard.

## CONCLUSION

Defendant Lacey's Supplement to his Rule 29 Motion provides no further support for the underlying motion.  The evidence at trial supports a rational juror finding that Lacey is guilty of Count 100.  Lacey's Rule 29 Motion should be denied.

Respectfully submitted this 22nd day of December, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/Andrew C. Stone*
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*

- 18 -